

1  BUCHALTER NEMER
   A Professional Corporation
2      JAMES B. WRIGHT (#63241)
       MIA S. BLACKLER (#188112)
3  333 Market Street, 25th Floor
   San Francisco, CA  94105-2126
4  Telephone: (415) 227-0900
   Facsimile: (415) 227-0770
5  jwright@buchalter.com
   mblackler@buchalter.com
6
   Attorneys for Defendant
7  BANK OF HAWAII

8              UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

10

11  MEGUMI HISAMATSU,                 CASE NO. 3:07-CV-04371-JSW

12              Plaintiff,            **DEFENDANT BANK OF HAWAII'S
                                      APPENDIX OF HAWAII AUTHORITIES
13        vs.                         IN SUPPORT OF MOTION TO DISMISS
                                      THE SECOND AMENDED
14  KAUSHAL NIROULA; BANK OF          COMPLAINT**
    HAWAII, A Corporation; DOES 1-60,
15  inclusive,                        Hearing:  August 22, 2008
                                      Time:  9:00 a.m.
16              Defendants.           Judge:  Hon. Jeffrey S. White
                                      Courtroom:  2, 17th floor
17

18        Defendant Bank of Hawaii respectfully submits this list of Hawaii authorities in support of

19  the Motion to Dismiss the Second Amended Complaint (full text of cases attached).

20                              <u>CASES</u>

21     1    *Courbat v. Dahana Ranch, Inc.*, 111 Haw. 254 (2006)

22     2    *Hawaii Community  Fed. Cred. Union v. Keka,* 94 Haw. 213 (2000)

23     3    *Honolulu Fed. Sav. & Loan Assn. v. Murphy,* 7 Haw. App. 196 (1988)

24     4    *Hough v. Pacific Ins. Co.,* 83 Haw. 457 (1996)

25     5    *Hunt v. First Insurance Co.,* 82 Haw. 363 (1996)

26     6    *Lee v. Aiu*, 85 Haw. 19, 936 P.2d 655, n.12 (1997)

27

28

1

## STATUTES

2       7      Hawaii Revised Statutes § 480-1

3       8      Hawaii Revised Statutes § 480-2

4       9      Hawaii Revised Statutes § 490:3-403(a)

5       10     Hawaii Revised Statutes § 490:4-401(a)

6

7  DATED:  June 10, 2008            BUCHALTER NEMER
                                       A Professional Corporation

8

9                                    By: _____

10                                        James B. Wright
                                       Attorneys for Defendant
                                       BANK OF HAWAII

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BN 2006456v1                      2

**APPENDIX OF HAWAII AUTHORITIES**

**1**

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
**(Cite as: 111 Hawai'i 254, 141 P.3d 427)**

In the context of a motion for summary judgment, a
fact is material if proof of that fact would have the
effect of establishing or refuting one of the essen-
tial elements of a cause of action or defense asser-
ted by the parties.

**[4] Appeal and Error 30 ☞934(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k934 Judgment
                30k934(1) k. In General. Most Cited
Cases
In reviewing the circuit court's grant or denial of a
motion for summary judgment, the evidence must
be viewed in the light most favorable to the non-
moving party; that is, the reviewing court must
view all of the evidence and the inferences drawn
therefrom in the light most favorable to the party
opposing the motion.

**[5] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
    30XVI Review
        30XVI(F) Trial De Novo
            30k892 Trial De Novo
                30k893 Cases Triable in Appellate Court
                    30k893(1) k. In General. Most
Cited Cases
The interpretation of a statute is a question of law
reviewable de novo.

**[6] Statutes 361 ☞181(1)**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k180 Intention of Legislature
                361k181 In General
                    361k181(1) k. In General. Most
Cited Cases

**Statutes 361 ☞188**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k187 Meaning of Language
                361k188 k. In General. Most Cited Cases
When construing a statute, the court's foremost ob-
ligation is to ascertain and give effect to the inten-
tion of the legislature, which is to be obtained
primarily from the language contained in the statute
itself.

**[7] Statutes 361 ☞184**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k180 Intention of Legislature
                361k184 k. Policy and Purpose of Act.
Most Cited Cases

**Statutes 361 ☞208**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic
Aids to Construction
                361k208 k. Context and Related
Clauses. Most Cited Cases
When construing a statute, courts must read stat-
utory language in the context of the entire statute
and construe it in a manner consistent with its pur-
pose.

**[8] Statutes 361 ☞190**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k187 Meaning of Language
                361k190 k. Existence of Ambiguity.
Most Cited Cases
When there is doubt, doubleness of meaning, or in-
distinctiveness or uncertainty of an expression used
in a statute, an ambiguity exists.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

Page 3

**[9] Statutes 361 ☞214**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k213 Extrinsic Aids to Construction
                361k214 k. In General. Most Cited Cases

**Statutes 361 ☞217.4**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k213 Extrinsic Aids to Construction
                361k217.4 k. Legislative History in
General. Most Cited Cases
When construing an ambiguous statute, the courts
may resort to extrinsic aids in determining legislat-
ive intent, including the use of legislative history as
an interpretive tool.

**[10] Statutes 361 ☞190**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k187 Meaning of Language
                361k190 k. Existence of Ambiguity.
Most Cited Cases
    (Formerly 361k181(2))

**Statutes 361 ☞217.4**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k213 Extrinsic Aids to Construction
                361k217.4 k. Legislative History in
General. Most Cited Cases
Absent an absurd or unjust result, reviewing courts
are bound to give effect to the plain meaning of un-
ambiguous statutory language; courts may only re-
sort to the use of legislative history when interpret-
ing an ambiguous statute.

**[11] Judgment 228 ☞181(15.1)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(15.1) k. In General. Most
Cited Cases
Presence or absence of an unfair or deceptive trade
practices was for the trier of fact, thereby rendering
summary judgment inappropriate in injured horse-
back rider's claim against ranch; under the applic-
able objective consumer test, the determination of a
deceptive omission with regard to the waiver signed
by horseback rider was one for the trier of fact.
HRS § 480-12.

**[12] Antitrust and Trade Regulation 29T ☞ 136**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk136 k. Fraud; Deceit; Knowledge
and Intent. Most Cited Cases
    (Formerly 29Tk16)
A deceptive act or practice is (1) a representation,
omission, or practice that (2) is likely to mislead
consumers acting reasonably under the circum-
stances where (3) the representation, omission, or
practice is material. HRS § 480-2.

**[13] Antitrust and Trade Regulation 29T ☞ 138**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk138 k. Reliance; Causation; In-
jury, Loss, or Damage. Most Cited Cases
For purposes of establishing a deceptive act or
practice, a representation, omission, or practice is
considered "material" if it involves information that
is important to consumers and, hence, likely to af-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fect their choice of, or conduct regarding, a product. HRS § 480-2.

**[14] Antitrust and Trade Regulation 29T ☜ 136**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk133 Nature and Elements
            29Tk136 k. Fraud; Deceit; Knowledge and Intent. Most Cited Cases
      (Formerly 29Tk17)
The test for establishing a deceptive act or practice is an objective one, turning on whether the act or omission is likely to mislead consumers as to information important to consumers in making a decision regarding the product or service. HRS § 480-2.

**[15] Contracts 95 ☜ 137(1)**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k135 Effect of Illegality
            95k137 Partial Illegality
               95k137(1) k. In General. Most Cited Cases
Under the general rule, severance of an illegal provision of a contract is warranted and the lawful portion enforceable when the illegal provision is not central to the parties' agreement.

**[16] Judgment 228 ☜ 185.3(21)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185.3 Evidence and Affidavits in Particular Cases
            228k185.3(21) k. Torts. Most Cited Cases
Reasonableness can only constitute a question of

law suitable for summary judgment when the facts are undisputed and not fairly susceptible of divergent inferences, because where, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury.

**[17] Judgment 228 ☜ 185.3(8)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185.3 Evidence and Affidavits in Particular Cases
            228k185.3(8) k. Contracts. Most Cited Cases
In the context of a motion for summary judgment, a question of interpretation of a contract is not left to the trier of fact where evidence is so clear that no reasonable person would determine the issue in any way but one.

**[18] Animals 28 ☜ 74(3)**

28 Animals
   28k66 Injuries to Persons
      28k74 Actions
         28k74(3) k. Presumptions and Burden of Proof. Most Cited Cases
Statutory presumption of non-negligence for equine-related injuries did not apply to claim by injured horseback rider against ranch; under terms of statute, presumption did not apply if the equine professional failed to reasonably supervise the equine activities, and the substance of injured rider's claim revolved around her assertion that ranch employee failed to monitor rider's approach toward his horse while he was engaged in a conversation with another guest. HRS § 663B-2(a).

**[19] Contracts 95 ☜ 114**

95 Contracts
   95I Requisites and Validity
      95I(F) Legality of Object and of Consideration
         95k114 k. Exemption from Liability.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
**(Cite as: 111 Hawai'i 254, 141 P.3d 427)**

Most Cited Cases
Waiver of liability signed by horseback rider and
her husband was validly executed before rider was
injured while riding at ranch; rider had read through
and responded to queries contained in the waiver
form and had no further questions before she signed
it, she was given adequate time and opportunity to
fully review the waiver, and husband conceded that
he routinely relied on his wife to review documents
before signing them and that he knew he was waiv-
ing rights when he signed the form.

**[20] Contracts 95 ☞93(2)**

95 Contracts
    95I Requisites and Validity
        95I(E) Validity of Assent
            95k93 Mistake
                95k93(2) k. Signing in Ignorance of
Contents in General. Most Cited Cases
The general rule of contract law is that one who as-
sents to a contract is bound by it and cannot com-
plain that he or she has not read it or did not know
what it contained.

**[21] Contracts 95 ☞114**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Considera-
tion
            95k114 k. Exemption from Liability.
Most Cited Cases
Parties are permitted to make exculpatory contracts
so long as they are knowingly and willingly made
and free from fraud; no public policy exists to pre-
vent such contracts.

**[22] Contracts 95 ☞114**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Considera-
tion
            95k114 k. Exemption from Liability.
Most Cited Cases

**Contracts 95 ☞189**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k189 k. Scope and Extent of Obliga-
tion. Most Cited Cases
Exculpatory contracts are not favored, and, if pos-
sible, bargains are construed not to confer this im-
munity.

**[23] Contracts 95 ☞114**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Considera-
tion
            95k114 k. Exemption from Liability.
Most Cited Cases
As a general rule, exculpatory clauses will be held
void if the agreement is (1) violative of a statute,
(2) contrary to a substantial public interest, or (3)
gained through inequality of bargaining power.

**[24] Contracts 95 ☞114**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Considera-
tion
            95k114 k. Exemption from Liability.
Most Cited Cases
In determining whether an exculpatory contract
should be held void for being contrary to a substan-
tial public interest, "public interest" has been
defined as involving all or some of the following
characteristics: (1) it concerns a business of a type
generally thought suitable for public regulation; (2)
the party seeking exculpation is engaged in per-
forming a service of great importance to the public;
(3) the party holds himself or herself out as willing
to perform this service for any member of the pub-
lic who seeks it, or at least for any member coming
within certain established standards; (4) as a result
of the essential nature of the service, in the eco-
nomic setting of the transaction, the party invoking

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
**(Cite as: 111 Hawai'i 254, 141 P.3d 427)**

Page 6

exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his or her services; (5) in exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; and (6) as a result of the transaction, the person or property of the purchaser is placed under the control of the seller of the service, subject to the risk of carelessness by the seller or his or her agents.

**[25] Contracts 95 ☞1**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
Contracts of adhesion are unenforceable if two conditions are present: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; and (2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party.

**[26] Contracts 95 ☞1**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
In analyzing the enforceability of a contract of adhesion, unequal bargaining strength involves the absence of alternatives; specifically, it involves whether the plaintiffs were free to use or not to use the defendant's services.

**[27] Contracts 95 ☞189**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k189 k. Scope and Extent of Obliga-

tion. Most Cited Cases
Scope of waiver of liability signed by horseback rider and her husband, before rider was injured while riding at ranch, did not extend beyond negligence claims; given that such exculpatory provisions were to be strictly construed against parties relying on them, the effect of the broad exculpatory language contained in the ranch's waiver was to construed to limit the waiver's scope to simple negligence claims, and it did not protect the ranch against its own gross negligence or willful misconduct.

**429 Andrew S. Iwashita, Hilo, on the briefs, for the plaintiffs-appellants Lisa Courbat and Steven Courbat.
Zale T. Okazaki, of Ayabe, Chong, Nishimoto, Sia and Nakamura, Honolulu, on the briefs, for the defendant-appellee Dahana Ranch, Inc.

MOON, C.J., LEVINSON and NAKAYAMA, JJ., and DUFFY, J., dissenting, with whom ACOBA, J. joins.

Opinion of the Court by LEVINSON, J.
*256 The plaintiffs-appellants Lisa Courbat and Steven Courbat [hereinafter, collectively, "the Courbats"] appeal from the May 13, 2002 judgment of the circuit court of the third circuit, the Honorable Riki May Amano presiding, entered pursuant to the circuit *257 **430 court's April 26, 2002 grant of summary judgment in favor of the defendant-appellee Dahana Ranch, Inc. (the Ranch).

On appeal, the Courbats contend that the circuit court erred: (1) in concluding that Hawai'i Revised Statutes (HRS) § 480-2 et seq. (Supp.1998) [FN1] do not apply to the Ranch's business practices of booking prepaid tours and subsequently requiring liability waivers upon check-in; (2) by applying the rebuttable presumption set forth in HRS § 663B-2(a) (Supp.1994) [FN2] in finding that *258 **431 Lisa's injuries were not due to the negligence of the tour operator; (3) in finding that the Courbats sufficiently read over the waiver before signing it; and (4) in concluding that the waiver was valid as to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

their negligence claims.

FN1. HRS ch. 480 provided in relevant part:

§ 480-2.... (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

(b) In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

....

§ 480-3 .... This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes....

....

§ 480-12.... Any contract or agreement in violation of this chapter is void and is not enforceable at law or in equity.

§ 480-13 .... (b) Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480-2:

(1) May sue for damages sustained by the consumer, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys' fees together with the costs of suit; ... and

(2) May bring proceedings to enjoin the

unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorneys' fees together with the cost of suit.

Effective June 28, 2002, HRS § 480-2 was amended in respects immaterial to the present matter. See 2002 Haw. Sess. L. Act 229, §§ 2 and 6 at 916-18. Effective May 2, 2001, June 28, 2002, and June 7, 2005, HRS § 480-13 was amended in respects immaterial to the present matter. See 2005 Haw. Sess. L. Act 108, §§ 3 and 5 at 265-66, 267; 2002 Haw. Sess. L. Act 229, §§ 3 and 6 at 917-18; 2001 Haw. Sess. L. Act 79, §§ 1 and 5 at 127-28.

FN2. HRS ch. 663B, entitled "Equine activities" and enacted in 1994, see 1994 Haw. Sess. L. Act 229, §§ 1 and 2 at 591-92, provides in relevant part:

§ 663B-1.... As used in this [chapter], unless the context otherwise requires:

"Engages in an equine activity" means riding ... or being a passenger upon an equine....

....

"Equine activity" means:

....

(5) Rides, trips, hunts, or other equine activities of any type however informal or impromptu that are sponsored by an equine activity sponsor; and

....

"Equine activity sponsor" means an individual, group, club, partnership, or corporation ... which sponsors, organizes, or provides the facilities for, an equine

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

activity....

"Equine professional" means a person engaged for compensation in instructing a participant or renting to a participant an equine for the purpose of riding, driving, or being a passenger upon the equine, or in renting equipment or tack to a participant.

"Inherent risks of equine activities" means those dangers or conditions which are an integral part of equine activities, including, but not limited to:

(1) The propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around them;

(2) The unpredictability of an equine's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals;

(3) Certain hazards such as surface and subsurface conditions;

(4) Collisions with other equines or objects; and

(5) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within the participant's ability.

"Participant" means any person, whether amateur or professional, who engages in an equine activity, whether or not a fee is paid to participate in the equine activity.

§ 663B-2.... (a) In any civil action for injury, loss, damage, or death of a participant, there shall be a presumption that the injury, loss, damage, or death was not caused by the negligence of an equine activity sponsor, equine professional, or their employees or agents, if the injury, loss, damage, or death was caused solely by the inherent risk and unpredictable nature of the equine. An injured person or their legal representative may rebut the presumption of no negligence by a preponderance of the evidence.

(b) Nothing in this section shall prevent or limit the liability of an equine activity sponsor, an equine professional, or their employees or agents if the equine activity sponsor, equine professional, or person:

....

(2) Provided the equine and ... failed to reasonably supervise the equine activities and such failure is a proximate cause of the injury....

(Some brackets in original and some omitted.)

For the reasons discussed *infra* in section III.A, we vacate the circuit court's May 13, 2002 judgment and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

The present matter arises out of personal injuries sustained by Lisa on February 1, 1999, while she and Steven were on a horseback riding tour on the Dahana Ranch on the Big Island of Hawai'i. The Courbats had booked the tour and prepaid the fee several months earlier through Island Incentives, Inc., an internet-based tour organizer. When they checked in at the Ranch, the Courbats were presented with a document to review and to sign which laid out the rules for the horseback tour and in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

cluded a waiver "releas[ing] and hold[ing] harmless ... [the] Ranch ... from ... injury to myself ... resulting from my ... being a spectator or participant or while engaged in any such activity in the event[-]related facilities" and stating that the undersigned "acknowledge[s] that there are significant elements of risk in any adventure, sport, or activity associated with horses." [FN3] According to admissions by the Courbats in subsequent depositions, Lisa read over the waiver and, having no questions regarding the rules and regulations it contained, signed it before passing it to her husband to sign. Steven evidently did not read it, but recognized that it was "some kind of release of some sort" and signed it. In fact, no guest of the Ranch had ever refused to sign a waiver. Steven was familiar with the concept of such waivers, having participated with his wife in a snorkeling activity earlier during the vacation, at which time they both signed similar forms.

> FN3. The rules and waiver stated in pertinent part:
>
> In order for us to keep our ride from being a "Nose To Tail Trail Ride [,"] there are certain rules which must be followed for your safety and the horses' mental well being. *FAILURE TO FOLLOW THESE RULES WILL RESULT IN FORFEITURE OF YOUR RIDE WITH NO REFUND.*
> *RULES AND REGULATIONS*
>
> • FOLLOW RIDING INSTRUCTIONS & DIRECTIONS THROUGHOUT THE RIDE
>
> ....
>
> • PLEASE DO NOT RIDE AHEAD OF YOUR GUIDE UNLESS TOLD TO DO SO
>
> ....
>
> • DO NOT FOLLOW ONE ANOTHER

> ....
> WAIVER
>
> I/We, the undersigned, hereby release and hold harmless the land owners, managers, operators (William P. Kalawai'anui, Daniel H. Nakoa, Dahana Ranch and Nakoa Ranch), [t]he State of Hawai['']i and the Department of Hawaiian Home Lands and all other persons directly related to those listed above for the event listed herein[,] their successors, assigns and affiliates from loss or damage to property or injury to myself or any person ... resulting from my ... being a spectator or participant or while engaged in any such activity in the event[-] related facilities. I/We acknowledge that there are significant elements of risk in any adventure, sport or activity associated with horses.
>
> I/WE HAVE READ AND UNDERSTOOD THE FOREGOING RULES, REGULATIONS AND WAIVER.
>
> (Emphasis in original.)

The Ranch's guide, Daniel Nakoa, briefed the Courbats on how to handle a horse and general rules of the trail, including the importance of not riding single-file or allowing the horses to bunch up end to end. Out on the ride, Lisa was injured when she rode up behind Nakoa's horse while Nakoa was speaking with another guest who had approached Nakoa with a question. According to later statements by both Nakoa and Lisa, Lisa approached Nakoa's horse from the rear while the three horses were in motion, and, when her horse neared Nakoa's horse, Nakoa's horse struck out at her horse, hitting Lisa in the left shin. Lisa described the incident in a deposition taken on November 3, 2001:

> Q: At what point did you believe that you needed to pull the reins back as you were approaching the guide ... ? ...

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

Page 10

**432 *259 [Lisa]: When I felt that the horse[ ] was getting too close to the horses above me.

Q: So it appeared to you that the nose end of the horse was getting too close to the butt end of the horse in front?

[Lisa]: To the horse in general. We were coming in. I was just trying to keep a certain space between myself and the horse.

Q: [T]hose two horses, the guide's horse and the guest's horse, they were to the left of your horse, is that correct, to the front left of you?

[Lisa]: Yes.

Q: You recall which hind leg of the horse kicked you? Was it the right or the left?

[Lisa]: It would be the right one.

Q: And that was a horse which was ridden by the guide or the guest?

[Lisa]: The guide.

Q: Just before the horse in front of you kicked you, were all of the horses still in motion? When I say "all the horses," yours, the guide's, and the guest that was riding parallel to the guide?

[Lisa]: Just before?

Q: Yes.

[Lisa]: Yes.

Q: Was there any conversation between you and the guide or the guest just before this kicking incident occurred?

[Lisa]: No.

Q: At the time this kicking incident occurred, w[ere] the guide and the guest still talking to each other?

[Lisa]: Yes.

Nakoa described the same incident in a January 9, 2002 deposition:

[Nakoa]: ... Everybody was facing the gate, the second gate.... And I was in the back. And because I lots of times don't want to be a part of the ride, I started riding to the right. And then a man came to talk to me and ask me about the horse.

....

Q: On which side of your horse was he at the time?

[Nakoa]: He was on the left side of me.

Q: And were you still moving or were you stopped?

[Nakoa]: We were walking.

....

Q: ... [H]ad you passed Lisa along the way?....

[Nakoa]: Because of the angle, she was off to my left.

Q: Still in front of you?

[Nakoa]: No. About the same.

....

Q: And when is the next time you notice[ ] Lisa's horse before the injury takes place?

....

[Nakoa]: She was still on the left side of me.

Q: ... [A]bout how far away do you estimate she was from your horse?

[Nakoa]: You know, 30 feet maybe....

Q: And from that point on, ... were you able to continually observe Lisa riding her horse until the time the injury occurred?

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

[Nakoa]: Yes. The man was on my left and I was talking to him.

....

Q: ... [W]hile [the guest is] asking you this question and you can see [Lisa], what is her horse doing as it's approaching your horse?

[Nakoa]: No, I didn't see her approaching my horse. That's what I'm trying to tell you. She was on the left side of this man and me and we're all going in that direction (indicating). She was trotting, and I was walking with this man. And I saw her. And then this man asked me something. And the next thing I knew, she was right in back of my horse telling me that my horse kicked her.

Nakoa later acknowledged in the deposition that, if he or his horse had been aware that Lisa's horse was approaching from behind, his horse would not have been surprised and would not have struck out at her horse. As a result of the impact, Lisa suffered severe pain and swelling, but no broken bones, and *260 **433 since the incident has complained of ongoing pain and injury to her leg.

The Courbats filed suit on January 31, 2001, asserting claims of negligence and gross negligence that resulted in physical injury to Lisa and loss of consortium injuries to Steven. On November 21, 2001, they filed a first amended complaint, adding a claim of unfair and deceptive trade practices regarding the waiver they had signed the day of the ride.

On January 16, 2002, the Ranch filed a motion for summary judgment on the grounds: (1) that the Courbats had assumed the risk of the activity; (2) that the Courbats had waived their rights to sue the Ranch for negligence; and (3) that the Ranch had not committed any acts that brought it under the purview of HRS §§ 480-2 and 480-13, see supra note 1.

The Courbats filed a memorandum in opposition to the Ranch's motion and a motion for partial summary judgment, urging the circuit court to rule,

inter alia: (1) that the Ranch owed Lisa a duty to protect her from injury by Nakoa's horse; and (2) that the rebuttable presumption of no negligence on a defendant's part set forth in HRS § 663B-2, see supra note 2, was inapplicable.

The circuit court conducted a hearing on both motions on February 13, 2002 and, on April 26, 2002, entered an order granting the Ranch's motion and denying the Courbats' motion. On May 13, 2002, the circuit court entered a final judgment in favor of the Ranch and against the Courbats. On August 8, 2002, the Courbats filed a timely notice of appeal.FN4

> FN4. On May 10, 2002, the Ranch filed a notice of taxation of costs which, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(3), tolled the time for filing an appeal. An order as to taxation of costs was never entered, and so, pursuant to HRAP Rule 4(a)(3), the request was deemed denied 90 days later, on August 8, 2002. The Courbats' appeal, filed prematurely on June 7, 2002, was therefore timely filed as of August 8, 2002, pursuant to HRAP Rule 4(a)(2) and (3).

## II. STANDARDS OF REVIEW

### A. Summary Judgment

[1][2][3][4] We review the circuit court's grant or denial of summary judgment de novo....

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most fa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

[*Hawai'i Cmty. Fed. Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) ] (citations and internal quotation marks omitted).

*Querubin v. Thronas,* 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.,* 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)) (internal citation omitted) (some brackets in original).

B. *Interpretation Of Statutes*

[5][6][7][8][9][10] The interpretation of a statute is a question of law reviewable *de novo. State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996).

Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty*261 **434 of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1-15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic

aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray [v. Admin. Dir. of the Court],* 84 Hawai'i [138,] 148, 931 P.2d [580,] 590 [ (1997) ] (footnote omitted).

*State v. Koch,* 107 Hawai'i 215, 220, 112 P.3d 69, 74 (2005) (quoting *State v. Kaua,* 102 Hawai'i 1, 7-8, 72 P.3d 473, 479-480 (2003)). Absent an absurd or unjust result, *see State v. Haugen,* 104 Hawai'i 71, 77, 85 P.3d 178, 184 (2004), this court is bound to give effect to the plain meaning of unambiguous statutory language; we may only resort to the use of legislative history when interpreting an ambiguous statute. *State v. Valdivia,* 95 Hawai'i 465, 472, 24 P.3d 661, 668 (2001).

III. *DISCUSSION*

A. *Inasmuch As The Presence Or Absence Of An Unfair Or Deceptive Trade Practice Is For The Trier Of Fact To Determine, The Circuit Court Erroneously Granted Summary Judgment In Favor Of The Ranch And Against The Courbats.*

[11] The Courbats do not dispute that they both signed the Ranch's waiver form, *see supra* note 3, prior to their ride. Nor do they dispute that waivers are an accepted method by which businesses may limit their liability. Rather, they assert that the Ranch's practice of booking ride reservations through an activity company, receiving payment prior to the arrival of the guest, and then, upon the guest's arrival at the Ranch, requiring the guest to sign a liability waiver as a precondition to horseback riding is an unfair and deceptive business practice to which the remedies of HRS ch. 480 apply. The Courbats maintain, *inter alia,* that the practice of withholding the waiver had "the capacity or tendency to mislead" customers, thereby satisfying this court's test for a deceptive trade practice as articulated in *State ex rel. Bronster v. United States Steel Corp.,* 82 Hawai'i 32, 50, 919 P.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

294, 312 (1996).

The Intermediate Court of Appeals held in *Beerman v. Toro*, 1 Haw.App. 111, 118, 615 P.2d 749, 754-55 (1980), that the remedies afforded by HRS ch. 480 are not available for personal injury claims. *See also Blowers v. Eli Lilly & Co.*, 100 F.Supp.2d 1265, 1269-70 (D.Haw.2000). The Courbats, however, assert that they are not invoking HRS ch. 480 for the purpose of establishing personal injury damages, but rather because the lack of notice as to the waiver requirement injured them economically, by way of the $116 cost of the tour, giving rise to a valid claim under HRS § 480-13, *see supra* note 1. As a deceptive trade practice, the Courbats maintain, the waiver is void under HRS § 480-12, *see supra* note 1.

### 1. The elements of a deceptive trade practice claim for rescission of a contract

To render the waiver void, the Courbats must establish that it is an unseverable part of a "contract or agreement in violation of [HRS ch. 480]." *See*HRS § 480-12, *supra* note 1. Furthermore, any "unfair or deceptive act [ ] or practice[ ] in the conduct of any trade or commerce" violates HRS § 480-2.

"Deceptive" acts or practices violate HRS § 480-2, but HRS ch. 480 contains no statutory definition of "deceptive." This court has described a deceptive practice as having "the capacity or tendency to mislead or deceive,"*United States Steel Corp.*, 82 Hawai'i at 50, 919 P.2d at 312, 313, but, beyond noting that federal cases have also defined deception "as an act causing, as a natural and probable result, a person to do that which he [or she] would not do otherwise,"*Keka*, 94 Hawai'i at 228, 11 P.3d at 16 (brackets in original) (quoting *United States Steel Corp.*, 82 Hawai'i at 51, 919 P.2d at 313 (citing *Bockenstette v. Federal Trade Comm'n*, 134 F.2d 369 (10th Cir.1943))), we have not articulated a more refined test.

[12][13][14] HRS § 480-3, *see supra* note 1,

provides that HRS ch. 480"shall be construed in accordance with judicial interpretations of similar federal antitrust statutes,"*262 **435 and HRS § 480-2(b) provides that "[i]n construing this section, the courts ... shall give due consideration to the ... decisions of ... the federal courts interpreting ...15 U.S.C. [§ ] 45(a)(1)[ (2000) ]," FN5 in recognition of the fact that HRS § 480-2 is "a virtual counterpart." FN6 *Keka*, 94 Hawai'i at 228, 11 P.3d at 16. The Federal Trade Commission (FTC), in *In re Cliffdale Assocs., Inc.*, 1984 WL 565319, 103 F.T.C. 110 (1984), developed a three-part analytical test for " deception," FN7 which the federal courts have thereafter extensively adopted, *see FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d. Cir.2006); *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir.2003); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988). Under the *Cliffdale Assocs.* test, a deceptive act or practice is "(1) a representation, omission, or practice[ ] that (2) is likely to mislead consumers acting reasonably under the circumstances [where] (3) [ ] the representation, omission, or practice is material." *Verity Int'l*, 443 F.3d at 63. A representation, omission, or practice is considered "material" if it involves " 'information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.' " *Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C.Cir.2000) (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165); *see also Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir.1992); *FTC v. Crescent Publ'g Group, Inc.*, 129 F.Supp.2d 311, 321 (S.D.N.Y.2001); *FTC v. Five-Star Auto Club, Inc.*, 97 F.Supp.2d 502, 529 (S.D.N.Y.2000); *FTC v. Sabal*, 32 F.Supp.2d 1004, 1007 (N.D.Ill.1998). Moreover, the *Cliffdale Assocs.* test is an objective one, turning on whether the act or omission "is likely to mislead consumers," *Verity Int'l*, 443 F.3d at 63, as to information "important to consumers," *Novartis Corp.*, 223 F.3d at 786, in making a decision regarding the product or service.FN8

FN5. 15 U.S.C. § 45(a)(1) provides that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

FN6. Hawai'i courts have long recognized, therefore, that federal interpretations of 15 U.S.C. § 45(a)(1) guide us in construing HRS § 480-2"in light of conditions in Hawai'i." *Ai v. Frank Huff Agency,* 61 Haw. 607, 613 n. 11, 607 P.2d 1304, 1309 n. 11 (1980); *see also Island Tobacco Co. v. R.J. Reynolds Tobacco Co.,* 63 Haw. 289, 299, 627 P.2d 260, 268 (1981)*overruled on other grounds by Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.,* 91 Hawai'i 224, 982 P.2d 853 (1999); *Rosa v. Johnston,* 3 Haw.App. 420, 426, 651 P.2d 1228, 1233-34 (1982).

FN7. *See Cliffdale Assocs.,* 103 F.T.C. at 164-65 (characterizing the new standard as a refinement of the "tendency or capacity to deceive" test used by the FTC to that point and pronouncing the old test "circular and therefore inadequate to provide guidance").

FN8. While federal courts have not expressly categorized the test as objective, the FTC, in *Cliffdale Assocs.,* commented that "[t]he requirement that an act or practice be considered from the perspective of a consumer acting reasonably in the circumstances is not new.... [The FTC] has long recognized that the law should not be applied in such a way as to find that honest representations are deceptive simply because they are misunderstood by a few.... [A]n advertisement would not be considered deceptive merely because it could be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons [to] whom the representation is addressed." 103 F.T.C. at 165 (footnotes and internal quotation sig-

nals omitted).

Given our obligation under HRS §§ 480-3 and 480-2(b) to apply federal authority as a guide in interpreting HRS ch. 480, we hereby adopt the three-prong *Cliffdale Assocs.* test in determining when a trade practice is deceptive.FN9

FN9. Other states have already adopted the *Cliffdale Assocs.* test. *See, e.g., Luskin's, Inc. v. Consumer Prot. Div.,* 353 Md. 335, 726 A.2d 702, 713 (1999); *Carter v. Gugliuzzi,* 168 Vt. 48, 716 A.2d 17, 23 (1998). Our adoption of the *Cliffdale Assocs.* test does not change the existing rule that, in order to establish a violation of HRS § 480-2, the plaintiff need not establish an intent to deceive on the part of the defendant, *World Travel Vacation Brokers,* 861 F.2d at 1029; *Five-Star Auto Club,* 97 F.Supp.2d at 526, nor any actual deceit, *United States Steel Corp.,* 82 Hawai'i at 51, 919 P.2d at 313.

2. *Under The Cliffdale Assocs. Objective Consumer Test, The Determination Of A Deceptive Omission Is One For The Trier Of Fact, Thereby Rendering Summary Judgment Inappropriate.*

[15] The Courbats do not allege that the waiver itself is deceptive; rather, they urge **\*263 \*\*436** that the deceptive practice at issue was the booking agent's failure to inform them of the waiver requirement during the negotiation and execution of the underlying contract.FN10 Nevertheless, if any deceptive omission occurred with respect to the negotiation and execution of the original contract, the operation of HRS § 480-12, *see supra* note 1, would render both the original contract and the waiver, signed afterward, void.FN11 Thus, the waiver's survival depends on the trier of fact's determination as to whether the omission of the waiver requirement during Island Incentives, Inc.'s booking process was deceptive and therefore in violation of HRS § 480-2.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
**(Cite as: 111 Hawai'i 254, 141 P.3d 427)**

FN10. It is undisputed that Island Incentives, Inc. was acting as the Ranch's agent in this matter, and "we note that an owner is responsible for the representations of his agent made within the scope of his agent's selling authority." *Au v. Au*, 63 Haw. 210, 215, 626 P.2d 173, 178 (1981) (citing *Negyessy v. Strong*, 136 Vt. 193, 388 A.2d 383, 385 (1978)).

FN11. If the waiver were severable from the underlying contract, it could survive despite a determination that the original contract was void. *See Ai v. Frank Huff Agency*, 61 Haw. 607, 619, 607 P.2d 1304, 1312 (1980) ( "The wording on HRS § 480-12 might ... appear to suggest that any contract containing an illegal provision ... should be held unenforceable in its entirety.... [U]nder ordinary contract law, however, ... a partially legal contract may be upheld if the illegal portion is severable from the part which is legal."). However, "the general rule is that severance of an illegal provision is warranted and the lawful portion ... enforceable when the illegal provision is not central to the parties' agreement." *Beneficial Hawaii, Inc. v. Kida*, 96 Hawai'i 289, 311, 30 P.3d 895, 917 (2001). The underlying contract at issue *is* the sum of the parties' agreement; the waiver would be considered an addendum to it. Therefore, the waiver is not severable and must stand or fall with the underlying contract.

[16][17] The application of an objective "reasonable person" standard, of which the *Cliffdale Assocs.* test is an example, is ordinarily for the trier of fact, rendering summary judgment "often inappropriate." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 107, 839 P.2d 10, 24 (1992), *cited in Casumpang v. ILWU Local 142*, 108 Hawai'i 411, 425, 121 P.3d 391, 405 (2005); *Arquero v. Hilton Hawaiian Village LLC*, 104

Hawai'i 423, 433, 91 P.3d 505, 515 (2004). "Inasmuch as the term 'reasonableness' is subject to differing interpretations ..., it is inherently ambiguous. Where ambiguity exists, summary judgment is usually inappropriate because 'the determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable [minds] might differ.' " *Amfac, Inc.*, 74 Haw. at 107, 839 P.2d at 24 (quoting *Bishop Trust Co. v. Cent. Union Church*, 3 Haw.App. 624, 628-29, 656 P.2d 1353, 1356 (1983)). Reasonableness can only constitute a question of law suitable for summary judgment " 'when the facts are undisputed and not fairly susceptible of divergent inferences' because '[w]here, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury.' " *Id.* at 108,839 P.2d at 24 (quoting *Broad & Branford Place Corp. v. J.J. Hockenjos Co.*, 132 N.J.L. 229, 39 A.2d 80, 82 (1944) (brackets in original)). " '[A] question of interpretation is not left to the trier of fact where evidence is so clear that no reasonable person would determine the issue in any way but one.' " *Id.* (quoting *Restatement (Second) of Contracts* § 212 cmt. e (1981) (brackets in original)). *See also Restatement (Second) of Contracts* § 212(2) (1981 and Supp.2005) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or *on a choice among reasonable inferences to be drawn from extrinsic evidence.*") (Emphasis added). There is no genuine issue of material fact regarding the failure to disclose the waiver requirement during negotiation of the original tour contract, but we cannot say that, applying the *Cliffdale Assocs.* test, reasonable minds could draw only one inference as to the materiality of that omission to reasonable consumers contemplating the transaction. Therefore, the question whether a waiver requirement would be materially important in booking a horseback tour remains one for the trier of fact.

Because a genuine issue of material fact, resolvable only by the trier of fact, remains in dispute, the grant of summary judgment on the HRS ch. 480

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

claim was erroneous. We therefore vacate the circuit court's May **437 *264 13, 2002 judgment and remand for further proceedings consistent with this opinion.

B. *The Consequences, On Remand, Of The Determination By The Trier Of Fact As To Whether Nondisclosure Of The Waiver Requirement Was An unfair Or Deceptive Trade Practice*

If, on remand, the trier of fact determines that the nondisclosure of the waiver was a deceptive trade practice, rendering the waiver void, then the Courbats' negligence claims proceed free of the waiver defense. Nevertheless, for the reasons set forth below and for purposes of any subsequent trial on the Courbats' negligence claims, we hold that HRS ch. 663B, entitled "Equine activities," *see supra* note 2, setting forth a rebuttable presumption of non-negligence on the part of the tour operator, does not apply to the present matter.

Conversely, if, on remand, the trier of fact determines that the nondisclosure of the waiver was *not* deceptive, then the Courbats validly waived their negligence claims.

1. *The Statutory Presumption Of Non-Negligence For Equine-Related Injuries Set Forth In HRS Ch. 663B Does Not Apply To The Courbats' Claims.*

[18] If the trier of fact determines that the failure to inform the Courbats of the waiver requirement was a deceptive trade practice, then the negligence waiver, along with the underlying contract, will be rendered void, and the Courbats' negligence claims will be revived. In order to provide guidance on remand, therefore, we hold that it was error for the circuit court in the present matter to apply HRS § 663B-2(a), *see supra* note 2, which establishes a rebuttable presumption in favor of horseback tour operators that any injury "caused solely by the inherent risk and unpredictable nature of the equine" is not due to the negligence of the tour operator.

