**1**

Westlaw.

468 P.2d 216

Page 1

2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88, 2 Fair Empl.Prac.Cas. (BNA) 712, 2 Empl. Prac. Dec. P 10,211, 62 Lab.Cas. P 9440
**(Cite as: 2 Cal.3d 493)**

▷
Alcorn v. Anbro Engineering, Inc.
Cal.
    MANUEL D. ALCORN, Plaintiff and Appellant,
                    v.
ANBRO ENGINEERING, INC., et al., Defendants
            and Respondents.
            **L.A. No. 29683.**

        Supreme Court of California
            Apr. 24, 1970.

            SUMMARY

Plaintiff, a Negro truck driver and shop steward for the Teamster's Union, was fired when he advised his employer's foreman of his advice to a non-teamster employee not to drive a truck to a job site. Plaintiff was reinstated through grievance and arbitration procedures and sued for actual and exemplary damages for the emotional and physical distress allegedly suffered. In a second cause of action, plaintiff alleged his discharge was solely because of his race and constituted unlawful discrimination under Civ. Code, §§ 51 and 52. The trial court entered an order of dismissal following the sustaining of a demurrer without leave to amend the third amended complaint. (Superior Court of Los Angeles County, Richard L. Wells, Judge.)

On appeal, the Supreme Court reversed the order of dismissal, holding that a cause of action for the intentional infliction of emotional distress was stated by allegations of defendant's status, the incident of his advice to the foreman, the foreman's shouting, "You goddam niggers are not going to tell me about the rules...," plaintiff's discharge, the particular susceptibility of Negroes such as plaintiff to emotional and physical distress from such conduct as defendants', the malicious intent of the foreman to cause plaintiff's physical and mental distress, and such distress by plaintiff, who sustained shock, nausea and insomnia. As to the second cause of action, it was held that the demurrer was properly sustained, on the basis that the concurrent enactment of the Fair Employment Practices Act indicated a legislative intent to exclude the subject of discrimination in employment from the Civil Rights Act. (Opinion by Burke, J., expressing the unanimous view of the court.)

            HEADNOTES

Classified to California Digest of Official Reports

**(1a, 1b) Torts § 4.2--Intentional Infliction of Emotional Distress-- Pleading.**
Reversal of an order of dismissal following the sustaining of a demurrer was required, where a cause of action for intentional infliction of emotional distress was stated by alleging that plaintiff was a Negro truck driver and shop steward employed by defendant, that he informed defendant's foreman of his advice to a non-teamster employee not to drive a truck to a job site, that the foreman shouted, "You goddam niggers are not going to tell me about the rules," and fired plaintiff, that defendant ratified the foreman's acts, that Negroes such as plaintiff were particularly susceptible to emotional and physical distress from conduct such as defendants', that the foreman maliciously intended to cause plaintiff humiliation, mental anguish, and physical and emotional distress, that plaintiff suffered such, and that he sustained shock, nausea and insomnia and was unable to work for several weeks.
[Right to recover for emotional disturbance or its physical consequences, in the absence of impact or other actionable wrong, note, 64 **A.L.R.2d** 100. See also **Cal.Jur.2d,** Torts, § 5; **Am.Jur.,** Torts (1st ed § 45 et seq.).]
**(2)** Pleading § 84(0.5)--Demurrer to Complaint--Demurrer as Admission.
A general demurrer admits the truth of all material factual allegations in the complaint.

() Appeal § 1027--Review--Order of Dismissal After Demurrer Sustained.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

468 P.2d 216

2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88, 2 Fair Empl.Prac.Cas. (BNA) 712, 2 Empl. Prac. Dec. P 10,211, 62 Lab.Cas. P 9440

**(Cite as: 2 Cal.3d 493)**

On appeal from an order of dismissal entered after the sustaining of defendants' demurrer to a complaint without leave to amend, the plaintiff's ability to prove the allegations of the complaint or the possible difficulty in making such proof does not concern the reviewing court.

**(4)** Pleading § 51--Complaint--Facts Constituting Cause of Action.
Plaintiff need only plead facts showing that he may be entitled to some relief.

**(5)** Torts § 4.2--Intentional Infliction of Emotional Distress--Damage.
In pleading the intentional infliction of emotional distress, the physical consequences of shock or other disturbance to the nervous system suffice to satisfy the requirement that plaintiff suffered physical injury from defendants' conduct.

**(6)** Torts § 4.2--Intentional Infliction of Emotional Distress--Pleading.
Though ordinarily mere insulting language without more would not constitute extreme outrage, allegations by plaintiff of aggravated circumstances, in that defendants, standing in a position or relation of authority over plaintiff, and aware of his peculiar susceptibility to emotional distress, and for the purpose of causing him to suffer such distress, intentionally humiliated him, insulted his race, ignored his union status, and terminated his employment, all without just cause or provocation, seemed sufficient to uphold his complaint for intentional infliction of emotional distress as against defendants' general demurrer.

**(7)** Torts § 4.2--Intentional Infliction of Emotional Distress--Questions of Law and Fact.
Though reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in a particular case, defendants' conduct has been sufficiently extreme and outrageous to result in liability to plaintiff for the intentional infliction of emotional distress.

**(8)** Civil Rights § 2(1)--Right to Public Accom-

modations.
There is no indication that the Legislature intended to broaden the scope of Civ. Code, § 51, requiring equal accommodations in all business establishments, to include discriminations other than those made by a business establishment in the course of furnishing goods, services or facilities to its clients, patrons or customers.

**(9)** Civil Rights § 1--Privileges and Immunities of Citizens:Labor § 209-- Unfair Labor Practice.
Though the Fair Employment Practices Act cannot be deemed to have repealed any provisions of the Civil Rights Act, the concurrent enactment of the Fair Employment Practices Act indicated a legislative intent to exclude the subject of discrimination in employment from the Civil Rights Act; consequently, defendants' demurrer was properly sustained to plaintiff's complaint alleging that he was discharged from employment with defendant solely because of his race and that such conduct constituted an unlawful discrimination under Civ. Code, § 51 and 52.

COUNSEL
Robert D. Bash and Hillel Chodos for Plaintiff and Appellant.
Haight, Lyon, Smith & Nye, Charles B. Smith and Henry F. Walker for Defendants and Respondents.
**BURKE, J.**
Plaintiff appeals from an order of dismissal entered after defendants' demurrer to the third amended complaint was sustained without leave to amend. The complaint seeks to recover actual and exemplary damages against defendants, based upon their alleged intentional infliction of emotional distress and alleged violation of the Unruh Civil Rights Act (Civ. Code, § 51-52). (1a)We have concluded that the complaint states a cause of action for intentional infliction of emotional distress, and that the order of dismissal must be reversed.

(2-4)At the outset, it is well settled that a general demurrer admits the truth of all material factual allegations in the complaint (*Flores v. Arroyo*, 56 Cal.2d 492, 497 [15 Cal.Rptr. 87, 364 P.2d 263]);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

468 P.2d 216

Page 3

2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88, 2 Fair Empl.Prac.Cas. (BNA) 712, 2 Empl. Prac. Dec. P 10,211, 62 Lab.Cas. P 9440
(Cite as: 2 Cal.3d 493)

that the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court (*Katenkamp v. Union Realty Co.*, 6 Cal.2d 765, 769 [59 P.2d 473]; *Division of Labor Law Enforcement v. Barnes*, 205 Cal.App.2d 337, 346 [23 Cal. Rptr. 55]); and that plaintiff need only plead facts showing that he may be entitled to some relief (*Vanoni v. Western Airlines*, 247 Cal.App.2d 793, 795 [56 Cal.Rptr. 115]).

(1b)In his first cause of action, plaintiff alleged that he is a Negro employed as a truckdriver by defendant Anbro Engineering, Inc., a corporation owned and operated by defendants Thomas Anderson, Sr., and Harlon Anderson, doing business as Anderson Bros., a partnership. On the day of the incident at issue, plaintiff informed defendant Palmer, Anbro's Caucasian field superintendent and plaintiff's foreman, that plaintiff, in his capacity as shop steward for the Teamster's Union, had advised another Anbro employee that he should not drive a certain truck to the job site, since that employee was not a teamster. Plaintiff's remarks to Palmer allegedly were neither rude, insubordinate nor otherwise violative of plaintiff's duties as an employee.

Immediately thereafter, Palmer allegedly shouted at plaintiff in a rude, violent and insolent manner as follows: "You goddam 'niggers' are not going *497 to tell me about the rules. I don't want any 'niggers' working for me. I am getting rid of all the 'niggers'; go pick up and deliver that 8-ton roller to the other job site and get your pay check; you're fired." Plaintiff thereupon delivered the roller and reported the incident to defendant Thomas Anderson, Jr., a Caucasian and Anbro's secretary, who allegedly ratified and confirmed Palmer's acts, including plaintiff's discharge, on behalf of Anbro and the other defendants.

As a result of the foregoing incident, plaintiff allegedly suffered humiliation, mental anguish and emotional and physical distress. Plaintiff was sick and ill for several weeks thereafter, was unable to work, and sustained shock, nausea and insomnia.

Plaintiff further alleged that defendant Palmer's conduct was intentional and malicious, and done for the purpose of causing plaintiff to suffer humiliation, mental anguish and emotional and physical distress, and that defendant Anderson, Jr.'s conduct in confirming and ratifying Palmer's conduct and in discharging plaintiff, was done with knowledge that plaintiff's emotional and physical distress would thereby increase, and was done intentionally or with a wanton and reckless disregard of the consequences to plaintiff.

Plaintiff also alleged that Negroes such as plaintiff are particularly susceptible to emotional and physical distress from conduct such as committed by defendants.

Plaintiff was reinstated with Anbro through grievance and arbitration procedures, and has received back pay. This action seeks the recovery of actual and exemplary [FN1] damages for the emotional and physical distress allegedly suffered by him.

> FN1 Defendants do not challenge the assumption that if plaintiff has stated a cause of action for intentional infliction of emotional distress, then exemplary damages would be a proper item of recovery. (See Civ. Code, § 3294; *State Rubbish etc. Assn. v. Siliznoff*, 38 Cal.2d 330, 341 [240 P.2d 282]; *Guillory v. Godfrey*, 134 Cal.App.2d 628, 633 [286 P.2d 474].)

This state has long recognized the right to recover damages for the intentional and unreasonable infliction of mental or emotional distress which results in foreseeable physical injury to plaintiff. (*State Rubbish etc. Assn. v. Siliznoff, supra.*, 38 Cal.2d 330, 336-337;*Vargas v. Ruggiero*, 197 Cal. App.2d 709, 717-718 [17 Cal.Rptr. 568]; *Richardson v. Pridmore*, 97 Cal.App.2d 124, 130 [217 P.2d 113, 17 A.L.R.2d 929]; *Bowden v. Spiegel, Inc.*, 96 Cal.App.2d 793, 794-795 [216 P.2d 571]; *Emden v. Vitz*, 88 Cal.App.2d 313, 316-319 [198 P.2d 696]; see Rest. 2d Torts, § 312.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

468 P.2d 216
2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88, 2 Fair Empl.Prac.Cas. (BNA) 712, 2 Empl. Prac. Dec. P 10,211, 62
Lab.Cas. P 9440
(Cite as: 2 Cal.3d 493)

Page 4

Plaintiff's allegations that defendants intentionally inflicted emotional *498 distress for the purpose of causing plaintiff to suffer emotional and physical harm, and that plaintiff did suffer physical illness, shock, nausea and insomnia as a result thereof, meet the requirements of the foregoing authorities. (5)The physical consequences of shock or other disturbance to the nervous system are sufficient to satisfy the requirement that plaintiff has suffered physical injury from defendants' conduct. (*Emden v. Vitz, supra.*, 88 Cal. App.2d 313, 316-317; see *Vanoni v. Western Airlines, supra.*, 247 Cal. App.2d 793, 796-797.)

Moreover, the courts of this state have also acknowledged the right to recover damages for emotional distress alone, without consequent physical injuries, in cases involving extreme and outrageous intentional invasions of one's mental and emotional tranquility. (*State Rubbish etc. Assn. v. Siliznoff, supra.*, 38 Cal.2d 330, 337-338;*Cornblith v. First Maintenance Supply Co.*, 268 Cal.App.2d 564 [74 Cal.Rptr. 216]; *Agostini v. Strycula*, 231 Cal.App.2d 804, 808 [42 Cal.Rptr. 314]; *Perati v. Atkinson*, 213 Cal.App.2d 472, 474 [28 Cal.Rptr. 898]; see Rest.2d Torts, § 46.)

Plaintiff has alleged facts and circumstances which reasonably could lead the trier of fact to conclude that defendants' conduct was extreme and outrageous, having a severe and traumatic effect upon plaintiff's emotional tranquility. (6)Thus, according to plaintiff, defendants, standing in a position or relation of authority over plaintiff, [FN2] aware of his particular susceptibility to emotional distress, [FN3] and for the purpose of causing plaintiff to suffer such distress, intentionally humiliated plaintiff, insulted his race, [FN4] ignored his union status, and terminated his employment, all *499 without just cause or provocation. Although it may be that mere insulting language, without more, ordinarily would not constitute extreme outrage, [FN5] the aggravated circumstances alleged by plaintiff seem sufficient to uphold his complaint as against defendants' general demurrer. (7)"Where reasonable men may dif-

fer, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." (Rest. 2d Torts, § 46, com. h; accord, *Halio v. Lurie* (1961) 15 App.Div.2d 62 [222 N.Y.S.2d 759, 764]; *Wallace v. Shoreham Hotel Corp.* (Mun.Ct.App. D.C. 1946) 49 A.2d 81, 83.)

FN2 The cases and commentators have emphasized the significance of the relationship between the parties in determining whether liability should be imposed. (See Prosser, Law of Torts [3d ed. 1964], ch. 2, § 11, p. 49; Harper and James, The Law of Torts [1956], § 9, pp. 666-667; Rest.2d Torts, § 46, com. e; Magruder, *Mental and Emotional Disturbances in the Law of Torts*, 49 Harv.L.Rev. 1033, 1051-1063; Prosser, *Insult and Outrage*, 44 Cal.L.Rev. 40, 47; Annot., 15 A.L.R.2d 108, 158-163.)Thus, plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a stranger to defendants. As provided in Labor Code section 1412: "The opportunity to ... hold employment without discrimination because of race, religious creed, color, national origin, or ancestry is hereby recognized as and declared to be a civil right."

FN3 Plaintiff's susceptibility to emotional distress has often been mentioned as significant in determining liability. (See Prosser, Law of Torts, *supra.*, at p. 50; Harper and James, *supra.*, at p. 669; Rest.2d Torts, *supra.*, com. f; Prosser, *supra.*, 44 Cal. L. Rev. 40, p. 50.)With respect to the susceptibility of Negroes to severe emotional distress from discriminatory conduct, see Colley, *Civil Actions for Damages Arising out of Violations of Civil Rights* (1965-1966) 17 Hast.L.J. 189, 201.

FN4 Although the slang epithet "nigger"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

468 P.2d 216                                                                    Page 5
2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88, 2 Fair Empl.Prac.Cas. (BNA) 712, 2 Empl. Prac. Dec. P 10,211, 62
Lab.Cas. P 9440
(Cite as: 2 Cal.3d 493)

may once have been in common usage, along with such other racial characterizations as "wop," "chink," "jap," "bohunk," or "shanty Irish," the former expression has become particularly abusive and insulting in light of recent developments in the civil rights' movement as it pertains to the American Negro. Nor can we accept defendants' contention that plaintiff, as a truckdriver must have become accustomed to such abusive language. Plaintiff's own Susceptibility to racial slurs and other discriminatory conduct is a question for the trier of fact, and cannot be determined on demurrer.

FN5 The Restatement view is that liability "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," but only to conduct so extreme and outrageous "as to go beyond all possible bonds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Rest. 2d Torts, § 46, com. d; see Prosser, Law of Torts, *supra.*, at pp. 46-47.)For examples of allegations held insufficient to state a cause of action for extreme outrage, see *Cornblith v. First Maintenance Supply Co.*, *supra.*,     268     Cal.App.2d     564 (defendant-employer directed coemployees not to assist plaintiff); *Agostini v. Strycula*, *supra.*, 231 Cal.App.2d 804 (defendants made     factual     statements     regarding plaintiff's unsuitability for employment); *Perati v. Atkinson*, *supra.*, 213 Cal.App.2d 472 (defendant-coemployee made factual statements regarding plaintiff's failure to obey orders). None of these cases involved vituperative language or vindictive conduct such as alleged in the instant case.

The multitude of cases [FN6] upholding on various theories complaints alleging similar circumstances strongly indicates at least that plaintiff has pleaded

a situation in which reasonable men may differ regarding defendants' liability. That being so, the order of dismissal should be reversed as to plaintiff's first cause of action.

> FN6 See, e.g., *Fisher v. Carrousel Motor Hotel, Inc.* (Tex. 1967) 424 S.W.2d 627; *Beavers v. Johnson* (1965) 112 Ga.App. 677 [145 S.E.2d 776]; *Ruiz v. Bertolotti* (1962) 37 Misc.2d 1067 [236 N.Y.S.2d 854]; *Browning v. Slenderella Systems of Seattle* (1959) 52 Wn.2d 440 [341 P.2d 859, 865]; *Amos v. Prom* (N.D.Iowa 1953) 115 F.Supp. 127, 133; *Curnett v. Wolf* (1953) 244 Iowa 683 [57 N.W.2d 915]; *Odom v. East Ave. Corp.* (1942) 178 Misc. 363 [34 N.Y.S.2d 312]; cf. *Guillory v. Godfrey*, *supra.*(1955) 134 Cal.App.2d 628, 633.

Plaintiff's second cause of action alleges that he was discharged from employment with Anbro solely because of his race, and that such conduct constituted an unlawful discrimination under sections 51 and 52 of the Civil Code. Section 51 requires "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments" regardless of "color, race, religion, ancestry, or national origin." Section 52 permits the recovery of damages for a violation of section 51. *500

Plaintiff contends that his right to remain in Anbro's employ was an "advantage" or "privilege" protected from discrimination under section 51. Although this court has held that the term "business establishments" in section 51 was used in the "broadest sense reasonably possible" (*Burks v. Poppy Constr. Co.*, 57 Cal.2d 463, 468-469 [20 Cal.Rptr. 609, 370 P.2d 313]), it is doubtful that the Legislature intended these sections to apply to discrimination in employment. The broad language of section 51 was adopted after several court decisions placed an unduly restrictive interpretation upon the former phrase "places of public accommodation or amusement" in the predecessor section to section

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

468 P.2d 216

2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88, 2 Fair Empl.Prac.Cas. (BNA) 712, 2 Empl. Prac. Dec. P 10,211, 62
Lab.Cas. P 9440
**(Cite as: 2 Cal.3d 493)**

Page 6

51. (See Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute-A Problem in Statutory Application*(1960) 33 So.Cal.L.Rev. 261, 272-276; Colley, *supra.*, fn. 3, at pp. 190-194.(8)However, there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a "business establishment" in the course of furnishing goods, services or facilities to its clients, patrons or customers. (See Horowitz, *supra.*, at pp. 288-289, 294.)

This conclusion is substantiated by the fact that at the same session wherein it adopted the language of section 51, the Legislature also enacted extensive provisions governing discrimination in employment. The Fair Employment Practices Act. (Lab. Code, § 1410 et seq.) declares that the opportunity to seek, obtain and hold employment without discrimination is a civil right (Lab. Code, § 1412), and provides for administrative procedures for relief from such discrimination, "including (but not limited to) hiring, reinstatement or upgrading of employees, with or without back pay ...." Lab. Code, § 1426.) [FN7]

> FN7  Apparently, plaintiff waived his FEPA rights in favor of union arbitration.

(9)Although the Fair Employment Practices Act can not be deemed to have repealed any provisions of the Civil Rights Act (see Lab. Code, § 1432), we conclude that the concurrent enactment of the former act indicated a legislative intent to exclude the subject of discrimination in employment from the latter act. Consequently, defendants' demurrer to plaintiff's second cause of action was properly sustained.

The judgment of dismissal of the second cause of action is affirmed. The judgment of dismissal of the first cause of action is reversed, and the *501 trial court is hereby instructed to overrule the demurrer and allow defendants to answer.

Mosk, Acting C. J., McComb, J., Peters, J., To-briner, J., and Sullivan, J., concurred. *502 Cal.

Alcorn v. Anbro Engineering, Inc.
2 Cal.3d 493, 468 P.2d 216, 86 Cal.Rptr. 88, 2 Fair Empl.Prac.Cas. (BNA) 712, 2 Empl. Prac. Dec. P 10,211, 62 Lab.Cas. P 9440

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

Page 1

▷

Badie v. Bank of America
Cal.App.2.Dist.
    SANDRA L. BADIE et al., Plaintiffs and Appel-
lants,
v.
BANK OF AMERICA, Defendant and Respondent.
**No. A068753.**

Court of Appeal, First District, Division 3, Califor-
nia.
Nov. 3, 1998.

## SUMMARY

Four credit card account customers and two con-
sumer-oriented organizations brought multiple
causes of action, including an action for declaratory
relief, against a bank, challenging the validity of an
alternative dispute resolution (ADR) clause, which
the bank sought to add to existing account agree-
ments between itself and its deposit account and
credit card account customers by sending its cus-
tomers a "bill stuffer" insert with their monthly ac-
count statements. The trial court entered judgment
in favor of the bank, ruling that the "change of
terms" provision in the original account agreements
permitted adding the ADR clause. (Superior Court
of the City and County of San Francisco, No.
944916, Thomas Mellon, Judge.)

The Court of Appeal reversed the judgment entered
in favor of the bank on plaintiffs' declaratory relief
action with respect to the validity and enforceabil-
ity of the ADR clause, and affirmed the judgment
in all other respects. The court held that the trial
court erred in finding the change of terms provision
in the original account agreements permitted adding
the ADR clause. The policy favoring ADR is not
operative unless the parties have entered into an en-
forceable agreement to arbitrate. Standard rules of
contract interpretation showed that the customers'
consent to allow the bank to change terms did not
constitute consent to the ADR clause by unilateral

notice. Although the change of terms provision
stated the bank could change any "term, condition,
service or feature" of a customer's credit account,
no term, condition, service, or feature in the origin-
al agreement addressed the method for resolving
legal claims. Thus, the original agreements did not
suggest that ADR was one of "those things con-
cerning which ... the parties intended to contract"
(Civ. Code, § 1648). Ambiguous contract language
is interpreted most strongly against the party who
prepared it (Civ. Code, § 1654), particularly with
adhesion contracts. Also, there was no unambigu-
ous and unequivocal waiver of the right to a jury
trial in the original agreements. And, there was no
waiver in any customer's failure to stop using an ac-
count after receiving the insert, since the insert was
not designed to achieve knowing consent to the
ADR clause. (Opinion by Phelan, P. J., with Cor-
rigan and Walker, JJ., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports

**(1) Appellate Review § 109--Briefs--Form and Re-
quisites--Argument and Authority--Waiver.**
When an appellant fails to raise a point, or asserts it
but fails to support it with reasoned argument and
citations to authority, the appellate court treats the
point as waived.

