**6**

Westlaw.

973 P.2d 527                                                                 Page 1
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

▷
CEL-TECH COMMUNICATIONS, INC., et al.,
Plaintiffs and Appellants, v. LOS ANGELES CEL-
LULAR TELEPHONE COMPANY, Defendant and
Respondent.
Cal. 1999.
      CEL-TECH COMMUNICATIONS, INC., et al.,
            Plaintiffs and Appellants,
                        v.
LOS ANGELES CELLULAR TELEPHONE COM-
   PANY, Defendant and Respondent.
                No. S066735.

          Supreme Court of California
                 Apr. 8, 1999.

                  SUMMARY

Sellers of cellular telephones brought an action
against a company that sold cellular telephones be-
low cost to gain subscribers for its cellular service.
Plaintiffs alleged several causes of action, including
violations of the Unfair Practices Act (Bus. & Prof.
Code, § 17000 et seq.) and the unfair competition
law (Bus. & Prof. Code, § 17200 et seq.). The trial
court found that there was no violation of the Un-
fair Practices Act because defendant intended
merely to compete with a third party, not to harm
plaintiffs. It thus ruled that the action under the un-
fair competition law necessarily failed along with
the other causes of action. (Superior Court of Los
Angeles County, No. VC015535, C. Robert
Simpson, Jr., Judge.) The Court of Appeal, Second
Dist., Div. Three, No. B094578, reversed as to the
cause of action under the unfair competition law
and affirmed the judgment as to the other causes of
action. Although the Court of Appeal found that de-
fendant proved it did not have injurious intent and
therefore did not violate the Unfair Practices Act, it
further found that defendant's actions might never-
theless have violated the unfair competition law and
remanded the matter for retrial on that cause of ac-
tion.

The Supreme Court affirmed the judgment of the
Court of Appeal, including the remand for retrial of
the unfair competition law cause of action. With re-
gard to the cause of action under the Unfair Prac-
tices Act, the court held that plaintiffs failed to
show defendant violated Bus. & Prof. Code, §
17043 (sales below cost "for the purpose of injuring
competitors or destroying competition"), since
plaintiffs did not establish defendant acted with the
necessary culpable mental state. Upon finding that
defendant's purpose was only to compete with a
third party rather than to injure plaintiffs, the lower
courts were correct in concluding defendant did not
violate Bus. & Prof. Code, § 17043. Plaintiffs' ac-
tion under Bus. & Prof. Code, § 17044, failed for
the same reason. The court further held that the trial
court erred in concluding that plaintiffs' unfair com-
petition law cause of action necessarily failed when
causes of action under the Unfair Practices Act
failed. If defendant's below-cost sales did not come
within either the safe harbor of Bus. & Prof. Code,
§ 17026.1 (cellular services providers may sell cel-
lular phones below cost as good faith endeavor to
meet legal market prices of competitors), nor the
direct prohibitions of Bus. & Prof. Code, §§ 17043
and 17044, defendant's conduct could nonetheless
be considered unfair under the unfair competition
law. Thus, it was necessary to remand to determine
if defendant's conduct was in fact unfair under the
unfair competition law-i.e., conduct that threatens
an incipient violation of an antitrust law, or that vi-
olates the policy or spirit of one of those laws be-
cause its effects are comparable to a violation of the
law, or that otherwise significantly threatens or
harms competition. (Opinion by Chin, J., with
George, C. J., Mosk and Brown, JJ., and Dibiaso,
J., FN* concurring. Concurring and dissenting
opinion by Kennard, J. (see p. 191). Concurring and
dissenting opinion by Baxter, J. (see p. 206).)

        FN* Associate Justice of the Court of Ap-
        peal, Fifth District, assigned by the Chief
        Justice pursuant to article VI, section 6 of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

the California Constitution.

HEADNOTES

Classified to California Digest of Official Reports

**(1) Unfair Competition § 3--Unfair Practices Act-
-Below-cost Sales and Loss Leaders--Necessary
Culpable Mental State.**
In an action under the Unfair Practices Act by
sellers of cellular telephones against a company
that sold cellular telephones below cost to gain sub-
scribers for its cellular service, plaintiffs failed to
show defendant violated Bus. & Prof. Code, §
17043 (sales below cost "for the purpose of injuring
competitors or destroying competition"), since
plaintiffs did not establish defendant acted with the
necessary culpable mental state. Bus. & Prof. Code,
§ 17043, uses the word "purpose," not "intent" or
"knowledge." An action is not purposive with re-
spect to a result unless the actor consciously desired
to cause such a result. Upon finding that defend-
ant's purpose was only to compete with a third
party rather than to injure plaintiffs, the court was
correct in concluding defendant did not violate Bus.
& Prof. Code, § 17043. It is not sufficient to show
defendant's knowledge that injuring competitors or
destroying competition would result. Plaintiffs' ac-
tion under Bus. & Prof. Code, § 17044 (loss lead-
ers), failed for the same reason-they did not prove
defendant acted with the necessary purpose. Al-
though on its face, the language of Bus. & Prof.
Code, § 17044, subd. (c), which prohibits use of
loss leaders, does not appear to require any culp-
able mental state, courts have unanimously inter-
preted the statute as containing the same mental
state requirement as Bus. & Prof. Code, § 17043,
i.e., the purpose to injure competitors or to destroy
competition.
[See 1 Witkin, Summary of Cal. Law (9th ed. 1987)
Contracts, § 591 et seq.]
**(2) Unfair Competition § 4--Unfair Competition
Law--Scope.**
The scope of the unfair competition law (Bus. &
Prof. Code, § 17200 et seq.), is broad. Unlike the

Unfair Practices Act (Bus. & Prof. Code, § 17000),
the unfair competition law does not proscribe spe-
cific practices. Rather, it defines "unfair competi-
tion" to include any unlawful, unfair or fraudulent
business act or practice (Bus. & Prof. Code, §
17200). Its coverage is sweeping, embracing any-
thing that can properly be called a business practice
and that at the same time is forbidden by law. It
governs anticompetitive business practices as well
as injuries to consumers, and it has as a major pur-
pose the preservation of fair business competition.
By proscribing "any unlawful" business practice,
Bus. & Prof. Code, § 17200, borrows violations of
other laws and treats them as unlawful practices
that the unfair competition law makes independ-
ently actionable. Additionally, the statutory lan-
guage referring to "any unlawful, unfair or fraudu-
lent" practice makes clear that a practice may be
deemed unfair even if not specifically proscribed by
some other law. Because Bus. & Prof. Code, §
17200, is written in the disjunctive, it establishes
three varieties of unfair competition-acts or prac-
tices that are unlawful, or unfair, or fraudulent. The
Legislature intended by this sweeping language to
permit tribunals to enjoin ongoing wrongful busi-
ness conduct in whatever context this activity might
occur.

**(3) Unfair Competition § 4--Unfair Competition
Law--Scope--As Limited by Specific Legislation.**
Although the scope of the unfair competition law
(Bus. & Prof. Code, § 17200 et seq.) is sweeping, it
is not unlimited. A plaintiff may not bring an action
under the unfair competition law if other specific
legislation bars it. However, the other provision
must actually bar the action and not merely fail to
allow it. In other words, courts may not use the un-
fair competition law to condemn conduct the Legis-
lature permits. Conversely, the Legislature's mere
failure to prohibit conduct does not prevent a court
from finding it unfair.

**(4) Unfair Competition § 4--Unfair Competition
Law--Determination of What Conduct Is "Unfair."**
If no statute provides a safe harbor for conduct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 3

challenged under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), a court must determine whether the conduct is unfair within the meaning of that law. In doing so, courts may not apply purely subjective notions of fairness, but rather may turn for guidance to unfair competition jurisprudence arising under the parallel section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(a)). Ultimately, any finding of unfairness to competitors under Bus. & Prof. Code, § 17200, must be tethered to some legislatively declared policy or proof of some actual or threatened effect on competition, resulting in adoption of the following test. In a challenge to a direct competitor's "unfair" act or practice under § 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or that violates the policy or spirit of one of those laws because its effects are comparable to a violation of the law, or that otherwise significantly threatens or harms competition.

**(5a, 5b)** Unfair Competition § 4--Unfair Competition Law--Determination of What Conduct Is "Unfair"--Below-cost Sales of Cellular Phones to Gain Subscribers for Cellular Service.
In an action by sellers of cellular telephones against a company that sold cellular telephones below cost to gain subscribers for its cellular service, the trial court erred in concluding that plaintiffs' unfair competition law cause of action (Bus. & Prof. Code, § 17200 et seq.) necessarily failed when causes of action under the Unfair Practices Act failed. In determining if defendant's conduct was unfair under the unfair competition law, it was first necessary to determine if the Legislature provided a "safe harbor" for defendant's conduct. If defendant's below-cost sales did not come within either the safe harbor of Bus. & Prof. Code, § 17026.1 (cellular services providers may sell cellular phones below cost as good faith endeavor to meet legal market prices of competitors), nor the direct prohibitions of Bus. & Prof. Code, §§ 17043 and 17044 (below-cost sales and loss leaders), defendant's conduct could nonetheless be considered unfair under the unfair com-

petition law. Thus, it was necessary to determine if defendant's conduct was in fact unfair under the unfair competition law-i.e., conduct that threatens an incipient violation of an antitrust law, or whose effects are comparable to a violation of the law, or that otherwise significantly threatens or harms competition. The trial court was required to determine this issue, and given defendant's government-protected position in the Los Angeles-area duopoly cellular service market, the fairness of its below-cost sales of cellular equipment required careful scrutiny at trial.

**(6)** Unfair Competition § 4--Acts Constituting Unfair Competition--Low Prices.
Courts must be particularly cautious in evaluating claims that a competitor's prices are too low. Pricing practices are not unfair merely because a competitor may not be able to compete against them. Low prices often benefit consumers and may be the very essence of competition. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Courts must not prohibit vigorous competition nor render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such result, for it is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.

COUNSEL
Spiegel Liao & Kagay and Charles M. Kagay for Plaintiffs and Appellants.
James R. McCall as Amicus Curiae on behalf of Plaintiffs and Appellants.
The Sturdevant Law Firm, James C. Sturdevant and Steven S. Kaufhold for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.
Thomas A. Papageorge, Deputy District Attorney (Los Angeles); and Lawrence Brown for California District Attorneys Association as Amicus Curiae on behalf of Plaintiffs and Appellants.
Milberg Weiss Bershad Hynes & Lerach, William

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 4

S. Dato, Alan M. Mansfield; Altshuler, Berzon, Nussbaum, Berzon & Rubin, Fred H. Altshuler and Michael W. Graf for Natural Resources Defense Council, Environmental Law Foundation and Utility Consumers' Action Network as Amici Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Robert C. Bonner, Rex S. Heinke, Mark Erich Weber, Joel S. Sanders, Kathleen M. Vanderziel and Theodore J. Boutrous for Defendant and Respondent.

Horvitz & Levy, Lisa Perrochet and David M. Axelrad for Truck Insurance Exchange as Amicus Curiae on behalf of Defendant and Respondent.

Latham & Watkins, John F. Walker, Jr., Peter W. Devereaux, Steven D. Atlee and Stephen J. Newman for the Los Angeles Area Chamber of Commerce as Amicus Curiae on behalf of Defendant and Respondent. *168

Wright & Talisman, Michael B. Day and Margaret A. Rostker for Cellular Carriers Association of California as Amicus Curiae on behalf of Defendant and Respondent.

Phillip E. Stano; Mayer, Brown & Platt, Evan M. Tager and Donald M. Falk for American Council of Life Insurance as Amicus Curiae on behalf of Defendant and Respondent.

Heller, Ehrman, White & McAuliffe, Paul Alexander, Vanessa Wells and Daniel Rockey for State Farm Insurance Companies and Symantec Corporation as Amici Curiae on behalf of Defendant and Respondent.

Fred J. Hiestand for the Association for California Tort Reform as Amicus Curiae on behalf of Defendant and Respondent.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Pauline E. Calande; Sheppard, Mullin, Richter & Hampton, Gary L. Halling and Thomas D. Nevins for the Hearst Corporation and San Francisco Newspaper Printing Company as Amici Curiae.

Peter Arth, Jr.; Mark Fogelman; and Fred Harris for the Public Utilities Commission of the State of California as Amicus Curiae.

**CHIN, J.**

Defendant Los Angeles Cellular Telephone Company (L.A. Cellular) sells cellular telephones and services. Cellular telephones are sold on the open market. As to wholesale sales of cellular *services*, however, L.A. Cellular has a government-protected "duopoly" status with one other company. In an effort to gain new subscribers for its services and increase overall profits, L.A. Cellular sold telephones below cost. It lost money on telephone sales but made up for those losses with its increased sales of services. Plaintiffs are companies that sell cellular telephones but may not sell services. These companies claim that, because they are not allowed to sell services, they cannot fairly compete with L.A. Cellular's strategy of selling telephones below cost and recouping the losses with profits on the sales of services. The action requires us to interpret California's Unfair *169 Practices Act (Bus. & Prof. Code, § 17000 et seq.) [FN1] and unfair competition law (§ 17200 et seq.). [FN2]

> FN1 All further statutory citations are to the Business and Professions Code unless otherwise indicated.
>
> FN2 The Legislature has given section 17200 et seq. no official name. Accordingly, we are now using the label "unfair competition law." (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, fn. 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

We conclude that to violate sections 17043 and 17044, part of the Unfair Practices Act, which prohibit below-cost sales and loss leaders, a company must act with the purpose, i.e., the desire, of injuring competitors or destroying competition. We also conclude that, even if L.A. Cellular's actions lacked the purpose necessary to violate the Unfair Practices Act, they might be deemed unfair under the unfair competition law. We therefore agree with the Court of Appeal's conclusions and affirm its judgment.

I. Factual and Procedural History

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 5

At the time relevant to this action, [FN3] the federal government licensed two companies to provide cellular telephone service in the Los Angeles area: L.A. Cellular and AirTouch Cellular. In addition to cellular service, L.A. Cellular sells cellular telephones. Plaintiffs Cel-Tech Communications Inc., Comtech, Inc., Cellular Service, Inc., and Nutek, Inc., sell cellular telephones. The Court of Appeal opinion described L.A. Cellular's activities challenged in this action. "The high price of cellular telephones was the primary obstacle to L.A. Cellular's obtaining new subscribers for its service. Sales of cellular telephones are very price sensitive and a purchase of cellular equipment is usually accompanied by a service activation or subscription to cellular service. Consequently, in the early 1990's, L.A. Cellular formulated a strategy of selling cellular telephones below cost in order to increase the number of subscribers to its cellular telephone service. L.A. Cellular estimated that each service activation was worth $1,500 to it. Thus, L.A. Cellular's multimillion-dollar losses on cellular telephone equipment sales were easily offset by its profits on cellular service."

> FN3 The situation may have changed somewhat in the meantime. "Competition in the cellular service market, which now consists of two regulated facilities-based carriers in each cellular market, will be expanded in many areas with the entry of an unregulated system ...." (*Re Regulation of Cellular Radiotelephone Utilities* (1995) 59 Cal.P.U.C.2d 192, 203.)This opinion concerns only the facts reflected in the record and not possible recent developments.

Plaintiffs sued L.A. Cellular, alleging that its below-cost telephone sales practice harmed them. It alleged several causes of action including, as relevant here, that L.A. Cellular violated the Unfair Practices Act and the unfair competition law. The action under the Unfair Practices Act alleged *170 L.A. Cellular had unlawfully engaged in below-cost sales (§ 17043) and used loss leaders (§ 17044).

The matter was tried before the court. At the end of plaintiffs' case-in-chief, and before the defense presented evidence, the court granted L.A. Cellular's motion for judgment under Code of Civil Procedure section 631.8. It issued an extensive statement of decision. On the cause of action under the Unfair Practices Act, the court found that L.A. Cellular did engage in below-cost sales and used loss leaders, and that it thereby harmed plaintiffs. It found, however, that L.A. Cellular did not violate the Unfair Practices Act because it intended merely to compete with AirTouch Cellular, not to harm the plaintiffs. It also ruled that the action under the unfair competition law necessarily failed along with the other causes of action. Plaintiffs appealed.

The Court of Appeal reversed as to the cause of action under the unfair competition law and affirmed the judgment as to the other causes of action. It held that L.A. Cellular proved it did not have an "injurious intent," and hence its actions did not violate sections 17043 and 17044 of the Unfair Practices Act. It also held that L.A. Cellular's actions might nevertheless have violated the unfair competition law and remanded the matter for retrial on that cause of action. Plaintiffs petitioned for review of the holding regarding the Unfair Practices Act, and L.A. Cellular petitioned for review of the holding regarding the unfair competition law. We granted both petitions.

## II. Discussion

Preliminarily, we note that some amici curiae have suggested that this action might infringe on the regulatory authority of the Public Utilities Commission (PUC). (See generally, *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 918 [55 Cal.Rptr.2d 724, 920 P.2d 669]; *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390-392 [6 Cal.Rptr.2d 487, 826 P.2d 730].) The Court of Appeal invited the PUC to file an amicus curiae brief addressing this question. That brief concludes that it is unlikely this action will interfere with the PUC's regulatory responsibilities.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Having considered the matter ourselves, we agree.

In 1995, the PUC issued an order largely rescinding prior prohibitions on the practice of "bundling," i.e., "packaging cellular telephone equipment with cellular service and discounting the price of the package." (*Re Regulation of Cellular Radiotelephone Utilities, supra,* 59 Cal.P.U.C.2d at p. 196.)The PUC expressed concern that cellular equipment dealers "will be unable to continue to profitably compete if bundling is permitted because of below-cost equipment sales ...." (*Id.* at p. 206.)Despite this concern, it chose to *171 permit bundling, but stressed that "California, similar to the other states, has laws which restrict the practice of below-cost pricing (e.g., [Bus. & Prof.] Code § 17043). Any bundling approval on our part must not violate or encourage any violation of below-cost pricing laws. California's prohibitions against below-cost pricing must be incorporated in any bundling authority that we may grant." (*Id.* at p. 205.)Because of these laws, the PUC said, "there is no basis to assume that below-cost pricing of equipment of the sort prohibited by [Business and Professions Code section] 17043 will occur." (*Id.* at p. 206.)Its order expressly permits bundling only if providers "conform to all applicable California and federal consumer protection and below-cost pricing laws." (*Id.* at p. 214.)

More recently, the PUC noted that the "court, not the [PUC], has jurisdiction to determine violations of antitrust laws," and that "[i]f an entity violates below-cost pricing law ..., it is subject to the usual consequences for such violations. We note that while we would, of course, review a below-cost allegation brought before us in an appropriate proceeding, we are certainly not the primary enforcer of below-cost pricing law." (*Investigation on the Commission's Own Motion Into the Regulation of Cellular Radiotelephone Utilities* (1997) Cal.P.U.C. Dec. No. 97-02-053, pp. 18, 39 [1997 WL 129412].)

We conclude that we may decide this action without infringing on the PUC's authority. [FN4]

FN4 In its amicus curiae brief, the PUC did express one "caveat": that a judicial decision prohibiting bundling would interfere with its jurisdiction. We need not decide this point, for the question of bundling is not before us. Like the Court of Appeal, we express no opinion regarding bundling.

### A. *Plaintiffs' Petition (Unfair Practices Act)*

Plaintiffs alleged defendant violated the Unfair Practices Act in two ways: (1) by selling below cost in violation of section 17043, and (2) by using loss leaders in violation of section 17044. Neither the trial court nor the Court of Appeal found any violation of either section because plaintiffs did not establish defendant acted with the necessary culpable mental state. Plaintiffs argue that the courts below misconstrued section 17043's mental state requirement, and that section 17044 does not require a culpable mental state.

### 1. *Below-cost Sales (§ 17043)*

Section 17043 provides: "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost *172 thereof to such vendor, or to give away any article or product, *for the purpose of injuring competitors or destroying competition.*" (Italics added.) The Court of Appeal held that this provision requires "a *specific intent* to injure competitors or destroy competition." (Original italics.) It found that because L.A. Cellular's "intent was simply to compete with Air-Touch for subscribers, and that the harm to plaintiffs was unintended," it did not violate section 17043.

(1) Plaintiffs contend the defendant need not *desire* to injure competitors or destroy competition to violate section 17043; instead, "plaintiffs need only show the defendant believed or knew that harm was substantially certain to result, or that the manifest probability of harm was very great." California courts have not decided this precise question. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

cases describing section 17043's mental state requirement have generally repeated the statutory language or loosely used the word "intent" without defining it. (E.g., *Wholesale T. Dealers v. National etc. Co.* (1938) 11 Cal.2d 634, 643 [82 P.2d 3, 118 A.L.R. 486] [quoting the statutory language]; *id.* at p. 658 [referring to the "intent" requirement].) No case has expressly considered whether the statute requires the desire to injure competitors or destroy competition or only knowledge that the injury or destruction will occur.

In some other contexts, courts have interpreted an intent requirement as plaintiffs urge. We have said that " 'intent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he knows are substantially certain to result from his conduct." (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 922 [114 Cal.Rptr. 622, 523 P.2d 662].)*Schroeder* quoted Justice Oliver Wendell Holmes: " 'If the manifest probability of harm is very great, and the harm follows, we say that it is done maliciously or intentionally; if not so great, but still considerable, we say that the harm is done negligently; if there is no apparent danger, we call it mischance.' (Holmes, *Privilege, Malice and Intent* (1894) 8 Harv.L.Rev. 1.)" (*Id.* at p. 922, fn. 10; see also *Estate of Kramme* (1978) 20 Cal.3d 567, 572-573 [143 Cal.Rptr. 542, 573 P.2d 1369] ["While the word 'intentionally' has been variously defined depending on the context and intent of the Legislature [citation], this section specifies that a particular result, rather than a particular act, must have been intended. For a result to be caused 'intentionally,' the actor must either desire the result or know, to a substantial certainty, that the result will occur. [Citations.]" (Fn. omitted.)].)

If section 17043 used the word "intent" to describe the necessary mental state, plaintiffs' position might have merit. Section 17043, however, does not say "intent"; it says "purpose." "Intent" might be ambiguous; "purpose" is not. *173

"Purpose" has a precise meaning. As an illustration,

we may turn to the Model Penal Code. In that code, the American Law Institute drafters defined four distinct culpable mental states. None of the definitions uses the ambiguous word "intent." The code's two highest mental states are to act "purposely" and to act "knowingly." (Model Pen. Code, § 2.02(1).) Persons act "purposely" with respect to a result if it is their "conscious object" to cause that result. (Model Pen. Code, § 2.02(2)(a)(i).) Persons act "knowingly" with respect to a result if they are "practically certain" their conduct will cause that result. (Model Pen. Code, § 2.02(2)(b)(ii).) The comment to the code explains the difference between purpose and knowledge. "In defining the kinds of culpability, the Code draws a narrow distinction between acting purposely and knowingly, *one of the elements of ambiguity in legal usage of the term 'intent.'* [FN5]Knowledge that the requisite external circumstances exist is a common element in both conceptions. But action is not purposive with respect to the nature or result of the actor's conduct unless it was his conscious object to perform an action of that nature or to cause such a result." (Model Pen. Code & Commentaries, com. 2 to § 2.02, p. 233, fn. omitted, italics added.) "The essence of the narrow distinction between these two culpability levels is the presence or absence of a *positive desire* to cause the result; purpose requires a culpability beyond the knowledge of a result's near certainty." (Robinson & Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond* (1983) 35 Stan.L.Rev. 681, 694, original italics.)

> FN5 The Model Penal Code itself resolves the ambiguity by defining " 'intentionally' or 'with intent' " as meaning "purposely." (Model Pen. Code, § 1.13(12).) Some of the states that have adopted that code's distinction between purpose and knowledge have used the word " intentionally " instead of "purposely" but have defined it to mean " conscious objective. " (Model Pen. Code & Commentaries, com. 2 to § 2.02, p. 235, fn. 11.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

We discuss the Model Penal Code and commentaries only because they focus on the difference between purpose and knowledge, the ambiguity of the word "intent," and the precise meaning of the word "purpose." Because the Model Penal Code was drafted after the Unfair Practices Act, the Legislature could not have considered the code in enacting the act. California has not adopted the Model Penal Code. But the American Law Institute did not modify the meaning of the word "purpose" or invent the ambiguity in the word "intent." Its discussion is instructive as to the correct interpretation of the word "purpose."

Plaintiffs cite for support the first Restatement of Torts, which was published near the time the Legislature enacted the Unfair Practices Act. That Restatement, however, also reflects the difference between purpose and knowledge, while recognizing that often knowledge alone is sufficient for *174 tort liability. Plaintiffs quote the first Restatement of Torts section 870: "A person who does any tortious act for the purpose of causing harm to another or to his things or to the pecuniary interests of another is liable to the other for such harm if it results ...." They further cite language in comment e to that section: "In many situations, an act done with the belief or knowledge that a result will happen has the same consequences as an act done for the purpose of causing the result." (Rest., Torts, § 870, com. e, p. 410.) That language states that a knowing act can cause harm as well as a purposeful act, but it clearly distinguishes between purpose and knowledge. The next sentence of that comment draws the same distinction: "Thus one who deceives another, knowing that a third person will be deceived by the misrepresentation, is liable to the third person as he would be if he acted for the purpose of deceiving the third person [citation]." (*Ibid.*)The same comment goes on to discuss when knowing but not purposeful acts might be insufficient to create tort liability.

Thus, the drafters of the first Restatement of Torts also understood the difference between purpose and knowledge, while they believed that often knowledge alone may be sufficient for liability. That understanding is reflected even more clearly elsewhere. Section 13 of that Restatement, defining battery, requires an "intention[al]" act. Comment d to that section defines an act as intentional if it is "done for the purpose of causing the contact or apprehension *or* with knowledge on the part of the actor that such contact or apprehension is substantially certain to be produced." (Rest., Torts, § 13, com. d, p. 29, italics added.) Although the Restatement defines intent broadly as including both purpose and knowledge, it recognizes the narrow meaning of the word "purpose." The Restatement Second of Torts rewrote section 870 to refer to "intentionally" causing an injury, which is defined as including knowledge. (Rest.2d Torts, § 870, com. b, p. 280; see also *id.* at § 8 A, p. 15.) But comment b to section 870 also says, "In some cases in which the claim may be entirely novel the court may decide to limit the liability to the situation in which the defendant acted for the purpose of producing the harm involved." (Rest.2d Torts, § 870, com. b, p. 280.) Again, the Restatement shows an awareness of the precise meaning of the word "purpose."

We do not doubt that an actor who knows but does not desire that an act will cause a result might be deemed to intend that result, or that this intent or knowledge might be sufficient for some forms of tort liability. But these circumstances do not change the meaning of the word "purpose." We are interpreting a statute. Section 17043 uses the word "purpose," not "intent," not "knowledge." We therefore conclude that to violate section 17043, a *175 company must act with the purpose, i.e., the desire, of injuring competitors or destroying competition. As plaintiffs do not contend they have shown that L.A. Cellular acted with that purpose, the lower courts were correct in finding it did not violate that section.

*2. Loss Leaders (§ 17044)*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Section 17044 provides: "It is unlawful for any person engaged in business within this State to sell or use any article or product as a 'loss leader' as defined in Section 17030 of this chapter." Section 17030, in turn, defines "Loss leader" as "any article or product sold at less than cost: [ ] (a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or [ ] (b) Where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers; or [ ] (c) Where the effect is to divert trade from or otherwise injure competitors." On its face, this language does not appear to require any culpable mental state when subdivision (c) applies. Plaintiffs argue that section 17044 prohibits use of loss leaders any time the effect is to divert trade from or otherwise injure competitors, and that they need not show defendant had any particular mental state.

Whatever merit the argument might have in the abstract, we are not deciding a question of first impression. Beginning in 1952, California courts have interpreted section 17044 as containing the same mental state requirement as section 17043. "While section 17044 of the act provides that the practice of using any article or product as a 'loss leader' is included among the prohibitions of the chapter, we conclude it was the intent of the Legislature to make it unlawful to sell articles below cost for the purpose of injuring competitors or destroying competition and that to be unlawful, 'loss leader' sales must be made for that purpose." (*Ellis v. Dallas* (1952) 113 Cal.App.2d 234, 239 [248 P.2d 63].)

This holding was reaffirmed in *Dooley's Hardware Mart v. Food Giant Markets, Inc.* (1971) 21 Cal.App.3d 513 [98 Cal.Rptr. 543]. There the plaintiff, like plaintiffs here, argued that section 17044 does not have an "intent" requirement "because there is no mention of it in either section 17044 or section 17030, the two sections directly and immediately applicable." (*Dooley's Hardware Mart v. Food Giant Markets, Inc., supra,*21 Cal.App.3d at p. 516.)They further argued that a 1953 amendment to *176section 17044 changed the

result of *Ellis v. Dallas, supra,*113 Cal.App.2d 234. FN6 The court disagreed: "We have examined the 1953 rewrite of the section and cannot find any basis for attributing the change in meaning urged by [plaintiff]. Furthermore we have also examined the legislative history of the 1953 bill ([Sen. Bill No.] 881) and found that it was enacted in exactly the same form as it was introduced. Finally, both sections 17071 and 17071.5, creating rebuttable presumptions of the requisite wrongful intent, apply expressly, without excepting section 17044, to *all* actions brought under the Act. The latter of these sections was enacted in 1961, some nine years after the *Ellis* decision. (Stats. 1961, ch. 1347, § 1, p. 3125.) It seems clear to us that the *Ellis* decision is still the governing law on this point in view of the failure of the Legislature to nullify by appropriate amendment the *Ellis* interpretation of section 17044 (see *Bishop v. City of San Jose* [(1969)] 1 Cal.3d 56, 65 [81 Cal.Rptr. 465, 460 P.2d 137]) and that therefore, notwithstanding the absence of any language to this effect in either section 17044 or section 17030, intent to injure competitors or to destroy competition is required for violation of section 17044. In other words for competition to be unfair under the Act, the person engaging in the challenged practice must possess an intent to injure his competitors or destroy his competition. (See § 17001.)" (*Dooley's Hardware Mart v. Food Giant Markets, Inc., supra,*21 Cal.App.3d at pp. 516-517, original italics, fn. omitted.)

> FN6 As originally enacted in 1941, section 17044 provided, "The practice of using any article or product as a 'loss leader' is included among the prohibitions of this chapter." (Stats. 1941, ch. 526, § 1, p. 1842.) The section was amended in 1953 to read as it now does. (Stats. 1953, ch. 334, § 1, p. 1601.) Section 17030 was enacted in 1941 with section 17044 and has not been amended since. (Stats. 1941, ch. 526, § 1, p. 1841.)

Two subsequent appellate court decisions have reit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

erated that sections 17043 and 17044 contain identical "intent" requirements, although without independent analysis. (*Western Union Financial Services, Inc. v. First Data Corp.* (1993) 20 Cal.App.4th 1530, 1540, fn. 10 [25 Cal.Rptr.2d 341]; *Hladek v. City of Merced* (1977) 69 Cal.App.3d 585, 591 [138 Cal.Rptr. 194].)

Decisions from this court are inconclusive but tend to support the conclusion that both sections require the same mental state. Plaintiffs rely on the early decision of *People v. Pay Less Drug Store* (1944) 25 Cal.2d 108 [153 P.2d 9]. In that case, the trial court found that the defendants had sold certain "items below cost for the purpose of destroying the business of competitors .... The court also found that the defendants had sold certain articles as 'loss leaders.' " (*Id.* at p. 112.)We noted that "Section 3 of the Unfair Practices Act makes it unlawful to sell any article or product at less than cost as defined, for the purpose of injuring competitors or destroying competition," and that the "section also prohibits the sale of 'loss leaders,' as *177 defined." (*Ibid.*) After discussing at length several contentions not relevant here, we disposed summarily of one contention using language plaintiffs cite: "The defendants contend that the provision defining 'loss leader' is indefinite in that it appears not to require the intent to injure competitors or destroy competition in all cases. Inasmuch as the judgment enjoined sales of articles as 'loss leaders' only when they diverted trade from or otherwise injured competitors, the defendants are not in a position to complain." (*Id.* at p. 117.)We read this language as only stating that the defendants before the court, who *had* acted purposely, were not in a position to complain about the statute's apparent lack of a mental requirement in other cases. Because the defendants had acted purposely, there was no need to decide the important issue presented here, involving defendants that do not act purposely.

A more recent decision also does not consider this question in detail, but supports the holding of *Ellis v. Dallas, supra,* 113 Cal.App.2d 234.In *Tri-Q, Inc.*

*v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 203 [45 Cal.Rptr. 878, 404 P.2d 486], we adopted a portion of the Court of Appeal opinion, including that portion relevant here. In that case, the plaintiff claimed the defendant had violated sections 17043 and 17044. (*Tri-Q, Inc. v. Sta-Hi Corp., supra,* 63 Cal.2d at p. 203.)The trial court found the defendant had not sold its product at less than cost. The opinion upheld that factual finding but then said: "But even had the trial court found that the product had been sold below cost, there would still be the issue of whether the seller had so acted 'for the purpose of injuring competitors or destroying competition.' (Bus. & Prof. Code, § 17043; ... *Ellis v. Dallas, supra,* 113 Cal.App.2d 234, 239.)" (*Id.* at p. 207.)The opinion noted that the trial court found, on sufficient evidence, that the defendant had no injurious intent, and, therefore, "it does not appear to be probable that a result more favorable to the plaintiff Tri-Q, Inc., would have been reached by the trial court even if it had found that such prices were less than the actual cost of the product." (*Id.* at p. 209.)This language apparently applied to both the sections 17044 and 17043 claims.

