**9**

Westlaw.

66 Cal.App.4th 478

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519

(Cite as: 66 Cal.App.4th 478)

Page 1

▷
Downey Venture v. LMI Ins. Co.

Cal.App.2.Dist.

DOWNEY VENTURE et al., Plaintiffs and Appellants,

v.

LMI INSURANCE COMPANY, Defendant and Appellant.

No. B106304.

Court of Appeal, Second District, Division 3, California.

Sept. 1, 1998.

SUMMARY

A lessee brought an action against its commercial lessors. After summary judgment was granted to the lessors, the lessors brought a malicious prosecution action against the lessee, which tendered defense of the action to its liability insurer, since malicious prosecution actions were expressly covered under its comprehensive general liability policy. The insurer provided a defense, but expressly reserved its rights to dispute coverage and seek reimbursement. The malicious prosecution action settled in favor of the lessors, and the insurer contributed $450,000 to that settlement. The insured filed an action against the insurer for breach of contract, bad faith, and fraud. The insurer cross-complained against the insured for declaratory relief and reimbursement. The trial court granted summary judgment to the insurer on plaintiff's complaint for breach of contract and bad faith, but denied summary judgment to the insurer on its cross-complaint, ruling that the insurer's claim for reimbursement of settlement funds should be reduced by an amount allocable to defense costs that the insurer saved by entering into the settlement. Plaintiff dismissed the cause of action for fraud without prejudice, and the trial court ruled that Ins. Code, § 533, which precludes insurance coverage for willful acts of an insured, did not preclude a cause of action for fraud. (Superior Court of Los Angeles County, No. BC125733, Ricardo A.

Torres, Judge.)

The Court of Appeal affirmed summary judgment granted to the insurer on the insured's complaint, reversed the trial court's order denying summary judgment to the insurer on its cross-complaint, and remanded to the trial court with directions to enter judgment in favor of the insurer for the total amount it had contributed to the settlement of the underlying malicious prosecution action against the insured. The court held that liability insurance coverage for a malicious prosecution claim is precluded by Ins. Code, § 533. The required showing of malice in a malicious prosecution action imports willfulness and, accordingly, is a willful act within the meaning of § 533. The court further held, however, that the insurer's specific and distinct promise to defend its insured against a malicious prosecution claim was not precluded by § 533. If the reasonable expectations of an insured are that a defense will be provided for a claim, then the insurer cannot escape that obligation merely because public policy precludes it from indemnifying that claim. The court also held that the trial court erred when it concluded that the insured could bring a fraud action against its liability insurer, based on the illusory nature of the insurer's promise to indemnify the insured for a malicious prosecution claim, since to require indemnification in defiance of the provisions of § 533, on the grounds that the terms of the policy promised the proscribed coverage, would amount to the enforcement of an illegal contract. Furthermore, this insurer's coverage promise actually provided substantial benefits to the insured. Finally, the court held that the trial court's order, reducing the insurer's right to reimbursement of the $450,000 it had contributed to settlement of the underlying malicious prosecution claim by the amount of defense costs "saved" by settling the action, was without legal authority or basis. (Opinion by Croskey, J., with Aldrich, J., concurring, and Klein, P. J., concurring in the judgment.)

HEADNOTES

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
**(Cite as: 66 Cal.App.4th 478)**

Classified to California Digest of Official Reports

**(1) Malicious Prosecution § 1--Public Policy.**
Malicious prosecution is a disfavored action. By contrast, it has been held that access to the courts is a constitutional right founded upon U.S. Const., 1st Amend. But regardless of any constitutional basis for the policy, strong public policy favors open access to the courts for the resolution of conflicts. Accordingly, litigants have the right to present issues that are arguably correct even if it is extremely unlikely they will win.

**(2) Malicious Prosecution § 3--Essentials to Maintenance of Action.**
In order to establish a cause of action for malicious prosecution of either a criminal or a civil proceeding, a plaintiff must demonstrate that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice.

**(3) Malicious Prosecution § 5--Essentials to Maintenance of Action--Malice.**
The "malice" element of a cause of action for malicious prosecution relates to the subjective intent or purpose with which the defendant acted in initiating the prior action. The motive of the defendant must have been something other than that of bringing a perceived guilty person to justice or the satisfaction in a civil action of some personal or financial purpose. The plaintiff must plead and prove actual ill will or some improper ulterior motive, which may range anywhere from open hostility to indifference. The principal situations in which the civil proceedings are initiated for an improper purpose are those in which (1) the person initiating them does not believe that his or her claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his or her property; and (4) the proceedings are initiated for the purpose of forcing a settlement that

has no relation to the merits of the claim.
[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 429, 450.]

**(4) Malicious Prosecution § 6--Essentials to Maintenance of Action--Want of Probable Cause--Objective Standard.**
One of the elements of the tort of malicious prosecution is the want of probable cause in bringing the prior suit. In this context, probable cause cannot be based upon a showing of reasonable investigation and diligent legal research on the part of an attorney or on his or her subjective honest or reasonable belief in the merits of the claim asserted. When there is no dispute as to the facts upon which an attorney acted in filing the prior action, the question of whether there was probable cause to institute that action is purely a legal question. If there is a dispute as to such facts, that dispute must be resolved by the trier of fact before the objective standard can be applied by the court. That legal question is to be determined by the trial court on the basis of whether, as an objective matter, the prior action was legally tenable or not. The subjective beliefs of the defendant attorney as to legal tenability of the action are not relevant to the question of probable cause. If the trial court determines that the prior action was objectively reasonable, the plaintiff has failed to meet the threshold requirement of demonstrating an absence of probable cause and the defendant is entitled to prevail.

**(5) Malicious Prosecution § 6--Essentials to Maintenance of Action--Want of Probable Cause.**
Probable cause depends entirely on an objective evaluation of legal tenability based on either the facts known to the attorney at the time he or she brought the prior action or subsequent events in the litigation that demonstrate, as a matter of law, that the prior action was objectively tenable. Only if the court determines that such objective tenability is absent will the jury be asked to determine the presence or absence of malice.

**(6) Malicious Prosecution § 5--Essentials to Maintenance of Action-- Malice--Effect of Lack of Prob-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

able Cause.

In a malicious prosecution action, malice cannot be inferred from an absence of probable cause. Because lack of probable cause is found when the prior action is adjudged objectively untenable, it is not logical to permit any inference to be drawn as to a defendant's subjective state of mind. The commission of the tort of malicious prosecution requires a showing of an unsuccessful prosecution of a criminal or civil action, which any reasonable attorney would regard as totally and completely without merit, for the intentionally wrongful purpose of injuring another person. The fact that the underlying action lacked legal tenability, as measured objectively (i.e., by the standard of whether any reasonable attorney would have thought the claim tenable), without more, would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind. In other words, the presence of malice must be established by other, additional evidence.

**(7)** Insurance Contracts and Coverage § 45--Exclusions--Willful Acts of Insured.

Ins. Code, § 533, which precludes insurance coverage (i.e., indemnification) for a wilful act, reflects a fundamental public policy to deny insurance coverage for willful wrongs. It is an implied exclusionary clause that, by statute, must be read into all insurance policies. As a result, the parties to an insurance policy cannot contract for such coverage. At a minimum, a willful act is an intentional one. Acts of gross negligence or recklessness are not willful acts within the meaning of § 533. A willful act under § 533 will include either an act deliberately done for the express purpose of causing damage or intentionally performed with knowledge that damage is highly probable or substantially certain to result. A willful act includes an intentional and wrongful act in which the harm is inherent in the act itself. Therefore, § 533 precludes indemnification for liability arising from deliberate conduct that the insured expected or intended to cause damage.

**(8)** Insurance Contracts and Coverage § 80--Liability and Indemnity Insurance--Statutory Exclusion--For Willful Acts--Application to Malicious Prosecution Claim.

Liability insurance coverage for a malicious prosecution claim is precluded by Ins. Code, § 533, which precludes insurance coverage (i.e., indemnification) for a willful act. The required showing of malice in a malicious prosecution action imports willfulness and, accordingly, establishes a willful act within the meaning of § 533. An insured can only be found liable for malicious prosecution if the insured is found to have possessed actual hostility or ill will toward the plaintiff or if the prior proceedings are instituted primarily for an improper purpose. This malice element is directly concerned with the subjective mental state of the defendant in instituting the prior action. The presence of such hostility, ill will, or improper motivation is sufficient to establish the tort of malicious prosecution as not only an intentional act, but one that is wrongful; and it is necessarily harmful to both the plaintiff and the judicial process.

[See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1997) ¶ 7:251 et seq.]

**(9)** Insurance Contracts and Coverage § 107.1--Liability and Indemnity Insurance--Determination of Obligation to Defend.

A liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. A carrier must defend a suit that potentially seeks damages within the coverage of the policy. Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. Once the defense duty attaches, the insurer is obligated to defend against all of the claims involved in the action, both covered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
**(Cite as: 66 Cal.App.4th 478)**

and noncovered, until the insurer produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a noncovered claim. Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor.

**(10)** Insurance Contracts and Coverage § 107.3--Liability and Indemnity Insurance--Obligation to Defend Insured--Defense of Willful Acts and Criminal Actions.
Even though a liability insurer's express promise to provide coverage (i.e., indemnification) for a malicious prosecution claim was precluded by Ins. Code, § 533, which precludes insurance coverage for a willful act, the insurer's specific and distinct promise to defend its insured against a malicious prosecution claim was not precluded by § 533. If the reasonable expectations of an insured are that a defense will be provided for a claim, then the insurer cannot escape that obligation merely because public policy precludes it from indemnifying that claim. The public policy concerns applicable to an insurer's indemnification do not extend to the provision of a defense, since an agreement to defend an insured upon mere accusation of a willful tort does not encourage such willful conduct.

**(11a, 11b, 11c, 11d, 11e)** Insurance Contracts and Coverage § 122--Fraud Action--Against Liability Insurer Based on Illusory Promise to Provide Coverage for Malicious Prosecution Claim.
The trial court erred when it concluded that an insured could bring a fraud action against its liability insurer, based on the illusory nature of the insurer's promise to indemnify the insured for a malicious prosecution claim, given that indemnification for such a claim was barred by Ins. Code, § 533, which precludes insurance coverage for a willful act. Both estoppel and promissory fraud require proof that the party asserting the fraud or estoppel justifiably relied on a promise or conduct. No insureds can plausibly maintain that they perpetrated acts of malicious prosecutions in justifiable reliance on an insurer's promise to save them from the consequences of those acts. Further, to require indemnification in

defiance of the provisions of § 533 on the grounds that the terms of the policy promise the proscribed coverage would amount to the enforcement of an illegal contract. Estoppel cannot defeat the operation of a policy protecting the public. Also, this insurer's coverage promise actually provided substantial benefits to the insured: a duty to defend against a malicious prosecution claim, indemnification for vicarious liability for such a claim, and unrestricted coverage for a malicious prosecution claim that arose in a jurisdiction that did not have a contravening public policy.

**(12)** Estoppel and Waiver § 1--Estoppel--Essential Elements.
The essentials of estoppel are: (1) knowledge of the facts by the party to be estopped; (2) intention that his or her conduct be acted upon, or he or she acts so that the party asserting estoppel has a right to believe that the conduct is so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) justifiable reliance on the conduct by the party asserting the estoppel to his or her injury.

**(13)** Fraud and Deceit § 2--Elements--Promissory Fraud.
The elements of fraud, which give rise to the tort action for deceit, are misrepresentation (false representation, concealment, or nondisclosure), knowledge of falsity (or "scienter"), intent to defraud, i.e., to induce reliance, justifiable reliance, and resulting damage. "Promissory fraud" is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, when a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.

**(14)** Insurance Contracts and Coverage § 45--Exclusions--Willful Acts of Insured--Post-Tort Promise of Coverage.
The policy reflected in Ins. Code, § 533, which precludes insurance coverage (i.e., indemnification) for a willful act, is not offended by the enforcement of a post-tort coverage commitment by the insurer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                          Page 5
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
**(Cite as: 66 Cal.App.4th 478)**

**(15)** Contracts § 12--Effect of Illegality.
An illegal contract is void; it cannot be ratified by a subsequent act, and no person can be estopped to deny its validity.
[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 442.]

**(16)** Insurance Contracts and Coverage § 80--Liability and Indemnity Insurance--Statutory Exclusion--For Willful Acts--Malicious Prosecution Claim-- Vicarious Liability.
Although Ins. Code, § 533, which precludes insurance coverage (i.e., indemnification) for a willful act, bars indemnity of an insured who personally commits an act of malicious prosecution, the statute does not bar indemnity of an insured who does not personally commit the act but who is vicariously liable for another person's act of malicious prosecution. An employee's willful, malicious, and even criminal torts may fall within the scope of his or her employment for purposes of respondeat superior, even though the employer has not authorized the employee to commit crimes or intentional torts. Thus, a principal who personally engages in no misconduct may be vicariously liable for an act of malicious prosecution committed by an agent within the course and scope of the agency. Likewise, a corporation may be liable for an act of malicious prosecution committed within the scope of its agent's authority to act for and on behalf of the corporation. When a principal is held vicariously liable for an agent's act of malicious prosecution, § 533 poses no obstacle to indemnifying the principal.

**(17)** Insurance Contracts and Coverage § 80--Liability and Indemnity Insurance--Statutory Exclusion--For Willful Acts--Malicious Prosecution Claim Arising in Another Jurisdiction.
Even though Ins. Code, § 533, which precludes insurance coverage (i.e., indemnification) for a willful act, bars indemnity of an insured who commits an act of malicious prosecution, § 533 does not preclude indemnification of an insured's claim that arises in a jurisdiction that does not require such preclusion. A liability insurance policy issued on a nationwide basis may be construed in accordance with the law of the jurisdiction in which a particular claim arises. Parties to an insurance contract understand this. In states where public policy does not forbid an insurer from indemnifying its insured against liability for the insured's willful misconduct, § 533 would not preclude indemnification. In other states where a plaintiff may recover for malicious prosecution without proving the defendant acted with malice in fact, i.e., with an improper motive or purpose, the contractual promise of indemnity would also be enforceable.

**(18)** Insurance Contracts and Coverage § 107--Liability and Indemnity Insurance--Obligation to Defend Insured--Termination of Obligation--At Time of Settlement.
A liability insurer that had expressly promised in the liability policy to indemnify its insured against a malicious prosecution claim was entitled to full reimbursement of the $450,000 it had contributed to settlement of a malicious prosecution claim against the insured, since indemnification of the claim was barred by Ins. Code, § 533, which precludes insurance coverage for a willful act. However, the insurer's specific and distinct promise to defend its insured against a malicious prosecution claim was not precluded by § 533. Hence, the trial court's order that sought to reduce or impair the insurer's right to reimbursement by the amount of defense costs "saved" by the insurer as the result of the settlement and the resulting termination of its defense obligation was without legal authority or basis. An insurer's duty to defend is discharged when the action against the insured is concluded. Also, the financial benefit resulting to the plaintiff in the malicious prosecution action from the trial court's order would provide some degree of indemnification to the defendant insureds and thus violate § 533.

COUNSEL
Shapiro, Hinds & Mitchell, Carl W. Shapiro, Keith A. Meyer and Cindy F. Forman for Plaintiffs and Appellants.
Shernoff, Bidart, Darras & Arkin, William M.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519

(Cite as: 66 Cal.App.4th 478)

Page 6

Shernoff, Sharon J. Arkin, Anderson, Kill & Olick, Jordan S. Stanzler, Deborah M. Mongan, Jordan S. Stanzler, John A. MacDonald, Troop, Meisinger, Steuber & Pasich, *486 Kirk A. Pasich, Lori M. Yankelevits, Irell & Manella and Thomas W. Johnson Jr., as Amici Curiae on behalf of Plaintiffs and Appellants.

Selman & Breitman, Alan B. Yuter and Lisa H. Kahn for Defendant and Appellant.

Musick, Peeler & Garrett, R. Joseph De Briyn, Harry W. R. Chamberlain II, Mary Catherine M. Bohen, Cheryl A. Orr, Barger & Wolen, Richard De Saint Phalle, Ethan A. Miller, Haight, Brown & Bonesteel, Roy G. Weatherup, John W. Sheller, Michael J. Leahy, Horvitz & Levy, Barry R. Levy, Mitchell C. Tilner, Sonnenschein, Nath & Rosenthal, Paul E. B. Glad, Hancock, Rothert & Bunshoft and Deborah A. Pitts as Amici Curiae on behalf of Defendant and Appellant.

William W. Palmer, Farmer & Murphy and George E. Murphy as Amici Curiae upon the request of the Court of Appeal.

**CROSKEY, J.**

The principal question presented by this case is whether insurance liability coverage for a claim of malicious prosecution, even though expressly promised in the policy, is precluded by the provisions of Insurance Code section 533 which bars indemnity for "wilful acts" of an insured. [FN1]

> FN1  Insurance Code section 533 (hereinafter section 533) provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."

The parties also raised the application of Civil Code section 1668 (hereinafter section 1668) which provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." While

there are some differences in their application, these two statutes do embody the same public policy with respect to "wilful" acts. However, it is not at all clear that section 1668 applies to indemnity agreements such as an insurance policy. (See *Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1741 [286 Cal.Rptr. 435].) Moreover, since section 533 clearly precludes an insurer from indemnifying an insured for liability arising from the wilful injury to the person or property of another, there would be no reason for us to discuss or consider section 1668 even if it did apply. Therefore, throughout this opinion (except for our recitations of trial court rulings) we will focus our discussion solely on section 533.

Plaintiffs, appellants and cross-respondents, Richard Posell (Posell), Mitchell Shapiro and Ruth Shapiro (Shapiro) and The Downey Venture, a limited partnership (Downey) (collectively, the Downey plaintiffs), seek reversal of a declaratory judgment determining that section 533 bars indemnity for a claim for malicious prosecution which had been asserted against *487 the Downey plaintiffs in the underlying action. Defendant, respondent and cross-appellant, LMI Insurance Company (LMI), had issued to Downey a comprehensive general liability policy [FN2] which expressly promised coverage for a claim of malicious prosecution. [FN3] LMI cross appeals from the trial court's determination that its claim for reimbursement of funds advanced to settle the underlying action may be reduced by an amount found to be allocable to defense costs which LMI "saved" by entering into the settlement.

> FN2  As general partners of Downey, Posell and Shapiro were also included as insured parties under the LMI policy issued to the partnership.

> FN3  The relevant portions of Downey's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519

(Cite as: 66 Cal.App.4th 478)

policy provided:

"Coverage B. Personal and Advertising Injury Liability

"1. Insuring Agreement.

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments-Coverages A and B. We will have the right and duty to defend any 'suit' seeking those damages.... [¶] ... 'Personal Injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses:

"1. False arrest, detention or imprison- ment;

"2. *Malicious prosecution;*

"3. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

"4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

"5. Oral or written publication of material that violates a person's right of privacy." (Italics added.)

We conclude that the public policy precluding indemnification coverage for "wilful acts," as expressed in section 533, bars indemnification for any malicious prosecution claim for which an insured is personally liable in California, even though such coverage was expressly promised in the policy; however, such public policy does not preclude a defense and an insurer promising coverage for malicious prosecution is nonetheless liable to provide a defense to such a claim. We therefore affirm the judgment declaring that indemnity is precluded, but we reverse the trial court's order which limited LMI's right to recoup amounts paid to settle claims against the Downey plaintiffs. Any such reduction

of the reimbursement right would have the practical consequence of providing a proscribed indemnity benefit and an improper increase in LMI's defense burden.

Factual and Procedural Background

In 1992, Downey filed suit against Elizabeth O'Grady and Timothy Watson, as trustees of a trust which was the owner and lessor of a shopping center in which Downey was a lessee. Posell and Shapiro were Downey's *488 attorneys of record in that suit and were also its general partners. The litigation arose out of a dispute between Downey and said trustees with respect to the terms of the lease. FN4 Downey alleged causes of action for (1) breach of contract, (2) intentional and negligent interference with contract and interference with prospective economic advantage and (3) civil RICO (Racketeer Influenced and Corrupt Oranizations Act) violations.

> FN4 The lease involved had apparently been signed over 30 years before and provided for a relatively low rental. The litigation was initiated by Downey after O'Grady and Watson refused to consent to a proposed amendment to that lease sought by Downey which would have improved Downey's ability to obtain long-term financing for its business. However, it also appears that the requested change in the lease was one which the trust was not obligated to accept and which would not have been in its interest to grant.

On October 15, 1992, a summary judgment was entered against Downey and in favor of the trustees. FN5 On December 10, 1992, O'Grady filed suit against the Downey plaintiffs on claims for breach of contract, declaratory relief, abuse of process and malicious prosecution. The Downey plaintiffs filed an answer denying that they had liability on any of the alleged claims. Defense of the action was tendered to LMI.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

FN5 In granting summary judgment in favor of O'Grady and Watson, the trial court noted that there was no question, in light of the undisputed facts, that Downey's complaint was without merit. In addition to granting a summary judgment, the court also awarded sanctions against Downey's attorneys. The court's oral comments at the time it made such order included the following: "I think this is egregious that people who own or lease five acres of land for $2,500 per month because someone wrote them a sweet deal thirty years ago, and they are going to be able to take advantage of it for another twenty years, would have the nerve to sue someone because they won't allow them to change the conditions of the lease."

On March 12, 1993, LMI wrote to Shapiro advising that there was coverage under the "personal injury" provisions of Downey's policy for the malicious prosecution claim, but not for the breach of contract, declaratory relief or abuse of process claims. FN6 Nonetheless, LMI agreed to provide a full defense and expressly stated that "we are *not* reserving our rights in this case." [FN7]However, before LMI could assume the defense, Downey successfully demurred to the malicious prosecution cause of action on the ground that there was a pending appeal from the summary judgment granted in favor of O'Grady in the prior action. Thus, O'Grady could not truthfully allege a termination of the prior action in her favor. *489

FN6 Under settled law, the existence of a *potential* for coverage of one claim triggers a duty to defend, which duty necessarily includes a defense to the *entire* action even though that may include claims which are *not* potentially covered. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 48 [65 Cal.Rptr.2d 366, 939 P.2d 766]; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210,

846 P.2d 792]; *Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553, 563 [91 Cal.Rptr. 153, 476 P.2d 825].)

FN7 This statement was made in the context of advising Downey that the counsel it had hired to defend the action was not the responsibility of LMI; since LMI was not reserving any rights in the matter it would exercise its right to select counsel of its own choosing.

Once that appeal was resolved by an affirmance of the summary judgment, O'Grady amended her complaint to reallege the malicious prosecution claim. Defense of the action was then retendered to LMI. For reasons not made clear by the record, LMI requested a coverage opinion from its counsel before responding to this new tender. LMI claims that upon receipt of that opinion, it first became aware that section 533 precluded indemnification. Therefore, on April 12, 1994, it agreed to provide the Downey plaintiffs with a defense of the O'Grady complaint, [FN8]*but this time LMI fully reserved its rights* to dispute coverage and to seek reimbursement of any defense costs incurred or amounts paid by LMI on any settlement or judgment entered. FN9

FN8 In light of a then recently filed federal case (*Lunsford v. American Guarantee & Liability Ins. Co.* (9th Cir. 1994) 18 F.3d 653) holding that "malicious prosecution" can encompass a claim for "abuse of process," LMI agreed to fund the defense of the O'Grady action from the date it was filed rather than from the date of the retender of the malicious prosecution claim.

FN9 In his April 12, 1994, reservation of rights letter, LMI's counsel stated that the defense was provided "without a waiver of its right to contend there is no coverage and no duty to defend these lawsuits under the terms of the policy. Furthermore, [LMI] reserves the right to withdraw from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                    Page 9
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

the insureds' defense should the facts of its investigation make it clear there is no coverage. [LMI] also reserves the right to seek reimbursement of all costs incurred in the defense of the insureds and for any payments made in the settlement or on a judgment entered in this case, in the event it is determined [LMI] has no duty to defend or indemnify its insured."

Prior to the date that letter was sent, Watson (the other trustee of the trust) had filed (on February 9, 1994) his own action against the Downey plaintiffs, also alleging breach of contract, declaratory relief, abuse of process and malicious prosecution claims. This action was likewise tendered to LMI and the April 12 reservation of rights letter was expressly intended to apply to it as well.

Before the O'Grady and Watson actions came to trial, the trial court made two important rulings which affected both the nature and timing of the outcome of that litigation. Pursuant to Civil Code section 3295, subdivision (c), the trial court entered an order allowing pretrial discovery of Downey's financial condition. [FN10] In addition, the court granted O'Grady's motion *in limine* (based upon the factors articulated in *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863 [254 Cal.Rptr. 336, 765 P.2d 498]) (*Sheldon Appel*) that the Downey plaintiffs had filed their action against O'Grady *without probable cause.* [FN11]

> FN10 Under Civil Code section 3295, subdivision (c), such an order may only be made if the court finds upon "supporting and opposing affidavits presented, that the plaintiff has established that there is a *substantial probability* that the plaintiff will prevail on the [punitive damage claim]." (Italics added.)

> FN11 In *Sheldon Appel*, the Supreme Court adopted the *objective* standard to determine the presence or absence of probable cause. "[T]he probable cause element

calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable. The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]" (*Sheldon Appel, supra,* 47 Cal.3d at p. 878, italics in original.)

Within a week after these rulings, the O'Grady case settled. As a result of the rulings, the only issue which had remained to be litigated was the *490 question of whether the Downey plaintiffs had acted with malice. [FN12] Because of the exposure to liability and the risk of punitive damages, the Downey plaintiffs had demanded that LMI settle both cases. LMI agreed to do so. The O'Grady case was settled on April 5, 1995, for $600,000, to which LMI contributed $350,000. [FN13] One week later, on April 12, 1995, the Downey plaintiffs filed this action against LMI for breach of contract, breach of the implied covenant of good faith, and fraud. Shortly thereafter, the Watson case was settled. LMI's contribution to this settlement was $100,000. [FN14] LMI answered the complaint filed by the Downey plaintiffs and filed a cross-complaint for declaratory relief and reimbursement. FN15

> FN12 To establish a cause of action for malicious prosecution, a plaintiff must prove that the prior action (1) had been commenced at the direction of the defendant and was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice.(*Sheldon Appel, supra,* 47 Cal.3d at p. 871.)

> FN13 Coverage counsel for the Downey plaintiffs recognized that LMI's contribution of $350,000 to the O'Grady settlement was under a complete reservation of rights

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                    Page 10
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

including the right to recover both defense costs and indemnity amounts paid out by LMI in both the O'Grady and Watson actions.

FN14 The Downey plaintiffs contributed nothing to the settlement of either the O'Grady or Watson actions. The difference between the total amounts paid to conclude the settlements and the amounts contributed by LMI was paid by other insurers.

FN15 In its correspondence of June 12, 1995, to coverage counsel for the Downey plaintiffs, LMI made its position clear: "This letter is to again advise you that it is LMI's position that it is not obligated to indemnify the insureds for any damages awarded against them in the underlying lawsuit, resulting from their alleged malicious prosecution of Mr. Watson, as barred by Insurance Code section 533, as discussed in our prior correspondence. LMI again reasserts its position that there is no coverage and no duty to defend or indemnify under the terms of its policy. Again, LMI specifically reserves the right to litigate the issue of its defense and/or indemnity obligation and to litigate the various parties' obligations and rights to reimbursement of amounts it has paid [in] not only the Watson but also the O'Grady lawsuits."

In its cross-complaint, LMI alleged that it had conditioned its settlement of the O'Grady and Watson claims upon its right to seek reimbursement of any amounts paid in settlement and the Downey plaintiffs, having insisted those cases be settled, accepted that condition and were now liable to reimburse LMI for those sums. LMI also sought a declaratory judgment determining that it had no duty to defend or indemnify the Downey plaintiffs for the O'Grady and Watson claims, and that it was entitled to reimbursement of the settlement sums it paid to resolve both actions.

On November 20, 1995, the Downey plaintiffs filed a motion for summary adjudication of the issue as to whether LMI had a duty to defend the *491 O'Grady and Watson suits. While the motion did not specifically request a ruling on the duty to indemnify, the trial court reached that issue as well. It ruled that section 533 prohibited LMI from *indemnifying* for damages caused by malicious prosecution *irrespective of express language to the contrary in the insurance policy.* However, despite finding that there could never be an obligation to indemnify, the court stated that there was a distinction between the duty to defend and the duty to indemnify and found that "Section 533 does not prevent LMI from fulfilling its obligation to defend plaintiffs in accordance with the express provisions of its policy." FN16

FN16 In a colloquy with counsel for the Downey plaintiffs, the court explained its views:
"The Court: 'My position is 533 prohibits indemnification period, and they can't pay it.'
"Mr. Shapiro: 'All [r]ight.'
"The Court: 'It's a violation of public policy ...' "
The court then invited LMI to make a motion on the issue of indemnification stating:
"The Court: '... There's no question, then, I'm going to-when this is all done, you're going to hear me tell the other side to make a motion for summary judgment on the indemnification and as a matter of law they're entitled to that and I'll so rule....' "

LMI then made its own motion for summary adjudication of issues seeking reimbursement of settlement amounts paid in the O'Grady and Watson actions. LMI based this motion on the court's prior ruling that section 533 prevented it from indemnifying for malicious prosecution and on its continual reservation of its right to seek reimbursement of its settlement contributions. While the court found that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                                Page 11
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

LMI was entitled to obtain reimbursement, it also found that LMI could not recover the full amount paid toward the settlements. Rather, the court, concluded that LMI's reimbursement had to be reduced by any portion of the settlement payment which constituted "defense costs." [FN17]*492

> FN17 At the hearing on this motion, the trial court explained its ruling as follows: "The Court: '... So, going through this then and assuming that the only cause of action remaining at the time of settlement was for malicious prosecution, the issue is how to characterize the settlement money. That's the issue. How do you characterize the settlement money ... and the only issue before the court is, what is it, was it indemnity or was it defense costs? And I have a triable issue of fact. [¶] You're going to have to determine-determine to the court and if they-and if it was indemnity, the right to have that back. If it was defense cost they don't get it back because they have a duty to defend, as I said before, but they don't have to indemnify. And that's the issue before the court and that's the issue that has to be resolved, and that's a triable issue of fact.
> "Mr. Yuter [counsel for LMI]: Well your Honor, I'm a little perplexed as to how they could be defense costs. The money paid in settlement-
> "The Court: Every time that I settle a case, every time I settle case, that's what they take into consideration; how much is it going to cost the defendant; ...
> "Mr. Yuter: Well it wouldn't-it wouldn't cost $450,000.
> "The Court: I didn't say it did."
> It appears that the trial court intended to reduce LMI's reimbursement claim by the amount of the defense costs which LMI may have *saved* by settling the two actions. This would require a determination of the portion of the $450,000 claim which could

reasonably be allocated to defense costs and thus not subject to reimbursement since LMI had a duty to defend. (LMI did not seek to recoup any defense cost expenditures.)

On July 29, 1996, LMI moved for summary judgment or, in the alternative, summary adjudication, on the remaining causes of action in the complaint for breach of contract, bad faith and fraud. The trial court found for LMI on the causes of action for breach of contract and bad faith. The court found LMI had provided a defense and had properly reserved its rights to seek reimbursement of all sums paid for indemnity and such rights could not be waived. The court stated that "the public policy of this State, as set forth in Insurance Code Section 533, and Civil Code Section 1668 does not permit the waiver of any such right." However, the court refused to dismiss the third cause of action for fraud. After the court ruled on the above referenced motions, the Downey plaintiffs dismissed the third cause of action for fraud *without prejudice* and LMI filed an amended cross-complaint. [FN18]

> FN18 These amendments were apparently made because the parties agreed that the fraud and reimbursement issues had not been properly framed by the trial court. However, all legal issues were fully briefed and ruled on by the trial court.

The court entered judgment on the amended pleadings as follows: (1) LMI was granted judgment on the first and second causes of action of the complaint for breach of contract and breach of the implied covenant of good faith and fair dealing; (2) on LMI's cross-complaint, the court ruled that LMI had a duty to defend the Downey plaintiffs in the O'Grady and Watson matters, even though section 533 and section 533 precluded any duty to indemnify. In addition, LMI had properly reserved its rights to seek reimbursement of sums paid in settlement and was entitled to recover any sums which represented indemnity as opposed to costs of defense; and (3) the public policy of California did

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

not permit any party to waive the provisions of sections 533 and 1668; but the policy as set forth in those statutes did not in and of itself preclude a claim for fraud based on the facts presented in the present matter. [FN19]

> FN19 Apparently, the fraud claim was based on the theory that LMI, when it promised in the policy to provide coverage for malicious prosecution, had no intention of indemnifying the Downey plaintiffs on such a claim if it were ever filed and at all times LMI intended to assert the statutory exclusions in section 533 and section 1668.

Neither LMI nor the Downey plaintiffs were happy with these rulings and both have filed timely appeals.

### Issues Presented

This case presents four issues for resolution. First, is indemnification coverage for malicious prosecution necessarily precluded as a "wilful act" within the meaning of section 533 even though expressly promised in the *493 policy? Second, even though section 533 may preclude indemnification, can an insurer's promise of a defense to a malicious prosecution claim nonetheless be enforced? Third, having expressly promised to provide liability coverage for damages awarded against an insured arising from a claim for malicious prosecution, is LMI estopped from relying on section 533 or can it be held liable in fraud for making a promise of coverage which it allegedly never intended to provide? Finally, where LMI provides and fully pays for a complete defense, and concludes a settlement of the action against its insured, and then seeks reimbursement of settlement funds from the insured, may the reimbursement claim be reduced by requiring an allocation of some portion of the settlement amount to defense costs "*saved*" by the settlement? We answer the first two questions in the affirmative and the remaining two in the negative. [FN20]

> FN20 The issues presented by this appeal all relate to the impact of section 533 on a liability policy promising coverage for malicious prosecution and the legal consequences flowing to the parties from the insurer's assertion of section 533 as an exclusion to coverage. These are all legal issues which we resolve de novo. (*Goodstein v. Superior Court* (1996) 42 Cal.App.4th 1635, 1641 [50 Cal.Rptr.2d 459].)

