**14**

Westlaw.

135 Cal.App.3d 451
135 Cal.App.3d 451, 185 Cal.Rptr. 341
**(Cite as: 135 Cal.App.3d 451)**

▷
IMO Development Corp. v. Dow Corning Corp.
Cal.App.4.Dist.
IMO DEVELOPMENT CORPORATION, Plaintiff,
Cross-defendant and Appellant,
v.
DOW CORNING CORPORATION, Defendant,
Cross-complainant and Appellant.
**Civ. No. 25820.**

Court of Appeal, Fourth District, Division 2, California.
Aug 26, 1982.

SUMMARY

In an action by the buyer of real estate against the seller for breach of a prior agreement and for a declaration of invalidity of the buyer's contractual waiver of its claims against the seller, in which the seller cross-complained for recovery on the buyer's promissory note, the trial court granted the seller's motion for judgment on the pleadings without leave to amend, and entered judgment in favor of the seller on the promissory note with interest and attorney fees.(Superior Court of Orange County, No. 257572, John K. Trotter, Jr., Judge.)

The Court of Appeal reversed the judgment as to the award of attorney fees, directing the trial court to recompute the award, and otherwise affirmed. The court held that since the buyer sought declaratory relief only as to the unenforceability of its contractual waiver of claims against the seller, and did not seek to invalidate any other portion of the contract or offer to return the property or proceeds of the seller's loan as restitution of the benefits which it obtained, the trial court properly determined that the buyer in effect sought a partial rescission of the contract and that, since no such remedy is recognizable, the buyer's count for a declaration of unenforceability of the waiver failed to state a cause of action. The court also held that since the contract provided for the sale of the property and the advance of the seller's loan in exchange for the buyer's waiver of claims and payment of the purchase price, the contract was not divisible and was therefore not subject to partial rescission. Further, the court held that the buyer's failure to allege in its pleading that it sought a declaration of the invalidity of the waiver and its failure to allege ultimate facts demonstrating the unconscionability of the waiver precluded the court from a determination that the waiver was unenforceable under Civ. Code, § 1670.5, which permits the courts to refuse to enforce unconscionable contracts. The court held that the buyer's allegation that its consent was obtained by economic duress was not tantamount to a showing of unconscionability, and that the presence of a supposed unconscionable contract provision, such as would admit to differential enforcement, does not logically provide for differential rescission. The court also held that the trial court properly granted the motion for judgment on the pleadings without leave to amend after counsel for plaintiff stated that no new facts could be alleged entitling it to the remedy sought. The court held that that the seller was contractually entitled not only to attorney fees incurred in connection with collection of the promissory note, but also to attorney fees incurred in litigating the issue of validity of the buyer's contractual waiver, since that issue was central to the entire litigation between the parties, in that its resolution determined whether the buyer's note obligations should be offset against the damages from the seller's alleged breach of the parties' prior agreement.(Opinion by McDaniel, J., with Morris, P. J., and Kaufman, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1)** Pleading § 92--Motions and Objections--Motion for Judgment on Pleadings.
A motion for judgment on the pleadings is in effect a general demurrer and on review is to be tested by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Cal.App.3d 451
135 Cal.App.3d 451, 185 Cal.Rptr. 341
(Cite as: 135 Cal.App.3d 451)

Page 2

the same rules. Thus, a defendant may move for judgment on the pleadings on the ground that the complaint fails to state a legally cognizable cause of action. Because such a motion has the purpose and effect of a general demurrer, the allegations of the complaint must be taken as true in deciding whether a cause of action has been stated.

**(2) Real Estate Sales § 65--Rescission and Abandonment--Rescission by Purchaser--Partial Rescission.**
A contract entered into by reason of duress or economic compulsion may be rescinded by the injured party. However, the entitled party must rescind the entire contract and may not retain the rights under it which he deems desirable and repudiate the remainder. Thus, where the buyer in a real estate sale contract sought declaratory relief only as to the unenforceability of a contractual provision whereby it waived certain claims against the seller, and did not seek to invalidate any other portion of the contract, or offer to return the property or proceeds of the seller's loan as restitution of the benefits obtained, the trial court properly determined that the buyer in effect sought a partial rescission of the contract. Since no such remedy was recognizable, the buyer's count seeking a declaration that the waiver provision was invalid and unenforceable due to economic duress failed to state a cause of action.
[See **Cal.Jur.3d**, Contracts, § 290; **Am.Jur.2d**, Contracts, § 488.]
**(3) Real Estate Sales § 63--Rescission and Abandonment--Partial Rescission--Divisibility of Contract.**
When a contract is divisible or severable, the contract may be subject to partial rescission as a remedy. If the consideration given for the contract is apportioned, the contract is divisible for purposes of rescission. Thus, where a real estate sale contract provided for the sale of the property and advance of the seller's loan to the buyer in exchange for the buyer's waiver of claims arising out of a previous contract and payment of the purchase price, evincing the parties' intention to treat their agreement as an entire contract, the contract was not divisible

and was therefore not subject to partial rescission.

**(4)** Contracts §
13--Legality--Enforceability--Unconscionability--Economic Duress.
In an action by a buyer of real estate contract seeking a declaration that a contractual provision whereby the buyer waived certain claims against the seller was unconscionable and therefore unenforceable under Civ. Code, § 1670.5, which permits the courts to refuse to enforce unconscionable contracts, the buyer's failure to allege in its pleading that it sought a declaration of the invalidity of the waiver and its failure to allege ultimate facts demonstrating the unconscionability of the waiver precluded the court from a determination of unenforceability. Moreover, the buyer's allegation that its consent to the contract was obtained by economic duress was not tantamount to a showing of unconscionability, and the presence of a supposed unconscionable contract provision, such as would admit to differential enforcement, did not provide for differential rescission.

**(5) Pleading § 67--Amendment and Withdrawal--Amendment on Leave of Court-- Trial Court's Discretion.**
Generally, great liberality is allowed at all stages of a proceeding in permitting the amendment of pleadings in order to dispose of cases on their merits. However, an appellate court will not interfere with the denial of a motion to amend unless there is an abuse of discretion. The granting of a motion for a judgment on the pleadings, without leave to amend, is not an abuse of discretion, where even if leave were granted, the complaint could not be made to state a cause of action by amendment.

**(6) Costs § 7--Amount and Items Allowable--Attorney Fees--Pursuant to Contract.**
In an action in which the buyer of real estate alleged that the seller breached a prior agreement, in which the seller cross-complained for recovery on the buyer's promissory note, and in which the buyer claimed that the note obligations should be offset against the damages from the seller's breach, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Cal.App.3d 451
135 Cal.App.3d 451, 185 Cal.Rptr. 341
**(Cite as: 135 Cal.App.3d 451)**

seller was contractually entitled to recover attorney fees from the buyer in connection with the seller's successful litigation of the issue of the validity of the buyer's contractual waiver of its claims against the seller for breach of the prior agreement, where the contract and the promissory note provided for a recovery of attorney fees incurred in their enforcement, and where the issue of the validity of the waiver was central to the entire litigation between the parties, in that its resolution determined whether the buyer's note obligations should be offset against the damages from the seller's alleged breach of the parties' prior agreement.

COUNSEL
Martin P. Eramo for Plaintiff, Cross-defendant and Appellant.
Johnsen, Manfredi & Thorpe, George A. Manfredi and Brien F. McMahon for Defendant, Cross-complainant and Appellant.
McDANIEL, J.
Plaintiff IMO Development Corporation (IMO) has appealed from a judgment on the pleadings in an action brought for damages for breach of contract involving a conveyance of real property by defendant Dow Corning Corporation (Dow Corning) and for declaratory relief as to the validity of a waiver provision in a later contract.*455 Defendant for its part has appealed from that portion of the judgment awarding it attorneys' fees because it believes that the award should have been larger.

Dow Corning owned nine acres of unimproved real property, and entered into negotiations to sell it to IMO, a developer. In October 1975, the parties first entered into an agreement under which Dow Corning agreed to sell the property and to help IMO obtain financing for the purchase of the land by executing all necessary documents. An amendment to this agreement explicitly provided that Dow Corning's execution of the financing documents would in no way obligate it to repay the loans, that IMO would be responsible for all sums borrowed and that IMO would hold Dow Corning harmless for any liability incurred as a result of its execution of any financing documents.

To carry forward this agreement, IMO and Dow Corning then obtained a loan commitment from Farmers New World Life Insurance Company (Farmers). For some unexplained reason, the loan commitment from Farmers showed Dow Corning as the sole applicant and purported to obligate Dow Corning to repay the loan to be made. While an amendment to the loan commitment added IMO as a signator and guarantor, the documents continued to identify Dow Corning as the party principally liable for the loan. Because Farmers refused to amend the loan commitment to release Dow Corning from liability to reflect its agreement with IMO, Dow Corning *rescinded* the loan commitment by letter dated July 15, 1976.

Thereafter IMO obtained alternative financing from Phoenix Mutual Life Insurance Company at less advantageous terms than those which had been available from Farmers. However, the loan proceeds did not become available until November 1976, by which time title to the property had passed to IMO.

Before taking title IMO had begun to construct improvements on the property and incurred other obligations in promoting its development which became due on September 21, 1976. With reference to these obligations, various contractors, materialmen and lessors of equipment threatened to record mechanic's liens on the property and to interdict development.

On that same day, IMO and Dow Corning entered into a *second* agreement for the sale of the property and to settle all disputes arising*456 from the first agreement. The second, or sales agreement, also provided that Dow Corning would lend IMO $250,000 in order to continue development of the property. The agreement contained a waiver and hold harmless undertaking by IMO with reference to all its claims against Dow Corning arising out of any previous contracts or agreements for financing of the property. [FN1]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN1 Paragraph 9 (c) of the sales agreement, containing the waiver and hold harmless provision provided: "Buyer agrees to (i) indemnify, defend and hold Seller harmless from and against any and all claims, liability or loss arising from, and does hereby (ii) waive any claims against Seller for, Buyer's use or occupancy of the Property, or from any activity, work or things done, permitted or suffered by Buyer in or about the Property, or from any agreements, contracts or other arrangements for financing of the purchase of the Property, or the construction of improvements thereon, whether interim or permanent financing, and any fees or charges paid in connection therewith, including without limitation any agreement with Phoenix Mutual Life Insurance Company, United California Mortgage Company, Farmers New World Life Insurance Company or the George Elkins Company."

In November 1976, as earlier noted, IMO took title to the property and shortly thereafter sued Dow Corning to recoup the differential arising from the increased financing costs.

The first cause of action for breach of contract alleged that Dow Corning breached the first agreement by repudiating the loan commitment with Farmers. IMO's alleged damages consisted of certain loan deposit fees and additional costs incurred in obtaining the alternative financing. In the fourth cause of action, IMO sought a declaration that the waiver and hold harmless provision in paragraph 9 (c) of the sales agreement was invalid and thus unenforceable because it was allegedly obtained under economic duress. Among other things, the fourth count alleged: (1) that Dow Corning knew that IMO had begun development of the land into an industrial park; (2) that Dow Corning knew that various contractors and materialmen threatened to record mechanic's liens and cease construction work if the sums due were not paid; (3) that on September 21,

1976, Dow Corning knew that IMO could not borrow additional sums to pay the outstanding claims and on the same day Dow informed IMO it would transfer title and make a loan of $250,000 *only if* IMO would waive any claims it had against Dow; (4) that the parties then entered into the "Sales Agreement"; and (5) that consent to paragraph 9 (c), above noted, was obtained through duress.

Dow Corning cross-complained seeking to recover $250,000 on the promissory note executed in accordance with the sales agreement. In its answer, IMO admitted it held title to the property and its failure to repay*457 the $250,000 loan. IMO pleaded an affirmative defense based on the unenforceability of the waiver clause.

Dow Corning moved for judgment on the pleadings on the grounds that the fourth cause of action: (1) sought a partial rescission which is an improper remedy; and (2) failed to state facts establishing a claim for economic duress. Dow Corning argued that a favorable ruling on either ground would result in the waiver clause's surviving intact, thereby barring the first cause of action based on breach of the earlier agreement.

The trial court, in granting the motion without leave to amend, based its ruling on the proposition that *partial rescission* is not recognized as a remedy. Thereafter, the court entered judgment in favor of Dow Corning on the promissory note for $250,000 together with interest and attorneys' fees in the sum of $6,000.

### Discussion

#### *Appeal*

(1)A motion for judgment on the pleadings is in effect a general demurrer and on review is to be tested by the same rules. ( *Colberg, Inc., v. State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 411-412 [62 Cal.Rptr. 401, 432 P.2d 3].) Thus,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Cal.App.3d 451
135 Cal.App.3d 451, 185 Cal.Rptr. 341
(Cite as: 135 Cal.App.3d 451)

a defendant may move for judgment on the pleadings on the ground that the complaint fails to state a legally cognizable cause of action. ( *Crain v. Electronic Memories & Magnetics Corp.* (1975) 50 Cal.App.3d 509, 512 [123 Cal.Rptr. 419].) Because such a motion has the purpose and effect of a general demurrer, the allegations of the complaint must be taken as true in deciding whether a cause of action has been stated. ( *Mathews v. State of California* ex rel. *Dept. of Transportation* (1978) 82 Cal.App.3d 116, 119-120 [145 Cal.Rptr. 443].) We proceed to determine the propriety of the trial court's ruling in view of these principles.

(2)The trial court granted the motion for judgment on the pleadings on the ground that the law does not permit partial rescission of a contract. IMO assigns that as error, and maintains that the fourth count does not seek partial rescission of the contract, but rather a declaration that the waiver clause is unenforceable as an unconscionable provision under Civil Code section 1670.5*458

It is well settled that "a contract entered into by reason of ... duress or economic compulsion may be rescinded by the injured party. However, it is axiomatic that in such an instance the *entitled party must rescind the entire contract and may not retain the rights under it* which he deems desirable *and repudiate the remainder* [citation]." ( *Yeng Sue Chow v. Levi Strauss & Co.* (1975) 49 Cal.App.3d 315, 326 [122 Cal.Rptr. 816]; accord: *Larsen v. Johannes* (1970) 7 Cal.App.3d 491, 503 [86 Cal.Rptr. 744]; *Hayutin v. Weintraub* (1962) 207 Cal.App.2d 497, 509 [24 Cal.Rptr. 761].) The rationale underlying the rule is that retention of only the benefits constitutes unjust enrichment and binds the parties to terms not contemplated within the agreement. ( *Simmons v. Cal. Institute of Technology* (1949) 34 Cal.2d 264, 275 [209 P.2d 581].)

Here IMO sought a declaration only as to the unenforceability of the waiver provision in paragraph 9 (c). It did not seek to invalidate any other portion of the sales agreement, nor did it offer to return the property or proceeds of the loan as restitution of the

benefits obtained. In its answer to the cross-complaint, IMO specifically admitted it held title to the property and accepted the proceeds of the loan. Thus, IMO alleged its entitlement to the benefits of the sales agreement and sought a declaration that it was free of the obligations contained in the waiver of claims provision. Furthermore, it is noteworthy that the fourth count expressly alleged that IMO's consent to the waiver provision was obtained through economic duress. Generally, rescission is available as a remedy where consent to a transaction is given under duress. (Civ. Code, § 1689, subd. (b)(1).) In view of the allegations of the pleading, we conclude that the trial court properly determined that IMO in effect sought a partial rescission of the contract, and, because no such remedy is recognizable, the fourth count failed to state a cause of action.

(3)IMO argues, however, that the rule against partial rescission does not apply to a contract which is severable and that determination of severability of the waiver clause here presented a triable issue of fact.

Plaintiff IMO is correct in its assertion that total rescission is not required where a contract is divisible or severable. The test in determining severability for purposes of rescission is set forth in *Yeng Sue Chow v. Levi Strauss & Co., supra,* 49 Cal.App.3d 315. "[W]here there is a showing that it was the intention of the parties to treat the agreement as an entire contract, and where it appears that their engagements would not have been entered into except upon the clear understanding*459 that the full object of the contract should be performed, the contract is not divisible [citations]." ( *Id.,* at p. 326.)In other words, if the consideration is apportioned, the contract is divisible. ( *Simmons v. Cal. Institute of Technology, supra.,* 34 Cal.2d 264, 275.)

Here, the complaint specifically alleged that Dow Corning informed IMO that it would transfer title to the property and make the $250,00 loan *only if* IMO would waive any claims it had against Dow Corn-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Cal.App.3d 451
135 Cal.App.3d 451, 185 Cal.Rptr. 341
**(Cite as: 135 Cal.App.3d 451)**

ing. Furthermore, the sales agreement, incorporated into the complaint, provides for the sale of the property and advance of the loan in exchange for waiver of the claims and payment of the purchase price. Thus, solely on the basis of the pleadings, we conclude, as a matter of law, that the parties intended to treat the sales agreement as an entire contract, that the contract is not divisible and that it is therefore not subject to partial rescission.

(4)Nevertheless, IMO's major contention on appeal is that the trial court had the authority to permit differential *enforcement* of the contract under newly enacted Civil Code section 1670.5. (Added by Stats. 1979, ch. 819, § 3, p. 2827.)

Section 1670.5 codifies the judicially developed doctrine of unconscionability and is identical to section 2-302 of the Uniform Commercial Code which has long been adopted by the majority of states.Section 1670.5 authorizes the court, after finding as a matter of law that the contract is unconscionable, in whole or part, to: (1) refuse to enforce the contract; (2) enforce the contract without the unconscionable provision; or (3) limit the application so as to avoid an unconscionable result. FN2The Legislative Committee comment following Civil Code section 1670.5 states that the purpose of the section is to allow "the courts to police explicitly against the contracts or clauses which they find to be unconscionable. In the past such policy has been accomplished by adverse construction of language, by manipulation of the rules of offer*460 and acceptance or by determinations that the clause is contrary to public policy or to the dominant purpose of the contract." The comment further states that the basic test of unconscionability is whether "the clauses involved are so one-sided as to be unconscionable." While unconscionability is not expressly defined, the comment indicates that "[t]he principle is one of prevention of oppression and unfair surprise...."

FN2 Civil Code section 1670.5 provides: "(a) If the court as a matter of law finds the contract or any clause of the contract to

have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. [¶] (b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."

IMO's contention, as we understand it, is: (1) that by merely pleading economic duress it has invoked the court's power to declare paragraph 9 (c) unconscionable; and (2) that such pleading entitled it to a trial on the merits in order to present evidence as to the contract's commercial setting, purpose, and effect. That contention is without merit, if not specious.

Nowhere did IMO allege in the pleading that it sought a declaration of the invalidity of paragraph 9 (c) as an "unconscionable" provision, nor did it allege ultimate facts demonstrating its unconscionability. For instance, there are no allegations that the sales agreement constituted a contract of adhesion whereby one party unfairly took advantage of another's weaker bargaining position or that the waiver provision was unduly one-sided, oppressive, or inherently unfair. In short, plaintiff has failed to allege any facts to bring itself within the purview of section 1670.5.

What IMO does allege is that its *consent* was obtained by economic duress. Business or economic duress "... exists when threats to business or property interests by way of coercion and/or wrongful compulsion are present." ( *U.S. Hertz, Inc. v. Niobrara Farms* (1974) 41 Cal.App. 3d 68, 81 [116 Cal.Rptr. 44], italics omitted.) That however, is not tantamount to a showing of unconscionability. *In other words, the presence of a supposed uncon-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Cal.App.3d 451
135 Cal.App.3d 451, 185 Cal.Rptr. 341
(Cite as: 135 Cal.App.3d 451)

scionable contract provision, such as would admit to differential enforcement, does not logically provide for differential rescission.

Because of our conclusion that Civil Code section 1670.5 is inapplicable, we need not discuss defendant's contentions that section 1670.5 does not apply retroactively and that if it did, it would violate the constitutional prohibition against impairment of contracts.

We next turn to IMO's contention that the trial court abused its discretion in granting the motion without leave to amend. *461

(5)The general rule allows great liberality at all stages of the proceeding in permitting the amendment of pleadings in order to dispose of cases upon their merits. ( Dunzweiler v. Superior Court (1968) 267 Cal.App.2d 569, 576 [73 Cal.Rptr. 331].) However, an appellate court will not interfere with the denial of a motion to amend unless there is an abuse of discretion. ( Security First Nat. Bank v. Rospaw (1951) 107 Cal.App.2d 220, 224 [237 P.2d 76].) The granting of a motion for judgment on the pleadings, without leave to amend, is not an abuse of discretion, where even if leave were granted, the complaint cannot be made to state a cause of action by amendment. ( Stiebel v. Roberts (1941) 42 Cal.App.2d 434, 440 [109 P.2d 22]; see HFH, Ltd. v. Superior Court (1975) 15 Cal.3d 508, 513, fn. 3 [125 Cal.Rptr. 365, 542 P.2d 237].)

Here the trial court granted the motion for judgment on the pleadings without leave to amend after counsel for plaintiff stated that no new facts could be alleged entitling it to the remedy sought. Likewise, on appeal, plaintiff has not suggested any facts with which the complaint could be supplemented in order to change the legal effect of its pleading. Accordingly, it cannot be said that the trial court abused its discretion in granting the motion without leave to amend.

*The Cross-appeal*

(6)The sole issue presented on the cross-appeal concerns the extent of Dow Corning's right to attorneys' fees as provided for by contract. The court's award was less than Dow Corning believes it is entitled to.

The record discloses that there are two contractual provisions which authorize the award of attorneys' fees. The promissory note provides: "If this Note is not paid when due, or if any Event of Default occurs, Borrower hereby promises to pay all costs of collection including, but not limited to, reasonable attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed hereon." The sales agreement provides: "If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the terms hereof, the losing or defaulting party shall pay to the prevailing party reasonable attorneys fees, costs and expenses incurred in connection with the prosecution or defense of such action."

Pursuant to these provisions, Dow Corning sought attorneys' fees for substantially all of the legal work done in the case which relates to establishing *462 the validity of the waiver clause. However, the trial court ruled that Dow Corning was entitled only to attorneys' fees incurred in connection with collection of the note on the cross-complaint, but that it was not entitled to attorneys' fees incurred in litigating the declaratory relief action, because such litigation did not fall within the scope of the attorneys' fee clause contained in the sales agreement.

The court then ordered Dow Corning to apportion its request for attorneys' fees between time spent defending the declaratory relief action on the one hand and for collection of the note on the other. Thereafter, counsel for Dow Corning submitted a declaration stating his inability to apportion time spent between the cross-complaint and the declaratory relief action. He requested attorneys' fees based upon Orange County Rule 23 setting forth reasonable attorneys' fees to be awarded in default cases. On this basis, the court awarded attorneys' fees of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Cal.App.3d 451
135 Cal.App.3d 451, 185 Cal.Rptr. 341
(Cite as: 135 Cal.App.3d 451)

Page 8

$6,000 based solely on the cross-complaint for collection of the note. Dow Corning appealed the award, contending the trial court erred in not awarding the full amount of $110,441.44 requested.

Dow Corning argues that it was entitled to the full amount of the fees requested under the attorneys' fee provision in the note. In doing so it contends that the cause of action for declaratory relief and cause of action for collection on the note are inextricably intertwined and involve exactly the same issue, namely, the validity of the waiver clause. Therefore, the argument goes, the attorneys' fees incurred for litigation of the issue in the main action are recoverable.

As already noted, both the note and the sales agreement contain attorney fee clauses which provide for an award of attorney fees to the prevailing party in any action commenced by either party thereunder. Both documents were executed as part of the transaction whereby IMO took title to the property. The entire litigation between IMO and Dow Corning related to a single issue, IMO's right to relief from the waiver provisions of the sales agreement. Dow Corning prevailed, and it contends therefore that it should have been awarded attorney fees in full and without regard to any purported segregation of the time which was spent.

Dow Corning attempted to collect the note by obtaining a judgment for payment in full. IMO defended solely on the ground that the note obligations should be offset against the damages alleged in the breach of contract action. Dow Corning successfully eliminated this defense by*463 showing that the claims on which IMO relied to establish payment had been waived, and obtained judgment for full payment of the note, without reduction or setoff.

In our view, the cost of litigating the issue raised by IMO's defense constituted part of the cost of collection, and Dow Corning should have been awarded attorney fees on that issue. The fact that the waiver issue was raised by the declaratory relief cause of

action is of no legal significance. IMO argued to the trial court that it was not necessary for Dow Corning to attempt to enforce the waiver provision of the sales agreement in order to collect the note. The short answer to such contention is that Dow Corning was required to litigate the enforceability of IMO's waiver because IMO alleged the invalidity of that waiver as an affirmative defense to the cross-complaint. Both causes of action therefore were inextricably intertwined, as were the documents from which they arose.

The test for determining whether two documents constitute part of a single contract was recently stated in *Huckell v. Matranga* (1979) 99 Cal.App.3d 471 [160 Cal.Rptr. 177], "Under Civil Code section 1642, it is the general rule that several papers relating to the same subject matter and executed as parts of substantially one transaction, are to be construed together as one contract [citation]. Thus, a note, mortgage and agreement of sale constitute one contract where they are a part of the same transaction [citation]." (*Id.*, at p. 481.)

Even a cursory review of the documents demonstrates that the sales agreement and the note involved in this case are part of a single transaction. The sales agreement provides in paragraph 11 that Dow Corning will make a loan to IMO of not more than $250,000 on condition that IMO execute a promissory note in the form attached to the agreement, and that said note should provide that it shall be due and payable not later than December 31, 1976. The note recites that IMO agrees to pay the sums disbursed pursuant to the contemporaneous agreement for purchase and sale between borrower and lender. Thus, the note and the Sales Agreement constitute a single transaction as a matter of law.

The attorney fee clause of the sales agreement provides for an award of reasonable attorney fees to the prevailing party "if either party commences an action against the other to enforce any of the terms hereof ...." By its complaint, IMO commenced an action by which it sought*464 to retain the benefits of the sales agreement, i.e., the property and the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceeds of the loan, while disregarding the waiver provision it found unattractive. Thus, IMO sought both to enforce the sales agreement on its own behalf and to prevent the enforcement by Dow Corning of a portion of that agreement. As so analyzed, the attorney fee clause clearly applies to the entire litigation.

Dow Corning's cross-complaint clearly constituted an action to enforce the sales agreement. Dow Corning incorporated the sales agreement in the cross-complaint, and alleged that the $250,000 promissory note "... was given by IMO as part of IMO's obligation under the purchase and sale agreement." Because the sales agreement provided for the execution of the note, the payment of that note necessarily constituted one of the obligations of the sales agreement, and Dow Corning's suit to collect the note also constituted a suit to enforce the sales agreement. The successful litigation by Dow Corning of the central issue, i.e., enforcement of IMO's waiver, was necessary in order for Dow Corning to prevail on its collection efforts under the cross-complaint; thus the two were clearly interrelated.

That Dow Corning also was forced to defend against IMO's claim that paragraph 9(c) of the sales agreement was unenforceable does not diminish its entitlement to attorney fees. The First District of this court has recently held, in an analogous case, that it is improper to distinguish between "offensive" and "defensive" costs and expenses. In *Wagner v. Benson* (1980) 101 Cal.App.3d 27 [161 Cal.Rptr. 516], the plaintiffs sued Lloyds Bank for misrepresentation and negligence in connection with the handling of a loan transaction, and the bank cross-complained upon promissory notes executed by the plaintiffs. The bank prevailed on the misrepresentation claim, but the trial court limited the bank's recovery of attorney's fees to the reasonable cost of suing on the promissory note. Fees incurred in defending against the fraud claim were not included in the award. The court reversed, holding "... the Bank's collection efforts were interrelated with its defense against the Wagners' fraud al-

legations. Defense of the charge of fraud was necessary in the Bank's efforts to collect the notes ... Attorney's fees incurred by the Bank in defending against the fraud action are compensable under the attorney fees provision of the promissory notes [citations]. The trial court erred in apportioning its award of legal fees between the defense and collection aspects of the Bank's case." ( *Id.*, at p. 37.)*465

In sum, the issues in this case cannot be segregated, and it was error for the trial court to attempt to do so for purposes of the attorney fee award. The finding that IMO was not entitled to a partial rescission of the sales agreement was necessarily dispositive of IMO's defenses to any obligation on the note under provisions of both the sales agreement and the note.

Based upon the foregoing analysis, we hold that the judgment in Dow Corning's favor, as to the central issue litigated, entitled it to an award of attorney's fees for all of the time spent on the case by its attorneys. Although there was evidence offered on the reasonable value of such time, the trial court did not make a finding thereon. As a consequence, an appropriate motion to the trial court will be necessary to obtain an order for fees representing the value of the entire time devoted to the case by Dow Corning's attorneys with no segregation of such time as to the promissory note itself.

### DISPOSITION

The award of attorney's fees appearing on line 3, page 3 of the judgment is reversed with directions that the trial court, upon appropriate motion by Dow Corning, fix a reasonable attorney's fee consistent with the holding above recited, and with further directions that it modify the judgment on line 5, page 3 thereof, to reflect an aggregate amount which includes the corrected award of attorney's fees. Otherwise, the judgment is affirmed, and Dow Corning is entitled to reasonable attorney's fees and costs on appeal likewise to be fixed by the trial court under procedure appropriate for that purpose.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 Cal.App.3d 451
135 Cal.App.3d 451, 185 Cal.Rptr. 341
**(Cite as: 135 Cal.App.3d 451)**

Morris, P. J., and Kaufman, J., concurred.**466**
Cal.App.4.Dist.
IMO Development Corp. v. Dow Corning Corp.
135 Cal.App.3d 451, 185 Cal.Rptr. 341

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**15**

*Westlaw.*

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

Page 1

▷

DENNIS J. IZZI et al., Plaintiffs and Respondents,
v.
MESQUITE COUNTRY CLUB et al., Defendants and Appellants.
No. E002372.

Court of Appeal, Fourth District, Division 2,
California.

Nov 6, 1986.

SUMMARY

In a class action for fraudulent concealment, breach of statutory duty, negligence and breach of fiduciary duty brought by the purchasers of condominiums against the sellers, the trial court denied defendants' motion to compel arbitration. The action arose from a purchase agreement for a condominium containing an arbitration agreement providing for the arbitration of disputes arising in connection with the agreement, which the trial court found not to apply to the pending tort action. The trial court alternatively found that a class action lawsuit could not be ordered into arbitration. (Superior Court of Riverside County, No. I-43298, Richard V. Lee, Temporary Judge. [FN*])

The Court of Appeal reversed with directions. The court held that the arbitration agreement applied to the pending tort action since any tort liability had its roots in the vendor-purchaser relationship created by the purchase and sale agreement containing the arbitration clause. The court also held that the purchase contract was not adhesive in nature, and, even if it were, the arbitration agreement was still enforceable since there was nothing in the arbitration provision conflicting with the reasonable expectations of an ordinary person, the arbitration agreement was not unduly oppressive or unconscionable, and the agreement did not provide for an arbitral forum presumptively biased against either party. Further, plaintiff could not avoid the terms of the contract on the grounds that he had failed to read it before signing it, and the arbitration agreement could be applied to named defendants who were not signatory to the purchase agreement since they had effectively waived any objection they might have asserted to arbitration of the dispute in the trial court and had expressly consented to arbitration at

oral argument. Finally, the court held that trial courts possess the authority to order classwide arbitrations in appropriate cases, and the pending case was especially appropriate for class action treatment since the individual compensatory damages claim per member would be relatively small and *1310 based on a standardized document subject to common proof, while the punitive damages claim was quite large, making multiple litigation of the claims inefficient and posing the danger of being both duplicative and cumulative.

> FN* Pursuant to California Constitution, article VI, section 21. (Opinion by Kaufman, J., with Campbell, P. J., and Dorr, J., [FN*] concurring.)

> FN* Assigned by the Chairperson of the Judicial Council.

HEADNOTES

Classified to California Digest of Official Reports

(1) Appellate Review § 21--Decisions Appealable--Order Denying Motion to Compel Arbitration.
A trial court's order denying a motion seeking to compel arbitration under an arbitration clause contained in a purchase agreement for a condominium was clearly appealable on an interlocutory basis under Code Civ. Proc., § 1294, subd. (a), providing for the appeal of orders denying or dismissing motions to compel arbitration.

(2a, 2b) Arbitration and Award § 3--Liberal Interpretation of Agreements.
Arbitration is a favored method of dispute resolution and agreements to arbitrate disputes are liberally interpreted. Arbitration should be upheld unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute. There is a strong public policy in favor of arbitration agreements, and the law is designed to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.

(3) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability of Tort Claims.
In the particular situation where contracts provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

arbitration for any controversy arising out of or relating to a contract, such arbitration agreements are sufficiently broad to include torts as well as contractual liabilities so long as the tort claims have their roots in the relationship between the parties which was created by the contract. Thus, in an action for fraudulent concealment, breach of statutory duty, negligence, and breach of fiduciary duty, arising out of a purchase agreement for a condominium, the trial court erred in denying a motion to compel arbitration under an arbitration agreement contained in the contract, where the sellers' alleged tort liability for failure to disclose that buyers of condominiums would be subject to assessments to pay for curbs, gutters, sewers, flood. **1311 control structures and the like had its roots in the vendor-purchaser relationship created by the purchase and sale contract containing the arbitration clause. Further, the "in connection with" language of the arbitration agreement was not limited to disputes involving aspects of the sale itself, since the question as to whether critical information was intentionally withheld during the negotiation and formation of an agreement was clearly "connected" with that agreement.

[Claim of fraud in inducement of contract as subject to compulsory arbitration clause contained in contract, note, 11 **A.L.R.4th** 744. See also Cal.Jur.3d, Arbitration and Award, § 7; Am.Jur.2d, Arbitration and Award, § 57.]

(4) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Language of Arbitration Clause.
An arbitration clause contained in a purchase agreement for a condominium, which related to attorney fees and arbitration and which defined the category of covered disputes in terms of "any arbitration or legal action instituted between the seller and the buyer," did not contemplate the filing of a legal action as an alternative to arbitration and was not therefore ambiguous; the words "or legal action" merely referred to the recovery of costs and attorney fees in cases in which arbitration had not been pursued.

