**19**

Westlaw.

149 Cal.App.4th 1
149 Cal.App.4th 1, 56 Cal.Rptr.3d 528, 07 Cal. Daily Op. Serv. 3391, 2007 Daily Journal D.A.R. 4248
(Cite as: 149 Cal.App.4th 1, 56 Cal.Rptr.3d 528)

Page 1

**C**
Queen Villas Homeowners Ass'n v. TCB Property
Management
Cal.App. 4 Dist.,2007.

Court of Appeal, Fourth District, Division 3, Cali-
fornia.
QUEEN VILLAS HOMEOWNERS ASSOCI-
ATION, a California Nonprofit Mutual Benefit
Corporation, Plaintiff and Appellant,
v.
TCB PROPERTY MANAGEMENT et al., Defend-
ants and Respondents.
No. G037019.

Feb. 28, 2007.

**Background:** Homeowners association brought
breach of contract action against property manager
that had paid association's board member from as-
sociation's funds for her services helping homeown-
ers with their construction defect cases, thereby al-
legedly allowing board member to embezzle. The
Superior      Court,      Orange      County,      No.
02CC18030,James J. Di Cesare, J., granted man-
ager summary judgment. Association appealed.

**Holding:** The Court of Appeal, Sills, P.J., held that
contractual indemnity provision did not constitute
exculpatory clause barring association's breach of
contract action.

Reversed.

West Headnotes

**[1] Contracts 95 ⇐189**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k189 k. Scope and Extent of Obliga-
tion. Most Cited Cases

**Indemnity 208 ⇐27**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k27 k. In General. Most Cited Cases
Provision in contract between homeowners associ-
ation and property manager, that association would
indemnify and hold manager harmless, did not con-
stitute "exculpatory clause" barring association's
breach of contract action arising from manager's al-
leged improper payment of association's funds to
association's board member; nothing in provision
indicated that it went beyond ordinary context of
third party indemnification to second party exculpa-
tion as manager was not performing its duties as a
favor and nothing in language indicated specific
risk associated with managing association's funds.
*See 1 Witkin, Summary of Cal. Law (10th ed. 2005)
Contracts, § 659 et seq.; Cal. Jur. 3d, Contribution
and Indemnity, § 30 et seq.*
**[2] Contracts 95 ⇐189**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k189 k. Scope and Extent of Obliga-
tion. Most Cited Cases
Where a two-party contract purportedly releases
one side from liability to the other, courts must look
for clear, unambiguous and explicit language not to
hold the released party liable.

**[3] Contracts 95 ⇐189**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k189 k. Scope and Extent of Obliga-
tion. Most Cited Cases
Contractual exculpatory clauses are construed
against the released party.

**[4] Indemnity 208 ⇐20**

208 Indemnity

149 Cal.App.4th 1                                                    Page 2
149 Cal.App.4th 1, 56 Cal.Rptr.3d 528, 07 Cal. Daily Op. Serv. 3391, 2007 Daily Journal D.A.R. 4248
(Cite as: 149 Cal.App.4th 1, 56 Cal.Rptr.3d 528)

208I In General
208k20 k. Nature of Obligation. Most Cited Cases
Terms "indemnify" and "hold harmless" are not synonymous; "indemnify" is an offensive right allowing an indemnitee to seek indemnification, and "hold harmless" is defensive, the right not to be bothered by the other party itself seeking indemnification.

**529 Stuart W. Knight, Tustin, for Plaintiff and Appellant.
Gates, O'Doherty, Gonter & Guy, K. Robert Gonter, Irvine, Jennifer C. Lyons and Gina Y. Kandarian-Stein for Defendants and Respondents.

*3 OPINION

SILLS, P.J.

1. Background

Jacqueline Wilburn was a member of the board of directors of the Queen Villas Homeowners Association in Inglewood. Allegedly (at least according to her) the condominiums suffered a variety of construction defects and Wilburn, thinking she had special skills in the management of plaintiffs' construction defect litigation, "agreed to provide extraordinary services" to "facilitate that litigation," including selecting and communicating with counsel, and coordinating the litigation on the association's side. She was paid for her "services" from the association checking account, allegedly with the knowledge and at least tacit agreement of the association's property management company, TCB Property Management, which is the dba of Laura Dawson. The property management company maintained the association's checking account and checkbook.

A dispute has arisen, and is the subject of the instant litigation, however, as to whether Wilburn was *properly* paid or whether the property management company, in control of the checkbook, had a duty to thwart Wilburn's self-dealing or at least

blow the whistle on it. According to the complaint filed by the association, TCB Property Management breached at least two of its contractual duties to the association: (1) to require the signature of two board members on all association expense checks; and (2) to furnish a monthly financial report to the board including check registers and expense *4 statements. The result was, according to the association, Wilburn's de facto embezzlement of about $134,000 of association money.

The property management company brought a summary judgment motion based on (among other things) the indemnity clause in the agreement between it and the association. Actually, we should say "clauses" because if one examines the copy of the contract appended to the complaint (in our record, the second amended complaint), the subject of indemnity is **530 covered in two sections, once as paragraph F under the heading of "Section II-Financial Management" [FN1] and again in the second paragraph under C in the heading "Section IV-Insurance and Indemnification." Here is the text of Section II, paragraph F: "Association agrees to indemnify, defend and hold agent and its employees, Agents, officers, and directors harmless against any and all claims, costs, suits, and damages, including attorneys fees arising out of the performance of this agreement or in connection with the management and operation of the Association, including claims, damages, and liabilities for injuries suffered, or occurrences of death or property damage relating to the property, excluding any claims or liabilities arising out of the sole negligence or willful misconduct of Agent or its employees. The indemnification language set forth above, shall survive the termination of the Agreement."

> FN1. All caps in original quotations from the agreement have been changed to normal capitalization for reading ease. There are no issues in this case involving size of type where the fact of all capitalization of text might be relevant.

We should also add that the first paragraph under C

149 Cal.App.4th 1
149 Cal.App.4th 1, 56 Cal.Rptr.3d 528, 07 Cal. Daily Op. Serv. 3391, 2007 Daily Journal D.A.R. 4248
(Cite as: 149 Cal.App.4th 1, 56 Cal.Rptr.3d 528)

in the heading "Section IV-Insurance and Indemnification" contains pretty much the same language, and for some reason it appears as a quotation in the contract, as if it was blocked out from the facts in some published opinion or other source and simply dropped into the contract. Here is that language, including the recognition that it itself is a quotation: " 'In accordance with Civil Code Section 2772, et seq., as it is amended from time to time, the Association hereby agrees to indemnify, hold harmless and defend Agent and its employees, agents, officers and directors against any loss, liability, damage, claim, demand, suit, or course of action [sic: probably meant "cause of action"] arising from Agent's performance of its duties and obligations under this Agreement, or when acting upon the express authorization of the Association and its Board of Directors, or when Agent within the course and scope of duties enforces the Association's governing documents against violators. The Association will also defend and hold Agent harmless for any action taken by Agent which is directly or indirectly related [to] this Agreement."

*5 The trial court granted the motion for summary judgment based on the indemnity clause quoted above as paragraph F under Section II, also concluding that the property manager's negligence only constituted "passive" negligence, and further that, as pled, the damages sustained by the association were not *solely* the property manager's fault. The association now appeals from the ensuing judg- ment.

## II. *Discussion*

[1] "Indemnification agreements ordinarily relate to third party claims." (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969, 17 Cal.Rptr.2d 242.) Thus we have no doubt, for example, that if a third-party visitor to the Queen Villas complex tripped over a shovel left out by a gardener hired by the management company, and then sued the management company for negligent hiring, the management

company would invoke the indemnity-and in that case properly so-for protection against the suit.

Here, however, the management company seeks to conscript the indemnification agreement in this case into a direct, two-party exculpatory clause, as happened in *Rooz v. Kimmel* (1997) 55 Cal.App.4th 573, 64 Cal.Rptr.2d 177.

**531 Because this case deals with a two-party situation where one party asserts that a contract purportedly releases it of all liability to the other, cases involving when classic three-party indemnification clauses may or may not operate in light of an indemnitee's negligence are not relevant. (E.g., *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 119 Cal.Rptr. 449, 532 P.2d 97; *Goldman v. Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 41 Cal.Rptr. 73, 396 P.2d 377.)

[2] In fact, bogging down in the issue of sole versus non-sole or active versus passive negligence only obscures the fact that *this* is a two-party exculpatory clause case Where a two-party contract purportedly releases one side from liability to the other (e.g., *Saenz v. Whitewater Voyages, Inc.* (1991) 226 Cal.App.3d 758, 276 Cal.Rptr. 672 [contract in which plaintiff's decedent expressly assumed the risk of white water rafting and relieved defendant rafting company of liability] ), courts must look for clear, unambiguous and explicit language not to hold the released party liable. As the *Saenz* court nicely put it: "Everyone agrees that drafting a legally valid release is no easy task. Courts have criticized and struck down releases if the language is oversimplified, if a key word is noted in the title but not the text, and if the release is too lengthy or too general, to name a few deficiencies.... However, we must remember that '[t]o be effective, a release need not achieve perfection.... It suffices that a release be clear, unambiguous, and *6 explicit, and that it express an agreement not to hold the released party liable for negligence.' " (*Id.* at p. 765, 276 Cal.Rptr. 672, quoting *National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court* (1989) 215 Cal.App.3d 934, 938, 264 Cal.Rptr. 44.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

149 Cal.App.4th 1
149 Cal.App.4th 1, 56 Cal.Rptr.3d 528, 07 Cal. Daily Op. Serv. 3391, 2007 Daily Journal D.A.R. 4248
**(Cite as: 149 Cal.App.4th 1, 56 Cal.Rptr.3d 528)**

Page 4

[3] In other words, exculpatory clauses are construed against the released party. (E.g., *Bennett v. United States Cycling Federation* (1987) 193 Cal.App.3d 1485, 1490, 239 Cal.Rptr. 55 [" 'courts have strictly construed the terms of exculpatory clauses against the defendant who is usually the draftsman' "]; *Philippine Airlines, Inc. v. McDonnell Douglas Corp.* (1987) 189 Cal.App.3d 234, 237, 234 Cal.Rptr. 423 ["The law generally looks with disfavor on attempts to avoid liability or to secure exemption for one's own negligence.... The law requires exculpatory clauses to be strictly construed against the party relying on them."]; *Salton Bay Marina v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 932, 218 Cal.Rptr. 839 [same]; *Celli v. Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 518-519, 105 Cal.Rptr. 904.)

The property management company cites us to only one case where a party obtained exculpation from an "indemnity" clause, *Rooz v. Kimmel, supra,* 55 Cal.App.4th 573, 64 Cal.Rptr.2d 177. Our own research has turned up no other.[FN2]

> FN2. *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 21 Cal.Rptr.3d 322 is not an exculpation or even an indemnity case. It is a scope-of-arbitration clause case where a party sought to avoid being compelled to arbitration and used, as one of its arguments, the idea that the arbitration clause was merely limited to third party claims because of the proximity of the arbitration clause to the indemnity clause. (See *id.* at p. 555, 21 Cal.Rptr.3d 322.) The court of course rejected the idea. (*Ibid.*)

*Rooz,* however, merely illustrates an extreme end of the rule of strict construction: If parties go out of their way and say "we really, really mean it," language clearly contemplating exculpation may be enforced.

While the facts in *Rooz* are a thicket of complications arising out of a "1031 exchange" between the owners of two office **532 buildings, we can sketch them in this paragraph. As part of the exchange the plaintiff was to receive consideration in the form of a deed of trust on yet another building, which we will call the "third building." The plaintiff was a bit cheap, though, and rather than open a formal escrow and purchase title insurance, insuring that his deed of trust would have a guaranteed second position (see *Rooz, supra,* 55 Cal.App.4th at p. 590, 64 Cal.Rptr.2d 177) on that third building, he asked a title company (which was simultaneously handling the other party's acquisition of that building) to simply record the trust deed on the property when the other party actually acquired it. The title officer explained to the plaintiff that the title company would only record the deed of trust as an "accommodation," and moreover *7 required the plaintiff to sign an indemnification agreement which specifically recited the recording of the deed as an accommodation " 'with no title or escrow liability.' " (*Id.* at p. 578, 64 Cal.Rptr.2d 177.) The indemnity agreement also specifically recited the absence of benefit otherwise derived by the title company, and the reluctance of the title company to " 'carry out' " the recording unless indemnified. (*Id.* at p. 585, 64 Cal.Rptr.2d 177.)

However, when the other party's escrow on the new building closed, the other party delayed in giving the title company permission to record the deed. In fact, the other party used the period of delay to encumber the third building with another $1.5 million in other loans. That meant that when the plaintiff's deed of trust was eventually recorded, it was already subject to more than $2 million in encumbrances. When the real estate recession of the early 1990's hit, the property was sold, and the plaintiff lost the value of the deed of trust. (*Rooz, supra,* 55 Cal.App.4th at pp. 579-580, 64 Cal.Rptr.2d 177.)

The plaintiff sued the title company to recover his loss, based on the delay in the "accommodation" recording. That brought the indemnity agreement to the fore. After a bench trial the court absolved the title company of liability based on the indemnity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

149 Cal.App.4th 1                                                                                    Page 5
149 Cal.App.4th 1, 56 Cal.Rptr.3d 528, 07 Cal. Daily Op. Serv. 3391, 2007 Daily Journal D.A.R. 4248
(Cite as: 149 Cal.App.4th 1, 56 Cal.Rptr.3d 528)

agreement, and the appellate court upheld the judgment. The appellate court noted that "strictly speaking" the indemnity clause was being applied as a release of liability clause. (*Rooz, supra,* 55 Cal.App.4th at p. 582, 64 Cal.Rptr.2d 177.) Even so, the court upheld that application-and in fact made a point of doing so regardless of whether the title company's negligence was "active" or "passive." (See *id.* at p. 586, 64 Cal.Rptr.2d 177.) The point was that the "commercial reality of the accommodation recording" showed that the parties *intended* for the indemnity clause to release the defendant title company. (*Id.* at p. 586, 64 Cal.Rptr.2d 177.)

The *Rooz* court gave two reasons for its conclusion that the parties intended exculpation: (1) The title company "made it clear" that the service it was to provide was a " 'favor.' " (*Rooz, supra,* 55 Cal.App.4th at p. 586, 64 Cal.Rptr.2d 177.)(2) The title company "made it clear" that it would undertake the service "only" if the plaintiff agreed to exonerate it from all liabilities arising (specifically) out of the recording. (*Ibid.*) Under such circumstances the alternative of *not* enforcing the indemnity clause would deprive the title company of the benefit of its bargain. (*Ibid.*)

In the case before us, in contrast to *Rooz,* there are no indicia in terms of the "commercial reality" or the "benefit of the bargain" received by the defendant that would require a court to interpret the words "indemnify" or "hold harmless" here beyond the usual context of third party indemnification.

**533 In fact, quite the contrary: The contract fixed specific duties regarding the management of the association's checking account upon the management *8 company for a consideration. The tasks were not being done as a favor. There are no references in the language of the indemnity agreement (in contrast to *Rooz* ) to the specific risk associated with the checkbook management services. And the reference in the indemnity agreement to "sole negligence"-and there was no such language in the part of the indemnity agreement quoted in *Rooz* (see *id.*

at pp. 585-586, 64 Cal.Rptr.2d 177)-underscores the purpose of this indemnity agreement as a classic third party indemnity agreement. The "sole negligence" clause points the reader to the fact that there will be, at least in theory, situations where the property management company might *not* be indemnified if it were sued by a third party.

On top of all of this, there is the reductio ad absurdum of the property management company's position vis-à-vis the association's contract claims (as distinct from negligence claims). Under the property management company's interpretation, it could just outright plain fail to do any work at all for the association, such as hiring a gardening company or arranging for insurance or the typical things that property managers do, and the clause would protect it even from a breach of contract action by the association for having paid for services never performed.

That leaves only the property management company's emphasis on the words "hold harmless" as somehow accomplishing the task of exculpation despite any other indicia of intent to exculpate.

In passing, at least two California cases have observed that the words "hold harmless" are synonymous with third-party indemnity situations. (See *Building Maintenance Service Company v. AIL Systems, Inc.* (1997) 55 Cal.App.4th 1014, 1029, 64 Cal.Rptr.2d 353 and *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 968-969, 17 Cal.Rptr.2d 242.)

The fountainhead of these observations is *Varco-Pruden, Inc. v. Hampshire Constr. Co.* (1975) 50 Cal.App.3d 654, 123 Cal.Rptr. 606. In *Varco-Pruden* a subcontractor agreed to build a building for a general contractor, and part of their agreement was the general contractor's agreement with the owner that the general contractor would hold the owner "free and harmless from any and all losses." (*Id.* at p. 660, 123 Cal.Rptr. 606.) The word "indemnify" was *not* part of the agreement. (See *id.* at pp. 659-660, 123 Cal.Rptr. 606.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

149 Cal.App.4th 1
149 Cal.App.4th 1, 56 Cal.Rptr.3d 528, 07 Cal. Daily Op. Serv. 3391, 2007 Daily Journal D.A.R. 4248
**(Cite as: 149 Cal.App.4th 1, 56 Cal.Rptr.3d 528)**

Page 6

When a fire broke out during construction, various amounts to compensate for the expenses incurred by the general contractor were deducted from the amount the general contractor paid the subcontractor, and the subcontractor sued for the difference. The general contractor asserted the "free and harmless" language as a defense and obtained summary judgment. In reversing the summary judgment and concluding that the clause did not impose any *9 liability on the plaintiff subcontractor, the appellate court reasoned that the clause only applied "to claims made by third parties." (*Varco-Pruden, supra,* 50 Cal.App.3d at p. 660, 123 Cal.Rptr. 606, relying on *Dixie Container Corporation v. Dale* (1968) 273 N.C. 624, 160 S.E.2d 708, 711.)

However, neither *Building Maintenance Service Company* nor *Myers Building Industries* nor *Varco-Pruden* addressed the possible problem of textual surplusage that arises if one treats "hold harmless" as synonymous with "indemnify." When two words are used in a contract, the rule of construction is that the words have different meanings (e.g., **534***ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1785, 22 Cal.Rptr.2d 206 ["In California, however, contracts-even insurance contracts-are construed to avoid rendering terms surplusage."]; but see Civ.Code, § 3537 ["Superfluity does not vitiate."].)

[4] Are the words "indemnify" and "hold harmless" synonymous? No. One is offensive and the other is defensive-even though *both* contemplate third-party liability situations. "Indemnify" is an offensive right-a sword-allowing an indemnitee to seek indemnification. "Hold harmless" is defensive: The right *not to be bothered* by the other party itself seeking indemnification.

Let us illustrate: As every veteran of construction defect litigation and every judge who ever picked up a hefty construction defect file knows, in third-party situations there is usually a blizzard of cross-complaints *seeking* indemnity for the cross-complainant's possible liability *for* indemnity. Con-

sider this hypothetical: Homeowner sues general contractor. General contractor sues Subs 1 and 2 for indemnity, that is, to make both subcontractors cover the general's prospective liability to the homeowner. Now suppose Sub 1 has an agreement with Sub 2 which requires Sub 2 to "indemnify and hold harmless" Sub 1. Sub 1 can use the word "indemnify" in the agreement as a basis *to sue* Sub 2 for indemnity for the possible liability Sub 1 may incur to the general. And Sub 1 can use the phrase "hold harmless" as a basis *to prevent* Sub 2 from suing *it* for the liability that Sub 2 might incur to the general. In other words, "indemnify and hold harmless" can both apply to third-party situations *without* violating the canon against surplusage.

Because the indemnity clause here should not be construed in an exculpatory manner, we are spared the need to address the public policy problems that might otherwise be raised if we affirmed. (See Civ.Code, § 1668; *Rooz, supra,* 55 Cal.App.4th at pp. 587-591, 64 Cal.Rptr.2d 177 [discussing why exculpation in that case did not offend public policy].)

*10 III. *Disposition*

The judgment is reversed. The association will recover its costs on appeal.

WE CONCUR: MOORE and FYBEL, JJ.
Cal.App. 4 Dist.,2007.
Queen Villas Homeowners Ass'n v. TCB Property Management
149 Cal.App.4th 1, 56 Cal.Rptr.3d 528, 07 Cal. Daily Op. Serv. 3391, 2007 Daily Journal D.A.R. 4248

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**20**

Westlaw.

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

▷

RUBY ROSENTHAL et al., Plaintiffs and
Respondents,
v.
GREAT WESTERN FINANCIAL SECURITIES
CORPORATION et al., Defendants and
Appellants.
No. S050952.

Supreme Court of California

Dec 12, 1996.

SUMMARY

Individuals who were bank depositors sued the bank, an affiliated company, and several of its representatives for losses they incurred from the purchase of stock and bond mutual funds. Plaintiffs alleged that representatives of both the bank and the affiliate led them to believe that the affiliate's representatives actually worked for the affiliate, or were as secure as, insured deposits with the bank, and that the funds were backed by the bank or by the United States government. Plaintiffs alleged the value of the funds subsequently declined and they lost portions of their principal investments. The affiliate and four individual defendants employed by it petitioned the trial court for an order compelling arbitration under the United States Arbitration Act (9 U.S.C. §§ 1-16) of all claims made by most of the plaintiffs, on the ground that these plaintiffs had executed client agreements containing a predispute arbitration clause. In opposition to the petition, plaintiffs asserted two grounds for not enforcing the arbitration agreement: that there was fraud in the inception of the contract and that the contracts they signed were permeated with fraud. Without holding an evidentiary hearing, the trial court denied the petition to arbitrate as to all but one of the plaintiffs on grounds that plaintiffs presented sufficient evidentiary support for their allegations of fraud in the inception of the agreement. (Superior Court of Los Angeles County, No. 674657, Valerie Lynn Baker, Judge.) The Court of Appeal, Second Dist. Div. Five, No. B094426, reversed with directions to conduct jury trials on plaintiffs' claims of fraud in the inception.

The Supreme Court affirmed the judgment of the Court of Appeal insofar as it reversed the order denying the petition to compel arbitration, but reversed insofar as it directed the trial court to conduct jury trials on the fraud claims. The court held that while the client agreements were subject to the United States Arbitration Act, the act's provision for a jury trial of questions regarding the existence of an arbitration agreement (9 U.S.C. § 4) *395 does not operate in California state courts. It further held that the state constitutional guaranties of due process of law and jury trial (Cal. Const. art. I, §§ 7, 16) do not entitle a party opposing arbitration to a jury trial on the existence or validity of the arbitration agreement. Rather, these questions are to be resolved by the trial court in the manner provided for the hearing and decision of motions (Code Civ. Proc., § 1290.2), either on the basis of affidavits or declarations or, in the exercise of the trial court's discretion where necessary to resolve material conflicts in the written evidence, upon live testimony. On the merits of defendants' petition to compel arbitration, the court held that most of the plaintiffs did not present legally sufficient evidence that they reasonably relied on fraudulent representations as to the essential character of the client agreements they signed, so as to render the agreements void for fraud in the execution, and that the petition to compel arbitration should have been granted as to those plaintiffs. The court held that one party's unreasonable reliance on another's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration clause contained in the contract. Whether a fraud claim that is insufficient as a defense to an arbitration demand may, if proven, nonetheless form the basis for equitable or other relief in the arbitral forum, is a separate issue. The court also held that a smaller number of plaintiffs (one who was legally blind and others who may not have been able to read English) presented potentially sufficient evidence of fraud in the execution so as to necessitate a remand for additional fact-finding. (Opinion by Werdegar, J., with George, C. J., Mosk, Baxter, Chin, and Brown, JJ., concurring. Concurring opinion by Kennard, J.)

HEADNOTES

Classified to California Digest of Official Reports

14 Cal.4th 394
Page 2

14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

(1) Arbitration and Award § 3--Arbitration Agreements--United States Arbitration Act.
9 U.S.C. § 2, which is part of the United States Arbitration Act (USSA) ( 9 U.S.C. § § 1-16), is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, which is applicable to any arbitration agreement within the coverage of the USSA. The rule of enforceability so established preempts any contrary state law and is binding on state courts as well as federal courts. *396

(2a, 2b) Arbitration and Award § 14--Arbitration Proceedings--United States Arbitration Act--Determination of Arbitrability--Federal or State Procedure--Jury Trial.
The provision in the United States Arbitration Act (USAA) (9 U.S.C. § § 1-16) for a jury trial of questions regarding the existence of an arbitration agreement subject to the USSA (9 U.S.C. § 4) does not operate in California state courts. Rather, these questions are to be resolved by the trial court in the manner provided for the hearing and decision of motions (Code Civ. Proc., § 1290.2), either on the basis of affidavits or declarations or, in the exercise of the court's discretion where necessary to resolve material conflicts in the written evidence, upon live testimony. Like other federal procedural rules, the procedural provisions of the USAA are not binding on state courts provided applicable state procedures do not defeat the rights granted by Congress, and the California procedures for a summary determination of a petition to compel arbitration serve to further, rather than defeat, the enforceability policy of the USAA. The use of a motion procedure to decide a petition to compel arbitration does not violate the prohibition in the USAA against states making special rules for arbitration agreements that are not applicable to con- tracts generally. (Disapproving Strauch v. Eyring (1994) 30 Cal.App.4th 181 [35 Cal.Rptr.2d 747], Main v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1977) 67 Cal.App.3d 19 [136 Cal.Rptr. 378], Rice v. Dean Witter Reynolds, Inc. (1991) 235 Cal.App.3d 1016 [1 Cal.Rptr.2d 265], Strotz v. Dean Witter Reynolds, Inc. (1990) 223 Cal.App.3d 208 [272 Cal.Rptr. 680], to the extent the cited cases hold there is a right to jury trial under such circumstances.)

(3) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State

Governments--Preemption--State Procedural Rules.
States may establish the rules of procedure governing litigation in their own courts even when the controversy is governed by substantive federal law. By the same token, however, where state courts entertain a federally created cause of action, the federal right cannot be defeated by the forms of local practice. Thus, a state procedural rule must give way if it impedes the uniform application of the federal statute that is essential to effectuate its purpose, even though the procedure would apply to similar actions arising under state law. At a minimum, the state procedure must be neutral as between state and federal law claims. More exactingly, the state rule may be preempted if it would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Uniform national application of a federal substantive law requires, in particular, that state *397 courts not apply procedural rules that would frequently and predictably produce different outcomes based solely on whether the federal claim is asserted in state or federal court.

(4) Jury § 7--Right to Jury Trial--Civil Cases--United States Arbitration Act--Determination of Arbitrability.
The provision in the United States Arbitration Act (USAA) (9 U.S.C. § § 1-16) for a jury trial of questions regarding the existence of an arbitration agreement subject to the USSA (9 U.S.C. § 4) does not operate in California state courts, and allowing the trial court to decide whether the arbitration agreement is void for fraud in the manner provided for the hearing and decision of motions (Code Civ. Proc., § 1290.2) is not a deprivation of the state constitutional rights to due process and a jury trial (Cal. Const. art. I. § § 7, 16). A petition to compel arbitration is in essence a suit in equity to compel specific performance of a contract. Because actions for specific performance were not recognized at common law, the California Constitution does not guarantee a jury trial to the parties to such a proceeding. Moreover, the fact that, in an action for specific performance of an agreement, the court must determine the existence of the agreement does not itself transform the action into one at law. Accordingly, plaintiffs petitioning for enforcement of arbitration agreements were not constitutionally entitled to a jury trial on whether the arbitration agreements should be specifically enforced, including the question of whether they were void for fraud.

(5) Arbitration and Award § 17--Arbitration

14 Cal.4th 394

Page 3

14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897

**(Cite as: 14 Cal.4th 394)**

Proceedings--Evidence and Burden of Proof--United
States    Arbitration    Act--Determination    of
Arbitrability.

When a petition to compel arbitration subject to the
United States Arbitration Act (9 U.S.C. § § 1-16) is
filed and accompanied by prima facie evidence of a
written arbitration agreement, the court itself must
determine whether the agreement exists (Code Civ.
Proc.. § § 1281.2, 1290.2) and, if any defense to its
enforcement is raised, whether it is enforceable.
Because the existence of the agreement is a statutory
prerequisite to granting the petition, the petitioner
bears the burden of proving its existence by a
preponderance of the evidence. If the party opposing
the petition raises a defense to enforcement-either
fraud in the execution voiding the agreement or a
statutory defense of waiver or revocation-that party
bears the burden of producing evidence of, and
proving by a preponderance of the evidence, any fact
necessary to the defense. A party opposing arbitration
must show fraud only by a preponderance of the
evidence (Evid. Code. § 115). Ordinarily, the facts
are to be proven by affidavit or *398 declaration and
documentary evidence, with oral testimony taken
only in the court's discretion. Although there is no
authority for the proposition that a trial court
necessarily abuses its discretion, in a motion
proceeding, by resolving evidentiary conflicts
without hearing live testimony, where the
enforceability of an arbitration clause may depend
upon which of two sharply conflicting factual
accounts is to be believed, the better course would
normally be for the trial court to hear oral testimony
and allow the parties the opportunity for cross-
examination.

(6) Contracts § 5--Consent--Fraud--In Inception or
Inducement--Effect.

California law distinguishes between fraud in the
"execution" or "inception" of a contract and fraud in
the "inducement" of a contract. In the former case the
fraud goes to the inception or execution of the
agreement, so that the promisor is deceived as to the
nature of the act, and actually does not know what he
or she is signing or does not intend to enter into a
contract at all, mutual assent is lacking, and the
contract is void. In such a case the contract may be
disregarded without the necessity of rescission. Fraud
in the inducement, by contrast, occurs when the
promisor knows what he or she is signing but consent
is induced by fraud, mutual assent is present, and a
contract is formed, but the contract, by reason of the
fraud, is voidable. In order to escape from its
obligations the aggrieved party must rescind.

(7) Arbitration and Award § 5--Arbitration
Agreements--Construction and Effect--Validity--
Fraud--United States Arbitration Act--Judicial
Determination.

Arbitration clauses governed by the United States
Arbitration Act (9 U.S.C. § § 1-16) must be viewed
as "separable" from other portions of a contract;
hence, fraud in the inducement relating to other
contractual terms does not render the arbitration
agreement unenforceable, even when it might justify
rescission of the contract as a whole. By entering into
the arbitration agreement, the parties establish their
intent that disputes coming within the agreement's
scope be determined by an arbitrator rather than a
court; this contractual intent must be respected even
with regard to claims of fraud in the inducement of
the contract generally. Thus, a claim that the contract
as a whole was obtained through fraud in the
inducement is, in the absence of evidence of the
parties' contrary intent, arbitrable. Included in this
rule of arbitrability are claims of a "grand scheme" of
fraud, or fraud "permeating" the transaction. Where,
however, a party's apparent assent to a written
contract is negated by fraud in the inception, there is
simply no arbitration agreement to be enforced. The
*399 parties cannot have intended arbitration under a
contract that is wholly void for fraud in its execution.
Thus, a court is not precluded from deciding claims
of fraud in the execution of the entire contract.

(8a, 8b) Arbitration and Award § 5--Arbitration
Agreements--Construction and Effect--Validity--
Misrepresentation--Failure to Read Contract.

One party's unreasonable reliance on another's
misrepresentations, resulting in a failure to read a
written agreement before signing it, is an insufficient
basis, under the doctrine of fraud in the execution, for
permitting that party to avoid an arbitration clause
contained in the contract. Whether a fraud claim that
is insufficient as a defense to an arbitration demand
may, if proven, nonetheless form the basis for
equitable or other relief in the arbitral forum, is a
separate issue.