HRS § 663B-2(b) provides in relevant part that "[n]othing in this section shall prevent or limit the liability of an equine activity sponsor ... if the equine activity sponsor, equine professional, or person: ... (2) [p]rovided the equine and ... failed to reasonably supervise the equine activities and such failure is a proximate cause of the injury." The substance of Lisa's claim revolves around her assertion that Nakoa failed to monitor her approach toward his horse while he was engaged in conversation with another guest; in other words, Lisa claims that Nakoa "failed to reasonably supervise the equine activities" that were the "proximate cause of [her] injury." Therefore, we hold that, if Lisa is correct, the presumption of non-negligence set forth in HRS § 663B-2(a) would not apply to the Courbats' claims.

2. *If The Trier Of Fact Determines That The Nondisclosure Of The Waiver Was Not An Unfair Or Deceptive Trade Practice, Then The Courbats Validly Waived Their Negligence Claims.*

a. *The waiver was validly executed.*

[19] Citing *Krohnert v. Yacht Sys. of Hawaii*, 4 Haw.App. 190, 201, 664 P.2d 738, 745 (1983), the Courbats assert that, because they manifested no clear and unequivocal acceptance of the terms of the waiver, the waiver cannot be enforced against them. However, pursuant to the following analysis, we hold that, if the trier of fact finds that the failure to inform the Courbats of the waiver requirement was not a deceptive trade practice, then the waiver, in all other respects, was valid.

[20][21][22][23] "The general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained." *Leong v. Kaiser Found. Hosps.*, 71 Haw. 240, 245, 788 P.2d 164, 168 (1990); *see also Joaquin v. Joaquin*, 5 Haw.App. 435, 443, 698 P.2d 298, 304 (1985); *In re Chung*, 43 B.R. 368, 369 (Bankr.D.Haw.1984); *In re Kealoha*, 2 B.R. 201, 209

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

(Bankr.D.Haw.1980). Furthermore, " '[p]arties are permitted to make exculpatory contracts so long as they are knowingly and willingly made and free from fraud. No public policy exists to prevent such contracts.' " *Fujimoto v. Au*, 95 Hawai'i 116, 156, 19 P.3d 699, 739 (2001) (some brackets omitted) (quoting **438 *Gen. Bargain Ctr. v. Am. Alarm Co., Inc.*, 430 N.E.2d 407, 411- 12 (Ind.Ct.App.1982)). " [S]uch bargains are not favored, however, and, if possible, bargains are construed not to confer this immunity." *Fujimoto*, 95 Hawai'i at 155, 19 P.3d at 738. Therefore, as a general rule, " '[e]xculpatory clauses will be held void if the agreement is (1) violative of a statute, (2) contrary to a substantial public interest, or (3) gained through inequality of bargaining power.' " '95 Hawai'i at 156, 19 P.3d at 739 (quoting *Andrews v. Fitzgerald*, 823 F.Supp. 356, 378 (M.D.N.C.1993)).

The Courbats have not alleged that any of the terms of the waiver, or the use of a waiver by the Ranch, violates a statute; on the contrary, the Courbats concede that waivers are an acceptable method by which tour operators may seek to limit their liability in response to rising insurance and litigation costs.

[24] In *Krohnert*, the ICA defined the public interest

as involving some or all of the following characteristics:

[1] It concerns a business of a type generally thought suitable for public regulation.

[2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

[3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

[4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

[5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

[6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller of the service, subject to the risk of carelessness by the seller or his agents.

4 Haw.App. at 199, 664 P.2d at 744 (finding under this test that the exculpatory clause contained in a contract for marine surveying was permissible) (brackets omitted) (quoting *Lynch v. Santa Fe Nat'l Bank*, 97 N.M. 554, 627 P.2d 1247, 1251-52 (N.M.Ct.App.1981) (holding that services of escrow agents in New Mexico were not in the nature of a public service so as to render an exculpatory clause unenforceable) (quoting *Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 445-46 (1963) (declaring invalid as against the public interest an exculpatory clause for future negligence required for admission to a public research hospital))); *see also* 15 *Corbin on Contracts* § 85.18 (2003 & Supp.2005) (summarizing a similar test commonly used by courts and noting that courts tend to enforce exculpatory clauses for recreational activities under the test).[FN12] Entities that have been found to fall under the public interest doctrine, rendering exculpatory clauses void, include common carriers, *see Adams Express Co. v. Croninger*, 226 U.S. 491, 509, 33 S.Ct. 148, 57 L.Ed. 314 (1913); *Shippers Nat'l Freight Claim Council, Inc. v. Interstate Commerce Comm'n*, 712 F.2d 740, 746 (2d Cir.1983); *Clairol, Inc. v. Moore-McCormack Lines, Inc.*, 79 A.D.2d 297, 309-10, 436 N.Y.S.2d 279 (N.Y.App.Div.1981),

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and hospitals, *see Tunkl,* 32 Cal.Rptr. 33, 383 P.2d at 447; *266\*\*439Smith v. Hosp. Auth. of Walker, Dade & Catoosa Counties,* 160 Ga.App. 387, 287 S.E.2d 99, 101 (1981); *Belshaw v. Feinstein,* 258 Cal.Rptr. 711, 65 Cal.Rptr. 788, 798 (1968).

> FN12. Courts have upheld exculpatory clauses relating to car racing, *see Cadek v. Great Lakes Dragaway, Inc.,* 843 F.Supp. 420 (N.D.Ill.1994); *Barbazza v. Int'l Motor Sports Ass'n,* 245 Ga.App. 790, 538 S.E.2d 859 (2000), snow skiing, *see Chauvlier v. Booth Creek Ski Holdings, Inc.,* 109 Wash.App. 334, 35 P.3d 383 (2001), skydiving, *see Scrivener v. Sky's The Limit, Inc.,* 68 F.Supp.2d 277 (S.D.N.Y.1999), and horseback riding, *see Street v. Darwin Ranch, Inc.,* 75 F.Supp.2d 1296, 1299 (D.Wyo.1999) (finding that "recreational trail rides are neither of great importance to the public, nor a practical necessity to any member of the public").

Applying these factors to the present matter, we determine that the public interest here is not at stake: recreational activity tours are not generally suitable to public regulation, in the manner of common carriers, nor of great importance to the public, nor of an essential nature, in the manner of medical care, such that the provider's bargaining power is greatly enhanced over any member of the public seeking their services.

[25][26] Finally, as the United States District Court for the District of Hawai'i noted, in considering negligence waivers in the context of recreational activity, while such waivers may be contracts of adhesion, in that they are presented on a "take-it-or-leave-it" basis, they are not unconscionable, but "are of a sort commonly used in recreational settings" and "are generally held to be valid." *Wheelock v. Sport Kites, Inc.,* 839 F.Supp. 730, 736 (D.Haw.1993). "[C]ontracts [of adhesion] are 'unenforceable if two conditions are present: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; and

(2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party.' " *Fujimoto,* 95 Hawai'i at 156, 19 P.3d at 739 (quoting *Brown v. KFC Nat'l Mgmt. Co.,* 82 Hawai'i 226, 247, 921 P.2d 146, 167 (1996)); *see also Wheelock,* 839 F.Supp. at 735 ("[A]dhesion contracts are fully enforceable provided that they are not unconscionable and do not fall outside the reasonable expectations of the weaker or adhering party."). Unequal bargaining strength "involves the absence of alternatives; specifically whether the plaintiffs were 'free to use or not to use' [the] defendant's ... services." *Krohnert,* 4 Haw.App. at 199, 664 P.2d at 744 (quoting *Lynch,* 627 P.2d at 1250). These conditions are generally not germane in the recreational waiver context. In the context of a recreational sport or adventure activity, freely undertaken for pleasure, "coercive bargaining" and "an absence of alternatives" are terms that hold little meaning.

In the present matter, Lisa read through and responded to queries contained in the waiver form and had no further questions or concerns regarding the contents before she signed it. Steven conceded that he routinely relied on his wife to review documents before signing them and that he knew he was waiving rights when he signed the form. The record demonstrates that the Courbats were given adequate time and opportunity to fully review the waiver presented to them before they signed it and that both knew that by signing it they were waiving legal rights in return for being allowed to participate in the ride. In short, there is no evidence of coercion. By signing the waiver form, they demonstrated that they agreed to its terms, and by reading it, or, in Steven's case, in relying on the advice of his wife, demonstrated knowledge of its contents. Moreover, they had signed similar waivers that week for another activity and were familiar with what they represented. Accordingly, we hold that, if the trier of fact determines that the nondisclosure of the waiver was not an unfair or deceptive trade practice, the Courbats' waiver was valid.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

141 P.3d 427
111 Hawai'i 254, 141 P.3d 427
(Cite as: 111 Hawai'i 254, 141 P.3d 427)

b. *The scope of the Courbats' waiver does not extend beyond negligence claims.*

[27] The language of the waiver, *see supra* note 3, releases the Ranch and its agents and holds it harmless "from loss or damage to property or injury to [the undersigned] ... resulting from [the undersigned] ... being a spectator or participant or while engaged in any such activity in the event[-]related facilities." However, because " '[e]xculpatory provisions are not favored by the law and are strictly construed against parties relying on them,' " the effect of the broad exculpatory language contained in the Ranch's waiver should be construed to limit the waiver's scope to simple negligence claims; it does not protect the Ranch against its own gross negligence or willful misconduct. *Fujimoto*, 95 Hawai'i at 156, 19 P.3d at 739 (quoting *Andrews*, 823 F.Supp. at 378); *see also Wheelock*, 839 F.Supp. at 736 (interpreting the reasoning in *Krohnert* to conclude that to allow an exculpatory clause to extend to gross negligence would violate *267 **440 the public interest, rendering the clause void).

### IV. *CONCLUSION*

In light of the foregoing analysis, we vacate the circuit court's May 13, 2002 judgment in favor of the Ranch and against the Courbats and remand for further proceedings consistent with this opinion.

Dissenting Opinion by DUFFY, J., in which ACOBA, J., joins.
I respectfully dissent. In my view, no reasonable person would find that the recreational tour operator's failure to disclose the waiver requirement of Dahana Ranch, Inc. during negotiation of the horseback riding activity was a deceptive trade practice under HRS § 480-2. The Courbats concede that waivers are an acceptable method by which recreational tour operators and sponsors may seek to limit their liability in response to rising insurance and litigation costs, and admit that they were required to sign such a waiver before participating in a snorkeling activity earlier during the same Hawai'i vacation. Applying the *Cliffdale Assoc.* test to the undisputed facts in this case involving the inherently dangerous activity of horseback riding, I respectfully submit that the tour operator's failure to disclose the waiver requirement of Dahana Ranch, Inc. during negotiation of the horseback riding activity with the Courbats was not a material omission implicating a deceptive trade practice under HRS § 480-2. I would thus affirm the circuit court's grant of summary judgment in favor of Dahana Ranch, Inc.

Hawai'i,2006.
Courbat v. Dahana Ranch, Inc.
111 Hawai'i 254, 141 P.3d 427

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

11 P.3d 1
94 Hawai'i 213, 11 P.3d 1
**(Cite as: 94 Hawai'i 213, 11 P.3d 1)**

Page 1

▷
Hawaii Community Federal Credit Union v. Keka
Hawai'i,2000.

Supreme Court of Hawai'i.
HAWAII COMMUNITY FEDERAL CREDIT UNION,
Plaintiff-Appellee,
v.
Arthur K. KEKA and Shirley A. Keka, Defendants-Appellants.
No. 22631.

Oct. 17, 2000.

Credit union brought action to foreclose mortgage, and mortgagors asserted counterclaims based on fraud, and on violations of federal Truth in Lending Act (TILA) and state unfair practices statutes. The Third Circuit Court granted summary judgment to credit union, and mortgagors appealed. The Supreme Court, Levinson, J., held that: (1) affidavit in which credit union officer averred that he was "personally familiar" with mortgagors' payment history and defaults was hearsay and could not support summary judgment in foreclosure action; (2) mortgagors' right to rescind transaction under TILA expired three years after transaction was entered; (3) fact issue existed as to whether credit union timely provided mortgagors with disclosure statements and forms required by TILA; (4) misstatement which extended initial period in which mortgagors could cancel transaction did not violate TILA; (5) fact issue existed as to counterclaim under unfair practices statute; and (6) whether alleged statement by loan officer that it would be "no problem" to change loan rate in future could support fraud claim was fact issue.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
            30k893 Cases Triable in Appellate Court
               30k893(1) k. In General. Most Cited
Cases
Circuit court's grant or denial of summary judgment is reviewed de novo under the same standard applied by the circuit court. Rules Civ.Proc., Rule 56(c).

**[2] Judgment 228 ☞181(2)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k181 Grounds for Summary Judgment
         228k181(2) k. Absence of Issue of Fact. Most
Cited Cases
A fact is material, so that genuine issue as to fact will preclude summary judgment, if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. Rules Civ.Proc., Rule 56(c).

**[3] Judgment 228 ☞185(2)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185 Evidence in General
            228k185(2) k. Presumptions and Burden of
Proof. Most Cited Cases
In considering motion for summary judgment, evidence must be viewed in the light most favorable to the non-moving party; in other words, court must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion. Rules Civ.Proc., Rule 56(c).

**[4] Judgment 228 ☞185.1(3)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
         228k185.1 Affidavits, Form, Requisites and
Execution of
            228k185.1(3) k. Personal Knowledge or
Belief of Affiant. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

Affidavit in which credit union officer averred that he was "personally familiar" with mortgagors' payment history, and that mortgagors were in default by a certain amount, and did not even identify credit union records on which he was relying, was inadmissible hearsay, and thus could not form basis for grant of summary judgment in mortgage foreclosure action. Rules Civ.Proc., Rule 56(c, e).

**[5] Judgment 228 ⬅⮞185(5)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(5) k. Weight and Sufficiency.
Most Cited Cases
An affidavit consisting of inadmissible hearsay cannot serve as a basis for awarding or denying summary judgment. Rules Civ.Proc., Rule 56(c).

**[6] Judgment 228 ⬅⮞185(4)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(4) k. Documentary Evidence or
Official Record. Most Cited Cases
An affiant does not comply with provision of summary judgment rule under which he or she must produce and authenticate the records upon which he or she is relying merely by omitting any reference to them in the affidavit. Rules Civ.Proc., Rule 56(e).

**[7] Appeal and Error 30 ⬅⮞863**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k862 Extent of Review Dependent on
Nature of Decision Appealed from
                30k863 k. In General. Most Cited Cases
On appellate review of grant of summary judgment, court considers only the evidence properly before the

circuit court. Rules Civ.Proc., Rule 56(c).

**[8] Consumer Credit 92B ⬅⮞60**

92B Consumer Credit
    92BII Federal Regulation
        92BII(C) Effect of Violation of Regulations
            92Bk60 k. In General; Validity of Transactions. Most Cited Cases
Mortgagors' right to rescind loan transaction, on basis that mortgagee had violated requirements of federal Truth in Lending Act (TILA), expired, at the latest, three years after they entered into transaction. Truth in Lending Act, § 125(a), 15 U.S.C.A. § 1635(a).

**[9] Courts 106 ⬅⮞100(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(H) Effect of Reversal or Overruling
            106k100 In General
                106k100(1) k. In General; Retroactive or
Prospective Operation. Most Cited Cases
When United States Supreme Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law, and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate Supreme Court's announcement of the rule.

**[10] Courts 106 ⬅⮞100(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(H) Effect of Reversal or Overruling
            106k100 In General
                106k100(1) k. In General; Retroactive or
Prospective Operation. Most Cited Cases
Decision by United States Supreme Court in *Beach v. Ocwen Federal Bank* that Truth in Lending Act (TILA) permits no federal right to rescind a loan transaction based on a TILA violation, defensively or otherwise, more than three years after transaction was entered, applied to action in which mortgagee sought to foreclose mortgage, and mortgagors asserted counterclaims, that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 P.3d 1
94 Hawai'i 213, 11 P.3d 1
**(Cite as: 94 Hawai'i 213, 11 P.3d 1)**

was pending at time *Beach* decision was handed down, even though underlying events had occurred prior to *Beach* decision. Truth in Lending Act, § 125(a), 15 U.S.C.A. § 1635(a).

**[11] Judgment 228 ☞181(25)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(25) k. Mortgage Cases. Most Cited Cases
Genuine issue of material fact as to whether credit union had timely provided borrowers who took mortgage loan with disclosure statements and forms required by Truth in Lending Act (TILA) precluded summary judgment with respect to counterclaim asserted by borrowers in mortgage foreclosure action, which was based on alleged violations of TILA. Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.; Rules Civ.Proc., Rule 56(c).

**[12] Consumer Credit 92B ☞51**

92B Consumer Credit
    92BII Federal Regulation
        92BII(B) Disclosure Requirements
            92Bk51 k. Form and Sufficiency of Disclosure in General. Most Cited Cases
A lender's failure to timely provide borrower with notice of their right to cancel and other disclosure statements in manner prescribed by Truth in Lending Act (TILA) constitutes a violation of TILA.

**[13] Consumer Credit 92B ☞51**

92B Consumer Credit
    92BII Federal Regulation
        92BII(B) Disclosure Requirements
            92Bk51 k. Form and Sufficiency of Disclosure in General. Most Cited Cases
Misstatement by credit union in notice of right to cancel loan transaction it provided to borrowers with respect to day on which right to cancel transaction pursuant to Truth in Lending Act (TILA) expired, in which credit

union stated date more than three business days following date of transaction, and thus actually benefitted borrowers by extending recission period, materially complied with requirements of Regulation Z, and thus did not result in violation of TILA. Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.; 12 C.F.R. § 226.23(a, b).

**[14] Consumer Credit 92B ☞32**

92B Consumer Credit
    92BII Federal Regulation
        92BII(A) In General
            92Bk32 k. Truth in Lending, in General. Most Cited Cases
Strict compliance with technical requirements of Truth in Lending Act (TILA) is generally required. Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.

**[15] Consumer Credit 92B ☞51**

92B Consumer Credit
    92BII Federal Regulation
        92BII(B) Disclosure Requirements
            92Bk51 k. Form and Sufficiency of Disclosure in General. Most Cited Cases
Requisite strict compliance with requirements of Truth in Lending Act (TILA) does not necessarily mean punctilious compliance if, with minor deviations from the language of TILA, there is still a substantial, clear disclosure of the fact or information demanded by the applicable statute or regulation. Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.

**[16] Consumer Credit 92B ☞51**

92B Consumer Credit
    92BII Federal Regulation
        92BII(B) Disclosure Requirements
            92Bk51 k. Form and Sufficiency of Disclosure in General. Most Cited Cases
Disclosure by lender regarding date on which borrower's right to rescind transaction pursuant to Truth in Lending Act (TILA) expires that recites a date later than the third business day following the date of the transaction as date of expiration does not prejudice the con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sumer's statutory right of rescission, but actually benefits the consumer by extending the rescission period, and thus materially complies with Regulation Z and does not result in violation of TILA. Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.; 12 C.F.R. § 226.23(a, b).

**[17] Antitrust and Trade Regulation 29T ⬅141**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk139 Persons and Transactions Covered Under General Statutes
                29Tk141 k. Consumers, Purchasers, and Buyers; Consumer Transactions. Most Cited Cases
    (Formerly 92Hk1 Consumer Protection)

**Antitrust and Trade Regulation 29T ⬅146(1)**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk139 Persons and Transactions Covered Under General Statutes
                29Tk146 Trade or Commerce; Business Activity
                    29Tk146(1) k. In General. Most Cited Cases
    (Formerly 92Hk6 Consumer Protection)
Transaction in which credit union made mortgage loan fell within ambit of statutes prohibiting unfair or deceptive trade practices; loan was an activity involving conduct of any trade and commerce, and borrowers were "consumers" within meaning of statutes. HRS §§ 480-1, 480-2.

**[18] Judgment 228 ⬅181(25)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(25) k. Mortgage Cases. Most

Cited Cases
Genuine issue of material fact as to whether credit union's loan officer negotiated mortgage loan with borrowers in a deceptive manner, and whether allegedly deceptive representations regarding interest rate applicable to loan caused borrowers to do that which they would not otherwise have done, precluded summary judgment with respect to counterclaim for unfair and deceptive trade practices asserted by borrowers in credit union's mortgage foreclosure action. HRS § 480-2; Rules Civ.Proc., Rule 56(c).

**[19] Antitrust and Trade Regulation 29T ⬅128**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk126 Constitutional and Statutory Provisions
                29Tk128 k. Purpose and Construction in General. Most Cited Cases
    (Formerly 382k862 Trade Regulation, 92Hk3 Consumer Protection)
Statute which makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful, like its federal counterpart in Federal Trade Commission (FTC) Act, was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair, or deceptive business practices for the protection of both consumers and honest businesspersons. Federal Trade Commission Act, § 1 et seq., 15 U.S.C.A. § 41 et seq.; HRS § 480-2.

**[20] Antitrust and Trade Regulation 29T ⬅135(1)**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk135 Practices Prohibited or Required
                    29Tk135(1) k. In General; Unfairness. Most Cited Cases
    (Formerly 92Hk4 Consumer Protection)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A practice is unfair, within meaning of statute which makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful, when it offends established public policy, and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. HRS § 480-2.

**[21] Antitrust and Trade Regulation 29T ⬅➝128**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk126 Constitutional and Statutory Provisions
            29Tk128 k. Purpose and Construction in General. Most Cited Cases
      (Formerly 92Hk3 Consumer Protection)
Consumer protection statute which makes unlawful any unfair methods of competition, and unfair or deceptive acts or practices in the conduct of any trade or commerce, is remedial in nature, and must be liberally construed in order to accomplish the purpose for which it was enacted. HRS § 480-2.

**[22] Statutes 361 ⬅➝236**

361 Statutes
   361VI Construction and Operation
      361VI(B) Particular Classes of Statutes
         361k236 k. Remedial Statutes. Most Cited Cases
Remedial statutes are liberally construed to suppress the perceived evil and advance the enacted remedy.

**[23] Antitrust and Trade Regulation 29T ⬅➝209**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(C) Particular Subjects and Regulations
         29Tk209 k. Finance and Banking in General; Lending. Most Cited Cases
      (Formerly 92Hk6 Consumer Protection)
A violation of federal Truth in Lending Act (TILA)

does not, per se, constitute a violation of statute which makes unlawful unfair methods of competition, and unfair or deceptive acts or practices in the conduct of any trade or commerce, since conduct in violation of TILA does not necessarily offend an established public policy, or constitute an immoral, unethical, oppressive, unscrupulous or substantially injurious practice. Truth in Lending Act, § 102 et seq., 15 U.S.C.A. § 1601 et seq.; HRS § 480-2.

**[24] Fraud 184 ⬅➝3**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k2 Elements of Actual Fraud
         184k3 k. In General. Most Cited Cases
To constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to his or her damage.

**[25] Fraud 184 ⬅➝12**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k8 Fraudulent Representations
         184k12 k. Existing Facts or Expectations or Promises. Most Cited Cases
To be actionable as fraud, a false representation must relate to a past or existing material fact, and not to the happening of future events.

**[26] Fraud 184 ⬅➝12**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k8 Fraudulent Representations
         184k12 k. Existing Facts or Expectations or Promises. Most Cited Cases
Fraud generally cannot be predicated upon statements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 P.3d 1
94 Hawai'i 213, 11 P.3d 1
**(Cite as: 94 Hawai'i 213, 11 P.3d 1)**

Page 6

that are promissory in their nature at the time they are made, and that relate to future actions or conduct.

**[27] Fraud 184 🔷12**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k12 k. Existing Facts or Expectations or Promises. Most Cited Cases
A promise relating to future action or conduct will be actionable as fraud if the promise was made without the present intent to fulfill the promise.

**[28] Banks and Banking 52 🔷100**

52 Banks and Banking
    52III Functions and Dealings
        52III(A) Banking Franchises and Powers, and Their Exercise in General
            52k100 k. Torts. Most Cited Cases
Mortgagors could not rely on representations allegedly made by credit union loan officer during negotiations as to interest rate which would be applicable to mortgage loan to support fraud claim, where mortgagors acknowledged that they did not actually rely on such representations when they actually executed loan agreement reflecting a different interest rate.

**[29] Judgment 228 🔷181(25)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(25) k. Mortgage Cases. Most Cited Cases
Genuine issue of material fact as to whether alleged representation by credit union loan officer, during negotiation of mortgage loan transaction, that it would be "no problem" to change loan's interest rate in the future, could be interpreted as a promise made by officer without intent that it be fulfilled in the future, precluded summary judgment with respect to fraud counterclaim asserted by mortgagors in mortgage foreclosure action.

Rules Civ.Proc., Rule 56(c).

**\*\*4\*216** Gary V. Dubin, on the briefs, Honolulu, for the defendants-appellants Arthur K. Keka and Shirley A. Keka.
Matthew G. Jewell and Keith M. Yonamine, (of Ashford & Wriston), on the briefs, Honolulu, for the plaintiff-appellee Hawaii Community Federal Credit Union.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by LEVINSON, J.
The defendants-appellants Arthur K. Keka and Shirley A. Keka (collectively, the Kekas) appealed from the judgment of the circuit court of the third circuit, entered on May 26, 1999, pursuant to a summary judgment order against the Kekas and in favor of the plaintiff-appellee Hawaii Community Federal Credit Union (the Credit Union) with respect to (1) all claims asserted by the Credit Union in its complaint to foreclose mortgage and (2) the Kekas' counterclaims. Pursuant to this court's order, filed on May 30, 2000, the circuit court entered an amended final judgment. On appeal, the Kekas argue that the circuit court erred in: (1) granting summary judgment in favor of the Credit Union, inasmuch as the Credit Union's motion was unsupported by admissible evidence sufficient to establish either a defaulted loan or a past due amount; (2) granting summary judgment in favor of the Credit Union, inasmuch as there were genuine issues of material fact as to the Kekas' liability and the rights asserted in their counterclaims; (3) granting the Credit Union a certification of finality pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) (2000),[FN1] inasmuch as there were unresolved issues concerning the Kekas' affirmative defenses and counterclaims; (4) failing to allow the Kekas a continuance in order to conduct discovery pursuant to HRCP Rule 56(f) (2000),[FN2] inasmuch as counsel, who had first appeared for the Kekas at the hearing on the motion for summary judgment, needed additional time to obtain necessary evidence; and (5) failing to enter adequate findings of fact. We agree with the Kekas that (1) the Credit Union failed to support its motion for summary judgment with admissible evidence of the Ke-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

kas' alleged default in the repayment of their loan and (2) genuine issues of material fact precluded summary judgment with respect to the Kekas' counterclaims based on (a) alleged violations of the Truth in Lending Act (15 U.S.C. §§ 1601 through 1692), (b) alleged unfair or deceptive trade practices in violation of Hawai'i Revised Statutes (HRS) ch. 480, and (c) alleged fraudulent misrepresentation.[FN3] Accordingly, we partially vacate **5 *217 the circuit court's amended final judgment, filed on June 14, 2000 in favor of the Credit Union and against the Kekas, and remand the matter to the circuit court for further proceedings consistent with this opinion.

FN1. HRCP Rule 54(b) provides in relevant part:

**Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

FN2. HRCP Rule 56(f) provides:

**When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

FN3. We need not reach the Kekas' third, fourth, and fifth points of error on appeal because (1) the circuit court's HRCP Rule 54(b) certification was superceded by the circuit

court's entry of its amended final judgment on June 14, 2000, which resolved all claims of all parties in the present matter, (2) the Kekas will have an opportunity to conduct discovery on remand, and (3) the circuit court was not required to enter any findings of fact in ruling on the Credit Union's motion summary judgment. *See* HRCP Rule 52(b) (2000) ("Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56[.]").

## I. BACKGROUND

### A. *Factual History*

On June 7, 1994, the Kekas borrowed $65,000.00 from the Credit Union, to be repaid in monthly installments over twenty years with interest at an annual rate of nine percent. The loan was secured by a mortgage on the Kekas' residence. The purpose of the loan was to refinance a previous loan. The Kekas allege that they had a prior agreement with the Credit Union that the interest rate on their loan would be seven and one-fourth percent, but that they were offered a nine percent interest rate at the time of the closing of the transaction on June 7, 1994. They allege that they were "induced" to enter into the transaction by a loan officer of the Credit Union, who represented that it would be "no problem" to change the interest rate at a later time, "when the in house rate changes." They further allege that, one year later, they attempted to have the interest rate on their loan lowered to seven and one-fourth percent, but the same loan officer represented to them that it would be "too much trouble." The Kekas have no finance or business experience and relied on the Credit Union's loan officer when they entered into the transaction. The Kekas allege that, on June 7, 1994, they were "induced" to sign a copy of the "Notice of the Right to Cancel" and "Disclosure Statement" required by the Truth in Lending Act (TILA), but that they did not receive copies of those documents until April 1998. On August 17, 1998, the Kekas attempted to cancel their mortgage loan by sending a letter to the Credit Union, stating:

I am exercising my right to cancel my mortgage

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

loan with [the Credit Union], pursuant to the 1995 amendments to the Truth in Lending Act and Regulation Z. By operation of Federal Law, the security interest and mortgage note is void automatically upon your receiving of this notice of rescission by way of recoupment.

The violation committed by your company is the failure to provide the required notice of right to cancel....

### B. *Procedural History*

On October 5, 1998, the Credit Union filed a complaint to foreclose mortgage against the Kekas, in which it alleged that the Kekas had defaulted on the installment payments prescribed by the loan and owed the Credit Union $59,802.47, in addition to interest and other charges. On November 24, 1998, the Kekas, proceeding *pro se,* responded with a counterclaim, in which they alleged in relevant part as follows:

... Plaintiff's [sic] raise defenses under Title 15 U.S.C. § 1601, Truth in Lending Act (TILA), rescission by way of recoupment, unfair and deceptive practices, and misrepresentation as a counterclaim against the foreclosure action brought by [the Credit Union.]

....

### COUNT I

....

Defendant's [sic] negligently misrepresented material facts to the Keka's [sic] which Mr. And Mrs. Keka reasonably relied; and said false statements induced the Keka's [sic] to take a security interest on the Keka's principal dwelling which the Keka's [sic] relied to their substantial detriment and as direct and proximate result have sustained substantial damages.

### COUNT II

....

The loan documents were not presented to Keka's [sic], including but not limited to incompleteness and/ or absence of the Disclosure Statement and the Notice of the Right to Cancel and Defendants presented Plaintiff more than 3 years after the 3 day cancellation period, with the intent of and for the purpose of defrauding the Keka's [sic] and as a direct and proximate result of said fraud, Plaintiff has sustained pecuniary general and special damages in an amount of not less than $65,000.

**\*\*6 \*218** COUNT III

....

[The Credit Union] has violated Chapter 480, ... Hawaii Revised Statutes, by engaging in unfair and deceptive trade practices and as a direct and proximate result, Plaintiff has sustained substantial pecuniary, general and special damages in an amount not less than $65,000.00 and said sums are being trebled pursuant to Chapter 480....

### COUNT IV

....

Defendants conduct is in direct violation of 15 U.S.C. § 1601, et seq., Regulation Z, 15U.S.C. § 1635(b), and as a direct and proximate result, Plaintiffs have sustained statutory damages of $1,000.

### COUNT V

....

Defendants, and each of them, intentionally and/or negligently caused Plaintiff to sustain severe emotional distress, and as a direct and proximate result, Plaintiff has sustained general and special damages in an amount to be proved at trial.

The Kekas attached affidavits to their counterclaim, asserting, *inter alia,* (1) that they did not receive copies of the "Notice of the Right to Cancel" and "Disclosure Statement" until April 1998, (2) that they were first informed by the Credit Union's loan officer that the in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 P.3d 1
94 Hawai'i 213, 11 P.3d 1
(Cite as: 94 Hawai'i 213, 11 P.3d 1)

Page 9

terest rate on their loan would be nine percent, instead of seven and one-fourth percent, on June 7, 1994, the day loan documents were signed, which "caught [them] unprepared," and (3) that the Credit Union was mistaken as to the amount owed by the Kekas.

On January 5, 1999, the Credit Union filed a motion for summary judgment against the Kekas with respect to (1) the relief sought in its complaint of foreclosure and (2) the claims for relief asserted in the Kekas' counterclaim; correlatively, the Credit Union sought HRCP Rule 54(b) certification, *see supra* note 1, and the entry of a final

Regarding the Kekas' counterclaim, Paranial attached "true" copies of the "Right to Cancel" and "Truth in Lending Disclosure Statement" forms, signed by the Kekas on June 7, 1994.

On February 9, 1999, still proceeding *pro se,* the Kekas filed a memorandum in opposition to the Credit Union's motion for summary judgment, in which they argued, *inter alia,* (1) that they had a right to rescind their loan and mortgage on the grounds that the Credit Union had committed (a) various violations of TILA and (b) common law "fraud in inducement" and (2) that Paranial's affidavit contained inadmissible hearsay that (a) did not generate a rebuttable presumption of the delivery of the "disclosures" required by 15 U.S.C. § 1635(c) [FN4] and (b) violated the requirements of HRCP Rule 56(e) (2000),[FNS] as **7 *219 construed by this court in *Pacific Concrete Federal Credit Union v. Kauanoe,* 62 Haw. 334, 614 P.2d 936 (1980). The Kekas attached a declaration of Arthur Keka to their memorandum, in which he averred, *inter alia,* (1) that the Credit Union (a) had failed to deliver the notice of right to cancel and disclosure statements required by TILA, (b) " induced" the Kekas to sign copies of the notice of right to cancel and disclosure statement when the loan documents were

judgment. In support of its motion, the Credit Union attached the affidavit of Charles E. Paranial, who averred that he was an officer of the Credit Union "personally familiar with the payment history of [the Kekas]," that the Kekas were "in default under the terms of the Note and Mortgage for failing to timely make the payments due and owing thereunder," and that the unpaid balance as of December 30, 1998 was as follows:

| | |
|---|---|
| Principal: | $59,802.47 |
| Accrued Interest: | 4,417.81 |
| Accrued Late Charges: | 263.16 |
| Total: | $64,483.44 |

signed on June 7, 1994, (c) " induced" the Kekas to sign the loan documents providing for a nine percent interest rate, purportedly an "in house" rate, instead of the rate of seven and one-fourth percent, as previously agreed, (2) that the Credit Union's loan officer had represented that it would be "no problem" to change the interest rate applicable to their loan when the "in house" rate decreased, but that the same loan officer had refused the Kekas' request to change the rate a year later, stating that it would be "too much trouble," and (3) that the Kekas had no finance and business experience and had relied on the Credit Union's loan officer's advice. The Credit Union filed no reply to the Kekas' memorandum.

FN4. 15 U.S.C. § 1635(c) provides:

**Rebuttable presumption of delivery of required disclosures.** Notwithstanding any rule of evidence, written acknowledgment of receipt of any disclosures required under this subchapter by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN5. HRCP Rule 56(e) provides:

**Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The circuit court heard the Credit Union's motion for summary judgment on March 29, 1999. At the hearing, the Kekas were represented by counsel for the first time. They argued: (1) that the Credit Union had failed to adduce admissible evidence sufficient to entitle it to summary judgment; (2) that the Kekas' uncontradicted averments regarding the promised and actual interest rates on their loan created a genuine issue of material fact as to whether the Kekas were defrauded; (3) that the Credit Union's conduct constituted "unfair and deceptive business practice, the bait-and switch"; and (4) that the disclosure forms provided by the Credit Union were defective for purposes of satisfying TILA, inasmuch as they incorrectly stated (a) the date of expiration of the borrower's right to rescind the transaction and (b) the annual percentage rate. The Credit Union's counsel represented to the circuit court that he was unprepared to respond to the Kekas' newly advanced arguments,

inasmuch as they had not been raised in the Kekas' memorandum in opposition to the Credit Union's motion for summary judgment. The circuit court ordered the Kekas to submit their arguments in writing and accorded the Credit Union an opportunity to respond.

On April 9, 1999, the Kekas filed a "supplemental memorandum in further opposition to [the Credit Union's] motion for summary judgment," arguing, *inter alia,* that "[C]ongressional policy, as expressed by 15 [U.S.C. § ] 1635(c), precludes granting a creditor summary judgment on the basis of a receipt acknowledgment alone where plaintiffs deny by affidavit that they received the disclosures required by the [Truth in Lending] Act," (quoting *Powers v. Sims & Levin Realtors,* 396 F.Supp. 12, 22-23 (E.D.Va.1975), *aff'd in part and rev'd in part on other grounds,*542 F.2d 1216 (4th Cir.1976)), and that a violation of TILA amounted to a *per se* violation of HRS ch. 480. The Kekas further argued that, inasmuch as they had been represented by counsel for several weeks only, they should be permitted to conduct discovery with respect to the issues of misrepresentation, breach of contract, and failure to disclose and deliver documents. In a declaration submitted pursuant to HRCP Rule 56(f), *see supra* note 2, the Kekas' counsel averred that "there [were] facts essential to the resolution of this case that [would] require ... discovery, and that that evidence [was] needed in order to completely oppose the pending summary judgment motion[.]" On April 15, 1999, the Credit Union filed a response to the Kekas' supplemental memorandum, together with a "supplemental affidavit" of Paranial with attachments, which included a ledger and payment history regarding the Kekas' mortgage loan and a copy of the Kekas' "Disclosure Statement," all certified as "business records."

On April 20, 1999, the circuit court entered an "Order Granting Plaintiff's Motion for Summary Judgment Against All Defendants, Decree of Foreclosure and Order of Sale filed January 5, 1999," which recited that

**8 *220 the Court having considered Plaintiff's Motion for Summary Judgment Against All Defendants, Decree of Foreclosure and Order of Sale filed January 5, 1999, the opposition, the supplemental memoranda

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and affidavits and having heard the arguments of counsel,

It Is Hereby Ordered Adjudged and Decreed:

The Motion is granted. There is no genuine issue of material fact, and Plaintiff is entitled to summary judgment as a matter of law.

On April 20, 1999, the Kekas moved *ex parte* to strike the Credit Union's "supplemental affidavit." The circuit court filed an order striking the "supplemental affidavit" on April 23, 1999. However, the Kekas' did not move for rescission or amendment of the April 20, 1999 or- der.

On May 26, 1999, the circuit court entered "Findings of Fact, Conclusions of Law and Order Granting Plaintiff's Motion for Summary Judgment Against All Defendants, Decree of Foreclosure and Order of Sale Filed 1/05/99." The circuit court's findings of fact adopted Paranial's as- sertion regarding the Kekas' default in payment of their loan and the specific amounts owing, as set forth in Paranial's first affidavit. The circuit court entered the following conclusions of law:

10. This court has jurisdiction over all the parties in this action and all the claims presented therein.

11. [The Kekas'] Note and Mortgage were and are valid and enforceable according to their terms, without set off, claims or other affirmative defenses.