**(2) Arbitration and Award § 3--Arbitration Agree-
ments--Determination Whether Parties Have
Agreed to Arbitrate.**
The initial step in determining whether there is an
enforceable alternative dispute resolution agree-
ment involves applying ordinary state law prin-
ciples that govern the formation and interpretation
of contracts in order to ascertain whether the parties
have agreed to some alternative form of dispute res-
olution. Under both federal and California state
law, arbitration is a matter of contract between the
parties. The liberal federal policy favoring arbitra-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion agreements is at bottom a policy guaranteeing the enforcement of private contractual arrangements. The policy favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate. Although the law favors contracts for arbitration of disputes between parties, there is no policy compelling persons to accept arbitration of controversies that they have not agreed to arbitrate. A judicially ordered reference pursuant to Code Civ. Proc., § 638, is also a matter of contract between parties.

**(3a, 3b, 3c, 3d, 3e, 3f)** Arbitration and Award § 5.5-- Arbitration Agreements--Validity--Bank's Addition of Alternative Dispute Resolution Clause to Existing Account Agreements by Unilateral Notice:Banks and Banking § 21--Actions.

In an action by credit card account customers and consumer organizations against a bank, challenging an alternative dispute resolution (ADR) clause the bank sought to add to existing account agreements by sending its customers a "bill stuffer" insert with their monthly account statements, the trial court erred in finding the "change of terms" provision in the original account agreements permitted adding the ADR clause. The policy favoring ADR is not operative unless the parties have entered into an enforceable agreement to arbitrate. Standard rules of contract interpretation showed that the customers' consent to allow the bank to change terms did not constitute consent to the ADR clause by unilateral notice. Although the change of terms provision stated the bank could change any "term, condition, service or feature" of a customer's credit account, no term, condition, service, or feature in the original agreement addressed the method for resolving legal claims. Thus, the original agreements did not suggest that ADR was one of "those things concerning which ... the parties intended to contract" (Civ. Code, § 1648). Ambiguous contract language is interpreted most strongly against the party who prepared it (Civ. Code, § 1654), particularly with adhesion contracts. Also, there was no unambiguous and unequivocal waiver of the right to a jury trial in the original agreements. And, there was no

waiver in any customer's failure to stop using an account after receiving the insert, since the insert was not designed to achieve knowing consent to the ADR clause.

[See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 499 et seq.]

**(4)** Contracts § 44--Performance--Breach--Covenant of Good Faith.

The essence of the good faith covenant is objectively reasonable conduct. The covenant of good faith can be breached by objectively unreasonable conduct, regardless of the actor's motive. When a party has the unilateral right to change the terms of a contract, it does not act in an objectively reasonable manner when it attempts to recapture a foregone opportunity by adding an entirely new term that has no bearing on any subject, issue, right, or obligation addressed in the original contract and that was not within the reasonable contemplation of the parties when the contract was entered into. That is particularly true when the new term deprives the other party of the right to a jury trial and the right to select a judicial forum for dispute resolution.

**(5)** Contracts § 13--Legality--Enforceability--Party's Reservation of Right to Vary Price or Performance.

As a general rule, an agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable. But the fact that one of the parties reserves the power of varying the price or other performance is not fatal (i.e., does not render the contract illusory and unenforceable) if the exercise of this power is subject to prescribed or implied limitations, as that the variation must be in proportion to some objectively determined base or must be reasonable.

**(6)** Contracts § 30--Construction and Interpretation--Ambiguities--Review.

When a dispute arises over the meaning of contract language, the court must decide whether the language is reasonably susceptible to the interpretations urged by the parties. Whether the contract is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: **67 Cal.App.4th 779**)

reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent. If the contract is capable of more than one reasonable interpretation, it is ambiguous, and it is the court's task to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties. When ambiguities in a standardized contract cannot be dispelled by application of the other rules of contract interpretation, they are resolved against the drafter (Civ. Code § 1654). Interpretation of a contract is solely a question of law unless the interpretation turns upon the credibility of extrinsic evidence. Even when extrinsic evidence is admitted to interpret a contract, unless it is conflicting and requires a determination of credibility, the reviewing court is not bound by the trial court's interpretation.

(7) Contracts § 28--Construction and Interpretation--Intention of Parties.
Courts ascertain the intent of the parties by considering an agreement as a whole, not by interpreting a provision in isolation (Civ. Code, § 1641). The court may consider the circumstances under which an agreement was made, including its object, nature, and subject matter (Civ. Code, § 1647) and must be mindful of the rule that, however broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract (Civ. Code, § 1648). The court must also provide an interpretation that will make an agreement lawful, operative, definite, reasonable, and capable of being carried into effect, and must avoid an interpretation that would make it harsh, unjust, or inequitable (Civ. Code, § 1643). The court interprets the words used in an agreement according to their ordinary and popular sense, unless the parties ascribed a special or technical meaning to them (Civ. Code, §§ 1644, 1645), and also interprets any ambiguous language in the sense in which the promisor believed, at the time the agreements were entered into, that the promisee understood it (Civ. Code, § 1649). Finally, if the un-

certainty is not removed by application of the other rules of interpretation, a contract must be interpreted most strongly against the party who prepared it (Civ. Code, § 1654). This last rule is applied with particular force in the case of adhesion contracts.

(8) Jury § 12--Waiver in Civil Cases--Mode of Waiver.
In order to be enforceable, a contractual waiver of the right to a jury trial must be clearly apparent in the contract and its language must be unambiguous and unequivocal, leaving no room for doubt as to the intention of the parties. Although an effective waiver, particularly in a nonadhesive contract, need not expressly state, "I waive my right to a jury trial" or words to that effect, it must clearly and unambiguously show that the party has agreed to resolve disputes in a forum other than the judicial one, which is the only forum in which disputes are resolved by juries. When parties agree to submit their disputes to arbitration, they select a forum that is alternative to, and independent of, the judicial-a forum in which disputes are not resolved by juries. In other words, waiver of the right to a jury trial is inherent in the decision to resolve disputes in a nonjudicial forum. But absent a clear agreement to submit disputes to arbitration or some other form of alternative dispute resolution, courts cannot infer that that the right to a jury trial has been waived. In light of the importance of the jury trial in our system of jurisprudence, any waiver thereof should appear in clear and unmistakable form. Where it is doubtful whether a party has waived his or her constitutionally protected right to a jury trial, the question should be resolved in favor of preserving that right.

COUNSEL
The Sturdevant Law Firm, James C. Sturdevant and Ann Saponara for Plaintiffs and Appellants.
John F. Cooney, Arne D. Wagner, Michael J. Halloran, Morrison & Foerster, Seth M. Hufstedler, Kathleen V. Fisher, Carla B. Oakley and Jennifer Lee Taylor for Defendant and Respondent.
**PHELAN, P. J.**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

Plaintiffs, four individuals and two consumer-oriented organizations, Consumer Action and California Trial Lawyers Association, [FN1] challenge the validity of an alternative dispute resolution (ADR) clause which Bank of America (the Bank) sought to add to existing account agreements between itself and its deposit account and credit card account customers by sending those customers an insert with their monthly account statements (hereafter, bill stuffer), notifying them of the new term. None of the individual plaintiffs had a deposit account with the Bank, but all had the Bank's credit cards. [FN2]

> FN1 Now renamed the Consumer Attorneys of California.

> FN2 Howard Suer opened a Visa account in the 1960's. Muriel Kraszewski opened both a Visa account and a MasterCard account in the 1960's. Sandra Badie opened a Visa account in 1990, before she was married. Paul Badie became an authorized user of that account in 1991, after he married Sandra. The Badies at one time had a deposit account with Security Pacific National Bank (Security Pacific), which was acquired by the Bank in the spring of 1992. Sandra Badie testified that she closed the Security Pacific account but then began receiving written material from the Bank. Although she contacted the Bank repeatedly over a period of several months, it was not until January 1993 that the Bank acknowledged the account was closed. The written material that was sent to the Badies before the Bank acknowledged their account was closed did not include the bill stuffer, as it was not sent to any former Security Pacific customer.

Plaintiffs filed their complaint shortly after the Bank began sending the bill stuffers to its customers. All six plaintiffs, acting as private attorneys *784 general, sought to enjoin implementation of the ADR provision on the ground that its addition to the account agreements violated the Unfair Competition Act, Business and Professions Code section 17200 et seq. The four individual plaintiffs alleged two additional causes of action on their own behalf. In one, they sought to enjoin implementation of the ADR provision on the ground that its addition to the account agreements violated the Consumer Legal Remedies Act, Civil Code section 1750 et seq., and in particular section 1770, former subdivisions (n) and (s). [FN3] In the other, they sought a declaration as to the validity and enforceability of the ADR clause.

> FN3 Civil Code section 1770 was amended in 1996 to redesignate former subdivisions (a) through (w) as (a)(1) through (a)(23). Former section 1770, subdivision (n) is now designated section 1770, subdivision (a)(14), and former section 1770, subdivision (s) is now designated section 1770, subdivision (a)(19). All references to these subdivisions will be to the new designations. Section 1770, subdivision (a)(14) provides that in a transaction intended to result in, or which results in, the sale or lease of goods or services to any consumer, "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," is unlawful. Under section 1770, subdivision (a)(19), "[i]nserting an unconscionable provision in the contract" is unlawful.

After a 17-day nonjury trial, the trial court entered judgment in favor of the Bank, ruling that the change of terms provision in the original account agreements permitted the addition of the ADR clause, and that the new provision was enforceable because it was not unfair or unconscionable and was consistent with the covenant of good faith and fair dealing. The trial court also ruled that plaintiffs had failed to prove their Consumer Legal Remedies Act claim.

Plaintiffs timely appealed. While they make numerous arguments referring to the alleged unfairness,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779                                                                                          Page 5
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: **67 Cal.App.4th 779**)

unlawfulness, deceptiveness and unconscionability of the ADR clause and the Bank's method of adding it to the account agreements, nowhere in either their opening brief or their reply brief do they directly address the statutory causes of action they brought under Business and Professions Code section 17200 et seq. or Civil Code section 1770, subdivision (a)(14) and (19). Indeed, the briefs do not even so much as cite to the Unfair Competition Act or the Consumer Legal Remedies Act, much less discuss their provisions or their application to the evidence presented at trial and to the causes of action framed under them. (1) When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as *785 waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317]; *Muega v. Menocal* (1996) 50 Cal.App.4th 868, 877 [57 Cal.Rptr.2d 697]; *San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 559 [45 Cal.Rptr.2d 117]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].) We therefore limit our review to the trial court's disposition of the third cause of action for declaratory relief as to the validity and enforceability of the ADR clause brought by the individual plaintiffs.

Background

Starting in June 1992 and for a period of several months thereafter, the Bank mailed half-page bill stuffers to its personal credit card and deposit account customers, informing them that, from that time forward, any dispute between a customer and the Bank regarding customer accounts would be resolved either "by arbitration or by reference" if either the Bank or customer so requested. [FN4] The full text of the bill stuffer sent to personal credit account customers reads as follows: "Change of Terms Notice for BankAmericard® Visa,® MasterCard,® Visa Gold, Gold MasterCard, and Apollo®

Accounts [¶] **Dispute Resolution**-If you or we request, any controversy with us will be decided either by arbitration or reference. Controversies involving one account, or two or more accounts with at least one common owner, will be decided by arbitration under the Commercial Arbitration Rules of the American Arbitration Association. All other controversies will be decided by a reference under California Code of Civil Procedure Section 638 and related sections. A referee who is an active attorney or retired judge will be appointed by the court after selection by the American Arbitration Association using its procedures for selecting arbitrators. The arbitration or reference will take the place of a trial before a judge and jury. (This is a new provision for Cardmember and Apollo Account Agreements. If you continue to use your account, this new provision will apply to all past and future transactions.)" (Bold in original.) The Bank's intention in sending the bill stuffer was to add a new provision to the existing account agreements. In attempting to add the ADR clause to the existing agreements, the Bank relied upon the change of terms provision included in the original account agreements, which gave the Bank the *786 unilateral right to modify the agreements after customers entered into them. It is undisputed that the account agreements were contracts of adhesion. [FN5]

> FN4 Because the individual plaintiffs had only credit card accounts and our review concerns only the trial court's disposition of the cause of action for declaratory relief brought by the individual plaintiffs and not the Unfair Competition Act claim brought as private attorneys general with respect to both deposit accounts and credit accounts, we need not discuss the nature of the agreements with deposit customers or the bill stuffer sent to them.

> FN5 "The term signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779                                                                    Page 6
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

opportunity to adhere to the contract or reject it." (*Neal v. State Farm Ins. Cos.*(1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) The fact that a contract is one of adhesion does not mean that it is also an "unconscionable" contract. (See *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 215-217 [27 Cal.Rptr.2d 396].)

The contract documents comprising the original credit account agreements consisted of either an application or, if the account was opened in response to a direct mail solicitation to accept a "pre-approved" credit card, an "Acceptance Certificate," plus a document referred to as an account agreement and disclosure statement, which was sent to the customer after the account was opened. A change of terms provision was included in each of these documents. The applications and acceptance certificates, which took various forms, set forth the Bank's annual percentage rate for purchases, its annual membership fee, its transaction fee for cash advances, its late payment fee, its method of computing balances for purchases, and its grace period for repayment of the balance for purchases. All of the exemplars of these forms which were admitted into evidence included a provision stating, "All terms are subject to change." All of them also stated that the signer agreed to be bound by the "terms and conditions of the agreement and disclosure statement" that would be sent to the signer with his or her cards.

The account agreement and disclosure statement provided a more detailed description of the account features, including fees, the method of calculating balances and finance charges, how payments were applied, the circumstances under which the Bank would close an account, and so forth. Multiple exemplars of the account agreement and disclosure statement were admitted into evidence. Some pertained to Visa accounts, and some pertained to MasterCard accounts. All versions of the agreement presented at trial included a provision labeled "Change of Terms," which was set forth in a section headed "Other Important Information." In most versions, which were dated between April 1988 and June 1992, the change of terms provision stated, "We may change any term, condition, service or feature of your Account at any time. We will provide you with notice of the change to the extent required by law." In two versions of the agreement, one a December 1989 reprint of an April 1986 version of the document pertaining to both Visa and MasterCard accounts, and the other an August 1988 version pertaining to Visa Gold accounts, the change of terms provision was worded as follows: "We May Change or Terminate Any Terms, Conditions, Services or Features of Your Account (Including Increasing Your **Finance Charges**) at Any Time. We May Impose Any Change in *787 Terms on Your Outstanding Balance, as Well as on Subsequent Transactions and Balances. We may also add new terms, conditions, services or features to your Account. To the extent required by law, we will notify you in advance of any change in terms by mailing a notice to you at your address as shown on our records." (Upper case and bold in original.) By mid-1992, the two versions of the account agreement that included this wording of the change of terms provision had been superseded. The language expressly allowing the Bank to *add* new terms was deleted from the versions of the agreement and disclosure statement that were in effect at the time the ADR bill stuffers were mailed to credit account customers. Neither party provided exemplars of cardmember agreements older than the late 1980's, so it is not entirely certain whether the earlier versions of these documents contained change of terms provisions, or, if they did, whether the language allowing the Bank to *add* new terms was included in such provisions. The Bank's expert witness did testify, however, that including a change of terms provision in account agreements had been the standard industry practice since bank credit cards first became available in the 1960's.

None of the agreements admitted into evidence contained any provision regarding the method or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779                                         Page 7
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

forum for resolving disputes. The only portions of the agreements that touched even obliquely on dispute resolution were general admonitions in the Fair Credit Billing Act notice, which was included in each agreement, regarding the need to notify the Bank promptly of suspected mistakes or questions about the bill; a reference under the heading "Other Bankcard Fees and Charges" to "court costs" a customer would be required to pay in the event the Bank incurred them while enforcing its rights if a customer defaulted; and a reference to the Bank's ability to collect from "or sue" any one of several cardholders without giving up its rights against the others, which was included in the two superseded versions of the agreement under the heading "Joint and Several Liability."

Discussion

1. *California's Public Policy Favoring ADR Is Not Operative Unless the Parties Have First Entered Into an Enforceable Agreement to Arbitrate.*

(2) The initial step in determining whether there is an enforceable ADR agreement between a bank and its customers involves applying ordinary state law principles that govern the formation and interpretation of contracts in order to ascertain whether the parties have agreed to some alternative form of dispute resolution. Under both federal and California state law, arbitration is a matter of contract between the parties. (*788*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944-945 [115 S.Ct. 1920, 1924-1925, 131 L.Ed.2d 985]; see also *Mastrobuono* v. *Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 56-57, 62-63 [115 S.Ct. 1212, 1215-1216, 1218-1219, 131 L.Ed.2d 76]; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 8 [10 Cal.Rptr.2d 183, 832 P.2d 899].) As the United States Supreme Court has stated, "The 'liberal federal policy favoring arbitration agreements,' [citation] ... is at bottom a policy guaranteeing the enforcement of private contractual arrangements."

*Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 625 [105 S.Ct. 3346, 3353, 87 L.Ed.2d 444]; see also *Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478 [109 S.Ct. 1248, 1255, 103 L.Ed.2d 488].) Similarly, the California Supreme Court has stated that, " '[T]he policy favoring arbitration cannot displace the necessity for a voluntary *agreement* to arbitrate.' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 739 [222 Cal.Rptr. 1, 710 P.2d 833], italics in original.) "Although '[t]he law favors contracts for arbitration of disputes between parties' [citation], ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate .... " ' [Citations.]" (*Id.* at pp. 744; see also *Arista Films, Inc. v. Gilford Securities, Inc.* (1996) 43 Cal.App.4th 495, 501 [51 Cal.Rptr.2d 35]; *Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 640 [223 Cal.Rptr. 838].)

A judicially ordered reference pursuant to Code of Civil Procedure section 638, the statute invoked in the Bank's bill stuffers, is also a matter of contract between parties. Section 638 provides for judicial reference only upon "the agreement of the parties filed with the clerk, or judge, or entered in the minutes or in the docket," or "upon the motion of a party to a written contract or lease which provides that any controversy arising therefrom shall be heard by a reference if the court finds a reference agreement exists between the parties."

(3a) In its statement of decision, the trial court asserted that California public policy favors arbitration and "embraces" judicial reference "since it is a long-standing statutory procedure," and implied that the need for consent with respect to such ADR procedures has been eroded since the California Supreme Court's decision in *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699 [131 Cal.Rptr. 882, 552 P.2d 1178]. Thus, the court stated that although it could not conclude from the evidence that, in general, the Bank's customers had read or understood the ADR clause, they would be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

bound by it because under *Madden*, as well as *Mormile v. Sinclair* (1994) 21 Cal.App.4th 1508 [26 Cal.Rptr.2d 725],*Michaelis v. Schori* (1993) 20 Cal.App.4th 133 [24 Cal.Rptr.2d 380],*Bolanos v. Khalatian* (1991) 231 Cal.App.3d 1586 [283 Cal.Rptr. 209], and *Hall v. Superior Court* (1993) 18 Cal.App.4th 427 [22 Cal.Rptr.2d 376], arbitration provisions have been *789 enforced against persons who have not read or signed them. These cases are inapposite and do not support the proposition that ADR can be imposed on a bank's customers without their consent.

In *Madden*, which did not involve a contract of adhesion (17 Cal.3d at pp. 711-712), the California Supreme Court held that the plaintiff, a state employee whose health care was covered by a Kaiser Foundation Health Plan (Kaiser) medical services contract, was bound by an arbitration provision in the contract even though she had not personally negotiated or signed it because the provision had been agreed upon by the Board of Administration of the State Employees Retirement System (the Board), which was authorized by statute to negotiate group medical plans as the agent for all state employees. (*Id.* at pp. 704-706.)The contract included a provision that allowed amendment by mutual agreement between the Board and Kaiser without the individual consent of the plan members. (*Ibid.*) Several years after the plaintiff enrolled in the health plan, the Board and Kaiser negotiated an amendment that required arbitration of all medical malpractice claims. Kaiser mailed a brochure describing the terms of the plan, including the new arbitration provision, to all members shortly before the contract was amended. (*Ibid.*) When the plaintiff was injured during surgery at a Kaiser hospital several months later, she argued that she was not bound by the provision because she had not received the brochure, was not aware of the arbitration amendment, and had no knowledge at the time of her operation that Kaiser required arbitration of malpractice claims. (*Id.* at pp. 704-705.)The Supreme Court rejected the plaintiff's argument on the ground that the Board was authorized by statute to act as the

agent for all state employees, including the plaintiff, in negotiating group medical plan contracts. Thus, *Madden* does not stand for the proposition that consent is no longer required in order for an arbitration agreement to be valid. It simply means that one can be bound by consent given by one's agent, even if one is personally unaware of the provision. *Madden* is inapposite to the consent and contract formation issues that confront us in this case, since the account agreements here were not negotiated by someone else on behalf of the Bank's customers.

*Mormile v. Sinclair, supra,*21 Cal.App.4th 1508,*Michaelis v. Schori, supra,*20 Cal.App.4th 133, and *Bolanos v. Khalatian, supra,*231 Cal.App.3d 1586 are similarly inapposite. All three cases involved arbitration agreements that complied with the requirements of the Medical Injury Compensation Reform Act set forth in Code of Civil Procedure section 1295, and in all three cases, the conclusion that a nonsigning third party was bound by the arbitration agreement rested in part on consideration of the public policies that led to enactment of that legislation (see, e.g., *Mormile, supra,*21 Cal.App.4th at pp. 1511-1513), and in part on the existence of an agency or *790 quasi-agency relationship between the patient who had signed the agreement and the nonsigning third party-in *Mormile* and *Michaelis*, the patient's spouse, and in *Bolanos*, the father of the patient's baby. Moreover, as the *Mormile* court pointed out, protection of the patient's right to medical privacy also requires that third parties be bound by the agreement to arbitrate claims arising out of the treatment of the signatory patient. (21 Cal.App.4th at p. 1512.)Thus, the factors that led to the results in *Mormile,Michaelis* and *Bolanos* are not present here. These cases are simply not relevant to our consideration of the consent and contract formation issues raised by the Bank's attempt to add the ADR clause to the existing account agreements by sending its customers a bill stuffer.