Although we did not expressly discuss whether section 17044 requires the same mental state as section 17043, this language in *Tri-Q, Inc. v. Sta-Hi Corp., supra,* 63 Cal.2d 199, and our citation to the very page of *Ellis* that decided the question (*Ellis v. Dallas, supra,* 113 Cal.App.2d at p. 239), shows we at least assumed both sections require the same mental state.

Plaintiffs argue the appellate court decisions were wrongly decided and we should overrule them. They also argue that *Tri-Q, Inc. v. Sta-Hi Corp., supra,* 63 Cal.2d 199, did not clearly decide the question. Additionally, they *178 note that we adopted the Court of Appeal opinion in that case, and claim that had the opinion decided this issue, it would merely have been another of the "erroneous court of appeal decisions" we should overrule. We disagree with the latter point. We expressly "adopt[ed]" the Court of Appeal opinion "as our

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576, 1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

opinion," which we do occasionally. (*Id.* at p. 203; e.g., *Arriaga v. County of Alameda* (1995) 9 Cal.4th 1055, 1059 [40 Cal.Rptr.2d 116, 892 P.2d 150].) The fact that we adopted a Court of Appeal opinion rather than drafted our own does not reduce its precedential value. When we "adopt" an opinion in this fashion, we do, indeed, make it "our opinion." We agree, however, that *Tri-Q, Inc. v. Sta-Hi Corp.*, *supra*,63 Cal.2d 199, did not itself definitively resolve this question. We considered it only by implication and did not expressly discuss it. The opinion does, however, support the unbroken line of appellate court decisions that did decide the question.

We thus see that, for almost half a century, California courts have unanimously interpreted section 17044 to require the same mental state as section 17043. Although we have never explicitly considered the question, we assumed that interpretation was correct in a decision that is itself over three decades old. During that time, the Legislature has amended California's statutes regulating competition numerous times, sometimes to overrule judicial interpretations. (See *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, *supra*,17 Cal.4th at pp. 569-570.)But it has left this rule intact. Legislative inaction is often not a convincing reason to refuse to change a statutory interpretation. (E.g., *Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 506 [66 Cal.Rptr.2d 304, 940 P.2d 891].) Under the circumstances here, however, including the longevity of the rule and the unanimity of the decisions stating it, we believe it is up to the Legislature to change it if it is to be changed. In *Dooley's Hardware Mart v. Food Giant Markets, Inc.*, *supra*,21 Cal.App.3d at pages 516-517, the court reaffirmed the holding of *Ellis v. Dallas*, *supra*,113 Cal.App.2d 234, partly because of legislative inaction in the intervening two decades. That rationale is even stronger today, yet another quarter of a century later.Section 17044 has a long-settled meaning. We should not at this late date find it requires no culpable mental state after 50 years of contrary judicial interpretation. We de-

cline plaintiffs' request to overrule that interpretation.

Accordingly, the lower courts were correct that plaintiffs' action under section 17044 fails for the same reason their action under section 17043 fails-they did not prove defendant acted with the necessary purpose.

### B. *Defendant's Petition (Unfair Competition Law)*

The Court of Appeal held that even though, when L.A. Cellular sold telephones below cost, it lacked the purpose necessary to violate the Unfair **\*179** Practices Act, its acts might nevertheless be deemed unfair under the unfair competition law. L.A. Cellular argues that its conduct "is both governed by and lawful under the express provisions of the Unfair Practices Act," and that what is lawful under that act cannot violate the unfair competition law. Plaintiffs counter that L.A. Cellular's actions were not unfair "simply because it was selling below cost. Rather, what made L.A. Cellular's actions unfair in this instance was that it subsidized massive sales below cost with duopoly profits that it knew were by law unavailable to its competitors."

#### 1. *General Principles*

The purpose of the Unfair Practices Act is "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." (§ 17001.) It prohibits specific "practices which the legislature has determined constitute unfair trade practices." (*Wholesale T. Dealers v. National etc. Co.*, *supra*,11 Cal.2d at p. 643.)The prohibitions against purposeful below-cost sales and loss leaders (§§ 17043, 17044) are two examples. The consequences of violating the Unfair Practices Act can be quite severe. A prevailing plaintiff may receive treble damages and attorney fees. (§ 17082.) The act even provides

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 12

criminal sanctions. Any person who violates the act is guilty of a misdemeanor punishable by up to a $1,000 fine and six months' imprisonment. (§ 17100.) This severity might explain why the Legislature applied these sanctions to below-cost sales and loss leaders only when done with the *purpose* of injuring competitors or destroying competition. FN7

> FN7 Justice Baxter would essentially read the word "purpose" out of section 17043 and subject L.A. Cellular to potential treble damages, attorney fees, and even criminal sanctions for nonpurposeful conduct despite the statutory language. We decline to do so.

The unfair competition law is independent of the Unfair Practices Act and other laws. Its remedies are "cumulative ... to the remedies or penalties available under all other laws of this state" (§ 17205), but its sanctions are less severe than those of the Unfair Practices Act. Prevailing plaintiffs are generally limited to injunctive relief and restitution. (§ 17203; see *ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1268 [61 Cal.Rptr.2d 112, 931 P.2d 290].) Plaintiffs may not receive damages, much less *treble* damages, or attorney fees. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Consumers Union of United States, Inc. v. Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1443 [257 Cal.Rptr. 151].) The law provides for civil penalties (e.g., § 17206) but contains no criminal provisions. *180

(2) In contrast to its limited remedies, the unfair competition law's scope is broad. Unlike the Unfair Practices Act, it does not proscribe specific practices. Rather, as relevant here, it defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." (§ 17200.) FN8 Its coverage is "sweeping, embracing ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*Rubin v. Green* (1993) 4 Cal.4th 1187,

1200 [17 Cal.Rptr.2d 828, 847 P.2d 1044], quoting *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817].) It governs "anti-competitive business practices" as well as injuries to consumers, and has as a major purpose "the preservation of fair business competition." (*Barquis v. Merchants Collection Assn., supra,* 7 Cal.3d at p. 110; see also *People v. McKale* (1979) 25 Cal.3d 626, 631-632 [159 Cal.Rptr. 811, 602 P.2d 731]; *People* ex rel. *Mosk v. National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 771 [20 Cal.Rptr. 516].) By proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices" that the unfair competition law makes independently actionable. (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1103 [53 Cal.Rptr.2d 229], citing *Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th at p. 383.)

> FN8 In its entirety, section 17200 provides: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code [which involves advertising]."

However, the law does more than just borrow. The statutory language referring to "any unlawful, unfair *or* fraudulent" practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition-acts or practices which are unlawful, or unfair, or fraudulent. 'In other words, a practice is prohibited as "unfair" or "deceptive" even if not " unlawful" and vice versa.' " (*Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89], quot-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

ing *State Farm Fire & Casualty Co. v. Superior Court, supra,*45 Cal.App.4th at p. 1102.)The case of *Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735 [162 Cal.Rptr. 543] is an example of the unfair competition law's independent force. There, the plaintiff challenged a newspaper's two-tiered advertising rate structure. The Court of Appeal held that the plaintiff stated a valid cause of action under the unfair competition law even though the Unfair Practices Act did not itself prohibit the pricing policy at issue. (*Motors, Inc. v. Times Mirror Co., supra,*102 Cal.App.3d at p. 741 [citing *181 § 17042, which states that nothing in the Unfair Practices Act "prohibits" certain price differentials].)

The unfair competition law, which has lesser sanctions than the Unfair Practices Act, has a broader scope for a reason. "[T]he Legislature ... intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, ... the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable ' "new schemes which the fertility of man's invention would contrive." ' (*American Philatelic Soc. v. Claibourne* (1935) 3 Cal.2d 689, 698 [46 P.2d 135].) As the *Claibourne* court observed: 'When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one....' (3 Cal.2d at pp. 698-699 ...; accord, *FTC v. The Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 240 [31 L.Ed.2d 170, 177, 92 S.Ct. 898].) With respect to 'unlawful' or 'unfair' business practices, [former] section 3369 [today section 17200] specifically grants our courts that power. [ ] In permitting the restraining of all 'unfair' business practices, [former] section 3369 [today section 17200] undeniably establishes only a wide standard to guide courts of equity; as noted above, given the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would

not be adequate." (*Barquis v. Merchants Collection Assn., supra,*7 Cal.3d at pp. 111-112, fn. omitted.) "[I]t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited [citations], since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery." (*People ex rel. Mosk v. National Research Co. of Cal., supra,*201 Cal.App.2d at p. 772.) [FN9]*182

> FN9 Apparently taking her cue from the brief of amicus curiae American Council of Life Insurance, Justice Kennard asserts the unfair competition law did nothing more than codify the common law. (Conc. & dis. opn. of Kennard, J., *post,* at p. 194.)(Even L.A. Cellular does not make such a sweeping argument.) She relies primarily on *International etc. Workers v. Landowitz* (1942) 20 Cal.2d 418 [126 P.2d 609]. (Conc. & dis. opn. of Kennard, J., *post,* at pp. 194, 196, 197, 200.)That decision does, indeed, contain some language supporting her position. However, in *Barquis v. Merchants Collection Assn., supra,*7 Cal.3d at page 109, we unanimously concluded "that 'unfair competition' as used in the section cannot be equated with the common law definition of 'unfair competition,' but instead specifies that, for the purposes of its provisions, unfair competition 'shall mean and include *unlawful, unfair* or fraudulent business practice ....' (Italics added.)" Regarding the language Justice Kennard cites, we stated, "Although the *Landowitz* opinion does contain some language which may be read to limit [Civil Code former] section 3369 [the original unfair competition law] to common law 'unfair competition,' subsequent cases ... have not confined the section so narrowly; in view of the factual context of *Landowitz,* such language was not crucial to the decision." (*Id.* at pp. 111-112, fn. 12; see also *Rubin v. Green,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527

Page 14

20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

*supra,*4 Cal.4th at p. 1200 ["to state a claim under the act one need not plead and prove the elements of a tort"]; *Bank of the West v. Superior Court, supra,*2 Cal.4th at p. 1264 ["the statutory definition of 'unfair competition' 'cannot be equated with the common law definition ....' "]; *Motors, Inc. v. Times Mirror Co., supra,*102 Cal.App.3d 735 [discussed in the text].)

A year after the decision in *People* ex rel. *Mosk v. National Research Co. of Cal.,supra,* 210 Cal.App.2d 765, again about three months after the decision in *Barquis v. Merchants Collection Assn., supra,*7 Cal.3d 94, and on occasion since, the Legislature amended the unfair competition law. On these occasions, rather than overrule these cases or *Motors, Inc. v. Times Mirror Co., supra,*102 Cal.App.3d 735, the Legislature *expanded* the law's coverage. (Stats. 1963, ch. 1606, § 1, p. 3184; Stats. 1972, ch. 1084, § 1, pp. 2020-2021; see *Stop Youth Addiction, Inc. v. Lucky Stores, Inc., supra,*17 Cal.4th at pp. 569-570.)

(3) Although the unfair competition law's scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a "safe harbor," plaintiffs may not use the general unfair competition law to assault that harbor.

*Rubin v. Green, supra,*4 Cal.4th 1187, illustrates this principle. In that case, the plaintiff relied on the unfair competition law to pursue an action that the litigation privilege of Civil Code section 47, subdivision (b), otherwise prohibited. We "rejected the claim that a plaintiff may, in effect, 'plead around' absolute barriers to relief by relabeling the nature of the action as one brought under the unfair competition statute." (*Rubin v. Green, supra,*4 Cal.4th at p. 1201.)A bar against an action "may not be circumvented by recasting the action as one under Business and Professions Code section 17200." (*Id.* at p. 1202.)We found "the conduct of defendants alleged in the complaint" came "within the scope of [Civil Code] section 47(b)," and thus was "absolutely immune from civil tort liability .... To permit the same ... acts to be the subject of an injunctive relief proceeding brought by this same plaintiff under the unfair competition statute undermines that immunity. If the policies underlying section 47(b) are sufficiently strong to support an absolute privilege, the resulting immunity should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct as that protected by section 47(b)." (*Id.* at pp. 1202-1203.)

A plaintiff may thus not "plead around" an "absolute bar to relief" simply "by recasting the cause of action as one for unfair competition." (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 283 [41 Cal.Rptr.2d 220, 895 P.2d 56].) The rule does not, however, prohibit an action under the unfair competition law merely because some other statute *183 on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the unfair competition law, another provision must actually "bar" the action or clearly permit the conduct. There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful. For example, Penal Code section 211, which defines robbery, does not make murder unlawful. Most assuredly, however, that section does not also make murder lawful. Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576, 1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

This conclusion is consistent with the overall pattern of the Unfair Practices Act and the unfair competition law. As discussed above, the Unfair Practices Act condemns specific conduct. The unfair competition law is less specific, because the Legislature cannot anticipate all possible forms in which unfairness might occur. If, in the Unfair Practices Act (or some other provision), the Legislature considered certain activity in certain circumstances and determined it to be lawful, courts may not override that determination under the guise of the unfair competition law. However, if the Legislature did not consider that activity in those circumstances, the failure to proscribe it in a specific provision does not prevent a judicial determination that it is unfair under the unfair competition law.

L.A. Cellular argues that the decision of *Motors, Inc. v. Times Mirror Co.*, *supra*, 102 Cal.App.3d 735, and the Court of Appeal decision in this case are inconsistent with another Court of Appeal decision, *Hobby Industry Assn. of America, Inc. v. Younger* (1980) 101 Cal.App.3d 358 [161 Cal.Rptr. 601] (*Hobby Industry*). We believe, however, that these cases can be mutually reconciled, and that all are consistent with the general framework of the unfair competition laws. *Hobby Industry* involved the Fair Packaging and Labeling Act (§ 12601 et seq.), which generally provides immunity to wholesalers and retailers. (*Hobby Industry, supra*, 101 Cal.App.3d at p. 369.) The Attorney General argued that, despite this immunity, "suits may be brought against [wholesalers and retailers] under the unfair competition statutes ...." (*Ibid.*) The court disagreed, finding "nothing in section 17200 et seq. which reimposes the liability on wholesalers and retailers which is expressly excluded by section 12602.... Although the Supreme Court has construed the orbit of the unfair competition statutes expansively (*People v. McKale* (1979) 25 Cal.3d 626, 631-632 [159 Cal.Rptr. 811, 602 P.2d 731], and *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111-113 [101 Cal.Rptr. 745, 496 P.2d 817]), it cannot be said that this *184 embracing purview also encompasses business practices which

the Legislature has expressly declared to be lawful in other legislation. (See *Barquis, supra*, 7 Cal.3d 94, 111, fn. 12.)" (*Id.* at pp. 369-370.) We express no opinion on whether the specific holdings of *Motors, Inc. v. Times Mirror Co., supra*, 102 Cal.App.3d 735, and *Hobby Industry, supra*, 101 Cal.App.3d 358, were correct. However, we agree with *Motors, Inc.*, that a court may find certain activities unfair under the unfair competition law even though the Unfair Practices Act does not prohibit them. We also agree with *Hobby Industry* that the unfair competition law does not permit an action that another statute expressly precludes.

We thus conclude that a plaintiff may not bring an action under the unfair competition law if some other provision bars it. That other provision must actually bar it, however, and not merely fail to allow it. In other words, courts may not use the unfair competition law to condemn actions the Legislature permits. Conversely, the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair. Plaintiffs may not "plead around" a "safe harbor," but the safety must be more than the absence of danger. [FN10]

> FN10 L.A. Cellular also relies on *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503] and *Blank v. Kirwan* (1985) 39 Cal.3d 311 [216 Cal.Rptr. 718, 703 P.2d 58]. Those cases have no bearing on this issue. We held in each that the plaintiff's allegations-entirely different from the allegations here-did not state a cause of action under the unfair competition law or some other law. In neither case did we suggest an action under the unfair competition law is precluded merely because some other statute does not provide for that action.

(4) If no statute provides a safe harbor, a court must determine whether the challenged conduct is unfair within the meaning of the unfair competition law. In doing so, courts may not apply purely subjective notions of fairness. "The appellate courts have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

'neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature....' (*Max Factor & Co. v. Kunsman* (1936) 5 Cal.2d 446, 454 [55 P.2d 177] .)" (*Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 562 [53 Cal.Rptr.2d 878].) This court has not yet defined "unfair" under this law. A few Courts of Appeal have attempted a definition. (E.g., *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164, 53 A.L.R.4th 661] ["[A]n 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."]; *State Farm Fire & Casualty Co. v. Superior Court, supra,*45 Cal.App.4th at p. 1104 [" 'the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim' "].) *185

We believe these definitions are too amorphous and provide too little guidance to courts and businesses. Vague references to "public policy," for example, provide little real guidance. " '[P]ublic policy' as a concept is notoriously resistant to precise definition, and ... courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy which deserves recognition at law.' " (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].) These concerns led us to hold that to establish the tort of wrongful discharge in violation of public policy, the public policy triggering the violation must be tethered to a constitutional or statutory provision (*ibid.*) or a regulation carrying out statutory policy (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 90 [78 Cal.Rptr.2d 16, 960 P.2d 1046]).

L.A. Cellular and supporting amici curiae emphasize the need for California businesses to know, to a reasonable certainty, what conduct California law prohibits and what it permits. We sympathize with this concern. An undefined standard of what is "unfair" fails to give businesses adequate guidelines as to what conduct may be challenged and thus enjoined and may sanction arbitrary or unpredictable decisions about what is fair or unfair. In some cases, it may even lead to the enjoining of *pro*competitive conduct and thereby undermine consumer protection, the primary purpose of the antitrust laws. "Because ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392 [45 Cal.Rptr.2d 436, 902 P.2d 740].) Courts must be careful not to make economic decisions or prevent rigorous, but fair, competitive strategies that all companies are free to meet or counter with their own strategies. Companies that cannot compete with others that are more capable or efficient may lawfully fail.

Accordingly, we believe we must devise a more precise test for determining what is unfair under the unfair competition law. To do so, we may turn for guidance to the jurisprudence arising under the "parallel" (*Barquis v. Merchants Collection Assn., supra,*7 Cal.3d at p. 110) section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(a)) (section 5). "In view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive." (*People ex rel. Mosk v. National Research Co. of Cal., supra,*201 Cal.App.2d at p. 773; see also *Bank of the West v. Superior Court, supra,*2 Cal.4th at pp. 1263-1264.)Admittedly, the two statutes are enforced in *186 significantly different ways. California has no administrative agency equivalent to the Federal Trade Commission (FTC), and private citizens have no right to seek personal enforcement of section 5 in lieu of FTC action. Nevertheless, California courts remain the ultimate arbiters of the meaning and scope of the unfair competition law, just as the federal courts are the ultimate arbiters of the meaning and scope of section 5 and the FTC's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

authority under it. As the issue before us in this case arises out of a claim of unfair competition between direct competitors, the relevant jurisprudence would be that arising under section 5's prohibition against "unfair methods of competition." FN11

> FN11 Section 5 contains two prohibitions: one against "unfair methods of competition" and the other against "unfair or deceptive acts or practices." The former generally governs injuries to competitors, the latter injuries to consumers as well as competitors. (*Barquis v. Merchants Collection Assn.*, *supra*,7 Cal.3d at pp. 109-110.)Our notice of federal law under section 5 means only that federal cases interpreting the prohibition against "unfair methods of competition" may assist us in determining whether a particular challenged act or practice is unfair under the test we adopt. We do not deem the federal cases controlling or determinative, merely persuas- ive.

The United States Supreme Court has stressed that the " 'antitrust laws ... were enacted for "the protection of *competition*, not *competitors*. " ' " (*Cargill, Inc. v. Monfort of Colorado, Inc.* (1986) 479 U.S. 104, 115 [107 S.Ct. 484, 491-492, 93 L.Ed.2d 427], original italics.) They "do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." (*Id.* at p. 116 [107 S.Ct. at p. 492].) Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws. (See *Atlantic Richfield Co. v. USA Petroleum Co.* (1990) 495 U.S. 328, 344 [110 S.Ct. 1884, 1894-1895, 109 L.Ed.2d 333]; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477, 488-489 [97 S.Ct. 690, 697-698, 50 L.Ed.2d 701]; § 17001 [the purpose of the antitrust law is "to foster and encourage competition" by prohibiting "practices by which fair and honest competition is

destroyed or prevented"].) The high court has also found unfair practices that "conflict with the basic policies of [some other laws] even though such practices may not actually violate these laws" or amount to "trade restraints in their incipiency." (*FTC v. Brown Shoe Co.* (1966) 384 U.S. 316, 321, 322 [86 S.Ct. 1501, 1504, 16 L.Ed.2d 587], fn. omitted.)

These principles convince us that, to guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened *187 impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. FN12

> FN12 This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as "fraudulent" or "unlawful" business practices or "unfair, deceptive, untrue or misleading advertising." We also express no view on the application of federal cases such as *FTC v. Sperry & Hutchinson Co.* (1972) 405 U.S. 233 [92 S.Ct. 898, 31 L.Ed.2d 170] that involve injury to consumers and therefore do not relate to actions like this one. Contrary to Justice Kennard's concurring and dissenting opinion, this test is not unduly uncertain. A body of law interpreting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527                                                                                                          Page 18
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
**(Cite as: 20 Cal.4th 163)**

section 5 already exists. (See, e.g., Averitt, *The Meaning of "Unfair Methods of Competition" in Section 5 of the Federal Trade Commission Act* (1980) 21 B.C. L.Rev. 227.)

### 2. Application to This Case

(5a) Applying these principles to this case is a two-step process. First, we must determine whether the Legislature has provided a safe harbor for L.A. Cellular's conduct. Second, if it has not, we must determine whether that conduct is unfair as we have just defined it.

L.A. Cellular argues that sections 17043 and 17044 provide a safe harbor for all below-cost sales when the seller lacks the purpose of injuring competitors or destroying competition. We disagree. Although the Legislature limited the sanctions of treble damages, attorney fee awards, and criminal charges to *purposeful* below-cost sales, nothing in section 17043 or 17044 makes all other below-cost sales lawful, including those that have the effect, although not the purpose, of destroying competition. The Unfair Practices Act neither outlaws nor affirmatively permits all nonpurposeful below-cost sales. Accordingly, it does not preclude a court from deeming nonpurposeful conduct unfair under the unfair competition law.

This conclusion becomes clear when we consider another provision of the Unfair Practices Act that we believe *does* provide a safe harbor. Section 17026.1, subdivision (a)(2), enacted in 1992 and operative in 1994, provides: "Consistent with the provisions of subdivision (d) of Section 17050, providers of cellular services *shall be permitted* to sell cellular telephones below cost, provided that sales below cost are a good faith endeavor to meet the legal market prices of competitors in the same locality or trade area." (Italics *188 added.) Section 17050, subdivision (d), enacted in 1941, provides that the Unfair Practices Act's prohibitions against sales below cost and loss leaders do not apply to any sale made "[i]n an endeavor made in good faith

to meet the legal prices of a competitor selling the same article or product, in the same locality or trade area and in the ordinary channels of trade." The italicized language of section 17026.1 shows the Legislature affirmatively permitted, i.e., made lawful, these good faith sales. If sections 17043 and 17044 had provided a safe harbor for *all* nonpurposeful below-cost sales, section 17026.1, subdivision (a)(2), would have been unnecessary.

L.A. Cellular argues, however, that because sections 17043 and 17044 deal with the same *subject* as this case-below-cost sales-and do not proscribe the conduct here, courts may not find it unfair. We are not persuaded. The practice challenged here resembles in some respects that condemned in sections 17043 and 17044, but differs in other ways. L.A. Cellular did not act with the purpose of injuring competitors or destroying competition. But it is a "duopolist," employing an overall strategy that might not be available to its nonduopolist competitors. As explained below, this circumstance is critical. The Legislature undoubtedly did not consider below-cost sales in this context. This may be one of the myriad unanticipated ways in which unfair competition may occur. The Legislature could not have anticipated this precise situation any more than it could "draft in advance detailed plans and specifications of all acts and conduct to be prohibited." (*People* ex rel. *Mosk v. National Research Co. of Cal., supra,*201 Cal.App.2d at p. 772.)The originality of this practice does not place it beyond the reach of the unfair competition law.

We thus conclude that (1) good faith sales that section 17026.1 permits may not be deemed unfair under the unfair competition law; (2) below-cost sales and loss leaders under sections 17043 and 17044, the purpose of which is to injure competitors and destroy competition, are subject to the sanctions of the Unfair Practices Act; and (3) sales that come within neither the safe harbor of section 17026.1 nor the prohibitions of sections 17043 and 17044 may be considered unfair under the independent provisions of the unfair competition law as we have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

defined it. Accordingly, we agree with the Court of Appeal that the trial court erred in concluding that the unfair competition law cause of action necessarily failed when the other causes of action failed. Permitting this action under the unfair competition law does not allow plaintiffs to "plead around" an absolute bar of some other provision.

We now turn to the question whether the below-cost sales of this case are unfair under the test we have just stated. Because the trial court granted *189 judgment for L.A. Cellular before it presented any evidence, and the parties did not litigate the case with the particular test in mind, we cannot yet give a definitive answer. But we agree with the Court of Appeal that plaintiffs might be able to show the sales were unfair under this test. Pricing practices that have the *effect* of harming competition may be unfair even if done without the purpose necessary to violate the Unfair Practices Act.

(6) Courts must be particularly cautious in evaluating claims that a competitor's prices are too low. Pricing practices are not unfair merely because a competitor may not be able to compete against them. Low prices often benefit consumers and may be the very essence of competition. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." (*Atlantic Richfield Co. v. USA Petroleum Co., supra,* 495 U.S. at p. 340 [110 S.Ct. at p. 1892].) Courts must not prohibit "vigorous competition" nor "render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for '[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.' " (*Cargill, Inc. v. Monfort of Colorado, Inc., supra,* 479 U.S. at p. 116 [107 S.Ct. at p. 492].)

(5b) The conduct challenged here, however, might be unfair. The PUC has indicated that the "cellular equipment market" is supposed to be openly "competitive," in contrast to the "cellular service market," which is not.(*Re Regulation of Cellular*

*Radiotelephone Utilities, supra,* 59 Cal.P.U.C.2d at pp. 203, 206.)Indeed, it expressed concern that, if it permitted bundling, below-cost pricing by service providers might destroy competition for providing equipment. It permitted bundling only because it believed that "cellular dealers operate in a reasonably competitive market that will continue to exist even if bundling is authorized." (*Id.* at p. 206.)

The trial court will have to determine whether the challenged strategy met the test of unfairness we have articulated. This case has an unusual circumstance that might bring it within the unfair competition law's coverage: L.A. Cellular's position as a wholesale duopolist. On remand, the court might find that L.A. Cellular used this legally privileged status in violation of section 17200. "[F]air and honest competition" (§ 17001) in equipment sales might not be possible when a legally privileged company sells equipment below cost as a strategy to increase profits on service sales that are prohibited to its equipment competitors.

Allowing a company to sell telephones at a loss to increase profits on service sales, and to recoup its losses with those profits, might threaten the *190 ability of any company not permitted to sell services to compete in telephone sales. As the Court of Appeal explained, "It is L.A. Cellular's privileged status as one of two holders of a lucrative government-licensed duopoly which enabled L.A. Cellular to subsidize massive losses on below-cost sales of cellular equipment with its duopoly profits on cellular service, profits which by law were unavailable to its competitors. In this regard, the PUC itself has recognized 'the discounts on cellular equipment are supported by the high profits on cellular service, *profits which are in turn made possible by the duopoly market structure....*' (*Re Regulation of Cellular Radiotelephone Utilities* (1995) 59 Cal.P.U.C.2d 192, 205, italics added [by the Court of Appeal].) Given L.A. Cellular's government-protected position in the duopoly service market, the fairness of its below-cost sales of cellular equipment requires careful scrutiny."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

L.A. Cellular's desire to make telephone purchases attractive to consumers in order to increase its service sales may be legitimate. If its pricing strategy is found unfair as we have defined it, it might still seek to gain customers in other ways, but it may not destroy the competitiveness of the telephone market. Accordingly, we agree with the Court of Appeal that this action must be remanded for retrial on the unfair competition law cause of action. Because we have stated the applicable test for the first time, we think plaintiffs should be allowed to present additional evidence to meet that test if they choose. Defendant may also, of course, present a defense. (*Pinsker v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 167 [81 Cal.Rptr. 623, 460 P.2d 495].) [FN13]

> FN13 Justices Kennard and Baxter have differing interpretations of the facts. The trial court concluded that, because L.A. Cellular did not violate the Unfair Practices Act, it did not violate the unfair competition law; therefore, it never considered the facts in light of the test we have stated. We think it best for the trial court to do so on remand in the first instance. We also express no opinion on the correct remedy should the trial court find L.A. Cellular violated the unfair competition law.

As we have noted, section 17026.1, which permits the sale of telephones below cost in "a good faith endeavor to meet the *legal* market prices of competitors in the same locality or trade area" (italics added), provides a safe harbor for those good faith sales. In light of its ruling on the Unfair Practices Act cause of action, the trial court expressly did not "reach[]" the question "whether L.A. Cellular in setting its prices in this manner fell within" this provision. It will have to do so on remand in determining whether L.A. Cellular violated the unfair competition law and, if it determines L.A. Cellular did, in fashioning a remedy. The court must not limit L.A. Cellular's actions in such a way as to make it unable to compete with its service

Section 17026.1, however, refers to a competitor's "legal" *191 prices. The trial court should bear in mind that the two duopolists may compete against each other directly for sales of services, and they should not be allowed to engage in unfair, and hence *illegal*, below-cost equipment sales together any more than either may separately. (*Page v. Bakersfield Uniform etc. Co.* (1966) 239 Cal.App.2d 762, 770-771 [49 Cal.Rptr. 46]; *People v. Gordon* (1951) 105 Cal.App.2d 711, 724 [234 P.2d 287].)

In its briefing in this court, L.A. Cellular assures us that it "and AirTouch compete vigorously in the service market ...." The court on remand should do nothing to hamper this competition for services. As the Court of Appeal noted, the PUC "has expressed a preference for 'healthy and direct [price] competition for cellular service' ...." (Quoting *Re Regulation of Cellular Radiotelephone Utilities, supra,* 59 Cal.P.U.C.2d at p. 205.)

### III. Conclusion

The judgment of the Court of Appeal is affirmed. The unfair competition law cause of action shall be retried consistently with the legal principles stated in this opinion.

George, C. J., Mosk, J. Brown, J., and Dibiaso, J., FN* concurred.

> FN* Associate Justice of the Court of Appeal, Fifth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.KENNARD, J., Concurring and Dissenting.-Plaintiffs, a group of cellular telephone and cellular service retailers, sued defendant Los Angeles Cellular Telephone Company. (L.A. Cellular), alleging that defendant's practice of selling cellular telephones below cost violated the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), the Unfair Practices Act (Bus. & Prof. Code, §§ 17043, 17044), and, not at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576, 1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 21

issue before this court, the Cartwright Act antitrust law (Bus. & Prof. Code, § 16720 et seq.). I concur in the majority opinion to the extent it concludes that defendant's conduct does not violate the Unfair Practices Act. I also agree that defendant's compliance with the Unfair Practices Act does not immunize its conduct from scrutiny under the unfair competition law.

I disagree, however, with the majority's novel and unsupported conclusion that under the unfair competition law, an "unfair ... business act or practice" is one that threatens an "incipient violation" of "an antitrust law," one that violates the "policy or spirit" of an antitrust law, or one that "significantly threatens or harms competition"-conduct that collectively might be described as falling within the penumbra of antitrust law. The *192 purpose of *antitrust law* is to prevent monopoly power or agreements restraining trade from destroying the consumer benefits provided by competition. The purpose of the legal prohibitions against *unfair business acts and practices*, by contrast, is to prevent deceptive conduct that injures a particular competitor. By recasting the statutory prohibition of unfair business acts and practices as an extension of antitrust law, the majority misinterprets the history and purpose of the unfair competition law. Moreover, the vagueness inherent in the majority's formulation of its standard will magnify the uncertainty that businesses face in trying to comply with the unfair competition law.

I

Section 17200 of the Business and Professions Code, part of the unfair competition law, defines "unfair competition" as follows: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code [addressing various forms of false advertising]."

Because here defendant's below-cost sales are not unlawful (the trial court held they did not violate state antitrust law or the Unfair Practices Act), are not fraudulent or deceptive, and are not advertising, the issue presented is whether they are an "unfair ... business act or practice."