### Discussion

#### 1. *The Element of Malice in the Tort of Malicious Prosecution*

(1) Central to the coverage issues presented by this case is the special nature of the tort of malicious prosecution and the public policies which inform our understanding and application of its three elements. [FN21] As one court put it, "Malicious prosecution is a disfavored action. [Citations.] This is due to the principles that favor open access to the courts for the redress of grievances. In fact, it has been held that access to the courts is a constitutional right founded upon the First Amendment to the United States Constitution. [Citations.] But regardless of any constitutional basis for the policy, it is beyond dispute that the strong public policy of this state favors open access to the courts for the resolution of conflicts. [Citations.] 'The courts of the state are open to every citizen for the redress of his wrongs, and unless he is at liberty to seek such redress without rendering himself liable in damages to the defendant, in case he shall fail to establish his complaint, this *494 right would in many instances be a barren privilege.' [Citation.] Accordingly, litigants have the right to present issues that are arguably correct even if it is extremely unlikely they will win. [Citations.] In view of these considerations the California Supreme Court has recently refused [in *Sheldon Appel*] to abandon or relax traditional limitations on malicious prosecution recovery. [Citation.]" (*Leonardini v. Shell Oil Co.* (1989)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

216 Cal.App.3d 547, 566 [264 Cal.Rptr. 883].) FN22

FN21 The malicious prosecution tort has ancient roots. Indeed, it goes back to the 10th or 11th century in Anglo-Saxon courts where the price for losing a suit was the loss of one's tongue. (See Note, *Groundless Litigation and the Malicious Prosecution Debate: A Historical Analysis* (1979) 88 Yale L.J. 1218, 1221.)Courts have long recognized the "chilling effect" of the tort on an ordinary citizen's willingness to report a crime or file a civil claim. (*Sheldon Appel, supra,*47 Cal.3d at p. 872.)Thus, "... the elements of the tort have historically been carefully circumscribed so that litigants with potentially valid claims will not be deterred from bringing their claims to court by the prospect of a subsequent malicious prosecution claim." (*Ibid.*)

FN22 In refusing to relax the rigid requirements for assertion of a malicious prosecution claim, the Supreme Court recognized that other remedies would be more effective in combating groundless litigation. "While the filing of frivolous lawsuits is certainly improper and cannot in any way be condoned, in our view the better means of addressing the problem of unjustified litigation is through the adoption of measures facilitating the speedy resolution of the initial lawsuit and authorizing the imposition of sanctions for frivolous or delaying conduct within that first action itself, rather than through an expansion of the opportunities for initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded. In recent years, the Legislature has taken several steps in this direction, enacting legislation to facilitate the early weeding out of patently meritless claims

and to permit the imposition of sanctions in the initial lawsuit-against both litigants and attorneys-for frivolous or delaying conduct. (See, e.g., Code Civ. Proc., §§ 437c, 1038, 128.5, 409.3.) Because these avenues appear to provide the most promising remedies for the general problem of frivolous litigation, we do not believe it advisable to abandon or relax the traditional limitations on malicious prosecution recovery." (*Sheldon Appel, supra,*47 Cal.3d at pp. 873-874.)

(2) In order to establish a cause of action for malicious prosecution of either a criminal or a civil proceeding, a plaintiff must demonstrate "that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations]." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

(3) The "malice" element, which is the one with which we are concerned in this matter, relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action. (*Sheldon Appel, supra,*47 Cal.3d at p. 874.)The motive of the defendant must have been something other than that of bringing a perceived guilty person to justice or the satisfaction in a civil action of some personal or financial purpose. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 429, 450 at pp. 511, 534). The plaintiff must plead and prove actual ill will *or* some *improper* ulterior motive.(*Ibid.*) It may range anywhere from open hostility to indifference. (See, e.g., *Bertero v. National General Corp., supra,*13 Cal.3d at p. 54 [attorney admitted filing suit because he " 'wanted to show the Appellate Court what a bastard Bertero was' "].)

In *Albertson v. Raboff* (1956) 46 Cal.2d 375 [295 P.2d 405], the defendant had prosecuted an action against the plaintiff in which he sought both a *495

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

money judgment and a lien on real property owned by the plaintiff or a judgment declaring that her title to the property in question had been obtained from her husband without consideration and in fraud of creditors. (*Id.* at p. 377.)After the plaintiff had successfully defeated that action, she filed an action for malicious prosecution against the defendant in which she alleged that he had no lien on or interest in her property and had knowingly and maliciously asserted false claims thereto. The court held that the element of malice was sufficiently alleged. "The malice required in an action for malicious prosecution is not limited to actual hostility or ill will toward plaintiff but exists when the proceedings are instituted *primarily* for an improper purpose. [Citations.] It has been pointed out that the 'principal situations in which the civil proceedings are initiated for an improper purpose are those in which (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; [and] (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim.' [Citation.]" (*Id.* at p. 383, italics added.) [FN23]

> FN23 This description of circumstances which will demonstrate an improper motive and thus the presence of "malice" is consistent with the way the term is defined by the Legislature when describing one of the elements which may be relied upon in order to justify an award of punitive damages: " '[m]alice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) However, we do not mean to suggest that a finding of malice sufficient to establish the tort of

malicious prosecution *necessarily* means that punitive damages are also recoverable. Under Civil Code section 3294, a punitive damage recovery depends upon the satisfaction of a higher standard of proof (i.e., "clear and convincing" evidence) as to the existence of elements (e.g., "malice" and "oppression") which are specifically defined by the statute. (Civ. Code, § 3294, subd. (a).)

(4) *Sheldon Appel* represents the Supreme Court's most recent consideration of the tort of malicious prosecution and, most particularly, the probable cause element of that tort. The court has rejected the notion that probable cause could be based upon a showing of reasonable investigation and diligent legal research on the part of an attorney as well as his or her subjective honest or reasonable belief in the merits of the claim asserted.(*Sheldon Appel, supra,*47 Cal.3d at pp. 878-879, 881-885.)The court's clarification of the rules applicable to probable cause has relevance to our concern with the issue of malice and the nature and character of the evidence necessary to prove it.

In its decision, the *Sheldon Appel* court departed from the approach adopted in earlier cases (see, e.g., *Runo v. Williams* (1912) 162 Cal. 444, 450*496 [122 P. 1082]; *Williams v. Coombs* (1986) 179 Cal.App.3d 626, 639 [224 Cal.Rptr. 865]; *Grove v. Purity Stores, Ltd.* (1957) 153 Cal.App.2d 234, 240 [314 P.2d 543]). Those pre-*Sheldon Appel* cases held that probable cause could be established by evidence that the attorney had conducted (1) a reasonable investigation and (2) an industrious search of legal authority and, based thereon, had an "honest belief" that the asserted claim was legally tenable. As one court summarized the prior rule, " 'The test [for probable cause] is twofold. The attorney must entertain a subjective belief ... that the claim merits litigation and that belief must satisfy an objective standard.' [Citation.] To meet the objective standard, the attorney must not prosecute 'a claim which a reasonable lawyer would not regard

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                                                    Page 15
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

as tenable or by unreasonably neglecting to invest-
igate the facts and law in making his determination
to proceed, ....' [Citation.]" (*Williams v. Coombs,
supra,* 179 Cal.App.3d at p. 639; see also *Albertson
v. Raboff, supra,* 46 Cal.2d at p. 382.)

*Sheldon Appel* has clearly altered this analysis. It
involved an action for malicious prosecution
against a law firm for filing and prosecuting an ac-
tion against the plaintiff arising from a real estate
dispute between the plaintiff and the defendant law
firm's clients. [FN24] The court held that where there
is no dispute as to the facts upon which an attorney
acted in filing the prior action, the question of
whether there was probable cause to institute that
action is purely a legal question. (47 Cal.3d at p.
868.) [FN25] That legal question is "to be determined
by the trial court on the basis of whether, *as an ob-
jective matter,* the prior action was legally tenable
or not." (47 Cal.3d at p. 868, italics added.) The
*subjective* beliefs of the defendant attorney as to
legal tenability of the action are not relevant to the
question of probable cause. "Whereas the malice
element is directly concerned with the *subjective*
mental state of the defendant in instituting the prior
action, the probable cause element calls on the trial
court to make an objective determination of the
'reasonableness' of the defendant's conduct, i.e., to
determine whether, on the basis of the facts known
to the defendant, the institution of the prior action
was legally tenable. The resolution of that question
of law calls for the application of an *497 *objective*
standard to the facts on which the defendant acted.
[Citation.] Because the malicious prosecution tort is
intended to protect an individual's interest 'in free-
dom from unjustifiable and unreasonable litigation'
[citation], if the trial court determines that the prior
action was objectively reasonable, the plaintiff has
failed to meet the threshold requirement of demon-
strating an absence of probable cause and the de-
fendant is entitled to prevail." (*Id.* at p. 878, italics
in original.)

FN24 In *Sheldon Appel,* the court dis-
cussed the impact of the attorney's know-

ledge in the context of a suit for malicious
prosecution brought against both the attor-
neys and their clients based on the prosec-
ution of the prior action. These are the
facts we have here. *Sheldon Appel*'s focus
on the actions, research, evaluation and
knowledge of the defendant attorneys no
doubt resulted from the fact that nonattor-
ney defendants can usually demonstrate
the existence of probable cause, and thus
avoid liability, by evidence showing that
they relied on the advice of counsel in
good faith after full disclosure of the facts.
(*Sosinsky v. Grant* (1992) 6 Cal.App.4th
1548, 1556 [8 Cal.Rptr.2d 552].)

FN25 If there is a dispute as to such facts,
that dispute must be resolved by the trier
of fact before the objective standard can be
applied by the court. (*Sheldon Appel,
supra,* 47 Cal.3d at p. 881; *Sosinsky v.
Grant, supra,* 6 Cal.App.4th at p. 1557; *Le-
onardini v. Shell Oil Co., supra,* 216
Cal.App.3d at p. 569.)

The court expressly rejected dicta in a number of
appellate decisions (see e.g., *Tool Research & En-
gineering Corp. v. Henigson* (1975) 46 Cal.App.3d
675, 683 [120 Cal.Rptr. 291]) to the effect that con-
sideration of probable cause could take into account
the attorney's lack of an "honest belief" that his or
her client's claim was legally tenable. (*Sheldon Ap-
pel, supra,* 47 Cal.3d at pp. 877-878.) [FN26] Despite
what it described as language in some of its own
earlier decisions which "are not as clear as they
might be with respect to the 'objective' versus 'sub-
jective' nature of the probable cause element,"
FN27 the court stated that, "properly understood," those decisions are consistent with the conclusion
that the attorney's *subjective* belief in the legal ten-
ability of the claim asserted in the client's prior ac-
tion is *not* relevant to the issue of probable cause.
(47 Cal.3d at pp. 879, 881.) [FN28] *Sheldon Appel*
also rejected the suggestion set out in the dicta of
the *Tool Research* decision and several cases which

66 Cal.App.4th 478                                                      Page 16
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
**(Cite as: 66 Cal.App.4th 478)**

thereafter followed it (see, e.g., *Weaver v. Superior Court* (1979) 95 Cal.App.3d 166, 188-190 [156 Cal.Rptr. 745]; *Williams v. Coombs, supra,* 179 Cal.App.3d at pp. 640-644), that an attorney's reasonable investigation and industrious search of legal authority are essential components of probable cause. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 882-883.)The court held that such an approach constituted an improper shift in the focus of the inquiry away from the legal issue of objective tenability and towards the adequacy of the particular defendant's performance as an attorney. The court specifically held that the adequacy of the attorney's research was "not relevant to the probable cause determination." (*Id.* at p. 883.)

> FN26 *Tool Research & Engineering Corp. v. Henigson, supra,* 46 Cal.App.3d 675, and its progeny were disapproved to the extent that they are contrary to the conclusions reached by the *Sheldon Appel* court.(*Sheldon Appel, supra,* 47 Cal.3d at p. 883, fn. 9.)

> FN27 See *Franzen v. Shenk* (1923) 192 Cal. 572, 576-578 [221 P. 932]; *Albertson v. Raboff, supra,* 46 Cal.2d at page 382; *Bertero v. National General Corp., supra,* 13 Cal.3d at page 55.

> FN28 As the *Sheldon Appel* court put it, "... the issue of the attorney's subjective belief or nonbelief in legal tenability would rarely be susceptible of clear proof and, when controverted, would always pose a factual question [which would] in many cases effectively leave the ultimate resolution of the probable cause element to the jury, rather than to the court." (47 Cal.3d at p. 879.)

(5) Thus, probable cause depends entirely on an *objective* evaluation of legal tenability based on either (1) the facts known to the attorney at the time *498 he or she brought the prior action (*Nicholson v. Lucas* (1994) 21 Cal.App.4th 1657, 1665-1666 [26 Cal.Rptr.2d 778]; *Leonardini v. Shell Oil Co., supra,* 216 Cal.App.3d at p. 570) or (2) subsequent events in the litigation which demonstrate, as a matter of law, that the prior action was *objectively* tenable. (*Hufstedler, Kaus & Ettinger v. Superior Court* (1996) 42 Cal.App.4th 55, 62, 64-66 [49 Cal.Rptr.2d 551].) Only if the court determines that such *objective* tenability is absent, will the jury be asked to determine the presence or absence of malice. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 874, 876-877.)

(6) The refocus of the probable cause analysis brought about by *Sheldon Appel* has undercut the rule recognized in the older cases that malice could be inferred from the absence of probable cause. (See, e.g., *Runo v. Williams, supra,* 162 Cal. at p. 450; *Williams v. Coombs, supra,* 179 Cal.App.3d at p. 639, fn. 8; *Grove v. Purity Stores, Ltd., supra,* 153 Cal.App.2d at p. 241; *Jensen v. Leonard* (1947) 82 Cal.App.2d 340, 351 [186 P.2d 206].) Prior to *Sheldon Appel,* such a rule had a logical basis since, as the Supreme Court had previously said, "... probable cause requires a *reasonable belief* in the validity of the claim asserted." (*Albertson v. Raboff, supra,* 46 Cal.2d at p. 382, italics added.) The absence of a reasonable belief in the claim, a factor relating to the defendant's *subjective* state of mind, would logically permit an inference that the prior action had in fact been prosecuted for an improper purpose. However, under the standard adopted in *Sheldon Appel,* the factor of a "reasonable" or "honest" belief in the claim asserted is no longer relevant to, nor a part of, the court's determination as to the existence of probable cause.

Thus, by itself, the conclusion that probable cause is absent logically tells the trier of fact nothing about the defendant's subjective state of mind. That being so, it does not seem logical to permit any inference to be drawn as to a *subjective* state of mind solely from the absence of *objective* tenability.Evidence Code section 600, subdivision (b), provides, "An inference is a deduction of fact that may *logically and reasonably* be drawn from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

another fact or group of facts found or otherwise established in the action." (Italics added.) Merely because the prior action lacked legal tenability, as measured objectively (i.e., by the standard of whether any reasonable attorney would have thought the claim tenable [see *Sheldon Appel, supra,*47 Cal.3d pp. 885-886]),*without more,* would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind. In other words, the presence of malice must be established by other, additional evidence. [FN29]

> FN29 We do not mean to suggest, however, that the court's legal determination that probable cause is absent is not a fact or circumstance which the jury may consider in determining the presence of malice. We hold only that, standing alone, it is not sufficient to demonstrate malice.

As we have discussed, that evidence must include proof of either actual hostility or ill will on the part of the defendant or a subjective intent to *499 deliberately misuse the legal system for personal gain or satisfaction at the expense of the wrongfully sued defendant. (See *Albertson v. Raboff, supra,*46 Cal.2d at p. 383.)In other words, in California, the commission of the tort of malicious prosecution requires a showing of an unsuccessful prosecution of a criminal or civil action, which any reasonable attorney would regard as totally and completely without merit (*Sheldon Appel, supra,*47 Cal.3d at p. 885), for the intentionally wrongful purpose of injuring another person. This leads to our consideration of the question of whether the commission of this tort *necessarily* constitutes a wilful act.

### 2. Section 533 Bars Indemnification for "Wilful" Acts

(7) Section 533 precludes insurance coverage (i.e., indemnification) for a "*wilful act.*" [FN30]

> FN30 Section 533 is a recodification of

former Civil Code section 2629, enacted in 1872 as part of the original Civil Code. (Former Civ. Code, § 2629 was repealed in 1935 and is now Ins. Code, § 533.) Section 2629 originally provided: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, nor by fraud or negligence on the part of his agents or others." The second clause of section 2629 was amended once, in 1874, to read: "but he is not exonerated by the negligence of the insured, or of his agents or others." (See Stats. 1873-1874, ch. 612, § 242, p. 256.) The first clause of section 2629, exonerating an insurer "for a loss caused by the wilful act of the insured," has survived without amendment since its enactment in 1872. (*Evans v. Pacific Indemnity Co.* (1975) 49 Cal.App.3d 537, 541 [122 Cal.Rptr. 680].)

In what appears to be the earliest case in which the California Supreme Court examined what is now section 533, the court stated the purpose of the section was to permit indemnity for negligent acts, no matter the degree of negligence, but to forbid indemnity for wilful acts of misconduct: "To set at rest questions involving the different degrees of negligence, and the results following therefrom, we may reasonably suppose was the object of the framers of our Civil Code. [¶] Under section 2629 of the Civil Code the nice distinctions often made necessary are dispensed with, and the general proposition is established that no form of negligence on the part of the insured, or his agents or others, leading to a loss avoids the policy, unless it amounts to a wilful act on the part of the insured." (*McKenzie v. Scottish U. & N. Ins. Co.* (1896) 112 Cal. 548, 557-558 [44 P. 922].)

The purpose of such a prohibition is obviously to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                                                   Page 18
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

discourage wilful torts. (*Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 648 [39 Cal.Rptr. 731, 394 P.2d 571].) It reflects a fundamental public policy to deny insurance coverage for wilful wrongs. (*J. C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1019-1020 [278 Cal.Rptr. 64, 804 P.2d 689].) FN31 It is an implied exclusionary clause which, by statute, must be read *500 into all insurance policies. (*Id.* at p. 1019.) FN32As a result, the parties to an insurance policy cannot contract for such coverage. (*Id.* at p. 1020, fn. 8.) The question we must answer is what is embraced in the term "wilful"?

> FN31 As we discuss below, while this is the public policy of California, it is not one which is universally shared. In some other states, a greater emphasis is placed upon the enforcement of contracts and the compensation of injured third party claimants. In those states where such different policy choices are made, insurance coverage for damages arising from an insured's wilful acts is not precluded.

> FN32 Because the exclusion embodied in section 533 is a statute, the normal rules of contract interpretation do not apply. Rather, the rules of *statutory* construction control. (*J. C. Penney Casualty Ins. Co. v. M. K.*, *supra*,52 Cal.3d at p. 1020, fn. 9.) Thus, in interpreting this statutory language we do not construe any ambiguity which may exist against the insurer, but instead we construe the statutory language so as to effectuate the legislative purpose and intent. As we have already stated, that legislative purpose is both clear and unequivocal. It is to deny insurance coverage for wilful wrongs.

Clearly, it is something more than mere negligence as, at a minimum, a wilful act is an *intentional* one. (*J. C. Penney Casualty Ins. Co. v. M. K.*, *supra*,52 Cal.3d at p. 1019.)Acts of gross negligence or recklessness are not wilful acts within the meaning of

section 533. (52 Cal.3d at pp. 1020-1021.)For example, drunk driving, per se, is reckless conduct. Nonetheless, there may be coverage for an accident caused by drunk driving, notwithstanding section 533. (*Interinsurance Exchange v. Flores* (1996) 45 Cal.App.4th 661, 672 [53 Cal.Rptr.2d 18].) A wilful act within the meaning of section 533 also means something more than the *intentional* doing of an act constituting ordinary negligence or the violation of a statute. (*B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 94 [9 Cal.Rptr.2d 894].)

A "wilful act" under section 533 will include either "an act deliberately done for the *express purpose* of causing damage or intentionally performed *with knowledge* that damage is highly probable or *substantially certain* to result." (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 742 [15 Cal.Rptr.2d 815], italics added.) It also appears that a wilful act includes an intentional and wrongful act in which "... the harm is inherent in the act itself." (*J. C. Penney Casualty Ins. Co.*, *supra*, *v. M. K.*, *supra*,52 Cal.3d at p. 1025.)In an earlier case, the Supreme Court had said that "... even an act which is 'intentional' or 'willful' within the meaning of traditional tort principles will not exonerate the insurer from liability ... unless it is done with a 'preconceived design to inflict injury.' " (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 887 [151 Cal.Rptr. 285, 587 P.2d 1098].) However, the issue to which the *Clemmer* court spoke involved a question of the insured's mental capacity. Subsequent decisions have made clear that the "preconceived design to injure" standard is relevant only when the insured's "mental capacity is an issue or the insured's intent or motive might justify an otherwise wrongful act." (*Shell Oil Co. v. Winterthur Swiss Ins. Co.*, *supra*,12 Cal.App.4th at p. 740; see also *J. C. Penney Casualty Ins. *501 Co. v. M. K.*, *supra*,52 Cal.3d at pp. 1021-1025.)Citing *J. C. Penney*, the *Shell Oil* court emphasized that "section 533 precludes *indemnification, whether or not the insured subjectively intended harm,* if the insured seeks coverage for an in-

66 Cal.App.4th 478                                                Page 19
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

tentional, wrongful act that is inherently and neces-
sarily harmful." (*Shell Oil Co. v. Winterthur Swiss
Ins. Co., supra,* 12 Cal.App.4th at pp. 740-741, ital-
ics added.)

Although it was speaking in the context of an envi-
ronmental pollution case, the *Shell Oil* court prop-
erly summarized the rule which governs the scope
and application of section 533: "We conclude that
section 533 prohibits indemnification of more than
just intentional acts that are subjectively desired to
cause harm and acts that are intentional, wrongful,
and necessarily harmful regardless of subjective in-
tent. A 'wilful act' under section 533 must also in-
clude a deliberate, liability-producing act that the
individual, before acting, expected to cause harm.
Conduct for which the law imposes liability, and
which is expected or intended to result in damage,
must be considered wrongful and willful. There-
fore, section 533 precludes indemnification for li-
ability arising from deliberate conduct that the in-
sured expected or intended to cause damage." (12
Cal.App.4th at pp. 742-743.)

*J. C. Penney,* on which the *Shell Oil* court so heav-
ily relied, represented a definitive clarification of
California law with respect to the proper analytical
approach to resolving issues raised under section
533 in a very specific fact situation (i.e., acts of
sexual molestation where the insured argued that he
had "intended no harm" to the minor victim). Per-
haps because of those very specific facts, *J. C. Pen-
ney* had expressly limited the application of its reas-
oning and analysis to cases involving the sexual
molestation of children. However, other courts have
had no trouble extending these same principles to
different factual circumstances where the defend-
ant's act was both intentional and wrongful and the
harm caused was inherent in or predictably resulted
from the act. In those cases, the insurer's liability to
indemnify for damages arising from the insured's
intentional, wrongful and inherently or predictably
harmful conduct was rejected in reliance on the
statutory proscription in section 533. (See, e.g., *Mi-
chaelian v. State Comp. Ins. Fund* (1996) 50

Cal.App.4th 1093, 1106-1107 [58 Cal.Rptr.2d 133]
[claims against insured involved assault, battery
and intentional infliction of emotional distress]; *In-
terinsurance Exchange v. Flores, supra,* 45
Cal.App.4th at pp. 672-673 [insured driver alleged
to have aided and abetted assault with a deadly
weapon in a drive-by shooting]; *Jacobs v. Fire Ins.
Exchange* (1995) 36 Cal.App.4th 1258, 1278-1279
[42 Cal.Rptr.2d 906] [insured charged with unjusti-
fied, nonaccidental shooting of third party]; *Re-
agen's Vacuum Truck Service, Inc. v. Beaver Ins.
Co.* (1994) 31 Cal.App.4th 375, 386-388 [37
Cal.Rptr.2d 89] [claim against insured employer in-
volved serious and willful *502 violation of an em-
ployee's right to a safe workplace]; *Baker v. Mid-
Century Ins. Co.* (1993) 20 Cal.App.4th 921,
924-925 [25 Cal.Rptr.2d 34] [insured sought recov-
ery from insurer of attorneys' fees awarded under
Code of Civil Procedure section 1021.4 in a person-
al injury case arising from insured defendant's felo-
nious conduct]; *Aetna Casualty Surety Co. v. Su-
perior Court* (1993) 19 Cal.App.4th 320, 330-331
[23 Cal.Rptr.2d 442] [insured alleged to have *in-
duced* patent infringement, an act which is neces-
sarily both intentional and knowing]; *Coit Drapery
Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14
Cal.App.4th 1595, 1603-1604 [18 Cal.Rptr.2d 692]
[insured employer's president/principal shareholder
and managerial employee were alleged to have en-
gaged in acts of sexual harassment]; *California
Casualty Management Co. v. Martocchio* (1992) 11
Cal.App.4th 1527, 1533 [15 Cal.Rptr.2d 277]
[insured sought to recover from insurer sanctions
for bad faith litigation tactics imposed pursuant to
Code of Civil Procedure section 128.5]; *B & E
Convalescent Center v. State Compensation Ins.
Fund, supra,* 8 Cal.App.4th at pp. 97-99 [insured
employer sought indemnity and defense under an
employer liability policy for employee's action for
employment discrimination and retaliatory dis-
charge]; *Fire Ins. Exchange v. Altieri* (1991) 235
Cal.App.3d 1352, 1358-1360 [1 Cal.Rptr.2d 360]
[insured parents and teenage son sued for serious
injuries caused by son's intentional physical assault
upon another teenager]; *Studley v. Benicia Unified*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Sch. Dist.* (1991) 230 Cal.App.3d 454, 458-459 [281 Cal.Rptr. 631] [insured's son shot the victim at point blank range while merely "intending" to frighten her]; *Aetna Cas. & Sur. Co. v. Sheft* (9th Cir. 1993) 989 F.2d 1105, 1108 [insured movie star was sued for damages by his sexual partner, who alleged that movie star had engaged in "high risk sex" with partner *after* learning that he (the movie star) had AIDS]; *Empl. Ins. of Wausau v. Musick, Peeler, & Garret* (S.D.Cal. 1994) 871 F.Supp. 381, 386-387 [claim against insured was based on fraud and misrepresentation, including securities fraud]; *Save Mart Supermarkets v. Underwriters* (N.D.Cal. 1994) 843 F.Supp. 597, 605-606 [claim against insured involved disparate treatment discrimination claims]; *Trailer Marine Transport v. Chicago Ins. Co.* (N.D.Cal. 1992) 791 F.Supp. 809, 811-812 [claim against insured involved allegations of intentional violations of the Sherman Antitrust Act (15 U.S.C. § 1)]; *Allstate Ins. Co. v. Tankovich* (N.D.Cal. 1991) 776 F.Supp. 1394, 1397-1398 [claim against insured arose from racially motivated hate crimes]; *State Farm Fire & Cas. Co. v. Ezrin* (N.D.Cal. 1991) 764 F.Supp. 153, 155-157 [adult insured was charged with committing a non-consensual sexual assault on an 17-year-old minor-- the court refused to limit *J. C. Penney* to sexual assaults on *children* under the age of 14 years].) (8) As we now discuss, what is true about all of these claims, and their intentional, wrongful and inherently or predictably harmful character, is also true about a claim for malicious prosecution. *503

### 3. *Section 533 Bars Indemnification for a Claim of Malicious Prosecution*

We do not write on an entirely clean slate. In *Maxon v. Security Ins. Co.* (1963) 214 Cal.App.2d 603 [29 Cal.Rptr. 586] and in *State Farm Fire & Casualty Co. v. Drasin* (1984) 152 Cal.App.3d 864 [199 Cal.Rptr. 749], it was held that coverage for a malicious prosecution claim was precluded by section 533.

In *Maxon,* the insured was a store owner who had

received a check from a customer which was later returned by the bank marked "account closed." Maxon then filed a complaint with the district attorney and the customer was arrested. However, the criminal complaint was later dismissed and the customer sued Maxon for malicious prosecution. When Maxon tendered defense of the action to his insurer, coverage was denied and a defense was refused. Maxon then sued the insurer to recover the sums he had expended in successfully defending against the customer's action. The matter was submitted to the trial court on the legal question of whether the language of the policy required the insurer to reimburse Maxon for his defense costs and expenses. Relying on section 533, the trial court granted summary judgment in favor of the insurer. In its opinion affirming that judgment, the Court of Appeal held that the liability policy issued to Maxon provided coverage for bodily injury sustained by any person " ' "caused by accident and arising out of the retail store hazard. " ' " (214 Cal.App.2d at p. 611.)Although there was no specific policy reference to "malicious prosecution," the court in *Maxon* held that the policy language would provide coverage for a claim arising from such a tort *except for the preclusion of section 533.* Emphasizing that absent evidence of malice an insured would never be held liable for any damages based on a claim of malicious prosecution, the court stated, " 'The element of malice necessarily involves the process of the mind and its thinking.' [Citation.] Malice imports willfulness; and, accordingly, in our opinion, is a 'willful act' within the meaning of section 533." (214 Cal.App.2d at p. 616.)

In *Drasin,* State Farm filed an action for declaratory relief to determine whether it had any duty to defend or indemnify its insured (under a homeowner's policy) in an action for malicious prosecution filed against him by a third party. A summary judgment in favor of State Farm was affirmed. The *Drasin* court relied entirely on *Maxon* when it held: "The malicious prosecution complaint filed against the Drasins does not potentially seek damages that come within the coverage of the subject policy. If

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 21

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

the Drasins' original action against Covell is held to be without malice and therefore not wilful, then there is no liability under the policy. Similarly, if the Drasins' original *504 action against Covell is held to be wilful and with malice, again there is no liability under the policy. (See Ins. Code, § 533.) 'The obligation to defend is predicated upon liability for a loss covered by the policy.' (Maxon v. Security Ins. Co., supra, 214 Cal.App.2d at p. 616; italics added.) Therefore, since State Farm could not be liable under the policy for damages predicated upon the tort of prosecution, it is not obligated to defend such an action." (State Farm Fire & Casualty Co. v. Drasin, supra, 152 Cal.App.3d at pp. 868-869.)

Other courts have been less definitive as to the impact of section 533 on a claim for malicious prosecution. In City Products Corp. v. Globe Indemnity Co. (1979) 88 Cal.App.3d 31 [151 Cal.Rptr. 494], we held that there was no coverage for a punitive damage award made in a malicious prosecution case. While that case involved a "personal injury" coverage clause like we have here, our holding of noncoverage was directed at and limited to the punitive award which had been made in the underlying action. Unlike the case before us, the defendant insurer had not denied coverage as to the claim of malicious prosecution itself and, indeed, had promptly paid the compensatory damage award which had been made. Thus, we were not called upon to reach the issue which is presented by this case.

Similarly, in two other cases the appellate court simply assumed that insurance coverage for malicious prosecution was available but found no coverage because of when the tort was committed. (Harbor Ins. Co. v. Central National Ins. Co. (1985) 165 Cal.App.3d 1029, 1043 [211 Cal.Rptr. 902]; Zurich Ins. Co. v. Peterson (1986) 188 Cal.App.3d 438, 448 [232 Cal.Rptr. 807].) In both of these cases, the policies also expressly provided for malicious prosecution coverage.

However, in California Casualty Management Co.

v. Martocchio, supra, 11 Cal.App.4th at page 1535-1536, the court rejected this distinction and asserted that Maxon had correctly stated the rule and it did not matter whether coverage was based on an "occurrence" or a "personal injury" clause. In California Casualty, Martocchio, the insured, sued a broadcaster for slander. The action was dismissed by the trial court because Martocchio failed to bring the case to trial in a timely fashion. The court also determined, upon a motion made by the defendant broadcaster, that Martocchio had engaged in bad faith litigation tactics. A sanction of $216,460 was awarded under Code of Civil Procedure section 128.5 on the grounds that (1) Martocchio had engaged in bad faith actions or tactics in filing and maintaining the lawsuit, and (2) the action was "totally and completely without merit." Martocchio then demanded that California Casualty, his liability insurer, pay the sanctions award. The insurer denied the claim and filed an action for declaratory relief to determine the issue of its liability. The trial *505 court granted summary judgment in favor of the insurer and the Court of Appeal, relying on section 533, affirmed. It held that bad faith litigation tactics which are frivolous or solely intended to cause unnecessary delay are always intentional and wrongful and the resulting harm is inherent as a matter of law. (California Casualty Management Co. v. Martocchio, supra, 11 Cal.App.4th at p. 1534.) Such acts, the court held, are patently "wilful" and insurance coverage is proscribed by section 533. (11 Cal.App.4th at p. 1534.) Although the policy contained provisions promising (personal injury) coverage for malicious prosecution, the court rejected Martocchio's argument that his actions were analogous to that tort so as to warrant coverage for the court-imposed sanctions. The court held that even if Martocchio's analogy argument had merit, there still would be no coverage. Relying on the decision in Maxon, the court concluded that coverage was not available for malicious prosecution. The court held that section 533 bars insurance coverage for any wilful acts-as a matter of statutory, not contractual, interpretation. (11 Cal.App.4th at p. 1535.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                Page 22
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

In *B & E Convalescent Center v. State Compensation Ins. Fund, supra,* 8 Cal.App.4th 78, we were presented with the question of whether there could be any liability coverage for claims of employer discrimination on the basis of the employee's age, gender or ethnicity, and retaliatory termination for the purpose of interfering with statutorily protected collective bargaining rights. These claims were based on allegations that the insured employer had wrongfully discharged the employee claimant in violation of state and federal laws proscribing (1) discrimination on the basis of age, gender or ethnic origin and (2) termination effected for the purpose of defeating established labor union rights. Clearly, such claims could only be established by evidence of an employer's motive and intent to violate or frustrate laws declaring fundamental public policy. We pointed out, albeit in a different factual context, that "[a]n affirmative act which can only violate the law when it is accompanied by such an impermissible motivation *necessarily* involves willful and intentional misconduct." (*Id.* at p. 95, italics in original, fn. omitted; see also *Trailer Marine Transport v. Chicago Ins. Co., supra,* 791 F.Supp. at pp. 811-812.)