(5a, 5b) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Contract of Adhesion.
An arbitration clause contained in a purchase agreement for a condominium was not unenforceable as appearing in a contract of adhesion or unenforceable as unconscionable or interfering with the buyers' reasonable expectations under the contract. Although the contract was standardized in form, that alone did not establish it as adhesive in character, and there was nothing establishing that buyers of the condominium units were offered the purchase agreements on a take it or leave it basis. No presumption was warranted that the buyers had no choice or power to negotiate as to the terms of their purchase agreement or that they could not obtain comparable or superior terms on a suitable condominium nearby. Further, even if the purchase agreement were adhesive, the arbitration agreement was enforceable; since the arbitration provision did not conflict with the reasonable expectations of an ordinary person, it was not unduly oppressive or unconscionable, and it did not provide for an arbitral forum presumptively biased against either party.

(6a, 6b) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Effect of Failure to Read Contract Before **1312 Signing.
In an action to compel arbitration arising under the arbitration clause of a purchase agreement for a condominium, the buyer's failure to read the arbitration clause before signing the contract did not render the arbitration agreement inapplicable, under the general rule that one who assents to a contract may not avoid its terms on the ground that he failed to read it before signing it.

(7) Contracts § 8--Legality--Contract Contravening Public Policy--Contract of Adhesion.
A contract of adhesion is a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it. However, even if a contract is adhesive in nature, the contract remains fully enforceable unless all or part of the contract falls outside the reasonable expectations of the weaker party or it is unduly oppressive or unconscionable under applicable principles of equity.

(8) Arbitration and Award § 3--Arbitration Agreements--Application of Agreement to Nonsignatories.
An arbitration clause contained in a purchase agreement for a condominium was applicable to named defendants in an action for fraudulent concealment, breach of statutory duty, negligence, and breach of fiduciary duty arising under the purchase agreement, even though certain of the defendants were not signatory to the purchase agreement. All of the defendants joined in a motion to compel arbitration and sought reversal of the order denying arbitration on appeal, thereby effectively

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

waiving any objection they might have asserted to arbitration of the dispute, and at oral argument the defendants expressly consented through counsel to arbitration. Although the situation of Doe defendants whose identity might have been ascertained in the future was not actually known, those defendants would presumably be the agents or employees of other defendants, and subject to the agreement.

(9) Appellate Review § 158--Determination and Disposition of Cause-- Alternative Ground for Trial Court Decision.

To the extent a trial court's statement that it was unable to find any cases in which a class action lawsuit was ordered into arbitration represented an alternative ground for the court's denial of defendants' motion to compel arbitration, and to the extent that the question of classwide arbitrability of a dispute would be likely to arise on remand, the appellate court was obliged to dispose of the issue (Code Civ. Proc., § 43).

(10) Arbitration and Award § 14--Arbitration Proceedings--Classwide Arbitration.

Trial courts possess authority to order classwide arbitrations *1313 in appropriate cases within the penumbra of the express statutory power courts retain to order arbitrations consolidated (Code Civ. Proc., § 1281.3). Further, an action for fraudulent concealment, breach of statutory duty, negligence, and breach of fiduciary duty, arising under purchase agreements for condominiums, and filed as a class action, was especially appropriate for class action treatment since the individual compensatory damages claim per member was relatively small and based on a standardized document subject to common proof, while the punitive damages claim was quite large, and since multiple litigation of the damage claims would be inefficient and pose the danger of being both duplicative and cumulative. Further, there was no compelling reason why a classwide arbitration could not proceed since the class was relatively small, notice would not prove difficult, the merits of the case were straightforward, and neither party contended that prejudice would result.

COUNSEL

Thompson & Colegate, Robert B. Swortwood and Sharon J. Waters for Defendants and Appellants.

Schlecht, Shevlin & Shoenberger and Jon A. Shoenberger for Plaintiffs and Respondents.

KAUFMAN, J.

Defendants Mesquite Country Club, James F. and Laura Temple, and Nellie Swope appeal from an order denying their petition to compel arbitration of a class action instituted by plaintiffs Dennis J. and Rhea Ann Izzi. In denying the petition the court, stated: "The Court finds that the Arbitration Clause contained in the escrow [sic] agreement does not apply to the type of action now before the Court. [¶] Further the Court is unable to find any cases in which a class action lawsuit was ordered into arbitration. [¶] In making this decision the Court is aware of the policy favoring arbitration."

Defendants contend the court erred in finding the arbitration clause inapplicable to the action brought by plaintiffs. Defendants further argue the court erred in apparently concluding that, since the action was pleaded as a class action, it could not be subject to arbitration. In defending the court's *1314 denial of arbitration, plaintiffs controvert defendants' contentions and further argue that the arbitration clause is unenforceable under the adhesion doctrine, that plaintiffs failed to read the arbitration clause and therefore have not knowingly consented to arbitral jurisdiction, and finally that there are in this action parties defendant who were not signatories to the agreement containing the arbitration clause and who therefore cannot properly be compelled to arbitrate.

Facts [FN1]

In September 1984, plaintiffs Dennis J. and Rhea Ann Izzi purchased a condominium in the Mesquite Country Club development in Palm Springs. In purchasing, plaintiffs signed a "Combined Deposit Receipt, Escrow Instructions and Purchase Agreement" (hereafter purchase agreement). The purchase agreement was also signed by James F. Temple, president of defendant Mesquite Country Club, Inc., and Nellie Swope, denominated in the agreement as "Sales Representative."

FN1 The facts in this matter are drawn from the complaint and documents supporting and opposing the petition to compel arbitration.

The purchase agreement contains the following paragraph: "12. *Attorneys' Fees, Arbitration*. In the event of any arbitration or legal action instituted between Seller and Buyer in connection with this Agreement, the prevailing party shall be entitled to recover from the losing party all of its costs and expenses, including court costs and reasonable attorney's fees. Any such dispute shall be settled by arbitration to be held at Seller's option in Orange or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

Riverside Counties under the American Arbitration Association rules. Any award or decision shall be final and binding, and judgment may be entered thereon in the applicable court."

In March 1985, plaintiffs filed a complaint seeking compensatory and punitive damages on allegations of fraudulent concealment, breach of statutory duty, negligence, and breach of fiduciary duty. The gravamen of the complaint is defendants' alleged failure to disclose to condominium buyers an agreement defendants had allegedly made with the City of Palm Springs to form a special assessment district for the purpose of relieving defendants " ... of the cost of constructing certain curbs, gutters, blacktop paving, sewer lines, bike paths, sidewalks, and flood control structures within the Mesquite Country Club development and to impose the cost of said improvements upon the purchasers of condominium units within said development." Each of plaintiffs' four causes of action is based on this alleged failure to disclose. The complaint further alleges the suppression of information about the assessment district was intended by defendants to induce plaintiffs to purchase condominiums in the development. *1315

Plaintiffs filed the action as individuals and on behalf of all others similarly situated, and the complaint appears adequately to plead the necessary foundational facts to support an eventual request for class certification. Petitioners estimate the number of affected purchasers who might join the class as approximately 140 and request compensatory damages in the amount of $3,000 per plaintiff and punitive damages of $5 million against each defendant.

(1)(See fn. 2.) Neither party reports, nor does the record indicate, that a motion for class certification was filed or heard before this appeal. [FN2]

FN2 The court's order denying defendants' motion seeking to compel arbitration is clearly appealable on an interlocutory basis. (Code Civ. Proc. § 1294, subd. (a); *Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1017, fn. 2 [225 Cal.Rptr. 895]; see *Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 353 [133 Cal.Rptr. 775, 84 A.L.R.3d 343].)

*Discussion*
By way of preface we observe plaintiffs' complaint sounds solely in tort. Defendants' alleged fraud in the inducement is not urged as a defense to any contract claim and no rescissory remedy is sought.

1. *Applicability of Arbitration Clause*
The arbitration clause at issue in this matter provides that "[a]ny such dispute shall be settled by arbitration ...." (Italics added.) The words "[a]ny such dispute" are obviously delimited by the language in the preceding sentence, "any ... action instituted between Seller and Buyer *in connection with* this Agreement ...." (Italics added.) Defendants' petition to compel arbitration thus required the trial court to determine whether plaintiffs' tort claims for fraudulent concealment, negligence, and breach of statutory and fiduciary duties arose "in connection with" the parties' agreement for purchase and sale of the condominium.

(2a) Arbitration is a favored method of dispute resolution and agreements to arbitrate disputes are liberally interpreted. "In California, the general rule is that arbitration should be upheld unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute. (*Pacific Inv. Co. v. Townsend* (1976) 58 Cal.App.3d 1, 910 [129 Cal.Rptr. 489].) (3) In the particular situation where contracts provide arbitration for "'any controversy ... arising out of or relating to the contract ...'" the courts have held such arbitration agreements sufficiently broad to include tort, as well as contractual, liabilities so long as the tort claims have their roots in the relationship between the parties which *1316 was created by the contract." (*Berman [v. Dean Witter & Co., Inc.* (1975)] 44 Cal.App.3d [999,] 1003 [119 Cal.Rptr. 130]; see also *Lewsadder v. Mitchum, Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255, 259 [111 Cal.Rptr. 405]; *Crofoot v. Blair Holdings Corp.* (1953) 119 Cal.App.2d 156, 182 [260 P.2d 156].)" (*Bos Material Handling, Inc. v. Crown Controls Corp.* (1982) 137 Cal.App.3d 99, 105-106 [186 Cal.Rptr. 740].)

The factual basis for plaintiffs' tort claims in this case persuades us the arbitration clause applies to such claims and the court erred in concluding otherwise. In the first place, defendants' alleged tort liability for failure to disclose that buyers of condominiums would be subject to assessments to pay for curbs, gutters, sewers, flood control structures and the like would have its roots in the purchaser-vendor relationship created by the purchase and sale contract containing the arbitration clause. (See *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1003 [119 Cal.Rptr. 130].) Indeed,

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

plaintiffs' entire complaint is predicated on the very claim that vital information was intentionally withheld by defendants in the communications between the parties leading up to that agreement. In this regard, the complaint specifically alleges that if plaintiff class members had been aware of the existence of the facts not disclosed by defendants, they would not have entered into the contract.

We find unpersuasive plaintiffs' contention the "in connection with" language should be limited in application to disputes involving deposit money, completion of the condominium unit, corrective work, or other aspects of the sale itself. A question as to whether critical information was intentionally withheld during the negotiation and formation of an agreement is clearly "connected" with that agreement. (4)In addition, we reject plaintiffs' argument that, because the arbitration clause defines the category of covered disputes in terms of "any arbitration *or legal action* instituted between Seller and Buyer" (italics added), the provision contemplates the filing of a legal action as an alternative to arbitration and is therefore ambiguous. While the language is somewhat awkward, as defendants correctly point out, the words "or legal action" in that sentence merely refer to the recovery of court costs and attorney's fees in cases in which arbitration has not been pursued. It does not limit the applicability of the clause or render it ambiguous.

Plaintiffs urge the decision of the first division of this district in *Weeks v. Crow* (1980) 113 Cal.App.3d 350 [169 Cal.Rptr. 830] compels us to affirm the trial court's order denying arbitration. Not so. The arbitration clause in *Weeks* arose in a medical services contract between an expectant father and mother and the hospital the mother entered for childbirth. In *1317 holding the arbitration clause inapplicable to a malpractice action against the hospital for the wrongful death of the newborn baby, the court's analysis focused on the fact that the patient who was to receive services under the contract was the mother, not the newborn baby. The court concluded the arbitration clause did not cover an action for allegedly negligent care and treatment of the baby. ( *Id.*, at pp. 352, 353.)

Thus, *Weeks* is legally distinguishable. In *Weeks* the hospital's attempt to compel arbitration of the wrongful death claim was rejected because the baby, was at most only a third party decedent, beneficiary of the contract for medical services between the hospital and the parents. In the instant case, plaintiffs are primary parties to the contract and

direct participants in the relationship created by that contract. Their right of action clearly arises "in connection with" that contractual relationship.

Having determined the court erred in concluding plaintiffs' complaint was outside the scope of the arbitration clause, we turn to plaintiffs' contentions that the arbitration clause is otherwise unenforceable. These arguments were included in plaintiffs' opposition to the petition to compel arbitration but were not specifically ruled on by the court in denying the petition.

### 2. *Enforceability of Arbitration Clause*

(5a)Plaintiffs principally contend the arbitration clause is unenforceable even if applicable to their complaint because it appears in a contract of adhesion and is either unconscionable or interferes with their reasonable expectations under the contract. (6a)In a related argument, plaintiffs assert that plaintiff Dennis J. Izzi failed to read the arbitration clause before signing the contract and that he therefore lacked the requisite knowledge to give informed consent to arbitral jurisdiction over the matter. (See generally, *Wheeler v. St. Joseph Hospital, supra,* 63 Cal.App.3d at pp. 354-367.)

(7)A contract of adhesion has been defined as "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." ( *Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781], cited in *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817 [171 Cal.Rptr. 604, 623 P.2d 165].) Even if the purchase agreement form furnished to plaintiffs by defendants was adhesive in nature, the contract would remain fully enforceable unless (1) all or part of the contract fell outside the reasonable expectations of the weaker party or (2) it was unduly oppressive or unconscionable under applicable principles of equity. ( *Keating v. Superior Court* (1982) 31 Cal.3d 584, 594 [*1318 183 Cal.Rptr. 360, 645 P.2d 1192]; *Wheeler v. St. Joseph Hospital, supra,* 63 Cal.App.3d at p. 357.)

(5b)The contract does appear to be standardized in form but that alone does not establish it is adhesive in character. There is nothing in the record establishing that buyers of the condominium units were offered the purchase agreements on a "take or leave it" basis. The assessment of the relative bargaining power among contracting parties is an imperfect discipline. The record is silent on the matter and no presumption is warranted that plaintiffs here had no choice or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

power to negotiate as to the terms of their purchase agreement or that they could not obtain comparable or superior terms on a suitable condominium nearby. (See *Smith v. Westland Life Ins. Co.* (1975) 15 Cal.3d 111, 122, fn. 12 [123 Cal.Rptr. 649, 539 P.2d 433].)

Even assuming arguendo the purchase agreement was adhesive in nature, we would still view it as enforceable. There is nothing in the circumstances of this case from which it appears the arbitration provision conflicts with the reasonable expectations of an ordinary person or is unduly oppressive or unconscionable. The challenged arbitration clause does not provide for an arbitral forum presumptively biased against either party. (See *Hope v. Superior Court* (1981) 122 Cal.App.3d 147, 154 [175 Cal.Rptr. 851].) The rules of the American Arbitration Association [FN3] specified by the clause as governing the resolution of disputes are generally regarded to be neutral and fair. In other words, even if defendants did have bargaining power superior to that of plaintiffs, the application of the arbitration clause to this dispute does not engender any unjust advantage to defendants. The invocation of the adhesion doctrine is unwarranted on these facts. [FN4]

> FN3 We take judicial notice of the Commercial Arbitration Rules pursuant to Evidence Code sections 459, subdivision (a), and 452, subdivision (g). These rules are available from the regional office of the American Arbitration Association, 443 Shatto Place, Los Angeles, Cal. 90020.

> FN4 Plaintiffs' reliance on our opinion in *Wheeler v. St. Joseph Hospital, supra*, 63 Cal.App.3d 345 is misplaced. There the application of the adhesion concept was necessary to address the unequal bargaining power between a hospital and its patients. We viewed the standardized "Conditions of Admission" form used by the hospital to be oppressive in nature: "To the ordinary person, admission to a hospital is an anxious, stressful, and frequently a traumatic experience. ... [T]he patient normally feels he has no choice but to seek admission to the designated hospital and to accede to all of the terms and conditions for admission .... Medical malpractice, much less arbitration of a medical malpractice claim, would hardly be a subject that enters the patient's mind." ( *Id.*, 63 Cal.App.3d at p. 360.) No such exigent imbalance of bargaining power

is likely to occur in the context of land purchase agreements generally, nor do we detect such condition in the present record.

(6b)Since plaintiffs' adhesion contention has been rejected, the general rule applies that one who assents to a contract cannot avoid its terms on the ground he failed to read it before signing it. ( *1319Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [131 Cal.Rptr. 882, 552 P.2d 1178]; *Ramirez v. Superior Court* (1980) 103 Cal.App.3d 746, 754 [163 Cal.Rptr. 223]; *Bauer v. Jackson* (1971) 15 Cal.App.3d 358, 370 [93 Cal.Rptr. 43], and cases there cited; cf. *Wheeler v. St. Joseph Hospital, supra*, 63 Cal.App.3d at pp. 359-360.) Accordingly, plaintiffs' argument that they did not consent to arbitration because plaintiff Dennis J. Izzi failed to read the arbitration clause is not meritorious.

(8)Plaintiffs' attempt to avoid arbitration by arguing the arbitration clause cannot be applied to named defendants who were not signatory to the purchase agreement requires only cursory discussion. Defendants James F. Temple, Nellie Swope and Laura Temple, the latter being the only named defendant who did not sign the agreement at least in a representative capacity, all joined in the motion to compel arbitration and on appeal seek reversal of the order denying arbitration. They have thereby effectively waived any objection they might have asserted to arbitration of the dispute and at oral argument through counsel expressly consented to arbitration. While the situation of the Doe defendants whose identity might be ascertained in the future is not actually known, such other defendants would presumably fall within the categorical description provided in paragraph 4 of plaintiffs' complaint: "At all times herein mentioned, each Defendant was the *agent and employee of the remaining Defendants* and was acting within the purpose and scope of his, her or its said agency or employment." (Italics added.) Thus such Doe defendants presumably would be subject to the agreement. The argument that the arbitration clause cannot be enforced against the nonsignatory defendants is thus largely without substance.

### 3. Classwide Arbitration

After stating its erroneous conclusion the arbitration clause was inapplicable to the instant dispute, the court added: "[T]he Court is unable to find any cases in which a class action lawsuit was ordered into arbitration." (9)To the extent this statement represents an alternative ground for the court's denial of arbitration and, in addition, to the extent the question of classwide arbitrability of this dispute is likely to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

arise on remand, we are obliged to dispose of the issue. (Code Civ. Proc., § 43.)

Initially, we note there is strong public policy favoring both class actions and arbitrations. Both are regularly acknowledged to be valuable procedures for expediting dispute resolution and ameliorating the burdens of formal litigation.

"[A]rbitration is generally considered to be a mutually advantageous process, providing for resolution of disputes in a presumptively less costly, *1320 more expeditious, and more private manner by an impartial person or persons typically selected by the parties themselves. (See *Madden v. Kaiser Foundation Hospitals, supra, 17 Cal.3d 699*.)" (*Keating v. Superior Court, supra, 31 Cal.3d at p. 595*.) (2b)"There is a strong public policy in favor of arbitration agreements and the law is designed to encourage persons 'who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.' (*Utah Const. Co. v. Western Pac. Ry. Co.* [1916 ]174 Cal. 156, 159 ....) Arbitration provides a means of giving effect to the intention of the parties [and] easing court congestion ...." (*Vernon v. Drexel Burnham & Co.* (1975) 52 Cal.App.3d 706, 715 [125 Cal.Rptr. 147].)

Judicial praise for the class action procedure has been equally fervent. "This court has repeatedly emphasized the importance of the class action device for vindicating rights asserted by large groups of persons. We have observed that the class suit "both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation. ...'" [Citation omitted.] Denial of a class action in cases where it is appropriate may have the effect of allowing an unscrupulous wrongdoer to 'retain[] the benefits of its wrongful conduct.' (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 808 ....) And, as we noted in *La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 877 ....: 'Controversies involving widely used contracts of adhesion present ideal cases for class adjudication; the contracts are uniform, the same principles of interpretation apply to each contract, and all members of the class will share a common interest in the interpretation of an agreement to which each is a party.'" (*Keating v. Superior Court, supra, 31 Cal.3d at p. 609*, fn. omitted.)

Plaintiffs contend, "An order compelling arbitration in this case would prevent the maintenance of a class

action thus abrogating the public policy favoring such actions." For their part defendants contend that plaintiffs "... should not be allowed to avoid their agreement to arbitrate by asserting a class action lawsuit." Thus both parties apparently see class actions and arbitrations as irreconcilably incompatible. As framed by the parties the question for our disposition is which public policy should prevail over the other.

The parties' conception that class actions and arbitrations are necessarily and inherently incompatible appears to find considerable support in judicial precedent. (See, e.g., *Keating v. Superior Court, supra, 31 Cal.3d at pp. 609-610*; *Vernon v. Drexel Burnham & Co., supra, 52 Cal.App.3d at pp. 711, 715-716*; see also *Harris v. Shearson Hayden Stone, Inc.* (1981) 82 App.Div.2d 87 [44] N.Y.S.2d 70, 74-76].) Each of the cited cases *1321 determined the public policy favoring arbitration *prevailed* over the policy favoring class actions. However, we are not entirely convinced the two procedures, both desirable, are irreconcilable. We entertain some thought that in cases in which the class action and arbitration devices would both appear to be appropriate and useful, recognition of a combined "classwide arbitration" mechanism, if properly administered and judiciously applied, might possibly preserve the essential values of both devices.

(10)Indeed, whether or not our thoughts in this regard are justified, the law in California has already recognized the existence of a classwide arbitration procedure. In *Keating v. Superior Court, supra, 31 Cal.3d 584*, reversed on other grounds *sub nom. Southland Corp. v. Keating* (1984) 465 U.S. 1 [79 L.Ed.2d 1, 104 S.Ct. 852], the Supreme Court of California concluded that trial courts possess authority to order classwide arbitrations in appropriate cases. This authority was recognized within the penumbra of the express statutory power courts retain to order arbitrations consolidated. (See Code Civ. Proc., § 1281.3.) The court observed: "If the alternative in a case of this sort is to force hundreds of individual [parties] each to litigate its cause ... in a separate arbitral forum, then the prospect of classwide arbitration, for all its difficulties, may offer a better, more efficient, and fairer solution. Where that is so, and gross unfairness would result from the denial of opportunity to proceed on a classwide basis, then an order structuring arbitration on that basis would be justified." (*Keating, supra, 31 Cal.3d at p. 613*.)

The "difficulties" referred to by the *Keating* court in

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

sanctioning classwide arbitrations involve the undetermined extent to which a court must supervise a classwide arbitration "... in order to safeguard the rights of absent class members to adequate representation and in the event of dismissal or settlement." (*Ibid.*) We would add that courts should refrain from unnecessary intrusions which would impair the arbitration's function as a speedy, "... complete proceeding, without resort to court facilities ...." ( *East San Bernardino County Water Dist. v. City of San Bernardino* (1973) 33 Cal.App.3d 942, 950 [109 Cal.Rptr. 510], quoting from *Application of Katz* (1957) 3 App.Div.2d 238 [160 N.Y.S.2d 159, 161].)

Subsequent to the *Keating* decision, which involved a class numbering in the hundreds, the first division of this district has ordered classwide arbitration in a securities margin accounts dispute involving a class numbering in the hundreds of thousands. [FN5] ( *Lewis v. Prudential Bache Securities, Inc.* (1986) 179 Cal.App.3d 935, 945-946 [225 Cal.Rptr. 691].) The court *1322 stated: "The alternative to class arbitration here is to force each Prudential customer to individually arbitrate claims, most of which probably cannot justify the time and money required to prove. This case appears to offer no great difficulty in adapting arbitration to fit the class action mold, with adequate judicial supervision over the class aspects." ( *Id.,* 179 Cal.App.3d at p. 946.)

    FN5 Plaintiffs' complaint estimates there would be about 140 potential class members in the present case.

The present case would appear to be an especially appropriate one for class action treatment because the individual compensatory damages claim per member is relatively small ($3,000) and is based on a standardized document subject to common proof, while the punitive damages claim is quite large ($5 million). Multiple litigation of these damage claims would be inefficient in the extreme and, in respect to individual punitive damage claims, would pose the danger of being both duplicative and cumulative.

We are aware of no compelling reason why a classwide arbitration cannot proceed in this case. The class is relatively small, the provision of notice should not prove difficult, the merits of the case are rather straightforward, and neither party contends prejudice will result. However, the record is decidedly sparse and the court below is therefore in a better position than this court to determine the practicability of a classwide arbitration procedure.

We shall therefore remand the case to the trial court for that determination. The court may limit its initial decision on remand to the specific issue of whether or not the action should proceed on a classwide arbitration basis. Such determination may be made on the court's own motion prior to any motion from the parties seeking certification of the class. Alternatively, the court may withhold such determination until one is sought by the parties. (See generally 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 222, pp. 271-273.)

If the court deems the classwide arbitration practicable, it may stay its order compelling arbitration pending its determination of the class action issues, including certification of the class, provision of notice and any discovery problems involved therein. Alternatively, if the court deems it preferable, it may order arbitration and reserve jurisdiction over these matters. [FN6] *1323

    FN6 In theory at least it seems possible the court could order class action issues determined, at least in the first instance, by the arbitrator. Arbitrators are authorized by law to determine all necessary questions to resolve the controversy submitted including questions of law; it is also within the province of the arbitrator to decide which questions are necessary for resolution. ( *Orpustan v. State Farm Mut. Auto. Ins. Co.* (1972) 7 Cal.3d 988, 991-992 [103 Cal.Rptr. 919, 500 P.2d 1119]; see Code Civ. Proc., § 1280, subd. (c).) Delegating the class certification and notice functions to the arbitrator in the first instance subject to due process review by the court might enhance the integrity and autonomy of the classwide arbitration device. (See Note, *Classwide Arbitration: Efficient Adjudication or Procedural Quagmire?* (1981) 67 Va.L.Rev. 787, 811-813.) However, frequent interruption of the arbitration proceeding for due process review of the arbitrator's class action determinations would be disruptive and largely destructive of the benefits to be had from arbitration, so at least until greater experience with these problems has been had, judicial determination of the class action problems would seem preferable.

### Disposition
The order denying defendants' petition to compel arbitration is reversed and the trial court is directed to file a new order granting the petition. The court may

186 Cal.App.3d 1309
186 Cal.App.3d 1309, 231 Cal.Rptr. 315
(Cite as: 186 Cal.App.3d 1309)

on its own motion, and shall on the motion of either party, determine whether a classwide arbitration procedure is practicable in this case. If it determines such procedure practicable, the court shall either stay its order compelling arbitration until it has resolved the class action issues or, alternatively, retain jurisdiction over the class action issues and discovery necessary thereto.

Campbell, P. J., and Dorr, J., [FN*] concurred.
*1324

FN* Assigned by the Chairperson of the Judicial Council.

Cal.App.4.Dist.,1986.

Izzi v. Mesquite Country Club

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**16**

Westlaw.

137 P.3d 914                                                                        Page 1
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
**(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)**

▷
Kearney v. Salomon Smith Barney, Inc.
Cal.,2006.

Supreme Court of California
Kelly KEARNEY et al., Plaintiffs and Appellants,
v.
SALOMON SMITH BARNEY, INC., Defendant
and Respondent.
**No. S124739.**

July 13, 2006.
Rehearing Denied Sept. 27, 2006.

**Background:** Two California clients of financial
institution filed a putative class action against the
institution, seeking injunctive relief, damages, and
restitution, alleging that numerous telephone calls
made to brokers in the institution's Georgia office
were recorded without the clients' consent, in viola-
tion of California statute. The Superior Court, San
Francisco County, No. 412197,A. James Robertson
II, J., sustained the institution's demurrer to the
complaint without leave to amend and dismissed
the action. Clients appealed. The Court of Appeal
affirmed, and the Supreme Court granted review,
superseding the opinion of the Court of Appeal.

**Holdings:** The Supreme Court, George, C.J., held
that:
(1) institution was subject to jurisdiction of Califor-
nia courts;
(2) applying California privacy law did not violate
due process;
(3) applying California privacy law did not violate
commerce clause;
(4) California statute prohibiting recording of tele-
phone conversation without consent of all parties
applied to conversation in which only one party
was in California;
(5) Georgia statutes prohibiting recording of tele-
phone conversation without consent of one party
applied to conversation in which only one party
was in Georgia;

(6) California law applied to determine whether re-
cording of conversations constituted unlawful inva-
sion of privacy; and
(7) clients could not recover damages or restitution.

Judgment of the Court of Appeal affirmed in part
and reversed in part.

Opinion, 11 Cal.Rptr.3d 749, superseded.

West Headnotes

**[1] Appeal and Error 30 ☞917(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k915 Pleading
                30k917 Demurrers
                    30k917(1) k. In General. Most
Cited Cases
On appeal from a judgment of dismissal after the
sustaining of a demurrer without leave to amend,
the Supreme Court assumes the truth of all well-
pleaded factual allegations of the complaint.

**[2] Corporations 101 ☞665(1)**

101 Corporations
    101XVI Foreign Corporations
        101k663 Actions by or Against
            101k665 Jurisdiction
                101k665(1) k. Facts and Circum-
stances Conferring Jurisdiction. Most Cited Cases
Financial institution, which was sued by California
clients for allegedly recording clients' calls to its of-
fice in Georgia, was subject to jurisdiction of Cali-
fornia courts under both general and specific cat-
egories of personal jurisdiction, since institution
maintained numerous offices and did extensive
business in California, and clients' action arose dir-
ectly out of institution's business activity in Califor-
nia.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                           Page 2
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
**(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)**

**[3] Constitutional Law 92 ⟶4462**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
         92XXVII(G)23 Search, Seizure, and Confiscation
            92k4462 k. Electronic Surveillance or Eavesdropping. Most Cited Cases
   (Formerly 92k319.5(2))

**Telecommunications 372 ⟶1440**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(A) In General
         372k1435 Acts Constituting Interception or Disclosure
            372k1440 k. Persons Concerned; Consent. Most Cited Cases

**Torts 379 ⟶326**

379 Torts
   379IV Privacy and Publicity
      379IV(A) In General
         379k326 k. Constitutional, Statutory, and Local Regulation. Most Cited Cases
Application of California privacy law requiring both parties' consent to recording of telephone conversation to California clients' action against financial institution for recording calls from California to office in Georgia, where only one party's consent was necessary, did not exceed constitutional limits imposed by federal due process clause on a state's legislative jurisdiction; California had an interest in protecting privacy of telephone conversations of California residents while they were in California. U.S.C.A. Const.Amend. 14; West's Ann.Cal.Penal Code § 632.

**[4] States 360 ⟶4**

360 States
   360I Political Status and Relations

360I(A) In General
      360k4 k. Status Under Constitution of United States, and Relations to United States in General. Most Cited Cases
The federal system contemplates that individual states may adopt distinct policies to protect their own residents and generally may apply those policies to businesses that choose to conduct business within that state.

**[5] States 360 ⟶18.81**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.81 k. Telecommunications; Wiretap. Most Cited Cases

**Telecommunications 372 ⟶1433**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(A) In General
         372k1433 k. Preemption. Most Cited Cases

**Torts 379 ⟶328**

379 Torts
   379IV Privacy and Publicity
      379IV(A) In General
         379k328 k. Preemption. Most Cited Cases
Application of California privacy law requiring both parties' consent to recording of telephone conversation to California clients' action against financial institution for recording calls from California to office in Georgia, where only one party's consent was necessary, was not preempted by federal law relating to recording of telephone conversations. 18 U.S.C.A. § 2511(2)(d); West's Ann.Cal.Penal Code § 632.

**[6] Commerce 83 ⟶59**

83 Commerce
   83II Application to Particular Subjects and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914
Page 3
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

Methods of Regulation
   83II(B) Conduct of Business in General
      83k59   k.   Telecommunications.   Most
Cited Cases

**Telecommunications 372 ☜1440**

372 Telecommunications
   372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
      372X(A) In General
         372k1435 Acts Constituting Interception
or Disclosure
            372k1440 k. Persons Concerned; Con-
sent. Most Cited Cases

**Torts 379 ☜326**

379 Torts
   379IV Privacy and Publicity
      379IV(A) In General
         379k326 k. Constitutional, Statutory, and
Local Regulation. Most Cited Cases
Application of California privacy law, requiring
both parties' consent to recording of telephone con-
versation, to California clients' action against finan-
cial institution for recording calls from California
to office in Georgia, where only one party's consent
was necessary, did not facially violate federal com-
merce clause; application of law affected only busi-
nesses' conversations with clients or consumers in
California and did not compel any action with re-
gard to conversations with non-California clients or
consumers. U.S.C.A. Const. Art. 1, § 8, cl. 3;
West's Ann.Cal.Penal Code § 632.

**[7] Action 13 ☜17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited
Cases
Courts use three-step governmental interest analysis
in resolving choice-of-law issues: first, court de-
termines whether relevant law of each potentially
affected jurisdictions is same or different, second, if

there is a difference, court examines each jurisdic-
tion's interest in application of its own law under
circumstances of particular case to determine
whether true conflict exists, and third, if court finds
true conflict, it carefully evaluates nature and
strength of interest of each jurisdiction in applica-
tion of its own law to determine which state's in-
terest would be more impaired if its policy were
subordinated to other state's, and then applies law
of state whose interest would be more impaired.

**[8] Telecommunications 372 ☜1440**

372 Telecommunications
   372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
      372X(A) In General
         372k1435 Acts Constituting Interception
or Disclosure
            372k1440 k. Persons Concerned; Con-
sent. Most Cited Cases
A business that adequately advises all parties to a
telephone call, at the outset of the conversation, of
its intent to record the call would not violate the
statute prohibiting the recording of telephone con-
versations without the consent of all parties. West's
Ann.Cal.Penal Code § 632.