(9) Contracts § 5--Consent--Misrepresentation--
Failure to Read.

When a party to a contract seeks a judicial
determination that the contract is void for fraud in the
execution, the law requires that, in failing to acquaint
himself or herself with the contents of a written
agreement before signing it, the party not have acted
in an objectively unreasonable manner. One party's
misrepresentations as to the nature or character of the

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
**(Cite as: 14 Cal.4th 394)**

writing do not negate the other party's apparent manifestation of assent, if, the second party had a reasonable opportunity to know of the character or essential terms of the proposed contract. If a party, with such a reasonable opportunity, fails to learn the nature of the document he or she signs, such negligence precludes a finding that the contract is void for fraud in the execution.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 407.]

(10) Contracts § 5--Consent--Effect of Fraud--Misrepresentation--Failure to Read--Client Agreement for Purchase of Securities--Arbitration Agreement.
In an action against an affiliate of a bank in which plaintiffs were depositors, alleging fraud and related causes of action arising out of plaintiffs' purchase of securities, plaintiffs failed to allege facts sufficient to avoid arbitration clauses in the client agreements they signed without reading. Statements by defendant's representatives that plaintiffs did not have to read the agreements, even if they were falsely and fraudulently made, did not void the written contracts, because it is generally unreasonable, in reliance on such assurances, to neglect to read a written agreement before signing it. *400 One party's making of such an assurance does not, by itself, deprive the other party to a prospective contract of the reasonable opportunity to discover the character and essential terms of the agreement. Plaintiffs' long-term relationships with the bank and their belief that defendant's representatives actually represented the bank did not make reasonable plaintiffs' complete reliance on the representatives' statements. Because the facts did not establish that plaintiffs lacked a reasonable opportunity to learn the character of the documents they signed, they did not prove fraud sufficient to make the contracts wholly void.

(11) Brokers § 21--Duties and Liabilities--Fiduciary Duties--Failure to Explain Customer Agreement.
Bank depositors who brought an action against an affiliate of a bank alleging fraud and related causes of action arising out of the purchase of securities were not excused from reading the client agreements they signed, and therefore could not avoid arbitration clauses in those agreements, on the ground that the affiliate and its representatives owed plaintiffs a fiduciary duty which they breached by failing accurately to explain the terms of the agreements to plaintiffs. Granting the existence of a fiduciary relationship between securities brokers and their

customers, the scope of the duty varies with the facts of the relationship. At the times the claimed nondisclosures occurred, no agency relationship had yet been formed, and those aspects of a broker's duty that derive from his or her role as the investor's agent were therefore not applicable. Under the circumstances, there was no authority for the proposition that the fiduciary obligations of a broker extend to orally alerting the customer to the existence of an arbitration clause or explaining its meaning and effect. Plaintiffs did not establish any actual concealment of the arbitration clauses, or any affirmative misrepresentations regarding the existence or meaning of the arbitration clauses in the client agreements.

(12) Fraud and Deceit § 29--Actions--Evidence--Reliance--Failure to Read Broker's Customer Agreement--Reasonableness.
In an action against an affiliate of a bank in which plaintiffs were depositors, alleging fraud and related causes of action arising out of plaintiffs' purchase of securities, some plaintiffs alleged facts that were sufficient to avoid arbitration clauses in the client agreements they signed without reading. Plaintiffs' declarations, if believed (and interpreted, where ambiguous or self-contradictory, in plaintiffs' favor), would establish facts sufficient to show reasonable reliance as an element of fraud in the execution of the client agreements. In light of plaintiffs' long-term relationships with the bank, which they were led to believe was also the *401 employer of the representatives with whom plaintiffs dealt, plaintiffs' limited ability to understand English, and the representations that the representatives' statements accurately reflected the terms of the agreements, plaintiffs would not have been negligent in relying on the representatives' statements instead of reading the agreements themselves. Under these circumstances, the alleged fraud of the representatives, if true, would have deprived plaintiffs of a reasonable opportunity to learn the character and essential terms of the documents they signed.

(13) Fraud and Deceit § 29--Actions--Evidence--Reliance--Failure to Read Broker's Customer Agreement--Reasonableness.
In an action against an affiliate of a bank in which plaintiff was a depositor, alleging fraud and related causes of action arising out of plaintiff's purchase of securities, plaintiff alleged facts sufficient to avoid an arbitration agreement in the client agreement she signed without reading. Her declaration, if believed and interpreted in her favor, showed facts that would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394                                                           Page 5
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

suffice to establish reasonable reliance for purposes of showing fraud in the execution of the agreement. In light of plaintiff's prior relationship with the bank, by whom she reasonably thought the representative with whom she dealt was employed, her warnings to the representative that she was legally blind and could not read the documents, his assurances they only repeated what he had told her, and his assurance that plaintiff was only signing a "signature card," plaintiff's failure to take additional steps to learn the contents of the written agreement would not have been negligent. Defendant's asserted fraud would have deprived her of a reasonable opportunity to learn the character and essential terms of the documents she signed.

COUNSEL

Morrison & Foerster, Shirley M. Hufstedler, Maren E. Nelson and David K. Barrett for Defendants and Appellants.

Michael B. Dashjian, Steven Drapkin, Lee W. Rierson, Proskauer, Rose, Goetz & Mendelsohn, Jeffrey A. Berman, Daniel E. Eaton, Paul, Hastings, Janofsky & Walker and Paul Grossman as Amici Curiae on behalf of Defendants and Appellants.

Michael Linfield, Laurence B. Frank, Hadsell & Stormer, Dan Stormer, Virginia Keeny, Anne Richardson and Randy Renick for Plaintiffs and Respondents. *402

The Sturdevant Law Firm, Ann Saponara, McGuinn, Hillsman & Palefsky, Cliff Palefsky and Keith Ehrman as Amici Curiae on behalf of Plaintiffs and Respondents.

WERDEGAR, J.

In this case involving the enforcement of a predispute arbitration clause in a client agreement executed in the purchase of securities, we address the procedures by which petitions to compel arbitration (Code Civ. Proc., § 1281.2) are to be determined in the superior courts. We conclude that while the client agreements here are subject to the United States Arbitration Act (9 U.S.C. §§ 1-16), the federal provision for a jury trial of questions regarding the existence of an arbitration agreement (9 U.S.C. § 4) does not operate in California state courts. We further conclude the state constitutional guarantees of due process of law and jury trial (Cal. Const., art. I, §§ 7, 16) do not entitle a party opposing arbitration to a jury trial on the existence or validity of the arbitration agreement. Rather, these questions are to be resolved by the trial court in the manner provided for the hearing and decision of motions (Code Civ. Proc., § 1290.2), either on the basis of affidavits or declarations or, in the exercise of the court's discretion where necessary to resolve material conflicts in the written evidence, upon live testimony.

On the merits of defendants' petition to compel arbitration, plaintiffs claim the arbitration agreements are void for fraud in their execution. We hold most of the plaintiffs did not present legally sufficient evidence that they reasonably relied on fraudulent representations as to the essential character of the client agreements they signed, so as to render the agreements void for fraud in the execution. (C. I. T. Corporation v. Panac (1944) 25 Cal.2d 547, 548-549 [154 P.2d 710, 160 A.L.R. 1285].) We will conclude the petition to compel arbitration should be granted as to these plaintiffs. A smaller number of plaintiffs have presented potentially sufficient evidence of fraud in the execution; as to these plaintiffs, we will conclude a remand for additional fact finding is required.

Factual and Procedural Background

Plaintiffs are 24 individuals, 23 of whom, through defendant Great Western Financial Securities Corporation (GWFSC), invested in stock and bond *403 mutual funds. (The remaining plaintiff, Michael Zinzun, sues "under Business & Professions Code § § 17000, 17200 and 17500 on behalf of the general public.") Before making these investments, most plaintiffs were depositors with Great Western Bank (GWB), a separate corporation related to GWFSC. [FN1] They allege representatives of both corporations led them to believe that the GWFSC representatives actually worked for GWB, that funds sold by GWFSC were, or were as secure as, insured deposits with GWB, and that the GWFSC funds were backed by GWB or by the United States Government. Plaintiffs allege the value of the GWFSC funds subsequently declined and they lost portions of their principal. The complaint names as defendants several individual GWFSC representatives, as well as GWFSC and GWB, and sets forth causes of action for breach of fiduciary duty, fraud, negligent misrepresentation, intentional and negligent infliction of emotional distress, unfair business practices and invasion of privacy.

FN1 The exact corporate relationship between GWB and GWFSC is not clear

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

from the briefing, and is not important to this appeal. Plaintiffs' counsel represented below that both are owned by a parent corporation, Great Western Financial Corporation (GWFC), which is also a defendant here. The complaint alleges GWFSC is a subsidiary of GWFC, which in turn is an "independent affiliate" of GWB.

GWFSC and four individual defendants employed by GWFSC (collectively GWFSC) petitioned the superior court for an order compelling arbitration of all claims made by most plaintiffs, on the ground these plaintiffs had executed client agreements containing a predispute arbitration clause. [FN2] In opposition to the petition, plaintiffs asserted two grounds for not enforcing the arbitration agreement: "that there was fraud in the inception of the contract" and that "the contracts they signed were 'permeated with fraud.'"

> FN2 GWFSC did not seek arbitration as to plaintiffs Zinzun (the public plaintiff) and Lee and Maxwell Trent, and did not claim they had signed arbitration agreements.

While arguing fraud *allegations* alone were sufficient to avoid arbitration, plaintiffs each submitted, in addition, a declaration under penalty of perjury purportedly showing the existence of fraud in the inception of, or "permeating," the client agreements. These declarations will be reviewed in detail later in this opinion; in broadest outline, and as relevant to enforceability of the arbitration agreements, the declarations contain evidence plaintiffs, most of whom were longtime GWB depositors, were led to believe the GWFSC representatives worked for GWB; plaintiffs therefore placed trust and confidence in the representatives; the representatives materially misrepresented the nature of the investments being sold; the representatives did not tell plaintiffs the client agreement contained an arbitration clause; and the representatives assured plaintiffs, in various ways, that the written client *404 agreement was a mere formality needed to open the "account." GWFSC countered with declarations from the representatives who had sold plaintiffs the subject funds, and who denied making the claimed fraudulent statements.

GWFSC, citing *Strauch v. Eyring* (1994) 30 Cal.App.4th 181 [35 Cal.Rptr.2d 747], argued that, although these agreements for the purchase of stock and bond funds were governed by the United States Arbitration Act, 9 United States Code sections 1-16 (the USAA), the USAA's provision for jury trial on the existence of an arbitration agreement (9 U.S.C. § 4) does not apply in state court. For that reason, GWFSC asserted, plaintiffs' *allegations* of fraud, by themselves, were an insufficient basis for denying the petition. GWFSC further maintained the facts alleged and shown by plaintiffs' declarations were insufficient, under the applicable federal substantive law of enforceability, to avoid arbitration on either asserted theory of fraud ("inception" or "permeation").

At a nonevidentiary hearing on the petition, the trial court questioned counsel as to whether and how it was to resolve the factual conflicts presented by the declarations. "[I]s it the court's role at this stage to resolve these factual issues or ... is it sufficient for the plaintiff to [raise] factual issues?" Ultimately, the trial court agreed with GWFSC that the USAA's provision for jury trial did not apply in state court. Nonetheless, without holding an evidentiary hearing, the court denied the petition to arbitrate as to all but one of the plaintiffs "on grounds that each of the above-named plaintiffs presented sufficient evidentiary support for their allegations of fraud in the inception of the arbitration agreement." The court granted the petition as to one plaintiff (Alfred Patrick), because he "did not present evidence of sufficient substantiality to support a claim of fraud in the inception of the arbitration clause."

GWFSC appealed the ruling denying its petition to compel as to 20 plaintiffs. (Code Civ. Proc.. § 1294, subd. (a).) The Court of Appeal held the superior court erred in determining plaintiffs were not entitled to a jury trial under section 4 of the USAA. Relying on prior Court of Appeal decisions, beginning with *Main v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19 [136 Cal.Rptr. 378], and declining to follow what it deemed dictum in *Strauch v. Eyring, supra,* 30 Cal.App.4th 181, the appellate court held the federal jury trial provision was applicable in a California court. The court did not address the merits of plaintiffs' fraud claims. Instead, it remanded for the trial court to determine whether plaintiffs have *405 sufficiently alleged fraud in the making of the arbitration agreement, and if so to try, by jury if requested, the issue of whether the arbitration agreements were the result of fraud.

We granted GWFSC's petition for review.

Discussion

Page 7

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

I. *Trial Court Procedure for Deciding a Petition to Compel Arbitration*

A. *Section 4 of the United States Arbitration Act*

The parties correctly agree that because the transactions here involved interstate commerce, questions concerning arbitrability of the parties' dispute are governed by the USAA. (See 9 U.S.C. § § 1, 2.) The primary substantive provision of the USAA is section 2, which provides: "A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.)

(1) "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [USAA]." (*Moses H. Cone Hospital v. Mercury Const. Corp.* (1983) 460 U.S. 1, 24 [74 L.Ed.2d 765, 785, 103 S.Ct. 927] (*Moses H. Cone*).) The rule of enforceability established by section 2 of the USAA preempts any contrary state law and is binding on state courts as well as federal. (*Southland Corp. v. Keating* (1984) 465 U.S. 1, 10-16 [79 L.Ed.2d 1, 11-16, 104 S.Ct. 852] (*Southland Corp.*).)

The policy of enforceability stated in section 2 of the USAA is implemented in the remaining sections of the USAA, especially sections 3 and 4, which concern attempts to resist arbitration or to litigate an issue subject to arbitration. Section 3 requires any court "of the United States" to grant a party's request for a stay of litigation on an arbitrable issue, pending completion of the arbitration. (9 U.S.C. § 3.) Section 4 requires a "United *406 States district court" to entertain an application to compel arbitration. (9 U.S.C. § 4.) Five days' notice of the application is required, to be served on the party in default "in the manner provided by the Federal Rules of Civil Procedure." (*Ibid.*) The court is to order arbitration if satisfied "that the making of the agreement for arbitration or the failure to comply therewith is not in issue." If such an issue *is* presented, the court is to "proceed summarily to the trial thereof." (*Ibid.*) Despite the summary nature of the proceeding, the party resisting arbitration may demand a jury trial on issues of the existence of the arbitration agreement or

the party's default thereunder. Upon this demand, the court is to refer the matter to a jury "in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose." (*Ibid.*) [FN3]

FN3 Section 5 of the USAA concerns court appointment of an arbitrator upon failure of the agreed method. Section 6 provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided." (9 U.S.C. § 6.) Section 7 provides for court enforcement of arbitrators' summons of witnesses. Section 8 concerns proceedings in admiralty cases. Sections 9 through 13 set standards and procedures for court confirmation, correction and vacation of arbitrators' awards. Section 14 limits retroactivity of the USAA. Section 15 concerns the Act of State doctrine. Section 16 provides for an appeal from specified orders made under the USAA. (9 U.S.C. § § 5-16.)

In most important respects, the California statutory scheme on enforcement of private arbitration agreements is similar to the USAA; the similarity is not surprising, as the two share origins in the earlier statutes of New York and New Jersey. (See Recommendation and Study Relating to Arbitration (Dec. 1960) 3 Cal. Law Revision Com. Rep. (1961) p. G-28 (Law Revision Commission Study); Feldman, *Arbitration Law in California: Private Tribunals for Private Government* (1957) 30 So.Cal.L.Rev. 375, 388, fn. 45.) Code of Civil Procedure section 1281, like section 2 of the USAA, provides that predispute arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." Code of Civil Procedure section 1281.2 (hereafter section 1281.2), like the USAA's section 4, provides a procedure by which a party may petition the court to order arbitration of a controversy. Under section 1281.2, as under section 4 of the USAA, the court may deny the application if it finds the party resisting arbitration did not in fact agree to arbitrate. [FN4] Like section 3 of the USAA, Code of Civil Procedure section 1281.3 provides that when a court has ordered arbitration of a controversy, any pending litigation on the same *407 controversy is to be stayed. [FN5] (2a) In one important respect, however, section 1281.2 differs from section 4 of the USAA: The California

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

statute does not provide for a jury trial of issues as to the making of the arbitration agreement or the resisting party's default thereunder. Instead, our statutory scheme requires petitions to compel arbitration to be determined "in the manner ... provided by law for the making and hearing of motions." (Code Civ. Proc., § 1290.2 (hereafter section 1290.2).)

> FN4 Section 1281.2 also makes explicitly clear that the petition may be denied, as well, if the petitioner has waived its right to compel arbitration or if grounds exist for revocation of the arbitration agreement.

> FN5 Unlike the federal law, however, section 1281.2 allows the court, in certain circumstances, to instead deny or stay arbitration pending completion of related litigation.

The question thus arises whether section 4 of the USAA, or sections 1281.2 and 1290.2, provide the procedure to be followed in a California court in a case where the USAA governs arbitrability of the controversy. As noted, the Courts of Appeal have reached differing results on this question. (Compare Strauch v. Eyring, supra, 30 Cal.App.4th at p. 186 [jury trial provision of the USAA's section 4 "does not apply in state court proceedings"] with Main v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, 67 Cal.App.3d at pp. 24-25 [noting the USAA "provides for a 'trial,' by jury if requested," and that "[t]he proceedings below ... were controlled by the [USAA]"]; Rice v. Dean Witter Reynolds, Inc. (1991) 235 Cal.App.3d 1016, 1025, fn. 4 [1 Cal.Rptr.2d 265] [State court litigant "is entitled to a jury trial on the issue of fraud. (9 U.S.C. § 4.)"], and Strotz v. Dean Witter Reynolds, Inc. (1990) 223 Cal.App.3d 208, 210, fn. 1 [272 Cal.Rptr. 680] [Under the USAA, as applicable in state court, "the parties are entitled to a jury trial of the issue whether a valid agreement to arbitrate exists."].) In light both of the specific language of the USAA and of general principles of federal preemption, we conclude the USAA does not require California courts to hold a jury trial on the existence of an arbitration agreement. [FN6] The Court of Appeal decisions just cited are disapproved to the extent they reach the opposite conclusion.

> FN6 Appellate courts in several other states have similarly found various of the USAA's procedural provisions inapplicable in state court. (See Atlantic Painting & Contracting

Inc. v. Nashville Bridge Co. (Ky. 1984) 670 S.W.2d 841, 846; Martin v. Norwood (1985) 395 Mass. 159 [478 N.E.2d 955, 958]; McClellan v. Barrath Constr. Co., Inc. (Mo.Ct.App. 1987) 725 S.W.2d 656, 658-659; Jack B. Anglin Co., Inc. v. Tipps (Tex. 1992) 842 S.W.2d 266, 268, 272; but see Merrill Lynch Pierce etc. v. Melemed (Fla.Dist.Ct.App. 1981) 405 So.2d 790, 793 [pre-Southland Corp. decision holding USAA section 3 applicable in state court].) The parties have not cited, and we have not discovered, any foreign decisions holding section 4's jury trial provision applicable in state court.

Section 4 of the USAA does not explicitly govern the procedures to be used in state courts. As already noted, the statute contemplates a petition in "United States district court," and provides that certain steps are to be taken "in the manner provided by the Federal Rules of Civil Procedure." This *408 language has led the United States Supreme Court to express its doubt that section 4 is applicable in state courts. Thus, in Southland Corp., supra, 465 U.S. 1, 16, footnote 10 [79 L.Ed.2d 15] the court explained: "In holding that the Arbitration Act preempts a state law that withdraws the power to enforce arbitration agreements, we do not hold that §§ 3 and 4 of the Arbitration Act apply to proceedings in state courts. Section 4, for example, provides that the Federal Rules of Civil Procedure apply in proceedings to compel arbitration. The Federal Rules do not apply in such state-court proceedings." In Volt Info. Sciences v. Leland Stanford Jr. U. (1989) 489 U.S. 468, 477 [103 L.Ed.2d 488, 498-499, 109 S.Ct. 1248], the high court again declined to decide the issue, which it stated had been "expressly reserv[ed]" in Southland Corp. The court remarked that sections 3 and 4 "by their terms appear to apply only to proceedings in federal court." (Volt Info. Sciences v. Leland Stanford Jr. U., supra, 489 U.S. at p. 477, fn. 6 [103 L.Ed.2d at p. 499].)

Although the wording of section 4 of the USAA thus suggests it is limited to federal courts, that language is not completely dispositive, in that section 2 of the USAA, by contrast, has no such restricted range. Under the holding in Southland Corp., section 2's rule of enforceability of arbitration clauses preempts contrary state law even in a state court proceeding. But the federal policy of ensuring enforcement of private arbitration agreements, centrally embodied in section 2, is not self-implementing; its effectuation

Page 9
14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

requires that courts have available some procedure by which a party seeking arbitration may compel a resisting party to arbitrate. Section 4 of the USAA establishes one such procedure; state law may or may not provide for other equivalent or similar procedures. If no adequate state procedures are provided, state courts may, in order fairly to adjudicate a federal claim for enforcement of an arbitration agreement, be obliged to adopt a procedure similar in its essentials to that set out in the USAA. As the high court has previously explained (albeit with reference to section 3 of the USAA, rather than section 4), "[t]his is necessary to carry out Congress' intent to mandate enforcement of all covered arbitration agreements; Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court." (_Moses H. Cone. supra._ 460 U.S. at p. 26. fn. 34 [74 L.Ed.2d at p. 786].) That section 2 of the USAA *does* preempt contrary state law is established; it follows that a state procedural statute or rule that frustrated the effectuation of section 2's central policy would, where the federal law applied, be preempted by the USAA.

The question whether a jury trial is called for thus requires us to go beyond the language of section 4 of the USAA and apply broader principles *409 of federal preemption. (3) It is a "general and unassailable proposition ... that States may establish the rules of procedure governing litigation in their own courts," even when the controversy is governed by substantive federal law. (_Felder v. Casey_ (1988) 487 U.S. 131. 138 [101 L.Ed.2d 123. 137. 108 S.Ct. 2302].) "By the same token, however, where state courts entertain a federally created cause of action, the 'federal right cannot be defeated by the forms of local practice.' " (_Ibid._) Thus, as we have previously recognized, a state procedural rule must give way "if it impedes the uniform application of the federal statute essential to effectuate its purpose, even though the procedure would apply to similar actions arising under state law." (_McCarroll v. L.A. County etc. Carpenters_ (1957) 49 Cal.2d 45. 61. 62 [315 P.2d 322].) At a minimum the state procedure must be neutral as between state and federal law claims. (_Howlett v. Rose_ (1990) 496 U.S. 356. 372 [110 L.Ed.2d 332. 350-351. 110 S.Ct. 2430].) More exactingly, the state rule may be preempted if it would stand " ' "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' " (_Felder v. Casey. supra._ 487 U.S. at p.

138 [101 L.Ed.2d at p. 138].) Uniform national application of a federal substantive law requires, in particular, that state courts not apply procedural rules that would "frequently and predictably produce different outcomes ... based solely on whether the [federal] claim is asserted in state or federal court." (_Ibid._)

(2b) Like other federal procedural rules, therefore, "the procedural provisions of the [USAA] are not binding on state courts ... *provided applicable state procedures do not defeat the rights granted by Congress.*" (_McClellan v. Barrath Constr. Co.. Inc.. supra._ 725 S.W.2d at p. 658. italics added.) We think it plain the California procedures for a summary determination of the petition to compel arbitration serve to further, rather than defeat, the enforceability policy of the USAA. Sections 1281.2 and 1290.2 are neutral as between state and federal law claims for enforcement of arbitration agreements. They display no hostility to arbitration as an alternative to litigation; to the contrary, the summary procedure provided, in which the existence and validity of the arbitration agreement is decided by the court in the manner of a motion, is designed to further the use of private arbitration as a means of resolving disputes more quickly and less expensively than through litigation. [FN7] Finally, having a court, instead of a jury, decide whether an arbitration agreement exists will not "frequently and predictably produce different outcomes." *410(_Felder v. Casey. supra._ 487 U.S. at p. 138 [101 L.Ed.2d at p. 138].) Because the California procedure for deciding motions to compel serves to further, rather than defeat, full and uniform effectuation of the federal law's objectives, the California law, rather than section 4 of the USAA, is to be followed in California courts.

> FN7 Prior to the Legislature's general revision of our arbitration law in 1961, the California statute on petitions to compel (Code Civ. Proc., former § 1282) closely paralleled section 4 of the USAA, including the jury trial provision. (See Historical Note, 19A West's Ann. Cal. Code Civ. Proc. (1982 ed.) § 1281.2, p. 247.) The Law Revision Commission's recommendation to eliminate the jury trial provision was based on a conclusion in its commissioned study that jury trial of the preliminary issues could frustrate the use of arbitration as a speedy means of resolving controversies. (Law Rev. Com. Study, supra, at p. G-38.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 10
14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

In a distinct, but related, argument, plaintiffs maintain the use of a motion procedure to decide the petition to compel arbitration violates the USAA because it constitutes a special rule for arbitration agreements, not applicable to contracts generally. As the United States Supreme Court has explained on several occasions, section 2 of the USAA, where applicable, precludes states from "singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.' " (*Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. ___, ___ [134 L.Ed.2d 902, 909, 116 S.Ct. 1652, 1656].) Thus, a substantive state law rule may be applied to agreements subject to the USAA only if the state law "arose to govern issues concerning the validity, revocability and enforceability of contracts generally." (*Perry v. Thomas* (1987) 482 U.S. 483, 492, fn. 9 [96 L.Ed.2d 426, 437, 107 S.Ct. 2520]; see also *Southland Corp., supra,* 465 U.S. at p. 16, fn. 11 [79 L.Ed.2d at pp. 15-16].) Contrary to plaintiffs' claim, however, nothing in the California procedures violates this principle. Sections 1281.2 and 1290.2 establish no special rule of nonenforceability applicable only to arbitration agreements. Nor do the California procedures place arbitration agreements at a disadvantage compared to other contracts, or single them out for suspect status. Our statutes do establish procedures for determining enforceability not applicable to contracts generally, but they do not thereby run afoul of the USAA's section 2, which states the principle of equal enforceability, but does not dictate the procedures for determining enforceability. Moreover, section 2, as part of a statutory scheme establishing special procedures for deciding enforceability of arbitration agreements, could not reasonably be interpreted as forbidding the use of such procedures.

B. *Jury Trial Under the California Constitution*
(4) Plaintiffs contend that if, as we hold above, section 4 of the USAA does not apply in California courts, then the California statutes (sections 1281.2 and 1290.2) must be construed to mandate the trial court make only a preliminary determination of sufficiency of evidence to void the arbitration agreement, with a jury trial of the issue to follow if the evidence of fraud is deemed sufficient. Plaintiffs maintain that allowing the court finally to decide whether the arbitration agreement is void for fraud would deprive *411 them of their state constitutional rights to due process and a jury trial. (Cal. Const., art. I, §§ 7, 16.) We find no violation of state constitutional rights in the summary procedure for

decision, without a jury, of whether a valid arbitration agreement exists.

A petition to compel arbitration " 'is in essence a suit in equity to compel specific performance of a contract.' " (*Spear v. California State Auto. Assn.* (1992) 2 Cal.4th 1035, 1040 [9 Cal.Rptr.2d 381, 831 P.2d 821]; *Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 479 [121 Cal.Rptr. 477, 535 P.2d 341]; *Trubowitch v. Riverbank Canning Co.* (1947) 30 Cal.2d 335, 347 [182 P.2d 182].) Because actions for specific performance were not recognized at common law, the California Constitution does not guarantee the parties to such a proceeding a jury trial. (*Hastings v. Matlock* (1985) 171 Cal.App.3d 826, 835 [217 Cal.Rptr. 856].) Moreover, "[t]he fact that in an action for specific performance of an agreement the court must determine the existence of the agreement does not itself transform the action into one at law." (*Ibid.*; *Walton v. Walton* (1995) 31 Cal.App.4th 277, 288 [36 Cal.Rptr.2d 901].) Under these principles, plaintiffs are not constitutionally entitled to a jury trial on whether the arbitration agreements should be specifically enforced, including the question whether they are void for fraud.

The petition for an order of arbitration here was not a new, independent action; rather, it was filed in response to a complaint seeking, among other forms of relief, money damages, and was coupled with a request that litigation of the complaint be stayed pending completion of the arbitration. Plaintiffs therefore compare this case to those in which a plaintiff's release of liability is raised as a defense in an action for damages from personal injury. In such cases courts have held the issue of fraud in the inception or inducement of the release is for the jury in the underlying action. (*Palmquist v. Mercer* (1954) 43 Cal.2d 92, 100 [272 P.2d 26]; *Frusetta v. Hauben* (1990) 217 Cal.App.3d 551, 558-560 [266 Cal.Rptr. 621].) Neither of the cited decisions, however, considered any constitutional issue; the question was simply whether, under the particular facts of the case, the trial court properly removed an issue of fraud from the jury by an order for nonsuit (*Palmquist*) or summary judgment (*Frusetta*). Neither stands for the proposition the Legislature is constitutionally barred from establishing a nonjury procedure for deciding whether to order specific enforcement of a particular type of contractual agreement.

Plaintiffs also compare sections 1281.2 and 1290.2 to various statutes creating barriers to pleading specific causes of action or claims for damages. (E.g.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394                                                             Page 11
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

Code Civ. Proc. § § 425.13 [punitive damages
against health care *412 provider], 425.14 [punitive
damages against religious corporation], 425.16
["SLAPP" (strategic lawsuits against public
participation) suits], Civ. Code. § 1714.10 [action for
civil conspiracy against attorney for conspiring with
client to contest or compromise dispute].) This court
and the Courts of Appeal, noting the potential
deprivation of jury trial that might result were these
statutes construed to require the plaintiff first to
*prove* the specified claim to the trial court, have
instead read the statutes as requiring the court to
determine only if the plaintiff has stated and
substantiated a legally sufficient claim. (See, e.g.,
*College Hospital, Inc. v. Superior Court* (1994) 8
Cal.4th 704, 719 [34 Cal.Rptr.2d 898, 882 P.2d 894]
[Code Civ. Proc. § 425.13]; *Lafayette Morehouse,
Inc. v. Chronicle Publishing Co.* (1995) 37
Cal.App.4th 855, 866-867 [44 Cal.Rptr.2d 46] [Code
Civ. Proc. § 425.16]; *Hung v. Wang* (1992) 8
Cal.App.4th 908, 926- 934 [11 Cal.Rptr.2d 113] [Civ.
Code. § 1714.10].)

Plaintiffs' reliance on these decisions is misplaced.
Under the cited statutes, the trial court is charged
with making a preliminary determination as to the
*merit* of the plaintiff's proposed cause of action or
claim for punitive damages.] In deciding an
application to compel, in contrast, the superior court
does not decide whether the plaintiff's causes of
action have merit, although some factual questions
considered in deciding the application may overlap
those raised by the plaintiff's claims for relief. The
only question implicated by the petition to compel
arbitration is whether the arbitration agreements
should be specifically enforced. As we have already
seen, plaintiffs are not constitutionally entitled to a
jury trial on that question. The plaintiff is not
impermissibly denied a jury trial when the superior
court decides only the facts necessary to determine
specific enforceability of an arbitration agreement, an
equitable question as to which no jury trial right
exists.