12. Plaintiff is entitled to accelerate the indebted- ness due under [the Kekas'] Note and Mortgage and the entire unpaid principal balance under the said Note is now due and owing.

13. All sums due, and to become due, respectively, to Plaintiff under [the Kekas'] Note and Mortgage constitute a valid first mortgage lien upon the Prop- erty described in said Mortgage, and Plaintiff is en- titled to have its Mortgage foreclosed, and all the Property covered by said Mortgage sold in the man- ner prescribed by law.

Therefore, the circuit court entered an order providing

in relevant part:
It Is Hereby Ordered, Adjudged And Decreed:

(1) On April 20, 1999, the Court entered its Order Granting Plaintiff's Motion for Summary Judgment Against All Defendants, Decree of Foreclosure and Order of Sale filed January 5, 1999, granting sum- mary judgment in favor of the Plaintiff on all claims asserted in its Complaint to Foreclose Mortgage; Ex- hibits "A" and "B"; Summons filed October 5, 1998 and against Defendants Keka on their Counterclaim filed November 24, 1998, which Order is incorpor- ated herein by reference;

(2) That said Mortgage in favor of Plaintiff shall be and is hereby foreclosed as prayed ... and that the Property described under said Mortgage, shall be sold as hereinafter set forth;

...

(10) There being no just reason for delay, this shall be an express direction that judgment be entered, pur- suant to Rules 54(b) and 58, H.R.C.P., as to all claims determined by this Order.

On the same day, the circuit court entered a "Judgment Based Upon Findings of Fact, Conclusions of Law and Order Granting Plaintiff's Motion for Summary Judg- ment Against All Defendants, Decree of Foreclosure and Order of Sale Filed 1/05/99," which provided as follows:
Pursuant to Plaintiff's Findings of Fact, Conclu- sions of Law and Order Granting Plaintiff's Motion for Summary Judgment Against All Defendants, De- cree of Foreclosure and Order of Sale Filed January 5, 1999, filed concurrently herein (the "Decree"), and the Court's determination that there is no just reason for delay under Rule 54(b), [HRCP], and the express direction for the entry of this judgment,

It Is Hereby Ordered, Adjudged and Decreed That, Judgment is entered, pursuant to Rules 54(b) and 58, [HRCP], in favor of Plaintiff as to all claims against Defendants [*i.e.*, the Kekas] as determined by the De- cree filed concurrently herein, in the above-entitled

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 P.3d 1
94 Hawai'i 213, 11 P.3d 1
(Cite as: 94 Hawai'i 213, 11 P.3d 1)

Page 12

cause.

**\*\*9 \*221** The Kekas' timely notice of appeal was filed on June 25, 1999. On May 26, 2000, we temporarily remanded the matter to the circuit court for entry of an amended final judgment on both the Credit Union's complaint and the Kekas' counterclaims and afforded the parties an opportunity to submit supplemental briefs.

## II. *STANDARD OF REVIEW*

[1][2][3] We review [a] circuit court's [grant or denial] of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. [v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85,] 104, 839 P.2d [10,] 22, [*reconsideration denied,*74 Haw. 650, 843 P.2d 144 (1992) ] (citation omitted). As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see...*HRCP ... Rule 56(c) (1990).

*Bronster v. United Public Workers,* 90 Hawai'i 9, 13, 975 P.2d 766, 770 (1999) (quoting *Roxas v. Marcos,* 89 Hawai'i 91, 116, 969 P.2d 1209, 1234 (1998) (quoting *Estate of Doe v. Paul Revere Ins. Group,* 86 Hawai'i 262, 269-70, 948 P.2d 1103, 1110-11 (1997) (quoting *Morinoue v. Roy,* 86 Hawai'i 76, 80, 947 P.2d 944, 948 (1997))) (some brackets added and some in original)).

"A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.,* 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Konno v. County of Hawai'i,* 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen,* 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996))...."The evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.,* 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire,* 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*Estate of Doe,* 86 Hawai'i at 270, 948 P.2d at 1111 (quoting *Morinoue,* 86 Hawai'i at 80, 947 P.2d at 948).

*Dairy Road Partners v. Island Ins. Co., Ltd.,* 92 Hawai'i 398, 411, 992 P.2d 93, 106 (2000).

## III. *DISCUSSION*

A. *Inadmissibility Of Evidence Adduced By The Movant Precluded Summary Judgment.*

[4] The Kekas argue that the evidence set forth in or attached to Paranial's affidavit, by which the Credit Union sought to establish the Kekas' default and the amounts due on their loan, constituted inadmissible hearsay and, therefore, that there was no factual basis upon which the circuit court could legitimately enter summary judgment in favor of the Credit Union. We agree.

[5] "[T]he rule in Hawai'i is that '[a]n affidavit consisting of inadmissible hearsay cannot serve as a basis for awarding or denying summary judgment.' "*GE Capital Hawaii, Inc. v. Miguel,* 92 Hawai'i 236, 242, 990 P.2d 134, 140 (App.1999) (quoting *Nakato v. Macharg,* 89 Hawai'i 79, 89, 969 P.2d 824, 834 (App.1998)) (some brackets added and some in original); *Rodriguez v. Nishiki,* 65 Haw. 430, 434 n. 3, 653 P.2d 1145, 1148 n. 3 (1982); *Cahill v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 539, 543 P.2d 1356, 1367 (1975) ("To the extent that the affidavits [do] not comply with [HRCP

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 P.3d 1
94 Hawai'i 213, 11 P.3d 1
(Cite as: 94 Hawai'i 213, 11 P.3d 1)

Rule 56(e),] they should be disregarded."). The facts of *GE Capital* are remarkably similar to those in the present matter. In an action by a mortgagee to foreclose on a loan secured by the debtor's residence, the defendants-mortgagors asserted a counterclaim for rescission, pursuant to **10 *222 TILA, based upon alleged nondisclosure and misrepresentation. The mortgagee's motion for summary judgment was supported by an affidavit of one of its officers, who asserted, on the basis of "personal knowledge," that the mortgagors had "failed, neglected, and refused" to pay in accordance with their loan agreement and recited the amounts allegedly due. The Intermediate Court of Appeals (ICA) reversed the circuit court's summary judgment in favor of the mortgagee on the ground that, by failing to attach sworn or certified copies of documents to which the affiant referred in his affidavit, the mortgagee had not met its initial burden of production as movant for summary judgment.

The *GE Capital* court, in turn, relied on this court's decision in *Pacific Concrete Federal Credit Union v. Kauanoe,* 62 Haw. 334, 614 P.2d 936 (1980), in which we similarly reversed a summary judgment in favor of a creditor because the facts regarding the defendant-debtor's payment history, as set forth in an affidavit in support of the creditor's motion for summary judgment, were not properly before the court, inasmuch as the affidavit merely referred to a ledger and certain checks and vouchers without attaching certified or sworn copies of them to the affidavit. We held that HRCP Rule 56(e), *see supra* note 5, required that

> facts set forth in ... affidavits [supporting motions for summary judgment] be admissible in evidence. All papers referred to in the affidavits must also be attached and sworn to or certified. These requirements are mandatory.... [M]ere statements in affidavits do not authenticate exhibits referred to unless these exhibits are sworn to or certified.

*Pacific Concrete,* 62 Haw. at 336-37, 614 P.2d at 938 (citation omitted).

The only distinction between the affidavits deemed insufficient by the *GE Capital* and *Pacific Concrete*

courts, on the one hand, and the Paranial affidavit in the present matter, on the other, is that Paranial did not even bother to identify the Credit Union's records on which he was relying, but merely asserted that he was "personally familiar with the [Kekas'] payment history."

Pursuant to HRCP Rule 56(c), however, affidavits in support of a motion for summary judgment "shall be made upon personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Consequently, affidavits which state ultimate or conclusory facts or conclusions of law cannot be utilized in support of a motion for summary judgment.

*GECC Financial Corp. v. Jaffarian,* 79 Hawai'i 516, 524-25, 904 P.2d 530, 538-39 (App.) (citing *Miller v. Manuel,* 9 Haw.App. 56, 66, 828 P.2d 286, 292 (App.1991)), *modified on other grounds,*80 Hawai'i 118, 905 P.2d 624 (1995); *see also Miller,* 9 Haw.App. at 66, 828 P.2d at 292 ("Affidavits in support of a summary judgment motion are scrutinized to determine whether the facts they aver are admissible at trial and are made on the personal knowledge of the affiant.").

[6][7] Paranial's bald allegation that he was "familiar" with the Kekas' payment history does not satisfy the foregoing foundational requirement. Obviously, an affiant does not comply with the imperative of HRCP Rule 56(e) to produce and authenticate the records upon which he or she is relying merely by omitting any reference to them in the affidavit. *See Cole Taylor Bank v. Corrigan,* 230 Ill.App.3d 122, 172 Ill.Dec. 114, 595 N.E.2d 177, 181-82 (1992) (holding that, where bank officer's "affidavit essentially consisted of a summary of unnamed records at the bank," unaccompanied by records themselves and unsupported by facts establishing basis of officer's knowledge, foundation was lacking for admission of officer's opinion regarding amount due on loan); *cf. Kam Fui Trust v. Brandhorst,* 77 Hawai'i 320, 327-28, 884 P.2d 383, 390-91 (App.1994) (ruling summary of contents of voluminous writing to be admissible, pursuant to Hawai'i Rules of Evidence (HRE) Rule 1006 (1993), only when underlying documents are themselves admissible, and failure to make underlying

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

documents available to objecting party for examination renders summary inadmissible). Absent the requisite foundation, Paranial's statements regarding the Kekas' default and the amount of their indebtedness were inadmissible, and the circuit court erred **11 *223 in relying upon them in granting summary judgment in the Credit Union's favor.[FN6]

> FN6. The Credit Union notes in its brief that properly authenticated copies of its records were attached to Paranial's second affidavit, which was itself attached to the Credit Union's response to the Kekas' supplemental memorandum in opposition to the motion for summary judgment. However, as we have noted, the circuit court struck Paranial's second affidavit, inasmuch as it violated the court's order that the Credit Union's response be limited to answering arguments raised in the Kekas' written opposition, and the Credit Union did not obtain the circuit court's leave to adduce additional post-hearing evidence. On appellate review, we consider only the evidence properly before the circuit court. *See, e.g., State v. Onishi,* 53 Haw. 593, 597, 499 P.2d 657, 660 (1972).

B. *Genuine Issues Of Material Fact Precluded Summary Judgment.*

The Kekas argue that the facts alleged in their affidavits and declaration in opposition to the Credit Unions' motion for summary judgment and in support of their affirmative defenses and counterclaims were sufficient to generate triable issues and preclude summary judgment.

1. *The Truth in Lending Act*

Initially, and as a general matter, the Kekas assert that the Credit Union violated TILA by (1) failing timely to provide them with notice of their right to cancel and (2) once notice was provided, incorrectly exhibiting (a) the date of expiration of the Kekas' right to cancel and (b) the "annual percentage rate."

The declared purpose of [TILA] is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a); *see Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 363-368, 93 S.Ct. 1652, 1657-1660, 36 L.Ed.2d 318 (1973). Accordingly, [TILA] requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights. *See* §§ 1631, 1632, 1635, 1638. Failure to satisfy [TILA] subjects a lender to criminal penalties for noncompliance, *see* § 1611, as well as to statutory and actual damages traceable to a lender's failure to make the requisite disclosures, *see* § 1640. Section 1640(e) provides that an action for such damages "may be brought" within one year after a violation of [TILA], but that a borrower may assert the right to damages "as a matter of defense by recoupment or set-off" in a collection action brought by the lender even after the one year is up.

Going beyond these rights to damages, [TILA] also authorizes a borrower whose loan is secured with his "principal dwelling," and who has been denied the requisite disclosures, to rescind the loan transaction entirely "until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later."§ 1635(a).... [TILA] provides, however, that the borrower's right of rescission "shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first," even if the required disclosures have never been made. § 1635(f). [TILA] gives a borrower no express permission to assert the right of rescission as an affirmative defense after the expiration of the 3-year period.

*Beach v. Ocwen Federal Bank,* 523 U.S. 410, 412-13, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998) (footnote omit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ted).

Accordingly, in *Beach,* the United States Supreme Court held that TILA "permits no federal right to rescind, defensively or otherwise, after the 3 year period of § 1635(f) has run." *Id.* at 419. The *Beach* Court explained as follows:

It is useful to look ahead to [15 U.S.C.] § 1640 with its provisions for recovery of damages. Subsection (e) reads that the 1-year limit on actions for damages "does not **12 *224 bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law." 15 U.S.C. § 1640(e). Thus the effect of the 1-year limitation provision on damages actions is expressly deflected from recoupment claims. The quite different treatment of rescission stands in stark contrast to this, however, there being no provision for rescission as a defense that would mitigate the uncompromising provision of § 1635(f) that the borrower's right "shall expire" with the running of the time.

*Id.* at 418-19, 118 S.Ct. 1408.

[8][9][10] The holding in *Beach* is dispositive of the Kekas' contention that TILA accorded them the right to rescind their loan transaction. Their right to rescission expired, at the latest, three years after they entered into the transaction, *i.e.,* on June 7, 1997, and their attempt to assert that right as a defense in the Credit Union's action to foreclose on the mortgage on their residence was as ineffective as their original attempt to rescind the transaction by sending the cancellation notice to the Credit Union on August 17, 1998.[FN7]

FN7. The Kekas suggest that *Beach* should not be applied retroactively, inasmuch as, prior to 1998, when *Beach* was decided, the prevailing view had been that the three-year limit of 15 U.S.C. § 1635(f) did not apply to a rescission claim asserted defensively. Their argument, however, is foreclosed by the holding in *Harp-*

*er v. Virginia Dept. of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), that "[w]hen this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule ."*Id.* at 97, 113 S.Ct. 2510. *See also Fidler v. Central Cooperative Bank,* 226 B.R. 734, 737 n. 7 (Bankr.D.Mass.1998) ("Although the events giving rise to this litigation predated the Supreme Court's decision in *Beach,* that decision has full retroactive effect in this case because it is still an open case subject to direct review.") (Citing *Harper.*). Furthermore, even if we were to apply this jurisdiction's applicable retroactivity test, namely, that "[w]here substantial prejudice results from the retrospective application of new legal principles to a given set of facts, the inequity may be avoided by giving the guiding principles prospective application only,"*Catron v. Tokio Marine Management, Inc.,* 90 Hawai'i 407, 411, 978 P.2d 845, 849 (1999) (quoting *State v. Ikezawa,* 75 Haw. 210, 214-15, 857 P.2d 593, 597-98 (1993)), which is, in essence, the test formerly espoused by the United States Supreme Court, *see Chevron Oil Co. v. Huson,* 404 U.S. 97, 106-07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), but subsequently abrogated, *see Harper, supra,* the *Beach* holding would still control, inasmuch as the Kekas have failed to demonstrate any prejudice that would result from the retroactive application of *Beach,* much less that *Beach* has established a new legal principle in this jurisdiction.

[11][12] However, *Beach* makes clear that the Kekas were entitled to assert their recoupment claim based upon the Credit Union's alleged violation of TILA. As we have noted, the Kekas allege that they did not timely receive notice of their right to cancel and other disclosure statements from the Credit Union, as required by TILA. A lender's failure to provide these documents in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the prescribed manner constitutes a violation of TILA. 15 U.S.C. § 1638(b); *Bartholomew v. Northampton Nat'l Bank of Easton, Easton, PA.,* 584 F.2d 1288, 1296 (3 Cir.1978) (TILA "requires that creditors make full disclosure prior to the extension of credit").

As attachments to Paranial's affidavit, the Credit Union produced "true" copies of the TILA disclosures, which the Kekas admit they signed on June 7, 1994. The Kekas counter in their affidavits and declaration, however, that they did not receive copies of the documents at the time. TILA provides that "written acknowledgment of receipt of any disclosures required under this subchapter by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof." 15 U.S.C. § 1635(c). The case law of other jurisdictions is well settled that a debtor's affidavit averring non-delivery is sufficient to create a genuine issue of material fact as to whether the statutory presumption had been rebutted, thereby precluding summary judgment with respect to a claim based upon a debtor's assertion of non-delivery. *Stone v. Mehlberg,* 728 F.Supp. 1341, 1353-54 (W.D. Mich.1989 & Supp. Opinion 1990); *Powers v. Sims & Levin Realtors,* 396 F.Supp. 12, 22-23 (E.D.Va.1975) ("congressional**13 *225 policy, as expressed by 15 U.S.C. § 1635(c), precludes granting a creditor summary judgment on the basis of a receipt acknowledgment alone where the [debtors] deny by affidavit that they received the disclosures required by [TILA]"); *Cintron v. Bankers Trust Co.,* 682 So.2d 616, 616-17 (Fla.Dist.Ct.App.1996); *Award Lumber & Constr. Co., Inc. v. Humphries,* 110 Ill.App.3d 119, 65 Ill.Dec. 676, 441 N.E.2d 1190, 1191-92 (1982) (discussing relevant case law and concluding that, "while an affidavit of non-delivery from defendant in this case would have sufficed to create a material issue of fact, the mere allegation thereof ... is insufficient to rebut the presumption raised by the signed acknowledgment of receipt"). We therefore hold that the Kekas' affidavits and declaration raised a genuine issue of material fact as to whether the Credit Union timely provided the Kekas with the disclosures required by TILA. Having done so, we must, on that basis alone, vacate the circuit court's sum-

mary judgment in favor of the Credit Union with respect to Count Four of the Kekas' counterclaim for damages allegedly resulting from the foregoing violation of TILA.

[13][14] The Kekas further urge that the documents proffered by the Credit Union as the statutorily required disclosures did not comply with the standards prescribed by TILA, inasmuch as the date of expiration of the Kekas' right to cancel the transaction, which the Credit Union stated as "June 13, 1994," and the annual percentage rate of interest, stated as "8.9994%," were incorrect. Federal law generally requires strict compliance with the technical requirements of TILA. *See, e.g., Jackson v. Grant,* 890 F.2d 118, 120 (9th Cir.1989) (incorrect expiration date that was prior to actual consummation of loan); *Semar v. Platte Valley Fed. Sav. & Loan Ass'n.,* 791 F.2d 699, 704 (9th Cir.1986) (expiration date omitted); *Riopta v. Amresco Residential Mortgage Corp.,* 101 F.Supp.2d 1326 (D.Haw.1999) (improperly dated notice of right to cancellation). Federal courts have held that "[t]he legal inquiry about the quality of disclosure is not directed at whether the credit consumer was actually confused or misled.... The court must engage only in an objective inquiry into the violation of specific provisions of TILA requirements." *Jenkins v. Landmark Mortgage Corp. of Virginia,* 696 F.Supp. 1089, 1095 (W.D.Va.1988) (citing *Powers,* 542 F.2d at 1219).

[15] Nevertheless, it has been acknowledged that "[s]trict compliance does not necessarily mean punctilious compliance if, with minor deviations from the language of [TILA], there is still a substantial, clear disclosure of the fact or information demanded by the applicable statute or regulation." *Smith v. Chapman,* 614 F.2d 968, 972 (5th Cir.1980). Thus, in ruling that a particular manner of disclosure violated TILA, the courts have invariably discussed why the disclosure was confusing, misleading, or otherwise potentially detrimental to the borrower. *See, e.g., Jenkins, supra.* In the cases involving noncompliance with the requirement that the date of expiration of the right of rescission be disclosed, lenders have either failed to disclose the expiration date altogether or stated a rescission period shorter than

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

three days, "counter to the basic rationale for a rescission, [*i.e.,*] 'to give the debtor an opportunity to reflect in the quiet of his home' without undue pressure." *Jenkins,* 696 F.Supp. at 1095 n. 4 (quoting *Rudisell v. Fifth Third Bank,* 622 F.2d 243, 249 n. 9 (6th Cir.1980), and *Curry v. Fidelity Consumer Discount Co.,* 656 F.Supp. 1129, 1131 (E.D.Pa.1987)). When a lender allows a borrower to cancel the loan transaction during a period greater than the three days prescribed by TILA, no such prejudice to the borrower results.

The Credit Union's notice to the Kekas of their right to cancel informed that, "[i]f you cancel by mail or by telegram, you must send the notice no later than midnight of *June 13, 1994* (or midnight of the third business day following the latest of the three events listed above)," (*i.e.,*"(1) the date of transaction, which is *June 7, 1994;* or (2) the date you received your [TILA] disclosures; or (3) the date you received this notice of your right to cancel"). (Emphasis added.) Inasmuch as June 7, 1994 was a Tuesday, the third business day thereafter was Friday, June 10, 1994. The Kekas insist that the Credit Union **14 *226** was required to state "June 10, 1994," rather than "June 13, 1994," in the disclosure.FN8

> FN8. The Credit Union has pointed out that June 10, 1994 was a Hawai'i state holiday, King Kamehameha Day, and June 11 and 12 fell on Saturday and Sunday, so that June 13 was, in fact, the third business day following June 7. However, the Federal Reserve System's Regulation Z, which governs TILA disclosure requirements, provides that
>
> "Business day" means a day on which the creditor's offices are open to the public for carrying on substantially all of its business functions. However, for purposes of rescission under [12 C.F.R.] §§ 226.15 and 226.23, and for purposes of § 226.31, the term means all calendar days except Sundays and the legal public holidays specified in 5 U.S.C. [§ ] 6103(a), such as New Year's Day, the Birthday of Martin Luther King, Jr., Washington's Birthday, Memorial Day, Independence Day,

Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, and Christmas Day.

> 12 C.F.R. § 226.2(a)(6). Inasmuch as 5 U.S.C. § 6103(a) does not currently list King Kamehameha Day as a legal holiday, and Saturdays do not count toward the rescission period pursuant to Regulation Z, *see supra,* the Credit Union actually overstated the Kekas' statutory entitlement to rescind by three days in its notice of right to cancel.

[16] 12 C.F.R. §§ 226.1 through 226.29, known as "Regulation Z," which implements TILA's detailed disclosure requirements, provides in relevant part that "[t]he consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last." 12 C.F.R. § 226.23(a). In 12 C.F.R. § 226.23(b), the regulation provides that "[t]he notice [of right to rescind] shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose ... (v)[t]he date the rescission period expires." Thus, although the regulation entitles the consumer to rescind "until midnight of the third business day following consummation," it merely directs the creditor "clearly and conspicuously" to disclose "the date the rescission period expires." Inasmuch as a disclosure that recites a date *later* than the third business day following the date of the transaction as being "the date the rescission period expires" does not *prejudice* the consumer's statutory right of rescission, but actually *benefits* the consumer by extending the rescission period, we hold that such a disclosure materially complies with 12 C .F.R. § 226.23(b)(v).FN9 Accordingly, we reject the Kekas' argument that the Credit Union's notice of right to cancel violated TILA on the grounds of nondisclosure of the expiration of the rescission period.FN10

> FN9. Some federal courts have stated that failure to notify the consumer of the precise date of expiration of the right to rescind constitutes a technical violation of TILA. *See Mayfield v. Vanguard Sav. & Loan Ass'n,* 710 F.Supp. 143,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

146 (E.D.Pa.1989) ("With respect to the rescission notices, the Board's regulations require creditors to provide customers with a notice of their right to rescind that specifies, *inter alia*, the precise date upon which the three day rescission period expires. 12 C.F.R. 226.23(b)(5)."); *Semar*, 791 F.2d at 701 ("TILA and its regulations, issued by the Federal Reserve System, 12 C.F.R. §§ 226.1-.29 ('Reg.Z'), require the lender to provide a form stating the specific date on which the three-day rescission period expires."). However, these pronouncements are dicta, insofar as the lenders in these cases omitted the expiration date from the prescribed notices altogether. To our knowledge, no federal court has held that a lender violated the TILA disclosure requirements by reciting an expiration date *later* than the third business day following consummation of the transaction.

FN10. Because the Kekas failed on appeal to advance any legal argument to support their claim that the annual percentage rate of interest stated in the Credit Union's disclosure statement was incorrect, we do not address their point of error in that regard. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7) (2000) ("Points not argued may be deemed waived.").

*2. HRS ch. 480*

The Kekas next contend that genuine issues of material fact as to whether the Credit Union's conduct violated HRS §§ 480-2 (1993) [FN11] and 480-12 (1993) [FN12] precluded the **15 *227 circuit court from entering summary judgment in the Credit Union's favor and against them on Count Three of their counterclaim and the Credit Union's foreclosure action, respectively. In particular, the Kekas rely on the Credit Union loan officer's alleged representations (1) prior to closing, that the Kekas' loan would bear a seven and one-fourth percent interest rate, rather than the nine percent actually charged at closing, and (2) at the time of closing, that it would be "no problem" to lower the rate "when the in

house rate changes," which the Credit Union later disavowed. The Kekas characterize the Credit Union's alleged conduct as a "bait-and-switch."

FN11. HRS § 480-2 provides in relevant part:

**Unfair competition, practices, declared unlawful.**(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

(b) In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended.

FN12. HRS § 480-12 provides that "[a]ny contract or agreement in violation of this chapter is void and is not enforceable at law or in equity."

[17] As a threshold matter, we note that the transaction at issue in the present matter falls within the ambit of HRS ch. 480, inasmuch as (1) a loan extended by a financial institution is activity involving "conduct of any trade and commerce" and (2) loan borrowers are "consumers" within the meaning of HRS § 480-1 (1993).[FN13] The first of these propositions is a consequence of our holding in *Cieri v. Leticia Query Realty, Inc.*, 80 Hawai'i 54, 905 P.2d 29 (1995), in which we construed HRS § 480-2, *see supra* note 11, to limit claims of unfair or deceptive trade practices, within the purview of HRS chapter 480, to transactions occurring within a "business context," *id.* at 65,905 P.2d at 40, which, by their very nature, include transactions conducted by a financial institution. *See Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir.1993) (holding that transactions by pawn shop constituted loans subject to TILA and violated HRS § 480-2); *Baird v. Norwest Bank*, 255 Mont. 317, 843 P.2d 327, 334 (1992) (holding that Montana Unfair Trade Practices and Consumer Protection Act governed making and col-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lecting consumer loans by banks); *Russell v. Fidelity Consumer Discount Co.,* 72 B.R. 855, 870-72 (Bankr.E.D.Pa.1987) (Pennsylvania Unfair Trade Practices and Consumer Protection law applied to conduct of commercial lender). The second proposition derives from our holding in *Cieri* that "real estate or residences qualify as 'personal investments' pursuant to HRS § 4801"; accordingly, the Kekas "qualify as 'consumers' who 'committed money in a personal investment.' " *Cieri,* 80 Hawai'i at 69, 905 P.2d at 44.

> FN13. HRS § 480-1 provides in relevant part that " 'Consumer' means a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment."

[18] The term "bait and switch" is usually applied in the context of advertising goods or services with the intent not to sell them as advertised.

> The practice of modifying proposed terms of a contract as the negotiations proceed is not at all analogous to "bait and switch" selling. The recognized deceptive practice of "bait and switch" involves an advertisement and offer of a product which is not bona fide because what the merchant actually has on hand and intends to sell is significantly different from that which drew the potential customer in. The technique, which is essentially a variant of false advertising, involves luring prospective purchasers through the "bait" of a desirable item, and then talking the customer into or steering him over to a less desirable item, presumably with greater profit margin for the seller. The trick is to lure the prospective "sucker" and then overwhelm him with glib salesmanship. The essence of this practice is that the seller really has no intention of delivering the product advertised.

*Goldberg v. Manhattan Ford Lincoln-Mercury, Inc.,* 129 Misc.2d 123, 492 N.Y.S.2d 318, 322 (N.Y.Sup.Ct.1985) (citations omitted). *See also Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 157 Cal.Rptr. 392, 598 P.2d 45, 52 (1979); *Tashof v. Federal Trade*

*Comm'n.,* 437 F.2d 707, 709 n. 3 (D.C.Cir.1970) (citing *Guides Against Bait Advertising,*16 C.F.R. § 238); *Garcia v. Overland Bond & Inv. Co.,* 282 Ill.App.3d 486, 218 Ill.Dec. 36, 668 N.E.2d 199, 204 (1996) ("bait and switch occurs[, within the meaning of Illinois Consumer Fraud Act,] when a seller makes alluring but insincere offer to sell a product or service that advertiser in truth does not intend or want to sell") (internal quotation signals **16 *228 omitted) (citations omitted); *Ford Motor Credit Co. v. Russell,* 519 N.W.2d 460, 463 (Minn.Ct.App.1994) (advertising eleven percent interest rate and providing financing to customer at thirteen and three-quarters of percent rate was not bait and switch operation when lender offered eleven percent rate to qualified customers); *Brashears v. Sight'N Sound Appliance Centers, Inc.,* 981 P.2d 1270 (Okla.Civ.App.1999) (Oklahoma Consumer Protection Act expressly prohibits "bait and switch" advertising); *Parrott v. Carr Chevrolet, Inc.,* 156 Or.App. 257, 965 P.2d 440, 448-49 (1998) (Oregon Unlawful Trade Practices Act expressly prohibits "bait and switch transactions," making it unlawful to advertise goods with intent not to provide them as advertised).

However, several courts have referred to "bait and switch" practices in contexts not involving public advertising. *See, e.g., S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir.1996) (court construed as claim for relief sounding in tort allegations that defendant engaged in "bait and switch" tactic by luring plaintiff into exclusive negotiations with false promises and making preliminary loan proposals with attractive terms, thereafter changing terms of loan to plaintiff's detriment); *Cummings v. Warren Henry Motors, Inc.,* 648 So.2d 1230, 1233 (Fla.Ct.App.1995) (plaintiff sufficiently stated claim for relief for violation of Florida's Deceptive and Unfair Trade Practices Act by claiming that defendant used "bait and switch" tactic in representing transaction to be sale and in fact having plaintiff sign lease); *Miles Rich Chrysler-Plymouth, Inc. v. Mass,* 201 Ga.App. 693, 411 S.E.2d 901, 904-05 (Ga.Ct.App.1991) (jury could find a variation of "bait and switch" scheme, in violation of Georgia's Fair Business Practices Act, when defendant car dealer led plaintiff to believe that she had ordered vehicle, but no

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such vehicle had been ordered or available, and defendant subsequently tried to pressure plaintiff into buying more expensive vehicle).

[19][20] As the cases cited *supra* demonstrate, "bait and switch" practices are proscribed by consumer protection laws. Inasmuch as the Kekas do not aver that the Credit Union engaged in misleading advertising, but, rather, that it misrepresented the interest rate that would be available to them, the present matter does not involve the classic "bait and switch" scenario but, instead, a variation on the theme. In any event, the averments in their affidavits and declaration raise the issue whether they were victims of an unfair or deceptive business practice.

The phrase "unfair or deceptive acts or practices in the conduct of any trade or commerce" is not defined in HRS chapter 480. However, HRS § 480-3 ( [1993] ) provides that the chapter "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes[,]" and HRS § 480-2 is "a virtual counterpart of § 5(a)(1) of the Federal Trade Commission Act."*Island Tobacco Co. v. R.J. Reynolds Tobacco Co.,* 63 Haw. 289, 300, 627 P.2d 260, 268 (1981) (footnote omitted). Our supreme court has stated, "HRS § 480-2, as its federal counterpart in the FTC Act, was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest business[persons]." *Ai v. Frank Huff Agency, Ltd.,* 61 Haw. 607, 616, 607 P.2d 1304, 1311 (1980) (footnote omitted).

In *Rosa v. Johnston,* 3 Haw.App. 420, 651 P.2d 1228 (1982), we adopted the definition set forth in *Spiegel, Inc. v. FTC,* 540 F.2d 287, 293 (7th Cir.1976), that "[a] practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rosa,* 3 Haw.App. at 427, 651 P.2d at 1234. The federal cases have defined deception as an act causing, as a natural and probable result, a person to do that which he [or she] would not otherwise do. *Bockenstette v. FTC,* 134

F.2d 369 (10th Cir.1943). However, the cases indicate that actual deception need not be shown; the capacity to deceive is sufficient. *Goodman v. FTC,* 244 F.2d 584 (9th Cir.1957).

*State ex rel. Bronster v. United States Steel Corp.,* 82 Hawai'i 32, 51, 919 P.2d 294, 313 (1996) (quoting **17*229*Eastern Star, Inc. v. Union Building Materials Corp.,* 6 Haw.App. 125, 132-33, 712 P.2d 1148, 1154 (1985)) (some brackets added and some in original) (footnote omitted).

The record in the present matter contains very scanty evidence of the circumstances surrounding the Kekas' loan transaction. Beyond what appears in the Kekas' affidavits and declaration, there is no evidence regarding when the Kekas applied for the loan, when precisely the alleged misrepresentations were made, what precisely was allegedly promised to the Kekas, whether any of the alleged statements were in writing, and whether the seven and one-fourth percent interest rate was ever offered by the Credit Union to any of its customers during the relevant time period.[FN14] Neither the Credit Union nor the Kekas conducted any discovery, and, in pursuing its motion for summary judgment, the Credit Union largely ignored the Kekas' counterclaims and defenses based on the alleged promise of a seven and one-fourth percent interest rate.

> FN14. Paranial's second affidavit, attached to the Credit Union's response to the Kekas' supplemental memorandum in opposition to the Credit Union's motion for summary judgment, avers (1) that the Kekas applied for the loan in April 1994, (2) that an initial TILA disclosure statement, dated April 11, 1994 and signed by the Kekas, informed the Kekas of the nine percent interest rate applicable to the loan for which they had applied, and (3) that, between April 1994 and June 1994, the Credit Union had not made any mortgage loans to anyone at an annual percentage rate lower than seven and three-quarters percent. However, as noted above, the circuit court struck the affidavit, and the evidence contained in it is therefore not before us as part of the record in this appeal.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nevertheless, the Kekas' averments raise a genuine issue of material fact as to whether the Credit Union's loan officer negotiated the loan with the Kekas in a deceptive manner, and, in particular, whether the alleged representations during the negotiation of the interest rate caused the Kekas, "as a natural and probable result," to believe that the interest rate to be charged on their loan would be seven and one-fourth percent and, therefore, "to do that which [they] would not otherwise do." *See United States Steel Corp.,* 82 Hawai'i at 51, 919 P.2d at 313. If, at the time when the loan documents were ready to be signed and the Kekas were faced with a nine percent rate, the Credit Union "unethically" or "unscrupulously" attempted to influence the Kekas to execute them by way of further deceptive representations, designed, as the Kekas allege, to alleviate their concerns that the interest rate was not that for which they had bargained by assuring them that the actual rate would be seven and one-fourth percent, *see id.,* then the Credit Union's conduct would indeed be analogous to a "bait and switch." *See Goldberg,* 492 N.Y.S.2d at 322. Such conduct would have been (1) "unethical, oppressive, unscrupulous and substantially injurious to consumers" and (2) would have reinforced the tendency to cause the Kekas, "as a natural and probable result," to enter into the transaction they may otherwise have declined, thus violating HRS § 480-2 as an unfair and deceptive trade practice. *See United States Steel Corp.,* 82 Hawai'i at 51, 919 P.2d at 313.

[21][22][23] Our consumer protection statute is remedial in nature and must be liberally construed in order to accomplish the purpose for which it was enacted. *Cieri,* 80 Hawai'i at 68, 905 P.2d at 43 (citing *Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 123, 883 P.2d 38, 44 (1994)). "Remedial statutes are liberally construed to suppress the perceived evil and advance the enacted remedy." *Id.* (Brackets omitted). Applying this principle, and viewing the present record and the inferences drawn therefrom in the light most favorable to the Kekas, there is a genuine issue of material fact as whether the Credit Union engaged in unfair and deceptive trade practices, in violation of HRS ch. 480.[FN15]

FN15. The Kekas further argue that a violation

of TILA constitutes a *per se* violation of HRS § 480-2. The United States District Court for the District of Hawai'i has held to the contrary. *Riopta v. Amresco Residential Mortgage Corp.,* 101 F.Supp.2d 1326, 1332-34 (D.Haw.1999). We agree with *Riopta* that TILA and HRS § 480-2 have differing "scope and application." *Id.* TILA was intended to ensure informed credit decisions by consumers, whereas HRS § 480-2 was designed to prevent fraudulent business practices directed against consumers. Thus, although the ultimate objective of both statutes is consumer protection, they effect their common purpose by non-coextensive means. Several courts have held that violations of TILA did not necessarily offend other consumer protection laws, *see Riopta,* 101 F.Supp.2d at 1334, and the cases cited therein. Accordingly, as illustrated by sections III.B.1 and 2 of this opinion, distinct analyses are required to determine whether conduct violating TILA is also violative of HRS § 480-2. Specifically, failure to provide the borrower with TILA-required disclosure statements does not, as a *per se* matter, violate HRS § 480-2, inasmuch as such conduct does not necessarily offend an established public policy or constitute an immoral, unethical, oppressive, unscrupulous or substantially injurious practice. *Cf. Riopta, supra.*

**\*\*18 \*230** 3. *Common law fraud*

[24][25][26][27][28][29] The Kekas alleged in Count One of their counterclaim that the Credit Union "negligently represented material facts to [the Kekas, on which they] reasonably relied; and said false statements induced [the Kekas to give the Credit Union security interest in their] principal dwelling ... to their substantial detriment." On appeal, the Kekas argue that the Credit Union's conduct amounted to "fraud in inducement" constituting grounds for "common law rescission."

To constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the pur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 P.3d 1
94 Hawai'i 213, 11 P.3d 1
(Cite as: 94 Hawai'i 213, 11 P.3d 1)

pose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to [his or her] damage.

The false representation, to be actionable, must relate to a past or existing material fact, and not to the happening of future events [.] Generally, fraud cannot be predicated upon statements [that] are promissory in their nature at the time they are made and [that] relate to future actions or conduct. A promise relating to future action or conduct will be actionable, however, if the promise was made without the present intent to fulfill the promise[.]

*Honolulu Fed. Sav. & Loan Ass'n v. Murphy,* 7 Haw.App. 196, 201-02, 753 P.2d 807, 811-12 (1988) (first, third, and fourth brackets added) (internal quotation marks and citations omitted); *accord Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) (listing the elements of fraud in the inducement); *Stahl v. Balsara,* 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978) (discussing past or present fact requirement).

*Pancakes of Hawaii, Inc. v. Pomare Properties Corp.,* 85 Hawai'i 300, 312, 944 P.2d 97, 109 (App.1997) (brackets in original).