Finally, *Hall v. Superior Court, supra,*18

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779                                                                          Page 9
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
**(Cite as: 67 Cal.App.4th 779)**

Cal.App.4th 427 offers even less support for the proposition that the consent requirement has been eroded since *Madden*. In *Hall*, a party who objected to an arbitration award on the ground that he had not signed the agreement had, in fact, stipulated to arbitration in court and participated in the arbitration without objection until he lost. In those circumstances, the court had no difficulty finding that he had, indeed, consented to arbitration even though he had not signed the agreement. (*Id.* at p. 436.)

When the trial court glossed over the threshold issue of consent and concluded that the validity of the Bank's modification of its account agreements depends on the manner in which ADR in general, and arbitration in particular, are viewed under California law, it put the cart before the horse. Whether there is an agreement to submit disputes to arbitration or reference does not turn on the existence of a public policy favoring ADR, as the trial court apparently believed. That policy, whose existence we readily acknowledge, does not even come into play unless it is first determined that the Bank's customers *agreed* to use some form of ADR to resolve disputes regarding their deposit and credit card accounts, and that determination, in turn, requires analysis of the account agreements in light of ordinary state law principles that govern the formation and interpretation of contracts. (See *First Options of Chicago, Inc. v. Kaplan, supra,* 514 U.S. at p. 944 [115 S.Ct. at p. 1924]; *Chan, Inc. v. Drexel Burnham Lambert, Inc., supra,* 178 Cal.App.3d at p. 637.)

*2. Whether the ADR Clause Became Part of the Account Agreements Depends Upon the Meaning and Scope of the Change of Terms Provision in the Original Account Agreements.*

Although the trial court characterized plaintiffs' action as a "facial challenge to the ADR Clause," the action is more appropriately described as a *\*791 challenge to the Bank's interpretation of the change of terms provision in the original account agree-

ments. Whether the Bank's customers can be said to have agreed to allow the Bank to add the ADR clause to those agreements simply by sending them notice of the change depends, as a threshold matter, on the meaning and scope of the change of terms provision itself. Implicit in the Bank's interpretation of that provision is the assumption that adding the ADR clause is not really a modification at all because, by entering the original account agreements, the customers agreed ahead of time to be bound by any term the Bank might choose to impose in the future. The Bank argues that neither traditional contract offer-and-acceptance principles nor Civil Code section 1698's requirements of written consent or additional consideration apply if the modification is "in accordance with the terms of the contract." [FN6](See *Busch v. Globe Industries* (1962) 200 Cal.App.2d 315, 320 [19 Cal.Rptr. 441].) The Bank appears to contend that regardless of the nature of a modification, the new ADR provision is a valid part of the contract as long as the prescribed procedure for making the modification was followed. In this case, the only procedural requirement set forth in the change of terms provision was that the Bank would notify the customer of the change. Thus, the Bank argues, because it sent notice in the form of the bill stuffer, it met the sole procedural requirement of the change of terms provision, and the modification was therefore valid because it was made "in accordance with the terms of the contract." We cannot agree.

> FN6 Civil Code section 1698 provides in pertinent part: "A contract in writing may be modified by a contract in writing" (*id.,* subd. (a)); and, "[u]nless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration" (*id.,* subd. (c)).

The contract modification cases cited by the Bank and relied on by the trial court in its statement of decision do not support the proposition that a party with the unilateral right to modify a contract has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
**(Cite as: 67 Cal.App.4th 779)**

carte blanche to make any kind of change whatsoever as long as a specified procedure is followed. In fact, those cases suggest that a modification made "in accordance with the terms of the contract" means, at least in part, a modification whose general subject matter was anticipated when the contract was entered into. For example, in *Busch v. Globe Industries, supra,*200 Cal.App.2d 315,*Clark Equipment Co. v. Mastelotto, Inc.* (1978) 87 Cal.App.3d 88 [150 Cal.Rptr. 797], and *Powell v. Central Cal. Fed. Sav. & Loan Assn.* (1976) 59 Cal.App.3d 540 [130 Cal.Rptr. 635], the modifications in question were specifically identified in the original contracts as changes that might be made in the future under certain circumstances. (See also *Hunt v. Mahoney* (1947) 82 Cal.App.2d 540, 546 [187 P.2d 43] [extension of time to perform was not a modification requiring a writing because the possibility of an extension was provided for in original contract].) *792

Similarly, the two cases cited by the Bank concerning amendment of bank bylaws, *Krupp v. Franklin Sav. Bank in City of New York* (1938) 255 A.D. 15 [5 N.Y.S.2d 365] and *State v. San Francisco Sav. etc. Soc.* (1924) 66 Cal.App. 53 [225 P. 309] (*San Francisco Sav. etc. Soc.*), also involved modifications pertaining to subjects addressed in original account agreements. In *Krupp,* a depositor agreed to be bound by the bank's bylaws and any amendments thereto. The bylaws in effect when the account was opened required presentation of the original passbook in order to make a withdrawal from the account. Twelve years later, the bank amended its bylaws to require the posting of an indemnity bond if the depositor requested the issuance of a new savings account passbook in the event the original had been lost or destroyed. The depositor, who wished to make a withdrawal after his passbook had been destroyed, contended that the bond requirement did not apply to him because it was not in the bylaws when he opened his account. The New York court concluded that the amendment was reasonable because a bond might be needed to protect the bank from double payment in the event an

account had been assigned. The court also held that the new requirement was enforceable in view of the depositor's express agreement to be bound by amendments to the bylaws and the fact that the bond amendment had been adopted pursuant to a New York statute that expressly conferred on savings banks the right to establish the conditions upon which payments would be made in the case of lost passbooks. (*Krupp, supra,* 5 N.Y.S.2d at pp. 367-368.)Unlike the ADR modification here, the bond amendment did not impose a contract term concerning some matter not addressed in any way, shape or form in the original agreement, but was clearly related to a matter addressed in the original contract, namely, the requirement that the passbook be presented before a withdrawal could be made.

In *San Francisco Sav. etc. Soc.,* the State of California successfully challenged the enforceability of an amendment to a bank's bylaws, even though the original agreements with the bank's depositors provided that the bylaws could be amended without notice to the depositors or their consent. (66 Cal.App. at p. 56.)The original agreements provided that the bank would pay "dividends" (i.e., interest) on all deposits. (*Ibid.*) The amended bylaw stopped interest payments after an account had been dormant for 10 years. When certain dormant accounts escheated to the state, the bank refused to pay the interest that would have accrued but for the amendment. The court stated that where a depositor agrees that a bylaw may be amended without notice to him, the amendment is binding "in so far as such amendment may affect *only* those general rules and regulations, common to all banking and other corporations, which relate to the general administrative policies thereof." (*Id.* at p. 61, italics added.) Even a depositor's agreement *793 that the bylaws may be amended does not permit an amendment that would materially change the depositor's contract where the amendment is made without further notice to him, " '... and without his *consent*.' " (*Ibid.*, quoting 3 R.C.L. § 339, italics added.) It is notable that the bylaw amendment in the *San Francisco Sav. etc. Soc.* case, like the modifications in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

cases discussed above, pertained to a matter expressly addressed in the original contracts, namely, the payment of interest. Nevertheless, that fact was not sufficient to assure the amendment's enforceability absent notice to the depositor and his *consent*, even though the original bylaws agreed to by the depositor expressly stated that no notice or consent were required.

In dictum, the court stated that, although the general rule seems to be that "where a person opens a deposit account with a bank the depositor is to be thereafter governed and bound by the by-laws existing at the time the account is opened," the rule is subject to the qualification that, if upon notice to the depositor, the bylaws are amended so as to materially change the original contract, deposits made after the amendment are held to be made under the contract so changed. (*San Francisco Sav. etc. Soc.,* *supra,*66 Cal.App. at p. 61.)Leaving aside questions about the adequacy of a bill stuffer as a notice, this dictum at first blush appears to support the Bank's contention that the bill stuffer was sufficient to bind the Bank's customers to the ADR requirement, at least with respect to transactions made after the bill stuffer was mailed. However, because the bylaw change in that case pertained to a matter that was already addressed in the original contract, i.e., payment of interest, we cannot assume that the court would have concluded that notice alone, without some affirmative evidence of the depositor's consent, could bind a depositor to a significant change regarding matters that were not addressed in the original contract at all.

The principal authority relied upon by the Bank and the trial court when it rejected plaintiffs' argument that the change of terms provision authorized only modifications of existing terms was *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503] (*Perdue*). The Bank contends that *Perdue* "unanimously approved the Bank's method for modifying its account agreement terms." It is mistaken.

In *Perdue,* the plaintiff filed a class action challen-ging the validity of charges imposed by Crocker National Bank for processing checks drawn on accounts with insufficient funds. Such checks were referred to as "NSF checks" and the charge for handling them was referred to as an "NSF charge." (38 Cal.3d at p. 920-923.)Crocker required each customer who opened a checking account to sign a "signature card," which was used to verify the authenticity of endorsements on checks. (*Id.* at p. 921.)The *794 signature card also stated that the undersigned depositors " 'agree with Crocker National Bank and with each other that ... this account and all deposits therein shall be ... subject to all applicable laws, to the Bank's present and future rules, regulations, practices and charges, and to its right of setoff for the obligations of any of us.' " FN7(*Ibid.*) The plaintiff alleged that the signature card was not a contract, or at least not a contract authorizing the unilateral imposition of NSF charges " 'in any particular sum or at all.' " (*Id.* at p. 922.)He argued that even if the signature card was a contract, it was illusory because it permitted Crocker "to set and change the NSF charges at its discretion, and without assent from the customer except such as may be inferred from the fact that the customer does not cancel his account after the bank posts notice of its rates." (*Id.* at p. 923, fn. omitted.) Citing the rule that " 'a contracting party's discretionary power to vary the price or other performance does not render the agreement illusory if the party's *actual* exercise of that power is reasonable' " (*ibid.*; italics in original), the Supreme Court held that the signature card was a contract authorizing Crocker to impose NSF charges, "subject to the bank's duty of good faith and fair dealing in setting or varying such charges" (*id.* at p. 924).

> FN7 The Bank implies that this language was found in the "separate rules and regulations" that were incorporated into the signature card by reference. This is not correct. The quoted language was part of the signature card itself. (*Perdue, supra,*38 Cal.3d at p. 921.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

Page 12

The Bank contrasts the change of terms provision in the account agreements here with the language on the signature card in *Perdue*, arguing that the right to modify the account agreement there was not express but had to be inferred because, in the case of the signature card, "the only indication ... that the terms of the agreement could be changed [was] the provision that the customer would be bound by 'present and *future* rules.' " (Italics added.) Thus, the Bank concludes that if the imposition or increase of NSF charges was valid in *Perdue*, then a fortiori its ADR clause is valid and enforceable because it was added to the account agreements pursuant to an express change of terms provision. In making this argument, the Bank fails to recognize that the *Perdue* signature card expressly addressed the imposition of both present and presumably different-i.e., "changed"-future charges. (*Perdue, supra,*38 Cal.3d at p. 921.)Thus, the NSF fees objected to by the *Perdue* plaintiff clearly fell within the category of matters agreed to when he opened his account.

By suggesting, as the Bank does here, that the result in *Perdue* turned on the customer's agreement to be bound by "present and future *rules*" (italics added) rather than on his agreement to be bound by present and future *charges*, the Bank implies that *Perdue* authorizes financial institutions to add **795** entirely new terms or conditions to existing contracts with their customers, even if the new terms pertain to subject matters not addressed in the original account agreements. In fact, the *Perdue* court was not faced with having to determine the validity of that type of modification, or of a modification premised on a customer's agreement to be bound by the bank's present and future "rules" or "practices"-words that are arguably analogous to the word "terms" in the change of terms provision here. Rather, the *Perdue* court was simply required to determine whether NSF *charges* were authorized by the signature card. Since present and future *charges* were expressly listed among the matters Crocker's customers agreed to by signing the card, increasing the fee for NSF checks did not add a rad-

ically new and unanticipated term to the contracts between Crocker and its customers. Here, on the other hand, by sending out the bill stuffers, the Bank sought to add an entirely new *kind* of term to the original account agreements, which did not include any provision regarding the method or forum for resolving disputes. *Perdue* did not involve that type of modification and, contrary to the Bank's claim that the *Perdue* court "unanimously approved the Bank's method for modifying its account terms," the *Perdue* opinion sheds little direct light on the meaning and scope of the change of terms provision here.

*Perdue* does, however, underscore the importance of the duty imposed on one having the discretionary power to affect the rights of the other party to exercise that power in a manner consistent with the covenant of good faith and fair dealing. (*Perdue, supra,*38 Cal.3d at p. 923.)Abuse of the power to specify terms is one of the judicially recognized types of bad faith. (Rest.2d., Contracts (1981) § 205, com. d, pp. 100-101.) While *Perdue* indicated that the bank's increase in NSF check fees was to be evaluated under the "... duty of good faith and fair dealing in setting or varying such charges" (38 Cal.3d at p. 924), other cases make it clear that the *exercise* of discretionary powers conferred on a party by contract must also be evaluated under the implied covenant to assure that the promises of the contract are effective and in accordance with the parties' legitimate expectations. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371-372 [6 Cal.Rptr.2d 467, 826 P.2d 710]; *Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785, 49 A.L.R.2d 496] ["... where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing"].) Thus, the trial court's conclusion that the Bank's modification of the account agreements satisfied the covenant of good faith and fair dealing because "[t]he ADR clause does not operate to deprive the customer of expected or bar-

67 Cal.App.4th 779                                                          Page 13
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

gained-for benefits of his or her agreement" does not withstand scrutiny. The court's focus on the ADR clause, standing alone, was misplaced: It is the Bank's exercise of its *796 discretionary right to change the agreement, not the ADR clause in and of itself, which must first be analyzed in terms of the implied covenant. If the Bank's performance under the change of terms provision was not consonant with the duty of good faith and fair dealing, then whether the ADR clause, considered in isolation, satisfies the implied covenant makes no difference.

(4) "The essence of the good faith covenant is objectively reasonable conduct." (*Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128, 141 [191 Cal.Rptr. 849].) "[T]he covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra,*2 Cal.4th at p. 373.)One commentor has suggested that good faith performance of the discretionary power to affect the other party's rights requires the party holding such power to exercise it "for any purpose within the reasonable contemplation of the parties at the time of [contract] formation-to capture opportunities that were preserved upon entering the contract, interpreted objectively," and that, conversely, breach of the covenant occurs when the discretionary power is used to "recapture opportunities foregone" when the contract was entered into. (Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith* (1980) 94 Harv.L.Rev. 369, 373, fn. omitted, 387; *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., supra,*2 Cal.4th at p. 372.)Where, as in this case, a party has the unilateral right to change the terms of a contract, it does not act in an "objectively reasonable" manner (*Lazar v. Hertz Corp., supra,*143 Cal.App.3d at p. 141) when it attempts to "recapture" a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reason-

able contemplation of the parties when the contract was entered into. That is particularly true where the new term deprives the other party of the right to a jury trial and the right to select a judicial forum for dispute resolution.

(3b) Here, the Bank reserved to itself the unilateral and nonnegotiable right to vary every aspect of the performance required by the parties to the account agreements. The Bank's interpretation of how broadly it may exercise that right, with no limitation on the substantive nature of the changes it may make as long as it complies with the de minimis procedural requirement of "notice," virtually eliminates the good faith and fair dealing requirement from the Bank's relationship with its credit account customers, and is thus antithetical to *Perdue*, not consistent with it, as the Bank claims. In short, we conclude the trial court erred in deciding that the implied covenant of good faith and fair dealing had been satisfied by the Bank in its performance under the change of terms provision. *797

Moreover, permitting the Bank to exercise its unilateral rights under the change of terms provision, without any limitation on the substantive nature of the change permitted, would open the door to a claim that the agreements are illusory. (5) As a general rule, " '[a]n agreement that provides that the price to be paid, or other performance to be rendered, shall be left to the will and discretion of one of the parties is not enforceable.... But the fact that one of the parties reserves the power of varying the price or other performance is not fatal [i.e., does not render the contract illusory and unenforceable] if the exercise of this power is subject to prescribed or implied limitations, as that the variation must be in proportion to some objectively determined base or must be reasonable.' " (*Automatic Vending Co. v. Wisdom* (1960) 182 Cal.App.2d 354, 357 [6 Cal.Rptr. 31], quoting 1 Corbin on Contracts, § 98, p. 311; see also *Perdue, supra,*38 Cal.3d at p. 923.)(3c) Here, the "objectively determined base" which, in addition to the implied covenant of good faith and fair dealing, supplies an implied limitation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: **67 Cal.App.4th 779**)

Page 14

on the change of term provision is the universe of terms included in the original agreements. As we will later conclude (*post*, pt. 3), the ADR provision is not in that universe.

Thus, we return to our starting point: What did the Bank's customers consent to when they agreed that the Bank could unilaterally change the terms of their account agreements? Plaintiffs contend that the change of terms provision did not authorize the addition of new terms, but only modification of what they refer to as the "price terms" of the credit account agreement, by which they mean the matters required to be disclosed under the Truth in Lending Act, 15 United States Code section 1601 et seq. When the trial court rejected this argument, it focused on construing the meaning of the word "change," rather than on construing the meaning of the word "terms." Citing Civil Code section 1644, which provides that, "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning ...," the trial court ruled that the word "change" was equivalent to the word "amend," and included the concepts "add," "delete," "revise," "replace," or "modify." Not only does using the somewhat legalistic word "amend" to define the garden-variety word "change" appear to run counter to the spirit of section 1644, but the conclusion that "change" was intended to mean "add" is questionable in light of the fact that the phrase stating that the Bank could "add" new terms had been deleted from the revised version of the change of terms provision in the account agreements in effect when the ADR bill stuffer was mailed.

In any event, whether the change of terms provision permitted the Bank to add the ADR clause simply by sending a bill stuffer depends principally on what the parties intended by the word "terms," not on whether the word *798 "change" also means "add," or on whether the Bank used the word "add" in the change of terms provision. Yet the trial court made no serious attempt to ascertain the meaning attributed by the parties to the word "terms" as of the time the account agreements were entered into. (Civ. Code, § 1636.)Instead, it simply stated that "the word 'terms' is not, as plaintiffs argue, limited purely to price terms for already existing services," and that the Bank had the ability "to modify any of the relevant terms of the contract." But without a threshold determination of what the parties intended when they agreed that the Bank could change the "terms" of the account agreement, the validity of the ADR clause cannot be properly assessed. In order to make that determination, we must apply the standard statutory rules of contract interpretation in order to ascertain the mutual intention of the parties as it existed at the time the original account agreements were entered into. (See Civ. Code, §§ 1636, 1637; *Stevenson v. Oceanic Bank* (1990) 223 Cal.App.3d 306, 316 [272 Cal.Rptr. 757].)

3. *Application of the Standard Rules of Contract Interpretation Demonstrates That the Customers' Consent to Allow the Bank to Change the Terms of the Credit Account Agreement Did Not Constitute Consent to Addition of an ADR Clause by a Unilateral Notice.*

(6) When a dispute arises over the meaning of contract language, the court must decide whether the language is "reasonably susceptible" to the interpretations urged by the parties. (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [66 Cal.Rptr.2d 487].) " '... Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself [citation] or from extrinsic evidence of the parties' intent [citation].' " (*Ibid.*, quoting *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 848 [44 Cal.Rptr.2d 227].)

If the contract is capable of more than one reasonable interpretation, it is ambiguous (*Oceanside 84, Ltd. v. Fidelity Federal Bank, supra,*56 Cal.App.4th at p. 1448; *Southern Cal. Edison Co. v. Superior Court, supra,*37 Cal.App.4th p. 848), and it is the court's task to determine the ultimate construction

to be placed on the ambiguous language by apply-
ing the standard rules of interpretation in order to
give effect to the mutual inten tion of the parties
(*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6
Cal.Rptr.2d 554]). When ambiguities in a standard-
ized contract, like the account agreement involved
here, cannot be dispelled by application of the other
rules of contract interpretation, they are resolved
against the drafter. (Civ. Code, § 1654; *Oceanside
84, Ltd. v. Fidelity Federal Bank, supra,*56
Cal.App.4th at p. 1448; *Powers v. Dickson, Carlson
& Campillo* (1997) 54 Cal.App.4th 1102, 1112 [63
Cal.Rptr.2d 261].)*799

Interpretation of a contract is solely a question of
law unless the interpretation turns upon the credib-
ility of extrinsic evidence. (*Parsons v. Bristol De-
velopment Co.* (1965) 62 Cal.2d 861, 865-866 [44
Cal.Rptr. 767, 402 P.2d 839]; *American President
Lines, Ltd. v. Zolin* (1995) 38 Cal.App.4th 910, 923
[45 Cal.Rptr.2d 370]; *Stevenson v. Oceanic Bank,
supra,*223 Cal.App.3d at p. 315.)Even where ex-
trinsic evidence is admitted to interpret a contract,
unless it is conflicting and requires a determination
of credibility, the reviewing court is not bound by
the trial court's interpretation.(*Stevenson v. Oceanic
Bank, supra,* at p. 315.)

(3d) As noted, the Bank contends the change of
terms provision authorizes any modification what-
soever, as long as the procedure set forth in the ac-
count agreements is followed, while plaintiffs con-
tend there are substantive limitations on the kinds
of changes authorized by the provision. We first ad-
dress the language of the credit account agreement
itself to determine whether it is reasonably suscept-
ible to either or both of these competing interpreta-
tions.

Customers who opened a credit account with the
Bank first encountered the change of terms provi-
sion in either the credit card application or the
"Acceptance Certificate" included in a direct mail
solicitation. The only "terms" actually set forth in
these documents pertain to percentage rates for pur-
chases, various fees, the method of computing bal-

ances, and the grace period. However, the applica-
tion and acceptance certificate also indicated that
by signing, the applicant agreed to be bound by the
"terms and conditions of the agreement and disclos-
ure statement" that would be sent to the applicant
with his cards.