A. *Common Law Unfair Competition*

Unfair competition originated as a common law tort. At common law, before the enactment of any statutory prohibition against unfair competition, "unfair competition" had a stable and relatively narrow meaning that focused on business practices that harmed competitors by deceiving customers. (*Dunston v. Los Angeles Van etc. Co.* (1913) 165 Cal. 89, 94 [131 P. 115] ["relief in such cases really rests upon the deceit or fraud which the later comer into the business field is practicing upon the earlier comer and upon the public"].) Originally, it was the deceptive "passing off" of one's goods or services as those of another, commonly accomplished by appropriating the trade name of another. "The fundamental principle underlying this entire branch of the law is, that no man has the right to sell his goods as the goods of a rival trader." (*Weinstock, Lubin & Co.* v. *Marks* (1895) 109 Cal. 529, 539 [42 P. 142]; see also *Lutz v. Western Iron & Metal Co.* (1923) 190 Cal. 554, 561 [213 P. 962]; *Banzhaf v. Chase* (1907) 150 Cal. 180, 183 [88 P. 704]; *Pierce v. Guittard* (1885) 68 Cal. 68, 71-72 [8 P. 645].)*193

Even though the tort has been extended to situations other than classic "passing off," deceptive conduct has remained at the heart of unfair competition. [FN1] As we said in *Weinstock, Lubin & Co.* v. *Marks, supra,*109 Cal. 529, 541, the principles of unfair competition "apply to all cases where fraud is practiced by one in securing the trade of a rival dealer; and these ways are as many and as various as the ingenuity of the dishonest schemer can invent." (See also *Schecter Corp. v. United States* (1935) 295 U.S. 495, 531-532 [55 S.Ct. 837, 843-844, 79 L.Ed. 1570,97 A.L.R. 974] [" 'Unfair

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

competition,' as known to the common law, is a limited concept.... Unfairness in competition has been predicated of acts which lie outside the ordinary course of business and are tainted by fraud, or coercion, or conduct otherwise prohibited by law." (Fn. omitted.)].) For example, in *American Philatelic Soc. v. Claibourne* (1935) 3 Cal.2d 689 [46 P.2d 135], the defendant was a stamp dealer with a stock of a stamp rare in perforated form but common in unperforated form. The defendant's stock was in the unperforated form; he perforated the stamps and offered them for sale to other dealers, disclosing that the perforations were unofficial but suggesting that they could be resold to collectors as genuine. Even though the defendant's sales to other dealers were not deceptive, this court had no trouble concluding that his sales were ultimately grounded in the deception of the collectors who were the end purchasers and that this injured the plaintiffs, dealers and collectors of genuine stamps: "[T]he conduct of [defendant] in offering for sale these privately perforated stamps will inevitably result in severe pecuniary injury to the [plaintiffs], and the gaining by [defendant] of an advantage arising out of, in the final analysis, duplicity and dishonesty." (*Id.* at p. 696.)**194**

> FN1 In the prestatutory period, the one use of the term "unfair competition" in the common law that developed outside the area of consumer deception was trade secret misappropriation. (*Scavengers' P. Assn. v. Serv-U-Garbage Co.* (1933) 218 Cal. 568 [24 P.2d 489];*Pasadena Ice Co. v. Reeder* (1929) 206 Cal. 697, 703 [275 P. 944,276 P. 995]; *New Method Laundry Co. v. MacCann* (1916) 174 Cal. 26, 30 [161 P. 990].) Economically, however, there is a strong similarity between the deceptive misappropriation of a trade name and the form of trade secret misappropriation most common in this court's cases of that period, namely, use of a competitor's customer lists. This becomes apparent when one considers that for a transaction to occur it

is not enough for a business to offer a desirable product at a competitive price. Every business also faces the problem, and expense, of searching out customers to inform them of its product and to persuade them to purchase it. In a trade name misappropriation case, the plaintiff has done so by incurring the cost of establishing a valuable trade name that serves as an efficient vehicle for disseminating information about its product to its customers. In a customer list misappropriation case, the plaintiff has done so by identifying individual customers and their needs, incurring the cost of acquiring that information. In both trade name and customer list misappropriation cases, the defendant is able to reduce its search costs incurred in obtaining new customers by free-riding on the investments of the plaintiff in searching out customers. It may have been an intuitive recognition of this similarity that led courts of the prestatutory period to extend the rubric of unfair competition to trade secret misappropriation.

### B. *Statutory Unfair Competition*

Our Legislature first recognized unfair competition in 1933 when it amended Civil Code former section 3369 (hereafter section 3369), which had addressed the availability of injunctive relief in general. The 1933 amendment had three aspects: It authorized injunctions in cases of "unfair competition"; it authorized the Attorney General, district attorneys, and private persons to seek such injunctions; and it defined "unfair competition" as any "unfair or fraudulent business practice and unfair, untrue or misleading advertising and any act denounced by Penal Code sections 654a, 654b or 654c." (Stats. 1933, ch. 953, § 1, p. 2482.)

In amending section 3369 in 1933, the Legislature provided statutory authorization of injunctive relief for unfair competition and broad standing to seek that remedy; there is no evidence, however, that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527                                                    Page 23
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Legislature in addition intended to expand the meaning of unfair business practices beyond the type of deceptive practices recognized at common law.

This court concluded as much when, not long after section 3369's amendment, it had occasion to consider the meaning of "unfair or fraudulent business practice" and concluded the term was limited to common law unfair competition. As we explained in *International etc. Workers v. Landowitz* (1942) 20 Cal.2d 418 [126 P.2d 609] (hereafter *Landowitz*): "[T]he statutory definition of 'unfair competition' thus incorporated in Civil Code, § 3369, is not essentially different from that which has historically furnished the basis for equity injunctions against unfair competition." (*Id.* at p. 422.)We concluded that, because of the potential vagueness of the term "unfair competition" outside its traditional common law definition, section 3369 did not authorize injunctive relief against other business practices that might be termed unfair, even those which were violations of other business regulation statutes.

We said: "The phrase 'unfair competition' when carried beyond its traditional scope in equitable actions, however, does not have a fixed meaning in the absence of statutory definition. Courts of equity, therefore, are loath to enjoin conduct on that ground in the absence of specific authorization therefor.... *Civil Code, section 3369, contains no broader a definition of the term 'unfair competition' than existed at common law* and in itself furnishes no basis for an injunction against the violation of the penal ordinance [regulating competition] involved in this case." (*Landowitz, supra*,20 Cal.2d 418, 422, italics added.)

Subsequent decisions have continued to view the unfair competition law's prohibition of any unfair business practice as a prohibition against deceptive *195 conduct. (See, e.g., *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545] [under the unfair competition law, "one need only show that 'mem-

bers of the public are likely to be deceived' "]; *Schwartz v. Slenderella Systems of Calif.* (1954) 43 Cal.2d 107 [271 P.2d 857]; *Don Alvarado Co. v. Porganan* (1962) 203 Cal.App.2d 377 [21 Cal.Rptr. 495];*People* ex rel. *Mosk v. National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 772 [20 Cal.Rptr. 516] ["What constitutes 'unfair competition' or 'unfair or fraudulent business practice' under any given set of circumstances is a question of fact [citation], the essential test being whether the public is likely to be deceived [citation]."]; *Wood v. Peffer* (1942) 55 Cal.App.2d 116, 123-124 [130 P.2d 220].)

In 1963, the Legislature again amended section 3369 to add "unlawful" business practices to the list of proscribed conduct. In doing so, it expanded the definition of unfair competition with respect to conduct violating statutory prohibitions, for now any business practice that violated an independent statutory duty was an instance of unfair competition that could be enjoined even if the underlying statute did not specifically authorize injunctive relief. (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 112-113 [101 Cal.Rptr. 745, 496 P.2d 817] [section 3369 extended to " 'anything that can properly be called a business practice and that at the same time is forbidden by law' "].) For those business practices that were not statutory violations, however, the Legislature made no change to the definition of "unfair ... business practice," implicitly accepting our interpretation in *Landowitz, supra*,20 Cal.2d 418.(See *People v. Ledesma* (1997) 16 Cal.4th 90, 100-101 [65 Cal.Rptr.2d 610, 939 P.2d 1310].) In 1977 the Legislature reenacted, without substantive change, the unfair competition portion of section 3369 as Business and Professions Code sections 17200, 17201, 17202, 17203, and 17204. (Stats. 1977, ch. 299, § 1, p. 1202.) In 1992, the Legislature expanded the scope of the unfair competition law to include unfair business *acts* as well as *practices*; the operative language now reads in full: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

ceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." (Bus. & Prof. Code, § 17200.)This change also did not alter the meaning of "unfair ... business practice" but merely extended it to include single instances of conduct.

Thus, the term "unfair ... business act or practice" continues to mean deceptive conduct that injures consumers and competitors. Because there is no allegation of deceptive conduct by defendant here, the trial court's *196 judgment for defendant on plaintiffs' unfair competition law cause of action was proper.

## II

The majority nevertheless holds to the contrary that the term "unfair ... business act or practice" does not at all encompass common law unfair competition or even deceptive conduct in general. Rather, the majority creates out of whole cloth a new and amorphous definition of unfair business act or practice: conduct that threatens an "incipient violation" of "an antitrust law," that violates the "policy or spirit" of an antitrust law, or that "significantly threatens or harms competition." (Maj. opn., *ante*, at pp. 186-187.) Because none of this conduct amounts to an actual violation of antitrust law, I shall refer to these forms of conduct as penumbral antitrust threats. The majority never identifies what body of antitrust law it supposes the Legislature intended to incorporate in section 3369: Federal antitrust law? State antitrust law? Some amalgamation of the two?

Until today, no case has held or even suggested that the unfair competition law's prohibition of "any unfair ... business act or practice" was a prohibition of penumbral antitrust threats, or that it was not a prohibition of deceptive conduct that harms competitors. Without citing any evidence of legislative intent, the majority insists nonetheless that its definition of unfair business practices is correct because

in its view section 3369 as amended by our Legislature in 1933 was intended to "parallel" section 5 of the Federal Trade Commission Act (15 U.S.C. § 45; hereafter the FTC Act), the federal statute that created the Federal Trade Commission (hereafter FTC). (Maj. opn., *ante*, at p. 185.) Section 5 of the FTC Act as enacted in 1914 originally prohibited "unfair methods of competition" (38 Stat. 719). In 1938, Congress amended section 5 to include "unfair or deceptive acts or practices" in order to expand the FTC's jurisdiction to encompass deceptive and unfair conduct that injured consumers without harming competitors. (The Wheeler-Lea Act of 1938, 52 Statutes at Large 111; see also *FTC v. Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 244 [92 S.Ct. 898, 905, 31 L.Ed.2d 170].) The FTC's jurisdiction under section 5 extends both to antitrust threats to competition and to deceptive business practices that injure competitors or consumers. (*FTC v. Sperry & Hutchinson Co., supra,* 405 U.S. 233, 239-246 & fn. 5 [92 S.Ct. 898, 903-906].) There is not a shred of evidence, however, that California's section 3369 is patterned after section 5 of the FTC Act, and in *Landowitz, supra,* 20 Cal.2d 418, we reached the quite different conclusion that section 3369's prohibition of any "unfair ... *197 business practice" was intended to incorporate common law unfair competition. [FN2]

> FN2 In looking to section 5 of the FTC Act, the majority may have been misled by this court's previous statement that the unfair competition law had "its origin as one of the so-called 'little FTC Acts' of the 1930's, enacted by many states in the wake of amendments to the Federal Trade Commission Act [i.e., the Wheeler-Lea Act of 1938, 52 Statutes at Large 111, added the phrase 'unfair or deceptive acts or practices' to the 'unfair methods of competition' prohibited by section 5 of the FTC Act] enlarging the commission's regulatory jurisdiction to include unfair business practices that harmed, not merely the interests of business competitors, but of the general

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 25

public as well." (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1200 [17 Cal.Rptr.2d 828, 847 P.2d 1044].)

Contrary to the assertion in *Rubin v. Green, supra,*4 Cal.4th 1187, 1200, there were no " 'little FTC Acts' of the 1930's." The term "little FTC Act" instead denotes a group of state statutes enacted in the 1960's and 1970's; these statutes, promoted by the FTC among others, were meant to complement the deceptive practices jurisdiction of the FTC, not its antitrust jurisdiction, and they address deceptive trade practices, not antitrust threats to competition. (See, e.g., Karns, *State Regulation of Deceptive Trade Practices Under "Little FTC Acts": Should Federal Standards Control?*(1990) 94 Dick. L.Rev. 373, 373-376; Bailey & Pertschuk, *The Law of Deception: The Past as Prologue* (1984) 33 Am. U. L.Rev. 849, 861 fn. 63 [authored by two FTC commissioners]; Comment, *Consumer Protection: The Practical Effectiveness of State Deceptive Trade Practices Legislation* (1984) 59 Tul. L.Rev. 427, 428; Note, *Toward Greater Equality in Business Transactions: A Proposal to Extend the Little FTC Acts to Small Businesses* (1983) 96 Harv. L.Rev. 1621, 1621-1624; Lovett, *State Deceptive Trade Practice Legislation* (1972) 46 Tul. L.Rev. 724, 730, fn. 14.)

California has such a "little FTC Act" incorporating verbatim the language of section 5 of the FTC Act, but it is not Business and Professions Code section 17200 et seq., the unfair competition law, and it does not prohibit penumbral antitrust threats. Rather, it is Civil Code sections 1750-1784, the Consumers Legal Remedies Act, which was enacted in 1970. The act lists certain prohibited "unfair methods of competition and unfair or deceptive acts or practices" (the language of section 5 of the FTC Act), beginning with "passing off," and it provides various remedies to injured consumers. (Civ. Code, § 1770; see also Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act* (1971) 2 Pacific L.J. 1.)

In addition to misunderstanding the term "little FTC Act," *Rubin v. Green, supra,*4 Cal.4th 1187, 1200, mixes up its chronology; because section 3369 was enacted in 1933, five years before the 1938 amendment expanding the FTC's jurisdiction, it obviously was not enacted in the "wake" of that amendment. The sole authority *Rubin* cites on this point, *Bank of the West v. Superior Court, supra,*2 Cal.4th 1254, 1264, is equally confused: "A host of so-called 'little FTC Acts' followed [the 1938 amendment of the FTC Act] including California's Unfair Business Practices Act. (§ 17200 et seq.; see also Civ. Code, former § 3369.)" It is worth noting that in each of these cases the question of the historical origins of the unfair competition law was not at issue and was not dispositive of any issue. Each decision discussed the point only in passing by way of background.

The majority's reliance on this court's statement in *Barquis v. Merchants Collection Assn., supra,*7 Cal.3d 94, 110, characterizing the unfair competition law's prohibition of any "unlawful [or] unfair ... business practice" and section 5 of the FTC Act as "parallel broad proscription[s]" is misplaced. The parallelism to which *Barquis* referred was the fact that section 5 of the FTC Act and our unfair competition law both protect consumers as *198 well as competitors, not that both prohibited penumbral antitrust threats. (See 7 Cal.3d at pp. 109-110.)

Nothing in *Barquis v. Merchants Collection Assn., supra,*7 Cal.3d 94, even hinted that unfair business practices, however broad a concept, were to be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

equated with penumbral antitrust threats. To the extent *Barquis* might be read to suggest that the term "unfair ... business practice" has an amorphous meaning extending in some undefined fashion beyond deceptive conduct, that suggestion is entirely dictum, for the issue decided in that case was whether the business practice in question was *unlawful*, not whether it was *unfair*. The suggestion is also unsound. Not only is it contrary to the historical development of the unfair competition law explained above, but it is based on *Barquis*'s misquotation of the unfair competition law. In substituting the word "deceptive" for the word "fraudulent," *Barquis* suggested that unfair practices were a category distinct from deceptive practices. (Compare section 3369 [prohibiting any "unlawful, unfair or fraudulent business practice"] with *Barquis*, *supra*, at p. 111 [quoting section 3369 as prohibiting any " 'unlawful, unfair or deceptive business practice' " (italics omitted)].) [FN3]

> FN3 The majority also misunderstands the significance of *Barquis*'s statement that "section 3369 indicates that 'unfair competition' as used in the section cannot be equated with the common law definition of 'unfair competition,' but instead specifies that, for the purposes of its provisions, unfair competition 'shall mean and include *unlawful, unfair* or fraudulent business practice ....' " (*Barquis v. Merchants Collection Assn., supra,*7 Cal.3d at p. 109, italics original; see maj. opn., *ante,* at p. 181, fn. 9.) Our point was that the unfair competition law expanded beyond the limits of common law unfair competition along two dimensions: First, because the unfair competition law provided relief for injury to consumers even absent any showing of injury to a competitor, it "extended to the entire consuming public the protection once afforded only to business competitors." (*Barquis v. Merchants Collection Assn., supra,*7 Cal.3d at p. 109; see also *id.* at p. 110 ["the courts, in interpreting the

section, have long declared that the provision is at least as equally directed toward 'the right of the *public* to protection from fraud and deceit[,]' as toward the preservation of fair business competition" (italics original)].) Second, because the unfair competition law included *unlawful* as well as *unfair* business practices, it prohibited a broader range of conduct than did common law unfair competition. (*Id.* at pp. 112-113.)Specifically, the unfair competition law prohibited not only the deceptive conduct that was an "unfair ... business practice" but also, as an "unlawful ... business practice," " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " (*Id.* at p. 113.)Nothing in *Barquis* suggested, however, that the term "unfair ... business practice" meant penumbral antitrust threats, or that it did not mean deceptive conduct.

Moreover, the majority misunderstands the term "unfair methods of competition" in section 5 of the FTC Act to mean only penumbral antitrust threats. (See maj. opn., *ante,* at p. 186, fn. 11; *id.* at p. 187.) As interpreted by the FTC and the federal courts, that phrase covers not only the penumbral antitrust threats the majority focuses on but also actual violations of the antitrust law and in addition acts of unfair competition having nothing to do *199 with antitrust law, including passing off and other forms of common law unfair competition and consumer deception. (See, e.g., *FTC v. Sperry & Hutchinson Co., supra,* 405 U.S. 233, 243, 244 [92 S.Ct. 898, 904-905] ["unfair competitive practices were not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws"]; *Sears, Roebuck & Co. v. Federal Trade Commission* (7th Cir. 1919) 258 F. 307, 311 [the first FTC enforcement action to be judicially reviewed, a case of deceptive advertising; "The commissioners, representing the government as parens patriae, are to exercise their common sense, as informed by their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

knowledge of the general idea of unfair trade at common law, and stop all those trade practices that have a capacity or a tendency to injure competitors directly or through deception of purchasers ...."]; FTC, Ann. Rep. (1935) 67-71 [Listing 27 "unfair methods of competition" prohibited by the FTC: "9. Passing off goods or articles for well and favorably known products of competitors through appropriation or simulation of such competitors' trade names, labels, dress of goods, etc...."], quoted in Handler, *Unfair Competition* (1936) 21 Iowa L.Rev. 175, 244-248; Bailey & Pertschuk, *The Law of Deception: The Past as Prologue, supra,* 33 Am. U. L.Rev. 849.)

Nor is there any other sound reason for presuming that our Legislature intended section 3369 to incorporate the antitrust portion of section 5 of the FTC Act. In amending section 3369 in 1933 to authorize injunctive relief against "[a]ny person performing or proposing to perform an act of unfair competition," the Legislature was acting in a field already well established by the common law. There is no reason to suppose that, without any express statement, the Legislature implicitly intended to reject the *common law* definition of unfair competition and adopt instead *antitrust law* as the definition of unfair competition. The majority offers no explanation why, if the Legislature in 1933 had wished to expand the scope of the antitrust laws to reach penumbral antitrust threats, it would have chosen the roundabout method of using a term-"unfair competition"-with an established meaning independent of antitrust law and amending a Civil Code provision relating to the general availability of injunctive relief, rather than directly amending California's antitrust law, the Cartwright Act, in terms that clearly evidenced its intent to broaden the scope of antitrust law. This is especially so if by its reference to "the antitrust laws" the majority includes federal antitrust law. It would be most implausible for the Legislature, if it intended to incorporate the entire body of federal antitrust law, the law of another sovereign, to seek to do so implicitly simply by using the term "unfair ... business practice" without

any reference to federal law. Given the absence of any evidence that the Legislature intended to vary or reject that common law understanding of unfair business practices as practices that harm competitors by deceiving *200 customers, the only reasonable conclusion is that the Legislature intended to adopt that understanding. This is the conclusion our court reached in *Landowitz, supra,*20 Cal.2d 418.

### III

In addition to being unfounded, the majority's definition will not solve the problem it identifies: the costs imposed on businesses by a vague and overbroad definition of unfair business practice. I can imagine no greater recipe for confusion and uncertainty than the majority's penumbral antitrust threat standard. It is difficult enough for courts and businesses alike to determine whether a business practice amounts to an *actual* violation of the antitrust laws prohibiting restraint of trade or exclusionary monopolistic conduct. A business seeking to guide its competitive conduct by the majority's standard will be put to the impossible task of deciding whether its conduct, even though not a violation of the antitrust laws, violates the "spirit" of the antitrust laws or is an "incipient" violation of those laws or is a threat to competition. A prominent antitrust treatise has criticized the FTC for enforcing section 5 of the FTC Act in cases of incipient antitrust violations or violations of the spirit of the antitrust laws, and it has argued that only actual violations of federal antitrust law should be actionable under section 5. (2 Areeda & Hovenkamp, Antitrust Law (1995 rev. ed.) 307, pp. 21-28.) There is no reason or need to import the uncertainty of section 5 into California law.

Even more significantly, the majority ignores two crucial distinctions that make the standard of section 5 of the FTC Act an inappropriate standard for private civil litigation:

First, the interpretation of section 5 that the FTC has developed is an administrative standard, whose

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527                                                                    Page 28
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

enforcement is subject to the informed discretion of an administrative agency with considerable economic expertise and regulatory experience. When questions arise as to the anticompetitive impact of a particular business practice, the FTC and its professional staff are able to investigate and analyze that practice not only for its impact on the consumers and competitors most immediately affected by the practice but for its potential to disrupt competition in the economy as a whole. The FTC can then use this broad base of data to exercise its discretion in determining whether the practice in question truly threatens competition to a degree that justifies the costs of suppressing the practice. By contrast, a court has no similar resources or competence for deciding wide-ranging questions of economic policy. "Unlike the courts, the Commission is not one or a few *201 judges acting solely on a record made by plaintiff and defendant. It is an elaborate institution of many lawyers, economists, researchers, and other professionals. Its facilities for gathering facts about a particular respondent and a segment of the economy are vastly superior to those of a court. Its specialized personnel provide a capacity for in-depth probes far beyond that of the courts." (2 Areeda & Hovenkamp, Antitrust Law, *supra*, 307, p. 26.)These justifications for having an administrative agency search out incipient antitrust violations and threats to competition before they have ripened into actual antitrust violations do not support permitting private plaintiffs to do so in a judicial forum.

Second, if the FTC does find a business's practice to be an incipient antitrust violation or a threat to competition and decides that it should be suppressed, it is limited to awarding only prospective relief in the form of a "cease-and-desist order" instructing the business to modify its future conduct. (15 U.S.C. § 45.)A business subject to an FTC cease-and-desist order does not face any civil or criminal penalties or monetary liability for its past conduct. By contrast, a defendant in an unfair competition law action may face massive restitutionary liability to the plaintiff and to others similarly situ-

ated. The majority proposes to use the FTC's section 5 standard to impose retrospective monetary liability for conduct that does not violate any antitrust law but that in the opinion of one judge may, if continued, threaten to violate an antitrust law in the future. This grossly distorts the purpose of that standard, which was to terminate present conduct not in violation of any law that, if unchecked, would ripen into unlawful anticompetitive conduct, not to impose liability for past lawful conduct.

## IV

Even if the majority were correct that an "unfair ... business act or practice" is properly defined as one that threatens an "incipient violation" of the state antitrust laws, one that violates the "policy or spirit" of the state antitrust laws, or one that "significantly threatens or harms competition," there is no basis for a retrial here. A defendant's motion for judgment in a bench trial occurs at the close of the plaintiff's case. (Code Civ. Proc., § 631.8.)Its premise is that, even without the presentation of any opposing evidence by the defendant, the plaintiff's evidence is insufficient to prove its claims by a preponderance of the evidence.

Here, to defeat defendant's motion for judgment, it was plaintiffs' burden to present all their evidence on their unfair competition cause of action and to prove by a preponderance of the evidence that defendant's price cutting *202 was unfair competition. In addition, both as part of its Unfair Practices Act cause of action and as part of its Cartwright Act antitrust action, plaintiffs presented evidence attempting to prove that defendant's price cutting had injured competition. They failed to prove this.

A plaintiff attempting to show that price cutting is an incipient violation of the antitrust laws, a violation of their policy or spirit, or a substantial threat or harm to competition faces a heavy burden. Ordinarily, price cutting is the *essence* of competition, not a substantial threat to it. Prices are the primary medium through which business entities compete. "

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527

Page 29

20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576, 1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

'Low prices benefit consumers regardless of how those prices are set ....' " (*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.* (1993) 509 U.S. 209, 223 [113 S.Ct. 2578, 2588, 125 L.Ed.2d 168].) Here, the consumer is interested only in the total price of a telephone plus service. As plaintiffs admit in their brief: "What matters to the consumer is the total cost of a telephone and service ...." It is not disputed that defendant's price discounting has reduced the total cost of a telephone and service, making the cellular telephone and cellular service more affordable to greater numbers of consumers, thereby increasing consumer welfare.

Price discounting is only a threat to competition in very narrow circumstances, when it becomes "predatory." In predatory pricing, a firm "invests" in below-cost pricing to drive its competitors out of the market, with the expectation that it will then be able to raise its prices to supracompetitive levels and earn monopoly profits to recoup its investment in below-cost sales. (*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, supra, 509 U.S. 209, 224 [113 S.Ct. 2578, 2588-2589]; 3 Areeda & Turner, Antitrust Law (1978) 711b, p. 151 ["predation in any meaningful sense cannot exist unless there is a temporary sacrifice of net revenues in the expectation of greater future gains"].) Predatory pricing only makes economic sense to the predator if it has a substantial expectation of recouping its costs by raising its prices to "supracompetitive" levels once competitors are eliminated. (*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, supra, 509 U.S. 209, 224 [113 S.Ct. 2578, 2588-2589]; 3 Areeda & Turner, Antitrust Law, supra, 711b, p. 151.)"Without [recoupment], [below-cost] pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." (*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, supra, 509 U.S. at p. 224 [113 S.Ct. at p. 2588].)

For supracompetitive pricing and recoupment to occur, however, the predator must acquire not only market share but market power by creating condi-

tions that would prevent new competitors from reentering the market *203 once the predator raises prices to supracompetitive levels. (*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, supra, 509 U.S. at pp. 225-226 [113 S.Ct. at pp. 2589-2590]; *Matsushita Elec. Industrial Co. v. Zenith Radio* (1986) 475 U.S. 574, 590-591 [106 S.Ct. 1348, 1358, 89 L.Ed.2d 538] ["In order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices."]; 3 Areeda & Turner, Antitrust Law, supra, 711b, pp. 151-152.)Because such barriers to entry rarely exist, "proven cases of predatory pricing have been extremely rare." (3 Areeda & Turner, Antitrust Law, supra, 711b, p. 152.)

As the trial court here found, defendant L.A. Cellular's purpose in making below-cost sales of cellular telephones was not to drive plaintiffs out of the telephone sales business or even to divert business from them but to compete with AirTouch Cellular (the other cellular service provider in Los Angeles) for customers in the cellular service market. Thus, defendant did not have a predatory intent to drive competitors out of business.

Nor did defendant's conduct have a predatory effect. Plaintiffs presented no evidence that the exit of these plaintiffs, or all independent telephone hardware sellers, from the cellular telephone market would injure competition by permitting defendant to raise its prices at all, much less raise them to supracompetitive levels. Nor did plaintiffs present evidence of substantial barriers to entry that would preclude others such as consumer electronics retailers from entering the cellular telephone market should defendant raise prices supracompetitively. "[U]nsuccessful predation is in general a boon to consumers. [ ] That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.' "

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 30

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., supra,* 509 U.S. 209, 224 [113 S.Ct. 2578, 2588], original italics.)

The majority speculates nonetheless that plaintiffs might be able to show that defendant harmed competition by its price discounting. (Maj. opn., *ante,* at pp. 187-188.) It rests this theory on the premise that defendant is a duopolist in the cellular service market and that plaintiffs are legally precluded from competing with defendant by selling phones below cost and offsetting those losses with profits from cellular service sales.

The majority's premise is false, as the trial record created by plaintiffs shows. Plaintiffs' economics expert testified that defendant L.A. Cellular *204 and its service competitor AirTouch Cellular are required by the California Public Utilities Commission to wholesale cellular airtime to independent resellers at 77 percent of retail cost. Thus, they are not a true duopoly, and others compete with them for the retail sale of cellular service. Some of the plaintiffs are retailers of cellular service, and it appears the rest could be. Plaintiffs offered no evidence that they could not have competed with defendant by selling telephones for similar below-cost prices and recouping their losses through profits on accompanying sales of service. If plaintiffs' argument is that the harm to competition rests on defendant's cross-subsidization of telephone sales by service profits that plaintiffs could not have earned, they bore, but did not meet, the burden of showing they could not have earned similar profits.

If on remand the trial court enjoins defendant L.A. Cellular under the unfair competition law from making below-cost sales of its cellular telephones, defendant will then undoubtedly seek to enjoin its service competitor AirTouch Cellular from making similar below-cost telephone sales. The result will be judicially imposed price fixing of minimum retail prices, establishing the sort of retail price maintenance that the antitrust laws condemn when resulting from agreements among market participants. Price fixing by litigation will replace price reduc-

tion by competition, and the ultimate loser will be the consuming public.

The majority's theory will also subject businesses owning patents and copyrights to unfair competition liability in many instances. Like defendant L.A. Cellular's cellular service license, a patent or copyright for a successful product is a government-granted franchise from which competitors are excluded. A business using revenue from its patents or copyrights to fund operations in another line of business is no different from defendant's use of its cellular service revenues to subsidize sales of cellular telephones. In doing so, the patent or copyright owner would be subsidizing that other line of business with patent or copyright revenue that its competitors in that line of business are legally precluded from earning, just as a cellular service licensee making below-cost telephone sales subsidizes those sales with cellular service profits that its competitors are legally precluded from earning. Thus, in these circumstances patent and copyright owners too will be subject to liability under the majority's theory.

If cross-subsidization between the regulated market for cellular service and the unregulated market for cellular telephones is a problem, there is no need to distort the unfair competition law to address it. There are both state and federal regulatory bodies charged with protecting consumer welfare *205 against injurious practices in the cellular marketplace (the Federal Communications Commission and the California Public Utilities Commission). They are far better equipped than a court of equity to determine whether cross-subsidization is causing consumer injury and, if so, what remedy should be imposed. How would a court determine the proper minimum resale price for cellular telephones? The cost of the telephones to defendant? That cost plus some fixed markup? Or the marginal cost of the telephones to defendant plus all the other expenses of selling the telephones? Or the average variable cost? Even telephone sales by a cellular carrier at or above the cost of the telephones themselves may be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

"subsidized" by service revenues if those revenues are used to pay for the other expenses incurred in making telephone sales (e.g., a newspaper ad by defendant for cellular service may also advertise a cellular phone; subsidization is occurring if these advertising costs, or any overhead or other indirect sales costs, are paid for by cellular service revenue). How would a court take these subsidies into account? The majority provides no answer to these difficult questions.

In sum, I doubt whether price discounting that is not predatory, is not done with the intent to injure competition, does not violate the Unfair Practices Act or other statutes, is not fraudulent, and increases consumer welfare by making more goods or services available to more people at lower prices can ever be an unfair business practice, even under the majority's standard. It certainly is not on the record that plaintiffs have presented. [FN4]

> FN4 I note that the FTC has taken no reported action anywhere in the United States to oppose the below-cost distribution of cellular telephones by cellular service providers. Apparently, unlike the majority, it sees no significant threat to competition from this widespread practice.

### Conclusion

The majority's amorphous definition of an "unfair ... business act or practice" as one that threatens an "incipient violation" of the antitrust laws, one that violates the "policy or spirit" of the antitrust laws, or one that "significantly threatens competition" is at once too narrow and too broad. It is too narrow to the extent that it reduces the prohibition against unfair business practices to nothing more than an appendage of antitrust law. Doing so ignores the distinct history and purpose of the unfair competition law's prohibition of unfair business practices, which was to protect consumers and individual competitors against injuries caused by consumer deception, not to protect or advance competition. Antitrust law, by contrast, is not concerned with

protecting individual competitors, nor with preventing acts of deception, but rather with the threats to competition and consumer welfare posed by monopoly power and agreements restraining trade. There is no evidence our Legislature intended the unfair competition law to be an antitrust law. *206

The majority's definition is too broad to the extent that it encompasses not violations of antitrust law but what might be called "antitrust lite": such vague and dubious metaphysical entities as incipient violations, violations of policies and spirits, and anything that might be characterized as a significant threat or harm to competition. That definition will provide no certainty to businesses seeking to know what conduct the unfair competition law prohibits, given the inherent vagueness of the majority's concepts of an "incipient violation" of an antitrust law, violations of the "policy or spirit" of an antitrust law, and "significant" threats or harms to competition.