Thus, in *B & E Convalescent Center,* the insured's alleged misconduct would only be actionable if the insured had acted with an improper and legally impermissible motive or purpose. The same is true with respect to malicious prosecution. The commission of that tort necessarily involves, indeed requires, an impermissible motivation. An insured can only be found liable for malicious prosecution if the insured is found to have possessed "actual hostility or ill will toward plaintiff [or if] ... the proceedings are instituted primarily for an improper purpose." (*Albertson v. Raboff, supra,* *50646 Cal.2d at p. 383.) As the court in *Sheldon Appel, supra,* explained, "... the malice element is directly concerned with the *subjective* mental state of the defendant in instituting the prior action, ..." (47 Cal.3d at p. 878, italics in original.)

The presence of such hostility, ill will or improper

motivation is sufficient to establish the tort of malicious prosecution as not only an intentional act, but one that is wrongful; and it is necessarily harmful to both the plaintiff and the judicial process. As the Supreme Court has clearly stated, "[t]he malicious commencement of a civil proceeding is actionable because it harms the individual against whom the claim is made, and also because it threatens the efficient administration of justice. The individual is harmed because he is compelled to defend against a fabricated claim which not only subjects him to the panoply of psychological pressures most civil defendants suffer, but also to the additional stress of attempting to resist a suit commenced out of spite or ill will, often magnified by slanderous allegations in the pleadings.... [¶] The judicial process is adversely affected by a maliciously prosecuted cause not only by the clogging of already crowded dockets, but by the unscrupulous use of the courts by individuals '... as instruments with which to maliciously injure their fellow men.' [Citation.]" (*Bertero v. National General Corp., supra,* 13 Cal.3d at pp. 50-51.) Such harm and injury is both inherent and predictable.

We therefore conclude that the commission of this tort constitutes a wilful act within the meaning of section 533. As a result, there can be no indemnification under the LMI policy as it is clearly precluded by that statutory provision. However, as we shall now discuss, that does not mean that there was no coverage provided to the Downey plaintiffs under that policy.

### 4. *Section 533 Does Not Preclude a Promised Defense to a Malicious Prosecution Claim*

(9) The general rules applicable to an insurer's duty to defend were summarized by the Supreme Court in *Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at page 1081: "It is by now a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] As we said in *Gray* [v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275

66 Cal.App.4th 478                                                              Page 23
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

[54 Cal.Rptr. 104, 419 P.2d 168]], 'the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy.' [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.] [¶] The determination whether the insurer owes a duty *507 to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy.... [¶] Once the defense duty attaches, the insurer is obligated to defend against all of the claims involved in the action, both covered and noncovered, until the insurer produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a noncovered claim. [Citations.] Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. [Citation.]" (Italics in original; see also *Buss v. Superior Court, supra,* 16 Cal.4th at pp. 45-46.)Put another way, a liability insurer is obligated to provide a defense to any claim which *potentially* covered under the terms of the policy and in light of the claim(s) asserted as defined by the pleadings in the action filed against the insured and by other facts or circumstances of which the insurer has knowledge. (*Buss v. Superior Court, supra,* 16 Cal.4th at p. 46; *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

Conversely, in an action filed against the insured in which there is *no* potential that the insurer will have to provide indemnification, then, as a general rule, there is no duty to defend. (*Buss v. Superior Court, supra,* 16 Cal.4th at p. 47.)(10) In this case, we have concluded that the Downey plaintiffs have no right of indemnification under the policy. The question which therefore arises, given the clear language of *Buss,* is why does that conclusion not also foreclose any obligation on LMI's part to provide a defense? The answer is found in the language of LMI's policy.

The personal injury section of the policy promises to *both* indemnify *and* defend any claims arising from certain specified "offenses" committed during the policy period. One of those "offenses" is malicious prosecution. In other words, there is a specific and express promise of both indemnity and defense coverage. Such language, absent the impact of section 533, would most certainly justify the conclusion of the reasonable policyholder that there was full coverage; and, indeed, but for section 533, there would be. However, as we have explained, *indemnity* coverage *is* precluded, the policy language to the contrary notwithstanding. Parties to a contract of insurance have no power to provide for coverage barred by section 533. (*J. C. Penney Casualty Ins. Co. v. M. K., supra,* 52 Cal.3d at pp. 1019-1020, fn. 8.)

However, while indemnification of such claim is precluded by section 533, that conclusion does not apply to LMI's defense commitment which, in this policy, is a specific and distinct commitment. With respect to that part of LMI's promise, section 533 presents no barrier. As we stated in *B & E *508 Convalescent Center,* " '[S]ection 533 precludes only *indemnification* of wilful conduct and not the *defense* of an action in which such conduct is alleged. [Citation.] ... [¶] [E]ven though public policy or section 533 precludes an insurer from indemnifying an insured in an underlying action the duty to defend still exists so long as the "insured reasonably expect[s] the policy to cover the types of acts involved in the underlying suit [.]" [Citation.]' [Citation]. Put another way, 'if the reasonable expectations of an insured are that a defense will be provided for a claim, then the insurer cannot escape that obligation merely because public policy precludes it from indemnifying that claim.' [Citation.]" (*B & E Convalescent Center v. State Compensation Ins. Fund, supra,* 8 Cal.App.4th at p. 93.)

In *B & E Convalescent Center,* we stated that we read this "statement of principle to mean only that an insurer and an insured are free to contract for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478

Page 24

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519

(Cite as: 66 Cal.App.4th 478)

provision of a defense to a claim which can not be indemnified. That is, if an insured either expressly purchases a defense without regard to indemnification (e.g., a litigation policy) or is led by the terms of the insurance agreement, whether those terms be clear or ambiguous, to reasonably expect a defense to the type of claim asserted, then a defense may be required even though there can legally be no duty to indemnify because of section 533." (8 Cal.App.4th at p. 101.) [FN33]Obviously, the public policy concerns applicable to an insurer's indemnification do not extend to the provision of a defense. An agreement to *defend* an insured " 'upon mere accusation of a wilful tort does not encourage such wilful conduct.' [Citation.]" (*Horace Mann Ins. Co.* v. *Barbara B., supra,*4 Cal.4th at p. 1087; see also *Jaffe v. Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 935, fn. 9 [214 Cal.Rptr. 567].)

> FN33 Under settled principles of policy interpretation and construction the focus is upon the insured's *objectively* reasonable expectations. (See *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265, 1276 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1106 [37 Cal.Rptr.2d 508].) Thus, any ambiguity which may exist in policy language will be resolved in a manner which is consistent with such expectations.

We are aware that the two cases heavily relied upon by LMI to demonstrate that no duty to indemnify exists (*Maxon v. Security Ins. Co., supra,*214 Cal.App.2d 603 and *State Farm Fire & Casualty v. Drasin, supra,*152 Cal.App.3d 864) also held that the insurer had no duty to provide a defense. Those cases are not controlling for two good reasons. First, the principles which we have discussed above regarding the impact of section 533 on the insurer's defense obligation spring from the Supreme Court's landmark decision in *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d

168], which was decided over three years after the decision in *Maxon.*Thus, neither *Maxon* nor *Drasin* (which relied entirely on *Maxon*) is compelling authority for LMI's argument. *509

Secondly, in each of those cases, the insured sought coverage under the general liability provisions relating to claims for alleged bodily injury. Coverage depended upon demonstrating the existence of an "accident" arising out of a "retail store hazard." [FN34]Unlike the case before us, there was no separate specific promise of a defense for the tort of malicious prosecution. To us, this distinction is important. Here, there was a distinct promise to provide a defense and such express commitment certainly would create a reasonable expectation on the part of the Downey plaintiffs that a defense would be provided. "In those cases where insurance coverage [i.e., indemnification] is precluded by section 533, an insurer's duty to defend must also be measured by the reasonable expectations of the insured in light of the nature and kinds of risks covered by the policy. [Citation.]" (*B & E Convalescent Center v. State Compensation Ins. Fund, supra,*8 Cal.App.4th at p. 99.) [FN35]In this case, the express promise to provide a defense to malicious prosecution claims was clearly sufficient to create an objectively reasonable expectation in the Downey plaintiffs that a defense would be provided.

> FN34 In *Maxon,* the policy terms relating to the promise of a defense read: " 'Defense.... With respect to such insurance as is aforded [sic] by this policy, the Company shall (a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent [.]' " (214 Cal.App.2d at p. 607.)The court's opinion in *Drasin* does not disclose the relevant policy terms. However, inasmuch as the *Drasin* court deemed the issues before it to be "controlled" by *Maxon* (152 Cal.App.3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

at p. 867), we can only assume the insurance policy in that case likewise contained no separate specific commitment to defense coverage for malicious prosecution.

FN35 To the extent that *Maxon* and *Drasin* can be read to reach a contrary conclusion with respect to an insurer's duty to defend a claim which would otherwise be covered except for the preclusive effect of section 533, we respectfully decline to follow them.

A similar defense obligation was recognized in *Melugin v. Zurich Canada* (1996) 50 Cal.App.4th 658 [57 Cal.Rptr.2d 781]. *Melugin* held that section 533 did not relieve Zurich from its obligation to defend a discrimination claim against Melugin under a policy that expressly covered discrimination: "The bottom line in this case is that Zurich explicitly offered its insureds coverage for claims alleging liability for 'discrimination [.]' .... The provisions of section 533 applied to this case do not relieve Zurich of the broad duty to defend, *eventhough it would have been entitled, in performing that duty, to reserve its right to contest its liability to indemnify.*" (50 Cal.App.4th at p. 669, italics added.)

We therefore conclude, despite section 533, that LMI owed to the Downey plaintiffs a duty to defend. In fact, in this case, LMI did provide a full defense which resulted in the ultimate settlement of the underlying action. (11a) Nonetheless, the issue is not moot because the existence of the defense obligation is relevant to the claim of the Downey plaintiffs that if *510 LMI's coverage arguments are sustained, then the coverage which the policy purported to provide was illusory. In addition, it is relevant to our consideration of LMI's cross-appeal relating to the trial court's order to reduce LMI's reimbursement claim by the amount of "saved" defense costs.

*5. LMI's Assertion of the Bar of Section 533 Does*

*Not Provide a Basis for Either Estoppel or Promissory Fraud*

*a. Downey Cannot Demonstrate the Justifiable Reliance Necessary to Any Claim of Estoppel or Promissory Fraud*

(12) "The essentials [of estoppel] are: (1) Knowledge of the facts by the party to be estopped; (2) intention that his conduct be acted upon, or he acts so that the party asserting estoppel has a right to believe that the conduct is so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) justifiable reliance on the conduct by the party asserting the estoppel to his injury." (*Busse v. Pacific Employers Ins. Co.* (1974) 43 Cal.App.3d 558, 570, fn. 11 [117 Cal.Rptr. 718].)

(13) " 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.] [¶] 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].)

(11b) Thus, both estoppel and promissory fraud require proof that the party asserting the fraud or the estoppel *justifiably relied* on a promise or conduct by the party against whom the fraud or estoppel is asserted. However, no insureds can plausibly maintain that they perpetrated acts of malicious prosecution in justifiable reliance on an insurer's promise to save them from the consequences of such acts. Malicious prosecution is never justified.

To find justifiable reliance under these circumstances would effectively repeal section 533 in

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
**(Cite as: 66 Cal.App.4th 478)**

cases involving malicious prosecution. Every policy provision promising coverage for malicious prosecution would result in indemnity for the insured on the theory that the insured relied on the insurer's promise in perpetrating the act. The result would be to liberate insureds from the consequences of their own acts of malicious prosecution, in clear contravention of the public policy expressed in section 533. *511

However, even if we disregard the issue of justifiable reliance, there are still substantial reasons why the Downey plaintiffs cannot successfully rely on either estoppel or promissory fraud.

### b. LMI Is Not Estopped From Asserting the Bar of Section 533

Section 533 protects the insurer, its innocent policyholders, and the insurance-buying public in general, from having to bear the consequences of one insured's wilful act of malicious prosecution. Wrongdoers cannot be allowed to defeat this public policy and escape the consequences of their conduct by invoking the doctrine of estoppel. As the Supreme Court recognized in *Tomerlin v. Canadian Indemnity Co., supra,* 61 Cal.2d at pages 648-649, estoppel cannot be relied upon to compel performance of a promise to indemnify for an insured's wilful wrong. In spite of this, the Downey plaintiffs rely heavily on *Tomerlin* because it sanctioned a recovery by the insured on an estoppel theory. However, that reliance is misplaced. What *Tomerlin* did do was hold that an insurer can be held liable to an insured on an estoppel theory for representations concerning the promise of coverage which were made *after* the "wilful" tort had allegedly been committed and on which promise the insured relied in dispensing with the services of his personal attorney in the underlying action and permitting counsel selected by the insurer to defend him. (14) The policy reflected in section 533 is not offended by the enforcement of a post-tort coverage commitment by the insurer. (*Tomerlin v. Canadian Indemnity Co., supra,* 61 Cal.2d at p. 648.)

(11c) In addition, to require indemnification in defiance of the provisions of section 533 on the ground that the terms of the policy promise the proscribed coverage would amount to the enforcement of an illegal contract. (15) An illegal contract is void; it cannot be ratified by any subsequent act, "and no person can be estopped to deny its validity. [Citations.]" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 442 at p. 396, italics omitted.) (11d) It is clear that estoppel cannot be relied upon to defeat the operation of a policy protecting the public. (*Garamendi v. Mission Ins. Co.* (1993) 15 Cal.App.4th 1277, 1289 [19 Cal.Rptr.2d 190].) FN36*512

> FN36 We also reject the related argument made by the Downey plaintiffs that LMI, by its unconditional acceptance of the initial tender of the defense of the O'Grady action, waived its right to thereafter assert section 533 as a bar. First, that argument contravenes Civil Code section 3513 which provides: "Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement." Second, a defense of illegality cannot be waived either by agreement or the failure to raise or plead it. The provisions of a statute established for a public purpose and constituting an expression of public policy may not be waived. (*Cook v. King Manor and Convalescent Hospital* (1974) 40 Cal.App.3d 782, 793 [115 Cal.Rptr. 471].)

### c. The LMI Policy Does Provide Significant Coverage for Malicious Prosecution Claims and Thus No Promissory Fraud Claim Is Viable

While, as we have already discussed, there can be no indemnification under the LMI policy for an insured who *personally* is held liable for the tort of malicious prosecution, it does not follow that the policy provides no coverage at all. As noted above, promissory fraud requires proof that the promisor

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                                    Page 27
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

misrepresented his intention to perform the prom- ise. The Downey plaintiffs contend that, if section 533 bars indemnity for acts of malicious prosecu- tion, an insurer cannot honestly promise coverage for such an act. That argument is unsound because it rests on the false assumption that the policy pro- vision promising coverage for malicious prosecu- tion affords *no* benefits or protections to the in- sured. In fact, substantial coverage benefits are provided to California insureds by policies prom- ising such coverage. Those benefits are (1) a de- fense to any such claim, (2) indemnification for *vi- carious* liability for malicious prosecution and (3) unrestricted coverage for such claims arising in jur- isdictions which do not have a public policy similar to that existing in California. With respect to a right to a defense to such a claim, we have already ex- plained that such a right exists and it is *not* pre- cluded by section 533. We now discuss the other two circumstances where full coverage is available.

### (1) *Coverage for Vicarious Liability*

(16) Although section 533 bars indemnity of an in- sured who *personally* commits an act of malicious prosecution, the statute does not bar indemnity of an insured who does not personally commit the act but who is vicariously liable for another person's act of malicious prosecution. "The rule of respon- deat superior is familiar and simply stated: an em- ployer is vicariously liable for the torts of its em- ployees committed within the scope of the employ- ment. [Citation.] Equally well established, if some- what surprising on first encounter, is the principle that an employee's willful, malicious and even criminal torts may fall within the scope of his or her employment for purposes of respondeat superior, even though the employer has not authorized the employee to commit crimes or intentional torts." (*Lisa M. v. Henry Mayo Newhall Memorial Hospit- al* (1995) 12 Cal.4th 291, 296-297 [48 Cal.Rptr.2d 510, 907 P.2d 358], fn. omitted; see also *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 209 [285 Cal.Rptr. 99, 814 P.2d 1341] [acts that "are willful or malicious in nature" may fall within the

scope of employment and subject the employer to liability]; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 618 [262 Cal.Rptr. 842] ["An employer is liable for the wilful and ma- licious torts of its employees committed in the scope of employment"].) Similarly, "[a] partnership is liable for all wrongful acts *513 committed by a partner in the ordinary course of business [.]" (*American States Ins. Co. v. Borbor by Borbor* (9th Cir. 1987) 826 F.2d 888, 892; see also Corp. Code, § 15013.)

Thus, a principal who *personally* engages in no misconduct may be vicariously liable for an act of malicious prosecution committed by an agent with- in the course and scope of the agency. (See *Lujan v. Gordon* (1977) 70 Cal.App.3d 260, 262 [138 Cal.Rptr. 654] [all partners in law firm exposed to liability for malicious prosecution as the result of malicious action filed by one partner]; *Kappel v. Bartlett* (1988) 200 Cal.App.3d 1457, 1466 [246 Cal.Rptr. 815] [under the doctrine of respondeat su- perior, employer could be liable for agent's abuse of process].) Likewise, a corporation may be liable for an act of malicious prosecution committed within the scope of its agent's authority to act for and on behalf of the corporation. (*Centers v. Dollar Mar- kets* (1950) 99 Cal.App.2d 534, 544 [222 P.2d 136].)

Where a principal is held vicariously liable for an agent's act of malicious prosecution, section 533 poses no obstacle to indemnifying the principal: "An exception to the rule stated in *Maxon* [barring indemnity for malicious prosecution] exists with re- spect to insureds held vicariously liable for com- pensatory damages caused by the willful tort of an- other.... '*Section 533 of the Insurance Code, ... has no application to a situation where the plaintiff is not personally at fault.*[Fn. omitted.]' " (*City Products Corp. v. Globe Indemnity Co., supra,* 88 Cal.App.3d at pp. 37-38, italics added, quoting *Arenson v. Nat. Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84 [286 P.2d 816]; see also *Califor- nia State Auto. Assn. Inter-Ins. Bureau v. Carter*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

Page 28

(1985) 164 Cal.App.3d 257, 263 [210 Cal.Rptr. 140, 54 A.L.R.4th 1177]; *Lisa M. v. Henry Mayo Newhall Memorial Hospital, supra,* 12 Cal.4th at p. 305, fn. 9 ["Neither Insurance Code section 533 nor related policy exclusions for intentionally caused injury or damage preclude a California insurer from indemnifying an employer held vicariously liable for an employee's willful acts"]; *Melugin v. Zurich Canada, supra,* 50 Cal.App.4th at p. 666 ["section 533 would not necessarily bar coverage to Canada Life for its own strict liability as a result of Melugin's wrongful [discriminatory] acts"]; *Fireman's Fund Ins. Co. v. City of Turlock* (1985) 170 Cal.App.3d 988, 1001 [216 Cal.Rptr. 796] [section 533 did not bar insurer from indemnifying city that was vicariously liable for its agent's fraud under the doctrine of respondeat superior]; *American States Ins. Co. v. Borbor by Borbor, supra,* 826 F.2d at p. 894 [section 533 barred insurer from indemnifying first partner, who committed wilful acts, but not second partner, who was vicariously liable for those acts]; see *Dart Industries, Inc. v. Liberty Mutual Insurance Co.* (9th Cir. 1973) 484 F.2d 1295, 1297 [section 533 did not bar coverage where corporation's liability was based on respondeat superior].*514

The public policy underlying section 533-to deny coverage for and thereby discourage commission of wilful wrongs-is not implicated when an insurer indemnifies an "innocent" insured held liable for the willful wrong of another person: "The public policy against insurance for losses resulting from such [wilful criminal] acts is usually justified by the assumption that such acts would be encouraged, or at least not dissuaded, if insurance were available to shift the financial burden of the loss from the wrongdoer to the insurer.... This policy, however, does not apply when the wrongdoer is not benefited and an insured who is innocent of the wrongdoing receives the protection afforded by the contract of insurance." (*American States Ins. Co. v. Borbor by Borbor, supra,* 826 F.2d at p. 895, citations omitted.)

*(2) Coverage for Claims Arising in Other Jurisdictions*

(17) With respect to the availability of coverage under the LMI policy for claims arising in other jurisdictions, there is no reason to believe that California would interpose *its* public policy concerns, as expressed in section 533, to preclude indemnification under the policy if such a result was not required by the law of the other jurisdiction.

A liability insurance policy issued on a nationwide basis may be construed in accordance with the law of the jurisdiction in which a particular claim arises. (See *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.* (1993) 14 Cal.App.4th 637, 646-647 [17 Cal.Rptr.2d 713].) Thus, the same policy language may receive different construction and application in different jurisdictions. Parties to an insurance contract understand this. Indeed, many such policies expressly provide that the policy will be deemed amended to conform to the requirements and limitations of local law. [FN37] This sort of provision alerts the insured to the fact that, notwithstanding the general language of the policy, coverage may vary in accordance with local law but the insurer "will honor its obligations *whatever* they are" under that law. (*St. Paul Mercury Ins. Co. v. Duke University, supra,* 670 F.Supp. at p. 635, fn. 14, italics in original.) *515

FN37 See, for example, *St. Paul Mercury Ins. Co. v. Duke University* (M.D.N.C. 1987) 670 F.Supp. 630, 635 (" 'Any part of this policy that conflicts with state law is *automatically changed* to conform to the law' " [italics in original]) affd. in part and revd. in part (4th Cir. 1988) 849 F.2d 133; *Rao v. Universal Underwriters, Ins.* (1988) 228 N.J. Super. 396, 411 [549 A.2d 1259, 1267] (" 'If any part of this policy is in conflict with state law, those provisions in conflict will automatically change to conform to the law' "); *Sonoco Bldgs., Inc. v. American Home Assur. Co.* (7th Cir. 1989) 877 F.2d 1350, 1352 (" 'Terms of this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478                                                          Page 29

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

policy which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statutes' "); *Bonfils v. Pacific Auto Ins. Co.* (1958) 165 Cal.App.2d 152, 159 [331 P.2d 766] (same).

In some states, unlike in California, public policy does *not* forbid an insurer from indemnifying its insured against liability for the insured's wilful misconduct. In those jurisdictions, the public policies favoring enforcement of contracts and compensation of injured third parties are considered paramount and outweigh any concerns about indemnifying wilful wrongdoers. Accordingly, in those jurisdictions, an insurer's agreement to cover malicious prosecution and other wilful misconduct will be enforced as written. [FN38]

> FN38 See, for example, *Sch. Dist. for City of Royal Oak v. Continental Cas.* (6th Cir. 1990) 912 F.2d 844, 847-850 (Michigan public policy did not prohibit insurer from indemnifying insured against liability for intentional religious discrimination), overruled on other grounds by *Salve Regina College v. Russell* (1991) 499 U.S. 225 [111 S.Ct. 1217, 113 L.Ed.2d 190]; *New Madrid School Dist. No. 1 v. Continental Cas.* (8th Cir. 1990) 904 F.2d 1236, 1241-1243 (Missouri public policy would not prohibit coverage for insured's intentional acts where policy provides for such coverage); *Titan Indem. Co. v. Riley* (Ala. 1996) 679 So.2d 701, 705-707 (Alabama public policy did not prohibit enforcement of insurer's agreement to indemnify insureds against liability for malicious prosecution and civil rights violations); *Indep. School D. 697 v. St. Paul F. & M.* (Minn. 1994) 515 N.W.2d 576, 579-580 (Minnesota public policy did not prohibit insurer from indemnifying insured against liability for intentional discrimination; contract would be enforced as written);

*University of Illinois v. Continental Cas.* (1992) 234 Ill.App.3d 340, 359 [175 Ill.Dec. 324, 599 N.E.2d 1338, 1351] ("... there is no Illinois public policy prohibiting insuring for damages caused by one's intentional acts [of misconduct] except to the extent that the insured wrongdoer may not be the person who recovers the policy proceeds").

In addition, other states, unlike California, allow a plaintiff to recover for malicious prosecution without proving the defendant acted with malice in fact, i.e., with an improper motive or purpose. In those jurisdictions, liability rests on malice in law, which is presumed from proof the defendant intentionally committed a wrongful act without just cause or excuse. [FN39] Thus, whether because they allow indemnity for wilful misconduct or because they do not include malicious prosecution in that category, many jurisdictions will enforce an insurer's agreement to indemnify an insured who personally *516 commits an act of malicious prosecution. [FN40] There is no reason to believe a California court would not enforce a contractual promise of indemnity against liability for malicious prosecution where the liability was incurred in a jurisdiction that does not require proof the insured acted with malice in fact.

> FN39 See for example, *Alamo Rent-A-Car, Inc. v. Mancusi* (Fla. 1994) 632 So.2d 1352, 1357 ("In an action for malicious prosecution it is not necessary for a plaintiff to prove actual malice; legal malice is sufficient and may be inferred from, among other things, a lack of probable cause, gross negligence, or great indifference to persons, property, or the rights of others"); *Morgan Intern. Realty v. Dade Underwriters* (Fla.Dist.Ct.App. 1993) 617 So.2d 455, 458 (legal malice may be inferred from circumstances "even though no actual malevolence or corrupt design is shown"); *Proctor v. Stevens Em-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 30

66 Cal.App.4th 478
66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519
(Cite as: 66 Cal.App.4th 478)

*ployment Services, Inc.* (Mo. 1986) 712 S.W.2d 684, 687 (malice in law suffices to sustain an action for malicious prosecution of a civil action); *Abbitt v. Bartlett* (1960) 252 N.C 40, 43 [112 S.E.2d 751, 754] ("Where only compensatory damages are sought [for malicious prosecution], ... it is sufficient if plaintiff proves legal malice alone, that is, that the prosecution was wrongfully, knowingly and intentionally maintained without just cause or excuse"); *F. B. C. Stores, Inc. v. Duncan* (1973) 214 Va. 246, 252 [198 S.E.2d 595, 600] ("The rule in Virginia is that in suits for malicious prosecution legal malice inferred from circumstances is sufficient to support an award of compensatory damages").

FN40 See, for example, *Morgan Intern. Realty v. Dade Underwriters, supra,* 617 So.2d at page 459 (holding insurer had duty to indemnify insured against compensatory damages awarded for malicious prosecution); *First Nat. Bank v. Fidelity & Deposit Co.* (1978) 283 Md. 228, 241 [389 A.2d 359, 366] ("We suspect that ... the common sense of the entire community would not construe ... insurance contracts [covering compensatory and punitive damages awarded for malicious prosecution] to be against public policy. In fact, we strongly suspect that the common sense of the community as a whole would expect a judgment including exemplary damages to be satisfied through the insurance policies for which small business people had paid").

(11e) For all of these reasons, we conclude that LMI's policy provisions describing coverage for "malicious prosecution" was hardly an empty or illusory promise. Those provisions included a valuable and enforceable commitment to provide (1) a defense to any such claim, (2) a defense *and* indemnification for any such claim which resulted in an award of damages based on the insured's vicarious liability and (3) a defense *and* indemnification for such claims arising in jurisdictions which do not have a public policy or restrictive statutes precluding indemnification for malicious prosecution or which define the tort in a different manner. In addition, the record clearly reflects that LMI fully performed its defense obligation and even advanced substantial settlement funds so as to protect the Downey plaintiffs from the very real risk of a punitive damage award. Thus, as a matter of law, the Downey plaintiffs cannot demonstrate that LMI sold its policy without any intention to perform. As a result there is no basis for a claim in promissory fraud. [FN41]

> FN41 We recognize that the Downey plaintiffs dismissed their fraud cause of action. However, they did so *without* prejudice for apparently tactical reasons and the parties have discussed the issue in their briefs. We have therefore, in the interest of judicial economy, addressed and disposed of the issue.

### 6. *LMI Is Entitled to a Full Reimbursement of Sums Advanced to Settle the Malicious Prosecution Claims*

(18) It is not disputed that LMI contributed $450,000 to a settlement of the malicious prosecution claims which had been filed by O'Grady and Watson. Indeed, it is clear that this settlement was made at the insistence of the Downey plaintiffs who had every reason to be concerned about the outcome of that litigation after the trial court had adversely resolved the probable cause issue and determined that there was a substantial probability *517 of a punitive damage award. The Downey plaintiffs, in making a demand for and ultimately agreeing to such settlement, were at all times aware that LMI had fully reserved its rights to recoup both settlement and defense costs. [FN42] Under such circumstances, California law clearly supports an insurer's right to reserve and enforce recoupment of sums advanced to procure a settlement and thus end

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 Cal.App.4th 478

Page 31

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519

**(Cite as: 66 Cal.App.4th 478)**

the litigation and the liability exposure of the insured. (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 19 [123 Cal.Rptr. 288, 538 P.2d 744]; *Val's Painting & Drywall, Inc. v. Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 587-588 [126 Cal.Rptr. 267].)

> FN42 LMI, however, never made any demand for a recovery of defense costs and does not seek them here. Given that LMI, as we have found, owed a defense obligation, it could not recover such costs in any event. (*Buss v. Superior Court, supra,* 16 Cal.4th at pp. 49-53.)

The trial court's order which seeks to reduce or impair LMI's right to such reimbursement by the amount of defense costs "saved" by LMI as the result of the settlement and thus the termination of its defense obligation is simply without legal authority or basis. As the Supreme Court pointed out in *Buss v. Superior Court, supra,* 16 Cal.4th 35, 46, an insurer's duty to defend is discharged when the action against the insured is concluded. Once the duty to defend is extinguished, the insurer "does not have a duty to defend further." (*Ibid.*) If its reimbursement right can be reduced by an amount equal to the "estimated" defense costs which it did not have to incur, LMI would be required, in effect, to pay additional defense expenses after its duty had been discharged. Moreover, the financial benefit resulting to the Downey plaintiffs would effectively provide some degree of indemnification to them and would thus violate the indemnity proscription set out in section 533.

### Conclusion

We conclude that section 533 precludes indemnification to any insured who is found personally (as opposed to vicariously) liable for a malicious prosecution claim arising from conduct which is prosecuted under the law of California. However, section 533 does not preclude a defense for such a claim and LMI, having promised to do so, was obligated to

provide a complete defense to the Downey plaintiffs for both the O'Grady and the Watson actions. LMI discharged that obligation and because it was not required to indemnify the Downey plaintiffs, it is entitled to fully recoup *all* funds advanced to effect a settlement of those two actions. LMI is not estopped to assert section 533 as a bar to indemnification and cannot be liable to the Downey plaintiffs in promissory fraud for doing so. *518

### Disposition

The summary judgment granted to LMI on the complaint of the Downey plaintiffs is affirmed. The court's order denying LMI's summary judgment on its cross-complaint is reversed and the matter is remanded to the trial court with directions to enter judgment in favor of LMI for the total amount it contributed to the settlement of the O'Grady and Watson actions, together with interest thereon as provided by law. LMI shall recover its costs on appeal.

Aldrich, J., concurred. Klein, P. J., concurred in the judgment.

A petition for a rehearing was denied September 17, 1998, and the petition of plaintiffs and appellants for review by the Supreme Court was denied December 2, 1998. *519

Cal.App.2.Dist.

Downey Venture v. LMI Ins. Co.

66 Cal.App.4th 478, 78 Cal.Rptr.2d 142, 98 Cal. Daily Op. Serv. 6916, 98 Daily Journal D.A.R. 9519

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**10**

Westlaw.

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
(Cite as: 28 Cal.3d 127)

Page 1

**H**
Fox v. Ehrmantraut
Cal.
THEO L. FOX, Plaintiff, Cross-defendant and Respondent,
v.
HARRY C. EHRMANTRAUT, Defendant, Cross-complainant and Appellant
**S.F. No. 24107.**

Supreme Court of California
Sep 4, 1980.

SUMMARY

After trial without a jury, the trial court entered judgment in favor of the seller of all of the corporate stock of an executive placement firm in his action against the purchaser on a promissory note given as a part of the sales price. Judgment was also entered in favor of plaintiff on defendant's cross-complaint claiming misrepresentation, fraud, and failure of consideration, seeking damages and rescission. The firm involved in the sale was licensed under an agreement with another corporation formed by plaintiff to use certain techniques bringing employers and qualified prospective employees together. Plaintiff had advertised the licensee firm for sale in a national publication and defendant had answered the ad. The original proposal had been for a sale of assets and assumption of liabilities but the transaction was restructured to a sale of the corporate stock. About three months after the sale, the licensor corporation petitioned for voluntary bankruptcy and the licensee firm later filed a similar petition. (Superior Court of Santa Clara County, No. 330401, David D. Bays, Temporary Judge. FN*)

The Supreme Court affirmed, holding that record evidence warranted a determination that plaintiff and defendant were knowledgeable investors with extensive business experience and expertise, that defendant engaged in an extensive investigation into activities of the licensee firm before agreeing to

purchase the shares of stock from plaintiff, and that there were no material misrepresentations or concealment as to that company or the licensor company. The court further held that plaintiff fully performed under the agreement, that defendant had received the consideration he bargained for, and that he was therefore not entitled to rescission. The court also held that the transaction was exempt from the qualification requirement of the Corporate Securities Law and the registration requirement of the Franchise Investment Law.

> FN* Pursuant to Constitution, article VI, section 21.(Opinion by Clark, J., expressing the unanimous view of the court.)

HEADNOTES

Classified to California Digest of Official Reports

**(1)    Fraud    and    Deceit    §
29--Actions--Evidence--Reliance--Time of Alleged Misrepresentation.**
In an action by the seller of all the corporate stock of an executive placement firm to recover on a promissory note given by the purchaser as part of the sales price, the evidence was sufficient to support a determination that alleged misrepresentations as to the financial affairs of a corporation that had sold a license to use certain placement techniques to the firm were not made until after the sale was completed, where defendant admittedly had not seen a financial statement containing the representations in question until after the sale, and where, though defendant claimed the controller of the corporation had shown him a handwritten draft of the document prior to the purchase, the controller testified that he had no recollection of ever showing or discussing the statement with defendant, but had discussed some financial projection for the licensing corporation and a rough financial statement for the licensee corporation with him.