**[9] Telecommunications 372 ☜1440**

372 Telecommunications
   372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
      372X(A) In General
         372k1435 Acts Constituting Interception
or Disclosure
            372k1440 k. Persons Concerned; Con-
sent. Most Cited Cases
In light of Legislature's express intent "to protect
the privacy of the people of this state," provision
prohibiting the recording of telephone conversa-
tions without the consent of all parties applies when
one party to a telephone call is in California and an-
other party is outside California. West's
Ann.Cal.Penal Code §§ 630, 632.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914

Page 4

39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
**(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)**

**[10] Telecommunications 372 ☞1440**

372 Telecommunications
　　372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
　　　　372X(A) In General
　　　　　　372k1435 Acts Constituting Interception or Disclosure
　　　　　　　　372k1440 k. Persons Concerned; Consent. Most Cited Cases
Applying the statute prohibiting the recording of telephone conversations without the consent of all parties to a situation, when one party to a telephone call is in California and another party is outside California, is not a disfavored extraterritorial application of the statute; crucial element is confidential communication by a California resident while in California. West's Ann.Cal.Penal Code § 632.

**[11] Telecommunications 372 ☞1440**

372 Telecommunications
　　372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
　　　　372X(A) In General
　　　　　　372k1435 Acts Constituting Interception or Disclosure
　　　　　　　　372k1440 k. Persons Concerned; Consent. Most Cited Cases
Georgia privacy statutes prohibiting the recording of telephone conversations unless one party has consented are intended to apply to a telephone call in which one of the parties is in Georgia and one of the parties is in another state. West's Ga.Code Ann. §§ 16-11-62, 16-11-66.

**[12] Telecommunications 372 ☞1443**

372 Telecommunications
　　372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
　　　　372X(A) In General
　　　　　　372k1442 Actions
　　　　　　　　372k1443 k. In General. Most Cited Cases

**Torts 379 ☞327**

379 Torts
　　379IV Privacy and Publicity
　　　　379IV(A) In General
　　　　　　379k327 k. What Law Governs. Most Cited Cases
True conflict existed between California statute that prohibited recording of telephone conversations without consent of all parties and Georgia statute prohibiting recording of telephone conversations unless one party consented, as applied to California clients' action against financial institution that recorded conversations between clients and brokers in Georgia, thereby requiring court to apply governmental interest test to resolve conflict in laws. West's Ann.Cal.Penal Code § 632; West's Ga.Code Ann. §§ 16-11-62, 16-11-66.

**[13] Action 13 ☞17**

13 Action
　　13II Nature and Form
　　　　13k17 k. What Law Governs. Most Cited Cases
In conducting impairment of governmental interest approach to resolve conflict of laws between states, court does not weigh conflicting governmental interests in sense of determining which conflicting law manifests better social policy on the specific issue; instead, comparative impairment process is an accommodation of conflicting state policies, attempting to achieve maximum attainment of underlying purpose by all governmental entities.

**[14] Action 13 ☞17**

13 Action
　　13II Nature and Form
　　　　13k17 k. What Law Governs. Most Cited Cases
Under the comparative impairment approach to resolving conflicts of laws between states, true conflicts are resolved by applying the law of the state whose interest would be the more impaired if its law were not applied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                            Page 5
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
**(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)**

**[15] Telecommunications 372 ⬷1432**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(A) In General
            372k1432 k. What Law Governs. Most
Cited Cases

**Torts 379 ⬷327**

379 Torts
    379IV Privacy and Publicity
        379IV(A) In General
            379k327 k. What Law Governs. Most
Cited Cases
California law that prohibited recording of tele-
phone conversations without consent of all parties,
rather than Georgia law prohibiting recording of
telephone conversations unless one party consen-
ted, applied to determine whether financial institu-
tion's alleged recording of its California clients'
telephone calls to brokers in Georgia constituted
unlawful invasion of privacy; California's strong in-
terest in protecting privacy of its residents would be
more greatly impaired if its law were not applied
than the impairment to Georgia's interests if Geor-
gia law were not applied. West's Ann.Cal.Penal
Code §§ 632, 637.2; West's Ga.Code Ann. §§
16-11-62, 16-11-66.
*See 5 Witkin, Summary of Cal. Law (10th ed. 2005)
Torts, § 189 et seq.; 3 Witkin, Cal. Procedure (4th
ed. 1996) Actions, § 94; 2 Witkin & Epstein, Cal.
Criminal Law (3d ed. 2000) Crimes Against Public
Peace and Welfare, § 413 et seq.; Cal. Jur. 3d,
Conflict of Laws, § 29 et seq.*

**[16] Constitutional Law 92 ⬷1210**

92 Constitutional Law
    92XI Right to Privacy
        92XI(A) In General
            92k1210 k. In General. Most Cited Cases
    (Formerly 92k82(7))
California's explicit constitutional privacy provi-
sion was enacted in part specifically to protect Cali-
fornians from overly intrusive business practices

that were seen to pose a significant and increasing
threat to personal privacy. West's Ann.Cal. Const.
Art. 1, § 1.

**[17] Telecommunications 372 ⬷1432**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(A) In General
            372k1432 k. What Law Governs. Most
Cited Cases

**Telecommunications 372 ⬷1451**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(A) In General
            372k1442 Actions
                372k1451 k. Judgment and Relief.
Most Cited Cases

**Torts 379 ⬷327**

379 Torts
    379IV Privacy and Publicity
        379IV(A) In General
            379k327 k. What Law Governs. Most
Cited Cases
Although, California law that prohibited recording
of telephone conversations without consent of all
parties, rather than Georgia law prohibiting record-
ing of telephone conversations unless one party
consented, applied to determine whether financial
institution's alleged recording of its California cli-
ents telephone calls to brokers in Georgia consti-
tuted unlawful invasion of privacy, and thus wheth-
er injunctive relief was available, clients were not
entitled to pursue monetary damages or restitution
for past conduct; Georgia had legitimate interest in
ensuring that those who acted in Georgia with reas-
onable expectation that Georgia law applied to their
conduct were not unexpectedly and unforeseeably
subjected to liability. West's Ann.Cal.Penal Code
§§ 632, 637.2; West's Ga.Code Ann. §§ 16-11-62,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                          Page 6
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

16-11-66.

***733 Markun Zusman & Compton, David S. Markun, Pacific Palisades, Edward S. Zusman and Kevin K. Eng, San Francisco, for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, and Margaret Reiter, Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Orrick, Herrington & Sutcliffe, William F. Alderman and Alejandro Vallejo, San Francisco, for Defendant and Respondent.

National Chamber Litigation Center, Robin S. Conrad, Washington, DC, Stephanie A. Martz; Mayer, Brown, Row & Maw, Donald M. Falk, Palo Alto, and Fatima Goss Graves for the Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendant and Respondent.

Deborah J. La Fetra and Timothy Sandefur, Sacramento, for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.

GEORGE, C.J.

*99 **917 The complaint in this case alleges that employees at the Atlanta-based branch of defendant Salomon Smith Barney (SSB)-a large, nationwide brokerage firm that has numerous offices and does extensive business in California-repeatedly have recorded telephone conversations with California clients without the clients' knowledge or consent. These facts give rise to a classic choice-of-law issue, because the relevant California privacy statute generally prohibits any person from recording a telephone conversation without the consent of *all* parties to the conversation, whereas the comparable Georgia statute does not prohibit the recording of a telephone conversation when the recording is made with the consent of *one* party to the conversation.

In this proceeding, several California clients of SSB filed a putative class action against SSB seeking to obtain injunctive relief against its Atlanta-based branch's continuing practice of recording telephone conversations, resulting from calls made to and from California, without knowledge or consent of the California clients, and also seeking to recover damages and/or restitution based upon recording that occurred in the past. SSB filed a demurrer to the complaint, maintaining that no relief is warranted, because the conduct of its Atlanta-based employees was and is permissible under Georgia law.

The trial court sustained SSB's demurrer and dismissed the action. The Court of Appeal affirmed the judgment rendered by the trial court, concluding that application of Georgia law is appropriate and supports the denial of all relief sought by plaintiffs. We granted review to consider the novel choice-of-law issue presented by this case.

*100 Past decisions establish that in analyzing a choice-of-law issue, California courts apply the so-called governmental interest analysis, under which a court carefully examines the governmental interests or purposes served by the applicable statute or rule of law of each of the affected jurisdictions to determine whether there is a "true conflict." If such a conflict is found to exist, the court analyzes the jurisdictions' respective interests to determine which jurisdiction's interests would be ***734 more severely impaired if that jurisdiction's law were not applied in the particular context presented by the case. (See, e.g., *Reich v. Purcell* (1967) 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727; *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666; *Bernhard v. Harrah's Club* (1976) 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719; *Offshore Rental Co. v. Continental Oil Co.* (1978) 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721(*Offshore Rental*).)

For the reasons discussed at length below, we conclude that this case presents a true conflict between California and Georgia law, and that, as a general matter, the failure to apply California law in this context would impair California's interest in protecting the degree of privacy afforded to California residents by California law more severely than the application of California law would impair any interests of the State of Georgia.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                    Page 7
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

As we shall explain, in light of the substantial number of businesses operating in California that maintain out-of-state offices or telephone operators, a resolution of this conflict permitting all such businesses to regularly and routinely record telephone conversations made to or from California clients or consumers without the clients' or consumers' knowledge or consent would significantly impair the privacy policy guaranteed by California law, and potentially would place local California businesses (that would continue to be subject to California's protective privacy law) at an unfair competitive disadvantage vis-à-vis their out-of-state counterparts. At the same time, application of California law will not have a significant detrimental effect on Georgia's interests as embodied in the applicable Georgia law, because applying California law (1) will not adversely affect any privacy interest protected by Georgia law, (2) will affect only those business telephone calls in Georgia that are made to or are received from California clients, and (3) with respect to such calls, will not prevent a business located in Georgia from implementing or maintaining a practice of recording *all* such calls, but will require only that the business *inform* its clients or customers, at the outset **918 of the call, of the company's policy of recording such calls. (As explained below, if a business informs a client or customer at the outset of a telephone call that the call is being recorded, the recording would not violate the applicable California statute.)

Although we conclude that the comparative impairment analysis supports the application of California law in this context, we further conclude that *101 because one of the goals of that analysis is "the 'maximum attainment of underlying purpose by *all* governmental entities' "(*Offshore Rental, supra,* 22 Cal.3d 157, 166, 148 Cal.Rptr. 867, 583 P.2d 721, italics added), it is appropriate in this instance to apply California law in a restrained manner that accommodates Georgia's reasonable interest in protecting persons who *in the past* might have undertaken actions in Georgia in reasonable reliance on Georgia law from being subjected to monetary liab-

ility for such actions. Prior to our resolution of this case it would have been reasonable for a business entity such as SSB to be uncertain as to which state's law-Georgia's or California's-would be applicable in this context, and the denial of monetary recovery for past conduct that might have been undertaken in reliance upon another state's law is unlikely to undermine significantly the California interest embodied in the applicable invasion-of-privacy statutes. We therefore conclude that it is Georgia's, rather than California's, interest that would be more severely impaired were monetary liability to be imposed on SSB for such *past* conduct. Under these circumstances, we conclude it is appropriate ***735 to decline to impose damages upon SSB (or to require it to provide restitution) on the basis of such past conduct.

Accordingly, we conclude that plaintiffs' action should be permitted to go forward with respect to the request for injunctive relief, but that the judgment rendered by the Court of Appeal should be affirmed insofar as it upholds the dismissal of plaintiffs' claim for damages or restitution based on SSB's past conduct.

I

[1] Because the trial court dismissed plaintiffs' action after sustaining a demurrer without leave to amend, for purposes of this appeal we assume the truth of all well-pleaded factual allegations of the complaint. (See, e.g., *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.)

According to the complaint, the named plaintiffs-Kelly Kearney and Mark Levy-are California residents who were employed in California by MFS Communications Company (MFS) when that company was acquired in 1996 by WorldCom (a large nationwide telecommunications firm). After the acquisition, both plaintiffs continued to work for WorldCom in California and, during the course of their employment, both were granted stock options in WorldCom that could be exercised only through

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                    Page 8
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

defendant SSB. The complaint alleges that in 1998, WorldCom's Human Relations Department informed Levy that the Atlanta branch office of SSB handled financial matters for WorldCom employees, and that this department "directed" him to that branch office with regard to matters involving the exercise of his stock options. Both Levy and Kearney opened accounts with SSB's Atlanta office and, during the *102 course of their relationships with SSB, each plaintiff, while in California, made and received numerous telephone calls from individual brokers in the Atlanta office.

At some point, Kearney and Levy filed claims against SSB with the National Association of Securities Dealers, alleging that SSB and its individual brokers had engaged in "malfeasance, fraud, and breach of fiduciary duties" in providing advice to them. Apparently in the course of the litigation of those claims, Kearney and Levy learned that numerous telephone calls that were made and received by SSB's Atlanta office to and from California clients, while the clients were in California, were tape-recorded by SSB employees without the clients' knowledge or consent.

Kearney and Levy then filed the present action, seeking relief on their own behalf and on behalf of all other clients of SSB who resided in California and whose accounts were serviced by the Atlanta branch of SSB. The complaint alleged that during the course of their relationship with SSB, the named **919 plaintiffs and other members of the class took part in numerous telephone conversations concerning their personal financial affairs, had an expectation of privacy in those communications, were unaware that their conversations were being recorded, and did not give consent to the recording of such conversations. The complaint further alleged that SSB intentionally recorded such conversations without disclosing that it was doing so.

The complaint maintained that the conduct of SSB alleged in the complaint provided a basis for a civil cause of action under section 637.2 of the Penal

Code-a provision of California's invasion-of-privacy statutory scheme-as well as under section 17200 of the Business and Professions Code, a provision of California's unfair competition law that provides a civil remedy against (among other things) unlawful ***736 business practices. The complaint sought (1) injunctive relief to restrain SSB in the future "from using its practice/policy of illegally recording telephone conversations with its clients," and (2) damages and restitution based upon SSB's past conduct.

SSB filed a demurrer to the complaint, and after briefing and a hearing on the legal issues, the trial court sustained the demurrer without leave to amend, concluding that "under both Georgia and federal law recordings may lawfully be made in Georgia with one party's consent. As such, defendant's conduct cannot be viewed as unlawful or unfair or deceptive under California Business *103 & Professions § 17200. Further, any attempt to apply Penal Code § 632 to recordings made in Georgia would be preempted by federal law and violate the Commerce Clause." [FN1]

> FN1. As explained below, Penal Code section 637.5 authorizes a civil cause of action for any violation of the applicable invasion-of-privacy statutory scheme, and Penal Code section 632 is the specific provision of that scheme that governs the unlawful recording of telephone conversations. (See, *post*, 45 Cal.Rptr.3d at pp. 746-749, 137 P.3d at pp. 928-930.)

On appeal, the Court of Appeal-although noting that the parties had failed to identify or brief the correct legal issue (that is, the choice-of-law issue) in either the trial court or, initially, in the Court of Appeal-nonetheless affirmed the judgment rendered by the trial court, concluding "that, on the specific facts of this case, Georgia has the greater interest in having its law applied." The Court of Appeal was of the view that "[a]ny other result would bless a legalistic 'gotcha': the office of a financial services organization in a state which, like the majority of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                    Page 9
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

states, has a statute which permits it to record routine telephone calls to and from its clients without their specific consent is left at risk that a client in one of the minority of states that requires *both parties* [to] consent will sue it in the client's home state and attempt to apply that state's law."

As noted above, we granted plaintiffs' petition for review to address the novel choice-of-law-issue presented by this case.[FN2]

> FN2. While this matter was pending before this court, plaintiff Kearney requested to be dismissed from the action in light of a settlement agreement she had entered into with SSB. We granted the request, noting that the dismissal would not affect the viability of the action, because plaintiff Levy remains a named plaintiff and a putative class representative.

> We note also that in 2003, SSB formally changed its name to Citigroup Global Markets, Inc., but for purposes of this case we shall continue to refer to defendant as SSB.

## II

Before addressing the choice-of-law issue, we believe it is useful to explain briefly why the numerous legal theories and authorities upon which SSB placed its initial reliance-and which SSB continues to advance in its briefing in this court-do not support the trial court's ruling sustaining SSB's demurrer without leave to amend.

[2] To begin with, although SSB cites and relies upon a number of cases dealing with personal jurisdiction, it is clear there can be no constitutional objection to California's exercising personal jurisdiction over SSB by adjudicating this civil action in a California court. The complaint alleges that SSB "systematically and continually does business" in California, and SSB does not deny that it maintains numerous offices and **920 does extensive busi-

ness in this state. Furthermore, this action-involving SSB's alleged recording of *104 telephone conversations relating to business transactions-plainly arises directly out of SSB's ***737 business activity in this state. Under these circumstances, SSB is clearly subject to the personal jurisdiction of California courts under both the "general" and " specific" categories of personal jurisdiction. (See, e.g., *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445-446, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)

[3] Second, contrary to SSB's strenuous argument, the application of California law in the setting of this case clearly would not exceed the constitutional limits imposed by the federal due process clause on a state's legislative jurisdiction, by seeking to impose California law on activities conducted outside of California as to which California has no legitimate or sufficient state interest. The present legal proceedings are based upon defendant business entity's alleged policy and practice of recording telephone calls of *California* clients, while the clients are *in California,* without the clients' knowledge or consent. California clearly has an interest in protecting the privacy of telephone conversations of California residents while they are in California sufficient to permit this state, as a constitutional matter, to exercise legislative jurisdiction over such activity. (See, for example, *Yu v. Signet Bank/ Virginia* (1999) 69 Cal.App.4th 1377, 1391, 82 Cal.Rptr.2d 304 [California may regulate business's out-of-state "distant forum abuse" against California consumers]; *People v. Fairfax Family Fund, Inc.* (1964) 235 Cal.App.2d 881, 883-885, 47 Cal.Rptr. 812 [upholding application of California Small Loan Law to out-of-state company that solicited business in California by mail].) This is not a case in which California would be applying its law in order to alter a defendant's conduct in another state *vis-à-vis another state's residents.* (Cf. *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 572-573, 116 S.Ct. 1589, 134 L.Ed.2d 809["[B]y attempting to alter BMW's nationwide policy, Alabama would be infringing on the policy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914

Page 10

39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

choices of other States. To avoid such encroachment, the economic penalties that a State such as Alabama inflicts on those who transgress its laws ... must be supported by the State's interest in protecting its own consumers or its own economy"].) Instead, application of California law would be limited to the defendant's surreptitious or undisclosed recording of words spoken over the telephone by California residents while they are in California. This is a traditional setting in which a state may act to protect the interests of its own residents while in their home state. (See, e.g., *Watson v. Employers Liability Corp.* (1954) 348 U.S. 66, 72, 75 S.Ct. 166, 99 L.Ed. 74 [in upholding Louisiana's application of a Louisiana statute permitting an injured person to bring a "direct action" against an insurer doing business in Louisiana even though the insurance policy in question was issued in Massachusetts and contained a clause prohibiting direct actions, the United States Supreme Court explained: "As a consequence of the modern practice of conducting widespread business activities throughout the entire United *105 States, this Court has in a series of cases held that more states than one may seize hold of local activities which are part of multistate transactions and may regulate to protect interests of its own people, even though other phases of the same transactions might justify regulatory legislation in other states"].)

[4] As is recognized by the cited cases-and numerous others-the federal system contemplates that individual states may adopt distinct policies to protect their own residents and generally may apply those policies to businesses that choose to conduct business within that state. (See, e.g., ***738*Allstate Ins. Co. v. Hague* (1981) 449 U.S. 302, 317-318, 101 S.Ct. 633, 66 L.Ed.2d 521 (plur. opn. by Brennan, J.); *id.* at pp. 329-331, 101 S.Ct. 633 (conc. opn. by Stevens, J.); *id.* at pp. 337-338, 101 S.Ct. 633 (dis. opn. by Powell, J.); *Clay v. Sun Ins. Office, Ltd.* (1964) 377 U.S. 179, 181-182, 84 S.Ct. 1197, 12 L.Ed.2d 229.) It follows from this basic characteristic of our federal system that, at least as a general matter, a company that conducts business in numerous states ordinarily is required to make itself aware of and comply with the law of a state in which it chooses to do business. As is demonstrated **921 by the above cases, a state generally does not exceed its constitutional authority when it applies its law in such a setting, even if the law may implicate some action or failure to act that occurs outside the state.

[5] Third, contrary to SSB's contention and the conclusion of the trial court, past decisions establish that although SSB's alleged conduct would not violate the provisions of the applicable federal law relating to the recording of telephone conversations (18 U.S.C. § 2511(2)(d)), federal law does not preempt the application of California's more protective privacy provisions.

In *People v. Conklin* (1974) 12 Cal.3d 259, 270-273, 114 Cal.Rptr. 241, 522 P.2d 1049, this court specifically addressed the question whether the provisions of title III of the federal Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520, hereafter title III)-relating to the wiretapping or recording of telephone conversations-preempted the application of the more stringent provisions embodied in California's invasion-of-privacy law. Reviewing the legislative history of title III, the court in *Conklin* determined that "Congress intended that the states be allowed to enact more restrictive laws designed to protect the right of privacy"(12 Cal.3d at p. 271, 114 Cal.Rptr. 241, 522 P.2d 1049), pointing out that a legislative committee report prepared in conjunction with the consideration of title III specifically observed that " '[t]he proposed provision envisions that States would be free to adopt *more restrictive* legislation, or no legislation, but not less restrictive legislation.' " (12 Cal.3d at p. 272, 114 Cal.Rptr. 241, 522 P.2d 1049.) Accordingly, the court in *Conklin* rejected the preemption claim.

Although an amicus curiae brief in the present case urges that the decision in *Conklin* be reconsidered (see amicus curiae brief of U.S. Chamber of *106 Commerce, pp. 20-23), the brief fails to point to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                              Page 11
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

any developments in the almost four decades since *Conklin* that would warrant such reconsideration, and omits reference to the numerous sister-state and federal decisions that have reached the same conclusion as *Conklin* with regard to the preemption issue. (See, e.g., *Roberts v. Americable Intern. Inc.* (E.D.Cal.1995) 883 F.Supp. 499, 503, fn. 6; *United States v. Curreri* (D.Md.1974) 388 F.Supp. 607, 613; *Bishop v. State* (1999) 241 Ga.App. 517, 526 S.E.2d 917, 920; *People v. Pascarella* (1981) 92 Ill.App.3d 413, 48 Ill.Dec. 1, 415 N.E.2d 1285, 1287; see also *Warden v. Kahn* (1979) 99 Cal.App.3d 805, 810, 160 Cal.Rptr. 471.) Indeed, the Georgia privacy statute that we shall examine below is itself in some respects more restrictive than the applicable federal provision, and Georgia-like this court in *Conklin*-specifically has rejected the argument that the federal statute precludes a state from adopting a policy more protective of privacy than the policy established by federal law. (*Bishop v. State, supra,* 241 Ga.App. 517, 526 S.E.2d 917, 920-921.) Accordingly, there is no basis for concluding that application of California law is preempted by federal law.[FN3]

> FN3. In conjunction with its federal preemption argument, SSB contends that in some instances federal law *requires* the kind of recording of telephone conversations that allegedly occurred at SSB's Atlanta branch, citing rule 3010 of the National Association of Securities Dealers (NASD). That rule requires firms that are members of the NASD and that employ a significant number of representatives who previously worked at firms that have been disciplined by the NASD to tape record *all* telephone conversations between their representatives and existing and potential customers. Although SSB acknowledges that it is not subject to rule 3010, it argues that this rule demonstrates that, at least in some circumstances, the California statute is incompatible with federal law.

SSB, however, fails to point to anything in NASD rule 3010 that would preclude a firm that is subject to this rule from informing an existing or potential client, at the outset of a conversation, that the telephone call is being recorded for business purposes. As explained below, a business can comply with the applicable California statute by providing such information at the outset of a telephone conversation so that the client or customer will not have a reasonable expectation that the conversation is not being recorded. Indeed, plaintiffs point to a notice that NASD issued in 1998 in relation to its rule 3010, stating that "[t]he best practice in each case would be for member firms to notify their registered persons and customers that their telephone calls are being tape recorded." (NASD Notice to Members, 98-52, at p. 394.)

***739 [6] Fourth and finally, application of California law in this setting would not, at least **922 on its face, constitute a violation of the federal commerce clause. (U.S. Const., art. I, § 8, cl. 3.) In advancing the contrary claim, SSB relies heavily on language in the United States Supreme Court's decision in *Healy v. The Beer Institute* (1989) 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275, to the effect that "the 'Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside the State's borders, whether or not the commerce has effects within the State.' " The quotation from *Healy* is inapplicable not only because the occurrences here at issue quite clearly did not take place "wholly outside [California's] *107 borders," but also because SSB's argument ignores the remainder of the quoted sentence from *Healy,* which goes on to state: "and, specifically, a State may not adopt legislation that has the practical effect of establishing 'a scale of prices for use in other states.' " (491 U.S. at p. 336, 109 S.Ct. 2491.) As the entirety of the quoted sentence suggests, the decision in *Healy* addressed the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                              Page 12
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

validity of a state statute that purported to regulate a business entity's pricing practices in the forum state with reference to the prices charged by the entity in other states, and found the statute violative of the commerce clause because of the inevitable effect that the statute would have on the prices charged by the entity in its sales to residents in other states.

On its face, application of the California law here at issue would affect only a business's undisclosed recording of telephone conversations with clients or consumers in California and would not compel any action or conduct of the business with regard to conversations with non-California clients or consumers. (Compare *Edgar v. MITE Corp.* (1982) 457 U.S. 624, 644, 102 S.Ct. 2629, 73 L.Ed.2d 269 [in invalidating an Illinois statute that effectively authorized Illinois to determine whether a nationwide tender offer could proceed anywhere, the court observed that "[w]hile protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders"].) Although SSB may attempt to demonstrate, at a later stage in the litigation, that application of the California statute would pose an undue and excessive burden on interstate commerce by establishing***740 that it would be impossible or infeasible for SSB to comply with the California statute without altering its conduct with regard to its non-California clients and that the burden that would be imposed upon it "is clearly excessive in relation to the putative local benefits"(*Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174), SSB clearly cannot prevail on such a theory at the demurrer stage of the proceeding.

Accordingly, we believe that the only substantial issue presented by the case is the choice-of-law issue. We turn to that issue.

### III

[7] Beginning with Chief Justice Traynor's seminal decision for this court in *Reich v. Purcell, supra,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (hereafter *Reich* ), California has applied the so-called governmental interest analysis in resolving choice-of-law issues. In brief outline, the governmental interest approach generally involves three steps. First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under *108 the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state"(*Bernhard v. Harrah's Club, supra,* 16 Cal.3d 313, 320, 128 Cal.Rptr. 215, 546 P.2d 719), and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied." (*Ibid.*)

A review of several of the leading decisions of this court applying the governmental interest analysis illustrates how this approach actually operates in practice.

### **923 A

In *Reich, supra,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727, for example, the plaintiffs filed a wrongful death action in California as a result of an automobile accident that occurred in Missouri. One of the cars involved in the accident was owned and operated by the defendant (Purcell), who was a California resident. The other car was owned and operated by Mrs. Reich, an Ohio resident, who was traveling with her two children. Mrs. Reich and one of her children were killed in the accident; the other child was injured. After the accident, Mr. Reich and his surviving child moved to California and then brought the wrongful death action against Purcell.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914
Page 13
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

The issue in the case related to the damages that the plaintiffs could recover in their wrongful death action.

In this setting there were three potentially affected jurisdictions-Missouri, Ohio, and California. Missouri law limited the recovery of damages in wrongful death actions to $25,000; by contrast, neither Ohio law nor California law placed a dollar limit on recovery in such actions. The trial court in that case held that Missouri law applied because the accident had occurred in that state, and limited the plaintiffs' recovery to $25,000. On appeal, however, this court rejected the prior "law of the place of the wrong" rule as the appropriate choice-of-law analysis, and instead adopted in its place the governmental interest analysis. (*Reich, supra,* 67 Cal.2d at pp. 553, 554, 555, 63 Cal.Rptr. 31, 432 P.2d 727.)

***741 In applying that analysis to the facts before it, the court in *Reich, supra,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727, initially concluded that California had no interest in applying its law, because plaintiffs had not been California residents at the time of the accident and because inasmuch as California law did not limit damages it had no particular interest in applying its law to defendant. In considering the respective interests of Missouri and Ohio, the court observed that although Missouri's limitation on damages in wrongful death actions expressed a *109 concern for avoiding the imposition of excessive financial burdens on defendants, that concern was primarily a local concern. The court explained that it failed "to perceive any substantial interest Missouri might have in extending the benefits of its limitation of damages to travelers from states having no similar limitation. Defendant's liability should not be limited when no party to the action is from a state limiting liability and when defendant, therefore, would have secured insurance, if any, without any such limit in mind.... Under these circumstances giving effect to Ohio's interest in affording full recovery to injured parties does not conflict with any substantial interest of Missouri." (67 Cal.2d at p. 556, 63 Cal.Rptr. 31, 432 P.2d

727.) Because the court found that Ohio had a substantial interest in having its law applied while Missouri did not, the case did not present a true conflict, and the court had little trouble determining that Ohio law should apply in that case with regard to the amount of damages recoverable in a wrongful death action. (*Id.* at pp. 556-557, 63 Cal.Rptr. 31, 432 P.2d 727.)

**B**

*Hurtado v. Superior Court, supra,* 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (hereafter *Hurtado* ), presented an issue and a fact pattern comparable to those presented in *Reich, supra,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727, and afforded our court an opportunity to provide further guidance on the appropriate mode of analysis under the governmental interest approach that had been adopted in *Reich, supra,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727. In *Hurtado,* as in *Reich,* the specific question at issue was the amount of damages recoverable in a wrongful death action that had been filed in a California court. In *Hurtado,* the plaintiffs in the wrongful death action-as well as the decedent-were residents of Mexico at the time of the accident, but the accident that had resulted in the decedent's death occurred in California, each of the defendant drivers was a California driver, and all the vehicles were registered in California. The two potentially affected jurisdictions were Mexico and California, and the question before the court was which jurisdiction's law should determine**924 the amount of damages recoverable by the plaintiffs.

In analyzing the issue, the court first examined the law of each of the jurisdictions and found that whereas Mexico limited the amount survivors could recover in a wrongful death action (to 24,334 pesos), California placed no dollar limit on the damages that could be recovered in such an action. In continuing its analysis under the governmental interest approach, the court in *Hurtado* observed that "[a]lthough the two potentially concerned states have different laws, there is still no problem

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                    Page 14
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

in choosing the applicable rule of law where only one of the states has an interest in having its law applied." (*Hurtado, supra,* 11 Cal.3d at p. 580, 114 Cal.Rptr. 106, 522 P.2d 666.) The court then found that in the setting of that case, Mexico did not have an interest in having its law applied, *110 explaining that "[t]he interest of a state in a tort rule limiting damages for wrongful death is to protect ***742 defendants from excessive financial burdens or exaggerated claims"(*id.* at pp. 580-581, 114 Cal.Rptr. 106, 522 P.2d 666) and that "this interest 'to avoid the imposition of excessive financial burdens on [defendants] ... is ... primarily local[,]' [citations]; that is, a state by enacting a limitation on damages is seeking to protect its residents from the imposition of these excessive financial burdens. Such a policy 'does not reflect a preference that widows and orphans should be denied full recovery.' [Citation.] Since it is the plaintiffs and not the defendants who are the Mexican residents in this case, Mexico has no interest in applying its limitation of damages-Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants." (*Id.* at p. 581, 114 Cal.Rptr. 106, 522 P.2d 666.) Because Mexico had no interest in applying its limitation on wrongful death damages, *Hurtado,* like *Reich,* did not present a true conflict, and the court consequently concluded that California law should apply. (*Id.* at pp. 581-582, 63 Cal.Rptr. 31, 432 P.2d 727.)

Although that case was readily resolved because it presented a false conflict, the court in *Hurtado, supra,* 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666, went on to elaborate on a number of distinct issues that must be carefully considered in resolving choice-of-law questions in wrongful death actions, issues that had not always been carefully separated and analyzed by the lower courts in other cases decided in the wake of *Reich.* After a fairly extended discussion (11 Cal.3d at pp. 582-584, 114 Cal.Rptr. 106, 522 P.2d 666), the court in *Hurtado* summarized its conclusions by emphasizing that "[i]t is important ... to recognize the three distinct

aspects of a cause of action for wrongful death: (1) compensation for survivors, (2) deterrence of conduct and (3) limitation, or lack thereof, upon the damages recoverable. *Reich v. Purcell* recognizes that all three aspects are primarily local in character. The first aspect, insofar as *plaintiffs* are concerned, reflects the state's interest in providing for compensation and in determining the distribution of the proceeds, said interest extending only to local decedents and local beneficiaries ...; the second, insofar as *defendants* are concerned, reflects the state's interest in deterring conduct, said interest extending to all persons present within its borders; the third, insofar as *defendants* are concerned, reflects the state's interest in protecting resident defendants from excessive financial burdens. In making a choice of law, these three aspects of wrongful death must be carefully separated. The key step in this process is delineating the issue to be decided." (*Hurtado, supra,* 11 Cal.3d at p. 584, 114 Cal.Rptr. 106, 522 P.2d 666.) This discussion in *Hurtado* teaches the importance, in applying the governmental interest analysis, of carefully examining what might at first blush appear to be a single subject or rule of law in order to identify the distinct state interests that may underlie separate aspects of the issue in question.

### *111 C

Unlike *Reich, supra,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727, and *Hurtado, supra,* 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666-cases that were found, upon analysis, to present a false conflict-the case of *Bernhard v. Harrah's Club, supra,* 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (hereafter *Bernhard* ) for the first time presented **925 this court with the task of resolving a true conflict pursuant to the governmental interest analysis. In *Bernhard,* the plaintiff, a California resident, was injured while in California by a drunk driver who allegedly had been served drinks, while intoxicated, at a tavern owned by the defendant (Harrah's Club) that was located***743 in Nevada. The plaintiff sued the defendant in California, con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                   Page 15
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

tending that the defendant should be held liable because the plaintiff's injury was proximately caused by the defendant's negligence in serving alcohol to an intoxicated patron. When *Bernhard* was decided, California law authorized a person who was injured by an intoxicated driver to recover damages from a negligent tavern owner under such circumstances (see *Vesely v. Sager* (1971) 5 Cal.3d 153, 95 Cal.Rptr. 623, 486 P.2d 151), but under Nevada law-although it was a crime to sell alcohol to an intoxicated person-the courts specifically had ruled that a tavern owner could *not* be held civilly liable in tort for the injured person's damages. (*Hamm v. Carson City Nugget, Inc.* (1969) 85 Nev. 99, 450 P.2d 358.) The question in *Bernhard* was whether California or Nevada law should be applied in determining whether the defendant tavern owner should be held liable.