In support of their claim the summary procedure of
sections 1281.2 and 1290.2 deprives them of due
process, plaintiffs assert the hearing and
determination of a petition to compel "could take
place early on in the proceedings, without the
opportunity for discovery." Plaintiffs do not,
however, assert they actually had insufficient time to
conduct discovery before hearing of the petition, or
that they sought and were refused discovery of any
matter pertinent to the enforceability of the

arbitration clause. Plaintiffs, of course, have full
access to, and have made full use of, their own
recollections of the transactions, the principal
evidence upon which their claim of fraud in inception
of the arbitration agreement is based. GWFSC has
provided pertinent written evidence (the client
agreements and other account forms), as well as
declarations of its representatives, in support of its
petition. These circumstances do not establish
plaintiffs have been unfairly *413 denied discovery
of anything they need to oppose the petition to
compel arbitration.

We therefore conclude the summary procedure
established by sections 1281.2 and 1290.2 does not
violate the cited provisions of the California
Constitution. A party opposing contractual arbitration
of a dispute does not have the right to a jury trial of
the existence or validity of the arbitration agreement.
(5) Instead, when a petition to compel arbitration is
filed and accompanied by prima facie evidence of a
written agreement to arbitrate the controversy, the
court itself must determine whether the agreement
exists and, if any defense to its enforcement is raised,
whether it is enforceable. Because the existence of
the agreement is a statutory prerequisite to granting
the petition, the petitioner bears the burden of
proving its existence by a preponderance of the
evidence. If the party opposing the petition raises a
defense to enforcement-either fraud in the execution
voiding the agreement, or a statutory defense of
waiver or revocation (see § 1281.2, subds. (a), (b))-
that party bears the burden of producing evidence of,
and proving by a preponderance of the evidence, any
fact necessary to the defense. (*Strauch v. Eyring,
supra,* 30 Cal.App.4th at p. 186.)

Defendants urge us to hold a party opposing
arbitration must show fraud not only by a
preponderance of evidence, but by clear and
convincing evidence. We are not persuaded such a
rule does or should exist. Except as the law otherwise
provides, the burden of proof is by a preponderance
of the evidence. (Evid. Code. § 115.) Section 1281.2,
which sets forth the bases for granting or denying an
application to compel, neither states nor suggests any
other burden of proof. We have, moreover,
previously rejected the suggestion that allegations of
fraud, in a civil action, must be proven by clear and
convincing evidence. (*Liodas v. Sahadi* (1977) 19
Cal.3d 278, 286-291 [137 Cal.Rptr. 635, 562 P.2d
316].) Defendants' invocation of the general policy
favoring enforcement of valid arbitration agreements
is insufficient to warrant imposing a higher burden on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394                                                                    Page 12
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

a party opposing arbitration, especially when the existence and enforceability of the agreement to arbitrate is the very issue before the trial court.

C. *Requirement of an Evidentiary Hearing*
We consider next the means to be used by the trial court in finding the facts relevant to enforcement of the arbitration agreement. As both parties acknowledge, hearing and determination "in the manner ... provided by law for the ... hearing of motions" (§ 1290.2) would ordinarily mean the facts are to be proven by affidavit or declaration and documentary evidence, *414 with oral testimony taken only in the court's discretion. (Code Civ. Proc.. § 2009; Cal. Rules of Court, rules 303(a)(2), 323(a); *Strauch v. Eyring, supra,* 30 Cal.App.4th at p. 184; *Reifler v. Superior Court* (1974) 39 Cal.App.3d 479, 483-484 [114 Cal.Rptr. 356]; *Haldane v. Haldane* (1962) 210 Cal.App.2d 587, 593 [26 Cal.Rptr. 670].)

GWFSC nevertheless maintains that when the declarations and documentary evidence present a material factual dispute as to the existence or enforceability of the arbitration agreement, "the trial court must proceed to a summary bench trial" of the issues. In cases of this sort, GWFSC insists, "the failure to resolve a material issue of fact by an evidentiary hearing is an abuse of discretion." We decline to embrace the broad rule proposed by GWFSC. There is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony. Nonetheless, we agree that where-as is common with allegations of fraud such as are made here-the enforceability of an arbitration clause may depend upon which of two sharply conflicting factual accounts is to be believed, the better course would normally be for the trial court to hear oral testimony and allow the parties the opportunity for cross-examination. As the trial court here remarked, "it's pretty difficult to weigh credibility without seeing the witnesses."

D. *Correctness of the Procedures Followed Here*
The declarations presented by plaintiffs and GWFSC were in extensive and material conflict. The trial court, lacking adequate appellate guidance on the issue, was unsure whether its role was to "resolve these factual issues" or merely to determine "whether the evidence presented by the plaintiff has sufficient substantiality." As discussed above, the former course was the correct one under sections 1281.2 and 1290.2. The trial court, however, appears to have

chosen the latter, denying the petition, as to all but one plaintiff, on the ground plaintiffs "presented sufficient evidentiary support for their allegations of fraud." To the extent, therefore, any plaintiff did produce legally sufficient evidence of fraud voiding the arbitration agreement, the trial court must determine the factual issues on remand. We turn next to the question whether any of the plaintiffs did produce such evidence.

II. *Legal Sufficiency of the Plaintiffs' Declarations*
A. *Arbitrability of Fraud Claims Under Prima Paint*
GWFSC contends plaintiffs' declarations are legally insufficient to raise a nonarbitrable issue because their claims of fraud, even if believed, are not *415 directed specifically at the arbitration clauses. GWFSC relies on *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395, 404 [18 L.Ed.2d 1270, 1277-1278, 87 S.Ct. 1801] (*Prima Paint*), in which the high court held that under the USAA, unless the parties have agreed otherwise, "claims of fraud in the inducement of the contract generally," that is, fraud claims not going "to the 'making' of the agreement to arbitrate," are to be decided by the arbitrator rather than the court. We have interpreted section 1281.2 to embody the same standard of enforceability. (*Ericksen, Arbuthnot, McCarthy, Kearney, & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322-323 [197 Cal.Rptr. 581, 673 P.2d 251] (*Ericksen*).) [FN8]

FN8 The *Prima Paint* court restricted its discussion to the standard to be applied in federal court. For that reason, and because the decision relies on language in section 4 of the USAA, rather than section 2 (see *Prima Paint, supra,* 388 U.S. at pp. 403-404 [18 L.Ed.2d at pp. 1277-1278]), one might question whether its rule applies in state courts even in transactions subject to the USAA. However, because the holding of *Prima Paint* is a substantive one limiting the circumstances under which arbitration clauses may be refused enforcement, it would appear to preempt contrary state law under the analysis of *Southland Corp., supra,* 465 U.S. at pages 10-16 [79 L.Ed.2d at pages 11-16], and would apply in both state and federal courts. In any event, as noted above, California follows the same rule.

To consider GWFSC's *Prima Paint* argument, we must separate out the two fraud theories upon which plaintiffs have relied to avoid enforcement of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 13

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

arbitration agreements: fraud in the *execution* of the client agreements, and fraud *"permeating"* the agreements.

(6) California law distinguishes between fraud in the "execution" or "inception" of a contract and fraud in the "inducement" of a contract. In brief, in the former case " 'the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is *void*. In such a case it may be disregarded without the necessity of rescission.' " (*Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028 [225 Cal.Rptr. 895].) Fraud in the inducement, by contrast, occurs when " 'the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*. In order to escape from its obligations the aggrieved party must rescind ....' " (*Ibid.*)

(7) GWFSC asserts *Prima Paint* mandates arbitration of any fraud claim, even one going to the execution of the contract, except an "independent" or "separate and distinct" challenge to the arbitration clause itself. Statements to that effect appear in some decisions applying *Prima Paint*. (See, e.g., *416 Rowland v. Paine Webber, Inc.* (1992) 4 Cal.App.4th 279, 285 [6 Cal.Rptr.2d 20] ["independent" challenge]; *Union Mutual Stock Life Ins. v. Beneficial Life.* (1st Cir. 1985) 774 F.2d 524, 529 [same]; see also *R. M. Perez & Associates, Inc. v. Welch* (5th Cir. 1992) 960 F.2d 534, 537-538 [holding "fraud in the factum," as well as in the inducement, subject to *Prima Paint*].) [FN9]

> FN9 GWFSC also relies upon *Teledyne, Inc. v. Kone Corp.* (9th Cir. 1989) 892 F.2d 1404, 1410, in which the court referred to the need for a "separate and distinct" challenge to the arbitration clause. The court that decided *Teledyne*, however, has since explained that its decision rested on other grounds and does not apply when the party opposing arbitration "den[ies] the existence of the contracts containing the arbitration provisions." (*Three Valleys Mun. Water Dist. v. E.F. Hutton* (9th Cir. 1991) 925 F.2d 1136, 1142.)

We do not believe, however, the language or logic of *Prima Paint* compels such a reading. To the contrary,

we conclude claims of fraud in the execution of the entire agreement are not arbitrable under either state or federal law. If the entire contract is void *ab initio* because of fraud, the parties have not agreed to arbitrate any controversy; under that circumstance, *Prima Paint* does not require a court to order arbitration. (Accord, *Rice v. Dean Witter Reynolds, Inc., supra,* 235 Cal.App.3d at p. 1024; *Strotz v. Dean Witter Reynolds, Inc., supra,* 223 Cal.App.3d at pp. 217-218; *Three Valleys Mun. Water Dist. v. E.F. Hutton, supra,* 925 F.2d at pp. 1140-1141; *Cancanon v. Smith Barney, Harris, Upham & Co.* (11th Cir. 1986) 805 F.2d 998, 999-1000; see also *Rush v. Oppenheimer & Co., Inc.* (S.D.N.Y. 1988) 681 F.Supp. 1045, 1049 [allegations of fraud need not be directed "exclusively" at the arbitration clause].)

The central rationale of the high court's decision in *Prima Paint* was that arbitration clauses must, under federal law established in the USAA, be viewed as " 'separable' " from other portions of a contract (*Prima Paint, supra,* 388 U.S. at p. 402 [18 L.Ed.2d at pp. 1276-1277]); hence, fraud in the inducement relating to other contractual terms does not render the arbitration agreement unenforceable, even when it might justify rescission of the contract as a whole. By entering into the arbitration agreement, the parties established their intent that disputes coming within the agreement's scope be determined by an arbitrator rather than a court; this contractual intent must be respected even with regard to claims of fraud in the inducement of the contract generally.

Where, however, a party's apparent assent to a written contract is *negated* by fraud in the inception, there is simply no arbitration agreement to be enforced. As one Court of Appeal recently explained, *Prima Paint* does not require "allegations directed specifically and solely at the agreement to *417 arbitrate. *Prima Paint*, rather, requires some allegation [and, as we held earlier, evidence] from which it may be determined that the parties in fact did not intend to arbitrate the issues set forth in the pleadings. The allegation may be directed solely at the 'making' of the agreement to arbitrate or, as recognized by the doctrine of fraud in the inception, it may be directed at the 'making' of the contract as a whole." (*Hayes Children Leasing Co. v. NCR Corp.* (1995) 37 Cal.App.4th 775, 784 [43 Cal.Rptr.2d 650].)

In the absence of a contrary agreement, parties to a predispute arbitration agreement are presumed to have intended arbitration of controversies, including

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

allegations of fraud in the inducement of the contract generally, that may allow rescission or reformation of the contract or part of it. They cannot, however, have intended arbitration under a contract wholly void for fraud in its execution. We therefore conclude *Prima Paint* does not preclude the court from deciding claims of fraud in the execution of the entire contract. The same is true of California law under our decision in *Ericksen. supra. 35 Cal.3d 312.* in which we explicitly distinguished cases where the party opposing arbitration " 'denied ever agreeing to anything.' " (*Id.* at p. 323, fn. 8.)

Although the question of fraud in the execution is for the trial court to decide, we reach a different conclusion on plaintiffs' second theory, fraud "permeating" the agreements. The "permeation doctrine" has developed in California courts as an ill-defined exception to *Prima Paint'* rule of arbitrability. (See *Strotz v. Dean Witter Reynolds. Inc.. supra. 223 Cal.App.3d at pp. 212-217* (*Strotz*) [tracing origins of the doctrine and ultimately rejecting it as vague and potentially inconsistent with *Prima Paint*].) After examining various statements of the doctrine, we conclude it conflicts with *Prima Paint* and; thus, is not a ground for avoiding arbitration.

In *Main v. Merrill Lynch, Pierce. Fenner & Smith, Inc.. supra. 67 Cal.App.3d at page 27* (*Main*), the court, having reviewed *Prima Paint* and several of its federal and state progeny, concluded, "where it is alleged that fraud either induced the arbitration clause itself, *or permeated the entire agreement including the arbitration clause*, that issue will be determined judicially and not by arbitration." (Italics added.) The court then found the plaintiff's allegations sufficient to show constructive fraud, in that "defendants gained an advantage over plaintiff by inclusion, in the lending agreement, of the provision to arbitrate." (*Id.* at p. 31; but see *Strotz. supra. 223 Cal.App.3d at p. 216* [persuasively criticizing *Main's* conclusion on the last point].)

In *Ericksen. supra. 35 Cal.3d at page 323. footnote 8.* this court mentioned *Main's* analysis briefly, but with apparent approval. In doing so, however, *\*418* we apparently understood the "permeation doctrine" to be identical or very similar to fraud in the inception or execution of a contract: we held it inapplicable because " 'this is not a case ... where the defendant denied ever agreeing to anything.' " (*Ibid.*; see also *Hayes Children Leasing Co. v. NCR Corp.. supra. 37 Cal.App.4th at p. 784* [*Ericksen* treated

permeation as "identical to the doctrine of fraud in the inception"]; *Herman Feil. Inc. v. Design Center of Los Angeles (1988) 204 Cal.App.3d 1406. 1416 [251 Cal.Rptr. 895]* ["As was observed in *Ericksen*, however, the ' permeation' claim is applicable only where the party seeking to avoid arbitration denies having agreed to *anything*."].)

The permeation doctrine received its broadest application in *Ford v. Shearson Lehman American Express, Inc.. supra. 180 Cal.App.3d at pages 1019-1028* (*Ford*). The court there interpreted *Prima Paint* as requiring arbitration only when the fraud claim "goes to the performance under a contract"; claims of fraud going to the "making or procurement" of a contract are to be decided by the trial court. (*Id.* at p. 1022.) In the case before it, the court concluded, arbitration could be avoided on a theory of fraud permeating the contract because the plaintiff had alleged "a grand scheme of fraud which permeated the entire relationship and transactions perpetrated by all defendants." (*Id.* at p. 1027.) Thus, the plaintiff sufficiently alleged "the fraud practiced on him pertained to the 'making' of the agreements containing the arbitration clause." (*Id.* at p. 1023.)

As another Court of Appeal has since explained, the *Ford* court appears to have "ignore[d] the rule in *Prima Paint* that the arbitration agreement is severable from the principal contract. [¶ ] The Supreme Court in *Prima Paint* did not hold that fraud which goes to the making of the contract is for the court and fraud related to the performance of the contract is for the arbitrator. Rather, the court specifically and expressly made a distinction between fraud which is directed at the arbitration agreement and fraud directed at the principal contract. The court quite clearly held that only fraud directed at the making or performance of the arbitration agreement is to be determined by the court. (*Prima Paint Corp. v. Flood & Conklin. supra. 388 U.S. 395. 403-404 [18 L.Ed.2 1270. 1277-12781.]*)" (*Strotz. supra. 223 Cal.App.3d at p. 217.*)

Thus, the permeation doctrine conflicts with *Prima Paint* "to the extent it indicates that an agreement to arbitrate may be found invalid simply because the contract as a whole was induced by fraud." (*Hayes Children Leasing Co. v. NCR Corp.. supra. 37 Cal.App.4th at p. 784.*) To the extent, on the other hand, the permeation doctrine is merely another name for fraud in the *\*419* execution of a contract, it is unnecessary. Seeing, therefore, no legally valid use for the theory, we decline further to recognize it.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394                                                                                                          Page 15
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

Claims that a party has employed fraud in inducing consent specifically to the arbitration agreement (e.g., by actively concealing its existence or misrepresenting its meaning or value) are, under *Prima Paint*, to be decided by the court, because they go to the valid making of the arbitration clause itself. Claims that, due to fraud in the execution of the agreement as a whole, the parties reached no contract containing an arbitration clause, are also to be decided by the court. But claims that the contract as a whole was obtained through fraud in the inducement are, in the absence of evidence of the parties' contrary intent, arbitrable under *Prima Paint*. Included in this rule of arbitrability are claims of a "grand scheme" of fraud, or fraud "permeating" the transaction.

### B. *Reasonableness of Reliance as an Element of Fraud in the Inception*

The parties dispute whether plaintiffs' declarations, even if believed, show fraud in the inception or execution of the client agreements sufficient to render the agreements entirely void. In assessing the legal sufficiency of plaintiffs' claims, we apply the California law of contracts generally, rather than any rules uniquely tailored to enforcement of arbitration agreements. We are precluded under <u>section 2</u> of the USAA from "singling out arbitration provisions for suspect status." (*Doctor's Associates, Inc. v. Casarotto, supra*, 517 U.S. ___, ___ [<u>134 L.Ed.2d 902. 909. 116 S.Ct. 1652. 1656].</u>) [FN10]

> FN10 Our reference to the federal rule embodied in the USAA, which governs this case, should not be taken to suggest California law is any different. Like <u>section 2</u> of the USAA, <u>Code of Civil Procedure section 1281</u> mandates the enforcement of arbitration agreements not be denied except on grounds applicable to "any contract."

(8a) The central disputed question is whether plaintiffs could justifiably rely on GWFSC's misrepresentations without themselves ascertaining the nature of the documents they signed. GWFSC argues plaintiffs had a reasonable opportunity to know the terms of the client agreements, but failed through their own neglect to read them. Plaintiffs, however, claim their failure to read the client agreements is legally excused by virtue of GWFSC's asserted fraud. They rely on <u>Lynch v. Cruttenden & Co. (1993) 18 Cal.App.4th 802. 807 [22 Cal.Rptr.2d 636]</u> (*Lynch*), in which the court stated, "The general rule in California is that even in the absence of a fiduciary relationship plaintiff's failure to read a

contract is excusable where reliance is placed on the misrepresentations of the other party." (Accord, <u>Strotz. supra. 223 Cal.App.3d at pp. 218-219.</u>)

California law supports GWFSC's position that fraud does not render a written contract *void* where the defrauded party had a reasonable opportunity *420 to discover the real terms of the contract. A contract may, however, be held wholly void, despite the parties' apparent assent to it, when, " 'without negligence on his part, a signer attaches his signature to a paper assuming it to be a paper of a different character.' " (<u>C. I. T. Corporation v. Panac. supra. 25 Cal.2d at p. 549.</u> quoting 1 Williston on Contracts (3d ed.1957) § 95A, pp. 350, 351, italics added; see also <u>Gardner v. Rubin (1957) 149 Cal.App.2d 368. 372 [308 P.2d 892]</u> [negotiable instrument not enforceable even by holder in due course where executed through fraud and "*in the absence of negligence on the part of the maker*" (italics added)]; <u>Ramirez v. Superior Court (1980) 103 Cal.App.3d 746. 756. fn. 3 [163 Cal.Rptr. 223]</u> ["no agreement exists unless the parties signing the document act voluntarily and are aware of the nature of the document and have turned their attention to its provisions *or reasonably should have turned their attention to its provisions*" (italics added)].) A release of a liability claim, for example, "may be rendered void on the grounds of fraud or misrepresentation regarding the nature of the claim covered by the release *so long as the releasor's failure to learn the nature of the terms was not attributable to his own negligence*." (<u>Frusetta v. Hauben. supra. 217 Cal.App.3d at p. 557.</u> italics added; see also <u>Casey v. Proctor (1963) 59 Cal.2d 97. 103 [28 Cal.Rptr. 307. 378 P.2d 579]</u> [release not binding if releaser's misapprehension of nature or scope caused by other party's misconduct and "*not due to his own neglect*" (italics added)].)

The Restatement position is similar. <u>Restatement Second of Contracts section 163</u>, titled "When a Misrepresentation Prevents Formation of a Contract," states as follows (italics added): "If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent *by one who neither knows nor a reasonable opportunity to know* of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." As the official comment explains, the misrepresentation in such a case "goes to what is sometimes called the 'factum' or the 'execution' rather than merely the 'inducement'," '" and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394                                                          Page 16
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

renders the contract "void" rather than merely "voidable." (Rest.2d Contracts, § 163, coms. a & c, pp. 443, 444.)

The *Lynch* and *Strotz* courts relied for their contrary statements of the law on 1 Witkin, Summary of California Law (9th ed. 1987) Contracts, section 407, pages 366-367. In that section Witkin asserts that, while misrepresentations were once regarded as an excuse for failure to read a contract only within a fiduciary relationship, "[i]t is now settled ... that the excuse may be asserted even in the situation where the parties are in no such relationship." (*Id.* at p. 366.) Upon examination of the authorities, we conclude *421 Witkin and the courts in *Lynch* and *Strotz* state the rule of excuse too broadly. While some prior cases have held equitable relief, such as rescission or reformation of the contract, may be available despite the defrauded party's failure to read the contract, our law is clear that misrepresentation does not render the contract *void* unless the misled party, before making the agreement, lacked a reasonable opportunity to learn its terms.

Aside from a case stating a special rule for insurance policies, Witkin relies principally on two decisions of this court: *California Trust Co. v. Cohn* (1932) 214 Cal. 619 [7 P.2d 297] (*Cohn*) and *Van Meter v. Bent Construction Co.* (1956) 46 Cal.2d 588 [297 P.2d 644] (*Van Meter*). (2 Witkin, Summary of Cal. Law, *supra*, Contracts, § 407, pp. 366-367.) Both cases, however, involve reformation of contracts, rather than the determination a contract is void for fraud in the execution.

In *Cohn*, the cross-complainants alleged the cross-defendant had made an oral agreement to hold certain real property in trust for the cross-complainants, to sell the property to third parties, and to pay cross-complainants part of the proceeds. Cross-defendant had then prepared and, by misrepresenting the writing's contents, induced cross-complainants to sign a written agreement under which cross-complainants were obliged to purchase the property themselves. Cross-complainants sought reformation of the written contract to reflect the terms of the oral agreement. (*Cohn, supra,* 214 Cal. at pp. 622-624.) This court held the alleged facts sufficient "to warrant a reformation of the written contract," despite cross-complainants' admitted failure to read the written agreement before signing it. (*Id.* at p. 626.) We noted "[t]here has always been a sharp struggle in the courts between the desire to repress fraud upon the one hand, and on the other to discourage negligence and

the opportunity and invitation to commit perjury." (*Id.* at p. 627.) We concluded that "where the failure to familiarize one's self with the contents of a written contract prior to its execution is traceable solely to carelessness or negligence, *reformation* as a rule should be denied; but that where such failure, and perhaps negligence, is induced, as alleged and admitted by the demurrer in this case, by the false representations and fraud of the other party to the contract that its provisions are different from those set out, the courts, even in the absence of a fiduciary or confidential relationship between the parties, *should reform, and in most cases have reformed*, the instrument so as to cause it to speak the true agreement of the parties." (*Ibid.*, italics added.)

Thus, in *Cohn*, this court allowed equitable relief for fraud, through reformation of the written contract, despite a party's failure to read the *422 writing. We did not hold a party who had reasonable opportunity to learn the terms of a contract before executing it but failed to do so, could, because of another party's misrepresentations, obtain a judgment the contract was completely void for lack of assent.

*Van Meter* involved a subcontractor's negligent failure to ascertain that the area of land to be cleared was greater than represented by the general contractor. As in *Cohn*, the plaintiff sought reformation of the contract rather than a declaration it had never been entered into. (*Van Meter, supra,* 46 Cal.2d at pp. 590, 593.) This court held the subcontractor's negligence did not bar it from obtaining relief. We noted that since the general contractor had believed true its statements regarding the area to be cleared, the contract might be reformable or rescindable under a theory of mutual mistake. (*Id.* at p. 594.) In addition, we relied on the principle that a defendant who had misrepresented the facts should not generally be heard, in an action for "equitable relief," to assert the plaintiff's reliance on his misrepresentations was negligent, at least in the absence of facts making the plaintiff's conduct "preposterous or irrational." (*Id.* at p. 595.) *Van Meter*, like *Cohn*, thus concerns only the propriety of equitable relief, and does not speak to the facts necessary to show a party's apparent assent is ineffective because of fraud in the execution of the contract.

Witkin also cites a section of the Restatement as treating the same subject, i.e., negligence of the defrauded party. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 407, p. 367.) Notably, however,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 17

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

the section cited is section 172, which deals only with fraud as grounds for avoidance or reformation of a contract (Rest.2d Contracts. § 172 & com. a, p. 469.), rather than section 163, which, as discussed earlier, concerns fraud negating assent to a contract and thereby rendering it void. Section 172 provides that a defrauded party's "fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." Comment *a* to the section explains it as an elaboration of the rule that "[t]he recipient's reliance on the misrepresentation must be justified in order to entitle him to avoidance (§ 164) [FN11] or reformation (§ 166)." (Rest.2d Contracts. § 172, com. a, p. 469.) When the defrauded party seeks such unjustifiable relief, relief will not be barred by "the mere fact that he could, by the exercise of reasonable care, have avoided the mistake." (*Ibid.*) *423 As the comment further explains, however, such negligence *does* bar the defrauded party from claiming the contract is void for lack of assent: "However, the recipient's fault will prevent application of the rule stated in § 163, under which a misapprehension as to the very nature of a proposed contract makes his apparent manifestation of assent ineffective. That rule applies only if he has neither knowledge nor reasonable opportunity to obtain knowledge of the character or essential terms of the proposed contract." (*Ibid.*) The same contrast between the standards for equitable relief and a finding of voidness is made in comment *b* to section 163. (Rest.2d Contracts. § 163, com. b, p. 444; see also *id.*, § 164, com. a, p. 445.)

> FN11 Restatement Second of Contracts section 164 delineates, inter alia, the circumstances under which a contract is "voidable" because one party's assent was induced by the other's fraudulent misrepresentation. (Rest.2d Contracts. § 164, com. a, pp. 445-446.) It describes, in other words, fraud in the inducement, which allows the defrauded party to avoid the contract by rescinding it. (See 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 403, p. 363.)

(9) We therefore conclude that, whatever validity the rule stated in *Lynch*, *Strotz* and *Witkin* may have when the plaintiff seeks equitable relief for fraud in the inducement of a contract, and whatever the exact parameters of that rule might be, the rule is not a correct statement of the test to be applied when the

plaintiff seeks a judicial determination the contract is void for fraud in the execution. In the latter case, California law, like the Restatement, requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had "reasonable opportunity to know of the character or essential terms of the proposed contract." (Rest.2d Contracts. § 163. p. 443.) If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such "negligence" precludes a finding the contract is void for fraud in the execution. (C. I. T. Corporation v. Panac. supra. 25 Cal.2d at p. 549.)

(8b) It follows that one party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract. Whether a fraud claim that is insufficient as a defense to an arbitration demand may, if proven, nonetheless form the basis for equitable or other relief in the arbitral forum, is a separate issue, with which we have no concern in this case.

### C. *Sufficiency of Plaintiffs' Showings of Fraud in the Execution*

It remains only to apply the foregoing test to the facts shown by the plaintiffs' declarations. We first examine the evidence common to most or all plaintiffs. (10) Many plaintiffs in the instant case declare GWFSC *424 representatives told them the written client agreements were unimportant, or that plaintiffs need not read them. (See, e.g., declarations of Allen [" 'it's not necessary to read them' "]; Fitzgerald ["documents just restated what he had already told me"]; George Lampel ["documents were necessary for us to open our account" but were "merely standard forms" and "just repeated what he told us"]; Pupo [" 'just a formality for opening your account' "]; Rosenthal ["just a formality and they just restated what he had already told me"]; and Warren ["not necessary to read them"].) Such statements, even if falsely and fraudulently made, do not void a written contract, because it is generally unreasonable, in reliance on such assurances, to neglect to read a written agreement before signing it. One party's making of such an assurance does not, by itself, deprive the other party to a prospective contract of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

the reasonable opportunity to discover the character and essential terms of the agreement. [FN12]

> FN12 Some plaintiffs also declare that the GWFSC representative "did not give me any time" to read the agreement (Allen), or that they felt "rushed" (Carcano) or "pressured" (Rosenthal). Without evidence the representative actually took some action or said something to hurry or pressure the prospective client, however, these claims add nothing to plaintiffs' showing.

Many plaintiffs also declare they were longtime depositors with GWB before they invested in mutual funds with GWFSC, and were led to believe the GWFSC representative worked for GWB. Plaintiffs generally contend, and some expressly declare, that for these reasons they placed their trust in the GWFSC representatives and relied upon the representatives' assurances they did not need to read the contract.

Floyd Allen, for example, declares he had banked at the same GWB branch for 30 years and believed the woman who sold him the funds to be an employee of GWB, "since her desk was near the tellers [one of whom referred Allen to her] and was in the same room as the other bank operations." Betty Connolly banked at the same GWB branch for more than 25 years. A GWFSC representative called her from the GWB branch to discuss her GWB certificate of deposit, which was expiring. Because he had information regarding her GWB account, and because his desk was in the branch along with other banking operations desks, she thought he was a GWB employee. She signed the client agreement without reading it, because "I trusted Great Western and its employees and he [the representative] had said that the forms just repeated what he had told me ...." Ruby Rosenthal, 94 years old, had banked at GWB for about 30 years. She thought the GWFSC representative worked for GWB because he worked in the same area as GWB staff, and had her telephone number and access to her bank records. She relied on the representative, signing the client agreement without reading it. Other plaintiffs make similar declarations. *425

Plaintiffs' long-term relationship with GWB and their belief the GWFSC representatives actually represented GWB do, to some degree, explain their asserted reliance on the representatives' assurances they need not read the client agreements. We do not

believe, however, these facts are so compelling as to make reasonable plaintiffs' complete reliance on the representatives. To make out a claim of fraud in the execution, it must be remembered, plaintiffs must show their apparent assent to the contracts-their signatures on the client agreements-is negated by fraud so fundamental that they were deceived as to the basic character of the documents they signed and had no reasonable opportunity to learn the truth. By their claim of fraud in the execution, plaintiffs do not seek equitable relief in the form of rescission or reformation, or damages for being misled, but, rather, a judicial determination they never assented to any contract. Because the facts described above do not establish these plaintiffs lacked a reasonable opportunity to learn the character of the documents they signed, they do not prove fraud sufficient to make the contracts wholly void.

(11) Plaintiffs also contend GWFSC and its representatives owed them a fiduciary duty and breached that duty by failing accurately to explain to plaintiffs the terms of the agreement. The existence of a fiduciary relationship, plaintiffs further contend, excuses their failure to read the client agreements before signing them. GWFSC argues that a stockbroker's fiduciary duty to the customer does not include the giving of legal advice, such as the explanation of contractual terms.