The Kekas may not predicate their fraud claim on the promise of seven and one-fourth percent interest rate allegedly made by the Credit Union's loan officer during the negotiation of the loan, inasmuch as they acknowledged that they did not rely on it when they actually executed the loan agreement. The record is uncontroverted that, prior to signing the loan documents on June 7, 1994, they were aware that the interest rate appearing on the loan papers was nine percent. The Kekas averred, however, that they discussed the possibility of lowering the rate with the loan officer, who allegedly represented that it would be "no problem" to change the interest rate on their loan in the future. Their averments are sufficient to generate a genuine issue of material fact with respect to their common law fraud claim because a reasonable trier of fact could construe the loan officer's representation as a promise, "made without the present in-

tent to fulfill" it, to lower the rate at a future time. *Pancakes,* 85 Hawai'i at 312, 944 P.2d at 109. Such a construction could be bolstered by the loan officer's alleged response, one year later, to the Kekas' request that the rate be reduced to seven and one-quarter percent, to the effect that it would be "too much trouble" to do so. That alleged response, which directly contradicted the alleged earlier promise, as opposed to merely explaining why the promise could not be fulfilled, could inferentially suggest that the loan officer's promise was illusory from the beginning, lacking any intention of fulfillment.

## IV. *CONCLUSION*

Based on the foregoing analysis, we partially vacate the circuit court's amended final judgment, filed on June 14, 2000 in favor of the Credit Union and against the Kekas, and **19 *231 remand the matter for further proceedings, consistent with this opinion, with respect to the Credit Union's complaint for foreclosure and Counts One, Three, and Four of the Kekas' counterclaim. In all other respects, the circuit court's amended final judgment is affirmed.

Hawai'i,2000.
Hawaii Community Federal Credit Union v. Keka
94 Hawai'i 213, 11 P.3d 1

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

FIND Request: 7 Haw. App. 196

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo
753 P.2d 807
Citation:

HONOLULU FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff-Appellee,
v.
Thomas H. MURPHY and Grant E. Marsh, Defendants-Appellants,
and
John Does 1-20, Mary Roes 1-20, Doe Corporations 1-20, Doe Partnerships 1-20,
Doe Associations 1-20, Doe Governmental Agencies 1-20, and Other Doe Entities
1-20, Defendants.
No. 11921.
Feb. 12, 1988.

Bank, as holder of note, brought action against guarantor. The First Circuit Court, Honolulu County, Robert G.
Klein, J., granted bank's motion for summary judgment, and guarantor appealed. The Intermediate Court of
Appeals, Tanaka, J., held that: (1) guarantor did not show fraud in the inducement; (2) guarantor did not show
impairment of collateral; but (3) genuine issue of material fact existed as to whether bank had modified guaranty
by agreeing to include forfeiture on other security before proceeding against guarantor.

Vacated and remanded.
West Headnotes

[1] Evidence k404
157k404

When written contract of guaranty is complete and not uncertain or ambiguous, writing will be presumed to contain
the entire agreement, and parol or extrinsic evidence is inadmissible to vary the terms of the written agreement.

[2] Evidence k434(1)
157k434(1)

Where it appears that written agreement has been conceived in fraud, parol evidence rule is inapplicable.

[3] Evidence k434(8)
157k434(8)

Parol or extrinsic evidence is admissible to show that execution of guaranty was procured by fraud.

[4] Contracts k94(1)
95k94(1)

[4] Fraud k7
184k7

"Fraud in the inducement" is fraud which induces the transaction by misrepresentation of motivating factors; "fraud
in the factum" is fraud which goes to the nature of the document itself; "constructive fraud" is characterized by the
breach of fiduciary or confidential relationship.

[5] Fraud k12
184k12

To be actionable, false representation must relate to a past or existing material fact and not to the happening of future events.

[6] Fraud k12
184k12

Promise relating to future action or conduct will be actionable if the promise was made without the present intent to fulfill the promise.

[7] Contracts k99(3)
95k99(3)

Standard of proving fraud with respect to written contracts is extremely high, and written contract will be cancelled only in clear case of fraud supported by clear and convincing evidence.

[8] Fraud k24
184k24

One element of fraudulent inducement is that a representation of a material fact was made for the purpose of inducing the other party to act.

[9] Guaranty k20
195k20

Guaranty was not invalid on theory of fraud in the inducement based on representation made by bank to debtor rather than guarantor, that it would make an additional loan to debtor's corporation in the absence of showing that that representation was made to the debtor in order to obtain the guaranty.

[10] Banks and Banking k100
52k100

Letters in which bank informed debtor that it did not have resources to fund project of debtor's corporation did not show that any representation made by bank to debtor at time that it took note from him concerning future loans to his corporation was made with the intent of not making the loan.

[11] Evidence k318(1)
157k318(1)

Newspaper article relating to "top-level management shakeup" of holder of note was hearsay which was not admissible in action on guaranty.

[12] Appeal and Error k863
30k863

Document and deposition which were not part of record which lower court considered in determining motion for summary judgment could not be considered on appeal.

[13] Guaranty k25(3)
195k25(3)

Evidence did not show bank's fraudulent intent not to perform its alleged promise to forbear or guaranty pending foreclosure on debtor's collateral and thus did not show that statement concerning forbearance was a fraudulent inducement of the guaranty.

[14] Contracts k238(2)
95k238(2)

Written contract can subsequently be orally modified if all the requisites of a valid or enforceable contract are met, including new consideration.

[15] Contracts k56
95k56

[15] Guaranty k16(4)
195k16(4)

Holder's agreement to forbear action against guarantor pending efforts to collect on debtor's collateral and guarantor's agreement to provide information needed by the holder to foreclose on the collateral were mutual reciprocal promises constituting good and sufficient consideration for valid contract and modification of guaranty.

[16] Bills and Notes k148.1
56k148.1
(Formerly 56k148)

Guaranty agreement is not a "negotiable instrument" under the Uniform Commercial Code. HRS s 490:3-102(1)(e).

[17] Guaranty k60.5
195k60.5
(Formerly 195k601/2)

Express reference in note to guaranty made guarantor a "party to the instrument" entitled to assert defense of impairment of collateral in action on guaranty. HRS s 490:3-606(1)(b).

[18] Guaranty k60.5
195k60.5
(Formerly 195k601/2)
Bank had no duty to maintain or preserve value of stock pledged by debtor as collateral by loaning money to the corporation, so that failure to make the loan was not an unjustified impairment of collateral which would be a defense to action on guaranty.

Contracts k236
95k236

Contracts k237(1)
95k237(1)

A written contract can subsequently be orally modified if all of the requisites of a valid or enforceable agreement are met. A requisite is that the modification must be supported by new consideration.

Judgment k185.3(8)
228k185.3(8)

Where defendant has affirmatively interposed fraud in the inducement as a defense, in resisting plaintiff's motion for summary judgment defendant must place in the record affirmative evidence of plaintiff's fraudulent intent.

Pledges k28
303k28

Under HRS s 490:9-207(1), the pledgee's duty of reasonable care is confined to the physical care of the collateral, and he is not liable for a decline in the value of pledged instruments.

Secured Transactions k89
349Ak89

HRS s 490:3-606(1)(b) imposes essentially the same duties on secured holders in possession of the collateral as HRS s 490:9-207 imposes on secured parties in possession of the collateral.

Secured Transactions k164.1
349Ak164.1
(Formerly 349Ak164)

There is no unjustifiable impairment of collateral unless there is a duty, a breach of that duty, and consequential damages.

**808 Syllabus by the Court

1. Where a written contract of guaranty is complete and unambiguous, the writing will be presumed to contain the entire agreement and parol or extrinsic evidence **809 is inadmissible to vary the terms of the written instrument.

2. Parol or extrinsic evidence is admissible to show that the execution of a guaranty was procured by fraud.

3. Fraud in the inducement is fraud which induces the transaction by misrepresentation of motivating factors.

4. To constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to his damage.

5. To be actionable, the false representation must relate to past or existing material fact. Fraud cannot be predicated upon a statement which is promissory in its nature at the time it is made and which relates to future action or conduct. However, if the promise was made without the present intent to fulfill the promise, it will be actionable.

6. Unless the present state of mind is misstated, there is no misrepresentation. When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action for deceit or for equitable relief.

7. Where defendant has affirmatively interposed fraud in the inducement as a defense, in resisting plaintiff's motion for summary judgment defendant must place in the record affirmative evidence of plaintiff's fraudulent intent.

8. A written contract can subsequently be orally modified if all of the requisites of a valid or enforceable agreement are met. A requisite is that the modification must be supported by new consideration.

9. Plaintiff's agreement to forbear and defendant's agreement to provide certain information desired by plaintiff were mutual reciprocal promises and constituted good and sufficient consideration for a contract.

10. A guaranty agreement is not a negotiable instrument under Hawaii's Uniform Commercial Code, Hawaii Revised Statutes (HRS) Chapter 490 (1985).

11. Where the promissory note does not bear defendant's signature but expressly refers to a guaranty signed by defendant, the defendant-guarantor is a "party to the instrument" within the meaning of HRS s 490:3-606(1)(b), which provides for the discharge of "any party to the instrument to the extent that without such party's consent the holder ... [u]njustifiably impairs any collateral for the instrument given by or on behalf of the party[.]"

12. HRS s 490:3-606(1)(b) imposes essentially the same duties on secured holders in possession of the collateral as HRS s 490:9-207 imposes on secured parties in possession of the collateral.

13. There is no unjustifiable impairment of collateral unless there is a duty, a breach of that duty, and consequential damages.

14. Under HRS s 490:9-207(1), the pledgee's duty of reasonable care is confined to the physical care of the collateral, and he is not liable for a decline in the value of pledged instruments.

*210 James M. Sattler (Frederick W. Rohlfing, III with him on the briefs), Honolulu, for defendant-appellant Grant E. Marsh.

Susan Oki Mollway (Stanley K.W. Chong with her on the brief, Cades Schutte Fleming & Wright, of counsel), Honolulu, for plaintiff-appellee.

*196 Before BURNS, C.J., and HEEN and TANAKA, JJ.

TANAKA, Judge.

In an action involving the collection on a promissory note and the enforcement of a guaranty for the repayment of the note, defendant Grant E. Marsh (Marsh), the guarantor, appeals the *198 summary judgment in favor of plaintiff Honolulu Federal Savings and Loan Association (Honfed), the payee on the note. Since there are genuine issues of material fact regarding a defense raised by Marsh, we hold that the lower **810 court improperly granted the summary judgment. We therefore vacate the judgment and remand the case for further proceedings.

I. FACTS

On September 28, 1984, defendant Thomas H. Murphy (Murphy) signed a promissory note for a $400,000 personal loan from Honfed. The note was secured by a pledge of 5,700 shares of stock of M.S.M. & Associates, Inc. (MSM) and a third mortgage covering real property in Colorado. Murphy was the president of MSM. The note required Murphy to pay interest only each month from November 20, 1984, $16,666.67 plus interest per month from October 20, 1985, and the principal balance and interest in full on September 28, 1986. On October 3, 1984, Marsh signed a guaranty agreement (Guaranty) for the repayment of Murphy's note. Murphy defaulted on the note and Honfed filed a complaint for collection against Murphy and Marsh on December 19, 1985. The foregoing facts are not in dispute.

Murphy answered the complaint and counterclaimed, alleging that Honfed's breach of an agreement to loan MSM $30 million [FN1] that was to be used for the development of the Ewa Marina Community Project, [FN2] rendered

Murphy incapable of repaying his $400,000 loan and caused him, inter alia, "severe and substantial mental anguish and emotional distress." Record, Vol. 1 at 22.

FN1. Honolulu Federal Savings and Loan Association (Honfed) loaned M.S.M. & Associates, Inc. (MSM) $7,500,000. MSM subsequently defaulted on the loan. Whether Honfed agreed to loan a total of $30 million to MSM is the subject of the dispute in First Circuit Court Civil No. 86-3087, Honolulu Federal Savings and Loan Association v. M.S.M. & Associates, Inc., presently under appeal in No. 12397.

FN2. Grant E. Marsh (Marsh) purchased 40,000 shares of stock of MSM at $65 per share in 1983, and became a director of MSM. As part of the agreement, MSM entered into a development contract with Turnmar Development Company, of which Marsh was the president.

Marsh answered the complaint and cross-claimed, seeking a judgment against Murphy if Honfed was entitled to a judgment *199 against Marsh. The answer also alleged Honfed's agreement to loan $30 million to MSM which Honfed had breached.
Honfed's motion for partial summary judgment [FN3] against Murphy and Marsh was granted on October 1, 1986. After the lower court denied Marsh's motion for reconsideration and certified the summary judgment as to its finality under Hawaii Rules of Civil Procedure (HRCP) Rule 54(b), Marsh timely appealed. [FN4]

FN3. Honfed moved for partial summary judgment on all claims and the counterclaim between Honfed and Thomas H. Murphy (Murphy) and Marsh. The motion did not involve Marsh's cross-claim against Murphy.
FN4. Murphy filed a pro se "Joinder in Appeal." Not having filed any briefs, however, he is deemed to have abandoned his appeal.

Marsh contends on appeal that the granting of summary judgment was error because there are genuine issues of material fact [FN5] regarding the following affirmative defenses he had raised:

FN5. Under Hawaii Rules of Civil Procedure (HRCP) Rule 56(c), a summary judgment will be sustained if the record discloses that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Also, "the evidence in the record and the inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party." Soukop v. Snyder, 6 Haw.App. 59, ---, 709 P.2d 109, 112 (1985). See also Fernandes v. Tenbruggencate, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (1982).

1. Honfed had fraudulently induced him to sign the Guaranty by its representation to loan $30 million to MSM;
2. Honfed had fraudulently induced him to sign the Guaranty by its representation that it would seek to recover on the collateral securing Murphy's loan first before proceeding on the Guaranty;
3. Honfed had modified the Guaranty by agreeing to conclude foreclosure on the third mortgage security before proceeding against Marsh; and
4. Honfed had impaired the value of the pledged MSM stock by breaching its agreement to loan $30 million to MSM, thereby **811 discharging Marsh in whole or in part from performing under the Guaranty.
We hold that there were no genuine issues of material fact and Honfed was entitled to a judgment as a matter of law as to defenses 1, 2, and 4, but there were genuine issues of material fact regarding defense 3. We will discuss each of these defenses in order.
*200 II. FRAUDULENT INDUCEMENT--THE MSM LOAN
Marsh initially claims that as indicated in the affidavits in the record, on March 23, 1984, Honfed orally agreed to loan $30 million to MSM, of which he had knowledge because he was a director of MSM. Marsh argues that Honfed made this loan commitment when it "did not have the resources to fund such a loan," and therefore "Honfed either made a representation that it knew was false or made a representation without knowledge whether the representation was true or false[.]" Consequently, Marsh concludes that Honfed's representation which he relied on in signing the Guaranty was fraud in the inducement, and the Guaranty is void.

Marsh contends that there are genuine issues of material fact regarding this defense and Honfed was not entitled to a summary judgment as a matter of law. We do not agree.
A.
Honfed's response is that since the Guaranty is an unambiguous, integrated written instrument, the parol evidence rule precludes Marsh from using extrinsic evidence to contradict, defeat, or modify its meaning or legal effect.

[1] The general rule is as stated by Honfed. Where a written contract of guaranty "is complete and not uncertain or ambiguous, the writing will be presumed to contain the entire agreement, and parol or extrinsic evidence is inadmissible to vary the terms of the written instrument." 38 Am.Jur.2d Guaranty s 124 at 1130 (1968). The rule has been "justified on the basis of reliance by the parties on the written document, and that to remove this reliance would destroy the confidence on which modern business has been built." Id. at 1131. See also Akamine & Sons,

Ltd. v. American Sec. Bank, 50 Haw. 304, 309, 440 P.2d 262, 266 (1968).

[2] However, where it appears that a written agreement has been "conceived in fraud[,]" the parol evidence rule is inapplicable. Cosmopolitan Fin. Corp. v. Runnels, 2 Haw.App. 33, 40, 625 P.2d 390, 396 (1981). Parol or extrinsic evidence is admissible "to show that execution of the guaranty was procured by fraud[.]" 38 Am.Jur.2d Guaranty s 124 at 1132.

[3] *201 Here, Marsh claims that he was fraudulently induced to sign the Guaranty. Consequently, he is not barred from the use of parol or extrinsic evidence to prove this defense.

We next consider the elements of fraud in the inducement.

### B.

[4] "Fraud in the inducement [FN6] is fraud which 'induces the transaction by misrepresentation of motivating factors[.]' " Adair v. Hustace, 64 Haw. 314, 320 n. 4, 640 P.2d 294, 299 n. 4 (1982) (quoting H. Dobbs, Remedies s 9.6 at 645 (1973)) (footnote added). We have stated:

FN6. Two other forms of fraud are "fraud in the factum" and "constructive fraud." "Fraud in the factum is fraud which goes to the nature of the document itself." Adair v. Hustace, 64 Haw. 314, 320 n. 4, 640 P.2d 294, 299 n. 4 (1982) (citing H. Dobbs, Remedies s 9.6 at 646 (1973)). Constructive fraud is characterized by the breach of fiduciary or confidential relationship. Silva v. Bisbee, 2 Haw.App. 188, 190, 628 P.2d 214, 216 (1981). To constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to [his] damage. **812 Dement v. Atkins & Ash, 2 Haw.App. 324, 327, 631 P.2d 606, 608 (1982) (citation omitted). See also Kang v. Harrington, 59 Haw. 652, 587 P.2d 285 (1978); Wolfer v. Mutual Life Ins. Co. of New York, 3 Haw.App. 65, 641 P.2d 1349 (1982) (alleged fraud in procuring guarantees).

[5][6][7] The false representation, to be actionable, must relate to a past or existing material fact, and not "to the happening of future events [.]" Stahl v. Balsara, 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978). See also Spudnuts, Inc. v. Lane, 131 Ariz. 424, 426, 641 P.2d 912, 914 (Ct.App.1982). Generally, "fraud cannot be predicated upon statements which are promissory in their nature at the time they are made and which relate to future actions or conduct." 37 Am.Jur.2d Fraud and Deceit, s 60 at 92 (1968). A promise relating *202 to future action or conduct will be actionable, however, if the promise was made "without the present intent to fulfill the promise[.]" Eastern Star, Inc. v. Union Bldg. Materials Corp., 6 Haw.App. 125, ---, 712 P.2d 1148, 1159 (1985). See also 37 Am.Jur.2d Fraud and Deceit, s 68 (1968). Moreover, the standard of proving fraud with respect to written contracts is extremely high, and a written contract will be cancelled only in a clear case of fraud supported by clear and convincing evidence. Kang v. Harrington, 59 Haw. at 656-57, 587 P.2d at 289; Dement v. Atkins & Ash, 2 Haw.App. at 327, 631 P.2d at 608.

### C.

[8][9] We apply the foregoing precepts to Marsh's first defense. Initially, we find that the record reveals that the alleged representation to loan $30 million was made by Honfed to MSM. There is nothing in the record showing that the representation was made by Honfed for the purpose of inducing Marsh, in his personal capacity, to sign the Guaranty to secure a note evidencing a personal loan to Murphy. An element of fraudulent inducement is that a representation of a material fact must be made for the purpose of inducing the other party to act. The lack of this element is fatal to Marsh's defense.

[10][11][12] More seriously, Marsh contends that at the time Honfed made the representation to loan $30 million to MSM, it had no intention of fulfilling the promise because it "did not have the resources to fund such a loan [.]" However, there is nothing in the record to support this contention. Marsh relies on two letters dated June 15, 1985 and July 7, 1985, respectively, signed by two different officers of Honfed, which in substance stated that Honfed did not have the resources to fund MSM's Ewa Marina project. [FN7] That evidence merely illustrates Honfed's inability to loan $30 million to MSM about 15 months after Honfed's alleged promise made on March *203 23, 1984. [FN8] At best, the evidence may support a claim for breach of contract, but not for fraud. As stated in a treatise on torts:

FN7. In opposing the motion for summary judgment, Marsh also submitted an article from the February 18, 1985 issue of the Pacific Business News relating to the "top-level management shake-up" of Honfed. The lower court could not consider this evidence since it was hearsay which would not be admissible at trial. See Wolfer v. Mutual Life Ins. Co. of New York, 3 Haw.App. 65, 68, 641 P.2d 1349, 1352 (1982).

FN8. In his reply brief, Marsh appended, inter alia, a copy of the minutes of Honfed loan committee meeting held on March 22, 1984, and a copy of the deposition of Honfed Vice President Albert Ho taken on March 26, 1987, in a related case (see note 1, supra ), to support his first defense. Since the document and deposition were not part of the record that the lower court considered in determining the motion for summary judgment, we may not consider them on appeal. Munoz v. Yuen, 66 Haw. 603, 605-06, 670 P.2d 825, 827 (1983). Unless the present

state of mind is misstated, there is of course no misrepresentation. When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action, either for deceit, or for equitable relief. Otherwise any breach of contract would call for such remedy. The mere breach of a promise is never enough in itself to establish the fraudulent intent. W. Keeton, Prosser and Keeton on the Law of Torts s 109 at 764 (5th ed. 1984) **813 (footnotes omitted). See also Robinson v. Perpetual Services Corp., 412 N.W.2d 562 (Iowa 1987).

There must be some affirmative evidence that Honfed possessed fraudulent intent. Aloha Petroglyph, Inc. v. Thomas, 1 Haw.App. 353, 354, 619 P.2d 518, 519 (1980). There is none in the record.

Accordingly, there was no genuine issue of material fact regarding Marsh's first defense and Honfed was entitled to a summary judgment as a matter of law.

### III. FRAUDULENT INDUCEMENT--FORBEARANCE ON THE GUARANTY

In his second defense, Marsh alleges that Honfed fraudulently induced him to sign the Guaranty by promising to complete foreclosure on the collateral securing Murphy's $400,000 note before looking to Marsh under the Guaranty. Marsh argues that since there were genuine issues of material fact regarding this defense, the granting of summary judgment was error. We disagree.

As stated above, a representation that is promissory in its nature may be actionable as fraud only if made without the present intent *204 to perform. As we also stated above, there must be some affirmative evidence of fraudulent intent.

[13] The record, viewed in the light most favorable to Marsh, is devoid of any evidence of Honfed's fraudulent intent not to perform its alleged promise to forbear on the Guaranty pending the foreclosure on Murphy's collateral securing the $400,000 note. Absent such intent, we must hold that "[b]ecause the bank's [alleged] representations as to how it intended to go about collecting the note in the event of default were promises as to future acts, they were insufficient as a matter of law to constitute fraud in the procurement of the guaranty." Rogers v. C. & S. Nat'l Bank, 156 Ga.App. 330, 330, 274 S.E.2d 722, 723 (1980).

Consequently, the lower court properly granted a summary judgment to Honfed on Marsh's second defense.

### IV. MODIFICATION OF THE GUARANTY

Marsh's third defense is based on his alleged claim that in January or February of 1986, after Honfed had commenced this action, William M. Borthwick, Jr. (Borthwick), Honfed's President and Chief Executive Officer, agreed to Marsh's request "that Honfed [would] first proceed and conclude proceedings against the mortgage Honfed had in Murphy's house in Colorado ... before looking to Marsh to pay any amounts owing under the Murphy loan." In other words, Marsh argues that the unconditional Guaranty had been modified. Based on our review of the record, we hold that there were genuine issues of material fact involving this defense.

[14] A written contract can subsequently be orally modified if all of the requisites of a valid or enforceable agreement are met. [FN9] Lo v. *205 First Trust Co. of Hilo, 25 Haw. 185, 187-88 (1919). See also 17 Am.Jur.2d Contracts s 465 (1964). A requisite is that the modification must be supported by new consideration. Brand S Corp. v. King, 102 Idaho 731, 639 P.2d 429 (1981); Boardman v. Dorsett, 38 Wash.App. 338, 685 P.2d 615 (1984).

FN9. We note that the alleged oral agreement to modify the Guaranty may be in violation of the Statute of Frauds which requires an agreement "[t]o charge any person upon any special promise to answer for the debt, default, or misdoings of another" to be in writing. Hawaii Revised Statutes (HRS) s 656-1(2) (1985). See also James D. Swoish, Inc. v. Panda Foods, Inc., 2 Haw.App. 679, 639 P.2d 426 (1982). However, since in challenging Marsh's modification of agreement defense in the lower court and on appeal, Honfed did not rely on the Statute of Frauds, which must be affirmatively asserted under HRCP Rule 8(c), we need not address its applicability.

[15] Marsh asserts that the consideration for the oral modification was that "certain information regarding the Colorado house" which Borthwick had requested and which Marsh had provided. Honfed argues that since Marsh's affidavit establishes that the undisclosed information about the Colorado house was requested and furnished **814 after Borthwick had agreed to Honfed's forbearance against Marsh, [FN10] the modification agreement was without consideration. The affidavit states, however, that Borthwick's request and Marsh's agreement to furnish the information were made "[d]uring the same conversation[.]" Viewing the statement in the light most favorable to Marsh, we must conclude that Honfed's agreement to forbear and Marsh's agreement to provide the information were mutual reciprocal promises, which constitute good and sufficient consideration for a valid contract. Guaschino v. Eucalyptus, Inc., 3 Haw.App. 632, 642, 658 P.2d 888, 895-96 (1983).

FN10. In the affidavit filed on August 28, 1986, Marsh states in paragraph 15: 15. In January or February 1986, during a telephone conversation I had with William M. Borthwick, Jr., President and Chief Executive Officer of HONFED, I requested, and Mr. Borthwick agreed, that HONFED would first proceed and conclude proceedings against the Colorado house before looking to me to pay HONFED any amounts owing under the Murphy Loan. During the same conversation, after Borthwick agreed that HONFED would first proceed and conclude

proceedings against the Colorado house before looking to me to pay HONFED any amounts owing under the Murphy Loan, Mr. Borthwick asked me to obtain certain information regarding the Colorado house. I agreed to and did provide Mr. Borthwick with the requested information. Record, Vol. 2 at 21.

Honfed submitted documentary evidence below to show that (1) Honfed, through its Colorado counsel, had submitted a "Notice of Intention to Redeem to the Public Trustee for the County of Douglas, State of Colorado," dated October 30, 1985, in the Colorado foreclosure proceeding involving Murphy's Colorado home and (2) it had obtained an appraisal report of the Colorado property in December 1985. Honfed argued to the lower court that it *206 could not "imagine what additional information it could have desired from Marsh that would have served as consideration for forbearance in enforcing the guaranty." Record, Vol. 2 at 191. Honfed's argument, however, goes to the credibility of Marsh's assertion; and it was not for the court to make this factual determination based on affidavits and documents appended thereto.

In our view there were genuine issues of material fact regarding the modification defense. Such factual issues as to what information, if any, Borthwick requested from Marsh and what Marsh agreed to do and actually did remain to be determined. Thus, Honfed was not entitled to summary judgment on this defense.

## V. IMPAIRMENT OF VALUE OF COLLATERAL

The last defense is that Honfed's breach of the alleged agreement to loan MSM $30 million destroyed or substantially impaired the value of the 5,700 shares of MSM stock which Murphy had pledged as collateral for the $400,000 loan, "thereby discharging Marsh in whole or in part from performing under the Guaranty." Marsh argues that there are genuine issues of material fact concerning this defense to preclude the granting of summary judgment. We hold that Honfed was entitled to a judgment as a matter of law on this defense.

### A.

In asserting this defense, Marsh relies on Hawaii Revised Statutes (HRS) s 490:3-606(1)(b) (1985) [FN11] which reads:

FN11. Hawaii Revised Statutes Chapter 490 (1985) is Hawaii's Uniform Commercial Code. Impairment of recourse or of collateral. (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

* * *

(b) Unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse. *207 Marsh claims that the defense under this section is "available to any party who is in the position of a surety," s 490:3-606 Comment 1, and the term "surety" includes a guarantor. HRS s 490:1-201(40) (1985).

[16] However, the term "instrument" in s 490:3-606 means "a negotiable instrument." HRS s 490:3-102(1)(e) (1985). A guaranty agreement is not a negotiable **815 instrument under the Uniform Commercial Code (UCC). Gregoire v. Lowndes Bank, 342 S.E.2d 264, 266 (W.Va.1986) (analyzing the requirements of a negotiable instrument under UCC s 3-104(1)). Cf. Liberty Bank v. Shimokawa, 2 Haw.App. 280, 282, 632 P.2d 289, 291-92 (1981) (continuing guaranty contract is not governed by the UCC). Since Marsh was not a signatory to the $400,000 note but signed a separate Guaranty, there is a question as to whether he is a "party to the instrument" and whether the s 490-3-606 defense is available to him.

[17] Although the note does not bear Marsh's signature, it provides in part as follows: Guaranty. The due and punctual payment of this Note and the full performance of its provisions are unconditionally guaranteed by that certain Guaranty executed concurrently herewith by Grant Marsh, dba Turnmar Development Company. Record, Vol. 2 at 11. We therefore hold that the express reference in the note to the Guaranty makes Marsh a "party to the instrument," the note, under HRS s 490:3-606(1)(b) and a beneficiary of the defense thereunder.

### B.

We must now determine what "unjustifiable impairment" of a collateral means under HRS s 490:3-606(1)(b) as applied to this case.

Recently, we held that: HRS s 490:3-606(1)(b) imposes essentially the same duties on secured holders in possession of the collateral as HRS s 490:9-207 imposes on secured parties in possession of the collateral. *208 Commercial Fin., Ltd. v. American Resources, Ltd., 6 Haw.App. 667; ---, 737 P.2d 1120, 1128 (1987) (footnote omitted). We also stated: In our view, there is no unjustifiable impairment unless there is a duty, a breach of that duty, and consequential damages. The question of whether a duty exists is a question of law. Id. In determining what the duties of a secured holder in possession of collateral are, we turn to HRS s 490:9-207(1) (1985) which provides: A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed. Comment 1 to HRS s 490:9-207 states in part: Subsection (1) states the duty to preserve collateral imposed on a pledgee at common law. See Restatement of Security, ss 17, 18.

Section 17 of the Restatement of Security (1941) provides that a "pledgee owes to the pledgor the duty of reasonable care of the pledged chattel[,]" and Comment a thereto states in part as follows: The rule of reasonable care expressed in this Section is confined to the physical care of the chattel, whether an object such as a horse or piece of jewelry or a negotiable instrument or document of title. [Emphasis added.] Section 18 of the Restatement imposes on the pledgee "the duty of using reasonable diligence to preserve and collect the claims" where the pledged instruments represent claims of the pledgor against third parties, and Comment a thereto states in part as follows: The pledgee is not liable for a decline in the value of pledged instruments, even if timely action could have prevented such decline.

Case law construing UCC s 9-207(1) applies sections 17 and 18 of the Restatement of Security. In Federal Deposit Ins. Corp. v. Air Atlantic, Inc., 389 Mass. 950, 957, 452 N.E.2d 1143, 1147 (1983), the Massachusetts Supreme Judicial Court held that "the duty of *209 reasonable care imposed by s 9-207(1) is confined to the physical care of the collateral." A Florida court concluded that under s 9-207(1) "a pledgee is not **816 liable for a decline in the value of pledged instruments." Tepper v. Chase Manhattan Bank, 376 So.2d 35, 36 (Fla.Dist.Ct.App.1979). See also New Jersey Bank v. Toffler, 139 N.J.Super. 161, 166, 353 A.2d 116, 118 (1976).

[18] Based on the foregoing authorities, in our view, Honfed had no duty to maintain or preserve the value of the 5,700 shares of MSM stock pledged by Murphy as collateral by loaning $30 million to MSM. Assuming there was a $30 million loan commitment agreement between MSM and Honfed which the latter breached, that is a matter between MSM and Honfed and has no bearing on Honfed's duty as a pledgee. Therefore, Honfed was entitled to a judgment as a matter of law regarding this defense.

## VI. ATTORNEYS' FEES, COSTS, AND EXPENSES

Marsh also contends that the lower court abused its discretion in awarding Honfed $66,436.89 in attorneys' fees, costs, and expenses.

Inasmuch as the summary judgment in favor of Honfed is being vacated and Honfed is not the prevailing party, we vacate the order awarding attorneys' fees, costs, and expenses.

## VII. CONCLUSIONS

Although Honfed was entitled to judgment as a matter of law on Marsh's defenses of (1) fraudulent inducement by the alleged agreement by Honfed to loan $30 million to MSM, (2) fraudulent inducement regarding forbearance on the Guaranty, and (3) impairment of value of the collateral for the loan, there were genuine issues of material fact regarding Marsh's defense that the Guaranty was allegedly modified and Honfed was not entitled to a judgment as a matter of law on this defense. Therefore, the lower court improperly granted Honfed a summary judgment as to Marsh.

Accordingly, we vacate (1) the judgment in favor of Honfed and against Marsh and (2) the order awarding to Honfed attorneys' *210 fees, costs, and expenses, and remand the case for further proceedings consistent with this opinion.

7 Haw.App. 196, 753 P.2d 807

**4**

Westlaw.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
**(Cite as: 83 Hawai'i 457, 927 P.2d 858)**

▷
Hough v. Pacific Ins. Co., Ltd.
Hawai'i,1996.

Supreme Court of Hawai'i.
Jeffrey J. HOUGH and Terry Medeiros Hough,
Plaintiffs-Appellants,
v.
PACIFIC INSURANCE COMPANY, LTD., a
Hawai'i corporation, Sentinel Insurance Company,
Ltd., Hartford Accident and Indemnity Company,
Hartford Fire Insurance Company, and The Hart-
ford Insurance Group, John Does 5-10, Doe Part-
nerships, Corporations, and/or Other Entities, De-
fendants-Appellees.
**No. 16019.**

Nov. 26, 1996.
As Amended Dec. 4, 1996.

Employee and spouse brought action against work-
ers' compensation insurer to recover for bad faith,
intentional and negligent infliction of emotional
distress, unfair and deceptive acts or practices,
breach of contract and fiduciary duty, conversion,
and loss of consortium in connection with insurer's
handling of employee's claim for benefits. The First
Circuit Court granted insurer's motion for summary
judgment. Employee and spouse appealed. The Su-
preme Court, Moon, C.J., held that: (1) alleged
emotional and physical suffering caused by in-
surer's denial of medical benefits and disability
payments was not "work injury" within meaning of
exclusive remedy provision limiting employee to
workers' compensation for work injury; (2) insurer
owed duty to handle and pay claims in good faith;
(3) statutory penalties for insurer's delay or failure
to pay benefits did not abrogate employee's com-
mon-law right to bring tort action; (4) circuit court
had subject matter jurisdiction over common-law
tort claims not based on original work injury; (5) no
private cause of action existed for violation of stat-
ute prohibiting unfair methods of competition and
unfair and deceptive acts and practices in business

of insurance; and (6) employee was not consumer
and, therefore, was not entitled to bring action for
unfair methods of competition and unfair and de-
ceptive acts or practices in conduct of any trade or
commerce.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Workers' Compensation 413 ☞2090**

413 Workers' Compensation
  413XX Effect of Act on Other Statutory or
Common-Law Rights of Action and Defenses
    413XX(A) Between Employer and Employee
      413XX(A)1 Exclusiveness of Remedies
Afforded by Acts
        413k2090 k. Injuries Not Within Acts.
Most Cited Cases
Employee's alleged emotional and physical suffer-
ing caused by workers' compensation insurer's al-
legedly outrageous and intentional denial of medic-
al benefits and disability payments did not arise out
of and in course of employment and, therefore, was
not "work injury" within meaning of exclusive rem-
edy provision limiting employee to workers' com-
pensation for work injury; scope and course of em-
ployment as construction worker did not involve
obtaining benefits, and alleged injuries occurred
after termination of employment. HRS §§ 386-1,
386-3, 386-5.

**[2] Workers' Compensation 413 ☞2084**

413 Workers' Compensation
  413XX Effect of Act on Other Statutory or
Common-Law Rights of Action and Defenses
    413XX(A) Between Employer and Employee
      413XX(A)1 Exclusiveness of Remedies
Afforded by Acts
        413k2084 k. In General. Most Cited
Cases
Exclusive remedy provision of Workers' Compens-
ation Act and entire workers' compensation scheme

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
**(Cite as: 83 Hawai'i 457, 927 P.2d 858)**

applies only to work injuries. HRS §§ 386-3, 386-5.

**[3] Workers' Compensation 413 ⟜1086**

413 Workers' Compensation
   413XII Administrative Officers and Boards
     413k1085 Jurisdiction
       413k1086 k. In General. Most Cited Cases
Director of Labor and Industrial Relations (DLIR)
had original jurisdiction over employee's claim
against workers' compensation insurer for violation
of Workers' Compensation Act. HRS §§ 386-1 et
seq., 386-73.

**[4] Workers' Compensation 413 ⟜1086**

413 Workers' Compensation
   413XII Administrative Officers and Boards
     413k1085 Jurisdiction
       413k1086 k. In General. Most Cited Cases
Employee's common-law tort claims against work-
ers' compensation insurer did not arise under Work-
ers' Compensation Act and, therefore, were not
within original jurisdiction of Director of Labor and
Industrial Relations (DLIR). HRS §§ 386-1 et seq.,
386-73.

**[5] Workers' Compensation 413 ⟜1042**

413 Workers' Compensation
   413X Payment of Compensation and Compli-
ance with Award
     413X(C) Enforcement of Payment or Com-
pliance
       413k1042 k. Unfair Practices; Bad Faith;
Penalties. Most Cited Cases
Administrative penalties for workers' compensation
insurer's delay or failure to pay benefits are not in-
jured worker's exclusive remedy for injuries result-
ing from insurer's tortious delay or termination of
benefits; statutes authorizing the penalties are not
intended to abrogate common-law rights to bring
action in tort. HRS §§ 386-31(b), 386-92.

**[6] Workers' Compensation 413 ⟜1086**

413 Workers' Compensation

**[7] Workers' Compensation 413 ⟜1042**

413 Workers' Compensation
   413X Payment of Compensation and Compli-
ance with Award
     413X(C) Enforcement of Payment or Com-
pliance
       413k1042 k. Unfair Practices; Bad Faith;
Penalties. Most Cited Cases
     (Formerly 413k1072)
Workers' compensation insurer owed to employee
express and implied contractual duties and duty to
handle and pay claims in good faith.

**[8] Workers' Compensation 413 ⟜1072**

413 Workers' Compensation
   413XI Insurance and Public Funds
     413XI(D) Private Insurance
       413k1071 Rights as Between Employers,
Insurers, and Employees
         413k1072 k. In General. Most Cited
Cases
Employee is "intended third-party beneficiary" of
employer's contract with insurance company for
workers' compensation coverage.

**[9] Workers' Compensation 413 ⟜1042**

413 Workers' Compensation
   413X Payment of Compensation and Compli-
ance with Award
     413X(C) Enforcement of Payment or Com-
pliance
       413k1042 k. Unfair Practices; Bad Faith;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

Penalties. Most Cited Cases
    (Formerly 413k1072)
Workers' compensation insurer's breach of implied
contractual duty of good faith, including duty to
handle and pay claims in good faith, gives rise to
independent tort cause of action for employee as
third-party beneficiary of employer's contract for
workers' compensation coverage.

**[10] Workers' Compensation 413 ☞1072**

413 Workers' Compensation
    413XI Insurance and Public Funds
        413XI(D) Private Insurance
            413k1071 Rights as Between Employers,
Insurers, and Employees
                413k1072 k. In General. Most Cited
Cases
Workers' compensation insurer is not in fiduciary
relationship with and, therefore, owes no fiduciary
duty to employee since both are in more of ad-
versarial than trust relationship.