The credit account agreement and disclosure state-
ments admitted into evidence at trial are all pamph-
lets about seven pages long. As we have pointed
out, they set forth detailed information about pur-
chases and cash advances, credit limits, finance
charges, membership fees, late charges and other
fees, calculation of balances and finance charges,
payments, and the procedure for notifying the Bank
of suspected errors on the bill as well as the Bank's
obligations in the event a suspected error is repor-
ted. Also included in each agreement is a section
headed "Other Important Information." It recites
that the Bank does not have a security interest in
purchases charged to the card or other property be-
longing to the customer, that the Bank requires the
customer to sign the card upon receipt, that notices
will be sent only to the first person listed on the ac-
count, that the customer must inform the Bank of
changes in personal information and must report
lost or stolen cards, that payment must be made in
United States currency, that the customer may ap-
ply for credit insurance, that the Bank provides in-
formation *800 to outside merchants for promotion-
al offers, that the Bank may obtain and release
credit information regarding the customer, that the
Bank may close an account at any time or suspend
credit privileges, that the Bank does not waive its
right to full payment by accepting checks or letters
marked "payment in full," that customers' telephone
conversations with the Bank may be monitored, that
the agreement is covered by California law and ap-
plicable federal law, and also describes foreign cur-
rency transactions and what constitutes default.
Also included, about two-thirds of the way into the
"Other Important Terms" section, is the "Change of
Terms" provision, which states that the Bank may
change any "term, condition, service or feature" of
a customer's credit account. Importantly, no "term,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

condition, service, or feature" in the original credit account agreement addressed the method or forum for resolving legal claims related to customer accounts.

Based solely on the language of the credit account agreement, we cannot conclude that either party's interpretation of the change of terms provision is clearly untenable. Although the Bank's interpretation is supported by the fact that the change of terms provision is broadly worded and contains no express limitation on its application, plaintiffs' narrower interpretation is supported by the fact that all the terms, conditions, services and features discussed in the original agreements pertain to matters that are integral to the Bank/creditor relationship, whereas the method and forum for dispute resolution-a matter which is collateral to that relationship-is not discussed at all.

Having determined that the credit account agreement is reasonably susceptible to the interpretations offered by both sides, we proceed to determine the construction of the ambiguous language by applying the appropriate canons of construction. (7) We ascertain the intent of the parties by considering an agreement as a whole, not by interpreting a provision in isolation. (See Civ. Code, § 1641; *Pinheiro v. County of Marin* (1976) 60 Cal.App.3d 323, 324-325 [131 Cal.Rptr. 633].) We may consider the circumstances under which an agreement was made, including its object, nature, and subject matter (Civ. Code, § 1647; *Western Camps, Inc. v. Riverway Ranch Enterprises* (1977) 70 Cal.App.3d 714, 723 [138 Cal.Rptr. 918]) and must be mindful of the rule that, "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract" (Civ. Code, § 1648). We must also provide an interpretation that will make an agreement lawful, operative, definite, reasonable, and capable of being carried into effect, and must avoid an interpretation that would make it harsh, unjust or inequitable. (Civ. Code, § 1643; *City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49

Cal.App.4th 64, 71 [56 Cal.Rptr.2d 723].) We interpret the words used in an agreement *801 according to their ordinary and popular sense, unless the parties ascribed a special or technical meaning to them (Civ. Code, §§ 1644, 1645), and we also interpret any ambiguous language in the sense in which the promisor believed, at the time the agreements were entered into, that the promisee understood it (Civ. Code, § 1649). Finally, if the uncertainty is not removed by application of the other rules of interpretation, a contract must be interpreted most strongly against the party who prepared it. (Civ. Code, § 1654; *Jacobs v. Freeman* (1980) 104 Cal.App.3d 177, 189 [163 Cal.Rptr. 680].) This last rule is applied with particular force in the case of adhesion contracts. (See *Goddard v. South Bay Union High School Dist.* (1978) 79 Cal.App.3d 98, 106 [144 Cal.Rptr. 701].)

(3e) As discussed above, the change of terms provision is employed in the context of consumer credit agreements between the Bank and its customers. All the provisions of the original credit account agreements concerned matters that were integral to that relationship. In this context, there is nothing about the original terms that would have alerted a customer to the possibility that the Bank might one day in the future invoke the change of terms provision to add a clause that would allow it to *impose* ADR on the customer. We do not view the passing reference to "court costs" in the section headed "Other Bankcard Fees and Charges" or the statement that the contract is governed by California law, which implicitly includes the right to jury trial, as sufficient to put a customer on notice that the method and forum for dispute resolution are among the "terms" of the agreement that the Bank has the right to change. All this is not to say that the Bank could not have included an ADR clause in the original account agreement simply because such a provision is not integral to the financial relationship between the Bank and its credit account customers in the same way interest rates or finance charges are. But the validity of an ADR provision included in an account agreement in the first instance is a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: **67 Cal.App.4th 779**)

different issue, which we are not required to address here. Our focus is on whether the words of the original account agreements mean that the Bank's customers, by agreeing to a unilateral change of terms provision, intended to give the Bank the power in the future to terminate its customers' existing right to have disputes resolved in the civil justice system, including their constitutionally based right to a jury trial. In our view, the object, nature and subject matter of these agreements strongly support the conclusion that the customers did not so intend, and that they, as promisors with respect to the change of terms provision, had no inkling that the Bank understood the provision differently. [FN8] In short, the original agreements do not suggest that ADR was one of "those things concerning which ... the parties intended to contract" (Civ. Code, § 1648).*802

> FN8 With respect to the change of terms provision, the customers agreed to allow the Bank to change terms in the future, but the Bank agreed to give the customers notice of the change. Therefore, as to that portion of the change of terms provision we are now interpreting, the customers were the promisors.

Although of dubious admissibility, the uncontradicted testimony of Sylvia Coats, a senior project manager in the marketing department of the Bank's credit card division, is consistent with plaintiffs' narrow interpretation of the change of terms provision, and provides little or no support for the Bank's position. [FN9] For example, when Ms. Coats was questioned about the meaning of the language "All terms are subject to change," as used in one of the Bank's credit card application forms, she initially testified that the word "terms" referred not only to the information set forth on the application itself, but also to the terms set forth in the cardmember agreement which the customer would receive later. When questioned further, however, she testified that "All terms are subject to change," as used in the application, referred only to the annual percent-

age rate, the variable rate index and spread, the annual membership fee, the grace period, and the charges for cash advances, service transactions, late payments, exceeding the account's credit limits, returned checks, and collection fees.

> FN9 Ms. Coats's testimony was received by the trial court without a parole evidence objection by either party, and on appeal the Bank does not contend that Ms. Coats was not competent to testify regarding the meaning of the contract language. "Although the intent of the parties determines the meaning of the contract (Civ. Code, §§ 1636, 1638), the relevant intent is 'objective'-that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54-55 [67 Cal.Rptr.2d 850]; see also *Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.* (1985) 164 Cal.App.3d 1122, 1127 [211 Cal.Rptr. 62] [Declaration of district's manager as to intent in including arbitration clause not relevant; "It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation."].)

Ms. Coats also testified that the language "All terms are subject to change," as used in one of the Bank's direct mail solicitation forms dating from 1989, referred only to the annual membership fee, the annual percentage rate for purchases, variable rate information, the method for computing balances, the grace period, and transaction fees for cash advances, late charges, exceeding the credit limit and collection charges. Indeed, she testified that "All terms are subject to change" meant the terms set forth in the solicitation might have changed already, before an applicant signed the form, not that they were subject to further change after the form was signed.

Ms. Coats's testimony does not favor the Bank's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

broad interpretation of the change of terms provision. If anything, it suggests that the Bank itself attributed a narrow technical meaning to the word "terms" until it decided it wanted to add the ADR clause to the account agreements. Nothing about Ms. Coats's testimony persuades us that ADR was one of "those things concerning which it appears that the parties intended to contract." (*803Civ. Code, § 1648.)The original credit account agreements are concerned with matters that are integral to the Bank/credit customer relationship, and do not address the collateral issue of how disputes are to be resolved. Certainly there is nothing in the original agreements to alert a customer that, by agreeing to allow the Bank to change the "terms," he or she might someday be deemed to have agreed to give up the right to a jury trial or to any judicial forum whatsoever. (See *Arista Films, Inc. v. Gilford Securities, Inc.*, *supra*,43 Cal.App.4th at p. 502.)

A narrow interpretation of the change of terms provision, which limits its operation to matters that are integral to the Bank/creditor relationship, does not render the provision inoperative or cause it to be mere surplusage. The Bank may still invoke it to modify fees, grace periods, annual percentage rates and so forth, subject to the Bank's duty of good faith and fair dealing. (See *Perdue*, *supra*,38 Cal.3d at pp. 924-925.)It is not our purpose here to catalog all the matters that are integral to the Bank/creditor relationship and therefore subject to modification pursuant to the change of terms provision, but we do conclude that that imposition of an ADR provision like the one involved here is not one of them.

Thus, after analyzing the credit account agreements in light of the standard canons of contract interpretation, we conclude that when the account agreements were entered into, the parties did not intend that the change of terms provision should allow the Bank to add completely new terms such as an ADR clause simply by sending out a notice. Further, to the extent that application of these canons of construction has not removed all uncertainty concerning the meaning of the provision, we resort to the

rule that ambiguous contract language must be interpreted most strongly against the party who prepared it (Civ. Code, § 1654), a rule that applies with particular force to the interpretation of contracts of adhesion, like the account agreements here. [FN10] (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 819-820 [171 Cal.Rptr. 604, 623 P.2d 165]; *Goddard v. South Bay Union High School Dist.*, *supra*,79 Cal.App.3d at pp. 105-106.)Application of this rule strengthens our conviction that the parties did not intend that the change of terms provision should permit the Bank to add new contract terms that differ *in kind* from the terms and conditions included in the original agreements.

> FN10 The Bank does not dispute the trial court's finding that its account agreements were contracts of adhesion. In fact, the Bank's former director of litigation admitted as much at trial.

To reach the contrary conclusion, i.e., that the original account agreements *did* authorize addition of the ADR clause, we would have to assume that by agreeing to the change of terms provision, the Bank's customers intended to *804 permit a modification that would amount to waiver of their constitutionally based right to a jury trial (Cal. Const., art. I, § 16). (8) In order to be enforceable, a contractual waiver of the right to a jury trial "must be clearly apparent in the contract and its language must be unambiguous and unequivocal, leaving no room for doubt as to the intention of the parties." (*Trizec Properties, Inc. v. Superior Court* (1991) 229 Cal.App.3d 1616, 1619 [280 Cal.Rptr. 885].) Although an effective waiver, particularly in a nonadhesive contract, need not expressly state, "I waive my right to a jury trial" or words to that effect, it must clearly and unambiguously show that the party has agreed to resolve disputes in a forum *other than* the judicial one, which is the only forum in which disputes are resolved by juries. Thus the Supreme Court's decision in *Madden*, holding that arbitration agreements need not *expressly* waive the right to a jury trial, does not dispense with the need

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779                                                                 Page 19
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
(Cite as: 67 Cal.App.4th 779)

for a waiver; it merely dispenses with the need for a particular verbal formulation of the waiver. (17 Cal.3d at pp. 713-714.)As the *Madden* court said, "When parties agree to submit their disputes to arbitration they select a forum that is alternative to, and independent of, the judicial-a forum in which, as they well know, disputes are not resolved by juries." (*Id.* at p. 714.)In other words, waiver of the right to a jury trial is inherent in the decision to resolve disputes in a nonjudicial forum. But absent a clear agreement to submit disputes to arbitration or some other form of ADR, we cannot infer that that the right to a jury trial has been waived. As Division Five of this court stated in *Titan Group, Inc. v. Sonoma Valley County Sanitation Dist., supra,*164 Cal.App.3d 1122, 1129: "In light of the importance of the jury trial in our system of jurisprudence, any waiver thereof should appear in clear and unmistakable form." Where it is doubtful whether a party has waived his or her constitutionally protected right to a jury trial, the question should be resolved in favor of preserving that right.(*Id.* at pp. 1127-1128;*Byram v. Superior Court* (1977) 74 Cal.App.3d 648, 654 [141 Cal.Rptr. 604].)

(3f) The Bank attempts to distinguish *Titan Group,* by claiming that, "While the [*Titan*] court noted *in dicta* that the arbitration agreement did not contain a clear and unmistakable waiver of a jury trial, that observation was not the basis for any conclusion or holding." (Italics in original.) This is not so. First, there was no "arbitration agreement," as the Bank refers to it, in *Titan.*Whether there was such an agreement was the sole issue in that case, and the court concluded there was not. There was, however, a contract which contained two provisions *pertaining to* arbitration. The first simply stated that any disputes between the parties could be resolved by arbitration if the parties " 'mutually agree[d].' " (164 Cal.App.3d at p. 1125, italics in original.) The second stated that disputes " 'may be' " subject to arbitration, and then described the procedures to be followed if arbitration were pursued. *805 (*Ibid.*, italics in original.) The court concluded that the first provision added nothing to the contract, since the

parties could agree to arbitrate even without that clause. (*Id.* at p. 1128.)The party who was seeking to compel arbitration argued that in spite of its use of the word "may," the second provision must be interpreted as an agreement to arbitrate, or otherwise, like the first provision, it would be a nullity. (*Id.* at pp. 1128-1129.)The court disagreed, stating that the second provision served a contractual function because it described the procedures to be followed in the event the parties agreed to arbitrate. But because the statement that a dispute "may" be submitted to arbitration was not a waiver of the right to jury trial "in clear and unmistakable form," the court found no agreement to arbitrate in the contract. The *Titan* court's point was not that the *words* "waiver" or "jury trial" must appear in a contract before an agreement to arbitrate will be found, but rather that without such a waiver in some form that is clear and unmistakable, the court can find no agreement to arbitrate. Thus, the statement that any waiver of the right to jury trial must appear in clear and unmistakable form is not dictum, as the Bank claims. The *Titan* court's holding rests squarely on its failure to find such a waiver in the parties' use of the word "may" in the provisions that set forth the procedures to be followed *if* the parties chose to arbitrate.

We find no unambiguous and unequivocal waiver of the right to a jury trial either in the language of the change of terms provision or in any other part of the original account agreements. Nor do we find an unambiguous and unequivocal waiver in any customer's failure to close or stop using an account immediately after receiving the bill stuffers because, as even the trial court concluded, the notice contained in the bill stuffer was "not designed to achieve 'knowing consent' " to the ADR provision. The trial court stated that it could not conclude from the evidence presented at trial that customers had in fact read and understood the ADR clause, although it found the four individual plaintiffs had read it. [FN11] The court also noted that "[t]he explanation of the implications of the chosen ADR mechanisms could have been longer," yet inexplic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
**(Cite as: 67 Cal.App.4th 779)**

ably declared that a longer explanation would have been ineffective.

> FN11 That finding comes as no surprise since they are the ones who have challenged the ADR provisions.

The wording of the bill stuffer itself is far from the direct, clear and unambiguous language required to alert a customer that by maintaining the status quo he or she is waiving an important constitutional right. For example, the conjunction of the conditional clause "If you or we request" with the mandatory language "any controversy with us will be decided" is potentially misleading. By stating that controversies will be decided by *806 arbitration or reference "*If* you or we request" (italics added), the bill stuffer implies that ADR is more optional than it really is. Yes, the customer may opt for ADR, but if he or she does not wish to go that route, there is *no* choice in the matter if the Bank *does* wish to do so: In that case, controversies "will" be decided in an alternative forum. The initial emphasis of the bill stuffer on the supposedly optional nature of the provision tends to dilute the effect of the compulsory language that follows. Additionally, the bill stuffer says that arbitration or reference will "take the place" of a trial before a judge and jury. While this statement is literally accurate, it seems calculated to reduce the likelihood that customers will be alerted to the reality that the Bank, at its option, can take away the right to a judicial forum with its concomitant right to a jury trial.

The trial court was also apparently lulled by the benign tone of the bill stuffer: It said, "Since the substantive change described in the ADR Clause was to make available ADR mechanisms favored under California law, the notice was adequate." Of course, the bill stuffers did no such thing. Arbitration and reference were both "available" to the parties before the bill stuffers went out. What the bill stuffers were really intended to do was make it possible for the Bank to *impose* ADR procedures on its customers. While it is true that customers were given the equal opportunity to "impose" those pro-

cedures on the Bank, since the Bank favored them anyway, the customer's exercise of the option is not likely to be viewed by the Bank as an unwelcome turn of events. In short, the language of the bill stuffer, as well as the method used to disseminate it, suggests that it was designed to downplay the true significance of the Bank's ADR program, and to reduce the likelihood that customers would notice and object to the new provision.

We recognize that not every dispute concerning a deposit account or credit card account invariably implicates the right to a *jury* trial because in some instances only injunctive relief might be sought (see, e.g., *Brennan v. Superior Court* (1994) 30 Cal.App.4th 454, 457 [35 Cal.Rptr.2d 693]), or only the resolution of purely legal issues might be required (see, e.g., *Oceanside 84, Ltd. v. Fidelity Federal Bank, supra,*56 Cal.App.4th at p. 1451). However, the Bank's interpretation of the change of terms provision would dispense with the requirement for a clear and unmistakable indication that the customer intended to waive the right to a jury trial. Because we find no unambiguous and unequivocal waiver of that right here, and because the right to select a *judicial* forum, whether a bench trial or a jury trial, as distinguished from arbitration or some other method of dispute resolution, is a substantial right not lightly to be deemed waived (*Arista Films, Inc. v. Gilford Securities, Inc., supra,*43 Cal.App.4th at p. 502; *Chan v. Drexel Burnham Lambert, Inc., supra,*178 Cal.App.3d at p. 643), the Bank's interpretation of the change of terms provision must be rejected. *807

Disposition

The judgment entered in favor of the Bank on the plaintiffs' third cause of action with respect to the validity and enforceability of the ADR clause is reversed. That clause is not a part of the Bank's contract with the four individual plaintiffs here and may not be enforced against them. The judgment is affirmed in all other respects. Costs are awarded to the individual appellants.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

67 Cal.App.4th 779                                                                                     Page 21
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal. Daily Op. Serv. 8189, 98 Daily Journal D.A.R. 11,359
**(Cite as: 67 Cal.App.4th 779)**

Corrigan, J., and Walker, J., concurred.
A petition for a rehearing was denied December 2,
1998, and respondent's petition for review by the
Supreme Court was denied February 24, 1999. Bax-
ter, J., and Chin, J., did not participate therein. **\*808**

Cal.App.2.Dist.
Badie v. Bank of America
67 Cal.App.4th 779, 79 Cal.Rptr.2d 273, 98 Cal.
Daily Op. Serv. 8189, 98 Daily Journal D.A.R.
11,359

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**



665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
**(Cite as: 34 Cal.3d 49)**

Page 1

▷
Bigbee v. Pacific Tel. and Tel. Co.
Cal.
CHARLES BIGBEE, Plaintiff and Appellant,
v.
PACIFIC TELEPHONE AND TELEGRAPH
COMPANY et al., Defendants and Respondents
**L.A. No. 31613.**

Supreme Court of California
Jun 23, 1983.

SUMMARY

A man who was injured when an automobile struck the telephone booth in which he was standing brought suit against the companies allegedly responsible for the design, location, installation, and maintenance of the booth, seeking recovery on theories of negligence and strict liability in tort. Defendants filed a joint motion for summary judgment, arguing that the risk of an automobile veering off the street and crashing into the booth was unforeseeable as a matter of law and that the driver's negligence constituted a superseding cause of plaintiff's injuries. The trial court granted the motion and entered a judgment of dismissal. (Superior Court of Los Angeles County, No. SWC 34005, Abraham Gorenfeld, Temporary Judge. FN*)

The Supreme Court reversed and remanded to the trial court for further proceedings consistent with the views expressed in its opinion. The court held a triable issue of fact existed as to the foreseeability of the risk that an automobile might crash into the booth at issue and injure an individual inside, since the evidence indicated that defendants placed the booth, which was difficult to exit, in a parking lot 15 feet from the side of a major thoroughfare and near a driveway. Under such circumstances, the court held it could not be concluded as a matter of law that it was unforeseeable that the booth might be struck by a car and cause serious injury to a person trapped within. The court held that a jury could reasonably conclude that such risk was foreseeable, particularly since there was also evidence that a booth at the same location had previously been struck. The court further held that it was of no consequence that the harm to plaintiff came about through the negligent or reckless acts of the driver, since the risk that a car might hit the telephone booth could be found to constitute one of the hazards to which plaintiff was exposed. Finally, with respect to plaintiff's negligence claims, the court held there were no policy considerations which weighed against the imposition of liability.

> FN* Pursuant to Constitution, article VI, section 21.(Opinion by Bird, C. J., with *50 Mosk, Kaus, Broussard and Reynoso, JJ., and Bancroft, J., FN* concurring. Separate concurring and dissenting opinion by Kroninger, J. FN*)

> FN* Assigned by the Chairperson of the Judicial Council.

> FN* Assigned by the Chairperson of the Judicial Council.

HEADNOTES

Classified to California Digest of Official Reports

(1) Negligence § 9--Elements of Actionable Negligence--Duty of Care.
A legal duty to use due care is a necessary element of a negligence action.

(2) Negligence § 15--Elements of Actionable Negligence--Proximate Cause.
Proximate cause is a necessary element of both negligence and strict products liability actions.

(3a, 3b, 3c) Negligence § 94--Actions--Trial and Judgment--Questions of Law and Fact--Foreseeability of Harm--Injury to Occupant of Telephone Booth.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
**(Cite as: 34 Cal.3d 49)**

In an action against a telephone company and others by a man who was injured when an automobile struck the telephone booth in which he was standing, a triable issue of fact existed as to the foreseeability of the risk that an automobile might crash into the booth and injure an individual inside, where the evidence indicated that defendants placed the booth, which was difficult to exit, in a parking lot 15 feet from the side of a major thoroughfare and near a driveway. Under such circumstances, it could not be concluded as a matter of law that it was unforeseeable that the booth might be struck by a car, resulting in serious injury to a person trapped within. A jury could reasonably conclude that such risk was foreseeable, particularly where there was also evidence that a booth at the same location had previously been struck. It was of no consequence that the harm to plaintiff came about through the negligent or reckless acts of the driver, since the risk that a car might hit the telephone booth could be found to constitute one of the hazards to which plaintiff was exposed. Finally, with respect to plaintiff's negligence claims, there were no policy considerations which weighed against the imposition of liability. Thus, the trial court erred in granting defendants' motion for summary judgment.
[See **Cal.Jur.3d**, Negligence, § 10; **Am.Jur.2d**, Negligence, §§ 58, 153 et seq.]
**(4)** Negligence § 27--Exercise of Care by Particular Persons--Companies Responsible for Location, Installation or Maintenance of Telephone Booth.
The relationship between a telephone company and a user of its instrumentalities is that of invitor and invitee. Accordingly, a telephone company owes such users a duty to exercise due care in the location, installation, and maintenance of a telephone booth. Further, an independent contractor hired to perform any of such activities has a duty commensurate with or analogous to that of the telephone company toward the company's invitees.