I would instead adhere to our historical understanding that the core of an unfair business practice is conduct that deceives consumers. As there is no allegation or evidence of deceptive conduct by defendant, plaintiffs' unfair competition claim fails.

Even if I were to apply the majority's definition here, however, I would conclude that plaintiffs have failed to show that defendant's price cutting is predatory and harmful to competition. The purpose of competition is to drive prices down. Although the unfair competition law protects competitors, even under the majority's definition it does not protect competitors at the expense of competition. That is, the unfair competition law does not authorize injunctive relief that harms consumer welfare by setting minimum prices that increase the prices consumers pay.

To claim, as the majority does, that the unfair competition law is an antitrust law aimed at maximizing consumer welfare and yet conclude, as the majority also does, that on this record a court could determine that consumer welfare would be enhanced by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

raising the prices of cellular telephones is an exercise in contradiction. Because price discounting is the primary medium of competition, to prohibit it here would elevate the interests of plaintiffs far above those of consumers. Competitors that sell below-cost phones may hurt plaintiffs, but they help consumers by making cellular telephones more affordable.

For the reasons discussed above, I dissent from the majority's analysis of the meaning of unfair business practice under the unfair competition law, and I would affirm the trial court's judgment in favor of defendant L.A. Cellular.

**BAXTER, J.,**

Concurring and Dissenting.-I concur in the judgment insofar as it reverses the judgment of the trial court for defendant on the cause of action brought under section 17204 of the Business and Professions Code for *207 violation of the unfair competition law (UCL) (§ 17200 et seq.). [FN1] I dissent insofar as the majority affirm judgment for defendant on the sections 17043, 17044, Unfair Practices Act (UPA) (§ 17000 et seq.), causes of action.

> FN1 All statutory references are to the Business and Professions Code unless otherwise indicated.

While I have several reservations about the majority opinion, my principal concern is that the majority construe the UPA as permitting below-cost sales which injure competitors and/or destroy competition because the intent of the below-cost seller is to compete, but not to cause injury. This construction is inconsistent with the purpose and language of the UPA, in particular sections 17050, subdivision (d), and 17071 under which the statutory presumption of intent or purpose to injure competitors or destroy competition arising on proof of below-cost sales may be rebutted only by proof of a good faith belief that the price of a competitor with which the below-cost sale was to compete was a legal price. Under the majority construction, intent to injure becomes a subjective element of a section 17043 violation, rather than the objective element created by the sec-

tion 17071 statutory presumption, and the limited exceptions to the ban on below-cost sales created by section 17050 are expanded far beyond those intended by the Legislature.

At the same time as they restrict UPA liability and abrogate an objective standard of intent, the majority expand potential liability under the UCL for "unfair" practices, again importing subjectivity into a law that no longer gives fair warning of conduct that may be deemed unlawful. Another regrettable consequence of the majority approach is an unnecessary divergence between California laws governing anticompetitive conduct and federal antitrust law, in particular a departure from the intent to injure concept that is part of the federal antitrust distinction between "competitive" and "predatory" pricing. The result will create uncertainty in the business community over potential liability for conduct that is permissible under federal law and under the UPA, but may, nonetheless, be deemed "unfair" under the UCL. Both the UPA and the UCL are susceptible to a construction that would largely eliminate that uncertainty and more closely conform to the apparent legislative intent underlying the California law. The majority reject this opportunity to adopt that construction.

I also have reservations about the majority's conclusion that "purpose" as used in section 17043 has a narrower meaning than "intent." I doubt that the Legislature had this distinction in mind when the UPA was enacted. *208

I

*Background*

Plaintiffs include wholesale and retailer sellers of cellular phones, as well as resellers of cellular service who are wholesalers of cellular telephones, two of whom also sell cellular telephones at retail. Defendant Los Angeles Cellular Telephone Company (L.A. Cellular), a cellular service provider,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 33

also engages in the wholesale and retail sale of cellular phones. Although L.A. Cellular's principal market is the provision of cellular service, because it has opted to sell cellular phones to its agents and to customers of its cellular service, it is competing in the wholesale and retail markets for sale of cellular phones. Thus plaintiffs are competitors which defendant reasonably should have known might be injured by below-cost sales in either market. Although the record shows that competition in the sale of cellular phones has not been destroyed as a result of defendant's conduct, and sellers continue to enter the market, the record also demonstrates that defendant's conduct did injure plaintiffs, its competitors, who were in business when the below-cost sales complained of in this action occurred.

Plaintiffs' evidence established that as a result of its inability to compete with defendant's subsidized below-cost sales, [FN2] plaintiff Cel-Tech Communications, Inc. (Cel-Tech) was ceasing operations. Plaintiffs Comtech, Inc. and Cellular Service, Inc., the resellers of cellular service, suffered business declines when their equipment sales deteriorated because they could not *209 compete with defendant's below-cost sales. All plaintiffs were injured as a result of their inability to compete with those below-cost sales.

> FN2 "Cost" is defined in section 17026: " 'Cost' as applied to production includes the cost of raw materials, labor and all overhead expenses of the producer.
> " 'Cost' as applied to distribution means the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor, plus the cost of doing business by the distributor and vendor and in the absence of proof of cost of doing business a markup of 6 percent on such invoice or replacement cost shall be prima facie proof of such cost of doing business.
> " 'Cost' as applied to warranty service agreements includes the cost of parts, transporting the parts, labor, and all over-

head expenses of the service agency.
"Discounts granted for cash payments shall not be used to reduce costs."
Section 17029 provides, in turn: " 'Cost of doing business' or 'overhead expense' means all costs of doing business incurred in the conduct of the business and shall include without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."
Finally, section 17073 provides: "Proof of average overall cost of doing business for any particular inventory period when added to the cost of production of each article or product, as to a producer, or invoice or replacement cost, whichever is lower, of each article or product, as to a distributor, is presumptive evidence of cost of each such article or product involved in any action brought under this chapter."

Judgment for defendant was entered pursuant to Code of Civil Procedure section 631.8, supposedly at the close of plaintiffs' evidence. However, in their case-in-chief, plaintiffs had called an officer of defendant L.A. Cellular as an adverse witness pursuant to Evidence Code section 776 [FN3] and defendant was allowed to call that person as a defense witness. Thus, the record reflects not only plaintiffs' evidence of below-cost sales of cellular phones by defendant and injury to plaintiffs and to competition in the cellular phone market, but also defendant's explanation of its purpose in doing so. That purpose, the trial court found, was only to compete with its competitor in the cellular service market, AirTouch Cellular (then PacTel). Before it launched its below-cost sales program, L.A. Cellular had been unable to attract new customers for its cellular service because the high prices for cellular phones deterred prospective subscribers. Thus, by its below-cost sales, defendant sought to compete in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527                                                                                Page 34
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

the cellular service market, not to injure sellers en-
gaged only in equipment sales.

> FN3 Evidence Code section 776, subdivi-
> sion (a): "A party to the record of any civil
> action, or a person identified with such a
> party, may be called and examined as if
> under cross-examination by any adverse
> party at any time during the presentation of
> evidence by the party calling the witness."

Perhaps the most dramatic evidence of the actual
injurious effect of L.A. Cellular's below-cost sales,
however, was the impact on plaintiff Cel-Tech.
That impact on plaintiff Cel-Tech was staggering.
Cel-Tech, a privately owned company started by its
owner with $4,000 in savings, was clearly a very
successful business before defendant launched its
below-cost sales campaign, having grown from
nothing in 1984 when it started business as a retail
seller to $36 million in revenues and $2 million in
gross profits by 1992. At that time it was primarily
a wholesaler/distributor of cellular phones, and was
the largest distributor of cellular phones in Los
Angeles and one of the largest in the nation. Based
on its volume of sales, Cel-Tech became a distribut-
or for several manufacturers and private label pro-
ducers of cellular phones, among them Mitsubishi
International, Mitsubishi Electric, NEC, OKI,
Toshiba, Ericsson/GE, and Pioneer from which it
was able to purchase cellular phones at or very near
the price charged to carriers. It sold cellular phones
to retailers who sold to "end users," and to re-
sellers, including agents of L.A. Cellular and Air-
Touch. By the end of 1994 it was out of the busi-
ness of cellular phone sales and distribution as both
a retailer and distributor and was liquidating its in-
ventory as a direct result of defendant's below-cost
sales. It could not compete without selling its
phones below cost. *210 Not only was it unable to
make a profit, it could not even cover its overhead
costs.

The trial court found that "L.A. Cellular was doing
what it said it was doing, which was keeping a
watchful eye on the ads and setting its hardware

prices to compete with its major competitor, Air-
Touch, and to increase its sale of service activa-
tions. Those were L.A. Cellular's primary motiva-
tions and ... injury to the plaintiffs was unintend-
ed." The Court of Appeal, correctly, disagreed
with the trial court's further finding that L.A. Cellu-
lar did not know that its conduct would injure
plaintiffs. It held, and I agree, that the record con-
tained substantial evidence that the injury to
plaintiffs was readily foreseeable.

The Court of Appeal questioned the sufficiency of
the evidence to support a conclusion that L.A. Cel-
lular's purpose was only to compete with AirTouch
for market share in the cellular service industry. I
share that skepticism. My review of the record sup-
ports plaintiffs' claim that the record is equally sus-
ceptible to a conclusion that AirTouch lowered its
prices for cellular phones in order to meet the pred-
atory pricing of L.A. Cellular. Regardless of how
this question should be resolved, however, the re-
cord contains no evidence that if L.A. Cellular ac-
ted to meet the prices of AirTouch for cellular
phones, it did so with a good faith belief that those
prices were legal.


II. The "Purpose" Element of a Section 17043 Viol-
ation

I agree with the majority that "intent" and
"purpose" may have different meanings. "Intent"
may encompass both acts done with the intent to
cause a particular result and those undertaken with
knowledge that there is a substantial certainty that
the result will follow, while "purpose" encompasses
only the former. I do not agree that the Legislature
intended that distinction in the UPA, however.

A statute must be construed with regard to the stat-
utory scheme of which it is a part and the court
should give meaning to every word if possible,
avoiding a construction that will render any part
surplusage. (*Briggs v. Eden Council forHope & Op-
portunity* (1999) 19 Cal.4th 1106, 1118 [81
Cal.Rptr.2d 471, 969 P.2d 564](*Briggs*);*People v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
**(Cite as: 20 Cal.4th 163)**

*Comingore* (1977) 20 Cal.3d 142, 147 [141
Cal.Rptr. 542, 570 P.2d 723].) A court will nor-
mally presume that when the Legislature uses dif-
ferent words in the same connection in different
parts of a statute that a different meaning was inten-
ded. *211 (*Briggs, supra,*19 Cal.4th at p. 1117.)In
the UPA , however, the Legislature appears to have
used "intent" and "purpose" interchangeably. The
enforcement provisions of the law suggest that the
distinction drawn by the majority was not intended.

One provision describing conduct proscribed by the
UPA uses "intent" to describe the mental element
of the offense. Section 17040 prohibits locality dis-
crimination, other than in a good faith effort to
meet a competitive price, when the discrimination
is "with intent to destroy the competition" of a reg-
ularly established dealer in the product, or to pre-
vent competition by a person who intends to be-
come a dealer in the product. Of the other UPA pro-
visions defining offenses, only sections 17043 and
17044 (by incorporation of section 17030) use the
term "purpose," the former to require for violation
through below-cost sales a mental element of acting
with the "purpose of injuring competitors or des-
troying competition," the latter to require as a "loss
leader" element a "purpose ... to induce, promote or
encourage the purchase of other merchandise." (§
17030.)Absent some reason to believe that the Le-
gislature intended broader applicability of the of-
fense defined in section 17040 than that in section
17043, it is difficult to accept the construction pro-
posed by the majority. Under the majority construc-
tion, locality discrimination is an offense if the act-
or knew or reasonably should have known that the
discrimination would injure competitors or destroy
competition, but the same actor whose below-cost
sales caused identical harm would be liable and
subject to an injunction only if the actor's purpose
was to injure or destroy competition.

Moreover, the presumptions and evidentiary rules
created by the UPA refer to proving the "purpose or
intent" of the actor. Section 17071 provides that be-
low-cost sales are "presumptive evidence of the

purpose or intent to injure competitors or destroy
competition." Section 17071.5 provides that a re-
tailer's limitation of quantity in a below-cost sale
creates a "presumption of the purpose or intent to
injure competitors or destroy competition." Section
17075 permits introduction of evidence of prevail-
ing wages to "prove the intent or purpose" to viol-
ate the UPA .

Finally, section 17095 provides: "Any person, who,
either as a director, officer or agent of any firm or
corporation or as agent of any person, violating the
provisions of this chapter, assists or aids, directly or
indirectly, in such violation is responsible therefore
equally with the person, firm or corporation for
which he acts." The UPA provisions authorizing in-
junctive relief and criminal prosecution against an
agent of the offending party then provide that it is
sufficient to prove the "unlawful *intent* of the per-
son, firm *212 or corporation for which he acts."
(§§ 17096, 17101, italics added.) Under the majority
construction, the principal that makes below-cost
sales or uses loss leaders violates the UPA only if
acting for the purpose of injuring or destroying
competition, but an agent of the principal is liable if
the principal acted with knowledge that this was a
probable result.

I am at a loss to understand why the Legislature
would relieve from UPA liability a principal that
acted with knowledge or reason to know that be-
low-cost pricing would injure competitors, but im-
pose liability on an agent of the principal on the
ground that the principal had such knowledge or
had reason to know. Yet this is the result of the dis-
tinction between "purpose" and "intent" drawn by
the majority.

On this basis alone I would hold that plaintiffs
made a prima facie showing of the specific intent
element of a section 17043 or 17044 violation by
presenting evidence that defendant engaged in be-
low-cost sales and used loss leaders in circum-
stances in which it knew or should have known be-
cause of the substantial certainty of the impact of
those sales that the below-cost sales would injure

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527                                                           Page 36
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

competitors and destroy competition. That defend-
ant's purpose was only to compete with AirTouch is
irrelevant. The UPA permits price competition. Ex-
cept in narrowly defined circumstances, however, it
does not permit below-cost sales which the actor
knows or should know will injure competitors or
destroy competition. If a competitor is engaging in
unlawful below-cost sales the UPA provides a rem-
edy which will restore competition to the market-an
injunction against the competitor's unlawful below-
cost sales. (§ 17070.)

### III. Rebutting the Presumption of Injurious Intent or Purpose

The most disturbing aspect of the majority's con-
struction of the below-cost sales prohibition of the
UPA, however, lies in their assumption that below-
cost sales do not violate section 17043 if the below-
cost seller acts with intent to compete with another
seller of the same product and does not have the
conscious intent or purpose to injure competitors or
destroy competition, regardless of whether the be-
low-cost seller has a good faith belief that the price
of the competitor is a legal price. With due respect,
this cannot have been the intent of the Legislature.
The majority holding in this respect is inconsistent
with the legislative purpose underlying the UPA,
the statutory presumption of violation the Legis-
lature created, and the limited circumstances in
which the Legislature permits the presumption to be
rebutted.

The UPA was enacted "to safeguard the public
[interest] against the creation or perpetuation of
monopolies and to foster and encourage *213 com-
petition ...." (§ 17001.) The Legislature has demon-
strated recognition that enforcement of the antitrust
laws is critical to achieving the purpose of the law.
It has done so by permitting private as well as gov-
ernmental enforcement and by providing for treble
damages (§ 17082) as further encouragement for
enforcement. It also directs that the UPA be liber-
ally construed (§ 17002) and, to ensure that violat-
ors will not escape liability by claiming lack of in-

tent to injure competition, in section 17071 has cre-
ated a presumption of intent or purpose to injure
competitors or destroy competition, a presumption
which arises on a showing of below-cost sales and
injury.

As the trial court and Court of Appeal recognized,
the Legislature has not placed on a UPA plaintiff
the heavy burden of proving the subjective intent or
purpose of a competitor who makes below-cost
sales. Absent a "smoking gun" memorandum or
"e-mail" revealing a below-cost seller's subjective
intent to injure competitors or destroy competition,
proof of such intent or purpose is well nigh im-
possible to come by. Instead of demanding this of
injured competitors of the below-cost seller, the Le-
gislature has created a presumption of intent or pur-
pose which arises on proof of both below-cost sales
and injurious effect. It then has defined the circum-
stances in which those sales do not violate the
UPA, shifting the burden to the defendant to estab-
lish that one of those circumstances motivated the
sales.

Section 17071 creates the presumption: "In all ac-
tions brought under this chapter proof of one or
more acts of selling or giving away any article or
product below cost or at discriminatory prices, to-
gether with proof of the injurious effect of such
acts, is presumptive evidence of the purpose or in-
tent to injure competitors or destroy competition."
FN4

> FN4 Section 17071.5 creates a similar pre-
> sumption when a retailer's limitation of
> quantity and sale of the item below invoice
> or replacement cost is established.

At the time most sales underlying this action took
place, section 17050 defined the circumstances in
which below-cost sales are permissible and thereby
established the means by which a defendant may re-
but the presumption of injurious purpose or intent:
It provides in pertinent part:

"The prohibitions of this chapter against locality

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 37

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

discrimination, sales below cost, and loss leaders do not apply to any sale made:

"(a) In closing out in good faith the owner's stock or any part thereof ....

"(b) When the goods are damaged or deteriorated in quality .... *214

"(c) By an officer acting under the orders of any court.

"*(d) In an endeavor made in good faith to meet the legal prices of a competitor selling the same article or product, in the same locality or trade area and in the ordinary channels of trade.*

"(e) In an endeavor made in good faith by a manufacturer, selling an article or product of his own manufacture, in a transaction and sale to a wholesaler or retailer for resale to meet the legal prices of a competitor selling the same or a similar or comparable article or product, in the same locality or trade area and in the ordinary channels of trade." (*Ibid.*, italics added.)

An additional exception to the ban on below-cost sales, available only to providers of cellular service and operative only as of January 1, 1994, is now found in section 17026.1, subdivision (a)(2). That subdivision authorizes below-cost sales of cellular phones by a provider of cellular service competing with another provider of cellular service. Section 17026.1, subdivision (a)(2), provides: "*Consistent with the provisions of subdivision (d) of Section 17050,* providers of cellular services shall be permitted to sell cellular telephones below cost, provided that sales below cost are a good faith endeavor to meet the legal market prices of competitors in the same locality or trade area." (Italics added.) This express authorization to sell equipment below cost to compete with the legal price of a company competing primarily in the market for cellular service which the Legislature described as being "[c]onsistent with subdivision (d) of Section 17050," confirms that the only competition-based

exception to the sections 17043 and 17044 ban on below-cost sales is for sales made to compete with what is believed in good faith to be a legal price of a competitor. The below-cost seller cannot rebut the presumptive intent to injure competitors or destroy competition with evidence that it simply intended to compete, not to injure.

The majority assume without discussion that section 17050 is not the exclusive means by which a defendant may rebut the presumption of section 17071 and establish the absence of intent or purpose to injure or destroy competition. They hold that even if a person selling below cost does so for competitive reasons other than a good faith attempt to meet a competitor's legal price, there is no violation of section 17043 absent a purpose to injure competition in the market for the product being sold. That is not the law.

The majority uncritically rely for that assumption, as did the trial court, on a statement in *Dooley'sHardware Mart v. Food Giant Markets, Inc.* (1971) *215 21 Cal.App.3d 513, 518 [98 Cal.Rptr. 543](*Dooley's Hardware*), that a UPA defendant may rebut the statutory presumption of intent or purpose to injure competitors or destroy competition "either by evidence tending to bring them within one of the exceptions to the prohibitions contained in the Act *or by evidence establishing otherwise that they did not have the requisite wrongful intent.*" (Italics added, fn. omitted.)

A careful reading of *People v. Pay Less Drug Store* (1944) 25 Cal.2d 108, 114 [153 P.2d 9](*Pay Less*), on which the Court of Appeal relied in *Dooley's Hardware*, reveals however that this court's statement that nonstatutory bases may exist by which to rebut the presumption that arises from belowcost sales was dictum. The defendants in *Pay Less* conducted a retail grocery business. They admitted below-cost sales of more than 400 items as "loss leaders" but denied intent to injure competitors or destroy competition. They claimed that the sales were made in a good faith effort to meet the legal prices of competitors, and thus relied only on subdivision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527                                                                    Page 38
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

(d) of section 17050 in their effort to rebut the presumption of injurious purpose or intent. In response to the defendants' claim that the presumption was unconstitutional, this court addressed the nature of the presumption now codified as section 17071 and the means by which it may be rebutted. "Proof of injurious effect is permitted to be shown with the proof of sales below cost as presumptive or prima facie evidence that the requisite intent existed. The obvious and only effect of this provision is to require the defendants to go forward with such proof as would bring them within one of the exceptions or which would negative the prima facie showing of wrongful intent. They may present facts showing that they were within the express exceptions regardless of actual intent; or they may introduce evidence of another *necessity* not expressly included to show that sales were made in good faith and not for the purpose of injuring competitors or destroying competition." (*Pay Less, supra,* 25 Cal.2d at p. 114, italics added.)

The court noted that it was unnecessary in the *Pay Less* case to consider what circumstances other than those expressly designated in section 17050 would justify sales below cost and thus negate the prima facie showing of unlawful intent since the defendants relied only on the exception found in subdivision (d) of the section. Nothing in *Pay Less* warrants a conclusion that, in stating that there might be circumstances other than those set forth in section 17050 on which below-cost sales could be justified, this court contemplated that price competition alone could justify below-cost sales. To have done so would have read the "good faith" effort to meet a competitor's *216 "legal price" out of the statute. Instead, the court referred to another "necessity" to resort to below-cost sales. Competition alone cannot create such a necessity. [FN5]

> FN5 *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199 [45 Cal.Rptr. 878, 404 P.2d 486], is not authority for such an exception to the limited circumstances in which section 17050 authorizes below-cost sales.

There, under pre-1985 procedures, a single appeal in consolidated cases was before this court on grant of hearing. The discussion of the section 17071 presumption there was in the portion of the vacated Court of Appeal opinion which addressed a UPA cause of action. This court adopted that part of the opinion because neither of the parties raised any issue as to its adequacy in the petition for hearing. (63 Cal.2d at p. 203.) The first issue addressed was whether the defendant corporation had sold its product below cost. The trial court found and the Court of Appeal agreed that the evidence supported its finding that under applicable accounting practices the product was not sold below cost. Moreover, the corporation did not intend to sell below cost. In that context the opinion states: "That evidence was sufficient to render the presumption embodied in section 17071 of the Business and Professions Code of little evidentiary value. Consequently, it does not appear to be probable that a result more favorable to the plaintiff Tri-Q, Inc., would have been reached by the trial court even if it had found that such prices were less than the actual cost of the product." (*Id.* at p. 209.) That dictum in *Tri-Q, Inc. v. Sta-Hi Corp., supra,* 63 Cal.2d 199, 209, at best stands for the proposition that a good faith belief that a product is not being sold below cost is a defense to a section 17043 action.

When construing a statute a court must consider the entire statutory scheme of which it is part and give effect to all parts of the statute, avoiding an interpretation that would render any provision nugatory. (*People v. Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918, 802 P.2d 420]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Subdivision (d) of section 17050 provides that below-cost sales do not violate the UPA when they are made in an effort to

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

Page 39

compete with what the seller in good faith believes is a legal price of a competitor. That legislative limitation on competitive below-cost sales is rendered nugatory by a construction of section 17043 which permits a seller to price its products below its cost to meet any competitor's price regardless of whether there is a good faith belief that the competitor's price is itself legal. The Legislature did not intend that a below-cost seller could avoid the requirement of a good faith belief that the competitor's price was legal by simply proving that it intended only to compete and meant no harm. The majority's contrary conclusion virtually ensures the end of meaningful competition in some product areas. As long as a below-cost seller intends no evil, it is free to wreak havoc on the competitive market for the product it sells below cost regardless of its knowledge of the impact of its action on other sellers of the same or a similar product.

The majority construction of the UPA also creates uncertainty over potential UCL liability, uncertainty that exists only because the majority hold that *217 the UPA does not expressly make below-cost sales for the purpose of competition lawful. I cannot agree. Section 17050 does make below-cost sales lawful in the circumstances specified therein. However, properly construed, unless an exception other than described in subdivision (d) of section 17050 is applicable, the UPA permits below-cost sales only when made to meet what is believed in good faith to be a *legal* price of a competitor. If that belief is present the sale is lawful and does not violate either the UPA or UCL. If it is absent the sale is both a violation of the UPA and the UCL.

The legislative limitation on below-cost sales in subdivision (d) of section 17050 to those made in a good faith belief that the price with which the seller is competing is legal does not deny the seller a fair opportunity to compete. When a seller is faced with competition from what appear to be unlawful below-cost sales by a competitor, the UPA provides the seller with a remedy other than further injury to any remaining competitors and potential destruction

of the remaining market through its own below-cost sales. That remedy is a UPA-authorized injunction (§ 17070) to force the competitor to discontinue unlawful below-cost sales. "Each side must obey the law; the fact that one competing party disregards the statute does not give the other side a legal excuse to do so." (*Page v. Bakersfield Uniform etc. Co.* (1966) 239 Cal.App.2d 762, 770 [49 Cal.Rptr. 46].)

The record reflects that in general L.A. Cellular established a wholesale price for cellular phones at 6 percent above its cost, [FN6] and a retail price at 2 percent higher. It had a "meet comp" (meet competition) policy, however, which sometimes affected the retail price at which it made retail sales and priced phones sold to its agents. In December 1993 the vice-president of sales and marketing for L.A. Cellular circulated a memorandum on hardware pricing and promotions to its agents. The memorandum stated that L.A. Cellular planned "to continue the policy of meeting what we believe to be the legal hardware prices of our primary competition(s)." The vice-president of sales and marketing testified that AirTouch (and its agents) was then its primary competitor. L.A. Cellular's guidelines, however, were only to monitor competitors' ads, TV, radio, and print media and to consider dropping its prices to meet prices that were below that at which L.A. Cellular was selling equipment. This guideline was to match the offers made by AirTouch as closely as possible, although it did not do so in all cases. This witness conceded that AirTouch prices did in some cases seem to be suspiciously low and he did not know what AirTouch's costs were. In many cases, *218 however, L.A. Cellular was selling below its cost. At this time "bundling" was not authorized in California, but L.A. Cellular had found a high correlation between sales of equipment and activation.

> FN6 Under section 17026, 6 percent is prima facie proof of the cost of doing business which must be added to the invoice or replacement cost of an item in establishing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

whether a product is sold below cost.

L.A. Cellular's aggressive pricing during 1993 resulted in a 56 percent increase in December 1993 activations over its activations in December 1992, a factor it attributed to having "cornered the market for mass marketing of equipment." During that period its price for one cellular phone product dropped from $399 to under $149. The witness conceded, however, that L.A. Cellular's price drop was not simply to compete with AirTouch, but because it wanted to meet the AirTouch competitive reaction to L.A. Cellular's price reductions.

The record is ambiguous with regard to whether defendant had a good faith belief that AirTouch or any sellers of cellular telephones whose price it was attempting to meet with its below-cost sales were selling the equipment below cost or, if so, were nonetheless selling cellular telephones at a legal price. The vice-president of sales and marketing testified that L.A. Cellular's marketing staff watched AirTouch ads and set its prices accordingly. [FN7] While they were not comfortable meeting the prices offered in advertisements from some sellers whose affiliation they were not sure of, L.A. Cellular "felt that if AirTouch had a broadly advertised price point, that we were reasonably comfortable they were doing it within the law." They did attempt to determine if a competitor's price was legal by talking with the manufacturers of the equipment, but the response from manufacturers with whom L.A. Cellular already had a relationship was "none of your business." They recognized that Motorola, which manufactured cellular phones sold by both L.A. Cellular and AirTouch also provided switching equipment to AirTouch and assumed that moneys might be applied "across those relationships." In the end, however, the belief was simply that the manufacturer probably had a pricing strategy for AirTouch that was similar to that for L.A. Cellular and a feeling that AirTouch would not want to hazard legal exposure by its pricing actions. No similar effort was made to determine the lawfulness of competitor's prices when the West Los Angeles super store policy was followed. If a person came into that store with a competitive ad at a lower price, the salesperson could meet that price with management authorization. *219

> FN7 Before it initiated a general practice of below-cost equipment sales in conjunction with sales of cellular service, L.A. Cellular sold equipment below cost at its "super store" in West Los Angeles when asked by a customer to meet the price of another retail seller with an adjacent business because that seller was offering lower prices. When it did so, it had the customer execute a document in which the customer stated that the customer was making the certificate to induce L.A. Cellular to sell the equipment at a price competitive with a named competitor pursuant to section 17050, subdivision (d) and that the customer had no reason to believe that the competitor's price was not a lawful price.

Thus, the record may support a finding that L.A. Cellular had a good faith belief that when it made below-cost sales to compete with AirTouch it was competing with a legal price. On the other hand, it does not appear to support a finding that all of the below-cost sales were made to compete with what L.A. Cellular believed in good faith was a legal price.

Regardless of whether there is a distinction between the mental elements of purpose and intent, plaintiffs established a prima facie violation of section 17043. Their evidence established below-cost sales of cellular phones and injurious effect. Defendant's evidence could not rebut the presumption of intent to injure competitors unless the concededly below-cost sales were made with a good faith belief that the prices of the competitors which defendant endeavored to meet were legal prices. That factual issue is one for the trial court. The judgment for defendant on the UPA causes of action should be set aside and the matter remanded for trial.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

IV. Reconciling Federal Competitive vs. Predatory
Pricing Doctrine With the UPA and UCL

A "predatory pricing scheme" such as one forbid-
den under the Sherman Act (15 U.S.C. § 2) [FN8]
generally encompasses (1) below-cost pricing
which (2) will drive competitors out of the market
or deter others from entering, the ultimate object of
which is to enable the predator to recover its losses
through higher prices in the monopolistic market
created thereby. (*Brooke Group Ltd.* v. *Brown &
WilliamsonTobacco Corp.* (1993) 509 U.S. 209,
222-224 [113 S.Ct. 2578, 2587-2589, 125 L.Ed.2d
168];*MatsushitaElec. Industrial Co.* v. *Zenith Ra-
dio* (1986) 475 U.S. 574, 584, fn. 8 [106 S.Ct.
1348, 1354-1355, 89 L.Ed.2d 538].) The UPA ban
on below-cost pricing has the same objective. Es-
tablishing a violation under the UPA is less cum-
bersome, however, as the plaintiff need only prove
below-cost pricing and injury to a competitor or to
competition. By limiting the circumstances in
which below-cost pricing is exempted from the ban
of sections 17043 and 17044, the UPA assumes that
below-cost sales in other situations will result in
monopolistic control of a market as sellers unable
to compete with below-cost sales are driven out.
Thus, a UPA plaintiff need not demonstrate that the
below-cost seller anticipates recoupment of losses
in the monopolistic market, the second prong of the
predatory pricing test applied under federal law.

> FN8 Title 15 United States Code section
> 13a (the Robinson-Patman Act) prohibits,
> inter alia, selling "goods at unreasonably
> low prices for the purpose of destroying
> competition or eliminating a competitor."

The majority construe the UPA as permitting a
product to be sold at a price below cost in order to
compete with a competitor's price, be that price leg-
al or otherwise, without violating the UPA even if
the seller knows that the sales will injure competit-
ors and potentially destroy competition as long as
the seller does not subjectively intend harm to the
competitors or to competition. They also hold,

however, that this conduct may subject the seller to
liability under the UCL. The result is that conduct
which is "predatory" and thus unlawful under fed-
eral antitrust law is permitted under the UPA, al-
though there is no reason to believe that, in enact-
ing the UPA proscription of below-cost pricing, the
California Legislature intended to afford California
consumers less protection than did Congress when
comparable federal antitrust legislation was adop-
ted. In fact California law appears to afford greater
protection since it protects competitors as well as
competition against discriminatory pricing, and per-
mits recovery without the showing required under
the second prong of the federal "predatory" pricing
test. Moreover, in holding that a seller that believes
its conduct is permissible under the UPA may non-
etheless be subject to suit under the UCL, the ma-
jority create a new arena of uncertainty for the busi-
ness community. The potential impact of UCL liab-
ility is minimized by the majority, but, in fact, a
UCL suit exposes a business to substantial risks.
(See, e.g., *Stop Youth Addiction, Inc.* v. *Lucky
Stores, Inc.* (1998) 17 Cal.4th 553 [71 Cal.Rptr.2d
731, 950 P.2d 1086].)