**(2) Fraud and Deceit §**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
(Cite as: 28 Cal.3d 127)

26--Actions--Evidence--Sufficiency--Making of Misrepresentations.
In an action by the seller of all of the corporate stock of an executive placement firm to recover on a promissory note given by the purchaser as part of the sale price, the evidence was sufficient to support the trial court's rejection of defendant's defense of misrepresentations with respect to compliance by a corporation that had sold a license to use certain placement techniques to the firm with the Franchise Investment Law (Corp. Code, § 31000 et seq.), where plaintiff denied he had advised defendant that documents were being prepared to register under that law and testified he had been advised by counsel and the office of the Corporations Commissioner that registration under the law was not required. The court could accept plaintiff's testimony and reject defendant's testimony that he had been interested in or had inquired into preparation of the franchise disclosure statement. The court could also properly determine that a statement in a pamphlet defendant received from the licensing corporation as to plans for making franchise disclosure statements in various states was not material to the purchase.

**(3) Fraud and Deceit § 8--Actual Fraud--False Representations-- Concealment--Duty of Disclosure.**
In an action by the seller of all of the corporate stock of an executive placement firm to recover on a promissory note given by the purchaser as part of the sales price, the evidence was sufficient to support a determination that a letter from the Corporations Commissioner to an attorney for a corporation that had sold a license to use certain placement techniques to the firm did not reflect an investigation of the corporation and that plaintiff, who had learned of the letter prior to the sale, was not required to disclose it to defendant, where the letter had only requested information and was the only indication plaintiff had of the asserted "investigation" at the time of sale.

**(4) Contracts § 39--Alteration and Extinction--Rescission--Failure of Consideration.**

In an action by the seller of all of the corporate stock of an executive placement firm to recover on a promissory note given by the purchaser as part of the sales price, the trial court properly rejected defendant's claim of a right to rescission, which was based on the theories that a corporation that had sold a license to use certain placement techniques to the firm was insolvent at the time of the sale of the business to defendant and that, because of that corporation's bankruptcy about three months after the sale, defendant did not receive the benefit of the license agreement, thereby causing a failure of consideration, where the record did not establish insolvency at the time of sale, where plaintiff fully performed his obligations under the agreement by transferring all of the firm's stock to defendant, where plaintiff did not warrant that the licensor corporation would continue to furnish services for more than three months or any period, where the license was only one of the assets of the firm involved in the sale, and where the bankrupt corporation and plaintiff were independent entities.

**(5a, 5b) Securities Regulations § 7--Corporate Securities Law--Permit to Sell Securities--Effect of Want of or Violation of Permit.**
A sale by one individual to another of all of the corporate stock of an executive placement firm did not violate the Corporate Securities Law qualification requirement of Corp. Code, § 25130, but fell within the exemptions set forth in Corp. Code, § 25104, as a sale by the bona fide owner for his own account, not accompanied by the publication of any advertisement and not effected by or through a broker-dealer in a public offering, even though the transaction was initiated by the seller's advertisement in a national publication, answered by the purchaser, where the advertisement was for sale of a business and mentioned neither securities nor corporation, where the seller was the bona fide owner of the stock selling for his own account and the sale was not effected by or through a broker- dealer, where the parties had originally considered consummating the sale by a transfer of assets, and where they at all times contemplated that the purchaser was not a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
**(Cite as: 28 Cal.3d 127)**

mere passive investor but would undertake full control of the business. The sale of an ongoing business by an owner advertising sale of the business is exempt from the qualification requirement when transfer of securities is merely incidental to the sale of the business.
[See **Cal.Jur.3d**, Securities Regulations, § 43; **Am.Jur.2d**, Securities Regulations-State, § 79.]
**(6)** Securities Regulations § 4--Corporate Securities Law--Purpose of Law.
The Corporate Securities Law (Corp. Code, § 25000 et seq.) was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture. Such contracts are clearly distinguished from instruments issued to persons who, for a consideration paid, stipulate for a right to share in the profits or proceeds of a business enterprise to be conducted by others, and a court will look through form to substance to discover whether in fact the transaction contemplates the conduct of a business enterprise by others than the purchasers, in the profits or proceeds of which the purchasers are to share.

**(7)** Franchise, Distribution, and Dealership Contracts § 5--Transfer of Franchise--Effect of Franchise Investment Law.
A sale by one individual to another of all of the corporate stock of an executive placement firm that operated under a license issued by another corporation did not violate Corp. Code, § 31110, which makes it unlawful to offer or sell a franchise unless the offer has been registered under the Franchise Investment Law or is exempted under the law. Even assuming that the license amounted to a franchise and that the sale of all the stock of a franchisee may be viewed as a sale of the franchise within the meaning of the statute, the transaction was exempt under the provisions of Corp. Code, § 31102, which exempts sales by franchisees. The stock was sold by its owner and, though the corporation that issued the license furnished information and helped in facilitating the sale, it did not receive any of the pur-

chase price. The provision of § 31102, excluding from the exemption sales effected "by or through a franchisor" excludes only those sales where the franchisor obtains all or a substantial part of the purchase price. Mere franchisor participation in the sale by furnishing information, referring prospective purchasers of the franchise, or approving purchasers does not deprive a franchisee of his exemption.

COUNSEL
Henrikson & Gee, Eric L. Henrikson and Brennan J. Newsom for Defendant, Cross-complainant and Appellant.
Hession, Creedon, Hamlin, Kelly, Hanson & Williams, Laurence P. Wilson and Richard G. Logan for Plaintiff, Cross-defendant and Respondent.
Robert E. La Noue, Robert M. Arhelger, Larry W. Kreig and C. J. San Felipe as Amici Curiae.
**CLARK, J.**
Defendant and cross-complainant, Dr. Harry C. Ehrmantraut, appeals from judgment for plaintiff and cross-defendant, Theo L. Fox, in this action to recover on a promissory note and a cross-action for misrepresentation, fraud, breach of contract, and rescission. We affirm.

In July 1974, Fox, a businessman and investor, agreed to purchase M. A. Baker and Associates, a company engaged in the search for and placement of business executives in the San Jose area. M. A. Baker and *132 Associates was licensed under agreement with Executive Search Associates, Inc., to use certain techniques in bringing employers and qualified prospective employees together. [FN1]

> FN1 The firms used videotape recordings to match employee candidates with prospective employers. The parent company provided a manual and training seminars and contemplated a nationwide system of sharing information.

Fox formed Execudex San Jose, Inc. and transferred to it the assets of M. A. Baker and Associates in exchange for all stock issued by Execudex San

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
(Cite as: 28 Cal.3d 127)

Page 4

Jose. Fox also purchased from Executive Search Associates licenses for San Francisco, Oakland, San Diego, Phoenix and Dallas. He personally managed a licensee business in San Francisco, while other persons managed licensee operations in San Jose.

In December 1974, Executive Search Associates, Inc., the licensor company, experienced financial difficulties and Fox formed a new corporation, Execudex, Inc., to acquire the licensor's assets and to assume selected liabilities.

Execudex, Inc. placed advertisements in the Wall Street Journal offering to license other areas of operations. In December 1974 Fox placed an advertisement in that paper, stating: "Investment Opportunity. Unique investment opportunity in the human resources industry. Established company licensed by national concern with new and exciting concepts. Experienced management in place, Santa Clara County, California location. Conflict of interest forces sale by absentee owner. Responsible investor could expect return of mid-five figure investment plus during 1975. For details phone Mr. Butler."

Ehrmantraut read the advertisement and in late December 1974 called Butler. Ehrmantraut has a doctorate in biophysics and, beginning in 1954, had created several small companies. As chief executive he had directed marketing, engineering and manufacturing activities and had ultimately sold the companies for substantial profits. He also worked as a business consultant primarily for new business ventures in which he was personally involved.

On 12 February 1975, after a number of meetings with Fox and employees of Execudex San Jose, attendance at a seminar conducted by Execudex, Inc. and visits to two licensees in Southern California, Ehrmantraut entered an agreement with Fox to purchase all outstanding *133 shares of Execudex San Jose for $25,000 cash and a promissory note for $60,000 payable in eight monthly installments. The original proposal by Fox had been for sale of the

assets and assumption of liabilities of the business rather than sale of shares. The record does not disclose who requested the transaction be restructured.

Before executing the agreement Ehrmantraut was advised that, while earlier projections had indicated Execudex San Jose would realize profit in 1974, the projections were inaccurate and the corporation had continually lost money.

A consent to transfer shares of Execudex San Jose was obtained from the Corporations Commissioner. Ehrmantraut paid the $25,000, executed the note, received the stock certificate, and took control of Execudex San Jose. The stock was never qualified for public sale.

On 7 May 1975, the Commissioner of Corporations issued a cease and desist order against Execudex, Inc. on the ground that it was selling franchises in violation of the California Franchise Investment Law. Before the time for any administrative hearing, Execudex, Inc. entered voluntary bankruptcy. Ehrmantraut continued to operate Execudex San Jose until September 1975 when it petitioned for voluntary bankruptcy. [FN2]

> FN2 Other licensees have continued in business, including Execudex of San Francisco, Inc.

Fox commenced this action to recover $60,000 owing him personally on the note. Ehrmantraut answered and cross-complained claiming misrepresentation, fraud, and failure of consideration, seeking damages and rescission. It is not alleged that Fox sold unqualified securities in violation of the Corporations Code, that Fox was the alter ego of Execudex, Inc., or that the contract of sale is void for any illegality. After trial without a jury, the court concluded Fox had not made false representations of nor had concealed any material fact. Judgment was entered for Fox on both the complaint and cross-complaint.

After taking the instant appeal, Ehrmantraut filed a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
(Cite as: 28 Cal.3d 127)

Page 5

petition in voluntary bankruptcy. Fox filed in that proceeding proof of claims asserted in these proceedings including a copy of the judgment. While Ehrmantraut has been discharged in bankruptcy, the trustee in bankruptcy has abandoned the right of appeal in the instant case to Ehrmantraut. *134

Both Fox and Ehrmantraut suffered substantial losses in the executive placement business.

I. Misrepresentation and Fraud

A. *Statements of Financial Status of Execudex, Inc. (The Parent Corporation)*

(1) Ehrmantraut does not claim misrepresentation as to the firm he purchased but rather that material misrepresentations of fact were made as to accounts receivable and the capital account of Execudex, Inc., the licensor. He notes a financial statement dated 31 December 1974 showed $52,000 in accounts receivable without mentioning they were of doubtful collectability, and $58,000 of "stockholder's investments" without mentioning the amount was in fact a loan from Fox to Execudex, Inc.

Admittedly, Ehrmantraut did not see the 31 December 1974 financial statement until after purchasing the stock of Execudex San Jose. However, he claims the Execudex, Inc. controller had shown him a handwritten draft of the document prior to the purchase. The controller testified that he had no recollection of ever showing or discussing the statement with Ehrmantraut, but that he discussed a financial projection indicating Execudex, Inc. would be successful if two licenses could be sold a month, FN3 that in response to a question by Ehrmantraut he advised Fox was providing financial backup during the "start up" period, and that the statements he discussed with Ehrmantraut were the financial projection for Execudex, Inc. and a "rough" financial statement for Execudex San Jose. The controller, who was a certified public accountant, also testified

that when a sole shareholder advances money to a corporation he will often treat the advance as a loan for tax purposes and that characterization of the money as capital was not improper because Fox as a practical matter could not remove the money.

> FN3 After Execudex, Inc. was formed, it succeeded in selling only one license.

The trial court could properly determine that the alleged misrepresentations as to the financial affairs of Execudex, Inc. were not made until after the purchase of Execudex San Jose was completed. *135

B. *Statements of Compliance with Franchise Investment Law (Corp. Code, § 31000 et seq.)* FN4

(2) Ehrmantraut testified that at their second meeting Fox stated that papers were being prepared to register licensing transactions under the Franchise Investment Law. Ehrmantraut said he was familiar with the law and believed compliance was required.

> FN4 Unless otherwise indicated all statutory references are to the Corporations Code.

Ehrmantraut also testified that at a training session in January 1975 he received a pamphlet from the vice president of Execudex, Inc., which stated: "I will be glad to review with you on an individual basis the financial statements of Execudex Incorporated. We will shortly be making the uniform franchise disclosure statement in the various States. This disclosure requires the inclusion of certain financial information."

Fox denied that he advised documents were being prepared to register under the Franchise Investment Law. He testified that in September 1974 in response to his question, M. A. Baker, president of the then licensor company advised him that the company had reviewed the matter with officials of the Corporations Commissioner's office in February, presenting copies of contracts used in licensing agreements. It was concluded the company was not

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
(Cite as: 28 Cal.3d 127)

a franchisor but a licensor and not required to register. Fox was sent a copy of counsel's letter of confirmation. In support of his denial of the statement claimed by Ehrmantraut, Fox argues that, having been advised by counsel and the office of the Corporations Commissioner that registration under the Franchise Investment Law was not required, there was no reason to represent that there would be a registration.

Fox also testified that he had sent for and obtained information from the National Association of Franchisers regarding state laws relating to franchises.

The trial court could properly find that Fox, having received confirmation that registration was not required in California, did not state that papers were being prepared to register in this state. Accepting the conflicting Fox testimony, the trial court could also reject Ehrmantraut's testimony that he had been interested in or had inquired into *136 preparation of the franchise disclosure statement, and the court could determine that the statement in the pamphlet was not material to the purchase.

(3) Ehrmantraut next contends that Fox had a duty to disclose the Corporations Commissioner was engaged in an "investigation" of Execudex, Inc., and that failure to disclose constituted fraud. On 28 October 1974 - after the letter stating that Execudex, Inc.'s predecessor was not a franchisor - the Corporations Commissioner requested information by a letter addressed to the attorney who had represented the predecessor company. Fox learned of the letter but did not respond, and the commissioner did nothing further until after the sale to Ehrmantraut when he sent a follow-up letter. The 28 October letter was the only information Fox had of the asserted "investigation" at the time of sale. The trial court could properly determine that the letter did not reflect an investigation and that Fox was not under a duty to disclose.

Record evidence warrants a determination that Fox and Ehrmantraut were knowledgeable investors with extensive business experience and expertise,

that Ehrmantraut engaged in an extensive investigation into activities of Execudex San Jose before agreeing to purchase shares of stock from Fox, and that there were no material misrepresentations or concealment as to that company or Execudex, Inc. So far as appears, the failures of the executive placement service ventures were due not to any misrepresentation by Fox but to difficulties inherent in the executive placement business during the 1974-1975 recession.

## II. Failure of Consideration

(4) Ehrmantraut contends he is entitled to rescission because he did not receive the services contemplated from Execudex, Inc. First, he urges there was a failure of consideration because Execudex, Inc. was insolvent at the time the sale of Execudex San Jose was consummated. However, the record does not establish the claimed insolvency.

Second, it is urged that, because Execudex, Inc. filed bankruptcy about three months after the sale, Ehrmantraut did not receive the benefit of the license agreement and that the bankruptcy caused a failure of consideration.

Civil Code section 1689, subdivision (b), provides: "A party to a contract may rescind the contract in the following cases: ... [¶] (2) If the *137 consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds. [¶] (3) If the consideration for the obligation of the rescinding party becomes entirely void from any cause. [¶] (4) If the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause ...."

Fox fully performed his obligations under the agreement transferring all stock of Execudex San Jose, Inc. to Ehrmantraut. Fox did not warrant that Execudex, Inc. would continue to furnish services for more than three months or any period, and in the absence of misrepresentation it must be con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
**(Cite as: 28 Cal.3d 127)**

cluded that Ehrmantraut received the consideration bargained for and that the subsequent failure of Execudex, Inc. did not cause a failure of consideration. (See, e.g., *Lavely v. Nonemaker* (1931) 212 Cal. 380, 383 [298 P. 976]; *Schiffman v. Atlas Mill Supply, Inc.* (1961) 193 Cal.App.2d 847, 851-853 [14 Cal.Rptr. 708]; *Norby v. Pister* (1952) 114 Cal.App.2d 510, 511-512 [250 P.2d 633].) The license with Execudex, Inc. was only one of the assets of Execudex San Jose, Inc., and because Execudex, Inc. and Fox were independent entities, its failure cannot be attributed to Fox.

III. Illegality

A. <i>Corporate Securities Law</i>

Section 25130 provides: "It is unlawful for any person to offer or sell any security in this state in any non-issuer transaction unless it is qualified for such sale ... or unless such security or transaction is exempted under Chapter 1 (commencing with Section 25100) of this part."

Security is broadly defined by the act. Included in the lengthy enumeration of instruments constituting a security under section 25019 are, in addition to stock, any notes, evidence of indebtedness, or participation in any profit sharing agreement.

Section 25104 provides: "The following transactions are exempt from the provisions of Section 25130: [¶] (a) Any offer or sale of a security by the bona fide owner thereof for his own account if the sale (1) is not accompanied by the publication of any advertisement and (2) is not effected by or through a broker-dealer in a public offering." **138**

(5a) It is undisputed that Fox was the bona fide owner of the stock selling for his own account and that the sale was not effected by or through a broker-dealer. The question presented is whether the sale was a sale of securities accompanied by an advertisement within the meaning of section 25104.

We are satisfied that the sale of an ongoing business by an owner advertising sale of the business is exempt from qualification requirement when transfer of the securities is merely incidental to the sale of the business.

Prior to 1969, it was well settled that the Corporate Securities Act did not apply to sale of securities by a vendor not an issuer unless the sale was made for benefit of an issuer or underwriter or made with intent to violate the securities law. (Former § 25104; *Clejan v. Reisman* (1970) 5 Cal.App.3d 224, 237 [84 Cal.Rptr. 897].) Under the prior statute, it is clear that the instant sale of stock would not have violated the statute.

The 1968 amendment to section 25104 recast the statute to its present form. The purpose of that section's exemption "is to eliminate any qualification requirement with respect to what are essentially private transactions by a person in his own property and to require such qualification only where a public market is created in outstanding securities." (1 Marsh & Volk, Practice Under the Cal. Securities Laws (rev. ed. 1979) p. 10-18.7.)

In determining the applicability of the act, California courts have traditionally looked through form to substance to further the purposes of the act. (*People v. Syde* (1951) 37 Cal.2d 765, 768-769 [235 P.2d 601]; *People v. Rankin* (1958) 160 Cal.App.2d 93, 97 [325 P.2d 10]; *Moore v. Stella* (1942) 52 Cal.App.2d 766, 772 [127 P.2d 300].) "'[A]s a general rule the sale of "securities" that is condemned by the courts involves an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money.'" (*Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811, 814-815 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135].)**139**

Bona fide agreements for the sale of services

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
(Cite as: 28 Cal.3d 127)

Page 8

providing for profit sharing have been held not to come within the act, although profit sharing agreements, like stock, are included in the broad definition of security in section 25019.

(6) "It is settled that the Corporate Securities Law was not intended to afford supervision and regulation of instruments which constitute agreements with persons who expect to reap a profit from their own services or other active participation in a business venture. Such contracts are clearly distinguished from instruments issued to persons who, for a consideration paid, stipulate for a right to share in the profits or proceeds of a business enterprise to be conducted by others; and the court will look through form to substance to discover whether in fact the transaction contemplates the conduct of a business enterprise by others than the purchasers, in the profits or proceeds of which the purchasers are to share. (*Domestic & Foreign Pet. Co., Ltd. v. Long*, 4 Cal.2d 547, 555 [51 P.2d 73]; *People v. Davenport*, 13 Cal.2d 681 [91 P.2d 892]; *Austin v. Hallmark Oil Co.*, 21 Cal.2d 718, 727 [134 P.2d 777]; *People v. Steele*, 2 Cal.App.2d 370, 374-375 [36 P.2d 40]; *Hollywood State Bk. v. Wilde*, 70 Cal.App.2d 103, 107 [160 P.2d 846]; *People v. Hoshor*, 92 Cal.App.2d 250, 253 [206 P.2d 882].)" (*People v. Syde, supra*, 37 Cal.2d 765, 768-769.)

Other cases have held the broker-dealer provisions of the Corporate Securities Law inapplicable to licensed real estate or business brokers when the real estate or business sale was effected by transfer of the corporate owner's total stock. (*Lyons v. Stevenson* (1977) 65 Cal.App.3d 595, 600-604 [135 Cal.Rptr. 457]; *Weber v. Jorgensen* (1971) 16 Cal.App.3d 74, 82 et seq. [93 Cal.Rptr. 668]; *Stoll v. Mallory* (1959) 173 Cal.App.2d 694, 698 et seq. [343 P.2d 970]; see *McKenna v. Edwards* (1937) 19 Cal.App.2d 327, 330 [65 P.2d 810].) [FN5]

> FN5 *Owen v. Off* (1951) 36 Cal.2d 751 [227 P.2d 457], held that a single transfer of shares was sufficient to invoke the Corporate Securities Law. The court did not consider whether the transfer of shares was

merely incident to a sale of real property - only a portion of owner corporation's shares being sold.

Many small business and professional offices are incorporated for tax and other purposes in which investment and management are not separated but come from the same source. Advertisements for sale of businesses and for association with professional corporations are common in our newspapers. These advertisements - frequently contemplating *140 present or future transfer of shares - were not intended to trigger a requirement of qualification with its extensive registration demands. Otherwise small businessmen seeking to sell and professional firms seeking employees would be gravely hampered without substantial furtherance of the purposes of the Corporate Securities Law. For example, incorporated law firms seeking to employ attorneys with a view to profit sharing or to future firm membership would be required to qualify if they advertised.

As we have seen, the purpose of the 1968 amendment to section 25104 was to eliminate the burdens of qualification in private transactions, requiring qualification only in public market securities. Sales of businesses and employment of professionals are essentially private transactions. Purchasers of businesses and professionals seeking employment are more than mere passive investors who do not personally investigate the opportunity. Advertisements for such sales or employment were not intended to result in deprivation of the nonissuer exemption.

(5b) The advertisement in the instant case was for sale of a business. It mentioned neither securities nor corporation. At one time the parties considered consummating the sale by a sale of assets, and it is undisputed that had the parties proceeded in this manner, the Corporate Securities Law would not be applicable. The parties at all times contemplated that Ehrmantraut was not a mere passive investor but would undertake full control of the business. We conclude the nonissuer exemption is applicable and there was no violation of the Corporate Securit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
**(Cite as: 28 Cal.3d 127)**

ies Law. [FN6]

FN6 Although the Commissioner of Corporations granted consent to transfer the shares to Ehrmantraut, the commissioner has filed an amicus brief claiming the sale was unlawful. The commissioner makes no claim that the consent was secured by fraud or misrepresentation.
The commissioner's consent will ordinarily be understood as meaning there is no violation of qualification requirements whether due to compliance or exemption. The commissioner should not consent to unlawful transactions because her consent provides a trap for unwary counsel who often could properly qualify the shares for sale if advised that qualification is required.

B. *Franchise Investment Law*

Section 31110 provides: "On and after April 15, 1971, it shall be unlawful for any person to offer or sell any franchise in this state unless *141 the offer of the franchise has been registered under this part or exempted under Chapter 1 (commencing with Section 31100) of this part." Section 31111 sets forth in extensive detail the numerous matters that must be included in an application for registration. The information required focuses on the history, financial status, and activities of franchisors and subfranchisors. Section 31112 requires that the application be verified by franchisors or subfranchisors. There is no provision for application by franchisees and subfranchisees.

Section 31113 provides that the commissioner may require escrow or impound of franchise fees where the franchisor fails to show adequate financial arrangements to carry out its obligations, and section 31114 requires the registration application be accompanied by a prospectus. Under section 31120, a registration is effective for one year unless the commissioner specifies otherwise.

Section 31102 provides: "The offer or sale of a franchise by a franchisee for his own account or the offer or sale of the entire area franchise owned by a subfranchisor for his own account, is exempted from the provisions of section 31110 if the sale is not effected *by or through* a franchisor. A sale is not effected by or through a franchisor merely because a franchisor has a right to approve or disapprove a different franchisee." (Italics added.)

(7) Even assuming the sale of all the stock of a franchisee might be viewed as a sale of the franchise within section 31110, the instant transaction would be exempt under the provisions of section 31102. That section exempts sales by franchisees. The provision in the section excluding from the exemption sales effected "by or through a franchisor" excludes only those sales where the franchisor obtains all or a substantial part of the purchase price.

Mere franchisor participation in the sale by furnishing information, referring prospective purchasers of the franchise, or approving purchasers does not deprive a franchisee of his exemption. It is apparent from sections 31110-31114 and 31120 that registration is demanded of franchisors not franchisees. Franchisees are not permitted to register (§ 31112), and so far as appears none of the sections are intended to impose burdens upon franchisees. Any potential franchisee may be expected to seek information of the franchisor, and most may be expected to inquire of him as to the availability of franchises. The exemption for *142 sales by franchisee in section 31102 would be meaningless if franchisor responses to such inquiries served to deprive franchisees of the exemption.

In the present case, the stock of the franchisee was sold to Ehrmantraut by Fox, the owner of the stock. Although the franchisor, Execudex, Inc., furnished information and helped in facilitating the sale, it did not receive any of the purchase price. [FN7] Accordingly, the exemption provided by section 31102 for sales by a franchisee for his own account is applicable, and the sale did not violate the Franchise Investment Law. [FN8]

615 P.2d 1383
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595, Blue Sky L. Rep. P 71,578
**(Cite as: 28 Cal.3d 127)**

FN7 Because Fox had previously pur-
chased the franchise in a bona fide sale, we
are not confronted with a case where a
franchisor has established a franchise with
intent to use the section 31102 exemption
to avoid the registration requirement.

FN8 This conclusion makes it unnecessary
to reach the questions whether the evid-
ence establishes a franchise rather than a
license arrangement and whether the sec-
tion 31110 prohibition of sales of fran-
chises without registration is violated when
there is no transfer of the franchise but a
sale of the stock of the franchisee.

The judgment is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J.,
Manuel, J., and Newman, J., concurred.
Appellant's petition for a rehearing was denied Oc-
tober 22, 1980. *143

Cal.
Fox v. Ehrmantraut
28 Cal.3d 127, 615 P.2d 1383, 167 Cal.Rptr. 595,
Blue Sky L. Rep. P 71,578

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**11**

**FRONTIER OIL CORPORATION et al., Plaintiffs and Appellants, v. RLI INSURANCE COMPANY, Defendant and Respondent.**

**B189158**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION THREE**

*153 Cal. App. 4th 1436; 63 Cal. Rptr. 3d 816; 2007 Cal. App. LEXIS 1289; 37 ELR 20201*

**August 6, 2007, Filed**

**SUBSEQUENT HISTORY:** Modified by *Frontier Oil Corp. v. RLI Ins. Co., 2007 Cal. App. LEXIS 1476 (Cal. App. 2d Dist., Sept. 5, 2007)*
Review denied by *Frontier Oil Corp. v. RLI Insurance Co., 2007 Cal. LEXIS 12848 (Cal., Nov. 14, 2007)*

**PRIOR HISTORY:** [***1]
  Superior Court of Los Angeles County, No. BC311259, Richard L. Fruin, Jr., Judge.

**DISPOSITION:**

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

Plaintiffs, a Texas-based oil company and its subsidiary, sued a Texas insurer, alleging the insurer had a duty to defend plaintiffs in several personal injury actions arising from the operation of an oil and gas production facility adjacent to a high school in Beverly Hills. The trial court granted summary judgment in favor of the insurer, concluding that, under Texas law, the policy did not include a duty to defend pollution claims because a pollution liability endorsement did not expressly promise a defense. (Superior Court of Los Angeles County, No. BC311259, Richard L. Fruin, Jr., Judge.)

The Court of Appeal reversed the judgment and remanded the case for further proceedings. The court concluded that California law, not Texas law, governed the interpretation of the insurance policy. Notwithstanding the application of the governmental interest analysis to other choice-of-law issues, *Civ. Code, § 1646*, was the choice-of-law rule that determined the law governing the interpretation of the policy. The policy included a duty to defend pollution claims arising from "sudden and accidental" releases. Under California law, the policy included a contractual duty on the insurer's part to defend. California was the intended place of performance of the contract with respect to the pollution claims. The parties anticipated that a suit arising from oil and gas operations in Beverly Hills could be prosecuted in California and that the insurer would be obligated to provide a defense in California if the claims were potentially covered under the policy. The facts alleged in the underlying third party complaints against plaintiffs were sufficient to create a potential for coverage giving rise to a duty to de-

153 Cal. App. 4th 1436, *; 63 Cal. Rptr. 3d 816, **;
2007 Cal. App. LEXIS 1289, ***; 37 ELR 20201

fend. The pollution liability endorsement did not clearly and unmistakably exclude pollution claims from the duty to defend stated in the body of the policy and thus did not exclude pollution claims from the duty to defend. Because the insurer failed to establish the absence of a duty to defend, it was not entitled to summary judgment against plaintiffs on that basis. (Opinion by Croskey, J., with Klein, P. J., and Kitching, J., concurring.) [*1437]

## HEADNOTES

CALIFORNIA OFFICIAL REPORTS HEADNOTES

**(1) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--California Law--Operation of Oil and Gas Production Facility.**--In a case in which a Texas-based insured alleged a Texas insurer had a duty to defend the insured in several personal injury actions arising from the operation of an oil and gas production facility adjacent to a high school in Beverly Hills, *Civ. Code, § 1646*, was the choice-of-law rule that determined the law governing the interpretation of the insurance policy. California, as the location of the risk insured under the policy, was the state where the insurer was obligated to perform its defense obligations under the policy, and the contracting parties knew this at the time the policy was issued. The policy included several endorsements reflecting the existence of a covered risk located in California. Therefore, California law governed the interpretation of the policy. Under California law, the insurer had a duty to defend the insured. The facts alleged in the underlying complaints against the insured were sufficient to create a potential for coverage giving rise to a duty to defend.

[1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 90; *Cal. Forms of Pleading and Practice (2007) ch. 140, Contracts, § 140.30*.]

**(2) Conflict of Laws § 1--Application of Out-of-state Law--Particular Issue.**--Choice of law refers to the determination of which state's or other jurisdiction's law applies to a particular issue. Choice of law is one branch of the larger doctrine of conflicts of laws, which also includes the questions in which jurisdiction a suit can be brought and the effect of a foreign judgment. Choice-of-law rules can be statutory or based on common law.

**(3) Statutes § 21--Construction--Legislative Intent.**--A court's fundamental task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of the law. Because the statutory language ordinarily is the most reliable indicator of legislative intent, the court begins by examining the words of the statute. The court gives the words of the statute their ordinary and usual meaning and construes them in the context of the statute as a whole and the entire scheme of law of which it is a part. If the language is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, the court presumes that the Legislature meant what it said and the plain meaning governs. If the language is ambiguous, the court may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy [*1438]

**(4) Conflict of Laws § 5--Contracts--Interpretation--Place of Performance.**--*Civ. Code, § 1646*, prescribes a choice-of-law rule concerning the interpretation of contracts. It states that a contract is to be interpreted according to the law and usage of the place where it is to be performed, but only if the contract indicates a place of performance, and is to be interpreted according to the law and usage of the place where it was made if the contract does not indicate a place of performance.

**(5) Conflict of Laws § 5--Contracts--Interpretation--Place of Performance--**

**Parties' Intention.**--*Civ. Code, § 1646*, was intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation. The parties' intention as to the place of performance sometimes can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance. Moreover, the use of the word "indicate" in *§ 1646* in lieu of a more restrictive word such as "specify" or "state" suggests that the Legislature intended a less restrictive meaning. Accordingly, a contract indicates a place of performance within the meaning of *§ 1646* if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. The intended place of performance is a question of contract interpretation for the court to decide, except to the extent the answer may depend on the credibility of extrinsic evidence.

**(6) Conflict of Laws § 5--Contracts--Interpretation--Place of Performance--Insurance--Execution and Validity.**--*Civ. Code, § 1646*, means that the place where the contract is made is of importance when the contract does not indicate a specific place of performance. The law of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity, unless the terms of the contract provide otherwise or the circumstances indicate a different intention.

**(7) Conflict of Laws § 4--Governmental Interest Analysis--Applicable Rules of Law--Examination of Interests--True Conflict--Comparative Impairment.**--Under the governmental interest analysis, the court first determines whether the applicable rules of law of the potentially concerned jurisdictions are the same or different. If the applicable rules of law are identical, the court may apply California law. If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute. If each jurisdiction has an interest in applying its own law to the issue, there is a true conflict [*1439] and the court must proceed to the third step. In the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue or, conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied. The court must apply the law of the jurisdiction whose interest would be more significantly impaired if its law were not applied.

**(8) Conflict of Laws § 4--Governmental Interest Analysis--Ascertainment of Appropriate Law.**--California follows a three-step governmental interest analysis to address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement. These rules apply whether the dispute arises out of contract or tort, and a separate conflict of laws inquiry must be made with respect to each issue in the case.

**(9) Conflict of Laws § 4--Governmental Interest Analysis--Interpretation of Contract.**--It cannot be concluded that California has judicially abrogated the express legislative mandate of *Civ. Code, § 1646*, relating to the interpretation of contracts. Instead, the choice-of-law rule in *§ 1646* determines the law governing the interpretation of a contract, notwithstanding the application of the governmental interest analysis to other choice-of-law issues. The California Supreme Court has never applied the governmental interest analysis to determine the law governing the interpretation of a contract and has never stated or suggested that *§ 1646* does not determine the law governing the interpretation of a contract. Broad statements declaring

the governmental interest analysis under California's choice-of-law rule and rejecting traditional choice-of-law rules should be viewed in light of the particular choice-of-law issues that were before the court in those cases.

**(10) Insurance Contracts and Coverage § 77--Defense and Indemnity Obligations--Insured Risk--Operations--One or More Fixed Locations.**--An indemnity obligation entails the payment of money in order to resolve liability. A defense obligation, in contrast, entails the rendering of a service, viz., the mounting and funding of a defense. An insurer performs its defense obligation by providing defense services through an attorney. If the insured risk involves operations at one or more fixed locations, a third party complaint against the insured arising from those operations typically is prosecuted in the jurisdiction where the operations are located. The insurer provides defense services in the jurisdiction where the suit is prosecuted. [*1440]

**(11) Insurance Contracts and Coverage § 10--Interpretation--Parties' Intent.**--A court interprets an insurance policy under California law using the same rules of interpretation applicable to other contracts. The mutual intention of the contracting parties at the time the contract was formed governs (*Civ. Code, § 1636*). The court ascertains that intention solely from the written contract if possible, but also considers the circumstances under which the contract was made and the matter to which it relates (*Civ. Code, §§ 1639, 1647*). The court considers the contract as a whole and interprets the language in context, rather than interprets a provision in isolation (*Civ. Code, § 1641*). The court interprets words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage (*Civ. Code, § 1644*). If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs.