In analyzing the issue, the court in *Bernhard* first found that the case presented a true conflict. Nevada had an interest in having its decisional rule applied in order to protect its resident tavern owners-like the defendant in that case-from being subjected to a form of civil liability that Nevada had declined to impose. At the same time, California also had an interest in applying its contrary rule imposing liability in such circumstances, inasmuch as the rule was intended to protect members of the general public from injuries to persons and property resulting from the excessive use of intoxicating liquor. California had a special interest in applying its law to a California resident-like the plaintiff in that case-who was injured by a drunk driver within California. Under these circumstances, the court in *Bernhard* recognized that it was required to determine "the appropriate rule of decision in a controversy where each of the states involved has a legitimate but conflicting interest in applying its own law in respect to the civil liability of tavern keepers." (*Bernhard, supra,* 16 Cal.3d at p. 319, 128 Cal.Rptr. 215, 546 P.2d 719.)

The court in *Bernhard, supra,* 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719, went on to discuss the basic process and standard by which true conflicts should be analyzed and resolved under California's governmental interest doctrine. The court explained that "[o]nce [a] preliminary analysis has identified a true conflict of *112 the governmental interests involved as applied to the parties under the particular circumstances of the case, the 'comparative impairment' approach to the resolution of such conflict seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be more impaired if its law were not applied. Exponents of this process of analysis emphasize that it is very different from a weighing process. The court does not ' "weigh" the conflicting governmental interests in the sense of determining which conflicting law manifested the "better" or the "worthier" social policy on the specific issue. An attempted balancing of conflicting state policies in that sense ... is difficult to justify in the context of a federal system in which, within constitutional limits, states are empowered to mold their policies as they wish.... [The process] can accurately be described as ... accommodation of conflicting state policies, as a problem of allocating domains of lawmaking power in multi-state contexts-limitations on the reach of state policies-as distinguished from evaluating the wisdom of those policies.... [E]mphasis is placed on the appropriate scope of conflicting state policies rather than on the "quality" of those poli***744 cies....' " (16 Cal.3d at pp. 320-321, 128 Cal.Rptr. 215, 546 P.2d 719.)

In applying the comparative impairment approach to the circumstances of that case, the court in *Bernhard* initially observed that "[a]t its broadest limits [California's] policy would afford protection to all persons injured in California by intoxicated persons who have been sold or furnished alcoholic beverages **926 while intoxicated regardless of where such beverages were sold or furnished. Such a broad rule would naturally embrace situations where the intoxicated actor had been provided with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914

Page 16

39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206

**(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)**

liquor by out-of-state tavern keepers." (*Bernhard, supra,* 16 Cal.3d at p. 322, 128 Cal.Rptr. 215, 546 P.2d 719.) The court in *Bernhard* then continued: "We need not, and accordingly do not here determine the outer limits to which California's policy should be extended, for it appears clear to us that it must encompass defendant, who as alleged in the complaint, '[advertises] for and otherwise [solicits] in California the business of California residents at defendant HARRAH'S CLUB Nevada drinking and gambling establishments, knowing and expecting said California residents, in response to said advertising and solicitation, to use the public highways of the State of California in going and coming from defendant HARRAH'S CLUB Nevada drinking and gambling establishments.' Defendant by the course of its chosen commercial practice has put itself at the heart of California's regulatory interest, namely to prevent tavern keepers from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California in the intoxicated state. It seems clear that California cannot reasonably effectuate its policy if it does not extend its regulation to include out-of-state tavern keepers such as defendant who regularly and purposely sell intoxicating *113 beverages to California residents in places and under conditions in which it is reasonably certain these residents will return to California and act therein while still in an intoxicated state. California's interest would be very significantly impaired if its policy were not applied to defendant." (16 Cal.3d at pp. 322-323, 128 Cal.Rptr. 215, 546 P.2d 719.)

Although the court in *Bernhard* recognized that application of California law would result in "an increased economic exposure" for a tavern keeper such as defendant (*Bernhard, supra,* 16 Cal.3d at p. 323, 128 Cal.Rptr. 215, 546 P.2d 719), it noted that "for businesses which actively solicit extensive California patronage, [such increased exposure] is a foreseeable and coverable business expense." (*Ibid.*) Finally, the court in *Bernhard* declared that "Nevada's interest in protecting its tavern keepers from civil liability of a boundless and unrestricted

nature will not be significantly impaired when as in the instant case liability is imposed only on those tavern keepers who actively solicit California business." (*Ibid.*) Accordingly, having found that "California has an important and abiding interest in applying its rule of decision to the case at bench [and] that the policy of this state would be more significantly impaired if such rule were not applied"(*ibid.*), the court in *Bernhard* concluded that California law should be applied.


**D**

The final precedent that we shall discuss is *Offshore Rental, supra,* 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721, a case that, like *Bernhard,* involved a true conflict.

In *Offshore Rental,* the plaintiff, a California corporation, brought a negligence action against the defendant out-of-state corporation, seeking to recover damages that the plaintiff corporation allegedly sustained as a result of an injury that an ***745 officer of the corporation suffered while the officer was on the defendant's premises in Louisiana. Prior to the commencement of the action, the defendant corporation already had compensated the injured officer for the damages that he had personally sustained, but, in the proceeding at issue in *Offshore Rental,* the plaintiff corporation sought to recover for the additional damages to its business interests that allegedly were caused by the injury to its officer.

In analyzing the choice-of-law issue, the court in *Offshore Rental, supra,* 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721, initially reviewed the respective laws of the two potentially affected jurisdictions-Louisiana and California. The court first noted that a Louisiana court recently had interpreted the relevant Louisiana statute-which provided that "[t]he master may bring an action against any man for beating or maiming his servant" (La. Civ.Code Ann., art. 174)-as *not* supporting a cause of action by a corporate plaintiff for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 17
137 P.3d 914
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

loss of services of *114 its officer. (See *Bonfanti Industries v. Teke, Inc.* (La.Ct.App.1969) 224 So.2d 15.) The **927 court in *Offshore Rental* then explained that, by contrast, the few expressions in California cases ("although chiefly dicta" (*Offshore Rental, supra,* 22 Cal.3d at p. 162, 148 Cal.Rptr. 867, 583 P.2d 721)) supported the plaintiff's assertion that California Civil Code section 49-which provides in part that "[t]he rights of personal relations forbid: [¶] ... [¶] (c) Any injury to a servant which affects his ability to serve his master"-authorizes an employer to maintain a cause of action against a third party for a loss sustained by the employer as a result of an injury to a key employee that was caused by the negligence of the third party. (See, e.g., *Darmour Prod. Corp. v. H.M. Baruch Corp.* (1933) 135 Cal.App. 351, 27 P.2d 664; *Fifield Manor v. Finston* (1960) 54 Cal.2d 632, 636, 7 Cal.Rptr. 377, 354 P.2d 1073.)

After determining that the applicable law of the two affected states apparently conflicted, the court in *Offshore Rental* examined the governmental interests involved in each state's law to determine whether, under the facts at issue, each state had an interest in having its law applied. The court found that, in view of the policies underlying the law of each state, both Louisiana and California had an interest in having its law applied in the case before it. Because Louisiana's law was aimed at protecting "negligent resident tortfeasors acting within Louisiana's borders from the financial hardships caused by the assessment of excessive legal liability or exaggerated claims resulting from the loss of services of a key employee"(*Offshore Rental, supra,* 22 Cal.3d at p. 164, 148 Cal.Rptr. 867, 583 P.2d 721), and because the defendant in the case was "a Louisiana 'resident' whose negligence on its own premises has caused the injury in question"(*ibid.*), Louisiana clearly had an interest in having its law applied. And because California's law reflected an interest "in protecting California employers from economic harm because of negligent injury to a key employee inflicted by a third party"(*ibid.*)-an interest that "extends beyond such an injury inflicted

within California, since California's economy and tax revenues are affected regardless of the situs of physical injury"(*ibid.*)-and because the plaintiff in that case was a California corporation that allegedly suffered loss as the result of the negligent injury of its key employee, California also had an interest in having its law applied. As a consequence, the court in *Offshore Rental* determined that the case involved a true conflict.

In thereafter undertaking the comparative impairment analysis set forth in ***746*Bernhard, supra,* 16 Cal.3d 313, 320, 128 Cal.Rptr. 215, 546 P.2d 719, and quoted above, the court in *Offshore Rental, supra,* 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721, explained that although the Louisiana rule of law had been set forth in a quite recent Louisiana decision that was directly in point, California, by contrast, "has ... exhibited little concern in applying section 49 to the employer-employee relationship: despite the provisions of the antique statute, no California court has heretofore squarely held that California law provides an action for harm to business employees, and no California court has recently considered the issue at all. If ...section 49 does *115 provide an action for harm to key corporate employees, ... the section constitutes a law 'archaic and isolated in the context of the laws of the federal union.' " (*Offshore Rental, supra,* 22 Cal.3d at p. 168, 148 Cal.Rptr. 867, 583 P.2d 721.) Under these circumstances, the court stated that "[w]e do not believe that California's interests in the application of its law to the present case are so compelling as to prevent an accommodation to the stronger, more current interest of Louisiana. We conclude therefore that Louisiana's interests would be the more impaired if its law were not applied, and consequently that Louisiana law governs the present case." (*Id.* at p. 169, 148 Cal.Rptr. 867, 583 P.2d 721.)

### IV

Keeping in mind the choice-of-law principles and methodology set forth in these prior cases, we turn

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914
Page 18
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

to the choice-of-law issue presented by the facts of this case. Here, the two potentially affected jurisdictions are California and Georgia, and the initial question is whether a conflict exists between the applicable law of each jurisdiction. In resolving that initial question, we must determine not only whether California law and Georgia law differ from one another, but also whether **928 each state's law was intended to apply to a telephone conversation that occurs in part in California and in part in Georgia.

### A

We begin with the California statutory scheme.

In 1967, the California Legislature enacted a broad, protective invasion-of-privacy statute in response to what it viewed as a serious and increasing threat to the confidentiality of private communications resulting from then recent advances in science and technology that had led to the development of new devices and techniques for eavesdropping upon and recording such private communications. (Stats.1967, ch. 1509, § 1, pp. 3584-3588, enacting Pen.Code, §§ 630-637.2.) [FN4] One of the provisions of the 1967 legislation-section 637.2-explicitly created a new, statutory private right of action, authorizing any person who has been injured by any *116 violation of the invasion-of-privacy legislation to bring a civil action to recover damages and to obtain injunctive relief in ***747 response to such violation.[FN5] Although other provisions of the statutory scheme authorize prosecutors to seek penal sanctions for violations of the statute, the imposition of criminal punishment on the basis of conduct that occurs in part outside of California presents potential constitutional and statutory questions different from those involved in the maintenance of a civil cause of action for damages or injunctive relief. (See, for example, *Heath v. Alabama* (1985) 474 U.S. 82, 87-93, 106 S.Ct. 433, 88 L.Ed.2d 387; *People v. Betts* (2005) 34 Cal.4th 1039-1047, 23 Cal.Rptr.3d 138, 103 P.3d 883; *People v. Morante* (1999) 20 Cal.4th 403,

427-430, 84 Cal.Rptr.2d 665, 975 P.2d 1071.) In the present case we have no occasion to consider the circumstances, if any, under which penal sanctions could or should appropriately be applied in such a factual context. The author of the 1967 legislation described the statutory provision establishing a private right of action as "perhaps the most effective enforcement mechanism available" for the privacy rights afforded by the enactment (Statement by Assem. Speaker Unruh Before Sen. Comm. on Judiciary re Assem. Bill No. 860 (1967-1968 Reg. Sess.) June 8, 1967, p. 4) [describing bill that became 1967 statute] ), and our concern here is solely whether plaintiffs may maintain a civil cause of action for damages and/or injunctive relief under section 637.2 under the factual circumstances alleged in the complaint.[FN6]

> FN4. The initial section of the 1967 legislation, codified as Penal Code section 630, reads in relevant part: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

> "The Legislature by this chapter intends to protect the right of privacy of the people of this state."

> Unless specified, all further statutory references are to the Penal Code.

> FN5. Section 637.2 currently provides in full:

> "(a) Any person who has been injured by a violation of this chapter may bring an action against the person who committed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                    Page 19
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

the violation for the greater of the fol-
lowing amounts:

"(1) Five thousand dollars ($5,000).

"(2) Three times the amount of actual
damages, if any, sustained by the plaintiff.

"(b) Any person may, in accordance with
Chapter 3 (commencing with Section
525) of Title 7 of Part 2 of the Code of
Civil Procedure, bring an action to en-
join and restrain any violation of this
chapter, and may in the same action seek
damages as provided by subdivision (a).

"(c) It is not a necessary prerequisite to
an action pursuant to this section that the
plaintiff has suffered, or be threatened
with, actual damages."

FN6.   Although   the   invasion-of-privacy
statutory scheme appears in the Penal Code
and the Legislature chose to impose penal
as well as civil sanctions for conduct that
is prohibited by the legislation, in determ-
ining the scope of the civil cause of action
embodied in section 637.2, we properly
must consider the *substance,* rather than
the *form,* of the statutory scheme. The
reach of section 637.2 would be the same
if the Legislature had adopted three separ-
ate statutes-one declaring that the prohib-
ited conduct was unlawful, a second spe-
cifying the civil sanctions that could be im-
posed upon such unlawful conduct, and a
third specifying the penal sanctions that
could be imposed for such conduct-and
had placed the first two statutes in the
Civil Code and the third in the Penal Code.
As noted above, the issue presented here is
whether plaintiffs may maintain a civil
cause of action for damages and/or injunct-
ive relief under 637.2 on the basis of the
facts alleged in the complaint, and in

resolving that issue there is no need to de-
termine whether penal sanctions properly
could or should be imposed under these
circumstances. In accordance with tradi-
tional notions of judicial restraint, we be-
lieve it is appropriate and prudent to wait
until we are faced with an instance in
which a prosecutor has chosen to charge a
criminal offense on the basis of such con-
duct before addressing the legal issues that
might be raised in such a prosecution.

**\*117 \*\*929** The recording of telephone conversa-
tions is governed by the provisions of section 632,
one of the original provisions of the 1967 legisla-
tion. Under subdivision (a) of section 632, "[e]very
person who, intentionally and without the consent
of *all* parties to a confidential communication, by
means of any electronic amplifying or recording
device, ... records the confidential communication,
whether the communication is carried on among the
parties in the presence of one another or by means
**\*\*\*748** of a telegraph, telephone, or other device"
(italics added), violates the statute and is punish-
able as specified in the provision. Section 632, sub-
division (b) provides in relevant part that "[t]he
term 'person' includes an individual, business asso-
ciation, ... corporation, ... or other legal entity, ...*but
excludes an individual known by all parties to a
confidential communication to be ... recording the
communication.*" (Italics added.) Section 632, sub-
division (c), in turn, provides that "[t]he term
'confidential communication' includes any commu-
nication carried on in circumstances as may reason-
ably indicate that any party to the communication
desires   it   to   be   confined   to   the   parties
thereto,[FN7]*but excludes a communication made
in a public gathering ... or in any other circum-
stance in which the parties to the communication
may reasonably expect that the communication may
be overheard or recorded.*" (Italics added.) [FN8]

        FN7. In *Flanagan v. Flanagan* (2002) 27
        Cal.4th   766,   772-777,   117   Cal.Rptr.2d
        574, 41 P.3d 575, our court addressed the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                              Page 20
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

question of when a communication is "confidential" within the meaning of this provision, holding that "a conversation is confidential under section 632 if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded"(*id.* at pp. 776-777, 117 Cal.Rptr.2d 574, 41 P.3d 575). We explained that the statutory scheme "protects against intentional, nonconsensual recording of telephone conversations regardless of the content of the conversation or the type of telephone involved." (*Id.* at p. 776, 117 Cal.Rptr.2d 574, 41 P.3d 575.)

FN8. Section 632 provides in full: "(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($ 2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment. If the person has previously been convicted of a violation of this section or Section 631, 632.5, 632.6, 632.7, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($ 10,000), by imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.

"(b) The term 'person' includes an individual, business association, partnership, corporation, limited liability company, or other legal entity, and an individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local, but excludes an individual known by all parties to a confidential communication to be overhearing or recording the communication.

"(c) The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

"(d) Except as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding.

"(e) This section does not apply (1) to any public utility engaged in the business of providing communications services and facilities, or to the officers, employees or agents thereof, where the acts otherwise prohibited by this section are for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility, or (2) to the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility, or (3) to any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional fa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                          Page 21
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

cility.

"(f) This section does not apply to the use of hearing aids and similar devices, by persons afflicted with impaired hearing, for the purpose of overcoming the impairment to permit the hearing of sounds ordinarily audible to the human ear."

***749 **930 [8] As made clear by the terms of section 632 as a whole, this provision does not absolutely preclude a party to a telephone conversation from *118 recording the conversation, but rather simply prohibits such a party from secretly or surreptitiously recording the conversation, that is, from recording the conversation without first informing all parties to the conversation that the conversation is being recorded.[FN9] If, after being so advised, another party does not wish to participate in the conversation, he or she simply may decline to continue the communication. A business that adequately advises all parties to a telephone call, at the outset of the conversation, of its intent to record the call would not violate the provision.[FN10]

FN9. Other provisions of the statutory scheme identify a number of limited circumstances in which secret recording by one party to a communication is permissible, such as when the recording is made "for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of extortion, kidnapping, bribery, any felony involving violence against the person, or a violation of Section 653m [making obscene phone calls with the intent to annoy]" (§ 633.5), or when a victim of domestic violence, acting pursuant to court authorization, records "any prohibited communication made to him or her by the perpetrator" of domestic violence (§ 633.6, subd. (a)). The calls at issue in this case do not fall within any of the statutorily authorized circumstances.

FN10. In one passage in its opinion, the Court of Appeal suggested that even in the absence of an explicit advisement, clients or customers of financial brokers such as SSB "know or have reason to know" that their telephone calls with the brokers are being recorded. The Court of Appeal, however, did not cite anything in the record or any authority establishing such a proposition as a matter of law, and in light of the circumstance that California consumers are accustomed to being informed at the outset of a telephone call whenever a business entity intends to record the call, it appears equally plausible that, in the absence of such an advisement, a California consumer reasonably would anticipate that such a telephone call is not being recorded, particularly in view of the strong privacy interest most persons have with regard to the personal financial information frequently disclosed in such calls.

The complaint in this case explicitly alleges that plaintiffs had a reasonable expectation of privacy in the telephone calls in question, and because this case is before us after the sustaining of a demurrer, we cannot assume for purposes of this appeal that the telephone conversations here at issue were not "confidential communications" within the meaning of section 632.

[9] *119 The language of section 632 does not explicitly address the issue whether the statute was intended to apply when one party to a telephone call is in California and another party is outside California. The legislatively prescribed purpose of the 1967 invasion-of-privacy statute, however, is "to protect the privacy of the people of this state" (§ 630), and that purpose certainly supports application of the statute in a setting in which a person outside California records, without the Californian's knowledge or consent, a telephone conversation of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914

Page 22

39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

a California resident who is within California. Furthermore, the companion wiretapping provision of the 1967 act-set forth in section 631, subdivision (a)-specifically applies to any person who attempts to learn the content of any communication "while the same *is in transit ... or is being sent from, or received at any place within this state.*" (Italics added).[FN11] ***750 Nothing in the language or purpose of the 1967 legislation suggests that the related provisions of section 632 should not similarly apply to protect against the secret recording of any confidential communication that is sent from or received at any place within California.

> FN11. Section 631, subdivision (a) provides in relevant part: "Any person who, by means of any machine, instrument, or contrivance ... intentionally taps, or makes any unauthorized connection ... with any telegraph or telephone wire, ... or who ... without the consent of all parties to the communication ... attempts to ... learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" commits a violation of the provision.

[10] SSB contends that section 632 should not be interpreted to apply in such a situation, because application of the statute in this setting would constitute a disfavored "extraterritorial" application of the statute. **931 (See, e.g., *North Alaska Salmon Co. v. Pillsbury* (1916) 174 Cal. 1, 4, 162 P. 93.)Interpreting that statute to apply to a person who, while outside California, secretly records what a California resident is saying in a confidential communication *while he or she is within California*, however, cannot accurately be characterized as an unauthorized *extraterritorial* application of the statute, but more reasonably is viewed as an instance of applying the statute to a multistate event in which a crucial element-the confidential communication by the California resident-occurred *in California*. The

privacy interest protected by the statute is no less directly and immediately invaded when a communication *within California* is secretly and contemporaneously recorded from outside the state than when this action occurs within the state. A person who secretly and intentionally records such a conversation from outside the state effectively acts within California in the same way a person effectively acts within the state by, for example, intentionally shooting a person in California from across the California-Nevada border. (See, for example, *State v. Hall* (1894) 114 N.C. 909, 19 S.E. 602, 602-606; see generally Leflar, American Conflicts Law (4th ed.1986) § 111, pp. 309-311.) Because there can be no question but that the principal purpose of section 632 is to protect the privacy *120 of confidential communications oF california residents *while they are in California*, we believe it is clear that section 632 was intended, and reasonably must be interpreted, to apply in this setting. Unlike the conduct at issue in the cases cited by SSB (see, for example, *North Alaska Salmon Co. v. Pillsbury, supra,* 174 Cal. 1, 4, 162 P. 93; *Norwest Mortgage, Inc. v. Superior Court* (1999) 72 Cal.App.4th 214, 222-223, 85 Cal.Rptr.2d 18), here SSB's employees allegedly acted to record conversations that were occurring contemporaneously in California. Although, as explained below in connection with the discussion of the relevant Georgia privacy statute, the privacy statute of another state also may apply to an interstate telephone call between California and the other state, we conclude that section 632 clearly is applicable in the present setting. [FN12]

> FN12. SSB concedes that this matter would not involve an improper extraterritorial application of a California statute if SSB's alleged wrongful conduct related to the *content* of a communication sent into California-for example, an obscene or harassing phone call (see, e.g., *Schlussel v. Schlussel* (1983) 141 Cal.App.3d 194, 197-198, 190 Cal.Rptr. 95 [holding that Pen.Code, § 653m, prohibiting the making of an obscene phone call with the intent to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                    Page 23
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

annoy, applies to a phone call made from Florida to California] )-but it maintains that this case is distinguishable because here the alleged wrongful conduct does not relate to the content of SSB's communications. Unlike the statute at issue in the *Schlussel* case to which SSB refers, however, the focus and purpose of the California statute here at issue is the protection of privacy, and the alleged conduct of SSB in question constitutes an invasion of privacy *within* California. Accordingly, for the same reason that the court in *Schlussel* concluded that the statute there at issue applied to an instance in which a phone call originating outside California inflicted, within California, the type of injury against which the relevant statute was intended to provide protection, we conclude that section 632 properly must be interpreted to apply to the invasion of privacy alleged to have occurred within California in the present case.

***751 Accordingly, construing section 632 in light of the language and purpose of the relevant statutory scheme as a whole, we conclude that section 632 applies when a confidential communication takes place in part in California and in part in another state.[FN13]

> FN13. In arguing that section 632 should not be interpreted to apply when a telephone call to or from California is recorded in another state, SSB relies upon a letter written by Assembly Speaker Jesse Unruh, the principal author of the 1967 invasion-of-privacy statute, in which he refers to an amendment to the 1967 act that he was considering introducing in the Legislature. Although the letter-which was not before, or considered by, the Legislature-does not appear to be a proper subject of judicial notice (see, for example, *California Teachers Assn. v. San Diego Com-*

*munity College Dist.* (1981) 28 Cal.3d 692, 699-701, 170 Cal.Rptr. 817, 621 P.2d 856), in any event we do not believe that the letter supports SSB's contention.

In the letter in question, the amendment that Speaker Unruh ostensibly proposed to introduce is set forth as follows: "No evidence obtained as a result of eavesdropping upon or recording a confidential communication in any other state, government, country or jurisdiction which if obtained in this state would have been obtained in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding." The letter explains that "[t]he purpose of the above amendment is to cover under the statute's provision out-of-state testimony obtained by means illegal in California, and to rule out such testimony just as it would be inadmissible if obtained in California." (Jesse M. Unruh, Speaker of the Assembly, letter to H. Lee Van Boven, Nov. 22, 1968.)

Although SSB apparently assumes that the amendment in question was intended to deal with the type of factual setting at issue in the present case, in our view it is more likely that the proposed amendment was intended to cover a situation in which the *entire* secretly recorded communication (telephone call or other) occurred outside of California, and in which a party in a lawsuit in California thereafter sought to introduce the recording of the communication into evidence in the California proceeding. There is nothing in the letter-or in any of the appropriately considered legislative history-indicating that Speaker Unruh (or, more importantly, the Legislature as a whole) believed the originally enacted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                              Page 24
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

version of section 632 would not apply to a telephone conversation in which an out-of-state participant secretly recorded what was said by a California party while within California.

*121 **932 B

We turn next to the applicable Georgia law.

Georgia, like California, has enacted a broad statute addressing eavesdropping upon or recording of private conversations. The basic provision of the Georgia privacy statute provides in relevant part that "[i]t shall be unlawful for: (1) Any person in a clandestine manner intentionally to overhear, transmit, or record or attempt to overhear, transmit, or record the private conversation of another which shall originate in any private place ..." (Ga.Code Ann. § 16-11-62.) The Georgia Supreme Court, in a decision concluding that the statute applied to one spouse's secret recording of telephone conversations of the other spouse, quoted a provision setting forth the general legislative intent underlying the statute: " 'It is the public policy of this State and the purpose and intent of this Chapter to protect the citizens of this State from invasions upon their privacy. This Chapter shall be construed in light of this expressed policy and purpose. The employment of devices which would permit the clandestine overhearing, recording or transmitting of conversations or observing ***752 of activities which occur in a private place has come to be a threat to an individual's right of privacy and, therefore, should be prohibited.' " (*Ransom v. Ransom* (1985) 253 Ga. 656, 324 S.E.2d 437, 438-439; see also *Bishop v. State, supra,* 241 Ga.App. 517, 526 S.E.2d 917 [interpreting Georgia statute to prohibit parents from recording their teenage child's telephone conversations without the teenager's consent].)

At the same time, however, another provision of the relevant Georgia statutory scheme explicitly provides that "[n]othing in Code Section 16-11-62 [that is, the foregoing statutory provision] shall prohibit a person from intercepting a wire, oral, or electronic communication *where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.*" (Italics added.) (Ga.Code Ann. § 16-11-66.) Georgia decisions long have interpreted the relevant Georgia privacy statutes as *not* applicable to a situation in which a conversation is *122 recorded by one of the participants in the conversation. (See, for example, *Mitchell v. State* (1977) 239 Ga. 3, 235 S.E.2d 509, 510-511.) In this respect, of course, Georgia law differs from California law.FN14

> FN14. The dichotomy between the California and Georgia privacy statutes in this regard is representative of a division in analogous privacy statutes throughout the nation. Privacy statutes in a majority of states (as well as the comparable federal provision)-like the Georgia statute-prohibit the recording of private conversations except with the consent of one party to the conversation, but a sizeable minority of states (11 states, according to an apparently well-researched law review article)-including California-prohibit such recording without the consent of all parties to the conversation. (See Bast, *What's Bugging You? Inconsistencies and Irrationalities of the Law of Eavesdropping* (1998) 47 DePaul L.Rev. 837, 870.)

[11] With regard to the further question whether the Georgia privacy statutes are intended to apply to a telephone call in which one of the parties is in Georgia and one of the parties is in another state, there is nothing in the language of the Georgia statutes that expressly addresses this issue. In light of the underlying purpose of the Georgia statute, however, we believe that-as we have concluded with regard to the California statute-the applicable Georgia statutes were intended, and reasonably should be interpreted, to apply to such a call.

**933 A hypothetical example may help explain our conclusion in this regard. Consider a situation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                              Page 25
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

in which a third party-located in a state other than Georgia or California-were to wiretap or intercept a telephone call between a person in Georgia and a person in California without the knowledge or consent of either party to the conversation. In that setting, the wiretapping would violate the relevant privacy law of both California and Georgia, and each state clearly would have a legitimate and substantial interest in applying its statute to the unlawful invasion of privacy of the person located within its state, whereas the state in which the person who committed the wiretapping was situated would not have *that* interest (although it still might have an interest in permitting an action against the wiretapper if the conduct were unlawful under its state's law). As this example demonstrates, in light of the principal purpose underlying the kind of privacy provisions here at issue, it is most reasonable to conclude that a state's privacy statute should be interpreted to apply to a telephone call in which one or more of the parties to the call are located within the state.

Accordingly, we conclude that the Georgia statute, as well as the California statute, applies to the telephone calls at issue ***753 in this case, and that the law of each state differs with regard to the legality of such conduct. Although it is unlawful under California law for a party to a telephone conversation to record the conversation without the knowledge of all other parties to the conversation, such conduct is not unlawful under Georgia law.

### *123 C

[12] Plaintiffs maintain, however, that although California law and Georgia law differ, there nonetheless is no true conflict in this situation. Although it is evident that California has a legitimate interest in having its law applied in the present setting because plaintiffs are California residents whose telephone conversations in California were recorded without their knowledge or consent, plaintiffs contend that Georgia does not have an interest in having its law applied here, because the fundamental purpose of the Georgia statute is to

protect the privacy of conversations that have some relationship to Georgia and in this case there is no claim that the privacy of any Georgia resident or any person or business in Georgia has been violated.

Although plaintiffs are correct that the facts of this case do not implicate the privacy interests protected by the Georgia statute, the Georgia statute also can reasonably be viewed as establishing the general ground rules under which persons in Georgia may act with regard to the recording of private conversations, including telephone calls. Because Georgia law prohibits the recording of such conversations except when the recording is made by one of the parties to the conversation or with such a party's consent, persons in Georgia reasonably may expect, at least as a general matter, that they lawfully can record their own conversations with others without obtaining the other person's consent, and Georgia has a legitimate interest in not having liability imposed on persons or businesses who have acted in Georgia in reasonable reliance on the provisions of Georgia law. Because the conduct of SSB that is at issue in this case involves activity that its employees engaged in within Georgia, we believe that Georgia possesses a legitimate interest in having its law applied in this setting.

Accordingly, we conclude that this case presents a true conflict of laws.

### V

[13][14] As discussed at some length earlier (*ante,* 45 Cal.Rptr.3d at pp. 742-746, 137 P.3d at pp. 924-928), the governing authorities establish that once a court's preliminary analysis has identified a true conflict, "the 'comparative impairment' approach ... seeks to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." (*Bernhard, supra,* 16 Cal.3d 313, 320, 128 Cal.Rptr. 215, 546 P.2d 719.) As our prior decisions have emphasized, in conducting this evaluation "[t]he court does not '

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914
Page 26
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

"weigh" the conflicting governmental interests in the sense of determining which conflicting law manifest[s] the "better" or the "worthier" social policy on the specific issue' "(*ibid.*), because " '[a]n attempted**934 balancing of conflicting state policies in that sense ... [would be] difficult to justify in the context of a federal system in which, within constitutional limits, states *124 are empowered to mold their policies as they wish.' " (*Ibid.*) Instead, the comparative impairment process can more " 'accurately be described as ... [an] accommodation of conflicting state policies' "(*ibid.*), attempting, to the extent practicable, to achieve "the 'maximum attainment of underlying purpose by all governmental entities.' " ***754(*Offshore Rental, supra,* 22 Cal.3d 157, 166, 148 Cal.Rptr. 867, 583 P.2d 721.) Under the comparative impairment approach, true conflicts are resolved "by applying the law of the state whose interest would be the more impaired if its law were not applied." (*Bernhard, supra,* 16 Cal.3d at p. 320, 128 Cal.Rptr. 215, 546 P.2d 719.)

[15] We proceed to evaluate the relative impairment of each state's interests that would result were the law of the other state to be applied in this setting, beginning with California's.

### A

In considering the degree of impairment of California's interest that would result if Georgia law rather than California law were applied, we note initially that the objective of protecting individuals in California from the secret recording of confidential communications by or at the behest of another party to the communication was one of the principal purposes underlying the 1967 invasion-of-privacy enactment. When the proposed legislation-then designated Assembly Bill No. 860-was before the California Legislature, Assembly Speaker Unruh, the principal author of the legislation, prepared a statement that he delivered before the Senate Committee on the Judiciary in conjunction with its consideration of the bill, in which he explained the impetus

for the legislation and described "four major changes" in the law proposed in the bill. (Statement by Assem. Speaker Unruh Before Sen. Com. on Judiciary re Assem. Bill No. 860 (1967-1968 Reg. Sess.) June 8, 1967, p. 2.) The first of the major changes described in Speaker Unruh's statement concerned the issue in question here: "In the first place, whereas such invasions of privacy are presently legal if only one party consents to the listening in, Assembly Bill 860 would require that all parties must consent. This is a most reasonable requirement. [¶] Presently it is entirely legal for one who receives a call to be totally unaware that it is being listened to by another party. Likewise, a party may converse in person with another party who is secretly recording the conversation-he may be seriously injured by that conversation, either personally or in his business affairs-and he has no recourse at law. [¶] Assembly Bill 860 would correct this defect. It is a defect that was less meaningful before the recent development and widespread availability of eavesdropping devices, but as the advertising material which I have passed out to you indicates, it is a legal defect which is most apparent today." (*Id.,* pp. 2-3, underlining in original.)