Granting the existence of a fiduciary relationship between securities brokers and their customers, the scope of the duty varies with the facts of the relationship. (See _Duffy v. Cavalier (1989) 215 Cal.App.3d 1517, 1535 [264 Cal.Rptr. 740]_ ["The question is not whether there is a fiduciary duty, which there is in every broker-customer relationship; rather, it is the _scope or extent_ of the fiduciary obligation, which depends on the facts of the case."].) Plaintiffs, according to their declarations, were given reason to believe the GWFSC representatives worked for GWB, an institution with which they had long acquaintance, and therefore might reasonably have regarded the representatives as generally trustworthy. Nonetheless, they had no ongoing relationship with GWFSC or its representatives. At the times the claimed nondisclosures occurred, no agency relationship had yet been formed, and those aspects of a broker's duty that derive from his or her role as the investor's agent are therefore not applicable. Under these circumstances, we find no authority for the proposition the fiduciary obligations of a broker extend to orally alerting the customer to the existence of an arbitration clause or explaining its meaning and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

effect. (See *Gouger v. Bear, Stearns & *426 Co., Inc.* (E.D.Pa. 1993) 823 F.Supp. 282, 286-288; *Castro v. Marine Midland Bank, N.A.* (S.D.N.Y. 1988) 695 F.Supp. 1548, 1551; *Rush v. Oppenheimer & Co., Inc., supra,* 681 F.Supp. at p. 1052.) As to other terms of the agreement, such as the risks and benefits of the investments, the question of a breach of fiduciary obligations is a separate matter-in this case for the arbitrators-which we do not address.

It should be stressed that plaintiffs' declarations do not establish any actual *concealment* by GWFSC of the arbitration clause, or any affirmative misrepresentations regarding the existence or meaning of an arbitration clause in the client agreements. The client agreement is a one-page (legal size) document; the arbitration agreement is in bold print in the center of the page's right column of text. It includes a brief explanation of the meaning of arbitration, including the important facts that arbitration is final and binding, that parties to arbitration waive their right to jury trial, and that judicial review of the award is "strictly limited." Immediately above the signature line, moreover, is a bold-print reminder that "this agreement contains a predispute arbitration clause above in paragraphs 9 and 10." Under these circumstances, plaintiffs understandably rest on their complete failure to read the agreements, which failure they argue was excused by GWFSC's fraudulent misrepresentations as to the nature of the documents, rather than on any specific claims of concealment or misrepresentation as to the arbitration clauses themselves. As we have already concluded, however, the relationship between plaintiffs and GWFSC representatives was insufficient to make reasonable plaintiffs' reliance on the representatives' assurances they need not read the agreements. [FN13]

FN13 Plaintiffs' brief leaves unclear whether the existence of a fiduciary duty is intended to show fraud in the execution, fraud in the inducement "permeating" the contract, or both. As we concluded earlier, only the former theory is, under *Prima Paint*, a viable theory for opposing arbitration. In the discussion immediately above, we hold the circumstances of the described relationships insufficient to justify plaintiffs' failure to read the contracts, and hence insufficient to show constructive fraud in the execution. To the extent plaintiffs also intend the asserted fiduciary relationship to serve as the premise for a showing of constructive fraud in the

inducement, *aimed specifically at the arbitration clauses*, the showing fails because any duty on the representatives' part, in the circumstances, did not extend to drawing plaintiffs' attention to, or explaining the meaning of, the arbitration clauses.

We conclude that the statements of GWFSC representatives to the effect the client agreements were merely a formality, or did not need to be read, were insufficient, even in light of the parties' relationship, to warrant a finding of fraud in the inception of the agreements. As to those plaintiffs *427 whose declarations disclose no additional evidence of fraud, the petition to compel should have been granted. [FN14]

FN14 The plaintiffs referred to are Floyd Allen, Michael Carcano, Betty Connolly, Almada Didio, Thomas Fitzpatrick, George and Veronica Lampel, Pearl Mitchell, Alfred Nabeta, Norma and Noel Resnick, Ruby Rosenthal, Birdie Vaughn, and Phillip Warren.

(12) Plaintiff Giovanna Greco declares she is an 81-year-old Italian immigrant, who speaks "only a few words of English" and "cannot read English at all." (Her signed declaration is in Italian, with an unsigned English translation provided.) Greco's daughter, plaintiff Rosalba Kasbarian, describes herself as a 45-year-old Italian immigrant, who is able "to speak and understand simple English," but "cannot read English very well at all," and has difficulty reading "complicated words or legal terms." (Kasbarian's signed declaration is in English.) Greco and Kasbarian were depositors of GWB.

Kasbarian received a telephone call from a man named Dominick, who said he was with "Great Western" and could help Kasbarian and Greco obtain a higher return than they were getting on their certificates of deposit. Kasbarian and Greco met with Dominick-apparently Dominick Divine, a GWFSC representative-who they thought worked for GWB. Divine described a safe investment with a high return, and they agreed to deposit money in it. According to Greco, she told Divine she could not understand a lot of what he was saying because her English was so poor. "He then took out some papers, which he held in his hand and said that he would read them for us and that Rosalba should translate for me. She translated for me what he was saying as he glanced over the documents." He again described the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

investment as having no risk of loss of principal and as " 'not at all like stocks.' " Divine "never mentioned the word 'arbitration' or that I was giving up any of my legal rights." Greco did not understand she was investing in a mutual fund or that she was agreeing to waive her "legal rights" in case of a dispute.

Greco continues, "After describing what the documents supposedly said, he said, 'you just need to sign this to open the account.' He explained that the documents he wanted me to sign 'just repeat what I told you and your sister [sic].' Because I trusted him to have correctly described the documents to me, I signed them where he pointed for me to sign." Several months later, according to Greco, she and Kasbarian returned to the branch to "deposit" more money in their new "account," and met with a different representative, Nina Daikovich. Daikovich, like Divine, purported to describe the investment accurately for them, but did not mention arbitration and urged them to *428 " 'just sign here.' " Kasbarian's narration of the interactions with Divine and Daikovich is consistent with Greco's.

Greco and Kasbarian's declarations, if believed (and interpreted, where ambiguous or self-contradictory, in plaintiffs' favor), would establish facts sufficient to show reasonable reliance as an element of fraud in the execution of the client agreements. In light of plaintiffs' prior relationship with GWB, which they were led to believe was also the employer of Divine and Daikovich, their limited ability to understand English, and Divine and Daikovich's representations that their oral recitals accurately reflected the terms of the agreements, plaintiffs would not have been negligent in relying on the GWFSC representatives instead of reading the agreements themselves. (See *C. I. T. Corporation v. Panac. supra.* 25 Cal.2d at pp. 553-560 [plaintiffs' functional illiteracy in English, together with other party's misrepresentations regarding the character of the written contract, incomplete oral reading of the agreement, and urgings that plaintiffs sign it without reading it themselves or obtaining independent advice, held sufficient to support finding of fraud in the inception].) Under these circumstances, we conclude, the alleged fraud of GWFSC's representatives, if true, would have deprived Greco and Kasbarian of a reasonable opportunity to learn the character and essential terms of the documents they signed. (Rest.2d Contracts. § 163. p. 443.)

The facts in Greco and Kasbarian's declarations, however, are far from undisputed. Divine and Daikovich both submitted responsive declarations contradicting plaintiffs on several critical points, including plaintiffs' English language abilities, the representatives' failure accurately to explain the investments, and the representatives' assurances plaintiffs did not need to read the client agreement. Indeed, Daikovich denies she opened an account for Greco and Kasbarian; instead, she states she opened an account for Greco and her son, Rosario Greco. Daikovich's version is supported in this respect with a copy of a client agreement signed by Greco and Rosario Greco, but not by Kasbarian. An earlier agreement is signed by Greco and Kasbarian. In addition, plaintiffs' declarations are in some respects vague, ambiguous and internally inconsistent. These factual issues are to be resolved by the trial court, as described earlier in this opinion.

(13) Plaintiff Jodie Anne Rosen, 30 years old, is legally blind as a result of a 1989 industrial injury. She initially placed her workers' compensation settlement of $125,000 in a short-term GWB certificate of deposit. She chose GWB, where she herself had banked for "several years," because "my family had banked with Great Western for decades." Shortly thereafter, a GWB *429 employee referred her to Carlos Ferlini, a GWFSC representative, whom the employee described as "Great Western's Investment Counselor." Because she recognized Ferlini as a former GWB teller, because Ferlini had access to her account, and because Ferlini's desk was right next to the loan department, she "never doubted" he was a GWB employee.

At the outset of her meeting with Ferlini, Rosen told him she was legally blind "so that he would know that he would have to explain things to me and not rely on my being able to read documents." Ferlini told her he had a safe, " 'government secured' " investment for her that would earn 12.5 percent interest. He never told her she was investing in a mutual fund, nor did he mention the arbitration clause or tell her she was waiving her "legal right" in case of a dispute. After she agreed to invest $110,000 of her settlement money in this " 'Sierra Fund,' " Rosen declares, the following occurred: "Mr. Ferlini took out some documents and told me to sign them to open the new account.... Mr. Ferlini explained, ' These documents just repeat what I have told you. You just need to sign by the "Xs." ' I told him I could not even see the 'Xs' to know where to sign. He then said, 'Okay, just sign where my finger is' and he then pointed to several places where I was supposed to

Page 21

14 Cal.4th 394

14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897

(Cite as: 14 Cal.4th 394)

sign. My sister, Sundae Rosen, who had come over to the table in the middle of my discussion with Mr. Ferlini, asked what I was signing. Mr. Ferlini said, 'It is just a signature card.' [¶] I trusted Mr. Ferlini and thought that I was signing a signature card and some form documents to open an account."

Rosen's signed declaration is followed by an attestation from her sister Sundae that Sundae accurately read Rosen the declaration before Rosen signed it.

Rosen's declaration, if believed and interpreted in her favor, shows facts that would suffice to establish reasonable reliance for purposes of showing fraud in the execution of the agreement. In light of Rosen's prior relationship with GWB, by whom she reasonably thought Ferlini was employed, her warnings to Ferlini that she could not read the documents, Ferlini's assurances they only repeated what he had told her, and his assurance that Rosen was only signing a "signature card," Rosen's failure to take additional steps to learn the contents of the written agreement would not have been negligent. GWFSC's asserted fraud would have deprived her of a reasonable opportunity to learn the character and essential terms of the documents she signed.

Rosen's declaration is contradicted by evidence submitted by GWFSC. Although Ferlini did not provide a declaration, GWFSC representative Bret *430 Davidson declares it was he, not Ferlini, who initially met with Rosen. Davidson then introduced Rosen and her sister to Ferlini, who gave them "a full presentation." Finally, Davidson filled out the paperwork, reviewed it with her, and obtained her signature. According to Davidson, Rosen never said or demonstrated she was visually impaired. She signed the client agreement and other documents without his aid and without saying she could not read them. The trial court, as discussed above, must resolve these testimonial conflicts.

Plaintiff Dorothy Bied did not submit a declaration. However, her daughter and guardian ad litem, Cecile Talsky, declares that Bied, 80 years old, is suffering from Alzheimer's disease. As a result, she has "severe memory loss, diminished understanding and is incapable of understanding complicated monetary transactions." According to Talsky, Bied has banked with GWB for 30 years. After learning Bied had, in January 1994, transferred some of her savings to a "Sierra Fund," Talsky informed "Great Western's branch office" that her mother had Alzheimer's

disease and should not be permitted to transfer money from certificates of deposit to mutual funds. In October 1994, however, Talsky discovered her mother had agreed to transfer additional savings into the mutual fund. Talsky telephoned GWFSC representative Joseph Duncan and told him to cancel the investment. She told Duncan her mother had Alzheimer's, could not understand the investments, and had, in May 1994, given her and her brother a power of attorney. Although Duncan assured her he would cancel the transaction, he did not.

Talsky's declaration provides no evidence any GWFSC representative made any fraudulent statement to Bied in the course of securing her apparent assent to the investments. It is possible, however, that Bied, in light of her asserted disability, can establish constructive fraud in GWFSC's abuse of a confidential or fiduciary relationship. (Civ. Code. § 1573; 1 Witkin, Summary of Cal. Law, supra, Contracts, § § 400-401, pp. 360-362.) The parties have not specifically briefed this point with regard to Bied, and the facts of her case are so unclear and in such dispute that legal analysis of the question would be premature. [FN15] In any event, Talsky's declaration, if believed, raises a factual issue as to Bied's capacity to contract; if extreme enough, her mental deficiency could render void any contract to which she apparently *431 assented, including client agreements containing the arbitration clause. (See 1 Witkin, supra, § 358, p. 326.) On remand, the trial court must find the facts and decide whether they render the contract void under either theory.

> FN15 Declarations of GWFSC representatives, and accompanying documents, would, if believed, establish: (1) that the GWFSC account opened in January 1994 was opened *jointly* by Bied, *Talsky*, and Talsky's brother, Neal Rayburn; (2) that the October 1994 transaction was not an additional investment of Bied's savings in mutual funds but a *sale* of mutual fund shares at Bied's request and the reinvestment of those moneys in an annuity; and (3) that the October 1994 transaction was canceled at Talsky's request in December 1994 and the money returned to Bied.

Two other plaintiffs, Raul Pupo and Felix Segarra, produced evidence of limited facility with English, but have not shown facts sufficient to make their complete reliance on GWFSC's representatives reasonable. Unlike Greco and Kasbarian, neither

14 Cal.4th 394
Page 22
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

Pupo nor Segarra presents evidence the representative purported to read the contract to them or to explain its full contents orally. Unlike Rosen, they present no evidence they told the representative they could not read the contracts, a fact that in Rosen's case made more reasonable her reliance on the subsequent misrepresentations. As far as appears from his declaration, moreover, Pupo had no prior relationship with GWFSC, GWB or the representative. Under these circumstances, Pupo and Segarra's failure to take measures to learn the contents of the document they signed is attributable to their own negligence, rather than to fraud on the part of GWFSC or its representatives.

Disposition

The judgment of the Court of Appeal is affirmed insofar as it reversed the order denying GWFSC's petition to compel arbitration. The judgment is reversed insofar as it directed the trial court to conduct jury trials on plaintiffs' claims of fraud in the inception. The cause is remanded to the Court of Appeal with instructions to direct further proceedings in the trial court consistent with our opinion.

George, C. J., Mosk, J., Baxter, J., Chin, J., and Brown, J., concurred.

KENNARD, J.,

Concurring.-I join in the majority's opinion. It decides that, for most of the plaintiffs, their claims that the arbitration clause is unenforceable because of fraud should now proceed to arbitration. I write separately to explain the procedure that should occur when those claims are presented to the arbitrator.

As explained by the majority, claims that an arbitration clause is unenforceable because of fraud are to be decided by the court if the fraud would render the entire contract void or if the fraud was specifically directed at the arbitration clause. Thus, claims of fraud in the execution of the entire contract (because they would show the contract to be void) and claims of fraud in the execution or the inducement of the arbitration clause itself (because they are directed at the arbitration clause), must be decided by the court in the first instance before it can compel arbitration. (Prima Paint v. *432 Flood & Conklin (1967) 388 U.S. 395, 403-404 [18 L.Ed.2d 1270, 1277-1278, 87 S.Ct. 1801]; Hayes Children Leasing Co. v. NCR Corp. (1995) 37 Cal.App.4th 775, 783-784 [43 Cal.Rptr.2d 650].) By contrast, a claim that a contract containing an arbitration clause

is unenforceable because of fraud in the inducement of a contract as a whole is for the arbitrator and not the court to decide (because such a fraud would make the contract voidable but not void). (Prima Paint v. Flood & Conklin, supra, 388 U.S. 395, 403-404 [18 L.Ed.2d 1270, 1277-1278]; Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street (1983) 35 Cal.3d 312, 323-324 [197 Cal.Rptr. 581, 673 P.2d 251].)

In this case, plaintiffs claim that the arbitration clause is unenforceable because defendants fraudulently misrepresented the contract's written terms. This type of claim can be either for the court or the arbitrator depending on whether the party objecting to arbitration presents evidence that it lacked a reasonable opportunity to learn of the written terms, and therefore reasonably relied on the other party's misrepresentations. If the party lacked a reasonable opportunity to learn of the contract's written terms, then the contract may be void, making the issue of fraud one for the court. (See maj. opn., ante, at pp. 419-420 and authorities cited thereat.) If the party had a reasonable opportunity to learn the terms of the contract but did not, then the contract is subject to reformation or other equitable relief although it is not void (California Trust Co. v. Cohn (1932) 214 Cal. 619, 627 [7 P.2d 297]; Van Meter v. Bent Construction Co. (1956) 46 Cal.2d 588, 593-595 [297 P.2d 644]; Rest.2d Contracts. §§ 166, 172 & com. a, pp. 450, 468-469), making the issue of fraud one for the arbitrator.

A court presented with a claim that an arbitration clause is unenforceable because the written terms of the contract of which it forms a part were misrepresented should initially decide, as the majority does here, whether the party has shown that it lacked a reasonable opportunity to learn of the contract's terms. If the court decides, as in the case of most of the plaintiffs here, that the party seeking to avoid arbitration had a reasonable opportunity to learn the terms of the contract and discover the alleged misrepresentation, it is for the arbitrator and not the court to resolve the further questions of whether the alleged misrepresentation actually occurred and whether reformation of the contract or other equitable relief is justified under the circumstances. (If, unlike here, the party objecting to arbitration asserts that the particular misrepresentation amounts to fraud in the execution or the inducement of the arbitration clause, the court must first decide those questions as well.)

14 Cal.4th 394
14 Cal.4th 394, 926 P.2d 1061, 58 Cal.Rptr.2d 875, 65 USLW 2419, 96 Cal. Daily Op. Serv. 8963, 96 Cal. Daily
Op. Serv. 9147, 96 Daily Journal D.A.R. 14,897
(Cite as: 14 Cal.4th 394)

Page 23

An arbitrator presented with a claim that the arbitration agreement is unenforceable because of fraudulent misrepresentation of the terms of the *433 written contract that contains it should decide that question first, for it potentially affects the arbitrator's jurisdiction to decide the merits of the other disputes between the parties. If the arbitrator decides that the contract should be rescinded or reformed to delete the arbitration clause because of fraud, then there is no enforceable agreement to arbitrate any further claims between the parties. (Because courts have the power to reform a contract or provide other equitable relief on this ground, an arbitrator has that power as well. *Advanced Micro Devices, Inc.* v. *Intel Corp.* (1994) 9 Cal.4th 362 [36 Cal.Rptr.2d 581, 885 P.2d 994] [arbitrators have greater remedial powers than courts]; see also *id.* at p. 391 (dis. opn. of Kennard, J.) [arbitrators should have same remedial powers as courts].)

In this respect, the position of an arbitrator presented with a defense of reliance on a misrepresentation of a written contract is similar to that of an arbitrator to whom the parties have expressly given the power to decide questions of arbitrability. In the latter case, if a party contends that a claim submitted for arbitration is outside the scope of the arbitration agreement, the arbitrator should decide that question first. If the arbitrator decides that the claim is not arbitrable under the arbitration agreement, the arbitrator should then issue a decision to that effect and leave the claim for judicial resolution. Here, too, if an arbitrator decides that, because of misrepresentations by the defendants as to the nature of the brokerage agreement signed by a given plaintiff, the brokerage agreement should be rescinded or equitably reformed to delete the arbitration clause, the logical consequence is that the arbitrator should then refuse to decide the merits of the plaintiff's other claims and leave them for judicial resolution. *434

Cal. 1996.

Rosenthal v. Great Western Financial Securities Corp.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**21**

Westlaw.

4 Cal.App.4th 279
4 Cal.App.4th 279, 6 Cal.Rptr.2d 20
(Cite as: 4 Cal.App.4th 279)

DON E. ROWLAND et al., Plaintiffs and
Respondents,
v.
PAINEWEBBER INCORPORATED et al.,
Defendants and Appellants.
No. B055572.

Court of Appeal, Second District, California.

Feb 13, 1992.

SUMMARY

A retired couple sued an investment management
company and its employees, alleging the purchase of
unsuitable investments, and misrepresentations and
omissions of material fact. Defendants petitioned the
trial court for an order compelling arbitration and
staying the court proceedings, asserting that the
couple had signed a written "client's agreement"
containing a provision requiring the arbitration of all
controversies. Although plaintiffs had not alleged
fraud in their initial complaint, plaintiffs opposed the
petition to compel, asserting that defendants
fraudulently induced plaintiffs to agree to arbitration.
The trial court denied the petition and ordered the
parties to proceed with a trial solely on the severed
issue of the alleged fraud relating to the arbitration
provision. (Superior Court of Santa Barbara County,
No. 183284, James M. Slater, Judge.)

The Court of Appeal reversed. The court held that
when a complaint is devoid of contractual fraud
allegations, a trial court hearing a petition to compel
arbitration must determine whether there are facts
supporting the opposing party's allegations of
fraudulent inducement. The court also held that
plaintiffs' declaration in opposition to the petition did
not reveal facts tending to show they were victims of
fraud. Thus, the court held that the trial court erred by
denying defendants' petition merely upon plaintiffs'
allegation of fraud. (Opinion by Stone (S. J.), P.J.,
with Gilbert and Yegan, JJ., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Arbitration and Award § 12--Statutory
Procedures for Compulsory Arbitration--Defenses--

Federal Arbitration Act.
The Federal Arbitration Act (9 U.S.C. § 1 et seq.)
mandates the enforcement of arbitration agreements
with only two limitations: such agreements must
*280 be part of written maritime contracts or
contracts involving commercial transactions, and
they can be revoked upon legal or equitable grounds
for the revocation of any contract. The enforceability
of arbitration clauses is subject to no other limits or
defenses under state law. By enacting the act,
Congress declared a national policy favoring
arbitration and withdrew the power of the states to
require a judicial forum for matters which the
contracting parties have agreed to arbitrate.

(2) Arbitration and Award § 3--Arbitration
Agreements--Public Policy.
California has a strong public policy in favor of
arbitration as a speedy and relatively inexpensive
means of dispute resolution. This policy is
particularly applicable to cases where the parties
agreeing to arbitration are of presumptively equal
bargaining power.

(3) Arbitration and Award § 12--Statutory
Procedures for Compulsory Arbitration--Defenses--
Fraudulent Inducement--Burden of Proof.
The trial court erred by denying defendants' petition
to compel arbitration pursuant to a contractual
arbitration provision, where plaintiffs merely alleged
fraudulent inducement in their opposition to the
petition and had not alleged contractual fraud in the
complaint. Even if plaintiffs' claims of fraud were
directed specifically to the arbitration agreement,
they were not entitled to a jury trial on the making of
the arbitration agreement if their claims did not state
a cause of action for fraud. Where a complaint is
devoid of contractual fraud allegations, a court
hearing a petition to compel arbitration must examine
whether there are any facts supporting the allegations
of fraudulent inducement. To deny or postpone an
arbitration upon the mere allegation of fraud in the
inducement would frustrate the purpose of an
arbitration agreement, that is, a speedy and relatively
inexpensive trial. Thus, the trial court erred by
permitting plaintiffs to successfully oppose
defendants' petition merely by alleging fraud without
any concomitant burden of proof.

[See Cal.Jur.3d (Rev), Arbitration and Award, §
23; 11 Witkin, Summary of Cal. Law (9th ed. 1990)

Page 2

4 Cal.App.4th 279
4 Cal.App.4th 279, 6 Cal.Rptr.2d 20
(Cite as: 4 Cal.App.4th 279)

Equity, § 39.]

**(4)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Fraudulent Inducement--Evidence.

The trial court erred by denying defendants' petition to compel arbitration pursuant to a written agreement, in order to permit a trial on plaintiffs' assertion of fraudulent inducement, where plaintiffs' declaration in opposition to the petition did not state facts tending to show that plaintiffs were victims of fraud. Although the declaration indicated one plaintiff was given numerous documents which were represented to be *281 simply "paperwork," was told that he did not have to read them, and was not given time to read the documents, parties dealing at arm's length do not have a duty to explain to each other the terms of a written contract. Reliance on an alleged misrepresentation was not reasonable where plaintiffs could have ascertained the truth through the exercise of reasonable diligence, which required the reading of the contract before it was signed. A party cannot use his or her own lack of diligence to avoid an arbitration agreement.

**(5)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Oppression.

In an action by investors against an investment management company and its employees, the trial court erred by denying defendants' petition for arbitration pursuant to a written agreement, even though plaintiffs claimed they were in a weaker position and were without a choice in signing or reading the agreement. One of the plaintiffs was once employed as a securities broker with a stock brokerage firm, and was not a helpless investor. Contracts made at arm's length between experienced business people should be honored by the parties and enforced by the courts. In addition, no facts were presented that plaintiffs were prevented from reading what it was their duty to read. Failure to read a contract before signing it is not by itself a reason to refuse its enforcement.

**(6)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Fraudulent Inducement--Fraud Inducing Arbitration Provision.

The trial court erred by denying defendants' petition for arbitration pursuant to a written agreement, in order to permit a trial on plaintiffs' assertion of fraudulent inducement, where the representations allegedly causing a fraudulent inducement related to the agreement as a whole rather than to the arbitration

provision in particular. The representations could not be characterized as fraud in the inducement of the arbitration provision. Where a challenge does not go to the validity of the arbitration clause, a dispute over the enforceability of the arbitration clause is a subject of mandatory arbitration.

COUNSEL

Scott M. Ratchick for Defendants and Appellants.

Zilinskas & Brantner, Victor G. Zilinskas and Todd Thompson for Plaintiffs and Respondents. *282

STONE (S. J.), P. J.

Here we hold that a defendants' petition to compel arbitration may not be denied simply by reason of plaintiffs raising allegations of fraud in relation to the execution of the arbitration agreement which were absent from plaintiffs' complaint.

Such allegations, under circumstances where the parties were not in a relationship of unequal bargaining power, do not justify the denial of a petition to compel.

Accordingly, we reverse the trial court's order denying defendants/appellants PaineWebber's and Robin Taliaferro's petition for an order compelling arbitration.

*Background*

Respondents/plaintiffs Don and Marie Rowland, who are retired, opened an investment account with appellant PaineWebber at its Santa Barbara office in March 1989. PaineWebber assigned its employee, appellant Taliaferro, to manage the account. Respondent Don Rowland is a former securities broker and employee of PaineWebber.

Upon opening the account, respondents signed a written contract with PaineWebber, entitled "Client's Agreement," detailing the parties' rights and responsibilities regarding the account. This agreement contains a provision requiring arbitration of all controversies arising out of the account. [FN1]

> FN1 This provision states: " 'The undersigned agrees, and by carrying an account(s) for the undersigned you agree, that ... all controversies which may arise between the undersigned and you (including your employees and agents) concerning any transaction in any account(s) or the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 Cal.App.4th 279
4 Cal.App.4th 279, 6 Cal.Rptr.2d 20
(Cite as: 4 Cal.App.4th 279)

construction, performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration.' "

In August 1990, respondents filed suit against appellants, alleging in regard to their account that appellants purchased unsuitable investments for their needs and made misrepresentations and omissions of material fact, causing respondents financial loss and emotional distress. The allegations related solely to appellants' supervision and handling of respondents' account. No allegations of misrepresentation or fraud were made regarding the execution of the Client's Agreement or, specifically, the arbitration provision.

In September 1990, pursuant to the arbitration provision in the Client's Agreement and following respondents' refusal to stipulate to arbitration, *283 appellants filed their petition for an order compelling arbitration of the dispute and staying the court proceedings.

Respondents opposed the petition to compel on the ground that they were surprised by the existence of the arbitration provision. They claimed that they never knowingly agreed to arbitrate potential claims against PaineWebber, and accused appellants of fraudulently concealing the arbitration clause and fraudulently inducing them to agree to arbitration.

In his declaration attached to respondents' opposition to the petition to compel, respondent Don Rowland stated the following: (1) he was "beseiged with a plethora of documents" during the process of opening the investment account, (2) the documents for opening the account were presented by appellant Taliaferro as "simply paperwork necessary for me to open my account," (3) Taliaferro stated that there was no reason to read the documents "since they were for PaineWebber's records and did not affect me or my legal rights," and (4) respondent was "never given ample time to read the material and trusted my broker's explanations."

In their reply to respondents' opposition, appellants charged them with attempting to create a fiction of fraud in order to circumvent their contractual obligation to proceed with arbitration.

At the hearing the trial court found that respondents failed to allege either in their complaint or their declaration that Taliaferro made any untrue statements. The court granted respondents 10 days to

amend their complaint to sufficiently allege their claim of fraud, and then proceeded to hear arguments on appellants' petition to compel arbitration. Following argument, the judge denied the petition and ordered the parties to proceed with a trial solely on the severed issue of the alleged fraud relating to the arbitration provision.

Subsequent to the court's ruling, respondents filed their amended complaint.

This appeal followed. We denied respondents' motion to augment the record on appeal to include their amended complaint.

Discussion

Appellants contend that, by denying their petition to compel arbitration and submitting the issue of the validity of the arbitration provision to the *284 superior court, the trial court violated *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395 [18 L.Ed.2d 1270, 87 S.Ct. 1801]. Appellants also argue that there were no facts before the trial court supplying a basis for respondents' claim of fraud.

Respondents counter that the trial court complied with applicable federal law.

The parties stipulate that the arbitration provision here is governed by the Federal Arbitration Act (FAA or Act). (9 U.S.C. § 1 et seq.) (1) The FAA mandates the enforcement of arbitration agreements with only two limitations: (1) such agreements must be part of written maritime contracts or contracts involving commercial transactions, and (2) they can be revoked upon legal or equitable grounds for the revocation of any contract. (9 U.S.C. § 2; *Southland Corp. v. Keating* (1984) 465 U.S. 1, 10-11 [79 L.Ed.2d 1, 11-13, 104 S.Ct. 852].) [FN2] The enforceability of arbitration clauses is subject to no other limits or defenses under state law. (465 U.S. at p. 11 [79 L.Ed.2d at pp. 12-13]; *Cohen v. Wedbush, Noble, Cooke, Inc.* (9th Cir. 1988) 841 F.2d 282, 285; *Tonetti v. Shirley* (1985) 173 Cal.App.3d 1144, 1148 [219 Cal.Rptr. 616].) By enacting the FAA, Congress declared a "national policy" favoring arbitration and withdrew the power of the states to require a judicial forum for matters which the contracting parties have agreed to arbitrate. (*Southland Corp. v. Keating, supra*; *Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24 [74 L.Ed.2d 765, 785, 103 S.Ct. 927].)

FN2 Code of Civil Procedure section 1281.2, calling for arbitration unless

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 Cal.App.4th 279
4 Cal.App.4th 279, 6 Cal.Rptr.2d 20
(Cite as: 4 Cal.App.4th 279)

Page 4

grounds exist for revocation of the arbitration clause, basically mirrors federal law. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322 [197 Cal.Rptr. 581, 673 P.2d 251].)

(2) California has a strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra,* 35 Cal.3d 322, citing *Christensen v. Dewor Developments* (1983) 33 Cal.3d 778 [191 Cal.Rptr. 8, 661 P.2d 1088]. This policy is particularly applicable to cases where the parties agreeing to arbitration are of presumptively equal bargaining power. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra,* 35 Cal.3d 322.)

Respondents' specific claim, that they were fraudulently induced into agreeing to arbitration, is a commonly raised issue in both state and federal cases dealing with challenges to arbitration agreements. *Prima Paint v. Flood & Conklin, supra,* 388 U.S. 395 settled the question of who decides a claim of fraudulent inducement in the signing of an arbitration agreement-the *285 court or an arbitrator. Affirming the principle that an arbitration agreement is separable or severable from the rest of the contract, *Prima Paint* held that if the claim of fraud is directed solely at the making of the arbitration agreement, then the court adjudicates the claim. If the fraud alleged relates generally to the making of the contract containing the arbitration clause, then the claim is for an arbitrator and not the court. (Pp. 400, 402-404 [18 L.Ed.2d 1274-1278].)