**[11] Insurance 217 ☞3417**

217 Insurance
    217XXVIII Miscellaneous Duties and Liabilities
        217k3416 Of Insurers
            217k3417 k. In General. Most Cited Cases
(Formerly 217k11)

**Insurance 217 ☞3585**

217 Insurance
    217XXXI Civil Practice and Procedure
        217k3584 Costs and Attorney Fees
            217k3585 k. In General. Most Cited Cases
(Formerly 217k602.4)
No private cause of action exists for violation of
statute prohibiting unfair methods of competition
and unfair and deceptive acts and practices in busi-
ness of insurance, including unfair claim settlement
practices. HRS §§ 431:13-101 et seq., 431:13-202(b).

**[12] Antitrust and Trade Regulation 29T ☞ 141**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk139 Persons and Transactions
Covered Under General Statutes
                29Tk141 k. Consumers, Purchasers,
and Buyers; Consumer Transactions. Most Cited
Cases
    (Formerly 92Hk1 Consumer Protection)
Employee was not "consumer" of workers' com-
pensation insurance within meaning of statute per-
mitting consumer to bring action for unfair compet-
ition and unfair and deceptive act or practice and,
therefore, lacked standing to maintain private cause
of action against workers' compensation insurer.
HRS §§ 480-1, 480-2, 480-13.

**[13] Antitrust and Trade Regulation 29T ☞ 290**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(E) Enforcement and Remedies
            29TIII(E)1 In General
                29Tk287 Persons Entitled to Sue or
Seek Remedy
                    29Tk290 k. Private Entities or Indi-
viduals. Most Cited Cases
    (Formerly 92Hk36.1 Consumer Protection)
Private cause of action against workers' compensa-
tion insurer for unfair competition and unfair or de-
ceptive act or practice in conduct of any trade or
commerce could not be maintained by employee
based on third-party beneficiary status, since cor-
porate employers were not consumers with standing
to bring action. HRS §§ 480-1, 480-2, 480-13.

**860 *459 Peter Van Name Esser and Willard J.
Peterson of Peterson and Esser, on the briefs, Hon-
olulu, for plaintiffs-appellants Jeffrey Hough and
Terry Medeiros Hough.
James F. Ventura, John S. Nishimoto, Calvin E.
Young and Diane W. Wong of Libkuman, Ventura,
Ayabe, Chong & Nishimoto nka Ayabe, Chong,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

Page 4

Nishimoto, Sia & Nakamura, on the briefs, Honolulu, for defendants-appellees Pacific Insurance Company Ltd., Sentinel Insurance Company, Ltd., Hartford Accident and Indemnity Company, Hartford Fire Insurance Company, and The Hartford Insurance Group.

MOON, C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and Circuit Judge MILKS, in place of KLEIN, J., Recused.

MOON, Chief Justice.
Plaintiffs-appellants Jeffrey J. Hough (Hough or claimant) and his wife, Terry Medeiros Hough (collectively, the Houghs), appeal from: (1) the order, filed on August 2, 1991, granting in part and denying in part defendants-appellees Pacific Insurance Company, Ltd., Sentinel Insurance Company, Ltd., Hartford Accident and Indemnity Company, Hartford Fire Insurance Company, and The Hartford Insurance Group's [hereinafter, collectively, Pacific] FN1 motion for summary judgment; (2) the order, filed on March 19, 1992, granting Pacific's motion for summary judgment; and (3) the judgment and notice of entry of judgment, filed on March 25, 1992.

> FN1. Defendant-appellee Sentinel Insurance Co., Ltd. sold the workers' compensation insurance policy at issue in this case to Hough's employers. Defendants-appellees Hartford Accident and Indemnity Co., Ltd., Hartford Fire Insurance Co. and The Hartford Insurance Group own and operate Pacific Insurance Company.

In this appeal, we are presented with the question whether a worker who originally sustains an injury covered by Hawai'i Revised Statutes (HRS) Chapter 386 (1993),FN2 Hawai'i's Workers' Compensation Law, is **861 *460 precluded from bringing a separate claim for damages against the workers' compensation insurer where the separate claim is based on allegations that the insurer committed intentional torts and acted in bad faith in processing the worker's compensation claim, caus-

ing separate and additional injury to the worker. For the reasons discussed below, we answer in the negative and vacate all orders granting summary judgment in favor of Pacific, except for: (1) that part of the August 2, 1991 order granting Pacific's motion for summary judgment on Hough's claims under Hawaii Revised Statutes (HRS) Chapters 386, 431, and 480; and (2) that part of the March 19, 1992 order granting Pacific's motion for summary judgment on Hough's claims for breach of fiduciary duty.

> FN2. Citations to the provisions of HRS Chapter 386 refer to the 1993 Replacement. Unless otherwise indicated, the provisions are unchanged from the version in effect at the relevant time.

## I. BACKGROUND

On March 13, 1985, Hough injured his back during the course and scope of his employment with Ramco, Inc. (Ramco), a construction firm.FN3 Thereafter, Hough continued to experience back pain and, on June 22, 1987, while working for Royal Contracting Co., Ltd. (Royal), he suffered a recurrence of the March 13, 1985 injury, resulting in temporary total disability.

> FN3. Consistent with the applicable standard of review, the facts of this case are viewed in the light most favorable to the Houghs, the non-moving parties.

Hough timely filed a claim for workers' compensation benefits with both Ramco and Royal. As the workers' compensation insurance carrier for both Ramco and Royal, Pacific initially made payments, under protest. However, on August 11, 1987, Pacific terminated all benefits.

On December 10, 1987, when Hough was still not being paid benefits for either the 1985 or 1987 injuries, Hough's physician, Donald E. Nicol, M.D., wrote Pacific, noting that:

My concern with Mr. Hough is that stress may be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
**(Cite as: 83 Hawai'i 457, 927 P.2d 858)**

contributing to his delayed convalescence from his low back injury....

Mr. Hough wears a lumbosacral belt while awake. He receives trigger point injections of corticosteroids bimonthly in my office, and his medications include Darvocet-N-100 on an ad lib basis. My records reveal an average use of # 120 Parafon Forte and # 30 Darvocet-N-100 per month.

....

Although his injury was work related, his 1985 employer denied responsibility by claiming his injury was "new" which in my opinion it was not, and his 1987 employer denied responsibility by claiming there was no definite injury of Mr. Hough while he worked for them. Although Pacific Insurance was the carrier for both employers, they refused to pay Mr. Hough under either policy while at the same time acknowledging that one policy or the other was responsible. Thus was Mr. Hough caught in a classic "catch 22".

I treated Mr. Hough during the period when he was attempting to deal with the insurance company and the strain on his day to day existence was obvious. He depleted his savings, sold his only car and eventually allowed his wife to start working. His marriage relationship grew strained, he has become withdrawn, and friends and family worried about possible self-destructive actions.

A psychiatrist who examined Hough, Mark Dillen Stitham, M.D., found that:

[Hough] has been suicidal at times but thinks of his children. Crying is admitted when alone. Appetite is increased with 25 pound[s of] weight gain.

....

This young man appears to have both endogenous and exogenous features of depression complicated by ethanol abuse.

After a complaint for reinstatement of benefits was

filed with the Director of the State Department of Labor and Industrial Relations's (DLIR) Disability Compensation Division, the Director determined that:

Both Dr. Nicol's report dated July 22, 1987 and Dr. Ishida's report dated August 4, 1987 indicate a recurrence in June 1987. Significantly, Dr. Ishida's report emphasized that claimant had continued to experience "constant backaches" that had not **862 *461 resolved since April 1985. Nevertheless, Ramco, Inc./Pacific chose to ignore the substance of these reports and focused on Dr. Nicol's imprecise use of the term "aggravation" as its excuse for unreasonable termination of benefits by letter dated August 11, 1987.

Moreover, Pacific terminated benefits when it knew or should have known that Pacific was the carrier for both the 1985 and 1987 claims, and that, in the event Ramco, Inc. was found not liable for the 1987 injury, a simple bookkeeping adjustment would have resolved the matter. Ramco, Inc./Pacific's retroactive[ [FN4] ] termination of benefits constituted a clear violation of Section 386-31, HRS, particularly when the medical evidence in Ramco, Inc./ Pacific's possession indicated claimant was unable to resume work, and Ramco, Inc./Pacific knew claimant was unrepresented at that time. Such unlawful termination of benefits caused claimant, quite unreasonably, to go without benefits from August 1987 to February 1988 when it was clear that liability would attach to one of Pacific's employers.

> FN4. Nothing in the letter terminating benefits indicated that the termination was intended to be retroactive. However, at the DLIR hearing, Pacific took the position that it was entitled to reimbursement of the benefits paid under protest. This is apparently what the Director was referring to by use of the phrase "retroactive termination."

The Director, thereafter, ordered that: (1) Ramco/ Pacific pay for the medical expenses incurred to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

Page 6

treat the 1985 injury and the 1987 recurrence, pursuant to HRS §§ 386-21 and -26; [FN5] (2) Ramco/Pacific pay Hough weekly compensation of $291.00, beginning June 22, 1987 "and terminating at such time as is determined by the director that such disability has ended [ ]" pursuant to HRS § 386-31(b); [FN6] (3) Ramco/Pacific pay $250.00 into the Special Compensation Fund, pursuant to HRS § 386-31(b); (4) Ramco/Pacific pay Hough $739.97 as a penalty, representing 10% of the unpaid compensation due claimant from August 10, 1987 through February 3, 1988, pursuant to HRS § 386-92; [FN7] (5) Ramco/Pacific reimburse Royal the amount of $9,063.00, pursuant to Hawai'i Administrative Rules (HAR) § 12-10-34 (1985).[FN8]

FN5. HRS § 386-21 provides in relevant part:

**Medical care, services and supplies.**(a) Immediately after a work injury sustained by an employee and so long as reasonably needed the employer shall furnish to the employee all medical care, services, and supplies as the nature of the injury requires.

HRS § 386-26 provides in relevant part:

**Guidelines on frequency of treatment and reasonable utilization of health care and services.** The director shall issue guidelines for the frequency of treatment and for reasonable utilization of medical care and services by health care providers which are considered necessary and appropriate under this chapter.

FN6. HRS § 386-31(b) provides in relevant part:

Where a work injury causes total disability not determined to be permanent in character, the employer, for the duration of the disability but not including the first three calendar days thereof, shall

pay the injured employee a weekly benefit at the rate of sixty-six and two-thirds percent of the employee's average weekly wages....

An employer or insurance carrier who fails to comply with this section shall pay not more than $2,500 into the special compensation fund upon the order of the director....

When the Director's order was filed, HRS § 386-31(b) provided for a penalty of $250.00. HRS § 386-31(b) (1985).

FN7. HRS § 386-92 provides in relevant part:

[I]f any temporary total disability benefits are not paid by such employer or carrier within ten days, exclusive of Saturdays, Sundays, and holidays, after being notified of the disability, and where the right to such benefits are not controverted in the employer's initial report of the industrial injury or where temporary total disability benefits are terminated in violation of section 386-31, there shall be added to the unpaid compensation an amount equal to ten percent thereof payable at the same time as, but in addition to, the compensation, unless the nonpayment is excused by the director after a showing by the employer or insurance carrier that the payment of the compensation could not be made on the date prescribed therefor owing to the conditions over which the employer or carrier had no control.

HRS § 386-92 has been amended to require a penalty of twenty percent of the compensation payable. *See* 1995 Sess. L. Haw. Act 234, § 14 at 613.

FN8. HAR § 12-10-34 provides in relevant

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

Page 7

part that, "[w]hen a liability determination is made, the liable employer, if not the last employer, shall reimburse the last employer."

**\*\*863 \*462** The Houghs filed a complaint against Pacific in the First Circuit Court on February 10, 1989. In their ten-count first amended complaint, filed on March 28, 1989, the Houghs alleged: intentional infliction of emotional distress (Count I); negligent infliction of emotional distress (Count II); a violation of HRS ch. 431 (Count III); violation of HRS ch. 480 (Count IV); violation of HRS ch. 386 (Count V); breach of contract (Count VI); breach of fiduciary duty (Count VII); breach of a common law duty of good faith (Count VIII); conversion (Count IX); and loss of consortium (Count X).[FN9] These claims were based solely on Pacific's conduct in handling Hough's attempt to obtain workers' compensation benefits and not on Hough's 1985 or 1987 back injuries. Neither Ramco nor Royal were named as defendants. Hough claimed that Pacific's conduct forced him to interrupt, forego, and/or reduce medical treatment that needlessly prolonged and/or exacerbated his injuries, all of which caused him to suffer severe emotional remedy.

> FN9. Mrs. Hough's claim is limited to Count X, loss of consortium.

On August 2, 1991, the circuit court partially granted Pacific's second motion for summary judgment FN10 as to Counts III, IV, V, VIII, and IX. The court ruled that "[t]he law in Hawaii does not recognize a private cause of action in plaintiffs for alleged violation of chapter 431, Chapter 386 or 480. In addition, Plaintiffs are surely not 'consumers' entitled to raise the 480-2 claim." The court also rejected Hough's bad faith claim and his argument that, by withholding the compensation funds, Pacific committed conversion. With respect to the other claims, the court ruled that a workers' compensation carrier

> FN10. Pacific's first motion for summary judgment, filed March 28, 1989, was

denied in its entirety on April 26, 1989. The court ruled that

> Plaintiffs' claims are cognizable in Circuit Court and are not barred by HRS Chapter 386, thus the complaint adequately states claims. With respect to the request for summary judgment, it is denied without prejudice to reconsideration or to the filing of future motions depending upon the facts discovered during litigation.

may be sued by [a] worker for wrongful termination/delay in providing workers compensation benefits. Such a claim is not barred by HRS section 386-5, since the claim is not based upon a work injury but a failure to provide prompt and fair benefits. The employee clearly has not bargained away his right to sue his employer's carrier where the carrier and/or the employer may be responsible for wrongfully terminating or delaying benefits.

On March 9, 1992, one week before trial, Pacific brought a third motion for summary judgment on the Houghs' remaining claims, arguing that all claims were barred by the exclusive remedy provision of HRS § 386-5. On March 19, 1992, the trial court filed its order granting Pacific's motion for partial summary judgment as to the Hough's remaining claims.[FN11] Judgment was entered on behalf of Pacific on March 25, 1992, and the Houghs filed a timely notice of appeal on March 31, 1992.

> FN11. Specifically, the order stated: "IT IS HEREBY ORDERED ADJUDGED AND DECREED that Pacific Defendants' Motion for Partial Summary Judgment filed on March 9, 1992, be and hereby is granted as to all of Plaintiffs' remaining claims. There are no remaining parties, claims or issues."

## II. *STANDARDS OF REVIEW*

It is well established in this jurisdiction that:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
**(Cite as: 83 Hawai'i 457, 927 P.2d 858)**

On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, in any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Iddings v. Mee-Lee,* 82 Hawai'i 1, 3, 919 P.2d 263, 267 (1996) (citation omitted).

"An interpretation of a statute is a question of law reviewable *de novo."* **\*864\*463***Cieri v. Leticia Query Realty, Inc.,* 80 Hawai'i 54, 59, 905 P.2d 29, 34 (1995) (citation omitted).

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. Where the language of a statute is unambiguous, our only duty is to give effect to the statute's plain and obvious meaning. Further, in interpreting a statute, we give the words their common meaning, unless there is something in the statute requiring a different meaning.

*Iddings,* 82 Hawai'i at 6-5, 919 P.2d at 268-69 (citations omitted).

### III. *DISCUSSION*

HRS § 663-1 (1993) codifies the common law principle that all persons are responsible for their tortious conduct:

**Torts, who may sue and for what.** Except as otherwise provided, all persons residing or being in the State shall be personally responsible in damages, for trespass or injury, whether direct or consequential, to the person or property of others, or to their spouses, children under majority, or wards, by such offending party, or the offending party's child under majority, or by the offending party's command, or by the offending party's animals, domestic or wild; and the party aggrieved may prosecute therefor in the proper courts.

Pacific claims, and the trial court apparently agreed, that a workers' compensation insurance carrier is in an "otherwise provided" situation by virtue of the provisions of HRS Chapter 386, which: (1) prescribe the exclusive remedy for an injured worker; (2) afford the same rights to an insurer as to an employer; (3) deprive the circuit court of jurisdiction; and (4) provide for penalties for an insurer's delay and failure to pay benefits. We examine Pacific's contention in light of the plain language and policies embodied in HRS Chapter 386, case law from this and other jurisdictions, and the maxim that "statutes abrogating common law rights must be strictly construed[.]" *Fonseca v. Pacific Construction,* 54 Haw. 578, 585, 513 P.2d 156, 160 (1973); *see also Burns Int'l Sec. Services v. Department of Transportation,* 66 Haw. 607, 611, 671 P.2d 446, 449 (1983) (explaining that "[w]here it does not appear there was a legislative purpose in superseding the common law, the common law will be followed").

A. *HRS Chapter 386 Does Not Bar The Houghs From Seeking Relief In The Circuit Court Because the Houghs' Injuries Are Not "Work Injuries" Within the Meaning of the Act.*

We recently reviewed the policies behind Hawai'i's Workers' Compensation Act in *Iddings* and explained that "one of the primary purposes underlying the implementation of a workers' compensation scheme in Hawai'i was to eliminate suits based on negligence in the workplace and to spread the costs of work-related injuries over the industry." 82 Hawai'i at 6-5, 919 P.2d at 269-70.

A compromise was thus struck in the form of a scheme of workers' compensation, wherein the em-

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

Page 9

ployee "is automatically entitled to certain benefits whenever he or she suffers a 'personal injury by accident arising out of and in the course of employment' or an occupational disease" and "negligence and fault are largely immaterial, both in the sense that the employee's contributory negligence does not lessen his or her rights and in the sense that the employer's complete freedom from fault does not lessen his or her liability."

*Id.* (quoting 1 Larson, *The Law of Workmen's Compensation* § 1.10 at 1-1 to 1-2 (1995) [hereinafter, Larson] ) (brackets omitted). In other words, Work[ers'] compensation laws were enacted as a humanitarian measure, to create legal liability without relation to fault. They represent a socially enforced bargain: the employee giving up his [or her] right to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries. Since liability is made dependent on a nexus to the job, the essential prerequisite for coverage under work[ers'] compensation acts is the existence of an employer-employee relationship.

**865 *464 *Hun v. Center Properties,* 63 Haw. 273, 276-77, 626 P.2d 182, 185 (1981) (citations omitted).

[1] This *quid pro quo*-whereby the employee is entitled to recover benefits for work-related injuries regardless of fault on the part of the employer in exchange for giving up his or her right to recover common law tort damages-is codified at HRS §§ 386-3 and -5. HRS § 386-3 provides in relevant part:

**Injuries covered.** If an employee suffers personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as hereinafter provided.

HRS § 386-5 provides in relevant part that:
The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury....

Pacific maintains that, as the employer's workers' compensation insurer, it enjoys statutory immunity from suit by its insureds' employees pursuant to the definition of "employer" in HRS § 386-1. HRS § 386-1 states that insurers are "entitled to [the employer's] rights and remedies under this chapter as far as applicable." Pacific contends that, therefore, HRS § 386-5 precludes tort liability of an insurer to its insured's employee. Pacific's argument requires that we determine whether an employer, and hence an insurer, would be immune from a common law action under the facts of this case.

[2] As previously stated, HRS § 386-5, the exclusivity provision relied on by Pacific, provides that "the rights and remedies herein granted to an employee ...*on account of a work injury suffered by an employee* shall exclude all other liability of the employer to the employee, ... at common law or otherwise, on account of the injury." HRS § 386-5 (emphasis added). By its plain language, HRS § 386-5, and indeed, the entire workers' compensation scheme, applies only to "work injuries." *See Estate of Coates v. Pacific Engineering,* 71 Haw. 358, 362, 791 P.2d 1257, 1259-60 (1990) ("The Hawaii State Legislature, by enacting the exclusivity provision, intended that our Workers' Compensation system be the exclusive remedy for *work-related* injuries and deaths." (Emphasis added.)); Riesenfeld, *Study of the Workmen's Compensation Law in Hawaii,* Legislative Reference Bureau, Report No. 1 (1963) at iii ("Workmen's compensation then is a branch of social insurance for workers aimed at protection against the consequences of *work injuries.* " (Emphasis added.)). The disposit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ive issue, therefore, is whether the alleged injuries claimed by Hough are "work injuries" within the meaning of HRS Chapter 386.

HRS § 386-1 defines "work injury" as "a personal injury suffered under the conditions specified in section 386-3," that is, one "arising out of and in the course of the employment." "Employment," in turn, "means any service performed by an individual for another person under any contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully entered into." HRS § 386-1.

In *Tate v. GTE Hawaiian Telephone Co.,* 77 Hawai'i 100, 881 P.2d 1246 (1994), this court clarified the nature and scope of coverage under the Hawai'i workers' compensation law by explaining the test used to determine when an injury is a "work injury" and, thus, compensable under HRS Chapter 386.

For an injury to be compensable under a workers' compensation statute, there must be a requisite nexus between the employment and the injury. The nexus requirement is articulated in Hawai'i, as in the majority of jurisdictions, on the basis that, to be compensable, an injury must arise out of and in the course of employment. This court has employed two different approaches**866 *465 in determining whether injuries meet this criterion.

....

More recently, the court has adopted a "unitary" test that considers whether there is a sufficient work connection to bring the accident within the scope of the statute. First articulated in *Royal State National Insurance Co. v. Labor and Industrial Relations Appeal Board,* 53 Haw. 32, 487 P.2d 278 (1971), the work connection approach simply requires the finding of a causal connection between the injury and any incidents of employment. *Chung [v. Animal Clinic],* 63 Haw. [642,] 648, 636 P.2d [721,] 725 [ (1981) ] (citations omitted). The unitary work connection test was formally adopted as the correct

means of interpreting and applying HRS Sec. 386-3 in *Chung. Id.* at 649, 636 P.2d at 726.

*Tate,* 77 Hawai'i at 103, 881 P.2d at 1249 (footnotes omitted). The *Tate* court went on to explain that "[a]n injury is said to arise in the course of the employment when it takes place within the period of employment, at a place where the employee may reasonably be, and while he or she is fulfilling his or her duties or engaged in doing something incidental thereto." *Id.* at 103-04, 881 P.2d at 1249-50 (quoting Larson, *supra,* § 14.00) (internal quotation marks and brackets omitted). *Accord Smith v. State Dept. of Labor and Indus. Rels.,* 80 Hawai'i 150, 154, 907 P.2d 101, 105, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995).

The relevant statutory language and our prior interpretations of that language do not reasonably envision emotional and physical suffering allegedly caused by an insurer's-and in this case, Pacific's-"outrageous and intentional denial of medical benefits and disability payments" as an injury "arising out of and in the course of employment." The alleged injuries occurred during Hough's attempt, as a claimant, to garner workers' compensation benefits. Hough sought these benefits on his own behalf, not as "a service performed by an individual for another person,"HRS § 386-1, or while he was "fulfilling his ... [employment] duties or engaged in doing something incidental thereto." *Tate,* 77 Hawai'i at 104, 881 P.2d at 1250. The scope and course of Hough's employment as a construction worker did not involve obtaining workers' compensation benefits. Moreover, the alleged injuries occurred *after* Hough's employment was terminated due to his total disability.

Hough alleges that intentional acts on the part of Pacific and its agents caused him harm, separate and distinct from the work injury suffered by Hough. The torts alleged by Hough were not directed against him because of his employment but because of his attempt to obtain workers' compensation benefits. The fact that Hough came into contact

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

with Pacific as a result of seeking workers' compensation benefits does not make the injuries suffered as a result of Pacific's conduct "work injuries" within the meaning of HRS Chapter 386. The factual and legal events that caused Pacific's agents to have contact with Hough are irrelevant to whether they committed torts, unrelated to the original work injury, after those contacts were made.

We therefore hold that the injuries alleged by Hough in the first amended complaint are not "work injuries" within the scope of HRS Chapter 386. Consequently, Hough is not precluded by the exclusivity provision of HRS § 386-5 from seeking common law tort remedies against Pacific.

[3] Pacific also argues that HRS § 386-73 deprives the circuit court of jurisdiction. HRS § 386-73 provides in relevant part that "[u]nless otherwise provided, the director of labor and industrial relations shall have original jurisdiction over all controversies and disputes arising under this chapter." In Count V of the first amended complaint, Hough alleges violations of HRS Chapter 386 itself. Clearly, Count V raises a "controvers[y] or dispute[ ] under this chapter," over which "the director of labor and industrial relations shall have original jurisdiction[.]" HRS § 386-73. We therefore hold that summary judgment was properly granted with respect to Count V because the circuit court was without jurisdiction over the claim.

[4] We reject Pacific's argument, however, with respect to Hough's common law tort **867 *466 claims. In those claims, Hough alleges injuries caused by Pacific's tortious conduct *outside* the course and scope of his employment. Because Hough's common law tort claims do not "arise under" HRS Chapter 386, the director of labor and industrial relations does not have original jurisdiction under HRS § 386-73.

Our reasoning is supported by decisions of other courts that have considered the same issue under similar workers' compensation statutes. For example, in *Hayes v. Aetna Fire Underwriters*, 187

Mont. 148, 609 P.2d 257 (1980), the Montana Supreme Court considered, as an issue of first impression, whether a complaint alleging that a workers' compensation insurer and its adjuster committed intentional torts upon a claimant is within the exclusive jurisdiction of the Workers' Compensation Court. Reviewing the law of other jurisdictions, the court explained that

[t]he right [to bring a tort action against the insurer for independent intentional torts] has been upheld on several different grounds. First, and most frequently, the courts have upheld the right to bring an action for independent intentional torts because the tortious conduct, which gives rise to the action, does not arise out of the original employment relationship. It occurs after employment and arises out of the employee's relationship with the insurance carrier after the employment relationship has been terminated. It is predicated on an act after the injury and during the settlement of the claim. The insurance carrier is no longer the "alter ego" of the employer, but rather is involved in an independent relationship to the employee when committing such tortious acts. *Gibson [v. National Ben Franklin Ins. Co.],* 387 A.2d [220,] 222-223 [ (Me.1978) ]; *Reed [v. Hartford Accident & Indem. Co.],* 367 F.Supp. [134,] 135 [ (E.D.Pa.1973) ]; *Martin [v. Travelers Ins. Co.],* 497 F.2d [329,] 330-331 [ (1st Cir.1974) ]; *Stafford [v. Westchester Fire Ins. Co. of N.Y., Inc.],* 526 P.2d [37,] 43 [ (Alaska 1974) ]; *Unruh [v. Truck Ins. Exchange],* 7 Cal.3d 616, 102 Cal.Rptr. 815, 498 P.2d [1063,] 1073 [ (1972) ]; *Coleman [v. American Universal Ins. Co.],* 86 Wis.2d 615, 273 N.W.2d [220,] 223 [ (1979) ]. Perhaps the best statement of the concept is found in *Coleman,* which stated:

The injury for which remedy is sought in the instant case is the emotional distress and other harm caused by the defendants' intentional acts during the investigation and during the course of payment of the claim. This claimed injury was distinct in time and place from the original on-the-job physical injury which was subject to the Compensation Act.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The injury for which recovery is sought in the present actions did not occur while the plaintiff was employed or while he was performing services growing out of and incidental to his employment. As the plaintiff repeatedly and correctly stresses in his brief, this action is based not on the original work-related injury but on a second and separate injury resulting from the intentional acts of the insurer and its agents while investigating and paying the claim. The Act does not cover the alleged injury, and the exclusivity provision[ ] does not bar the claim. 273 N.W.2d at 223.

*Hayes,* 609 P.2d at 261-62. *See also Zurich Am. Ins. Co. v. Dicks,* 220 Ga.App. 725, 470 S.E.2d 279 (1996) (holding that plaintiff's claim of physical injury caused by insurer's tortious delay in making payments was outside scope of Workers' Compensation Act and therefore not barred by exclusivity provision); *Tallman v. Hanssen,* 427 N.W.2d 868 (Iowa 1988) (exclusivity provisions of workers' compensation act did not bar tort action that alleged intentional infliction of mental anguish by refusing to pay medical bills, inasmuch as bad faith claim was outside scope of exclusivity); *Kaluza v. Home Ins. Co.,* 403 N.W.2d 230, 236 (Minn.1987) ("Tort claims against an employer or its insurer are not barred by exclusivity provisions if the injuries claimed or the damages sought did not arise out of and in the course of employment."); *Seale v. American Motorist Ins. Co.,* 798 S.W.2d 382, 391 (Tex.Ct.App.1990); [FN12] 2A Larson, *supra,* § 68.34(b) at 13-196 *467 **868 ("Plainly the existence of a compensation claim does not give insurers or employers a blanket exemption from the law of tort."); *Annotation: Tort Liability of Worker's Compensation Insurer for Wrongful Delay or Refusal to Make Payments Due,* 8 A.L.R.4th 902 (1981 and Supp.1996) and cases cited therein. *And see Fonseca,* 54 Haw. at 585, 513 P.2d at 160 (stating that "[t]here is no evidence that the legislature ever intended to make workmen's compensation benefits representative of full monetary recovery in the absence of essential prerequisites for coverage.").

FN12. The *Seale* Court held that:

We reject the contention that the exclusivity provisions of the Workers' Compensation Act provide the exclusive remedies for the injured worker and thereby preclude any cause of action against a carrier for bad faith or intentional misconduct in the processing of compensation claims, either for benefits or medical aid or hospital services. The compensation act spells out a compensation scheme and schedule for personal injuries sustained by an employee in the course of his employment.... It is clear then that the Act provides that the remedies set forth by the statute are exclusive only if the personal injury complained of is an injury contemplated by the Act; that is, a personal injury sustained in the course and scope of employment. Hence, the Act was not intended by the legislature to shield carriers from the entire field of tort law. Therefore, liability resulting from a carrier's breach of the duty of good faith and the duty of fair dealing from intentional misconduct in the processing of a compensation claim is different and separate from the liability for the actual accidental personal injury arising on the job.

*Seale,* 798 S.W.2d at 391.

[5] Pacific also argues, albeit halfheartedly, that Hough's claims are barred by HRS §§ 386-31(b) and -92,[FN13] which authorize specific penalties for an insurer's delay or failure to pay benefits. We discern no indication, however, that the administrative penalties authorized by HRS §§ 386-31(b) and -92 were intended by the legislature to abrogate common law rights to bring an action in tort.

FN13. *See supra* notes 6 and 7.

We are persuaded by the reasoning of the Texas Su-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

preme Court in *Aranda v. Insurance Company of North America*, 748 S.W.2d 210 (Tex.1988), wherein the court stated:

Of the penalty provisions cited by the carriers, however, only two provide direct benefits to claimants. Under [the first provision], a carrier is subject to a 15% penalty if the carrier fails to pay benefits or file a notice of controversion within twenty days of receiving notice of the claim. Under [the second provision], a 12% penalty and attorney's fees may be imposed as a sanction against a carrier who fails to pay promptly the proceeds of a settlement, IAB award, or agreed judgment. Neither provision affords relief to the claimant when a carrier breaches the duty of good faith and fair dealing by refusing to pay benefits for a compensable claim until ordered to do so by the Industrial Accident Board. Even if these provisions addressed such misconduct, the Act does not contemplate that the failure of a carrier to act in good faith or the carrier's intentional tort can be meaningfully redressed by the mere addition of 12% or 15% to the past due compensation. Such nominal penalties are of questionable value as an incentive for the carrier to act reasonably in processing an employee's claim.

*Id.* at 214-15 (citations omitted). Similarly, of the penalty provisions cited by Pacific, only HRS § 386-92 provides for penalties payable directly to the claimant and only, until its amendment by the 1995 legislature, in the amount of ten percent of the compensation.[FN14] Although we recognize that a number of other courts have taken a contrary position regarding the significance of administrative penalties, "we are not persuaded by the contrary view because[,] although administrative fines may have some deterrent effect ..., they do not purport to address the plight of the injured worker who may suffer great deprivation as a result of the tortious denial or delay of his or her benefits." *Falline v. GNLV Corp.*, 107 Nev. 1004, 823 P.2d 888, 894 (1991).

FN14. *See supra* note 7.

The placement of the penalty provision in Part III of the Act, entitled "Administration," suggests a legislative intent to provide "teeth" to the DLIR's administration of the Act rather than to create an exclusive remedy for tortious conduct on the part of the insurer. Moreover, the arbitrary amount of the penalty, ten percent of the compensation owed, does not bear any particularized relationship**869 *468 to the injury suffered as a result of the insurer's acts. We will not presume, in the absence of any indication in the language of the statute or its legislative history, that the legislature intended administrative fines to be the exclusive remedy for workers injured by a workers' compensation insurer's tortious delay or failure to pay benefits. We agree with the court in *Falline* that, "[i]f the Legislature sees fit to declare the statutory scheme of fines an exclusive remedy to aggrieved work [ers] whose claims are denied or delayed as a result of negligence or bad faith, the Legislature may enact legislation to that end." *Falline*, 823 P.2d at 893.

[6] Because we determine that: (1) the exclusive remedy provisions of HRS § 386-5 do not bar judicial remedies for non-work injuries; (2) HRS § 386-73 does not deprive the circuit court of subject matter jurisdiction over common law tort claims not based on the original work injury; and (3) the administrative penalties authorized by HRS §§ 386-31(b) and -92 were not intended to provide an injured workers' exclusive remedy for injuries resulting from an insurer's tortious delay or termination of benefits, we hold that an employee seeking workers' compensation benefits is not precluded by these statutory provisions from pursuing a judicial remedy for torts allegedly perpetrated by his or her employer's workers' compensation insurance carrier subsequent and unrelated to the work injury. Accordingly, we vacate the circuit court's grant of summary judgment in favor of Pacific and against the Houghs on these bases.

B. *Hough May Bring an Action Based Upon Breach of Contract and Bad Faith, But Summary Judgment Was Properly Granted With Respect to Count VI*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

Page 14

*Alleging Breach of Fiduciary Duty.*

[7] In addition to the torts of intentional and negligent infliction of emotional distress, conversion, and loss of consortium, Hough alleges, in Count VIII of the first amended complaint, that Pacific violated a duty of "good faith" owed to him. Subsequent to the motions court's grant of summary judgment to Pacific on Count VIII and the briefing on this appeal, this court, in *Best Place, Inc. v. Penn America Insurance Co.,* 82 Hawai'i 120, 920 P.2d 334 (1996), recognized a cause of action based on violation of the duty of good faith in insurance contracts. We held "that there is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action." *Best Place,* 82 Hawai'i at 132, 920 P.2d at 346.

[8] Although our rulings in *Best Place* were directed toward the rights of the insured and not those of claimants, an employee is not merely a potential claimant in relation to his or her employer's workers' compensation insurance contract. An employee is an intended third-party beneficiary [FN15] of an employer's contract with an insurance company for workers' compensation coverage.

> FN15. An "intended beneficiary" is defined in *Restatement (Second) of Contracts,* § 302 (1981) as follows:
>
> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

The Workers' Compensation Act sets forth a compensation scheme that is based on a three-party agreement entered into by the employer, the employee, and the compensation carrier.... As between the compensation carrier and the employee, there is a promise for a promise: the carrier agrees to compensate the employee for injuries sustained in the course of employment, and the employee agrees to relinquish his common law rights against his employer. The employee is thus a party to the contract and therefore entitled to recover in that capacity.
**870 *469 *Aranda,* 748 S.W.2d at 212 (citations omitted.); *Franks v. United States Fidelity and Guar. Co.,* 149 Ariz. 291, 718 P.2d 193, 197 (Ct.App.1985) ("A claim by an injured employee against the workers' compensation carrier is a first-party claim."). *See also Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 128 n. 12, 883 P.2d 38, 49 n. 12 (recognizing non-contracting parties' rights as third party beneficiaries of an insurance contract), *reconsideration denied,*77 Hawai'i 489, 889 P.2d 66 (1994); *Hunt v. First Ins. Co. of Hawai'i, Ltd.,* 82 Hawai'i 363, 367, 922 P.2d 976, 980 (App.1996) (same), *cert. dismissed,*83 Hawai'i 204, 925 P.2d 374 (1996).

[9] Pacific, therefore, owed contractual duties, express and implied, to Hough, as an intended beneficiary of his employers' workers' compensation insurance contract. Accordingly, we hold that Hough may enforce these duties, *see Restatement (Second) of Contracts* § 304 (1981), including the duty to handle and pay claims in good faith. Under the rationale articulated in *Best Place,* a breach of the implied contractual duty of good faith gives rise to the independent tort cause of action for a third-party beneficiary, under the same standards and with the same limitations for punitive damages as discussed in *Best Place,* 82 Hawai'i at 132-34, 920 P.2d at 346-48.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

Page 15

Consequently, summary judgment in favor of Pacific on Counts VI (breach of contract) and VIII ("bad faith") was improperly granted. Although we vacate the circuit court's order granting summary judgment in favor of Pacific on Counts VI and VIII and remand for a determination of the merits of those claims, we also reiterate our cautions concerning the "bad faith" claim in the context of an insurance contract:

[C]onduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith. In addition, an erroneous decision not to pay a claim for benefits due under a policy does not by itself justify an award of compensatory damages. Rather, the decision not to pay a claim must be in "bad faith." *California Shoppers Inc. v. Royal Globe Ins. Co.*, 175 Cal.App.3d 1, 221 Cal.Rptr. 171 (1985) (bad faith implies unfair dealing rather than mistaken judgment).

*Id.* at 133, 920 P.2d at 347 (most citations omitted).

[10] In Count VI of the first amended complaint, Hough alleges a claim for damages based on breach of a fiduciary duty owed to him by Pacific. In *Best Place*, we recognized that no fiduciary relationship existed between an insurer and an insured in a first-party context. The absence of a fiduciary relationship, however, did not affect our conclusion that an insured could sue for bad faith in a first-party claim. On the other hand, it is tautological that the absence of a fiduciary relationship would preclude a claim based upon such a relationship. A employee who sues an insurer, based on the insurer's failure to pay benefits under the employer's workers' compensation insurance contract, is in a similar position to the employer. Both are in more of an adversarial than a trust relationship. Consequently, no fiduciary relationship exists between the employee and the insurer in such a situation. Accordingly, we hold that the circuit court did not err in granting summary judgment with regard to Count VI of the first amended complaint. *See Best Place*, 82 Hawai'i at 129, 920 P.2d at 343.

C. *Hough May Not Assert A Claim For Damages For Pacific's Alleged Violation Of HRS Chapter 431.*

[11] In Count III of the complaint, Hough claims that Pacific's conduct amounted to a violation of HRS Chapter 431, entitled "Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance," and that, as a result of the violation, Hough suffered severe mental and emotional distress. The Intermediate Court of Appeals' (ICA) recent holding in *Hunt* is dispositive of this issue on appeal.