**(5)** Negligence § 94--Actions--Trial and Judgment--Questions of Law and Fact--Foreseeability of Harm.
Ordinarily, foreseeability is a question of fact for the jury. It may be decided as a question of law only if under the undisputed facts there is no room for a reasonable difference of opinion.

**(6)** Summary Judgment § 3--Propriety--Existence of Triable Issue of Fact.
If any triable issue of fact exists, it is error for a trial court to grant a party's motion for summary judgment (Code Civ. Proc., § 437c).

**(7)** Pleading § 29--Demurrer to Complaint--Hearing and Determination.
In ruling on a demurrer, the trial court assumes the truth of all facts properly pleaded in a complaint.

**(8)** Appellate Review § 156--Review--Successive Appeals and Law of the Case--Identity of Parties.
Questions presented and decided by an appellate court upon appeal from a judgment on demurrer become the law of the case and are not open to question on a subsequent appeal unless the evidence is substantially different in a material respect. This rule applies even though the prior appellate opinion was rendered in an extraordinary writ proceeding, and even though the subsequent appeal comes before the Supreme Court, whereas the prior proceeding was before the Court of Appeal. However, this rule applies only to those parties who appealed and whose rights were affected by such prior appeal.

**(9)** Negligence § 94--Actions--Trial and Judgment--Questions of Law and Fact--Foreseeability of Harm.
Foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct. One may be held accountable for creating even the risk of a slight possibility of injury if a reasonably prudent person would not do so. Moreover, what is required to be foreseeable is the general character of the event or harm, not its precise nature or manner of occurrence.

COUNSEL

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
(Cite as: 34 Cal.3d 49)

Binder & Cacciatore and Thomas P. Cacciatore for
Plaintiff and Appellant.
Robert M. Ralls, Bart Kimball, Waters, McCluskey
& Corcoran, Laurence R. Corcoran, Lawler, Felix
& Hall, J. Richard Morrissey, Mark V. Berry,
Steven J. Miller, John E. Carlson, Springer, Heath,
Henrickson & Murry and William C. Heath for De-
fendants and Respondents.

**BIRD, C. J.**

This appeal questions the correctness of a summary
judgment entered in favor of four defendants in this
personal injury action. The determinative issue is
whether, under the evidence presented on the mo-
tion, foreseeability remains a question of fact for
the jury. (See *Weirum v. RKO General, Inc.* (1975)
15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].)

I.

On November 2, 1974, plaintiff, Charles Bigbee,
was severely injured when an automobile driven by
Leona North Roberts struck the telephone booth in
which he was standing. Plaintiff thereafter brought
an action for damages against Roberts and the com-
panies allegedly responsible for serving her alco-
holic beverages. A settlement was reached as to
these defendants. In addition, plaintiff sued the
companies allegedly responsible for the design, loc-
ation, installation, and maintenance of the tele-
phone booth, including Pacific Telephone and Tele-
graph Company (Pacific Telephone), the owner of
the booth, Western Electric Company, Inc.
(Western Electric), Western Industrial Services,
Inc. (Western Industrial), and D.C. Decker Com-
pany (Decker).

Plaintiff sought recovery against the latter defend-
ants [FN1] on theories of negligence and strict liabil-
ity in tort. A second amended complaint (hereafter,
the complaint), filed in 1978, alleged in substance
that on the night of the accident, at approximately
12:20 a.m., plaintiff was standing in a public tele-
phone booth located in the parking lot of a liquor
store on Century Boulevard in Inglewood, Califor-
nia. Roberts, who was intoxicated, was driving east

along Century Boulevard. She lost control of her
car and veered off the street into the parking lot,
crashing into the booth in which plaintiff was
standing. *53

> FN1 As used hereafter, the term defend-
> ants refers only to these four companies
> who are the only other parties to this ap-
> peal.

Plaintiff saw Roberts' car coming toward him and
realized that it would hit the telephone booth. He
attempted to flee but was unable to do so. Accord-
ing to the allegations of the complaint, the tele-
phone booth was so defective in design and/or man-
ufacture, or so negligently installed or maintained
that the door to the booth "jammed and stuck, trap-
ping" plaintiff inside. Had the door operated freely,
he averred, he would have been able to escape and
would not have suffered injury.

Additionally, plaintiff alleged that the telephone
booth was negligently located in that it was placed
too close to Century Boulevard, where "traffic ...
travelling easterly, generally and habitually speeded
in excess of the posted speed limit," thereby creat-
ing an unreasonable risk of harm to anyone who
used the telephone booth.

In September of 1978, Pacific Telephone and West-
ern Electric both demurred to the complaint on the
grounds that it failed to state facts sufficient to con-
stitute a cause of action in negligence or in strict li-
ability. The trial court sustained the demurrers
without leave to amend.

Plaintiff then sought review of this ruling by peti-
tion for writ of mandate. (See generally, *Coulter v.
Superior Court* (1978) 21 Cal.3d 144, 148 [145
Cal.Rptr. 534, 577 P.2d 669].) The Court of Appeal
issued an alternative writ [FN2] and, after hearing,
concluded that the complaint was sufficient to with-
stand a general demurrer. (*Bigbee v. Superior Court
(Bigbee I)* (1979) 93 Cal.App.3d 451 [155 Cal.Rptr.
545, 17 A.L.R.4th 1298].) Accordingly, the appel-
late court issued a peremptory writ of mandate dir-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
(Cite as: 34 Cal.3d 49)

Page 4

ecting the trial court to vacate the judgment of dismissal and to overrule the demurrers.

> FN2 The trial court thereafter entered a judgment of dismissal as to Pacific Telephone and Western Electric.

When the case was returned to the trial court, all four defendants filed answers generally denying the material allegations of the complaint. Discovery was conducted and on July 29, 1980, defendants filed a joint motion for summary judgment, arguing that the undisputed facts demonstrated the absence of two elements essential to plaintiff's case. (See Code Civ. Proc., § 437c; *Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland, Teerlink & Bell* (1977) 70 Cal.App.3d 331, 338, 339 [138 Cal.Rptr. 670].) (1) **(See fn. 3.)** More specifically, defendants argued that they had no duty to protect phone booth users from the risk encountered by plaintiff - a car veering off the street and crashing into the phone booth - since that risk was unforeseeable *54 as a matter of law. [FN3]For the same reason, they maintained that Roberts' intervening negligent driving constituted a "superseding cause" of plaintiff's injuries. (2) Therefore, no act or omission of theirs could be found to be a proximate cause of those injuries. FN4

> FN3 A legal duty to use due care is a necessary element of a negligence action. (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770].)

> FN4 Proximate cause is a necessary element of both negligence and strict products liability actions. ( *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc., supra,* 1 Cal.3d at p. 594;*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)

In support of their motion, defendants produced

evidence which established, in substance, that the accident occurred in the manner alleged in the complaint, and that plaintiff could have escaped injury had the door to the phone booth not jammed. In addition, several "new facts" were brought before the court.

First, the deposition testimony of Michael Zellis supported plaintiff's assertion that he could have escaped. Zellis was standing next to the phone booth occupied by plaintiff just prior to the accident. He testified that he saw Roberts' car veer toward the booth and that although he waited several seconds before running away, he was able to get out of the car's path and to avoid injury.

Second, the phone booth in which plaintiff was standing when injured was one of two booths located in the parking lot of the Fortune Liquor Store. The booths were situated close to the front wall of the store, between the front door and the sidewalk bordering Century Boulevard, near an entrance to the parking lot. Plaintiff occupied the booth nearest the street, 15 feet to the south of the curb line of Century Boulevard. [FN5]

> FN5 A diagram of the scene of the accident, which was prepared by the licensed land surveyor at defendants' request, appears as an appendix to this opinion. See *post*, page 63.

Third, Century Boulevard is a six-lane thoroughfare which runs east and west. For several blocks on either side of the liquor store, it is straight and level. The posted speed limit is 35 or 40 miles per hour.

Fourth, Roberts may have been speeding when she lost control of her car. In the opinion of defendants' expert witness, her car was traveling at a speed of 30 to 35 miles per hour when it struck the phone booth.

In opposition, plaintiff introduced declarations which established that this accident was not the first

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
(Cite as: 34 Cal.3d 49)

Page 5

one involving a phone booth at this particular location. On February 13, 1973, some 20 months prior to plaintiff's accident, another *55 car struck a phone booth in this same location. [FN6]Following this previous accident, defendants placed three steel "bumper posts" between the phone booths and the parking lot. No such posts were placed between the booths and Century Boulevard.

> FN6 In its answers to plaintiff's interrogatories, Pacific Telephone suggests that the former accident was caused by a car backing into the telephone booth. However, it would appear that this suggestion is based on sheer conjecture as the company admits that the accident occurred "during the night" and was caused by a "hit-and-run driver."
> The company also states that the prior accident caused only "minor damage." The record indicates that the accident necessitated the replacement of the phone booth.

In addition, plaintiff introduced a telephone company manual which states that telephone booth doors, when operating normally, "should open with a slight pull on the handle ...."

At the hearing on the motion, which was held on August 27, 1980, the dispute between the parties centered on whether the evidence presented triable issues of fact as to the questions of duty and proximate cause. At the close of argument, the court granted the motion and entered a judgment of dismissal. [FN7]

> FN7 Since the trial court granted defendants' motion for summary judgment, the court did not consider Western Electric's alternative request for a finding that it did not participate in the siting of the telephone booth. Accordingly, that issue is not before this court.

This appeal by the plaintiff followed.

## II.

(3a), (4) Defendants contend that their duty to use due care in the location, installation, and maintenance of telephone booths does not extend to the risk encountered by plaintiff [FN8] and that neither their alleged negligence in *56 carrying out these activities nor any defect in the booth was a proximate cause of plaintiff's injuries. These contentions present the same issue in different guises. Each involves this question - was the risk that a car might crash into the phone booth and injure plaintiff reasonably foreseeable in this case? (See, e.g., *Weirum v. RKO General, Inc., supra,* 15 Cal.3d 40, 45-46;*Akins v. County of Sonoma* (1967) 67 Cal.2d 185, 198-199 [60 Cal.Rptr. 499, 430 P.2d 57]; see generally, 2 Harper & James, Law of Torts (1956) §§ 18.2, 20.5, at pp. 1022, 1141-1143;Rest.2d Torts, § 281, coms. e, f and h; see also *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 127 [104 Cal.Rptr. 433, 501 P.2d 1153].)

> FN8 The few courts which have considered whether the company or companies responsible for the location, installation or maintenance of a telephone booth have a duty to exercise due care in carrying out these activities have concluded that such a duty exists. (See generally, Annot., Liability of Telephone Company for Injury Resulting From Condition or Location of Telephone Booth (1982) 17 A.L.R.4th 1308, 1309.)Moreover, although this court has not ruled on this precise issue, well settled principles of law would require the recognition of a duty to use due care.
> The relationship between a telephone company and a user of its instrumentalities is that of invitor and invitee. (*Jaehne* v. *Pacific Tel. & Tel. Co.* (1951) 105 Cal.App.2d 683, 687 [234 P.2d 165].) It is, of course, settled law that "one who invites another to do business with him owes the invitee the duty to exercise reasonable care to prevent his being injured on 'the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
**(Cite as: 34 Cal.3d 49)**

premises.'" (*Schwartz v. Helms Bakery Limited* (1967) 67 Cal.2d 232, 239 [60 Cal.Rptr. 510, 430 P.2d 68]; accord *Jaehne v. Pacific Tel. & Tel. Co., supra*, at p. 688 [telephone company owes users of its instrumentalities "the duty of maintaining its property in a reasonably safe condition, and of exercising reasonable care in protecting [them] from injury through its negligence"].) Further, an independent contractor hired to perform any of the aforementioned activities would have a duty "commensurate with" or "analogous to" that of the telephone company toward the company's invitees. (See generally, *Chance v. Lawry's, Inc.* (1962) 58 Cal.2d 368, 376-379 [24 Cal.Rptr. 209, 374 P.2d 185].)

(5) Ordinarily, foreseeability is a question of fact for the jury. ( *Weirum v. RKO General, Inc., supra*, 15 Cal.3d 40, 46.) It may be decided as a question of law only if, "under the undisputed facts there is no room for a reasonable difference of opinion." (*Schrimscher v. Bryson* (1976) 58 Cal.App.3d 660, 664 [130 Cal.Rptr. 125]; accord *Richards* v. *Stanley* (1954) 43 Cal.2d 60, 66 [271 P.2d 23]; see generally, Rest.2d Torts, § 453, com. b.) Accordingly, this court must decide whether foreseeability remains a triable issue in this case. (6) If any triable issue of fact exists, it is error for a trial court to grant a party's motion for summary judgment. (Code Civ. Proc., § 437c [FN9]; see generally, *Stationers Corp. v. Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

> FN9 Section 437c of the Code of Civil Procedure provides that summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers,

... and all inferences reasonably deducible from such evidence, [but] *summary judgment shall not be granted by the court based on inferences reasonably deducible from such evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact.*" (Italics added.)

(7) (**See fn. 10.**)There is a threshold question as to whether the facts assumed to be true by the court in *Bigbee I, supra*, 93 Cal.App.3d 451 [FN10] and the facts presented in this case are sufficiently different to permit this court to redecide the question as to whether foreseeability is a triable issue.

> FN10 In ruling on a demurrer, the court assumes the truth of all facts properly pleaded in a complaint. (See generally, 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 800, p. 2413.)

In *Bigbee I*, the Court of Appeal impliedly determined that under the facts alleged in the complaint, foreseeability was a question of fact for the jury and could not be decided adversely to plaintiff as a matter of law. (See 93 Cal.App.3d at pp. 454-456; see generally, 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 802, p. 2415.) Under the doctrine known as the "law of the case," this court would ordinarily be required to adhere to that ruling - even if erroneous - unless the evidence presented on the second appeal were substantially different. *57

(8) "[Q]uestions presented and decided by [an] appellate court upon appeal from a judgment on demurrer become the law of the case, and are not open to question on a subsequent appeal" unless the evidence "'is substantially different in a material respect.'" (*Blatz Brewing Co. v. Collins* (1948) 88 Cal.App.2d 438, 444, 445 [160 P.2d 37]; accord *Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 169 [74 P.2d 252]; *Pacific Gas & Elec. Co. v. Minnette* (1953) 115 Cal.App.2d 698, 707 [252 P.2d 642]; see generally, *People* v. *Shuey* (1975) 13 Cal.3d 835, 840-842 [120 Cal.Rptr. 83,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
(Cite as: 34 Cal.3d 49)

Page 7

533 P.2d 211].) [FN11]

> FN11 This rule applies even though the
> prior appellate opinion was rendered in an
> extraordinary writ proceeding, and even
> though the subsequent appeal comes before
> this court whereas the prior proceeding
> was before the Court of Appeal. (*Price v.
> Civil Service Com.* (1980) 26 Cal.3d 257,
> 267, fn. 5 [161 Cal.Rptr. 475, 604 P.2d
> 1365].)

However, this rule applies only to those parties who
appealed and whose rights were affected by that
prior appeal. (*March* v. *Barnet* (1898) 121 Cal. 419,
424 [53 P. 933]; see also *Penziner* v. *West Americ-
an Finance Co., supra,* 10 Cal.2d at p. 169; see
generally 5 Cal.Jur.3d, Appellate Review, § 653, p.
383.) Pacific Telephone and Western Electric were
the only defendants who were parties to the *Bigbee
I* proceeding. The rights of Western Industrial and
Decker were not determined in that proceeding.
Therefore, in order to determine whether summary
judgment was properly granted as to them, this
court must consider anew the question of foreseeab-
ility. [FN12]

> FN12 If this court were to conclude, con-
> trary to the decision in *Bigbee I,* that fore-
> seeability may be determined adversely to
> plaintiff as a matter of law, then and only
> then would it be necessary to determine
> whether the similarity in the evidence in
> the two proceedings requires a finding that
> Pacific Telephone and Western Electric are
> bound by the holding in *Bigbee I.*

(3b) Turning to the merits of this case, the question
presented is a relatively simple one. Is there room
for a reasonable difference of opinion as to whether
the risk that a car might crash into the phone booth
and injure an individual inside was reasonably fore-
seeable under the circumstances set forth above?

(9) In pursuing this inquiry, it is well to remember
that "foreseeability is not to be measured by what is

more probable than not, but includes whatever is
likely enough in the setting of modern life that a
reasonably thoughtful [person] would take account
of it in guiding practical conduct." (2 Harper &
James, Law of Torts, *supra,* § 18.2, at p. 1020.)One
may be held accountable for creating even "'the risk
of a slight possibility of injury if a reasonably
prudent [person] would not do so.'" (*Ewart v.
Southern Cal. Gas Co.* (1965) 237 Cal.App.2d 163,
172 [46 Cal.Rptr. 631], quoting from *Vasquez v.
Alameda* (1958) 49 Cal.2d 674, 684 [321 P.2d 1]
(dis. opn. of Traynor, J.); see also *Crane v. Smith*
(1943) 23 Cal.2d 288, 299 [144 P.2d 356]; see gen-
erally, Rest.2d Torts, § 291.) Moreover, it is settled
that what is required to be *58 foreseeable is the
general character of the event or harm - e.g., being
struck by a car while standing in a phone booth -
not its precise nature or manner of occurrence.
(*Taylor* v. *Oakland Scavenger Co.* (1941) 17 Cal.2d
594, 600 [110 P.2d 1044]; *Gibson v. Garcia* (1950)
96 Cal.App.2d 681, 684 [216 P.2d 119]; see gener-
ally, Rest.2d Torts, § 435, subd. 1, com. a.)

(3c) Here, defendants placed a telephone booth,
which was difficult to exit, in a parking lot 15 feet
from the side of a major thoroughfare and near a
driveway. Under these circumstances, this court
cannot conclude as a matter of law that it was un-
foreseeable that the booth might be struck by a car
and cause serious injury to a person trapped within.
A jury could reasonably conclude that this risk was
foreseeable. (Cf. *Barker v. Wah Low* (1971) 19
Cal.App.3d 710, 723 [97 Cal.Rptr. 85] [reasonable
jurors could find that the chance that a car in the
parking lot of a drive-in restaurant might strike a
patron at the adjacent service counter was foresee-
able].) This is particularly true where, as here, there
is evidence that a booth at this same location had
previously been struck. (See, *ante,* pp. 54-55 and
fn. 6.)

Indeed, in light of the circumstances of modern life,
it seems evident that a jury could reasonably find
that defendants should have foreseen the possibility
of the very accident which actually occurred here.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
(Cite as: 34 Cal.3d 49)

Page 8

Swift traffic on a major thoroughfare late at night is to be expected. Regrettably, so too are intoxicated drivers. (See *Coulter v. Superior Court, supra,* 21 Cal.3d 144, 154.) Moreover, it is not uncommon for speeding and/or intoxicated drivers to lose control of their cars and crash into poles, buildings or whatever else may be standing alongside the road they travel - no matter how straight and level that road may be.

Where a telephone booth, which is difficult to exit, is placed 15 feet from such a thoroughfare, the risk that it might be struck by a car veering off the street, thereby causing injury to a person trapped within, cannot be said to be unforeseeable as a matter of law.

It is of no consequence that the harm to plaintiff came about through the negligent or reckless acts of Roberts. [FN13]"If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." (Rest.2d Torts, § 449; accord *59Weirum v. RKO General, Inc., supra,* 15 Cal.3d 40, 46;*Vesely v. Sager* (1971) 5 Cal.3d 153, 164 [95 Cal.Rptr. 623, 486 P.2d 151]; *Richardson* v. *Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269]; see also *Cronin v. J.B.E. Olson Corp., supra,* 8 Cal.3d 121, 126-127.) Here, the risk that a car might hit the telephone booth could be found to constitute one of the hazards to which plaintiff was exposed.

> FN13 The police officer who investigated this accident was of the opinion that Roberts' blood alcohol level was above 0.10 percent, the legal limit. However, no blood alcohol or other chemical sobriety test was done.

Other courts considering cases presenting factual situations similar to this one have reached precisely the same conclusions. (See, e.g., *Noon v. Knavel* (1975) 234 Pa.Super. 198 [339 A.2d 545];*Brinkley*

*v. Southern Bell Telephone & Telegraph Company* (Fla.App. 1977) 353 So.2d 593; see generally, Annot., Liability of Telephone Company for Injury Resulting From Condition or Location of Telephone Booth, *supra,* 17 A.L.R.4th 1308.)In *Brinkley* a car, driven by a person who was allegedly drunk, struck a telephone booth in a shopping center parking lot. The court thought the question of foreseeability was so obviously a triable issue that it reversed a summary judgment for the telephone company in a two-paragraph opinion.

*Noon v. Knavel, supra,* 339 A.2d 545, involved an accident in which the plaintiff was struck by a car while standing in a telephone booth located on the premises of a gas station. The booth was situated at the bottom of a long downgrade about 10 feet from the edge of the street and about 5 feet from a railroad crossing. The accident occurred when the car's brakes failed and the car ricocheted off a train at the crossing and crashed through the telephone booth. (*Id.,* at pp. 547-548.)

The court affirmed a jury verdict against the telephone company after concluding that the company was under a duty to use due care to protect users of the booth from the accidental, negligent or reckless acts of drivers. The risk of a railroad crossing accident was found to be among the foreseeable hazards which made the location of the booth unreasonably dangerous. Accordingly, the court concluded that the telephone company's negligence, in failing to use due care in positioning the booth, was a proximate cause of plaintiff's injuries. (*Id.,* at pp. 549-552.)