As I have demonstrated above, the UPA and UCL
are subject to a construction which would avoid
having conduct that is lawful under the UPA
deemed "unfair" under the UCL. A construction of
the UPA which bans all below-cost pricing except
that expressly permitted by section 17050, and thus
permits below-cost pricing only to meet what is be-
lieved to be a competitor's legal price, would better
protect consumers and would lessen uncertainty in
the business community over the lawfulness of be-
low-cost pricing. A pricing scheme that violated the
UPA would necessarily violate the UCL, but would
not otherwise constitute an "unfair" business prac-
tice.

The construction of the UPA and UCL that I pro-
pose would also be consistent with federal prohibi-
tions on predatory pricing, which federal law distin-
guishes from pricing that is simply competitive. A
California business that engaged in below-cost

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

sales only to meet a competitor's legal price would not violate federal antitrust law in so doing. It might do so under the majority's construction of the UPA.

The UPA is, as this court recognized in *Stop Youth Addiction Inc. v. Lucky Stores, Inc., supra,* 17 Cal.4th at page 570, "roughly analogous to the federal *221 Clayton Act" in its prohibition of below-cost pricing and price discrimination. It should, therefore, be construed accordingly.

In construing either the state or the federal antitrust laws, the court should recognize that the overarching purpose of these laws is to protect the consumer, not the competitors of a business whose efficiencies enable it to sell its products at a low price. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." (*Atlantic Richfield Co. v. USA Petroleum Co.* (1990) 495 U.S. 328, 340 [110 S.Ct. 1884, 1892, 109 L.Ed.2d 333].)

Under federal law, a plaintiff alleging a violation need not prove that a competitor intends to injure the plaintiff or destroy competition. [FN9] The initial burden is only to establish that the price is predatory. To do so, "a plaintiff ... must prove that the prices complained of are below an appropriate measure of its rival's costs" and "that the competitor had a reasonable prospect, or ... a dangerous probability, of recouping its investment in below-cost prices. [Citations.] 'For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered.' [Citation.] Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers.

FN9 The concept of intent to injure has decreased in importance over the past 20 years. (See McCall, *Private Enforcement of Predatory Price Laws Under the California Unlawful Practices Act and the Federal Antitrust Acts* (1997) 28 Pacific L.J. 311, 331.)

"That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for 'the protection of *competition,* not *competitors.*' " (*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., supra,* 509 U.S. at pp. 222, 224 [113 S.Ct. at pp. 2587, 2588], original italics.)

The rationale underlying the federal approach to predatory pricing was explained in *Matsushita Elec. Industrial Co. v. Zenith Radio, supra,* 475 U.S. at page 589 [106 S.Ct. at page 1357]: "[T]he success of [predatory pricing] schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly *222 pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." "In order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices." (*Id.* at pp. 590-591 [106 S.Ct. at p. 1358].)

As explained by authors Areeda and Turner, whose reasoning apparently underlies the current federal approach (see *Brooke Group Ltd. v. Brown & WilliamsonTobacco Corp., supra,* 509 U.S. at pp. 221-222, 225 [113 S.Ct. at pp. 2586-2587, 2589]), rational business behavior seeks to maximize profits. Each competitor in a given market is attempting to attract more business. In most in-

973 P.2d 527

Page 43

20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576, 1999 Daily Journal D.A.R. 3360
(Cite as: 20 Cal.4th 163)

stances, one sale by a business translates to one sale lost by its competitors. It is a benefit to consumers to have such a system because businesses attempt to beat out their competitors by underselling them, thus attracting consumers. In a highly competitive market, prices approach the level of cost. It would be deemed irrational in the short run for business to sell below cost because a business is a profit-seeking entity. Thus, when an item is sold below cost, it is reasonable to presume a motive other than competition on the merits. (See Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act* (1975) 88 Harv. L. Rev. 697.)

L.A. Cellular's conduct might not violate federal antitrust law. While it was able to recoup its losses, and clearly anticipated that it would be able to do so, that recoupment was in profits from increased sales of its cellular service, not cellular phones. Moreover, while these plaintiffs were injured by defendant's below-cost sales, competition was not. The record confirms that the cellular telephone business in the Los Angeles area continued to grow and new retailers continued to enter the market. Thus, competition continued in both the cellular phone and the cellular service markets. L.A. Cellular did not achieve and the record does not suggest that it intended to achieve or sustain monopoly power in the cellular phone market.

Nonetheless, insofar as the UPA is broader than federal antitrust law and does give broader protection to competitors, as does the UCL (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 109-111 [101 Cal.Rptr. 745, 496 P.2d 817]), the purpose or intent element of California law may be conformed to federal law by the construction of the UPA suggested above. Recognizing that intent or purpose to injure competitors or destroy competition is presumed whenever a product is intentionally (*Tri-Q, Inc. v. Sta-Hi,* **223** *supra,* 63 Cal.2d at pp. 207-208) sold below cost, unless section 17050 exempts the sale, would bring California antitrust law into conformity with the first prong of the fed-

eral test of predatory pricing. It would also carry out more fully the legislative intent of protecting competitors as well as consumers from the impact of below-cost pricing.

Requiring proof of subjective intent to injure competitors, or as the majority do, permitting the presumption of intent or purpose to be rebutted by proving simply lack of such intent, is not appropriate in the competitive business arena. "[C]utting prices in order to increase business often is the very essence of competition." (*Matsushita Elec. Industrial Co.* v. *Zenith Radio, supra,* 475 U.S. at p. 594 [106 S.Ct. at p. 1360].)

Any price cut which attracts a consumer who would have gone to another seller, harms the seller that did not make the sale. Evidence that the below-cost seller did not intend to injure is meaningless. To intend to compete through below-cost sales is, necessarily, to intend to injure a competitor. For this reason the UPA does not require proof of intent to injure, but instead presumes that intent exists for purposes of section 17043 and 17044 when a business engages in below-cost selling.

Modern economic theory assumes that a business with prices lower than those of its competitors intends harm to the competitors insofar as it is able to attract customers who would otherwise trade with the competitors. Since this behavior stimulates competition it benefits consumers. Therefore, it is inappropriate to import into antitrust law the criminal law concept of intent or purpose to cause injury as a state of mind warranting punishment. Subdivision (d) of section 17050 demonstrates that the California Legislature did not intend to do so. Antitrust law encourages the state of mind of beating competitors through lower prices because, to a certain point, consumers benefit. It is only when "[a] firm ... drives out or excludes rivals by selling at unremunerative prices [that it] is not competing on the merits, but engaging in behavior that may properly be called predatory." (Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, supra,* 88 Harv. L.Rev. at p.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

973 P.2d 527
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576,
1999 Daily Journal D.A.R. 3360
**(Cite as: 20 Cal.4th 163)**

697.)

The UPA draws the predatory price line at average total cost. (§§ 17026, 17029.)No article or product may be sold at a lower price unless permitted by section 17050 because intent to injure rather than compete on the merits is presumed when pricing is predatory.

This court should, to the extent possible under the language of California antitrust laws and consistent with legislative intent, construe the purpose or *224 intent provision of the UPA in conformity with federal law. Uniformity benefits both the business community and the consumers for whose protection these laws were enacted.

For all of the above reasons, I believe that the judgment for defendant on the UPA cause of action should be set aside and the matter remanded to the superior court for trial on both the UPA and UCL causes of action. *225

Cal. 1999.
Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.
20 Cal.4th 163, 973 P.2d 527, 83 Cal.Rptr.2d 548, 1999-1 Trade Cases P 72,495, 99 Cal. Daily Op. Serv. 2576, 1999 Daily Journal D.A.R. 3360

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7

Westlaw.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
**(Cite as: 9 Cal.3d 371)**

Page 1

▷
Cooper v. Union Bank
Cal.
    ABRAHAM COOPER et al., Plaintiffs and Appel-
lants,
v.
UNION BANK et al., Defendants and Respondents
**L.A. No. 30087.**

Supreme Court of California
March 20, 1973.

SUMMARY

An attorney who was a member of a joint venture whose affairs he handled employed a woman as his secretary despite knowledge of her financial diffi-culties and gambling propensity. She forged his name, as indorser, on numerous checks, in some of which the venture had an interest, and cashed them over a period of about one and one-half years. The attorney and other members of the venture sued the collecting and payor banks for conversion. In addi-tion to finding that plaintiffs' negligence substan-tially contributed to the forgeries made after a cer-tain date, the trial court concluded that defendants had no proceeds remaining in their hands and denied recovery on the basis of Com. Code, § 3419, subd. (3), limiting recovery for conversion to the amount of any proceeds remaining in the bank's hands. (Superior Court of Los Angeles County, No. 916635, John L. Cole, Judge.)

The Supreme Court reversed as to the collecting banks with respect to the checks received before the date specified in the finding relating to plaintiffs' negligence, but affirmed with respect to the other defendants. Explaining that the amounts which a payor bank remits on a forged indorsement, and the amounts which a collecting bank remits to a person who transfers to the bank a forged indorsement, do not constitute proceeds of the instrument, the court held that Com. Code, § 3419, subd. (3), afforded no defense to the banks. However, with respect to the

checks received after the date specified in the find-ing relating to plaintiffs' negligence, the court held that such negligence contributed to the conversion, estopped plaintiffs from denying that the forgeries were operative indorsements, and precluded recov-ery.

In Bank. (Opinion by Mosk, J., expressing the un-animous view of the court.) *372

HEADNOTES

Classified to California Digest of Official Reports

**(1)** Banks and Banking §
160--Collections--Payments of Forged Drafts as Not Proceeds.
The amounts which a payor bank remits on a forged indorsement are not proceeds of the instrument.

**(2)** Banks and Banking §
160--Collections--Payment of Forged Drafts--Suing Collecting Bank as Ratification of Collection.
The true owner, in bringing an action against a col-lecting bank for conversion of a check collected on a forged indorsement, ratifies the collection of the proceeds from the payor bank. The ratification transmutes the remittance of funds by the payor bank into an authorized act for which it may debit its customer's account. Ratification of collection, however, does not constitute ratification of the col-lecting bank's delivery of the proceeds to the wrong person.

**(3)** Banks and Banking § 155--Collections--Status and Authority of Bank.
The amounts a collecting bank remits to a person who transfers to the bank a check bearing a forged indorsement do not constitute the proceeds of the instrument. The collecting bank is initially an agent of the person who delivers the instrument to that bank for collection. When, however, the bank re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
(Cite as: 9 Cal.3d 371)

ceives a final statement for an item it has forwarded for collection, the agency status, in the absence of a mutual agreement to the contrary, typically ends, and the bank becomes a mere debtor of its customer. As a mere debtor, it becomes entitled to use the proceeds as its own, and where the proceeds are completely merged with the bank's own funds, the bank retains the proceeds even though amounts set forth in the instruments, in the bank's own money, were remitted on a forged indorsement to the forger. And in the absence of a diminution in the amount of cash on hand below the amount of the claimant's money which has been mingled with the fund, the money received by the bank is traceable by the proper claimant into those funds.

**(4)    Banks    and    Banking    §**
**160--Collections--Payment of Forged Drafts-- Liabilities of Collecting and Payor Banks.**
A payor bank is, in effect, strictly liable to the true owner if it pays an instrument on a forged indorsement. The collecting banks are, in turn, strictly liable to the payor bank for breach of warranty of good title.

**(5)    Negotiable    Instruments    §**
**41--Defenses--Applicability of Statute Restricting Liability for Conversion.**
In the ordinary bank collection transaction, the collecting bank and its customer have tacitly agreed that a debtor-creditor relationship will emerge on collection. However, the ordinary agency transaction gives rise to no debt when the agent receives funds intended for the principal. Where the true agent remits the amount of an instrument to his customer, the agent actually does part with the proceeds, and it is this kind of a situation, rather than the typical bank collection transaction, to which Com. Code, § 3419, subd. (3), limiting liability for conversion of an instrument, appears to be addressed.

**(6)** Negotiable Instruments § 135--Payment to Holder as Effecting Discharge.
Plaintiffs, the true owners of instruments which had been collected and paid on forged indorsements to

the alleged forger, a person employed as secretary by one of the plaintiffs, although entitled to recover from the collecting banks for the amount received by those banks prior to a certain date, were precluded from recovering from such banks for conversion of instruments received after such date, where evidence established that, among other things, plaintiffs' negligence in supervision of the secretary in the face of knowledge of her financial difficulties and gambling propensity substantially contributed to the conversion of such instruments, and was sufficient to estop plaintiffs from denying that the banks had been discharged by payment to a holder.

**(7)** Banks and Banking § 160--Ratification of Collection on Forged Endorsement as Validating Payor Bank's Remission.
The ratification of collection of negotiable instruments collected and paid on a forged indorsement resulting from the true owner's action against the collecting banks for conversion retroactively validates the payor bank's remission of proceeds and provides the payor bank with a defense to the action.

**(8)** Banks and Banking § 160--Payment of Forged Drafts--Effect of Statute Where Collection Not Ratified.
Even assuming that Com. Code, § 3419, subd. (3), limiting recovery for conversion to the amount of proceeds remaining in the bank's hands, applies to payor banks, it would afford them no protection in the true owner's action against them for conversion arising out of the collection and payment of a negotiable instrument on a forged indorsement, where the true owner does not ratify the collection.

**(9)** Banks and Banking § 160--Payment of Forged Drafts--Effect of True Owner's Negligence.
A payor bank was not liable with respect to checks involving no ratification of collection paid on a forged indorsement, where it appeared that, among other things, the bank acted in good faith and in accordance with reasonable commercial standards, and that the true owners' negligence substantially

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
**(Cite as: 9 Cal.3d 371)**

Page 3

contributed to the forgery.
[See **Cal.Jur.2d, Rev.,** Banks, § 166.]

COUNSEL
Stell & Levine and Arthur S. Levine for Plaintiffs
and Appellants.
Ernest S. Gould, Robert F. Strange, Cosgrove,
Cramer, Rindge & Barnum and L. P. McElhaney
for Defendants and Respondents.
**MOSK, J.**
We here consider the rights of the true owner of a
negotiable instrument which has been collected and
paid on a forged indorsement. The question has not
previously arisen in this state under the Uniform
Commercial Code, and has seldom been addressed
in other jurisdictions. [FN1] *375

> FN1 The only case directly on point with
> respect to the liability of a collecting bank
> to the true owner appears to be *Ervin v.
> Dauphin Deposit Trust Co.* (Pa. Ct. of
> Com. Pls. 1965) 38 Pa.D.&C.2d 473 [3
> U.C.C.Rep. 311]. This case has received
> considerable attention from commentators;
> see, e.g., Advanced ALI-ABA Course of
> Study on Banking and Secured Transac-
> tions under the Uniform Commercial Code
> (ALI 1968) pages 54-57 (dialogue between
> Prof. E. Allan Farnsworth and Fairfax
> Leary, Jr.); Bailey, The Law of Bank
> Checks (4th ed. 1969) section 15.14, pages
> 496-501; Clark & Squillante, The Law of
> Bank Deposits, Collections and Credit
> Cards (1970) pages 141-147. The *Ervin*
> case appears to reach the same conclusion
> expressed herein. In *Harry H. White Lbr.
> Co. v. Crocker-Citizens Nat. Bk.* (1967)
> 253 Cal.App.2d 368, 376 [61 Cal.Rptr.
> 381], the court held that the true owner of
> an instrument has a cause of action against
> the collecting bank under the code, but did
> not deal with the bank's possible defenses.
> The court stated, however, that the code
> appeared not to change pre-existing Cali-
> fornia law with respect to the liability of

collecting banks. See also *Salsman v. Na-
tional Community Bank of Rutherford*
(1968) 102 N.J.Super. 482 [246 A.2d 162],
which held a collecting bank liable on the
ground it had violated reasonable commer-
cial standards. *Federal Dep. Ins. Corp. v.
Marine Nat. Bank of Jacksonville* (5th Cir.
1970) 431 F.2d 341 and *Belmar Trucking
Corp. v. American Trust Co.* (N.Y.Civ.Ct.
1970) 8 U.C.C. Rep. 73, were decided on
the same basis. Except for the *Ervin* case,
these decisions do not discuss the issue of
whether the collecting bank retains the
proceeds of the instrument. See also *Stone
& Webster Eng. Corp. v. First National B.
& T. Co.* (1962) 345 Mass. 1 [184 N.E.2d
358, 99 A.L.R.2d 628] (action by drawer
against collecting bank denied). There ap-
pear to be no cases discussing in detail the
right of the true owner to recover from the
payor bank under the Uniform Commercial
Code; in the *Ervin* case, however, such an
action was upheld on demurrer. (See An-
not: Construction and Effect of U.C.C. Art.
3, Dealing With Commercial Paper, 23
A.L.R.3d 932, 1002-1004.)

The record recounts a typical tale of forgery.
Plaintiff Joseph Stell, an attorney, employed one
Bernice Ruff as a secretary and bookkeeper. During
a period of approximately a year and one-half Ruff
purloined some 29 checks intended for Stell and
forged the necessary indorsements thereon. [FN2] She
cashed some of these checks at defendants Union
Bank and Crocker Citizens National Bank and de-
posited the remainder (except one that was cashed
elsewhere) to her personal account at the latter
bank. The entire amount of such deposits was sub-
sequently withdrawn by Ruff prior to discovery of
the forgeries. Certain of the checks were forwarded
to and paid by defendants Crocker Citizens Nation-
al Bank, Security First National Bank, and First
Western Bank and Trust Company; the remainder
were drawn on payors who are not parties to this
action.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609

9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209

(Cite as: 9 Cal.3d 371)

Page 4

FN2 Twenty-one of the checks were made out to Stell. Of these, one was intended for Stell personally, fourteen were intended for a joint venture of which Stell and the other plaintiffs were members, and six were intended for a receivership of which Stell was receiver. The remaining eight instruments were made out in the name of and intended for one Rebecca Smithson, one of Stell's clients. Stell has been assigned the rights of the receivership and of Rebecca Smithson.

Stell and his partners bring this action in conversion against both the collecting and the payor banks to recover the amounts of the instruments handled by them on the forged indorsements. The critical California Commercial Code provision [FN3] is section 3419 which establishes that "(1) An instrument is converted when ... (c) It is paid on a forged indorsement." Notwithstanding this language, the superior court denied recovery on the basis of section 3419, subdivision (3), which provides: "(3) Subject to the provisions of this code concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands."

FN3 All code references are to the California Commercial Code unless otherwise indicated.

The court concluded that all defendants in the case, including payor *376 as well as collecting banks, qualified as representatives, had acted in good faith and in accordance with reasonable commercial standards, and had no proceeds remaining in their hands. Thus defendants were held immune from liability. The court also found that plaintiffs had been negligent in failing to discover Ruff's defalcations

by April 1, 1966, approximately six months following their commencement, and that such negligence substantially contributed to the making of the subsequent forged indorsements. On this additional basis it held plaintiffs were "precluded from asserting such forgeries or lack of authorized signatures against any of the respective Defendants herein on checks presented after April 1, 1966."

We hold that the trial court relied on an erroneous interpretation of section 3419 and that therefore the judgment must be reversed in part. Inasmuch as collecting banks and payor banks raise distinctive issues under section 3419, the application of this section to the two categories of banks will be discussed separately.

*Collecting Banks*

It is clear, excluding for the moment the issue of plaintiffs' negligence, that defendant collecting banks are liable for conversion unless they can establish a defense under section 3419, subdivision (3). A careful study of this provision, however, reveals no possible defense in this case after it becomes evident that the court below erroneously held defendant collecting banks had parted with the proceeds of the fraudulently indorsed instruments. The code, unfortunately, fails to define the word "proceeds" in the context of bank collection. Therefore, to fully comprehend the code section we must examine the concept of proceeds as it was understood prior to enactment of the code and to general theory of bank collection found elsewhere in the code and in other parts of the law. [FN4]

FN4 For an extensive discussion of the history of legal treatment of forged indorsements and the environment from which the Uniform Commercial Code provisions grew, see Kessler, *Forged Indorsements* (1938) 47 Yale L.J. 863.

Whether defendant depository banks have any proceeds of the fraudulently indorsed checks remain-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
(Cite as: 9 Cal.3d 371)

ing in their hands is resolved through a bifurcated inquiry: first, did they receive any proceeds and second, have they parted with any proceeds they may have received? Each of these queries is more complex than superficially appears. A collecting bank obviously does not receive any proceeds of an instrument unless such proceeds are forwarded to it from a payor bank. (1) Under the dominant theory of bank collection that preexisted the code and which the code has left unchanged, however, the amounts a payor bank remits on *377 a forged indorsement are not considered the proceeds of the instrument. The explanation for this result lies in the relationship between a payor bank and its customer, the depositor-drawer. The relationship is one of debtor and creditor: the bank is indebted to the customer and promises to debit his account only at his direction. If the bank pays, on an instrument drawn by its customer, any person other than the designated payee or a person to whom the instrument is negotiated, the bank's indebtedness to the customer is not diminished. If the bank does debit the customer's account, the customer can compel the bank to recredit the sum. Inasmuch as the full amount of the instrument remains in the account of the drawer when the bank pays on a forged indorsement, the bank manifestly does not part with the proceeds of the instrument but merely remits other funds from its own account. [FN5]

> FN5 "The general rule must be conceded that the undertaking of a bank is to pay out the depositor's money only on the order of the depositor and in accordance with that order. If it pays out money on a check drawn to order, ... upon a forged indorsement of the payee's name, it has not paid in accordance with the depositor's order, and in the absence of anything further, has no right to charge such payment against the depositor's account." (*Los Angeles Inv. Co. v. Home Sav. Bank* (1919) 180 Cal. 601, 604 [182 P. 293, 5 A.L.R. 1193]; see Britton, Bills and Notes (2d ed. 1961) § 142, pp. 406-407, § 147, p. 422; 10 Am.Jur.2d,

Banks, §§ 622, 623, pp. 586-589; Johnson & Parachini, *Forged Indorsements and Conflict of Laws* (1965) 82 Banking L.J. 95; see also cases cited in Beutel, Brannan's Negotiable Instruments Law (7th ed. 1948) § 23, pp. 445-447.) It appears that nothing in the Uniform Commercial Code changes this relationship between a bank and its depositor. It is consequently preserved by section 1103, which provides: "Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

(2) General bank collection theory also instructs us that the true owner, in bringing an action against a collecting bank for conversion of a check collected on a forged indorsement, is deemed to have ratified the collection of the proceeds from the payor bank. This ratification transmutes the remittance of funds by the payor bank into an authorized act for which it may debit its customer's account. [FN6] In the case at bar, it appears that plaintiffs' action against defendant collecting banks constitutes such a ratification, *378 and these banks, therefore, must be considered to have received the proceeds of the instruments.

> FN6 Although courts have employed various theories in holding collecting banks liable, the theory of ratification appears to have dominated. (See *Mackey-Woodard, Inc.* v. *Citizens State Bank* (1966) 197 Kan. 536 [419 P.2d 847, 853-854]; *United States Port. Cement Co.* v. *United States Nat. Bank* (1916) 61 Colo. 334 [157 P. 202]; *Independent Oil Men's Ass'n* v. *Fort Dearborn Nat. Bank* (1924) 311 Ill. 278 [142 N.E. 458, 459]; Britton, Bills and Notes (1961) *supra*, § 147, pp. 422-424.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
(Cite as: 9 Cal.3d 371)

The ratification doctrine has been firmly established in the law of California; see *Morgan v. Morgan* (1963) 220 Cal.App.2d 665, 678 [34 Cal.Rptr. 82]; *Jones v. Bank of America* (1942) 49 Cal.App.2d 115, 121-122 [121 P.2d 94]; *George v. Security Trust and Savings Bank* (1928) 91 Cal.App. 708 [267 P. 560].

Ratification of collection, however, does not constitute a ratification of the collecting banks' delivery of the proceeds to the wrong person. The dominant pre-code law established, on the contrary, that the proceeds were held, after collection by the collecting bank, for the benefit of the true owner. [FN7](3) Again resorting to general banking theory, we find that the amounts a collecting bank remits to a person who transfers to the bank a check bearing a forged indorsement do not constitute the proceeds of the instrument. This result is quite clear in the case of an instrument cashed over the counter. At the time the bank takes such an instrument it has obviously not made any prior collection and, thus, has nothing that could be considered proceeds. The money paid over the counter is, consequently, the bank's own money. Upon collection of the instrument, the proceeds become merged with the bank's general funds and are therefore retained by the bank. (See Advanced ALI-ABA Course of Study on Banking and Secured Transactions under the Uniform Commercial Code (ALI 1968) *supra*, p. 56.)

> [FN7] See authorities cited in footnote 6, *supra*.

A bank that accepts an instrument for deposit likewise ultimately retains the proceeds of that instrument. Such a bank is initially considered to be an agent of the person who delivers the instrument to it for collection. When, however, the bank receives a final settlement for an item it has forwarded for collection, the agency status typically ends, and the bank becomes a mere debtor of its customer. As a mere debtor, it becomes entitled to use the proceeds as its own. [FN8]

> [FN8] See 5 Scott on Trusts (3d ed. 1967) section 534, pages 3712-3718.

The foregoing view was expressed by Justice Cardozo for the United States Supreme Court in the following terms: "Whether a fiduciary relation continues even afterwards [when the collecting bank has completed the business of collection] upon the theory that the proceeds of the collection until remitted to the forwarder are subject to a trust, depends upon the circumstances. In the absence of tokens of a contrary intention, the better doctrine is, where the common law prevails, that the agency of the collecting bank is brought to an end by the collection of the paper, the bank from then on being in the position of a debtor, with the liberty, like debtors generally, to use the proceeds as its own." (*Jennings* v. *U.S.F. & G. Co.* (1935) 294 U.S. 216, 219 [79 L.Ed. 869, 872, 55 S.Ct. 394, 99 A.L.R. 1248].) [FN9] *379

> [FN9] We disagree, however, with any implication that might be read into *Jennings* that the collecting bank does not receive the proceeds of the instrument for the purpose of section 3419 when the instrument is collected through a clearing house and the proceeds are used to offset liabilities of the collecting bank.

It is significant that the Commercial Code does not make a collecting bank accountable to its customer for the *proceeds* of an instrument but only for "the *amount* of the item." (§ 4213, subd. (3); italics added.) Justice Cardozo's conception of the post-collection status of collecting banks is clearly preserved: "[I]f a collecting bank receives a settlement for an item which is or becomes final, the bank is accountable to its customer for the amount of the item. One means of accounting is to remit to its customer the amount it has received on the item. If previously it gave to its customer a provisional credit for the item in an account its receipt of final settlement for the item 'firms up' this provisional credit and makes it final. When this credit given by it so becomes final, in the usual case *its agency*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
**(Cite as: 9 Cal.3d 371)**

Page 7

*status terminates and it becomes a debtor to its customer for the amount of the item.*" (§ 4213, com. 9; italics added.)

As suggested by Justice Cardozo, the parties can by mutual agreement extend the agency relationship until the amount of an instrument is received by the customer. Under such an agreement the proceeds would be maintained as a separate fund until paid over to the customer. [FN10]The ordinary banking transaction, however, contains no such agreement, and it is apparent that there was none in the present case. Defendant collecting banks, on the contrary, became debtors, and the proceeds of the instruments were completely merged with the banks' own funds. The effect of this commingling is that the banks retain the proceeds of the instruments even though amounts set forth in the instruments, in the banks' own money, were remitted to Ruff. This conclusion is derived by reference to the law of constructive trusts. The cases in that area establish that money received by a bank and mingled with the bank's funds is traceable by a proper claimant into those funds. This result is unaffected by withdrawals so long as the amount of the cash on hand is not diminished below the amount of the claimant's money that has been mingled with the fund. [FN11]Since it is obvious that no such severe diminution of funds occurred in the present case, defendant *380 collecting banks must be deemed to retain the proceeds of the instruments transferred by Ruff, regardless of whether those instruments were cashed or accepted for deposit. [FN12]

> FN12 *Ervin v. Dauphin Deposit Trust Co.* (1965) *supra*, 38 Pa.D.&C.2d 473 [3 U.C.C. Rep. 311, 319], arrives at this same conclusion. The court states: "When [the collecting bank] purchased or cashed the forged checks drawn on other banks it did so with its own money and then, in putting them through for collection it obtained from the drawee banks money which belongs to the plaintiff." Commentators have suggested that the *Ervin* case may stand for

the rule that the collecting bank parts with the proceeds if it accepts an instrument for deposit in an account and later pays out the money in the account but does not part with the proceeds if it cashes the instrument. (Advanced ALI-ABA Course of Study on Banking and Secured Transactions under The Uniform Commercial Code (ALI 1968) *supra*, pp. 54-57 (dialogue between Professor E. Allan Farnsworth and Fairfax Leary, Jr.); Clark & Squillante, The Law of Bank Deposits, Collections and Credit Cards (1970) pp. 143-144.) There appears to be no practical rationale for this arbitrary solution, and the *Ervin* decision clearly appears to negate it: "As far as the problem in the instant case is concerned we can find no distinction between the *cashing* of a forged check and the *accepting* of such check for deposit. ..."

FN10 Restatement Second of Agency, section 398; Seavey, The Law of Agency (1964) section 153, page 250.

FN11 Scott on Trusts, *supra*, section 540, page 3734, states: "Where the bank has mingled cash of the claimant with its own cash, it is perfectly well settled that the right of the claimant to follow his money is not lost. The mere fact that the cash of the claimant is indistinguishably mingled with the cash of the bank does not cut off the claimant's interest, but he acquires an equitable lien upon the whole of the mingled cash in the bank. This is in accordance with the general rule as to the effect of mingling funds. It is immaterial that withdrawals have been made from the cash and additions of the bank's own money have been made, so long as the amount of cash on hand is not diminished below the amount of the claimant's money which has been mingled in the fund." (3 U.C.C. Rep. at p. 315.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
(Cite as: 9 Cal.3d 371)

Page 8

Our conclusion that defendant collecting banks did not part with the proceeds of the instruments in making the various payments to Ruff is reinforced by several additional factors. To begin with, had the draftsmen of the Commercial Code intended to absolve collecting banks from liability by virtue of such payments, it seems probable they would have employed language more explicit than that of retaining or parting with proceeds. Instead, the words "for value" could have been employed. The collecting banks in this case are in a situation comparable to that of a holder in due course under the Commercial Code or a bona fide purchaser under the law of constructive trusts inasmuch as they took property and in return gave consideration to the transferor. With respect to a holder in due course or a bona fide purchaser, however, this consideration is termed "value." (§ 3302; 5 Scott on Trusts, *supra*, §§ 474-475, pp. 3454-3456.) The fact that different terminology is contained in section 3419, subdivision (3), suggests that the ambiguous language of this provision was not intended to refer to the giving of such consideration. If the draftsmen and the Legislature had intended to protect collecting banks that had merely given value for an instrument, it may be assumed they would have clearly said so.

Secondly, an examination of the law existing prior to the enactment of the Uniform Commercial Code reveals a nearly unanimous agreement among the jurisdictions that the true owner of an instrument collected on a forged indorsement could recover in a direct suit against a collecting bank even though the bank had acted in good faith and with the highest degree of care and even though it had remitted the amount of the instrument [FN13] to a prior party. [FN13]Since the rule had apparently operated satisfactorily, there is no reason to believe the code draftsmen or the Legislature would have wished to modify it to make direct suits extremely difficult. (4) As discussed below, the payor bank is in effect strictly liable to the true owner if it pays an instrument on a forged indorsement. The collecting banks that handled the instrument for collection are, in turn, strictly liable to the payor bank for breach of

warranty of good title. (§ 4207.) [FN14]Because liability ultimately rests with the first collecting bank, it is unlikely that such a bank was intended to have a ready defense in a direct suit by the true owner. Requiring cumbersome and uneconomical circuity of action *382 to achieve an identical result would obviously run contra the code's explicit underlying purposes "to simplify, clarify and modernize the law governing commercial transactions." (§ 1102, subd. (2) (a).)

FN13 "The vast majority of cases in this country hold, in the absence of negligence, laches or estoppel, that a collecting bank which cashes a check on a forged or unauthorized indorsement of the payee, and procures the proceeds thereof from the drawee, is liable to the payee who is the true owner of the check." (*Mackey-Woodard, Inc. v. Citizens State Bank* (1966) *supra*, 419 P.2d 847, 852.)See, e.g., *Morgan v. Morgan* (1963) *supra*, 220 Cal.App.2d 665, 677;*Jones v. Bank of America* (1942) *supra*, 49 Cal.App.2d 115, 122;*George v. Security Trust and Savings Bank* (1928) *supra*, 91 Cal.App. 708;*Henderson v. Lincoln Rochester Trust Co.* (1951) 303 N. Y. 27 [100 N.E.2d 117, 119-120]; *Independent Oil Men's Ass'n v. Fort Dearborn Nat. Bank* (1924) *supra*, 311 Ill. 278 [142 N.E. 458, 459]; *Gresham State Bank v. O and K Construction Co.* (1962) 231 Ore. 106 [370 P.2d 726, 729, 100 A.L.R.2d 654]; *United States Port. Cement Co. v. United States Nat. Bank* (1916) *supra*, 61 Colo. 334 [157 P. 202]. See Annotation: Right of check owner to recover against one cashing it on forged or unauthorized indorsement and procuring payment by drawee, 100 A.L.R.2d 670;10 Am.Jur.2d, Banks, section 632, pages 599-600. The leading case reaching a result that opposed the general rule (*Tibby Bros. Glass Co. v. Farmers' and Mechanics' Bank* (1908) 220 Pa. 1 [69 A. 280])

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
(Cite as: 9 Cal.3d 371)

was expressly overruled in a subsequent decision (*Lindsley v. First Nat. Bank of Philadelphia* (1937) 325 Pa. 393 [190 A. 876]).