**(12) Insurance Contracts and Coverage § 10--Interpretation--Insuring Clause--Exclusions--Reasonable Expectations.**--A court interprets an insuring clause broadly consistent with the reasonable expectations of the insured. An exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect. The exclusionary clause must be conspicuous, plain, and clear. An exception to an exclusion is treated in the same manner as a coverage provision and therefore is interpreted broadly consistent with the insured's reasonable expectations.

**(13) Insurance Contracts and Coverage § 10--Interpretation--Endorsements.**--An endorsement modifies the basic insuring forms of the policy and is an integral part of the policy. Standing alone, an endorsement means nothing. Endorsements on an insurance policy form a part of the insurance contract, and the policy of insurance with the endorsements and riders thereon must be construed together as a whole. An endorsement can expand or restrict the coverage otherwise provided by the policy. If there is any conflict between an endorsement and the body of a policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be conspicuous, plain, and clear.

**(14) Insurance Contracts and Coverage § 79.6--Liability--Environmental Risks--Pollution Incident--Sudden and Accidental.**--California courts interpret the phrase "sudden and accidental" when used in the context of an insuring clause providing coverage for damages arising from a pollution incident, to mean abrupt in time, unexpected, and unintended. [*1441]

**(15) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--Policy Interpretation--Uncertainties--Reasonable Expectations.**--The duty to defend is independent of

and broader than the duty to indemnify. Uncertainties concerning policy interpretation must be resolved in favor of the reasonable expectations of the insured. An insurer must defend a suit that potentially seeks damages covered by the policy.

**(16) Insurance Contracts and Coverage § 77--Liability--Duty to Defend.**--The duty to defend arises whenever the insurer ascertains facts that create a potential for liability under the policy, whether the insurer learns those facts from the complaint, the insured, or other sources.

**(17) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--California Law.**--A liability insurer has a duty to defend its insured under California law if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy. The facts need only raise the possibility that the insured will be held liable for covered damages. An insurer has a duty to defend even if the claims against the insured are groundless, false, or fraudulent. Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor.

**(18) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--California Law--Prospective Extinguishment.**--A duty to defend arises under California law upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. If a duty to defend has arisen by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively only, and not retroactively.

**(19) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--Texas Law.**--A liability insurer has a duty to defend its insured under Texas law if facts alleged in the complaint potentially could give rise to coverage under the policy. A plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend. Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. In case of doubt as to whether or not the allegations of a complaint [*1442] against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor. Under Texas law, the duty to defend is determined based on the policy terms and the allegations of the complaint, without regard to the truth or falsity of those allegations and without regard to extrinsic evidence. Any doubt as to whether the complaint alleges facts that give rise to a duty to defend must be resolved in favor of the insured. If the duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered.

**(20) Insurance Contracts and Coverage § 77--Liability--Duty to Defend--Texas and California Law--Extrinsic Facts.**--Texas law differs from California law in that under Texas law, facts extrinsic to the complaint cannot give rise to a duty to defend. Under California law, extrinsic facts known to the insurer give rise to a duty to defend if the facts create a potential for coverage under the policy.

**COUNSEL:** Dickstein Shapiro Morin & Oshinsky, Kirk A. Pasich, Clyde M. Hettrick and Daniel H. Rylaarsdam for Plaintiffs and Appellants.

Morison-Knox Holden & Prough, William C. Morison, Michael D. Prough and Richard A. Eggerth for Defendant and Respondent.

**JUDGES:** Croskey, J., with Klein, P. J., and Kitching, J., concurring.

**OPINION BY:** Croskey

**OPINION**

[**821]    **CROSKEY, J.**--Frontier Oil Corporation (Frontier) and its wholly owned subsidiary, Wainoco Oil & Gas Company (Wainoco), appeal a summary judgment in favor of RLI Insurance Company (RLI). Frontier and Wainoco contend RLI has a duty to defend them in several personal injury actions arising from the operation of an oil and gas production facility adjacent to Beverly Hills High School in Beverly Hills, California. Frontier's predecessor and RLI's predecessor had entered into a liability insurance policy in Texas. The parties dispute whether RLI agreed under the terms of the policy to defend pollution claims and whether a duty to defend the underlying actions has arisen. Each of these questions presents a choice-of-law issue concerning the law governing our determination. Each choice-of-law issue in turn [***2] presents the threshold question of the applicable choice-of-law rule.

**(1)** We conclude that notwithstanding the application of the governmental interest analysis to *other* choice-of-law issues, *Civil Code section 1646* is the [*1443] choice-of-law rule that determines the law governing the *interpretation* of a contract. *Section 1646* states that a contract is to be interpreted according to the law and usage of the place it is to be performed if the contract "indicate[s] a place of performance" and according to the law and usage of the place it was made if the contract "does not indicate a place of performance." [1] A contract "indicate[s] a place of performance" within the meaning of *section 1646* if the contract expressly specifies a place of performance or if

the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. California, as the location of the risk insured under the policy, was the state where RLI would be obligated to perform its defense obligations under the policy, and the contracting parties knew this at the time the policy was issued. Indeed, the policy included several endorsements reflecting the existence of a covered risk located [***3] in California. The law of California therefore governs the interpretation of the policy. Interpreting the policy under California law, we will hold that it includes a contractual duty to defend and that the facts alleged in the underlying complaints were sufficient to create a potential for coverage giving rise to a duty to defend. We will therefore reverse the judgment.

> 1    *Civil Code section 1646* provides: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."

**FACTUAL AND PROCEDURAL BACKGROUND**

*1. The Insurance Policy*

Underwriters Indemnity Company, RLI's predecessor in interest, issued a commercial general liability insurance policy to Wainoco Oil Corporation, Frontier's predecessor in interest, in January 1988. Wainoco Oil Corporation, acting through an insurance brokerage, and Underwriters Indemnity Company entered into the insurance contract in Texas. The policy was effective from October 1, 1987, to October 1, 1988.

The policy's liability insuring clause states: "We will pay those sums that the insured becomes legally [***4] obligated to pay as damages because of 'bodily injury' or 'property

damage' to which this insurance applies. ... The 'bodily injury' or 'property [**822] damage' must be caused by an 'occurrence' ... . *We will have the right and duty to defend any 'suit' seeking those damages.*" (Italics added.) Exclusion of, in the same coverage form, provided for an "absolute" pollution exclusion: "This insurance does not apply to: [¶] ... [¶] ... 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants ... ."

The policy includes several contemporaneously issued endorsements, including one entitled "Oil and Gas Lease Operators' Pollution Liability  [*1444]  Coverage" (the pollution liability endorsement), which states at the top of its first page, "This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein." The pollution liability endorsement *deletes* exclusion of from the policy and states: "We will pay those sums that the 'insured' becomes legally obligated to pay as compensatory damages because of 'bodily injury' or 'property damage' to which this [***5] insurance applies, caused by a 'pollution incident'." The endorsement defines "pollution incident" as "the sudden and accidental emission, discharge, release or escape of pollutants into or upon land or the atmosphere, provided that such emission, discharge, release or escape emanates from operations conducted on land and results in ?environmental damage'." [2] "Environmental damage" is defined as "the injurious presence in or upon land or the atmosphere of solid, liquid, gaseous or thermal contaminants, irritants or pollutants." The endorsement, however, does not mention a duty to defend.

> 2  The effect of this endorsement was to remove the *absolute* pollution exclusion from the original policy and provide in its place a limited promise of coverage for claims arising from any "sudden and accidental emission, discharge, release or escape of pollutants."

The policy also includes three additional endorsements relating specifically to the oil and gas operations in Beverly Hills, California. One adds the City of Beverly Hills as an additional insured ("with respect to claims arising out of the following project: Oil and Gas Operations at 9865 Olympic Blvd., City of Beverly Hill[s], CA"), apparently  [***6] as a public entity that had issued a permit to conduct oil and gas operations at the site; the second adds the department of transportation of the City of Los Angeles as an additional insured, also apparently as a public entity that had issued a permit; and the third is a "Waiver of Transfer Rights of Recovery Against Others" made out in favor of the City of Beverly Hills with respect to claims arising from the same project.

Finally, an endorsement for certain "Texas Changes" apparently conforms this policy issued in Texas with Texas law with respect to three specific areas, none of which is relevant to the issues raised in this appeal: (1) the "notice prejudice" rule, (2) policy cancellation, and (3) policy renewal. That endorsement also states that the insured may complain to the Texas State Board of Insurance if any dispute concerning the premium or a claim is not resolved.

## 2. *Underlying Actions and Tender of Defense*

Lori Lynn Moss and numerous other plaintiffs filed a complaint against Frontier, Wainoco, and other oil and gas industry defendants in June 2003 (*Moss v. Venoco, Inc.* (Super. Ct. L.A. County, No. BC297083)). The plaintiffs alleged that the defendants' oil and gas operations [***7] at "Drill-Site #1"  [*1445]  and other locations at the Beverly Hills site caused releases of toxic chemicals into the environment resulting in personal injuries and deaths. Other  [**823]  plaintiffs filed similar complaints against Frontier, Wainoco, and others alleging the same operative facts in six additional actions filed from July 2003 to May 2005. Frontier and Wainoco tendered defense

153 Cal. App. 4th 1436, *; 63 Cal. Rptr. 3d 816, **;
2007 Cal. App. LEXIS 1289, ***; 37 ELR 20201

of all of these actions to several primary liability insurers, including RLI. RLI responded that it would investigate the matter.

In January 2004, Frontier and Wainoco made a written demand on numerous insurers, including RLI, to provide a defense in the underlying actions. On February 12, 2004, RLI filed a complaint in the United States District Court for the Southern District of Texas seeking a declaratory judgment that it had no duty to defend or indemnify Frontier or Wainoco in the underlying actions (*RLI Insurance Co. v. Wainoco Oil & Gas Co.* (S.D.Tex., No. H-04-0553)). RLI sent a letter to Frontier and Wainoco the next day denying coverage and a defense.

### 3. *Trial Court Proceedings*

Frontier and Wainoco filed their complaint in this action against RLI and other insurers in February 2004, alleging counts for (1) [***8] declaratory relief, (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing, all relating to the insurers' refusal to defend the underlying actions. The Texas federal district court stayed RLI's declaratory relief action in April 2004 under its broad discretionary authority to abstain from ruling on a declaratory relief action where there is a pending state court action in which the matters in controversy might be fully resolved. Frontier and Wainoco later resolved this action with respect to all of the insurer defendants except RLI.

RLI moved for summary judgment against Frontier in November 2005, arguing that it had no duty to defend Frontier in the underlying actions. RLI argued that Texas law governed the dispute pursuant to *Civil Code section 1646* and *Code of Civil Procedure section 1857* and that under Texas law, RLI had no duty to indemnify or defend Frontier. Specifically, RLI argued that under Texas law (1) the pollution liability endorsement does not promise a defense of pollution claims, so the policy pro-

vides for indemnity of pollution claims but not a defense; and, in any event (2) the allegations in the underlying complaints do not [***9] create a potential for coverage. RLI moved for summary judgment against Wainoco on the same grounds, and also argued that Wainoco was entitled to no relief because it was not a named insured under the policy. [*1446]

[**824] The trial court concluded that *Civil Code section 1646* determined whether the law of California or Texas governed the dispute. [3] Noting the ?Texas Changes" endorsement, the court stated, "The insurance policy as a whole shows the intent of the parties at the time the insurance contract was made was that Texas law would apply to any disputes arising out of the contract." The court concluded, "the insurance contract was made and accepted between a Texas insurer and a Texas-based insured in Texas and was to be performed under Texas law." The court therefore held that Texas law governed this dispute. The court acknowledged that "[t]he major risk identified by the parties in their contract was the insured's petroleum drilling operation in California," but stated that such circumstance alone did not compel the conclusion that California law governed.

>   3   The trial court also apparently relied on *Code of Civil Procedure section 1857* (see fn. 4, *post*).

The trial court concluded that, under [***10] Texas law, the policy did not include a duty to defend pollution claims because the pollution liability endorsement did not expressly promise a defense. The court therefore held that RLI had no duty to defend Frontier or Wainoco regardless of the allegations in the underlying actions. The court granted the summary judgment motions against both Frontier and Wainoco and entered a judgment in favor of RLI. Frontier and Wainoco filed a timely appeal.

### *CONTENTIONS*

Frontier and Wainoco contend (1) the governmental interest analysis is the choice-of-law rule that determines whether California law or Texas law governs the parties' rights under the policy, and under that analysis California law applies; (2) even under *Civil Code section 1646* and *Code of Civil Procedure section 1857*, the contemplated place of performance was California, so California law applies; (3) interpreted in accordance with California law, the policy includes a contractual duty to defend that extends to claims arising from pollution incidents; (4) the allegations of the third party complaints establish a potential for coverage under the policy and therefore create a duty to defend; and (5) RLI has a duty to defend under [***11] Texas law, even if it applies.

RLI disputes these contentions and argues that (1) *Civil Code section 1646* and *Code of Civil Procedure section 1857* establish the choice-of-law rule that determines whether California law or Texas law governs the interpretation of the policy and, under that analysis, Texas law applies because the policy does not expressly specify a place of performance and the contract was made in Texas; (2) even under the governmental interest analysis, Texas law [*1447] applies; (3) interpreted in accordance with Texas law, the policy does not include a duty to defend pollution claims; (4) the allegations of the third party complaints do not establish a potential for coverage under the policy and therefore cannot support a duty to defend under Texas law; (5) if California law applies, the matter should be remanded to the superior court to consider extrinsic evidence that was not considered in ruling on the prior summary judgment motion; and (6) Wainoco is not an insured under the policy, so the judgment should be affirmed as to Wainoco.

## DISCUSSION

### 1. *Standard of Review*

A party is entitled to summary judgment only if there is no triable issue of material fact and the party is entitled [***12] to judgment as a matter of law. (*Code Civ. Proc., § 437c, subd. (c)*.) A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. (*Id., subd. (p)(2)*.) A defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff cannot reasonably obtain needed evidence. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal. Rptr. 3d 103, 75 P.3d 30].) If the defendant meets this burden, the burden shifts to the plaintiff to set forth "specific facts" showing that a triable issue of material fact exists. (*Code Civ. Proc., § 437c, subd. (p)(2)*.) We review the trial court's ruling de novo, liberally construe the evidence in favor of the opposing party, and resolve all doubts concerning the evidence in favor of the opposing party. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal. Rptr. 3d 797, 115 P.3d 77].) [**825]

### 2. *Choice-of-law Doctrine*

(2) Choice of law refers to the determination of which state's or other jurisdiction's law applies to a particular issue. Choice of law is one branch of the larger doctrine of conflicts of laws, which also includes the [***13] questions in which jurisdiction a suit can be brought and the effect of a foreign judgment. (See Weintraub, Commentary on the Conflict of Laws (5th ed. 2006) § 1.1, p. 1; *Rest.2d Conflict of Laws, § 2, com. a*, pp. 2-3.) Choice-of-law rules can be statutory or based on common law. (See *Rest.2d Conflict of Laws, § 5, coms. b, c*, p. 9; Leflar, *Choice-of-Law Statutes* (1977) *44 Tenn. L.Rev. 951*.) Courts and commentators have long struggled with differing approaches to challenging choice-of-law problems.

The determination whether RLI has a duty to defend under the policy presents two principal issues. The first is whether the policy includes a duty [*1448] to defend pollution claims. This is a question of contract interpretation. The second is whether the underlying personal injury actions trigger the duty to defend. Each of these questions presents a choice-of-law issue as to whether the law of California or another state governs. Each choice-of-law issue in turn presents the threshold question of which choice-of-law rule properly applies.

We first will decide that *Civil Code section 1646* is the choice-of-law rule that determines the law governing the interpretation of the policy. We then will apply [***14] *section 1646*, conclude that California law governs, and interpret the policy under California law. Such interpretation will require us to conclude that the policy includes a duty to defend pollution claims. Next, we will consider the choice of law with respect to whether the underlying actions trigger the duty to defend. We will hold that California law governs under either *section 1646* or the governmental interest analysis. Applying California law, we will conclude that RLI has a duty to defend Frontier and Wainoco in the underlying actions.

3. *Civil Code Section 1646 Is California's Choice-of-law Rule That Determines the Law Governing the Interpretation of a Contract*

*Civil Code section 1646* (see fn. 1, *ante*) [4] was first enacted in 1872 based on an identical provision in the Field Code (Field's Draft N.Y. Civ. Code (1865) § 811) and remains unchanged today. Published opinions by California courts have applied the statute as a choice-of-law rule determining the law governing the interpretation of a contract very infrequently, and those opinions (discussed *post*) provide little guidance as to the meaning of the critical phrase "indicate a place of performance" (*Civ. Code, § 1646*).

4 *Code of Civil Procedure section 1857* [***15] states, in terms somewhat similar to *Civil Code section 1646*: "The language of a writing is to be interpreted according to the meaning it bears in the place of its execution, unless the parties have reference to a different place." In light of our conclusion that *Civil Code section 1646* determines the law governing the interpretation of a contract and the apparent similarities between the two statutes, we need not decide whether *Code of Civil Procedure section 1857* also states a choice-of-law rule or only an interpretive rule concerning usage.

(3) Our fundamental task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of the law. (*Hassan v. Mercy American River Hospital (2003) 31 Cal.4th 709, 715 [3 Cal. Rptr. 3d 623, 74 P.3d 726]*.) Because the statutory language ordinarily is the most reliable indicator of legislative intent, we begin by examining the words of the statute. (*Ibid.*) We give the words of the statute their ordinary and usual meaning [**826] and construe them in the context of the statute as a whole and the entire scheme of law of which it is a part. (*State Farm Mutual Automobile Ins.* [*1449] *Co. v. Garamendi (2004) 32 Cal.4th 1029, 1043 [12 Cal. Rptr. 3d 343, 88 P.3d 71]*.) If the language is clear and a literal construction [***16] would not result in absurd consequences that the Legislature did not intend, we presume that the Legislature meant what it said and the plain meaning governs. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles (2004) 34 Cal.4th 733, 737 [21 Cal. Rptr. 3d 676, 101 P.3d 563]*.) If the language is ambiguous, we may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy. (*Ibid.*)

(4) *Civil Code section 1646*, by its express terms, prescribes a choice-of-law rule concerning the interpretation of contracts. It states that a contract is to be interpreted according to the

law and usage of the place where it is to be performed, but only if the contract "indicate[s] a place of performance," and is to be interpreted according to the law and usage of the place where it was made if the contract "does not indicate a place of performance." [5] Frontier and Wainoco construe the quoted language to mean that a contract must be interpreted according to the law of the place where it is to be performed if the contract *contemplates* performance in a particular place, while RLI construes the same language to mean that the law of the place where the contract is to be performed governs [***17] only if the contract *expressly specifies* a place of performance.

> 5    *Civil Code section 1646* prescribes both a choice-of-law rule concerning the interpretation of contracts and a rule of interpretation regarding word usage. The California Supreme Court has cited *section 1646* in several opinions to support the admissibility of evidence of usage for the purpose of interpreting a contract. (*Callahan v. Stanley (1881) 57 Cal. 476, 479*; *Burns v. Sennett & Miller (1893) 99 Cal. 363, 371-372 [33 P. 916]*; *Law v. Northern Assurance Co. (1913) 165 Cal. 394, 407 [132 P. 590]*; *Alta Planing Mill Co. v. Garland (1914) 167 Cal. 179, 183 [138 P. 738]*; *Buckner v. Leon & Co. (1928) 204 Cal. 225, 227 [267 P. 693]*; *Alamitos Land Co. v. Shell Oil Co. (1935) 3 Cal.2d 396, 404 [44 P.2d 573]*; *Ermolieff v. R.K.O. Radio Pictures (1942) 19 Cal.2d 543, 550 [122 P.2d 3]*; *Beneficial etc. Ins. Co. v. Kurt Hitke & Co. (1956) 46 Cal.2d 517, 525-526 [297 P.2d 428]*.) Those opinions typically cited *section 1646* together with other statutes stating that the words of a contract or writing are to be interpreted in accordance with any special meaning intended by the parties (e.g., *Civ. Code, §§ 1644, 1645*; *Code Civ. Proc., § 1861*), and did not discuss the meaning of "indi-

cate a place of performance" in *section 1646*. [***18] The California Supreme Court has never cited *section 1646* as a choice-of-law rule.

The apparent purpose of *Civil Code section 1646* is to determine the choice of law with respect to the interpretation of a contract in accordance with the parties' presumed intention at the time they entered into the contract. This was the explanation given by courts and commentators for the former common law rule on which *section 1646* apparently was based. Judge Joseph Story, in his highly regarded treatise on conflict of laws, described an exception to the general rule that the law of the place of making governed the validity and interpretation of a contract: "[W]here the contract is, either expressly or tacitly, to be performed in any other place, there the general rule [*1450] is in conformity to the presumed intention of the parties that the contract as to its validity, nature, obligation, and interpretation is to be governed by the law of the place of performance." (Story, Conflict of Laws (7th ed. 1872) § 280, p. 325.) Similarly, Kent's Commentaries explained that the law of the place a contract is to be performed should govern because, "The rights of the parties are to be judged of by that law by which [***19] they intended, or rather by which [**827] they may justly be presumed to have bound themselves. [Citations.]." [6] (2 Kent, Commentaries on American Law (12th ed. 1873) p. 622 (459) fn. 1.) Numerous contemporary judicial opinions followed this rule based on the parties' presumed intention. (See, e.g., *Vanzant Jones & Co. v. Arnold, Hamilton & Johnson et al. (1860) 31 Ga. 210*; *McDaniel v. The Chicago & Northwestern Railway Co. (1868) 24 Iowa 412*; *Dyke v. Erie Railway (1871) 45 N.Y. 113, 116-117*; *Waverly Bk., Appellant, v. Hall (1892) 150 Pa. 466, 472-473 [24 A. 665]*.)

> 6    The former common law rule described by these commentators was not limited to the choice-of-law issue of *con-*

*tract interpretation*, as is *Civil Code section 1646.*

**(5)** In our view, *Civil Code section 1646* was intended to give effect to the parties' presumed intention that the law of the place a contract is to be performed should govern its interpretation. [7] The parties' intention as to the place of performance sometimes can be gleaned from the nature of the contract and the surrounding circumstances, even if the contract does not expressly specify a place of performance. This was Story's view. (Story, Conflict of Laws, *supra*, § 280, p. 325 ["where the contract [***20] is, *either expressly or tacitly*, to be performed in any other place, ..." (italics added)]; see also *Pomeroy v. Ainsworth* (N.Y. Sup. 1856) 22 Barb. 118, 128 ["If no place of performance is expressly stated, *or implied from the terms of the contract*, the law of the place where it was made will govern" (italics added)].) [8] Moreover, the use of the word "indicate" in *section 1646* in lieu of a more restrictive word such as "specify" or "state" suggests that the Legislature intended a less restrictive meaning. Accordingly, we conclude that a contract "indicate[s]" a place of performance within the meaning of *section 1646* if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances. The intended place of performance is a question of contract interpretation for the court to decide, except [*1451] to the extent the answer may depend on the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal. Rptr. 767, 402 P.2d 839]; *American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245 [37 Cal. Rptr. 3d 918].)

7  If the parties state their intention in an express choice-of-law clause, California courts ordinarily will enforce the parties' [***21] stated intention unless (1) the chosen state has no substantial relationship to the parties or their transaction, and there is no other reasonable basis for

the parties' choice, or (2) the chosen state's law is contrary to a fundamental policy of the state whose law otherwise would apply, and the latter state has a materially greater interest in the matter than does the chosen state. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 464-466 & fns. 5 & 6 [11 Cal. Rptr. 2d 330, 834 P.2d 1148].)

8  Both of these authorities were among the references cited in the notes to section 811 of the Field's Draft New York Civil Code, which was the source for the identical language in *Civil Code section 1646.*

### 4. *Prior California Opinions Offer Little Guidance on the Application of Civil Code Section 1646 As a Choice-of-law Rule*

The California Courts of Appeal have cited *Civil Code section 1646* in several opinions involving choice-of-law issues, but those opinions offer little or no meaningful guidance as to the meaning of "indicate a place of performance."

*Blochman etc. Bank v. Ketcham* (1918) 36 Cal.App. 284 [171 P. 1084] (*Blochman*) was the first opinion by a California court to expressly invoke *Civil Code section 1646* as a choice-of-law    [***22] rule. *Blochman* involved    [**828] a promissory note executed and delivered in Mexico, with the place of payment left blank. The plaintiff later inserted in the blank a location in California. (*Blochman, supra,* at p. 285.) *Blochman* concluded that the parties intended to allow the holder to designate a place for payment. The court stated that this was the law of California when a blank was left in a note for the holder to fill in, stated that there was nothing in the record to indicate that Mexican law was to the contrary, and therefore presumed that Mexican law was the same. (*Id. at pp. 286-287.*) Although this discussion concerned the choice of law with respect to the interpretation of the contract,

*Blochman* did not cite *section 1646* in this context. Instead, *Blochman* cited *section 1646* in support of its conclusion that California law, rather than the law of Mexico, governed the validity and enforceability of the note because the note was payable in California. [9] (*36 Cal.App. at p. 287*.) *Blochman* did not discuss whether there was any indication that the contracting parties anticipated that the note would be made payable in California.

> 9   *Civil Code section 1646* states that a contract is to be interpreted [***23] according to the law and usage of the place it is to be performed if the contract indicates a place of performance, but does not state that the validity and enforceability of a contract are to be determined according to the law of the intended place of performance.

(6) *Blair v. New York Life Ins. Co. (1940) 40 Cal. App. 2d 494 [104 P.2d 1075]* (*Blair*) was an action by an insured for payment of disability insurance benefits. The defendant executed and issued the policy in New York, and delivered it to the insured in the State of Washington. The insured moved to California several years later. The insured received disability benefits in Washington and California before the defendant discontinued the payment of benefits based on the insured's failure to disclose material facts concerning her physical condition. (*Id. at p. 496*.) The choice-of-law issue concerned the [*1452] interpretation of an incontestability clause. (*Id. at p. 500*.) *Blair* quoted *Civil Code section 1646* and stated that the statute "means that the place where the contract is made is of importance when the contract does not indicate a specific place of performance." (*Blair, supra, at p. 498*.) After an intervening discussion, *Blair* stated, "The law [***24] of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity (*Flittner v. Equitable Life Assur. Soc.*

[(1916)] *30 Cal.App. 209 [157 Pac. 630]*), unless the terms of the contract provide otherwise or the circumstances indicate a different intention." [10] (*Id. at [**829] p. 499*.) *Blair* did not cite *section 1646* with regard to this last quoted statement.

> 10   *Flittner v. Equitable Life Assur. Soc., supra, 30 Cal.App. 209* held that a minor could rescind a life insurance policy and recover the premiums paid, applying California law. (*Id. at pp. 215-216*.) The choice-of-law issue was whether the law of California or New York governed the minor's right to rescind the contract. The contract was made in California, and *Flittner* concluded that the contract contemplated performance in New York. (*Id. at p. 213*.) *Flittner* stated: "All matters connected with the performance of a contract are regulated by the law of the place where the contract by its terms is to be performed. All matters bearing upon the execution, the *interpretation*, and the validity of contracts including the capacity [***25] of the parties to contract, are *determined by the law where the contract is made* (*Union Nat. Bank v. Chapman, 169 N. Y. 538, [88 Am. St. Rep. 614, 57 L. R. A. 513, 62 N. E. 672]*; *Phoenix Mut. Life Ins. Co. v. Simons, 52 Mo. App. 357*; 2 Wharton on Conflict of Laws, sec. 401; note in *Mayer v. Roche, 77 N.J.L. 681 [75 A. 235, 26 L. R. A. (N. S.) 767]*; *Hauck Clo. Co. v. Sharpe, 83 Mo. App. 385*)." (*Id. at p. 215*, italics added.) *Flittner* did not cite *Civil Code section 1646* with respect to the law governing the interpretation of a contract and cited no California authority in support of the quoted statement.

The terms of the insurance policy in *Blair* provided for payment of premiums at the defendant's home office in New York or to an authorized agent elsewhere. (*Blair, supra, 40 Cal. App. 2d at p. 498*.) *Blair* concluded, "[u]nder

this provision, the contract was to be performed partly in New York and partly in any other place where the premiums were paid or other necessary business could be transacted." (*Id. at p. 499*; but see *Flittner v. Equitable Life Assur. Soc., supra*, 30 Cal.App. at p. 213, reaching a different conclusion on similar facts.) *Blair* stated that the contract was performed partly in New York and [***26] partly in Washington, that the defendant waived the right to apply Washington law by paying benefits to the plaintiff in California, and that the law of California governed because the breach occurred in California. [11] (*Blair, at p. 499*; see also *Braun v. New York Life Ins. Co.* (1941) 46 Cal. App. 2d 335, 344-346 [115 P.2d 880] [followed *Blair* and declined to [*1453] discuss the argument that *Blair* failed to give effect to *Civ. Code, § 1646*].) The holding in *Blair* apparently was based on the stated choice-of-law rule that in the circumstances of that case, liability for breach of contract was governed by the laws of the state where the breach occurred; the holding apparently was not based on *section 1646*.

> 11  *Blair, supra,* 40 Cal. App. 2d at page 499 stated: "In recognizing California as the place for the payment of benefits by delivery thereof in this state, defendant waived any right to insist that the Washington law governed. The waiver is not one of jurisdiction, but of the right to apply the Washington law to an action tried in California. The intention of the parties, as gathered from attending circumstances, is controlling in determining the place of trial and the governing laws. Liability for the breach [***27] of a contract partly performed in one state, and made and partly performed in another, is fixed by the laws of the state wherein the breach occurred. (17 C. J. S., p. 343.) The breach in this case was defendant's refusal to pay further disability income benefits to plaintiff in California."

*Shippers Dev. Co. v. General Ins. Co.* (1969) 274 Cal. App. 2d 661 [79 Cal. Rptr. 388] (*Shippers*) involved the interpretation of an insurance policy exclusion. (*Id. at pp. 673-674.*) *Shippers* stated that the insurer relied on *Civil Code section 1646*, quoted the statute, and then stated: "The insurer's argument fails to consider the following rule: 'The law of the place of performance of an insurance contract controls as to its legal construction and effect, but that of the place where made governs on all questions of execution and validity [citation], unless the terms of the contract provide otherwise or the circumstances indicate a different intention. In this case, the circumstances do not indicate that in the matter of the interpretation of the contract, the parties intended to be restricted to the laws of the State of Washington, where the contract was consummated by the delivery of the policy.' (*Blair v. New York Life Ins. Co.[, supra,]* 40 Cal. App. 2d [at p.] 499 [104 P.2d 1075].) [***28] It was contemplated that the policy would be effective and might have to be performed outside the State of Washington. The law of this state in interpreting the policy will govern the extent of the coverage with respect to losses occurring within this state. [Citation.]" (*Shippers, supra, at p. 674,* fn. omitted.) Thus, it appears that rather than construe and apply *section 1646*, *Shippers* followed dicta [**830] from *Blair*. Although it appears that the dicta may be somewhat consistent with *section 1646* with respect to the law governing contract interpretation, we must construe and apply the statute rather than a purported rule of law of some other origin.

Some California opinions citing *Civil Code section 1646* have concluded that there was no conflict between the laws of the states involved, and therefore have not determined whether the contract indicated a place of performance. (See, e.g., *Gitano Group, Inc. v. Kemper Group* (1994) 26 Cal.App.4th 49, 56-57 & fn. 4 [31 Cal. Rptr. 2d 271]; *International Service Ins. Co. v. Gonzales* (1987) 194 Cal. App. 3d 110, 116 [239 Cal. Rptr. 341].) Other

opinions have cited *section 1646* to support conclusions on choice-of-law issues other than the law governing the interpretation of a contract (e.g., [***29] *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc. (1995) 38 Cal.App.4th 1532, 1540-1541 [46 Cal. Rptr. 2d 33]* [statute of limitations]; *Klein v. Superior Court (1988) 198 Cal. App. 3d 894, 902 [244 Cal. Rptr. 226]* [formation of an oral contract]; *Henderson v. Superior Court* [*1454] *(1978) 77 Cal. App. 3d 583, 592-593 [142 Cal. Rptr. 478]* [validity and enforceability of a contract, statute of limitations, statute of frauds, and parol evidence rule]; *Wheeling v. Financial Indem. Co. (1962) 201 Cal. App. 2d 36, 40 [19 Cal. Rptr. 879]* [validity of an insurance policy exclusion]; *Bracker v. American Nat. Food, Inc. (1955) 133 Cal. App. 2d 338, 344 [284 P.2d 163]* [measure of contract damages]; *Hardy v. Musicraft Records, Inc. (1949) 93 Cal. App. 2d 698, 702 [209 P.2d 839]* [validity of a stock sale under securities laws]; *Blochman, supra, 36 Cal.App. at p. 287* [validity of a promissory note]), without explaining why a statute that by its express terms establishes a choice-of-law rule only as to the interpretation of a contract should determine other choice-of-law issues. These and other California opinions offer little or no analysis of the meaning of "indicate a place of performance" in *section 1646*. [12]

12    *Wheeling v. Financial Indem. Co., supra, 201 Cal. App. 2d 36* and *Estate of Grace (1948) 88 Cal. App. 2d 956 [200 P.2d 189]* [***30] reflect differing views on the meaning of "indicate a place of performance" (*Civ. Code, § 1646*). *Wheeling* stated that an automobile liability insurance policy "was made and delivered in California, and did not specify a place of performance," and therefore applied California law to a claim arising from an accident in Virginia. (*Wheeling, supra, at p. 40*.) In contrast, *Estate of Grace* stated that an adop-

tion contract made in both Texas and California "necessarily would be performed wherever the Graces might take the child," and held that the contract was enforceable in California although void in Texas. (*Estate of Grace, supra, at pp. 962-963, 966*.)