In addition, it is clear that this is most certainly *not* an instance like *Offshore Rental, supra,* 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721, in which the court found that the California *125 statute in question was "ancient" and rarely if ever utilized or relied upon and concluded that the state had little *current* interest in the application of its own law. (*Id.* at pp. 167-168, 148 Cal.Rptr. 867, 583 P.2d 721.) On the contrary, California decisions repeatedly have invoked and vigorously enforced the provisions of section 632 (see, e.g., *Flanagan v. Flanagan, supra,* 27 Cal.4th 766, 776, 117 Cal.Rptr.2d 574, 41 P.3d 575 ["the Privacy Act ... protects against intentional, nonconsensual recording of telephone conversations regardless of the content of the conversation or the type of telephone involved]"; *Ribas v. Clark* (1985) 38 Cal.3d 355, 361, 212 Cal.Rptr. 143, 696 P.2d 637 ["secret monitoring denies the speaker an important aspect of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                    Page 27
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

privacy of communication-the right to control the nature and extent of the firsthand dissemination of his statements"]; *Warden v. Kahn, supra,* 99 Cal.App.3d 805, 812-814, 160 Cal.Rptr. 471) and have looked to the policy embodied in the provision in analyzing invasion-***755 of-privacy claims in related contexts. (See, e.g., **935*Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 914-923, 85 Cal.Rptr.2d 909, 978 P.2d 67; *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 234-235, 74 Cal.Rptr.2d 843, 955 P.2d 469.)

[16] Furthermore, in recent years the California Legislature has continued to add provisions to and make modifications of the invasion-of-privacy statutory scheme here at issue (see, for example, Pen.Code, §§ 632.5-632.7 [cordless or cellular phones], 633.6 [permitting recording by victims of domestic violence upon court order] ) and in addition repeatedly has enacted new legislation in related areas in an effort to increase the protection of California consumers' privacy in the face of a perceived escalation in the impingement upon privacy interests caused by various business practices. (See, e.g., Civ.Code, §§ 1798.80-1798.84 [disclosure of consumer records], 1798.85-1795.86 [Social Security numbers], 1798.90.1 [driver's license information], 1798.91 [medical information], 1799-1799.2 [business records], 1799.3 [disclosure of personal information by providers of video cassette sales or rental services].) In addition, California's explicit constitutional privacy provision (Cal. Const., art. I, § 1) was enacted in part specifically to protect Californians from overly intrusive business practices that were seen to pose a significant and increasing threat to personal privacy. (See, e.g., *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15-20, 26 Cal.Rptr.2d 834, 865 P.2d 633; *White v. Davis* (1975) 13 Cal.3d 757, 775, 120 Cal.Rptr. 94, 533 P.2d 222; cf. *Rattray v. City of National City* (9th Cir.1994) 51 F.3d 793, 797 ["Having one's personal conversations secretly recorded may well infringe upon the right to privacy guaranteed by the California Constitution"].)

Thus, we believe that California must be viewed as having a strong and continuing interest in the full and vigorous application of the provisions of section 632 prohibiting the recording of telephone conversations without the knowledge or consent of *all* parties to the conversation.

*126 We also believe that the failure to apply section 632 in the present context would substantially undermine the protection afforded by the statute. Many companies who do business in California are national or international firms that have headquarters, administrative offices, or-in view of the recent trend toward outsourcing-at least telephone operators located outside of California. If businesses could maintain a regular practice of secretly recording all telephone conversations with their California clients or customers in which the business employee is located outside of California, that practice would represent a significant inroad into the privacy interest that the statute was intended to protect. As noted above (*ante,* 45 Cal.Rptr.3d at pp. 737-738, 137 P.3d at pp. 920-921), an out-of-state company that does business in another state is required, at least as a general matter, to comply with the laws of a state and locality in which it has chosen to do business. (See, e.g., *Watson v. Employers Liability Assurance Corp., supra,* 348 U.S. 66, 72, 75 S.Ct. 166, 99 L.Ed. 74.) As this court determined in *Bernhard, supra,* 16 Cal.3d 313, 322-323, 128 Cal.Rptr. 215, 546 P.2d 719, with regard to the need to apply California law relating to the liability of tavern owners to the out-of-state tavern owner at issue in that case, the failure to apply California law in the present context seriously would undermine the objective and purpose of the statute.

Moreover, if section 632-and, by analogy, other similar consumer-oriented privacy statutes that have been enacted in California***756 -could not be applied effectively to out-of-state companies but only to California companies, the unequal application of the law very well might place local companies at a competitive disadvantage with their out-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

of-state counterparts. To the extent out-of-state companies may utilize such undisclosed recording to further their economic interests-perhaps in selectively disclosing recordings when disclosure serves the company's interest, but not volunteering the recordings' existence (or quickly destroying them) when they would be detrimental to the company-California companies that are required to comply with California law would be disadvantaged. By contrast, application of section 632 to all companies in their dealings with California residents would treat each company equally with regard**936 to California's concern for the privacy of the state's consumers.

In sum, we conclude that the failure to apply California law in the present context would result in a significant impairment of California's interests.

## B

By contrast, we believe that, for a number of reasons, the application of California law rather than Georgia law in the context presented by the facts of this case would have a relatively less severe effect on Georgia's interests.

First, because California law, with regard to the particular matter here at issue, is more protective of privacy interests than the comparable Georgia *127 privacy statute, the application of California law would not violate any privacy interest protected by Georgia law. In addition, there is, of course, nothing in Georgia law that *requires* any person or business to record a telephone call without providing notice to the other parties to the call, and thus persons could comply with California law without violating any provision of Georgia law.

Second, with respect to businesses in Georgia that record telephone calls, California law would apply only to those telephone calls that are made to or received from California, not to all telephone calls to and from such Georgia businesses. In considering the practicability of singling out California calls for

distinct treatment, there would appear to be little question that it would be feasible for a business to identify those calls that its own employees *are making to* current or potential California clients. Similarly, with regard to calls *received by* a business in Georgia, it appears likely that technical tools-such as "caller ID"-are available that readily would make it possible to identify which calls received by the Georgia office are coming from California, and, even in the absence of such technological devices, there would appear to be no reason why an SSB employee, when answering a call, could not simply inquire where the client is calling from. Thus, application of California law would appear to affect only those telephone calls to or from California.

Furthermore, applying California law to a Georgia business's recording of telephone calls between its employees and California customers will not severely impair Georgia's interests. As discussed above (*ante*, 45 Cal.Rptr.3d at p. 749, 137 P.3d at p. 930), California law does not totally prohibit a party to a telephone call from recording the call, but rather prohibits only the *secret* or *undisclosed* recording of telephone conversations, that is, the recording of such calls without the knowledge of all parties to the call. Thus, if a Georgia business discloses at the outset of a call made to or received from a California customer that the call is being recorded, the parties to the call will not have a reasonable expectation that ***757 the call is not being recorded and the recording would not violate section 632. Accordingly, to the extent Georgia law is intended to protect the right of a business to record conversations when it has a legitimate business justification for doing so, the application of California law to telephone calls between a Georgia business and its California clients or customers would not defeat that interest. The Court of Appeal, in reaching the conclusion that Georgia law should apply, thought it important to emphasize that Georgia has a legitimate interest in permitting a financial services entity, such as SSB, to routinely record telephone calls "for the perfectly understandable purpose of protecting themselves from the customer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                          Page 29
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

who might later claim the institution misunderstood his or her investment instructions," but the appellate court failed to recognize that the application of California law would not thwart that interest. Although the *128 application of California law to telephone calls between Georgia and California would impair Georgia's interests to the extent Georgia law is intended to protect a business's ability *secretly* to record its customers' telephone calls, we believe that, particularly as applied to a business's blanket policy of routinely recording telephone calls to and from California customers, this consequence would represent only a relatively minor impairment of Georgia's interests.

**937 For the foregoing reasons, we conclude that, as a realistic matter, the application of California law in this context would not result in a severe impairment of Georgia's interests.

### C

Accordingly, because we have found that the interests of California would be severely impaired if its law were not applied in this context, whereas Georgia's interest would not be significantly impaired if California law rather than Georgia law were applied, we conclude that, with the one exception we discuss below, California law should apply in determining whether the alleged secret recording of telephone conversations at issue in this case constitutes an unlawful invasion of privacy.

### VI

[17] Although, for the reasons just discussed, we have concluded that, as a general matter, the comparative impairment analysis supports the application of California law in this context, we believe it is appropriate to make an exception with regard to one distinct issue-the question of SSB's potential monetary liability for its *past* conduct.

As we have noted above, prior California decisions establish that one of the objectives of the comparat-

ive impairment analysis "is the 'maximum attainment of underlying purpose by *all* governmental entities....' " (*Offshore Rental, supra,* 22 Cal.3d 157, 166, 148 Cal.Rptr. 867, 583 P.2d 721, italics added.) In seeking to maximize each affected state's interest to the extent feasible in the present context, we believe it is appropriate, for the reasons discussed below, to restrain the application of California law with regard to the imposition of liability for acts that have occurred in the past, in order to accommodate Georgia's interest in protecting persons who acted in Georgia in reasonable reliance on Georgia law from being subjected to liability on the basis of such action.

To begin with, we recognize that Georgia has a legitimate interest in ensuring that individuals and businesses who act in Georgia with the reasonable expectation that Georgia law applies to their conduct are not thereafter *129 unexpectedly and unforeseeably subjected to liability for such actions. The Court of Appeal in the present case relied heavily upon this interest in reaching its conclusion, and we believe that ***758 court's assessment of the substantiality of this state interest is reasonable. (Accord *People v. One 1953 Ford Victoria* (1957) 48 Cal.2d 595, 599, 311 P.2d 480 [recognizing propriety of accommodating reasonable expectations of persons who act in another state in reasonable reliance on the other state's law].)

To be sure, one legitimately might maintain that SSB reasonably should have anticipated that its recording of a telephone conversation with a California client when the client is in California would be governed by California law, regardless of where the SSB employee with whom the client is speaking happens to be located. (See NASD Notice to Members 98-52 (eff. Aug. 17, 1998), p. 394.) [FN15] Although SSB would have reached that conclusion had it undertaken the extended **938 choice-of-law analysis set forth above, we recognize that at the time of SSB's past actions the few lower court decisions that had considered a legal challenge to the recording of an interstate telephone conversation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                                      Page 30
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

had reached differing conclusions as to which state's law should apply-the law of the state where the person who recorded the conversation was situated, or instead the law of the state where the person whose words were being recorded was located.FN16 Although none of the prior cases involved ***759 the type of repeated recording of customer telephone calls by *130 a business entity that is involved here, we nonetheless believe that prior to our resolution of the issue in this case a business entity reasonably might have been uncertain as to which state's law was applicable and reasonably might have relied upon the law of the state in which its employee was located. Under these circumstances, we believe Georgia has a legitimate interest in not having SSB subjected to liability on the basis of its employees' past actions in Georgia.

> FN15. This NASD document, issued in 1998 with regard to the application of NASD rule 3010 (see, *ante,* 45 Cal.Rptr.3d at p. 739, fn. 3, 137 P.3d at p. 921, fn. 3), states in relevant part: "In complying with the Taping Rule, members must comply with federal and state civil and criminal statutes governing the tape recording of conversations. Each state has a statute governing wiretapping; there also is a federal statute governing wiretapping and electronic surveillance. The federal statute and the majority of the state statutes permit taping the telephone conversations with the consent of one party (one-party statutes); a minority of state statutes require the consent of all parties to the conversation (two-party statutes). Three issues arise from the proposed Rule; what is necessary to comply with one-party statutes; what is necessary to comply with two-party statutes; and how to comply where a conversation occurs between a person in a one-party state and a person in a two-party state.

> "*The question of which state law applies when a conversation occurs between a person in a one-party statute state and a person in a two-party statute state is an open issue that depends on the individual laws of each state and the individual facts. Firms would be required to independently determine that state laws are satisfied. The best practice in each case would be for member firms to notify their registered persons and customers that their telephone calls are being tape recorded.*" (NASD Notice to Members 98-52, p. 394, italics added, fns. omit- ted.)

> FN16. The prior cases involved the application of the law of four jurisdictions: Florida, Massachusetts, New York, and Texas, although not all of the cases analyzed the issue under choice-of-law principles. In Florida, an intermediate state appellate court held that Florida law-which, like California law, prohibits the recording of a telephone call without the consent of all parties-applied and rendered unlawful the recording in Georgia of a telephone call between the defendant in Georgia and the plaintiff in Florida. (*Koch v. Kimball* (Fla.Ct.App.1998) 710 So.2d 5.) In Massachusetts, a number of federal district court decisions applying Massachusetts law ruled that the law of the state in which the person is doing the recording should apply, and therefore rejected actions brought by Massachusetts residents (whose law-like California law-requires the consent of all parties) against defendants who recorded the calls in states where the consent of only one party is required. (*MacNeill Engineering Co. v. Trisport, Ltd.* (D.Mass.1999) 59 F.Supp.2d 199, 202; *Pendell v. AMS/Oil, Inc* (D.Mass.1986) 1986 WL 5286, 1986 U.S.Dist. Lexis 26089.) In New York, a federal district court applying New York

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914                                                                Page 31
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)

law held that where the party whose conversation was secretly recorded was located in a state that permitted the recording of a conversation with the consent of one party, that party could not maintain an action even though the defendant who recorded the conversation was located in a state that required the consent of all parties to the conversation. (*Wehringer v. Brannigan* (S.D.N.Y.1990) 1990 WL 200563, 1990 U.S. Dist. Lexis 16447; see also *Locke v. Aston* (2006) 31 A.D.3d 33, 814 N.Y.S.2d 38.) In Texas, a federal district court applying Texas's "most significant relationship" choice-of-law test concluded that Texas law (which required the consent of only one party to the conversation), rather than California law, should apply when a company employee in Texas recorded telephone conversations with other company employees in California. (*Becker v. Computer Sciences Corp.* (S.D.Tex.1982) 541 F.Supp. 694, 703-705.)

At the same time, although California law expressly authorizes the recovery of damages for violations of section 632 (§ 637.2, subd. (a)), we believe that it is appropriate to recognize that ascribing a monetary value to the invasion of privacy resulting from the secret recording of a telephone conversation is difficult in any event, and that the deterrent value of such a potential monetary recovery cannot affect conduct that already has occurred. Under these circumstances, we conclude that denying the recovery of damages for conduct that was undertaken in the past in ostensible reliance on the law of another state-and prior to our clarification of which state's law applies in this context-will not seriously impair California's interests.

Accordingly, although we conclude that in general California law is applicable in this setting and that plaintiffs may seek injunctive relief to require SSB to comply with California law in the future, we shall apply Georgia law with respect to SSB's po-

tential monetary liability for its past conduct, thus relieving SSB of any liability for damages for its past recording of conversations. (Cf., e.g., *Ex parte Archy* (1858) 9 Cal. 147, 171 [applying clarification of choice-of-law rule prospectively].) [FN17] In light of our decision, of course, out-of-state companies that do business in California now are on notice that, with regard to future conduct, they are subject to California law *131 with regard to the recording of telephone conversations made to or received from California, and that the full **939 range of civil sanctions afforded by California law may be imposed for future violations. [FN18]

FN17. For the same reasons that lead us to conclude that monetary damages may not be obtained on the basis of SSB's past actions, we also conclude that it would be inappropriate to require SSB to provide reimbursement under the provisions of the unfair competition law on the basis of such past actions.

FN18. To avoid any misunderstanding regarding the scope of our ruling, we note that this case does not present the question whether secret recordings that were made prior to this decision would or would not be admissible in a judicial or other proceeding, and we express no opinion on that question.

Furthermore, because this case does not involve the isolated recording of a personal telephone call by an out-of-state individual in a nonbusiness setting, or the recording of a phone call by an out-of-state business that has a reasonable, individualized basis for believing that a particular caller is engaged in criminal or wrongful conduct, we have no occasion to determine how the comparative impairment analysis would apply in those or other comparable settings.

**VII**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 P.3d 914
Page 32
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily
Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206
**(Cite as: 39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730)**

Finally, we briefly address a point raised by one of the amicus curiae briefs ***760 that have been filed in this court, focusing specifically upon the potential application of California's unfair competition law (UCL) in this case. The brief of amicus curie Pacific Legal Foundation suggests that because, as compared to other states' consumer protection laws, the UCL "provides the broadest right of action to the widest number of people," the reach of the statute should be restrained in the application of California's choice-of-law principles.

In our view, we have no occasion in the present case to address the concerns advanced by amicus curiae, because this case does not present any of the potentially more controversial aspects of the UCL and the provisions of that law will not affect the potential relief that plaintiffs may obtain in this case. Here, we are not dealing with conduct that assertedly is simply "unfair" (see generally *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180-187, 83 Cal.Rptr.2d 548, 973 P.2d 527), but rather with alleged conduct that is "unlawful" and already subject to an express statutory private right of action. (§ 637.2.) Further, both the named plaintiffs and the members of the proposed class allegedly are direct victims of the unlawful conduct, rather than simply unharmed persons suing on behalf of the general public. (Cf., e.g., *Consumers Union of United States, Inc. v. Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1437-1444, 257 Cal.Rptr. 151; see also Prop. 64, Gen. Elec. (Nov. 2, 2004), amending Bus. & Prof.Code, § 17204.) In addition, an injunctive remedy is authorized not only by the terms of the UCL (Bus. & Prof.Code, § 17203), but by the terms of section 637.2 itself. Finally, as discussed earlier (*ante,* 45 Cal.Rptr.3d at p. 759, fn. 17, 137 P.3d at p. 938, fn. 17), to the extent plaintiffs seek reimbursement under the UCL for SSB's past conduct, we have concluded that such reimbursement is unavailable.

**\*132 VIII**

For the reasons discussed above, the judgment of the Court of Appeal is reversed insofar as it precludes plaintiffs from going forward with their action to obtain injunctive relief, and is affirmed insofar as it upholds the dismissal of the action with regard to the recovery of monetary damages and restitution. Plaintiffs shall recover their costs on appeal.

WE CONCUR: KENNARD, BAXTER, WERDEGAR, CHIN, MORENO, and CORRIGAN, JJ.
Cal.,2006.
Kearney v. Salomon Smith Barney, Inc.
39 Cal.4th 95, 137 P.3d 914, 45 Cal.Rptr.3d 730, Blue Sky L. Rep. P 74,586, 153 Lab.Cas. P 60,240, 06 Cal. Daily Op. Serv. 6326, 2006 Daily Journal D.A.R. 9206

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**17**

Westlaw.

235 P.2d 7
37 Cal.2d 696, 235 P.2d 7
(Cite as: **37 Cal.2d 696**)

▷
M. F. Kemper Const. Co. v. City of Los Angeles
Cal.
  M. F. KEMPER CONSTRUCTION COMPANY (a
    Co-partnership), Plaintiff and Respondent,
                    v.
  THE CITY OF LOS ANGELES et al., Appellants;
  M. F. KEMPER et al., Cross-Defendants and Re-
                  spondents.
              **L. A. No. 21472.**

        Supreme Court of California
              Aug. 28, 1951.

              HEADNOTES

(1) Municipal Corporations § 356--Contracts--Bids.
Once opened and declared, a construction com-
pany's bid on a municipal public improvement
project is in the nature of an irrevocable option, a
contract right of which the city cannot be deprived
without its consent unless the requirements for res-
cission are satisfied.
See 18 Cal.Jur. 1006; 38 Am.Jur. 175.
(2)        Municipal        Corporations        §
356--Contracts--Bids--Mistake.
Actual notice by a city, before it attempted to ac-
cept a bid on a municipal public improvement
project, that the bidder had made an error in his es-
timates, is treated as equivalent to mutual mistake
for purposes of rescission. (See Civ. Code, § 1689.)

(3) Cancellation § 32--Mistake.
Relief from mistaken bids is consistently allowed
where one party knows or has reason to know the
other's error and the requirements for rescission are
fulfilled.
Unilateral mistake as basis of bill in equity to res-
cind contract, note, 59 **A.L.R.** 809. Rights and rem-
edies of bidder of public contract who has not
entered into a contract where bid was based on his
own mistake of fact, notes, 80 **A.L.R.** 586; 107
**A.L.R.** 1451. See, also, 4 Cal.Jur. 783; 9 Am.Jur.

377.
(4) Cancellation § 9--Conditions Precedent to Re-
lief.
Rescission may be had for mistake of fact if the
mistake is material to the contract and is not the
result of neglect of a legal duty, if enforcement of
the contract as made would be unconscionable, if
the other party can be placed in statu quo, if the
party seeking relief gives prompt notice of his elec-
tion to rescind, and if he restores or offers to restore
to the other party everything of value which he has
received under the contract. (Civ. Code, §§ 1577,
1689, 1691, 3406, 3407.)

(5)        Municipal        Corporations        §
356--Contracts--Bids--Mistake.
The omission of an item of $301,769 from a con-
struction company's bid of $780,305 on a municipal
public improvement project is a material mistake
for the purpose of rescission.

(6) Cancellation § 31--Mistake.
Not all carelessness constitutes a "neglect of legal
duty" within the meaning of Civ. Code, § 1577, de-
fining a mistake of fact for which relief may be al-
lowed by way of rescission.

(7)        Municipal        Corporations        §
361--Contracts--Bids--Rescission.
In an action by a construction company to cancel a
bid it submitted on a municipal public improvement
project, it cannot be said as a matter of law, under
all the circumstances, that the omission of an item
of $301,769 from a bid of $780,305 is a neglect of a
legal duty such as will bar equitable relief, where it
appears, among other things, that the item was in-
advertently omitted in the transfer of figures from
work sheets to an accumulation sheet by men who
were exhausted from long hours spent under pres-
sure in preparing the bid. (Civ. Code, § 1577.)

(8)        Municipal        Corporations        §
361--Contracts--Bids--Rescission.
In an action by a construction company to cancel a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

235 P.2d 7                                                    Page 1
37 Cal.2d 696, 235 P.2d 7
(Cite as: 37 Cal.2d 696)

▷

M. F. Kemper Const. Co. v. City of Los Angeles
Cal.
    M. F. KEMPER CONSTRUCTION COMPANY (a
    Co-partnership), Plaintiff and Respondent,
                        v.
    THE CITY OF LOS ANGELES et al., Appellants;
    M. F. KEMPER et al., Cross-Defendants and Re-
                    spondents.
              L. A. No. 21472.

          Supreme Court of California
                Aug. 28, 1951.

              HEADNOTES

(1) Municipal Corporations § 356--Contracts--Bids.
Once opened and declared, a construction com-
pany's bid on a municipal public improvement
project is in the nature of an irrevocable option, a
contract right of which the city cannot be deprived
without its consent unless the requirements for res-
cission are satisfied.
See 18 Cal.Jur. 1006; 38 Am.Jur. 175.
(2)      Municipal      Corporations        §
356--Contracts--Bids--Mistake.
Actual notice by a city, before it attempted to ac-
cept a bid on a municipal public improvement
project, that the bidder had made an error in his es-
timates, is treated as equivalent to mutual mistake
for purposes of rescission. (See Civ. Code, § 1689.)

(3) Cancellation § 32--Mistake.
Relief from mistaken bids is consistently allowed
where one party knows or has reason to know the
other's error and the requirements for rescission are
fulfilled.
Unilateral mistake as basis of bill in equity to res-
cind contract, note, 59 A.L.R. 809. Rights and rem-
edies of bidder of public contract who has not
entered into a contract where bid was based on his
own mistake of fact, notes, 80 A.L.R. 586; 107
A.L.R. 1451. See, also, 4 Cal.Jur. 783; 9 Am.Jur.

377.
(4) Cancellation § 9--Conditions Precedent to Re-
lief.
Rescission may be had for mistake of fact if the
mistake is material to the contract and is not the
result of neglect of a legal duty, if enforcement of
the contract as made would be unconscionable, if
the other party can be placed in statu quo, if the
party seeking relief gives prompt notice of his elec-
tion to rescind, and if he restores or offers to restore
to the other party everything of value which he has
received under the contract. (Civ. Code, §§ 1577,
1689, 1691, 3406, 3407.)

(5)      Municipal      Corporations        §
356--Contracts--Bids--Mistake.
The omission of an item of $301,769 from a con-
struction company's bid of $780,305 on a municipal
public improvement project is a material mistake
for the purpose of rescission.

(6) Cancellation § 31--Mistake.
Not all carelessness constitutes a "neglect of legal
duty" within the meaning of Civ. Code, § 1577, de-
fining a mistake of fact for which relief may be al-
lowed by way of rescission.

(7)      Municipal      Corporations        §
361--Contracts--Bids--Rescission.
In an action by a construction company to cancel a
bid it submitted on a municipal public improvement
project, it cannot be said as a matter of law, under
all the circumstances, that the omission of an item
of $301,769 from a bid of $780,305 is a neglect of a
legal duty such as will bar equitable relief, where it
appears, among other things, that the item was in-
advertently omitted in the transfer of figures from
work sheets to an accumulation sheet by men who
were exhausted from long hours spent under pres-
sure in preparing the bid. (Civ. Code, § 1577.)

(8)      Municipal      Corporations        §
361--Contracts--Bids--Rescission.
In an action by a construction company to cancel a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bid it submitted on a municipal public improvement project, the evidence clearly supports a conclusion that it would be unconscionable to hold the company to its bid at the mistaken figure, where the city had knowledge before the bid was accepted that the company had made a clerical error which resulted in the omission of an item amounting to nearly one third of the amount intended to be bid, and where, under all the circumstances, it appears that it would be unjust and unfair to permit the city to take advantage of the company's mistake.

**(9)** Municipal Corporations §
361--Contracts--Bids--Rescission.
In an action by a construction company to cancel, on the ground of a clerical mistake, a bid it submitted on a municipal public improvement project, there is no reason for denying relief on the ground that the city cannot be restored to status quo, where it had ample time to award the contract without readvertising, and where it actually did award the contract to the next lowest bidder. (Civ. Code, § 3407.)

**(10)** Municipal Corporations §
361--Contracts--Bids--Rescission.
In an action by a construction company to cancel, on the ground of a clerical mistake, a bid it submitted on a municipal public improvement project, the city will not be heard to complain that it cannot be placed in statu quo because it will not have the benefit of an inequitable bargain.

**(11)** Municipal Corporations §
361--Contracts--Bids--Rescission.
In an action by a construction company to cancel a bid it submitted on a municipal public improvement project, in which all of the other requirements of rescission, including prompt notice upon the discovery of a clerical error, have been met, no offer of restoration was necessary where the company received nothing of value which it could restore. (Civ. Code, § 3407.)

**(12)** Municipal Corporations §
356--Contracts--Bids--Mistake--Errors of Judgment

Distinguished.
In an action by a construction company to cancel, on the ground of a clerical mistake, a bid it submitted on a municipal public improvement project, a statement in the invitation and official bid form that bidders "will not be released on account of errors" will be given effect by interpreting it as relating to errors of judgment as distinguished from clerical mistakes.

**(13)** Cancellation § 31--Mistake.
There is no distinction between public and private contracts with regard to the right of equitable relief by way of rescission for mistake. (See Civ. Code, § 1635.)

**(14)** Municipal Corporations §
356--Contracts--Bids--Forfeiture.
The language of a city charter, providing that the bid bond of a successful bidder is forfeited on his failure to enter into the contract awarded him, cannot be construed as requiring forfeiture in situations where the bidder has a legal excuse for refusing to enter into the formal written contract.

SUMMARY

APPEAL from a judgment of the Superior Court of Los Angeles County. Alfred L. Bartlett, Judge. Affirmed.

Action against a city to cancel a bid on public construction work. Judgment for plaintiff affirmed.

COUNSEL
Ray L. Chesebro, City Attorney, Bourke Jones, Assistant City Attorney and James A. Doherty, Deputy City Attorney, for Appellants.
Stephen Monteleone, John M. Martin and Frank L. Martin for Respondents.
Gardiner Johnson and Thomas E. Stanton, Jr., as Amici Curiae on behalf of Respondents. *699
GIBSON, C. J.
M. F. Kemper Construction Company brought this action against the city of Los Angeles to cancel a bid it had submitted on public construction work

235 P.2d 7
37 Cal.2d 696, 235 P.2d 7
(Cite as: 37 Cal.2d 696)

and to obtain discharge of its bid bond. The city cross-complained for forfeiture of the bond and for damages. The trial court cancelled the bid, discharged the bond, and allowed appellant city nothing on its cross- complaint. The sole issue is whether the company is entitled to relief on the ground of unilateral mistake.

On July 28, 1948, the city Board of Public Works published a notice inviting bids for the construction of the general piping system for the Hyperion sewer project. Pursuant to the city charter, the notice provided that each bid must be accompanied by a certified check or surety bond for an amount not less than 10 per cent of the sum of the bid "as a guarantee that the bidder will enter into the proposed contract if it is awarded to him," and that the bond or check and the proceeds thereof "will become the property of the city of Los Angeles, if the bidder fails or refuses to execute the required contract. ..." ᶠᴺ*The charter provides: "After bids have been opened and declared, except with the consent of the officer, board or City Council having jurisdiction over the bidding, no bid shall be withdrawn, but the same shall be subject to acceptance by the city for a period of three months. ..." (§ 386(d).) The notice inviting bids reserved to the board the right to reject any and all bids, and both it and the official bid form stated that bidders "will not be released on account of errors."

FN* Section 386(d) of the charter of the city of Los Angeles provides in part that every bid shall be accompanied by a certified check or surety bond for an amount not less than ten per cent of the aggregate sum of the bid "guaranteeing that the bidder will enter into the proposed contract if the same be awarded to him." Section 386(i) provides, "If the successful bidder fails to enter into the contract awarded him ... within ten days after the award, then the sum posted in cash or by certified check or guaranteed by the bid bond is forfeited to the city. Such forfeiture shall not preclude

recovery of any sum over and above the amount posted or guaranteed to which the city sustains damage by reason of such default or failure to contract. ..."

Respondent company learned of the invitation for bids on August 17 and immediately began to prepare its proposal. Over a thousand different items were involved in the estimates. The actual computations were performed by three men, each of whom calculated the costs of different parts of the work, and in order to complete their estimates, they all worked until 2 o'clock on the morning of the day the bids *700 were to be opened. Their final effort required the addition and transposition of the figures arrived at by each man for his portion of the work from his "work sheet" to a "final accumulation sheet" from which the total amount of the bid was taken. One item estimated on a work sheet in the amount of $301,769 was inadvertently omitted from the final accumulation sheet and was overlooked in computing the total amount of the bid. The error was caused by the fact that the men were exhausted after working long hours under pressure. When the bids were opened on August 25, it was found that respondent company's bid was $780,305 and the bids of the other three contractors were $1,049,592, $1,183,000 and $1,278,895.

The company discovered its error several hours after the bids were opened and immediately notified a member of the board of its mistake in omitting one item while preparing the final accumulation of figures for its bid. On August 27 the company explained its mistake to the board and withdrew its bid. A few days later, at the board's invitation, it submitted evidence which showed the unintentional omission of the $301,769 item. The board, however, passed a resolution accepting the erroneous bid of $780,305, and the company refused to enter into a written contract at that figure. On October 15, 1948, without readvertising, the board awarded the contract to the next lowest bidder. The city then demanded forfeiture of the Kemper Company's bond, and the company commenced the present ac-

235 P.2d 7
37 Cal.2d 696, 235 P.2d 7
(Cite as: 37 Cal.2d 696)

tion to cancel its bid and obtain discharge of the bond.

The trial court found that the bid had been submitted as the result of an excusable and honest mistake of a material and fundamental character, that the company had not been negligent in preparing the proposal, that it had acted promptly to notify the board of the mistake and to rescind the bid, and that the board had accepted the bid with knowledge of the error. The court further found and concluded that it would be unconscionable to require the company to perform for the amount of the bid, that no intervening rights had accrued, and that the city had suffered no damage or prejudice.

(1) Once opened and declared, the company's bid was in the nature of an irrevocable option, a contract right of which the city could not be deprived without its consent unless the requirements for rescission were satisfied. (See *Conduit & Foundation Corp. v. Atlantic City,* 2 N.J.Super. 433 [64 A.2d 382, 384-385]; *701*School District of Scottsbluff v. Olson Const. Co.,* 153 Neb. 451 [45 N.W.2d 164, 166-168]; 5 Williston on Contracts [1937] §§ 1441, 1578.) The company seeks to enforce rescission of its bid on the ground of mistake. (See Civ. Code, § 1689.) The city contends that a party is entitled to relief on that ground only where the mistake is mutual, and it points to the fact that the mistake in the bid submitted was wholly unilateral. (See Rest., Contracts, § 503; Rest., Restitution, § 12; 5 Williston on Contracts [1937] § 1579.) (2) However, the city had actual notice of the error in the estimates before it attempted to accept the bid, and knowledge by one party that the other is acting under mistake is treated as equivalent to mutual mistake for purposes of rescission. (5 Williston on Contracts [1937] § 1557, p. 4362; see, also, *School District of Scottsbluff v. Olson Const. Co.,* 153 Neb. 451 [45 N.W.2d 164, 166]; Rest., Contracts, § 503, comment a, Illus. 5; Rest., Restitution, § 12, comment c; 3 Pomeroy's Equity Jurisprudence [1941] § 870a, pp. 389-390.) (3) Relief from mistaken bids is consistently allowed where one party knows or has

reason to know of the other's error and the requirements for rescission are fulfilled. (*Moffett, Hodgkins & Clarke Co. v. Rochester,* 178 U.S. 373, 385, 387 [20 S.Ct. 957, 961-962, 44 L.Ed. 1108]; *Conduit & Foundation Corp. v. Atlantic City,* 2 N.J.Super. 433 [64 A.2d 382, 386]; *Geremia v. Boyarsky,* 107 Conn. 387 [140 A. 749]; *R. O. Bromagin & Co. v. City of Bloomington,* 234 Ill. 114 [84 N.E. 700]; *W. F. Martens & Co. v. City of Syracuse,* 183 App.Div. 622 [171 N.Y.Supp. 87]; note 59 A.L.R. 809, 815-817; 80 A.L.R. 586; see *School District of Scottsbluff v. Olson Const. Co., supra,* 153 Neb. 451 [45 N.W.2d 164, 166]; 5 Williston on Contracts [1937] § 1578, pp. 4410-4412; Lubell, Unilateral Palpable and Impalpable Mistake in Construction Contracts [1931] 16 Minn.L.Rev. 137, 143-147.)