Under *Prima Paint,* a court must not remove from arbitration substantive challenges to the underlying contract unless there is an independent challenge to the arbitration clause itself. (*Teledyne, Inc. v. Kone Corp.* (9th Cir. 1989) 892 F.2d 1404, 1410.) *Prima Paint* was followed by the California Supreme Court in *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra,* 35 Cal.3d at page 323.

Here, both parties incorrectly suggest that the central issue is whether respondents' claim of fraud in their opposition to appellants' motion to compel arbitration relates to the execution of the entire client's agreement or just to the arbitration provision. (3) The more fundamental question is whether respondents may successfully oppose appellants' petition to compel arbitration without having made any substantive challenge in their complaint to the arbitration provision or the "Client's Agreement," and without presenting any facts in their opposition to the petition tending to show they were the victims of fraud. We hold that they may not.

Even if plaintiffs' claims of fraud are directed specifically to the arbitration agreement, plaintiffs are not entitled to a jury trial on the making of the arbitration agreement if their claims do not state a cause of action for fraud. (*Cohen v. Wedbush, Noble, Cooke, Inc., supra,* 841 F.2d at p. 287.)

Moreover, the use of "procedural gamesmanship," by which preliminary issues may end up being decided by the courts, is to be guarded against, for it undermines the advantages of arbitration and robs it of much of its value. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra,* 35 Cal.3d at p. 323.) Arbitration " 'should not be denied or postponed upon the mere cry of fraud in the inducement, *as this would permit the frustration of the very purposes sought to be achieved by the agreement to arbitrate, i.e., a speedy and relatively inexpensive trial ....*' " (*Id.* at p. 318, citing *Robert Lawrence Company v. Devonshire Fabrics, Inc.* (2d Cir. 1959) 271 F.2d 402, 410.)

In circumstances where plaintiff's complaint is devoid of contractual fraud allegations, the approach that should be utilized by a trial court in deciding *286 a petition to arbitrate is whether there are any facts supporting the allegations of fraudulent inducement. This should avoid unmeritorious allegations of fraud being presented for the sole purpose of avoiding the obligation to arbitrate. Here, the trial court erroneously permitted respondents to successfully oppose appellants' petition to compel arbitration merely by alleging fraud without any concomitant burden of proof.

(4) Examination of respondents' declaration in their opposition to the petition to compel reveals no facts tending to show they were the victims of fraud. Respondent Don Rowland declared that (1) he was besieged with numerous documents when opening the account which appellant Taliaferro represented as simply necessary paperwork, (2) Taliaferro told respondent that since these documents did not affect respondent's legal rights he did not have to read them, and (3) respondent was not given sufficient time to read the documents. [FN3] These reasons are insufficient.

FN3 The identical reasons were forwarded by plaintiff in the case of *Strotz v. Dean*

4 Cal.App.4th 279
4 Cal.App.4th 279, 6 Cal.Rptr.2d 20
(Cite as: 4 Cal.App.4th 279)

Page 5

_Witter Reynolds, Inc._ (1990) 223 Cal.App.3d 208 [272 Cal.Rptr. 680], cited by respondents. Plaintiff, a customer of a stock brokerage firm, alleged in her complaint that defendants told her the contracts she signed were necessary to open her investment account, they did not affect her legal rights; and it was not necessary to read them. Plaintiff also complained that she was not given the opportunity to read the documents.

No law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract, particularly where, as here, the language of the contract expressly and plainly provides for the arbitration of disputes arising out of the contractual relationship. (_Cohen v. Wedbush, Noble, Cooke, Inc., supra,_ 841 F.2d at p. 287.) Reliance on an alleged misrepresentation is not reasonable when plaintiff could have ascertained the truth through the exercise of reasonable diligence. (_Ibid._) Reasonable diligence requires the reading of a contract before signing it. A party cannot use his own lack of diligence to avoid an arbitration agreement. (_Pierson v. Dean, Witter, Reynolds, Inc._ (7th Cir. 1984) 742 F.2d 334, 339.)

(5) Respondents' suggestion that they were in a weaker position and somehow were without a choice in signing or reading the client's agreement, is without merit. Respondent Don Rowland was once employed as a securities broker with a stock brokerage firm. He is "not a helpless investor lost in the world of stocks and bonds who can be ... easily dominated ...." _King v. Prudential-Bache Securities, Inc._ (1990) 226 Cal.App.3d 749, 756 [277 Cal.Rptr. 214].) Presumably, he was familiar with all industry contract terms necessary to open an investment account. Contracts made at arm's length between experienced business people should be honored by the parties and enforced by the courts. (_Southland Corp. v. Keating, supra,_ 465 U.S. at p. 7 [79 L.Ed.2d at pp. 9- 10].) *287

Respondents' alternative theory, that they were never given the opportunity to read the contract, is disingenuous. No facts were presented that they were in any way prevented from reading what it was their duty to read. Failure to read a contract before signing it is not by itself a reason to refuse its enforcement. (_Vernon v. Drexel Burnham & Co._ (1975) 52 Cal.App.3d 706, 714 [125 Cal.Rptr. 147].)

(6) Finally, the evidence of Taliaferro's comments relates to the Client's Agreement as a whole rather than to the arbitration provision in particular. Hence, Taliaferro's alleged remarks cannot be characterized as fraud in the inducement of the arbitration provision. Even assuming a statement by a nonlawyer regarding a question of law can constitute fraud, where plaintiff's challenge does not go to the validity of the arbitration clause, the dispute over the enforceability of the arbitration clause is a subject of mandatory arbitration. (_Cohen v. Wedbush, Noble, Cooke, Inc., supra,_ 841 F.2d at p. 287, citing _Prima Point v. Flood & Conklin, supra,_ 388 U.S. at pp. 403- 404 [18 L.Ed.2d at pp. 1277-1278].)

_Strotz v. Dean Witter Reynolds, Inc., supra,_ 223 Cal.App.3d 208, although dealing with an arbitration agreement between a brokerage firm and a customer/investor, is not applicable here.

_Strotz_ held that allegations of a fiduciary relationship existing between plaintiff customer and defendant brokerage firm sufficiently supported plaintiff's claim of fraud to warrant denial of defendant's petition to compel arbitration. The appellate court reasoned that an allegation of fraud which is directed at the execution of the principal contract necessarily affects the agreement to arbitrate, and thus is sufficient to place the issue of fraud before the court and not an arbitrator. (223 Cal.App.3d at pp. 217-218.)

Appellants argue that _Strotz_ violates the holding in _Prima Paint._ However, we need not address whether or not _Strotz_ is good law. The case is inapposite for two reasons. The fraud which was claimed to have affected the _Strotz_ plaintiff's understanding of the arbitration agreement was alleged in her complaint. Thus, her challenge to the arbitration clause was not a mere eleventh hour procedural device to avoid arbitration. In addition, the _Strotz_ court relied on the theory that a complaint sufficiently alleges fraud in the inception of an agreement to arbitrate where there are facts showing the plaintiff was under control of the defendant and did not know what she was signing. (223 Cal.App.3d at p. 217.) Here, there are no facts tending to show respondents were under appellants' dominion and control.

The order denying appellants' petition to compel arbitration is reversed. *288

Costs on appeal are awarded to appellants.

Gilbert, J., and Yegan, J., concurred. *289

Cal.App.2.Dist.,1992.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 Cal.App.4th 279
4 Cal.App.4th 279, 6 Cal.Rptr.2d 20
(Cite as: 4 Cal.App.4th 279)

Rowland v. PaineWebber Inc.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**22**

Westlaw.

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

▷

ROY SUPPLY, INC., et al., Plaintiffs and
Appellants,
v.
WELLS FARGO BANK, N. A., Defendant and
Respondent.
No. C017141.

Court of Appeal, Third District, California.

Oct 26, 1995.

SUMMARY

Corporate plaintiffs and the president of the
corporations brought an action for negligence against
the bank that held the corporate checking accounts,
based on the bank's payment of over $3 million in
checks forged by the corporate secretary over a
period of years. The trial court dismissed the first
amended complaint, effectively terminating the entire
action. (Superior Court of Sacramento County, No.
525869, Joe S. Gray, Judge.)

The Court of Appeal reversed the judgment of
dismissal as to the causes of action asserted by the
corporate plaintiffs, and remanded with directions to
allow those plaintiffs leave to amend to set forth with
greater certainty any checks that were the subjects of
statements of account within one year preceding the
corporate plaintiffs' demand for payment of them
upon the bank. The court affirmed the judgment of
dismissal as to the causes of action asserted by the
corporate president, and also affirmed in all other
respects. The court held that Cal. U. Com. Code,
former § 4406, subd. (4) (now § 4406, subd. (f)),
barred the corporate plaintiffs from bringing a
negligence action against the bank based wholly on
the bank's alleged negligence in paying forged checks
that plaintiffs had not reported to the bank within one
year of plaintiffs' receipt of the statements of account
that showed payment of those forged checks. The
court further held that the bank owed no duty of care
to the corporate president, but only to the
corporations, which were the bank's customers.
(Opinion by Sparks, Acting P. J., with Sims and
Nicholson, JJ., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1a, 1b, 1c, 1d, 1e) Banks and Banking § 11--
Withdrawals and Payments--Payment of Forged or
Altered Checks--Customer's Duty to Discover and
Report Unauthorized Signatures--Failure to Report as
Bar to *1052 Negligence Action Against Bank.
  In an action for negligence brought by corporate
plaintiffs against the bank that held the corporate
checking accounts, based on the bank's payment of
over $3 million in checks forged by the corporate
secretary over a period of years, Cal. U. Com. Code,
former § 4406, subd. (4) (now § 4406, subd. (f)),
precluded recovery for negligent payment of forged
checks that were not reported by plaintiffs to the bank
within one year following the receipt of the monthly
statements of account showing payment of the forged
checks. This statutory preclusion specifically applies
without regard to the care or lack of care exercised by
either the customer or the bank. Thus, the trial court
appropriately sustained defendant's demurrer,
although plaintiffs were entitled to amend the
complaint to set forth with greater certainty any
forged checks that were the subjects of statements of
account within one year preceding plaintiff's demand
for payment upon defendant.

[Construction and application of UCC sec. 4-406,
requiring customer to discover and report
unauthorized signature, in cases involving bank's
payment of check or withdrawal on less than required
number of signatures, note, 7 A.L.R.4th 1111. See
also 3 Witkin, Summary of Cal. Law (9th ed. 1987)
Negotiable Instruments, § 288.]

(2) Banks and Banking § 2--Regulation of Banking
Business--Applicability of General Principles of Law
and Equity.
  Although particular provisions of divisions 3 and 4
of the California Uniform Commercial Code govern
the relationship between banks and customers with
respect to checks, Cal. U. Com. Code, § 1103,
probably the single most important provision in the
code, continues the applicability of general principles
of law and equity except insofar as they are
"displaced by particular provisions" of the code.
Thus, many branches of general contract law, agency
law, property law, and the like continue to apply
under the code; the general law applies when a case
is not covered by statute.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Cal.App.4th 1051

39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450

(Cite as: 39 Cal.App.4th 1051)

(3) Banks and Banking § 11--Withdrawals and Payments--Payment of Forged or Altered Checks--Customer's Duty to Discover and Report Unauthorized Signatures.

A check with an unauthorized signature is not properly payable, and the bank breaches its agreement with its customer when paying such an item; the bank's payment of such is said to have been made out of the bank's own funds. A payor bank's initial liability to its customer for making payment of a check on a forged signature is absolute; that is, it applies without regard to *1053 whether the bank was negligent. However, this absolute liability is temporally limited. Cal. U. Com. Code. § 4406, imposes a duty on a customer to discover and report promptly an unauthorized signature or alteration. When a bank sends or makes available a statement of account accompanied by items paid in good faith, then the customer must exercise reasonable care and promptness to examine the statement and checks for unauthorized signatures or alterations and promptly notify the bank of any such discovery. A payor bank's absolute liability ceases after the time in which the customer should have discovered and reported an unauthorized signature to the payor bank and thereafter the care or lack of care exercised by the customer and the bank are in issue.

(4) Banks and Banking § 11--Withdrawals and Payments--Payment of Forged or Altered Checks--Customer's Duty to Discover and Report Unauthorized Signatures--Statutory Issue Preclusion--Comparison to Statute of Limitations.

Cal. U. Com. Code. § 4406, is not per se a statute of limitations but instead is an issue-preclusion statute. Unlike a statute of limitations, it does not purport to bar an action against a bank; rather, it simply precludes a customer from asserting a forgery or alteration against the bank if the customer has failed to discover and report the forgery or alteration to the bank. The effect this will have on a customer's claim against the bank will depend upon whether proof of the forgery is an essential element of the particular claim asserted. In essence, if a customer must prove a forgery in order to establish a claim, then the customer will not be able to establish the claim because he or she is precluded from proving the forgery. On the other hand, any claim that is not dependent upon proof of the forgery will not be precluded by Cal. U. Com. Code, former § 4406, subd. (4) (now § 4406, subd. (f)), although the customer will still be precluded from asserting the forgery in pursing that claim. One other difference

between this issue-preclusion statute and a statute of limitations such as Code Civ. Proc., § 340, subd. (3), is in the steps a plaintiff must take to fulfill the requirements of the statute. Under Cal. U. Com. Code. § 4406, subd. (f), all the customer must do to avoid the preclusion is to notify the bank of the forgery within one year, while Code Civ. Proc., § 340, subd. (3), requires that the customer commence suit within one year. However, Code Civ. Proc., § 340, subd. (3), like other statutes of limitations, is subject to principles of waiver and estoppel.

(5) Banks and Banking § 11--Withdrawals and Payments--Payment of Forged or Altered Checks--Customer's Duty to Discover and *1054 Report Unauthorized Signatures--Failure to Report as Bar to Action Against Bank.

Unless a bank customer discovers and reports a forged signature on a check to the bank within a one-year period after receipt of the monthly statement of account, he or she cannot pursue a contractual or statutory claim based upon the alleged forgery (Cal. U. Com. Code. § 4406, subd. (f)). This statute also bars a negligence action, where the only alleged negligence is in accepting the forged signatures and making payment on them, since an essential element of the negligence cause of action is proof that the signatures were forged. However, § 4406, subd. (f), would not bar a negligence action based on an independent wrong simply because there was also an alteration or forgery; in such a case, proof of the alterations would not be essential to the negligence causes of action.

(6) Courts § 43--Decisions and Orders--Doctrine of Stare Decisis-- Conflicting Opinions.

A lead opinion that expresses the views of less than a majority of the members of a reviewing court is not precedent.

(7) Banks and Banking § 11--Withdrawals and Payments--Payment of Forged or Altered Checks--Customer's Duty to Discover and Report Unauthorized Signatures--Critical Dates.

Cal. U. Com. Code. § 4406, subd. (f), bars a bank customer from raising the issue of forgery in an action against the bank that is based on forged checks that were not reported by the customer to the bank within one year following the receipt of the monthly statement of account showing payment of the forged check. The critical dates are (1) the date the item and a statement of account showing payment of the item were sent or made available to the customer in a reasonable manner, and (2) the date the customer

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

discovered the forgery and reported it to the bank. The application of the statute is not determined by reference to the date on the face of the check or the date it was paid by the bank. Moreover, the one-year period applies independently to each forged check regardless of whether multiple checks were part of a series of malefactions by the same wrongdoer. The monthly statement custom is sufficiently established to support judicial notice, and the date of issuance of a check may support an inference that it was the subject of a statement more than one year preceding its discovery and report by the customer. However, such an inference will not support an order sustaining a bank's demurrer to an action on this basis without leave to amend where it is reasonably possible the plaintiff could allege that a forgery was discovered and reported within one year of the statement covering the particular forged check. *1055

(8) Banks and Banking § 11--Withdrawals and Payments--Payment of Forged or Altered Checks-- Bank's Duty of Care to Corporate President.
A trial court correctly ruled that a corporate president had no cause of action for negligence against a bank that held corporate checking accounts based on the bank's payment of over $3 million in checks forged by the corporate secretary over a period of years. The gist of any claim based upon the improper payment of a check is the bank's expressed or implied contractual obligation to honor only those checks which the customer authorizes to be paid. The duty owed by the bank derived from its contracts with its customers, the corporations. The president was not a party to those contracts, nor was he an intended beneficiary of them. The president's complaint did not state a viable cause of action, since it did not allege facts showing the existence of a legal duty of care; hence, the trial court did not err in sustaining the bank's demurrer without leave to amend.

COUNSEL

Moyer, Buechner & Towne, Mark E. Buechner and Bruce A. Scheidt for Plaintiffs and Appellants.

Coblentz, Cahen, McCabe & Breyer, Jonathan R. Bass and Susan K. Jamison for Defendant and Respondent.

SPARKS, Acting P. J.

In this case we consider whether corporate depositors may pursue causes of action against their bank for the negligent payment of forged checks when they failed to discover and report the forgeries to the bank in a timely manner. We hold that the statutory provisions of the California Uniform Commercial Code [FN1] preclude the depositors from asserting the forged checks against the bank and this preclusion is fatal to their claims for the negligent payment of forged checks not timely reported to the bank.

> FN1 Hereafter all further references to "the Code" or to "the Commercial Code" will refer to the California Uniform Commercial Code. (Cal. U. Com. Code. § 1101.) Unless otherwise specified, section references will also refer to this code.

Plaintiffs Roy Supply, Inc. (Roy Supply), R.M.R. Drywall, Inc. (Drywall), and Edward Roy (Roy), appeal from a judgment of dismissal entered after *1056 the trial court sustained without leave to amend the demurrer of defendant Wells Fargo Bank, N.A. (the Bank). Although we conclude that the trial court properly sustained the Bank's demurrer, we shall reverse the judgment of dismissal as to the corporate plaintiffs and remand with directions that they be given leave to amend their complaint on the question of timeliness.

Also at issue on appeal is the question whether the trial court properly ruled that plaintiff Roy does not have an individual cause of action in negligence against the Bank for cashing the forged checks. Because the forged checks were drawn on the corporate plaintiffs' checking accounts, and because the Bank had no commercial relationship with Roy involving those accounts, we shall hold that the Bank did not owe a duty of care to Roy personally and consequently the demurrer was properly sustained without leave to amend as to Roy's individual cause of action.

Factual and Procedural History
The underlying action involves the commercial checking accounts of plaintiffs Roy Supply and Drywall with the Bank. The corporate plaintiffs authorized their checking accounts to be debited for checks drawn in accordance with signature cards submitted to the Bank. These signature cards authorized withdrawals from the accounts only by order of checks or drafts bearing the signatures of both Roy and Twila June Moore. [FN2] At all relevant times, Roy was president, chief executive officer and a shareholder of the corporate plaintiffs.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

Moore was the secretary and treasurer of the
corporate plaintiffs.

> FN2 Moore, a cross-complainant and cross-
> defendant in the action, is not a party to this
> appeal.

Over a period spanning several years, the Bank
honored over $3 million in checks drawn against the
corporate plaintiffs' accounts which had been drawn
by Moore in an irregular manner. On most of these
checks Roy's signature had been forged by Moore.
On the remaining checks, Roy's signature was
missing altogether.

Plaintiffs filed a nine-count complaint in March
1992. In a first amended complaint filed in April
1993, plaintiffs eliminated claims based on checks
which they conceded were time-barred or which
served legitimate corporate purposes, thereby
reducing the Bank's potential liability to slightly over
$2 million.

Three of the counts in the amended complaint are
based on a negligence theory. These three counts are
the subject of this appeal. *1057

The fifth and sixth counts allege the Bank
negligently maintained its records and negligently
operated, managed and controlled its check
processing operations so as to allow checks drawn
with a forged signature to be charged against the
corporate plaintiffs' accounts.

The ninth count sought damages suffered by Roy as
president of the corporate plaintiffs. It was there
alleged that as a proximate result of the Bank's
negligence, the corporate plaintiffs lacked sufficient
funds to pay state and federal taxes for the tax years
1988 through 1991 (federal tax years) and 1989
through 1991 (state tax years), and Roy was
personally required to satisfy the federal and state tax
liability of the corporate plaintiffs. As a result, Roy
was injured in his "health, strength, activity and
marital relations, sustaining injury to his nervous
system and person, all of which injuries have caused
... Roy great mental, physical and nervous pain and
suffering."

The Bank successfully demurred to the fifth and
sixth counts to the extent they related to the corporate
plaintiffs' claim of negligence as to checks drawn
with a forged signature. The Bank argued, and the
trial court agreed, that the corporate plaintiffs'

common law negligence remedy was supplanted by
the remedies available in the Commercial Code.
[FN3]

> FN3 The demurrer did not address any of
> the corporate plaintiffs' claims concerning
> the cashing of checks drawn without the
> required signatures.

The Bank also successfully demurred to Roy's
individual cause of action for negligence, as set forth
in the ninth count, ruling it was legally insufficient
because the Bank did not owe a duty of care to Roy
individually as he was not a customer of the Bank.

Thereafter, the parties settled the remaining claims
not affected by the demurrer.

In October 1993, the trial court dismissed the first
amended complaint, effectively terminating the entire
action. Plaintiffs appeal from the judgment of
dismissal.

## Discussion

### I

In the fifth and sixth causes of action, as relevant
here, the corporate plaintiffs seek recovery for the
negligent payment of forged checks. In *1058
sustaining the demurrer the trial court held, as a
matter of law, that the corporate plaintiffs' negligence
claim was "precluded by the Commercial [C]ode as
displaced by the warranty rights created thereby."
(1a) The plaintiffs contend on appeal that the Code
does not foreclose their right to pursue a common law
negligence cause of action for payment of forged
checks and that the three-year statute of limitations
applicable to negligent injury to personal property
(Code Civ. Proc., § 338, subd. (c)), is the controlling
limitation in that respect. To this argument the Bank
responds that sections 1103 and 4406, subdivision
(4), support the trial court's conclusion that a
common law negligence action is foreclosed by the
Code. As we shall explain, the Code, in sections 1103
and 4406, subdivision (4), precludes a customer from
asserting a forgery against the bank unless the
customer discovers and notifies the bank of the
forgery within one year of receiving a statement of
account showing payment of the forged check.

(2) Section 1103 provides: "Unless displaced by the
particular provisions of this code, the principles of
law and equity, including the law merchant and the
law relative to capacity to contract, principal and
agent, estoppel, fraud, misrepresentation, duress,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." This provision has been described by commentators as "probably the most important single provision in the Code. It continues the applicability of general principles of law and equity except insofar as they are 'displaced by particular provisions' of the Code. Thus many branches of general contract law, of the law of agency, of property law, etc., continue to apply under the Code." (1 White & Summers, Uniform Commercial Code (3d ed. 1988) Introduction, § 5, p. 19.) As the comment to the Commercial Code makes clear, section 1103 "restates with greater detail the principle that the general law applies when a case is not covered by statute." (Cal. U. Com. Code com., 23A West's Ann. Cal. U. Com. Code, § 1103 (1964 ed.) p. 20.)

(1b) We agree with the Bank that "particular provisions" of the Code are applicable here and that, for the most part, they preclude recovery for negligent payment of forged checks in the circumstances of this case. Divisions 3 and 4 of the Code contain detailed statutory provisions governing the relationship between banks and customers with respect to checks. [FN4] In particular, division 4 (§ 4101 et seq.) is entitled "Bank Deposits and Collections" and "provides uniform rules governing the (1) collection by banks of *1059 checks and other instruments for the payment of money and (2) relationship of banks with their depositors in connection with the collection and payment of items." (Introductory com., 23B West's Ann. Cal. U. Com. Code, div. 4 (1964 ed.) p. 513.) We turn to those rules governing forged checks. [FN5]

FN4 This action was filed in 1992 and concerns checks which were drawn and paid in 1991 and earlier. Effective January 1, 1993, divisions 3 and 4 of the Code were substantially revised. (Stats. 1992, ch. 914, § 37.) The provision we find controlling here, section 4406, subdivision (4), was rewritten and redesignated as section 4406, subdivision (f), but was not changed in substance. Henceforward the provisions of the Code we cite will be those in effect at the time this action arose and which governed the relationship of the parties at that time. Where relevant we will note changes in the law.

FN5 For the most part the applicable Code provisions are concerned with whether or

not a signature was authorized. A signature may be valid if the person who placed it upon an instrument was authorized to do so regardless whether he or she is the person whose signature it purports to be. Within the meaning of the Code provisions, an " '[u]nauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery." (§ 1201, subd. (43).) Under the Code, checks with forged signatures are generally treated in the same manner as altered checks and many, but not all, of the same rules apply to checks with forged indorsements. Since we are here concerned with checks bearing forged drawer signatures we shall focus our discussion on that type of check and references to forged checks are meant to refer to checks with forged drawer signatures.

Our discussion of these provisions requires that we first set forth a few basic definitions. A "check" is a draft drawn on a bank and payable on demand. (§ § 3104, subd. (2)(b), 4104, subd. (3).) [FN6] A "presentment" is a demand for acceptance or payment of the check made upon the person or entity responsible for payment. (§ § 3504, subd. (1), 4104, subd. (3).) The bank upon which the check is drawn and by which it is payable is referred to as the drawee or "payor bank." (§ 4105, subd. (b).) When a maker or drawer issues a check in favor of a payee, that person will generally submit the check to a bank which may or may not be the payor bank. Regardless whether it is also the payor bank, the first bank to which a check is submitted for collection is called the "depositary bank." (§ 4105, subd. (a).) If the depositary bank is not also the payor bank, it will present the check to the payor bank either directly or through one or more "intermediary banks," defined as any bank to which the check is transferred in the course of collection except the depositary bank and the payor bank. (§ 4105, subd. (c).) In this process any bank handling the check for collection, including the depositary bank but excluding the payor bank, is referred to as a "collecting bank." (§ 4105, subd. (d).)

FN6 To be considered a negotiable instrument within the meaning of the Code, a written instrument must be signed by the maker or drawer; contain an unconditional promise or order to pay a sum certain in money and no other promise, order,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

39 Cal.App.4th 1051

39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

obligation or power given by the maker or drawer; be payable on demand or at a definite time; and be payable to order or to bearer. (§ 3104, subd. (1).) An instrument payable to the order of a named drawee or payee is considered payable to order. (§ 3110, subds. (1)(a) & (1)(c).) In this regard a "check" will often be a negotiable instrument within the meaning of the Code, but need not be. (§ 3104, subd. (3).)

In the check collection process the duties and liabilities of a bank depend upon its definitional status, with particular distinctions drawn between payor *1060 banks and collecting banks. A collecting bank is required to exercise ordinary care in presenting a check or sending it for presentment; sending notice of dishonor or nonpayment or returning the check after learning that the check has not been paid or accepted; settling for a check when the bank receives final settlement; [FN7] making and providing for any necessary protest; and notifying its transferor of any loss or delay in transit. (§ 4202, subd. (1)(a), (b), (c), (d) & (e).)

FN7 "Settlement" occurs when a check is paid through some mechanism, such as remittance, credit, or clearinghouse settlement, and may be either provisional or final. (§ 4104, subd. (1)(j).) Generally a settlement given by a collecting bank is provisional, and the bank is regarded as the agent or subagent of the owner of the check, until that bank receives settlement. (§ § 4201, subd. (1), 4212, subd. (1).)

In this process there are certain statutory warranties deemed to be made by each customer and collecting bank. (§ 4207.) [FN8] These warranties run from the customer and depositary bank through any intermediary banks to the payor *1061 bank. The warranties which run to the payor bank, however, are more limited in nature than those which run to the intermediary banks. (Cf. § 4207, subds. (1) and (2).) Upon dishonor an intermediary bank can look to its transferor to reverse the transaction and take up the item. (§ 4207, subd. (2).) In this manner the item may be returned up the chain of transferors to the depositary bank, which must then seek recourse from its customer. However, if the payor bank honors the item and makes payment, it can seek recovery from earlier transferors only to the extent of a breach of warranty. But the warranties made to the payor bank are limited in nature and are affected by the concept

of a holder in due course. [FN9] Thus, as a practical matter, the payor bank that honors a check and makes payment will seldom have recourse against any collecting bank. (See 1 White & Summers, Uniform Commercial Code *supra*, § 15-3, pp. 751-753.) However, a payor bank that makes payment on a check may have rights in subrogation to the extent it has suffered loss by reason of its payment of the check. [FN10]

FN8 At all relevant times section 4207 provided: "(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that [¶] (a) He has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and [¶] (b) He has no knowledge that the signature of the maker or drawer is unauthorized, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith [¶] (i) To a maker with respect to the maker's own signature; or [¶] (ii) To a drawer with respect to the drawer's own signature, whether or not the drawer is also the drawee; or [¶] (iii) To an acceptor of an item if the holder in due course took the item after the acceptance or obtained the acceptance without knowledge that the drawer's signature was unauthorized; and [¶] (c) The item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith [¶] (i) To the maker of a note; or [¶] (ii) To the drawer of a draft whether or not the drawer is also the drawee; or [¶] (iii) To the acceptor of an item with respect to an alteration made prior to the acceptance if the holder in due course took the item after the acceptance, even though the acceptance provided 'payable as originally drawn' or equivalent terms; or [¶] (iv) To the acceptor of an item with respect to an alteration made after the acceptance. [¶] (2) Each customer and collecting bank who transfers an item and receives a settlement or other consideration for it warrants to his transferee and to any subsequent collecting bank who takes the item in good faith that [¶] (a) He has a good title to the item or is

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

authorized to obtain payment or acceptance on behalf of one who has a good title and the transfer is otherwise rightful; and [¶] (b) All signatures are genuine or authorized; and [¶] ] (c) The item has not been materially altered; and [¶] (d) No defense of any party is good against him; and [¶] (e) He has no knowledge of any insolvency proceeding instituted with respect to the maker or acceptor or the drawer of an unaccepted item. [¶] ] In addition each customer and collecting bank so transferring an item and receiving a settlement or other consideration engages that upon dishonor and any necessary notice of dishonor and protest he will take up the item. [¶] (3) The warranties and the engagement to honor set forth in the two preceding subdivisions arise notwithstanding the absence of indorsement or words of guaranty or warranty in the transfer or presentment and a collecting bank remains liable for their breach despite remittance to its transferor. Damages for breach of such warranties or engagement to honor shall not exceed the consideration received by the customer or collecting bank responsible plus finance charges and expenses related to the item, if any. [¶] (4) Unless a claim for breach of warranty under this section is made within a reasonable time after the person claiming learns of the breach, the person liable is discharged to the extent of any loss caused by the delay in making claim."

FN9 In general a holder in due course is a holder who takes an instrument for value, in good faith, and without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. (§ 3302, subd. (1)(a), (b) & (c).) The concept of a holder in due course limits the defenses which may be asserted against the holder. (§ 3305.) For example, a holder in due course takes an instrument free of any claim to it on the part of any person, and free of what might be termed "personal defenses" which could have been asserted by any party with whom the holder has not dealt. The holder in due course does not take the instrument free of defenses of persons with whom the holder has dealt or of what might be termed "real defenses," such as incapacity and certain types of

misrepresentation. (See generally, 1 White & Summers, Uniform Commercial Code, *supra*, § 14-9, pp. 731-734.)

FN10 Section 4407 provides: "If a payor bank has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank shall be subrogated to the rights [¶] (a) Of any holder in due course on the item against the drawer or maker; and [¶] (b) Of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose; and [¶] (c) Of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which the item arose."