In *Hunt*, the ICA concluded that "[n]othing in the plain language of [HRS Chapter 431,] Article 13 expressly provides for a private cause of action for persons injured by insurance companies who violate this article" and that "[a] review of the relevant legislative history of Article 13 fails to indicate a **871 *470 legislative intent to either create or deny a private cause of action." 82 Hawai'i at 371, 922 P.2d 976. Because no appellate court in this jurisdiction had previously decided whether there is a private cause of action for violation of HRS Chapter 431, the ICA looked to other jurisdictions whose unfair claims practices acts, like Hawai'i's, were modeled after the National Association of Insurance Commissioners' (NAIC) Model Unfair Claims Practices Act.

The great majority of these state versions of the Model Act have been held not to create a private cause of action. In addition, the 1980 Report of the NAIC has stated explicitly that the Model Act " 'does not contain an individual right of action provision[.]' " Moreover, HRS § 431:13-202(b) provides: "No order of the commissioner ... shall in any way relieve or absolve any person affected by the order from any *other* liability, penalty, or forfeiture required by law." (Emphasis added). Other jurisdictions with a similar statutory provision have found that the term "other" supports denying a private cause of action because the term indicates that liability against insurer [sic] must be found outside of the statute.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
(Cite as: 83 Hawai'i 457, 927 P.2d 858)

Page 16

*Id.* at 372,922 P.2d at 985 (citations and footnote omitted) (ellipses in original). Accordingly, the ICA held that "no private cause of action exists under HRS Chapter 431, Article 13." *Id. See also Best Place,* 82 Hawai'i at 126, 920 P.2d at 340 (stating that "Article 13 of the Hawai'i Insurance Code does not authorize a private cause of action pursuant to its administrative remedies." (Citation omitted.)) Therefore, we hold that summary judgment was properly granted in favor of Pacific on Count III of the first amended complaint.

D. *Hough May Not Assert A Claim For Damages For Pacific's Alleged Violation of HRS Ch. 480.*

[12] Although Hough contends, on appeal, that the circuit court erred in granting summary judgment with respect to Count IV, alleging that Pacific violated provisions of HRS Chapter 480, he does not present arguments in his briefs to support such a position.

Chapter 480 specifies that acts or practices that comprise unfair or deceptive practices constitute violations. HRS § 480-2 provides in relevant part:

**Unfair competition, practices, declared unlawful.**(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

....

(d) No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

Accordingly, Hough may only bring an action under this chapter if he is a "consumer" within the meaning of the statute. HRS § 480-1 defines "consumer" as follows:
"Consumer" means a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to pur-

chase goods or services or who commits money, property, or services in a personal investment.

*See also Cieri,* 80 Hawai'i at 67-69, 905 P.2d at 42-44 (explaining purpose of restricting standing to "consumers," and holding that purchasers of residence were "consumers" because they committed money in a "personal investment"). Hough is not a consumer within the meaning of this statute. He did not purchase workers' compensation insurance from Pacific. He is a third party beneficiary of the contracts of insurance purchased by his employers.

[13] Although the ICA, in *Hunt,* did not address the argument raised by Hunt that, as a third-party beneficiary to a contract of insurance, she had standing to assert all contractual rights available to the named insured and, therefore, had standing to maintain a private cause of action under HRS §§ 480-2 and -13, it held that, notwithstanding her third-party status, the named insured was also not a "consumer" because it was not a natural person. 82 Hawai'i at 373, 922 P.2d at 986. The same situation obtains in the instant case. As previously stated, Hough is not a consumer and therefore lacks standing to maintain a private cause of action pursuant**872 *471 to HRS § 480-13. Nor can he maintain an action based on his third-party beneficiary status, because neither Royal nor Ramco is a "consumer" as defined by HRS § 480-1. We therefore hold that Hough has no standing to bring an action based on an alleged violation of HRS § 480-2. Accordingly, the circuit court did not err in granting summary judgment with respect to Count IV.

IV. *CONCLUSION*

For the foregoing reasons, we vacate the March 25, 1992 judgment in favor of Pacific as to Counts I, II, VI, VIII, IX, and X and remand for adjudication on the merits of those claims. The judgment in favor of Pacific as to Counts III, IV, V, and VII is affirmed.

Hawai'i,1996.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 P.2d 858
83 Hawai'i 457, 927 P.2d 858
**(Cite as: 83 Hawai'i 457, 927 P.2d 858)**

Hough v. Pacific Ins. Co., Ltd.
83 Hawai'i 457, 927 P.2d 858

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

Westlaw.

922 P.2d 976
82 Hawai'i 363, 922 P.2d 976
**(Cite as: 82 Hawai'i 363, 922 P.2d 976)**

▷
Hunt v. First Ins. Co. of Hawaii, Ltd.
Hawai'i App.,1996.

Intermediate Court of Appeals of Hawai'i.
Grisell HUNT, Plaintiff-Appellant,
v.
FIRST INSURANCE COMPANY OF HAWAII,
LTD., Joanne Toby Vogel, John Does 1-10, Jane
Does 1-10, Doe Corporations 1-10, Doe Partner-
ships 1-10, Doe Joint Ventures 1-10, and Doe Gov-
ernmental Entities 1-10, Inclusive, Defendants-Ap-
pellees.
**No. 16515.**

May 9, 1996.
Certiorari Granted May 24, 1996.
Certiorari Dismissed by Stipulation Sept. 23, 1996.

Customer injured in slip and fall in grocery store
sued store's commercial general liability (CGL) in-
surer, asserting breach of contract, bad faith, and
other theories in connection with her claim for
medical payments coverage under the CGL policy.
The Third Circuit Court, Hawai'i County, granted
partial summary judgment to insurer, and customer
appealed. The Intermediate Court of Appeals,
Kirimitsu, J., held that: (1) customer was intended
third-party beneficiary of store's CGL policy with
respect to medical payments coverage; (2) general
prohibition against direct action by injured party
against tort-feasor's liability insurer did not apply;
(3) as matter of first impression, no private cause of
action, express or implied, exists against insurer for
violations of unfair claim settlement practices stat-
ute; and (4) customer did not qualify as "consumer"
having standing to sue insurer under unfair trade
practices statute.

Affirmed in part; vacated and remanded in part.

West Headnotes

**[1] Appeal and Error 30 ☞863**

30 Appeal and Error
 30XVI Review
  30XVI(A) Scope, Standards, and Extent, in
General
   30k862 Extent of Review Dependent on
Nature of Decision Appealed from
    30k863 k. In General. Most Cited Cases
Summary judgment order is reviewed under same
standard applied by trial court.

**[2] Judgment 228 ☞181(2)**

228 Judgment
 228V On Motion or Summary Proceeding
  228k181 Grounds for Summary Judgment
   228k181(2) k. Absence of Issue of Fact.
Most Cited Cases

**Judgment 228 ☞185(2)**

228 Judgment
 228V On Motion or Summary Proceeding
  228k182 Motion or Other Application
   228k185 Evidence in General
    228k185(2) k. Presumptions and Bur-
den of Proof. Most Cited Cases
Summary judgment is proper where, viewing all
evidence in light most favorable to nonmoving
party, there is no genuine issue as to any material
fact and moving party clearly demonstrates that he
or she is entitled to judgment as matter of law.

**[3] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
 30XVI Review
  30XVI(F) Trial De Novo
   30k892 Trial De Novo
    30k893 Cases Triable in Appellate Court
     30k893(1) k. In General. Most
Cited Cases

**Insurance 217 ☞2533**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

922 P.2d 976
82 Hawai'i 363, 922 P.2d 976
**(Cite as: 82 Hawai'i 363, 922 P.2d 976)**

217 Insurance
   217XX Coverage--Health and Accident Insurance
      217XX(B) Medical Insurance
         217XX2533 k. Questions of Law or Fact.
Most Cited Cases
     (Formerly 217k467.13)
Construction and legal effect given medical payments coverage provision in liability insurance policy is question of law, which is reviewed de novo.

**[4] Appeal and Error 30 ⋘⟫893(1)**

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
            30k893 Cases Triable in Appellate Court
               30k893(1) k. In General. Most
Cited Cases

**Insurance 217 ⋘⟫3382**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(C) Settlement Duties; Bad Faith
         217k3378 Actions
            217k3382 k. Questions of Law or Fact.
Most Cited Cases
     (Formerly 217k602.12(2))
Whether claimant seeking medical payments coverage under liability insurance policy had private cause of action against insurer for violations of unfair claim settlement practices and unfair trade practices statutes was question of law, which was reviewed de novo. HRS §§ 431:13-103, 480-2, 480-13.

**[5] Contracts 95 ⋘⟫186(1)**

95 Contracts
   95II Construction and Operation
      95II(B) Parties
         95k185 Rights Acquired by Third Persons

         95k186 Privity of Contract in General
            95k186(1) k. In General. Most
Cited Cases
"Privity of contract" is that connection or relationship which exists between two or more contracting parties.

**[6] Contracts 95 ⋘⟫186(1)**

95 Contracts
   95II Construction and Operation
      95II(B) Parties
         95k185 Rights Acquired by Third Persons
         95k186 Privity of Contract in General
            95k186(1) k. In General. Most
Cited Cases
Absence of privity is generally not valid defense in actions for damages in contract.

**[7] Contracts 95 ⋘⟫187(1)**

95 Contracts
   95II Construction and Operation
      95II(B) Parties
         95k185 Rights Acquired by Third Persons
         95k187 Agreement for Benefit of Third Person
            95k187(1) k. In General. Most
Cited Cases
"Third-party beneficiary" is one for whose benefit promise is made in contract but who is not party to contract.

**[8] Contracts 95 ⋘⟫187(1)**

95 Contracts
   95II Construction and Operation
      95II(B) Parties
         95k185 Rights Acquired by Third Persons
         95k187 Agreement for Benefit of Third Person
            95k187(1) k. In General. Most
Cited Cases
Rights of third-party beneficiary must be limited to terms of promise, which may be express or implied from circumstances.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

922 P.2d 976
82 Hawai'i 363, 922 P.2d 976
**(Cite as: 82 Hawai'i 363, 922 P.2d 976)**

Page 3

**[9] Contracts 95 ⬤⟶187(1)**

95 Contracts
    95II Construction and Operation
        95II(B) Parties
            95k185 Rights Acquired by Third Persons
                95k187 Agreement for Benefit of
Third Person
                95k187(1) k. In General. Most
Cited Cases
Prime requisite to status of third-party beneficiary
under contract is that parties to contract must have
intended to benefit third party, who must be
something more than mere incidental beneficiary.

**[10] Insurance 217 ⬤⟶3462**

217 Insurance
    217XXIX Persons Entitled to Proceeds
        217XXIX(F) Life, Health and Accident In-
surance
            217k3462 k. In General. Most Cited Cases
        (Formerly 217k583(1))
Customer injured in slip and fall in grocery store
was entitled to benefits as intended third-party be-
neficiary of store's commercial general liability
(CGL) policy with respect to the medical payments
coverage provided thereunder.

**[11] Action 13 ⬤⟶6**

13 Action
    13I Grounds and Conditions Precedent
        13k6 k. Moot, Hypothetical or Abstract
Questions. Most Cited Cases
Customer's suit against grocery store's commercial
general liability (CGL) insurer concerning coverage
under policy's medical payments provision was
ripe, notwithstanding that she had not yet secured
settlement or judgment against store, since she was
intended third-party beneficiary of policy with re-
spect to medical payments coverage, and as such
was not prevented from bringing direct action.

**[12] Insurance 217 ⬤⟶3542**

217 Insurance

    217XXXI Civil Practice and Procedure
        217k3542 k. Direct Action by Injured Person,
in General. Most Cited Cases
        (Formerly 217k608.1)
General prohibition against direct action by injured
party against tort-feasor's liability insurer did not
apply to customer's suit against grocery store's
commercial general liability (CGL) insurer con-
cerning coverage under policy's medical payments
provision after she was injured in slip and fall in
store, since she was intended third-party benefi-
ciary of policy with respect to medical payments
coverage, and thus was suing in contract rather than
in tort.

**[13] Insurance 217 ⬤⟶3335**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3334 In General
                217k3335 k. In General. Most Cited
Cases
    (Formerly 217k602.1)
No private cause of action, express or implied, ex-
ists against insurer for violations of unfair claim
settlement practices statute. HRS §§ 431:13-101,
431:13-103, 431:13-103(a)(10), 431:13-107,
431:13-201, 431:13-202.

**[14] Antitrust and Trade Regulation 29T ⬤⟶ 141**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk139 Persons and Transactions
Covered Under General Statutes
            29Tk141 k. Consumers, Purchasers,
and Buyers; Consumer Transactions. Most Cited
Cases
    (Formerly 92Hk1 Consumer Protection)

**Insurance 217 ⬤⟶3357**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(C) Settlement Duties; Bad Faith
         217k3346 Settlement by Liability Insurer
            217k3357 k. Persons Entitled to Recover; Insurers Liable. Most Cited Cases
      (Formerly 217k602.1)
Customer of grocery store, who was seeking coverage under medical payments provision of store's commercial general liability (CGL) policy after she was injured in slip and fall in store, did not qualify as "consumer" having standing to sue insurer under unfair trade practices statute. HRS §§ 480-1, 480-2, 480-13.

**[15] Antitrust and Trade Regulation 29T ☞ 141**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk139 Persons and Transactions Covered Under General Statutes
            29Tk141 k. Consumers, Purchasers, and Buyers; Consumer Transactions. Most Cited Cases
      (Formerly 92Hk1 Consumer Protection)

**Insurance 217 ☞ 3357**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(C) Settlement Duties; Bad Faith
         217k3346 Settlement by Liability Insurer
            217k3357 k. Persons Entitled to Recover; Insurers Liable. Most Cited Cases
      (Formerly 217k602.1)
Customer of grocery store, who was seeking coverage under medical payments provision of store's commercial general liability (CGL) policy after she was injured in slip and fall in store, did not derivatively qualify as "consumer" having standing to sue insurer under unfair trade practices statute by virtue of her status as third-party beneficiary of policy with respect to medical payments coverage, insofar

as store was not natural person and thus was not itself "consumer." HRS §§ 480-1, 480-2, 480-13.

*\*\*977 \*364 Syllabus by the Court*

1. Customer sustained injuries after she slipped and fell while grocery shopping. At the time, the grocery store was covered by a commercial general liability policy that included a requirement for the store's insurer to pay medical expenses for bodily injury caused by accidents at the store. When the insurer paid for some, but not all, of the customer's related medical expenses, she sued insurer for, *inter alia,* breach of contract and various statutory violations.

2. This opinion decides that: (1) the customer is an intended third party beneficiary who has enforceable contractual rights under the medical provision of the above policy; (2) the general prohibition on direct action against insurers is not applicable in the instant case; (3) no private cause of action exists under Hawai'i Revised Statutes (HRS) Chapter 431, Article 13; and (4) the customer had no standing to sue insurer under HRS §§ 480-2 and -13 because she was not a "consumer" as defined by HRS § 480-1.

Dwayne Stephen Lerma and Jo Anne E. Goya (Lerma & Goya, of counsel), on the briefs, Hilo, for plaintiff-appellant.
Robert P. Richards, Ralph J. O'Neill and L. Darlene Mitchell (Reid, Richards & Miyagi\*\*978 \*365 , of counsel), on the briefs, Honolulu, for defendants-appellees First Insurance Company of Hawaii, Ltd. and Joanne Toby Vogel.

Before ACOBA and KIRIMITSU, JJ., and Circuit Judge BLONDIN in place of BURNS, C.J., Recused.

KIRIMITSU, Judge.
In an insurance contract dispute, plaintiff-appellant Grisell Hunt (Hunt) appeals from the Third Circuit Court's (1) August 13, 1992 Order Granting Partial Summary Judgment; (2) September 16, 1992 Order

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Denying Plaintiff's Motion for Reconsideration and Granting Plaintiff's Request for Rule 54(b) Certification of the Order Granting Motion for Partial Summary Judgment filed herein on August 13, 1992; and (3) September 24, 1992 Final Judgment Upon Less Than All of the Claims. All of the foregoing were filed in favor of defendants-appellees First Insurance Company of Hawaii, Ltd. (First Insurance) and Joanne Toby Vogel (Vogel).[FN1]

> FN1. At all relevant times, Joanne Toby Vogel was a claims adjuster for First Insurance Company of Hawaii, Ltd. (First Insurance).

For the reasons stated below, we affirm in part and vacate in part.

## I. BACKGROUND

On July 10, 1990, Hunt sustained injuries after she slipped and fell on WD-40 lubricant while grocery shopping at the KTA Super Stores (KTA) in Hilo, Hawai'i. At the time of Hunt's slip and fall, KTA was covered by a commercial general liability policy (Policy), policy no. CPP 7018785 01, issued by First Insurance. This Policy included, *inter alia,* a medical payment coverage, requiring First Insurance to pay medical expenses for bodily injury caused by accidents at KTA.

On September 4, 1990, Hunt's attorneys contacted First Insurance and requested information about the medical-payment coverage limits of First Insurance's Policy that was effective at Hunt's July 10, 1990 slip and fall.

On September 11, 1990, Michael Anderson (Anderson), a claims adjuster for First Insurance, responded to the September 4, 1990 letter and advised Hunt that the medical payment coverage limit was $5,000. To process Hunt's medical payments, Anderson explained that First Insurance needed a signed medical authorization, copies of medical bills, and names of medical providers. However, Anderson made no mention of any time limit for

Hunt to submit her claim for medical expenses.

On November 5, 1990, Hunt submitted a signed medical authorization to First Insurance. On various dates covering the period from July 31, 1990 through August 26, 1991, Hunt submitted demands to First Insurance for payment of medical bills and included copies of the bills from Hunt's medical providers.[FN2] According to Hunt, First Insurance paid 100% of Hunt's initial four demands for payments which included the cost for missed appointments as well.

> FN2. Some of these bills included charges for missed, cancelled, or late appointments. Plaintiff-appellant Grisell Hunt (Hunt) also billed First Insurance for airfare, car rental, and hotel accommodations related to an August 12, 1991 appointment with a physician on O'ahu.

On January 28, 1991, First Insurance informed Hunt that her claims adjuster, Anderson, was no longer working for First Insurance and that her claims were reassigned to another claims adjuster, Vogel. First Insurance also notified Hunt that it would not be able to process her pending, current, and future claims until it brought its files up to date. For example, First Insurance awaited a medical report concerning Hunt's current course of treatment and whether any apportionment was warranted due to Hunt's previous injuries sustained in an automobile accident on or about April 4, 1990. Subsequently, First Insurance denied all of Hunt's requests to Vogel for payment of medical expenses, including the request for expenses to consult with a Honolulu medical specialist.

In a letter dated July 29, 1991, First Insurance informed Hunt that it would pay its 30% apportionment of Hunt's medical expenses incurred through July 10, 1991, when the coverage for medical expenses expired, or up **979 *366 to the Policy's limit of $5,000. Although offering no clear basis for this 30% apportionment, First Insurance's July 29, 1991 letter suggests that this apportionment was

based in part on preexisting injuries that Hunt sustained in an earlier automobile accident on or about April 4, 1990. The letter further stated that as of July 29, 1991, "[First Insurance] paid a total of $1,636.04 in medical expenses on behalf of [Hunt]."

On August 8, 1991, Hunt informed First Insurance that, *inter alia,* (1) she had previously requested a copy of the applicable Policy, but First Insurance intentionally withheld a copy, and (2) First Insurance's actions with regard to Hunt's medical claims constituted malicious and unfair settlement practices.

On August 22, 1991, First Insurance responded that "Hawaii law does not require that we provide a copy [of the Policy]." First Insurance further stated: "With regard to your allegations of unfair claims settlement practices, our review of the files shows no indication that we mishandled [Hunt's] claim."

On August 27, 1991, Hunt filed her Complaint against First Insurance and Vogel (hereinafter collectively, First Insurance) alleging, *inter alia,* breach of the KTA insurance contract, bad faith breach of the insurance contract, and various violations of Hawai'i Revised Statutes (HRS) Chapters 431 (Insurance Code) and 480 (Monopolies; Restraint of Trade).[FN3]

> FN3. Hunt also filed a liability action against KTA Super Stores (KTA) in *Hunt v. Puna Plantation Hawaii, Ltd. dba KTA Super Stores, et al.,* Civil No. 92-142. However, Hunt's lawsuit against KTA is not at issue in the instant case.

On May 8, 1992, First Insurance filed a motion for partial summary judgment. On August 13, 1992, the circuit court filed its Order Granting Motion for Partial Summary Judgment ruling that:

1. [Hunt], the injured third party, does not have privity with [First Insurance], the insurer, *Olekele [sic] Sugar Co. v. McCabe, Hamilton & Renny Co.,*

53 Haw. 69, 487 P.2d 769 (1971);

2. [Hunt] does not have a private cause of action pursuant to HRS, section 431:13-103; and

3. [Hunt] does not have a cause of action under HRS, sections 480-2 and 480-13, nor for the violation of the above-statutes.

On August 19, 1992, Hunt filed Plaintiff's Motion for Reconsideration of Order Granting Partial Summary Judgment filed on August 13, 1992. On September 16, 1992, the circuit court filed its Order Denying Plaintiff's Motion for Reconsideration and Granting Plaintiff's Request for Rule 54(b) Certification of the Order Granting Motion for Partial Summary Judgment filed on August 13, 1992. Thereafter, Hunt filed a timely notice of appeal.

## II. *STANDARD OF REVIEW*

[1][2] A summary judgment order is reviewed under the same standard applied by the trial court. *State v. Tradewinds Elec. Serv. and Contracting Inc.,* 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995). Summary judgment is proper where, viewing all evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party clearly demonstrates that he or she is entitled to judgment as a matter of law. *Id.*

[3] The construction and legal effect given an insurance contract provision governing the right to medical expenses under the Policy is a question of law, which we review *de novo. Romero v. Hariri,* 80 Hawai'i 450, 459, 911 P.2d 85, 94 (App.1996) (citing *Hawaiian Isles Enter. Inc. v. City and County of Honolulu,* 76 Hawai'i 487, 489, 879 P.2d 1070, 1072 (1994)).

[4] The question of whether Hunt has a private cause of action under HRS § 431:13-103, HRS § 480-2, and HRS § 480-13 is also a question of law, which we review *de novo. BLT Advertisement Co., Inc. v. Edades,* 80 Hawai'i 270, 272, 909 P.2d 598,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

600 (App.1995) (citing *Kuhnert v. Allison,* 76 Hawai'i 39, 43, 868 P.2d 457, 461 (1994)).

**980 *367 III. DISCUSSION**

The dispositive issue on appeal is whether the trial court erred in granting First Insurance's motion for partial summary judgment. In granting this partial summary judgment, the circuit court ruled that: (1) Hunt does not have privity with First Insurance; (2) Hunt does not have a private cause of action pursuant to HRS § 431:13-103; and (3) Hunt does not have a cause of action under HRS §§ 480-2 and -13. On appeal, Hunt challenges all three rulings.

A. *The trial court erred in granting partial summary judgment on the breach of contract claim on the grounds of Hunt's lack of privity with First Insurance.*

[5][6] Privity of contract is "[t]hat connection or relationship which exists between two or more contracting parties." *Black's Law Dictionary* 1199 (6th ed. 1990). However, the absence of privity is generally not a valid defense in actions for damages in contract, since courts have, *inter alia,* "extended the right to sue for injuries or damages to third party beneficiaries [.]" *Id.*(citation omitted). *See, e.g., Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 128 n. 12, 883 P.2d 38, 65 n. 12 (recognizing non-contracting parties' rights as third party beneficiaries of an insurance contract), *reconsideration denied,*77 Hawai'i 489, 889 P.2d 66 (1994).

[7][8] A third party beneficiary is "[o]ne for whose benefit a promise is made in a contract but who is not a party to the contract." *Black's Law Dictionary* at 1480 (quoting *Chitlik v. Allstate Ins. Co.,* 34 Ohio App.2d 193, 299 N.E.2d 295, 297 (1973)). "[T]he rights of the third [party beneficiary] ... must be limited to the terms of the promise[,]" and this promise "may be express or it may be implied from the circumstances [.]" *Remington Typewriter Co., Inc. v. Kellogg,* 19 Haw. 636, 640 (1909) (internal quotation marks and citation omitted).

[9] Furthermore, "[a] prime requisite to the status of 'third party beneficiary' under a contract is that the parties to the contract must have intended to benefit the third party, who must be something more than a mere incidental beneficiary." *Black's Law Dictionary* at 1480 (quoting *McKinney v. Davis,* 84 N.M. 352, 353, 503 P.2d 332, 333 (1972)). For example, if contracting parties intend to confer direct benefits on a third party, that third party will have generally an enforceable contractual right. *See Villa Sierra Condominium Ass'n. v. Field Corp.,* 878 P.2d 161, 166 (Colo.App.1994) (recognizing the rights of third parties who were not signatories to a construction contract); *Seubert Excavators, Inc. v. Eucon Corp.,* 125 Idaho 409, 417, 871 P.2d 826, 834 (1994) (concluding that non-parties to a contract bond were intended third party beneficiaries).

1. *Hunt may enforce the contract as an intended third party beneficiary.*

[10] Hunt's Complaint asserts a cause of action for breach of contract. Hunt alleges wrongful conduct in the handling of her claim for payment of medical expenses under the Policy issued by First Insurance to its insured, KTA.

Upon the review of the Policy, we conclude that Hunt is entitled to medical benefits as an intended third party beneficiary under the insurance contract between KTA and First Insurance. Coverage C of the Policy provides in relevant part:

**COVERAGE C. MEDICAL PAYMENTS**

**1. Insuring Agreement.**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

....

b. *We will make these payments regardless of fault.* These payments will not exceed the applicable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

922 P.2d 976
82 Hawai'i 363, 922 P.2d 976
(Cite as: 82 Hawai'i 363, 922 P.2d 976)

Page 8

[\$5,000] limit of insurance.[FN4] We will pay for reasonable medical expenses for:

> FN4. KTA's commercial general liability policy with First Insurance provides that the "MEDICAL EXPENSE LIMIT" for "ANY ONE PERSON" is "\$5,000."

(1) First aid at the time of an accident;

**981 *368 (2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions.**

We will not pay expenses for "bodily injury:"

**a.** To any insured.

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

**e.** To a person injured while taking part in athletics.

**f.** Included within the "products-completed operations hazard."

**g.** Excluded under Coverage A.[FN5]

> FN5. Coverage A provides in relevant part:
>
> **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

....

**2. Exclusions.**

This insurance does not apply to:

**a.** "Bodily injury" ... expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b.** "Bodily injury" ... for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** Assumed in a contract or agreement that is an "insured contract;" or

**(2)** That the insured would have in the absence of the contract or agreement.

**c.** "Bodily injury" ... for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages....

**d.** Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law:

**e.** "Bodily injury" to:

**(1)** An employee of the insured arising out of and in the course of employment by the insured; or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(2) The spouse, child, parent, brother or sister of that employee as a consequence of the (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. (Emphasis added.) A plain reading of the medical payments section of the Policy indicates that this provision is intended to confer separate and distinct benefits directly on third parties injured on KTA's premises. In addition, because this provision does not exclude coverage for KTA customers, we conclude that such injured customers are intended third party beneficiaries of the Policy.

Because Hunt, a customer, suffered injuries on KTA's premises and because the Policy provides medical payments to reimburse KTA customers for such injuries, we hold that Hunt is an intended third party beneficiary who has enforceable contractual rights under the Policy issued by First Insurance.

2. *Hunt's lawsuit against First Insurance is ripe.*

[11] First Insurance appears to argue that Hunt has no contractual rights under the Policy because the Policy only permits direct actions against First Insurance if a settlement or judgment is first obtained against the insured, *i.e.,* KTA. Because Hunt has not yet secured a settlement or final judgment against KTA, First Insurance seems to contend that

Hunt's Complaint is not ripe. We disagree.

**\*\*982 \*369** The Policy does restrict who may bring a liability action against First Insurance. Section IV of the Policy provides:

**SECTION IV-COMMERCIAL GENERAL LIABILITY CONDITIONS**

....

**3. Legal Action Against Us.**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial .... An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

While this provision generally restricts direct actions against First Insurance, we conclude that this provision is not applicable to Hunt because her claims are filed under the medical payments provision of the Policy and are based on contract, not liability.

In *Olokele Sugar Co. v. McCabe, Hamilton & Renny Co.,* 53 Haw. 69, 487 P.2d 769 (1971), a stevedoring firm was engaged in off-loading a truck from a vessel and to a trailer when the truck slipped from a sling and fell on the trailer-damaging both the truck and the trailer. The owner of the truck and the owner of the trailer (collectively, the plaintiffs) sued the stevedoring firm and the firm's insurer for property damage. The trial court subsequently dismissed the plaintiffs' claims against insurer for failure to state a claim upon which relief can be gran-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

922 P.2d 976
82 Hawai'i 363, 922 P.2d 976
**(Cite as: 82 Hawai'i 363, 922 P.2d 976)**

ted. The plaintiffs appealed this dismissal. *Id.* at 69, 487 P.2d at 770.

On appeal, the Hawai'i Supreme Court affirmed the trial court's judgment. *Id.* at 72, 487 P.2d at 771. In so holding, the Hawai'i Supreme Court stated:

In determining the insured's liability, joinder of or a direct action against the insurer is generally prohibited unless statutorily or contractually permitted. The reasons ascribed for the rule are varied although a deep-seated reason is simply that the courts feel that it would not be sound public policy to permit the insurer to be joined as a defendant, in deference to what is believed to be a jury's tendency to find negligence or to augment the damages, if it thinks that an affluent institution such as an insurance company will bear the loss.

*Id.* at 71, 487 P.2d at 770 (citing 8 Appleman, *Insurance Law and Practice*, § 4861, at 294 (1962)).

In the instant case, Section IV of the Policy clearly restricts liability actions directly against First Insurance unless a settlement or final judgment against the insured is first obtained. Accordingly, unless Hunt obtained such a settlement or judgment against KTA, *Olokele* would prohibit Hunt from directly suing First Insurance for any tort committed by KTA.

[12] In contrast, Hunt's claim in the instant case is based on contract rather than tort. Hunt's rights as an intended third party beneficiary do not arise through the negligence of the insured, KTA, but rather through a contractual obligation conferred by First Insurance. *See* discussion, *supra*, at 367-369, 922 P.2d at 980-82. Therefore, because the liability of KTA is not at issue in the instant case, we conclude that the general prohibition on direct action against the insurer as set forth in *Olokele* is not applicable in the instant case. *See Desmond v. American Ins. Co.*, 786 S.W.2d 144, 145 (Mo.App.1989) (holding that an injured theater patron was entitled to bring a direct action against the theater's insurer based on a medical payment provision in the in-

surer's liability insurance policy); *Maxwell v. Southern Am. Fire Ins. Co.*, 235 So.2d 768, 770 (Fla.Dist.Ct.App.1970) (allowing an injured pedestrian to bring a direct action for medical expenses against the insurer because the pedestrian was a third party beneficiary under the medical payment provision of a homeowner policy). *See also* 8A Appleman, *Insurance Law and Practice* § 4902.05 at 232-33 (1981) (recognizing that the purpose of a **983 *370 medical payment provision in liability insurance policy is to ensure the payment of medical expenses of the injured party).

Accordingly, because Hunt is an intended third party beneficiary to the medical payment provision of the Policy and because nothing in the Policy restricts Hunt from filing a direct action against First Insurance, we hold that Hunt's claim against First Insurance is ripe.

Having held that Hunt is an intended third party beneficiary who has an enforceable contractual right for medical expenses under the Policy, we vacate that part of the August 13, 1992 Order Granting Motion for Partial Summary Judgment that precludes the breach of contract claim based on lack of privity and remand this matter for further proceedings consistent with this opinion.

*B. Hunt does not have a private cause of action pursuant to HRS Chapter 431, Article 13.*

[13] In granting First Insurance's motion for partial summary judgment, the trial court ruled that Hunt does not have a private cause of action pursuant to HRS Chapter 431, Article 13, which includes, *inter alia,* prohibitions against unfair claim settlement practices as defined by HRS § 431:13-103(a)(10) (1993).[FN6]

> FN6. HRS § 431:13-103(a)(10) (1993) provides in relevant part:
>
> **Unfair methods of competition and unfair or deceptive acts or practices defined.** (a) The following are defined

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

922 P.2d 976
82 Hawai'i 363, 922 P.2d 976
**(Cite as: 82 Hawai'i 363, 922 P.2d 976)**

as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:

....

(10) Unfair claim settlement practices. Committing or performing with such frequency as to indicate a general business practice any of the following:

(A) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(B) With respect to claims arising under its policies, failing to respond with reasonable promptness, in no case more than fifteen working days, to communications received from:

....

(ii) Any other persons, including the commissioner[.]

....

The response shall be more than an acknowledgement that such a person's communication has been received, and shall adequately address the concerns stated in the communication;

(C) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(D) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(E) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(F) Failing to offer payment within thirty calendar days of affirmation of liability, if the amount of the claim has been determined and is not in dispute;

(G) Failing to provide the insured, or when applicable the insured's beneficiary, with a reasonable written explanation for any delay, on every claim remaining unresolved for thirty calendar days from the date it was reported;

(H) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

(I) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds;

(J) Attempting to settle a claim for less than the amount to which a reasonable person would have believed the person was entitled by reference to written or printed advertising material accompanying or made part of an application;

....

(L) Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which the payments are being made;

....

(P) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement....

A plain reading of the language of Article 13 sup-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 12

922 P.2d 976
82 Hawai'i 363, 922 P.2d 976
(Cite as: 82 Hawai'i 363, 922 P.2d 976)

ports the trial court's ruling. For example, HRS § 431:13-101 (1993) FN7 provides**984 *371 that the purpose of Article 13 is to set forth an overall regulatory scheme to address the problems of "unfair methods of competition [and] unfair [and] deceptive acts [and] practices" in the business of insurance. In addition, HRS § 431:13-107 (1993) FN8 limits enforcement of this article to the State Insurance Commissioner-a further indication that Article 13 is directed more toward regulatory, as opposed to private, enforcement. Moreover, Article 13 only provides administrative remedies and penalties for violations of this article.FN9 The remedies and penalties include cease and desist orders, fines, and/or suspension or revocation of a person's insurance license. Nothing in the plain language of Article 13 expressly provides for a private cause of action for persons injured by insurance companies who violate this article.

   FN7. HRS § 431:13-101 (1993) provides in relevant part:

      The purpose of ... [Article 13] is to *regulate* trade practice in the business of insurance ... by defining, or providing for the determination of, all acts, methods, and practices which constitute unfair methods of competition or unfair or deceptive acts or practices in this State, and by prohibiting the trade practices so defined or determined.

   (Emphasis added.)

   FN8. HRS § 431:13-107 (1993) provides: "All remedies, penalties and proceedings set forth in this article are to be invoked *solely and exclusively* by the commissioner." (Emphasis added.)

   FN9. HRS §§ 431:13-201 and -202 (1993) set forth the remedies and penalties for violating HRS Chapter 431, Article 13.

   HRS § 431:13-201 provides in relevant

part:

**Cease and desist and penalty orders; judicial review.** (a) If ... the commissioner shall determine that the person charged has engaged in an unfair method of competition or an unfair or deceptive act or practice, the commissioner shall reduce the findings to writing and shall issue and cause to be served upon the person charged with the violation a copy of the findings and an order to cease and desist from engaging in the method of competition, act or practice. If the act or practice is a violation of HRS § 431:13-103 [ (Unfair methods of competition and unfair or deceptive acts or practices defined) ], the commissioner may ... order any one or more of the following:

(1) Payment of a fine of not more than $1,000 for each and every act or violation but not to exceed $10,000, unless the person knew or reasonably should have known that the person was in violation of section 431:13-103, in which case the fine shall not be more than $5,000 for each and every act or violation but not to exceed $50,000 in any six month period.

(2) Suspension or revocation of the person's license, if the person knew or reasonably should have known that the person was in violation of section 431:13-103.

HRS § 431:13-202 provides:

**Penalty for violation of cease and desist orders.** (a) Any person who violates a cease and desist order of the commissioner under section 431:13-201 may be subject at the discretion of the commissioner, after notice and hearing and upon

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

order of the commissioner, to either or both of the following:

(1) A fine of not more than $10,000 for each and every act in violation of the cease and desist order; or

(2) Suspension or revocation of the person's license.

(b) No order of the commissioner pursuant to this section or order of court to enforce it shall in any way relieve or absolve any person affected by the order from any other liability, penalty, or forfeiture required by law.

However, on appeal, Hunt contends that an implied private cause of action exists for violation of HRS Chapter 431, Article 13, because the state legislature enacted Article 13 to protect the rights of insurance consumers in Hawai'i and nothing in the legislative history of Article 13 prohibits a private cause of action.

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted'...-that is, does the statute create a ... right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ..."

*Reliable Collection Agency, Ltd. v. Cole,* 59 Haw. 503, 507, 584 P.2d 107, 109 (1978) (quoting *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975)) (emphasis in original omitted).

A review of the relevant legislative history of Article 13 fails to indicate a legislative intent to either create or deny a private cause of action. Specifically, Sen.Stand.Comm.Rep. No. 1715, in 1989 Senate Journal, at 1423, states:

[T]his bill and Act 97, Session Laws of Hawaii 1987, are not intended to indicate legislative support or objection to recognition of a statutory private cause of action with respect to violations of Article 13 of the Insurance Code. This bill and Act 97 are also not intended to impair the courts' **985 *372 ability to recognize or decline to recognize such a right.

Because Hawai'i courts have never addressed the issue of whether a private cause of action exists under Article 13, this issue is one of first impression.

Article 13 is modeled after the National Association of Insurance Commissioner's (NAIC) Model Unfair Claims Practices Act (Model Act), which has been adopted by at least 48 states. *See* House Stand.Comm.Rep. No. 395, in 1983 House Journal, at 1015; *Moradi-Shalal v. Fireman's Fund Ins.,* 46 Cal.3d 287, 250 Cal.Rptr. 116, 121-22, 758 P.2d 58, 63*reh'g denied* (1988). The great majority of these state versions of the Model Act have been held not to create a private cause of action.[FN10] *Morris v. American Family Mut. Ins. Co.,* 386 N.W.2d 233, 235 (Minn.1986) (recognizing this majority view). In addition, the 1980 Report of the NAIC has stated explicitly that the Model Act " 'does not contain an individual right of action provision [.]' " *Moradi-Shalal,* 250 Cal.Rptr. at 123, 758 P.2d at 65 (quoting 2 N.A.I.C. Proceedings (1980) 345-46)). Moreover, HRS § 431:13-202(b) provides: "No order of the commissioner ... shall in any way relieve or absolve any person affected by the order from any *other* liability, penalty, or forfeiture required by law." (Emphasis added.) Other jurisdictions with a similar statutory provision have found that the term "other" supports denying a private cause of action because the term indicates that liability against insurer must be found outside of the statute. *See, e.g., Scroggins v. Allstate Ins. Co.,* 74 Ill.App.3d 1027, 30 Ill.Dec. 682, 688, 393 N.E.2d 718, 724 (1979); *Seeman v. Liberty Mut. Ins. Co.,* 322 N.W.2d 35, 42 (Iowa 1982).