Considering the case law and the circumstances of this case, this court cannot conclude as a matter of law that injury to plaintiff, inflicted by negligent or reckless third party drivers, was unforeseeable. "[J]ust as we may not rely upon our private judgment on this issue, so the trial court may not impose its private judgment upon a situation, such as this, in which reasonable minds may differ." ( *Schwartz v. Helms Bakery Limited, supra,* 67 Cal.2d 232, 244.) [FN14]*60

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
(Cite as: 34 Cal.3d 49)

Page 9

FN14 With regard to plaintiff's negligence claims, it should be noted that there are no policy considerations which weigh against imposition of liability under the circumstances presented by this case. (Cf., e.g., *Schrimsher* v. *Bryson* (1976) 58 Cal.App.3d 660, 665 [130 Cal.Rptr. 125].) In terms of the various factors suggested by *Rowland* v. *Christian* (1968) 69 Cal.2d 109, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], it is undisputed that plaintiff suffered serious injury. An affirmative finding on foreseeability by the jury would obviously establish not only "the foreseeability of harm to plaintiff" but also a sufficiently "close[] connection between the defendant[s'] conduct and the injury suffered." As to the remaining factors, although defendants' conduct may have been without "moral blame," imposition of liability would further the policy of "preventing future harm." Finally, imposition of liability would not be unduly burdensome to defendants given the probable availability of insurance for these types of accidents which defendants themselves maintain do not recur with great frequency. This is not to say, of course, that defendants are liable for plaintiff's injury. This court decides only that this question is one that should be reserved for a jury.

Since the foreseeability of harm to plaintiff remains a triable issue of fact, the judgment is reversed and the case is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Bancroft, J., FN* concurred.

FN* Assigned by the Chairperson of the Judicial Council.

**KRONINGER, J.,** FN*

FN* Assigned by the Chairperson of the Judicial Council.
Concurring and Dissenting.

I respectfully disagree with this court's holding that the negligent siting theory of plaintiff's case should be submitted to the trier of fact.

Whether a duty of care is owed in any particular instance is a question of law and "is the court's 'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.'" (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) There are a number of such considerations; "the major ones are the foreseeability of harm to plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) Thus, foreseeability is but one of many considerations in weighing the question of whether a duty should be found to exist.

"When ... the existence of a duty rests on the reasonable foreseeability of injury to the plaintiff, it may become primarily a question for the jury unless reasonable minds cannot differ. Necessarily involved in submitting the case to the jury, however, is a preliminary determination that, granted a foreseeable risk, a duty arises. On the other hand, there are many situations involving foreseeable risks where there is no duty." (*61Richards* v. *Stanley* (1954) 43 Cal.2d 60, 66 [271 P.2d 23].) Foreseeability does not establish duty; it merely defines its limits.

As the majority points out, some courts in other jur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
(Cite as: 34 Cal.3d 49)

isdictions have reached the majority's result on similar facts, though sometimes with a strong dissent, as in the cited *Noon v. Knavel* (1975) 234 Pa.Super. 198 [339 A.2d 545]. However, "[d]eterminations of the duty issue as a matter of law adversely to the plaintiff are particularly common in situations similar to that in the present case, in which the defendant's responsibility for the activities of third persons is involved." (*Richards v. Stanley, supra,* 43 Cal.2d at p. 67.) And an equal number of courts in other jurisdictions have found against liability (see, e.g., *Eckerd-Walton, Inc. v. Adams* (1972) 126 Ga.App. 210 [190 S.E.2d 490]; *Feldman v. Whipkey's Drug Shop* (1970) 121 Ga.App. 580 [174 S.E.2d 474].)

This court recognized in *Richards* that foreseeable risks are inherent in all motoring activities. However, as also pointed out in *Richards,* "The problem is not answered by pointing out that there is a foreseeable risk of negligent driving on the part of [a third person]. There is a foreseeable risk of negligent driving whenever anyone drives ...." (*Richards v. Stanley, supra,* 43 Cal.2d at p. 65.)

Risk of harm from third persons is similarly inherent and foreseeable in pedestrian activities in proximity to vehicular traffic. By themselves, however, those risks are not deemed unreasonable and accordingly, without more, as a matter of law no one should be said to be under a duty of care to protect others from them, particularly where, as here, there is no reason to believe that the party sought to be charged was in a superior position to foresee the risk of harm. [FN1]

> FN1 The fact that the telephone booth was damaged some years previously cannot be said to have put defendants on any special notice of foreseeable harm from a drunken driver veering off a nearby street. On the contrary, it appears that the source of the previous damage was unknown, and was thus reasonably assumed to have been a vehicle maneuvering in the parking lot where the booth was located. Steps were taken to guard against further damage from

that direction.

The location of the telephone booth here, 15 feet from the curb, beside a straight and level roadway, and adjacent to a building, provided, if anything, more protection from the risk of curb-jumping automobiles than the adjacent sidewalk itself. To hold that defendants could be found liable for locating the booth where they did is tantamount to holding that one may be found negligent whenever he conducts everyday activities on or adjacent to the public sidewalk. It will go far toward making all roadside businesses insurers of safety from wayward travelers. *62

There is no suggestion of anything defendants might reasonably have done differently with respect to siting except simply not to maintain a telephone booth in the vicinity at all. Public telephones have, in fact, long been maintained adjacent to streets and highways for the convenience of the public, despite the obvious but remote risks. But "virtually every act involves some conceivable danger. Liability is imposed only if the risk of harm resulting from the act is deemed unreasonable - i.e., if the gravity and likelihood of the danger outweigh the utility of the conduct involved." ( *Weirum v. RKO General, Inc., supra,* 15 Cal.3d at p. 47.) Balancing the gravity and likelihood of danger against the usefulness of conveniently located public telephones, and applying each of the other "considerations" enumerated in *Rowland, supra,* 69 Cal.2d 108, I would opt for encouraging their continued maintenance adjacent to streets and highways, and would hold that on the present facts there arose no duty which could impose liability based on location of the booth.

As to defendant Western Electric Company, Inc., the only evidence on the siting issue was to the effect that such defendant neither had nor exercised any right or duty in selecting the location of the subject telephone booth. I would also affirm as to Western Electric on that issue for that reason.

It does not follow, however, that defendants might not be found liable for injury resulting from defect-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
**(Cite as: 34 Cal.3d 49)**

ive maintenance. The sticky door, if it existed, increased plaintiff's danger by frustrating effective use of his own self-protective faculties. Needlessly to increase the usual risks could be found negligent by the jury. The risk of a sidewalk-jumping car is a risk a pedestrian might seek to avoid by getting out of the way. Such an occurrence could be deemed not to supersede but to concur with negligently impeding plaintiff's freedom to take protective action. The judgment is properly reversed on that question.

That plaintiff's injuries were not proximately the result of any failure of a duty of care in siting the telephone booth, however, should be held to be "without substantial controversy" (Code Civ. Proc., § 437c, subd. (f)), and the trial court's ruling affirmed to that extent. **\*63**

**\*64**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

665 P.2d 947
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857
(Cite as: **34 Cal.3d 49**)



Cal.
Bigbee v. Pacific Tel. & Tel. Co.
34 Cal.3d 49, 665 P.2d 947, 192 Cal.Rptr. 857

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**



45 Cal.App.4th 1667

45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515, 71 Fair Empl.Prac.Cas. (BNA) 9, 68 Empl. Prac. Dec. P 44,112, 96 Cal. Daily Op. Serv. 3993, 96 Daily Journal D.A.R. 6340

**(Cite as: 45 Cal.App.4th 1667)**

▷

Brookwood v. Bank of America, Nat. Trust and Sav. Ass'n

Cal.App.6.Dist.

JOHNETTA BROOKWOOD, Plaintiff and Appellant,

v.

BANK OF AMERICA, NATIONAL TRUST AND SAVINGS ASSOCIATION et al., Defendants and Respondents.

**No. H013943.**

Court of Appeal, Sixth District, California.

May 31, 1996.

### SUMMARY

Plaintiff sued her former employers, which included a bank and a related investment company, for wrongful termination in violation of the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.). Defendants filed a petition to compel arbitration (Code Civ. Proc., § 1281.2) on the ground that a written agreement to arbitrate existed. The trial court granted the petition. (Superior Court of Santa Clara County, No. CV745987, Richard C. Turrone, Judge.)

The Court of Appeal affirmed the order granting defendants' motion to compel arbitration. The court held that the trial court properly granted defendants' petition to compel arbitration based on a written agreement between the parties, despite plaintiff's assertion of unilateral ignorance of the contractual terms. Plaintiff was bound by the provisions of the arbitration agreement regardless of whether she read it or was aware of the arbitration clause. Moreover, although plaintiff asserted that there was no arbitration clause in her agreement with the bank, several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together (Civ. Code, § 1642). The trial court implicitly found that the bank's contract, the investment com-

pany's contract, and the Uniform Application for Securities Industry Registration or Transfer (U-4 form), were substantially one transaction and should have been taken together. The bank and investment company were related companies that hired plaintiff at the same time in a dual capacity with responsibilities that required her to be a registered securities representative. Thus, the arbitration covenant in the registered representative agreement, U-4 form, and incorporated National Association of Securities Dealers, Inc., provisions ran between plaintiff and the bank notwithstanding that there was no specific arbitration provision in the bank's employment agreement for salaried employees. (Opinion by Premo, Acting P. J., with Elia and Wunderlich, JJ., concurring.)

### HEADNOTES

Classified to California Digest of Official Reports

**(1) Arbitration and Award § 8--Statutory Procedures for Compulsory Arbitration--Validity of Arbitration Agreement--Petition to Compel Arbitration.**
In California the issue of the validity of an arbitration agreement is determined upon a petition to compel arbitration. A petition to compel arbitration is to be heard in the manner of a motion. Factual issues on motions are submitted on affidavits or declarations, or oral testimony in the court's discretion.

**(2) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Exercise of Independent Judgment by Reviewing Court.**
Whether an arbitration agreement applies to a controversy is a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of interpretation was introduced in the trial court.

**(3) Contracts § 28--Construction and Interpretation--Intention of Parties.**
The fundamental canon of interpreting written in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

45 Cal.App.4th 1667                                                                          Page 2
45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515, 71 Fair Empl.Prac.Cas. (BNA) 9, 68 Empl. Prac. Dec. P 44,112, 96 Cal.
Daily Op. Serv. 3993, 96 Daily Journal D.A.R. 6340
(Cite as: 45 Cal.App.4th 1667)

struments is the ascertainment of the intent of the parties. As a rule, the language of an instrument must govern its interpretation if the language is clear and explicit.

**(4)** Arbitration and Award § 8--Statutory Procedures for Compulsory Arbitration--Federal Arbitration Act.

Arbitration under the Federal Arbitration Act (9 U.S.C. § 1 et seq.) generally is strongly favored, and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. California also has a strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution. The act provides that a written arbitration provision in a contract involving commerce is valid and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract. State law, whether of legislative or judicial origin, is applicable to arbitration clauses if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.

**(5)** Arbitration and Award § 8--Statutory Procedures for Compulsory Arbitration--Uniform Application for Securities Industry Registration or Transfer (U-4 Form).

A statutory cause of action for wrongful termination due to age discrimination is subject to compulsory arbitration under the terms of a Uniform Application for Securities Industry Registration or Transfer (U-4 form) alone.

**(6a, 6b)** Arbitration and Award § 5.5--Arbitration Agreements-- Construction and Effect--Agreements Between Employee and Related Employers-- Substantially One Transaction--Unilateral Mistake.

In a wrongful termination action against plaintiff's employers, which included a bank and a related investment company, the trial court properly granted defendants' petition to compel arbitration (Code Civ. Proc., § 1281.2) based on a written agreement between the parties, despite plaintiff's assertion of unilateral ignorance of the contractual terms. Plaintiff was bound by the provisions of the arbitra-

tion agreement regardless of whether she read it or was aware of the arbitration clause. Moreover, although plaintiff asserted that there was no arbitration clause in her agreement with the bank, several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together (Civ. Code, § 1642). The trial court implicitly found that the bank's contract, the investment company's contract, and the Uniform Application for Securities Industry Registration or Transfer (U-4 form), were substantially one transaction and should have been taken together. The bank and investment company were related companies that hired plaintiff at the same time in a dual capacity with responsibilities that required a securities registration. Thus, the arbitration covenant in the registered representative agreement, U-4 form, and incorporated National Association of Securities Dealers, Inc., provisions ran between plaintiff and the bank notwithstanding that there was no specific arbitration provision in the bank's employment agreement for salaried employees.

[See 11 **Witkin**, Summary of Cal. Law (9th ed. 1990) Equity, § 36 et seq.]

**(7)** Arbitration and Award § 7--Arbitration Agreements--Rescission-- Unilateral Mistake.

California law allows rescission of a contract for a unilateral mistake only when the unilateral mistake is known to the other contracting party and is encouraged or fostered by that party. No law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract, particularly where the language of the contract expressly and plainly provides for the arbitration of disputes arising out of the contractual relationship. Reliance on an alleged misrepresentation or, by extension of reasoning, a unilateral mistake not encouraged or fostered by the other party, is not reasonable when plaintiff could have ascertained the truth through the exercise of reasonable diligence. Reasonable diligence requires the reading of a contract before signing it. A party cannot use his or her own lack of diligence to avoid an arbitration agreement.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

45 Cal.App.4th 1667
45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515, 71 Fair Empl.Prac.Cas. (BNA) 9, 68 Empl. Prac. Dec. P 44,112, 96 Cal.
Daily Op. Serv. 3993, 96 Daily Journal D.A.R. 6340
(Cite as: 45 Cal.App.4th 1667)

Page 3

COUNSEL
Alexander H. Singleton and Ronald A. Peters for
Plaintiff and Appellant.
Payne & Fears, Karen O. Strauss and Jay J. Price
for Defendants and Respondents.
**PREMO, Acting P. J.**
Plaintiff Johnetta Brookwood sued her former em-
ployers defendants Bank of America NT & SA, a
California corporation (hereafter, Bank), BA In-
vestment Services, Inc., a California corporation
(hereafter, BAIS), [FN1] and Robert Goldman for
wrongful termination (sex discrimination) contrary
to California's Fair Employment and Housing Act.
(Gov. Code, § 12900 et seq.) Defendants filed a pe-
tition to compel arbitration on the ground that a
written agreement to arbitrate existed. (Code Civ.
Proc., § 1281.2.)Plaintiff opposed the petition by
arguing that (1) she did not knowingly agree to sub-
mit her claims to arbitration, and (2) no agreement
to arbitrate with Bank existed in any event. The tri-
al court granted the petition, and plaintiff appeals
from the order. We affirm.

> FN1 According to BAIS's business letter-
> head, BAIS was "A BankAmerica Com-
> pany."

Scope of Review

(1) In California the issue of the validity of an ar-
bitration agreement "is determined upon a petition
to compel arbitration." (*Strauch v. Eyring* (1994) 30
Cal.App.4th 181, 185-186 [35 Cal.Rptr.2d 747].)
"A petition to compel arbitration is to be heard in
the manner of a motion. [Citation.] Factual issues
on motions are submitted on affidavits or declara-
tions (or oral testimony in the court's discretion).
[Citations.]" (*Id.* at p. 184.)

(2) Whether an arbitration agreement applies to a
controversy is a question of law to which the appel-
late court applies its independent judgment where
no conflicting extrinsic evidence in aid of interpret-
ation was introduced in the trial court. (*Bos Materi-
al Handling, Inc. v. Crown Controls Corp.* (1982)
137 Cal.App.3d 99, 105 [186 Cal.Rptr. 740].) Here,

no conflicting extrinsic evidence in aid of interpret-
ation was introduced.

(3) "The fundamental canon of interpreting written
instruments is the ascertainment of the intent of the
parties. [Citations.] As a rule, the language of an in-
strument must govern its interpretation if the lan-
guage is clear and *1671 explicit." (*Ticor Title Ins.
Co. v. Rancho Santa Fe Assn.* (1986) 177
Cal.App.3d 726, 730 [223 Cal.Rptr. 175].)

The parties agree that this case is governed by the
Federal Arbitration Act (9 U.S.C.A. § 1 et seq.;
hereafter, the Act). (4) "Generally, under the Act,
arbitration is strongly favored, and 'any doubts con-
cerning the scope of arbitrable issues should be re-
solved in favor of arbitration....' [Citations.]" (*Rice
v. Dean Witter Reynolds, Inc.* (1991) 235
Cal.App.3d 1016, 1023 [1 Cal.Rptr.2d 265].) Cali-
fornia also has a " 'strong public policy in favor of
arbitration as a speedy and relatively inexpensive
means of dispute resolution.' " (*Strauch v. Eyring*,
*supra*, 30 Cal.App.4th at p. 186.) The California
Supreme Court has "warned against 'procedural
gamesmanship' aimed at undermining the advant-
ages of arbitration. [Citation.]" (*Ericksen, Arbuth-
not, McCarthy, Kearney & Walsh, Inc. v. 100 Oak
Street* (1983) 35 Cal.3d 312, 323 [197 Cal.Rptr.
581, 673 P.2d 251].)

The Act "provides that a written arbitration provi-
sion in a contract involving commerce is valid and
enforceable 'save upon such grounds as exist at law
or in equity for the revocation of any contract.'
[Citation.]" (*Lynch v. Cruttenden & Co.* (1993) 18
Cal.App.4th 802, 807 [22 Cal.Rptr.2d 636].) "
'[S]tate law, whether of legislative or judicial ori-
gin, is applicable [to arbitration clauses] *if* that law
arose to govern issues concerning the validity, re-
vocability, and enforceability of contracts gener-
ally.' [Citations.]" (*Rice v. Dean Witter Reynolds,
Inc.*, *supra*, 235 Cal.App.3d at p. 1023.)

California law states: "A written agreement to sub-
mit to arbitration an existing controversy or a con-
troversy thereafter arising is valid, enforceable and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

45 Cal.App.4th 1667
45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515, 71 Fair Empl.Prac.Cas. (BNA) 9, 68 Empl. Prac. Dec. P 44,112, 96 Cal.
Daily Op. Serv. 3993, 96 Daily Journal D.A.R. 6340
(Cite as: 45 Cal.App.4th 1667)

Page 4

irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.)

Background

Bank and BAIS hired plaintiff as an investment specialist to promote and sell BAIS's services regarding mutual funds, stocks, and bonds to Bank's clients. Bank also hired plaintiff to sell its annuities generally.

Plaintiff signed a registered representative agreement with BAIS which required her to be a registered representative "appropriately licensed under the rules and regulations of the National Association of Securities Dealers, Inc. ('NASD'), the New York Stock Exchange, Inc. ('NYSE'), the Securities and Exchange Commission and applicable state securities regulatory agencies ...." The agreement stated that plaintiff was "dually employed by [Bank] pursuant to an additional employment agreement" and required to *1672 hold herself out to customers "in a manner designed to clearly identify when [she was] representing BAIS and when [she was representing Bank]." It also provided: "[Y]ou will strictly adhere to the Rules of Fair Practice and other requirements of the NASD, as set forth in the NASD Manual, and to the Constitution, Rules and other requirements of the NYSE, copies of which will be maintained by BAIS for your reference." [FN2] The agreement specifically stated: "You agree that any dispute, controversy or claim relating to this Agreement, or its breach, shall be settled by arbitration under applicable NASD and NYSE rules."

FN2 The National Association of Securities Dealers, Inc. (NASD) Code of Arbitration Procedure generally requires that any dispute between members arising in connection with the business or activities of a member be arbitrated.

In addition, plaintiff transferred her existing NASD

registration from her former employer to BAIS by executing a Uniform Application for Securities Industry Registration or Transfer, commonly known as the U-4 form. At the top of the signature page, the U-4 form states in bold type: "THE APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY." Below this, in paragraph 5, the form provides: "I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction." [FN3]

FN3 The organizations indicated in item 10 of the U-4 form were the NASD, New York Stock Exchange, and the State of California.

On the same day that plaintiff signed the registered representative agreement, she signed an employment agreement for salaried employees with Bank. This agreement generally acknowledges plaintiff's dual employment, provides that it "also applies to [plaintiff's] employment with BAIS," states that Bank or BAIS may terminate the employment at any time with or without cause, and allows that a termination by BAIS automatically terminates plaintiff's employment by Bank unless Bank determines otherwise.

Plaintiff's Defense

Plaintiff's declaration in opposition to defendants' petition generally stated that she was not aware that the registered representative agreement and U-4 form contained arbitration clauses.

Discussion

(5) A statutory cause of action for wrongful termination due to age discrimination is subject to com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

45 Cal.App.4th 1667                                                                                                      Page 5
45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515, 71 Fair Empl.Prac.Cas. (BNA) 9, 68 Empl. Prac. Dec. P 44,112, 96 Cal.
Daily Op. Serv. 3993, 96 Daily Journal D.A.R. 6340
(Cite as: 45 Cal.App.4th 1667)

pulsory arbitration under the terms of a U-4 *1673 form alone. (*Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 23 [114 L.Ed.2d 26, 35, 111 S.Ct. 1647].)

The court in *Spellman v. Securities, Annuities & Ins. Services, Inc.* (1992) 8 Cal.App.4th 452 [10 Cal.Rptr.2d 427], applied *Gilmer* in reversing an order denying a petition for arbitration. At issue in *Spellman* was a claim under the Fair Employment and Housing Act for wrongful termination due to racial discrimination. The plaintiff in *Spellman* had signed an employment agreement containing an arbitration clause and the U-4 form.

(6a) Plaintiff's position is, of necessity, that a ground for revocation of contract is unilateral lack of understanding. She cites no state law for such a proposition. [FN4] Her sole authority is *Prudential Ins. Co. of America v. Lai* (9th Cir. 1994) 42 F.3d 1299.

> FN4 "Civil Code section 1689 provides that a party to a contract may rescind the contract if his consent was given by mistake or fraud exercised by or with the connivance of the party as to whom he rescinds ...." (*Merced County Mut. Fire Ins. Co. v. State of California* (1991) 233 Cal.App.3d 765, 771 [284 Cal.Rptr. 680].) In other words, "rescission is available for a unilateral mistake, when the unilateral mistake is known to the other contracting party and is encouraged or fostered by that party." (*Id.* at p. 772.)This case does not involve such a fact pattern.

"In *Lai*, the court analyzed a provision of the Civil Rights Act of 1991 which states that '[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title....' [Citation.] Despite this seemingly express Congressional endorsement of arbitration of Title VII claims, the Ninth Circuit,

relying on a passage from a single committee report from the House of Representatives and a statement by Senator Robert Dole, held that Congress intended that Title VII claims could be arbitrated 'only when such a procedure was *knowingly accepted.*' [Citation.]" (*Maye v. Smith Barney Inc.* (S.D.N.Y. 1995) 897 F.Supp 100, 107, italics added.) [FN5]

> FN5 "The reasoning of *Lai* has been criticized by courts in this and other Circuits as contrary to Supreme Court precedent and as based on citation of inadequate legislative history." (*Maye v. Smith Barney Inc., supra,* 897 F.Supp. at p. 107.)