FN14 "§ 4207. [Warranties of Customer and Collecting Bank on Transfer or Presentment of Items; Time for Claims] (1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that (a) He has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has good title. ..." (§ 3417 provides for a parallel remedy against nonbank transferors of instruments.) The remedies of direct action by the true owner and of circuitous action through the payor bank are not strictly co-incident inasmuch as the payor's warranty action may be barred by his failure to act in a timely fashion. Section 4207, subdivision (4), provides: "Unless a claim for breach of warranty under this section is made within a reasonable time after the person claiming learns of the breach, the person liable is discharged to the extent of any loss caused by the delay in making claim." This proviso is of small significance with respect to forged indorsements since the forgery is rarely, if ever, discovered soon enough to prevent loss. The fact that the direct action and the circuitous action might result in different allocation of liability in one improbable situation appears insufficient to justify the diseconomy and injustice created by circuitous action. Moreover, assuming the payor bank failed to make a timely claim to the collecting bank, which failure proximately resulted in the collecting bank's payment of the amount of an instrument on a forged indorsement, and that the true owner re-

covered from the collecting bank in a direct action, it would appear that the collecting bank should be able to recover its loss from the payor bank, if not under the code, in an action for common law negligence or in a suit in equity to prevent unjust impoverishment.

Such a modification would also create a significant potential for injustice. In cases involving forged indorsements collecting banks are generally the most feasible defendants. A forger typically transfers instruments bearing forged indorsements to only one or two banks for collection. Often the banks are located near the true owner. Thus it would be practical for him to bring a suit against such banks. The payors, by contrast, may be situated in many and distant states or in foreign countries, and the drawers may be equally geographically diverse. Even though the collecting banks would be ultimately liable after initial suits were brought in all the various fora, the expense and difficulty of bringing such suits would have the actual effect of freeing the collecting banks from any responsibility. The true owner would be required to shoulder the loss that should have been that of the banks; thus the banks would receive a windfall. That section 3419, subdivision (3), was intended to produce this unjust result is highly doubtful.

Had such substantial and controversial deviation from prior law been intended, moreover, it could be expected that the official commentary to section 3419 would have so stated and would have included extensive explanation of the reasons for the change. Neither the California nor the uniform comment to this section, however, contains any such discussion. The comments, on the contrary, are brief and state that section 3419, subdivision (3), is merely a codification of prior decisions (U.Com.Code, com. 5) and is entirely consistent with prior California law (Cal. com. 5).

The prior decisions to which the Uniform Commercial Code comment makes reference are presumably a line of cases primarily involving defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
(Cite as: 9 Cal.3d 371)

that had acted as investment brokers and had marketed negotiable securities, remitting the consideration received to their customers. [FN15] The relationships between the representatives and their customers in those cases appear to have been true agency relationships that did not merge into debtor-creditor relationships upon collection of the proceeds. (5) Unlike the ordinary bank collection transaction, in which the collecting bank and its customer have tacitly agreed a debtor-creditor relationship will emerge upon collection, the ordinary agency transaction gives rise to no such debt when the agent receives funds intended for the principal. Such funds, instead of being mingled, must be kept separate from the agent's own *383 funds and identified as the property of the principal. [FN16] Thus, when the true agent remits the amount of an instrument to his customer, the agent actually does part with the proceeds. It is to this kind of situation, rather than to the typical bank collection transaction, that section 3419, subdivision (3), appears to be addressed.

> FN15 E.g., *Pratt v. Higginson* (1918) 230 Mass. 256 [119 N.E. 661, 1 A.L.R. 714]; *Gruntal v. National Surety Co.* (1930) 254 N. Y. 468 [173 N.E. 682, 73 A.L.R. 1337]; *First Nat. Bank of Blairstown v. Goldberg* (1941) 340 Pa. 337 [17 A.2d 377].

> FN16 Restatement Second of Agency, section 398; Seavey, The Law of Agency (1964) section 153, page 250.

(6) Defendant collecting banks are, therefore, liable to plaintiffs for the amounts of those instruments received by them as of April 1, 1966. Plaintiffs' negligence, however, bars them from recovering for conversion of instruments received after that date. Plaintiffs do not dispute the trial court's finding that their negligence substantially contributed to the conversion of these instruments, and it appears, viewing the evidence in the light most favorable to the judgment, substantial evidence existed to justify such a finding. Stell had been retained by Ruff in 1963 because of her insolvency and because of litigation instituted against her by several creditors.

She had informed Stell at that time that her financial difficulties were primarily due to considerable gambling losses she had sustained. A short time thereafter he hired her as a secretary and bookkeeper. He exercised practically no supervision over her, never reviewed the books, and never checked the bank reconciliation of deposits on the accounts she handled. Only during an annual examination made for tax return purposes by one of Stell's partners were Ruff's records reviewed, and even then, despite the suspicious absence of an entry, her accounts were accepted without checking for accuracy or veracity.

Section 3404 provides: "Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it *or is precluded from denying it.* ..." (Italics added.) The Uniform Commercial Code comment to this section adds the following explanation: "The words 'or is precluded from denying it' are retained in subsection (1) to recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that the signature is genuine; *and to recognize the negligence which precludes a denial of the signature.*" (§ 3404, U.Com.Code, com. 4; italics added.) The preclusion language of section 3404 is essentially the same as that of section 23 of the Negotiable Instruments Law (former § 3104 of the Civ. Code). This language had been interpreted to provide for equitable estoppel in order to avoid an unconscionable result. [FN17] We conclude that the doctrine *384 must be invoked in the present case. Plaintiffs' negligent failure to discover Ruff's patent defalcations was directly responsible for defendant depositary banks' detrimental change of position in paying Ruff the amount of the instruments. Defendants acted entirely in good faith, and, though their conduct with respect to certain of the instruments may have fallen somewhat below reasonable commercial standards, it was not sufficiently egregious to shift the balance of the scales in plaintiffs' favor.

> FN17 See Beutel, Brannan's Negotiable In-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
(Cite as: 9 Cal.3d 371)

struments Law (7th ed. 1948) section 23, pages 455-464; Britton, Bills and Notes (2d ed. 1961) section 128, pages 343-344. See also Annot.: Payee's prior negligence facilitating forging of indorsement as precluding recovery from bank paying check, 87 A.L.R.2d 638; Annot: When depositor-drawer of check is "precluded," under Negotiable Instruments Law, § 23, from setting up forgery of indorsement or want of authority against drawee bank, 39 A.L.R.2d 641.

For the purposes of this case, therefore, plaintiffs are precluded from denying the forged signatures are operative indorsements. Ruff is then deemed to be a "holder," which the code defines as "a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank." (§ 1201, subd. (20).) Good faith payment or satisfaction to the holder of an instrument discharges a party to the extent of his payment or satisfaction, even though the holder may have acquired the instrument by theft. (§ 3603, subd. (1).) Defendant collecting banks are thus discharged on the instruments received by them after April 1, 1966.

*Payor Banks*

(7)All but three of the instruments paid by defendant payor banks had been transferred for collection by collecting banks that are also parties to this suit. As indicated above, plaintiffs ratified the collection of these instruments by bringing this action against the collecting banks. This ratification retroactively validates the payor banks' remission of proceeds and provides a defense to an action for conversion. With respect to these instruments, therefore, no liability exists as to any payor bank. Two of the instruments on which this action is based, however, were presented by Ruff directly to the payor, Crocker Bank. The one remaining instrument was collected through banks that are not parties to this action and was also paid by Crocker. With respect to these three instruments no ratification occurred, and we must therefore consider whether Crocker is liable for their conversion.

(8)The conclusion of the court below that section 3419, subdivision (3), shields defendant payor banks from liability is erroneous. [FN18]Even if *385 we assume arguendo that section 3419, subdivision (3), was intended to apply to payor banks, the provision would afford them no protection in cases such as this. As we stated above, the amounts a payor bank transfers to a collecting bank on a forged indorsement do not constitute the proceeds of the instrument, unless the true owner ratifies the collection. It follows that, absent such ratification, the proceeds remain in the hands of the payor bank. The payor bank is, consequently, liable for the full amount of the instrument notwithstanding section 3419, subdivision (3).

> FN18 It appears clear that section 3419, subdivision (3), was not intended to apply to nondepositary payor banks. The fact that the provision expressly includes depositary and collecting banks but does not mention payor banks creates a strong negative inference in this regard. The applicability of the term "representative" to nondepositary payor banks is also doubtful. It is significant that the extensive commentary on section 3419 by numerous experts in the law of commercial paper apparently does not contain a single suggestion that the defense of section 3419, subdivision (3), is available to nondepositary payor banks. Some commentators have declared outright that the defense is not available. (E.g., 6C Willier & Hart, U.C.C. Reporter-Digest, § 3-419, A2; *Allocation of Losses from Check Forgeries Under the Law of Negotiable Instruments and The Uniform Commercial Code* (1953) 62 Yale L.J. 417, 471.)Others arrive at the same conclusion by implication in discussing the defense

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
(Cite as: 9 Cal.3d 371)

only in the context of depositary and collecting banks. (E.g., Advanced ALI-ABA Course of Study on Banking and Secured Transactions Under the Uniform Commercial Code (ALI 1968) p. 64; Bailey, The Law of Bank Checks (4th ed. 1969) § 15.14, pp. 496-501; Clark & Squillante, The Law of Bank Deposits, Collections and Credit Cards (1970) pp. 141-147; Cosway, *Negotiable Instruments - A Comparison of Washington Law and the Uniform Commercial Code* (1968) 43 Wash.L.Rev. 499, 543; 2 New York Law Revision Commission Study of the Uniform Commercial Code (1955) p. 1079; O'Malley, *Common Check Frauds and the Uniform Commercial Code* (1969) 23 Rutgers L.Rev. 189, 231.)

It is not now necessary for us to undertake an extensive analysis of the applicability of section 3419, subdivision (3), to payor banks. (9) Inasmuch as the three instruments that concern us were all transferred by Ruff after April 1, 1966, plaintiffs' negligence stands as a bar to recovery. Section 3406 states that "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

The record contains substantial evidence to support the trial court's finding that Crocker acted in good faith and in accordance with reasonable commercial standards in handling the three instruments. Ruff held an account with Crocker, and at the time the account was opened, she had been introduced to the bank by one of its established customers. Nothing on the face of the instruments would have led the bank to suspect they were irregular in any way. A single branch of a large bank, as the testimony indicated, may handle several thousand instruments bearing third *386 party indorsements in a single day. Considering this burden, it would be commercially unreasonable to expect payor banks to undertake foolproof efforts to verify ostensibly valid indorsements. Crocker's diligence with respect to the check received through bank collection channels is, of course, particularly evident, inasmuch as Crocker apparently received the instrument with all prior indorsements guaranteed by the collecting banks. Having acted in good faith and in accordance with reasonable commercial standards, Crocker is therefore entitled to invoke the defense of section 3406. FN19

> FN19 We find no merit to plaintiffs' additional contention that the findings of the trial court were insufficiently specific to support the judgment in that the court failed to state precisely what procedures constitute reasonable commercial practices. After outlining the procedures defendant banks had followed, the court concluded that they had acted in accordance with reasonable commercial standards. These findings are sufficient under Code of Civil Procedure section 634 to assure adequate review of the trial court decision. (*Whitney Inv. Co.* v. *Westview Dev. Co.* (1969) 273 Cal.App.2d 594, 604 [78 Cal.Rptr. 302].)

## Conclusion

We conclude that defendant collecting banks are liable for the amount of any instrument received by them prior to April 1, 1966. The record reveals that only 7 of the 23 misappropriated checks were received by that date, and each of them was taken for collection by defendant Union Bank. The total amount of these seven checks is $2,791.11. The judgment is therefore reversed with directions to enter judgment against Union for $2,791.11 plus the appropriate interest due on the amounts of each of the seven checks. With respect to the other defendants the judgment is affirmed. The parties shall

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

507 P.2d 609
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209
**(Cite as: 9 Cal.3d 371)**

bear their own costs on appeal.

Wright, C. J., McComb, J., Tobriner, J., Burke, J., Sullivan, J., and Files, J., [FN*] concurred.

    FN* Assigned by the Chairman of the Judicial Council.

Appellants' petition for a rehearing was denied April 19, 1973. *387

Cal.
Cooper v. Union Bank
9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1, 12 UCC Rep.Serv. 209

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**8**

Westlaw.

27 P.3d 702
Page 1
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

▷

BRIAN J. DONOVAN, Plaintiff and Appellant, v.
RRL CORPORATION, Defendant and Respondent.
Cal. 2001.

BRIAN J. DONOVAN, Plaintiff and Appellant,
v.
RRL CORPORATION, Defendant and Respondent.
**No. S082570.**

Supreme Court of California
July 30, 2001.

SUMMARY

An automobile dealer advertised a used automobile for sale in a newspaper, but, because of typographical and proofreading errors made by the newspaper, the advertisement listed a price ($25,995) that was significantly less than the intended sales price ($37,995). An individual read the advertisement and, after examining the vehicle, attempted to purchase it by tendering the advertised price. The dealer refused to sell the automobile at that price, and the individual brought an action against the dealer for breach of contract. The trial court entered judgment for defendant on the ground that the mistake in the advertisement precluded the existence of a contract. (Municipal Court of the Harbor Judicial District, Orange County, No. 97HC2268, Christopher W. Strople, Judge.) The Court of Appeal, Fourth Dist., Div. Three, No. G024997, reversed.

The Supreme Court reversed the judgment of the Court of Appeal. The court held that a contract satisfying the statute of frauds arose from defendant's advertisement and plaintiff's tender of the advertised price, but that defendant's unilateral mistake of fact provided a basis for rescinding the contract. Although Veh. Code, § 11713.1, subd. (e), justifies a reasonable expectation on the part of consumers that an automobile dealer intends that such an advertisement constitute an offer, and that the offer can be accepted by paying the advertised price, the statute did not supplant governing common law

principles authorizing rescission of a contract on the ground of mistake. Rescission was warranted here because the evidence established that defendant's unilateral mistake of fact was made in good faith, defendant did not bear the risk of the mistake, and enforcement of the contract with the erroneous price would be unconscionable. (Opinion by George, C. J., with Kennard, Chin, and Brown, JJ., concurring. Dissenting opinion by Werdegar, J., with Baxter, J., concurring (see p. 294).)

HEADNOTES

Classified to California Digest of Official Reports

(1) Contracts § 4--Consent--Sufficiency--Offer.
An essential element of any contract is the consent of the parties, or mutual assent. Mutual assent usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror. An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that assent to that bargain is invited and will conclude it. The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances. The objective manifestation of the party's assent ordinarily controls, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer.
[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 119, 128.]
(2)                  Contracts                §
4--Consent--Sufficiency--Offer--Newspaper Advertisement-- Mistake in Price:Automobiles and Highway Traffic § 20--Sales.
In a breach of contract action by a prospective automobile purchaser against a dealer who refused to sell plaintiff a particular automobile at the advertised price because of a mistake in the price listed in a newspaper advertisement, the trial court's conclu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

Page 2

sion that defendant's advertisement did not consti-
tute an offer because the erroneous price stated was
the result of a good faith mistake, was error. Be-
cause the existence of an offer depended upon an
objective interpretation of defendant's assent as re-
flected in the advertisement, the mistaken price (not
reasonably known to plaintiff to be a mistake) was
irrelevant in determining the threshold question
whether the advertisement constituted an offer. In
this situation, mistake instead properly would be
considered in deciding whether a contract resulted
from the acceptance of an offer containing mistaken
terms, or whether any such contract could be
voided or rescinded.

(3) Contracts §
4--Consent--Sufficiency--Offer--Newspaper Ad-
vertisement by Licensed Dealer:Automobiles and
Highway Traffic § 20--Sales.
A licensed automobile dealer's advertisement for
the sale of a particular vehicle at a specific price-
when construed in light of Veh. Code, § 11713.1,
subd. (e) (duty to sell a vehicle to any person at the
advertised price)-reasonably justifies a consumer's
understanding that the dealer intends the advertise-
ment to constitute an offer and that the consumer's
assent to the bargain is invited and will conclude it.
It is immaterial that dealers are required by statute
to prepare a written contract when selling a vehicle.
The dealer's printed name in the advertisement
evidences an intention to authenticate the advertise-
ment as an offer and therefore constitutes a signa-
ture satisfying the statute of frauds (Cal. U. Com.
Code, § 2201, subd. (38)).
[See 1 Witkin, Summary of Cal. Law (9th ed. 1987)
Contracts, §§ 188, 281.]
(4) Contracts § 39--Alteration and Extinction-
-Rescission--Sufficiency of Notice:Automobiles
and Highway Traffic § 20--Sales.
It is not necessary to the rescission of a contract
that the notice to rescind be formal and explicit; it
is sufficient that notice be given to the other party
which clearly shows the intention of the person res-
cinding to consider the contract at an end. Thus, a
car dealer gave sufficient notice of its intent to res-

cind a contract with a prospective purchaser who
tendered an amount based on a mistake in a news-
paper advertisement, when defendant informed
plaintiff of the mistake in the advertisement, re-
fused to perform, and offered to compensate
plaintiff for his time and expenses.

(5) Contracts § 5--Consent--Effect of Mistake-
-Mistake of Fact--What Constitutes:Automobiles
and Highway Traffic § 20--Sales.
On appeal from a judgment for the purchaser, in a
breach of contract action by a prospective auto-
mobile purchaser against a dealer who refused to
sell plaintiff a particular automobile at the advert-
ised price because of a mistake in the price listed in
a newspaper advertisement, the Court of Appeal
erred in determining that defendant's mistake did
not constitute a mistake of fact within the meaning
of Civ. Code, § 1577, and in finding that a unilater-
al misinterpretation of contractual terms, without
knowledge by the other party at the time of con-
tract, does not constitute a mistake. Defendant's
mistake did not consist of a subjective misinterpret-
ation of a contract term, but rather resulted from an
unconscious ignorance that the advertisement set
forth an incorrect price for the automobile. The
Rest.2d Contracts, § 153, subd. (a), consistent with
California law, authorizes rescission for a unilateral
mistake of fact where the effect of the mistake is
such that enforcement of the contract would be un-
conscionable.

(6) Contracts § 39--Alteration and Extinction-
-Rescission--Mistake of Fact--Conditions.
Where a plaintiff has no reason to know of and
does not cause the defendant's unilateral mistake of
fact, the defendant must establish the following
facts to obtain rescission of a contract: (1) the de-
fendant made a mistake regarding a basic assump-
tion upon which the defendant made the contract;
(2) the mistake has a material effect upon the
agreed exchange of performances that is adverse to
the defendant; (3) the defendant does not bear the
risk of the mistake; and (4) the effect of the mistake
is such that enforcement of the contract would be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

Page 3

unconscionable.
[See 1 Witkin, Summary of Cal. Law (9th ed. 1987)
Contracts, § 370.]
(7) Contracts § 5--Consent--Effect of Mistake-
-Mistake of Fact-- Materiality--Price:Automobiles
and Highway Traffic § 20--Sales.
Where rescission of a contract is sought, a signific-
ant error in the price term of the contract constitutes
a mistake regarding a basic assumption upon which
the contract is made, and such a mistake ordinarily
has a material effect adverse to the mistaken party.
In establishing a material mistake regarding a basic
assumption of the contract, the party must show
that the resulting imbalance in the agreed exchange
is so severe that it would be unfair to require that
party to perform. Ordinarily, a party can satisfy this
requirement by showing that the exchange not only
is less desirable for the party, but also is more ad-
vantageous to the other party. Thus, in a contract
for the sale of a car, the mistaken advertised price
of $25,995, which would require an auto dealer to
sell the vehicle to the buyer for $12,000 less than
the intended advertised price of $37,995-an error
amounting to 32 percent of the price the dealer in-
tended-constituted a material mistake regarding a
basic assumption on which the dealer made the con-
tract.

(8) Contracts § 5--Consent--Effect of Mistake-
-Mistake of Fact--Allocation of Risk:Automobiles
and Highway Traffic § 20--Sales.
In a breach of contract action by a prospective auto-
mobile purchaser against a dealer who refused to
sell plaintiff a particular automobile at the advert-
ised price because of a mistake in the price listed in
a newspaper advertisement, it was not reasonable
under the circumstances to allocate to defendant the
risk of the mistake in the advertisement, under Civ.
Code, § 1577, which provides that the risk of a mis-
take must be allocated to a party where the mistake
results from that party's neglect of a legal duty. A
negligent violation of any duty imposed by Veh.
Code, § 11713.1, subd. (e) (duty to sell a vehicle to
any person at the advertised price), did not consti-
tute the neglect of a legal duty or a sufficient basis

for denying defendant equitable relief for its good
faith mistake. Also, Veh. Code, § 11713.1, subd.
(e), does not eliminate mistake as a common law
ground for rescission of the contract.

(9) Contracts § 5--Consent--Effect of Mistake-
-Mistake of Fact--Good Faith:Automobiles and
Highway Traffic § 20--Sales.
In a breach of contract action by a prospective auto-
mobile purchaser against a dealer who refused to
sell plaintiff a particular automobile at the advert-
ised price because of a mistake in the price listed in
a newspaper advertisement, the trial court's finding
that the mistake was made in good faith was sup-
ported by the evidence. No evidence suggested that
defendant knew of the mistake before plaintiff at-
tempted to purchase the automobile, that defendant
intended to mislead customers, or that it had adop-
ted a practice of deliberate indifference regarding
errors in advertisements. Defendant's fault con-
sisted of failing to review a proof sheet reflecting a
change made two days before the actual advertise-
ment appeared-choosing instead to rely upon the
newspaper's advertising staff to proofread the re-
vised version. Although such an omission might
constitute negligence, it did not involve a breach of
defendant's duty of good faith and fair dealing that
would preclude equitable relief for mistake.

(10a, 10b) Contracts § 39--Alteration and Extinc-
tion--Rescission-- Mistake--When Enforcement Un-
conscionable--Price of Advertised Car:Automobiles
and Highway Traffic § 20--Sales.
In a breach of contract action by a prospective auto-
mobile purchaser against a dealer who refused to
sell plaintiff a particular automobile at the advert-
ised price because of a mistake in the price listed in
a newspaper advertisement, defendant established,
in support of rescission of the contract based upon
mistake, that enforcement of the contract for the
sale of the advertised car at the listed price of
$25,995 would be unconscionable. Enforcing the
contract with the mistaken price of $25,995 would
require defendant to sell the vehicle to plaintiff for
$12,000 less than the intended advertised price of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702                                                          Page 4
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

$37,995-an error amounting to 32 percent of the price defendant intended. Defendant subsequently sold the automobile for slightly more than the intended advertised price, suggesting that that price reflected its actual market value.

[See West's Key Number Digest, Sales k. 36.]

**(11) Contracts § 39--Alteration and Extinction--Rescission--Mistake--When Enforcement Unconscionable--Standard and Factors.**

Although the standards of unconscionability warranting rescission of a contract for mistake are similar to those for unconscionability justifying a court's refusal to enforce a contract or term, the general rule governing the latter situation is inapplicable to mistake, because unconscionability resulting from mistake does not appear at the time the contract is made. An unconscionable contract ordinarily involves both a procedural and a substantive element: (1) oppression or surprise due to unequal bargaining power, and (2) overly harsh or one-sided results. However, in ascertaining whether rescission of a contract is warranted for a unilateral mistake of fact, substantive unconscionability often will constitute the determinative factor, because the oppression and surprise ordinarily results from the mistake-not from inequality in bargaining power. Accordingly, even though the party seeking rescission is not the weaker party to the contract and its mistake did not result from unequal bargaining power, if the party was surprised by the mistake, overly harsh or one-sided results are sufficient to establish unconscionability entitling the party to rescission.

COUNSEL

Brian J. Donovan, in pro. per., for Plaintiff and Appellant.

Donald Seth; Law Offices of S. Chandler Visher, S. Chandler Visher, Marie Noel Appel; The Harris Law Firm, Aurora Dawn Harris; Law Office of William E. Kennedy and William E. Kennedy for National Association of Consumer Advocates as Amicus Curiae on behalf of Plaintiff and Appellant.

James G. Lewis for Defendant and Respondent.

Manning, Leaver, Bruder & Berberich and Halbert B. Rasmussen for California Motor Car Dealers Association as Amicus Curiae on behalf of Defendant and Respondent.

Baker & Hostetler, Glen A. Smith and Megan E. Gray for the Times Mirror Company and the California Newspaper Publishers Association as Amici Curiae on behalf of Defendant and Respondent.

GEORGE, C. J.

Defendant RRL Corporation is an automobile dealer doing business under the name Lexus of Westminster. Because of typographical and proofreading errors made by a local newspaper, defendant's advertisement listed a price for a used automobile that was significantly less *267 than the intended sales price. Plaintiff Brian J. Donovan read the advertisement and, after examining the vehicle, attempted to purchase it by tendering the advertised price. Defendant refused to sell the automobile to plaintiff at that price, and plaintiff brought this action against defendant for breach of contract. The municipal court entered judgment for defendant on the ground that the mistake in the advertisement precluded the existence of a contract. The appellate department of the superior court and the Court of Appeal reversed, relying in part upon Vehicle Code section 11713.1, subdivision (e), which makes it unlawful for an automobile dealer not to sell a motor vehicle at the advertised price while the vehicle remains unsold and before the advertisement expires.

We conclude that a contract satisfying the statute of frauds arose from defendant's advertisement and plaintiff's tender of the advertised price, but that defendant's unilateral mistake of fact provides a basis for rescinding the contract. Although Vehicle Code section 11713.1, subdivision (e), justifies a reasonable expectation on the part of consumers that an automobile dealer intends that such an advertisement constitute an offer, and that the offer can be accepted by paying the advertised price, this statute does not supplant governing common law principles authorizing rescission of a contract on the ground of mistake. As we shall explain, rescission is warranted here because the evidence establishes that defendant's unilateral mistake of fact was made

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702                                                                    Page 5
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

in good faith, defendant did not bear the risk of the mistake, and enforcement of the contract with the erroneous price would be unconscionable. Accordingly, we shall reverse the judgment of the Court of Appeal.

I

While reading the April 26, 1997, edition of the Costa Mesa Daily Pilot, a local newspaper, plaintiff noticed a full-page advertisement placed by defendant. The advertisement promoted a "Pre-Owned Coup-A-Rama Sale!/2-Day Pre-Owned Sales Event" and listed, along with 15 other used automobiles, a 1995 Jaguar XJ6 Vanden Plas. The advertisement described the color of this automobile as sapphire blue, included a vehicle identification number, and stated a price of $25,995. The name Lexus of Westminster was displayed prominently in three separate locations in the advertisement, which included defendant's address along with a small map showing the location of the dealership. The following statements appeared in small print at the bottom of the advertisement: "All cars plus tax, lic., doc., smog & bank fees. On approved credit. Ad expires 4/27/97[.]"

Also on April 26, 1997, plaintiff visited a Jaguar dealership that offered other 1995 Jaguars for sale at $8,000 to $10,000 more than the price *268 specified in defendant's advertisement. The following day, plaintiff and his spouse drove to Lexus of Westminster and observed a blue Jaguar displayed on an elevated ramp. After verifying that the identification number on the sticker was the same as that listed in defendant's April 26 Daily Pilot advertisement, they asked a salesperson whether they could test drive the Jaguar. Plaintiff mentioned that he had seen the advertisement and that the price "looked really good." The salesperson responded that, as a Lexus dealer, defendant might offer better prices for a Jaguar automobile than would a Jaguar dealer. At that point, however, neither plaintiff nor the salesperson mentioned the specific advertised price.

After the test drive, plaintiff and his spouse discussed several negative characteristics of the automobile, including high mileage, an apparent rust problem, and worn tires. In addition, it was not as clean as the other Jaguars they had inspected. Despite these problems, they believed that the advertised price was a very good price and decided to purchase the vehicle. Plaintiff told the salesperson, "Okay. We will take it at your price, $26,000." When the salesperson did not respond, plaintiff showed him the advertisement. The salesperson immediately stated, "That's a mistake."

After plaintiff asked to speak with an individual in charge, defendant's sales manager also told plaintiff that the price listed in the advertisement was a mistake. The sales manager apologized and offered to pay for plaintiff's fuel, time, and effort expended in traveling to the dealership to examine the automobile. Plaintiff declined this offer and expressed his belief that there had been no mistake. Plaintiff stated that he could write a check for the full purchase price as advertised. The sales manager responded that he would not sell the vehicle at the advertised price. Plaintiff then requested the sales price. After performing some calculations, and based upon defendant's $35,000 investment in the automobile, the sales manager stated that he would sell it to plaintiff for $37,016. Plaintiff responded, "No, I want to buy it at your advertised price, and I will write you a check right now." The sales manager again stated that he would not sell the vehicle at the advertised price, and plaintiff and his spouse left the dealership.

Plaintiff subsequently filed this action against defendant for breach of contract, fraud, and negligence. In addition to testimony consistent with the facts set forth above, the following evidence was presented to the municipal court, which acted as the trier of fact.

Defendant's advertising manager compiles information for placement in advertisements in several local newspapers, including the Costa Mesa Daily Pilot. Defendant's advertisement published in the Sat-

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

Page 6

urday, April 19, 1997, *269 edition of the Daily Pilot listed a 1995 Jaguar XJ6 Vanden Plas but did not specify a price for that automobile; instead, the word "Save" appeared in the space where a price ordinarily would have appeared. The following Thursday afternoon, defendant's sales manager instructed the advertising manager to delete the 1995 Jaguar from all advertisements and to substitute a 1994 Jaguar XJ6 with a price of $25,995. The advertising manager conveyed the new information to a representative of the Daily Pilot that same afternoon.

Because of typographical and proofreading errors made by employees of the Daily Pilot, however, the newspaper did not replace the description of the 1995 Jaguar with the description of the 1994 Jaguar, but did replace the word "Save" with the price of $25,995. Thus, the Saturday, April 26, edition of the Daily Pilot erroneously advertised the 1995 Jaguar XJ6 Vanden Plas at a price of $25,995. The Daily Pilot acknowledged its error in a letter of retraction sent to defendant on April 28. No employee of defendant reviewed a proof sheet of the revised Daily Pilot advertisement before it was published, and defendant was unaware of the mistake until plaintiff attempted to purchase the automobile.

Except for the 1995 Jaguar XJ6 Vanden Plas, defendant intended to sell each vehicle appearing in the April 26, 1997, Daily Pilot advertisement at the advertised price. Defendant's advertisements in the April 26 editions of several other newspapers correctly listed the *1994* Jaguar XJ6 with a price of $25,995. In May 1997, defendant's advertisements in several newspapers listed the 1995 Jaguar XJ6 Vanden Plas for sale at $37,995. Defendant subsequently sold the automobile for $38,399.

The municipal court entered judgment for defendant. During the trial, the court ruled that plaintiff had not stated a cause of action for negligence, and it precluded plaintiff from presenting evidence in support of such a claim. After the close of evidence and presentation of argument, the municipal court concluded as a matter of law that a newspaper ad-

vertisement for an automobile generally constitutes a valid contractual offer that a customer may accept by tendering payment of the advertised price. The court also determined that such an advertisement satisfies the requirements of the statute of frauds when the dealer's name appears in the advertisement. Nevertheless, the municipal court held that in the present case there was no valid offer because defendant's unilateral mistake of fact vitiated or negated contractual intent. The court made factual findings that defendant's mistake regarding the advertisement was made in good faith and was not intended to deceive the public. The municipal court also found that plaintiff was unaware of the mistake before it was disclosed to him by defendant's representatives. *270

Plaintiff appealed from the judgment to the appellate department of the superior court (Cal. Rules of Court, rule 121), limiting his contentions to the breach of contract claim. The appellate department reversed the judgment for defendant and directed the municipal court to calculate plaintiff's damages. Relying upon the public policies underlying Vehicle Code section 11713.1, subdivision (e), the appellate department concluded that the advertisement constituted an offer capable of acceptance by tender of the advertised price. Section 11713.1, subdivision (e), provides that it is a violation of the Vehicle Code for a dealer to "[f]ail to sell a vehicle to any person at the advertised total price ... while the vehicle remains unsold, unless the advertisement states the advertised total price is good only for a specified time and the time has elapsed." The appellate department further concluded that defendant bore the risk of the mistaken transmission of its offer, because plaintiff was unaware of the mistake.