5. *The Governmental Interest Analysis Does Not Supplant Civil Code Section 1646 As to the Law Governing the Interpretation of Contracts*

The most prevalent modern choice-of-law rule in California is the governmental interest analysis. It replaced former common law choice-of-law rules, and is sometimes labeled California's modern choice-of-law rule. Some courts and commentators (discussed *post*) have inferred or suggested that the judicially developed governmental interest analysis supplants the choice-of-law rule [***31] stated in *Civil Code section 1646*. Our careful review of the governmental interest analysis as developed by the California Supreme Court, however, causes us to conclude that it does not supplant the legislative command of *section 1646*.

(7) Under the governmental interest analysis, the court first determines whether the [**831] applicable rules of law of the potentially concerned jurisdictions are the same or different. If the applicable rules of law are identical, the court may apply California law. If the applicable rules of law differ materially, the court proceeds to the second step, which involves an examination of the interests of each jurisdiction in having its own law applied to the particular dispute. If each jurisdiction has an interest in applying its own law to the issue, there is a "true conflict" and the court must proceed to the third step. In [*1455] the third step, known as the comparative impairment analysis, the court determines which jurisdiction has a greater interest in the application of its own law to the issue or, conversely, which jurisdiction's interest would be more significantly impaired if its law were not applied. The

court must apply the law of the jurisdiction whose interest [***32] would be more significantly impaired if its law were not applied. (*Kearney v. Salomon Smith Barney, Inc. (2006) 39 Cal.4th 95, 107-108 [45 Cal. Rptr. 3d 730, 137 P.3d 914] (Kearney)*; *Washington Mutual Bank v. Superior Court (2001) 24 Cal.4th 906, 919-920 [103 Cal. Rptr. 2d 320, 15 P.3d 1071] (Washington Mutual).*)

The California Supreme Court first definitively adopted the governmental interest analysis for use in tort actions in *Reich v. Purcell (1967) 67 Cal.2d 551 [63 Cal. Rptr. 31, 432 P.2d 727] (Reich)*, a wrongful death action arising from the collision of two automobiles in Missouri driven by residents of California and Ohio. [13] (*Id. at p. 552.*) The choice-of-law issue involved the amount of tort damages. A Missouri statute limited the amount of damages in a wrongful death action, while there were no such limitations under the laws of California and Ohio. (*Id. at pp. 552-553.*) *Reich* rejected the former common law rule that the law of the place of the wrong governed in tort actions. (*Id. at pp. 553, 555.*) *Reich* stated, "The forum must search to find the proper law to apply based upon the interests of the litigants and the involved states" (*id. at p. 553*), and stated that the former rigid rule "must be subordinated to the objective of proper choice of law in conflict cases, i.e., to determine [***33] the law that most appropriately applies to the issue involved [citation]" (*id. at p. 555*). *Reich* concluded that California had no interest in applying its law to the benefit of the defendant because California did not limit the amount of damages awardable, and that Missouri had no interest in applying its law limiting damages to the benefit of a defendant who was not a resident of that state as of the date of injury. The court therefore concluded that the law of Ohio governed the amount of damages and that the Missouri limitation on damages did not apply. (*Id. at pp. 555-556.*)

13    *Bernkrant v. Fowler (1961) 55 Cal.2d 588 [12 Cal. Rptr. 266, 360 P.2d 906]*, a precursor to *Reich, supra, 67 Cal.2d 551*, was an action to cancel a promissory note pursuant to an oral contract. (*Bernkrant, supra, at pp. 590-591.*) *Bernkrant* concluded that California had no interest in applying its own statute of frauds to a transaction made and performed in Nevada involving the refinancing of a loan secured by land in Nevada, and therefore held that the Nevada statute of frauds governed. (*Id. at pp. 595-596.*)

The California Supreme Court subsequently applied the governmental interest analysis in several other cases involving questions of tort and [***34] contract law. *Travelers Ins. Co. v. Workmen's Comp. App. Bd. (1967) 68 Cal.2d 7 [64 Cal. Rptr. 440, 434 P.2d 992]* was an action for workmen's compensation benefits. The plaintiff originally [**832] entered into an oral employment contract in California, and later was injured in Utah. (*Id. at pp. 9-11.*) The plaintiff was entitled to benefits under California's workmen's compensation statute only if [*1456] he were injured while working under an employment contract that was entered into in California. (*Id. at p. 11.*) The choice-of-law issues concerned the place of formation of the employment contract, whether an employment agency in Colorado acted as the employer's agent for purposes of transmitting an employment offer to the plaintiff, and whether the parties had rescinded the oral contract and formed a new employment contract in Wyoming. (*Ibid.*) *Travelers* decided each of these questions by considering the governmental interests of the states involved, stating, "California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case." (*Id. at p. 11*, fn. omitted.) *Travelers* concluded that California had a strong [***35] interest in applying its own laws to determine whether an injured Californian was entitled to benefits un-

der the workmen's compensation act and that the other states involved had no significant interest in applying their laws to the dispute. (*Id. at pp. 11-14.*) The court therefore concluded that California law governed the place-of-contracting, agency, and rescission issues. (*Id. at p. 14.*)

*Hurtado v. Superior Court (1974) 11 Cal.3d 574 [114 Cal. Rptr. 106, 522 P.2d 666]* was a wrongful death action arising from a collision in California involving three automobiles driven by residents of California and Mexico. (*Id. at p. 578.*) The choice-of-law issue involved the amount of tort damages. *Hurtado* concluded that Mexico had no interest in the application of its law limiting the amount of damages in a wrongful death action to the benefit of defendants who were not residents of Mexico, so there was no true conflict and the measure of damages of California, as the forum state, should apply. (*Id. at pp. 580-582.*)

*Bernhard v. Harrah's Club (1976) 16 Cal.3d 313 [128 Cal. Rptr. 215, 546 P.2d 719]* (*Bernhard*) involved a collision in California between an automobile driven by a California resident and a motorcycle driven by the plaintiff, who was also a California resident. [***36] The automobile driver allegedly was intoxicated after drinking liquor served by the defendant at a gambling casino in Nevada. (*Id. at pp. 315-316.*) The choice-of-law issue concerned the existence of tort liability. The allegations of the complaint supported negligence liability under California law, but did not support liability under Nevada law. (*Id. at p. 317.*) *Bernhard* concluded that each state was interested in the application of its own law, so there was a true conflict, and that the true conflict should be resolved by a comparative impairment analysis. (*Id. at pp. 318-321.*) *Bernhard* concluded that California's interest in preventing the sale of alcoholic beverages to intoxicated persons whose intoxicated state is likely to contribute to injuries in California would be more significantly impaired than would Ne-

vada's interest in protecting its tavern keepers from unlimited liability. (*Id. at pp. 322-323.*) The court therefore concluded that [*1457] California law applied and that the complaint alleged facts sufficient to state a cause of action under California law. (*Id. at pp. 323, 325.*) [**833]

*Offshore Rental Co. v. Continental Oil Co. (1978) 22 Cal.3d 157 [148 Cal. Rptr. 867, 583 P.2d 721]* (*Offshore Rental*) was a negligence action [***37] arising from a personal injury suffered by an officer of the plaintiff corporation while on the defendant's premises in Louisiana. The plaintiff sought to recover damages for injuries to its business interests resulting from the loss of the officer's services. (*Id. at pp. 160-161.*) The choice-of-law issue concerned the existence of tort liability. *Offshore Rental* assumed that California law (*Civ. Code, § 49*) allowed a cause of action for negligent injury to a business employee, and concluded that Louisiana law did not allow such a cause of action. (*Offshore Rental, supra, at pp. 162-163.*) *Offshore Rental* noted that no California court had squarely held that the California statute supported such a cause of action, while a Louisiana appellate court nine years earlier had held that Louisiana law did not allow a cause of action by a corporate plaintiff for the loss of services of its officer. (*Id. at pp. 162, 168.*) *Offshore Rental* characterized the California statute as "unusual and outmoded" and concluded that California's interest in establishing liability under the statute was less strong than Louisiana's interest in the application of its " 'prevalent and progressive' " law. (*Id. at p. 168.*) [***38] The court therefore concluded that Louisiana law applied and that the trial court's dismissal of the cause of action was proper. (*Id. at pp. 169-170.*)

*Washington Mutual, supra,* 24 Cal.4th 906 was an action against a home mortgage lender for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair business practices under the unfair competition

law (UCL) (*Bus. & Prof. Code, § 17200 et seq.*), unjust enrichment, and conversion. The deed of trust included a choice-of-law provision stating that the security instrument was governed by federal law and the law of the jurisdiction where the secured property was located. (*Washington Mutual, supra, at p. 912.*) The trial court certified the action as a nationwide class action without determining which law would apply to the class members. (*Id. at p. 913.*) The *Washington Mutual* court stated that a consideration of the law applicable to the class members' claims was essential to an informed decision on class certification. (*Id. at p. 915.*) It also stated that the trial court must apply the analysis set forth in *Nedlloyd Lines B.V. v. Superior Court, supra, 3 Cal.4th 459* to determine whether the class causes of action [***39] were subject to enforceable choice-of-law agreements. (*Washington Mutual, supra, at pp. 915-916.*) The court also stated that if the choice-of-law agreements were unenforceable or did not apply to the class causes of action and the party opposing class certification continued to assert that the law of another state applied to nonresident class members, the trial court must apply the governmental interest analysis to determine which state's law to apply. (*Id. at pp. 918-919.*) Thus, the choice-of-law issues concerned the law [*1458] governing the plaintiffs' causes of action for breach of contract, breach of the implied covenant, unfair business practices, unjust enrichment, and conversion.

(**8**) *Washington Mutual, supra, 24 Cal.4th at page 919* stated, "California follows a three-step 'governmental interest analysis' to [**834] address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement. [Citations.]" After describing the governmental interest analysis, the court concluded, "[t]hese rules apply whether the dispute arises out of contract or tort [citations], and a separate conflict of laws inquiry must be made with respect [***40] to each issue in the case

[citations]." (*Id. at p. 920.*) *Washington Mutual* reversed the judgment by the Court of Appeal with directions to issue a peremptory writ of mandate directing the trial court to vacate its certification order and conduct the choice-of-law analyses described in the opinion. (*Id. at p. 929.*)

In *Kearney, supra, 39 Cal.4th 95,* clients of the defendant brokerage firm alleged that the defendant had surreptitiously recorded their telephone conversations without their consent in violation of a California statute (*Pen. Code, § 632*). The plaintiffs, in a class action complaint, alleged violations of the statute and unfair business practices under the UCL. (*Kearney, supra, at pp. 102-103* & fn. 1.) The choice-of-law issue concerned the law governing those statutory causes of action. The court stated that the allegations of the complaint supported the alleged causes of action under California law, but did not support liability under Georgia law. (*Id. at pp. 120-122.*) *Kearney* concluded that California's interest in protecting individuals in California from the secret recording of their confidential telephone conversations would be more significantly impaired than would Georgia's [***41] interest in protecting the right of a business to record telephone conversations for legitimate business reasons. (*Id. at pp. 124-128.*) The court therefore held that California law applied and that the complaint alleged facts sufficient to state a cause of action under California law. (*Id. at pp. 323, 325.*)

Some federal courts have concluded or suggested that the governmental interest analysis has judicially supplanted the choice-of-law rule stated in *Civil Code section 1646* or that the state of California law on this point is uncertain. The Ninth Circuit in *Strassberg v. New England Mut. Life Ins. Co. (9th Cir. 1978) 575 F.2d 1262* applied the governmental interest analysis to determine the law governing whether an insurance policy had lapsed due to nonpayment of insurance premiums. *Strassberg*

stated, "California conflicts law has developed significantly since the original enactment of *California Civil Code § 1646*," and "California law moved away from a mechanical choice of law process to employ the 'governmental interest analysis.'" (*Id. at p. 1263*.) Later, in *Arno v. Club Med Inc.* (9th Cir. 1994) 22 F.3d 1464, the Ninth Circuit applied the governmental interest analysis to determine [***42] the law [*1459] governing the existence of an implied-in-fact contract. *Arno* stated that *section 1646* would yield the same result and, "[t]here appears to be some difference of opinion as to whether California's choice of law rule for contracts is the governmental interest test ... or the test of *Cal.Civ. Code § 1646*." [14] (*Arno, at pp. 1468-1469* & [**835] fn. 6.) Although *section 1646* states a choice-of-law rule only as to contract interpretation, *Strassberg* and *Arno,* in making these statements, did not distinguish contract interpretation from other choice-of-law issues.

14    See also *Shannon-Vail Five Inc. v. Bunch (9th Cir. 2001) 270 F.3d 1207, 1210-1213* (Nev. law governed the viability of a usury cause of action under either *Civ. Code, § 1646* or the governmental interest analysis), and *Costco Wholesale Corp. v. Liberty Mut. Ins .Co. (S.D.Cal. 2007) 472 F. Supp. 2d 1183, 1197-1198, 1207* (Conn. law governed the scope of an insurance policy exclusion under either *§ 1646* or the governmental interest analysis). In contrast, *Royal Indemnity Group v. Travelers Indemnity Co.* (N.D.Cal., Sept. 6, 2005, No. C-04-00886) 2005 WL 2176896, pages *4-*5 concluded that the California courts had not abrogated the choice-of-law [***43] rule in *section 1646.*

The Sixth Circuit in *Northland Ins. Co. v. Guardsman Products, Inc. (6th Cir. 1998) 141 F.3d 612* applied the governmental interest analysis to determine the law governing the interpretation of an insurance policy, stating, "the

California Supreme Court 'has moved away from the mechanical application of *§ 1646*'" and "'now employs what is commonly termed the "governmental interest analysis" approach to choice-of-law questions.' [Citation.]" (*Id. at p. 617*.) Similarly, *Vestrock Partners v. California Energy Co.* (S.D.N.Y., Aug. 26, 1993, No. 92 Civ. 5690) 1993 WL 328912 stated with regard to the governmental interest analysis, "California courts normally employ the choice of law test in contracts cases notwithstanding *§ 1646*." (*Id.* at p. *5; see also Reppy, *Choice of Law Problems Arising when Unmarried Cohabitants Change Domicile* (2002) *55 SMU L.Rev. 273, 292,* fn. 90 [stating, "the California Supreme Court's adoption of interest analysis had worked a judicial repeal of the ... choice of law rule in *section 1646*"].) Again, in making these statements, these authorities did not distinguish contract interpretation from other choice-of-law issues.

**(9)** After reviewing [***44] all of these authorities, and in light of the fact that our Supreme Court has not addressed this issue, we are unable to conclude that California has "judicially abrogated" the express legislative mandate of *Civil Code section 1646* relating to the *interpretation* of contracts. Instead, we hold that the choice-of-law rule in *Civil Code section 1646* [**836] determines the law governing the interpretation of a contract, notwithstanding the application of the governmental interest analysis to other choice-of-law issues. [15] The California Supreme Court has never applied the governmental interest analysis to determine the law governing the interpretation of a contract and has [*1460] never stated or suggested that *section 1646* does not determine the law governing the interpretation of a contract. Broad statements declaring the governmental interest analysis California's choice-of-law rule [16] and rejecting traditional choice-of-law rules [17] should be viewed in light of the particular choice-of-law issues that were before the court in those [***45] cases.

15  Whether this differentiated approach is either wise or desirable is a question best addressed to the Legislature, which has the sole authority to repeal a statute.

16  *Washington Mutual, supra, 24 Cal.4th at page 919* ("California follows a three-step 'governmental interest analysis' to address conflict of laws claims and ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement"); *Offshore Rental, supra, 22 Cal.3d at page 161* ("Questions of choice of law are determined in California, as plaintiff correctly contends, by the 'governmental interest analysis' rather than by the trial court's 'most significant contacts theory'").

17  *Travelers Ins. Co. v. Workmen's Comp. App. Bd., supra, 68 Cal.2d at p. 11* ("California has rejected the traditional mechanical solutions to choice-of-law problems and adopted foreign law only when it is appropriate in light of the significant interests in the particular case").

The opinions by the California Courts of Appeal cited by Frontier and Wainoco are not inconsistent with our conclusion that *Civil Code section 1646* determines the law governing contract interpretation notwithstanding the application of the governmental interest analysis to other choice-of-law issues. *Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co. (1980) 103 Cal. App. 3d 198 [162 Cal. Rptr. 720]* was a declaratory relief action against [***46] a liability insurer. The trial court determined that the insurer had a duty to defend an action against the insured, and the question on appeal was whether the insured was entitled to recover its attorney fees incurred in the declaratory relief action. Applying the governmental interest analysis, the *McMullan* court concluded that the laws of California and the other states involved did not differ on that question and that even if the laws differed,

only California had an interest in applying its own laws to the dispute. (*Id. at pp. 203-206.*) The choice-of-law issue concerned the right to recover attorney fees in an action to enforce the insured's rights under the policy and did not involve an issue of contract interpretation.

*Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc. (1993) 14 Cal.App.4th 637 [17 Cal. Rptr. 2d 713]* (*Stonewall*) was a declaratory relief action by excess liability insurers against their insured. The trial court concluded that the insurers were not required to indemnify the insured for a punitive damages award because California law, for reasons of public policy, prohibits indemnity for punitive damages. (*Id. at pp. 640-641.*) The question on appeal was whether the insurers could [***47] be required to indemnify the insured for punitive damages. Applying the governmental interest analysis, the Court of Appeal concluded that the laws of California and Wisconsin differed on that question and that California had a greater interest in applying its own laws to the dispute. (*Id. at pp. 645, 649.*) In deciding that California law governed, *Stonewall* placed particular importance on the location of the [*1461] insured risk. [18] (*Id. at pp. 646-647,* citing *Rest.2d Conflict of Laws, § 193 & com. f,* pp. 613-614.) The choice-of-law issue concerned the existence of a right of indemnity for punitive damages and did not involve an issue of contract interpretation.

18  We cited *Stonewall, supra, 14 Cal.App.4th 637* on this point in *Downey Venture v. LMI Ins. Co. (1998) 66 Cal.App.4th 478, 514 [78 Cal. Rptr. 2d 142]* (*Downey Venture*), and stated, "[a] liability insurance policy issued on a nationwide basis may be construed in accordance with the law of the jurisdiction in which a particular claim arises. [Citation.] Thus, the same policy language may receive different construction and application in different jurisdictions." We held in *Downey Venture* that *Insurance*

*Code section 533* precluded indemnification for malicious prosecution [***48] under California law but did not relieve an insurer of the duty to defend a malicious prosecution claim. (*Downey Venture, supra, at pp. 506, 509.*) We concluded that despite the bar of indemnification under California law, an express promise to provide coverage for malicious prosecution was not illusory, not only because the insurer was required to defend such claims, but also because a California court could enforce the laws of other states that might not preclude indemnification. (*Id. at pp. 514-516.*) Our statement with regard to such a choice-of-law decision by a California court concerned the enforceability of an express contractual promise, rather than contract interpretation.

### 6. *The Intended Place of Performance of a Liability Insurance Policy Is the Place of the Insured Risk*

**(10)** The liability insurance policy at issue in this case includes both indemnity and defense obligations. An indemnity obligation "entails the payment of money in order to resolve liability. [Citations.]" [**837] (*Buss v. Superior Court (1997) 16 Cal.4th 35, 46 [65 Cal. Rptr. 2d 366, 939 P.2d 766] (Buss).*) A defense obligation, in contrast, "entails the rendering of a service, viz., the mounting and funding of a defense [citations]." (*Ibid.*) An insurer performs [***49] its defense obligation by providing defense services through an attorney. If the insured risk involves operations at one or more fixed locations, as here, a third party complaint against the insured arising from those operations typically is prosecuted in the jurisdiction where the operations are located. The insurer provides defense services in the jurisdiction where the suit is prosecuted. There is little doubt that this was the understanding of the parties at the time they entered into the insurance contract in this case.

The policy provides general liability coverage and specifically refers to claims arising from oil and gas operations at Drill-Site #1 in Beverly Hills, California. Two policy endorsements name the City of Beverly Hills and the Department of Transportation of the City of Los Angeles as additional insureds "with respect to claims arising out of ... [¶] Oil or Gas Operations" in the City of Beverly Hills, California. In another endorsement, RLI waives its right of recovery against the City of Beverly Hills for certain payments made under the policy with respect to the same specified claims. These three endorsements clearly demonstrate that the parties intended [***50] the policy to provide coverage for the insureds' oil and gas operations in Beverly Hills. [*1462] Accordingly, we conclude that the parties anticipated that a suit arising from those operations in Beverly Hills could be prosecuted in California and that RLI would be obligated to provide a defense in California if the claims were potentially covered under the policy.

We therefore conclude that California was the intended place of performance of the contract with respect to those claims, that the policy thus "indicate[s] a place of performance" within the meaning of *Civil Code section 1646* with respect to such claims, and that California law governs the interpretation of the policy. Accordingly, we have no need to apply a governmental interest analysis or give consideration to Texas law with respect to the interpretation of the policy.

### 7. *Interpreted Under California Law, the RLI Policy Includes a Duty to Defend Pollution Claims Arising from "Sudden and Accidental" Releases*

**(11)** We interpret an insurance policy under California law using the same rules of interpretation applicable to other contracts. (*Palmer v. Truck Ins. Exchange (1999) 21 Cal.4th 1109, 1115 [90 Cal. Rptr. 2d 647, 988 P.2d 568].*) "The mutual intention of the contracting

[***51] parties at the time the contract was formed governs. (*Civ. Code, § 1636; Palmer, supra, at p. 1115.*) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. (*Civ. Code, §§ 1639, 1647.*) We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. (*Id., § 1641.*) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id., § 1644.*) If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (*Id., § 1638.*)" (*American Alternative Ins. Corp. v. Superior Court, supra, 135 Cal.App.4th at p. 1245.*) [**838]

**(12)** We interpret an insuring clause broadly consistent with the reasonable expectations of the insured. (*MacKinnon v. Truck Ins. Exchange (2003) 31 Cal.4th 635, 648 [3 Cal. Rptr. 3d 228, 73 P.3d 1205]; AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 822 [274 Cal. Rptr. 820, 799 P.2d 1253].*) An exclusion from coverage otherwise within the scope of an insuring clause must be clear and unmistakable to be given effect. (*MacKinnon, supra, at p. 648.*) [***52] " 'The exclusionary clause "must be *conspicuous, plain and* [*1463] *clear.*" ' [Citation.]" (*Ibid.*) An exception to an exclusion is treated in the same manner as a coverage provision and therefore is interpreted broadly consistent with the insured's reasonable expectations. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co. (2006) 40 Cal.4th 19, 27-28 [50 Cal. Rptr. 3d 597, 145 P.3d 472].*)

**(13)** An endorsement modifies the basic insuring forms of the policy and is an integral part of the policy. [19] (*Adams v. Explorer Ins. Co. (2003) 107 Cal.App.4th 438, 450-451 [132 Cal. Rptr. 2d 24].*) "Standing alone, an endorsement means nothing. 'Endorsements on an insurance policy form a part of the insurance contract [citation], and the policy of insurance with the endorsements and riders thereon must be construed together as a whole [citation].' " (*Id. at p. 451.*) An endorsement can expand or restrict the coverage otherwise provided by the policy. If there is any conflict between an endorsement and the body of a policy, the endorsement controls, provided that any reduction in coverage reasonably expected under the body of a policy must be " 'conspicuous, plain and clear.' " (*Haynes v. Farmers Ins. Exchange (2004) 32 Cal.4th 1198, 1208 [13 Cal. Rptr. 3d 68, 89 P.3d 381].*)

> 19    Moreover, the pollution liability [***53] endorsement here expressly states that it "forms a part of the policy to which attached."

The policy here expressly promises both indemnity and a defense. The insuring clause in the commercial general liability coverage form provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by "an 'occurrence,' " and states that RLI has the right and duty to defend any suit seeking those damages. Exclusion of in the same coverage form states that the insurance does not apply to bodily injury or property damage caused by the actual or threatened release of pollutants at premises owned, occupied, or used by the insured. The pollution liability endorsement deletes exclusion of and provides coverage for sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by "a 'pollution incident.' " The endorsement does not mention the duty to defend, does not clearly and unmistakably exclude pollution claims from the duty to defend stated in the body of the policy, and therefore does not exclude pollution claims from the contractual duty to defend.

**(14)** The insuring clause [***54] in the pollution endorsement provides coverage for

damages arising from "a 'pollution incident,' " which is defined in relevant part as a "sudden and accidental" release resulting in environmental damage. California courts interpret the phrase "sudden and accidental" when used in this context to mean abrupt in time, unexpected, and unintended. (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 755 [15 Cal. Rptr. 2d 815].) [*1464]

[**839] Interpreting the policy under California law, we conclude that RLI promised to defend claims for damages arising from pollution incidents with respect to the oil and gas operations in Beverly Hills notwithstanding that the pollution liability endorsement does not mention a duty to defend.

8. *The Allegations of the Third Party Complaints Create a Duty to Defend*

a. *The Applicable Choice-of-law Rule*

(15) The fundamental principles under California law regarding whether a duty to defend arises were established in *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal. Rptr. 104, 419 P.2d 168] (*Gray*). *Gray* rejected the argument that an insurer had a duty to defend under the policy only if the insured was entitled to indemnity, and held that the duty to defend was independent of and broader than the duty to indemnify. [***55] (*Id. at pp. 274-275.*) *Gray* stated that uncertainties concerning policy interpretation must be resolved in favor of the reasonable expectations of the insured, and that in light of the policy language, the insured reasonably would expect the insurer to defend a suit involving a loss of the nature and kind covered by the policy. (*Ibid.*) *Gray* therefore concluded that an insurer must defend a suit that *potentially* seeks damages covered by the policy. (*Id. at p. 275.*)

(16) *Gray* seemed to state that these conclusions reflected the court's interpretation of policy provisions, as distinguished from a rule of law imposed on the parties for public policy

reasons regardless of their intentions upon entering into the insurance contract. (*Gray, supra, 65 Cal.2d at p. 274.*) [20] This suggests that the fundamental principles discussed above regarding whether a duty to defend arises are rules of law regarding policy interpretation and that *Civil Code section 1646* determines the appropriate choice of law governing these issues. On the other hand, it was not necessary for the court in *Gray* to decide whether these rules of law were rules of policy interpretation for purposes of *section 1646*; these rules could [***56] be characterized as public policy choices that do not necessarily reflect the actual or presumed intention of the parties. Moreover, *Gray* stated further that the duty to defend arises whenever the insurer ascertains facts that create a potential for liability under the policy, whether the insurer learns those facts from the complaint, the insured, or other sources, and did not explain that [*1465] conclusion as a question of policy interpretation or refer to the reasonable expectations of the insured. (*Gray, supra, at pp. 276-277.*) [21] We need not decide whether these [**840] or other rules regarding the duty to defend are rules of policy interpretation for purposes of *section 1646* because our conclusion under either *section 1646* or the governmental interest analysis is that California law governs, as we will explain. [22]

20    *Gray, supra, 65 Cal.2d at page 274* stated: "Since we must resolve uncertainties in favor of the insured and *interpret the policy provisions according to the layman's reasonable expectations,* [fn. omitted] and since the effect of the exclusionary clause is neither conspicuous, plain, nor clear, we hold that in the present case the policy provides for an obligation to defend and that [***57] such obligation is independent of the indemnification coverage." (Italics added.)

21    In *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287 [24 Cal. Rptr. 2d 467, 861 P.2d 1153] (*Mon-*

trose), the Supreme Court made clear that its analysis in *Gray, supra,* 65 Cal.2d 263 was not limited to policy interpretation: "Because the policy at issue in *Gray* was ambiguous, and could be read either to exclude or to provide for coverage, we held that ordinary principles of insurance contract interpretation required it be construed in the insured's favor, according to his reasonable expectations. (*Gray, supra,* 65 Cal.2d at pp. 271-272; [citation].) As a distinct, separate, and alternative basis for our decision, we recognized that the insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy. (*Gray, supra,* 65 Cal.2d at pp. 275-276.) [¶] The alternative holding in *Gray, supra,* 65 Cal.2d 263, establishes the rule that the insurer must defend in some lawsuits where liability under the policy ultimately fails to materialize; this is one reason why [***58] it is often said that the duty to defend is broader than the duty to indemnify. [Citation.]" (*Montrose, supra,* at p. 299.)

22    We explain our conclusion under *Civil Code section 1646* that California law governs the interpretation of the policy in parts 3 through 6, *ante.*

### b. *The Applicable Rules of Law of California and Texas Do Not Materially Differ*

The first step in the governmental interest analysis is to determine whether the applicable rules of law of the potentially concerned jurisdictions materially differ. (*Washington Mutual, supra,* 24 Cal.4th at p. 919.) If there is no material difference, there is no choice-of-law problem and the court may proceed to apply California law. (See *id. at p. 920.*) The party arguing that foreign law governs has the burden

to identify the applicable foreign law, show that it materially differs from California law, and show that the foreign law furthers an interest of the foreign state. (*Id. at p. 919; Bernhard, supra,* 16 Cal.3d at pp. 317-318.)

**(17)** A liability insurer has a duty to defend its insured under California law if facts alleged in the complaint, or other facts known to the insurer, potentially could give rise to coverage under the policy. (*Scottsdale Ins. Co. v. MV Transportation (2005) 36 Cal.4th 643, 654-655 [31 Cal. Rptr. 3d 147, 115 P.3d 460] [***59] (Scottsdale); Gray, supra,* 65 Cal.2d at pp. 275-277.) The facts need only "raise the possibility" that the insured will be held liable for covered damages. (*Montrose, supra,* 6 Cal.4th at p. 304.) An insurer has a duty to defend even if the claims against the insured are " 'groundless, false, or fraudulent.' " (*Waller v. Truck Ins. Exchange, Inc. (1995)* 11 Cal.4th 1, 19 [44 Cal. Rptr. 2d 370, 900 P.2d 619].) "Any doubt as to whether the facts [*1466] establish the existence of the defense duty must be resolved in the insured's favor." (*Montrose, supra,* at pp. 299-300.)

**(18)** A duty to defend arises under California law upon the tender to the insurer of a potentially covered claim and continues until the lawsuit is concluded or until the insurer shows that facts extrinsic to the third party complaint conclusively negate the potential for coverage. (*Scottsdale, supra,* 36 Cal.4th at p. 655; *Montrose, supra,* 6 Cal.4th at pp. 298-300.) If a duty to defend arises, the insurer must defend the action in its [*1467] entirety, including claims that are not potentially covered. (*Buss, supra,* 16 Cal.4th at pp. 48-49.) If a duty to defend has [**841] arisen by virtue of the existence of a potential for coverage but is later extinguished, it is extinguished prospectively [***60] only, and not retroactively. (*Id. at p. 46.*)

**(19)** A liability insurer has a duty to defend its insured under Texas law if facts alleged in the complaint potentially could give rise to

coverage under the policy. (*GuideOne Elite v. Fielder Rd Baptist Church (Tex. 2006) 197 S.W.3d 305, 310* (*GuideOne*); *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co. (Tex. 1965) 387 S.W.2d 22, 26* (*Heyden*).) "A plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend ... [citation]." (*GuideOne, supra, at p. 310*.) " 'Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.' " (*Heyden, supra, at p. 26*; accord, *Nat. Union Fire v. Merch. Fast Motor Lines (Tex. 1997) 939 S.W.2d 139, 141* [***61] (*Nat. Union*).) Under Texas law, the duty to defend is determined based on the policy terms and the allegations of the complaint, "without regard to the truth or falsity of those allegations" and without regard to extrinsic evidence. (*GuideOne, supra, at p. 308*; see also *Heyden, supra, at p. 24*.) Any doubt as to whether the complaint alleges facts that give rise to a duty to defend must be resolved in favor of the insured. [23] (*Allstate Ins. Co. v. Hallman (Tex. 2005) 159 S.W.3d 640, 643*; *Heyden, supra, at p. 26*.) If the duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered. (*Warrantech Corp. v. Steadfast Ins. Co. (Tex.App. 2006) 210 S.W.3d 760, 766*; *Nokia, Inc. v. Zurich American Ins. Co. (Tex.App. 2006) 202 S.W.3d 384, 388*.)

23    RLI quotes language from *Nat. Union, supra, 939 S.W.2d at page 142*, stating: "We will not read facts into the pleadings. [Citation.] Nor will we look outside the pleadings, or imagine factual

scenarios which might trigger coverage." The complaint against the insured in that case alleged that the insured's driver negligently discharged a firearm while driving a truck, killing a passenger [***62] in another vehicle. (*Ibid.*) The Texas Supreme Court concluded that the facts alleged in the complaint did not indicate that the death resulted from use of the insured vehicle, as required for coverage under the policy. (*Id. at p. 142*.) The court stated, "the facts alleged in the pleadings do not suggest even a remote causal relationship between the truck's operation and Gonzalez's injury." (*Ibid.*) It was in this context that the court, in the language quoted *ante*, refused to augment the allegations of the complaint in the guise of a liberal construction.