(4) Rescission may be had for mistake of fact if the mistake is material to the contract and was not the result of neglect of a legal duty, if enforcement of the contract as made would be unconscionable, and if the other party can be placed in statu quo. (See Civ. Code, §§ 1577, 3406, 3407, 1689, 1691; 3 Pomeroy's Equity Jurisprudence [1941] § 870a.) In addition, the party seeking relief must give prompt notice of his election to rescind and must restore or offer to restore to the other party everything of value which he has received under the contract. (Civ. Code, § 1691; see *McCall v. Superior Court,* 1 Cal.2d 527, 535-536 [*702*36 P.2d 642, 95 A.L.R. 1019]; *Seeger v. Odell,* 18 Cal.2d 409, 417-418 [115 P.2d 977, 136 A.L.R. 1291].)

(5) Omission of the $301,769 item from the company's bid was, of course, a material mistake. The city claims that the company is barred from relief because it was negligent in preparing the estimates, but even if we assume that the error was due to some carelessness, it does not follow that the company is without remedy. Civil Code section 1577, which defines mistake of fact for which relief may be allowed, describes it as one not caused by "the neglect of a legal duty" on the part of the person making the mistake. (6) It has been recognized nu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 P.2d 7
37 Cal.2d 696, 235 P.2d 7
(Cite as: 37 Cal.2d 696)

merous times that not all carelessness constitutes a "neglect of legal duty" within the meaning of the section. (*Los Angeles etc. Co. v. New Liverpool Salt Co.*, 150 Cal. 21, 28 [87 P. 1029]; *Mills v. Schulba*, 95 Cal.App.2d 559, 565 [213 P.2d 408]; see *Burt v. Los Angeles Olive Growers Assn.*, 175 Cal. 668, 675-676 [166 P. 993]; 3 Pomeroy's Equity Jurisprudence § 856b.) On facts very similar to those in the present case, courts of other jurisdictions have stated that there was no culpable negligence and have granted relief from erroneous bids. (See *Conduit & Foundation Corp. v. Atlantic City*, 2 N.J.Super. 433 [64 A.2d 382]; *School District of Scottsbluff v. Olson Const. Co.*, 153 Neb. 451 [45 N.W.2d 164]; *Board of Regents of Murray State Normal Sch. v. Cole*, 209 Ky. 761 [273 S.W. 508]; *Geremia v. Boyarsky*, 107 Conn. 387 [140 A. 749]; *Barlow v. Jones*, (N.J.) 87 A. 649; *W. F. Martens & Co. v. City of Syracuse*, 183 App.Div. 622 [171 N.Y.Supp. 87]; *R. O. Bromagin & Co. v. City of Bloomington*, 234 Ill. 114 [84 N.E. 700]; *Board of School Com'rs v. Bender*, 36 Ind.App. 164 [72 N.E. 154]; *Moffett, Hodgkins & Clarke Co. v. Rochester*, 178 U.S. 373 [20 S.Ct. 957, 44 L.Ed. 1108]; see 59 A.L.R. at 818-824;*cf. Steinmeyer v. Schroeppel*, 226 Ill. 9 [80 N.E. 564, 117 Am.St.Rep. 224, 10 L.R.A.N.S. 114].) (7) The type of error here involved is one which will sometimes occur in the conduct of reasonable and cautious businessmen, and, under all the circumstances, we cannot say as a matter of law that it constituted a neglect of legal duty such as would bar the right to equitable relief.

(8) The evidence clearly supports the conclusion that it would be unconscionable to hold the company to its bid at the mistaken figure. The city had knowledge before the bid was accepted that the company had made a clerical error which resulted in the omission of an item amounting to nearly one third of the amount intended to be bid, and, under all the *703 circumstances, it appears that it would be unjust and unfair to permit the city to take advantage of the company's mistake. (9, 10) There is no reason for denying relief on the ground that the city cannot be restored to status quo. It had ample

time in which to award the contract without readvertising, the contract was actually awarded to the next lowest bidder, and the city will not be heard to complain that it cannot be placed in statu quo because it will not have the benefit of an inequitable bargain. (*Union & People's Nat. Bank v. Anderson-Campbell Co.*, 256 Mich. 674 [240 N.W. 19, 80 A.L.R. 584]; *School District of Scottsbluff v. Olson Const. Co.*, 153 Neb. 451 [45 N.W.2d 164, 166-167]; see 59 A.L.R. at p. 825.)(11) Finally, the company gave notice promptly upon discovering the facts entitling it to rescind, and no offer of restoration was necessary because it had received nothing of value which it could restore. (See *Rosemead Co. v. Shipley Co.*, 207 Cal. 414, 420-422 [278 P. 1038].) We are satisfied that all the requirements for rescission have been met.

(12) The city nevertheless contends that the company is precluded from relief because of the statement in the invitation and in the official bid form that bidders "will not be released on account of errors," and that this language required all contractors to warrant the accuracy of their bids and to waive all rights to seek relief for clerical mistake. There is a difference between mere mechanical or clerical errors made in tabulating or transcribing figures and errors of judgment, as, for example, underestimating the cost of labor or materials. The distinction between the two types of error is recognized in the cases allowing rescission and in the procedures provided by the state and federal governments for relieving contractors from mistakes in bids on public work. (See *School District of Scottsbluff v. Olson Const. Co.*, 153 Neb. 451 [45 N.W.2d 164, 166]; Cal. Gov. Code, § 14352; Federal Armed Services Procurement Regulation, 32 C.F.R. 401; Decisions B-91381, 29 Comp. Gen. 393.) Generally, relief is refused for error in judgment and allowed only for clerical or mathematical mistakes. (See cases cited in 59 A.L.R. 827-830 and 80 A.L.R. 586.)Where a person is denied relief because of an error in judgment, the agreement which is enforced is the one he intended to make, whereas if he is denied relief from a clerical error, he is forced to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 P.2d 7
37 Cal.2d 696, 235 P.2d 7
(Cite as: 37 Cal.2d 696)

Page 6

perform an agreement he had no intention of making. The statement in the bid form in the present case can be given effect by interpreting it as relating to errors of judgment as *704 distinguished from clerical errors. If we were to give the language the sweeping construction contended for by the city, it would mean holding that the contractor intended to assume the risk of a clerical error no matter in what circumstances it might occur or how serious it might be. Such interpretation is contrary to common sense and ordinary business understanding and would result in the loss of heretofore well-established equitable rights to relief from certain types of mistake.

The city also argues that public interest precludes any right to rescind for mistake, and in this connection it asserts that a literal interpretation should be given to the provision in section 386(d) of the charter that "After bids have been opened and declared, except with the consent of the officer, board or City Council having jurisdiction over the bidding, no bid shall be withdrawn. ..." (13) As we have seen, such a bid is in the nature of an irrevocable offer or option, but the offer is subject to rescission upon proper equitable grounds, and the cases recognize no distinction between public and private contracts with regard to the right of equitable relief. In *Moffett, Hodgkins & Clarke Co. v. Rochester*, 178 U.S. 373, 386 [20 S.Ct. 957, 961, 44 L.Ed. 1108], the city of Rochester urged that a construction of a charter provision similar to one involved here prevented a bidder from rescinding, and the court in rejecting the argument, said, "... If the [city is] correct in [its] contention there is absolutely no redress for a bidder for public work, no matter how aggravated or palpable his blunder. The moment his proposal is opened by the executive board he is held as in a grasp of steel. There is no remedy, no escape. If, through an error of his clerk, he has agreed to do work worth one million dollars for ten dollars, he must be held to the strict letter of his contract, while equity stands by with folded hands and sees him driven into bankruptcy. The [city's] position admits of no compromise, no ex-

ception, no middle ground." Most of the authorities from other jurisdictions heretofore cited as allowing rescission for mistake and relief from forfeiture involved public construction contracts, and in many of them there were express contract or charter provisions making the bids irrevocable. (See, also, cases collected in 59 A.L.R. 809, 824; 80 A.L.R. 586; 107 A.L.R. 1451.)The California cases uniformly refuse to apply special rules of law simply because a governmental body is a party to a contract. (See *705Petrovich v. City of Arcadia*, 36 Cal.2d 78, 85 [222 P.2d 231]; *Brown v. Town of Sebastopol*, 153 Cal. 704, 709 [96 P. 363, 19 L.R.A.N.S. 178]; *County of Sacramento v. Southern Pac. Co.*, 127 Cal. 217, 222-223 [59 P. 568, 825]; *Corporation of America v. Durham etc. Co.*, 50 Cal.App.2d 337, 340 [123 P.2d 81]; *Milovich v. City of Los Angeles*, 42 Cal.App.2d 364 [108 P.2d 960]; *Los Angeles Athletic Club v. Board of Harbor Commrs.*, 130 Cal.App. 376, 393 [20 P.2d 130]; see, also, Civ. Code, § 1635.)

(14) There is no merit in the city's contention that, even assuming the company is entitled to cancellation of the bid and is not liable for breach of contract, the bid bond should nevertheless be enforced because the company failed to enter into a written contract. It is argued that forfeiture of the bond is provided for by charter and that equity cannot relieve from a statutory forfeiture. We do not agree however that the city charter should be construed as requiring forfeiture of bid bonds in situations where the bidder has a legal excuse for refusing to enter into a formal written contract. Under such circumstances the contingency which would give rise to a forfeiture has not occurred. (See *Rainey v. Quigley*, 180 Ore. 554 [178 P.2d 148, 152, 170 A.L.R. 1149].) In line with the general policy of construing against forfeiture wherever possible, decisions from other jurisdictions permitting rescission of bids uniformly excuse the contractors from similar provisions relating to forfeiture of bid bonds or deposits. (See, for example, *Moffett, Hodgkins & Clarke Co. v. Rochester*, 178 U.S. 373 [20 S.Ct. 957, 44 L.Ed. 1108]; *Conduit & Foundation Corp. v. Atlantic*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*City,* 2 N.J.Super. 433 [64 A.2d 382, 383, 386]; *Union & People's Nat. Bank v. Anderson-Campbell Co.,* 256 Mich. 674 [240 N.W. 19, 80 A.L.R. 584]; *School District of Scottsbluff v. Olson Const. Co.,* 153 Neb. 451 [45 N.W.2d 164]; *Board of Regents of Murray State Normal Sch. v. Cole,* 209 Ky. 761 [273 S.W. 508]; *W. F. Martens & Co. v. City of Syracuse,* 183 App.Div. 622 [171 N.Y.Supp. 87]; *R. O. Bromagin & Co. v. City of Bloomington,* 234 Ill. 114 [84 N.E. 700]; *Barlow v. Jones,* (N.J.) 87 A. 649; *Board of School Com'rs v. Bender,* 36 Ind.App. 164 [72 N.E. 154]; see *Kemp v. United States,* 38 F.Supp. 568, 573.)The city places reliance on language in *Palo & Dodini v. City of Oakland,* 79 Cal.App.2d 739, 750 [180 P.2d 764], where the opinion justified the enactment and enforcement of statutory provisions for forfeiture of bid bonds. However, the court's remarks must be read in light of the fact that the bidder *706 there had not alleged matters entitling him to relief on the ground of mistake and had failed to comply with statutory provisions regarding relief from forfeiture. (See 79 Cal.App.2d at 746-747, 749.)

The judgment is affirmed.

Shenk, J., Edmonds, J., Traynor, J., and Schauer, J., concurred.

CARTER, J.
I dissent. The majority opinion is based upon two grounds: (1) That a bidder on a public construction job may rescind his bid for unilateral mistake after it is opened and thus escape the forfeiture provided by statute; (2) That the clause in the invitation for bids and the bid, that bidders "will not be released on account of errors" does not apply to clerical errors, and, therefore, is not applicable in the instant case. I do not agree with either premise.

The first violates one of the obvious and fundamental principles of the law of rescission for unilateral mistake, that is, that the one against whom rescission is sought *must have had knowledge of the mistake before a binding contract is made.*This question is glossed over in the majority opinion by a tacit assumption that the contract being rescinded

is the contract for the performance of the work rather than the irrevocable and binding offer-the bid. Yet the action is one to cancel the bid-to permit its withdrawal-and throughout the opinion, the binding effect of the bid is the thing considered. For illustration it is said: "The company seeks to enforce *rescission* of its *bid* on the ground of mistake." Indeed, there is no contract to perform the work, for the bidder refused to enter into it. The contract to be rescinded is a contract to make a contract to perform the work, that is, the irrevocable bid, the performance of which is guaranteed by the bid bond. At the time the bids were opened the city had no knowledge and had no means of knowing that the bidder had made a mistake. There is nothing left therefore but a naked unilateral mistake which is not ground for rescission. As it is said: "A mistake of only one party that forms the basis on which he enters into a transaction does not of itself render the transaction voidable. ..." (Rest. Contracts, § 503.)If that rule is not applied to bidding contracts there is nothing left of the supposedly binding bid and forfeiture provision, for the bidder may always avoid it by claiming mistake. The proof of whether or not he has made *707 such a mistake is so completely within his control and power that the public body is helpless to refute it. Charter provisions, invitation for bids, and the forfeiture provisions, such as those here involved, are made wholly meaningless, for in practically every case the reason the bidder wants to withdraw is because he has made a mistake. The important considerations of public policy behind those provisions will be completely destroyed. Those considerations were well expressed in *Palo & Dodini v. City of Oakland,* 79 Cal.App.2d 739, 750 [180 P.2d 764]: "It would be very difficult to fix the money value of the city's loss. Among the factors involved are the following: First, of course, would be the cost of readvertising (and even this amount plaintiffs have not offered to pay); secondly, there would be the delay in getting a new contract; thirdly, the lower returns the city would probably receive under a new contract, now that the highest bidder has been eliminated; fourthly, the fact that possibly in view of their ex-

235 P.2d 7
37 Cal.2d 696, 235 P.2d 7
**(Cite as: 37 Cal.2d 696)**

perience at the first bidding, the other bidders would not bid at all.

"Provisions requiring a deposit accompanying a bid for city contracts, or for forfeiture thereof, *are necessary as a matter of public policy to protect the public interests.*If, as here, a bidder were allowed without loss to himself to withdraw his bid after the bids have been publicly opened, *fraudulent practices would develop.*The body awarding contracts could agree to release a favored contractor if it turned out that his proposal was low as compared to other bids. Moreover, any bidder who found that in comparison with the other bidders, his bid was quite low, could withdraw his bid, and the city would thereby lose the value of competitive bidding and be forced to pay the prices of higher bidders with no compensation to itself for the loss sustained." (Italics added.) This court recently approved the holding of that case when it said: "*Palo & Dodini v. City of Oakland,* 79 Cal.App.2d 739 [180 P.2d 764], involved a provision of the Oakland City Charter requiring the deposit of a certified check with a bid and the forfeiture of the check in the event the successful bidder failed to execute the contract. It was held that, restricting the charter language to its most technical limits, as required by the established rule, *the explicit and mandatory terms called for a forfeiture and prohibited any relief therefrom.*"(Italics added.) (*Petrovich v. City of Arcadia,* 36 Cal.2d 78, 82 [222 P.2d 231].) Likewise, *708 in the instant case the policy is expressly declared by the charter that there shall be no relief from forfeiture.

The cases support the foregoing rule. (*Sanitary Dist. v. Ricker,* 91 F. 833; *Mayor, etc. of Baltimore v. Robinson Const. Co.,* 123 Md. 660 [91 A. 682, L.R.A. 1915A 225, Ann.Cas. 1916C 425]; *Bowes Co. v. Town of Milton,* 255 Mass. 228 [151 N.E. 116]; *Brown v. Levy,* 29 Tex.Civ.App. 389 [69 S.W. 255]; *United States v. Conti,* 119 F.2d 652; *Southbridge Roofing Co. v. Providence Cornice Co.,* 39 R.I. 35 [97 A. 210]; *State v. Scholz Bros.,* (Tex. Civ. App.) 4 S.W.2d 661.)The rule an-

nounced in the above cited cases has been thus stated: "When it is necessary for a person to make calculations or estimates, in order to determine the sum which he will bid for an offered contract, or to determine the cost to him of a proposed contract, or whether or not it will be advantageous to him to enter into it, he must assume the risk of any error or oversight in his computations, and cannot have relief in equity on the ground of mistake, if he reaches a wrong conclusion through inadvertence, misunderstanding of that which is plain on its face, or mathematical error. Thus, the negligent omission by a bidder for public work to take into consideration certain features of the work in making the estimates on which his bid was based, does not constitute a mistake which will authorize a court of equity to release him from the contract created by the acceptance of such bid. So, where plaintiff makes an offer to erect a building for a certain amount, and defendant accepts it, there is a consummated and binding agreement, although the plaintiff, in adding up the items of his estimates, makes a mistake of a very large sum, provided defendant is not in any way responsible for it. And a contract by which a company agrees to construct waterworks and furnish a municipal corporation and its inhabitants with an adequate supply of water, all to be taken from springs on certain land, will not be canceled merely because the springs prove inadequate, the mistake as to their capacity having been no more the fault of the one party than of the other. So a contractor who agrees to build a house for a specified sum is not justified in refusing to carry out his undertaking because of the error of a subcontractor in making his bid, which error induced the subcontractor to refuse to accept the work." (Black on Rescission & Cancellation, § 142.)

In addition to the foregoing, the bidder here was advised by words printed in capital letters in the invitation for bids and *709 also in the bid itself that *he would not be released for errors.*Nothing could be more explicit. There is no room left for claiming mistake. Yet the majority say that the "errors" to

which reference is made in the above mentioned documents, are of judgment, not in computation. The term "error" has a broad meaning and is not confined to those of judgment. It means the same as mistake. To narrow its meaning is to alter the contract of the parties. The phrase was used to avoid the precise claim now made by the bidder. It was contemplated by the parties that the risk of any mistakes was to be borne by the bidder. Pertinent rules are stated: " 'Where the parties treat upon the basis that the fact is doubtful, and the consequent risk each is to encounter is taken into consideration in the stipulations assented to, the contract will be valid, notwithstanding any mistake of one of the parties.' The rule is elaborated in 2 Pomeroy on Equity Jurisprudence, section 855, quoted in *Colton v. Stanford*, 82 Cal. 351, 388, 389 [23 P. 16, 16 Am.St.Rep. 137]. The cases put by Mr. Pomeroy presuppose 'an arrangement based upon uncertain or contingent events purposely as a compromise of doubtful claims arising from them, *and where parties have knowingly entered into a speculative contract or transaction*-one in which they intentionally speculated as to the result-and there is in either case an absence of bad faith, violation of confidence, misrepresentation or concealment or other inequitable conduct.' 'In such classes of agreements and transactions,' says the learned author, 'the parties are supposed to calculate the chances, and they certainly assume the risks, breach of confidence, misrepresentation, culpable concealment, or other like conduct amounting to actual or constructive fraud.' Defendant still further relies upon the rule as stated in *Ashcom v. Smith*, 2 Pen. & W. (Pa.) 211, [21 Am.Dec. 437], where acreage was estimated. The court said: 'Equity will indeed relieve against a plain mistake, as well as against misrepresentation and fraud. But can mistake be alleged in a matter which was considered doubtful, and treated accordingly? Where each of the parties is content to take the risk of its turning out in a particular way, chancery will certainly not relieve against the event.' " (Italics added.) (*Taber v. Piedmont Heights Bldg. Co.*, 25 Cal.App. 222, 227 [143 P. 319]; see, also, *Colton v. Stanford*, 82 Cal. 351,

388 [23 P. 16, 16 Am.St.Rep. 137].)

The majority opinion cites *School Dist. of Scottsbluff v. Olson Const. Co.*, 153 Neb. 451 [45 N.W.2d 164], but there *710 was no clause there like we have here. Reference is made to section 14352 of the Government Code, dealing with state contracts as excusing claimed mistakes. That provision, however, illustrates that no such excuse existed here. The Legislature felt that it was necessary to deal expressly and specifically with the subject. It provided that a bidder cannot be relieved for mistake but may bring an action for the amount forfeited (Gov. Code, § 14350), and in such action must establish that the mistake was in filling out of the bid and not in judgment (*Id.*, § 14352.)

To limit the errors of the bidder for which he is responsible to those of judgment, is to strike at the very purpose of the clause in question and the bid bond. The clause and bond are there to assure certainty of contract and to preserve the integrity of the bidding system in letting public contracts. In the majority of cases that purpose will be defeated by the limitation. From the standpoint of the bidder, his mistake is far more inexcusable when it is in computation rather than judgment. There is no reason why he cannot have his arithmetic correct. School boys have been disciplined for stupidity in that field. It is entirely within his control unaffected by any extraneous uncertain factors such as are involved in judgment as to the amount of materials and labor required, complicated by the fluctuation in their value, the physical conditions encountered, etc.

Thus we have: The charter provisions requiring competitive bidding; that the bidder's bid be irrevocable and binding; and that security must be posted to assure that the bidder will execute the contract, which security will be forfeited if he does not do so. The bidding papers expressly state that the bidder will not be excused for any mistakes he makes. Nevertheless, the majority opinion holds by dubious reasoning that all of those circumstances mean nothing. The disastrous effect of the majority

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 P.2d 7
37 Cal.2d 696, 235 P.2d 7
**(Cite as: 37 Cal.2d 696)**

Page 10

holding in the Petrovich case on public corporations seeking bids for public improvements, fades into insignificance by the holding of the majority in the case at bar.

I would, therefore, reverse the judgment.

Appellants' petition for a rehearing was denied September 24, 1951. Carter, J., voted for a rehearing. *711

Cal.
M. F. Kemper Const. Co. v. City of Los Angeles
37 Cal.2d 696, 235 P.2d 7

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**18**

Westlaw.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

▷
Nedlloyd Lines B.V. v. Superior Court of San
Mateo County (Seawinds Ltd.)
Cal. 1992.
    NEDLLOYD LINES B.V. et al., Petitioners,
                        v.
THE SUPERIOR COURT OF SAN MATEO
COUNTY, Respondent; SEAWINDS LIMITED,
            Real Party in Interest.
        **Nos. S015917, S019540.**

        Supreme Court of California
            Aug 31, 1992.

            SUMMARY

A shipping company, incorporated in Hong Kong
with its principal place of business in California,
entered into a contract with three other shipping
companies, incorporated, and with their principal
place of business, in the Netherlands. The contract
contained a choice-of-law clause providing that the
contract was to be governed by Hong Kong law.
The Hong Kong corporation brought an action
against the other corporations which included
causes of action for breach of the implied covenant
of good faith and fair dealing and breach of fidu-
ciary duty. Defendant corporations demurred to the
complaint. Applying California law, the trial court
sustained the demurrer with leave to amend.
(Superior Court of San Mateo County, No. 337705,
Thomas M. Jenkins, Judge.) The Court of Appeal,
First Dist., Div. One, No. A049718, denied defend-
ants' petition for a writ of mandate seeking the ap-
plication of Hong Kong law to the ruling on the de-
murrer. Subsequently, the trial court overruled de-
fendants' demurrer to plaintiff's first amended com-
plaint, again applying California law. The Court of
Appeal, First Dist., Div. One, Nos. A049718 and
A050535, summarily denied defendants' second
writ petition challenging the order overruling the
demurrer.

In a consolidated proceeding, the Supreme Court
reversed the judgments of the Court of Appeal and
remanded to that court with instructions to issue a
peremptory writ of mandate directing the trial court
to reconsider its ruling on defendants' demurrer in
light of applicable Hong Kong law. It held that the
choice-of-law clause, which required that the con-
tract be "governed by" the law of Hong Kong, was
fully enforceable and applicable to claims for
breach of the implied covenant of good faith and
fair dealing and for breach of fiduciary duties al-
legedly arising out of the contract, since Hong
Kong was a jurisdiction having a substantial con-
nection to the parties, and there was a substantial
basis for choosing Hong Kong law. (Opinion by
Baxter, J., with Lucas, C. J., Arabian and George,
JJ., concurring. Separate concurring and dissenting
opinion by Panelli, J., with Mosk, J., concurring.
Separate concurring and dissenting opinion by
Kennard, J.)

            HEADNOTES

    Classified to California Digest of Official Reports

(1) Courts § 23--Jurisdiction--Acquisition, Scope,
and Extent of Jurisdiction--Contractual Forum Se-
lection Provision.
There is no public policy reason to deny enforce-
ment of a forum selection clause appearing in a
contract entered into freely and voluntarily by
parties who have negotiated at arm's length.
[Validity of contractual provision limiting place or
court in which action may be brought, note, 31
**A.L.R.4th** 404.]
(2) Conflict of Laws § 5--Contracts--Choice-of-law
Provision--Standards of Enforceability.
In determining the enforceability of an arm's-length
contractual choice- of-law provision, the court must
first determine either: (1) whether the chosen state
has a substantial relationship to the parties or their
transaction, or (2) whether there is any other reas-
onable basis for the parties' choice of law. If neither
of these tests is met, that is the end of the inquiry,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If there is a fundamental conflict with California law, the court must then determine whether California has a materially greater interest than the chosen state in the determination of the particular issue, and if so, the provision will not be enforced.
[See Cal.Jur.3d, Conflict of Laws, § 69; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 44.]

(3) Conflict of Laws § 5--Contracts--Choice-of-law Provision-- Enforceability--Breach of Implied Covenant of Good Faith and Fair Dealing.
In an action for breach of the implied covenant of good faith and fair dealing brought by a Hong Kong corporation against three Netherlands corporations, arising from a contract that contained a choice-of-law clause providing that Hong Kong law governed the contract, the trial court erred in failing to apply Hong Kong law in ruling on defendants' demurrer to the complaint. As the parties' chosen state, Hong Kong clearly had a substantial relationship to the parties, since the plaintiff and one of the other parties to the contract were incorporated in Hong Kong, and, for the same reason, the parties had a reasonable basis for their choice. Also, there was no fundamental policy of California requiring the application of California law. The covenant is not a government regulatory policy designed to restrict freedom of contract, but an implied promise inserted in an agreement to carry out the presumed intentions of contracting parties. Further, there was no authority exalting the implied covenant over the express covenant of the parties that Hong Kong law govern their agreement.

(4a, 4b) Conflict of Laws § 5--Contracts--Choice-of-law Provision-- Enforceability--Breach of Fiduciary Duty.
In an action for breach of fiduciary duty brought by a Hong Kong corporation against three Netherlands

corporations, arising from a contract that contained a choice-of-law clause providing that the contract was "governed by" Hong Kong law, the trial court erred in failing to apply Hong Kong law in ruling on defendants' demurrer to the complaint. When two sophisticated, commercial entities agree to a choice-of-law clause, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action, including tortious breaches of duties, arising from or related to their contract. The phrase "governed by" reflected the parties' contemplation that all aspects be controlled by Hong Kong law. Any fiduciary duty arose only from the existence of the contract. Further, Hong Kong had a substantial relationship with the parties, there was a substantial basis for choosing Hong Kong law, and no public policy of California was offended by applying Hong Kong law to the dispute. Indeed, it is the policy of California to respect choices made by parties to voluntarily negotiated agreements.

(5) Conflict of Laws § 5--Contracts--Interpretation of Choice-of-law Provision.
In a breach of fiduciary duty action arising from a contract that contained a choice-of-law provision, the question of the interpretation of the choice-of-law provision was one of California law. The choice-of-law clause stated, "This agreement shall be governed by and construed in accordance with Hong Kong law." The agreement included the choice-of-law clause itself. Thus the question of whether that clause was ambiguous as to its scope, i.e., whether it included the fiduciary duty claim, was a question of contract interpretation that normally would be determined pursuant to Hong Kong law. However, the parties did not request judicial notice of Hong Kong law on this question of interpretation or supply the court with evidence of the relevant aspects of that law.

COUNSEL
Walsh, Donovan, Lindh & Keech, Charles S. Donovan, Ann S. Crownover and Elizabeth M. Miller for Petitioners.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

No appearance for Respondent. *462
Furth, Fahrner & Mason, Thomas R. Fahrner,
Michele C. Jackson and Michael R. Hudson for
Real Party in Interest.
**BAXTER, J.**
We granted review to consider the effect of a
choice-of-law clause in a contract between com-
mercial entities to finance and operate an interna-
tional shipping business. In our order granting re-
view, we limited our consideration to the question
whether and to what extent the law of Hong Kong,
chosen in the parties' agreement, should be applied
in ruling on defendant's demurrer to plaintiff's com-
plaint.

We conclude the choice-of-law clause, which re-
quires that the contract be "governed by" the law of
Hong Kong, a jurisdiction having a substantial con-
nection with the parties, is fully enforceable and ap-
plicable to claims for breach of the implied coven-
ant of good faith and fair dealing and for breach of
fiduciary duties allegedly arising out of the con-
tract. Our conclusion rests on the choice-of-law
rules derived from California decisions and the Re-
statement Second of Conflict of Laws, which re-
flect strong policy considerations favoring the en-
forcement of freely negotiated choice-of-law
clauses. Based on our conclusion, we will reverse
the judgments of the Court of Appeal and remand
for further proceedings.

Statement of Facts and Proceedings Below

Plaintiff and real party in interest Seawinds Limited
(Seawinds) is a shipping company, currently under-
going reorganization under chapter 11 of the United
States Bankruptcy Code, whose business consists of
the operation of three container ships. Seawinds
was incorporated in Hong Kong in late 1982 and
has its principal place of business in Redwood City,
California. Defendants and petitioners Nedlloyd
Lines B.V., Royal Nedlloyd Group N.V., and
KNSM Lines B.V. (collectively referred to as
Nedlloyd) are interrelated shipping companies in-
corporated in the Netherlands with their principal

place of business in Rotterdam.

In March 1983, Nedlloyd and other parties
(including an Oregon corporation, a Hong Kong
corporation, a British corporation, three individual
residents of California, and a resident of Singapore)
entered into a contract with Seawinds to purchase
shares of Seawinds's stock. The contract, which was
entitled "Shareholders' Agreement in Respect of
Seawinds Limited," stated that its purpose was "to
establish [Seawinds] as a joint venture company to
carry on a transportation operation." The agreement
also provided that Seawinds would carry on the
business of the transportation *463 company and
that the parties to the agreement would use "means
reasonably available" to ensure the business was a
success.

The shareholders' agreement between the parties
contained the following choice-of-law and forum
selection provision: "This agreement shall be gov-
erned by and construed in accordance with Hong
Kong law and each party hereby irrevocably sub-
mits to the non-exclusive jurisdiction and service of
process of the Hong Kong courts."

In January 1989, Seawinds sued Nedlloyd, alleging
in essence that Nedlloyd breached express and im-
plied obligations under the shareholders' agreement
by: "(1) engaging in activities that led to the cancel-
lation of charter hires that were essential to Sea-
winds' business; (2) attempting to interfere with a
proposed joint service agreement between Sea-
winds and the East Asiatic Company, and delaying
its implementation; (3) making and then reneging
on commitments to contribute additional capital,
thereby dissuading others from dealing with Sea-
winds, and (4) making false and disparaging state-
ments about Seawinds' business operations and fin-
ancial condition." Seawinds's original and first
amended complaint included causes of action for
breach of contract, breach of the implied covenant
of good faith and fair dealing (in both contract and
tort), and breach of fiduciary duty. This matter
comes before us after trial court rulings on demur-
rers to Seawinds's complaints.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

Nedlloyd demurred to Seawinds's original complaint on the grounds that it failed to state causes of action for breach of the implied covenant of good faith and fair dealing (either in contract or in tort) and breach of fiduciary duty. In support of its demurrer, Nedlloyd contended the shareholders' agreement required the application of Hong Kong law to Seawinds's claims. In opposition to the demurrer, Seawinds argued that California law should be applied to its causes of action.

In ruling on Nedlloyd's demurrer, the trial court expressly determined that California law applied to all of Seawinds's causes of action. It sustained the demurrers with leave to amend as to all causes of action, relying on grounds not pertinent to the issues before us. Nedlloyd sought a writ of mandate from the Court of Appeal directing the application of Hong Kong law. After the Court of Appeal summarily denied Nedlloyd's initial writ petition, we granted Nedlloyd's petition for review and transferred the case back to the Court of Appeal with instructions to issue an alternative writ.

After complying with our direction, the Court of Appeal denied Nedlloyd's first writ petition and discharged the alternative writ. In a published *464 opinion, the Court of Appeal upheld the application of California law to Seawinds's claims. We granted Nedlloyd's petition for review.

In the meantime, the trial court overruled Nedlloyd's demurrer to Seawinds's first amended complaint, again applying California law to Seawinds's causes of action. The Court of Appeal summarily denied Nedlloyd's second writ petition challenging the order overruling the latter demurrer; we also granted review of that order and consolidated proceedings on the two writ matters so as to preserve the choice-of-law issue for review. As noted above, we have limited review in both proceedings to the choice-of-law issue.