The rights and liabilities of a payor bank and its checking account customer are not expressed in terms of warranty. Under the Code, a payor bank must act in good faith and with ordinary care. (§ 4103.) It must act promptly to determine whether a check should be honored. (§ § 4301-4302.) And the bank is liable to its customer for any damages proximately caused by wrongful dishonor of an item, although damages are limited to actual damages if the dishonor occurs through mistake. (§ 4402.) *1062

In the check paying process, a payor bank "may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft." (§ 4401, subd. (a), Stats. 1992, ch. 914, § 40.) However, under the Code no person is liable for a check unless his signature appears thereon and thus an unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it. (§ § 3401, 3404.) (3) Consequently, "... a check with an unauthorized signature is not properly payable, and the bank breaches its agreement with its customer when paying such an item." (*Danning v. Bank of America* (1984) 151 Cal.App.3d 961, 969 [199 Cal.Rptr. 163], disapproved on another ground in *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1137- 1138 [275 Cal.Rptr. 797, 800 P.2d 1227].) Thus it is said that "[t]he relationship between a payor bank and its customers is that of debtor and creditor, being founded upon contract, and the bank

Page 8

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

is under a duty to pay checks only in strict accordance with its customer's orders. [Citation.] The bank is without authority to charge its customer's account with an unauthorized order, and payment of such is said to have been made out of the bank's own funds." (*Danning v. Bank of America, supra,* 151 Cal.App.3d at p. 969.)

The rule that a payor bank cannot charge a customer's account in the absence of an authorized signature operates to impose liability on the bank for payment of a forged check regardless of the quality of the forgery. "Under the Code, the drawer cannot be liable since his valid signature does not appear on the instrument. U.C.C. § 3-401(1). Nor can the drawer bank charge the drawer's account, since a forged signature is not 'properly payable' under U.C.C. § 4-401(1). Another basis for the drawee bank's liability to the drawer is said to lie in their contractual relationship; there is an express or implied agreement between the drawee bank and the depositor that the bank will only charge the depositor's account according to his order. [Citations.] If the bank pays an instrument with a forged signature, contrary to the depositor's order or without his authority, the bank is said to have paid from its own funds rather than from the depositor's account." (Hinchey, *An Analysis of Bank Defenses to Check Forgery and Alteration Claims under Uniform Commercial Code Articles 3 and 4: Claimants' Negligence and Failure to Give Notice* (1982) 10 Pepp. L.Rev. 2, 3, fn. 6.)

A payor bank's initial liability to its customer for making payment of a check on a forged signature is absolute; that is, it applies without regard to whether the bank exercised due care or was negligent or worse. However, this absolute liability is temporally limited. Section 4406, which we have set *1063 out in full in the margin, [FN11] imposes a duty on a customer to discover and report promptly an unauthorized signature or alteration. Under section 4406, subdivision (1), when a bank sends or makes available a statement of account accompanied by items paid in good faith, then the customer must exercise reasonable care and promptness to examine the statement and the items to discover any unauthorized signature or alteration of an item and must promptly notify the bank of any such discovery. When a customer fails to fulfill his or her duty to discover and report a forgery then the customer may not assert the forgery against the bank if the bank has suffered loss thereby, and may not assert subsequent forgeries by the same wrongdoer which were paid by the bank in good faith after the

customer had a reasonable time, not to exceed 14 days, to discover and report the forgery. However, subject to the one-year period discussed below, these preclusions do not apply if the customer establishes a lack of ordinary care on the part of the bank in paying the item or items. Under these provisions a payor bank's absolute liability ceases after the time in which the customer should have discovered and reported an unauthorized signature to the payor bank and *1064 thereafter the care or lack of care exercised by the customer and the bank are in issue. [FN12]

FN11 At the time in question section 4406 provided: "(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after the discovery thereof. [¶] (2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subdivision (1) the customer is precluded from asserting against the bank [¶] ] (a) His unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and [¶] (b) An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration. [¶] (3) The preclusion under subdivision (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s). [¶] (4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subdivision (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 9

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

unauthorized indorsement, and if the bank so requests exhibit the item to the bank for inspection, is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration. The burden of establishing the fact of such unauthorized signature or indorsement or such alteration is on the customer. [¶] (5) If under this section a payor bank has a valid defense against a claim of a customer upon or resulting from payment of an item and waives or fails upon request to assert the defense the bank may not assert against any collecting bank or other prior party presenting or transferring the item a claim based upon the unauthorized signature or alteration giving rise to the customer's claim."

FN12 In the revision of division 4 of the Commercial Code that was effective in 1993, these provisions were changed in some respects, most notably by: (1) permitting the bank to retain items if it provides a statement containing sufficient information to permit the customer to identify the items paid and a telephone number through which the customer may request a copy of the items (subd. (a)); (2) holding the customer responsible for discovering and reporting only unauthorized payments that reasonably should have been discovered (subd. (c)); (3) extending to 30 days the period that a reasonable time to report unauthorized payments may not exceed (subd. (d)(2)); and (4) providing for a modified comparative fault distribution of loss in the event the customer fails to promptly discover and notify the bank of a forgery and the customer establishes a lack of ordinary care on the part of the bank (subd. (e)). (§ 4406; Stats. 1992, ch. 914, § 45.)

(1c) The provision which most concerns us here is contained in subdivision (4) of section 4406. That subdivision precludes a customer from asserting a forgery against a payor bank unless he or she has discovered and reported the forgery within one year of the time a statement and the item were made available by the bank. That subdivision specifically applies without regard to the care or lack of care exercised by either the customer or the bank. [FN13]

FN13 In the revision of the code that was effective in 1993, this provision was retitled subdivision (f) but was not materially changed. Subdivision (f) now provides: "Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subdivision (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. If there is a preclusion under this subdivision, the payor bank may not recover for breach of warranty under Section 4208 with respect to the unauthorized signature or alteration to which the preclusion applies."

Section 4406 codifies and adds definitude to duties that have long been imposed upon customers with respect to payor banks. It has long been, and still is, the rule that there is no limitation upon the time in which a customer may bring an action to recover money deposited with a bank. (Code Civ. Proc., § 348.) [FN14] However, since a depositor should easily be able to discover and report forged or altered checks, early judicial decisions imposed a duty upon a customer to discover and report forgeries and alterations to the bank without unreasonable delay. (Janin v. London & S. F. Bank (1891) 92 Cal. 14, 23-24 [27 P. 1100].) This early rule was flexible. Its application depended upon notions of reasonableness and relative prejudice. (Ibid.) In addition, in order to rely upon a customer's failure to discover and report a *1065 forgery or alteration, the payor bank would have to be shown to be free of negligence itself. (Union Tool Co. v. Farmers etc. Nat. Bk. (1923) 192 Cal. 40. 47-48 [218 P. 424. 28 A.L.R. 1417].)

FN14 Although there is no statute of limitations with respect to moneys deposited with a bank, the procedures a customer must follow may be affected by the Unclaimed Property Law (Code Civ. Proc., § 1500 et seq.), if the account has been inactive sufficiently long as to have come within that law.

In 1905 our Legislature, following the trend established in other states, acted to make a depositor's duty more exact by amending Code of Civil Procedure section 340, subdivision (3), to provide a one-year statute of limitations for the commencement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

of an action "by a depositor against a bank for the payment of a forged or raised check." (Stats. 1905, ch. 258, § 2, pp. 231-232.) In 1929 the statute was further amended to add "or a check that bears a forged or unauthorized indorsement." (Stats. 1929, ch. 518, § 1, p. 896.) By this statute the Legislature "sought to fix a definite time, after which no claim could be asserted, based upon the alleged forging or raising of the check, which it was the duty of the depositor to detect." (*Atwell v. Mercantile Trust Co. (1928) 95 Cal.App. 338, 342 [272 P. 799].*) To this end the statute provided a distinct and narrow exception to the general rules of limitation applicable to actions against a bank. It applied only to an action by a depositor against a bank and only insofar as the action was for the payment of a forged or raised check. However, where the statute was applicable it barred recovery regardless whether the bank was negligent and it could not be defeated by artfully framing the pleadings. (See *Union Tool Co. v. Farmers etc. Nat. Bk., supra, 192 Cal. at pp. 50-52.*) And it was held that the statute would begin to run when the canceled check and a statement of account were furnished to the customer. (*Id.* at pp. 52-53.)

Section 4406 of the Commercial Code is consistent with this history. [FN15] Section 4406 imposes a duty upon a customer to act promptly in discovering and reporting forgeries and alterations. If the customer fails to fulfill this duty then the payor bank is relieved from absolute liability and for an initial one-year period the loss may be imposed upon the bank only if it was negligent in the matter. After one year the statute bars the customer from asserting a forgery or alteration against the payor bank unless it has been earlier discovered and reported to the bank.

FN15 The version of subdivision (4) of section 4406 that was adopted by our Legislature differs somewhat from the Uniform Commercial Code version. Specifically, the Uniform Commercial Code provides for a one-year period for a customer to discover and report forgeries of his or her own signature and alterations to the face of the check, but provides for a three-year period for the discovery and report of forged indorsements. The California State Bar found the distinction questionable and inconsistent with Code of Civil Procedure section 340, subdivision (3), and upon its recommendation forged indorsements were included in the one-year period in California's version of the Uniform

Commercial Code. (See 37 State Bar J. (1962) pp. 169-170.)

(4) Section 4406 is not per se a statute of limitation but instead is an issue-preclusion statute. Unlike a statute of limitations, it does not purport to *1066 bar an action against a bank; rather, it simply precludes a customer from asserting a forgery or alteration against the bank if the customer has failed to discover and report the forgery or alteration to the bank. The effect this will have on a customer's claim against the bank will depend upon whether proof of the forgery is an essential element of the particular claim asserted. In essence, if a customer must prove a forgery in order to establish a claim then the customer will not be able to establish the claim because he or she is precluded from proving the forgery. On the other hand, any claim that is not dependent upon proof of the forgery will not be precluded by section 4406, subdivision (4), although the customer will still be precluded from asserting the forgery in pursing that claim. [FN16]

FN16 One other difference between an issue-preclusion statute such as section 4406, subdivision (4), and a statute of limitation such as Code of Civil Procedure section 340, subdivision (3), is in the steps a plaintiff must take to fulfill the requirements of the statute. Under section 4406, subdivision (4), all the customer must do to avoid the preclusion is to notify the bank of the forgery within one year, while Code of Civil Procedure section 340, subdivision (3), requires that the customer commence suit within one year. However, Code of Civil Procedure section 340, subdivision (3), like other statutes of limitation, is subject to principles of waiver and estoppel. (*Calistoga Nat. Bk. v. Calistoga V. Co. (1935) 7 Cal.App.2d 65, 71-73 [46 P.2d 246].*) For example, where a customer notifies a bank of a forgery and the bank induces the customer to forego filing suit, the bank will not be permitted to rely upon the statute of limitations. (*Ibid.*) Since all section 4406, subdivision (4), requires is that the customer give notice to the bank, waiver or estoppel could arguably apply only in the event of unusual prenotice actions by the bank, but that is not a matter we need consider here.

(5) Although in the abstract there may be any number of possible claims a customer could assert

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

against a bank, plaintiffs' complaint suggests the bases for two types of claims, both of which are treated in the Code. As we have noted previously, a bank's absolute liability for payment of a forged check is statutory and contractual in nature and arises from the bank's contractual undertaking to make payment only upon the customer's authorized signature. In this respect section 3404, subdivision (1), provides that an unauthorized signature is wholly inoperative as that of the person whose name is signed "unless he ratifies it or is precluded from denying it[.]" Section 4406, subdivision (4), establishes such a preclusion and thus unless the customer discovers and reports the forgery to the bank within the one-year period he or she cannot pursue a contractual or statutory claim based upon the alleged forgery.

The other type of action suggested by plaintiffs' complaint is one for negligence in making payment over a forged signature. In this respect the Code is also explicit. The preclusion of section 4406, subdivision (4), applies "[w]ithout regard to care or lack of care of either the customer or the bank ...." Where, as here, the only alleged negligence was in accepting *1067 the forged signatures and making payment on them, an essential element of the cause of action is proof that the signatures were forged and it necessarily follows that the plaintiffs cannot establish their causes of action for negligence to the extent they are precluded from asserting the fact of the forgeries.

In these respects we find the provisions of the Code to be clear and unambiguous. We also find that they expressly cover the allegations of plaintiffs' complaint. Under these circumstances the provisions of the Code are controlling and must be deemed to displace common law negligence principles with respect to the payment of forged checks by a payor bank. (§ 1103.)

Plaintiffs contend, however, that the decision in Sun'n Sand, Inc. v. United California Bank (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920], (Sun'n Sand), establishes that the preclusion in section 4406, subdivision (4), applies only in warranty actions and has no application when the plaintiff alleges negligence. We reject the decision in Sun'n Sand as controlling authority for a variety of reasons.

First, the lead opinion in Sun'n Sand, relied upon by plaintiffs, is not precedential authority. That dispute was not determined by the normal complement of seven justices, but was heard before but five. Of the five justices who participated in the decision, the first or lead opinion had the support of but two. [FN17] (6) It is well established that an opinion that expresses the views of less than a majority of the members of the court is not precedent. Thus, in Del Mar Water, etc. Co. v. Eshleman (1914) 167 Cal. 666 [140 P. 591], the decision of the court as issued consisted of a lead opinion that expressed the views of two members of the court and a "concurring" opinion that in fact expressed the views of four justices. The court issued an opinion on the denial of rehearing stating: "In view of the principal grounds advanced in the petition, it is proper to say, in explanation, that in the decision of a case before the court in Bank the concurrence of at least four justices is necessary, and that any proposition or principle stated in an opinion is not to be taken as the opinion of the court, unless it is agreed to by at least four of the justices." (167 Cal. at p. 682. See also *1068Fuentes v. Tucker (1947) 31 Cal.2d 1. 6 [187 P.2d 752].) Similarly, in People v. Newland (1940) 15 Cal.2d 678. 681 [104 P.2d 778], the court said: "As to the Lamson case [People v. Lamson (1934) 1 Cal.2d 648 (36 P.2d 361)], it may be said that nothing was decided in that case except that the judgment be reversed. On no other question involved on the appeal was there a concurrence of a majority of the members of the court. Therefore that portion of the first opinion in that case which quoted and approved the above excerpt from the Staples case [People v. Staples (1906) 149 Cal. 405 (86 P. 886)], cannot be considered an adjudication or an effective approval of the declaration in the prior case."

FN17 The lead opinion in Sun'n Sand was authored by Justice Mosk and concurred in by Acting Chief Justice Tobriner. Justice Richardson concurred in the result. Justice Clark filed a concurring and dissenting opinion in which he agreed with the result but rejected the reasoning of the lead opinion. Justice Sullivan filed a separate concurring and dissenting opinion, expressing general agreement with the lead opinion but refusing to endorse its rationale in all respects. Thus, although all of the five justices who decided the case concurred in the result, only two justices concurred in the reasoning of the lead opinion.

The lead opinion in Sun'n Sand expressed the views of only two members of the court and, as Witkin would say, that opinion "is not a precedent at all." (9

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 808, p. 789.)

In addition, we find the circumstances in *Sun'n Sand* inapposite to the facts involved here. There the plaintiff corporations had checking accounts with Union Bank. A faithless employee prepared and obtained authorized signatures on checks for small sums payable to the United California Bank (UCB), which in fact was owed nothing by the plaintiffs. The employee then altered the checks by increasing the sums payable, and cashed the checks at UCB by having the sums paid into her own personal account at UCB. In these circumstances UCB was the named payee on the checks, the depositary bank, and a collecting bank, but was not the payor bank. The payor bank, Union Bank, was not involved in the issues on appeal. As our earlier discussion makes clear, under the Code the rights and liabilities of a payor bank to its customer are treated separate and apart from the rights and liabilities of a payee/depositary bank/collecting bank. Since *Sun'n Sand* did not involve a dispute between a payor bank and its customer, it may not be considered authority with respect to that relationship.

The first question the lead opinion in *Sun'n Sand* addressed was whether the maker of a check could sue a collecting bank on the warranties set forth in section 4207. As we have noted (at pp. 1060-1061 *ante*), those warranties run through the chain of collecting banks and ultimately, in a more limited form, to the payor bank. Although they do not specifically run to the maker or drawer of a check, the lead opinion in *Sun'n Sand* concluded by implication that the maker or drawer may bring a direct action against a collecting bank based upon those warranties. (21 Cal.3d at pp. 681-682.) Although that conclusion is irrelevant to the issues we are considering, it is noteworthy that the lead opinion in *Sun'n Sand* also concluded that the bar of section 4406, subdivision (4), would apply in such an action and that the plaintiffs were *1069 precluded from asserting alterations *qua alterations* with respect to eight of the nine checks at issue there since they had failed to discover and report the alterations within the statutory one-year period. (21 Cal.3d at p. 692.)

After determining that section 4406, subdivision (4), precluded the plaintiffs' warranty action with respect to most of the checks at issue, the *Sun'n Sand* lead opinion proceeded to consider whether the plaintiffs could nevertheless pursue recovery for those sums in

causes of action based upon negligence. In this respect the alleged negligence was not in accepting and paying altered checks, but was in permitting the employee, who was not a party to the checks in any capacity, to cash the checks and personally retain the funds. The lead opinion found authoritative support for the claim that this was negligent behavior by a payee/depositary bank and concluded that the complaint stated causes of action in negligence. (21 Cal.3d at pp. 693-695.) In considering whether section 4406, subdivision (4), would bar the causes of action in negligence the lead opinion reached the conclusion, with which we agree, that section 4406, subdivision (4), would not bar a negligence action based upon an independent wrong simply because there was also an alteration or forgery. [FN18] (21 Cal.3d at p. 700.)

> FN18 This conclusion necessarily follows from recognition that section 4406, subdivision (4), is an issue-preclusion statute and not an action-abatement statute, such as a statute of limitations. In *Sun'n Sand* the fact that the checks were altered was mere happenstance with respect to the negligence alleged, that is, proof of the alterations was not essential to the negligence causes of action. Although the lead opinion in *Sun'n Sand* did not secure the support of a majority of the court, all five of the justices who considered the case agreed that the negligence causes of action could proceed and in that result, although not in the reasoning of the lead opinion, *Sun'n Sand* is precedent. However, regardless of the precedential value of *Sun'n Sand*, we have no reason to doubt the specific result there.

Although the court in *Sun'n Sand* reached a result which we find to be consistent with the language of the Code, in reaching this conclusion the lead opinion utilized language that is overbroad with respect to the issue that was presented. It purported to find an implicit legislative intent to limit the bar of section 4406, subdivision (4), to warranty actions, and concluded that the rules set forth in section 4406 were not intended to apply to negligence actions. (21 Cal.3d at pp. 699-700.) In the words of the lead opinion, "subdivision (4) of section 4406 applies only to actions based on warranties set forth in the California Uniform Commercial Code." (*Id.* at p. 699.) It is this assertion that plaintiffs rely upon in asserting that the bar of section 4406, subdivision (4), does not apply to them because they have alleged that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

the defendant Bank was negligent in paying the checks over forged signatures. Although it is not clear that the lead opinion in *Sun'n Sand* actually *1070 supports this assertion of the plaintiffs, [FN19] to the extent that it may be so construed we decline to follow it. (1d) First, section 4406 is specifically concerned with the relationship between a payor bank and its customer and it would be anomalous to purport to find some implied legislative intent to limit the reach of that section to warranty actions when the Legislature did not see fit to define that relationship in terms of warranty and the warranty provisions of the Code have no application to begin with. (See § 4207.) Second, to adopt the construction urged by plaintiffs and purportedly supported by the lead opinion in *Sun'n Sand*, we would be compelled to disregard the clear and unambiguous language of section 4406, subdivision (4), and to conclude in essence that "[w]ithout regard to care or lack of care" means "[w]ithout regard to care or lack of care [*unless there was a lack of care*]." We decline to so construe the statute. [FN20]

FN19 The specific conclusion reached by the lead opinion in *Sun'n Sand* was that the bar of section 4406, subdivision (4), "has no application in a negligence action based on an independent wrong-e.g., failure to detect an irregularity in negotiation-in which there was also an alteration." (21 Cal.3d at p. 700.) But, as we have noted, the lead opinion found the bar applicable to the plaintiffs' action insofar as it was based specifically on the fact of the alterations. (*Id.* at p. 692.) The middle ground, where a plaintiff bases a claim for recovery specifically on a claim of forgery or alteration but adds an allegation of negligence in not discovering the forgery or alteration, was not at issue and was not specifically addressed in *Sun'n Sand*. Although some of the language in the lead opinion was of sufficient breadth to suggest that any allegation of negligence would overcome the bar of section 4406, subdivision (4), it is by no means clear that the lead opinion was intended to propose such a result through what would be obiter dictum if the opinion had the force of precedent.

FN20 In *Sun'n Sand*, the lead opinion also gratuitously states that Code of Civil Procedure section 340, subdivision (3), "is

not intended to apply to actions for negligence." (21 Cal.3d at p. 698.) However, after its enactment and before the relationship of bank and depositor was more clearly defined in the Commercial Code, Code of Civil Procedure section 340, subdivision (3), was held to bar recovery against a bank despite a trial court's express finding of bank negligence. (See *Union Tool Co. v. Farmers etc. Nat. Bk., supra,* 192 Cal. at pp. 47, 52-54.) The lead opinion in *Sun'n Sand* did not discuss this or any precedent with respect to Code of Civil Procedure section 340, subdivision (3). But, in fact, that statute was not implicated in *Sun'n Sand*. By its terms it applies only to an action by a depositor against a payor bank, and *Sun'n Sand* did not involve such an action. Accordingly, that assertion by the lead opinion in *Sun'n Sand* would be dictum if that opinion were otherwise precedential.

The other authorities relied upon by plaintiffs are not persuasive. In particular plaintiffs note the decision in *Commercial Cotton Co. v. United California Bank* (1985) 163 Cal.App.3d 511 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017] (*Commercial Cotton*). That was an action for negligence, breach of the implied covenant of good faith and fair dealing, and the intentional infliction of emotional distress, based upon the payor bank's negligent payment of a check and subsequent refusal to reimburse the customer's account. Although there were other aspects of negligence involved, the action was in part based upon the fact that the bank negligently paid *1071 check bore unauthorized signatures, [FN21] and the bank refused reimbursement at least in part on the ground of the customer's failure to discover and report the unauthorized signatures within one year. In this respect the court of appeal cited the lead opinion in *Sun'n Sand* as a "landmark decision" that established that the bar of section 4406, subdivision (4), does not apply in negligence actions where the customer alleges a breach of duty. (163 Cal.App.3d at p. 515.) As we have been at pains to point out, not only is the lead opinion in *Sun'n Sand* not a landmark decision, it is not even precedent. The *Commercial Cotton* decision did not set forth any reasoning supportive of the position urged by plaintiffs here, and stripped of its erroneous reliance on the lead opinion in *Sun'n Sand*, it has no persuasive value with respect to that position. [FN22]

FN21 The check at issue in *Commercial*

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

*Cotton* not only bore unauthorized signatures, it was part of a series of blank checks that had been stolen and reported lost by the customer four years earlier and that was part of a different number series with a different style and color than the checks then used by the customer. (163 Cal.App.3d at p. 514.) The *Commercial Cotton* court did not address whether these additional factors constituted an independent wrong that could be addressed in a negligence action even if the customer were precluded from asserting the unauthorized signatures and that is not an issue we need consider here.

FN22 In determining that a customer may sue a payor bank for breach of the covenant of good faith and fair dealing, the *Commercial Cotton* decision characterized that relationship as quasi-fiduciary. (163 Cal.App.3d at p. 516.) That characterization and the conclusion which followed were severely criticized in other Court of Appeal decisions. The *Commercial Cotton* court ultimately revisited the issue, found the characterization to be no longer appropriate, and withdrew approval of the *Commercial Cotton* decision. (*Copesky v. Superior Court* (1991) 229 Cal.App.3d 678, 693-694 [280 Cal.Rptr. 338].) In doing so the court noted *Commercial Cotton's* reliance on *Sun'n Sand,* but did not address the *Sun'n Sand* issue. (*Id.* at p. 683.)

The only other appellate decision we have found that appears to rely upon *Sun'n Sand* for the proposition urged by plaintiffs is *Lee v. Bank of America* (1990) 218 Cal.App.3d 914 [267 Cal.Rptr. 387]. However, neither the *Sun'n Sand* situation nor the one with which we are concerned was involved there. In *Lee,* the customer discovered the payment of an unauthorized check and reported it to the bank well within the one-year period required by section 4406, subdivision (4). Accordingly, the court's citation of the lead opinion in *Sun'n Sand* was unnecessary and lacks authoritative value. [FN23] *1072

FN23 Although the customer in *Lee* reported the unauthorized check within one year and was not precluded by section 4406, subdivision (4), she did not discover and report the check "promptly" and thus could have been subject to the preclusion of section 4406, subdivision (2). However, that

preclusion would depend upon a showing of loss to the bank and would be defeated by a showing of negligence on the bank's part. Those questions were obviated in *Lee* because after receiving notice from the customer the bank repaid her account. Under those circumstances the Court of Appeal upheld an order sustaining a demurrer to the customer's complaint for unspecified compensatory damage and such things as emotional distress and punitive damages.

Plaintiffs argue that this case is governed by the decisions in *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642] and *Danning v. Bank of America, supra,* 151 Cal.App.3d 961. We do not find either *Bullis* or *Danning* to be applicable. In *Bullis,* the defendant bank was held liable for permitting one co-executor of an estate to withdraw money from the estate's account although pursuant to statute, contract and the common law the signatures of both co-executors should have been required. (21 Cal.3d at pp. 807, 811.) In *Danning,* the defendant bank erroneously paid a check which neither had nor purported to have an authorized signature thereon and the bank's error was discovered and reported almost immediately. (151 Cal.App.3d at pp. 968-969.) Neither of these decisions involved the payment of a forged or altered check and neither was concerned with a customer's failure to discover and report promptly a forgery or alteration.

Plaintiffs argue that the decisions in *Bullis* and *Danning* stand for the proposition that the loss distribution provisions of the Code do not preempt a customer's right to assert a common law cause of action against a bank. Total preemption of the common law would be a conclusion of greater breadth than our more limited reading of the statute. In applying the Code we are admonished that principles of the general law retain vitality and supplement the Code except to the extent they are displaced by particular provisions of the Code. (§ 1103.) As we read it, section 4406, subdivision (4), is an issue-preclusion statute and in considering the application of that statute we may assume that a customer remains free to pursue any cause of action that is not foreclosed by a precluded issue. However, where the customer's cause of action is dependent upon proof of an issue which is expressly precluded by the Code, then the issue-preclusive effect of the statute is fatal to the cause of action. To conclude otherwise would be to ignore the clear and

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

unambiguous provisions of the statute and, in effect, to allow the common law not to supplement but to displace the particular provisions of the Code. Nothing in *Bullis* or *Danning* compels or supports such a result. [FN24]

> FN24 In so holding we need not consider the decision in *Joffe v. United California Bank* (1983) 141 Cal.App.3d 541, 557-558 [190 Cal.Rptr. 443], which is criticized by the plaintiffs here. In *Joffe*, the Court of Appeal identified the pivotal factual question as whether the check was paid to an authorized representative of the payee. If it was, then the check was "properly payable" and the bank could not be held liable under the Code, while if it was not then the bank would be liable regardless whether it was negligent. In the specific circumstances presented the Court of Appeal found the particular provisions of the Code to be controlling and concluded the common law principles had therefore been displaced. That decision was concerned with different Code provisions and different factual circumstances than those which concern us here, and although its reasoning may be somewhat analogous to our own we need not rely upon it since we find our conclusion to be dictated by the specific Code provisions we are considering.

It remains for us to apply this reasoning to the allegations of plaintiffs' complaint. From the complaint it appears that Moore's alleged misconduct *1073 occurred over a period of several years, involved two commercial checking accounts, and involved hundreds of improperly drawn checks. The complaint is broken down into causes of action based upon the specific ground for recovery and the specific checking account involved. The checks involved in each cause of action are set forth in exhibits to the complaint and are listed by check number, date, and amount.

The fifth cause of action seeks recovery for checks alleged to have been negligently paid from Roy Supply's account. That cause of action concerns checks paid without Roy's signature which are set forth in exhibit C to the complaint, and checks paid over Roy's forged signature which are set forth in exhibit E to the complaint. The sixth cause of action seeks recovery for checks alleged to have been negligently paid from Drywall's account. That cause

of action concerns checks paid without Roy's signature which are set forth in exhibit D to the complaint, and checks paid over Roy's forged signature which are set forth in exhibit F to the complaint. The demurrer did not affect these causes of action with respect to the checks that did not bear Roy's signature and the parties entered into a settlement with respect to those checks. We are here concerned with the forged signature checks set forth in exhibits E and F. Exhibit E sets forth a lengthy list of checks with identified dates between January 24, 1989, and March 11, 1991. Exhibit F sets forth a lengthy list of checks with identified dates between January 31, 1989, and March 27, 1991. The complaint does not specify whether the date set forth for each check is the date on the face of the check or the date upon which the defendant Bank paid it. The complaint alleges that the forgeries were reported to the Bank on or about January 31, 1992.

(7) The critical dates with respect to the applicability of the issue-preclusion provisions of section 4406, subdivision (4), are (1) the date the item and a statement of account showing payment of the item were sent or made available to the customer in a reasonable manner, and (2) the date the customer discovered the forgery and reported it to the bank. The application of that subdivision is not determined by reference to the date on the face of the check or the date it was paid by the bank. In order to avoid the preclusion of that subdivision the customer must discover and report a forgery to the bank within one year of the time the check and a statement of account showing payment of the check are made available to the customer. [FN25]

> FN25 In this respect the period within which the customer must act under section 4406, subdivision (4), begins to run at the same time the statute of limitations contained in Code of Civil Procedure section 340, subdivision (3), begins to run. (See *Union Tool Co. v. Farmers etc. Nat. Bk., supra,* 192 Cal. at pp. 52-53.) However, a customer acts in a timely manner with respect to section 4406, subdivision (4), by reporting a forgery to the bank within one year while under the statute of limitations an action must be commenced within that time. But the statute of limitations may be tolled and it would not be extraordinary to find the statute tolled through the express or implied conduct of a bank after notice of a forgery and while the claim was evaluated and/or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

negotiated, or in some other manner. In this case plaintiffs reported the forgeries to the defendant bank on January 31, 1992, and filed their complaint on March 2, 1992. The demurrer addressed only the preclusion of section 4406, subdivision (4), and under the rule that a demurrer must specify the statute of limitations as a ground in order to place that defense in issue (see *Minton v. Cavaney* (1961) 56 Cal.2d 576, 581 [15 Cal.Rptr. 641, 364 P.2d 473]), the statute of limitations issue was not resolved in the trial court and is not at issue in this appeal. Accordingly, we need not consider whether the statute of limitations may bar some of plaintiffs' claims that are not otherwise precluded by section 4406, subdivision (4).