FN10. Only two states, Montana and West Virginia, recognize a statutory cause of ac-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion for private litigants. *See Klaudt v. Flink,* 202 Mont. 247, 658 P.2d 1065 (Mont.1983), *superseded in part by statute, O'Fallon v. Farmers Ins. Exchange,* 260 Mont. 233, 859 P.2d 1008, 1014-15 (1993); *Jenkins v. J.C. Penney Cas. Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled on other grounds, State ex rel. State Farm Fire & Cas. Co. v. Madden,* 192 W.Va. 155, 159, 451 S.E.2d 721, 725 (1994).

Accordingly, in light of the legislative scheme, the NAIC Report, and the majority view that the Unfair Claims Practices Act was not intended to create any private cause of action, we hold that no private cause of action exists under HRS Chapter 431, Article 13.

*C. Hunt has no cause of action under HRS § 480-2 and § 480-13 (1993).*

[14] Hunt contends that the trial court erred when it ruled that: "[Hunt] does not have a cause of action under HRS, sections 480-2 and 480-13, nor for the violation of the above-statutes." Hunt appears to argue that because First Insurance engaged in unfair and deceptive acts or practices in violation of HRS Chapter 480, she is entitled to a private cause of action pursuant to HRS Chapter 480.

HRS Chapter 480 prohibits monopolies and restraint of trade. Specifically, HRS § 480-2 sets forth a general prohibition against unfair or deceptive acts or practices in the conduct of any trade or commerce, and HRS § 480-13 provides a private cause of action against anyone violating HRS § 480-2. While HRS Chapter 480 authorizes private causes against those engaging in unfair or deceptive acts or practices in the conduct of any trade or commerce, both HRS §§ 480-2 and -13 limit private causes of action to "consumers."

HRS § 480-2 provides in relevant part:

**Unfair competition, practices, declared unlaw-**

**ful.** (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

....

(d) No person other than *a consumer,* the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

(Emphasis added.) HRS § 480-13(b) provides:
(b) *Any consumer* who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480-2:

**\*\*986 \*373** (1) May sue for damages sustained by the consumer, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys fees together with the costs of the suit;

(2) May bring proceedings to enjoin the unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorneys fees together with the cost of suit.

(Emphasis added.) In light of the plain and unambiguous language of HRS §§ 480-2 and -13, the question before this court is whether Hunt is a "consumer" as defined by HRS Chapter 480.

HRS § 480-1 (1993) defines a "consumer" as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment."

However, nowhere in the record does Hunt indicate or allege that she (1) purchased or attempted to purchase, or was solicited to purchase goods or services from First Insurance or (2) committed money, property, or services in a personal investment. Be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

922 P.2d 976
82 Hawai'i 363, 922 P.2d 976
**(Cite as: 82 Hawai'i 363, 922 P.2d 976)**

cause she failed to allege the foregoing, Hunt is not a "consumer" as defined by HRS Chapter 480 and, therefore, lacks standing to maintain a private cause of action pursuant to HRS § 480-13.

[15] Hunt insists that she does have standing. Hunt claims that "as a beneficiary under KTA Super Store's insurance contract issued by [First Insurance], [she] may assert all contractual rights under the insurance contract which are available to the named insured, KTA Super Stores." Accordingly, Hunt contends that she "should be allowed to maintain her cause of action under HRS § 480-2 and HRS § 480-13."

Hunt's argument is without merit. As discussed, *supra,* HRS §§ 480-2 and -13 limits private causes of action, based upon unfair and deceptive acts or practices, to "consumers." HRS § 480-1 defines a "consumer" as a "natural person." Because KTA is not a "natural person," it is also not a "consumer" as defined by HRS § 480-1 and, therefore, has no private cause of action pursuant to HRS § 480-13. Accordingly, because KTA has no private cause of action pursuant to HRS § 480-13, Hunt also has no derivative claim on this ground.

By the above holding, however, we do not address the issue of whether a person has standing to maintain a cause of action under HRS §§ 480-2 and -13 by virtue of the person's status as a third party beneficiary.

## IV. *CONCLUSION*

For the aforesaid reasons, we vacate that part of the August 13, 1992 Order Granting Motion for Partial Summary Judgment that precludes Hunt's breach of contract claim based on lack of privity and remand this case for proceedings consistent with this opinion. With regard to all other parts of that August 13, 1992 order, we affirm.[FN11]

> FN11. Hunt also appeals the September 16, 1992 Order Denying Plaintiff's Motion for Reconsideration and Granting Plaintiff's

Request for Rule 54(b) Certification of the Order Granting Motion for Partial Summary Judgment filed herein on August 13, 1992 and the September 24, 1992 Final Judgment Upon Less Than All of the Claims. However, because we reverse in part the August 13, 1992 Order Granting Partial Summary Judgment, Hunt's remaining issues on appeal are moot.

Hawai'i App., 1996.
Hunt v. First Ins. Co. of Hawaii, Ltd.
82 Hawai'i 363, 922 P.2d 976

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**6**

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo
936 P.2d 655
Citation:

Elizabeth Ann LEE, a single woman, Plaintiff-Appellee/Cross-Appellant,

v.

Edwin I. AIU, a single man, Defendant-Appellee/Cross-Appellee,
and
Steven B. Dixon and Lucy Pearson-Dixon, husband and wife, Defendants-
Appellants/Cross-Appellees
No. 18761.
April 15, 1997.

Real property owner sued co-signee of mortgage whose name appeared on deed as joint tenant and co-signee's real estate agents seeking equitable reformation of deed, enforcement of settlement agreement between owner and co-signee, tortious interference with contractual relations, negligent/intentional infliction of emotional distress, and malice. The Third Circuit Court struck jury's findings dealing with reformation and breach of settlement agreement and entered judgment for defendants, but awarded owner damages of $49,691.35 on remaining tort claims, as well as punitive damages totaling $40,000 against co- signee's real estate agents. Real estate agents appealed, and owner cross- appealed. The Supreme Court, Moon, C.J., held that: (1) trial court properly tried legal matters to jury prior to ruling on equitable claims but court was bound by jury's findings of fact when making its equitable determinations; (2) substantial evidence supported jury's finding that owner and co-signee did not intend to take property as joint tenants such that reformation of deed was proper; (3) substantial evidence supported jury's finding that co-signee breached settlement agreement; (4) substantial evidence supported finding that real estate agents tortiously interfered with settlement agreement; (5) evidence of attorney fees that owner incurred in litigation with co-signee was admissible as element of damages for tortious interference claim against real estate agents; and (6) substantial evidence supported award of punitive damages against real estate agents.

Affirmed in part, vacated in part, and remanded.
West Headnotes

[1] Jury k12(1)
230k12(1)

Right to jury trial in suits at common law goes to particular issue rather than overall case. Const. Art. 1, s 13; Rules Civ.Proc., Rule 38(a).

[2] Trial k4
388k4

Where legal and equitable claims are present in same case, trial court is precluded from ruling, in the first instance, on any equitable claims that may determine outcome of legal claims.

[3] Trial k374(2)
388k374(2)
When jury is called upon to make findings in connection with both legal and equitable matters resting upon same set of facts, trial court is bound by jury's findings of fact when making its equitable determinations.

[4] Trial k4
388k4

[4] Trial k374(2)
388k374(2)

Trial court was required to try home owner's claims against co-signee of mortgage whose name appeared on deed and co-signee's attorney/real estate agent for tortious interference with contractual relations, infliction of emotional distress, and malice prior to ruling on owner's equitable claims seeking reformation of deed and enforcement of settlement agreement between owner and co-signee; further, once jury made factual determinations regarding legal claims, trial court was bound by those findings in its determination of equitable claims.

[5] Frauds, Statute Of k106(2)
185k106(2)

Even if settlement agreement, providing that co-signee of mortgage whose name appeared on deed as joint tenant would pay home owner in exchange for agreement to remove name from deed, was required to be in writing, co-signee's handwritten notes to owner promising to vacate premises and release any interest in property in exchange for certain sum of money and real estate listing agreements indicating that sum of money would be

paid to co-signee upon sale were sufficient writings to evidence the agreement for purposes of statute of frauds.

[6] Judgment k199(3.6)
228k199(3.6)

Where there is conflicting evidence, or there is insufficient evidence to make a one-way verdict proper, judgment notwithstanding the verdict (JNOV) should not be awarded.

[7] Reformation of Instruments k45(4.1)
328k45(4.1)

Substantial evidence supported jury's finding that purchaser was sole owner of purchased property and that co-signee of mortgage would be on title and deed in name only, in purchaser's action seeking equitable reformation of deed, where co-signee testified that property was intended to belong solely to purchaser and that his name appeared on deed due to mistaken belief that it was condition precedent to co-signing note.

[8] Compromise and Settlement k23(3)
89k23(3)

Substantial evidence supported jury's finding that co-signee of mortgage and note, whose name appeared on deed as joint tenant with purchaser, had breached settlement agreement with purchaser which required purchaser to pay co-signee $25,000 in return for removal of co-signee's name from deed, for purposes of purchaser's equitable action seeking enforcement of agreement, where real estate agent testified about his involvement in working on special terms of listing agreement that reflected agreement, co-signee testified that purchaser attempted to secure a loan to pay him $25,000, and co-signee's handwritten notes reflected promise to vacate premises and release any interest in property in exchange for monetary payment.

[9] Specific Performance k62
358k62

Specific enforcement of agreement between purchaser and co-signee of mortgage whose name appeared as joint tenant on deed, wherein co-signee would pay purchaser $25,000 in return for removal of his name from deed, was appropriate remedy for co-signee's breach, where purchaser suffered no monetary damages as result of breach.

[10] Specific Performance k134
358k134

House purchaser's claim for specific enforcement of settlement agreement with co-signee of mortgage whose name appeared on deed was not an action in assumpsit, and as such purchaser was not entitled to award of attorney fees as the prevailing party. HRS s 607-14.

[11] Torts k212
379k212
(Formerly 379k12)

Tortious interference with contractual relations claim requires proof of contract between plaintiff and third party, defendant's knowledge of contract, defendant's intentional inducement of third party to breach contract, absence of justification on defendant's part, subsequent breach of contract by third party, and damages to plaintiff.

[12] Torts k263
379k263
(Formerly 379k27)

Substantial evidence supported jury's finding that real estate agents were liable for tortious interference with contractual relations arising out of settlement agreement between purchaser and co-signee of mortgage whose name appeared on deed, which provided that purchaser would pay $25,000 to co-signee in exchange for removing co-signee's name from deed; real estate agents knew of agreement and intentionally encouraged co-signee to breach agreement with purchaser by convincing him to enter into new contract with them for sale of interest in property.

[13] Costs k194.16
102k194.16

Attorney fees are chargeable against opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent.

[14] Damages k73
115k73

Where wrongful act of defendant causes plaintiff to engage in litigation with third party in order to protect his or her rights or interests, attorney fees incurred in litigating with that third party may be chargeable against wrongdoer as element of plaintiff's damages regardless of whether actions against both defendant and third party are brought together or separately.

[15] Damages k177
115k177

Evidence of attorney fees that purchaser incurred in litigation with co-signee of mortgage that were caused by real estate agent's tortious interference with contractual relation between purchaser and co-signee was admissible as element of purchaser's damages in her tortious interference claim against real estate agents.

[16] Damages k57.21
115k57.21
(Formerly 115k50.10)

Intentional infliction of emotional distress claim requires proof that act allegedly causing harm was intentional, that act was unreasonable or outrageous, and that actor should have recognized that act was likely to result in illness.

[17] Damages k192
115k192

Substantial evidence supported jury's finding that real estate agents' conduct was outrageous and was likely to result in illness, for purposes of intentional infliction of emotional distress claim brought by purchaser of property who had entered into settlement agreement with co-signee of mortgage which provided that co-signee would remove his name from deed in exchange for $25,000; real estate agents intentionally interfered with settlement agreement by persuading co-signee to sell his interest in property to them, agents informed purchaser that they owned half of home and cautioned her to continue paying mortgage or risk foreclosure, and agents knew that co-signee had been diagnosed with breast cancer and underwent chemotherapy.

[18] Damages k87(1)
115k87(1)

Punitive damages are not compensatory in nature; rather, they are designed to punish defendant for aggravated or outrageous misconduct and to deter that defendant from similar conduct in future.

[19] Damages k189.5
115k189.5
(Formerly 115k184)

Substantial evidence supported jury's award of punitive damages against real estate agents who intentionally interfered with contractual relations between purchaser and co-signee of mortgage whose name appeared on deed by inducing co-signee to breach settlement agreement in which purchaser was to pay $25,000 to co-signee in exchange for his agreement to remove his name from deed.

[20] Costs k194.10
102k194.10

[20] Damages k87(1)
115k87(1)

Attorney fees cannot be awarded in addition to exemplary damages; rather, they must constitute the whole of punitive damage award or be accounted for as portion of total punitive damage award.

[21] Damages k87(1)

115k87(1)

[21] Damages k94.7
115k94.7
(Formerly 115k94)

Whether to award punitive damages and determination of amount are within sound discretion of trier of fact, whether judge or jury. Restatement (Second) of Torts s 908 comment.

[22] Damages k165
115k165

Evidence of plaintiff's attorney fees incurred in litigation with defendants was admissible on issue of punitive damages.
**658 *22 Eric A. Seitz, Honolulu, on the briefs, for defendants- appellants/cross-appellees Steven B. Dixon and Lucy Pearson-Dixon.
William J. Rosdil and Paul K. Hamano, Hilo, on the briefs, for plaintiff-appellee/cross-appellant Elizabeth Ann Lee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.
Following a jury trial, defendants-appellants/cross-appellees Steven B. Dixon and Lucy Pearson-Dixon [FN1] (collectively, the Dixons) appeal from the third circuit court's February 13, 1995 amended judgment, awarding plaintiff-appellee/cross-appellant Elizabeth Ann Lee general and punitive damages. Briefly stated, this case involves a dispute over the title to real property located at 702 Keha Place in Hilo, Hawai'i (the Keha Place property), breach of a purported settlement agreement entered into between Lee and defendant-appellee Edwin I. Aiu, [FN2] claims of tortious interference with the purported settlement agreement by the Dixons, intentionally tortious or negligent conduct by Dixon toward Lee, and Lee's emotional distress claims.

FN1. Pearson-Dixon is now known as Lucy Larkin.

FN2. We note that Aiu has not made an appearance in this appeal.

Lee cross appeals from that portion of the amended judgment entered in favor of the Dixons and Aiu with respect to reformation of the deed to the Keha Place property and in favor of Aiu with respect to the settlement agreement. Lee also cross appeals from the trial court's denial of her request for attorney's fees.
For the reasons discussed below, we vacate that portion of the amended judgment with respect to the deed and the settlement agreement and remand this case to the trial court with instructions to: (1) equitably reform the deed to the Keha Place property to reflect Lee as the sole owner; and (2) specifically enforce the settlement agreement. We affirm the trial court's denial of Lee's request for attorney's fees against Aiu. Additionally, we affirm in part that portion of the amended judgment with respect to the Dixons' liability to Lee on the tortious interference with contractual relations claim, but remand for a new trial on the issue of damages consistent with our holding that Lee be allowed to introduce, as an element of her damages, evidence of those attorney's fees she incurred in litigation with Aiu that were caused by the Dixons' tortious interference with the contractual relation between Lee and Aiu. Additionally, we affirm the jury's finding that punitive damages are warranted, but vacate the award and remand for a new trial to determine the amount of punitive damages consistent with our holding that Lee be allowed to introduce, as an element of punitive damages, evidence of those attorney's fees she incurred in litigation with the Dixons.
Finally, because it appears from the record that Dixon, a licensed attorney, engaged in conduct that may not comport with the Hawai'i Rules of Professional Conduct (HRPC), we refer this matter to the Office of Disciplinary Counsel (ODC) for review and appropriate action.

I. BACKGROUND
According to the testimony adduced at trial, Lee met Aiu approximately one year after **659 *23 her husband, Clifford Lee (Clifford), passed away. By May 1983, Lee and Aiu had become romantically involved, and Aiu took up residence with Lee and her minor daughter in Lee's Oxnard, California home a few months thereafter. Upon moving in, Aiu brought approximately $5,000.00 into the relationship and contributed to the maintenance of the home and living expenses from his employment earnings and military pension. Aiu acknowledged during his testimony that he "did not have ... ownership in the Oxnard house."

As a result of many conversations Lee had with her brother-in-law, Wilbert Lee (Wilbert), who resided in Hawai'i, Lee decided to purchase a home in Hilo with proceeds from Clifford's life insurance and the sale of her two homes: the Oxnard residence and another house in Rhode Island. Aiu decided to move to Hawai'i with Lee, at

least temporarily, until Lee and her daughter were settled in a new home. Both Lee and Wilbert testified that Lee had made it clear that, although Aiu was moving with her, it was her intention that she would finance the purchase of a new home and that she would be the sole owner.

The sale of the Oxnard home netted Lee $62,215.78. Because she was unable to be present at closing or during the move to Hilo, Lee instructed escrow to disburse $15,000.00 of the net proceeds to Aiu to cover the moving expenses and to disburse the balance to her. Upon her subsequent arrival in Hilo, Lee deposited the $47,215.78 balance into a joint account with Aiu (the Merrill- Lynch account). Lee testified that she did not intend to make a gift to Aiu, but put his name on the account so that if anything happened to her, Aiu could carry out her intended purpose: to purchase a home in Hilo for her daughter. Using the proceeds from Clifford's life insurance and the sale of the Rhode Island home, Lee also established a similar account with Wilbert. Lee testified that she had no intention to make a gift to Wilbert and put his name on the account for the same reason that she put Aiu's name on the Merrill-Lynch account. While looking for a home to purchase in Hilo, Aiu, Lee, and Lee's daughter [hereinafter, collectively, the threesome] stayed with Wilbert for a few months and then moved into a rental home. Eventually, the threesome located a suitable home at the Keha Place property. By that time, however, Lee was experiencing credit problems due to a stolen credit card and general financial difficulty. [FN3] According to Lee, Aiu offered to assist her in securing financing by co-signing the mortgage and the note. She testified that, because Aiu's name would appear on the mortgage papers, they believed that Aiu's name would also have to appear on the deed to the property.

FN3. The record indicates that, at the time, the Merrill-Lynch account balance had declined to approximately $30,000.00.

In February 1986, Lee's offer to purchase the Keha Place property was accepted. It is undisputed that Lee made the $15,000.00 down payment exclusively from her own monies. She and Aiu then proceeded to sign all of the relevant documents as joint tenants with the right of survivorship. In response to the question whether Aiu "ever discuss[ed] the fact that [Aiu's] involvement in the purchase of a residence was to allow her to qualify for a loan[ ]," Aiu stated, "[T]hat was the key purpose."

The threesome moved to the Keha Place property and lived there together, off and on, until July 1990. Although Lee and her daughter lived in the home continuously, Aiu went back and forth between Hawai'i and California for employment purposes. Between 1985 and 1990, both Lee and Aiu contributed financially to the cost of the Keha Place property. Although Aiu made approximately $23,000.00 in mortgage payments, Lee testified that, during that period, Aiu, in conversations with various members of Aiu's family, referred to the Keha Place property as "the nice home that [Lee] had bought in Hilo."

Sometime in early 1989, the relationship between Lee and Aiu began to deteriorate. Lee testified that Aiu expressed a desire to remove his name from the deed and move back to California permanently. In July 1989, after a brief reconciliation, Lee testified that Aiu once again informed her that he was **660 *24 leaving Hawai'i and requested that Lee reimburse him the $23,000.00 that he had contributed to the mortgage in exchange for his consent to remove his name from the deed. Lee refused, reminding Aiu of their agreement that the house was hers. The matter was dropped for several months until December 13, 1989, when Lee learned that she had breast cancer.

Lee underwent a radical mastectomy on December 29, 1989, was released from the hospital on December 31, 1989, and immediately began a nine-month course of chemotherapy. Toward the end of January 1990, Lee testified that Aiu again announced that he wanted to leave Hawai'i. According to Lee, Aiu, on this occasion, demanded $25,000.00 in exchange for his agreement to remove his name from the deed. When asked why he wanted to leave following Lee's surgery, Aiu testified that "[s]he wouldn't talk to me.... So it was like 180 degrees switch over from loving to ... a person that ... had problems. I told her then that a mastectomy to me if she loses a breast it doesn't matter if she loses a breast...." He also testified, however, that "my feelings were that she had the problems.... I respected her very much but the mastectomy really turned me off to her. I don't know why." In January 1990, following Lee's surgery, Aiu moved out of Lee's bedroom, and their communication became very limited. Aiu testified that, because Lee would not talk to him, he began communicating with her by way of notes. His notes contained, inter alia, repeated demands for $25,000.00 to reimburse him for his share of the mortgage payments.

Feeling harassed and badgered, Lee turned to Wilbert for counsel. He advised her that, "[i]f this is a joint tenancy and you have cancer, whoever predeceases the other will leave the survivor everything. That means [your daughter is] out. If he's asking for $25,000.00, the easier of anything may be to give him what he wants." Lee testified that it was at that point that she acquiesced and promised to give Aiu $25,000.00 and, Aiu, in turn, promised not to pursue joint tenancy status by agreeing to remove his name from the deed [hereinafter, the settlement agreement]. Thereafter, Lee and Aiu discussed the logistics of how Aiu would be paid, eventually deciding that they would sell the house. From the net proceeds of the sale, Aiu would be paid $25,000.00, and the balance would be disbursed to Lee. With this plan in mind, Lee and Aiu executed a listing agreement on February 12, 1990.

Aiu, however, decided that he should consult an attorney and therefore met with Dixon, a licensed attorney, on

March 22, 1990. Aiu and Dixon initially contemplated that Dixon and his wife, both of whom were realtors, "might take a listing for sale on the house." The fee agreement between Aiu and Dixon reflects that Aiu paid Dixon $600.00 and that any additional fees would be paid to Dixon out of Aiu's share of the proceeds of the sale of the Keha Place property. Dixon characterized the $600.00 as an "attorney/or/broker commission to be determined by client Edwin K. Aiu whether this is an attorney fee retainer or brokerage commission."

Dixon advised Aiu that Aiu's equity in the property was probably about fifty to fifty-five thousand dollars and that Aiu would be ill-advised to waive his rights to it. Although Dixon disavowed any knowledge of the settlement agreement between Lee and Aiu, Dixon testified that he advised Aiu not to sell to anyone for $25,000.00 "[be]cause it was worth twice that." Moreover, Dixon's notes of the March 22, 1990 meeting with Aiu contain the notation "[w]illing [to] take 25K." Dixon further testified that Aiu told him: (1) "[w]ell, I might take 25,000 from [Lee] just to settle this whole mess"; and (2) "at one point I was willing to take 25."

Lee testified that sometime after executing the listing agreement, Aiu suggested that, rather than sell the house, she could take out a $25,000.00 loan to pay him. Thus, they canceled the listing agreement, and Lee applied for a loan; however, she was unable to qualify. Although Wilbert agreed to co-sign the loan, Aiu objected to Wilbert's involvement. Consequently, Lee and Aiu returned to their original plan to sell the house.

Wilbert, who was also a real-estate broker, testified that, on May 3, 1990, he spent several *25 **661 hours with Lee and Aiu drafting a new listing agreement for the sale of the Keha Place property. In the section marked "special terms" on the listing agreement, the following statement appears: (1) upon the successful completion of a sales transaction, net proceeds to sellers shall be: (a) twenty-five thousand dollars to Mr. Edwin K. Aiu, and (b) the balance to Elizabeth A. Lee. Wilbert testified that the information he wrote on the listing agreement form "was coming from both [Lee and Aiu] and after they came to an agreement I said, fine ... this is what you agreed to .... [a]nd this is what we put down." According to Wilbert, Aiu indicated that he wanted to take the listing agreement to an attorney, "[b]ut he had essentially agreed to everything here. And that's why it was put down.... [Aiu] told me that everything was acceptable to him."

Dixon testified that, on May 4, 1990, Aiu brought the unsigned listing agreement to his office for review. [FN4] Dixon, as reflected in his notes, advised Aiu to "retain [an] independent broker, not talk to other parties but allow attorney to handle, advise E[dwin] A[iu] not to waive any rights." Dixon also testified that he gave the listing agreement back to Aiu and understood that Aiu presented it, unsigned, to Lee. According to Wilbert, Dixon had called him on May 4, 1990, advising that he (Dixon) wished to co-list the property.

FN4. Aiu, however, testified that he had never seen the listing agreement until it was produced by Lee in discovery, that he was not present when Wilbert drafted it, and that he never had any intention of settling with Lee for $25,000.00. However, one of Aiu's signed, handwritten notes to Lee was introduced at trial. It contained, inter alia, the following passages: All I ask is $25,000.00 to dissolve our partnership, or my share of the partnership, even though it is worth twice that amount. There are a couple ways to do this: (1) $25,000 and a "quit claim" deed; (2) Sell the house, and present me with $25,000 out of the net[.] If there is friction or hostile occurrence then: (1) 50% split of the net on the house .... I have given you terms to solve our problems and dissolve our partnership. I ask for less than half of what you will net or what it is worth, and yet you hesitate.... There are other avenues that I could use but they are harsh and I refrain from these recourses.

Subsequent to his meeting with Dixon, Aiu informed Wilbert that his attorney did not agree with the listing contract and also that Aiu was entitled to fifty percent of the property. Lee testified that, after Aiu took the listing agreement to Dixon, he brought it back with the terms lined out and indicated that the listing agreement was not acceptable.

On May 16, 1990, after "much discussion between [them]," Wilbert drafted a Deposit, Receipt, Offer, and Acceptance (DROA) pursuant to Lee and Aiu's instructions, "all of which were put in writing here so that it would be good reference for everybody to see." By its terms, Lee would pay Aiu $25,000 in return for his release of any interest in the Keha Place property. Aiu drafted a handwritten note, to be attached to the DROA, which stated: [Lee] would like a copy for assurance of special term of house sale; (To be attached to DROA). This offer also includes the following provision: On completion of sale, escrow is hereby instructed to pay directly to Edwin K. Aiu, $25,000, for his partnership to 702 Keha Place house. Aiu signed the note, leaving a space for the date and took the DROA and the note to Dixon. Dixon testified that, because Aiu did not want to agree to the terms, Dixon wrote "rejected" across the face of DROA.

On July 3, 1990, Aiu delivered a handwritten note to Dixon at his office, stating: "[I] would like to sell my share of house (partnership) for the amount agreed upon earlier." Dixon testified that he was not aware of any earlier agreement Aiu had made with anyone and never asked Aiu what "the amount agreed upon earlier" meant. Despite his own advice to Aiu that $25,000 was a "ridiculous" offer for his interest, Dixon, along with his wife, Pearson-Dixon, offered to buy Aiu's interest for $25,000.00. Aiu accepted. In a **662 *26 document prepared by Dixon for Aiu's signature, dated July 13, 1990, Dixon "worked out the numbers at the top and showed [Aiu] that his equity was worth about $53,[5]00; and if we paid him $25,000 for it, we would, apparently, have a windfall of $28,500." The document further stated that: Ed Aiu acknowledges that the purchase price and interest rate is substantially below market value, Aiu wants Steve and Lucy Dixon to buy his interest in the house and understands that as his

lawyer S.B. Dixon has a conflict of interest in this self dealing transaction and Aiu waives that conflict of interest and understands that Aiu has the right to retain independent legal counsel. Aiu testified that he did not know, and Dixon did not tell him, the meaning of the phrases "conflict of interest" and "self dealing transaction," but he signed the document anyway because Dixon was his lawyer, Dixon told him to sign it, and, at the time, he (Aiu) was under stress and not thinking straight and had communicated that fact to Dixon. The Dixons gave Aiu $4,000.00 and a promissory note for the balance of $21,000.00, to be paid upon sale of the Keha Place property, and Aiu executed a warranty deed. A few days thereafter, without telling Lee what he had done, Aiu moved to the mainland. Just prior to his departure, Aiu, in response to Lee's inquiry, advised her to simply call him when the house was sold to discuss the payment of his $25,000.00. Lee did not learn about the arrangement between Aiu and the Dixons until Pearson-Dixon wrote her a letter, declaring the Dixons' ownership of a one-half undivided interest in her house. The letter also advised Lee that, because the Dixons had not assumed the mortgage, Lee must continue to pay the mortgage or risk foreclosure. In her letter, Pearson- Dixon also cautioned Lee not to commit waste and suggested that Lee consider a lower selling price for the house in order to achieve a faster sale. Following receipt of the letter and consulting with her attorneys, Lee filed the present action against Aiu and the Dixons on September 7, 1990.

After some discovery, Lee filed an amended complaint on March 25, 1992. The five counts of the amended complaint alleged the following claims for relief: I: Equitable Reformation of Deed (reformation); II: Breach of Settlement Agreement/Judicial Enforcement of Settlement Agreement (breach of settlement agreement); [FN5]

FN5. The First Amended Complaint referred to the agreement between Lee and Aiu as an "accord and satisfaction and/or compromise and settlement." Although sometimes referred to as an accord and satisfaction, the Lee/Aiu agreement was characterized throughout the proceedings as a settlement agreement and, therefore, will be referred to as such throughout this opinion. III: Negligent/Intentional Infliction of Emotional Distress (NIED/IIED); IV: Tortious Interference with Contractual/ Advantageous Relationship (TICR); and V: Intentional Tort/Malice, Bad Faith, Negligent Conduct (malice). All of the aforementioned claims for relief ultimately survived two motions for summary judgment, as well as a motion to bifurcate counts I and II from the remaining counts, and trial was scheduled to commence on March 21, 1994.

On March 21, 1994, the day jury selection was scheduled to begin, the Dixons filed a motion to strike Lee's jury demand and, alternatively, renewed their motion for bifurcation. The Dixons urged the trial court to resolve the threshold equitable issues separately, before any evidence was presented to the jury, because, if the Court does not rule in her favor on the equitable claims, Ms. Lee will have no legal claims, and the litigation will be over since, if Mr. Aiu was a joint tenant, and there were [sic] no valid contract to specifically perform, neither Mr. Dixon nor Ms. Dixon could be held liable for interfering with something that did not exist. After hearing argument on the motion, the trial court orally ruled as follows: My proposal, as I suggested last week, was to have the jury give an advisory opinion to the Court on the two matters to which they are—to which plaintiff's [sic] **663 *27 are not entitled to a jury decision, and that to take the jury decision as to the remaining three matters which, in my opinion, do give rise to jury triable issues.... I think the best way to proceed is to allow all of the evidence to come out and that I'll make a decision on the matters involving Mr. Aiu, and at the close of evidence, and then we will decide on the jury instructions, if appropriate, and the special verdict form, if appropriate, and the only matters for the jury will be the remaining three against the Dixons.... At the close of evidence we're going to make a decision on who's going to decide what as against these—as to all these issues. There are five. And also, that following the decision on that matter, the Court may immediately thereafter decide those matters which the Court feels must be decided by the— by the judge.

Jury selection began immediately following the hearing. At the close of Lee's case, the Dixons and Aiu moved for entry of judgment on the equitable issues in favor of the defendants and alternatively, for a directed verdict. The court denied the motion, stating: The Court is going to deny all motions for directed verdict. The basis of the denial is that the law is very clear that I must take this motion in light most favorable to the non-moving party and view the evidence in a light, again, most favorable to the non-moving parties. And I do so. I believe that there has been a sufficiency of evidence to support taking this matter before the jury and accordingly I deny the motions. Just to advise the parties, that pursuant to Rule 39(c) [of the Hawai'i Rules of Civil Procedure (HRCP) ], this Court will take all issues—rather, counts one [ (reformation) ] and two [ (breach of settlement agreement) ] in an advisory capacity to the jury. But this court has every intention of making the decisions on those two counts. Those are not jury triable issues. And the court will make the decisions.

The Dixons and Aiu again moved for a directed verdict at the close of the defendants' portion of the case, which was again denied on the same basis. During closing argument, with respect to the TICR claim, Lee suggested that the jury award her $28,500 in damages based upon the "windfall" that Dixon had calculated: Now the question is what are these amounts of damages [for TICR]. One of the exhibits that you're going to see ... is a document that was admitted by Mr. Dixon, he wrote up, and was sign[ed] by Mr. Aiu. And what he shows up here is that when you sell your undivided interest to him, Mr. Aiu, and you only have to pay $25,000 as far as his calculations are concerned based upon a value of $165,000, he's got [about] $28,500. That's what he's making. That's his profit. That would have been [Lee's]. To me this is clearly the amount of damages.

The jury returned its verdict on March 29, 1994. In answer to the first five questions on the special verdict form, the

jury found that: (1) at the time the Keha Place property was purchased, Lee and Aiu agreed that Lee would be the sole owner and that Aiu would be on the title in name only; (2) there was a binding and enforceable agreement between Lee and Aiu wherein Aiu agreed to sell his rights and interests in the Keha Place property for $25,000.00; (3) Aiu breached that agreement; (4) Lee suffered damages as a result of the breach; (5) such damages amounted to $15,000.00.

The jury also awarded Lee: (1) $10,000.00 in emotional distress damages; (2) $28,500.00 for TICR; (3) $28,500.00 for "interference with prospective advantage"; (4) $28,500.00 for "intentional tortious conduct"; (5) $25,000.00 in punitive damages against Dixon; and (6) $15,000.00 in punitive damages against Pearson-Dixon.

Subsequent to receiving the jury's special verdict, the trial court struck the jury's findings as to the first five questions on the verdict form dealing with the reformation and breach of settlement claims. stating: With respect to count one which is [Lee's] claim for reformation. the Court is going to enter judgment in favor of Defendant for these reasons. It is clear from the evidence adduced that all of the documentary evidence supports the finding of a **664 *28 joint tenancy and not a sole ownership. This would include the deed. mortgage documents. Also, payment by--of the mortgage by the Defendant Aiu albeit some made from joint accounts and joint funds indicate the intent of the parties. in my own mind, to proceed jointly. This of course is consistent with the documentary evidence and also consistent with other courses of conduct testified to by both Miss Lee and Mr. Aiu. In my own mind the most persuasive evidence was [Lee's] testimony in which she the described [sic] relationship and many of the things they did together. Most importantly. looking for a home over the course of almost one year. Her description was they looked for a home jointly that they both agreed on. For these reasons the Court feels that as to count one [Lee] has not met her burden. As to count two. accord and satisfaction the Court is also entering judgment in favor of defendant for these reasons. There is no question in my mind that there is a bona fide dispute. which [is] one of the elements of accord and satisfaction. However. by definition. accord is the promise to undertake the payment of an obligation. And the testimony and the evidence shows that while the parties agreed to an exchange of $25,000 in consideration of removing an interest--Mr. Aiu's interest from the property. an important and critical part of accord and satisfaction would have necessitated the understanding and promise to undertake the payment of the mortgage as well. And there was testimony by Miss Lee that such an agreement or such a discussion never took place. Furthermore. there was never any performance on the accord and satisfaction. And therefore the elements are not met. Accordingly, the Court will strike the jury's responses to questions numbers one. two, three, four. and five.

On April 5. 1994, the Dixons filed a motion for judgment notwithstanding the verdict (JNOV). or. in the alternative. for a new trial as to the claims for TICR, NIED/IIED. and malice. The Dixons argued that the trial court. by its rulings on the reformation and breach of settlement agreement claims. had already concluded that the jury's verdict was against the weight of the evidence as to critical elements of Lee's case against the Dixons. In other words. in order to prevail on the TICR claim. Lee was required to establish the critical element of the existence of a contract in the first instance. Because the court found that there was no binding and enforceable agreement between Lee and Aiu. the jury's finding regarding the TICR claim could not stand. Carrying this argument one step further. the Dixons also asserted that. absent a TICR claim. there existed no relationship between the Dixons and Lee upon which a NIED/IIED or malice claim could rest. The motion was denied.

On February 13. 1995. the court entered an amended judgment dismissing counts I (reformation) and II (breach of settlement agreement) and awarding Lee damages in the amount of $49,691.35 [FN6] on the remaining counts, as well as punitive damages in the amount of $25,000.00 against Dixon and $15,000 against Pearson-Dixon. The Dixons' notice of appeal and Lee's notice of cross-appeal were timely filed. [FN7]

FN6. Although not specifically delineated in the judgment itself. it appears from the record that $11,357.35 of the $49,691.35 was awarded as costs. Moreover. nowhere in the record is there any explanation of how the court arrived at the figure of $49,691.35 or $38,334.00, if the reference to $11,357.35 in costs is correct. We note also that damages awarded to Lee by the jury as indicated on the special verdict form is in excess of $150,000.00. Nevertheless, Lee does not raise as a point of error on appeal the fact that the amended judgment awards her a damage amount inconsistent with that reflected on the special verdict form.

FN7. Aiu did not appeal from the judgment of the trial court.

## II. DISCUSSION

Of the many issues raised by the Dixons and Lee, we address the following issues, which are dispositive of this case: 1. The Dixons' argument that there was no basis for awarding TICR. NIED/IIED. malice, and punitive damages because the trial court ruled in their favor on the equitable issues: and **665 *29 2. Lee's arguments that the trial court erroneously (a) contradicted the factual findings of the jury by ruling against her on the reformation and breach of settlement agreement claims, (b) refused to award attorney's fees against Aiu and the Dixons, and (c) refused to permit the jury to consider the amount of her attorney's fees when determining punitive damages.

A. Legal Versus Equitable Issues--General Principles

The Dixons argue that the trial court should have decided the reformation and breach of settlement agreement issues first because they were equitable in nature. The Dixons also argue that the TICR, NIED/IIED, and malice claims were predicated upon a finding that a settlement agreement existed and that, because the trial court found that no such enforceable agreement existed, it therefore erred in denying the Dixons' motions for directed verdict and JNOV or new trial.

Lee, on the other hand, maintains that, in determining whether to grant the equitable relief sought, the trial court was required to submit all factual determinations regarding her legal claims to the jury and that any findings of fact common to both the equitable and legal claims were binding on the trial court in its equitable determinations. Lee therefore submits that the trial court, having failed to find that the jury's factual determinations were unsupported by the evidence, erred when it disregarded the jury's factual findings as to the equitable reformation and breach of settlement agreement claims.

We begin our analysis by considering (1) which issues were required to be tried before a jury and (2) whether the jury's factual findings on those issues were binding on the trial court in its determination of issues that were not triable as of right to a jury. Such an inquiry presents a question of law, which we review de novo. See Mehau v. Reed, 76 Hawai'i 101, 869 P.2d 1320 (1994); Kimball v. Lincoln, 72 Haw. 117, 809 P.2d 1130 (1991).