*Lai*'s unfortunate choice of the words "knowingly accepted" is what gives life to plaintiff's position. Without any basis, plaintiff seizes upon the words and claims that they mean something more than "accepted" in the sense that any enforceable contract is "accepted." She can, so the argument goes, rescind a contract simply by proving her unilateral ignorance of the contractual terms.

(7),(6b) Plaintiff's position turns contract law on its head. California law allows rescission of contract for a unilateral mistake only "when the *1674 unilateral mistake is known to the other contracting party and is encouraged or fostered by that party." (*Merced County Mut. Fire Ins. Co. v. State of California, supra,* 233 Cal.App.3d 765, 772.) "No law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract, particularly where, as here, the language of the contract expressly and plainly provides for the arbitration of disputes arising out of the contractual relationship. [Citation.] Reliance on an alleged misrepresentation [or, by extension of reasoning, a unilateral mistake not encouraged or fostered by the other party,] is not reasonable when plaintiff could have ascertained the truth through the exercise of reasonable diligence. [Citation.] Reasonable diligence requires the reading of a contract before signing it. A party cannot use his own lack of diligence to avoid an arbitration agreement. [Citation.]" (*Rowland v. PaineWebber Inc.* (1992) 4

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515, 71 Fair Empl.Prac.Cas. (BNA) 9, 68 Empl. Prac. Dec. P 44,112, 96 Cal.
Daily Op. Serv. 3993, 96 Daily Journal D.A.R. 6340
(Cite as: 45 Cal.App.4th 1667)

Cal.App.4th 279, 286 [6 Cal.Rptr.2d 20].)

Hence, plaintiff was "bound by the provisions of the [arbitration] agreement regardless of whether [she] read it or [was] aware of the arbitration clause when [she] signed the document. [Citation.]" (*Macaulay v. Norlander* (1992) 12 Cal.App.4th 1, 6 [15 Cal.Rptr.2d 204].)

Plaintiff counters that California courts do not have authority to create a standard for arbitration that differs from federal law. We are therefore bound by *Lai*, so the argument goes, despite its seeming divergence from state law principles for revocation of contract.

We disagree, however, that *Lai* must be interpreted as making the revolutionary change in contract law that plaintiff accepts as a matter of fact.

In deciding the issue at hand, the *Lai* court did not open the door for extrinsic evidence of subjective intent inconsistent with the written words of a contract. It made a narrow decision, confined to the four corners of the contracts in question: "... the court held that since [the U-4 forms] did not describe the types of disputes that were to be subject to arbitration they could not constitute knowing acceptance of arbitration for Title VII claims. [Citation.] Likewise, the arbitration agreements that the *Lai* plaintiffs signed with [NASD] were insufficient because the arbitration clause in the NASD Manual did not refer to employment disputes." (*Maye v. Smith Barney Inc.*, *supra*, 897 F.Supp. at p. 107.)

Here, there is no question that the applicable clauses, being broad in scope, apply to plaintiff's causes of action. (*Spellman v. Securities, Annuities & Ins. Services, Inc.*, *supra*, 8 Cal.App.4th at pp. 464-465.)

In any event, *Lai* is inconsistent with United States Supreme Court authority to the extent that it purports to create a federal contractual standard *1675 for arbitration clauses. (*Perry v. Thomas* (1987) 482

U.S. 483, 493, fn. 9 [96 L.Ed.2d 426, 437, 107 S.Ct. 2520] ["Thus state law, whether of legislative or judicial origin, is applicable [to arbitration clauses] *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."].)

As a fallback position, plaintiff argues that there is no arbitration clause in the employment agreement with Bank in any event. And she relies upon the integration clause of that contract which states: "This Employment Agreement is the complete agreement between the Bank and me, and takes the place of all prior oral and/or written agreements concerning the conditions, nature, tenure, and/or duration of my employment relationship with the Bank. Any and all such prior oral and/or written agreements are invalid, except any specific provisions set forth in prior written agreements stating my compensation and/or benefits."

Plaintiff 's analysis is erroneous.

"Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Civ. Code, § 1642.)Whether Civil Code section 1642 applies in a particular case is a question of fact for resolution by the trial court. (*Cadigan v. American Trust Co.* (1955) 131 Cal.App.2d 780, 786 [281 P.2d 332].)

Thus, in order to prevail before us, plaintiff must demonstrate that there is no substantial evidence to support the trial court's implicit finding that Bank's contract, BAIS's contract, and the U-4 form, were substantially one transaction and should be taken together. (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].) [FN6]

> FN6 We are without power to substitute our deductions for those of the trial court. In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all fac-

45 Cal.App.4th 1667
45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515, 71 Fair Empl.Prac.Cas. (BNA) 9, 68 Empl. Prac. Dec. P 44,112, 96 Cal.
Daily Op. Serv. 3993, 96 Daily Journal D.A.R. 6340
**(Cite as: 45 Cal.App.4th 1667)**

tual matters will be viewed most favorably to the prevailing party and in support of the judgment. We look only at the evidence supporting the successful party and disregard the contrary showing. All conflicts must therefore be resolved in favor of the prevailing party below. (*Campbell v. Southern Pacific Co., supra*, 22 Cal.3d at p. 60.)

Plaintiff, however, fails to make a proper appellate argument. She cites the evidence favorable to her and ignores that in support of the judgment.

It is sufficient to note that Bank and BAIS are related companies that hired plaintiff at the same time in a dual capacity with principal responsibilities that required a securities registration. This evidence supports a finding that the employment agreement for salaried employees, registered representative *1676 agreement, and U-4 form, were parts of substantially one transaction and should be taken as one. Thus, the arbitration covenant in the Registered representative agreement, U-4 form, and incorporated NASD provisions ran between plaintiff and Bank notwithstanding there was no specific arbitration provision in the employment agreement for salaried employees.

### Disposition

The order granting defendants' motion to compel arbitration is affirmed.

Elia, J., and Wunderlich, J., concurred. *1677
Cal.App.6.Dist.
Brookwood v. Bank of America
45 Cal.App.4th 1667, 53 Cal.Rptr.2d 515, 71 Fair Empl.Prac.Cas. (BNA) 9, 68 Empl. Prac. Dec. P 44,112, 96 Cal. Daily Op. Serv. 3993, 96 Daily Journal D.A.R. 6340

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

Westlaw.

122 Cal.App.4th 1400                                                                    Page 1
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
**(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)**

**H**
Building Permit Consultants, Inc. v. Mazur
Cal.App. 2 Dist.,2004.

Court of Appeal, Second District, Division 3, California.
BUILDING PERMIT CONSULTANTS, INC.,
Plaintiff and Appellant,
v.
David MAZUR et al., Defendants and Respondents.
**No. B170797.**

Oct. 7, 2004.

**Background:** Firm that agreed to provide insured with "litigation support services," to assist insured with regard to coverage dispute with his insurer, sued insured and others after insured settled dispute without paying firm. Firm alleged multiple causes of action including breach of contract and conversion. Defendants filed demurrers. The Superior Court, Los Angeles County, No. BC286232,Robert Hess, J., sustained the demurrers without leave to amend, dismissed the first amended complaint, and entered judgment. Firm appealed.

**Holdings:** The Court of Appeal, Croskey, J., held that:
(1) firm's agreement called for performance of services that fell within Insurance Code's definition of "public insurance adjuster", and
(2) firm's failure to have obtained public insurance adjuster's license voided its agreement with insured.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ☞837(4)**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in
General
            30k837 Matters or Evidence Considered

in Determining Question
            30k837(4) k. Pleadings and Rulings
Thereon. Most Cited Cases

**Appeal and Error 30 ☞917(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k915 Pleading
                30k917 Demurrers
                    30k917(1) k. In General. Most
Cited Cases
When reviewing a judgment dismissing a complaint after the granting of a demurrer without leave to amend, courts must assume the truth of the complaint's properly pleaded or implied factual allegations, and consider judicially noticed matters.

**[2] Appeal and Error 30 ☞863**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in
General
            30k862 Extent of Review Dependent on
Nature of Decision Appealed from
                30k863 k. In General. Most Cited Cases
When reviewing a judgment dismissing a complaint after the granting of a demurrer without leave to amend, the appellate court gives the complaint a reasonable interpretation and reads it in context.

**[3] Appeal and Error 30 ☞863**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in
General
            30k862 Extent of Review Dependent on
Nature of Decision Appealed from
                30k863 k. In General. Most Cited Cases
When reviewing a judgment after the granting of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                                                 Page 2
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

demurrer, the Supreme Court determines whether the complaint states facts sufficient to state a cause of action.

**[4] Appeal and Error 30 ☜960(1)**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k960 Rulings on Motions Relating to Pleadings
            30k960(1) k. In General. Most Cited Cases
When reviewing a judgment dismissing a complaint after the granting of a demurrer without leave to amend, the appellate court must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment and, if an amendment could cure the defect, the appellate court finds that the trial court abused its discretion and reverses; if not, no abuse of discretion has occurred.

**[5] Appeal and Error 30 ☜901**

30 Appeal and Error
   30XVI Review
      30XVI(G) Presumptions
         30k901 k. Burden of Showing Error. Most Cited Cases
On appeal from a judgment dismissing a complaint after the granting of a demurrer without leave to amend, the plaintiff has the burden of proving that an amendment would cure the defect.

**[6] Appeal and Error 30 ☜837(4)**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
         30k837 Matters or Evidence Considered in Determining Question
            30k837(4) k. Pleadings and Rulings Thereon. Most Cited Cases
When reviewing a judgment dismissing a complaint after the granting of a demurrer without leave to amend, the well pled allegations that the appellate court accepts as true necessarily include the contents of any exhibits attached to the complaint, and the contents of an incorporated document will take precedence over and supersede any inconsistent or contrary allegations set out in the pleading; in the case of such a conflict, the appellate court will look solely to the attached exhibit.

**[7] Insurance 217 ☜3222**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(B) Claim Procedures
         217XXVII(B)4 Adjusters
            217k3222 k. In General. Most Cited Cases
Insurance Code provision that defines "public insurance adjuster" does not limit the definition to persons who only directly represent or act on behalf of the insured in the negotiation or settlement of a claim, but rather, applies to anyone who, for compensation, acts on behalf of or aids in any manner, an insured in negotiating for or effecting the settlement of a claim or claims for loss or damage under any policy of insurance. West's Ann.Cal.Ins.Code § 15007.

**[8] Insurance 217 ☜3222**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(B) Claim Procedures
         217XXVII(B)4 Adjusters
            217k3222 k. In General. Most Cited Cases
Firm's agreement to provide insured with "litigation support services," in order to assist insured with regard to a coverage dispute with his insurer, called for performance of services that fell within Insurance Code's definition of "public insurance adjuster"; terms of the agreement called for more than mere litigation support, inasmuch as the agreement gave control to firm over both attorney compensation and the settlement terms of coverage dispute.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                     Page 3
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
**(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)**

West's Ann.Cal.Ins.Code § 15007.
*See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 251; Cal. Jur. 3d, Insurance Adjusters, § 1 et seq.*
**[9] Insurance 217 ☞3227**

217 Insurance
   217XXVII Claims and Settlement Practices
      217XXVII(B) Claim Procedures
         217XXVII(B)4 Adjusters
            217k3227 k. Agreements with Principals. Most Cited Cases
Firm's failure to have obtained a public insurance adjuster's license voided its agreement to provide insured with "litigation support services" in order to assist insured with regard to a coverage dispute with his insurer, thereby leaving firm with no claim against insured for breach of contract or other services rendered; public insurance adjuster licensing provision gave insured the option to void any contract based on failure to obtain a license as required, and insured elected to do so. West's Ann.Cal.Ins.Code § 15006(a, b).

**[10] Fraud 184 ☞12**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k8 Fraudulent Representations
         184k12 k. Existing Facts or Expectations or Promises. Most Cited Cases
In a promissory fraud action, the essence of the fraud is the existence of an intent at the time of the promise not to perform it.

**[11] Fraud 184 ☞49**

184 Fraud
   184II Actions
      184II(C) Pleading
         184k49 k. Issues, Proof, and Variance. Most Cited Cases
To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend

to perform at the time he or she made the promise, and that the promise was intended to deceive or induce the promisee to do or not do a particular thing.

**[12] Fraud 184 ☞12**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k8 Fraudulent Representations
         184k12 k. Existing Facts or Expectations or Promises. Most Cited Cases
The mere failure to perform a promise made in good faith does not constitute fraud.

**[13] Attorney and Client 45 ☞26**

45 Attorney and Client
   45I The Office of Attorney
      45I(B) Privileges, Disabilities, and Liabilities
         45k26 k. Liabilities to Adverse Parties and to Third Persons. Most Cited Cases
Firm that agreed to provide insured with "litigation support services," in order to assist insured with regard to a coverage dispute with his insurer, failed to allege a cognizable claim for promissory fraud against attorneys who represented insurer; although attorneys promised to honor firm's purported lien interest in insured's settlement, firm was unable to show that it suffered any damages, inasmuch as insured was able to void the agreement it had with firm, and therefore there was no lien to protect. West's Ann.Cal.Civ.Code § 1709.

**[14] Fraud 184 ☞25**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k25 k. Injury and Causation. Most Cited Cases
Fraud without damage is not actionable.

**[15] Implied and Constructive Contracts 205H ☞13**

205H Implied and Constructive Contracts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

Page 4

205HI Nature and Grounds of Obligation
    205HI(B) Money Received
        205Hk13 k. Nature of Right. Most Cited
Cases
Firm that engaged in public adjuster services without the required license, when it agreed to provide insured with "litigation support services" in order to assist insured with regard to a coverage dispute with his insurer, could not assert a claim based on money had and received; public adjuster statute provided that insured was not liable for payment based on firm's failure to obtain license, and firm was not permitted to circumvent statute by reliance on a common count theory. West's Ann.Cal.Ins.Code § 15006(b).

**564 James S. Link; Law Offices of Michael Anatole and Michael Anatole, Calabasas, for Plaintiff and Appellant.
Law Offices of Louis J. Khoury, Louis J. Khoury, Los Angeles; Law Offices of Nairie A. Balian and Nairie A. Balian, Pasadena, for Defendant and Respondent, David Mazur.
Shea Stokes & Carter and Jeffrey J. Leist, Los Angeles, for Defendant and Respondent, Chapin, Shea, McNitt & Carter.
Gordon & Rees LLP, Peter Schwartz and Jeffrey A. Evans, Los Angeles, for Defendant and Respondent, Truck Insurance Exchange.
Reed Smith LLP, James C. Martin, Lorenzo E. Gasparetti and Benjamin G. Shatz, Los Angeles, for Defendant and Respondent, Crosby, Heafey, Roach & May.
Berger & Kahn, Sherman M. Spitz, Irvine, and Ryan C. Tuley, Marina del Rey, for Defendant and Respondent, Berger Kahn.
CROSKEY, J.
*1404 The appellant, Building Permit Consultants, Inc. (BPC), appeals from a judgment entered after the defendants' several demurrers to the first amended complaint (hereafter, FAC) were all sustained without leave to amend. Among other things, the trial court concluded that BPC's multiple claims allegedly arose from and were based upon a voidable contract to provide public insurance adjuster

services that were regulated and licensed by the Department of Insurance pursuant to Insurance Code sections 15006, 15007 and 15008.[FN1] Since BPC did not (and, in fact, could not) allege that it possessed the required license, and that failure has been raised and asserted as a defense to the enforcement of BPC's contract, the trial court concluded that the contract was void and all of the claims alleged by BPC necessarily failed.

    FN1. Unless otherwise indicated, all statutory references are to the Insurance Code.

After a review of the contract, which was attached as an exhibit to BPC's FAC, and the relevant Insurance Code provisions, we are satisfied that the trial court properly sustained the defendants' demurrers. We therefore will affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND [FN2]

    FN2. As this matter comes to us after the sustaining of a demurrer, the facts that we recite are taken from BPC's FAC or otherwise appear to be not in dispute.

The defendant and respondent, David Mazur, is the owner of two developed parcels of real property at 1233 and 1237 N. Fuller Avenue, Los Angeles, California (hereafter, the property). The property allegedly sustained some damage in the 1994 Northridge earthquake. Mazur, however, failed to make sufficient timely claim(s) to his insurer, the defendant and respondent, Truck Insurance Exchange (Truck).[FN3]

    FN3. This factual assertion is stated somewhat tentatively, as neither the FAC nor the parties' briefs have provided us with very much background. But this short summary appears, at least inferentially, to be accurate.

**565 On July 27, 1997, Mazur entered into a writ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                          Page 5
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

ten agreement with BPC entitled "Agreement For Litigation Support Services" (hereafter, the agreement). Under the terms of the agreement, Mazur retained "BPC to render the hereinafter described services in connection with [Mazur's] claim for insurance proceeds resulting from the damage or destruction to [Mazur's property]...."

Specifically, the relevant provisions of the agreement stated:"(a) [Mazur] will retain the services of an attorney to litigate, arbitrate and/or negotiate *1405 [Mazur's] claim with the insurance carrier. [¶] (b) [Mazur] retains BPC to support the attorney retained by [Mazur] by providing the following services: [¶] (i) BPC at the direction of [Mazur's] attorney will obtain the information and/or reports that the said attorney deems prudent or necessary to support [Mazur's] insurance claim. [¶] (ii) BPC will retain the services of a general building construction contractor and/or engineers (e.g.civil, structural, soil) and/or other consultants (which may include BPC), to prepare appropriate cost estimates, reports, plans and/or such other data and/or information that the attorney deems prudent or necessary [¶] (c) BPC is not responsible for the contents of any report a consultant prepares on [Mazur's] behalf. BPC shall not be held liable for the negligence or intentional misconduct of any consultant retained pursuant to the terms of this Agreement. [¶] (d) Subject to BPC's prior written approval of the fee agreement between [Mazur] and the attorney, BPC will pay the costs and expenses charged to [Mazur] by said attorney on the terms agreed to by [Mazur]. [¶] (e) BPC shall not be responsible for the representation of [Mazur] in the event that [Mazur's] insurer files a cross-complaint or separate action against [Mazur]."

Under the terms of the agreement, Mazur agreed that BPC would be entitled to receive 27-1/2 percent of the net amount of all sums paid to Mazur by Truck on all portions of Mazur's claim after the date of the agreement. All costs and expenses incurred by BPC [FN4] would be deducted from the gross recovery from Truck and repaid to BPC, but

would not be included in the recovery for purposes of calculating BPC's 27-1/2 percent share. This was a contingency arrangement and in the event of no recovery from Truck, then BPC would receive nothing (i.e., even the costs and expenses incurred by BPC would not have to be repaid). BPC was, however, to be fully paid out of first monies received from Truck even if this did not leave sufficient funds for Mazur to repair the earthquake damage to the property that had served as the basis for the claim.[FN5]

> FN4. The costs and expenses that the agreement anticipated would be incurred by BPC included (but were not necessarily limited to): (1) court filing fees; (2) process serving fees; (3) fees and mileage to private investigators; (4) fees to photographers or graphic artists; (5) experts for consultation and/or appearance at deposition or trial; (6) fees for obtaining attendance of other witnesses at deposition or trial; (7) fees to court reporters for taking deposition or copies of transcripts; (8) jury fees; (9) messenger and mail expenses; (10) traveling and lodging expenses for reaching out of town insurance people; (11) long distance telephone charges; (12) photocopying and telecopier charges.
>
> These costs and expenses do *not* include the fees that would be incurred by Mazur to hire the attorney with whom BPC, under the agreement, anticipated working.
>
> FN5. The agreement also contained a Co-operation Clause that provided: "5. CO-OPERATION. [Mazur] agree[s] to cooperate in the pursuit of the actions BPC and/or [Mazur's] attorney take on [Mazur's] behalf by providing necessary information, allowing inspections, producing documents, providing testimony and in such other ways as may be required. *In the event that [Mazur] refuse[s] to accept a settlement which BPC believes to be appropriate and*

122 Cal.App.4th 1400                                                                                    Page 6
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

*in [Mazur's] best interest, [Mazur] shall be deemed to be not cooperating and BPC shall, upon written notification to [Mazur], be entitled to withdraw from further representation of [Mazur]. In said event, BPC shall be entitled to: a) immediate reimbursement of all costs and expenses advanced on [Mazur's] behalf, and b) a lien on [Mazur's] claim in an amount equal to the total fee that would have been earned by BPC had [Mazur] settled as recommended by BPC plus the total amount advanced by BPC for costs and expenses which have not been reimbursed by [Mazur]. Further, [Mazur] shall be responsible for the amount of all costs and expenses which are required to further pursue [Mazur's] claim subsequent to the notification of [Mazur's] lack of cooperation."* (Italics added.)

**566 *1406 It is not clear from the record what, if any, services were performed by BPC on Mazur's behalf, but it alleges that it provided some "funds" and, as a result, Truck "reopened" Mazur's claim. Truck retained a law firm to represent its interests, the defendant and respondent Berger, Kahn, Shafter, Moss, Figler, Simon & Gladstone (hereafter, Berger).[FN6]

FN6. BPC alleges, on information and belief, that at some point in time, Berger was succeeded as counsel for Truck by *either* Crosby, Heafy, Roach and May (hereafter, Crosby) *or* Chapin, Shea, McNitt and Carta (hereafter, Chapin). Each of these law firms, along with Berger, (1) was named as a defendant in BPC's FAC, (2) successfully demurred to the FAC, and (3) is a respondent in this appeal.

On or about April 4, 2002, Mazur's earthquake claim was allegedly settled with Truck and the settlement proceeds were paid to Mazur.[FN7] BPC was neither involved in the settlement discussions nor informed as to the fact or terms of the settlement.

Although BPC had, under the terms of the agreement, a lien right on any such proceeds and, allegedly had served notice of such right on Berger (who allegedly acknowledged such notice), nothing was ever paid in satisfaction of such lien.

FN7. The record does not disclose the amount of this settlement; nor, indeed, does BPC anywhere allege the amount of the "funds" it allegedly spent on Mazur's behalf.