The appellate department of the superior court certified the appeal to the Court of Appeal, which ordered the case transferred to it for hearing and decision. (Cal. Rules of Court, rules 62(a), 63(a).) Like the appellate department, the Court of Appeal reversed the judgment of the municipal court and held that defendant's advertisement constituted a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7
27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001 Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

contractual offer that invited acceptance by the act of tendering the advertised price, which plaintiff performed. Acknowledging that the question was close, however, the Court of Appeal reasoned that Vehicle Code section 11713.1, subdivision (e), "tips the scale in favor of ... construing the advertisement as an offer ...." The court disagreed with the municipal court's conclusion that defendant's unilateral mistake of fact, unknown to plaintiff at the time he tendered the purchase price, precluded the existence of a valid offer. With regard to the contention that defendant should not bear the risk of an error resulting solely from the negligence of the newspaper, the Court of Appeal made a factual finding based upon the appellate record (Code Civ. Proc., § 909) that defendant's failure to review a proof sheet for the Daily Pilot advertisement constituted negligence that contributed to the placement of the erroneous advertisement.

We granted defendant's petition for review and requested that the parties include in their briefing a discussion of the effect, if any, of California Uniform Commercial Code division 2, chapter 2, sections 2201-2210, upon the present case.

## II

(1) An essential element of any contract is the consent of the parties, or mutual assent. (Civ. Code, §§ 1550, subd. 2, 1565, subd. 2.) Mutual assent *271 usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 128, p. 153 (hereafter Witkin).) " ' "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." ' [Citations.]" (*City of Moorpark v. Moorpark Unified School Dist.* (1991) 54 Cal.3d 921, 930[1 Cal.Rptr.2d 896, 819 P.2d 854](*Moorpark*).) The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends

upon all the surrounding circumstances. (1 Corbin, Contracts (rev. ed. 1993) § 2.2, p. 105.) The objective manifestation of the party's assent ordinarily controls, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer. (1 Witkin, *supra*, Contracts, § 119, p. 144; 1 Farnsworth, Contracts (2d ed. 1998) § 3.10, p. 237.)

(2) In the present case, the municipal court ruled that newspaper advertisements for automobiles generally constitute offers that can be accepted by a customer's tender of the purchase price. Its conclusion that defendant's advertisement for the 1995 Jaguar did not constitute an offer was based solely upon the court's factual determination that the erroneous price in the advertisement was the result of a good faith mistake.

Because the existence of an offer depends upon an objective interpretation of defendant's assent as reflected in the advertisement, however, the mistaken price (not reasonably known to plaintiff to be a mistake) is irrelevant in determining the threshold question whether the advertisement constituted an offer. In this situation, mistake instead properly would be considered in deciding whether a contract resulted from the acceptance of an offer containing mistaken terms, or whether any such contract could be voided or rescinded. (See *Chakmak v. H. J. Lucas Masonry, Inc.* (1976) 55 Cal.App.3d 124, 129[127 Cal.Rptr. 404]; Rest.2d Contracts, § 153; 1 Corbin, Contracts, *supra*, § 4.11, pp. 623-627; 2 Williston, Contracts (4th ed. 1991) § 6:57, pp. 682-695.) Thus, the municipal court did not make any factual findings relevant to the issue whether defendant's advertisement constituted an offer, and we shall review the question de novo. (*Richards v. Flower* (1961) 193 Cal.App.2d 233, 235[14 Cal.Rptr. 228].)

Some courts have stated that an advertisement or other notice disseminated to the public at large generally does not constitute an offer, but rather is presumed to be an invitation to consider, examine, and negotiate. (E.g., *Harris v. Time, Inc.* (1987) 191

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

Cal.App.3d 449, 455[237 Cal.Rptr. 584]; see Rest.2d Contracts, § 26, com. b, p. 76; 1 Corbin, Contracts, *supra*, § 2.4, *272 p. 116; 1 Farnsworth, Contracts, *supra*, § 3.10, p. 242; 1 Williston, Contracts (4th ed. 1990) § 4:7, pp. 285-287, 294.) Nevertheless, certain advertisements have been held to constitute offers where they invite the performance of a specific act without further communication and leave nothing for negotiation. Advertisements for rewards typically fall within this category, because performing the requested act (e.g., returning a lost article or supplying particular information) generally is all that is necessary to accept the offer and conclude the bargain. (1 Witkin, *supra*, Contracts, § 188, p. 200; Rest.2d Contracts, § 29, com. b, illus. 1, p. 84; 1 Corbin, Contracts, *supra*, § 2.4, p. 119.)

Various advertisements involving transactions in goods also have been held to constitute offers where they invite particular action. For example, a merchant's advertisement that listed particular goods at a specific price and included the phrase "First Come First Served" was deemed to be an offer, because it constituted a promise to sell to a customer at that price in exchange for the customer's act of arriving at the store at a particular time. (*Lefkowitz v. Great Minneapolis Surplus Store* (1957) 251 Minn. 188 [86 N.W. 2d 689, 691];Rest.2d Contracts, § 26, com. b, illus. 1, p. 76.) Similarly, external wording on the envelope of an item of bulk rate mail promising to give the recipient a watch "just for opening the envelope" before a certain date was held to constitute an operative offer accepted by performance of the act of opening the envelope. (*Harris v. Time, Inc.*, *supra*, 191 Cal.App.3d 449, 455-456.)In addition, an advertisement stating that anyone who purchased a 1954 automobile from a dealer could exchange it for a 1955 model at no additional cost constituted an offer that was accepted when the plaintiff purchased the 1954 vehicle. (*Johnson v. Capital City Ford Co.* (La.Ct.App. 1955) 85 So.2d 75, 79-80; see also *Cobaugh v. Klick-Lewis* (1989) 385 Pa.Super. 587 [561 A.2d 1248, 1249-1250] [sign at golf course stated "hole-in-one wins" an automobile at a specified

price].) In such cases, courts have considered whether the advertiser, in clear and positive terms, promised to render performance in exchange for something requested by the advertiser, and whether the recipient of the advertisement reasonably might have concluded that by acting in accordance with the request a contract would be formed. (1 Williston, Contracts, *supra*, § 4:7, pp. 296-297; 1 Corbin, Contracts, *supra*, § 2.4, pp. 116-117; see, e.g., *Chang v. First Colonial Sav. Bank* (1991) 242 Va. 388 [410 S.E.2d 928, 929-930] [bank's newspaper advertisement stating "Deposit $14,000 and receive ... $20,136.12 upon maturity in 3 1/2 years" constituted an offer that was accepted by the plaintiffs' deposit of that sum for the specified period].)

Relying upon these decisions, defendant contends that its advertisement for the 1995 Jaguar XJ6 Vanden Plas did not constitute an offer, because the *273 advertisement did not request the performance of a specific act that would conclude the bargain. According to defendant, plaintiff's assertion that the advertisement was an offer conflicts with the generally accepted "black-letter" rule that an advertisement that simply identifies goods and specifies a price is an invitation to negotiate.

This court has not previously applied the common law rules upon which defendant relies, including the rule that advertisements generally constitute invitations to negotiate rather than offers. Plaintiff observes that such rules governing the construction of advertisements have been criticized on the ground that they are inconsistent with the reasonable expectations of consumers and lead to haphazard results. (See Eisenberg, *Expression Rules in Contract Law and Problems of Offer and Acceptance* (1994) 82 Cal. L.Rev. 1127, 1166-1172.)Plaintiff urges this court to reject the black-letter advertising rule.

In the present case, however, we need not consider the viability of the black-letter rule regarding the interpretation of advertisements *in general.* (3) Like the Court of Appeal, we conclude that a licensed automobile dealer's advertisement for the sale of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 9
27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

particular vehicle at a specific price-when construed in light of Vehicle Code section 11713.1, subdivision (e)-reasonably justifies a consumer's understanding that the dealer intends the advertisement to constitute an offer and that the consumer's assent to the bargain is invited and will conclude it.

Vehicle Code section 11713.1 sets forth comprehensive requirements governing a licensed automobile dealer's advertisements for motor vehicles. This statute requires, among other things, that an advertisement for a specific automobile identify the vehicle by its identification number or license number (*id.*, subd. (a)), disclose the type of charges that will be added to the advertised price at the time of sale (*id.*, subd. (b)), and refrain from containing various types of misleading information (*id.*, subds. (i), (*l*), (o), (p), (r)).

In addition, Vehicle Code section 11713.1, subdivision (e) (hereafter section 11713.1(e)), states that it is a violation of the Vehicle Code for the holder of any dealer's license to "[f]ail to sell a vehicle to any person at the advertised total price, exclusive of [specified charges such as taxes and registration fees], while the vehicle remains unsold, unless the advertisement states the advertised total price is good only for a specified time and the time has elapsed." [FN1]

FN1 Vehicle Code section 11713.1 states in pertinent part: "It is a violation of this code for the holder of any dealer's license issued under this article to do any of the following: [¶] ... [¶] (e) Fail to sell a vehicle to any person at the advertised total price, exclusive of taxes, vehicle registration fees, the fee charged by the state for the issuance of any certificate of compliance or noncompliance pursuant to any statute, finance charges, mobilehome escrow fees, the amount of any city, county, or city and county imposed fee or tax for a mobilehome, and any dealer document preparation charge, which charges shall not exceed forty-five dollars ($45) for the doc-

ument preparation charge and not to exceed fifty dollars ($50) for emission testing plus the actual fees charged for certificates pursuant to Section 44060 of the Health and Safety Code, while the vehicle remains unsold, unless the advertisement states the advertised total price is good only for a specified time and the time has elapsed."

*274 The administrative regulation implementing section 11713.1(e) states in relevant part: "A specific vehicle advertised by a dealer ... shall be willingly shown and sold at the advertised price and terms while such vehicle remains unsold ..., unless the advertisement states that the advertised price and terms are good only for a specific time and such time has elapsed. Advertised vehicles must be sold at or below the advertised price irrespective of whether or not the advertised price has been communicated to the purchaser." (Cal. Code Regs., tit. 13, § 260.04, subd. (b).) [FN2]

FN2 A dealer's violation of section 11713.1(e) constitutes a ground for suspension or revocation of the dealer's license by the Department of Motor Vehicles and is a misdemeanor. (Veh. Code, §§ 11705, subd. (a)(10), 40000.11, subd. (a).)

Plaintiff asserts that because a dealer is prohibited by section 11713.1(e) from failing to sell a particular vehicle at the advertised price, an advertisement for such a vehicle cannot be a mere request for offers from consumers or an invitation to negotiate, but instead must be deemed an operative offer that is accepted when a consumer tenders the full advertised price. We agree that, in light of the foregoing regulatory scheme, a licensed automobile dealer's advertisement for a particular vehicle at a specific price constitutes an offer.

As one commentator has observed, legislation can affect consumer expectations and cause reasonable individuals to regard certain retail advertisements for the sale of goods as offers to complete a bargain. (1 Corbin, Contracts, *supra*, § 2.4, p. 118.) By

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

authorizing disciplinary action against a licensed automobile dealer that fails to sell a vehicle at the advertised price, section 11713.1(e) creates a reasonable expectation on the part of consumers that the dealer intends to make an offer to sell at that price, and that the consumer can accept the offer by paying the price specified in the advertisement. Interpreted in light of the regulatory obligations imposed upon dealers, an advertisement for a particular automobile at a specific price constitutes an objective manifestation of the dealer's willingness to enter into a bargain on the stated terms, and justifies the consumer's understanding that his or her assent to the bargain is invited and will conclude it. Such an advertisement *275 therefore constitutes an offer that is accepted when a consumer tenders the advertised price. [FN3]

> FN3 Of course, the consumer's tender of payment must be in a form that is commercially acceptable (see Cal. U. Com. Code, § 2511), and other legal requirements necessary to complete the transaction must be satisfied, such as execution of a formal written agreement containing the required statutory disclosures, and proper delivery of the certificate of ownership and registration (see Veh. Code, § 5600).

Defendant and its supporting amici curiae contend that section 11713.1(e) was not intended to modify the common law of contracts, and that therefore the statute should not be considered in determining whether a contract arose from defendant's advertisement and plaintiff's tender of the advertised price. As we shall explain (pt. IV, post), we agree that section 11713.1(e) does not reflect a legislative intent to supplant the common law governing contracts for the sale of motor vehicles by licensed dealers. Nevertheless, the statute does govern the conduct of dealers and thus creates an objective expectation that dealers intend to sell vehicles at the advertised price. Therefore, even though section 11713.1(e) does not alter the applicable common law regarding contractual offers, consumer expecta-

tions arising from the statute are relevant in determining whether defendant's advertisement constituted an offer pursuant to governing principles of contract law.

Amicus curiae California Motor Car Dealers Association further asserts that an advertisement for the sale of a vehicle does not constitute an offer because consumers have reason to believe that an automobile dealer does not intend to conclude the bargain until agreement is reached with regard to numerous terms other than price and until the contract is reduced to writing. (See Rest.2d Contracts, §§ 26, 27; 1 Witkin, supra, Contracts, § 142, pp. 166-167.) For example, a written contract for the sale of an automobile by a dealer typically includes terms such as the form of payment, warranties, insurance, title, registration, delivery, taxes, documentation fees, and, if applicable, financing. (See *Twaite v. Allstate Ins. Co.* (1989) 216 Cal.App.3d 239, 243[264 Cal.Rptr. 598]; *O'Keefe v. Lee Calan Imports, Inc.* (1970) 128 Ill.App.2d 410 [262 N.E.2d 758, 760, 43 A.L.R.3d 1097]; see also Civ. Code, § 2981 et seq. [requirements for conditional contracts for the sale of motor vehicles].) In addition, specific written disclosures, required by statute, must appear in the contract. (E.g., Veh. Code, § 11713.1, subds. (v) [retail automobile sales contract clearly and conspicuously must disclose whether the vehicle is being sold as used or new], (x) [dealer must disclose on the face of the contract whether the transaction is or is not subject to a fee received by an "autobroker" as defined in the Vehicle Code].)

Plaintiff, on the other hand, contends that the existence of a contract is not defeated by the circumstance that he and defendant might have included *276 additional terms in their ultimate written agreement, or that acceptance of defendant's offer might have been communicated by means other than tender of the purchase price, for example by signing a written contract. Plaintiff relies upon the following principle: "Manifestations of assent that are in themselves sufficient to conclude a contract

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702

Page 11

26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

will not be prevented from so operating by the fact
that the parties also manifest an intention to prepare
and adopt a written memorial thereof; but the cir-
cumstances may show that the agreements are pre-
liminary negotiations." (Rest.2d Contracts, §
27.)Plaintiff also observes that "[a]n offer to make
a contract shall be construed as inviting acceptance
in any manner and by any medium reasonable in
the circumstances," unless otherwise indicated.
(Cal. U. Com. Code, § 2206, subd. (1)(a).) [FN4]

> FN4 The parties agree that division 2 of
> the California Uniform Commercial Code
> applies to the sale of motor vehicles. (Cal.
> U. Com. Code, §§ 2102, 2105, subd. (1);
> *English v. Ralph Williams Ford* (1971) 17
> Cal.App.3d 1038, 1046[95 Cal.Rptr. 501].)

Although dealers are required by statute to prepare
a written contract when selling an automobile, and
such a contract contains terms other than the price
of the vehicle, we agree with plaintiff that a dealer's
advertisement specifying a price for a particular
vehicle constitutes a sufficient manifestation of the
dealer's assent to give rise to a contract. As we have
explained, in light of section 11713.1(e) such an ad-
vertisement objectively reflects the dealer's inten-
tion to sell the vehicle to a member of the public
who tenders the full advertised price while the
vehicle remains unsold and before the advertise-
ment expires. The price almost always is the most
important term of the bargain, and the dealer's in-
tention to include other terms in a written contract
does not preclude the existence of mutual assent
sufficient to conclude a contract.

In sum, because section 11713.1(e) makes it unlaw-
ful for a dealer not to sell a particular vehicle at the
advertised price while the vehicle remains unsold
and before the advertisement expires, plaintiff reas-
onably could believe that defendant intended the
advertisement to be an offer. Therefore, we con-
clude that defendant's advertisement constituted an
offer that was accepted by plaintiff's tender of the
advertised price.

III

Defendant contends that even if its advertisement
constituted an offer that was accepted by plaintiff's
tender of the purchase price, plaintiff is not author-
ized by law to enforce the resulting contract, be-
cause there was no signed writing that satisfied the
requirements of the statute of frauds for the sale of
goods. Plaintiff, on the other hand, maintains that
defendant's name, *277 as it appeared in the news-
paper advertisement for the sale of the vehicle, con-
stituted a signature within the meaning of the stat-
ute.

The applicable statute of frauds states in relevant
part: "Except as otherwise provided in this section a
contract for the sale of goods for the price of five
hundred dollars ($500) or more is not enforceable
by way of action or defense unless there is some
writing sufficient to indicate that a contract for sale
has been made between the parties and *signed by
the party against whom enforcement is sought or by
his or her authorized agent or broker*. A writing is
not insufficient because it omits or incorrectly
states a term agreed upon [,] but the contract is not
enforceable under this paragraph beyond the quant-
ity of goods shown in the writing." (Cal. U. Com.
Code, § 2201, subd. (1), italics added.)

The California Uniform Commercial Code defines
the term "signed" as including "any symbol ex-
ecuted or adopted by a party with present intention
to authenticate a writing." (Cal. U. Com. Code, §
1201, subd. (38).) The comment regarding the cor-
responding provision of the Uniform Commercial
Code states: "The inclusion of authentication in the
definition of 'signed' is to make clear that as the
term is used in [the code] a complete signature is
not necessary. Authentication may be printed,
stamped, or written; it may be by initials or by
thumbprint. It may be on any part of the document
and in appropriate cases may be found in a billhead
or letterhead. No catalog of possible authentications
can be complete and the court must use common
sense and commercial experience in passing upon
these matters. The question always is whether the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702                                                                                         Page 12
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
**(Cite as: 26 Cal.4th 261)**

symbol was executed or adopted by the party with present intention to authenticate the writing." (U. Com. Code com., reprinted at 23A West's Ann. Cal. U. Com. Code (1964 ed.) foll. § 1201, p. 65; see 1 Witkin, *supra*, Contracts, § 281, p. 273 [citing California decisions generally consistent with this comment]; Rest.2d Contracts, § 134.)

Some decisions have relaxed the signature requirement considerably to accommodate various forms of electronic communication. For example, a party's printed or typewritten name in a telegram has been held to satisfy the statute of frauds. (E.g., *Hessenthaler v. Farzin* (1989) 388 Pa.Super. 37 [564 A.2d 990, 993-994]; *Hillstrom v. Gosnay* (1980) 188 Mont. 388 [614 P.2d 466, 470].) Even a tape recording identifying the parties has been determined to meet the signature requirement of the Uniform Commercial Code. (*Ellis Canning Company v. Bernstein* (D.Colo. 1972) 348 F.Supp. 1212, 1228.)

When an advertisement constitutes an offer, the printed name of the merchant is intended to authenticate the advertisement as that of the merchant. (See Rest.2d Contracts, § 131, com. d, illus. 2, p. 335 [newspaper *278 advertisement constituting an offer to purchase certain goods, with offeror's name printed therein, satisfies the requirements of the statute of frauds].) In other words, where the advertisement reasonably justifies the recipient's understanding that the communication was intended as an offer, the offeror's intent to authenticate his or her name as a signature can be established from the face of the advertisement.

In the present case, the parties presented no evidence with regard to whether defendant intended that its name in the advertisement constitute a signature. Therefore, the issue whether the appearance of defendant's name supports a determination that the writing was "signed" is closely related to the question whether the advertisement constituted an offer. Those characteristics of the advertisement justifying plaintiff's belief that defendant intended it to be an offer also support a finding that defendant intended that its name serve as an authentication.

As established above, defendant's advertisement reflected an objective manifestation of its intention to make an offer for the sale of the vehicle at the stated price. Defendant's printed name in the advertisement similarly evidenced an intention to authenticate the advertisement as an offer and therefore constituted a signature satisfying the statute of frauds.

IV

Having concluded that defendant's advertisement for the sale of the Jaguar automobile constituted an offer that was accepted by plaintiff's tender of the advertised price, and that the resulting contract satisfied the statute of frauds, we next consider whether defendant can avoid enforcement of the contract on the ground of mistake.

A party may rescind a contract if his or her consent was given by mistake. (Civ. Code, § 1689, subd. (b)(1).) A factual mistake by one party to a contract, or unilateral mistake, affords a ground for rescission in some circumstances. (4)(See fn. 5)Civil Code section 1577 states in relevant part: "Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: [¶] 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract ...." [FN5]

> FN5 Plaintiff asserts that this court should not consider rescission as a remedy for defendant's unilateral mistake, because defendant did not seek rescission. We must affirm the trial court's judgment for defendant if it is correct on any ground, however. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, p. 382.) Accordingly, we shall consider whether rescission on the ground of mistake constitutes a defense to plaintiff's breach of contract claim. (See Civ. Code, § 1692.)
> Contrary to the position expressed by plaintiff at oral argument, the parties have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

briefed extensively the issue of mistake as a defense to the breach of contract action. In their brief supporting defendant, amici curiae The Times Mirror Company and the California Newspaper Publishers Association discuss the prerequisites for rescission on the ground of unilateral mistake of fact. In response, plaintiff has sought to distinguish case authority governing rescission on this ground and contends that "rescission is not warranted by the facts or law." In addition, at trial the parties presented evidence regarding all questions that this court's prior decisions have considered when authorizing rescission based upon a party's unilateral mistake of fact, as we shall discuss. Finally, defendant gave sufficient notice of its intent to rescind the contract when defendant informed plaintiff of the mistake in the advertisement, refused to perform, and offered to compensate plaintiff for his time and expenses. " ' " 'It is not necessary that the notice to rescind shall be formal and explicit; it is sufficient that notice shall be given to the other party which clearly shows the intention of the person rescinding to consider the contract at an end.' " ' [Citations.]" (Wilson v. Lewis (1980) 106 Cal.App.3d 802, 809[165 Cal.Rptr. 396] [oral repudiation of contract constituted adequate notice of rescission].)

(5) The Court of Appeal determined that defendant's error did not constitute a mistake of fact within the meaning of Civil Code section 1577. *279 In support of this determination, the court relied upon the following principle: "[A] unilateral misinterpretation of contractual terms, without knowledge by the other party at the time of contract, does not constitute a mistake under either Civil Code section 1577 [mistake of fact] or 1578 [mistake of law]." (Hedging Concepts, Inc. v. First Alliance Mortgage Co. (1996) 41 Cal.App.4th 1410, 1422[49 Cal.Rptr.2d 191](Hedging Concepts).)

The foregoing principle has no application to the present case. In Hedging Concepts, the plaintiff believed that he would fulfill his contractual obligations by introducing potential business prospects to the defendant. The contract, however, required the plaintiff to procure a completed business arrangement. The Court of Appeal held that the plaintiff's subjective misinterpretation of the terms of the contract constituted, at most, a mistake of law. Because the defendant was unaware of the plaintiff's misunderstanding at the time of the contract, the court held that rescission was not a proper remedy. (Hedging Concepts, supra, 41 Cal.App.4th at pp. 1418-1422, citing 1 Witkin, supra, Contracts, § 379, pp. 345-346 [relief for unilateral mistake of law is authorized only where one party knows of, does not correct, and takes advantage or enjoys the benefit of another party's mistake].) Defendant's mistake in the present case, in contrast, did not consist of a subjective misinterpretation of a contract term, but rather resulted from an unconscious ignorance that the Daily Pilot advertisement set forth an incorrect price for the automobile. Defendant's lack of knowledge regarding the typographical error in the advertised price of the vehicle cannot be considered a mistake of law. Defendant's error constituted a mistake of fact, and the Court of Appeal erred in concluding otherwise. As we shall explain, the Court of Appeal also erred to the extent it suggested that a unilateral mistake of fact affords a ground for rescission only where the other party is aware of the mistake. *280

Under the first Restatement of Contracts, unilateral mistake did not render a contract voidable unless the other party knew of or caused the mistake. (1 Witkin, supra, Contracts, § 370, p. 337; see Rest., Contracts, § 503.) In Germain etc. Co. v. Western Union etc. Co. (1902) 137 Cal. 598, 602[70 P. 658], this court endorsed a rule similar to that of the first Restatement. Our opinion indicated that a seller's price quotation erroneously transcribed and delivered by a telegraph company contractually could bind the seller to the incorrect price, unless the buyer knew or had reason to suspect that a mistake had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

been made. Some decisions of the Court of Appeal have adhered to the approach of the original Restatement. (See, e.g., *Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1097-1098[56 Cal.Rptr.2d 386], and cases cited therein.) Plaintiff also advocates this approach and contends that rescission is unavailable to defendant, because plaintiff was unaware of the mistaken price in defendant's advertisement when he accepted the offer.

The Court of Appeal decisions reciting the traditional rule do not recognize that in *M. F. Kemper Const. Co. v. City of L. A.* (1951) 37 Cal.2d 696, 701[235 P.2d 7](*Kemper*), we acknowledged but rejected a strict application of the foregoing Restatement rule regarding unilateral mistake of fact. The plaintiff in *Kemper* inadvertently omitted a $301,769 item from its bid for the defendant city's public works project-approximately one-third of the total contract price. After discovering the mistake several hours later, the plaintiff immediately notified the city and subsequently withdrew its bid. Nevertheless, the city accepted the erroneous bid, contending that rescission of the offer was unavailable for the plaintiff's unilateral mistake.

Our decision in *Kemper* recognized that the bid, when opened and announced, resulted in an irrevocable option contract conferring upon the city a right to accept the bid, and that the plaintiff could not withdraw its bid unless the requirements for rescission of this option contract were satisfied. (*Kemper, supra,* 37 Cal.2d at pp. 700, 704.)We stated: "Rescission may be had for mistake of fact if the mistake is material to the contract and was not the result of neglect of a legal duty, if enforcement of the contract as made would be unconscionable, and if the other party can be placed in statu quo. [Citations.]" (*Id.* at p. 701.)Although the city knew of the plaintiff's mistake before it accepted the bid, and this circumstance was relevant to our determination that requiring the plaintiff to perform at the mistaken bid price would be unconscionable (*id.* at pp. 702-703), we authorized rescission of the city's option contract even though the city had not known

of or contributed to the mistake before it opened the bid.

Similarly, in *Elsinore Union etc. Sch. Dist. v. Kastorff* (1960) 54 Cal.2d 380[6 Cal.Rptr. 1, 353 P.2d 713](*Elsinore*), we authorized the rescission of *281 an erroneous bid even where the contractor had assured the public agency, after the agency inquired, that his figures were accurate, and where the agency already had accepted the bid before it was aware of the mistake. In this situation, the other party clearly had no reason to know of the contractor's mistake before it accepted the bid.

The decisions in *Kemper* and *Elsinore* establish that California law does not adhere to the original Restatement's requirements for rescission based upon unilateral mistake of fact-i.e., only in circumstances where the other party knew of the mistake or caused the mistake. Consistent with the decisions in *Kemper* and *Elsinore*, the Restatement Second of Contracts authorizes rescission for a unilateral mistake of fact where "the effect of the mistake is such that enforcement of the contract would be unconscionable." (Rest.2d Contracts, § 153, subd. (a).) FN6 The comment following this section recognizes "a growing willingness to allow avoidance where the consequences of the mistake are so grave that enforcement of the contract would be unconscionable." (*Id.*, com. a, p. 394.) Indeed, two of the illustrations recognizing this additional ground for rescission in the Restatement Second of Contracts are based in part upon this court's decisions in *Kemper* and *Elsinore*.(Rest.2d Contracts, § 153, com. c, illus. 1, 3, pp. 395, 396, and Reporter's Note, pp. 400-401; see also *Schultz v. County of Contra Costa* (1984) 157 Cal.App.3d 242, 249-250[203 Cal.Rptr. 760] [applying section 153, subdivision (a), of the Restatement Second of Contracts], disagreed with on another ground in *Van Petten v. County of San Diego* (1995) 38 Cal.App.4th 43, 50-51[44 Cal.Rptr.2d 816]; 1 Witkin, *supra*, Contracts, § 370, p. 337 [reciting the rule of the same Restatement provision].) Although the most common types of mistakes falling within this category

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

occur in bids on construction contracts, section 153 of the Restatement Second of Contracts is not limited to such cases. (Rest.2d Contracts, § 153, com. b, p. 395.)

> FN6 Section 153 of the Restatement Second of Contracts states: "Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and [¶] (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or [¶] (b) the other party had reason to know of the mistake or his fault caused the mistake."

Because the rule in section 153, subdivision (a), of the Restatement Second of Contracts, authorizing rescission for unilateral mistake of fact where enforcement would be unconscionable, is consistent with our previous decisions, we adopt the rule as California law. As the author of one treatise recognized more than 40 years ago, the decisions that are inconsistent with the traditional rule "are too numerous and too appealing to the sense of *282 justice to be disregarded." (3 Corbin, Contracts (1960) § 608, p. 675, fn. omitted.) We reject plaintiff's contention and the Court of Appeal's conclusion that, because plaintiff was unaware of defendant's unilateral mistake, the mistake does not provide a ground to avoid enforcement of the contract.

Having concluded that a contract properly may be rescinded on the ground of unilateral mistake of fact as set forth in section 153, subdivision (a), of the Restatement Second of Contracts, we next consider whether the requirements of that provision, construed in light of our previous decisions, are satisfied in the present case. (6) Where the plaintiff has no reason to know of and does not cause the defendant's unilateral mistake of fact, the defendant

must establish the following facts to obtain rescission of the contract: (1) the defendant made a mistake regarding a basic assumption upon which the defendant made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to the defendant; (3) the defendant does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable. We shall consider each of these requirements below.

(7) A significant error in the price term of a contract constitutes a mistake regarding a basic assumption upon which the contract is made, and such a mistake ordinarily has a material effect adverse to the mistaken party. (See, e.g., *Elsinore,supra*, 54 Cal.2d at p. 389 [7 percent error in contract price]; *Lemoge Electric v. County of San Mateo* (1956) 46 Cal.2d 659, 661-662[297 P.2d 638] [6 percent error]; *Kemper,supra*, 37 Cal.2d at p. 702 [28 percent error]; *Brunzell Const. Co. v. G. J. Weisbrod, Inc.* (1955) 134 Cal.App.2d 278, 286[285 P.2d 989] [20 percent error]; Rest.2d Contracts, § 152, com. b, illus. 3, p. 387 [27 percent error].) In establishing a material mistake regarding a basic assumption of the contract, the defendant must show that the resulting imbalance in the agreed exchange is so severe that it would be unfair to require the defendant to perform. (Rest.2d Contracts, § 152, com. c, p. 388.) Ordinarily, a defendant can satisfy this requirement by showing that the exchange not only is less desirable for the defendant, but also is more advantageous to the other party. (*Ibid.*)

Measured against this standard, defendant's mistake in the contract for the sale of the Jaguar automobile constitutes a material mistake regarding a basic assumption upon which it made the contract. Enforcing the contract with the mistaken price of $25,995 would require defendant to sell the vehicle to plaintiff for $12,000 less than the intended advertised price of $37,995-an error amounting to 32 percent of the price defendant intended. The exchange of performances would be substantially less desir-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702                                                                                                                    Page 16
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

able for defendant and more desirable for plaintiff. Plaintiff implicitly concedes that defendant's mistake was material. *283

(8) The parties and amici curiae vigorously dispute, however, whether defendant should bear the risk of its mistake. Section 154 of the Restatement Second of Contracts states: "A party bears the risk of a mistake when [¶] (a) the risk is allocated to him by agreement of the parties, or [¶] (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or [¶] (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." Neither of the first two factors applies here. Thus, we must determine whether it is reasonable under the circumstances to allocate to defendant the risk of the mistake in the advertisement.

Civil Code section 1577, as well as our prior decisions, instructs that the risk of a mistake must be allocated to a party where the mistake results from that party's neglect of a legal duty. (Kemper, supra, 37 Cal.2d at p. 701.) [FN7]It is well established, however, that ordinary negligence does not constitute neglect of a legal duty within the meaning of Civil Code section 1577. (Kemper, supra, 37 Cal.2d at p. 702.)For example, we have described a careless but significant mistake in the computation of the contract price as the type of error that sometimes will occur in the conduct of reasonable and cautious businesspersons, and such an error does not necessarily amount to neglect of legal duty that would bar equitable relief. (Ibid.; see also Sun 'n Sand, Inc. v. United California Bank (1978) 21 Cal.3d 671, 700-701[148 Cal.Rptr. 329, 582 P.2d 920] (plur. opn. of Mosk, J.); Elsinore, supra, 54 Cal.2d at pp. 388-389.)

> FN7 Civil Code section 1577 does not include language regarding allocation of the risk of mistake to one party, but rather excludes from the definition of "mistake of fact" any mistake resulting from the neg-

lect of a legal duty.

A concept similar to neglect of a legal duty is described in section 157 of the Restatement Second of Contracts, which addresses situations in which a party's fault precludes relief for mistake. Only where the mistake results from "a failure to act in good faith and in accordance with reasonable standards of fair dealing" is rescission unavailable. (Rest.2d Contracts, § 157.)This section, consistent with the California decisions cited in the preceding paragraph, provides that a mistaken party's failure to exercise due care does not necessarily bar rescission under the rule set forth in section 153.