(20) Texas law differs from California law in that under Texas law, facts extrinsic to the complaint cannot give rise to a duty to defend. (*GuideOne, supra, 197 S.W.3d at p. 308*; *Heyden, supra, 387 S.W.2d at p. 24*.) Under California law, in contrast, extrinsic facts known to the insurer give rise to a duty to defend if the facts create a potential for coverage under the policy. (*Scottsdale, supra, 36 Cal.4th at p. 654*; *Gray, supra, 65 Cal.2d 263, 276-277*.) Because the complaints in the underlying actions allege facts that create a potential for coverage without regard to extrinsic evidence, as explained *post*, this difference between California [***63] law and the law of Texas is not relevant here. Apart from this distinction, the foregoing Texas rules of law do not [**842] materially differ from California law, and no party has shown that any other Texas rule of law applicable to these facts materially differs from California law. We therefore conclude that the applicable rules of law of California and Texas are substantially identical with respect to a liability insurer's duty to defend; thus, even if the governmental interest analysis was the choice-of-law rule that we were to use to determine if a duty to defend ever arose, California law

would be applied. (*Washington Mutual, supra, 24 Cal.4th at p. 920.*)

c. *The Third Party Complaints Allege Claims That Are Potentially Covered Under the Policy*

The complaints allege that defendants, including Frontier and Wainoco, conducted oil and gas exploration, production, processing, and storage activities at Drill-Site #1. They allege that as a result of those operations, hazardous substances were "spilled, emitted, released, [and] discharged" into the environment. They allege further that the operations resulted in "releases, discharges, fugitive emissions, leaks and spills." The complaints [***64] allege damage of a nature and kind covered by the policy and do not foreclose the possibility that the damage was caused by a sudden and accidental release, and therefore create a *potential* for coverage under the policy. (*Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 19; Gray, supra, 65 Cal.2d at pp. 274-275.*) This is sufficient to establish RLI's duty to defend. (*Montrose, supra, 6 Cal.4th at pp. 299-300; Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal.4th 1076, 1082-1083 [17 Cal. Rptr. 2d 210, 846 P.2d 792].*) RLI [*1468] potentially could extinguish its defense duty prospectively, but cannot extinguish it retroactively. (*Scottsdale, supra, 36 Cal.4th at p. 655; Buss, supra, 16 Cal.4th at p. 46.*) RLI failed to show that facts extrinsic to the third party complaints conclusively negated the potential for coverage before the termination of the underlying actions and therefore failed to extinguish the duty to defend before the termination of those actions. Because RLI failed to establish the absence of a duty to defend, RLI was not entitled to summary judgment against Frontier and Wainoco on that basis.

9. *RLI Failed to Establish That Wainoco Is Not an Insured*

The policy declarations identify the named insured as "Wainoco [***65] Oil Corporation, et al." [24] (Capitalization omitted.) An endorsement referenced on the declarations page and incorporated in the policy lists several additional named insureds, including "Wainoco Oil & Gas Company, and the Northwestern Mutual Life Insurance Co., A Joint Venture" and several "Wainoco Appalachian" partnerships. The commercial general liability coverage form states that if the named insured is a partnership or joint venture, the insured's members and partners "are also insureds, but only with respect to the conduct of [the partnership's or joint venture's] business."

> 24  Wainoco Oil Corporation was predecessor in interest to Frontier, as stated *ante*, and is to be distinguished from Frontier's wholly owned subsidiary, Wainoco.

RLI argued in its summary judgment motion against Wainoco and argues again on appeal that Wainoco is not an insured with respect to the underlying actions because the alleged conduct does not pertain to Wainoco's joint venture activities. As the party moving for summary judgment, RLI had the burden to present either evidence [**843] that negates an element of the cause of action or evidence that Frontier and Wainoco cannot reasonably obtain needed evidence. [***66] (*Kahn v. East Side Union High School Dist., supra, 31 Cal.4th at p. 1003.*) RLI cited no evidence in support of its argument that Wainoco is not an insured apart from the policy and the third party complaints. A policy endorsement specifically identifies the Beverly Hills site and supports a reasonable inference that the parties intended the policy to provide coverage for Wainoco's operations at the site. The third party complaints allege that Wainoco conducted oil and gas operations at the Beverly Hills site. Nothing in either the policy or the third party complaints forecloses the possibility that Wainoco's operations at the Beverly Hills site pertained to its joint venture with Northwestern Mutual Life Insurance Company. Absent evidence to com-

153 Cal. App. 4th 1436, *; 63 Cal. Rptr. 3d 816, **;
2007 Cal. App. LEXIS 1289, ***; 37 ELR 20201

pel the conclusion that Wainoco's operations at the site did not pertain to its joint venture business, RLI failed to establish that Wainoco is not an insured. [*1469]

## DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings not inconsistent with the views expressed herein. Frontier and Wainoco are entitled to recover their costs on appeal.

Klein, P. J., and Kitching, J., concurred.

107J15

********** Print Completed **********

Time of Request: Monday, June 09, 2008   14:30:28 EST

Print Number:    2822:97065218
Number of Lines: 1238
Number of Pages:

Send To:  COGAN, EFRAT
          BUCHALTER NEMER
          1000 WILSHIRE BLVD STE 1500
          LOS ANGELES, CA 90017-2457

**12**

Westlaw.

95 Cal.App.4th 1332
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
(Cite as: 95 Cal.App.4th 1332)

Page 1

**H**
DENNIS A. HARRIS, Plaintiff and Respondent, v.
RUDIN, RICHMAN & APPEL et al., Defendants
and Appellants.
Cal.App.2.Dist.
DENNIS A. HARRIS, Plaintiff and Respondent,
v.
RUDIN, RICHMAN & APPEL et al., Defendants
and Appellants.
**No. B142179.**

Court of Appeal, Second District, California.
Feb. 6, 2002.

SUMMARY

A client sued a law firm and its attorneys for pre-
paring a trust that exposed the trustees to liability
for taxes on distributions under the trust. The
parties reached an oral settlement and began negoti-
ating a formal written agreement. Subsequently, de-
fendants discovered an amendment to the Probate
Code that defendants claimed eliminated the tax
problem, and defendants stated that they were with-
drawing from the settlement. Plaintiff brought an
action for breach of an oral and written contract,
and the trial court granted plaintiff summary judg-
ment. Defendants then moved for reconsideration,
for vacation of the judgment, and for a new trial.
The trial court denied all three motions and im-
posed monetary sanctions against defendants under
Code Civ. Proc., § 128.5 (bad faith or delaying tac-
tics). (Superior Court of Los Angeles County, No.
SC033404, David D. Perez, Judge.)

The Court of Appeal reversed the judgment for
plaintiff and affirmed the order of sanctions against
defendants. The court held that defendants raised a
triable issue of fact as to whether they were entitled
to rescind the settlement agreement based on mutu-
al mistake. If defendants' interpretation of the
amendment was correct, plaintiff's damages were
diminished; any recovery would be a windfall.
Also, even if defendants' interpretation was wrong,

they had sufficient confidence in their interpretation
to rescind the contract and risk a finding of liability
at trial. However, the court held that the trial court
did not abuse its discretion in imposing monetary
sanctions against defendants, since defendants re-
peatedly raised the same unmeritorious claim that
the trial court had rejected. (Opinion by Johnson,
Acting P. J., with Woods and Perluss, JJ., concur-
ring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Summary Judgment § 25--Appellate Review.
In order to obtain summary judgment, a plaintiff
must prove each element of the cause of action on
which he or she seeks judgment. Once the plaintiff
meets this burden, the burden shifts to the defend-
ant to show there is a triable issue of material fact
as to that cause of action or a defense thereto. The
appellate court reviews the trial court's decision de
novo to determine whether those burdens were met.

(2a, 2b, 2c) Compromise, Settlement, and Release
§ 11--Settlement-- Avoidance--Mutual Mistake-
-Legal Malpractice Action--Subsequent Statutory
Amendment That Negates Effect of Malprac-
tice:Contracts § 5--Mistake.
In an individual's action for breach of a settlement
agreement of a legal malpractice suit that arose
from defendant attorneys' preparation of a trust that
exposed the trustees to liability for taxes on distri-
butions under the trust, the trial court erred in
granting plaintiff summary judgment, where de-
fendants withdrew from the settlement upon their
discovery of a statutory amendment that defendants
claimed eliminated the tax problem. Defendants
raised a triable issue of fact as to whether they were
entitled to rescind the settlement agreement based
on mutual mistake. When the parties entered into
their agreement, they believed that the pertinent
statute would remain as it had when the malpractice

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95 Cal.App.4th 1332
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
**(Cite as: 95 Cal.App.4th 1332)**

Page 2

suit was originally filed; neither side knew that two weeks earlier the Governor had signed the law enacting the amendment. If defendants' interpretation of the amendment was correct, plaintiff's damages were diminished; any recovery would be a windfall. Also, even if defendants' interpretation was wrong, they had sufficient confidence in their interpretation to rescind the contract and risk a finding of liability at trial. Further, even if defendants were negligent in failing to discover the amendment earlier, freedom from negligence is not a requirement for rescission based on a mistake of law, and a negligent failure would not bar rescission based on mistake of fact. Finally, the agreement was not yet executed, and thus the parties could easily be returned to the status quo.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 368 et seq.; West's Key Digest System, Compromise and Settlement k. 8(4).]

**(3) Appellate Review § 34--Presenting and Preserving Issues--Defenses-- Failure to Plead--Lack of Objection.**
On appeal of the trial court's granting of summary judgment to an individual in his action for defendants' breach of a settlement agreement of a legal malpractice suit, defendants were not barred from raising the defense of rescission of the settlement agreement, even though defendants did not specifically plead the defense of rescission in their answer. Plaintiff did not object when defendants raised the rescission defense in their separate statement of disputed and undisputed facts and argued the defense in opposition to plaintiff's motion for summary judgment. Thus, plaintiff waived any objection.

**(4) Contracts § 5--Mistake--Rescission.**
To bar rescission of a contract based on a mistake of fact, the party seeking to rescind must be guilty of gross negligence, i.e., the want of even scant care or an extreme departure from the ordinary standard of conduct. However, the negligent failure of a party to know or discover facts as to which both parties are under a mistake does not preclude rescission or reformation because of the mistake.

**(5a, 5b) Courts § 5.1--Powers--Imposition of Sanctions--Bad Faith or Delaying Tactics--Repeating Claim That Court Rejected.**
In an individual's action for breach of a settlement agreement of a legal malpractice suit, in which the trial court erroneously granted plaintiff summary judgment, the trial court did not abuse its discretion in imposing monetary sanctions under Code Civ. Proc., § 128.5 (bad faith or delaying tactics), against defendants, who moved for reconsideration, for vacation of the judgment, and for a new trial. In opposing plaintiff's motion for summary judgment, defendants unsuccessfully argued that plaintiff had not established that he performed under the agreement, and in each of their subsequent motions, defendants repeated this argument. The argument was without merit, since plaintiff's lack of performance was not a bar to summary judgment, as the evidence was undisputed that the parties were negotiating the language of the releases when defendants withdrew the settlement agreement, thereby excusing further performance by plaintiff. The trial court could have reasonably concluded that defendants' continuous filing of motions, which only repeated the same claim the trial court had previously rejected, constituted bad faith under § 128.5. Further, the trial court sufficiently explained its reasons for imposing sanctions.

**(6) Courts § 5.1--Powers--Imposition of Sanctions--Bad Faith or Delaying Tactics.**
Under Code Civ. Proc., § 128.5, a trial court is authorized to order a party, the party's attorney, or both to pay any reasonable expenses, including attorney fees, incurred by another party as a result of bad faith actions or tactics that are frivolous or solely intended to cause unnecessary delay. A bad faith action or tactic is frivolous if it is totally and completely without merit. To be entitled to sanctions, the moving party must show that the action or tactic was in bad faith and frivolous or brought solely to cause unnecessary delay. The appellate court reviews a sanction award for abuse of discretion.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

95 Cal.App.4th 1332
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
(Cite as: 95 Cal.App.4th 1332)

COUNSEL

Heenan Blaikie, Jonathan J. Panzer and Lisa K. Skaist for Defendants and Appellants.

Parker, Mills & Patel, Jayesh Patel and Angeli Cuesta-Aragon for Plaintiff and Respondent.

**JOHNSON, Acting P. J.**

In this action for breach of a settlement agreement, both sides moved for summary judgment. The trial court granted plaintiff's motion and denied defendants' motion. Defendants moved for reconsideration, for an order setting aside and vacating the judgment and for a new trial. The trial court denied those motions and awarded sanctions against defendants on the latter two motions. We reverse the judgment for plaintiff because defendants raised triable issues of fact as to whether they were entitled to rescind the agreement based on a mutual mistake of fact or law. We affirm the award of sanctions which arose from a different issue.

### Facts and Proceedings Below

Plaintiff Dennis A. Harris retained the law firm of Rudin, Richman & Appel to prepare an irrevocable inter vivos trust for him. He subsequently brought a malpractice action against the firm and five of its members, Milton Rudin, Fredric Richman, Martin Appel, Raymond Kaplan and Jeffrey Berkowitz, alleging they had prepared the trust in such a way the trustees were exposed to personal liability for gift and estate taxes on distributions under the trust. Kaplan was dismissed from the malpractice action several months before the settlement negotiations which generated the present lawsuit.

The parties entered into settlement negotiations and, on August 30, 1996, counsel representing all defendants wrote a letter to Harris's counsel stating, in relevant part, "I am writing to confirm the essential terms of the settlement which we reached today. The present defendants in this matter will pay a total of $205,000 in exchange for a general release of, and complete protection against, all claims and potential claims against them arising from or related to the Dennis A. Harris Irrevocable Inter

Vivos Trust Agreement. This office will prepare the initial draft of the settlement documents, and your firm should inform the Court that the matter has been resolved as soon as is reasonably practicable." **\*1336**

Following this letter, the parties entered into negotiations over the language of a formal written agreement. In the meantime, counsel for the parties appeared at a pretrial conference and on the scheduled trial date. On both occasions they told the trial court "that, with the exception of some additional drafting work, the matter had been resolved."

On October 25, 1996, defendants sent Harris a letter stating they had just discovered an amendment to the Probate Code which would take effect on January 1, 1997, and would eliminate the tax problem which had led to Harris's malpractice suit. In light of this amendment Harris would suffer no damage as a result of the way defendants prepared his trust and therefore, defendants announced, they were taking "the settlement arrangement off the table."

Harris responded to this letter by bringing a motion to enforce the alleged settlement agreement pursuant to Code of Civil Procedure section 664.6. [FN1] The trial court denied the motion on the ground the August 30 letter was not signed by all the parties as required by section 664.6. The court granted plaintiff leave to amend his complaint to add a new cause of action for breach of written contract. It then sustained defendants' demurrer to that cause of action without leave to amend.

> FN1 All statutory references are to the Code of Civil Procedure unless otherwise noted.

In a reported decision, *Harris v. Rudin, Richman & Appel* [FN2](*Harris I*) we affirmed the denial of the motion to enforce the settlement but reversed the judgment with respect to the cause of action for breach of contract. We held "[a]t a minimum, Harris's complaint alleges facts evidencing an oral

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95 Cal.App.4th 1332                                                          Page 4
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
**(Cite as: 95 Cal.App.4th 1332)**

agreement.... Whether the parties intended their communications to be a binding settlement agreement or an agreement to further negotiate after a formal draft was prepared is a factual question not properly the subject of a demurrer...." [FN3]

> FN2 *Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299[87 Cal.Rptr.2d 822].

> FN3 *Harris I, supra,* 74 Cal.App.4th at page 308, citation omitted.

Upon remand to the trial court, Harris amended his complaint to allege breach of an oral and written contract. Defendants answered and both sides moved for summary judgment. The trial court granted Harris's motion for summary judgment and denied defendants' motion. Defendants then moved for reconsideration, for vacation of the judgment and for a new trial. The trial court denied all three motions and imposed sanctions on defendants in the sum of $4,750. Defendants filed a timely appeal from the judgment and the sanctions awards. *1337

Discussion

I. *Standard of Review.*

(1) In order to obtain summary judgment a plaintiff must prove each element of the cause of action on which he seeks judgment. Once the plaintiff meets this burden, the burden shifts to the defendant to show there is a triable issue of material fact as to that cause of action or a defense thereto. [FN4] We review the trial court's decision de novo to determine whether those burdens were met. [FN5]

> FN4 Section 437c, subdivision (*o*)(1).

> FN5 *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163[80 Cal.Rptr.2d 66].

(2a) Defendants contend they have shown triable issues of fact exist as to whether the parties entered

into a settlement agreement. They further contend even if there was an agreement they were entitled to rescind it on the basis of a mutual mistake of law or fact.

We conclude that although the undisputed facts appear to show the parties entered into an oral settlement agreement on August 30, there are triable issues of fact as to whether defendants properly rescinded the agreement on October 25.

II. *Defendants Raised Triable Issues of Fact as to Their Defense of Rescission Based on a Mutual Mistake of Law or Fact.*

Defendants argue even if a settlement contract was formed they were entitled to rescind it once they learned of the amendment to Probate Code section 16081 which, in their view, negated the possibility the trustees would be exposed to personal tax liability for distributions pursuant to the trust, thereby removing the rationale for Harris's malpractice suit. [FN6] We conclude defendants raised triable issues of fact as to their rescission defense. Therefore the trial court erred in granting summary judgment to Harris.

> FN6 Harris's malpractice complaint alleged the trust was drafted in such a way as to make the trustees personally liable for taxes on trust distributions and therefore the trustees had a conflict of interest with the beneficiaries of the trust.

(3) Initially we note there is no bar to considering defendants' rescission defense even though defendants did not specifically plead the defense in their answer. Harris did not object when defendants raised the rescission defense in their separate statement of disputed and undisputed facts and *1338 argued the defense in opposition to Harris's motion for summary judgment. Thus, any objection was waived. [FN7]

> FN7 *Stalnaker v. Boeing Co.* (1986) 186 Cal.App.3d 1291, 1302, and footnote

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5

95 Cal.App.4th 1332
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
(Cite as: 95 Cal.App.4th 1332)

[231 Cal.Rptr. 323]. In the present case, defendants moved to amend their answer to include the rescission defense and Harris opposed the motion. The parties stipulated the motion to amend should be heard at the same time as their cross-motions for summary judgment. The trial court, however, never ruled on the motion, apparently accepting Harris's argument the motion was moot if the court granted his motion for summary judgment.

(2b) The evidence relating to the rescission defense is as follows.

Legislation to amend Probate Code section 16081 was introduced in February 1996 as Senate Bill No. 1907 (1995-1996 Reg. Sess.). The Senate passed the bill in May 1996 and sent it to the Assembly, which passed it with amendments in July 1996. The Senate concurred in the Assembly amendments and passed the bill on August 8, 1996. The Governor signed the bill on August 17, 1996, 13 days before the parties entered into their settlement agreement. FN8

> FN8 2 Senate Final History (1995-1996 Reg. Sess.) 1253.

When the parties agreed to settle the malpractice action on August 30, 1996, they were unaware of this amendment to the Probate Code which would take effect on January 1, 1997, and apply retroactively. Furthermore, each defendant claimed he first learned about the amendment a few days before sending the notice of rescission in October 1996 and he would not have agreed to the August 30 settlement had he known about the amendment.

Defendants contend this evidence raises triable issues of fact as to whether they and plaintiff acted under a mutual mistake of law or fact in agreeing to the settlement.

The mutual mistake was the parties' belief the tax consequences of distributions from the trust would be governed by Probate Code section 16081 as it existed when the malpractice action was filed in 1994 instead of under the 1996 amendment. FN9 This mutual mistake, defendants contend, went to an essential element of the contract-settlement of defendants' potential liability for malpractice-and thereby entitled them to rescind.

> FN9 Defendants submitted no evidence to support their alternative claim the mistake was unilateral on their part because Harris was aware of the 1996 amendment when he negotiated the settlement with defendants.

The triable issues of fact include the date on which the defendants discovered the amendment to Probate Code section 16081 and, if this date was after August 30, 1996, whether defendants would have entered into the agreement had they known of the amendment at the time. *1339

We conclude defendants are entitled to a trial on their rescission defense.

Under Civil Code section 1689, subdivision (b)(1) a party may rescind a contract if the party's consent was given by mistake. A mistake may be either one of fact [FN10] or law. [FN11]

> FN10 Civil Code section 1577.

> FN11 Civil Code section 1578.

A mistake of law arises from "[a] misapprehension of the law by all parties, all supposing that they knew and understood it, and all making substantially the same mistake as to the law ...." [FN12] According to defendants' declarations, this is what occurred here. When the parties entered into the settlement agreement on August 30th they were under the impression Probate Code section 16081 read as it had when the malpractice action was filed in 1994. Neither side knew that two weeks earlier the Governor had signed an amendment to that section.

> FN12 Civil Code section 1578, subdivision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95 Cal.App.4th 1332                                                      Page 6
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
(Cite as: 95 Cal.App.4th 1332)

1.

Assuming the truth of defendants' declarations, their circumstances are analogous to those of the plaintiff in *Hannah v. Steinman*. [FN13] In *Hannah*, the plaintiff leased a vacant lot from the defendant for a three-year period with an option to extend the lease for an additional two years. Both parties contemplated the plaintiff would erect a wooden building on the lot; the construction of any other type of building being financially infeasible given the short lifespan of the lease. When the parties signed the lease neither knew that two days earlier the city had passed an ordinance which made it unlawful to construct a wooden building on the lot. It was undisputed that had the plaintiff known of the change in the law he would not have signed the lease because without the right to erect a wooden building the lot "was absolutely without value." [FN14] The Supreme Court held the plaintiff was entitled to rescind the lease because the parties' mistake as to the city's building ordinance was "material and goes to the very essence of the contract.... [¶] ... [¶] ... Without the right to construct a wooden building the tenant, so far as all practical considerations are concerned, was obtaining nothing." [FN15]

FN13 *Hannah v. Steinman* (1911) 159 Cal. 142[112 P. 1094].

FN14 *Hannah v. Steinman, supra*, 159 Cal. at page 145.

FN15 *Hannah v. Steinman, supra*, 159 Cal. at pages 148, 150.

In a more recent case, *Home Bldg. & Loan Ass'n v. Perpetual Sav. & Loan*, [FN16] the Supreme Court of South Dakota held a material change in state law unknown to the defendant when he entered into a contract with the plaintiff entitled the defendant to rescind the contract. In this case Perpetual, *1340 located in Rapid City, wanted to establish a branch office in Aberdeen but the law in effect at the time prohibited it from doing so. The only way Perpetual could operate in Aberdeen was to purchase the

charter of a savings and loan company in that city. Perpetual thus began negotiations to purchase Home Building's stock so it could open an Aberdeen office under Home Building's charter. These negotiations led to a purchase agreement. Unbeknownst to Perpetual, the law prohibiting it from establishing a branch office in Aberdeen was repealed shortly before it commenced contract negotiations with Home Building. When Perpetual found out about the change in the law it notified Home Building it would not proceed with the purchase. Home Building sued for breach of contract and Perpetual defended on the ground it was entitled to rescind the contract based on a mistake of law. The trial court upheld Perpetual's right to rescind and the South Dakota Supreme Court affirmed. The court reasoned: "Since the purchase of Home Building's charter was solely for the purpose of opening a branch office, the change in this law was certainly material to the contract. The charter was the only asset of any value that Perpetual would have received under the contract." [FN17]

FN16 *Home Bldg. & Loan Ass'n v. Perpetual Sav. & Loan* (S.D. 1983) 338 N.W.2d 456.

FN17 *Home Bldg. & Loan Ass'n v. Perpetual Sav. & Loan, supra*, 338 N.W.2d at page 459.

In the present case, the parties' mutual mistake regarding Probate Code section 16081 went to the very heart of their settlement agreement. If the amendment to the statute has the effect defendants claim it has then, under the trust as drafted by defendants, the trustees will suffer no adverse tax consequences from making distributions to the beneficiaries, and the settlement value of Harris's malpractice suit is obviously diminished.

The equities are also on the side of defendants. They allege they discovered the amendment approximately two months after its enactment and two months before it took effect. They acted promptly by giving notice of rescission a few days after dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95 Cal.App.4th 1332                                                           Page 7
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
(Cite as: 95 Cal.App.4th 1332)

covering the amendment. If defendants are correct in their view the amendment will prevent any tax liability on the part of the trustees, then to the extent defendants' settlement payment is intended as indemnification for the trust or the trustees it constitutes a windfall to Harris. [FN18]

> FN18 It appears from the post-August settlement negotiations a portion of the money was intended to indemnify the trustees for any tax liability they might incur in distributing funds from the trust, thereby removing their conflict of interest with the beneficiaries. The remainder of the settlement amount was intended to reimburse Harris for costs and attorney fees incurred in the litigation.

Harris argues defendants cannot rescind on the basis of a mistake of law because so far the "mistake" exists only in their own minds. Defendants' contention the amendment to Probate Code section 16081 moots the damage claimed in the malpractice action is based solely on their interpretation of *1341 the amendment-an interpretation the Internal Revenue Service and the courts may or may not accept. Thus, this case is distinguishable from *Hannah* and *Home Bldg.*, discussed above, where the effect of the change in the law was clear and undisputed.

Harris's argument misses the point. Defendants' evidence tends to show they would not have entered into the settlement agreement with Harris had they known about the amendment to Probate Code section 16081. Regardless of whether defendants' interpretation of the amendment ultimately proves to be correct, they had enough confidence in their interpretation to rescind the settlement agreement and risk a finding of liability at trial.

Harris also contends defendants cannot rescind the agreement because any mistake on their part as to Probate Code section 16081 resulted from their own negligence. Defendants, he asserts, should have known about and tracked the proposed amend-

ment to section 16081 since that statute went to the heart of Harris's claim for malpractice. Had defendants done so, they would have known the Governor signed the amendment into law before they agreed to the settlement. Defendants' failure to discover the amendment prior to settlement was particularly egregious, Harris argues, because Appel was a certified tax specialist and Berkowitz was a certified public accountant and attorney trained primarily in tax law.

Freedom from negligence, however, is not a requirement for rescission based on a mistake of law. Freedom from negligence is only required for rescission based on a mistake of fact. [FN19] Arguably the mistake at issue here was one of law-all parties supposing they knew the provisions of Probate Code section 16081. [FN20] In that case, negligence is not an issue and Harris's argument fails.

> FN19 Compare Civil Code section 1577 (allowing rescission for mistake of fact only if "not caused by the neglect of a legal duty") with Civil Code section 1578 (no reference to negligence).

> FN20 See Civil Code section 1578, subdivision 1.

Even if we treat the parties' mistake as one of fact, Harris's argument still fails.

Harris cites no authority for his proposition a party to a lawsuit, even if he or she is a lawyer, has a duty to monitor all the bills introduced in the Legislature during the pendency of the suit lest one of them affect the merits of the claim or defense. Furthermore, assuming such a radical duty could be *1342 established, its breach would be no more than ordinary negligence and ordinary negligence does not constitute "neglect of a legal duty" as that term is used in Civil Code section 1577. [FN21] (4) To bar rescission, the party seeking to rescind must be guilty of gross negligence-"the want of even scant care or an extreme departure from the ordinary standard of conduct." [FN22] It is well settled,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95 Cal.App.4th 1332
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
(Cite as: 95 Cal.App.4th 1332)

however, "the negligent failure of a party to know or discover facts as to which both parties are under a mistake does not preclude rescission or reformation because of the mistake." [FN23]

> FN21 *Sun 'N Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 701[148 Cal.Rptr. 329, 582 P.2d 920].

> FN22 *Van Meter v. Bent Construction Co.* (1956) 46 Cal.2d 588, 594[297 P.2d 644].

> FN23 *Van Meter v. Bent Construction Co.,* supra, 46 Cal.2d at page 594.

(2c) Finally, Harris argues defendants should bear the risk of a change in the tax law. Defendants drafted the August 30 memorandum, yet they included no provision with respect to future legislation affecting their liability. As tax attorneys, they should have been aware of the constant revisions in this field of law. [FN24]

> FN24 Compare *Mosher v. Mayacamas Corp.* (1989) 215 Cal.App.3d 1, 6[263 Cal.Rptr. 373] (rescission denied because defendant should have known value of property could be affected by future tax legislation).

We reject Harris's argument for three reasons. As we have indicated in our discussion of negligence above, placing the risk of loss solely on defendants imposes an unfair burden on them as litigants. Furthermore, unlike *Mosher v. Mayacamas Corp.,* relied on by Harris, the contract here was still in its executory stage when defendants gave notice of rescission and the parties could be returned to the status quo ante without having to undo any performance by either side. Finally, although defendants did not discover the amendment to Probate Code section 16081 before they entered into the settlement agreement, they discovered it promptly thereafter and before changes in the law took effect.

For the reasons set forth above, we see no inequity to Harris in allowing defendants to rescind the settlement agreement if they can establish the facts they have asserted in their declarations.

> III. *The Trial Court Properly Sanctioned Defendants for Filing Motions Which Only Repeated a Claim the Court Had Rejected.*

(5a) Although we have ruled defendants' rescission defense entitles them to reversal of the summary judgment for plaintiff, our ruling does not *1343 negate the sanctions properly imposed on defendants for repeatedly arguing a claim the trial court had rejected.

Following the trial court's order granting summary judgment to plaintiff on his breach of contract action, defendants filed a motion for reconsideration solely on the ground plaintiff had not established he performed under the contract by providing the releases called for in the agreement. Defendants maintain plaintiff's performance is a necessary element in a breach of contract action and therefore Harris was not entitled to summary judgment. [FN25] The trial court denied defendants' motion for reconsideration and also denied Harris's motion for sanctions.

> FN25 A plaintiff seeking summary judgment must prove "each element of the cause of action entitling the party to judgment on that cause of action." (§ 437c, subd. (*o*)(1).)

The following month defendants filed motions to vacate the judgment and for new trial, again arguing only Harris's nonperformance of the contract. Finding "[n]othing I've read in these two motions is any different, legally or factually, from the previous motions," the trial court denied the motions and imposed sanctions on defendants in the amount of $2,750 for the motion to vacate and $2,000 for the motion for new trial.

(6) Under section 128.5 a trial court is authorized to order a party, the party's attorney, or both to pay any reasonable expenses, including attorney fees,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95 Cal.App.4th 1332
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
(Cite as: 95 Cal.App.4th 1332)

incurred by another party as a result of "bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." [FN26]A bad faith action or tactic is considered "frivolous" if it is "totally and completely without merit." [FN27]To be entitled to sanctions the moving party must show the action or tactic was in bad faith *and* frivolous or brought solely to cause unnecessary delay. [FN28]

> FN26 This action was filed prior to January 1, 1995; therefore section 128.5, not 128.7, is the applicable sanction statute. The trial court's order does not specify to whom its sanction order applies, defendants, defendants' attorneys or both. The order does state, however, "[p]laintiff's request for sanctions is therefore granted." Because plaintiff's request for sanctions was aimed at defendants, not their attorneys, we will assume the trial court intended to sanction defendants only.

> FN27 Section 128.5, subdivision (b)(2).

> FN28 *Dolan v. Buena Engineers, Inc.* (1994) 24 Cal.App.4th 1500, 1506[29 Cal.Rptr.2d 903].

We review a sanction award for abuse of discretion. [FN29]

> FN29 *Dolan v. Buena Engineers, Inc.*, *supra*, 24 Cal.App.4th at page 1504.

(5b) As previously noted, defendants' motion for reconsideration was based on the contention Harris had not submitted proof of his performance under the contract and therefore he had not established an essential element of his cause of action for breach of contract. The trial court properly denied this motion because it was "totally and completely without merit." *1344

Harris's lack of performance was not a bar to summary judgment in this case because the evidence is undisputed the parties were negotiating the language of the releases when defendants took the set-

tlement agreement "off the table," thereby excusing further performance by Harris. [FN30]

> FN30 Civil Code section 1440 states: "If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."

Defendants argue they did not "prevent" Harris from performing his part of the bargain. He could have signed one of the versions of the releases drafted before the agreement was taken "off the table." There is no merit to this argument. Harris need not have been physically or legally prevented from performing in order for his performance to be excused. It is enough to excuse his performance that defendants repudiated the contract before his performance was due. [FN31] Furthermore, Harris had as much right to negotiate the terms of the releases as defendants had. The parties were engaged in such negotiations when defendants repudiated the contract. Defendants did not claim Harris failed to negotiate in good faith. Therefore, defendants' breach of the contract excused Harris from providing the promised releases.

> FN31 Civil Code section 1440, quoted *ante*, footnote 30.

Disregarding the trial court's previous ruling rejecting their nonperformance argument, defendants proceeded to file motions to set aside the judgment and for new trial which were not "any different, legally or factually, from the previous motions." The trial court could reasonably conclude defendants' continuous filing of motions which only repeated the same claim the trial court had previously rejected constituted bad faith under section 128.5. The court could infer defendants knew their motions lacked merit-at least in the court's view-yet

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95 Cal.App.4th 1332                                                                         Page 10
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal. Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492
**(Cite as: 95 Cal.App.4th 1332)**

continued to pursue their claim for some ulterior motive. [FN32]

> FN32    See *In re Luckett* (1991) 232 Cal.App.3d 107, 110[283 Cal.Rptr. 312]; *Summers v. City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1073[275 Cal.Rptr. 594].

Defendants contend the trial court failed to "recite in detail the conduct or circumstances justifying the order" as required by section 128.5, subdivision (c). We disagree.

In its minute order the court states: "[T]here is nothing significantly legally or factually different in either of the above captioned motions that the court has not heard/ruled on previously." We find this explanation for the *1345 court's order sufficient to apprise defendants and this reviewing court of the reasons why sanctions were imposed. [FN33]

> FN33    Compare *Javor v. Dellinger* (1992) 2 Cal.App.4th 1258, 1262[3 Cal.Rptr.2d 662]; *Jansen Associates, Inc. v. Codercard, Inc.* (1990) 218 Cal.App.3d 1166, 1171[267 Cal.Rptr. 516].

We conclude, therefore, the trial court did not abuse its discretion in awarding sanctions against defendants under section 128.5.

### Disposition

The judgment for plaintiff is reversed. The order awarding sanctions against defendants is affirmed. Each side is to bear its own costs on appeal.

Woods, J., and Perluss, J., concurred.
A petition for a rehearing was denied March 5, 2002, and the opinion was modified to read as printed above. *1346

Cal.App.2.Dist.
Harris v. Rudin, Richman & Appel
95 Cal.App.4th 1332, 116 Cal.Rptr.2d 552, 02 Cal.

Daily Op. Serv. 1250, 2002 Daily Journal D.A.R. 1492

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**13**

Westlaw.

16 Cal.App.3d 391

Page 1

16 Cal.App.3d 391, 94 Cal.Rptr. 33

**(Cite as: 16 Cal.App.3d 391)**

**C**

Howell v. Courtesy Chevrolet, Inc.

Cal.App.2.Dist.

HARLEY W. HOWELL, as Trustee, etc., Plaintiff
and Respondent,

v.

COURTESY CHEVROLET, INC., Defendant and
Appellant

**Civ. No. 36874.**

Court of Appeal, Second District, Division 5, Cali-
fornia.

March 30, 1971.