Discussion

*I. The proper test*

We have not previously considered the enforceability of a contractual choice-of-law provision. (1) We have, however, addressed the closely related issue of the enforceability of a contractual choice-of-forum provision, and we have made clear that, "No satisfying reason of public policy has been suggested why enforcement should be denied a forum selection clause appearing in a contract entered into freely and voluntarily by parties who have negotiated at arm's length." (*Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491, 495-496 [131 Cal.Rptr. 374, 551 P.2d 1206] (*Smith*).) The forum selection provision in *Smith* was contained within a choice-of-law clause, and we observed that, "Such choice of law provisions are usually respected by California courts." (*Id.*, at p. 494.)We noted this result was consistent with the modern approach of section 187 of the Restatement Second of Conflict of Laws (Restatement). (17 Cal.3d at p. 494.) Prior Court of Appeal decisions, although not always explicitly referring to the Restatement, also overwhelmingly reflect the modern, mainstream approach adopted in the Restatement. (*Mencor Enterprises, Inc. v. Hets Equities Corp.* (1987) 190 Cal.App.3d 432, 435-436 [235 Cal.Rptr. 464] [explicit reference to Rest.§ 187]; *Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 417 [197 Cal.Rptr. 757] [no explicit reference]; *Ashland Chemical Co. v. Provence* (1982) 129 Cal.App.3d 790, 794-795 [181 Cal.Rptr. 340] [no explicit reference]; *Gamer v. duPont Glore Forgan, Inc.* (1976) 65 Cal.App.3d 280, 287 [135 Cal.Rptr. 230] [explicit reference to Rest. § 187].) [FN1]

> FN1 Federal courts applying California's conflicts law have also adhered to this approach. (*Consul Ltd. v. Solide Enterprises, Inc.* (9th Cir. 1986) 802 F.2d 1143, 1146-1147;*S. A. Empresa, etc. v. Boeing Co.* (9th Cir. 1981) 641 F.2d 746, 749;*Sarlot-Kantarjian v. First Pa. Mortg. Trust* (9th Cir. 1979) 599 F.2d 915, 917.)The mainstream nature of this approach is fur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

Page 5

ther reflected by a recent study indicating that 15 states other than California follow the general approach of the Restatement Second. (Chow, *Limiting Erie in a New Age of International Law: Toward a Federal Common Law of International Choice of Law* (1988) 74 Iowa L.Rev. 165, 190-191.)

(2) We reaffirm this approach. In determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall *465 apply the principles set forth in Restatement section 187, which reflects a strong policy favoring enforcement of such provisions. [FN2]

> FN2 There may be an exception to application of the Restatement approach. Choice-of-law issues arising from contracts subject to the Uniform Commercial Code are governed by California Commercial Code section 1105, subdivision (1), which provides that, subject to specified exceptions, the parties may choose the law of a state having a "reasonable relation" to the transaction. This "reasonable relation" test appears to be similar to the "substantial relationship" test we adopt from the Restatement. (See official code com. to U. Com. Code § 1-105 [Deering's Ann. Cal. U. Com. Code, § 1105 (1986 ed.) p. 10; 23A West's Ann. Cal. U. Com. Code, § 1105 (1964 ed.) p. 37].) Neither party to this action, however, contends that California Uniform Commercial Code section 1105 applies to their contract. We therefore need not and do not determine whether and to what extent, if any, the Commercial Code and Restatement approaches are different.

More specifically, Restatement section 187, subdivision (2) sets forth the following standards: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in

their agreement directed to that issue, unless either [¶] (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or [¶] (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." [FN3] *466

> FN3 Subdivision (1) of section 187 of the Restatement states: "(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." As comment c to section 187, subdivision (1) explains: "The rule of this Subsection is a rule providing for incorporation by reference and is not a rule of choice of law. The parties, generally speaking, have power to determine the terms of their contractual engagements. They may spell out these terms in the contract. In the alternative, they may incorporate into the contract by reference extrinsic material which may, among other things, be the provisions of some foreign law. ... [M]ost rules of contract law are designed to fill gaps in a contract which the parties could themselves have filled with express provisions." (Rest., § 187, subd. (1), com. c, p. 563.) The record in this case does not indicate that the parties incorporated by reference extrinsic material in the form of Hong Kong law in order to fill a gap in their contract. Subdivision (1) therefore is not at issue, and we need not and do not further consider its potential application or scope.

Briefly restated, the proper approach under Restate-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

Page 6

ment section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. [FN4]If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. [FN5]If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue ...." (Rest., § 187, subd. (2).) If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy. [FN6]We now apply the Restatement test to the facts of this case. *467

FN4 As noted above, a different result might obtain under Restatement section 187, subdivision (1), which appears to allow the parties *in some circumstances* to specify the law of a state that has no relation to the parties or their transaction. The Restatement gives these two illustrations: "4. In State X, A establishes a trust and provides that B, the trustee, shall be paid commissions at the highest rate permissible under the local law of state Y. *A and B are both domiciled in X, and the trust has no relation to any state but X.* In X, the highest permissible rate of commissions for trustees is 5 per cent. In Y, the highest permissible rate is 4 per cent. The choice-of-law provision will be given effect, and B will be held entitled to commissions at the rate of 4 per cent. [¶] 5. Same facts as in Illustration 4 except that the highest permissible rate of commissions in X is 4 per

cent and in Y is 5 per cent. Effect will not be given to the choice-of-law provision since under X local law the parties lacked power to provide for a rate of commissions in excess of 4 per cent and Y, the state of the chosen law, has no relation to the parties or the trust." (Rest., § 187, subd. (1), com. c., illus. 4 & 5, p. 564; italics added.)

FN5 To be more precise, we note that Restatement section 187, subdivision (2) refers not merely to the forum state-for example, California in the present case-but rather to the state "... which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." For example, there may be an occasional case in which California is the forum, and the parties have chosen the law of another state, but the law of yet a third state, rather than California's, would apply absent the parties' choice. In that situation, a California court will look to the fundamental policy of the third state in determining whether to enforce the parties' choice of law. The present case is not such a situation.

FN6 There may also be instances when the chosen state has a materially greater interest in the matter than does California, but enforcement of the law of the chosen state would lead to a result contrary to a fundamental policy of California. In some such cases, enforcement of the law of the chosen state may be appropriate despite California's policy to the contrary. (*S. A. Empresa, etc. v. Boeing Co., supra,* 641 F.2d 746, 749.)Careful consideration, however, of California's policy and the other state's interest would be required. No such question is present in this case, and we thus need not and do not decide how

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

Restatement section 187 would apply in such circumstances.

II. *Application of the test in this case*

A. *Breach of contract*

Nedlloyd did not assert in its second demurrer that the amended complaint failed to state a cause of action under Hong Kong law for breach of contract. Rather, Nedlloyd challenged the amended complaint's breach of contract allegations only on the ground of uncertainty. (Code Civ. Proc., § 430.10, subd. (f).) In light of our order limiting review to the issue of whether Hong Kong law "should be applied in ruling on the demurrers," we need not and do not consider the correctness of the trial court's ruling on the demurrer to this cause of action. As we shall explain, however, Hong Kong law, although not asserted as a bar to Seawinds's contract cause of action at the pleading stage, does govern all causes of action pleaded in the amended complaint, including the contract cause of action.

B. *Implied covenant of good faith and fair dealing*

1. *Substantial relationship or reasonable basis*

(3) As to the first required determination, Hong Kong-"the chosen state"-clearly has a "substantial relationship to the parties." (Rest., § 187, subd. (2)(a).) The shareholders' agreement, which is incorporated by reference in Seawinds' first amended complaint, shows that Seawinds is incorporated under the laws of Hong Kong and has a registered office there. The same is true of one of the shareholder parties to the agreement-Red Coconut Trading Co. The incorporation of these parties in Hong Kong provides the required "substantial relationship." (*Id.,*) com. f [substantial relationship present when "one of the parties is domiciled" in the chosen state]; *Carlock v. Pillsbury Co.* (D.Minn. 1988) 719 F.Supp. 791, 807 ["A party's incorpora-

tion in a state is a contact sufficient to allow the parties to choose that state's law to govern their contract."]; *Hale v. Co- Mar Offshore Corp.* (W.D.La. 1984) 588 F.Supp. 1212, 1215 [same effect].)

Moreover, the presence of two Hong Kong corporations as parties also provides a "reasonable basis" for a contractual provision requiring application of Hong Kong law. "If one of the parties resides in the chosen state, the parties have a reasonable basis for their choice." (*Consul Ltd. v. Solide Enterprises, Inc., supra,* 802 F.2d 1143, 1147.)The reasonableness of choosing Hong Kong becomes manifest when the nature of the agreement before us is considered. A state of incorporation is certainly at least one government entity with a keen and intimate interest in internal corporate affairs, including the purchase and sale of its shares, as well as corporate management and *468 operations. (See Corp. Code, § 102 [applying California's general corporation law to domestic corporations].)

2. *Existence of fundamental public policy*

We next consider whether application of the law chosen by the parties would be contrary to "a fundamental policy" of California. We perceive no fundamental policy of California requiring the application of California law to Seawinds's claims based on the implied covenant of good faith and fair dealing. The covenant is not a government regulatory policy designed to restrict freedom of contract, but an implied promise inserted in an agreement to carry out the presumed intentions of contracting parties. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 689-690 [254 Cal.Rptr.211,765 P.2d 373] (*Foley*) ["When a court enforces the implied covenant it is in essence acting to protect 'the interest in having promises performed' [citation]-the traditional realm of a contract action-rather than to protect some general duty to society which the law places on an employer without regard to the substance of its contractual obligations to its employee."].)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Seawinds directs us to no authority exalting the *implied* covenant of good faith and fair dealing over the *express* covenant of these parties that Hong Kong law shall govern their agreement. We have located none. Because Seawinds has identified no fundamental policy of our state at issue in its essentially contractual dispute with Nedlloyd, the second exception to the rule of section 187 of the Restatement does not apply.

### C. *Fiduciary duty cause of action*

#### 1. *Scope of the choice-of-law clause*

(4a) Seawinds contends that, whether or not the choice-of-law clause governs Seawinds's implied covenant claim, Seawinds's fiduciary duty claim is somehow independent of the shareholders' agreement and therefore outside the intended scope of the clause. Seawinds thus concludes California law must be applied to this claim. We disagree.

When two sophisticated, commercial entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract. Initially, such an interpretation is supported by the plain meaning of the language used by the parties. (5)(See fn. 7.) The choice-of-law clause in the shareholders' agreement provides: "This agreement shall be *governed by* and construed in accordance *469 with Hong Kong law and each party hereby irrevocably submits to the non-exclusive jurisdiction and service of process of the Hong Kong courts." (Italics added.) [FN7]

> FN7 As we have noted, the choice-of-law clause states: "This agreement shall be governed by and *construed in accordance with Hong Kong law* ...." (Italics added.) The agreement, of course, includes the choice-of-law clause itself. Thus the question of whether that clause is ambiguous as

to its scope (i.e., whether it includes the fiduciary duty claim) is a question of contract interpretation that in the normal course should be determined pursuant to Hong Kong law. (*S. A. Empresa, etc. v. Boeing Co., supra,* 641 F.2d 746, 751 [interpreting choice-of-law clause pursuant to law chosen by the parties]; *McGill v. Hill* (1982) 31 Wn.App. 542 [644 P.2d 680, 683].) The parties in this case, however, did not request judicial notice of Hong Kong law on this question of interpretation (Evid. Code, § 452, subd. (f)) or supply us with evidence of the relevant aspects of that law (Evid. Code, § 453, subd. (b)). The question therefore becomes one of California law. (*Com'l Ins. Co. of Newark v. Pacific-Peru Const.* (9th Cir. 1977) 558 F.2d 948, 952; Rest., § 136, subd. (2), com. h. p. 378.)

(4b) The phrase "governed by" is a broad one signifying a relationship of absolute direction, control, and restraint. Thus, the clause reflects the parties' clear contemplation that "the agreement" is to be completely and absolutely controlled by Hong Kong law. No exceptions are provided. In the context of this case, the agreement to be controlled by Hong Kong law is a shareholders' agreement that expressly provides for the purchase of shares in Seawinds by Nedlloyd and creates the relationship between shareholder and corporation that gives rise to Seawinds's cause of action. Nedlloyd's fiduciary duties, if any, arise from-and can exist only because of-the shareholders' agreement pursuant to which Seawinds's stock was purchased by Nedlloyd.

In order to control completely the agreement of the parties, Hong Kong law must also govern the stock purchase portion of that agreement and the legal duties created by or emanating from the stock purchase, including any fiduciary duties. If Hong Kong law were not applied to these duties, it would effectively control only part of the agreement, not all of it. Such an interpretation would be inconsistent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

Page 9

with the unrestricted character of the choice-of-law clause.

Our conclusion in this regard comports with common sense and commercial reality. When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all* disputes arising out of the transaction or relationship. We seriously doubt that any rational businessperson, attempting to provide by contract for an efficient and business-like resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship. Nor do we believe such a *470 person would reasonably desire a protracted litigation battle concerning only the threshold question of what law was to be applied to which asserted claims or issues. Indeed, the manifest purpose of a choice-of-law clause is precisely to avoid such a battle.

Seawinds's view of the problem-which would require extensive litigation of the parties' supposed intentions regarding the choice-of-law clause to the end that the laws of multiple states might be applied to their dispute-is more likely the product of postdispute litigation strategy, not predispute contractual intent. If commercially sophisticated parties (such as those now before us) truly intend the result advocated by Seawinds, they should, in fairness to one another and in the interest of economy in dispute resolution, negotiate and obtain the assent of their fellow parties to explicit contract language specifying what jurisdiction's law applies to what issues.

Justice Mosk long ago cogently observed that, "Given two experienced businessmen dealing at arm's length, both represented by competent counsel, it has become virtually impossible under recently evolving rules of evidence to draft a written contract that will produce predictable results in court. The written word, heretofore deemed immutable, is now at all times subject to alteration by self-serving recitals based upon fading memories of antecedent events. This, I submit, is a serious impediment to the certainty required in commercial transactions." (*Delta Dynamics, Inc. v. Arioto* (1968) 69 Cal.2d 525, 532 [72 Cal.Rptr. 785, 446 P.2d 785] (dis. opn. of Mosk, J.).)

With due acknowledgment of Justice Mosk's prescience, other courts have more recently reiterated that, "While [the] rule [of easily pleaded ambiguity] creates much business for lawyers and an occasional windfall to some clients, it leads only to frustration and delay for most litigants and clogs already overburdened courts." (*Trident Center v. Connecticut General Life Ins.* (9th Cir. 1988) 847 F.2d 564, 569; *Wilson Arlington Co. v. Prudential Ins. Co.* (9th Cir. 1990) 912 F.2d 366, 370.)We need not envelop choice-of-law clauses in this fog of uncertainty and ambiguity.

For the reasons stated above, we hold a valid choice-of-law clause, which provides that a specified body of law "governs" the "agreement" between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates.

### 2. *Enforceability of chosen law as to fiduciary duty claim*

Applying the test we have adopted (see pt. I, *ante,* at pp. 464- 466.), we find no reason not to apply the parties' choice of law to Seawinds's cause of *471 action for breach of fiduciary duty. As we have explained, Hong Kong, the chosen state, has a "substantial relationship to the parties" because two of those parties are incorporated there. Moreover, their incorporation in that state affords a "reasonable basis" for choosing Hong Kong law. (See pt. II.B.1., *ante,* at pp. 467- 468].)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148

Page 10

3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

Seawinds identifies no fundamental public policy of this state that would be offended by application of Hong Kong law to a claim by a Hong Kong corporation against its allegedly controlling shareholder. We are directed to no California statute or constitutional provision designed to preclude freedom of contract in this context. Indeed, even in the absence of a choice-of-law clause, Hong Kong's overriding interest in the internal affairs of corporations domiciled there would in most cases require application of its law. (See Rest., § 306 [obligations owed by majority shareholder to corporation determined by the law of the state of incorporation except in unusual circumstances not present here]; *McDermott Inc. v. Lewis* (Del.Super.Ct. 1987) 531 A.2d 206, 214-216 [corporate voting rights dispute governed by law of state of incorporation]; *Matter of Reading Co.* (3d Cir. 1983) 711 F.2d 509, 517 [minority shareholder fiduciary duty claim governed by law of state of incorporation].)

For strategic reasons related to its current dispute with Nedlloyd, Seawinds seeks to create a fiduciary relationship by disregarding the law Seawinds voluntarily agreed to accept as binding-the law of a state that also happens to be Seawinds's own corporate domicile. To allow Seawinds to use California law in this fashion would further no ascertainable fundamental policy of California; indeed, it would undermine California's policy of respecting the choices made by parties to voluntarily negotiated agreements.

### Disposition

By a choice-of-law clause in a fully negotiated commercial contract, the parties have chosen Hong Kong law to apply to their dispute in this case, including each of the causes of action asserted by Seawinds.

Seawinds's action is now proceeding based on its first amended complaint, which will be the focus of further proceedings applying Hong Kong law to resolve the parties' differences. Therefore, the judg-

ments of the Court of Appeal in the consolidated proceedings (Court of Appeal Nos. A049718 and A050535) are reversed, and the matters are remanded to the Court of Appeal with instructions to issue a peremptory writ of mandate directing the trial *472 court to reconsider its ruling on Nedlloyd's demurrer to Seawinds's first amended complaint in light of applicable Hong Kong law.

Lucas, C. J., Arabian, J., and George, J., concurred.
**PANELLI, J.,**
Concurring and Dissenting.

I generally concur in the majority opinion's explanation of the standards controlling when a contractual choice-of-law provision will be honored by the courts of this state and with the majority's application of these standards to Seawinds's cause of action for breach of the covenant of good faith and fair dealing. I write separately to express my disagreement with the majority's conclusion, based on the record before us, that the choice-of-law clause in this case governs Seawinds's cause of action for breach of fiduciary duty. In my view, the majority's analysis of the scope of the choice-of-law clause is unsound.

The choice-of-law clause in this case reads in pertinent part: "This agreement shall be governed by and construed in accordance with Hong Kong law. ..." [FN1] The majority determines that the scope of the choice-of-law clause, which was incorporated into the first amended complaint by attachment, extends to related, *noncontractual* causes of action, such as Seawinds's breach of fiduciary duty claim. In so doing, the majority opinion adopts the rule that "[w]hen two sophisticated, commercial entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract." (Maj. opn., *ante,* at p. 468.) Without citing any authority, the majority opinion announces a binding rule of contractual interpretation, based solely upon "common sense and commercial reality." (*Id.* at p. 469.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

> FN1 I agree with the majority that the scope of the choice-of-law clause in this contract is a question that would ordinarily be determined under Hong Kong law. (Maj. opn., *ante*, at p. 469.) I further agree with the majority that, since the parties neither produced any evidence of Hong Kong law relating to this subject nor requested judicial notice of any such law, we may apply California law to ascertain the scope of the clause.(*Ibid.*)

The problem with the majority's approach is that it ignores controlling California law. On demurrer, a pleading must be liberally construed. (Code Civ. Proc., § 452.)The accepted rule of contractual construction on demurrer is that "[w]here a written contract is pleaded by attachment to and incorporation in a complaint, and where the complaint fails to allege that the terms of the contract have any special meaning, a court will construe the language of the contract on its face to determine whether, as a matter of law, the contract is reasonably subject to a construction sufficient to sustain a cause of action ...." (*Hillsman v. Sutter Community Hospitals* (1984) 153 Cal.App.3d 743, 749-750 [200 Cal.Rptr. 605]; accord *473Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1561 [260 Cal.Rptr. 237].) In this case, the language of the incorporated contract easily can be read to apply only to contractual causes of action: *"This agreement* shall be governed ... by Hong Kong law."

In my view, the majority's mistaken construction of the choice-of-law clause is clear when the language used in the present contract is compared, as Nedlloyd urges us to do, with the language construed by this court in *Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491 [131 Cal.Rptr. 374, 551 P.2d 1206]. In that case, this court determined that claims for unfair competition and intentional interference with advantageous business relationships were governed by a choice-of-forum clause as " 'actions or proceedings insti-

tuted by ... [Smith] under this Agreement with respect to any matters arising under *or growing out of this agreement ....*' " (*Id.* at p. 497, italics in the original.) In contrast to the language used by Nedlloyd and Seawinds in their agreement, the contractual language, "arising under or growing out of this agreement," which was used in *Smith,* explicitly shows an intent to embrace related noncontractual claims, as well as contractual claims. Although similar language was readily available to them, the sophisticated parties in the present case did not draft their choice-of-law clause to clearly encompass related noncontractual causes of action.[FN2]Therefore, on demurrer and in the absence of parol evidence, I cannot fairly construe the contractual language at issue here to be consistent with the interpretation proposed by Nedlloyd and adopted in the majority opinion. To do so would violate the statutory canon of contract interpretation that "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.)

> FN2 Despite the majority's artfully crafted argument, the words "governed by" do not assist in defining what causes of action the choice-of- law clause was intended to address. Rather, the parties defined the scope of their choice-of-law clause by choosing the phrase "[t]his agreement."

Finally, the majority's rule effectively subordinates the intent of the contracting parties to the need for predictability in commercial transactions. The majority strikes this balance despite the fact that our Legislature has commanded otherwise. Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.)In contrast to this legislative command, the majority conclusively presumes that choice- of-law clauses entered into between or among commercial entities apply to related noncontractual causes of action regardless of whether the intent of the parties

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

or the contract language (as in this case) shows otherwise. I believe that the departure by the majority from *474 established California law is unwarranted and is unnecessary to further the goals of predictability in the enforcement of contracts and protection of the justified expectations of contracting parties. These goals can be adequately protected within the framework of the current law governing contractual interpretation by enforcing choice-of-law clauses in a manner consistent with the language of the contract and the intent of the parties.

I am keenly aware of the need for predictability in the enforcement of commercial contracts. Nevertheless, although courts and litigants may wish the law were otherwise, not every issue can be conclusively determined at the pleading stage. On the present record, the scope of the choice-of-law clause must be construed in favor of Seawinds.

Mosk, J., concurred.
**KENNARD, J.,**
Concurring and Dissenting.

Fueled by advances in technology, communications and global cooperation, trade across state and international borders is vastly greater than in decades past. California occupies a leading position in the field of international trade, and this leadership is of vital importance to the welfare of the state and its residents. As commerce across borders expands, novel legal problems arise, and familiar issues assume renewed significance.

This case involves the effect of a choice-of-law clause in a contract between multinational parties to conduct an international shipping business. I agree with the majority that the parties' agreement, calling for the contract to be interpreted according to Hong Kong law, should be applied by the California courts in determining whether plaintiff, a Hong Kong corporation, has stated a cause of action for breach of the implied covenant of good faith and fair dealing. I disagree, however, with the majority's conclusion that the choice-of-law clause, which provides only that the contract shall be gov-

erned by Hong Kong law, unambiguously extends to related noncontractual causes of action and therefore should be applied by the trial court in determining whether the plaintiff has stated a cause of action for breach of fiduciary duty.

### I. Background

Defendants and petitioners Nedlloyd Lines B.V., Royal Nedlloyd Group N.V., and KNSM Lines B.V. (hereafter collectively Nedlloyd) are interrelated shipping companies based in Rotterdam, the Netherlands. Plaintiff and real party in interest Seawinds Limited (hereafter Seawinds) is a shipping company that was incorporated in Hong Kong in late 1982, with its principal place of business in Redwood City, California. *475

In 1983, Nedlloyd Lines B.V. entered into a contract to purchase shares in Seawinds. The other parties to the contract were an Oregon corporation, a Hong Kong corporation, a British corporation, three individual residents of California, a resident of Singapore, and Seawinds itself. [FN1] The agreement's stated purpose was "to establish [Seawinds] as a joint venture company to carry on a transportation operation." The contract contained this choice-of-law provision: "This agreement shall be governed by and construed in accordance with Hong Kong law and each party hereby irrevocably submits to the non-exclusive jurisdiction and service of process of the Hong Kong courts."

> FN1 Seawinds did not, however, purchase its own shares.

Seawinds engaged in the shipping business from April 1983 until October 1984, when it commenced bankruptcy proceedings that are apparently still pending in federal court.

In January 1989, Seawinds sued Nedlloyd, [FN2] alleging that Nedlloyd had detrimentally interfered with its business, reneged on promises to make capital contributions, and falsely disparaged its operation. The original complaint set forth three causes

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

Page 13

of action: (1) "Breach of Contract; Breach of Implied Covenant of Good Faith and Fair Dealing"; (2) "Tortious Breach of Implied Covenant of Good Faith and Fair Dealing"; and (3) "Violation of Fiduciary Duties."

> FN2 The complaint named Nedlloyd Lines B.V. as the first defendant, and alleged alter ego relationships between it and Royal Nedlloyd Group N.V. and KNSM Lines B.V. According to the complaint, Royal Nedlloyd Group N.V. owns 100 percent of both Nedlloyd Lines B.V. and KNSM Lines B.V.

Nedlloyd demurred to the complaint on the ground that under Hong Kong law the complaint failed to state a cause of action for breach of the implied covenant, tortious breach of the implied covenant, and breach of fiduciary duties. Nedlloyd also demurred to the second cause of action on the ground that "many of the necessary elements of tortious breach of contract are not pled." With respect to the third cause of action, Nedlloyd demurred on the basis that the complaint failed to allege that Nedlloyd was a majority shareholder, and that, "[i]n addition, if Hong Kong law applies, any fiduciary duties of majority shareholders run only to other shareholders, not to the corporation itself."

The trial court ruled broadly that "California law shall apply in this case." But the court sustained Nedlloyd's demurrer with leave to amend as to all three causes of action, ruling that: (1) the first cause of action should be split into two causes of action; (2) the second cause of action had not alleged a sufficient special relationship; and (3) "no controlling interest sufficient to *476 establish a fiduciary relationship" had been alleged in the third cause of action.

Nedlloyd petitioned the Court of Appeal for a writ of mandate to overturn the trial court's choice-of-law ruling. The Court of Appeal denied the writ petition. [FN3]It held that the trial court had properly decided to apply California law because Hong

Kong, the state whose law was chosen by the parties, had no substantial relationship with the parties or their claims, and because enforcement of the choice-of-law clause would "ero[de] a California law protective of its citizens' rights" in that "Hong Kong law does not recognize the concept of an implied covenant of good faith and fair dealing in contracts whereas California implies such a covenant in every contract." The Court of Appeal also concluded: "Under Hong Kong law, shareholders seemingly owe no fiduciary duties to the company; instead, a majority shareholder might owe a fiduciary duty to another shareholder. In contrast, California law imposes a fiduciary duty on a majority of shareholders or a controlling shareholder to the minority shareholders and the company." This court granted Nedlloyd's petition for review.

> FN3 The Court of Appeal at first denied the writ petition summarily. This court then granted Nedlloyd's petition for review, and transferred the matter back to the Court of Appeal with directions to issue an alternative writ.

Meanwhile, in the trial court, Seawinds had filed an amended complaint, alleging causes of action for: (1) "Breach of Contract"; (2) "Breach of Implied Covenant of Good Faith and Fair Dealing"; and (3) "Violations of Fiduciary Duties." Nedlloyd demurred to the amended complaint on four grounds: (1) the breach of contract cause of action was uncertain; (2) the breach of implied covenant cause of action failed under Hong Kong law; (3) the breach of implied covenant cause of action failed "because the necessary elements of such breach are not pled"; and (4) the cause of action for breach of fiduciary duty "fails to allege any duty or breach."

The trial court overruled the demurrer to the amended complaint, and Nedlloyd once again petitioned the Court of Appeal for a writ of mandate. Upon the Court of Appeal's denial of this second writ application (contemporaneous with its opinion on the first petition), this court granted Nedlloyd's separate petition for review and consolidated it with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

the related proceeding.

As will be explained, in substance two distinct issues are before us: (1) whether the choice-of-law clause requires the application of Hong Kong law to the implied covenant cause of action; and (2) whether the choice-of-law clause requires the application of Hong Kong law to the breach of fiduciary duty cause of action. I will discuss each issue separately. *477

### II. Breach of the Implied Covenant

#### A. *Existence of a Conflict*

The first step in the analysis of an asserted conflict of laws is to determine whether a choice of law by the court is actually required. In the context of a contractual choice-of-law clause, a conflict is presented only if there is a material difference between the law of the chosen state and the law of the state whose law would apply in the absence of an effective choice by the parties. In this case, the parties agree that if Hong Kong law does not apply, the law of California does.

In its original complaint, Seawinds pleaded two theories of liability-breach of contract and breach of the implied covenant of good faith and fair dealing-as part of the same cause of action. In the amended complaint, Seawinds separated these theories, pleading each as a cause of action. I analyze them separately.

In its demurrer to the amended complaint, Nedlloyd did not assert that the amended complaint failed to state a cause of action for breach of contract under Hong Kong law. Rather, Nedlloyd challenged the amended complaint's breach of contract allegations only on the ground of uncertainty (Code Civ. Proc., § 430.10, subd. (f)). Thus, the breach of contract cause of action presents no choice-of-law issue at this time.

Seawinds' second theory of liability in the amended complaint is breach of the implied covenant of good faith and fair dealing. In its demurrer, Nedlloyd asserted that this theory of liability fails because Hong Kong law governs the contract and, unlike California law, does not recognize an implied covenant of good faith and fair dealing. Accordingly, this theory of liability does present a choice-of-law issue, but only if, as Nedlloyd asserts, there is a material difference between the relevant law of Hong Kong and California. (See *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 580 [114 Cal.Rptr. 106, 522 P.2d 666]; *Bos Material Handling, Inc. v. Crown Controls Corp.* (1982) 137 Cal.App.3d 99, 105 [186 Cal.Rptr. 740]; *New Linen Supply v. Eastern Environmental Controls, Inc.* (1979) 96 Cal.App.3d 810, 817, fn. 2 [158 Cal.Rptr. 251].)

Under California law, every contract contains an implied covenant of good faith and fair dealing. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373].) This implied covenant requires "that neither party do anything which will deprive the other of the benefits of the agreement" (*478Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158]), and its breach ordinarily gives rise to contract remedies (*ibid.*).

The parties presented evidence of the relevant Hong Kong law. [FN4] In support of its demurrer, Nedlloyd submitted the declaration of William Catley, a Hong Kong solicitor. Based on his review of the case law, Catley stated in his declaration that Hong Kong courts will not imply a covenant into a contract unless "it is necessary either to give effect to the intentions of the parties or to give the contract business efficacy." Noting that in this case the shareholders' agreement contained a clause requiring the shareholders to cooperate in good faith, but that Seawinds was not a shareholder, Catley set forth his view that it was "unlikely that a court in Hong Kong would imply a term in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[shareholders' agreement] extending this sub-clause to include Seawinds." [FN5]

> FN4 Because a demurrer raises only questions of law (Code Civ. Proc., § 589), trial courts ordinarily do not consider evidence in connection with a demurrer. But a court may consider matters subject to judicial notice when ruling on a demurrer, and foreign law is subject to judicial notice (Evid. Code, § 452, subd. (f)). In taking judicial notice, a court may rely on "the advice of persons learned in the subject matter ... whether or not furnished by a party." (Evid. Code, § 454, subd. (a)(1); see *Estate of Chichernea* (1967) 66 Cal.2d 83, 86, fn. 2 [57 Cal.Rptr. 135, 424 P.2d 687]; *City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 231 [123 Cal.Rptr. 1, 537 P.2d 1250]; *Volkswagenwerk Aktiengesellschaft v. Superior Court* (1981) 123 Cal.App.3d 840, 852 [176 Cal.Rptr. 874].)

> FN5 The clause provides: "Each Shareholder agrees that he or it will at all times: [¶] (a) use all means reasonably available to him or it ... so as to insure that the Company [Seawinds] shall implement the provisions of this agreement ...; and [¶] (b) cooperate in good faith and execute such further documents and take such other action as may be reasonably required in order to give full effect to the provisions and intent of this agreement."

In response to Catley's declaration, Seawinds submitted the declaration of another Hong Kong solicitor, Geoffrey Miles. According to Miles, "the Hong Kong courts could well take the view that in order to secure the success of the venture it would be necessary, as a matter of business efficacy, to imply such a term" extending to Seawinds the good faith duties owed to the shareholders.

If Hong Kong law governs the contract, as

Nedlloyd contends, Seawinds must show that business efficacy, as Hong Kong courts understand that concept, requires that a good faith term applicable to Seawinds be implied into the contract. But if California law governs the contract, as Seawinds contends, the contract must be deemed to include an implied covenant of good faith and fair dealing. Thus, there appears to be a material difference between Hong Kong and California law, necessitating a choice-of-law analysis. *479

### B. *Choice-of-law Standards*

Although this court has not directly addressed the enforceability of a choice-of-law provision in a contract, the issue has been the subject of a number of appellate court decisions. When a contract specifies the parties' choice of law, California courts have enforced the contractual choice-of-law clause, subject to two qualifications. First, the chosen state must bear some substantial relationship to the parties or the contract, or there must be some other reasonable basis for the parties' choice. Second, application of the chosen state's law must not violate a strong policy of California law. These standards have been adopted, with some variations in language and emphasis, by the overwhelming majority of California decisions. (See *Mencor Enterprises, Inc. v. Hets Equities Corp.* (1987) 190 Cal.App.3d 432, 435-436 [235 Cal.Rptr. 464] [strong policy and substantial relationship]; *Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 417 [197 Cal.Rptr. 757] [strong policy]; *Ashland Chemical Co. v. Provence* (1982) 129 Cal.App.3d 790, 794 [181 Cal.Rptr. 340] [strong policy and substantial relationship]; *Bos Material Handling, Inc. v. Crown Controls Corp., supra*, 137 Cal.App.3d 99, 108 [substantial relationship]; *Gamer v. duPont Glore Forgan, Inc.* (1976) 65 Cal.App.3d 280, 287 [135 Cal.Rptr. 230] [strong policy and substantial relationship]; *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1971) 20 Cal.App.3d 668, 673 [97 Cal.Rptr. 811] [strong policy and substantial relationship]; *Ury v. Jewelers Acceptance Corp.* (1964) 227 Cal.App.2d 11, 18, 20 [38 Cal.Rptr. 376]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

[strong policy].) The federal appellate courts, in applying California conflicts law, have also adhered to these rules. (*Consul Ltd. v. Solide Enterprises, Inc.* (9th Cir. 1986) 802 F.2d 1143, 1146-1147 [strong policy and substantial relationship]; *S. A. Empresa, etc. v. Boeing Co.* (9th Cir. 1981) 641 F.2d 746, 749 [same]; *Sarlot-Kantarjian v. First Pa. Mortg. Trust* (9th Cir. 1979) 599 F.2d 915, 917 [same]; *Foreman v. George Foreman Associates, Ltd.* (9th Cir. 1975) 517 F.2d 354, 357 [strong policy].)