In applying this standard to the facts alleged in the complaint we may borrow two points from the lead opinion in *Sun'n Sand*. First, that opinion *1074 concluded that the one-year period applies independently with respect to each forged check regardless whether multiple checks are part of a series of malefactions by the same wrongdoer. (21 Cal.3d at p. 692.) We find that conclusion to be consistent with the provisions of section 4406 and adopt that portion of the lead opinion in *Sun'n Sand* for the reasons stated there. Second, in *Sun'n Sand* the trial court took judicial notice of the custom of commercial banks to provide customers with monthly statements and canceled checks. (21 Cal.3d at p. 679, fn. 1.) The lead opinion found that with respect to eight of the nine checks involved the checks bore issuance dates sufficient to compel an inference that they were negotiated and made available in a monthly statement more than one year prior to their discovery. (21 Cal.3d at p. 692.) We are satisfied that the monthly statement custom is sufficiently established to support judicial notice, and that the antiquity of issuance of a check may support an inference that it was the subject of such a statement more than one year preceding its discovery and report by the customer. However, such an inference will not support an order sustaining a demurrer without leave to amend where it is reasonably possible the plaintiff could allege that a forgery was discovered and reported within one year of the statement covering the particular forged check.

(1e) Most of the checks for which recovery is sought in the fifth and sixth causes of action are identified with dates sufficiently in advance of the date the forgeries were discovered and reported as to give rise to a strong inference that they were included in statements of account beyond the one-year period preceding that date. However, one check involved in the fifth cause of action and seven checks involved in the sixth cause of action were identified with dates which would indicate that they were not the subject of statements of account more than one year before they were discovered and reported. [FN26] And with respect to each cause of action there are checks with identified dates more than one year in advance of plaintiffs' *1075 demand but not sufficiently so that they necessarily must have been the subject of statements of account which were sent or made available more than a year before the demand. Under these circumstances and in light of section 4406, subdivision (4), as we have discussed it, we conclude that it was appropriate for the trial court to sustain the demurrer to the fifth and sixth causes of action but that plaintiffs should be accorded an opportunity to amend to set forth with greater certainty any checks that were the subject of statements of account within one year preceding their demand upon the defendant. [FN27] (See *Gonzales v. State of California* (1977) 68 Cal.App.3d 621, 634 [137 Cal.Rptr. 681]; *Miller v. Brown* (1951) 107 Cal.App.2d 304, 307 [237 P.2d 320].) Accordingly, we will reverse the judgment of dismissal and remand with directions to give plaintiffs an opportunity to amend their complaint.

FN26 The one check in the fifth cause of action and six of the seven checks in the sixth cause of action are identified with dates within one year of plaintiffs' demand on the bank. The seventh check in the sixth cause of action is identified with a date one year and one day before plaintiffs' demand and thus appears unlikely to have been included in a monthly statement more than one year before the demand. These checks were also the subject of the first and second causes of action.

FN27 The one check involved in the fifth cause of action and the seven checks involved in the sixth cause of action that clearly appear not to be subject to issue preclusion under section 4406, subdivision (4), were the subjects of the first and second causes of action which were not affected by the demurrer and which were the subject of a settlement. Plaintiffs cannot be permitted to recover twice for the same forged checks and thus may be barred from seeking recovery for those checks in the fifth and

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

sixth causes of action. However, that is a defensive matter that must be addressed on remand. We do not find plaintiffs' failure to seek recovery for other forged checks in the first and second causes of action to preclude them from seeking recovery under the fifth and sixth causes of action for checks that may have been the subject of statements of account within one year preceding their demand. First, in the complaint there is no express concession that only the checks identified in the first and second causes of action were discovered and reported within one year of statements of account. Second, since the complaint is uncertain whether the date identified with each check is the date of issuance or the date it was paid but does not indicate the date of the statement of account covering the various checks, there is no basis for finding section 4406, subdivision (4), to be necessarily applicable to all other checks by inference or implication. Third, since each individual check must be considered on its own merits under section 4406, subdivision (4), there is no requirement that they be joined in a single cause of action and the exclusion of some checks from the first and second cause of action would not preclude their recovery under another cause of action. Finally, since under section 4406 the defendant bank's negligence is in issue with respect to forgeries which were not discovered and reported promptly but were discovered and reported within one year, the inclusion of checks in a negligence cause of action cannot be taken as an implied concession that the code would otherwise preclude recovery.

II

(8) The ninth count of the complaint alleged that as a result of the Bank's misfeasance in paying checks drawn with Roy's forged signature, the corporate plaintiffs were deprived of funds needed to pay various state and federal taxes. Roy personally was required to pay such taxes. As a result, *1076 Roy "was hurt and injured in his health, strength, activity and marital relations, ..."

The trial court ruled Roy had no cause of action for a wrong done to the corporate plaintiffs. We agree.

Roy's individual claim rests on the premise that the

Bank, in maintaining the corporate plaintiffs' checking accounts, owed a duty of care to Roy as the president and as a shareholder of the corporate plaintiffs. But in order to state a viable cause of action for negligence, the complaint must allege facts showing the existence of a legal duty of care. (Palmer v. Crafts (1936) 16 Cal.App.2d 370, 374-375 [60 P.2d 533].) Roy has not, indeed cannot, allege any such facts.

The gist of any claim based upon the improper payment of a check is the Bank's express or implied contractual obligation to honor only those checks which the customer authorizes to be paid. (Fireman's Fund Ins. Co. v. Security Pacific Nat. Bank (1978) 85 Cal.App.3d 797, 805 and fn. 7 [149 Cal.Rptr. 883].) The duty owed by the Bank in this case derives from its contracts with its customers, i.e., the corporate plaintiffs. Roy was not a party to those contracts, nor is there any allegation Roy was an intended beneficiary of the contracts between defendant and the corporate plaintiffs. (See Civ. Code. § 1559.)

Roy relies on several decisions for the proposition a defendant who breaches a contract may be held liable for negligence to one who was not a party to the contract where harm to that person was "foreseeable." None of the cited cases concerns the liability of a bank for alleged mishandling of a corporate bank account. Absent extraordinary and specific facts, which Roy neither alleges nor claims that he can allege, a bank is liable only to its customer for its mishandling of that customer's account. (Dodd v. Citizens Bank of Costa Mesa (1990) 222 Cal.App.3d 1624, 1628 [272 Cal.Rptr. 623] [Absent a showing the noncustomer was an alter ego of, or had personally guaranteed the debts of, the bank's customer, the bank owes a duty of care only to its actual customer]; see also American Nat. Bank v. Stanfill (1988) 205 Cal.App.3d 1089, 1100 [252 Cal.Rptr. 861]; Kendall Yacht Corp. v. United California Bank (1975) 50 Cal.App.3d 949, 956 [123 Cal.Rptr. 848].) The trial court did not err in sustaining without leave to amend the demurrer as to the ninth count.

Disposition

The judgment of dismissal is reversed as to the fifth and sixth causes of action asserted by plaintiffs Roy Supply, Inc., and R.M.R. Drywall, Inc., and *1077 the cause is remanded with directions to allow those plaintiffs leave to amend in accordance with the views expressed in this opinion. The judgment is affirmed as to plaintiff Edward Roy and in all other

39 Cal.App.4th 1051
39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 27 UCC Rep.Serv.2d 1363, 95 Cal. Daily Op. Serv. 8401, 95 Daily
Journal D.A.R. 14,450
(Cite as: 39 Cal.App.4th 1051)

respects. Defendant is awarded its costs on appeal.

Sims, J., and Nicholson, J., concurred..

Cal.App.3.Dist.,1995.

Roy Supply, Inc. v. Wells Fargo Bank, N.A.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**23**

Westlaw.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
**(Cite as: 34 Cal.2d 264)**

▷
Simmons v. California Institute of Technology
Cal.
EDWARD E. SIMMONS, JR., Respondent,
v.
CALIFORNIA INSTITUTE OF TECHNOLOGY (a
Corporation) et al., Appellants.
**L. A. No. 19484.**

Supreme Court of California
Sept. 16, 1949.

HEADNOTES

**(1) Master and Servant § 6--Contracts of Employ-
ment--Consideration.**
In an action to have declared rescinded an agree-
ment by a research assistant and inventor with a
technological institute concerning the payment of
royalties under any licensing agreement made by
him for the use of his invention, a finding that the
agreement was executed without consideration on
the part of the institute was supported by the evid-
ence, including testimony that both the inventor and
the faculty member in charge of the research under-
stood the phrase "in consideration of employment,"
which appeared in the agreement, as referring to
past employment.

**(2) Evidence § 391--Extrinsic Evidence-
-Consideration for Instrument.**
The true consideration of a contract may be shown
by extrinsic evidence.
See 10 **Cal.Jur.** 932; 20 **Am.Jur.** 973.
**(3) Contracts § 95--Consideration.**
Past employment is inadequate consideration to
support a contract.

**(4) Contracts § 87--Consideration.**
The consideration for a promise must be an act or a
return promise, bargained for and given in ex-
change for the promise.
See 6 **Cal.Jur.** 167; 12 **Am.Jur.** 567.
**(5) Cancellation of Instruments § 34--Want of Con-**

sideration.
Promises of an inventor to grant licenses to use his
invention only on approval by a technological insti-
tute and to pay royalties to the institute, where the
only consideration contemplated by the parties was
past employment of the inventor, were made gratu-
itously and may be revoked by cancellation or res-
cission of the instruments incorporating them.

**(6) Cancellation of Instruments § 34--Want of Con-
sideration.**
Where a prior contract by a research assistant and
inventor with a technological institute concerning
the payment of royalties under any licensing agree-
ment made by him for the use of his invention was
rescinded for lack of consideration, the beneficiary
provisions of a subsequent agreement by the invent-
or with a manufacturer for the manufacture of his
invention, which was based on the prior contract
and which contained a provision for payment of
royalties to the institute, were unsupported by con-
sideration and also may be rescinded.

**(7)       Cancellation      of      Instruments      §
76--Evidence--Fraud.**
In an action to have declared rescinded an agree-
ment by a research assistant and inventor with a
technological institute concerning the payment of
royalties under any licensing agreement made by
him for the use of his invention, the evidence sup-
ported findings in favor of the inventor on the issue
of fraud where it appeared that he was induced to
enter into the contract in reliance on certain misrep-
resentations by the faculty member of the institute
in charge of the research.

**(8) Agency § 187--Relation Between Principal and
Third Person-- Representations of Agent.**
A rescission of contract may be had against even an
innocent principal because of unauthorized misrep-
resentations by his agent.

**(9) Evidence § 388--Extrinsic Evidence--Fraud.**
Parol evidence of fraud to establish the invalidity of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

Page 2

a written instrument induced by a promise made without any intention of performing it is permissible in the case of a promise to do some act which was not covered by the terms of the contract, and not in the case of a promise directly at variance with the terms of the instrument.
Right to show fraud in inducement of execution of written contract, note, 56 **A.L.R.** 13. See, also, 10 **Cal.Jur.** 937; 24 **Am.Jur.** 102.

**(10)** Evidence § 388--Extrinsic Evidence--Fraud.
In an action to have declared rescinded an agreement by a research assistant and inventor with a technological institute declaring that "the royalty on said invention shall be paid to the ... Institute, or committees or other agencies or bodies which the ... Institute may designate," it was proper to receive parol evidence to prove that the promises of a faculty member in charge of the research were that the money, although paid to the institute as a matter of administrative procedure, nevertheless was to be used exclusively for the research, since the promise was directed to the matter of the *use* of the money, whereas the terms of the agreement dealt with nothing more than the form of the *payment* of it.

**(11)** Cancellation of Instruments § 13--Conditions Precedent--Restitution.
No restoration or offer to restore benefits received was necessary as a condition precedent to an action by an inventor to have declared rescinded a contract which he entered into with a technological institute concerning payment of royalties under any licensing agreement made by him for the use of his invention, where he received no benefits in return for his promise.

**(12)** Cancellation of Instruments § 8--Partial Rescission.
The general rule is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions. The theory underlying such a rule is that retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not

contemplate.

**(13a, 13b)** Cancellation of Instruments § 8--Partial Rescission.
The rule that one must rescind all of his contract and not a mere part thereof is not controlling in the case of a severable or divisible contract, such as a contract with a manufacturer for the manufacture of an invention which contains provisions relating to application of payment of royalties to a technological institute, and which latter provisions are severable from the terms and conditions applicable to the manufacturer.

**(14)** Contracts § 158--Interpretation--Entire and Severable Contracts.
Generally speaking, the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable.

**(15)** Contracts § 158--Interpretation--Entire and Severable Contracts.
A contract may be severable as to some of its terms or for certain purposes, but indivisible as to other terms or for other purposes.

**(16)** Money Received § 10--Money Obtained by Fraud or Paid Under Mistake.
Where monies received by a technological institute were paid by a manufacturer as royalties on plaintiff's invention under a contract to apply them to Impact Research of the institute, which contract was induced by fraud and executed in the mistaken belief that plaintiff owed an obligation to the institute, the principles of unjust enrichment and restitution require that such monies may not be retained.

**(17)** Parties § 8--Who may or must be Parties.
In an action to have declared rescinded an agreement by a research assistant and inventor with a technological institute concerning the payment of royalties under any licensing agreement made by him for the use of his invention, a judgment for plaintiff was not improper because the manufacturer was not made a party to the action where the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

agreement was merely between the inventor and the institute, and the manufacturer had no rights or interests dependent on or arising from that agreement.

## SUMMARY

APPEAL from a judgment of the Superior Court of Los Angeles County. John Beardsley, Judge. Affirmed.

Action to have a royalty agreement by inventor with technological institute declared rescinded and a license agreement by inventor with manufacturer declared void, and for damages for benefits already received by the institute.

COUNSEL
O'Melveny & Myers, Louis W. Myers, Pierce Works, John Whyte and Lyon & Lyon for Appellants.
Samuel L. Kurland and A. Arnold Klein for Respondent.

EDMONDS, J.
Edward E. Simmons is an inventor who devised a strain sensitive element which is used in the measurement of impacts. He entered into a contract with California Institute of Technology concerning the payment of royalties under any licensing agreement made by him for its use and, subsequently, a contract with Baldwin Locomotive Works for the manufacture of his apparatus. The present action for *268 declaratory relief was brought to have the first agreement declared rescinded, the second one declared void insofar as it confers benefits upon the Institute, and for damages to the extent of benefits already received by the Institute. The appeal is from a judgment in his favor.

Following attendance at the Institute as a student, Simmons was graduated in 1934 and received his Master's degree in 1936. During the summer and fall of the latter year, he occupied an office in the electrical engineering department on the campus and did work for various persons at the Institute and some others who had no connection with the organization. He was paid for his services upon an hourly basis.

At that time Dr. Donald S. Clark, a member of the faculty of the Institute, was in charge of a commercially sponsored project carried on by it and known as "Impact Research." In the course of developing a method for measuring and determining the force of time relations which occur to metals during impact loading, Simmons, who had a reputation for ingenuity, was consulted and made a suggestion for the use of a strain sensitive element. The evidence shows that Simmons' ideas were used and, under his supervision, an apparatus embodying them was constructed which operated successfully.

A few months later, Simmons became a member of the staff of the Institute, on a part-time basis, for work with Impact Research but, at the time he conceived the idea of his invention and put it to practical use, he was not employed by, nor did he receive any compensation for services rendered to the research project. However, in June, 1938, Simmons was employed by the Institute to work with Impact Research on a fellowship basis and received a reappointment for the following academic year.

In the fall of 1939, Baldwin Locomotive Works became interested in the Simmons invention and its representative had conversations with Simmons and Dr. Clark which culminated in the two agreements which are the basis of the present controversy. By this time, Simmons had become greatly interested in the work of Impact Research and its continuation, and suggested to Dr. Clark that the Baldwin offer would be a good proposition if the income received from royalties could be used to pay for materials and the expense of carrying on further research. Dr. Clark agreed that this would be most desirable.

Simmons and Dr. Clark had many conversations in regard *269 to the terms and conditions which should be embodied in a contract and the provisions as to the use of the royalties. Dr. Clark told him that all royalties should be paid directly to the Institute but that they would be used for Impact Research.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

He explained to Simmons that the project could receive money only from the Institute, but that any sums paid by Baldwin would be used for Impact Research.

A memorandum entitled "Agreement," bearing date of February 21, 1940, prepared by counsel for Baldwin and executed only by Simmons, recites "that as to my inventions involving an electrical strain gauge ... I will not grant any licenses to make, use or sell apparatus or methods embodying any of said inventions unless such licenses are approved by the California Institute of Technology, ... any license so granted to be subject to such terms and conditions as may be reasonably required by [it] ... The royalty on said inventions shall be paid to the ... Institute ... unless at my option I shall request in writing ... at least thirty (30) days prior to the end of any three (3) months' period in which royalty accrues that up to and including forty per cent (40%) of the total royalty paid by a licensee shall be paid to me by the said licensee." Dr. Clark signed this document as a witness to the signature of Simmons, and it was received in evidence marked Exhibit "A."

A contract executed by Simmons and Baldwin "as of March 13, 1940" declares that it is "subject to approval" of the Institute. This contract, designated in the record as Exhibit "B," grants to Baldwin, with specified reservations, the exclusive license to make for use, rental and sale the inventions covered by the patent for a royalty of five (5) per cent of the sale price or income from rentals of that portion of apparatus embodying the invention. All royalty "shall be paid to the Institute, unless Simmons at his option shall request in writing to Baldwin and to the Institute, at least thirty (30) days prior to the end of any three (3) months' period in which royalty accrues that any portion up to and including forty per cent (40%) of said royalty shall be paid to him by Baldwin." Following this contract is a statement which reads as follows: "The granting of the foregoing license is approved by the California Institute of Technology in accordance with an agree-

ment between [it and] Edward E. Simmons, Jr., ... dated February 21, 1940. California Institute of Technology By: A. C. Balch Pres." It appears from the evidence that this approval was given by direction *270 of the executive council of the Institute, but there was no action by it authorizing or ratifying a similar approval of the memorandum executed by Simmons.

Simmons testified that Dr. Clark had told him "the thing to do is to use the income from this invention of yours for the further development of impact testing and dynamic test procedures, and that ... would make the continuation of the Impact Research project a possibility." Simmons stated that his reply was: "I told Doctor Clark I was very much interested in having the Impact Research project continue, and I would be glad to have the income from this patent go to the Impact Research fund for further use in the development of equipment and tests in the laboratory." Dr. Clark assured Simmons that the royalties, although paid to the Institute would be used solely for the maintenance of Impact Research, and it appears from the evidence that this promise of continuing development of the project, made by Dr. Clark to the young scientist, was the major inducing force behind the agreements here in controversy.

Not until April or May of 1941 did Simmons know that Baldwin's royalty payments were not being, and never had been, used in Impact Research. Simmons then called Dr. Clark's attention to his promises on the subject. Shortly thereafter, Simmons was informed by Dr. Clark that his fellowship would not be renewed after July, 1941, because the project's funds were running low. When Simmons pointed out that the sums being paid by Baldwin were more than the amount of his salary, Dr. Clark replied that the Institute, and not Impact Research, was receiving these royalties and he could do nothing about it. Moreover, said Dr. Clark, there was no need for any further discussion of the subject.

Although the project continued for some time after his discharge, Simmons was not again employed by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

it although subsequently, upon Dr. Clark's recommendation, he did some work in connection with research being done by the Institute for the government. In January, 1942, Simmons served notice of rescission upon the Institute and this action followed.

From this and other evidence, the trial court determined that Simmons is entitled to the amount of the royalties received by the Institute, and it decreed that the Institute has no right to any royalties accrued, or to accrue. This conclusion is based upon findings that Simmons received no consideration for the execution of the document designated Exhibit "A" nor for the licensing agreement (Exhibit "B") *271 insofar as the latter contract purports to confer rights upon the Institute; that Dr. Clark made fraudulent statements which Simmons believed and relied upon and that Dr. Clark's acts and representations were neither authorized nor ratified by the Institute.

As justifying a reversal of the judgment, the Institute and Dr. Clark contend that there is insufficient evidence to support the findings as to lack of consideration for the benefits conferred upon the Institute, or the findings that the execution of the writings was induced by fraud. They also assert that no evidence should have been admitted upon the charge of fraud, and that Simmons is not entitled to the relief sought.

The finding as to the first cause of action is that "there was and is no consideration for the said written instrument executed by plaintiff and defendant Clark ... [Exhibit A]; that it is true that plaintiff has received nothing in consideration of, or for, said written instrument," and that "it is true that ... plaintiff executed and entered into the licensing agreement ... referred to ... as Exhibit B, in pursuance and consideration of the aforementioned written instrument ... Exhibit A; that it is true that there was, and is, no consideration for said licensing agreement, Exhibit B, insofar as said agreement purports to confer rights upon California Institute of Technology; that it is true that plaintiff has re-

ceived nothing in consideration of, or for, said licensing agreement insofar as it purports to confer rights upon ... California Institute of Technology." Another finding was stated in the following terms: "That it is not true that the aforementioned instrument ... Exhibit A, was at any time and/or now is, supported by a valid and/or valuable consideration, or any consideration whatsoever; that it is not true that the aforementioned licensing agreement ... Exhibit B, insofar as the same purports to confer rights upon ... [the] Institute, was at any time and/or now is, supported by a valid and/or valuable consideration, or any consideration whatsoever."

The findings clearly show that the trial court treated Exhibit "A" as a memorandum of a contract between Simmons and the Institute resulting from the negotiations between him and Dr. Clark. Exhibit "B" is a third party beneficiary contract between Simmons and Baldwin, under which the Institute is the beneficiary.

(1, 2) The finding that Exhibit "A" was executed by Simmons *272 without consideration on the part of the Institute is supported by the evidence. The true consideration of a contract may be shown by extrinsic evidence (*Shiver v. Liberty Bldg.-Loan Assn.,* 16 Cal.2d 296 [106 P.2d 4]; *Johnston v. Courtial,* 216 Cal. 506 [14 P.2d 771]), and the record includes testimony to the effect that both Simmons and Dr. Clark understood the phrase, "in consideration of employment," which appears in Exhibit "A" as referring to past employment. (3) Such employment is inadequate consideration to support a contract, and the promises of Simmons to grant licenses to use his invention only upon approval by the Institute and to pay royalties to the Institute were made without any counterpromise by the Institute.

The appellants argue that there are three "aspects of consideration," any one of which is sufficient to support the promises of Simmons. First, it is said that Simmons was reemployed by the Institute after the term under which he was serving had expired. Secondly, the appellants assert that the agreements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

Page 6

were made as a compromise of a dispute between Simmons and the Institute regarding the Institute's claim to an interest in the patent. Finally, they rely upon the services rendered by the Institute, through Dr. Clark, in handling the negotiations of the contract with Baldwin as constituting sufficient and adequate consideration.

(4) But the consideration for a promise must be an act or a return promise, bargained for and given in exchange for the promise. (*Bard v. Kent,* 19 Cal.2d 449 [122 P.2d 8, 139 A.L.R. 1032]; *Tiffany & Co. v. Spreckels,* 202 Cal. 778 [262 P. 742]; *Williams v. Hasshagen,* 166 Cal. 386 [137 P. 9]; *Lasar v. Johnson,* 125 Cal. 549 [58 P. 161]; Rest., Contracts, § 75; see Williston, Contracts, [rev. ed.] §§ 61, 100, 102, 102a.) In the words of section 75 of the Restatement of Contracts (com. b): "Consideration must actually be bargained for as the exchange for the promise ... The existence or non-existence of a bargain where something has been parted with by the promisee or received by the promisor depends upon the manifested intention of the parties ... The fact that the promisee relies on the promise to his injury, or the promisor gains some advantage therefrom, does not establish consideration without the element of bargain or agreed exchange." (Language approved in *Bard v. Kent, supra,* p. 452.) (5) In the present case, the evidence shows, and the trial court necessarily found, that it was the past employment of Simmons and not the promises or acts suggested by the appellants, \*273 which the parties contemplated as the consideration for Simmons' promises. His promises, therefore, were made gratuitously and may be revoked by cancellation or rescission of the instruments. (*Baltimore & Ohio R. Co. v. Evans,* 188 F. 8 [110 C.C.A. 156]; 1 Black on Rescission and Cancellation, (2d ed.) § 157, p. 458 et seq.)

(6) The trial court found that, insofar as the third party beneficiary provision of Exhibit "B" is concerned, it was executed "in pursuance and consideration of" the contract evidenced by Exhibit "A." It necessarily follows that if the prior contract was

rescinded for lack of consideration, the beneficiary provisions of Exhibit "B," which were based thereon, are unsupported by consideration and also may be rescinded. The judgment was rendered upon this theory.

(7) The findings of the trial court in favor of Simmons on the issue of fraud are likewise supported by the record. It clearly appears that, apart from the question of the consideration bargained for, Simmons was induced to enter into the contracts in reliance upon certain misrepresentations by Dr. Clark. As a young man, experimenting on the borderland of what appeared to be a vast new field of scientific and engineering development, he was greatly impressed with the importance of the work being conducted at Impact Research. "It was a new field," he explained, "the matter of dynamic testing materials was just becoming of importance at that time, and I was extremely interested in that particular subject, and the instrumentation useful in such investigations, and I think we mutually agreed that the money could be well used in Impact work."

The substantial evidence which supports these findings places them beyond the reach of an appellate court. (*DeYoung v. DeYoung,* 27 Cal.2d 521 [165 P.2d 457]; *Viner v. Untrecht,* 26 Cal.2d 261 [158 P.2d 3]; *Juchert v. California Water Service Co.,* 16 Cal.2d 500 [106 P.2d 886]; *Raggio v. Mallory,* 10 Cal.2d 723 [76 P.2d 660]; *Albaugh v. Mt. Shasta Power Corp.,* 9 Cal.2d 751 [73 P.2d 217]; *Gane v. Gane,* 6 Cal.2d 145 [56 P.2d 948]; *Bellon v. Silver Gate Theatres, Inc.,* 4 Cal.2d 1 [47 P.2d 462]; *Crawford v. Southern Pac. Co.,* 3 Cal.2d 427 [45 P.2d 183].) (8) Moreover, the determination that Dr. Clark was employed by the Institute, but that his acts and representations were not authorized or ratified by it is not inconsistent with other conclusions in favor of Simmons, for "the rule is now firmly established that a rescission of contract \*274 may be had against even an innocent principal because of unauthorized misrepresentations by his agent." (*Greenberg v. DuBain Realty Corp.,* 2 Cal.2d 628, 629 [42 P.2d 628]; and see *Weiner v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

*Roof,* 10 Cal.2d 450, 453 [74 P.2d 736].)

The Institute and Dr. Clark assert that it was error to have admitted parol evidence of such promissory fraud, because it is "at variance with the contractual features of the writing." The determinative question upon this issue is "whether the writing was intended to cover a certain subject of negotiation; for if it was not, then the writing does not embody the transaction on that subject, and one of the circumstances of decision will be whether the one subject is so associated with the other that they are in effect 'parts' of the same transaction, and therefore, if reduced to writing at all, they must be governed by the same writing." (9 Wigmore on Evidence, § 2430, p. 97.)

(9) It is clear that "where the execution of a contract has been induced by a promise made without any intention of performing it, this constitutes such fraud in obtaining the contract that it may be declared null and void" but that "a distinction must be made between ... a parol promise ..., which by its very nature is superseded by the final writing, inconsistent with it, and a promise made with no intention of performing the same, not inconsistent with the writing, but which was the inducing cause thereof." (*Cobbs v. Cobbs,* 53 Cal.App.2d 780, 783, 785 [128 P.2d 373].) (10) Exhibit "A" provided that "the royalty on said invention shall be paid to the ... Institute, or committees or other agencies or bodies which the ... Institute may designate. ..." The promises of Dr. Clark were that the money, although paid to the Institute as a matter of administrative procedure, nevertheless was to be used exclusively for Impact Research. Therefore, the promise was directed to the matter of the *use* of the money, whereas the terms of the memorandum dealt with nothing more than the form of the payment of it. These promises by Dr. Clark as to the use of the royalties were the fraudulent inducement, or motive, for the contract, but they were not incorporated in or superseded by the terms of the agreement as to payment. The two are not inconsistent or "at variance," inasmuch as they deal with wholly different matters. It was, therefore, proper to receive parol evidence to prove the promises of Dr. Clark. (*Stockburger v. Dolan,* 14 Cal.2d 313 [94 P.2d 33, 128 A.L.R. 83]; *Buckner v. Leon & Co.,* 204 Cal. 225 [267 P. 693]; *275Whittier v. Home Sav. Bank,* 161 Cal. 311 [119 P. 92]; *Savings Bank of So. Cal. v. Asbury,* 117 Cal. 96 [48 P. 1081]; *Lindsay v. Mack,* 5 Cal.App.2d 491 [43 P.2d 350]; *Gardiner v. Burket,* 3 Cal.App.2d 666 [40 P.2d 279].)

(11) The argument of the appellants that Simmons is not entitled to the relief which he seeks is in two parts. The first, directed to Exhibit "A," is that he failed to tender or return the benefits received. This argument assumes that something other than past employment was the intended consideration for the promises of Simmons. But as he received no benefits in return for his promise, he is not required to tender or return any amounts paid to him. The second part of the argument, directed to Exhibit "B," is that a rescission must be total and not partial; that Simmons may not rescind as to the burdens imposed upon him while retaining the bene- fits.

(12) The general rule is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions. (*Buena Vista Fruit Co. v. Tuohy,* 107 Cal. 243 [40 P. 386]; *Bohall v. Diller,* 41 Cal. 532; *Purdy v. Bullard,* 41 Cal. 444; *Jones v. Bay Cities Electric Co.,* 22 Cal.App. 81 [133 P. 492].) The theory underlying such a rule is that retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate.

(13a) This rule, however, is not controlling in the case of a severable or divisible contract such as Exhibit "B." (14) Generally speaking, the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable. (*Traiman v. Rappaport,* 41 F.2d 336, 71 A.L.R. 475.)(15) And a contract may be severable as to some of its terms, or for certain

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
**(Cite as: 34 Cal.2d 264)**

purposes, but indivisible as to other terms, or for other purposes. (*In re Marshall's Garage,* 63 F.2d 759; *Ireland v. Craggs,* 56 F.2d 785; *Cosden Oil Co. v. Scarborough,* 55 F.2d 634.)(13b) Here there was a total rescission of the provisions relating to the Institute, and they are clearly severable from the terms and conditions applicable to Baldwin. And "where a good cause for rescission exists as to one part of a divisible or separable contract, such portion may be rescinded in equity without disturbing the remainder." (*Hesselberg v. Aetna Life Ins. Co.,* 102 F.2d 23, 25.)The rescission as to the Institute is total, not *276 partial. No injustice is done the Institute by Simmons' failure to rescind as to Baldwin, and the Institute has incurred no injury if Simmons and Baldwin, as between themselves, elect to be bound by Exhibit "B." By the terms of the decree of the trial court, the Institute and Simmons have been placed *in status quo.*

(16) As to royalties already received by the Institute, they were paid under a contract induced by fraud and executed in the mistaken belief that, under the terms of Exhibit "A," Simmons owed an obligation to the Institute. In such a situation the principles of unjust enrichment and restitution require that such monies may not be retained. (See Restatement of Restitutions, §§ 5, 133[1].)

(17) There is no merit in the argument, made for the first time upon appeal, that the judgment is improper because Baldwin was not made a party to the action. Exhibit "A" is a memorandum of an agreement between Simmons and the Institute; Baldwin has no rights or interests dependent upon or arising from that agreement. It is, therefore, only as the judgment may purport to affect Exhibit "B," the contract between Simmons and Baldwin, that the licensee could have any direct interest. However, the trial court made no finding as to Baldwin's interests under that contract; it expressly restricted the determination of the rights as between Simmons and the Institute to the amount of royalties paid or to be paid pursuant to the contract. Baldwin continues to receive the benefit it contracted for, the right to

manufacture the invention; it is under obligation to pay the same amount in royalties for that privilege and probably it is of no consequence to Baldwin to whom that money is paid. If it is, that company may raise such defense in any action hereafter brought by Simmons to collect royalties.