Article I, section 13 of the Hawai'i Constitution guarantees that, "[i]n suits at common law where the value in controversy shall exceed five thousand dollars, the right of trial by jury shall be preserved." HRCP Rule 38(a) provides that "the right of trial by jury as given by the Constitution or a statute of the State or the United States shall be preserved to the parties inviolate."

[1] The right given by the Hawai'i Constitution and preserved by HRCP Rule 38(a) is the right to a jury trial in suits at common law. The test to determine whether a suit is "at common law" is ... whether the cause of action seeks "legal" or "equitable" relief. In other words, courts look to the nature of the remedy to determine whether a jury trial is warranted. Historically, actions in equity were heard by a judge; actions at law were triable by a jury. Mehau, 76 Hawai'i at 110, 869 P.2d at 1329 (citations omitted). Furthermore, "[i]t is well settled that a jury question goes to the particular issue rather than the overall case." Id. at 111, 869 P.2d at 1330 (citation omitted) (emphasis added); see also HRCP Rule 39.

[2] Where legal and equitable claims are present in the same case, this court has long held that the trial court is precluded from ruling, in the first instance, on any equitable claims that may determine the outcome of the legal claims. Harada v. Burns, 50 Haw. 528, 445 P.2d 376 (1968). In the federal courts, there is no question that, when legal and equitable issues turn on the same operative facts, a jury must decide the legal issue first. See, e.g., United States v. Williams, 441 F.2d 637 (5th Cir.1971).

[3] Furthermore, when a jury is called upon to make findings in connection with both legal and equitable matters resting upon the same set of facts, the trial court is bound by the jury's findings of fact when making its equitable determinations. See, e.g., Zions First Nat. v. Rocky Mountain Irrigation Inc., 795 P.2d 658, 662 (Utah 1990); International Harvester Credit v. Pioneer Tractor, 626 P.2d 418, 421 n. 2 (Utah 1981) (citation omitted); Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); see generally Charles A. **666 *30 Wright & Arthur R. Miller, Federal Practice and Procedure ss 2305, 2306, & 2338 (1971).

B. The Legal and Equitable Issues in this Case

[4] Lee sought monetary damages with respect to the TICR, NIED/IIED, malice, and, as alternative relief, breach of settlement agreement claims—all of which involve legal issues, triable as of right to a jury. And, because some of the findings regarding the legal claims would be dispositive of the equitable claims, the trial court was required to try the legal matters to the jury first. Williams, 441 F.2d at 637. For example: (1) the existence of a contract/settlement agreement was a factual determination common to both the breach of settlement agreement claim and the TICR claim; and (2) the existence and worth of Aiu's putative joint interest was a factual determination common to both the equitable reformation claim and the damages element of the TICR claim. See Kimball, 72 Haw. at 126, 809 P.2d at 1134-35 (the determination of an interest in land and any damages incidental thereto is a legal determination for the jury). Once the jury made factual determinations regarding the legal claims, the trial court was bound by those findings in its determination of the equitable claims. Zions First Nat., 795 P.2d at 662.

[5] In this case, the jury found, inter alia, that: (1) Lee and Aiu did not intend to take the property as joint tenants; (2) Lee and Aiu had entered into a settlement agreement; [FN8] (3) Aiu breached that agreement; (4) Lee suffered monetary damages as a result of the breach; and (5) such damages totaled $15,000.00. In order for the trial court to ignore the jury's findings, as indeed it did, it would necessarily have had to determine that such findings were not supported by the evidence. Kimball, 72 Haw. at 129, 809 P.2d at 1136; see also Kainea v. Kreuger, 30 Haw. 860, 870 (1929). [FN9]

FN8. The Dixons, relying on the statute of frauds, argue that the settlement agreement was unenforceable because the agreement involved the transfer of an interest in land and it was not evidenced by a sufficient writing. This argument is without merit. The jury found that Aiu did not have any such interest in the Keha Place property, a finding which we hold, infra, must be upheld. Aiu himself testified that he was simply seeking reimbursement for his contributions to the mortgage. The fact that he threatened to disregard the "key purpose" of placing his name on the deed, that is, to assist Lee in financing her home, did not invest him with an interest in the Keha Place

property. And, assuming arguendo that the settlement agreement was required to be in writing, because it resolved a dispute regarding real property, Aiu's handwritten notes to Lee and the listing agreements were sufficient writings to evidence the agreement between Lee and Aiu.

FN9. The Keinea court held that, [w]here a party is entitled by express provision of law to a trial by jury of issues of fact and it is not discretionary with the court to direct an issue or refuse it, the verdict of the jury is generally regarded in the same light as the verdict of a jury in a common-law action, and the chancery court is bound by it and cannot disregard it except under the same circumstances as would justify the judge in the law court in setting aside a verdict in a common-law action. Where a distinct legal issue, on which a party to an equity suit is entitled to a jury trial as of right, is tried by a jury, the verdict will be given the same force as in ordinary jury trials, and will not be set aside but will be regarded as conclusive between the parties, unless the court has specified that it is palpably against the evidence. 30 Haw. at 870 (citations omitted) (emphases added).

Because both the equitable and legal matters in this case rested upon the same set of operative facts, the trial court's decision to reverse the jury's verdict was the functional equivalent of granting a motion for directed verdict or for JNOV.
[6] It is well settled that a trial court's rulings on directed verdict or JNOV motions [are reviewed] de novo. Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion. In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable **667 *31 to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment. Carr v. Strode, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995) (quoting Richardson v. Sport Shinko (Waikiki Corp.), 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994)) (brackets in original). Thus, "[w]here there is conflicting evidence, or there is insufficient evidence to make a one-way verdict proper, [JNOV] should not be awarded." Id. at 487, 904 P.2d at 501 (internal quotations and citations omitted).
[7][8][9] An examination of the record reveals that the jury was presented with the following evidence: (1) Lee's testimony that (a) the property was intended to belong solely to Lee, (b) Aiu's name appeared on the deed only because Lee and Aiu had mistakenly believed it to be a condition precedent to co-signing the note, and (c) in conversations with various members of his family, Aiu referred to the Keha Place property as "the nice home that [Lee] had bought in Hilo"; (2) Aiu's testimony that Lee attempted to secure a loan, rather than sell the house, to pay him the $25,000.00; (3) Wilbert's testimony regarding his involvement in working on the special terms of a listing agreement that reflected Lee and Aiu's agreement; and (4) Aiu's handwritten notes, as well as the DROA, reflecting Aiu's promise to vacate the premises and release any interest he may have had in the Keha Place property in exchange for $25,000.00.
Based upon our review of the record, we believe there was substantial evidence to support the jury's findings with respect to Counts I and II. We therefore hold that the trial court erred when it entered judgment contrary to such findings. Consequently, we reinstate the jury's findings with respect to Count I (reformation) and remand this case with instructions that the trial court enter an order equitably reforming the deed to reflect Lee as the sole owner of the Keha Place property. See Carman v. Athearn, 77 Cal.App.2d 585, 175 P.2d 926, 932 (Cal.Ct.App.1947) (holding that "reforming the writ[ing] by making it conform to what the court was convinced, and the evidence show [ed], had been the true intent of the parties, but which had by mutual mistake or the fraud of defendant been incorrectly expressed," was an appropriate remedy). Because Aiu did not have an interest in the Keha Place property, he had nothing to transfer to the Dixons; thus, they too have no interest in the Keha Place property. We also reinstate the jury's findings with respect to Count II (breach of settlement agreement) insofar as it found that an agreement existed wherein Lee would pay Aiu $25,000.00 in return for the removal of his name from the deed and that Aiu breached that agreement. Because, on remand, the deed will be equitably reformed to reflect Lee as the sole owner, the Dixons no longer stand to gain a "windfall" inasmuch as they have no interest in the Keha Place property. Thus, Lee has suffered no monetary damages as a result of Aiu's breach, and the appropriate remedy is specific enforcement of the agreement. Consequently, we instruct the trial court to enter an order specifically enforcing the settlement agreement, that is, removal of Aiu's name from the deed—an act that will be accomplished through equitable reformation—and payment of $25,000.00 by Lee to Aiu.
[10] In conjunction with her breach of settlement agreement claim, Lee has requested an award of attorney's fees under HRS s 607-14 (1993), which provides that the prevailing party, inter alia, in actions in the nature of assumpsit, shall recover attorney's fees against the losing party not to exceed twenty-five percent of the judgment. State ex rel. Bronster v. United States Steel Corp., 82 Hawai'i 32, 56 n. 7, 919 P.2d 294, 318 n. 7 (1996). A suit to enforce an agreement is a suit for specific performance and is not an action in the nature of assumpsit. "[A] ssumpsit is a common law form of action for the recovery of damages for non-performance of a contract." Smothers v. Renander, 2 Haw.App. 400, 401, 633 P.2d 556, 559 (1981). Although Lee requested damages as alternative relief, we have determined that specific performance of the agreement is the remedy consistent with equitable reformation of the deed. Hence, because Lee's claim for specific enforcement is not an action in

assumpsit, *32 **668 we affirm the trial court's denial of her request for attorney's fees against Aiu under HRS s 607-14.

C. The Remaining Legal Issues (The TICR, NIED/IIED, Malice, and Punitive Damages Claims )

Relying on essentially the same arguments that they made in their April 5, 1994 motion for JNOV, discussed supra, the Dixons argue that the trial court erred in accepting the jury's verdict with respect to the TICR, NIED/IIED, malice, and punitive damages claims after having ruled against Lee on the equitable issues. The Dixons maintain that, once the trial court ruled in Aiu's favor on the equitable claims, they were entitled to a directed verdict or JNOV in their favor on the remaining issues. The Dixons, however, raise other arguments, discussed infra, directly challenging the jury's verdict on all of the remaining claims, presumably in anticipation of an adverse ruling by this court. Having indeed concluded that the trial court erred in finding for Aiu on Counts I and II, we now address the arguments raised by the Dixons and Lee on the remaining claims, with the exception of malice. We need not address the malice claim further as Dixon (to whom Count V applies exclusively) raises no additional arguments on appeal.

### 1. The TICR Claim

[11] The requisite elements of TICR are: (1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach the contract; (4) the absence of justification on the defendant's part; (5) the subsequent breach of the contract by the third party; and (6) damages to the plaintiff. Weinberg v. Mauch, 78 Hawai'i 40, 50, 890 P.2d 277, 287 (1995).

[12] The existence of a contract/settlement agreement between Lee and Aiu, and Aiu's breach thereof, are established. See supra section II.B. Based upon our examination of the record, we believe that there is substantial evidence to support the jury's findings that the Dixons were cognizant of the settlement agreement between Lee and Aiu and that they intentionally proceeded to encourage Aiu to breach that agreement by convincing him to enter into a new contract with them. The evidence further supports the finding that the Dixons were without justification, that is, that they were motivated only by their own personal gain. This is particularly so in light of: (1) Dixon's advice to Aiu that $25,000.00 for Aiu's putative interest in the Keha Place property was a ridiculous sum of money and that Aiu would be ill-advised to honor it; and (2) the Dixons' subsequent acquisition of Aiu's putative interest for that same "ridiculous" sum.

However, because we have directed the trial court to reform the deed to reflect Lee as the sole owner, Lee may now sell the property and reap all profits therefrom. Her damages, which the jury found to be $28,500.00 (that is, the amount of the "windfall" that the Dixons' might have realized as a result of their tortious interference with the settlement agreement) are therefore negated.

[13] Lee, however, argues that the trial court erred in refusing to allow her to introduce evidence of her attorney's fees incurred in litigating with Aiu as an element of damages in her TICR claim. We agree. Normally, pursuant to the "American Rule," each party is responsible for paying for his or her own litigation expenses. Survivors of Medeiros v. Maui Land & Pineapple Co., 66 Haw. 290, 296, 660 P.2d 1316, 1320 (1983); Thornley v. Sanchez, 9 Haw.App. 606, 618, 857 P.2d 601, 608 (1993). This general rule, however, is subject to a number of exceptions: attorney's fees are chargeable against the opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent. Id. As a matter of precedent, other jurisdictions have recognized that attorney's fees are chargeable against the wrongdoer in the context of a TICR claim. See, e.g., Dassance v. Nienhuis, 57 Mich.App. 422, 225 N.W.2d 789 (1975); Prospero Assocs. v. Redactron Corp., 682 P.2d 1193 (Colo.Ct.App.1983). Although not in the context of a TICR claim, this court has applied the exception where the wrongful act of the defendant **669 *33 causes the plaintiff to litigate with a third party. In Uyemura v. Wick, 57 Haw. 102, 551 P.2d 171 (1976), we held that, where the wrongful act of the defendant[, (in this case, the Dixons' TICR),] has involved the plaintiff in litigation with [another, (in this case, Aiu) ], or placed [the plaintiff] in such relations with others as makes it necessary to incur expenses to protect his [or her] interest, such expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful act, and may be recovered as damages. Id. at 108-09, 551 P.2d at 176 (emphasis added); see also Restatement (Second) of Torts s 914(2)(1979) [hereinafter, Restatement ]. [FN10]

FN10. Section 914 of the Restatement, supra, entitled "Expense of Litigation," provides: (1) The damages in a tort action do not ordinarily include compensation for attorneys' fees or other expenses of the litigation. (2) One who through the tort of another has been required to act in the protection of his [or her] interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorneys' fees and other expenditures thereby suffered or incurred in the earlier action.

[14] Thus, where the wrongful act of a defendant causes a plaintiff to engage in litigation with a third party in order to protect his or her rights or interests, attorney's fees incurred in litigating with that third party may be chargeable against the wrongdoer as an element of the plaintiff's damages. [FN11] Id. at 110, 551 P.2d at 176.

FN11. Lee also argues that the Dixons' are responsible for the attorney's fees she incurred in litigating with them. However, we address that question in connection with our discussion regarding punitive damages. See infra

section II.C.3. In order to recover attorneys' fees under this principle, the plaintiff must establish: (1) that the plaintiff had become involved in a legal dispute either because of a breach of contract by the defendant, or because of defendant's tortious conduct, that is, that the party sought to be charged with the fees was guilty of a wrongful or negligent act or breach of agreement; (2) that the litigation was with a third party, not with the defendant from whom the fees are sought to be recovered; (3) that the attorneys' fees were incurred in that third-party litigation; and (4) whether the fees and expenses were incurred as a result of defendant's breach of contract or tort, that they are the natural and necessary consequences of the defendant's act, since remote, uncertain, and contingent consequences do not afford a basis for recovery[.] Uyemura, 57 Haw. at 109, 551 P.2d at 176 (citations omitted).

[15] As previously discussed, Lee became involved in a legal dispute with Aiu because of the Dixons' tortious interference with the contractual relation between Lee and Aiu. As a natural and necessary consequence of the Dixons' tortious interference, Lee was required to litigate with Aiu, which in turn caused her to incur attorney's fees. Although some jurisdictions have held that this exception to the American Rule does not apply where the plaintiff consolidates his or her actions against both the contract breacher (in this case, Aiu) and the tortfeasor (in this case, the Dixons), we are in accord with those jurisdictions that hold that it is of no consequence whether the actions are brought together or separately. As aptly stated by the Colorado Court of Appeals, we see "no reason why attorneys' fees should be recoverable when the aggrieved party files separate lawsuits against the contract breacher and the tortfeasor, but should be denied when he [or she] consolidates both into one law suit." Prospero Assocs., 682 P.2d at 1199.

In such a case, the jury will be required to make a determination as to that portion of attorney's fees incurred by the plaintiff in the consolidated action that is attributable to the plaintiff's litigation with the third party, that is, Lee's litigation with Aiu. For purposes of clarity, we note that our holding in this section does not also entitle Lee to include the attorney's fees she incurred in litigating with the Dixons as an element of her TICR damages. In order to recover those attorney's fees from the Dixons, she must establish an independent exception; otherwise, the general rule that one is responsible for his or her **670 *34 own litigation expenses applies. On the facts of this case, Lee has successfully demonstrated that she is entitled to recover the attorney's fees she expended in litigating with the Dixons. See infra section II.C.3.

Accordingly, with regard to the TICR claim, we affirm the trial court's finding of liability, but vacate the damage award and remand with instructions to retry the issue of damages. On remand, Lee will be permitted to introduce, as an element of her damages, evidence of any attorney's fees that she incurred in litigation with Aiu that were caused by the Dixons' tortious interference with the contractual relation between Lee and Aiu.

## 2. NIED/IIED Claims

[16] The Dixons argue that emotional distress damages are not sustainable because Lee has failed to prove that she suffered a physical injury; however, Lee also asserted a claim for IIED, which does not require proof of physical injury. The elements of IIED are: "(1) that the act allegedly causing harm was intentional; (2) that the act was unreasonable [or outrageous [FN12]]; and (3) that the actor should have recognized that the act was likely to result in illness." Marshall v. University of Hawaii, 9 Haw.App. 21, 38, 821 P.2d 937, 947 (1991) (citation omitted) (emphasis added).

FN12. The terms "unreasonable" and "outrageous" have been used interchangeably and have been construed to mean "without just cause or excuse and beyond all bounds of decency." Chedester v. Stecker, 64 Haw. 464, 468, 643 P.2d 532, 535 (1982).

[17] As previously discussed, we believe that there was substantial evidence that the Dixons intentionally interfered with the settlement agreement. We also believe, based on our review of the record, that there was substantial evidence to support the jury's finding that Lee suffered emotional distress. With respect to the Dixons' conduct, the jury was presented with the following evidence: (1) Pearson-Dixon's letter to Lee (a) informing Lee that the Dixons now owned half of her home, (b) cautioning Lee to continue paying the mortgage or risk foreclosure, (c) instructing Lee not to commit waste, and (d) suggesting that Lee lower her selling price in order to accomplish a faster sale. The evidence also established that Aiu had related to Dixon that Aiu wished to leave Lee because she had changed since having been diagnosed with breast cancer and undergoing chemotherapy and that Aiu found it unbearable to live with her. Based on such evidence, and on the present record, it was reasonable for the jury to have found that the Dixons' conduct was "outrageous" and that such conduct "was likely to result in illness." Id.

## 3. Punitive Damages

[18][19] Finally, the Dixons argue that the evidence cannot sustain an award of punitive damages against them. We disagree. Punitive damages are not compensatory in nature; rather, they are designed to punish a defendant for "aggravated or outrageous misconduct" and to deter that defendant from similar conduct in the future. Masaki v. General Motors Corp., 71 Haw. 1, 6, 780 P.2d 566, 569, reconsideration denied, 71 Haw. 664, 833 P.2d 899 (1989). On the facts discussed in the previous section regarding the IIED claim, we hold that the present record contains substantial evidence from which the jury could find that the Dixons engaged in aggravated or outrageous

misconduct. We therefore affirm the jury's award of punitive damages against both Dixon and Pearson-Dixon.

On cross-appeal, Lee argues that she should have been permitted to introduce evidence of attorney's fees she incurred in litigation with the Dixons because punitive damages may be used as a method of paying an injured party's attorney's fees. We note that, in our seminal decision regarding punitive damages, this court recognized that other jurisdictions have held that "paying the plaintiff's attorneys' fees" is one of the purposes of punitive damages. Masaki, 71 Haw. at 8, n. 2, 780 P.2d at 572, n. 2. Recently, relying on Masaki and on the trend in the majority of our sister states, the Intermediate Court of Appeals held that "we adopt the majority view that a jury should be allowed to consider a plaintiff's attorney fees in determining the amount of a punitive damages award." Kunewa v. Joshua, 83 Hawai'i 65, 77, 924 P.2d 559, 571 (App.1996); see also **671 *35 Romero v. Hariri, 80 Hawai'i 450, 911 P.2d 85 (App.1996). When considering attorney's fees in calculating the amount of the punitive damage award, the fee amount must be "reasonable and necessary." Jolley v. Puregro Company, 94 Idaho 702, 496 P.2d 939, 947 (1972).

[20][21] Attorneys' fees cannot be awarded in addition to exemplary damages; rather, they must constitute the whole of the punitive damage award or be accounted for as a portion of the total punitive damage award. 22 Am.Jur.2d s 808 (1988); Romero, 80 Hawai'i at 458-59, 911 P.2d at 93-94 (affirming the trial court's ruling that "the motion for attorneys' fees is denied inasmuch as the Court finds that the punitive damages will cover, not only the punishment and deterrence aspect, but [also payment of the plaintiff's attorney's fees]"). And, "[w]hether to award punitive damages and the determination of the amount are within the sound discretion of the trier of fact, whether judge or jury." Restatement, supra, s 908, comment (d).

[22] Therefore, because facilitating payment of a plaintiff's attorney's fees is one of the purposes of punitive damages, we hold that the trial court erred in prohibiting Lee from presenting the jury with evidence of her attorney's fees incurred in litigating with the Dixons. We therefore affirm the jury's finding that punitive damages are warranted, vacate the award of $25,000.00 against Dixon and the award of $15,000.00 against Pearson-Dixon, and remand with instructions to retry the issue of punitive damages. On remand, Lee will be permitted to introduce, as an element of punitive damages, evidence of any attorney's fees that she incurred in litigation with the Dixons.

### III. REFERRAL TO THE ODC

As previously stated, it appears from the record in this case that Dixon engaged in conduct that may not comport with the HRPC. [FN13] We are therefore compelled to refer the record of this case to ODC for its review and appropriate action. See Bettencourt v. Bettencourt, 80 Hawai'i 225, 909 P.2d 553 (1995) (referring record to ODC where it appeared appellate counsel engaged in conduct prohibited by the HRPC).

FN13. See, e.g., HRPC Rules 1.2(a), 1.8(a), 1.8(j), and 8.4(c), which provide in relevant part: RULE 1.2 SCOPE OF REPRESENTATION (a) ... A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.... RULE 1.8 CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless: (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) the client consents in writing thereto. .... (j) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may: (1) acquire a lien granted by law to secure the lawyer's fee or expenses; and (2) contract with a client for a reasonable contingent fee in a civil case. RULE 8.4 MISCONDUCT It is professional misconduct for a lawyer to: .... (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. (Bold emphasis in original.)

### IV. CONCLUSION

For the reasons discussed above, we vacate that portion of the amended judgment with respect to the deed and the settlement agreement and remand this case to the trial court with instructions to: (1) equitably reform the deed to the Keha Place property to reflect Lee as the sole owner; and (2) specifically enforce the settlement agreement. We affirm the trial court's denial of Lee's request for attorney's fees against Aiu. Additionally, we affirm in part that portion of the amended judgment with respect to the Dixons' liability to Lee on the tortious interference with contractual relations claim, but remand for a new trial on the issue of damages consistent with our holding that Lee be allowed to introduce, as an element of her damages, **672 *36 evidence of those attorney's fees she incurred in litigation with Aiu that were caused by the Dixons' tortious interference with the contractual relation between Lee and Aiu. Additionally, we affirm the jury's finding that punitive damages are warranted, but vacate the award and remand for a new trial to determine the amount of punitive damages consistent with our holding that Lee be allowed to introduce, as an element of punitive damages, evidence of those attorney's fees she incurred in litigation with the Dixons.

Furthermore, in connection with the above-described conduct of attorney Steven B. Dixon, we refer the matter of Supreme Court No. 18761 as well as Civil No. 90-347 to the ODC for its review and appropriate action. We direct the Clerk of the Supreme Court to transmit a certified copy of this opinion to the ODC. We further direct all clerks of the several courts of this state to make available the records of the aforementioned cases for the ODC's review and to provide certified copies, at no cost, of any documents requested by the ODC in connection with its investigation of this matter.

85 Hawai'i 19, 936 P.2d 655

7

## [PART I. ANTITRUST PROVISIONS]

### Revision Note

Sections 480-1 to 24 have been designated Part I in view of addition of Part II by L 1972, c 205.

**§480-1 Definitions.**  As used in this chapter:
"Class action" includes the definition as provided in rule 23 of the Hawaii rules of civil procedure.
"Commodity" includes, but is not restricted to, goods, merchandise, produce, choses in action, and any other article of commerce.  It also includes trade or business in service trades, transportation, insurance, banking, lending, advertising, bonding, and any other business.
"Consumer" means a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment.
"De facto class action" means an action that has not been certified by the court but includes identical considerations as provided in Hawaii rules of civil procedure rule 23 such as common questions of law or fact, claims or defenses of the representative parties are typical of the claims or defenses of nonparties and, as a practical matter, the disposition of the interest of the class or other members not parties to the adjudications would substantially impair or impede their ability to protect their interest.
"Person" or "persons" includes individuals, corporations, firms, trusts, partnerships, limited partnerships, limited liability partnerships, limited liability limited partnerships, limited liability companies, and incorporated or unincorporated associations, existing under or authorized by the laws of this State, or any other state, or any foreign country.
"Purchase" or "buy" includes "contract to buy", "lease", "contract to lease", "acquire a license", and "contract to acquire a license".
"Purchaser" includes the equivalent terms of "purchase" and "buy".
"Sale" or "sell" includes "contract to sell", "lease", "contract to lease", "license", and "contract to license".
"Seller" includes the equivalent terms of "sale" and "sell". [L 1961, c 190, §1; Supp, §205A-1; HRS §480-1; am L 1987, c 274, §1; am L 1990, c 63, §1; am L 2005, c 108, §1]

### Attorney General Opinions

Land and land activities are within scope of chapter. Att. Gen. Op. 62-39.

### Law Journals and Reviews

The Antitrust Laws and Land: An Answer to Hawaii's Housing Crisis? 8 HBJ 5.

## Case Notes

Because defendant wholesale food marketer and distributor did not meet definition of a consumer, it lacked standing to sue for deceptive practices under §480-2.  61 F. Supp. 2d 1092.

Defendants' motion for summary judgment on plaintiffs' claim under §480-4 granted; although the word "commodity" was defined to include "any other business", the purchase of real estate by an individual owner could not be considered a business.  338 F. Supp. 2d 1106.

Where the dispute giving rise to a claim for unfair and deceptive act in trade or commerce occurred after the alleged injury, when plaintiff alleged that defendant failed to comply with their agreement regarding the release of plaintiff's medical records, plaintiff lacked standing as a consumer to bring a claim under §480-2, and defendant was not engaged in trade or commerce.  383 F. Supp. 2d 1244.

Suit against State based on this chapter precluded by sovereign immunity.  60 H. 228, 588 P.2d 430.

Real estate or residences did not qualify as "goods" under this section, but did qualify as "personal investments"; homebuyer thus had standing as "consumer" to bring claim under §480-13.  80 H. 54, 905 P.2d 29.

Where employee was not a "consumer" as defined under this section, employee lacked standing to maintain private cause of action under §480-13 against workers' compensation insurer based on alleged violation of §480-2.  83 H. 457, 927 P.2d 858.

Where employer was not a "consumer" as defined under this section, employee could not maintain action under §480-13, based on employee's third party beneficiary status, against workers' compensation insurer for alleged violation of §480-2.  83 H. 457, 927 P.2d 858.

By the plain language of this chapter, no actual purchase is necessary as a prerequisite to a consumer recovering damages under §480-13, based on injuries stemming from violations of §480-2.  98 H. 309, 47 P.3d 1222.

Plaintiff suing store's commercial general liability insurer for injuries received in slip and fall was not "consumer" as defined in this section, and therefore lacked standing to maintain private cause of action under §480-13.  82 H. 363 (App.), 922 P.2d 976.

Plaintiff corporation and officers of corporation were not "consumers" as defined in this section; thus, plaintiffs, individually and collectively, did not have standing to bring suit under chapter 480 for alleged unfair/deceptive trade practices.  107 H. 423 (App.), 114 P.3d 929.

**8**

**§480-2  Unfair competition, practices, declared unlawful.**  (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.
(b)  In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.
(c)  No showing that the proceeding or suit would be in the public interest (as these terms are interpreted under section 5(b) of the Federal Trade Commission Act) is necessary in any action brought under this section.
(d)  No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.
(e)  Any person may bring an action based on unfair methods of competition declared unlawful by this section. [L 1965, c 129, pt of §1; Supp, §205A-1.1; HRS §480-2; am L 1987, c 274, §2; am L 1988, c 51, §1; am L 2002, c 229, §2]

## Law Journal and Reviews

Misrepresentation and Deception Under Section 480-2 of the Hawaii Revised Statutes.  10 HBJ 69.

## Case Notes

Requires showing that suit in public interest; may be proven by knowledge of illegality.  732 F.2d 1403.
Employer's negligent misrepresentation that it guaranteed employees full payment of their pensions was not "unfair act".  804 F.2d 1418.
Neither contractor association's collective bargaining representation nor its fee for representation were unfair or deceptive acts.  809 F.2d 626.
Section does not apply to claims arising from securities transactions.  849 F.2d 388; 758 F. Supp. 1357.
Violated where pawn shop created "likelihood of confusion" by soliciting borrowers while disguising loans as sales.  3 F.3d 1261.
Court erred in finding this section preempted, where court dismissed claim that issuer of title insurance policy violated this section.  95 F.3d 791.
Where the dispute giving rise to a claim for unfair and deceptive act in trade or commerce occurred after the alleged injury, when plaintiff alleged that defendant failed to comply with their agreement regarding the release of plaintiff's medical records, plaintiff lacked standing as a consumer to bring a claim under this section, and defendant was not engaged in trade or commerce.  383 F. Supp. 2d 1244.
Attachment available only where contract at issue also establishes

a debtor-creditor relationship for payment of money.  485 F. Supp.
1015.
   Inability to establish antitrust claim does not prevent
establishment under this section; plaintiffs may recover for
violations which occurred prior to four year statute of limitations
if they can prove fraudulent concealment; practice is unfair when it
offends public policy and when the practice is immoral, unethical,
oppressive, unscrupulous, or substantially injurious to consumers;
section 480-13 creates private right of action.  491 F. Supp. 1199.
   Plaintiffs could show that violation of federal or state securities
laws satisfies public interest requirement to bring suit under this
section.  501 F. Supp. 830.
   Continuance of unlawful pricing program in contravention of court
order is as a matter of law, an unfair method of competition.  513 F.
Supp. 726.
   Action by shopping center tenant against shopping center owner.
530 F. Supp. 499.
   Preempted by federal labor regulations.  687 F. Supp. 1453.
   Suit for causes of action which arose prior to amendment is not
precluded.  691 F. Supp. 247.
   Minority shareholder of a corporation is not a consumer; no private
cause of action for unfair methods of competition.  700 F. Supp.
1056.
   Although distributor corporation had standing to bring unfair
competition claim, shareholders were not "consumers" with standing to
sue under deceptive practices clause.  775 F. Supp. 1329.
   Section inapplicable to insurance business.  795 F. Supp. 1036.
   As a business, plaintiff had standing to sue for unfair competition
under this section.  808 F. Supp. 736.
   Plaintiff corporation lacked standing to sue for deceptive
practices under chapter 480; plaintiffs, shareholders and officers of
corporation, lacked standing to sue for deceptive practices, where
harm suffered by plaintiffs arose indirectly as a result of harm done
to corporation.  895 F. Supp. 1365.
   Plaintiff had standing to bring its §480-2 claim for unfair methods
of competition; plaintiff's likelihood of confusion allegations may
support both §§480-2 unfair methods of competition and 481A [sic]
deceptive acts or practices claims.  945 F. Supp. 1344.
   Hawaii supreme court would find that plaintiff, a third-party
beneficiary of insurance contract between defendant insurer and a
consumer, had standing to bring a deceptive acts or practices claim
pursuant to this section.  947 F. Supp. 429.
   Because defendant wholesale food marketer and distributor did not
meet definition of a consumer, it lacked standing to sue for
deceptive practices under this section.  61 F. Supp. 2d 1092.
   Plaintiffs' unfair or deceptive acts or practices claims dismissed;
this section and §480-13 do not provide a cause of action for
personal injury claims.  100 F. Supp. 2d 1265.
   A technical violation of Truth In Lending Act (TILA) does not
constitute a per se violation of this section.  The technical

violation of TILA at issue, i.e., the failure to provide a properly dated notice of right to cancel, did not qualify as an unfair act or practice. 101 F. Supp. 2d 1326.

A municipality may be held liable under this chapter if its act is done "in the conduct of any trade or commerce", but is not subject to a treble damage penalty. 215 F. Supp. 2d 1098.

Federal statutes and decisions are to be used as guides. 63 H. 289, 627 P.2d 260.

Complexity of insurance policy, without more, does not make document deceptive. 55 H. 155, 516 P.2d 720.

Violation where financial institution failed to inform parents with education plan, that it had a side deal with schools to pay tuition in semiannual installments. 71 H. 285, 788 P.2d 833.

A broker or salesperson actively involved in a real estate transaction engages in "conduct in any trade or commerce" and is thus subject to liability under this chapter. 80 H. 54, 905 P.2d 29.

Where employee was not a "consumer" as defined under §480-1, employee lacked standing to maintain private cause of action under §480-13 against workers' compensation insurer based on alleged violation of this section. 83 H. 457, 927 P.2d 858.

Where employer was not a "consumer" as defined under §480-1, employee could not maintain action under §480-13, based on employee's third party beneficiary status, against workers' compensation insurer for alleged violation of this section. 83 H. 457, 927 P.2d 858.

There is no private claim for relief under §480-13 for unfair methods of competition in violation of this section; private remedy is restricted to claims of unfair or deceptive acts or practices. 91 H. 224, 982 P.2d 853.

Genuine issues of material fact precluded summary judgment with respect to defendant's counterclaims based on alleged violation of this section where defendants alleged that plaintiff credit union "unethically" or "unscrupulously" attempted to influence defendants to sign loan documents by making deceptive representations to alleviate defendants' concerns that the mortgage interest rate was not that for which they had bargained for. 94 H. 213, 11 P.3d 1.

By the plain language of this chapter, no actual purchase is necessary as a prerequisite to a consumer recovering damages under §480-13, based on injuries stemming from violations of this section. 98 H. 309, 47 P.3d 1222.

Under the filed-rate doctrine, telephone customers' claims failed as a matter of law where customers could not demonstrate that telephone company's allegedly inadequate disclosures constituted an unfair or deceptive trade practice because (1) company's tariffs on file with the public utilities commission disclosed that fees should be assessed against customers receiving touch calling services; (2) knowledge of these disclosures contained in the tariff was imputed to the customers, and, thus, (3) customers could prove neither the injury nor the likelihood of damage that is required under this section or chapter 481A. 109 H. 69, 123 P.3d 194.

Any person may bring a claim of unfair methods of competition based

upon conduct that could also support a claim of unfair or deceptive acts or practices as long as the nature of the competition is sufficiently alleged in the complaint.  113 H. 77, 148 P.3d 1179.

By its plain language, subsection (e) authorizes any person, i.e., businesses and individual consumers, to bring an action grounded upon unfair methods of competition; thus, trial court erred to the extent that it premised its dismissal of plaintiffs' unfair methods of competition claims on its conclusion that plaintiffs "are not competitors of defendant".  113 H. 77, 148 P.3d 1179.

Retroactive application of subsection (e), which created a private claim for relief, is not permitted inasmuch as the legislature did not expressly or obviously indicate its intention that subsection (e) apply retroactively; thus, trial court correctly concluded that plaintiffs' claims of unfair methods of competition based upon defendant's alleged wrongful acts prior to the effective date of subsection (e) were barred.  113 H. 77, 148 P.3d 1179.

Under this section, plaintiffs need not be "in competition" with defendant; thus, trial court erred to the extent that its dismissal of plaintiffs' unfair methods of competition claims were premised on its conclusion that plaintiffs "are not in competition with defendant".  113 H. 77, 148 P.3d 1179.

Whether it was an unfair practice for creditor to threaten to cut off business with debtor's employer unless debt was paid was a jury question.  2 H. App. 301, 632 P.2d 1071.

Corporation committed unfair or deceptive acts by allowing another to use its contractor's license and guaranteeing its own contractual obligations; section does not supersede remedy for common law fraud. 6 H. App. 125, 712 P.2d 1148.

Unfair or deceptive trade practice claimed where defendants' labels implied that foreign-made kukui nut leis were manufactured in Hawaii.  7 H. App. 600, 789 P.2d 501.

Evidence supported conclusion that person and corporation owned and operated by person engaged in unfair and deceptive acts or practices in publication of corporation's newspaper and television advertisements.  9 H. App. 106, 826 P.2d 879.

In action by consumer under this section, "unclean hands" of consumer not a defense to claim for damages under §480-13(b)(1).  86 H. 405 (App.), 949 P.2d 1026.

**9**

**§490:3-403  Unauthorized signature.**  (a)  Unless otherwise provided in this Article or Article 4, an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value.  An unauthorized signature may be ratified for all purposes of this Article.

(b)  If the signature of more than one person is required to constitute the authorized signature of an organization, the signature of the organization is unauthorized if one of the required signatures is lacking.

(c)  The civil or criminal liability of a person who makes an unauthorized signature is not affected by any provision of this Article which makes the unauthorized signature effective for the purposes of this Article. [L 1991, c 118, pt of §1]

**10**

## PART 4. RELATIONSHIP BETWEEN PAYOR
## BANK AND ITS CUSTOMER

§490:4-401  **When bank may charge customer's account.** (a)  A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft.  An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank.

(b)  A customer is not liable for the amount of an overdraft if the customer neither signed the item nor benefited from the proceeds of the item.

(c)  A bank may charge against the account of a customer a check that is otherwise properly payable from the account, even though payment was made before the date of the check, unless the customer has given notice to the bank of the postdating describing the check with reasonable certainty.  The notice will be effective for the period stated in section 490:4-403(b) for stop-payment orders, and must be received at such time and in such manner as to afford the bank a reasonable opportunity to act on it before the bank takes any action with respect to the check described in section 490:4-303.  If a bank charges against the account of a customer a check before the date stated in the notice of postdating, the bank is liable for damages for the loss resulting from its act.  The loss may include damages for dishonor of subsequent items under section 490:4-402.

(d)  A bank that in good faith makes payment to a holder may charge the indicated account of its customer according to:

(1)  The original terms of the altered item; or

(2)  The terms of the completed item, even though the bank knows the item has been completed unless the bank has notice that the completion was improper. [L 1965, c 208, §4-401; HRS §490:4-401; am L 1991, c 118, pt of §4]

### COMMENTS TO OFFICIAL TEXT

**Prior Uniform Statutory Provision:**  None.
**Purposes:**

1.  It is fundamental that upon proper payment of a draft the drawee may charge the account of the drawer.  This is true even though the draft is an overdraft since the draft itself authorizes the payment for the drawer's account and carries an implied promise to reimburse the drawee.

2.  Subsection (2) parallels the provision which protects a holder in due course against discharge by reason of alteration and permits him to enforce the instrument according to its original tenor. Section 3-407(3).  It adopts the rule of cases extending the same protection to a drawee who pays in good faith.  The subsection also follows the policy of Sections 3-115 and 3-407(3) by protecting the drawee who pays a completed instrument in good faith according to the instrument as completed.