As a result, on December 2, 2002, BPC filed its original complaint in this matter. In that pleading it alleged causes of action against Mazur, and all of the other defendants, for (1) breach of contract, (2) fraudulent concealment, (3) negligent concealment, (4) breach of equitable lien, (5) imposition of constructive trust, (6) conversion and (7) negligence. BPC did *not* attach a copy of the agreement to its original complaint nor did it characterize its contractual relationship as a provider of *services*. Rather, BPC generally alleged only that under its contract with Mazur it had agreed to "provide funds for the purpose of helping Mazur in Mazur's pursuit of insurance proceeds for damage to Mazur's real property, resulting from the 1994 earthquake in the Los Angeles area."

The several defendants, including Mazur, responded to this complaint with demurrers which, among other things, asserted that BPC had failed to attach a copy of the agreement in order to avoid the very issue of voidability that is now before us. The trial court sustained the demurrers with leave to amend on April 28, 2003.

*1407 On May 7, 2003, BPC filed the FAC again alleging Mazur's claim for breach of contract, conversion and a common count for money had and received. Against Berger, it alleged a count for promissory fraud, intentional and negligent interference with contract, a common count for money had and received and conversion. Against Chapin and Crosby, BPC alleged counts for intentional and negligent interference with contract and conversion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                                                               Page 7
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

together**567 with a count for money had and received.

Mazur and the other defendants again demurred. The principal objection that they asserted was that the agreement was now before the court and plainly demonstrated that it was a contract for services (not the mere "providing of funds") and that the services described in the agreement fell under the provisions of sections 15006-15008 which define, and require the Department of Insurance's regulation and licensure of, public insurance adjusters. The other defendants joined Mazur in this argument and raised two other issues. They contended that the action against the several attorneys failed to comply with Civil Code section 1714.10 (requiring a court order before filing an action charging an attorney for conspiring with a client) and Civil Code section 47, subdivision (b) (the litigation privilege).

On June 26, 2003, the trial court sustained these demurrers, on all three grounds, without leave to amend. On August 18, 2003, the court dismissed the FAC and entered judgment.[FN8] BPC thereafter filed this timely appeal.

> FN8. In its judgment, the trial court set out the basis of its ruling: "1. The contract between Building Permit Consultants and David Mazur was voidable under Insurance Code §§ 15006 and 15007 based upon the admitted failure of Building Permit Consultants, Inc. to obtain a valid public adjuster license. The Court ruled that the activities of Building Permit Consultants as described in the contract with David Mazur, attached to the 1st Amended Complaint as Exhibit 1, required a public adjuster license. The Demurrer by David Mazur demonstrated that David Mazur had elected to void the contract, and this precluded any recovery against all defendants. The Court noted that plaintiff's counsel admitted during the oral argument that the contract utilized by Building Permit Consultants, Inc. required that David Mazur

hire an attorney and that attorney was required by the contract to utilize the services of Building Permit Consultants. This, together with the contingency fee recovery provided for in the contract which is not standard for expert witness retention, demonstrates that Building Permit Consultants acted independently of any attorney hired by David Mazur, and further demonstrates that Building Permit Consultants was required to obtain a public adjuster's license and that its failure to do so voids the contract. [¶] 2. Court denied plaintiff's request to file an amended complaint to attach letters obtained from the Department of Insurance on the grounds that any such letters should have been attached to Plaintiffs Opposition to the Demurrers, and that Court was not bound by conclusions of law or an administrative agency's determination on a legal issue. (See *A.M. Castle & Co. v. Franchise Tax Board* (1995) 36 Cal.App.4th 1794 [43 Cal.Rptr.2d 340].)[¶] 3. All causes of action directed against Defendants Chapin Shea McNitt & Carter, Crosby Heafy Roach & May, and Berger Kahn were disguised attempts to state claims for conspiracy between the law firms and their client, Truck Insurance Exchange. Therefore, all causes of action against these law firm defendants are barred by plaintiffs failure to obtain a court order prior to filing the complaint as required by Civil Code § 1714.10. [¶] 4. The 4th cause of action for money had and received failed to state a valid claim. [¶] 5. There was no liquidated sum to which plaintiff undisputed rights, and therefore the cause of action for conversion of money could not be stated."

#### *1408 ISSUES RAISED

As BPC expressly states in its opening brief, "the pivotal and controlling question" presented in this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                                              Page 8
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
**(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)**

matter is whether the FAC, and the agreement attached thereto as an exhibit, demonstrate that the services that BPC agreed to provide, and which serve as the fundamental basis for all of its claims, fall afoul of the provisions of sections 15006, 15007 and 15008. If they do, then the agreement is void and all of BPC's claims against all defendants, other than the promissory fraud claim, necessarily fail.

BPC contends that the services called for in agreement are not subject to the **568 Department of Insurance's regulation and license requirements and that the agreement is legal. BPC insists that the statute, when properly construed, should only be applied to one "who *directly* represents or acts on behalf of the insured in the negotiation or settlement of a claim" (italics added) and nothing alleged in the FAC reflects that BPC did any such acts.

The defendants, on the other hand, argue that the plain language of section 15007, which defines a "public insurance adjuster," is very broad and clearly encompasses the very services that BPC had promised in the agreement to provide.

We agree with the trial court and the defendants on this point. As a result we have no need to reach or discuss the issues raised by the attorney defendants under Civil Code sections 47, subdivision (b) and 1714.10.

### DISCUSSION

#### 1. Standard of Review

[1][2][3][4][5] "When reviewing a judgment dismissing a complaint after the granting of a demurrer without leave to amend, courts must assume the truth of the complaint's properly pleaded or implied factual allegations. [Citation.] Courts must also consider judicially noticed matters. (*Ibid.*) In addition, we give the complaint a reasonable interpretation, and read it in context. (*Ibid.*) If the trial court has sustained the demurrer, we determine whether the complaint states facts sufficient to state a cause of action. If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. (*Ibid.*) If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no *1409 abuse of discretion has occurred. (*Ibid.*) The plaintiff has the burden of proving that an amendment would cure the defect. (*Ibid.*)(*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081, 6 Cal.Rptr.3d 457, 79 P.3d 569.)

[6] The well pled allegations that we accept as true necessarily include the contents of any exhibits attached to the complaint. Indeed, the contents of an incorporated document (in this case, the agreement) will take precedence over and supercede any inconsistent or contrary allegations set out in the pleading. In the case of such a conflict, we will look solely to the attached exhibit. (*Holland v. Morse Diesel International Inc.* (2001) 86 Cal.App.4th 1443, 1447, 104 Cal.Rptr.2d 239; *Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604-605, 176 Cal.Rptr. 824.)

#### 2. *The Insurance Code Contains Very Broad Provisions Regarding The Scope of the Public Adjuster Law*

Section 15007, in pertinent part, provides: "A public insurance adjuster within the meaning of this chapter is a person who, for compensation, acts on behalf of *or aids in any manner,* an insured in negotiating for or effecting the settlement of a claim or claims for loss or damage under any policy of insurance covering real or personal property or ... any person who, for compensation, investigates, settles, adjusts, advises, or assists an insured with reference to claims for those losses on behalf of any public insurance adjuster." (Italics added.)

[7] BPC's principal argument is that this language requires that a public insurance adjuster be one who

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                                                              Page 9
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

*directly* represents or acts on behalf of the insured in the negotiation or settlement or a claim. We disagree.

**569 Section 15007 is much broader than this. BPC's narrow reading of the statute is not justified by the language used. Section 15007 does not limit the definition of a public insurance adjuster to persons who only *directly* represent or act on behalf of the insured in the negotiation or settlement of a claim, but rather applies to anyone "who, for compensation, acts on behalf of or aids in any manner, an insured in negotiating for or effecting the settlement of a claim or claims for loss or damage under any policy of insurance ..." The statute does not use the word "directly," does not limit its scope to negotiations directly with insurance company personnel and, in fact, is drafted in broad terms so as to apply to anyone who "aids in any manner" an insured in negotiating for or "effecting the settlement of a claim."

*1410 The terms of the statute are broad, and concern all persons (except those listed in Insurance Code section 15008) [FN9] whose conduct or involvement impacts the resolution of the insurance claim. The breadth of such language sharply conflicts with the meaning that BPC argues that we should adopt which would limit the scope of the statute to one who actually talks directly to insurance company representatives and discusses the terms of a settlement. Further, the statute also requires licensing of those who receive compensation for services (investigate, settle, adjust, advise) or provide assistance to the insured with reference to claims.

> FN9. In section 15008, the following categories of persons are excepted:
>
> "(a) An officer or employee of the United States of America or of the state or of a political subdivision thereof while the officer or employee is engaged in the performance of his or her official duties. [¶] (b) A charitable philanthropic

society duly incorporated under the laws of this state which is organized and maintained for the public good and not for private profit. [¶] (c) An attorney at law in performing his or her duties as an attorney at law. [¶] (d) Admitted insurers, agents, and insurance brokers licensed by the state performing duties in connection with insurance transactions by them. [¶] (e) The legal owner of personal property which has been sold under a conditional sales agreement or a mortgagee under the terms of a chattel mortgage. [¶] (f) Any salaried office employee who performs exclusively clerical and administrative duties attendant to the disposition of the business regulated by this chapter. [¶] (g) Photographers, estimators, appraisers, engineers, and arbitrators, who are employed exclusively by a public insurance adjuster for the purpose of furnishing technical assistance to a licensed public insurance adjuster. [¶] (h) A private investigator licensed pursuant to Chapter 11.5 (commencing with Section 7512) of Division 3 of the Business and Professions Code while acting within the scope of that license."

As we read section 15007's definitional language, it casts a broad net. We assume that the Legislature in using such broad language did so advisedly. If it had intended a scope as narrow as BPC contends, it certainly could have articulated that intent.

3. *BPC's Agreement With Mazur Calls For Performance of Services That Fall Within Section 15007*

[8] BPC insists that the agreement is only one for litigation support and that it was not agreeing to *directly* negotiate with Truck on Mazur's behalf. As we have already indicated, we will not read such a limited meaning into section 15007. Moreover,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                                                    Page 10
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

even a cursory review of the provisions of the agreement indicate that BPC was agreeing to something well beyond the simple provision of assistance to Mazur's attorney.

First the agreement is between BPC and Mazur, not BPC and an attorney already retained by Mazur. Indeed, BPC conceded during oral argument that the agreement required Mazur to hire an attorney**570 who would in turn contract with BPC for all of the services spelled out in the agreement. More *1411 significantly, BPC reserved the right to approve the fee agreement between Mazur and whatever attorney he did retain. BPC undertook to retain the services of the various kinds of experts and professionals who, under section 15008, are themselves excepted from the licensing requirement *when* they are employed by a licensed public insurance adjuster. Finally, if Mazur refused to accept a settlement that BPC "believes to be appropriate and in Mazur's best interest," BPC would be entitled to the immediate payment of all of its costs as well as a lien on Mazur's claim against Truck for 27-1/2 percent of the rejected settlement amount.

While we cannot determine from this record what services, *if any,* that BPC actually performed, it seems clear to us that the terms of the agreement called for more than mere litigation support. Certainly, the control that was given to BPC under the agreement over both attorney compensation and the settlement terms strongly suggests that something far different is going on here.

The author of the legislation that added sections 15007-15008 to the Insurance Code explained, in a letter to Governor Deukmejian on September 13, 1985, urging the Governor to sign Assembly Bill 1636 (1985-1986 Reg. Sess.), "The bill is designed to prevent some abuses which have been occurring in the field of public adjusting of insurance losses. As you know, 'public' adjusters represent the insured during the claims settlement process and they take a percentage of the loss payments for their services. Insurance proceeds are not increased to cover the fee of public adjusters. [¶] To enhance profes-

sionalism in the field of public adjusting and correct the abuses which have, on occasion, been taking place, the bill provides for the licensing of public adjusters and it would require all adjusting firms to demonstrate their qualifications to the Insurance Commissioner. [¶] It also enacts certain provisions ensuring that claimants are fully informed of the benefits and costs of public adjusting services and provides the claimant with the right to cancel the contract within 72 hours."

Sections 15006-15008 are part of the Public Adjusters Act. Enacted in 1986, the Public Adjusters Act established a statutory scheme to regulate the activities of persons and firms who make it their business to assist insureds to file and pursue claims with insurers after insured-against calamities. An analysis prepared by the Assembly Committee on Finance and Insurance, where the Public Adjusters Act originated, defined a public adjuster as "an individual who obtains, secures or enforces a client's claim against an insurance company for a fee." (Assem. Com. on Fin. and Ins., Rep. on Assem. Bill 1636 (1985-1986 Reg. Sess.) Apr. 21, 1985) The goal of the Act, as articulated in this committee analysis and numerous others, was to *1412 curtail unethical and abusive practices by some members of this then-new profession. The Senate Insurance Committee in reviewing the bill stated: "Historically, 'public' adjusters have presented danger to the public by 'chasing fires' and soliciting clients under conditions of duress. Further, where there has been [*sic* ] problems with public adjusters steering repair or salvage work to specific contractors. A number of adjusters have come from the east coast where they have run afoul of the regulatory authority of those states." (Sen. Com. on Ins., Claims and Corp., Analysis of Assem. Bill. 1636 (1985-1986 Reg. Sess.) July 17, 1985). In a letter to Governor Deukmejian, the author of the Public Adjusters Act reiterated many of the same concerns: "The bill is designed to prevent some abuses which have been occurring in the field of public adjusting of **571 insurance losses. As you know, 'public' adjusters represent the insured during the claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                                                     Page 11
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

settlement process and they take a percentage of the loss payments for their services. Insurance proceeds are not increased to cover the fee of public adjusters. [¶] To enhance professionalism in the field of public adjusting and correct the abuses which have, on occasion, been taking place, the bill provides for the licensing of public adjusters and it would require all adjusting firms to demonstrate their qualifications to the Insurance Commissioner. [¶] It also enacts certain provisions ensuring that claimants are fully informed of the benefits and costs of public adjusting services and provides the claimant with the right to cancel the contract within 72 hours."

This history demonstrates that the Legislature recognized that insureds would often be susceptible to exploitation in the wake of earthquakes, fires, floods, and similar catastrophes and that consumers of public adjusting services needed protection. In addition to price gouging and collusion with contractors, the Public Adjusters Act protects California consumers from a number of other abuses including high-pressure sales tactics, fraud, and incompetence. To ensure accountability and compliance with professional standards already in place for adjusters employed by the insurers, the Legislature included the licensure requirement as a part of the statutory scheme. In light of the consumer protection goals of the statute as a whole, we infer that the licensure requirement was aimed at any firm that might potentially exploit insureds in a vulnerable position by offering to help them through the insurance claim ordeal. It is, therefore, insignificant that BPC's business strategy does not precisely match the approach taken by other public adjusters which were in operation at the time the law was enacted. In our view, the agreement between BPC and Mazur is the very kind of transaction that the Legislature intended to control and regulate. It is not important for present purposes that BPC's services are characterized as litigation support and assistance. As already stated, BPC's agreement would give it effective *1413 control over the client's attorney. Furthermore, the legislative history

also indicates that one of the law's purposes was to prevent circumvention of existing professional standards. In a letter to the Governor, advocates of the bill stated: "It is very likely that some public adjusters operate without a license contending that current definitions do not apply to their practices." It would be improper and contrary to the clear legislative intent of the Public Adjusters Act to allow firms to bypass the licensure requirement and associated standards by packaging public adjusting services while still presenting the same dangers of dishonesty, sharp dealing, and incompetence to the consumer.

BPC argues that a ruling that anyone who does not *directly* handle an insured's claim is subject to the license requirement would lead to absurd results. BPC contends that the logic of such a ruling would compel application of the licensure requirement to anyone remotely involved in the insurance claims process, including auto body shops and building contractors, inasmuch as they furnish bills, estimates, and other documents used in adjusting claims. We disagree. A public adjuster's function is essentially to determine what services an insured needs and is entitled to after an insured-against event and then to help in achieving a full and fair settlement. Contractors and auto body shops merely provide a service without any reference to the event occasioning the need for that service. So long as they do not seek to involve themselves in the settlement negotiation process with their customers' insurers or represent that they will do so, businesses **572 like these do not present the same consumer protection problems as do public insurance adjusters. Furthermore, in enacting the law, the Legislature foresaw the need to avoid confusion by exempting certain professionals commonly involved in the claims adjusting process from the licensure requirement. Among the exempt are photographers, estimators, appraisers, engineers and arbitrators employed by public insurance adjusters. (§ 15008(g).) However, these persons are only exempt when they are retained by a public adjuster who, in turn, must be licensed so that honesty and fair dealing are reason-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400                                                              Page 12
122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)

ably ensured. BPC's agreement with Mazur, in contrast, provides no safeguards of accountability, competence, or professionalism. As such, enforcing BPC's contract in this instance would undermine the regulation goals for public insurance adjusters which are at the heart of the legislation.

### 4. BPC's Failure To Have Obtained A License Voids The Agreement

[9] Section 15006, subdivision (a), provides in pertinent part, "No person shall engage in a business regulated by this chapter, or act or assume to act as, or represent himself or herself to be, licensee unless he or she is licensed under this chapter."

*1414 Section 15006, subdivision (b) provides, "Any contract for services regulated by this chapter that is entered into by an insured with any person who is in violation of subdivision (a) may be voided at the option of the insured, and the insured shall not be liable for the payment of any past services rendered, or future services to be rendered, by that person under that contract or otherwise."

Mazur has elected to void the agreement as there is no dispute that BPC has not alleged (and apparently cannot truthfully do so) that it was licensed at the time that the agreement was executed. Since the agreement is void and unenforceable, BPC has no claim for breach of contract against Mazur. Further, under the express language of section 15006, subdivision (b), BPC has no claim against Mazur of any kind based upon services rendered.

### 5. BPC's Promissory Fraud Claim Is Without Merit

[10][11][12] Actionable deceit exists where a promise is made "without any intention of performing it." (Civ.Code, § 1710(4).) In a promissory fraud action, "the *essence* of the fraud is the *existence of an intent at the time of the promise* not to perform it." (*Benson v. Hamilton* (1932) 126 Cal.App. 331, 334, 14 P.2d 876, italics in original.) "To maintain an action for deceit based on a false

promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing." (*Tarmann v. State Farm Mutual Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 159, 2 Cal.Rptr.2d 861.) "The mere failure to perform a promise made in good faith does not constitute fraud." (*Merciful Saviour v. Volunteers of America, Inc.* (1960) 184 Cal.App.2d 851, 859, 8 Cal.Rptr. 48.)

[13] In this case, BPC has alleged that Berger's agent signed a letter promising to honor BPC's purported contractual lien interest in Mazur's insurance settlement "without any intention to honor the promise that BPC's lien on the proceeds of any monetary resolution of the claim would be protected...." At the time Berger promised it would protect BPC's lien, the agreement on which the lien was based was *voidable*, not void. As counsel to a party in the negotiation of the settlement agreement, Berger was in a position to know whether the parties planned to honor **573 BPC's lien. Therefore, BPC might have justifiably relied on such a representation to its detriment. Although it is doubtful that Berger actually intended to defraud BPC in this manner (under *1415 the terms of the agreement it had nothing to gain by denying BPC a share in the settlement), the mental state required for promissory fraud has been properly pleaded.

[14] In addition to fraudulent intent, however, actionable deceit also requires damages resulting from reliance on a misrepresentation. (Civ.Code, § 1709.) "[F]raud without damage is not actionable." *Furia v. Helm* (2003) 111 Cal.App.4th 945, 956, 4 Cal.Rptr.3d 357. BPC's alleged theory of damages was that Berger's representation caused it to take no other steps to secure its lien interest. The flaw in this allegation is that the greatest damage BPC could have suffered in detrimental reliance on Berger's representation was the total loss of its lien. However, because Mazur chose to void the agreement, BPC had no lien to protect. Therefore, even

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407
**(Cite as: 122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562)**

assuming BPC's fraud allegations are true, the cause of action fails for the failure and inability to allege that any damages resulted from such fraud. This defect cannot be cured by amendment because BPC has expressly alleged in the FAC that, in reliance on Berger's representations, it "refrained from taking any legal action." That is, Berger's actions did not cause BPC affirmatively to incur any expenses, but rather passively to forgo an opportunity to prosecute a claim that we have concluded was baseless. Thus, BPC cannot allege that Berger did it any cognizable wrong.

### 6. *BPC Cannot Assert A Claim Based On Money Had And Received*

[15] Section 15006 subdivision (b) provides: "Any contract for services regulated by this chapter that is entered into with any person who is in violation of subdivision (a) may be voided at the option of the insured, *and the insured shall not be liable for the payment of any past services rendered, or future services to be rendered, by that person under that contract or otherwise.*" (Italics added.) The statutory language only applies to "services rendered." In this case, BPC does not claim to have actually *performed* any services; it only provided funds. However, a fair reading of subdivision (b) is that it denies the unlicensed public adjuster from receiving *any* benefit from its activities. In addition to facing possible criminal sanctions for practicing without a license (§ 15053), unlicensed public adjusters do so at the risk of losing their investment. We see no reason to permit BPC to circumvent these statutory provisions by reliance on a common count theory.

### *1416 DISPOSITION

The judgment is affirmed.[FN10] The defendants shall recover their costs on appeal.

> FN10. We summarily reject BPC's procedural argument that the trial court should have granted it leave to file a second

amended complaint alleging that the Department of Insurance had previously issued two letter "opinions" expressing the view that BPC did not have to be licensed. BPC, however, failed to provide a copy of those letters to the trial court or otherwise demonstrate that they were anything other than informal "private letters" issued by the Department with no precedential impact or effect. In short, the trial court was provided with no basis for concluding that the Department had ever taken any official action with respect to the issue of BPC's licensure obligation. BPC had an obligation to make some demonstration to the trial court that a further opportunity to plead a viable cause of action was truly justified. In the absence of such showing in its moving papers, we cannot say that the trial court abused its discretion in denying BPC further leave to amend. Moreover, we would not, in any event, be bound in our construction of the relevant Insurance Code sections by any opinion letters written to BPC by the Department. (See generally, *Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 234-235, 5 Cal.Rptr.2d 782, 825 P.2d 767, fns. 6 and 7.)

We Concur: KLEIN, P.J., and ALDRICH, J.

Cal.App. 2 Dist.,2004.

Building Permit Consultants, Inc. v. Mazur

122 Cal.App.4th 1400, 19 Cal.Rptr.3d 562, 04 Cal. Daily Op. Serv. 9089, 2004 Daily Journal D.A.R. 12,407

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.