"The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude ... avoidance ... [on the ground of mistake]. Indeed, since a party can often avoid a mistake by the exercise of such care, the availability of relief would be severely *284 circumscribed if he were to be barred by his negligence. Nevertheless, in extreme cases the mistaken party's fault is a proper ground for denying him relief for a mistake that he otherwise could have avoided.... [T]he rule is stated in terms of good faith and fair dealing.... [A] failure to act in good faith and in accordance with reasonable standards of fair dealing during pre-contractual negotiations does not amount to a breach. Nevertheless, under the rule stated in this Section, the failure bars a mistaken party from relief based on a mistake that otherwise would not have been made. During the negotiation stage each party is held to a degree of responsibility appropriate to the justifiable expectations of the other. The terms 'good faith' and 'fair dealing' are used, in this context, in much the same sense as in ... Uniform Commercial Code § 1-203." (Rest.2d Contracts, § 157, com. a, pp. 416-417, italics added.) Section 1201, subdivision (19), of the California Uniform Commercial Code defines "good faith," as used in section 1203 of that code, as "honesty in fact in the conduct or transaction concerned."

Because of its erroneous conclusion that defend-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702                                                                    Page 17
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

ant's error was not a mistake of fact, the Court of Appeal did not reach the question whether the mistake resulted from defendant's neglect of a legal duty. The Court of Appeal did make an independent finding of fact on appeal that, in light of the statutory duties imposed upon automobile dealers, defendant's failure to review the proof sheet for the advertisement constituted *negligence*. This finding, however, was relevant only to the Court of Appeal's determination that defendant's concurrent negligence rendered it unnecessary for the court to consider the application of *Germain etc. Co. v. Western Union etc. Co.*, *supra*, 137 Cal. 598, to the present case, because *Germain* involved a mistaken offer resulting solely from the negligence of an intermediary. In any event, as established above, ordinary negligence does not constitute the neglect of a legal duty within the meaning of Civil Code section 1577 and the governing decisions. (See also 3 Corbin, Contracts, *supra*, § 606, pp. 649-656 [negligence is no bar to relief from unilateral mistake if other party can be placed in status quo].) Accordingly, we shall consider in the first instance whether defendant's mistake resulted from its neglect of a legal duty, barring the remedy of rescission.

Plaintiff contends that section 11713.1(e) imposes a legal duty upon licensed automobile dealers to ensure that their advertisements containing sale prices are accurate. As established above, section 11713.1(e) provides that it is a violation of the Vehicle Code for a dealer to "[f]ail to sell a vehicle to any person at the advertised total price ... while the vehicle remains unsold, unless the advertisement states the advertised total price is good only for a specified time and the time has elapsed." Plaintiff also relies upon Vehicle Code section 11713, subdivision (a), which provides that a *285 licensed dealer shall not "[m]ake or disseminate ... in any newspaper ... any statement which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading ...." According to plaintiff, defendant's alleged violation of the duties arising from these statutes also constitutes the neglect of a

legal duty within the meaning of Civil Code section 1577.

Even if we were to conclude that the foregoing statutes impose a duty of care upon automobile dealers to ensure that prices in an advertisement are accurate, a violation of such a duty would not necessarily preclude the availability of equitable relief. Our prior decisions instruct that the circumstance that a statute imposes a duty of care does not establish that the violation of such a duty constitutes "the neglect of a legal duty" (Civ. Code, § 1577) that would preclude rescission for a unilateral mistake of fact.

In *Sun 'n Sand, Inc. v. United California Bank*, *supra*, 21 Cal.3d 671, for example, a bank contended that a customer's violation of its statutory duty to examine bank statements and returned checks for alterations or forgeries (Cal. U. Com. Code, § 4406) constituted the neglect of a legal duty within the meaning of Civil Code section 1577, thus barring relief for the customer's mistake of fact. We rejected the bank's defense: "It does not follow ... that breach of this duty by failure to exercise reasonable care in discharging it constitutes the 'neglect of a legal duty' such that a cause of action for mistake of fact must be barred.... We have ... recognized on a number of occasions that 'ordinary negligence does not constitute the neglect of a legal duty as that term is used in section 1577 of the Civil Code.' [Citations.] The rule developed in these cases reflects a determination that the 'neglect of a legal duty' qualification derives content from equitable considerations and principles, and that it would be inequitable to bar relief for mistake because of the breach of a duty of care when the [other] party ... suffers no loss. That [the plaintiff] may have failed to exercise care in examining its bank statements is thus not a sufficient basis for denying it equitable relief for mistake." (*Sun 'n Sand, Inc. v. United California Bank*, *supra*, 21 Cal.3d at pp. 700-701 (plur. opn. of Mosk, J.); see *id.* at p. 709 (conc. & dis. opn. of Sullivan, J.) [agreeing with conclusion of plur. opn. on this claim].)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702

Page 18

26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

Plaintiff also seeks to preclude relief for defendant's mistake on the ground that defendant's alleged violation of Vehicle Code section 11713.1(e) constitutes negligence per se pursuant to Evidence Code section 669, which provides that an individual's violation of a statute can lead to a presumption that he or she failed to exercise due care. As we have seen, however, a failure to exercise due care, by itself, does not constitute the neglect of a legal duty. Without evidence of bad faith on the part of *286 defendant, its alleged violation of any duty of care arising from section 11713.1(e) constitutes, at most, ordinary negligence. Accordingly, a negligent violation of any duty imposed by section 11713.1(e) does not constitute the neglect of a legal duty or a sufficient basis for denying defendant equitable relief for its good faith mistake.

In a related claim, plaintiff contends that section 11713.1(e) imposes upon automobile dealers an absolute obligation to sell a vehicle at the advertised price-notwithstanding any mistake regarding the price, or the circumstances under which the mistake was made-and that this statute therefore supplants the common law regarding rescission of contracts and eliminates the defense of mistake. Allowing automobile dealers to avoid contracts because of carelessness in proofreading advertisements, plaintiff asserts, would undermine the legislative intent and public policy favoring the protection of consumers and ensuring accuracy in advertise- ments.

Plaintiff's contention regarding the effect of section 11713.1(e) upon the common law is inconsistent with our prior decisions. In *Moorpark, supra,* 54 Cal.3d 921, we held that a statute supplying the parameters for the price term of a contract, and requiring one party to perform certain acts as part of the process of making the contract, "does not remove the contract-making process from the purview of the common law unless the Legislature intends to occupy the field." (*Id.* at p. 929.)Our decision in *Moorpark* indicated that where a statutory scheme neither explicitly defines an offer nor, by

the breadth of its regulation, implicitly supplants the common law of contracts, general common law principles govern the question whether an effective legal offer has been made. (*Id.* at p. 930.)

Section 11713.1(e) does not eliminate mistake as a ground for rescission of the contract, as plaintiff contends. The statute is part of a regulatory scheme that subjects licensed dealers to potential discipline for a violation of the duties set forth therein. As in *Moorpark, supra,* 54 Cal.3d 921, nothing in section 11713.1(e) or the regulatory scheme reflects a legislative intent completely to remove the contract-making process from the purview of the common law. At most, section 11713.1(e) reflects an intent to *supplement* contract law by establishing a ceiling for the price term of a contract for the sale of an advertised vehicle. Therefore, the common law, including the law governing mistake, remains applicable.

In *Kemper, supra,* 37 Cal.2d 696, we rejected a contention similar to that advanced by plaintiff. Relying upon a charter provision that "no bid shall be withdrawn" after being opened and declared, the city maintained that the public interest precluded the contractor from having the right to rescind its *287 bid for mistake. Our decision stated that the offer remained subject to rescission upon proper equitable grounds, and that prior cases did not recognize any distinction between public and private contracts with regard to the right of equitable relief. (*Id.* at p. 704.) [FN8]In support of this statement, we quoted from *Moffett, Hodgkins &c. Co. v. Rochester* (1900) 178 U.S. 373, 386 [20 S.Ct. 957, 961, 44 L.Ed. 1108], which had rejected a similar argument, as follows: " 'If the [city is] correct in [its] contention[,] there is absolutely no redress for a bidder for public work, no matter how aggravated or palpable his blunder. The moment his proposal is opened by the executive board he is held as in a grasp of steel. There is no remedy, no escape. If, through an error of his clerk, he has agreed to do work worth a million dollars for ten dollars, he must be held to the strict letter of his contract,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 19
27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
**(Cite as: 26 Cal.4th 261)**

while equity stands by with folded hands and sees him driven to bankruptcy. The [city's] position admits of no compromise, no exception, no middle ground.' " (*Kemper, supra*, 37 Cal.2d at p. 704.)

> FN8 Subsequently, the Legislature enacted specific procedures for obtaining relief for a mistaken bid submitted to a public entity. (Pub. Contract Code, § 5100 et seq.)

In *Kemper* we further rejected the city's contention that a statement in the official bid form that bidders " 'will not be released on account of errors' " (*Kemper, supra*, 37 Cal.2d at p. 703) required all contractors to waive the right to seek relief for mistake. Our decision recognized a distinction between mere mechanical or clerical errors in tabulating or transcribing figures, on the one hand, and errors of judgment, on the other. "Where a person is denied relief because of an error in judgment, the agreement which is enforced is the one he intended to make, whereas if he is denied relief from a clerical error, he is forced to perform an agreement he had no intention of making.... If we were to give the language the sweeping construction contended for by the city, it would mean holding that the contractor intended to assume the risk of a clerical error no matter in what circumstances it might occur or how serious it might be. Such interpretation is contrary to common sense and ordinary business understanding and would result in the loss of heretofore well-established equitable rights to relief from certain types of mistake." (*Id.* at pp. 703-704.)

As in the foregoing cases, if we were to accept plaintiff's position that section 11713.1(e), by requiring a dealer to sell a vehicle at the advertised price, necessarily precludes relief for mistake, and that the dealer always must be held to the strict terms of a contract arising from an advertisement, we would be holding that the dealer intended to assume the risk of all typographical errors in advertisements, no matter how serious the error and regardless of the circumstances in which the error was made. For example, if an automobile dealer proofread an advertisement but, through careless-

ness, *288 failed to detect a typographical error listing a $75,000 automobile for sale at $75, the defense of mistake would be unavailable to the dealer. FN9

> FN9 Pursuant to Civil Code section 1577 and the Restatement Second of Contracts section 157, the neglect of a legal duty amounting to a breach of the duty of good faith and fair dealing bars relief from mistake, whether or not the other party has reason to know of the mistake.

The trial court expressed a similar concern when it posed the following hypothetical to plaintiff. "The perennial mistakes in ads are infinite. You can move the decimal point over two, three places, so you are selling a $1,000,000 item for $100, any ridiculous example you can think of. [¶] If your theory is correct, that a printout would constitute an unconditional offer to sell, would that same result be attained if we had one of these mistakes, where some printer, instead of printing a million, left off some of the zeros, put in a thousand, and you are selling a million dollar yacht, and it came out to a thousand dollars, would a person be entitled, under your theory of the law, to say here's my thousand bucks, and I would like to sail away?" Consistent with his contention that the violation of section 11713.1(e) constitutes the neglect of a legal duty, plaintiff responded that the answer to the court's hypothetical is "yes." Plaintiff reiterated his position in this regard at oral argument in this court. FN10

> FN10 In addition, if we were to accept plaintiff's position that Vehicle Code section 11713.1(e) imposes an absolute contractual obligation upon dealers to sell a vehicle at the advertised price to any person-notwithstanding any legal justification for refusing to do so-a dealer would be required to enter into a sales contract with an individual who obviously lacks the mental capacity to contract. (See Civ. Code, §§ 38, 1556, 1557.) And, under plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
Page 20
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
**(Cite as: 26 Cal.4th 261)**

view of the statute, a dealer would be required to sell a vehicle at an erroneous price mistakenly broadcast by a radio announcer, even though the dealer would have had no opportunity to correct the announcer's error before it was made. Pursuant to analogous consumer protection legislation, an unintentional publication of a false or misleading advertisement does not result in statutory liability. (See Civ. Code, § 1784 [no damages may be awarded for unintentionally false advertising resulting from bona fide error]; Bus. & Prof. Code, § 17502 [newspaper protected from liability for unknowingly publishing false advertising].)

Giving such an effect to section 11713.1(e), however, "is contrary to common sense and ordinary business understanding and would result in the loss of heretofore well-established equitable rights to relief from certain types of mistake." (*Kemper*, *supra*, 37 Cal.2d at p. 704.)Although this statute obviously reflects an important public policy of protecting consumers from injury caused by unscrupulous dealers who publish deceptive advertisements (see *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 356[185 Cal.Rptr. 453, 650 P.2d 328]), and establishes that automobile dealers that violate the statute can suffer the suspension or revocation of their licenses, there is no indication in the statutory scheme that the Legislature intended to impose such an absolute *contractual* obligation upon automobile dealers who make an honest mistake. Therefore, *289 absent evidence of bad faith, the violation of any obligation imposed by this statute does not constitute the neglect of a legal duty that precludes rescission for unilateral mistake of fact.

(9) The municipal court made an express finding of fact that "the mistake on the part of [defendant] was made in good faith[;] it was an honest mistake, not intended to deceive the public ...." The Court of Appeal correctly recognized that "[w]e must, of course, accept the trial court's finding that there was a 'good faith' mistake that caused the error in the advertisement." The evidence presented at trial compellingly supports this finding.

Defendant regularly advertises in five local newspapers. Defendant's advertising manager, Crystal Wadsworth, testified that ordinarily she meets with Kristen Berman, a representative of the Daily Pilot, on Tuesdays, Wednesdays, and Thursdays to review proof sheets of the advertisement that will appear in the newspaper the following weekend. When Wadsworth met with Berman on Wednesday, April 23, 1997, defendant's proposed advertisement listed a 1995 Jaguar XJ6 Vanden Plas without specifying a price, as it had the preceding week. On Thursday, April 24, a sales manager instructed Wadsworth to substitute a 1994 Jaguar XJ6 with a price of $25,995. The same day, Wadsworth met with Berman and conveyed to her this new information. Wadsworth did not expect to see another proof sheet reflecting this change, however, because she does not work on Friday, and the Daily Pilot goes to press on Friday and the edition in question came out on Saturday, April 26.

Berman testified that the revised advertisement was prepared by the composing department of the Daily Pilot. Berman proofread the advertisement, as she does all advertisements for which she is responsible, but Berman did not notice that it listed the 1995 Jaguar XJ6 Vanden Plas for sale at $25,995, instead of listing the 1994 Jaguar at that price. Both Berman and Wadsworth first learned of the mistake on Monday, April 28, 1997. Defendant's sales manager first became aware of the mistake after plaintiff attempted to purchase the automobile on Sunday, April 27. Berman confirmed in a letter of retraction that Berman's proofreading error had led to the mistake in the advertisement.

Defendant's erroneous advertisement in the Daily Pilot listed 16 used automobiles for sale. Each of the advertisements prepared for several newspapers in late April 1997, except for the one in the Daily Pilot, correctly identified the 1994 Jaguar XJ6 for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 21
27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

sale at a price of $25,995. In May 1997, defendant's advertisements in several newspapers listed the 1995 Jaguar XJ6 *290 Vanden Plas for sale at $37,995, and defendant subsequently sold the automobile for $38,399. Defendant had paid $35,000 for the vehicle.

Evidence at trial established that defendant adheres to the following procedures when an incorrect advertisement is discovered. Defendant immediately contacts the newspaper and requests a letter of retraction. Copies of any erroneous advertisements are provided to the sales staff, the error is explained to them, and the mistake is circled in red and posted on a bulletin board at the dealership. The sales staff informs customers of any advertising errors of which they are aware.

No evidence presented at trial suggested that defendant knew of the mistake before plaintiff attempted to purchase the automobile, that defendant intended to mislead customers, or that it had adopted a practice of deliberate indifference regarding errors in advertisements. [FN11] Wadsworth regularly reviews proof sheets for the numerous advertisements placed by defendant, and representatives of the newspapers, including the Daily Pilot, also proofread defendant's advertisements to ensure they are accurate. Defendant follows procedures for notifying its sales staff and customers of errors of which it becomes aware. The uncontradicted evidence established that the Daily Pilot made the proofreading error resulting in defendant's mistake.

> FN11 Plaintiff attempted to establish at trial that defendant continued to advertise the 1995 Jaguar at an erroneous price. He introduced into evidence defendant's advertisements in the May 31, 1997, edition of two newspapers. One listed a price of $37,995 for the automobile; the other stated a price of $35,995. Wadsworth, however, offered a reasonable explanation for the discrepancy. After consistently advertising the vehicle for $37,995 in several newspapers throughout the month of May,

defendant reduced the price by $2,000 at the end of the month, and the two newspapers had gone to press on different dates. The trial court's findings establish that the court found this testimony to be credible.

Defendant's fault consisted of failing to review a proof sheet reflecting the change made on Thursday, April 24, 1997, and/or the actual advertisement appearing in the April 26 edition of the Daily Pilot-choosing instead to rely upon the Daily Pilot's advertising staff to proofread the revised version. Although, as the Court of Appeal found, such an omission might constitute negligence, it does not involve a breach of defendant's duty of good faith and fair dealing that should preclude equitable relief for mistake. In these circumstances, it would not be reasonable for this court to allocate the risk of the mistake to defendant.

As indicated above, the Restatement Second of Contracts provides that during the negotiation stage of a contract "each party is held to a degree of responsibility appropriate to the justifiable expectations of the other." (Rest.2d Contracts, § 157, com. a, p. 417.) No consumer reasonably can *291 expect 100 percent accuracy in each and every price appearing in countless automobile advertisements listing numerous vehicles for sale. The degree of responsibility plaintiff asks this court to impose upon automobile dealers would amount to strict contract liability for any typographical error in the price of an advertised automobile, no matter how serious the error or how blameless the dealer. We are unaware of any other situation in which an individual or business is held to such a standard under the law of contracts. Defendant's good faith, isolated mistake does not constitute the type of extreme case in which its fault constitutes the neglect of a legal duty that bars equitable relief. Therefore, whether or not defendant's failure to sell the automobile to plaintiff could amount to a violation of section 11713.1(e) -an issue that is not before us-defendant's conduct in the present case does not preclude rescission. [FN12]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702

26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001 Daily Journal D.A.R. 7821

(Cite as: 26 Cal.4th 261)

Page 22

FN12 Amicus curiae National Association of Consumer Advocates asserts that plaintiff has a private right of action pursuant to section 11713.1(e) and urges this court to authorize plaintiff's recovery of damages for defendant's alleged violation of this statute. As far as the record and briefing indicate, however, plaintiff's complaint did not include a cause of action for violation of section 11713.1(e), but instead simply referred to the statute in connection with his cause of action for negligence, which he has abandoned. In any event, because plaintiff never raised the statutory theory of recovery now supported by amicus curiae, we shall not consider it.

(10a) The final factor defendant must establish before obtaining rescission based upon mistake is that enforcement of the contract for the sale of the 1995 Jaguar XJ6 Vanden Plas at $25,995 would be unconscionable. (11) Although the standards of unconscionability warranting rescission for mistake are similar to those for unconscionability justifying a court's refusal to enforce a contract or term, the general rule governing the latter situation (Civ. Code, § 1670.5) is inapplicable here, because unconscionability resulting from mistake does not appear at the time the contract is made. (Rest.2d Contracts, § 153, com. c, p. 395; 1 Witkin, *supra*, Contracts, § 370, pp. 337-338.)

An unconscionable contract ordinarily involves both a procedural and a substantive element: (1) oppression or surprise due to unequal bargaining power, and (2) overly harsh or one-sided results. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114[99 Cal.Rptr.2d 745, 6 P.3d 669].) Nevertheless, " 'a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.]" (*Ibid.*)For example, the Restatement Second of Contracts states that

"[i]nadequacy of consideration does not of itself invalidate a bargain, but gross disparity in the values exchanged may be an important factor in a determination that a contract is *292 unconscionable and may be sufficient ground, without more, for denying specific performance." (Rest.2d Contracts, § 208, com. c, p. 108.) In ascertaining whether rescission is warranted for a unilateral mistake of fact, substantive unconscionability often will constitute the determinative factor, because the oppression and surprise ordinarily results from the mistake-not from inequality in bargaining power. Accordingly, even though defendant is not the weaker party to the contract and its mistake did not result from unequal bargaining power, defendant was surprised by the mistake, and in these circumstances overly harsh or one-sided results are sufficient to establish unconscionability entitling defendant to rescission.

Our previous cases support this approach. In *Kemper, supra,* 37 Cal.2d 696, we held that enforcement of the city's option to accept a construction company's bid, which was 28 percent less than the intended bid, would be unconscionable. Our decision reasoned that (1) the plaintiff gave prompt notice upon discovering the facts entitling it to rescind, (2) the city therefore was aware of the clerical error before it exercised the option, (3) the city already had awarded the contract to the next lowest bidder, (4) the company had received nothing of value it was required to restore to the city, and (5) "the city will not be heard to complain that it cannot be placed in statu quo because it will not have the benefit of an inequitable bargain." (*Id.* at p. 703.)Therefore, "under all the circumstances, it appears that it would be unjust and unfair to permit the city to take advantage of the company's mistake." (*Id.* at pp. 702-703.)Nothing in our decision in *Kemper* suggested that the mistake resulted from surprise related to inequality in the bargaining process. (Accord, *Farmers Sav. Bank, Joice v. Gerhart* (Iowa 1985) 372 N.W.2d 238, 243-245 [holding unconscionable the enforcement of sheriff's sale against bank that overbid because of a mistake caused by negligence of its own attorney].) Simil-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702                                                                      Page 23
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
(Cite as: 26 Cal.4th 261)

arly, in *Elsinore, supra,* 54 Cal.2d 380, we author-
ized rescission of a bid based upon a clerical error,
without suggesting any procedural unconscionabil-
ity, even where the other party afforded the con-
tractor an opportunity to verify the accuracy of the
bid before it was accepted.

(10b) In the present case, enforcing the contract
with the mistaken price of $25,995 would require
defendant to sell the vehicle to plaintiff for $12,000
less than the intended advertised price of
$37,995-an error amounting to 32 percent of the
price defendant intended. Defendant subsequently
sold the automobile for slightly more than the in-
tended advertised price, suggesting that that price
reflected its actual market value. Defendant had
paid $35,000 for the 1995 Jaguar and incurred costs
in advertising, preparing, displaying, and attempt-
ing to sell the vehicle. Therefore, defendant would
lose more than $9,000 of its original investment in
the automobile. *293 Plaintiff, on the other hand,
would obtain a $12,000 windfall if the contract
were enforced, simply because he traveled to the
dealership and stated that he was prepared to pay
the advertised price.

These circumstances are comparable to those in our
prior decisions authorizing rescission on the ground
that enforcing a contract with a mistaken price term
would be unconscionable. Defendant's 32 percent
error in the price exceeds the amount of the errors
in cases such as *Kemper* and *Elsinore.* For example,
in *Elsinore, supra,* 54 Cal.2d at page 389, we au-
thorized rescission for a $6,500 error in a bid that
was intended to be $96,494 -a mistake of approxim-
ately 7 percent in the intended contract price. As in
the foregoing cases, plaintiff was informed of the
mistake as soon as defendant discovered it. Defend-
ant's sales manager, when he first learned of the
mistake in the advertisement, explained the error to
plaintiff, apologized, and offered to pay for
plaintiff's fuel, time, and effort expended in travel-
ing to the dealership to examine the automobile.
Plaintiff refused this offer to be restored to the
status quo. Like the public agencies in *Kemper* and

*Elsinore,* plaintiff should not be permitted to take
advantage of defendant's honest mistake that resul-
ted in an unfair, one-sided contract. (Cf. *Drennan v.
Star Paving Co.* (1958) 51 Cal.2d 409, 415-416[3 33
P.2d 757] [no rescission of mistaken bid where oth-
er party detrimentally altered his position in reason-
able reliance upon the bid and could not be restored
to the status quo].)

The circumstance that section 11713.1(e) makes it
unlawful for a dealer not to sell a vehicle at the ad-
vertised price does not preclude a finding that en-
forcing an automobile sales contract containing a
mistaken price would be unconscionable. Just as
the statute does not eliminate the defense of mis-
take, as established above, the statute also does not
dictate that enforcing a contract with an erroneous
advertised price necessarily must be considered
equitable and fair for purposes of deciding whether
the dealer is entitled to rescission on the ground of
mistake. In *Kemper, supra,* 37 Cal.2d 696, we con-
cluded that it would be unconscionable to bar res-
cission of a bid pursuant to a city charter provision
prohibiting the withdrawal of bids, where "it ap-
pear[ed] that it would be unjust and unfair to permit
the city to take advantage of the company's mis-
take." (*Id.* at p. 703.)Thus, notwithstanding the pub-
lic interest underlying the charter provision, our de-
cision in *Kemper* precluded the city from relying
upon that provision to impose absolute contractual
liability upon the contractor. (*Id.* at p. 704.)

Accordingly, section 11713.1(e) does not under-
mine our determination that, under the circum-
stances, enforcement of the contract for the sale of
the *294 1995 Jaguar XJ6 Vanden Plas at the
$25,995 mistaken price would be unconscionable.
The other requirements for rescission on the ground
of unilateral mistake have been established. De-
fendant entered into the contract because of its mis-
take regarding a basic assumption, the price. The
$12,000 loss that would result from enforcement of
the contract has a material effect upon the agreed
exchange of performances that is adverse to defend-
ant. Furthermore, defendant did not neglect any leg-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702

26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001 Daily Journal D.A.R. 7821

(Cite as: 26 Cal.4th 261)

Page 24

al duty within the meaning of Civil Code section 1577 or breach any duty of good faith and fair dealing in the steps leading to the formation of the contract. Plaintiff refused defendant's offer to compensate him for his actual losses in responding to the advertisement. "The law does not penalize for negligence beyond requiring compensation for the loss it has caused." (3 Corbin, Contracts, *supra*, § 609, p. 684.) In this situation, it would not be reasonable for this court to allocate the risk of the mistake to defendant.

Having determined that defendant satisfied the requirements for rescission of the contract on the ground of unilateral mistake of fact, we conclude that the municipal court correctly entered judgment in defendant's favor.

V

The judgment of the Court of Appeal is reversed.

Kennard, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J.,** Dissenting.

Although I agree with the majority's conclusion that an enforceable contract was formed between the parties, I respectfully dissent from the majority's grant of contractual rescission to defendant RRL Corporation, relief that is both unsolicited and procedurally irregular. As the majority implicitly acknowledges, defendant did not seek in the trial court to rescind its contract with plaintiff. (Maj. opn., *ante*, at p. 278, fn. 5.) But the majority neglects to note, further, that at no point on appeal or on review in this court has defendant argued for rescission; defendant's position throughout has been, instead, that no contract was formed between plaintiff and itself. Thus, neither the petition for review nor the answer, which ordinarily delimit the issues to be briefed in this court (Cal. Rules of Court, rule 29.3(c)), so much as mentions rescission. Even at oral argument, counsel for defendant resisted the suggestion that he was seeking rescission, viewing that position as a concession that a contract had been formed, although counsel did

eventually agree he "would be pleased to prevail on any theory."

The possibility of rescission appears to have been raised first by amici curiae. Because amici curiae are, like the parties, expected to restrict their *295 briefs to the issues on review (see Cal. Rules of Court, rule 14(b)), plaintiff justifiably limited his response to a few lines, noting only that defendant had not sought rescission and that the case of *M. F. Kemper Const. Co. v. City of L. A.* (1951) 37 Cal.2d 696[235 P.2d 7], upon which amici curiae (like the majority) chiefly relied, appeared distinguishable. At oral argument, when questioning from the bench made clear the court's interest in rescission, counsel for plaintiff requested the opportunity to brief the question if it was "significant to the court's consideration" of the case. The majority nevertheless decides the issue in favor of defendant, rather than giving plaintiff an opportunity to brief it by transferring the case to the Court of Appeal.

Rescission may be asserted in an answer or cross-complaint, or by other notice to the nonrescinding party. (Civ. Code, §§ 1691, 1692.)But the party seeking to rescind must give such notice "promptly upon discovering the facts which entitle him to rescind." (Civ. Code, § 1691.)Delay in giving notice is grounds for denying relief if the nonrescinding party has been substantially prejudiced. (Civ. Code, § 1693.)Defendant here, of course, has never given any actual notice of rescission, by pleading or otherwise. To the extent defense counsel's oral expression of willingness to accept rescission is deemed equivalent to notice, plaintiff should, at the least, be permitted to brief the question of prejudice on transfer to the Court of Appeal. Although I cannot predict what briefing would reveal, prejudice may lie, for example, in the costs of maintaining this suit and appeal, which could presumably have been resolved more expeditiously had defendant earlier asserted the single defense to which the majority now holds it was entitled. (See *Citicorp Real Estate, Inc. v. Smith* (9th Cir. 1998) 155 F.3d 1097, 1103 [unexcused delay in pleading rescission, during lit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702                                                           Page 25
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
**(Cite as: 26 Cal.4th 261)**

igation over contract, bars relief under Civ. Code, §§ 1691 and 1693]; *Doctor v. Lakeridge Const. Co.* (1967) 252 Cal.App.2d 715, 720[60 Cal.Rptr. 824] [same].) [FN1]

> FN1 The majority, citing *Wilson v. Lewis* (1980) 106 Cal.App.3d 802[165 Cal.Rptr. 396], argues that defendant gave oral notice of rescission when its employees told plaintiff the advertised price was erroneous. (Maj. opn., *ante*, at p. 279, fn. 5.) *Wilson*, in which an owner of real property signed a written agreement to sell, but telephoned the buyer's agent the next day to "repudiat[e]" the agreement (*Wilson, supra*, at p. 807), is clearly distinguishable. Here, while plaintiff wished to conclude a contract, defendant's agents repeatedly told him they *would not sell* him the vehicle at the advertised price. In any event, the majority's invention of an oral rescission theory unaddressed by the parties illustrates my principal objection to its approach, that it decides debatable issues regarding the propriety of rescission relief without full briefing and informed deliberation.

As analyzed by the majority, the question of defendant's equitable entitlement to rescission turns principally on two subsidiary questions: whether defendant should be deemed to bear the risk of an error in the advertisement; and whether enforcement of the contract as formed would be unconscionable. (Maj. opn., *ante*, at pp. 283-288, 291-292.)Although the parties have *296 tried and argued the effect of the mistake-because it related to defendant's claim the mistake vitiated its intent to contract-they have neither tried nor argued the question of unconscionability. (The trial court's statement of decision does not mention unconscionability.) The majority's apparent assumption (maj. opn., *ante*, at pp. 278-279, fn. 5) that all evidence significant to rescission was presented below is, therefore, unfounded. Again, it is not the place of a reviewing court to speculate on what evidence and

argument might have been presented had the parties litigated different issues than they did, but presumably additional evidence could have been presented as to the (probably slight) economic impact enforcement would have on defendant, as well as any lost opportunities or other costs suffered by plaintiff resulting from his seeking to hold defendant to performance of the contract. (See Civ. Code, § 1670.5, subd. (b) [parties shall be afforded reasonable opportunity to present evidence relating to unconscionability].)

Finally, under Civil Code section 1692, a court ordering rescission "may require the party to whom such relief is granted to make any compensation to the other which justice may require and may otherwise in its judgment adjust the equities between the parties." Needless to say, the parties have not addressed this equitable question in their briefs, and the majority makes no provision for such compensation.

I acknowledge the principle that a judgment is to be affirmed if correct on any ground. I do not, however, believe that rule is properly applied where, as here, (1) the affirmance is based on a factual theory that was not raised at trial and as to which the trial court's statement of decision contains no supportive findings; (2) affirmance would involve the granting of equitable relief that no party has sought and that is subject to unsatisfied procedural requirements; (3) the opposing party has not had a fair opportunity to brief the availability of such equitable relief; and (4) the record does not contain all the facts relevant to such relief. In the present circumstance we should, rather than reverse the Court of Appeal's judgment and thereby reinstate the trial court's judgment for defendant, either affirm the judgment of the Court of Appeal or, at most, transfer the case to that court for briefing and decision on the rescission issue, with a remand for trial on that issue to follow if necessary.

For these reasons, I dissent.

Baxter, J., concurred.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 P.3d 702
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807, 45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv. 6397, 2001
Daily Journal D.A.R. 7821
**(Cite as: 26 Cal.4th 261)**

Appellant's petition for a rehearing was denied
September 12, 2001, and the opinion was modified
to read as printed above. Baxter, J., and Werdegar,
J., were of the opinion that the petition should be
granted.

Cal. 2001.
Donovan v. RRL Corp.
26 Cal.4th 261, 27 P.3d 702, 109 Cal.Rptr.2d 807,
45 UCC Rep.Serv.2d 343, 00 Cal. Daily Op. Serv.
6397, 2001 Daily Journal D.A.R. 7821

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.