SUMMARY

A leasing company agreed with an automobile deal-
ership to finance the purchase of three trucks by a
sanitation company. The trucks were to be equipped
with rubbish bodies that were to be installed by a
body company which was owned by the sanitation
company. A representative of the leasing company
induced the automobile dealership to submit an in-
voice which included a separate stated amount for
the rubbish bodies to a trust which represented an-
other leasing company that was actually to furnish
the financing. The company represented by the trust
issued a check to the dealership in payment of the
invoice and the dealership issued a check to an in-
dividual who represented himself as the owner of
the body company. The bodies were never installed
and the sanitation company ended in bankruptcy.
The trustee served notice of rescission on the deal-
ership and then brought an action for rescission of
the purchase on the grounds of fraud, negligence,
mistake, and failure of consideration. The trial
court found, inter alia, that plaintiff justifiably re-
lied on the representation made on the invoice as to
the bodies, that such representation was made neg-
ligently and with the intent and purpose of inducing
plaintiff to make the payment as invoiced, and that
the company which induced defendant to include
the bodies on the invoice was neither the actual nor
ostensible agent of plaintiff or any of its affiliates.

Judgment was entered in plaintiff's favor for a sum
which represented the cost allocated to the rubbish
bodies. (Superior Court of Los Angeles County,
Raymond R. Roberts, Judge.)

The Court of Appeal affirmed the judgment, hold-
ing that there was substantial support in the record
for the trial court's findings that the company which
induced defendant to include the truck bodies on
the invoice was neither the actual nor ostensible
agent of plaintiff or any of its affiliates and that de-
fendant's preparation of the invoice in such manner
and causing it to be so presented to plaintiff without
investigation constituted negligence. It took the
view that the trial court's finding as to plaintiff's
justifiable reliance on the invoice was proper, and
that defendant's plea of contributory negligence did
not raise a material issue in the action and no find-
ing thereon was necessary or proper. Partial rescis-
sion was regarded as proper under the circum-
stances of the case and the court pointed out that
plaintiff's total recoupment by judgment and other-
wise was less than its investment. Contentions that
plaintiff had waived the right to rescind and that the
trustee was not a proper party plaintiff were rejec-
ted. (Opinion by Frampton, J., [FN*] with Kaus, P.
J., and Reppy, J., concurring.)

> FN* Retired judge of the superior court sit-
> ting under assignment by the Chairman of
> the Judicial Council.

HEADNOTES

Classified to California Digest of Official Reports

**(1a,        1b)        Agency        §
15--Existence--Evidence--Sufficiency.**
In an action against an automobile dealership for
rescission of a purchase of trucks, there was sub-
stantial support in the record for the trial court's
findings that a corporation which requested defend-
ant to include the price of truck bodies that were to
be installed by another on its invoice was neither

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
**(Cite as: 16 Cal.App.3d 391)**

the actual nor ostensible agent of plaintiff or any of its affiliates and that defendant's preparation of the invoice in such manner and causing it to be so presented to plaintiff without investigation constituted negligence on defendant's part, where the documentation relied on by defendant to establish the agency went no further than to show that the corporation was entitled to fees from plaintiff under certain conditions, where one letter, in fact showed that plaintiff had refused to assume responsibility for the corporation's activities, and where it did not appear that any of such documentation, except a letter indicating that the corporation was acting on its own behalf, ever reached defendant.

**(2) Agency § 62--Authority--Ostensible Authority.**
In order to establish ostensible agency under Civ. Code, § 2300, the principal must intentionally communicate this relationship to the third party, or negligently cause the third person to believe that there is an agency relationship.

**(3)** Agency §
38--Authority--Evidence--Declarations of Agent.
The declarations of an agent are not admissible to prove the fact of his agency or the extent of his power as such agent.

**(4a,        4b)** Fraud §
94(5)--Actions--Findings--Necessity of Specific Findings on Material Issues--When Findings Not Necessary; Failure to Find.
In an action against an auto dealership for rescission of a purchase of trucks on grounds of fraud, negligence, mistake, and failure of consideration, the trial court properly declined to make a finding that plaintiff was contributorily negligent in connection with an invoice to plaintiff which included an amount for truck bodies which were never actually installed, where the issue was whether plaintiff was justified in relying on the representation made on the invoice, and where the court found that plaintiff did so rely; contributory negligence, although pleaded by defendant, did not raise a material issue in the action, and no finding thereon was necessary or proper.

[See **Cal.Jur.2d,** Fraud and Deceit, § 35; **Am.Jur.2d,** Fraud and Deceit, § 384.]
**(5)** Fraud § 18(5)--Actual Fraud--Knowledge and Intent--Positive Unwarranted Assertions.
If one asserts that a thing is true within his personal knowledge, or makes a statement as of his own knowledge, or makes such an absolute unqualified positive statement as implies knowledge on his part, when in fact he has no knowledge whether his assertion is true or false, and his statement proves to be false, he is as culpable as if he had wilfully asserted that to be true which he knew to be false, and he is equally guilty of fraud.

**(6)** Fraud § 26(1)(a)--Actual Fraud--Reliance--Right to Rely--Duty to Investigate.
Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means of knowledge were open to him; in such case, no duty is devolved upon him to employ such means of knowledge.

**(7a, 7b)** Sales § 187--Actions for Rescission--Judgment--Partial Rescission.
In an action against an auto dealership for rescission of a purchase of trucks, the trial court properly granted partial rescission for the amount allocated on defendant's invoice to truck bodies that were never furnished, where it did not appear that such partial rescission would result in unjust enrichment to plaintiff or in any way prejudice defendant.

**(8)** Contracts § 195--Rescission.
Generally, a party seeking to rescind a contract must rescind all of it and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions, but the rule is not controlling in the case of a severable or divisible contract.

**(9)** Contracts § 158--Interpretation--Entire and Severable Contracts.
Generally, the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable, and a con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
**(Cite as: 16 Cal.App.3d 391)**

tract may be severable as to some of its terms, or for certain purposes, but indivisible as to other terms, or for other purposes.

**(10a, 10b, 10c)** Sales § 186--Actions for Rescission--Trial--Findings.
In an action against an automobile dealership for rescission of a purchase of trucks, the trial court was not required to find, as a matter of law, that plaintiff had waived its right to rescind, where there was testimony that plaintiff first knew that the trucks might not have been as represented when it was notified that the lessee of the trucks was in bankruptcy, where plaintiff, who was located in an eastern state, thereupon sent a representative to this state to investigate and ascertain the location and condition of the leased equipment, where the representative, on discovering that the trucks were not equipped with bodies as represented, contacted defendant to ascertain the facts and circumstances surrounding the sale of the trucks, and where the record did not disclose what negotiations may have transpired and the length of time involved in winding up such investigation.

**(11)** Estoppel and Waiver § 13--Appeal.
The defense of waiver raises an issue of fact to be decided after a consideration of all the circumstances of the particular case, and is a question primarily for the trial court.

**(12)** Vendor and Purchaser § 83--Fraud--Actions--Defenses--Limitations and Laches.
A vendee who has been defrauded by his vendor is entitled to a reasonable time to investigate the falsity of the representations and the time so consumed cannot be charged as unreasonable delay.

**(13a, 13b)** Sales § 187--Rescission and Modification--Actions for Rescission--Judgment--Damages.
In an action against an automobile dealership for rescission of a purchase of trucks, the damages awarded by the trial court bore a reasonable relation to the loss suffered and could not be said to be excessive as a matter of law, where the amount of the

judgment plus sums otherwise recouped by plaintiff totalled less than the amount of plaintiff's original investment in the trucks.

**(14)** Contracts § 203--Rescission--Restoration of Benefits.
In an action to enforce rescission, the successful plaintiff is entitled to recover the consideration he gave and any other compensation necessary to make him whole.

**(15)** Parties § 12(2)--Who May Be Parties--Parties Plaintiff--Persons Authorized by Statute.
The trustee of an express trust created by a corporation for the purpose of administering certain lease agreements was a proper party to bring and maintain an action for rescission of the purchase of trucks by the corporation that was the beneficiary of the trust, and it was not necessary to join, as parties plaintiff, those for whose benefit the action was prosecuted. (Code Civ. Proc., § 369.)

COUNSEL
Paris & Paris and Reynold F. Paris for Defendant and Appellant.
Low & Stone and Herbert N. Wolfe for Plaintiff and Respondent.FRAMPTON, J. [FN*]

> FN* Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

*Statement of the Case*

Plaintiff sued for rescission of the purchase from defendant of three trucks, each equipped with rubbish bodies, for a total purchase price of $47,738.43, on the grounds of fraud, negligence, mistake and failure of consideration.

Plaintiff contends that it relied upon an invoice prepared by defendant Courtesy Chevrolet, Inc. (hereafter Courtesy), which included the description and cost of the three trucks with the rubbish bodies mounted thereon. Courtesy contends that this invoice was prepared for the convenience of plaintiff's agent, Western Leasing Co. (hereafter

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
**(Cite as: 16 Cal.App.3d 391)**

Western), and upon receipt of the total purchase price from plaintiff, Courtesy transmitted that *396 portion of the purchase price allocated to the rubbish bodies to a body company designated by Western, and the plaintiff's lessee, Aladdin Sanitation and Engineering Corporation (hereafter Aladdin).

The body company which received the payment was owned by Aladdin and never installed the rubbish bodies on the trucks.

The court rendered judgment for partial rescission for negligent misrepresentation and for failure of consideration caused by the fault of Courtesy in the sum of $28,136.40, which represented the cost of the three rubbish bodies. This sum was reduced by a remittitur in the amount of $1,100.

### Statement of Facts

Plaintiff, Harley W. Howell, was the trustee for the D. L. Peterson Trust, created for the purpose of administering certain lease agreements on behalf of AFLC, Inc., the beneficiary under the trust agreement. The funds to purchase equipment that would be subject to lease arrangements administered by plaintiff were provided by AFLC, Inc., pursuant to the trust agreement. Western was an independent business entity which submitted to plaintiff certain proposals for the leasing of equipment.

Lloyd Bolen, president of Aladdin, in about June of 1964, ordered four trucks to his specifications from Courtesy. These trucks were financed by means of a lease agreement entered into with Bank of America. A short time thereafter, Mr. Bolen ordered four additional trucks, which order was later reduced to three in number, to be financed in the same manner, and, as in the previous transactions, Courtesy prepared an invoice for the three trucks (the same trucks involved in the subject litigation) for Bank of America. On that invoice there was no reference to rubbish bodies. When Bank of America notified Courtesy that it would not finance the second transaction, Bolen advised the salesman for Courtesy

that Western was arranging for the financing of the three trucks. At Bolen's request, Herman Walker, the salesman for Courtesy, met with William Babcock, president of Western. In discussing the leasing of the three trucks, Walker told Babcock that the trucks had been delivered to Bolen and had been in the latter's possession since July or August 1964 and that Bolen was making arrangements for the purchase and installation of rubbish bodies on the three trucks.

Babcock, on behalf of Western, agreed to finance Bolen in the purchase of the trucks, but insisted that it be handled as a "package deal," that is, that the trucks and rubbish bodies be invoiced together to "simplify our bookkeeping." *397

At the request and direction of Babcock, Walker, on September 12, 1964, prepared an invoice for Courtesy directed to: "D. L. Peterson, Trust, 2707 North Charles St., Baltimore 18, Maryland, c/o Western Leasing Company, 9465 Wilshire Blvd., Beverly Hills, Calif."

This invoice described the three trucks and included the cost of three rubbish truck bodies mounted on the chassis of the trucks. The total invoice was for $47,738.43. The amount of this total allocated to the rubbish bodies was $28,136.40. The amount of the cost of the rubbish bodies was given to Walker by both Babcock and Bolen.

Subsequent to the preparation of the invoice, and on September 24, 1964, prior to any monies being paid by plaintiff, Babcock, on behalf of Western, sent a letter to Courtesy, to the attention of Walker, reading as follows:

"This letter will authorize you to release three (3) 1964 Chevrolet trucks, Model # C 6803, being leased through our company to Aladdin Sanitation and Engineering Corporation, P. O. Box 221, Malibu, California.

"The invoices will be paid through our Baltimore office the first of October."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
(Cite as: 16 Cal.App.3d 391)

On or about September 25, 1964, Courtesy was presented with an invoice from A. R. Body Company for the installation of the rubbish bodies. This invoice, bearing date September 25, 1964, was in the sum of $28,136.40. Both Babcock and Bolen had previously advised Walker that A. R. Body Company was installing the rubbish bodies.

On October 13, 1964, Bolen went to the offices of plaintiff in Baltimore, Maryland, and secured a check drawn by AFLC, Inc., in favor of Courtesy in the sum of $47,738.43, which represented the total cost of the trucks with the rubbish bodies mounted thereon. The check was delivered to Bolen upon the presentment to plaintiff of three forms designated as "SP-29's," and a lease agreement executed by Aladdin, and personally by Bolen and Yvonne Bolen, his wife, after an extensive investigation as to the financial status of Aladdin and the Bolens. No inspection of the trucks was made by plaintiff prior to the issuance of its check in payment therefor.

Bolen and D. W. Fraser, who represented himself as the owner of A. R. Body Company, took the check for $47,738.40 to Courtesy and Courtesy, in turn, delivered its check to Fraser in the sum of $28,136.40, for the rubbish bodies pursuant to the information and invoice previously supplied it by Babcock and Bolen.

Mr. Fraser never installed bodies on the trucks and testified that Bolen *398 was the true owner of A. R. Body Company. Fraser testified that he was general manager of Aladdin, and acted "like a front man" for Bolen in connection with his having signed the certificate of doing business under a fictitious name as sole owner of A. R. Body Company, and that the company never engaged in the business of manufacturing rubbish truck bodies.

Bolen failed to make the payments on the lease agreement as they became due and disappeared about six months thereafter. Not until plaintiff had received notice that Aladdin was in bankruptcy did it repossess the trucks, at which time (May 1965) it

was discovered that two of the trucks had no rubbish bodies on them, and one of them had an "old beat up body" on it.

On November 8, 1965, after some discussion between Mr. Irving Reifman, one of counsel for plaintiff, and representatives of Courtesy, concerning the circumstances surrounding the transaction wherein the trucks were sold without rubbish bodies mounted on the chassis of the trucks, plaintiff served a notice of rescission on Courtesy. The within litigation followed.

Based upon the foregoing facts, the trial court found, among other things, that plaintiff justifiably relied on the representation made on the invoice of September 12, 1964, which stated that trash bodies were included on the trucks delivered by Courtesy; there were no trash bodies on the three trucks purchased at the time the invoice was presented to plaintiff, or at the time said trucks were delivered, or when the sum of $47,738.43 was paid to Courtesy; that such representation was made negligently and with intent and purpose of inducing plaintiff to make the payment as invoiced; there was a partial and material failure of consideration when Courtesy failed to deliver the trash bodies, and that Western Leasing Company was neither the actual nor ostensible agent of plaintiff, or any of its affiliates. Judgment followed in favor of plaintiff and against Courtesy in the principal sum of $28,136.40, later reduced by $1,100 by remittitur after hearing on the motion for a new trial. The appeal is from the judgment.

*Contentions on Appeal*

Courtesy raises the following questions on appeal: (1) Was the lower court's finding that Western Leasing Company was neither the actual nor ostensible agent of plaintiff or any of its affiliates supported by substantial evidence, and error as a matter of law. (2) Whether there was substantial evidence to support the finding that Courtesy was negligent. (3) Whether the lower court should have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
**(Cite as: 16 Cal.App.3d 391)**

found negligence on the part of plaintiff as a matter of law thereby precluding the granting of relief for the negligence, if any, of Courtesy. (4) Whether the court erred in granting *399 a partial rescission for the sum of $28,136.40 which represented the cost allocated to the rubbish bodies. (5) Whether the court should have found a waiver of the right to rescind as a matter of law. (6) Whether the amount of damages awarded was excessive as a matter of law. (7) Whether the conclusion of law that the plaintiff, Harley W. Howell, Trustee for the D. L. Peterson Trust, was the proper party plaintiff is error.

### Agency and Negligence

(1a) Mr. Herbert Hightower, vice-president and operating officer of AFLC, testified with respect to the relationship between AFLC and Western Leasing Company that: "Well, it wasn't very much at all except for the fact that Peterson, Howell & Heather, through its executive vice president, Mr. Smith, Charles J. Smith, was trying to develop some leasing business on the West Coast, and there was a contract made with a Mr. Babcock with a company known as Western Leasing Company for the referral of business to Peterson, Howell & Heather, and then from Peterson, Howell & Heather to AFLC." He testified further that to his knowledge there was no written agreement between Western Leasing Company and Peterson, Howell & Heather, D. L. Peterson Trust or AFLC concerning the referral of leasing agreements, and that AFLC made all of the decisions as to whether or not to accept leases submitted to it. When Mr. Hightower was asked whether, to his knowledge, Western Leasing Company had any authority to accept or reject lease agreements, Courtesy's counsel objected to the question on the ground that it called for the conclusion of the witness, and such objection was sustained. It does not appear that this subject was pursued further by either counsel. Certainly there is no evidence here of an agency created by express agreement, authorizing Western to bind AFLC or its associates in any manner with respect to lease agreements originating with Western and referred by Western to AFLC or

its associates for acceptance or rejection.

Courtesy urges that the following evidence discloses, as a matter of law, that Western was the ostensible agent for AFLC and its associates with authority to bind them with respect to leasing agreements originating with Western: (1) The testimony of Walker (of Courtesy) wherein Bolen had stated to him that Western was a subsidiary of Peterson, Heather & Howell, the latter firm being known to Walker; (2) the letter to Courtesy from Western stating that payment for the trucks would be made by "our" Baltimore office; (3) a wholly owned subsidiary of Peterson, Howell & Heather (Transelco) was formed for the purpose of segregating the business referred to AFLC by Western; (4) testimony of Hightower that Charles J. Smith, executive vice-president of Peterson, Howell & Heather, had contacted Babcock of Western for the referral of business to Peterson, Howell & *400 Heather and then from Peterson, Howell & Heather to AFLC; (5) section 17 of the lease agreement between Aladdin and AFLC which reads: "*Creation and Administration of Agreement.* It is understood and agreed that Western Leasing Company has created this Agreement, but that, from and after the date hereof, Western Leasing Company shall have no further interest in this Agreement. It is further understood and agreed that Transelco, Inc. will administer this Agreement and will perform the functions therein provided to be performed by the Lessor. Lessee shall have no liability to Western Leasing Company or to Transelco, Inc. for any fees, costs and expenses in connection with the creation or administration of this Agreement, and shall only be liable for the obligations of the Lessee hereunder. Lessor hereby agrees to indemnify and hold Lessee harmless from and against the payment of any such fees, costs or expenses."; (6) Courtesy's invoice directed to D. L. Peterson Trust c/o Western Leasing Company; (7) a finder's fee was paid to Western by Transelco for finding the business; (8) the text of a letter dated August 14, 1964, from Smith to Babcock, stating, "When I was at your office you asked about how we use the truck lease for other than mo-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
**(Cite as: 16 Cal.App.3d 391)**

bile equipment. The attached supplement accomplishes this. I assume that you will need a supply, and so I shall send about 100 copies to you under separate cover." Attached to his letter is a blank form designated "Supplemental Agreement" between AFLC, INC., as lessor "and _____, as Lessee"; (9) exhibits C, D, E, G, H, M, O, P and Q which Courtesy urges contain a voluminous number of documents and correspondence relating to and describing a plan with Western for the procuring of leasing business in the Los Angeles area; and (10) "The Thawley file" which Courtesy urges shows approximately 50 prospective transactions in which Western participated.

We have examined the exhibits and correspondence above referred to and find nothing therein which would compel a holding that Western acted as the agent of plaintiff or its affiliates in obtaining and referring prospective lessees to plaintiff. This documentation goes no further than to show that Western was entitled to a fee on the referral of a prospective lessee only if the proposal was accepted by AFLC. In fact, one letter offered in evidence by Courtesy (marked exh. E), written on November 4, 1964, by Peterson, Howell & Heather to Mr. A. N. Willis, president of Commercial Credit Company, Baltimore, Maryland, states in part: "Hammond has stated that we should assume responsibility for Western Leasing activities. This, we cannot do because the arithmetic does not justify it. We give you a fixed yield (subsidized by us during the first six months of the period) and we give Western Leasing about 25% of our fee during the first two years. As you know, we do all the work."

It may be noted here that none of the documentation above referred to *401 ever reached Courtesy, except for the letter (exh. Z) written under date of September 24, 1964, by Western to Courtesy wherein it was stated that "The invoices [for the trucks with rubbish bodies mounted] will be paid through *our* Baltimore office the first of October." (Italics added.) The only other circumstance which

may have misled Courtesy as to Western's right to bind AFLC and its affiliates in leasing transactions was the statement, testified to by Walker, Courtesy's salesman, made to him by Babcock, that "This [Western] is a subsidiary of Peterson, Heather & Howell." The record does not disclose that AFLC or its affiliates were ever aware of the contents of the letter of September 24, 1964, or of the statement made by Babcock to Walker, until at trial.

An agent is one who represents another, called the principal, in dealings with third persons. (Civ. Code, § 2295.) An agency is either actual or ostensible. (Civ. Code, § 2298.) An agency is actual when the agent is really employed by the principal. (Civ. Code, § 2299.) (2) An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him. (Civ. Code, § 2300; *Bayuk* v. *Edson*, 236 Cal.App.2d 309, 315 [46 Cal.Rptr. 49].)

It is clear from the foregoing that in order to establish ostensible agency, the principal must intentionally communicate this relationship to the third party, or negligently cause the third person to believe that there is an agency relationship.

(3) The declarations of an agent are not admissible to prove the fact of his agency or the extent of his power as such agent. (*Swinnerton* v. *Argonaut L. & D. Co.*, 112 Cal. 375, 379 [44 P. 719]; *LeMire* v. *Queirolo*, 250 Cal.App.2d 799, 805 [58 Cal.Rptr. 804].) In *Ernst* v. *Searle*, 218 Cal. 233, 240 [22 P.2d 715], the Supreme Court, in quoting from 1 Mechem on Agency, second edition, section 743, page 527, stated the rule as follows: "'An assumption of authority to act as agent for another of itself challenges inquiry. Like a railroad crossing, it should be in itself a sign of danger and suggest the duty to "stop, look and listen." It is therefore declared to be a fundamental rule, never to be lost sight of and not easily to be overestimated, that persons dealing with an assumed agent, whether the assumed agency be a general or special one, are

bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority, and in case either is controverted, the burden of proof is upon them to establish it.'" (See also *Hill v. Citizens Nat. Trust & Sav. Bk.,* 9 Cal.2d 172, 177 [69 P.2d 853].)

(1b) We are satisfied that the trial court's finding that Western was *402 neither the actual nor ostensible agent of the plaintiff or any of its affiliates finds substantial support in the record, and that Courtesy's preparation of the invoice showing that rubbish bodies were mounted on the truck chassis, and causing such invoice to be presented to plaintiff in such form, without investigation, constituted negligence on Courtesy's part.

### *Claimed Negligence on Part of Plaintiff*

(4a) Courtesy urges that the trial court should have found negligence as a matter of law on the part of plaintiff; that Courtesy pleaded contributory negligence as an affirmative defense, requested a specific finding thereon and the trial court declined to make such finding which, under the circumstances, is claimed to be reversible error.

In support of its contention that it was entitled to assert the defense of contributory negligence of the plaintiff in an action for fraud and deceit, Courtesy cites and relies on *Osgood v. City of San Diego,* 17 Cal.App.2d 345 [62 P.2d 195], an action for damages for personal injuries sustained in an automobile accident and *Henderson* v. *Braden,* 35 Cal.App.2d 88 [94 P.2d 625], an action for damages for wrongful death. Neither of the foregoing cases is authority for the right to assert as a defense to an action for fraud and deceit the contributory negligence of the plaintiff.

"[T]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true, is declared by the code to amount to actual fraud. (5) If, therefore, one asserts that a thing is

true within his personal knowledge, or makes a statement as of his own knowledge, or makes such an absolute, unqualified and positive statement as implies knowledge on his part, when in fact he has no knowledge whether his assertion is true or false, and his statement proves to be false, he is as culpable as if he had wilfully asserted that to be true which he knew to be false, and is equally guilty of fraud. [Citations.]" (*Lerner v. Riverside Citrus Assn.,* 115 Cal.App.2d 544, 547 [252 P.2d 744].)

The elements of plaintiff's cause of action in the case at bench which must be pleaded and proved are (1) defendant made a representation of a material fact; (2) that such fact was false; (3) that defendant knew it to be false or negligently or recklessly made the assertion as a fact without reasonable grounds to believe it to be true; (4) that such representation was made with intent to induce the other party to act upon it; and (5) that it was relied upon by the other party to his damage. (Cf. *Clar* v. *Board of Trade,* 164 Cal.App.2d 636, 645 [331 P.2d 89].)*403

"It is usually said that the plaintiff must show not only actual reliance ... but justifiable reliance; i.e., that the circumstances were such as to make it reasonable for him to accept the defendant's statements without an independent inquiry or investigation." (2 Witkin, Summary of Cal. Law, Torts, § 203, p. 1388.) "The liberal rule of justifiable reliance, with its rejection of the defense of contributory negligence ... applies to negligent as well as to intentional misrepresentation." (2 Witkin, Summary of Cal. Law, Torts, § 208, p. 1394.)

(6) "Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means of knowledge were open to him. In such a case, no duty in law is devolved upon him to employ such means of knowledge." (*Blackman* v. *Howes,* 82 Cal.App.2d 275, 279 [185 P.2d 1019, 174 A.L.R. 1004].) (4b) In the case at bench the issue was whether plaintiff was justified in relying on the representation of Courtesy. Here, the trial court found that "Plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
**(Cite as: 16 Cal.App.3d 391)**

justifiably relied on the representation made on the invoice, which stated that trash bodies were to be included with the trucks delivered by Courtesy Chevrolet." This was a proper, and the only finding necessary on the issue here raised by Courtesy. Contributory negligence, although pleaded by Courtesy, did not raise a material issue in the action, and no finding thereon was necessary or proper.

### Partial Rescission

(7a) In the case at bench, Courtesy was interested only in the sale of the three trucks as chassis, and not with special rubbish bodies mounted thereon. The manufacture and the mounting of the rubbish bodies upon the chassis appear from the record to have been specialty equipment which Courtesy was not set up to provide. Bolen, of Aladdin, was to provide these special rubbish bodies and have them mounted on the chassis. Babcock insisted that the trucks and the rubbish bodies be handled as a "package deal" to "simplify our bookkeeping." From the foregoing arrangement, Courtesy, as an accommodation to Babcock and Bolen, rendered an invoice to the D. L. Peterson Trust for the amount of the three trucks, setting forth thereon, as a separate item, the cost of the three rubbish bodies mounted in the sum of $28,136.40. The arrangement was that upon the receipt by Courtesy of payment of the full amount of the invoice from plaintiff, Courtesy, in turn, would pay A. R. Body Company upon the latter's invoice for the cost of the manufacture and mounting of the rubbish bodies. The record does not disclose that Courtesy had contracted with A. R. Body Company for the manufacture and mounting of such bodies. Courtesy simply volunteered to handle the funds representing the cost of the rubbish bodies in the foregoing manner as an accommodation to Babcock and Bolen. As far as *404 Courtesy was concerned the sale of the trucks was a separate transaction from that of the manufacture and installation of the rubbish bodies, over which it exercised no supervision or control.

Plaintiff, by its complaint sought total rescission of its contract and restoration of the total amount paid of $47,738.43. The court awarded partial rescission in the amount of $28,136.40 being the amount allocated on the invoice to the rubbish bodies.

"(b) A party to a contract may rescind the contract in the following cases.

"

. . . . . . . . . .

"(2) If the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds.

"

. . . . . . . . . .

"(4) If the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause." (Civ. Code, § 1689; cf. *Nelson v. Sperling,* 270 Cal.App.2d 194, 195 [76 Cal.Rptr. 481].)

(8) "The general rule is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions. [Citations.] The theory underlying such a rule is that retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate.

"This rule, however, is not controlling in the case of a severable or divisible contract such as Exhibit 'B.' (9) Generally speaking, the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable. [Citation.] And a contract may be severable as to some of its terms, or for certain purposes, but indivisible as to other terms, or for other purposes." (*Simmons* v. *Cal. Institute of Technology,* 34 Cal.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
**(Cite as: 16 Cal.App.3d 391)**

Page 10

264, 275 [209 P.2d 581].)

(7b) Here, Courtesy was interested only in selling its trucks. It had no right, title or interest in the rubbish bodies which were supposedly to be manufactured and installed by A. R. Body Company, Bolen's *alter ego*. It does not appear that to grant rescission only as to that portion of the contract relating to failure of consideration the cost of the rubbish bodies, and to deny rescission for the total amount of the contract will result in unjust enrichment to the plaintiff or in any way prejudice Courtesy. Courtesy was paid for the full value of its trucks as invoiced. Under these *405 circumstances it was not error to render judgment based upon failure of consideration for the value of the rubbish bodies only.

*Waiver*

(10a) Courtesy urges that the trial court should have found, as a matter of law, that plaintiff had waived its right to rescind.

Mr. Hightower testified that the first time plaintiff knew that there might not have been rubbish bodies on the trucks was when plaintiff was notified that Aladdin was in bankruptcy (about May 1965). Plaintiff later respossessed the trucks, at which time it was discovered that no rubbish bodies, as originally invoiced, were mounted on them. Thereafter, a representative of plaintiff discussed the transaction with Mr. Walker of Courtesy. Notice of rescission was served upon Courtesy in November 1965.

The record discloses that after the notice of rescission was served, plaintiff sent some additional bills to Aladdin and that the account with Aladdin was charged off about June of 1967 when the bankruptcy proceeding was concluded. The record also discloses that plaintiff filed a claim in the Aladdin bankruptcy proceeding for the $47,738.43 claimed as damages for the alleged fraud in the sale and purchase of the trucks as well as delinquent lease rentals due from Aladdin. The amount of this claim

against Aladdin was made contingent upon the amount of plaintiff's recovery against Courtesy in the present action.

(11) "The defense of waiver raises an issue of fact to be decided after a consideration of all the circumstances of the particular case, and is a question primarily for the trial court." (*Hefferan* v. *Freebairn*, 34 Cal.2d 715, 722 [214 P.2d 386].) (10b) Here, plaintiff trustee was situated in the State of Maryland. Upon learning of the bankruptcy of Aladdin, plaintiffs' representative came to California to investigate and ascertain the location and condition of the leased equipment. Upon discovering that the trucks were not equipped with rubbish bodies, as represented, plaintiff's representative contacted Courtesy to ascertain the facts and circumstances surrounding the sale of the trucks. What negotiations may have transpired and the length of time involved in winding up such investigation is not disclosed by the record.

"The courts have frequently declared that there is no artificial rule as to the lapse of time which will justify the application of the doctrine of laches. Each case must be determined upon the basis of its facts, and in the absence of palpable abuse of discretion the trial court's finding upon the issue will not be disturbed upon appeal. [Citations.]

(12) "A vendee who has been defrauded by his vendor is entitled to a *406 reasonable time to investigate the falsity of the representations and the time so consumed cannot be charged as unreasonable delay." (*Williams v. Marshall*, 37 Cal.2d 445, 455 [235 P.2d 372].) (10c) Under all of the circumstances here presented, we cannot say, as a matter of law, that plaintiff waived its right to rescind.

*Amount of Damages*

(13a) As heretofore pointed out the trial court awarded plaintiff $28,136.40 based upon the billed cost of three rubbish bodies which had never been manufactured or mounted on the trucks as represented

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16 Cal.App.3d 391
16 Cal.App.3d 391, 94 Cal.Rptr. 33
(Cite as: 16 Cal.App.3d 391)

Page 11

by Courtesy's invoice to plaintiff.

Mr. Hightower testified that plaintiff had received, as a dividend from the bankruptcy court, the sum of $2,170.36, based upon plaintiff's claim theretofore filed. The amount of the claim in bankruptcy against Aladdin was made contingent upon the outcome of the present litigation as to the purchase price of the trucks. In addition, the claim included $15,686.70 for unpaid rentals under the lease agreement between AFLC, Inc., and Aladdin. There had been paid by way of rentals under the lease prior to bankruptcy the sum of $10,419.74. The three trucks were sold by AFLC, Inc., in March or April 1967, for the sum of $2,800. The sum of $1,100 remitted from the judgment was to carry out the terms of a stipulation, apparently overlooked by the trial court at the time of rendition of the judgment, consenting to the allocation of trustees' fees in the bankruptcy proceeding. From the foregoing it appears that plaintiff received a net judgment in the rescission action in the sum of $27,036.40. Plaintiff received from lease rentals prior to bankruptcy $10,419.74; from a dividend from the bankrupt estate $2,170.36, and from the sale of the trucks $2,800, making a total of $15,390.10 recouped as against an investment of $47,738.43 in equipment, a substantial part of which was nonexistent.

(14) "In an action to enforce rescission the successful plaintiff is entitled to recover the consideration he gave and any other compensation necessary to make him whole." (*Modoc Mineral & Oil Co.* v. *Cal-Vada Drilling etc. Co.*, 236 Cal.App.2d 868, 873 [46 Cal.Rptr. 508]; Civ. Code, § 1692.) (13b) We are of the opinion that the damages awarded bear a reasonable relationship to the loss suffered, and cannot be said to be excessive as a matter of law as claimed by Courtesy.

*Proper Party Plaintiff*

(15) Courtesy questions the right of plaintiff to bring and maintain the action. *407

The record reveals that plaintiff Harley W. Howell was trustee under an express trust created by AFLC, Inc., and of which AFLC, Inc., was the beneficiary. As such trustee, Howell was a proper party to bring and maintain the action, and it was not necessary to join, as parties plaintiff, those for whose benefit the action was prosecuted. (Code Civ. Proc., § 369; *Triplett v. Williams*, 269 Cal.App.2d 135, 137-138 [74 Cal.Rptr. 594]; 2 Witkin, Cal. Procedure, Pleading, § 465, pp. 1452-1453.)

The judgment is affirmed.

Kaus, P. J., and Reppy, J., concurred. *408
Cal.App.2.Dist.
Howell v. Courtesy Chevrolet, Inc.
16 Cal.App.3d 391, 94 Cal.Rptr. 33

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.