The "substantial relationship" and "strong policy" standards of California law are similar to the approach of the Restatement Second of Conflict of Laws, section 187, subdivision (2). [FN6] Although some California courts have *480 referred to this part of the Restatement Second with approval, they have never expressly adopted it. [FN7]

> FN6 There is an exception. Choice- of-law issues arising from contracts that are subject to the Uniform Commercial Code are governed by California Uniform Commercial Code section 1105, which provides in pertinent part that, subject to certain exceptions, the parties may choose the law of a state having a "reasonable relation" to the transaction. Neither party contends that California Uniform Commercial Code section 1105 applies in this case. The California Uniform Commercial Code's "reasonable relation" test is in any event similar to the "substantial relationship" test I apply. (See official code com. to U. Com. Code § 1-105 [Deering's Ann. Cal. U. Com. Code, § 1105 (1986 ed.) p. 10; 23A West's Ann. Cal. U. Com. Code, § 1105 (1964 ed.) p. 37].)
>
> FN7 Section 187 of the Restatement Second of Conflict of Laws provides:
> "(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have

resolved by an explicit provision in their agreement directed to that issue.

"(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either [¶] (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties['] choice, or [¶] (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [section] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

"(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law."

California courts have frequently employed the "substantial relationship" and "strong policy" tests without reference to the Restatement Second of Conflict of Laws. (See, e.g., *Hall v. Superior Court, supra,* 150 Cal.App.3d at p. 417;*Ashland Chemical Co. v. Provence, supra,* 129 Cal.App.3d at p. 794;*Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 20 Cal.App.3d at p. 673.) Those California courts that have cited the Restatement Second of Conflict of Laws have typically focused on section 187, subdivision (2), as have the courts of other jurisdictions.

The Restatement comment to subdivision (1) explains: "The rule of this Subsection is a rule providing for incorporation by reference and is not a rule of choice of law. The parties, generally speaking, have power to determine the terms of their contractual agreements. They may spell out

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

these terms in the contract. In the alternative, they may incorporate into the contract by reference extrinsic material which may, among other things, be the provisions of some foreign law. ... [M]ost rules of contract law are designed to fill gaps in a contract which the parties could themselves have filled with express provisions." (Rest.2d Conf. of Laws, § 187, subd. (1), com. c., p. 563.) Here, there is no indication that the parties incorporated by reference extrinsic material in the form of Hong Kong law in order to fill a gap in the contract. Accordingly, subdivision (1) is not at issue, and I do not further consider its potential scope.

As noted above, this court has not previously and directly determined the enforceability of a choice-of-law clause in a contract. The court has, however, considered the related problem of contractual forum selection clauses. In *Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491, 496 [131 Cal.Rptr. 374, 551 P.2d 1206], the court held that forum selection clauses are valid and may be given effect in the court's discretion and in the absence of a showing that enforcement of the clause would be unreasonable. Citing section 187 of the Restatement Second of Conflict of Laws, the court observed in passing that "choice of law provisions are usually respected by California courts." (17 Cal.3d at p. 494.) In following the general approach *481 of the Restatement Second, California courts are within the jurisprudential mainstream. [FN8]

> FN8 According to one recent study, fifteen states, not including California, follow the general approach of the Restatement Second; nineteen states adhere to the first Restatement, under which the court applies the law of the place where the contract was made, regardless of the parties' choice; three states and the District of Columbia employ a "center of gravity" approach; three states use a "governmental interests"

approach or some variant; and in nine states the rule is unclear. (Chow, *Limiting Erie in a New Age of International Law: Toward a Federal Common Law of International Choice of Law* (1988) 74 Iowa L.Rev. 165, 190-191.)The parties do not urge this court to adopt any of the three other general approaches that have found some favor in the courts; I deem the general approach adopted by the California courts and the Restatement Second to be the most appropriate, because it is the only framework that accords any substantial weight to the parties' choice, as I discuss below.

In providing that the parties' choice of a state's law to govern a contract will be respected unless either the parties or the contract have no substantial relationship to the chosen state and the parties have no other reasonable basis for the choice, or application of the chosen law would violate a strong policy of the state of the law that would otherwise apply, California choice-of-law analysis reconciles differing and important interests that are in tension in many cases. The first of these interests is party autonomy.

"Party autonomy means that the parties to a contract are free to select the law that governs the contract." (Scoles & Hay, Conflict of Laws (2d ed. 1992) § 18.1, p. 657.) A basic principle of contract law is that contracts should be interpreted to give effect to the intentions of the parties (Civ. Code, § 1636), and the concept of party autonomy implements that principle in the context of choice-of-law clauses.

But to allow parties a completely unrestrained choice of the law they wish to apply to a contract would have unacceptable results. It would license parties to a contract to evade at will the law of the state in which they reside and conduct their activities; they could make contracts, enforceable in their state of residence, that had no substantial connection to the state of the chosen law and that violated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

the law of the state that would otherwise apply in the absence of a choice-of-law clause. In other words, to allow unrestricted party autonomy in the selection of the governing law would lead to a state's loss of control over the law of contracts and over the activities governed by that law.

Thus, contractual choice-of-law analysis recognizes both the parties' interest in autonomy and the interest of a state in applying its own law to contracts that have a substantial connection to that state. Accordingly, California cases recognize that the ability of parties to select the law that governs a contract should be limited to situations in which the state of the chosen law *482 has some substantial connection to the parties or the transaction, or to situations in which the parties have some other reasonable basis for their choice, and in which enforcement of the chosen law will not defeat an important policy of the law of the state that would otherwise apply. (See, e.g., *Ashland Chemical Co. v. Provence, supra,* 129 Cal.App.3d at p. 794. *Gamer v. duPont Glore Forgan, Inc., supra,* 65 Cal.App.3d at pp. 287-289.)

Application of these standards to this case demonstrates that the parties' choice of Hong Kong law governs Seawinds cause of action for breach of the implied covenant of good faith and fair dealing. As I shall explain, enforcement of the choice-of-law clause here is appropriate because Hong Kong has a substantial connection to the parties and enforcement of the clause will not defeat an important policy of the law of California, the state whose law would otherwise apply.

### C. Substantial Relationship

As noted above, the purpose of requiring that the parties or the contract have some substantial relationship to the chosen state is to assure that the parties have not selected the chosen state's law to avoid the application of the law of a particular state to their transaction by stipulating for the law of a state that has no interest in having its law applied.

(See *Seeman v. Phila. Warehouse Co.* (1927) 274 U.S. 403, 408 [71 L.Ed. 1123, 1126-1127, 47 S.Ct. 626]; *Mencor Enterprises, Inc. v. Hets Equities Corp., supra,* 190 Cal.App.3d at p. 437 [235 Cal.Rptr. 464]; see generally *Woods-Tucker Leasing Corp., etc. v. Hutcheson-Ingram* (5th Cir. 1981) 642 F.2d 744, 750-751.)The "substantial relationship" requirement guards against purposeful evasion of a state's laws. [FN9]

> FN9 As an alternative, a party seeking enforcement of a contractual choice-of-law clause may also show that there is, in the language of the Restatement Second of Conflict of Laws, some "other reasonable basis for the parties['] choice ...." (Rest.2d Conf. of Laws, § 187, subd. (2)(a).) Comment f to section 187 of the Restatement Second provides this illustration:
> "For example, when contracting in countries whose legal systems are strange to them as well as relatively immature, the parties should be able to choose a law on the ground that they know it well and that it is sufficiently developed For only in this way can they be sure of knowing accurately the extent of their rights and duties under the contract. So parties to a contract for the transportation of goods by sea between two countries with relatively undeveloped legal systems should be permitted to submit their contract to some well-known and highly elaborated commercial law."

In this case, the "substantial relationship" requirement is satisfied. The shareholders' agreement, which is incorporated as a part of Seawinds's amended complaint, shows that Seawinds itself is incorporated under the laws of Hong Kong and has a registered office there. Moreover, one of the nine shareholders that is a party to the agreement (Red Coconut Trading Co.) *483 also is incorporated under the laws of Hong Kong and has a registered office there. "If one of the parties resides in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

chosen state, the parties have a reasonable basis for their choice." (*Consul Ltd. v. Solide Enterprises, Inc., supra,* 802 F.2d at p. 1147.)

Seawinds contends, however, that the parties and the contract subject matter have contacts with California that are far more extensive than those with Hong Kong. In its amended complaint, Seawinds alleged that its principal place of business was in Redwood City, California; that Nedlloyd "transacted a substantial amount of business" in California; and that Nedlloyd committed in California the acts alleged in the complaint. [FN10]But when, as here, the parties have chosen the law of a particular state to apply to their contract, the test is not whether another state has a more significant or substantial connection to the parties or the transaction; rather, the test is whether there is a substantial connection with the chosen state. (See *Gamer v. duPont Glore Forgan, Inc., supra,* 65 Cal.App.3d at pp. 288- 289.) In this case, there is.

> FN10 Seawinds argues that these contacts are shown by a declaration of its managing director, Bengt Henriksen. As noted earlier, evidentiary submissions are not cognizable at the pleading stage. This is true even when, as here, the evidentiary submissions are contained in a declaration that was part of the record in a prior lawsuit. Accordingly, I decline to consider Henriksen's declaration.

Once a court has concluded that the parties or the transaction have a substantial connection to the chosen state or there is some other reasonable basis for the parties' choice, the next step in analysis of a contractual choice-of-law provision is to determine whether enforcement of the provision will defeat an important policy of the state whose law would apply in the absence of a choice by the parties.

### D. *Nature and Strength of State's Interest*

As I have explained, California's rule that applica-

tion of the chosen law must not violate a strong policy of the state whose law would otherwise apply is similar to the Restatement Second of Conflict of Laws' "fundamental policy" rule. That rule provides that the law of the state chosen by the parties will be applied unless "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [section] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." (Rest.2d Conf. of Laws, § 187, subd. (1)(b).) Under section 188 of the Restatement Second, the state of the applicable law is the state that has "the most significant relationship to the transaction and the parties ...." (Rest.2d Conf. of Laws, § 188, subd. (1).) *484

In this case, the parties agree that in the absence of a choice-of-law clause, California law would apply. I assume for argument's sake that this is correct. Under the Restatement Second of Conflict of Laws, then, the task is to decide whether California's interest in determining the particular issue is materially greater than Hong Kong's interest and, if so, whether application of Hong Kong's law would be contrary to a fundamental policy of California. Because, as I explain below, California's interest in enforcing its substantive law is not materially greater than Hong Kong's, I need not reach the fundamental policy issue.

I first assess the nature and strength of California's interest in applying its substantive law to the transaction at issue here. California's interests, however, are not confined to those expressed in its substantive contract rules. As I mentioned earlier, California also has a significant interest in respecting and promoting party autonomy in matters affecting the interpretation and enforcement of contracts. When the parties have by contractual stipulation chosen to have their agreement governed by a law other than California's, our state's separate interests in enforcing its substantive law and in respecting party

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

Page 20

autonomy are placed in competition with each other. Therefore, to determine California's actual interest in applying its law to override the parties' choice-of-law agreement, I analyze both of the relevant California interests, and then weigh the one against the other.

First, I assess the strength of the state's interest in enforcing the legal rule at issue in this particular case. As mentioned earlier, California law deems every contract to contain an implied-in-law duty of good faith and fair dealing. Our state's law has long recognized this obligation (see, e.g., *Universal Sales Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771 [128 P.2d 665]); it has also been adopted by the Restatement Second of Contracts (Rest.2d Contracts, § 205) and by the majority of American jurisdictions (see *Foley v. Interactive Data Corp., supra,* 47 Cal.3d 654, 683 [hereafter *Foley*]). California courts have enforced the implied covenant of good faith and fair dealing in a variety of circumstances, including insurance contracts, employment contracts, contracts to sell real property, and ordinary commercial contracts. This court observed in *Foley*: "Initially, the concept of a duty of good faith developed in contract law as 'a kind of "safety valve" to which judges may turn to fill gaps and qualify or limit rights and duties otherwise arising under rules of law and specific contract language.' [Citations.]" (*Id.* at p. 684.)

This court has also recognized, however, that breach of the implied covenant has legal significance that varies with the context of the contract. For example, this court has held that breach of the covenant of good faith by *485 an insurer gives rise to tort remedies, which may include punitive damages. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818-819 [169 Cal.Rptr. 691, 620 P.2d 141] (hereafter *Egan*).) On the other hand, we have declined to extend tort remedies for breach of the implied covenant to breaches of employment contracts. (*Foley, supra,* 47 Cal.3d 654.)

In *Egan,* the court emphasized the "inherently unbalanced" relationship of insurer and insured, and

observed that the "adhesive nature of insurance contracts places the insurer in a superior bargaining position." (*Egan, supra,* 24 Cal.3d at p. 820.) The court pointed out that insurers are purveyors of a vital, quasi-public service, and that insureds do not seek to obtain commercial advantage but protection against calamity. (*Id.* at pp. 819-820.) The court also observed that " '[i]nsurer's hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust.' " (*Id.* at p. 820.)

By contrast, in *Foley* the court reasoned that there were "significant differences" between employer-employee relationships and insurer-insured relationships that justified allowing tort remedies in the one context but not the other. (*Foley, supra,* 47 Cal.3d at p. 689.) The court recognized, among other considerations, that "the role of the employer differs from that of the 'quasi-public' insurance company" because the employer "is not providing a public service." (*Id.* at p. 692.) The court stressed that, as compared to the insurance situation, the interests of employer and employee are "most frequently in alignment," and thus "the need to place [additional] disincentives on an employer's conduct ... simply does not rise to the same level as that created by the conflicting interests at stake in the insurance context." (*Id.* at p. 693.) And the court underscored that "predictability of the consequences of actions related to employment contracts is important to commercial stability." (*Id.* at p. 696.)

These distinctions indicate that although the state has an interest in enforcing the implied covenant of good faith and fair dealing in every contract, the state's interest is stronger when the covenant acts to protect weaker parties in an inherently unbalanced relationship-typically a relationship in which one party enjoys a superior bargaining position so that it is able to dictate the terms of the agreement-and the weaker party seeks not profit but an essential service. Conversely, the state's interest in enforcing the implied covenant is less compelling when the parties are sophisticated business entities of appar-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

Page 21

ently equal bargaining power that have struck a bargain that is tailored to their particular needs, evidently negotiated and drafted by experienced counsel, and made for no motive other than profit.

This case concerns a contract between multiple sophisticated business entities engaged in transoceanic shipping; the shareholders' agreement is not *486 a standard form contract, but on its face is drawn to meet the particular needs of the parties, who contemplated large-scale capital investment; commercial advantage was the entire motive behind the contract; and Seawinds seeks damages of $50 million in lost profits for the alleged breaches of the contract's express terms and the implied covenant. Under these circumstances, I have no difficulty concluding, even at the pleading stage, that California's interest in enforcing the implied covenant of good faith and fair dealing is considerably less compelling here than in those contexts in which the covenant acts to protect parties with little bargaining power who seek advantages other than profit.

But this does not end the inquiry into California's interest. There is another interest of California that is implicated: respecting and enforcing party autonomy.

As I have shown, the value served by enforcing a choice-of-law provision is that of party autonomy. Party autonomy itself serves the important and closely related goals of protecting the parties' justified expectations, and promoting predictability. Generally, these goals are important in every type of contract. But they are not of equivalent importance in every type of contract. Predictability has special importance in the commercial context. This court observed in *Foley*: "[P]redictability about the cost of contractual relationships plays an important role in our commercial system." (*Foley, supra,* 47 Cal.3d at p. 683.)

Nedlloyd argues that the needs for predictability and protection of the justified expectations of the parties possess even greater force in the international business context. The United States Supreme

Court has endorsed this position in a closely related context, stating that a choice-of-forum provision is "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." (*Scherk v. Alberto-Culver Co.* (1974) 417 U.S. 506, 516 [41 L.Ed.2d 270, 279, 94 S.Ct. 2449]; accord *The Bremen v. Zapata Off-Shore Co.* (1972) 407 U.S. 1, 9, 15-16 [32 L.Ed.2d 513, 519-520, 523-524, 92 S.Ct. 1907].) As the high court has observed: "The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. ... We cannot have trade and commerce in world markets and international waters exclusively on our terms ...." (*The Bremen v. Zapata Off-Shore Co., supra,* 407 U.S. at p. 9 [32 L.Ed.2d at pp. 519-520).)Similarly, due respect by California courts for contractual choice-of-law provisions will assist California's resident businesses and industries to expand and prosper. *487

The desirability of recognizing the international aspects of commercial transactions is underscored when one considers the accelerating frequency of such transactions. "In the past few decades, there has been a dramatic increase in the volume and complexity of transactions with transnational elements, especially business and commercial activity. ... [T]ransactions with international elements are now routine." (Chow, *Limiting Erie in a New Age of International Law: Toward a Federal Common Law of International Choice of Law, supra,* 74 Iowa L.Rev. 165, 192-193 (fns. omitted).) As I have noted at the outset, California occupies a position of leadership in international trade, [FN11] and it is in the interest of this state and its residents that transactions with international aspects not be discouraged.

> FN11 California leads the United States in exporting, accounting for one out of every seven export dollars. "In 1991, California exported over $63 billion in goods .... Cali-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

Page 22

fornia ports handled two-way trade valued at nearly $175 billion." (Cal. State World Trade Com., 1991 Cal. Trade Highlights, p. 1.) Between 1987 and 1990, exports increased by an average of 20 percent per year. Exports represented "approximately 60 percent of the state's real economic growth in 1991." (*Ibid.*) Foreign investment in California exceeded $60 billion in 1989 (the latest year for which figures are available), and total employment in California attributable to foreign investment was 496,400 in 1989. (*Id.* at p. 2.)

The reasons for giving effect to the parties' choice of law are compelling when the courts are concerned with a sophisticated transnational business transaction. When, as here, the parties to a lawsuit are large-scale international business entities of apparently equal bargaining power seeking commercial advantage, the case does not implicate the concerns the law properly has for individuals and smaller entities that may be offered contractual terms for a vital service or product on a "take-it-or-leave-it" basis by a party with greater economic power.

In this case, California's interest in respecting the parties' choice-of- law agreement is at least as strong as its interest in applying its substantive law to the transaction at issue. Because, on balance, honoring the parties' choice of governing law will serve California's interests as well or better than overriding that choice, California should not be deemed to have a materially greater interest than Hong Kong in determining whether the amended complaint states a cause of action for breach of an implied covenant of good faith and fair dealing.

Accordingly, consideration of the pertinent factors in this context leads me to conclude that California has no substantial interest in applying its law to Seawinds' cause of action for breach of the implied covenant of good faith and fair dealing. *488

III. Breach of Fiduciary Duty

A. *Existence of a Conflict*

As I have mentioned, one of the consolidated proceedings before this court involves a ruling on a demurrer to the original complaint, while the other arises from a ruling on a demurrer to the amended complaint. In its demurrer to the original complaint, Nedlloyd contended that if Hong Kong law applied, both the implied covenant and the fiduciary duty causes of action failed. In its demurrer to Seawinds' amended complaint, Nedlloyd renewed its argument that Hong Kong law applied to the breach of implied covenant cause of action, but did not renew the contention that Hong Kong law applied to the breach of fiduciary duty cause of action. The amended complaint superseded the original complaint (see 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 1114, p. 532), and a reviewing court ordinarily will not consider the sufficiency of a superseded pleading (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 884 [92 Cal.Rptr. 162, 479 P.2d 362]; *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311 [70 Cal.Rptr. 849, 444 P.2d 481]).

Nevertheless, the question whether Hong Kong law applies to the fiduciary duty cause of action was properly before the trial court and the Court of Appeal, and was ruled on by those courts. The parties dispute the issue in this court; if the issue is not addressed in this proceeding, it is virtually certain it will be raised again. Inevitably, resolution of the question whether Hong Kong law governs the fiduciary duty cause of action will be required at some stage in these proceedings. Thus, it is procedurally appropriate to consider the issue here, and doing so serves the interests of judicial efficiency. (See *Sokol v. Public Utilities Commission* (1966) 65 Cal.2d 247, 256-257 [53 Cal.Rptr. 673, 418 P.2d 265].) But, because the original complaint has been superseded by the amended complaint, I will analyze the breach of fiduciary duty cause of action as pleaded in the amended, not the original, complaint.

In its amended complaint, Seawinds set forth two

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148                                              Page 23
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

bases on which Nedlloyd owed it a fiduciary duty. First, Seawinds alleged that Nedlloyd was the controlling shareholder of the corporation, though not a majority shareholder, and actually exercised control. Second, Seawinds alleged that it "at all times reposed special trust and confidence in Nedlloyd," relying on *489 Nedlloyd's expertise in the shipping industry, and Nedlloyd accepted this trust and confidence and undertook to act on Seawinds' behalf. [FN12]

> FN12 In the original complaint, Seawinds alleged only that "the [s]hareholders' [a]greement created a fiduciary relationship" between it and Nedlloyd.

As to the second or "trust and confidence" theory of fiduciary duty (a theory not alleged in the original complaint), the record contains no evidence of the content of Hong Kong law. Because the record fails to demonstrate that on this subject Hong Kong law and California law differ in any material way, no choice-of-law issue is presented at this stage of the proceedings by the "trust and confidence" theory of fiduciary duty.

With respect to the first or "controlling shareholder" theory of fiduciary duty, the record does contain some evidence of the content of Hong Kong law. Does this evidence demonstrate a material difference between California law and the law of Hong Kong?

The declaration of Nedlloyd's expert on Hong Kong law, William Catley, states: "Under Hong Kong law, a shareholder of a company owes no fiduciary duty to that company." Seawinds' expert on Hong Kong law, Geoffrey Miles, did not dispute this assertion in his declaration, although he had the opportunity to do so. Therefore, it is reasonable to conclude that if Hong Kong law governs Seawinds' cause of action for breach of fiduciary duty, to the extent the cause of action is premised on the "controlling shareholder" theory, it is barred.

California law, however, is to the contrary. In *Jones*

*v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 109-111 [81 Cal.Rptr. 592, 460 P.2d 464], this court held that majority or controlling shareholders owe a fiduciary duty to minority shareholders and to the corporation itself. (See *Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 133, fn. 7 [214 Cal.Rptr. 177]; 12B Fletcher, Cyclopedia of the Law of Private Corporations (1984 rev.) § 5811, pp. 155-156.)

Under California law, Seawinds is entitled to proceed on its breach of fiduciary duty cause of action against Nedlloyd in the latter's capacity as an alleged controlling shareholder. Under Hong Kong law, however, Seawinds is not entitled to proceed against Nedlloyd as a controlling shareholder as defined by Hong Kong law. Accordingly, a conflict of law exists.

### B. *Scope of the Choice-of-law Clause*

As I noted earlier, the choice-of-law clause of the shareholders' agreement provides, in its entirety: "This Agreement shall be governed by and construed in accordance with Hong Kong law and each party hereby irrevocably *490 submits to the non-exclusive jurisdiction and service of process of the Hong Kong courts." The parties dispute whether, under our precedents, this clause encompasses non-contractual causes of action.

Nedlloyd contends that the breach of fiduciary duty cause of action comes within the choice-of-law clause, relying on *Smith, Valentino & Smith, Inc. v. Superior Court, supra,* 17 Cal.3d 491, 497(*Smith*). There, this court held that a forum-selection clause in a contract was valid with respect to the contractual cause of action. Turning to the tort causes of action, Justice Richardson wrote for the court: "Smith contends that the clause is limited in its application to breach of contract actions and should not apply to the tort counts in Smith's complaint. These counts (unfair competition and intentional interference with advantageous business relationships) arose directly out of Smith's contractual rela-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148

Page 24

3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

tionship with [the defendant] and reasonably may be interpreted as falling within the clause which provides for a Pennsylvania forum to litigate 'Any actions or proceedings instituted by ... [Smith] under this [a]greement with respect to any matters arising under *or growing out of this agreement.* ...' " (*Ibid.*, original italics.)

By contrast, the choice-of-law clause in the contract here provided only that "[t]his Agreement shall be governed by and construed in accordance with Hong Kong law ..."; it did not include language comparable to that emphasized by the court in *Smith.*Unlike the forum- selection clause in *Smith,* it cannot be said of the choice-of-law clause in this case that it was clearly intended by the parties to encompass related noncontractual causes of action. Nor, however, can it be said that the choice-of-law clause here was plainly intended to exclude related noncontractual causes of action. Instead, the clause is ambiguous; it is not clear whether the parties intended it to govern related noncontractual causes of action.

Here, the facts alleged to form the basis for the breach of fiduciary duty cause of action are related to those alleged as the basis for the breach of contract and implied covenant causes of action, which are governed by the parties' choice of Hong Kong law. Under all three causes of action, Seawinds alleged that Nedlloyd engaged in a course of conduct aimed at forcing Seawinds out of the transpacific container shipping business so that it might obtain commercial advantage.

Because the choice-of-law clause in the parties' contract is ambiguous regarding whether it was intended to govern noncontractual causes of action, Seawinds should have alleged in the complaint its interpretation of the clause. (E.g., *Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1561 [260 Cal.Rptr. 237] [" ' "if the instrument is ambiguous, the pleader must allege the meaning he ascribes to it " ' "]; accord, *491 Hillsman v. Sutter Community Hospitals* (1984) 153 Cal.App.3d 743, 749-750 [200 Cal.Rptr. 605]; 4

Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 477, p. 514.) Seawinds did not do so.

This pleading omission, however, is not fatal. The statutory rule is that pleadings are to be liberally construed. (Code Civ. Proc., § 452.)When a plaintiff fails to allege the meaning of an ambiguous contractual provision, but the contract containing the provision is, as in this case, set forth in an attachment to the complaint, the courts will construe the contract to determine whether it is reasonably susceptible to an interpretation sufficient to sustain the cause of action. (*Beck v. American Health Group Internat., Inc., supra,* 211 Cal.App.3d at p. 1561;*Hillsman v. Sutter Community Hospitals, supra,* 153 Cal.App.3d at p. 750.) As I have explained, the choice-of-law provision in this case is ambiguous. It necessarily follows that the clause is reasonably susceptible of an interpretation that does not encompass noncontractual causes of action; therefore, this court is required to so construe it at the pleading stage. Any other approach would be inconsistent with the settled rules of pleading.

Accordingly, because the choice-of-law clause in this case does not unambiguously extend to noncontractual causes of action, it should not be applied by the trial court in determining whether the plaintiff has stated a cause of action for breach of fiduciary duty. [FN13]

> FN13 Nedlloyd also contends that the "internal affairs" doctrine compels a decision in its favor on the breach of fiduciary duty cause of action. The doctrine's status in California is doubtful; it has been criticized as inconsistent with the state's general approach to resolving conflict-of-laws questions. (*Wilson v. Louisiana-Pacific Resources, Inc.* (1982) 138 Cal.App.3d 216, 224 [187 Cal.Rptr. 852].) But even assuming the internal affairs doctrine should be followed in California, resolution of the issue under that doctrine would require a determination whether

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

Page 25

California or Hong Kong has a "more sig-
nificant relationship" to the parties under
section 306 of the Restatement Second of
Conflict of Laws. This question is essen-
tially factual, and thus ill-suited to resolu-
tion at the pleading stage. For this reason,
and because Nedlloyd failed to raise the in-
ternal affairs doctrine in the trial court or
in the Court of Appeal, I decline to address
it here.

### C. Defects of the Majority's Approach

In an earlier part of this opinion, I have emphasized
the particular need for predictability and protection
of the parties' justified contractual expectations in
the commercial context. Until today, California law
governing contractual choice-of-law and choice-
of-forum provisions served that need. Sophisticated
commercial parties who desired choice-of-law and
choice-of-forum provisions to control all related
contractual and noncontractual aspects of their rela-
tionship could achieve their aim by using clauses
that resembled those this court enforced in *Smith*,
*supra*, 17 Cal.3d 491, governing "any *492 matters
arising under or growing out of the agreement."
Other sophisticated parties who desired more nar-
row clauses could draft specific clauses suited to
the parties' needs in the expectation that those
clauses would be enforced as they were intended.

But under the majority's approach, as I understand
it, when two commercial entities agree to a choice-
of-law clause in a contract, as a matter of law the
clause applies to all conceivably related noncon-
tractual causes of action, regardless of any ambigu-
ous language in the clause or of the parties' actual
intent regarding its coverage. The party resisting
application of the choice-of-law clause will have no
opportunity to show that it was intended to apply
only to contractual causes of action. This rigid rule
has, in my view, serious defects.

The majority ignores the most fundamental stat-
utory command of contract law interpretation: "A
contract must be so interpreted as to give effect to

the mutual intention of the parties as it existed at
the time of contracting, so far as the same is as-
certainable and lawful." (Civ. Code, § 1636; see
Code Civ. Proc., § 1859 ["In the construction of a statute
the intention of the Legislature, and in the construc-
tion of an instrument the intention of the parties, is
to be pursued, if possible; ..."].)

It is not at all difficult to foresee situations in which
contracting parties intend a choice-of-law clause
such as the one at issue here to govern only con-
tractual causes of action. A party could demonstrate
such intent by showing, for example, that the scope
of the choice-of-law clause was a subject of negoti-
ation, and that early drafts of the parties' agreement
contained a choice-of-law clause similar to the
clause in *Smith, supra,* 17 Cal.3d 491, while the fi-
nal version, after negotiation, more resembled the
clause at issue here. Such documentary evidence of
negotiation that successively narrowed the scope of
the clause would strongly indicate that the parties
intended the clause to apply only to contractual
causes of action.

But the majority would simply disregard the parties'
intent even in cases in which it could be demon-
strated that the parties intended the choice-of-law
clause *not* to apply to noncontractual causes of ac-
tion. The majority would do so in direct violation of
the command of Civil Code section 1636, which re-
quires the courts to ascertain and give effect to the
intention of the parties. And the majority would do
so in the name of "certainty and predictability,"
while, ironically, defeating the expectations of the
parties that the choice-of-law clause would, cer-
tainly and predictably, apply only to contractual
causes of action.

It is unrealistic to conclude that the choice-of-law
clause in this case is not ambiguous. Certainly,
reasonable minds may differ as to whether the
clause *493 in this case, which states only that
"[t]his Agreement shall be governed by and con-
strued in accordance with Hong Kong law ...,"
should be interpreted to cover noncontractual
causes of action. Indeed, the ambiguity in the scope

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
(Cite as: 3 Cal.4th 459)

of this clause proceeds not so much from its language as from its context. Taken without reference to context, the clause *is* unambiguous, but not in the manner suggested by the majority. Because the clause refers only to "this Agreement," and not, like the similar clause at issue in *Smith,* to "matters arising under *or growing out of this agreement.* ...' " (*Smith, supra,* 17 Cal.3d at p. 497 (italics in original)), it appears on its face not to apply to noncontractual causes of action.

Given the context of the agreement, the parties may well have intended a clause that would assure that all their disputes would be governed by Hong Kong law, but simply have failed to make this explicit. On the other hand, the parties may well have intended what Justice Panelli, in his separate opinion, joined by Justice Mosk, assumes they intended: that only their contract disputes be governed by Hong Kong law. Indeed, the very fact that Justices Panelli and Mosk disagree with the majority regarding the meaning of the clause, and that both the majority and these two justices find the clause clear, but conclude it has opposite meanings, ironically and convincingly demonstrates that the clause *is* ambiguous.

Even under circumstances in which the ambiguity arises more from context than language, extrinsic evidence is admissible to show the meaning the parties intended. The majority mistakenly assumes that, because the term "this Agreement" means to four members of this court "this Agreement and all related controversies," it could reasonably have no different meaning to the parties or anyone else. Outside of the choice-of-law area, however, the courts of this state have rejected such a narrow view of meaning. As Chief Justice Traynor put it in the landmark case of *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38-39 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373] (*Pacific Gas*): "[T]he meaning of a writing '... can only be found by interpretation in light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evid-

ence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended. ...' [Citations.]"

Under the majority's approach, "contractual obligations flow, not from the intention of the parties but from the fact that they used certain magic words." (*Pacific Gas, supra,* 69 Cal.2d at p. 38.) The majority's primitive "magic words" approach is inconsistent with statutory rules of contract interpretation.
*494

The majority's approach is also inconsistent with the approach taken by Justice Richardson in his thoughtful opinion for this court in *Smith, supra,* 17 Cal.3d 491. There, Justice Richardson interpreted the meaning of a choice-of-forum clause by focusing on the particular language chosen by the parties, as the language reflects the parties' intent. Without admitting it, the majority has abandoned this traditional and sound approach.

IV. Conclusion

Parties enter into contracts to allocate risks and to bring certainty, order, and predictability to their mutual relations. One of the principal aims of contract law is to assist contracting parties in achieving this objective by making the outcome of legal disputes clear and predictable. When the parties are residents of different jurisdictions, or their activities span state or national borders, the potential application of the varying legal rules of different jurisdictions undermines the parties' efforts to avoid unexpected legal consequences. When the parties have anticipated and provided for this problem by including in their agreement a choice-of-law provision, courts should generally give effect to the provision. In so doing, courts protect the parties' reasonable expectations and establish a legal climate in which commerce can flourish.

In this case, the parties have elected to have their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

834 P.2d 1148
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531
**(Cite as: 3 Cal.4th 459)**

Page 27

agreement governed by Hong Kong law. Applying the test articulated in the Restatement Second of Conflict of Laws, I conclude, like the majority, that Hong Kong law, the law expressly chosen by the parties, should be applied to Seawinds' contractual cause of action for breach of the implied covenant of good faith and fair dealing. But the goal of protecting contracting parties' reasonable expectations is not served by applying Hong Kong law to Seawinds' noncontractual cause of action for breach of fiduciary duty. Absent extrinsic evidence that the parties intended a broader application of their choice-of-law provision, the choice-of-law provision is most reasonably interpreted as applying only to contractual causes of action. Unlike the majority, therefore, I conclude that the trial court should not apply Hong Kong law to determine whether Seawinds has stated a cause of action for breach of fiduciary duty. **\*495**

Cal. 1992.
Nedlloyd Lines B.V. v. Superior Court
3 Cal.4th 459, 834 P.2d 1148, 11 Cal.Rptr.2d 330, 1994 A.M.C. 531

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.