The interests of Baldwin under the contract are "so separable that a decree may be rendered between the parties before the court without affecting ... [them, so that they] may perhaps be 'necessary' parties to a complete settlement of the entire controversy or transaction, but are not 'indispensable' to any valid judgment ... They should normally be joined ... [b]ut, since the rule ... [as to joinder of necessary parties] is one of equity, it is limited and qualified by considerations of fairness, convenience, and practicality. Where, for example, it is impossible to find these other persons or impracticable to bring them in, the action may proceed as to those parties who are present." (*277Bank of California v. Superior Court,* 16 Cal.2d 516, 523 [106 P.2d 879].)

The fact that Baldwin is a foreign corporation may have placed some difficulty in the way of making it a party to this litigation had Simmons been disposed to do so. But he was satisfied to proceed solely against the Institute and Clark and must accept the responsibility of a judgment which does not bind Baldwin. Any dispute between Simmons and Baldwin has not been settled by this judgment, and Baldwin is in no way bound by it.

The judgment is affirmed.

Gibson, C. J., Traynor, J., and Peters, J. pro tem., concurred.
CARTER, J.
I concur in the conclusion reached in the majority opinion, but I do not agree with the reasons on which it is based.

From the facts as disclosed by the record it appears that we have what is, in effect, a third party donee beneficiary contract. There are, in the case, two Ex-

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

hibits, "A" and "B." Exhibit "A" which was signed only by Simmons, the plaintiff, bears the date of February 21, 1940, and is entitled "Agreement." It appears that this instrument was prepared by counsel for The Baldwin Locomotive Works, and it recites that Simmons will not grant any licenses to make, use or sell his invention unless approval therefor is given by the Institute. It also recites that any royalties received for the use of such license to use, etc., shall be paid to the Institute, unless, he at his option, requests in writing a certain percentage thereof. Exhibit "B" is dated March 13, 1940, and purports to be an agreement between plaintiff and the Baldwin Company and is signed by both of them. This agreement reads, in part, as follows: "This Agreement made as of March 13, 1940, between Edward E. Simmons, Jr., of Pasadena, California, and The Baldwin Locomotive Works of Philadelphia Pennsylvania, a corporation organized and existing under the laws of the State of Pennsylvania hereinafter respectively referred to as 'Simmons' and 'Baldwin'. This agreement is subject to the approval of the California Institute of Technology, or Committees or Other Agencies or Bodies Which the California Institute of Technology May Designate, hereinafter referred to as 'Institute'." Clause (8) provides: "Any part of this agreement may be altered without effect on the remaining portions thereof by mutual agreement between Baldwin, Simmons and the Institute." Clause (11) *278 provides that: "The terms and conditions herein set forth are not subject to change without the approval of the California Institute of Technology."

This is the situation with which we are confronted: Simmons, due to the representations of agents of the Institute, agreed that the royalties were to be paid to the Institute to be used by it for Impact Research. The funds were not so used. Under the rule set forth in the majority opinion, that even an innocent principal is bound by the unauthorized misrepresentations of his agent, we have the principal-the Institute-bound by the misrepresentations of its employees. We find a promise on the part of Simmons to grant a license to Baldwin to use his invention,

and a promise on the part of Baldwin to pay the royalties to the Institute. The Institute, having given no consideration for this promised benefit is in the position of a donee beneficiary. Not only that, but it achieved this benefit through the fraud of its agents, even though that fraud may not have been authorized by it.

"There are two quite distinct types of cases which pass current under the name of promises for the benefit of a third person. To the first class belong promises where the promisee has no pecuniary interest in the performance of the contract, his object in entering into it being the benefit of a third person. To the second class belong promises where the promisee seeks indirectly to discharge an obligation of his own to a third person by securing from the promisor a promise to pay his creditor.

"The first class is properly called a contract for the benefit of a third person, and the phrase 'sole beneficiary' should be reserved for this class. As the promisee has no pecuniary interest in the performance of the promise, he can have, generally speaking, no other intention than to benefit the third person, to give him a right." (Samuel Williston, *Contracts for the Benefit of a Third Person*, 15 Harv.L.Rev. 767.)

It was proved at the trial that the words "in consideration of employment" found in Exhibit "A" were intended by both Simmons and Dr. Clark to mean Simmons' *past* employment by the Institute. In plaintiff's first amended complaint, as his first cause of action, he alleges that both Exhibit "A" and Exhibit "B" are without consideration and therefore null and void as to the Institute. In its findings of fact, the trial court found these allegations to be true. In plaintiff's second cause of action, the plaintiff alleges that he was induced to enter into the two agreements because of promises *279 made by the Institute that he would be employed on a permanent basis and that the monies received by the Institute from Baldwin would be applied to Impact Research. He also alleged that the Institute never intended to perform these promises.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

These allegations the trial court, in its findings of fact, found to be true. The trial court, in its conclusions of law, found that both instruments, as to the Institute, were null and void, and that the Institute had no right, title or interest in or to the royalties accrued or to accrue from Baldwin.

If it is true that plaintiff entered into the contract upon the understanding *that he was to be given permanent employment* and that the royalties to be paid by Baldwin were to be used by the Institute for Impact Research, then at the time the contract was made, there was consideration. The Restatement of Contracts, section 274, provides: "In promises for an agreed exchange, any material failure of performance by one party not justified by the conduct of the other discharges the latter's duty to give the agreed exchange even though his promise is not in terms conditional. An immaterial failure does not operate as such a discharge." Comment b: "Consideration, as used in the phrase, failure of consideration, means merely an exchange in fact agreed upon. Failure of consideration, therefore, is failure to receive such an exchange. In the formation of contracts, consideration is the exchange for a promise. In the present connection the consideration in question is the promised performance of one party agreed to be exchanged for that of the other." If the allegations in plaintiff's first cause of action are true, this is the situation: Plaintiff promises to grant a license to Baldwin. In consideration of this promise Baldwin promises to pay royalties to the Institute and in exchange for these promises, the Institute promises to employ Simmons on a permanent basis, and to use the money received from Baldwin for Impact Research. Thus, if this situation is the true one, there was consideration present at the time the contract was entered into. Section 473 of the Restatement of Contracts provides: "A *contractual promise* made with the undisclosed intention of not performing it is fraud." [Emphasis added.]

However, the trial court, in its conclusions of law, adjudged that both exhibits were, as to the Institute, null and void, presumably because of lack of consideration. It would seem to me that the findings of fact with respect to the fact that neither Exhibit "A" nor Exhibit "B" were supported by *280 consideration so far as the Institute was concerned are consistent with the conclusion of law that the exhibits were null and void. However, if the findings of fact as to the fraud of the Institute mean that plaintiff was induced to enter into the agreement because of promises made without intention of performance, then the conclusions of law are inconsistent, *because there was, at the time of the formation of the contract, consideration.* And, due to the fraud of the Institute, there has been a *failure* of consideration in that plaintiff did not receive what he bargained for, and thus he may rescind as to the Institute as to future monies to be paid by Baldwin, and be placed *in statu quo* as to monies paid to the Institute prior to the commencement of this action.

If, however, the findings of fact as to *lack* of consideration and the conclusion of law to the same effect are taken into consideration, then there is consistency. Since it was proved at the trial that plaintiff and the Institute were both referring to the *past* employment of plaintiff by the Institute, we have a finding of fact by the trial court which is not supported by the evidence. Disregarding that finding of fact, because it is inconsistent with the conclusion of law, we have this situation: Plaintiff intended the money paid by Baldwin to the Institute to be used by the Institute for Impact Research. That was his reason for entering into the agreement. The Institute did not so use the money. Plaintiff was under no obligation other than to grant the license to Baldwin. The general rule is that findings are to be harmonized and reconciled if it is possible and can be done reasonably. (*Stohr v. Stohr,* 148 Cal. 180 [82 P. 777]; *Davis v. Martin,* 157 Cal. 657 [108 P. 866]; *Lasher v. Faw,* 209 Cal. 726 [289 P. 821]; *Culjac v. Better Built Homes, Inc.,* 58 Cal.App.2d 720 [137 P.2d 492]; *Menghetti v. Dillon,* 10 Cal.2d 470 [75 P.2d 596]; *Pacific Coast etc. Land Bank v. Jones,* 14 Cal.2d 8 [92 P.2d 390, 123 A.L.R. 695]. Also, inferences which necessarily follow from findings may be resorted to.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

Page 11

*People v. Ocean Shore R., Inc.,* 22 Cal.App.2d 657 [72 P.2d 167].) Where the facts found support the conclusions necessary to the judgment, inconsistent conclusions stated in the findings will be disregarded. (*Danziger v. Benson,* 175 Cal. 565 [166 P. 313].) "In many cases the purpose of the promisee in securing a promise for the benefit of a third party is to confer a gratuitous benefit upon that third party. In such cases this third party will usually be the only person who will be benefited by the promised performance; he will be the sole beneficiary. *Performance will *281 not benefit the promisee; he is not to receive it,* and such performance will not discharge any duty of the promisee, for he owes none to the beneficiary. (Arthur L. Corbin, Contracts for the Benefit of Third Persons, Selected Readings on the Law of Contracts, Association of American Law Schools (1931 ed.), pp. 648, 663-665.

The authorities are strangely silent on this state of affairs-where the fraud is that of a donee. The usual situation is where fraud on the part of either the promisor or the promisee has brought about the contract for the benefit of a third person. The problem is analogous to that of the fraud of a third person. The Restatement of the Law of Contracts, section 477, states the rule thus: "Fraud or material misrepresentation by a third person renders a transaction voidable by a party induced thereby to enter into it if the other party thereto (a) has reason to know of the fraud or misrepresentation before he has given or promised in good faith something of value in the transaction or changed his position materially by reason of the transaction, or (b) is affected by the fraud or misrepresentation under the law of Agency or Trusts. " This is commented on as follows: "As between the original parties to a transaction induced by the fraud or material misrepresentations of a third person, the injured party has power of avoidance, unless the other party is not only ignorant of the fraud or misrepresentation when he enters into the transaction, but has either parted with value or has changed his position materially in reliance on the transaction. A donee cannot conscientiously retain an advantage obtained from another because of a third person's misconduct, even if the donee neither knew nor had reason to know of it."

It would seem that under this rule the plaintiff could not rescind the contract as to Baldwin. Baldwin did not know of the fraud and was in no way concerned with it. The only fraud is that of the Institute who is the recipient of the royalties paid by Baldwin. If the case is viewed as one where a gift was made because of fraudulent representations, we find that such a gift may be avoided by the donor. "A gift obtained from the donor by fraud or by the pressure of undue influence upon his mind and will may be set aside in equity and the property recovered. ...

"But it is to be remembered that an executed gift, even though procured through fraud, mistake, or undue influence, or made by one lacking in mental capacity, is voidable only.*282 ... It passes title to the property to the donee, where it remains until a disaffirmance by the donor, or perhaps by his executor after his death;. ..." (Black, on Rescission and Cancellation (2d ed.), pp. 1257-1258.)

Or the situation may be considered as analogous to that of a contract of insurance. Let us assume that A induces B through fraudulent representations to make him the beneficiary of a contract of insurance between B and the X Company. B reserves no power to change the beneficiary. The contract between B and the X Company is perfectly valid, and yet had it not been for A's fraud, B would not have named him as beneficiary, but would have named his own estate.

The Restatement of the Law of Restitution, section 26, provides (1) a person is entitled to restitution from another to whom gratuitously and induced thereto by a mistake of fact he has given money or the mistake (a) was caused by fraud or material misrepresentation,. ... The comment is as follows: "Fraud and misrepresentation: If the donor has been induced to make the gift because of the fraud or in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

nocent misrepresentation of the donee although it would not have affected the conduct of a reasonable man, the transaction can be rescinded."

Although the general rule undoubtedly is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions, there are certain exceptions where the circumstances justify a rescission only as to particular matters or particular parties involved in an entire transaction. (*Hoffman v. Kirby,* 136 Cal. 26 [68 P. 321]; 12 C.J.S. § 78b, p. 1080; Civ. Code, § 3414.) In the present case, if the donee Institute were allowed to retain the fruits of its own fraud, it would be unjustly enriched at the expense of the plaintiff.

Plaintiff should, therefore, be entitled to restitution of the benefits previously received by defendant Institute as well as receive any which may accrue in the future.

SCHAUER, J.
I dissent.

This case has been a peculiarly difficult one for the court to resolve with any satisfaction either to itself or the parties. The condition of the record is lamentable in several respects. I dislike to add a dissent to the discussion in the majority opinion but because I think that opinion reaches certain erroneous conclusions of law and of fact and because such errors, *283 with the implications of the opinion, may have a grave import to the Institute and to Dr. Clark, I deem it proper to show why I think a different result should be reached.

After extended study of the entire record I am of the view that the evidence does not support the finding that there was a total lack of consideration from the Institute for its benefits under the contract. On any tenable view of the evidence, in my opinion, the contract between Simmons and the Institute necessarily represents a settlement of their conflicting claims in the Impact Research project; the settlement of mutually conflicting claims constitutes

legal consideration for the benefits thereby reciprocally given and received. Furthermore, it is my view that defendants are correct in their contention that Dr. Clark's asserted fraudulent promises cannot be shown to invalidate the agreement because "where the promise relied upon to establish the fraud is at variance with the contractual features of the writing, the same may not be proven either as an element of inducement or otherwise."

Impact Research at the Institute encompassed something more than Mr. Simmons, his inventions and his employment. The research in this field was well under way before Mr. Simmons was called into it. It was not a part of the Institute's regular educational curriculum; it was a commercially sponsored venture which "was to be divided into two phases, one the development of equipment [including the impact dynamometer], the method of procedure by which we could determine force time relations. The second phase was to be by applying that procedure, equipment and so forth, in the actual testing of a large number of metals and alloys to determine their response to rapid loading."

The development of Impact Research is described in the undisputed testimony of Dr. Clark. "That project had a gradual evolution, which started back, I presume, about in ... 1934, when I became interested in the general subject. A little later on ... Doctor Datwyler ... became interested in this project of the dynamics of materials, and we set about to make some experiments at quite high velocities by using explosives and so on. Such work was principally paid for out of my own pocket, and a small amount out of the institute funds. We obtained some preliminary data for which also we acknowledge with gratitude the efforts of Mr. Simmons in the participation with us in our personal activities in that regard. ... None of us were compensated. His assistance was *284 primarily in giving us some suggestions for this, that and the other thing [including the development of an explosive bomb device in the summer of 1935], and procuring from electrical engineering certain equipment that we

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

wanted. That more or less congealed our ideas in respect to impact, and led us to the belief that we could get most from our experiment if we could determine the force acting during the impact over very short periods of time. We [Clark and Datwyler] proposed the details of our ideas to the Chairman of the Executive Council, who thought well of our fundamental plan for really going into the matter of Impact testing, whereupon a meeting was held with industrial firms to determine whether or not they would be willing to give support for such a project, and shortly thereafter-that was the fall of 1936, I believe,-some industrial firms saw fit to sponsor this project." In about October, 1936, Impact Research was organized under commercial sponsorship. Dr. Clark was its director. "Doctor Datwyler was the first paid research assistant on the project, and he proceeded to investigate the possibilities of various methods of determining force time relations ... Doctor Datwyler examined into many different possible methods ... Those tests in general were quite rank failures ... and during that time Mr. Simmons was in consultation with us purely as a matter of discussion on those things."

The device which Dr. Datwyler was attempting to develop was an impact dynamometer; i. e., an instrument to translate "instantaneous forces into instantaneous electric impulses so that they will be recorded by means of an oscillograph." He was engaged in this particular phase of the work even before the completion in approximately October, 1936, of the more or less formal organization of Impact Research as a commercially sponsored project. The dynamometer itself was not a new device, but he was unsuccessful in finding a strain sensitive element which would make it workable in measuring impacts. After various experiments (frankly described in Dr. Clark's above quoted testimony as "rank failures") Clark and Datwyler, in the latter part of August, 1936, requested plaintiff's aid on this problem. Early in September, 1936, plaintiff conceived and communicated to Datwyler a proposed solution, the use of a thin wire bonded to the dynamometer bar with a material called glyptal.

Pursuant to plaintiff's suggestions, and with plaintiff participating in the work of construction, Datwyler constructed a dynamometer. This instrument was improved in various respects pursuant *285 to Datwyler's and plaintiff's further ideas as to how to overcome various defects, and within a month after plaintiff's original suggestion a successful instrument had been constructed. Plaintiff during this time was not employed by the Institute and he received no pay for his work in inventing the wire strain gauge and assisting in its application to the dynamometer, other than the consideration provided for in the contract evidenced by Exhibits A and B, hereinafter set forth in footnote 1.

On December 11, 1936, two months after the dynamometer had been completed, plaintiff for the first time was employed for pay in Impact Research. Nearly three years later, in the fall of 1939, a representative of Baldwin visited plaintiff and Clark at the Impact Research laboratory and informed them that Baldwin was interested in obtaining patent protection for, and exploiting, the wire strain gauge. Prior to this time, so far as the evidence shows, neither party had expressly stated any opinion as to, or claim of, ownership of the dynamometer using the wire strain gauge. The Institute, having successfully developed the dynamometer employing the gauge, which may be said to have constituted the first phase of the Impact Research project, had simply been carrying on the second phase of that project, which, as previously indicated, involved the use of the dynamometer. The gauge, according to Simmons' own language, "was voluntarily given to Impact." But after Baldwin suggested its interest in patenting and exploiting the impact- measuring device, there followed the discussions between plaintiff and Dr. Clark, and the negotiations with representatives of Baldwin, which culminated in the execution of Exhibits A FN1 and B FN2. *286

FN2 Exhibit B is dated March 13, 1940, and reads in material part as follows: "Agreement ... between ... 'Simmons' and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

'Baldwin.' This agreement is subject to the approval of the ... 'Institute.'

"Whereas, Simmons has made certain inventions ... Baldwin is desirous of obtaining an exclusive license to make or have made for use and/or sale apparatus embodying said inventions.

"Now, Therefore, in consideration of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, it is agreed as follows:

"1. Simmons hereby grants to Baldwin an exclusive license ... subject, however, to the following reservations: ... [The Institute, Simmons, and Dr. Clark are each] licensed to make and use for his own use apparatus embodying said inventions ... The sponsors of Impact Research [commercial firms which paid for the research project wherein the inventions were made] ... are licensed to make and use for their own research and testing only, apparatus embodying said inventions ... Gottfried Datwyler [who worked with Dr. Clark and plaintiff in Impact Research] may be granted a non-exclusive license for the country of Switzerland ...

"2. Baldwin agrees at its own expense and without recourse whatsoever to Simmons or to the Institute to ... prosecute an application ... for United States Letters Patent on said inventions and to pay all fees in connection therewith. Baldwin shall have full control of the prosecution of such applications. Baldwin agrees not to permit any patentable item contained in the said application ... to be lost by abandonment ...

"3. Baldwin agrees to prosecute or settle any interference or infringement matter ... without recourse to Simmons or the Institute ...

"4. Baldwin agrees to pay a royalty of five per cent ... to the Institute, unless Simmons at his option shall request ... that any portion up to and including forty per cent

(40%) of said royalty shall be paid to him by Baldwin ...

"Edward E. Simmons, Jr.

FN1 Exhibit A was executed by plaintiff and signed by Dr. Clark as " Witness" on February 21, 1940. It reads in material part as follows: "In consideration of my employment by the California Institute of Technology I agree that as to my inventions ... I will not grant any licenses to make, use or sell apparatus or methods embodying any of said inventions unless such licenses are approved by the ... Institute ... The royalty on said inventions shall be paid to the ... Institute ..., unless at my option I shall request ... that up to and including forty per cent (40%) of the total royalty paid by any licensee shall be paid to me ... I agree not to grant any license or make any assignment of said inventions or patent rights thereto without the express consent of the ... Institute."

"The Baldwin Locomotive Works

"By

——————————————————

——

Vice-President

"The granting of the foregoing license is approved by the California Institute of Technology in accordance with an agreement between Edward E. Simmons, Jr., and the California Institute of Technology dated February 21, 1940.

"California Institute of Technology

"By: A. C. Balch

Pres.

[There seems to be no evidence that Bald-

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

Page 15

win, through its officers, signed Exhibit B; this has not been mentioned by the parties to this action.]"

The discussions between plaintiff and Clark chiefly concerned three matters: Plaintiff's future employment at the Institute, the use of the Baldwin royalties in Impact Research, and the respective interests of plaintiff and the Institute in the invention. The evidence as to what was said and done by plaintiff and Clark as to these three matters shows, I think beyond question, that there was, as a matter of law, consideration bargained for and exchanged between plaintiff and the Institute by the mutual settlement of their disputed claims of interest in the invention. I have noted that plaintiff urges that "All that the evidence established was that Clark, himself, had the *belief* that the Institute had an equity or interest in the invention *287 ... Now, we submit, Clark's own belief, and the opinions of others on the Institute campus, certainly were not tantamount to the assertion of any claim by the Institute, through its properly authorized officials, that it had any interest in or to ownership of the invention or patent." But I think that the record, on any reasonable view, does not sustain plaintiff's position on this point.

The writings define the rights of the three parties in "inventions involving an electrical strain gauge wire" and "inventions relating to the measurements and indications of various conditions including impact testing"; they refer to these inventions as having been made by Simmons. There is no doubt that the wire strain gauge element of the dynamometer was conceived by Simmons alone, at a time when he was not employed by or a student at the Institute, although he was then on campus and had been and expected again to be (and was again) both an employe and a graduate student. It is apparent from the writings' description of the "inventions" which are the subject of agreement that the devices which Baldwin agreed to patent, to exploit, etc., include not only the wire strain gauge but also that gauge set up in useful fashion with the dynamometer, oscillograph, etc. Of course, neither Simmons nor the

Institute makes any claim to having "invented" such devices as the oscillograph and the dynamometer. But both Simmons and the Institute claimed rights in the applications of those devices, with the wire strain gauge, which were developed by Simmons and Datwyler. The following testimony shows that there was a bona fide dispute between Simmons and Clark as to the respective interests of Simmons and the Institute (such words as "equity," "owned," etc., are not, it is clear from the whole of the testimony, used therein in any technical sense):

Plaintiff testified that during the discussions which led up to the execution of the writings "Doctor Clark took the position that due to moral considerations, the Institute had a claim on ... this patent .... Doctor Clark made claims that the Institute had some sort of moral claim, and at no time did he make any claim that the Institute had a legal right to the inventions ... [I]n substance [Doctor Clark] said that inasmuch as my work at the Institute and the fact I had been paid by the Institute for working, I had a moral obligation to assign the patent to the Institute, on which occasion I objected to that point of view, and I said that inasmuch as the *288 actual invention of the gauge was made on my own time and *was voluntarily given to Impact* [italics added], that I felt that the patent was entirely mine, and also, as I had always understood it, the Institute was not engaged in the commercial or patent activity, and that they had never held any claims against anybody's inventions, that is, made by people at the Institute." It is thus apparent from plaintiff's own testimony that he had "voluntarily given to Impact" the invention in question and that, after becoming more aware of its possible value, he was seeking to get it back. He was asserting a claim to that which he had previously freely donated. Simmons was also asked the following question: "[Clark] claimed that the Institute was entitled to some equity in your invention, and you disputed that. That is the size of it at the present time?" He answered, "That is right," but further explained that the word "equity" was not used in his discussions with Clark. Simmons testified, further, that "Doctor Clark had the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

belief that the Institute owned everything that was developed there, and that opinion was held by other people on the campus ... I don't think that Doctor Clark actually made the statement that the Institute owned everything; "owned,"-there is a matter of words which I had no intent of them being strictly applied legally. Doctor Clark expressed at all times that the Institute had some sort of moral claim or right arising from patents developed at the Institute, in which case he stated that if he had a patent, why, he would give it to the Institute on moral grounds. He never at any time said that the Institute had a legal ground, nor did he ever discuss legal grounds; in fact, Doctor Clark told me on one occasion that he had no knowledge of legal matters and he wasn't bringing this matter of a legal matter of the Institute having an ownership, but purely as a matter of moral consideration ... Prior to this interest by Baldwin ... there had never been any discussions [between plaintiff and Clark] on patent matters or Institute rights or anything else ... There was never any discussions about assigning the entire interest [in the inventions] to the Institute, or assigning any interest to the Institute ... the discussions were that Doctor Clark told me that the Institute had a moral interest in the inventions ... In one of the discussions along this line he stated that it would be nice to have these royalties paid to the Institute funds so that they could be used for Impact, and I agreed with that point ... but inasmuch as it looked at that time ... like it would be a fairly *289 good commercial product, and I could see the proposition arising whereby there might actually be more funds than Impact could use at a given period, and I wanted to reserve the right to draw part of those funds ... I suggested 40 per cent, and Doctor Clark agreed ... There was no other discussion of 60 or 30 or 20 [per cent] or whatever it might be ... I never had any discussions about assigning everything to Cal. Tech. Q. Have you ever had any discussion of assigning any particular amount other than 40 per cent? ... A. No. In other words, when it came to a discussion, this percentage, it was set and fixed ... Never had any discussion nor saw any writings ... regarding an entire assignment or a partial assign-

ment of the patent to California Institute of Technology. It was never discussed. ... Nothing was said about the Institute's claim *or* 100 per cent [as opposed to 10 per cent or 60 per cent]; in other words, we had already months before agreed among ourselves that all the money would go to Impact." In his deposition plaintiff was asked, "[Doctor Clark] took the position ... that the Institute was entitled to the sole patent right, is that it, did he go that far? A. Yes, that was his position ... he, among all out there, was the strongest of that opinion, I believe, and these conversations from time to time over a period involved arguments why I should assign this, and what benefits I would derive from being at the Institute."

Counsel for the Institute stated, "We admit that Mr. Simmons was the owner of the patents or patent on the device *subject to our rights under these two agreements.*"(Italics added.)

Dr. Clark testified that after Baldwin expressed its desire to exploit the inventions "the matter of the Institute's interest in this whole matter was set forth by myself, and was discussed from that time on between Simmons and me ... I pointed out what, in my belief, was the Institute's interest, not necessarily the Institute's position ... The substance of what I said, insofar as I can recollect, is that this device had been devised as a result of our requirements, devised at the Institute in conjunction with the activities of Doctor Datwyler, and that it was my firm belief that the Institute had definite interests in such development, and that it was recognized that Simmons had conceived the idea. Simmons took issue with me on the point that the Institute had any *290 interest or right in the matter, and that led to continual discussions ... until the culmination of the final draft, or agreement, which was signed ... [Simmons stated that] it was his invention, that the Institute had no right or interest, therefore, in the invention ... Q. ... you did tell Mr. Simmons ... during the course of those conversations which led up to ... Exhibit A ... that the school had an interest in this invention because he had been paid for the time

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
(Cite as: 34 Cal.2d 264)

during which he had made the invention? A. Partially so; in addition, for doing it at the Institute with the Institute's facilities. Q. And you sincerely believe that the Institute did have an interest or equity of some kind by reason of those facts? A. Yes, I do ... [M]y recollection is that the point being that this matter of paying all of the royalties to the Institute and my inability to agree that they would be devoted to Impact Research gave rise to Mr. Simmons' desire to withdraw forty per cent of those royalties for his own use."

The trial court, its findings indicate, disbelieved Dr. Clark's statement as to his "inability to agree that they [royalties] would be devoted to Impact Research" and believed plaintiff's statement that "we ... agreed among ourselves that all the money would go to Impact." Whether Clark or plaintiff is believed as to this aspect of the controversy, the above quoted evidence, upon any reasonable view, shows indisputably that plaintiff and Dr. Clark were in disagreement as to the respective interests of plaintiff and the Institute in the inventions; that plaintiff had originally "voluntarily given to Impact" the invention in question but that he wished to reclaim it, or some interest in it, for his private account; that both plaintiff and Dr. Clark were sincere in their claims; that each had grounds for his position; that discussions as to the claims began contemporaneously with and continued during the negotiations with Baldwin which resulted in the execution of Exhibits A and B. It is beyond reason to say that, although Exhibits A and B dispose in detail of the respective interests of plaintiff and the Institute, those instruments were executed without plaintiff's and Clark's having considered, bargained as to, and mutually settled those very conflicting claims of which the agreement disposes.

I am of the opinion, also, that the evidence indisputably shows that the parties intended Exhibits A and B, executed only after much discussion and negotiation, to be the final written memorials of their understandings. Section 1625 of the Civil Code provides, "The execution of a contract in writing

*291 ... supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." The asserted fraudulent promises of Clark, although they did not become part of the contract, directly concerned "its matter"; they did not concern independent or collateral subjects. The asserted promise of permanent employment concerned a subject-employment of Simmons-which was expressly referred to in Exhibit A. The asserted promise that the royalties would be devoted solely to Impact Research conflicts with the provision, found in both Exhibit A and Exhibit B, that royalties shall be paid to the Institute "or committees or other agencies or bodies which the California Institute of Technology may designate." I cannot agree with the strained point of view of the majority that, although the writings permit *payment* to anyone whom the Institute may designate, they are not inconsistent with Dr. Clark's asserted promise because the writings contain no reference to *use* of the funds.

The following discussion in *Lindeman v. Corvell* (1922), 59 Cal.App. 788, 791 [212 P. 47], is pertinent: "While generally there are exceptions to all rules, the nonobservance of this particular one [the aspect of the parol evidence rule which forbids a showing by extrinsic evidence that a written memorial does not correctly represent the understanding of the parties] in certain cases has caused legal chaos, for the different construction given to it at times has resulted in great confusion and conflict in the authorities, and it would be an idle task to review in detail the various departures. There is no question that particular evidence is admissible to vary a writing when fraud is alleged. In discussing this subject, however, Wigmore, in his work on Evidence, states that the term 'fraud' must be understood in its legitimate narrow sense, and that failure knowingly to perform an extrinsic agreement not embodied in the writing cannot in strictness be legally included in the term 'fraud.' (4 Wigmore on Evidence, sec. 2439.) The rule that parol evidence is admissible where there is fraud on the part of the payee at the inception of the instrument is recog-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

209 P.2d 581
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81
**(Cite as: 34 Cal.2d 264)**

Page 18

nized, and the doctrine of estoppel has been applied
with respect to representations of a party to prevent
their operating as a fraud upon one who has been
led to rely upon them. This doctrine, however, has
been held to have no place for application when the
statements relate to rights depending upon contracts
yet to **292** be made, to which the person complain-
ing is a party, as under such circumstances he has it
in his power to guard in advance against any and all
consequences of a subsequent change of conduct by
the person with whom he is dealing, and to admit
evidence of extrinsic agreements would be to open
the door to all evils that the parol evidence rule was
designed to prevent."

Since the evidence shows, as a matter of law, that
there was consideration for the benefits received by
the Institute, and since plaintiff should not have
been allowed to vary the terms of the writing by
showing assertedly fraudulent promises inconsist-
ent therewith, the judgment is without support and
should be reversed and the cause remanded for a
new trial.

Spence, J., concurred.
Appellants' petition for a rehearing was denied Oc-
tober 13, 1949. Schauer, J., and Spence, J., voted
for a rehearing. Peters, J. pro tem., acting in place
of Shenk, J.

Cal.
Simmons v. California Institute of Technology
34 Cal.2d 264, 209 P.2d 581, 83 U.S.P.Q. 81

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.