**24**

C
Stafford v. California Canning Peach Growers
Cal.

R. M. STAFFORD et al., Respondents,
v.
CALIFORNIA CANNING PEACH GROWERS (a Nonprofit Cooperative Association), Appellant.
**S. F. No. 15839.**

Supreme Court of California
April 22, 1938.

HEADNOTES

**(1)** Co-operative Marketing Associations--Contracts--Reformation.
Where peach growers entered into a contract with a nonprofit co-operative association for the sale of their peaches, upon the representation of the executive officers of the association that the execution of the latter's regular member form of agreement plus an oral understanding, entry on the books of their names as renter members, plus a previous resolution of the association fixing the rights of such renter members, would have the legal effect of making them renter members within the meaning of that resolution and entitle them to payments for their peaches as therein provided, the contract was properly a subject for reformation, where the association insisted that the parties should be held to the terms of the regular membership contract.

**(2)** Co-operative Marketing Associations--Sections 3399, 3401, Civil Code-- Mistake--Reformation.
Under section 3399 of the Civil Code, when through fraud or mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised, on the application of the party aggrieved, so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value; and under section 3401 of the Civil Code, in revising a written instrument the court may inquire as to what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be.

**(3)** Co-operative Marketing Associations--Execution of Contract--Mistake of Law.
Where both parties in the present case knew that they were signing a contract calling for a pooled price for peaches sold by the grower to the association less 5 per cent and expenses, but both honestly believed and intended that the legal effect of that instrument, when considered in view of the agreement to list the growers on the books as renter members, and in view of the previous resolution was to provide for market price less twenty-five cents per ton, and both parties knew that many such contracts had been entered into by the association, and that the latter always had considered the provisions of the resolution were part of the contract and controlled the subject of payment, this clearly constituted a mistake of law within the meaning of section 3399 of the Civil Code, as such mistake is defined in section 1578 (1) of that code.
See 22 **Cal. Jur.** 721; 23 **R. C. L.** 322 (7 **Perm. Supp.,** p. 5331).
**(4)** Co-operative Marketing Associations--Denial of Reformation--Fraud.
Even if such case did not involve a mistake of law, it presented a situation where to deny reformation would be to sanction a fraud; and although the trial court made no express finding of fraud, where it found that the association took upon itself to represent to the growers the legal effect and consequence of their acts, and purported to interpret their contract, this information, although given in good faith, being false, the facts found were sufficient from which fraud may be inferred, and to condone the use of the contract for purposes other than those represented would be to sanction a constructive fraud and the trial court properly reformed the con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78 P.2d 1150
11 Cal.2d 212, 78 P.2d 1150
(Cite as: 11 Cal.2d 212)

tract.

**(5)** Co-operative Marketing Associations--Ultra Vires--Violation of By-laws--Estoppel.
Even if the resolution, in such case, authorizing the transaction with "renter members" was *ultra vires* the by-laws, but did not violate the articles of incorporation or any principle of public policy, but was in exact accord with the legislative policy of the state, the association, under the facts, was estopped from denying the validity of the contract.

## SUMMARY

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Maurice T. Dooling, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

## COUNSEL
Agnew & Boekel, Carroll Single and Stanley J. Cook for Appellant.
Richard W. Young, Floyd B. Cerini and F. X. Kerner, as *Amici Curiae,* on Behalf of Appellant.
Seth Millington and Jerome D. Peters for Respondents.

## THE COURT.
The two respondents R. M. and H. L. Stafford are sons of T. H. Stafford. During the times here involved the father owned a ranch in Sutter County, about 100 acres of which were devoted to the growing of canning peaches. In 1932 and prior thereto, this ranch was operated by the father and these two sons under an oral agreement to split the profits and losses. Under this agreement the ultimate control of all questions of policy involving the ranch, rested in the father, who was approaching 80 years of age.\*214 In 1932 the father became a regular member of appellant association and entered into the usual member's marketing agreement. During the seasons 1932, 1933 and 1934 the peaches grown on the 100 acres were delivered to the association and paid for by it on the basis provided in this agreement, that is, the pooled price less 5 per cent and expenses. In 1933 one of the sons-R. M. Stafford-

was elected a director of the appellant, although he was not a member of the association. The question of his qualifications as a director was discussed at various meetings of the board, but no formal action was taken in reference thereto. He participated in the deliberations of the board from December of 1933 to June of 1935.

The Staffords did not have sufficient capital to finance the ranch operations from year to year. Until the close of the peach season of 1934, and for many years prior thereto, the father had been financing operations by means of year to year loans advanced by a credit association in Marysville. There was also a deed of trust on the property. Late in the year 1934 the manager of the credit association informed the father that his association would not finance the 1935 operations as it had in the past; that because of the father's advanced age, the possibility of his death, and the difficulty of dealing with estates, the existing method of financing was not satisfactory to the credit association; that some other and different arrangement must be made in 1935.

R. M. and H. L. Stafford, and three other children of T. H. Stafford, consulted together and with their father, and with the then attorney for appellant association, as to the proper solution of their problem. It was finally agreed between the children and their father that a family corporation should be organized, and that this corporation should buy the orchard from the father. As part of this agreement it was decided that after such sale to the corporation it would be in the best interests of the corporation to withdraw from appellant association. The marketing agreement then in effect between the father and appellant expressly provided that upon a *bona fide* sale of the grower's orchard the agreement could be cancelled. The trial court found, and the finding is not challenged, that this proposed sale to the proposed corporation was *bona fide.*\*215

Thereafter, but before the new corporation was organized, R. M. Stafford informed the general manager of appellant-A. D. Poggetto-of the proposed new arrangement, and of the fact that the corpora-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78 P.2d 1150
11 Cal.2d 212, 78 P.2d 1150
**(Cite as: 11 Cal.2d 212)**

tion, when it became the owner of the ranch, intended to exercise its privilege of cancelling the marketing agreement, and that for the season of 1935 and thereafter the corporation would not sell its fruit to appellant. The appellant association desired, if possible, to retain the large tonnage produced on the Stafford ranch. After some discussion Poggetto, in an effort to retain this fruit for the association, suggested that, instead of forming a new corporation, the two sons, R. M. and H. L. Stafford, should lease the orchard from their father; that if they did so they would then be "renters", and as such eligible for admission to the association as "renter members" as defined in the 1924 resolution; that under this arrangement the association would buy the fruit for market price less 25c per ton; that if this were done the existing contract with the father would be cancelled. This plan appealed to the Staffords. The two sons thereafter secured from their father a *bona fide* written lease for the years 1935 and 1936, and the association thereupon cancelled the existing marketing agreement with the father. Before entering into a new marketing agreement the Staffords inquired as to the procedure necessary to be followed to become renter members. They were informed by Poggetto and the assistant secretary Schmitt that the practice followed by the association was to have the renter member sign a regular members contract (which was the only form available); that the association would then enter the member on its books as a renter member; that this would bring the member under the terms of the resolution of January 15, 1924, and make him a renter member. On these representations the Staffords and the association executed the new marketing agreement in February, 1935. The trial court found, and the finding is unchallenged, that these "statements made to plaintiffs by said officers were believed by said officers to be true and were made for the purpose of having plaintiffs believe same, and to induce plaintiffs to execute said agreement, and the same and each of the same were believed by plaintiffs, and if it were not for such statements and representations, plaintiffs and each of them would not have executed said marketing agreement"; that

both of the parties *216 intended that by the signing of the marketing agreement the plaintiffs should become renter members and be paid for their fruit in accordance with the 1924 resolution; that when the agreement was executed the plaintiffs knew that in the past the association had entered into similar contracts with other renters and that the procedure followed in executing the contracts in the other cases was the same procedure followed by them; and that in the past the association had paid these other renter members in accordance with the intent and understanding of the parties.

In June of 1935, as already set forth in the Harkey case, (*California C. P. Growers v. Harkey, ante,* p. 188 [78 Pac. (2d) 1137]), decided this day, the association elected a new board of directors. In August of 1935 the Staffords, in company with their attorney visited the new management to ascertain their rights under their contract. The association, while not denying that a renter member contract had in fact been entered into with the Staffords, stated that it would not recognize any such renter member contracts entered into by it through its old management unless ordered to do so by a court; that the Staffords could either deliver their fruit and be paid on an owner member basis and sue the association for the difference, or refuse to deliver at all; but, if they failed to deliver, the association would sue for breach of contract and ask for 50 per cent of the market value of the crop as liquidated damages as provided in the marketing agreement.

The plaintiffs elected to and did deliver their 1935 crop to the association. They were paid only the amount per ton paid to owner members. They thereupon brought this action to reform the contract so as to have it declare the true intent of the parties, and to recover the balance due them under the contract as so reformed. The association by answer challenged plaintiffs' right to reformation, and likewise pleaded that if the contract were not reformed, the written contract between the parties was a regular members contract, and under the parol evidence rule, proof of any oral modifications should not be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78 P.2d 1150
11 Cal.2d 212, 78 P.2d 1150
(Cite as: 11 Cal.2d 212)

permitted. The association likewise pleaded that renter member contracts are *ultra vires* and not binding on the association. The association also sought declaratory relief as to the 1936 season. This last issue was removed from consideration by a stipulation of the *217 parties that the Staffords would deliver their 1936 fruit to the association, and would be paid as owner or renter members depending upon the final outcome of this case.

The trial court found in favor of plaintiffs on all material issues. It ordered that the contract of February 20, 1935, should be reformed so as to call for payments as provided in the 1924 resolution, and entered its judgment accordingly. It is conceded by appellant that if the Staffords are legally entitled to be paid on a renter member basis for 1935 the amount of the judgment as fixed by the trial court is correct.

(1) The first and main point urged by appellant is that no proper case for reformation has been presented by respondents, and that they should have been held to the terms of their written contract. It is appellant's contention that there was neither fraud, nor a mistake of law or of fact sufficient to warrant reformation. In this connection appellant seeks to bring this case within the well-settled rule that where parties reduce their agreement to writing, understand all of its terms, and are fully cognizant of its legal effect, reformation will not be granted to accord with a contemporaneous oral agreement not intended to be embodied in the written agreement and contrary thereto. (*Coneland Water Co. v. Nickalls,* 75 Cal. App. 212 [242 Pac. 518]; *National Bank v. Exchange Nat. Bank,* 186 Cal. 172 [199 Pac. 1]; *Horton v. Winbigler,* 175 Cal. 149 [165 Pac. 423].) That rule is not properly applicable to the facts here presented. The respondents executed the standard marketing agreement upon the representation of the executive officers of appellant that the execution of that agreement, plus the oral understanding of the parties, plus the entry on the books of respondents' names as renter members, plus the resolution of 1924, would have the legal

effect of making respondents renter members within the meaning of that resolution, and entitled to payment as therein provided. The parties at the time they executed the contract may have made a mistake of law as to the legal effect of the transaction, but there is no dispute but that at that time both intended and honestly believed that the legal effect of the transaction was to entitle respondents to market price less 25c per ton for their peaches as provided in the 1924 resolution. At the moment of execution and for some time thereafter, if either of the contracting parties had been asked as to their intention and *218 legal relationship they would have agreed that this was their intention. The contracting parties intended that the resolution of 1924 should be and believed it was a part of their contract, and intended and believed that it should control the provisions as to amount and method of payment contained in the standard marketing agreement. There is no doubt that the mistake was a mutual one. The factual situation thus presented falls directly within the language and intent of the statutes providing for reformation, and within the cases interpreting those sections.

(2) Section 3399 of the Civil Code provides that "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised, on the application of the party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." Section 3401 of the Civil Code provides that: "In revising a written instrument, the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be." The principles announced in these statutes have long been the law of California without special reference to the code sections. In *Murray v. Dake,* 46 Cal. 644, a landlord signed a lease with his tenants which he knew expressly referred to the leased premises as "all" of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78 P.2d 1150
11 Cal.2d 212, 78 P.2d 1150
(Cite as: 11 Cal.2d 212)

designated building. At the time the lease was executed the landlord refused to sign without a reservation to himself of a second floor which he contemplated adding to the building during the period of the lease. The tenants orally stated that that was their understanding of the lease, and that they agreed the lease should not cover the second story when it was built. The landlord added the additional floor and moved in, whereupon the tenants brought this action for ejectment. The landlord asked that the lease be reformed so as to express the true intent of the parties. In holding that these facts presented a proper case for reformation the court first pointed out that the evidence showed (as it does in the instant case, the trial court so finding) that had it not been for the assurances of the tenants as to their intent, the landlord would not have signed the lease, and then stated: *219 "It was not, however, a case of mistake as to the contents of the lease, for the defendant knew at the time what he was signing, though he may not have known the legal effect of the words used. Nor does it appear that either of the lessees had at that time any fraudulent intention to use the lease for any purpose other than what was named and agreed to"-that intent, the court pointed out, was formed later. The court continued as follows: "This presents the question whether a court of equity will interfere to prevent the fraudulent use of a paper for a purpose not contemplated at the time it was made, but where there was no mistake or fraud in its execution. There is some conflict in the authorities upon the question, but we think the better opinion is that relief will be granted." After a review of some of the cases, the court concluded that "To permit the plaintiff here to avail himself of this lease, in violation of his express agreement, to recover the property in controversy, would be to uphold and sanction fraud and bad faith."

It is true that there are cases from other states refusing reformation under such circumstances, but we think the rule of the Murray case is a proper and salutary one, and should be followed. It has frequently been approved. See particularly *Fidelity &*

*Cas. Co. v. Fresno Flume etc. Co.,* 161 Cal. 466 [119 Pac. 646, 37 L. R. A. (N. S.) 322]; *Holmes v. Anderson,* 90 Cal. App. 276 [265 Pac. 1010].

(3) The instant case presents a stronger factual situation for the application of the above rule than did the Murray case. Here both parties, it is true, knew that they were signing a contract calling for a pooled price less 5 per cent and expenses, but both honestly believed and intended that the legal effect of that instrument, when considered in view of the agreement to list respondents on the books as renter members, and in view of the resolution of 1924, was to provide for market price less 25c per ton. Both parties knew that many such contracts had been entered into by the association, and that the association always had considered that the provisions of the 1924 resolution were part of the contract, and controlled the subject of payment. This clearly constitutes a mistake of law within the meaning of section 3399 of the Civil Code, as such mistake of law is defined in section 1578 (1) of that code. *220

(4) Moreover, even if the case was not one involving a mistake of law, it presents a situation where to deny reformation would be to sanction a fraud. It is true the court below made no express finding of fraud, but it did find the facts from which such fraud may be inferred. It found that the association took it upon itself to represent to respondents the legal effect and consequences of their acts. It purported to interpret the contract. This information, although given in good faith, was false. To now condone the use of the contract for purposes other than those represented would be to sanction a constructive fraud. In our opinion the trial court properly reformed the contract.

(5) The appellant next urges that the contract as reformed is *ultra vires* and void. The trial court found it was not *ultra vires,* but also found if it were *ultra vires* appellant is estopped to deny its validity. As already held in the Harkey case, *supra,* the by-laws of the association did not authorize and in fact prohibited the type of transaction here under discus-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

78 P.2d 1150
11 Cal.2d 212, 78 P.2d 1150
**(Cite as: 11 Cal.2d 212)**

sion. But as also pointed out in that case, the resolution of 1924 authorizing such transactions did not violate the articles or any principle of public policy-in fact it was in exact accord with the legislative policy of the state. As to the year 1935, which is the only year involved on this appeal, the association is not seeking to be released from an executory contract claimed to be *ultra vires,* but has insisted that respondents deliver their fruit upon threat of an action for breach of contract and of a 50 per cent liquidated damage claim. The association does not seek rescission with its consequent restoration of material benefits received by it. It is seeking to enforce the terms of the standard marketing agreement, a contract-in view of the reformation-that we must hold was never executed by the parties. What was said in the Harkey case on this phase of the controversy is equally applicable here. On the grounds therein stated it is held that appellant's contention now under discussion lacks merit.

The other points urged by appellant are without merit. For the foregoing reasons the judgment appealed from is affirmed.

Houser, J., and Langdon, J., deeming themselves disqualified, did not participate herein.
Rehearing denied. *221

Cal.
Stafford v. California Canning Peach Growers
11 Cal.2d 212, 78 P.2d 1150

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**25**

Westlaw.

Page 1

42 Cal.App.4th 1733
42 Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 29 UCC Rep.Serv.2d 894, 96 Cal. Daily Op. Serv. 1573, 96 Daily Journal
D.A.R. 2477
(Cite as: 42 Cal.App.4th 1733)

c

STORY ROAD FLEA MARKET, INC., Plaintiff and
Appellant,
v.
WELLS FARGO BANK, N.A., Defendant and
Respondent.
No. H012671.

Court of Appeal, Sixth District, California.

Feb 6, 1996.

SUMMARY

In an account holder's action against a bank for
honoring forged checks, defendant's demurrer to
plaintiff's negligence, breach of contract and common
counts causes of action was sustained by the trial
court without leave to amend on the theory that Cal.
U. Com. Code, former § 4406, displaced all other
actions based on the forged checks. Defendant's
motion for summary judgment on the § 4406 cause
of action was granted after defendant presented
evidence that its system for reviewing checks was
consistent with general banking usage and that it had
utilized that system with respect to the checks.
(Superior Court of Santa Clara County, No. P57202,
Jeremy D. Fogel, Judge.)

The Court of Appeal affirmed. The court held that
Cal. U. Com. Code, former § 4406, providing that if
a bank customer fails to promptly discover forgeries
and notify the bank, the customer is precluded from
asserting the forgeries against the bank unless the
customer establishes that the bank did not use
"ordinary care" in honoring the forgeries, is a defense
for a bank against a customer's action based on
unauthorized signatures on checks. Action or
nonaction consistent with a general banking usage
prima facie constitutes the exercise of ordinary care.
The court held that defendant's showing on the
motion for summary judgment was sufficient to
establish, in the absence of evidence to the contrary,
that it had used "ordinary care" in processing the
checks under Cal. U. Com. Code, former § 4406.
The court further held that plaintiff's evidence failed
to raise a triable issue; it was merely an attempt to
show that defendant's system was inadequate because
it did not result in sight review of checks like
plaintiff's. Plaintiff's expert opined that defendant's
check processing system was "commercially
unreasonable" because it resulted in sight review of
only 1 percent of the checks processed and it did not
require sight review of all out-of-sequence checks.
However, plaintiff's expert did not provide any
evidence that defendant's check processing system
was inconsistent with the general practice in the
banking industry in the area, which establishes
ordinary care. Neither Cal. U. *1734 Com. Code,
former § 4406, nor Cal. U. Com. Code. § 3103,
provides that the preclusion is obviated if bank
procedures which are consistent with general banking
usage are nevertheless shown to be unfair,
unreasonable, or arbitrary. (Opinion by Mihara, J.,
with Premo, Acting P. J., and Elia, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Banks and Banking § 11--Payment of Forged or
Altered Checks--Defense.
Cal. U. Com. Code, former § 4406, providing that if
a bank customer fails to promptly discover forgeries
and notify the bank, the customer is precluded from
asserting the forgeries against the bank unless the
customer establishes that the bank did not use
"ordinary care" in honoring the forgeries, does not
define a cause of action against the bank displacing
all other causes of action based on the unauthorized
signatures; rather, it is a defense for a bank against a
customer's action based on unauthorized signatures
on checks under certain circumstances. Where the
customer has failed to timely notify the bank of an
unauthorized signature on an item after receiving the
item from the bank with the customer's statement, the
customer will be precluded under former § 4406
from founding any action on the bank's payment of
subsequent items bearing unauthorized signatures by
the same wrongdoer unless the customer can show
that the bank failed to use "ordinary care" in honoring
these subsequent items. If the customer timely
notified the bank of the initial unauthorized signature
or the bank failed to exercise ordinary care in paying
subsequent items, this preclusion does not apply and
the customer may allege any appropriate cause of
action based on the bank's conduct in honoring the
items bearing unauthorized signatures.

(2) Summary Judgment § 26--Appellate Review--

Page 2
42 Cal.App.4th 1733
42 Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 29 UCC Rep.Serv.2d 894, 96 Cal. Daily Op. Serv. 1573, 96 Daily Journal D.A.R. 2477
(Cite as: 42 Cal.App.4th 1733)

Scope of Review.
Appellate review of a summary judgment is de novo. First, the court identifies the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. Second, the court determines whether the moving party's showing has established facts that negate the opponent's claim and justify a judgment in the movant's favor. If a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. *1735

(3a, 3b) Banks and Banking § 11--Payment of Forged or Altered Checks-- Defense--Ordinary Care- -Sufficient Showing.
In an account holder's action against a bank for honoring forged checks, defendant's showing on a motion for summary judgment was sufficient to establish, in the absence of evidence to the contrary, that it had used "ordinary care" in processing the checks under Cal. U. Com. Code, former § 4406, providing that if a bank customer fails to promptly discover forgeries and notify the bank, the customer is precluded from asserting the forgeries against the bank unless the customer establishes that the bank did not use "ordinary care" in honoring the forgeries. Defendant submitted evidence showing that the unauthorized checks had been processed by defendant's automated check processing procedure, involving an initial procedure in which certain checks were selected for "individual sight review" based on a set of criteria. None of the unauthorized checks on plaintiff's account were selected for sight review. Nevertheless, defendant established that it had processed the forged checks in accordance with its own check processing procedures, and that these procedures were in accord with reasonable commercial standards and with general banking practice in the area.

[See 3 Witkin, Summary of Cal. Law (9th ed. 1987) Negotiable Instruments, § 288.]

(4) Banks and Banking § 11--Payment of Forged or Altered Checks--Defense-- Ordinary Care.
Under Cal. U. Com. Code, former § 4406, providing that if a bank customer fails to promptly discover forgeries and notify the bank, the customer is precluded from asserting the forgeries against the bank unless the customer establishes that the bank

did not use "ordinary care" in honoring the forgeries, action or nonaction consistent with a general banking usage prima facie constitutes the exercise of ordinary care. The Legislature's 1992 addition of a more detailed definition of "ordinary care" to Cal. U. Com. Code, § 3103, was not a "change in law. The revised provisions continue to provide that a bank can show that it used "ordinary care" by establishing that it processed an instrument using procedures that were consistent with general banking usage.

(5) Banks and Banking § 11--Payment of Forged or Altered Checks--Defense-- Ordinary Care--Rebuttal-- Sufficiency.
In an account holder's action against a bank for honoring forged checks, in which defendant's showing on a motion for summary judgment was sufficient to establish, in the absence of evidence to the contrary, that it had used *1736 "ordinary care" in processing the checks under Cal. U. Com. Code, former § 4406 (if bank customer fails to promptly discover forgeries and notify bank, customer is precluded from asserting forgeries against bank unless customer establishes that bank did not use "ordinary care" in honoring the forgeries). Plaintiff's evidence failed to raise a triable issue; it was merely an attempt to show that defendant's system was inadequate because it did not result in sight review of checks like plaintiff's. Plaintiff's expert opined that defendant's check processing system was "commercially unreasonable " because it resulted in sight review of only 1 percent of the checks processed and it did not require sight review of all out-of-sequence checks. However, plaintiff's expert did not provide any evidence that defendant's check processing system was inconsistent with the general practice in the banking industry in the area, which establishes ordinary care. Neither Cal. U. Com. Code, former § 4406, nor Cal. U. Com. Code. § 3103, provides that the preclusion is obviated if bank procedures which are consistent with general banking usage are nevertheless shown to be unfair, unreasonable, or arbitrary.

COUNSEL

Hoffman & Kazubowski and Daniel S. Cornell for Plaintiff and Appellant.

A. David Darman, R. Stewart Baird, Coblentz, Cahen McCabe & Breyer, Jonathan R. Bass and Susan K. Jamison for Defendant and Respondent.

MIHARA, J.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

2 Cal.App.4th 1733

2 Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 29 UCC Rep.Serv.2d 894, 96 Cal. Daily Op. Serv. 1573, 96 Daily Journal

.A.R. 2477

Cite as: 42 Cal.App.4th 1733)

Defendant Wells Fargo Bank, N. A. honored more than a hundred forged checks against plaintiff's account. Plaintiff did not discover the forgeries until more than a year after defendant began honoring these checks. Defendant refused to credit plaintiff's account for any of these unauthorized checks, and plaintiff filed suit against defendant. Plaintiff alleged causes of action for negligence, breach of contract and common counts and asserted a cause of action for money damages for defendant's alleged violation of California Uniform Commercial Code section 4406. Defendant's demurrer to plaintiff's negligence, breach of contract and common counts causes of action was sustained without leave to amend on the theory that California Uniform Commercial Code section 4406 displaced all other actions based on these forged checks. Defendant's motion for summary *1737 judgment on the California Uniform Commercial Code section 4406 cause of action was granted after defendant established that its system for reviewing checks was consistent with general banking usage and that it had utilized that system with respect to these checks. On appeal, plaintiff claims that summary judgment was improper because there was a triable issue of fact and the demurrer should not have been sustained since California Uniform Commercial Code section 4406 does not displace all other causes of action. We affirm the judgment.

### Background

In 1981 plaintiff established a checking account with defendant. The written agreement between plaintiff and defendant provided that defendant would honor only checks signed by authorized signatories. The authorized signatories on the account were Glen Norris and Suzanne Norris. Plaintiff's then attorney, Kenneth Fehl, was responsible for plaintiff's accounts payable. He delegated this task to Helen Shino, whom he employed as a bookkeeper. Between August 1990 and May 1992, Shino stole more than 100 of plaintiff's checks. Beginning in September 1990, Shino forged the signature of one of the authorized signatories on these checks and used the checks to obtain funds for her own purposes. In all, Shino managed to drain $255,761.60 from plaintiff's checking account without its knowledge. Shino intercepted the bank statements sent to plaintiff by defendant, destroyed them and posted false entries in plaintiff's books to conceal her scheme. Plaintiff discovered Shino's scheme on June 6, 1992, and immediately filed this action. Plaintiff also demanded that defendant credit plaintiff's account for the unauthorized checks defendant had honored.

Defendant refused to do so. Plaintiff alleged that defendant's conduct in paying these unauthorized checks was due to "a lack of ordinary care."

Plaintiff's complaint alleged causes of action for negligence, breach of contract and "common counts" and it purported to allege a cause of action based on defendant's breach of its obligations under California Uniform Commercial Code section [FN1] 4406. Defendant demurred to the complaint by asserting that the negligence, breach of contract and "common counts" causes of action were barred because section 4406 defined plaintiff's exclusive remedy against defendant under these circumstances. The demurrer was sustained without leave to amend. Defendant then brought a motion for summary judgment on the remaining cause of action. Defendant asserted that plaintiff could not succeed on this cause of action because plaintiff had failed to discover and notify defendant of the forgeries promptly after receipt *1738 of the bank statement which contained the initial forgeries. The declarations in support of defendant's summary judgment motion established that it had exercised "ordinary care" in honoring the unauthorized checks by processing the checks in accordance with its own check processing procedures, which procedures were "in accord with reasonable commercial standards ... [and] with general banking practice" in the area.

FN1 Subsequent statutory references are to the California Uniform Commercial Code unless otherwise specified.

Plaintiff did not dispute defendant's evidence, and defendant's motion for summary judgment was granted. However, the order granting defendant's motion gave plaintiff 60 days in which to seek reconsideration if it obtained evidence that defendant had failed to exercise "ordinary care" in paying the unauthorized checks. Plaintiff thereafter sought reconsideration and submitted declarations which it claimed established a material dispute of fact regarding whether defendant had exercised "ordinary care." The court found that plaintiff had failed to raise a material triable issue of fact by submitting any proof that defendant had failed to exercise "ordinary care." Plaintiff's motion for reconsideration was denied, and judgment was entered in favor of defendant. Plaintiff filed a timely notice of appeal.

### Analysis

The critical statute at issue in this case is former section 4406. This statute provided as follows. "(1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4
2 Cal.App.4th 1733
2 Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 29 UCC Rep.Serv.2d 894, 96 Cal. Daily Op. Serv. 1573, 96 Daily Journal
D.A.R. 2477
Cite as: 42 Cal.App.4th 1733)

When a bank sends to its customer a statement of account accompanied by items paid in good faith ..., the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after the discovery thereof. [¶ ] (2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subdivision (1) the customer *is precluded from asserting against the bank* [¶ ] (a) His unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and [¶ ] (b) An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration. [¶ ] (3) The preclusion under subdivision (2) does not apply if the customer establishes *lack of ordinary care* on the part of the bank in paying the item(s). " (Former, § 4406, italics added.)

A. *Precluson Applies to All Causes of Action*
The precise meaning of former section 4406 is critical to plaintiff's appellate arguments. Plaintiff claims that the statute would not preclude its *1739 contract and negligence causes of action even if plaintiff failed to establish that defendant's payment of the forged checks involved a lack of ordinary care. We disagree. "The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.... In order to determine this intent, we begin by examining the language of the statute." (*People v. Pieters (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 18, 802 P.2d 420],* citations omitted.) (1) The language of former section 4406 is unambiguous. If a bank customer fails to promptly discover the forgeries and notify the bank, the customer is precluded from asserting [the forgeries] against the bank" unless the customer establishes that the bank did not use "ordinary care" in honoring the forgeries. This language contains none of the limitations plaintiff imagines.

First, we must cast off the erroneous notion that former section 4406 *defined a cause of action* against the bank which *displaced* all *other* causes of action based on the unauthorized signatures. This is a serious misconstruction of the meaning of the statute. Where the customer has failed to timely notify the

bank of an unauthorized signature on an item after receiving the item from the bank with the customer's statement, the customer will be precluded under former section 4406 from founding *any action* on the bank's payment of subsequent items bearing unauthorized signatures by the same wrongdoer unless the customer can show that the bank failed to use "ordinary care" in honoring these subsequent items. If the customer timely notified the bank of the initial unauthorized signature or the bank failed to exercise ordinary care in paying subsequent items, this preclusion does not apply and the customer may allege *any* appropriate cause of action based on the bank's conduct in honoring the items bearing unauthorized signatures. The essence of former section 4406 is a defense for a bank against a customer's action based on unauthorized signatures on checks under certain circumstances.

Each of plaintiff's causes of action against defendant was based on defendant's alleged wrongdoing in honoring forged checks. [FN2] Under former section 4406, plaintiff could assert the forgeries against defendant as the basis for a legal action only if plaintiff had promptly notified defendant of *1740 the initial forgeries or defendant had failed to exercise "ordinary care" in honoring the forged checks. In this case, it was undisputed that plaintiff had not promptly notified defendant of the initial forgeries. The only question was whether defendant had exercised "ordinary care" in honoring the forged checks. [FN3] As this question was resolved on defendant's motion for summary judgment, the propriety of the demurrer depends on whether the court properly granted summary judgment. If the summary judgment motion properly established, on undisputed facts, that defendant had exercised " ordinary care" in honoring the forged checks, all of plaintiff's causes of action fall to defendant's defense under former section 4406. Since we conclude that the summary judgment motion was properly granted, plaintiff had no viable causes of action.

> FN2 Although plaintiff alleged in its complaint that defendant had paid some checks "without any signatures whatsoever," it did not assert any cause of action based solely on defendant's conduct in honoring unsigned checks as opposed to checks bearing unauthorized signatures. In response to defendant's summary judgment motion in which defendant asserted that it was undisputed that all of the checks bore unauthorized signatures, plaintiff did not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5
42 Cal.App.4th 1733
42 Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 29 UCC Rep.Serv.2d 894, 96 Cal. Daily Op. Serv. 1573, 96 Daily Journal D.A.R. 2477
Cite as: 42 Cal.App.4th 1733)

dispute that all of the checks bore unauthorized signatures. Consequently, plaintiff is not permitted to now argue that it had a cause of action based solely on allegedly unsigned checks because it essentially conceded below that there were no unsigned checks.

FN3 It is interesting to note that the common law had established a similar rule prior to the enactment of the California Uniform Commercial Code. If a bank customer failed to notify the bank of forged checks within a reasonable time after receiving the checks back from the bank, the customer was estopped from challenging the bank's conduct in honoring the forged checks so long as the bank exercised "proper care" in processing the checks. (*Basch v. Bank of America* (1943) 22 Cal.2d 316, 321-323 [139 P.2d 1].) This rule appears to have been applicable to both contract and tort actions. (*Ibid.*; *Pac. Coast Cheese, Inc. v. Sec.-First Nat. Bk.* (1955) 45 Cal.2d 75, 79-80 [286 P.2d 353].)

B. *Precision Applied*
1. *Standard of Review*

The applicability of the preclusion set forth in former section 4406 was established by defendant in its motion for summary judgment. (2) Appellate review of a summary judgment is de novo. (*Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071 [258 Cal.Rptr. 721]; *Barisich v. Lewis* (1990) 226 Cal.App.3d 12, 15 [275 Cal.Rptr. 331].) "First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading.... [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor .... [¶ ] [If] a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203], citations omitted.)

2. *Defendant Proved That It Had Used "Ordinary Care"*

Plaintiff alleged that defendant's conduct in paying

these unauthorized checks was due to "a lack of ordinary care." (3a) In order to establish its *1741 defense, defendant had to prove that it had used ordinary care in honoring the forged checks. Defendant submitted evidence which showed that the unauthorized checks had been processed by defendant's "automated check processing procedure." This process involved an initial procedure in which certain checks were selected for "individual sight review" based on a set of criteria. None of the unauthorized checks on plaintiff's account were selected for sight review. Nevertheless, defendant established that it had processed the forged checks "in accordance with its own check processing procedures," and that these procedures were "in accord with reasonable commercial standards ... [and] with general banking practice" in the area.

(4) Whether defendant's declarations are sufficient to establish that defendant used "ordinary care" in honoring the forged checks depends on what former section 4406 meant by "ordinary care." Section 4406 did not and does not define "ordinary care," but the California Uniform Commercial Code did and does elsewhere specify the meaning of this term. The California Uniform Commercial Code was revised in 1992. Prior to these revisions, the California Uniform Commercial Code defined how a "prima facie" showing of "ordinary care " could be made by a bank. "[A]ction or nonaction consistent ... *with a general banking usage* ... prima facie constitutes the exercise of *ordinary care.* " (Former § 4103, subd. (3), italics added.) "The term 'general banking usage' is not defined [by statute] but should be taken to mean a general usage common to banks in the area concerned." (Com. to former § 4103.) By defining a bank's standard of "ordinary care" in terms of "general banking usage," former section 4103 reflected the Legislature's decision to subject some conduct of banks to a "professional negligence" standard of care which looks at the procedures utilized in the banking industry rather than what a "reasonable person" might have done under the circumstances. (Cf. *Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 271-273 [7 Cal.Rptr.2d 101].) The Legislature's decision to utilize a professional standard of care with respect to the conduct of banks was rational because banking is a complicated process which requires special training and skill, and the nature of this process is not a matter of common knowledge. (Cf. *Ibid.*) This standard of care seems even more appropriate when it is noted that, even prior to the enactment of the California Uniform Commercial Code, courts faced with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

? Cal.App.4th 1733
? Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 29 UCC Rep.Serv.2d 894, 96 Cal. Daily Op. Serv. 1573, 96 Daily Journal
.A.R. 2477
Cite as: 42 Cal.App.4th 1733)

sue of the propriety of a bank's procedures for
:tecting unauthorized signatures considered whether
e bank's process comported with "the accepted
odern practice" of banks in the area. (*Basch v. Bank
: America. supra,* 22 Cal.2d at p. 330.)

Ioting that former section 4103 explained the
eaning of "ordinary care" in terms of "general
inking usage" prior to the 1992 revision of the
1742 California Uniform Commercial Code,
:fendant asserts that the Legislature's 1992 addition
: a more detailed definition of "ordinary care " to
ction 3103 was not a "change in law" and therefore
overns this case. Plaintiff asserts that the
:gislature's 1992 addition of a new definition of "
dinary care" changed the law, and therefore it is not
oplicable to this case because the checks herein at
sue were honored prior to the effective date of this
atutory change. "Unless a change in law, as
ontrasted with a clarification, has clearly been made,
is code, as it existed on January 1, 1993, shall be
:emed declaratory of the meaning of this code as it
:isted prior to January 1, 1993." (§ 16104.) "
rdinary care' [means] ... [i]n the case of a bank that
ikes an instrument for processing for collection or
iyment by automated means, reasonable
ommercial standards do not require the bank to
:amine the instrument if the failure to examine does
ot violate the bank's prescribed procedures and the
ink's procedures do not vary unreasonably from
:neral banking usage not disapproved by this
vision or Division 4 (commencing with Section
l01)." (§ § 3103, 4104, subd. (c).)

Ve agree with defendant that this definition of
dinary care did not "change " the law but merely
arified it, and therefore the definition of "ordinary
ire" in section 3103 is "declaratory" of the meaning
: "ordinary care" in former section 4406. Prior to the
)92 changes, "ordinary care" could be established
/ a bank by showing that the bank's practices
omported with " general banking usage" in the area.
:ormer § 4103, subd. (3); see § 3103, subd. (a)(7),
ilics added.) The 1992 addition of a more precise
:finition of ordinary care clarified this standard by
:tailing that "reasonable commercial standards do
ot require the bank to *examine the instrument* if the
ilure to examine does not violate the bank's
escribed procedures *and the bank's procedures do
ot vary unreasonably from general banking usage*
. " (§ 3103, subd. (a)(7), italics added.) The 1993
:finition of "ordinary care" does not vary
:monstrably from the pre-1993 definition. Both
:finitions require a bank to show that its practices

comported with general banking usage. The revised
definition simply notes that "ordinary care" *can* be
established notwithstanding the bank's failure to
"examine the instrument" so long as the bank's
processing of the instrument was in accordance with
*both* the bank's practices *and general banking usage.*
This qualification means that a bank cannot establish
"ordinary care" unless it can show that its practices
comported with "general banking usage." The fact
that the pre-1993 definition of "ordinary care" did not
expressly mention a duty to "examine the instrument
" implies that a bank could then establish "ordinary
care" even if the bank had failed to examine the
instrument so long as the bank was able to establish
that its practices comported with general banking
usage. *1743

We can see no "change" in the law in regard to the
definition of "ordinary care" in this context. Before
the 1992 revision of the California Uniform
Commercial Code, a bank could establish that it had
processed an instrument in accordance with practices
which comported with general banking usage and
thereby establish a prima facie case of "ordinary
care." The provisions of the California Uniform
Commercial Code prior to the 1992 revisions did not
prohibit the bank from making such a showing even
if it had failed to examine the instrument. The revised
provisions of the California Uniform Commercial
Code continue to provide that a bank can show that it
used "ordinary care" by establishing that it processed
an instrument using procedures that were consistent
with general banking usage. (3b) Consistent with
these requirements, defendant made an adequate
showing that the procedures it utilized in dealing with
the forged checks comported with "general banking
practice" in the area. This showing was sufficient to
establish, in the absence of evidence to the contrary,
that defendant had used "ordinary care" in processing
the checks in question.

*3. Plaintiff's Evidence Failed to Raise a Triable Issue*
Once defendant established that it had used
"ordinary care," the burden shifted to plaintiff to raise
a triable issue of fact as to either whether defendant
had followed its own procedures or whether
defendant had utilized procedures which were
consistent with "general banking practice" in the area.
Plaintiff submitted evidence that the signatures on the
unauthorized checks " did not bear any reasonable
resemblance" to the authorized signatures. It also
submitted evidence that the unauthorized checks
were "out-of-sequence with respect to the other
accounts payable checks ...." Plaintiff also submitted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 Cal.App.4th 1733
Page 7
2 Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 29 UCC Rep.Serv.2d 894, 96 Cal. Daily Op. Serv. 1573, 96 Daily Journal ).A.R. 2477
Cite as: 42 Cal.App.4th 1733)

vidence which purported to establish that *there is no ndustry standard* for check processing systems ecause they are proprietary and each bank keeps its ystem secret. Because the evidence established that one of the unauthorized checks on plaintiff's account ad been sight reviewed and that defendant's check rocessing system ordinarily detected unauthorized ignatures on sight reviewed checks, plaintiff sought ) establish that defendant's system for deciding /hich checks to "out-sort" for sight review was nadequate. Plaintiff's evidence established that (1) nere was no specific dollar limit below which the ystem ignores a particular check, but all checks over 50,000 are sight reviewed, (2) the system is not able ) detect unsigned checks, (3) the criteria used by the ystem for determining whether a check should be ut-sorted" included "location information," the ollar amount of the check and whether the check is ut-of-sequence," (4) a check that is "in-sequence" nd under $10,000 will not ordinarily be sight :viewed, (5) a business check payable to an idividual which is deposited at *1744 a non-Wells argo branch and is out of sequence will not be sight :viewed unless it exceeds $10,000, and (6) checks at are out of sequence *or* over $10,000 may be out->rted if they meet other criteria. Plaintiff attempted show that the unauthorized checks at issue herein ere "out-of-sequence," but this showing is nmaterial because plaintiff's evidence indicated that /en an out-of-sequence check which was deposited a non-Wells Fargo branch and was for less than 10,000 would not be sight reviewed. All of the necks at issue here were deposited at non-Wells argo branches, were for less than $10,000 and were ot sight reviewed. It is irrelevant whether these necks were "out-of-sequence."

5) Defendant established its entitlement to judgment / showing that the preclusion set forth in former ction 4406 applied. None of plaintiff's evidence tablished any material triable issue of fact with gard to defendant's showing that its check ocessing system comported with general banking age in the area. Instead, plaintiff's showing was erely an attempt to show that defendant's system as inadequate because it did not result in sight view of checks like those herein in question. aintiff's expert opined that defendant's check ocessing system was "commercially unreasonable " cause it resulted in sight review of only 1 percent the checks processed and it did not require sight view of all out-of-sequence checks. However, aintiff's expert did not provide any evidence that fendant's check processing system was inconsistent with the general practice in the banking industry in the area. Plaintiff's evidence failed to controvert defendant's showing.

Plaintiff nevertheless claims that summary judgment was precluded because it was entitled to proceed on its theory that "the procedures followed by a bank are unreasonable, arbitrary or unfair." Plaintiff derives this language from a comment to section 3103, subdivision (a)(7). "The second sentence of subsection (a)(7) is a particular rule limited to the duty of a bank to examine an instrument taken by a bank for processing for collection or payment by automated means. This particular rule applies primarily to Section 4-406 and it is discussed in Comment 4 to that section. Nothing in Section 3-103(a)(7) is intended to prevent a customer from proving that the procedures followed by a bank are unreasonable, arbitrary or unfair." (Com. to § 3103.) Plaintiff apparently believes that this comment *obviates the preclusion* stated in former section 4406 when there is evidence that a bank has used "unreasonable " procedures. We find no such meaning in this comment.

Neither section 4406 nor section 3103 provides that the preclusion set forth in section 4406 is obviated if bank procedures which are consistent *1745 with general banking usage are nevertheless shown to be unfair, unreasonable or arbitrary. The import of the comment to section 3103, subdivision (a)(7) is that, *in an action where the fairness of bank procedures is relevant*, a customer may prove that certain bank practices were unreasonable, unfair or arbitrary, even though those practices were consistent with general banking usage. For instance, a bank customer might bring an action for negligence against a bank which was based on something other than unauthorized signatures on checks. (See *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 700 [148 Cal.Rptr. 329, 582 P.2d 920] [customer may bring a negligence action based on "an independent wrong " notwithstanding section 4406].) Such an action could be supported by proof that the bank's procedures were unfair even though they were consistent with general banking usage. The language in question indicates that the professional standard of care, imported into section 4406 by its use of the term " ordinary care," is applicable to bank procedures for processing checks in an action based on unauthorized signatures, but may not be applicable in actions based on independent wrongs by the bank. This comment does not obviate the clear and unambiguous preclusion set forth in section 4406.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

!2 Cal.App.4th 1733                                                    Page 8
!2 Cal.App.4th 1733, 50 Cal.Rptr.2d 524, 29 UCC Rep.Serv.2d 894, 96 Cal. Daily Op. Serv. 1573, 96 Daily Journal
).A.R. 2477
**Cite as: 42 Cal.App.4th 1733)**

Defendant proved that it had a complete defense to
.ll of plaintiff's causes of action. Plaintiff failed to
lispute defendant's showing by raising any triable
ssue of fact. The trial court's judgment must be
ipheld.

<div align="center">Conclusion</div>

The judgment is affirmed.

Premo, Acting P. J., and Elia, J., concurred. *1746

:al.App.6.Dist.,1996.

:tory Road Flea Market, Inc. v. Wells Fargo Bank,
J.A.

:ND OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**26**

Westlaw.

Page 1

2 Cal.App.4th 153
2 Cal.App.4th 153, 2 Cal.Rptr.2d 861
(Cite as: 2 Cal.App.4th 153)

C

CEIL TARMANN, Plaintiff and Appellant,
v.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Defendant and
Respondent.
No. H006997.

Court of Appeal, Sixth District, California.

Dec 30, 1991.

SUMMARY

Plaintiff brought an action for fraud and negligent misrepresentation against an insurer alleging the insurer made false statements concerning its obligation to indemnify plaintiff. In her complaint plaintiff generally alleged that the declarants were "authorized agents" of the insurer, but specifically alleged that she did not know their names. The trial court sustained without leave to amend the insurer's demurrer to the fifth amended complaint and dismissed the action. (Superior Court of Santa Clara County, No. 632416, Peter G. Stone, Judge.)

The Court of Appeal affirmed. It held that plaintiff's complaint did not meet the requirement that a fraud complaint against a corporation plead the names of the individuals who made allegedly false representations. It also held that the insurer's statements concerning indemnity were either statements of opinion or intentional false promises, and thus plaintiff failed to state a cause of action for negligent misrepresentation. (Opinion by Capaccioli, Acting P. J., with Premo and Cottle, JJ., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

(1) Pleading § 29--Demurrer to Complaint--Determination.
In reviewing the sufficiency of a complaint against a general demurrer, the court is guided by long-settled rules. It treats the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. It also considers matters that may be judicially noticed. Further, the court gives the complaint a reasonable interpretation, reading it as a whole and its parts in

their context.

(2) Appellate Review § 128--Scope of Review--Rulings on Demurrers.
When a demurrer is sustained, the appellate court determines *154 whether the complaint states facts sufficient to constitute a cause of action. When it is sustained without leave to amend, the appellate court decides whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and the appellate court reverses; if not, there has been no abuse of discretion and the appellate court affirms. The burden of proving a reasonable possibility is squarely on the plaintiff.

(3) Fraud and Deceit § 25--Actions--Pleading--Action Against Corporation.
Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow the defendant to understand fully the nature of the charge made. The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written. Thus, in a fraud action against an insurer for making false statements concerning its obligation to indemnify plaintiff, the trial court did not err in sustaining without leave to amend the insurer's demurrer to the complaint, where plaintiff generally alleged that the declarants were "authorized agents" of the insurer, but specifically alleged that she did not know their names. The exception to the rule of specificity for situations in which the facts are in the possession of the defendant did not apply, since the insurer had no more reason to know who made the allegedly false statements than plaintiff.

[See Cal.Jur.3d, Fraud and Deceit, § 69; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § § 662, 868.].

(4) Fraud and Deceit § 6--Actual Fraud--False Representations--Statements of Opinion.
To be actionable, a negligent misrepresentation must ordinarily be as to past or existing material facts. Predictions as to future events, or statements as to future action by some third party, are deemed

2 Cal.App.4th 153
2 Cal.App.4th 153, 2 Cal.Rptr.2d 861
(Cite as: 2 Cal.App.4th 153)

opinions, and not actionable fraud.

[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 678.]

(5a, 5b, 5c) Fraud and Deceit § 25--Actions--Pleading--Negligent Misrepresentation--Insurer's Representation of Future Payment.
In a negligent misrepresentation action arising from an insurer's alleged representations that it would make payments to plaintiff in the future, the trial court did not err in sustaining without leave to amend the *155 insurer's demurrer to the complaint. To the extent that the representations were statements of opinion as to the insurer's obligation to indemnify plaintiff, they were not actionable. To the extent the representations constituted promises with no intention of performance, they were intentional conduct and not actionable under a theory of negligent misrepresentation.

(6) Fraud and Deceit § 7--Actual Fraud--False Representations--Promises.
Certain broken promises of future conduct may be actionable. Civ. Code. § 1710, subd. (4), defines one type of deceit as "A promise, made without any intention of performing it." A false promise is actionable on the theory that a promise implies an intention to perform, that intention to perform or not to perform is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of fact. The allegation of a promise, which implies a representation of intention to perform, is the equivalent of the ordinary allegation of a representation of fact. To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing. Given this requirement, an action based on a false promise is simply a type of intentional misrepresentation, i.e., actual fraud. The specific intent requirement precludes pleading a false promise claim as a negligent misrepresentation.

[See 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 670.]

(7) Fraud and Deceit § 7--Actual Fraud--False Representations--Promises-- Unreasonable Intent to Perform.
Making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise.

(8) Appellate Review § 128--Scope of Review--Rulings on Demurrers-- Appellant's Burden.
It is the correctness of the trial court's action in sustaining a demurrer, not its reasons, that is reviewable. The burden is upon the appellant to demonstrate that the action of the trial court was an abuse of discretion.

COUNSEL

Harry Delizonna for Plaintiff and Appellant.

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Daniel R. Kirwan and Mark Bonino for Defendant and Respondent. *156

CAPACCIOLI, Acting P. J.

*Statement of the Case*
Plaintiff Ceil Tarmann appeals from a judgment entered after the trial court sustained without leave to amend defendant State Farm Mutual Automobile Insurance Company's (State Farm) demurrer to Tarmann's fifth amended complaint. She claims her complaint sufficiently pled causes of action for fraud and negligent misrepresentation. We disagree and affirm the judgment.

*Standard of Review*
(1) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] (2) When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

*Facts Alleged in the Fifth Amended Complaint*
On September 22, 1985, Tarmann was involved in an auto accident with Andy Roselada, a State Farm

2 Cal.App.4th 153
2 Cal.App.4th 153, 2 Cal.Rptr.2d 861
(Cite as: 2 Cal.App.4th 153)

Page 3

insured. Roselada's liability was reasonably clear. Tarmann obtained an estimate of $3,200 to repair her vehicle, and State Farm authorized the estimate.

In particular, State Farm represented to her that she was authorized to have her vehicle repaired at Capitol Ford, Inc., of Almaden, that their obligation to indemnify her for her damages was reasonably clear, and that it "would pay Plaintiff for all such repairs ... immediately upon completion of those repairs." These representations were made by persons whose names were "unknown to Plaintiff but [who] were adjustors and/or claims supervisors/managers" employed by State Farm and acting as its agents. The *157 representations, however, "were and are false and [State Farm] knew or should have known them to be false at the time they were made." The true facts were that State Farm "had no intention to reasonably and in good faith effectuate a prompt and reasonable processing, evaluation, investigation and settlement of Plaintiff's claim, nor pay the complete repair of Plaintiff's vehicle."

State Farm's representations were intended to induce Tarmann's reliance so that she would bring her vehicle in for repairs and delay filing an action for damages. Tarmann relied on the representations and brought her vehicle to be repaired. However, State Farm refused to pay for the repairs or indemnify her. Because Tarmann lacked the funds to complete the repairs or obtain the release of her vehicle, she was left without its use for an extended period of time.

Tarmann hired an attorney, who filed an action against Roselada. In September 1986, State Farm settled her claim for $3,476.47. She then initiated this action.

Discussion
The Cause of Action for Fraud
(3) "Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow defendant to understand fully the nature of the charge made." (*Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 109 [128 Cal.Rptr. 901]; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216-217 [197 Cal.Rptr. 783, 673 P.2d 660]; *Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 73 [269 Cal.Rptr. 337].

The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly

fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written. (*Archuleta v. Grand Lodge etc. of Machinists* (1968) 262 Cal.App.2d 202, 208-209 [68 Cal.Rptr. 694]; *Gautier v. General Telephone Co.* (1965) 234 Cal.App.2d 302, 308 [44 Cal.Rptr. 404]; *Mason v. Drug, Inc.* (1939) 31 Cal.App.2d 697, 703 [88 P.2d 929]; *Sanders v. Ford Motor Co.* (1979) 96 Cal.App.3d Supp. 43, 46 [158 Cal.Rptr. 656]; see Grossman & Van Alstyne, California Practice (2d ed. 1976) § 984, pp. 111-114.)

Here, Tarmann generally alleged that the persons were "authorized agents of State Farm ... cloaked with such authority" and were "adjustors and/or *158 claims supervisors/managers[.]" However, she specifically alleged she did not know their names. [FN1]

> FN1 We note that in her original complaint under the Insurance Code, Tarmann specifically alleged the names of State Farm agents who initially authorized her $3,200 estimate.

We acknowledge that the requirement of specificity is relaxed when the allegations indicate that "the defendant must necessarily possess full information concerning the facts of the controversy" (*Bradley v. Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 825 [106 Cal.Rptr. 718], disapproved on another ground in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212-213 [266 Cal.Rptr. 638, 786 P.2d 365]) or "when the facts lie more in the knowledge of the opposite party[.]" (*Turner v. Milstein* (1951) 103 Cal.App.2d 651, 658 [230 P.2d 25].) However, we consider this exception inapplicable here, for State Farm has no more reason to know who made the allegedly false representations to Tarmann than Tarmann.

Under the circumstances, the court properly sustained the demurrer to the fraud claim without leave to amend.

The Cause of Action for Negligent Misrepresentation
(4) To be actionable, a negligent misrepresentation must ordinarily be as to past or existing material facts. "[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 678, pp. 779-780; *Richard P. v. Vista Del Mar Child Care Service* (1980) 106 Cal.App.3d 860, 865 [165 Cal.Rptr. 370].)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 Cal.App.4th 153
2 Cal.App.4th 153, 2 Cal.Rptr.2d 861
(Cite as: 2 Cal.App.4th 153)

Page 4

(5a) Here, the gist of both Tarmann's fraud and negligent misrepresentation claims is that State Farm said it *would* pay for her repairs *immediately upon their completion*, it failed to do so, Tarmann could not complete the repairs or redeem her vehicle, and she lost the use of it until State Farm settled the case.

The critical alleged misrepresentation as to immediate payment upon completion did not involve a past or existing material fact. Rather, it involved a promise to perform at some future time.

(6) Certain broken promises of future conduct may, however, be actionable. Civil Code section 1710, subdivision (4) defines one type of deceit as "A promise, made without any intention of performing it." As Witkin explains, "A false promise is actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state *159 of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact*. The allegation of a *promise* (which implies a representation of intention to perform) is the equivalent of the ordinary allegation of a representation of fact." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 670, p. 120, italics in original.)

To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing. (*Hills Trans. Co. v. Southwest Forest Industries, Inc.* (1966) 266 Cal.App.2d 702, 708 [72 Cal.Rptr. 441]; *Regus v. Schartkoff* (1957) 156 Cal.App.2d 382, 389 [319 P.2d 721].) (5b) Given this requirement, an action based on a false promise is simply a type of *intentional* misrepresentation, i.e., actual fraud. [FN2] The specific intent requirement also precludes pleading a false promise claim as a negligent misrepresentation, i.e., "The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." (Civ. Code, § 1710, subd. (2).) (7) Simply put, making a promise with an honest but unreasonable intent to perform is wholly different from making one with no intent to perform and, therefore, does not constitute a false promise. Moreover, we decline to establish a new type of actionable deceit: the negligent false promise.

FN2 If we assume Tarmann's fraud cause of action alleges a promise and an actual

contemporaneous intent not to perform it, her failure to name the actual promisor would still be a fatal defect.

(5c) In light of our discussion, the trial court properly sustained the demurrer to Tarmann's cause of action for negligent misrepresentation.

*Conclusion and Disposition*

(8) "It is the correctness of the trial court's action in sustaining a demurrer, not its reasons, which is reviewable. [Citation.] The burden is upon appellant to demonstrate that the action of the trial court was an abuse of discretion. [Citation.]" (*Stansfield v. Starkey, supra,* 220 Cal.App.3d at p. 72.)

Since the trial court's rejection of Tarmann's fraud and negligent misrepresentation claims was correct and Tarmann neither argues nor suggests that her complaint states a cause of action under any other legal theory, she has not met her burden of proving the trial court abused its discretion in sustaining State Farm's demurrer to her fifth amended complaint without leave to amend. *160

The judgment is affirmed.

Premo, J., and Cottle, J., concurred. *161

Cal.App.6.Dist.,1991.

Tarmann v. State Farm Mut. Auto. Ins. Co.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**27**

Westlaw.

West's Ann.Cal.Bus. & Prof.Code § 17200

► **Effective: [See Text Amendments]**

WEST'S ANNOTATED CALIFORNIA CODES
BUSINESS AND PROFESSIONS CODE
DIVISION 7. GENERAL BUSINESS REGULATIONS
PART 2. PRESERVATION AND REGULATION OF COMPETITION
CHAPTER 5. ENFORCEMENT
→ **§ 17200. Unfair competition; prohibited activities**

As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

VALIDITY

*This section is recognized as preempted by federal law, as to credit reporting agencies, in Howard v. Blue Ridge Bank, N.D.Cal.2005, 371 F.Supp.2d 1139.*

*This statute was held preempted, as to claims involving interstate sales of wholesale electricity, by the Federal Power Act, under which the Federal Energy Regulatory Commission was granted exclusive jurisdiction over interstate sales of wholesale electricity, in the decision of In re Enron Corp., 2005, 328 B.R. 75.*

*This section was held preempted by the Home Owners' Loan Act, in the case of Silvas v. E*Trade Mortg. Corp., S.D.Cal.2006, 421 F.Supp.2d 1315.*

Current through Ch. 214 of 2007 Reg.Sess. urgency legislation

© 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**28**

California Codes

California Business and Professions Code

BUSINESS AND PROFESSIONS CODE SECTION 17203

17203.  Injunctive Relief--Court Orders
   Any person who engages, has engaged, or proposes to engage in
unfair competition may be enjoined in any court of competent
jurisdiction.  The court may make such orders or judgments, including
the appointment of a receiver, as may be necessary to prevent the
use or employment by any person of any practice which constitutes
unfair competition, as defined in this chapter, or as may be
necessary to restore to any person in interest any money or property,
real or personal, which may have been acquired by means of such
unfair competition.  Any person may pursue representative claims or
relief on behalf of others only if the claimant meets the standing
requirements of Section 17204 and complies with Section 382 of the
Code of Civil Procedure, but these limitations do not apply to claims
brought under this chapter by the Attorney General, or any district
attorney, county counsel, city attorney, or city prosecutor in this
state.

**29**

Westlaw.

West's Ann.Cal.Civ.Code § **1572**

**C**

**Effective: [See Text Amendments]**

West's Annotated California Codes Currentness
    **Civil** Code (Refs & Annos)
      Division 3. Obligations (Refs & Annos)
        Part 2. Contract (Refs & Annos)
          Title 1. Nature of a Contract
            Chapter 3. Consent (Refs & Annos)

      → **§ 1572. Actual fraud**

ACTUAL FRAUD, WHAT. Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;

3. The suppression of that which is true, by one having knowledge or belief of the fact;

4. A promise made without any intention of performing it; or,

5. Any other act fitted to deceive.

CREDIT(S)

(Enacted 1872.)

West's Ann. Cal. Civ. Code § **1572**, CA **CIVIL** § **1572**

Current with urgency legislation through Ch. 26 of 2008 Reg.Sess. and Ch. 7 of 2007-2008 Third Ex.Sess., and Props. 98 and 99

© 2008 Thomson Reuters/West

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**30**

Westlaw.

West's Ann.Cal.Civ.Code § **1577**

C

**Effective: [See Text Amendments]**

West's Annotated California Codes Currentness
    Civil Code (Refs & Annos)
        Division 3. Obligations (Refs & Annos)
            Part 2. Contract (Refs & Annos)
                Title 1. Nature of a Contract
                    Chapter 3. Consent (Refs & Annos)

      → **§ 1577.** Mistake of fact

MISTAKE OF FACT. Mistake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in:

1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or,

2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed.

CREDIT(S)

(Enacted 1872.)

West's Ann. Cal. Civ. Code § **1577**, CA **CIVIL** § **1577**

Current with urgency legislation through Ch. 26 of 2008 Reg.Sess. and Ch. 7 of 2007-2008 Third Ex.Sess., and Props. 98 and 99

© 2008 Thomson Reuters/West

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**31**

Westlaw.

West's Ann.Cal.Civ.Code § **1646**

C

**Effective: [See Text Amendments]**

West's Annotated California Codes Currentness
  Civil Code (Refs & Annos)
    Division 3. Obligations (Refs & Annos)
      ↖⊞ Part 2. Contract (Refs & Annos)
        ↖⊞ Title 3. Interpretation of Contracts (Refs & Annos)

→ **§ 1646. Law and usage of place**

LAW OF PLACE. A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.

CREDIT(S)

(Enacted 1872.)

**LEADING CASES**

*Frontier Oil Corp. v. RLI Insurance Co., 153 Cal.App.4th 1436, 63 Cal.Rptr.3d 816 (2007)* (California **Civil** Code § **1646**, which requires courts to apply the law of the place of performance if a contract "indicates" a place of performance, rather than California government interest analysis, determines the law applicable to the interpretation of an insurance contract. An insurance policy "indicates" the place of performance "if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstance." In the case of a liability insurance contract, the presumed intended place of performance is the location of the insured risk, which, in this case, was an oil production facility in Beverly Hills, California. Thus, California law determined whether the insurer had a duty to defend personal injury claims resulting from the alleged release of toxic chemicals into the environment around the Beverly Hills oil production facility.)

West's Ann. Cal. Civ. Code § **1646**, CA **CIVIL** § **1646**

Current with urgency legislation through Ch. 26 of 2008 Reg.Sess. and Ch. 7 of 2007-2008 Third Ex.Sess., and Props. 98 and 99

© 2008 Thomson Reuters/West

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**32**

Westlaw.

West's Ann.Cal.Civ.Code § **1668**

C

**Effective: [See Text Amendments]**

West's Annotated California Codes Currentness
    **Civil** Code (Refs & Annos)
        Division 3. Obligations (Refs & Annos)
            Part 2. Contract (Refs & Annos)
                Title 4. Unlawful Contracts (Refs & Annos)

        → **§ 1668.** Contracts contrary to policy of law

CERTAIN CONTRACTS UNLAWFUL. All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

CREDIT(S)

(Enacted 1872.)

West's Ann. Cal. Civ. Code § **1668**, CA **CIVIL** § **1668**

Current with urgency legislation through Ch. 26 of 2008 Reg.Sess. and Ch. 7 of
2007-2008 Third Ex.Sess., and Props. 98 and 99

© 2008 Thomson Reuters/West

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**33**



West's Ann.Cal.Civ.Code § 1689

C                                  Effective: [See Text Amendments]

WEST'S ANNOTATED CALIFORNIA CODES
CIVIL CODE
DIVISION 3. OBLIGATIONS
PART 2. CONTRACT
TITLE 5. EXTINCTION OF CONTRACTS
CHAPTER 2. RESCISSION
→§ 1689. Grounds

(a) A contract may be rescinded if all the parties thereto consent.

(b) A party to a contract may rescind the contract in the following cases:

(1) If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party.

(2) If the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds.

(3) If the consideration for the obligation of the rescinding party becomes entirely void from any cause.

(4) If the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause.

(5) If the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault.

(6) If the public interest will be prejudiced by permitting the contract to stand.

(7) Under the circumstances provided for in Sections 39, 1533, 1566, 1785 [FN1], 1789 [FN2], 1930 and 2314 of this code, Section 2470 of the Corporations Code [FN3], Sections 331, 338, 359, 447, 1904 and 2030 of the Insurance Code or any other statute providing for rescission.

[FN1] Repealed. See, now, Comm.C. § 2610.

[FN2] Repealed. See, now, Comm.C. §§ 2106, 2507, 2601, 2607, 2608, 2711, 2714, 2715, 2717.

[FN3] Repealed. See, now, Comm.C. §§ 8301, 8315.

Current through Ch. 214 of 2007 Reg.Sess. urgency legislation

© 2007 Thomson/West

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**34**

Westlaw.

West's Ann.Cal.Civ.Code § 1691

C                          Effective: [See Text Amendments]

WEST'S ANNOTATED CALIFORNIA CODES
CIVIL CODE
DIVISION 3. OBLIGATIONS
PART 2. CONTRACT
TITLE 5. EXTINCTION OF CONTRACTS
CHAPTER 2. RESCISSION
→§ 1691. Procedure

Subject to Section 1693, to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind if he is free from duress, menace, undue influence or disability and is aware of his right to rescind:

(a) Give notice of rescission to the party as to whom he rescinds; and

(b) Restore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so.

When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both.

Current through Ch. 214 of 2007 Reg.Sess. urgency legislation

© 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**35**

Westlaw.

West's Ann.Cal.Civ.Code § 2773

C

**Effective: [See Text Amendments]**

West's Annotated California Codes Currentness
  Civil Code (Refs & Annos)
    Division 3. Obligations (Refs & Annos)
      Part 4. Obligations Arising from Particular Transactions (Refs & Annos)
        Title 12. Indemnity (Refs & Annos)

→ **§ 2773.** Future wrongful act; invalidity

An agreement to indemnify a person against an act thereafter to be done, is void, if the act be known by such person at the time of doing it to be unlawful.

CREDIT(S)

(Enacted 1872. Amended by Code Am. 1873-74, c. 612, p. 259, § 253.)

HISTORICAL AND STATUTORY NOTES

1993 Main Volume

The 1873-74 amendment substituted "be" for "is" and "unlawful" for "wrongful".

West's Ann. Cal. Civ. Code § 2773, CA **CIVIL** § 2773

Current with urgency legislation through Ch. 26 of 2008 Reg.Sess. and Ch. 7 of 2007-2008 Third Ex.Sess., and Props. 98 and 99

© 2008 Thomson Reuters/West

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**36**

Westlaw.

West's Ann.Cal.Civ.Code § 3513

C

**Effective: [See Text Amendments]**

West's Annotated California Codes Currentness
   **Civil** Code (Refs & Annos)
      Division 4. General Provisions (Refs & Annos)
         Part 4. Maxims of Jurisprudence (Refs & Annos)

→ § 3513. Waiver of advantage; law established for public reason

Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.

CREDIT(S)

(Enacted 1872.)

West's Ann. Cal. Civ. Code § 3513, CA **CIVIL** § 3513

Current with urgency legislation through Ch. 26 of 2008 Reg.Sess. and Ch. 7 of 2007-2008 Third Ex.Sess., and Props. 98 and 99

© 2008 Thomson Reuters/West

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**37**

California Codes

California Commercial Code

## COMMERCIAL CODE SECTION 1201 (41)

1201. The following definitions apply for purposes of this code,
subject to additional definitions contained in the subsequent
divisions of this code that apply to specific divisions or chapters
thereof, and unless the context otherwise requires:

   (41) "Term" means that portion of an agreement that relates to a
particular matter.
   (42) "Unauthorized" signature means one made without actual,
implied, or apparent authority, and includes a forgery.

**38**

California Codes

California Commercial Code

COMMERCIAL CODE SECTION 3403

3403.  (a) Unless otherwise provided in this division or Division 4
(commencing with Section 4101), an unauthorized signature is
ineffective except as the signature of the unauthorized signer in
favor of a person who in good faith pays the instrument or takes it
for value.  An unauthorized signature may be ratified for all
purposes of this division.
    (b) If the signature of more than one person is required to
constitute the authorized signature of an organization, the signature
of the organization is unauthorized if one of the required
signatures is lacking.
    (c) The civil or criminal liability of a person who makes an
unauthorized signature is not affected by any provision of this
division which makes the unauthorized signature effective for the
purposes of this division.

**39**

California Codes

California Commercial Code

## COMMERCIAL CODE SECTION 4101

4101.  This division may be cited as Uniform Commercial Code--Bank
Deposits and Collections.

**40**

California Codes

California Commercial Code

COMMERCIAL CODE SECTION 4406

4406.  (a) A bank that sends or makes available to a customer a
statement of account showing payment of items for the account shall
either return or make available to the customer the items paid or
provide information in the statement of account sufficient to allow
the customer reasonably to identify the items paid. The statement of
account provides sufficient information if the item is described by
item number, amount, and date of payment. If the bank does not return
the items, it shall provide in the statement of account the
telephone number that the customer may call to request an item, a
substitute check, or a legible copy thereof pursuant to subdivision
(b).
     (b) If the items are not returned to the customer, the person
retaining the items shall either retain the items or, if the items
are destroyed, maintain the capacity to furnish legible copies of the
items until the expiration of seven years after receipt of the
items. A customer may request an item from the bank that paid the
item, and that bank shall provide in a reasonable time either the
item or, if the item has been destroyed or is not otherwise
obtainable, a legible copy of the item. If the paid item requested by
a customer was presented as a substitute check, the bank shall
provide, in a reasonable time, either the substitute check or, if the
substitute check has been destroyed or is not otherwise obtainable,
a legible copy of the substitute check. A bank shall provide, upon
request, and without charge to the customer, at least two items,
substitute checks, or legible copies thereof, with respect to each
statement of account sent to the customer.
     (c) If a bank sends or makes available a statement of account or
items pursuant to subdivision (a), the customer shall exercise
reasonable promptness in examining the statement or the items to
determine whether any payment was not authorized because of an
alteration of an item or because a purported signature by or on
behalf of the customer was not authorized. If, based on the statement
or items provided, the customer should reasonably have discovered
the unauthorized payment, the customer shall promptly notify the bank
of the relevant facts.
     (d) If the bank proves that the customer failed, with respect to
an item, to comply with the duties imposed on the customer by
subdivision (c), the customer is precluded from asserting any of the
following against the bank:
     (1) The customer's unauthorized signature or any alteration on the
item if the bank also proves that it suffered a loss by reason of
the failure.
     (2) The customer's unauthorized signature or alteration by the
same wrongdoer on any other item paid in good faith by the bank if
the payment was made before the bank received notice from the
customer of the unauthorized signature or alteration and after the
customer had been afforded a reasonable period of time, not exceeding

30 days, in which to examine the item or statement of account and notify the bank.

(e) If subdivision (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subdivision (c) and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under subdivision (d) does not apply.

(f) Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subdivision (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. If there is a preclusion under this subdivision, the payer bank may not recover for breach of warranty under Section 4208 with respect to the unauthorized signature or alteration to which the preclusion applies.

(g) As used in this section, "substitute check" shall have the same meaning as used in Section 229.2 of Title 12 of the Code of Federal Regulations.

(h) This section shall remain in effect only until January 1, 2010, and as of that date is repealed, unless a later enacted statute, which is enacted before January 1, 2010, deletes or extends that date.

**41**

California Codes

California Penal Code

## PENAL CODE SECTION 470

470.   (a) Every person who, with the intent to defraud, knowing that he or she has no authority to do so, signs the name of another person or of a fictitious person to any of the items listed in subdivision (d) is guilty of forgery.

(b) Every person who, with the intent to defraud, counterfeits or forges the seal or handwriting of another is guilty of forgery.

(c) Every person who, with the intent to defraud, alters, corrupts, or falsifies any record of any will, codicil, conveyance, or other instrument, the record of which is by law evidence, or any record of any judgment of a court or the return of any officer to any process of any court, is guilty of forgery.

(d) Every person who, with the intent to defraud, falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine, any of the following items, knowing the same to be false, altered, forged, or counterfeited, is guilty of forgery: any check, bond, bank bill, or note, cashier's check, traveler's check, money order, post note, draft, any controller's warrant for the payment of money at the treasury, county order or warrant, or request for the payment of money, receipt for money or goods, bill of exchange, promissory note, order, or any assignment of any bond, writing obligatory, or other contract for money or other property, contract, due bill for payment of money or property, receipt for money or property, passage ticket, lottery ticket or share purporting to be issued under the California State Lottery Act of 1984, trading stamp, power of attorney, certificate of ownership or other document evidencing ownership of a vehicle or undocumented vessel, or any certificate of any share, right, or interest in the stock of any corporation or association, or the delivery of goods or chattels of any kind, or for the delivery of any instrument of writing, or acquittance, release or discharge of any debt, account, suit, action, demand, or any other thing, real or personal, or any transfer or assurance of money, certificate of shares of stock, goods, chattels, or other property whatever, or any letter of attorney, or other power to receive money, or to receive or transfer certificates of shares of stock or annuities, or to let, lease, dispose of, alien, or convey any goods, chattels, lands, or tenements, or other estate, real or personal, or falsifies the acknowledgment of any notary public, or any notary public who issues an acknowledgment knowing it to be false; or any matter described in subdivision (b).

(e) Upon a trial for forging any bill or note purporting to be the bill or note of an incorporated company or bank, or for passing, or attempting to pass, or having in possession with intent to pass, any forged bill or note, it is not necessary to prove the incorporation of the bank or company by the charter or act of incorporation, but it may be proved by general reputation; and persons of skill are competent witnesses to prove that the bill or note is forged or counterfeited.

470a.  Every person who alters, falsifies, forges, duplicates or in any manner reproduces or counterfeits any driver's license or identification card issued by a governmental agency with the intent that such driver's license or identification card be used to facilitate the commission of any forgery, is punishable by imprisonment in the state prison, or by imprisonment in the county jail for not more than one year.

470b.  Every person who displays or causes or permits to be displayed or has in his possession any driver's license or identification card of the type enumerated in Section 470a with the intent that such driver's license or identification card be used to facilitate the commission of any forgery, is punishable by imprisonment in the state prison, or by imprisonment in the county jail for not more than one year.

**42**

# SUMMARY OF CALIFORNIA LAW

## Tenth Edition

### by B. E. WITKIN

*and members of the*

### WITKIN LEGAL INSTITUTE

Volume 5



**WITKIN**
*LEGAL INSTITUTE*

*2005*

TORTS                                                                 §188

would produce mischiefs far worse.'' (28 C.A.3d 492.) (See *Kachig v. Boothe* (1971) 22 C.A.3d 626, 641, 99 C.R. 393, supra. §21 [privilege applied in action for intentional infliction of emotional distress based on false documents and perjured testimony introduced in litigation].)

### 3.   [§187]   Discharge of Liability.

Tort liability may be discharged by the following:

(1) *Release*. (See 1 *Summary* (10th), *Contracts*, §**old893; Rest.2d, Torts §952.)

(2) *Merger in judgment*. (See 7 *Cal. Proc.* (4th), *Judgment*, §342 et seq.)

(3) *Bar by judgment*. (See 7 *Cal. Proc.* (4th), *Judgment*, §348 et seq.)

(4) *Statute of limitations*. (See 3 *Cal. Proc.* (4th), *Actions*, §405 et seq.; Rest.2d, Torts §899.)

(5) *Discharge in bankruptcy*. (See 8 *Cal. Proc.* (4th), *Enforcement of Judgment*, §486 et seq.)

*West's Key Number Digest,* Torts ⬦16

### 4.   [§188]   What Are Not Defenses.

Among the excuses for tortious conduct that are usually rejected by the courts are the following:

(1) *Mistake or Innocent Motive*. This is seldom a defense. Thus, in actions for defamation, trespass, or conversion, the innocent motive or belief of the defendant is immaterial where the action is intentional. (See *Poggi v. Scott* (1914) 167 C. 372, 375, 139 P. 815; *Shahood v. Cavin* (1957) 154 C.A.2d 745, 751, 316 P.2d 700; Rest.2d, Torts §164; infra, §§626, 693, 713; on privileged mistake as defense, see Dobbs, The Law of Torts §69; 1 Harper, James & Gray 3d, §2.5.)

(2) *Coercion*. In accordance with the common law conception that all persons are free and equal, ''[o]ne whose conduct is otherwise tortious is not relieved from liability merely by the fact that his conduct is pursuant to the command of or is on account of another.'' (Rest.2d, Torts §888.)

(3) *''Jus Tertii'' (Rights of Third Persons)*. A defendant liable for interference with land or a chattel does not escape liability because a third person has an interest superior to that of the plaintiff, unless the third person either adopts the tortious act or discharges the defendant. (Rest.2d, Torts §895; see 1 Harper, James & Gray 3d, §2.8.)

(4) *Plaintiff's Violation of Law*. The fact that the injured person is committing a tort or crime, or is illegally in possession of land or a chattel

319

**43**

# SUMMARY OF CALIFORNIA LAW

## Tenth Edition

by B. E. WITKIN

*and members of the*

WITKIN LEGAL INSTITUTE

Volume 5



*2005*

auctioneer has knowledge of the fraud, he or she may be liable to the true
owner; if the auctioneer is without knowledge or notice, he or she is not
liable. And here, the trial judge found on sufficient evidence that plaintiffs
were estopped. Plaintiffs knew that the cattle were consigned to defendant,
they transferred physical possession to C, and they knew they were
accepting a draft. Plaintiffs were in a position to inquire into defendant's
ability to pay before putting him in possession and clothing him with
indicia of title. (259 C.A.2d 438.) (See 96 A.L.R.2d 208 [personal liability
of auctioneer to owner or mortgagee for conversion].)

#### (f) [§718] Negligent Loss or Destruction.

Because the act itself must be knowingly done, no action for conver-
sion will lie where only a negligent loss or destruction of property is
shown. (*Emmert v. United Bank* (1936) 14 C.A.2d 1, 4, 57 P.2d 963;
Rest.2d, Torts §224, Comment b; see 18 Am.Jur.2d (2004 ed.), Conver-
sion §22.)

In *George v. Bekins Van & Storage Co.* (1949) 33 C.2d 834, 848, 205
P.2d 1037, the court explained contrary dicta in prior cases, and held that
where the trial court found that goods were destroyed as a result of
defendant warehouseman's negligence, a further finding that defendant
had converted the goods could not be sustained.

### 6. [§719] Defense of Privilege.

Acts that would otherwise be a tortious interference with possession
of personal property may be protected by various privileges. (See gener-
ally Rest.2d, Torts §259 et seq.; supra, §131 et seq.) Thus:

(1) *Repossession by Person Entitled.* A person entitled to possession,
such as an unpaid conditional seller, has a privilege to peacefully repos-
sess the goods. (*Silverstin v. Kohler & Chase* (1919) 181 C. 51, 53, 183 P.
451; see Rest.2d, Torts §§183, 272.)

(2) *Landlord's Lien.* An apartment house keeper with a lien on his or
her tenant's personal property for unpaid rent may, on court order, take
possession of the property peaceably. (C.C. 1861a; see Rest.2d, Torts
§273; on entry under C.C. 1861a as defense to trespass to land, see supra,
§697.)

(3) *Court Order.* A public officer, e.g., a sheriff, may take goods under
a writ or other court order valid on its face. (Rest.2d, Torts §266; supra,
§161.) And a peace officer or game warden may seize property used or
obtained in violation of the law. (See *Bruce v. Sibeck* (1938) 25 C.A.2d

§719                                    TORTS

691, 696, 78 P.2d 741 [game wardens seized boats and equipment of men arrested for illegal fishing].)

(4) *Self-Defense.* A person " 'is privileged to commit an act which would otherwise be a trespass to or a conversion of a chattel in the possession of another, for the purpose of defending himself or a third person against the other.' " (*Church of Scientology v. Armstrong* (1991) 232 C.A.3d 1060, 1072, 283 C.R. 917 [quoting Rest.2d. Torts §261].) In *Church of Scientology,* defendant, a former member of plaintiff church, was given permission to conduct research for a planned biography of the church founder. During the search he ultimately obtained 500,000 to 600,000 documents. He was forced to take a lie detector test for reporting discrepancies between the information in the documents and representations previously made concerning the founder, and he left the church. Plaintiff then issued a series of "suppressive person declares" labeling defendant as an enemy of the church and subjecting him to the "Fair Game Doctrine"; i.e., he could be tricked, sued, lied to, deprived of property, or otherwise injured by any church member. Plaintiff also confiscated photographs of the founder that defendant had arranged to sell to a third party and ordered him to leave the church property when he objected. Thereafter, defendant received a letter from plaintiff threatening him with a lawsuit, and he became aware of investigators watching his house and following him. Fearing that his life was in danger and that he would be subjected to costly and harassing lawsuits, defendant sent a number of the documents to his attorney, and plaintiff brought this action for conversion. *Held,* judgment for defendant affirmed. Because he believed that his knowledge about the founder's life and the church's secret financial activities endangered the physical and mental well-being of himself and his wife, defendant was justified in taking the documents as a means of enabling him to support what he had said about the founder and the church and to refute the church's allegations against him. (232 C.A.3d 1073.)

*West's Key Number Digest.* Trover and Conversion ⊂=22

## C.  [§720]  Trespass to Personal Property.

(1) *In General.* Where the act in question does not amount to a dispossession, as in the case of conversion (see supra, §699), but of intermeddling with or use of or damage to the property, the normal action will be for trespass. The plaintiff recovers the actual damages suffered by impairment of the property or loss of its use. (*Zaslow v. Kroenert* (1946) 29 C.2d 541, 551, 176 P.2d 1 [defendant cotenant removed plaintiff's personal property to warehouse, notifying him that it could be obtained on

**44**

# RESTATEMENT OF THE LAW SECOND

# CONTRACTS 2d

### Volume 1
### §§ 1–177

*As Adopted and Promulgated*

BY

THE AMERICAN LAW INSTITUTE
AT WASHINGTON, D.C.

May 17, 1979

ST. PAUL, MINN.
AMERICAN LAW INSTITUTE PUBLISHERS
1981

## § 153. When Mistake of One Party Makes a Contract Voidable

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

Comment:

*a. Rationale.* Courts have traditionally been reluctant to allow a party to avoid a contract on the ground of mistake, even as to a basic assumption, if the mistake was not shared by the other party. Nevertheless, relief has been granted where the other party actually knew (see §§ 160, 161) or had reason to know of the mistake at the time the contract was made or where his fault caused the mistake. There has, in addition, been a growing willingness to allow avoidance where the consequences of the mistake are so grave that enforcement of the contract would be unconscionable. This Section states a rule that permits avoidance on this latter basis, as well as on the more traditional grounds. The rules stated in this Section also apply to option contracts, under which a party's offer is irrevocable either under a statute, such as one applying to bids for public works, or on other grounds. The parol evidence rule does not preclude the use of prior or contemporaneous agreements or negotiations to establish that a party was mistaken. See § 214(d). Nevertheless, because mistakes are the exception rather than the rule, the trier of the facts should examine the evidence with particular care when a party attempts to avoid liability by proving mistake. See Comment *c* to § 155. The rule stated in this Section is subject to that stated in § 157 on fault of the party seeking relief. It is also subject to the rules on exercise of the power of avoidance stated in §§ 380–85.

*b. Similarity to rule where both are mistaken.* In order for a party to have the power to avoid a contract for a mistake that he alone made, he must at least meet the same requirements that he would have had to meet had both parties been mistaken (§ 152). The mistake must be one as to a basic assumption on which the contract was made;

it must have a material effect on the agreed exchange of performances; and the mistaken party must not bear the risk of the mistake. The most common sorts of such mistakes occur in bids on construction contracts and result from clerical errors in the computation of the price or in the omission of component items. See Illustration 1. The rule stated in this Section is not, however, limited to such cases. It also applies, for example, to a misreading of specifications (see Illustration 4) or such misunderstanding as does not prevent a manifestation of mutual assent (see Illustrations 5 and 6). Where only one party is mistaken, however, he must meet either the additional requirement stated in Subparagraph (a) or one of the additional requirements stated in Subparagraph (b).

    *c. Additional requirement of unconscionability.* Under Subparagraph (a), the mistaken party must in addition show that enforcement of the contract would be unconscionable. The reason for this additional requirement is that, if only one party was mistaken, avoidance of the contract will more clearly disappoint the expectations of the other party than if he too was mistaken. See Introductory Note. Although § 208, Unconscionable Contract or Term, is not itself applicable to such cases since the unconscionability does not appear at the time the contract is made, the standards of unconscionability in such cases are similar to those under § 208 (see Comment *c* to § 208). The mistaken party bears the substantial burden of establishing unconscionability and must ordinarily show not only the position he would have been in had the facts been as he believed them to be but also the position in which he finds himself as a result of his mistake. For example, in the typical case of a mistake as to the price in a bid, the builder must show the profit or loss that will result if he is required to perform, as well as the profit that he would have made had there been no mistake.

**Illustrations:**

    1. In response to B's invitation for bids on the construction of a building according to stated specifications, A submits an offer to do the work for $150,000. A believes that this is the total of a column of figures, but he has made an error by inadvertently omitting a $50,000 item, and in fact the total is $200,000. B, having no reason to know of A's mistake, accepts A's bid. If A performs for $150,000, he will sustain a loss of $20,000 instead of making an expected profit of $30,000. If the court determines that enforcement of the contract would be unconscionable, it is voidable by A.

2. The facts being otherwise as stated in Illustration 1, the item that A inadvertently omits is a $35,000 item which would have made the total $185,000, so that if he does the work for $150,000 he will sustain a loss of $5,000 rather than make a profit of $30,000. The court may reach a result contrary to that in Illustration 1, on the ground that enforcement of the contract would not be unconscionable, and hold that it is not voidable by A.

3. The facts being otherwise as stated in Illustration 1, B has not accepted A's bid before notification of the mistake, but by statute A's bid is an irrevocable option contract because B is a state agency. In addition, A has posted a $10,000 bidder's bond with S as surety. If the court determines that enforcement of the option contract would be unconscionable, it is voidable by A and, on avoidance by A, S is not liable on the bond.

4. The facts being otherwise as stated in Illustration 1, the $50,000 error in A's bid is the result of A's mistake in interpreting B's specifications. If the court determines that enforcement of the contract would be unconscionable, it is voidable by A.

5. A writes B offering to sell for $100,000 a tract of land that A owns known as "201 Lincoln Street." B, who mistakenly believes that this description includes an additional tract of land worth $30,000, accepts A's offer. If the court determines that enforcement of the contract would be unconscionable, it is voidable by B.

6. A offers to sell B goods shipped from Bombay ex steamer "Peerless." B accepts. There are two steamers of the name "Peerless" sailing from Bombay at materially different times. B means Peerless No. 2, and A has reason to know this. A means Peerless No. 1, but B has no reason to know this. Under the rule stated in § 20 there is a contract for the sale of goods from Peerless No. 2, but, under the rule stated in this Section, if the court determines that its enforcement would be unconscionable, it is voidable by A. See Illustration 4 to § 20.

*d. Effect of reliance on unconscionability.* Reliance by the other party may make enforcement of a contract proper although enforcement would otherwise be unconscionable. If the mistake is discovered and the other party notified before he has relied on the contract, avoidance by the mistaken party deprives the other party only of his expectation, the "benefit of the bargain," (see § 344). If, however, the other party has relied on the contract in some substantial way, avoidance may leave that reliance uncompensated. In such a case, enforcement of the contract would not be unconscionable, even if

it otherwise would be.  If, however, the court can adequately protect
the other party by compensating him for his reliance under the rules
stated in § 158, avoidance is not then precluded on this ground.

**Illustrations:**

7.   In response to an invitation from B, a general contractor,
for bids from subcontractors, A submits an offer to B to do paving
work for $10,000, to be used by B as a partial basis for B's bid on a
large building.  As A knows, B is required to name his subcon-
tractors in his general bid.  Because of the short time in which A
has to prepare his bid, A inadvertently totals his bid as $10,000
rather than $15,000.  B uses A's bid in arriving at his offer of
$100,000, making A's offer irrevocable as an option contract (§
87).  B's offer is accepted, but A discovers his mistake before B
accepts his bid.  The option contract is not voidable by A because
of B's reliance by using A's offer in making up his own offer.  See
Illustration 6 to § 87.

8.   The facts being otherwise as stated in Illustration 1, on
A's refusal to perform for $150,000, B is no longer able to accept
the next lowest bid and has to re-advertise for bids at a cost of
$1,000 before getting a bid that he accepts.  If the court deter-
mines that enforcement of the contract would be unconscionable,
the contract is voidable by A in spite of B's reliance, because B can
be adequately protected by holding A liable for the $1,000 cost of
re-advertising (see § 158(1) and Comment *b* to that Section).

*e.  Had reason to know of or caused the mistake.*  If the other
party had reason to know of the mistake, the mistaken party can avoid
the contract regardless of whether its enforcement would be uncon-
scionable.  (The terminology "reason to know" is used instead of
"should know" on the ground explained in Comment *b* to § 19.  The
situation in which the other party actually knows of the mistake is
covered in § 161.  See Comment *d* to § 161.)  Similar results follow
where the other party's fault caused the mistake.  (If the mistake was
the fault of both parties, it was not caused by the other party within
the meaning of this Section and the court may exercise its discretion
under the rule stated in § 158(2).  See Comment *c* to § 158.)  In at-
tempting to unscramble a partially or completely executed transac-
tion, the court may allow the mistaken party recovery under the rules
stated in § 158(1).

Illustrations:

9.   The facts being otherwise as stated in Illustration 1, A does not prove what his profit or loss will be if he performs, but B had estimated the expected cost as $180,000 before advertising for bids and the ten other bids were all in the range between $180,000 and $200,000. If it is determined, because of the discrepancy between A's bid on the one hand and B's estimate and the ten other bids on the other, that B had reason to know of A's mistake, the contract is voidable by A.

10.   The facts being otherwise as stated in Illustration 7, if it is determined that B had reason to know of A's mistake, the contract is voidable by A.

*f.  Allocation of risk.*   Here, as under § 152, a party may undertake to perform in spite of a mistake that would otherwise allow him to avoid the contract. It is, of course, unusual for a party to bear the risk of a mistake that the other party had reason to know of or that was caused by his fault within Subparagraph (b). Because of the significance of allocation of risk in the law of mistake, the scope of this exception is spelled out in detail in § 154. (It is assumed in the illustrations to the present Section that the adversely affected party does not bear the risk under the rule stated in § 154.)

*g.  Mistake as to identity.*   Mistakes as to the identity of a party have sometimes been treated as distinct from other mistakes, but the modern trend is to apply the rules applicable to other mistakes. Cf. Uniform Commercial Code § 2–403(1)(a). Such a mistake is therefore subject generally to the rules stated in this Chapter and, since it is by its nature a mistake of only one of the parties, particularly to the rule stated in this Section. The identity of the other party, as distinguished, for example, from his financial standing (see Comment *b* to § 152), is usually a basic assumption on which a contract is made. If the other party knows that he is not the intended offeree, he cannot accept an offer. That case is governed by § 52. If, however, he accepts without knowing that he is not the intended offeree, a contract may result. See Comment *b* to § 52. Whether that contract is voidable by the offeror on the ground of mistake is governed by the rule stated in this Section. The contract is voidable by the mistaken party, under the rule stated in Subparagraph (b), if the other party has caused a mistake as to his identity or if he had reason to know of the mistake, as long as it has a material effect on the agreed exchange of performances. Otherwise it is not voidable unless enforcement of the contract would be unconscionable, under the rule stated in Subparagraph (a). In some transactions the identity of the other party is of sufficient

importance that he will be able to show unconscionability, but often he will not.

The situation in which a party deals with an agent acting secretly for an undisclosed principal is governed by the Restatement, Second, of Agency and not by the Restatement of this Subject. The basic principles there applied are not, however, inconsistent with the rule stated in this Section. The party who deals with such an agent gets that which he expects, the liability of the agent on the contract. See Restatement, Second, Agency § 322. Indeed, he gets more, for on disclosure of the agent's principal he can also hold the principal. See Restatement, Second, Agency § 186. Although it is also true that he may himself be liable to the principal, as well as to the agent, on the contract, this additional burden has not been regarded by the law of agency as sufficiently important to make enforcement of the contract against him unconscionable, since it does not change the terms of the contract.

**Illustrations:**

11.  In answer to an inquiry from "J. B. Smith Company," A offers to sell goods for cash on delivery. A mistakenly believes that the offeree is John B. Smith, who has an established business of good repute, but in fact it is a business run by his son, whose business is new and near insolvency. The son accepts, not knowing of A's mistake. If the court concludes that, because payment is to be cash on delivery, enforcement of the contract would not be unconscionable, the contract is not voidable by A.

12.  The facts being otherwise as stated in Illustration 11, A's offer is to sell goods on 90 days credit. If the court determines that, because payment is to be on 90 days credit, enforcement of the contract would be unconscionable, the contract is voidable by A. See §§ 251, 252; Uniform Commercial Code §§ 2–609, 2–702(1).

13.  The facts being otherwise as stated in Illustration 11, A's offer contains references to "your long established business" from which the son had reason to know of A's mistake. The contract is voidable by A.

## REPORTER'S NOTE

Subparagraph (a) liberalizes the rule stated in former § 503 (cf. Restatement of Restitution § 12) to take account of the trend of allowing avoidance although only one party has been mistaken. Subparagraph (b) states well-established grounds for avoidance. See 3 Corbin, Con-

§ 153    CONTRACTS, SECOND    Ch. 6

tracts §§ 608–12 (1960 & Supp. 1980); 13 Williston, Contracts §§ 1573, 1577–80 (3d ed. 1970); 2 Palmer, Law of Restitution § 12.3 (1978); Palmer, Mistake and Unjust Enrichment, ch. 3 (1962); Kronman, Mistake, Disclosure, Information, and the Law of Contracts, 7 J. Leg. Stud. 1 (1978), reprinted in Kronman & Posner, The Economics of Contract Law 114 (1979); Rabin, A Proposed Black-Letter Rule Concerning Mistaken Assumptions in Bargain Transactions, 45 Tex. L. Rev. 1273 (1967); Grimes & Walker, Unilateral Mistakes in Construction Bids: Methods of Proof and Theories of Recovery—A Modern Approach, 5 B.C. Ind. & Com. L. Rev. 213 (1964); Sharp, Promises, Mistake, and Reciprocity, 19 U. Chi. L. Rev. 286 (1952); Sharp, Promissory Liability II, 7 U. Chi. L. Rev. 250, 263–68 (1940); Lubell, Unilateral Palpable and Impalpable Mistake in Construction Contracts, 16 Minn. L. Rev. 137 (1932); Patterson, Equitable Relief for Unilateral Mistakes, 28 Colum. L. Rev. 859 (1928).

*Comment a.* Courts frequently show lack of sympathy with claims that one party "did not understand" a term, even if the legal consequences of the term are far from self-evident. See, e.g., Quinn v. Briggs, 172 Mont. 468, 565 P.2d 297 (1977) (tax consequences and character of real estate transaction); Farina v. Calvary Hill Cemetery, 566 S.W.2d 650 (Tex. Civ. App. 1978), ref. n.r.e. (personal liability in real estate transaction); Hurt v. Leatherby Ins. Co., 354 So.2d 918 (Fla. Dist. Ct. App. 1978) (effect of release of personal injury claim on claims against unnamed third parties). Cf. Reynolds-Penland Co. v. Hexter & Lobello, 567 S.W.2d 237

(Tex. Civ. App. 1978). Compare the so-called duty to read, discussed in Reporter's Note to § 23 Comment *b.* However, in Plains Cotton Coop. v. Wolf, 553 S.W.2d 800 (Tex. Civ. App. 1977), ref. n.r.e., members of a cooperative were permitted to claim mistake despite their failure to read a contract because of their reliance on representations by an agent of the cooperative.

*Comment c.* Illustration 1 is based on Elsinore Union Elementary School Dist. v. Kastorff, 54 Cal.2d 380, 6 Cal. Rptr. 1, 353 P.2d 713 (1960); Board of School Comm'rs v. Bender, 36 Ind. App. 164, 72 N.E. 154 (1904); Board of Educ. of Floyd County v. Hooper, 350 S.W.2d 629 (Ky. 1961); Board of Regents of Murray State Normal School v. Cole, 209 Ky. 761, 273 S.W. 508 (1925); Kutsche v. Ford, 222 Mich. 442, 192 N.W. 714 (1923); St. Nicholas Church v. Kropp, 135 Minn. 115, 160 N.W. 500 (1916); School Dist. of Scottsbluff v. Olson Constr. Co., 153 Neb. 451, 45 N.W.2d 164 (1950); Barlow v. Jones, 87 A. 649 (N.J. Ch. 1913); James T. Taylor & Son v. Arlington Independent School Dist., 160 Tex. 617, 335 S.W.2d 371 (1960); cf. Colvin v. Baskett, 407 S.W.2d 19 (Tex. Civ. App. 1966); Frazier v. State Bank of Decatur, 101 Ark. 135, 141 S.W. 941 (1911). But cf. Crenshaw County Hosp. Bd. v. St. Paul Fire & Marine Ins. Co., 411 F.2d 213 (5th Cir. 1969); Heifetz Metal Crafts v. Peter Kiewit Sons' Co., 264 F.2d 435 (8th Cir. 1959); Steinmeyer v. Schroeppel, 226 Ill. 9, 80 N.E. 564 (1907). Compare United States v. Systron-Donner Corp., 486 F.2d 249 (9th Cir. 1973), in which the mistake favored the mistaken party. This Illustration rejects, in part, Il-

lustration 1 to former § 503. As to Illustration 2, cf. O'Neill v. Broadview, Inc., 112 So.2d 280 (Fla. App. 1959); John J. Calnan Co. v. Talsma Builders, Inc. 67 Ill.3d 213, 10 Ill. Dec. 242, 367 N.E.2d 695 (1977) (it must be possible to place other party in statu quo). That the burden of showing unconscionability is on the party seeking avoidance, see Glamorgan Pipe & Foundry Co. v. Washington Suburban Sanitary Comm'n, 188 F. Supp. 840 (D. Md. 1960); Board of Water & Sewer Comm'rs of Mobile v. Spriggs, 274 Ala. 155, 146 So.2d 872 (1962). Illustration 3 is based on M. F. Kemper Constr. Co. v. City of Los Angeles, 37 Cal.2d 696, 235 P.2d 7 (1951); Boise Junior College Dist. v. Mattefs Constr. Co., 92 Idaho 757, 450 P.2d 604 (1969). See also Wil-Fred's, Inc. v. Metropolitan Sanitary Dist., 57 Ill. App.3d 16, 372 N.E.2d 946 (1978) (unconscionable to forfeit bid deposit when contractor's bid had been based on a subcontractor's mistake, the subcontractor would have been rendered insolvent if forced to perform and the Sanitary District had not changed its position). With respect to a clause in the invitation for bids stating that the bidder will not be released on account of mistake, see M. F. Kemper Constr. Co. v. City of Los Angeles, supra; Board of Regents of Murray State Normal School v. Cole, supra.

Illustration 4 is based on Connecticut v. F. H. McGraw & Co., 41 F. Supp. 369 (D. Conn. 1941); People v. John W. Rouse Constr. Corp., 26 A.D.2d 405, 274 N.Y.S.2d 981 (1966); Union Tank Car Co. v. Wheat Bros., 15 Utah 2d 101, 387 P.2d 1000 (1964); State v. Union Constr. Co., 9 Utah 2d 107, 339 P.2d 421 (1959). Illustration

5 is based on Fleischer v. McGehee, 111 Ark. 626, 163 S.W. 169 (1914); Goodrich v. Lathrop, 94 Cal. 56, 29 P. 329 (1892); see Winkelman v. Erwin, 333 Ill. 636, 165 N.E. 205 (1929); Stong v. Lane, 66 Minn. 94, 68 N.W. 765 (1896); Beatty v. Depue, 78 S.D. 395, 103 N.W.2d 187 (1960); cf. Perlmutter v. Bacas, 219 Md. 406, 149 A.2d 23 (1959). The facts in Illustration 6 are adapted from those in Illustration 4 to § 20; cf. Sunshine v. M. R. Mansfield Realty, Inc., 195 Colo. 95, 575 P.2d 847 (1978); Shrum v. Zeltwanger, 559 P.2d 1384 (Wyo. 1977).

Comment d.  Illustration 7 is based on Drennan v. Star Paving Co., 51 Cal.2d 409, 333 P.2d 757 (1958). Cf. John J. Calnan Co. v. Talsma Builders, Inc., 67 Ill.3d 213, 10 Ill. Dec. 242, 367 N.E.2d 695 (1977); Rural Municipality of Storthoaks v. Mobil Oil Canada Ltd., 55 D.L.R.3d 1 (1975), 7 U. T. Fac. L. Rev. 93 (1976). Illustration 8 is based on Board of Regents of Murray State Normal School v. Cole, 209 Ky. 761, 273 S.W. 508 (1925). But cf. Berkeley Unified School Dist. v. James I. Barnes Constr. Co., 123 F. Supp. 924 (N.D. Cal. 1954); W. F. Martens & Co. v. City of Syracuse, 183 A.D. 622, 171 N.Y.S. 87 (1918).

Comment e.  Illustration 9 is based on C. N. Monroe Mfg. v. United States, 143 F. Supp. 449 (E.D. Mich. 1956); Kemp v. United States, 38 F. Supp. 568 (D. Md. 1941); Kenneth E. Curran, Inc. v. State, 106 N.H. 558, 215 A.2d 702 (1965); Rushlight Automatic Sprinkler Co. v. City of Portland, 189 Or. 194, 219 P.2d 732 (1950); Gardner v. Meiling, 280 Or. 665, 572 P.2d 1012 (1978); Cofrancesco Constr. Co. v. Superior Components, 52 Tenn. App. 88, 371 S.W.2d 821 (1963);

**45**

# Restatement of the Law Second
# SECOND

# CONTRACTS 2d

## Volume 1
## §§ 1–177

### *As Adopted and Promulgated*

BY

## THE AMERICAN LAW INSTITUTE
AT WASHINGTON, D.C.

## May 17, 1979

ST. PAUL, MINN.
AMERICAN LAW INSTITUTE PUBLISHERS
1981

§ 153    CONTRACTS, SECOND    Ch. 6

see also Illustration 1 to former § 503; State of Connecticut v. F. H. McGraw & Co., 41 F. Supp. 369 (D. Conn. 1941); Chernick v. United States, 372 F.2d 492 (Ct. Cl. 1967); Geremia v. Boyarsky, 107 Conn. 387, 140 A. 749 (1928); Tyra v. Cheney, 129 Minn. 428, 152 N.W. 835 (1915); Union Tank Car Co. v. Wheat Bros., 15 Utah 2d 101, 387 P.2d 1000 (1964). But cf. Heifetz Metal Crafts v. Peter Kiewit Sons' Co., 264 F.2d 435 (8th Cir. 1959); Saligman v. United States, 56 F. Supp. 505 (E.D. Pa. 1944); Wender Presses v. United States, 170 Ct. Cl. 483, 343 F.2d 961 (1965). On the inference of one party's knowledge of the other's mistake, compare De Paola v. City of New York, 90 Misc.2d 379, 394 N.Y.S.2d 525 (1977), with Seattle-First Nat'l Bank v. Earl, 17 Wash. App. 830, 565 P.2d 1215 (1977). Illustration 10 is based on Union Tank Car Co. v. Wheat Bros., supra. As to the other party causing the error, see Plains Cotton Coop. v. Wolf, 553 S.W.2d 800 (Tex. Civ. App. 1977), ref. n.r.e.; Centex Constr. Co. v. James, 374 F.2d 921 (8th Cir. 1967); Standard Accident Ins. Co. v. Wilmans, 214 F. Supp. 53 (E.D. Ark. 1963).

*Comment g.* See 3 Corbin, Contracts §§ 601–03 (1960); 13 Williston, Contracts § 1558 (3d ed. 1970); Williams, Mistake as to Party in the Law of Contract, 23 Can. B. Rev. 271

(1945); Klein v. Tabatchnick, 418 F. Supp. 1368 (S.D.N.Y. 1976). Illustration 11 is based on Clement v. British America Assurance Co., 141 Mass. 298, 5 N.E. 847 (1886); Lunn & Sweet Co. v. Wolfman, 256 Mass. 436, 152 N.E. 893 (1926); cf. Traff v. Fabro, 337 Ill. App. 83, 84 N.E.2d 874 (1949); A & W Equip. Co. v. Carroll, 377 S.W.2d 895 (Ky. 1964); John Weber & Co. v. Hearn, 49 A.D. 213, 63 N.Y.S. 41 (1900). Contra: School Sisters of Notre Dame v. Kusnitt, 125 Md. 323, 93 A. 928 (1915). Illustration 12 is based on Moore v. Furstenwerth-Uhl Jewelry Co., 17 Ga. App. 669, 87 S.E. 1097 (1916); cf. Nutmeg State Mach. Corp. v. Shuford, 129 Conn. 659, 30 A.2d 911 (1943); Roof v. Morrison, Plummer & Co., 37 Ill. App. 37 (1890); School Sisters of Notre Dame v. Kusnitt, supra; Leone's Case, 239 Mass. 1, 131 N.E. 196 (1921); Jones v. Chicago, B. & Q. R. Co., 102 Neb. 853, 170 N.W. 170 (1918); Arthur Coal & Coke Co. v. Pittsburgh Coal Co., 17 Ohio C.C.R. (n.s.) 491, 32 Ohio C.C.R. 247 (1911), aff'd mem., 88 Ohio St. 621, 105 N.E. 766 (1913). It rejects the rule applied in Illustration 2 to former § 503. Illustration 13 is suggested by Potucek v. Cordeleria Lourdes, 310 F.2d 527 (10th Cir.), cert. denied, 372 U.S. 930 (1962).

## § 154.  When a Party Bears the Risk of a Mistake

**A party bears the risk of a mistake when**

**(a) the risk is allocated to him by agreement of the parties, or**

**(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the**

facts to which the mistake relates but treats his limited knowledge as sufficient, or

   (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

## Comment:

   *a.  Rationale.*  Absent provision to the contrary, a contracting party takes the risk of most supervening changes in circumstances, even though they upset basic assumptions and unexpectedly affect the agreed exchange of performances, unless there is such extreme hardship as will justify relief on the ground of impracticability of performance or frustration of purpose.  A party also bears the risk of many mistakes as to existing circumstances even though they upset basic assumptions and unexpectedly affect the agreed exchange of performances.  For example, it is commonly understood that the seller of farm land generally cannot avoid the contract of sale upon later discovery by both parties that the land contains valuable mineral deposits, even though the price was negotiated on the basic assumption that the land was suitable only for farming and the effect on the agreed exchange of performances is material.  In such a case a court will ordinarily allocate the risk of the mistake to the seller, so that he is under a duty to perform regardless of the mistake.  The rule stated in this Section determines whether a party bears the risk of a mistake for the purposes of both §§ 152 and 153.  Stating these rules in terms of the allocation of risk avoids such artificial and specious distinctions as are sometimes drawn between "intrinsic" and "extrinsic" mistakes or between mistakes that go to the "identity" or "existence" of the subject matter and those that go merely to its "attributes," "quality" or "value."  Even though a mistaken party does not bear the risk of a mistake, he may be barred from avoidance if the mistake was the result of his failure to act in good faith and in accordance with reasonable standards of fair dealing.  See § 157.

   *b.  Allocation by agreement.*  The most obvious case of allocation of the risk of a mistake is one in which the parties themselves provide for it by their agreement.  Just as a party may agree to perform in spite of impracticability or frustration that would otherwise justify his non-performance, he may also agree, by appropriate language or other manifestations, to perform in spite of mistake that would otherwise justify his avoidance.  An insurer, for example, may expressly undertake the risk of loss of property covered as of a date already past.  Whether the agreement places the risk on the mistaken party is a

question to be answered under the rules generally applicable to the
scope of contractual obligations, including those on interpretation,
usage and unconscionability. See Chapter 9.

**Illustration:**

> 1.  A contracts to sell and B to buy a tract of land.  A and B
> both believe that A has good title, but neither has made a title
> search.  The contract provides that A will convey only such title
> as he has, and A makes no representation with respect to title.  In
> fact, A's title is defective.  The contract is not voidable by B,
> because the risk of the mistake is allocated to B by agreement of
> the parties.

*c.  Conscious ignorance.*  Even though the mistaken party did
not agree to bear the risk, he may have been aware when he made the
contract that his knowledge with respect to the facts to which the
mistake relates was limited.  If he was not only so aware that his
knowledge was limited but undertook to perform in the face of that
awareness, he bears the risk of the mistake.  It is sometimes said in
such a situation that, in a sense, there was not mistake but "conscious
ignorance."

**Illustration:**

> 2.  The facts being otherwise as stated in Illustration 2 to §
> 152, A proposes to B during the negotiations the inclusion of a
> provision under which the adversely affected party can cancel the
> contract in the event of a material error in the surveyor's report,
> but B refuses to agree to such a provision.  The contract is not
> voidable by A, because A bears the risk of the mistake.

*d.  Risk allocated by the court.*  In some instances it is reasona-
bly clear that a party should bear the risk of a mistake for reasons
other than those stated in Subparagraphs (a) and (b).  In such in-
stances, under the rule stated in Subparagraph (c), the court will allo-
cate the risk to that party on the ground that it is reasonable to do so.
A court will generally do this, for example, where the seller of farm
land seeks to avoid the contract of sale on the ground that valuable
mineral rights have newly been found.  See Comment *a.*  In dealing
with such issues, the court will consider the purposes of the parties
and will have recourse to its own general knowledge of human behav-
ior in bargain transactions, as it will in the analogous situation in which
it is asked to supply a term under the rule stated in § 204.  The rule
stated in Subsection (c) is subject to contrary agreement and to usage
(§ 221).

**Illustrations:**

3.  The facts being otherwise as stated in Illustration 6 to § 152, C is not dead but is afflicted with an incurable fatal disease and cannot live more than a year. The contract is not voidable by A, because the court will allocate to A the risk of the mistake.

4.  A, an owner of land, and B, a builder, make a contract under which B is to take from A's land, at a stated rate per cubic yard, all the gravel and earth necessary for the construction of a bridge, an amount estimated to be 114,000 cubic yards. A and B believe that all of the gravel and earth is above water level and can be removed by ordinary means, but in fact about one quarter of it is below water level, so that removal will require special equipment at an additional cost of about twenty percent. The contract is not voidable by B, because the court will allocate to B the risk of the mistake. Compare Illustration 5 to § 266.

5.  A contracts with B to build a house on B's land. A and B believe that subsoil conditions are normal, but in fact some of the land must be drained at an expense that will leave A no profit under the contract. The contract is not voidable by A, because the court will allocate to A the risk of the mistake. Compare Illustration 8 to § 266.

6.  The facts being otherwise as stated in Illustration 1 to § 153, the $50,000 error in A's bid is the result of A's mistaken estimate as to the amount of labor required to do the work. A cannot avoid the contract, because the court will allocate to A the risk of the mistake.

## REPORTER'S NOTE

This Section is new. See 3 Corbin, Contracts §§ 598, 600, 605 (1960 & Supp. 1980); 13 Williston, Contracts §§ 1543A, 1559, 1560, 1566A, 1568, 1568A (3d ed. 1970); Kronman, Mistake, Disclosure, Information, and the Law of Contracts, 7 J. Leg. Stud. 1 (1978), reprinted in Kronman & Posner, The Economics of Contract Law 114 (1979); Rabin, A Proposed Black-Letter Rule Concerning Mistaken Assumptions in Bargain Transactions, 45 Tex. L. Rev. 1273 (1967); Patterson, The Apportionment of Business Risks Through Legal De-

vices, 24 Colum. L. Rev. 335, 355–57 (1924).

*Comment b.* Illustration 1 is based on Illustration 7 to former § 502 and Talman v. Dixon, 253 N.C. 193, 116 S.E.2d 338 (1960); see Beecher v. Able, 575 F.2d 1010 (2d Cir. 1978); Flippin Materials Co. v. United States, 312 F.2d 408 (Ct. Cl. 1963); United States v. Hathaway, 242 F.2d 897 (9th Cir. 1957); cf. Raddue v. LeSage, 138 Cal. App.2d 852, 292 P.2d 522 (1956).

*Comment c.* The facts in Illustration 2 are suggested by those in Illus-

§ 154    CONTRACTS, SECOND    Ch. 6

tration 2 to § 152, and the result is supported by Friedman v. Grevnin, 360 Mich. 193, 103 N.W.2d 336 (1960); Highway Prods. v. United States, 208 Ct. Cl. 926, 530 F.2d 911 (1976); cf. Wright and Pierce v. Wilmington, 290 F.2d 30 (1st Cir. 1961).

*Comment d.*    Illustration 3 is based on Aldrich v. Travelers Ins. Co., 317 Mass. 86, 56 N.E.2d 888 (1944); Woodworth v. Prudential Ins. Co., 258 A.D. 103, 15 N.Y.S.2d 541 (1939), aff'd mem., 282 N.Y. 704, 26 N.E.2d 820 (1940); cf. Backus v. MacLaury, 278 A.D. 504, 106 N.Y.S.2d 401 (1951); Wood v. Boynton, 64 Wis. 265, 25 N.W. 42 (1885). The

facts in Illustration 4 are suggested by Illustration 5 to § 266 and by Mineral Park Land Co. v. Howard, 172 Cal. 289, 156 P. 458 (1916), and Edwards v. Trinity & B. V. Ry. Co., 54 Tex. Civ. App. 334, 118 S.W. 572 (1909), error ref.; cf. Flippin Materials Co. v. United States, 312 F.2d 408 (Ct. Cl. 1963). The facts in Illustration 5 are suggested by Illustration 8 to § 266 and by Rowe v. Town of Peabody, 207 Mass. 26, 93 N.E. 604 (1911), and Stees v. Leonard, 20 Minn. 494 (1874); see Illustration 8 to former § 502.

## § 155.    When Mistake of Both Parties as to Written Expression Justifies Reformation

**Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.**

**Comment:**

*a.  Scope.*  The province of reformation is to make a writing express the agreement that the parties intended it should.  Under the rule stated in this Section, reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing.  Their mistake is one as to expression—one that relates to the contents or effect of the writing that is intended to express their agreement—and the appropriate remedy is reformation of that writing properly to reflect their agreement.  For the rule stated in this Section to be invoked, therefore, there must have been some agreement between the parties prior to the writing.  The prior agreement need not, however, be complete and certain enough to be a contract.  Compare § 1 with § 3; see § 33. If the parties reach agreement as to only part of a prospective bargain,

**46**

# RESTATEMENT OF THE LAW
## SECOND

# CONTRACTS 2d

## Volume 1
§§ 1–177

*As Adopted and Promulgated*

BY

THE AMERICAN LAW INSTITUTE
AT WASHINGTON, D.C.

May 17, 1979

ST. PAUL, MINN.
AMERICAN LAW INSTITUTE PUBLISHERS
1981

§ 156    CONTRACTS, SECOND    Ch. 6

supra, denying reformation of a memorandum within the Statute of Frauds has been disapproved in 2 Corbin, Contracts § 342 (1950); 16 Cornell L.Q. 390 (1931); 44 Harv. L. Rev. 866 (1931); 29 Mich. L. Rev. 1085 (1931); 40 Yale L.J. 795 (1931). Illustration 3 is based on Calhoun v. Downs, 211 Cal. 766, 297 P. 548 (1931); Hughes v. Payne, supra; cf. Froyd v. Schultz, supra. This Section rejects the position taken in Safe Deposit & Trust Co. v. Diamond Coal & Coke Co., 234 Pa. 100, 83 A. 54 (1912), and Fosburgh v. Sando, 24 Wash.2d 586, 166 P.2d 850 (1946), that reformation cannot be granted where a writing within the Statute of Frauds is insufficient on its face because of an omission. Compare Fosburgh v. Sando, supra, with Tenco, Inc. v. Manning, 59 Wash.2d 479, 368 P.2d 372 (1962). Illustration 4 is supported by Hughes v. Payne, 27 S.D. 214, 130 N.W. 81 (1911). But see Ogilvie v. Hill, 563 S.W.2d 846 (Tex. Civ. App. 1978), ref. n.r.e.

## § 157.  Effect of Fault of Party Seeking Relief

**A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.**

**Comments:**

*a. Rationale.* The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude either avoidance (§§ 152, 153) or reformation (§ 155). Indeed, since a party can often avoid a mistake by the exercise of such care, the availability of relief would be severely circumscribed if he were to be barred by his negligence. Nevertheless, in extreme cases the mistaken party's fault is a proper ground for denying him relief for a mistake that he otherwise could have avoided. Although the critical degree of fault is sometimes described as "gross" negligence, that term is not well defined and is avoided in this Section as it is in the Restatement, Second, of Torts. Instead, the rule is stated in terms of good faith and fair dealing. The general duty of good faith and fair dealing, imposed under the rule stated in § 205, extends only to the performance and enforcement of a contract and does not apply to the negotiation stage prior to the formation of the contract. See Comment *c* to § 205. Therefore, a failure to act in good faith and in accordance with reasonable standards of fair dealing during pre-contractual negotiations does not amount to a breach. Nevertheless, under the rule stated in this Section, the failure bars a mistaken party from relief

based on a mistake that otherwise would not have been made. During the negotiation stage each party is held to a degree of responsibility appropriate to the justifiable expectations of the other. The terms "good faith" and "fair dealing" are used, in this context, in much the same sense as in § 205 and Uniform Commercial Code § 1–203.

**Illustrations:**

1. The facts being otherwise as stated in Illustration 1 to § 153, A's mistake is caused by his failure to exercise reasonable care in totalling and verifying his figures. A's negligence does not amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing, and he is not precluded from avoiding the contract.

2. The facts being otherwise as stated in Illustration 1 to § 153, B, on finding that A's bid is the lowest, asks A to check his figures to make certain that there has been no mistake. A states that he has done so although he has not and although such a check would have revealed his mistake. B then accepts A's bid. A's conduct amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing, and he cannot avoid the contract.

b. *Failure to read writing.* Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them; his assent is deemed to cover unknown as well as known terms. See Comment b to § 23; Comment b to § 211. But see the special rule of § 211(3) for the case of standardized agreements. The exceptional rule stated in the present Section with regard to reformation has no application to the common case in which the term in question was not the subject of prior negotiations. It only affects cases that come within the scope of § 155, under which there must have been an agreement that preceded the writing. In such a case, a party's negligence in failing to read the writing does not preclude reformation if the writing does not correctly express the prior agreement. See Illustration 3. Where there was no prior agreement, however, this Section does not apply because reformation is not available under § 155. See Illustration 4.

**Illustrations:**

3. The facts being otherwise as stated in Illustration 1 to § 155, neither A nor B reads the writing before signing it, although the omission would be obvious to either if he read it. Neither A's nor B's conduct amounts to a failure to act in good faith and in

§ 157        CONTRACTS, SECOND        Ch. 6

accordance with reasonable standards of fair dealing, and neither A nor B is precluded from obtaining a decree reforming the writing.

4.  A mails B a written offer to sell B a tract of land for $100,000, with a provision that B will assume an existing mortgage of $50,000.  B fails to read all of the terms of A's offer and sends his acceptance without knowing of the provision for assumption of the mortgage.  B is bound by the provision for assumption.  Since B cannot obtain a decree of reformation under the rule stated in § 155, this Section does not apply.

### REPORTER'S NOTE

This Section is based in part on former § 508. Cf. Restatement of Restitution § 59. See 3 Corbin, Contracts §§ 606, 607 (1960 & Supp. 1980); 13 Williston, Contracts § 1596 (3d ed. 1970).

*Comment a.* Illustration 1 is based on James T. Taylor & Son v. Arlington Indep. School Dist., 160 Tex. 617, 335 S.W.2d 371 (1960), on remand, 354 S.W.2d 618 (1962), ref. n.r.e.; cf. Bethlehem Steel Corp. v. Centex Homes Corp., 327 So.2d 837 (Fla. Dist. Ct. App. 1976) (issue of fact whether there was "inexcusable neglect"); State v. Union Constr. Co., 9 Utah 2d 107, 339 P.2d 421 (1959). Contra: Steinmeyer v. Schroeppel, 226 Ill. 9, 80 N.E. 564 (1907); John J. Calnan Co. v. Talsma Builders, Inc., 67 Ill.3d 213, 10 Ill. Dec. 242, 367 N.E.2d 695 (1977); see Terre Haute Cooperage v. Branscome, 203 Miss. 493, 35 So.2d 537 (1948). Courts purporting to apply a harsher rule than that stated in this Section may temper the result obliquely. Some have applied a rule of law excusing negligent mistakes induced by the other party's misrepresentation, even if innocent. See, e.g., Isaacs v. Bokor, 566 S.W.2d 532 (Tenn. 1978); Plains Cotton Coop. v. Wolf, 553 S.W.2d 800

(Tex. Civ. App. 1977), ref. n.r.e.; but see Farina v. Calvary Hill Cemetery, 566 S.W.2d 650 (Tex. Civ. App. 1978), ref. n.r.e. Others have made a finding of fact that a specific failure to exercise care was not unreasonable. See, e.g., Vermette v. Anderson, 16 Wash. App. 466, 558 P.2d 258 (1976) (failure to investigate slope stability not "culpably negligent" in circumstances); St. John's Episcopal Hosp. v. McAdoo, 94 Misc.2d 967, 405 N.Y.S.2d 935 (Civ. Ct. 1978) ("A hospital emergency room is certainly not a place in which any but the strongest can be expected to exercise calm and dispassionate judgment"). Illustration 2 is supported by Anderson Bros. v. O'Meara, 306 F.2d 672 (5th Cir. 1962); cf. Bowser, Inc. v. Hamilton Glass Co., 207 F.2d 341 (7th Cir. 1953).

*Comment b.* The general rule of non-excuse of mistakes caused by one party's failure to read a writing is illustrated by Quinn v. Briggs, 172 Mont. 468, 565 P.2d 297 (1977); Reynolds-Penland Co. v. Hexter & Lobello, 567 S.W.2d 237 (Tex. Civ. App. 1978). Illustration 3 is based on Illustration 2 to former § 508; Collins v. Parkinson, 98 Idaho 871, 574 P.2d 913 (1978); Cox v. Hall, 54 Mont. 154, 168

**47**

# RESTATEMENT OF THE LAW
## Second

# TORTS 2d

## Volume 1
### §§ 1–280

*As Adopted and Promulgated*

BY

THE AMERICAN LAW INSTITUTE

AT WASHINGTON, D. C.

May 25, 1963
and
May 22, 1964

ST. PAUL, MINN.

AMERICAN LAW INSTITUTE PUBLISHERS

1965

§ 153                  TORTS, SECOND                  Ch. 6

b. Statutes in many jurisdictions regulate the punishment which may be inflicted in public or even private schools, particularly with reference to corporal punishment.

Comment on Subsection (2):

c. The words "public officer" include a teacher in a public school, provided by the State for the education of its children, and the staff of a reformatory or other institution to which children are committed for education or training, even though such commitment is a penalty for delinquency. Such persons do not act as the delegates of the parent, but as officers of the State or municipality, carrying out its public policy.

d. Public schools. This Subsection applies not only where the parent is required to send his child to a public school, but also where, having the option to send the child to such a school or to a private school, he elects the former. It is also applicable where the parent, without obligation to do so, sends his child to a high school or State college or university. In such cases, the fact that the parent expresses a desire that the child should not be punished in a particular way or for a particular offense does not restrict the privilege of the school authorities. The will of the parent cannot defeat the policy of the State. The school authorities, therefore, have such disciplinary privilege as is reasonably necessary to secure the education of the child irrespective of the wishes of its parent. The same is true where the parent sends the child to a public school in preference to a private school as a matter of economy or choice. However, no order of the school board or other body in charge of the public schools can confer upon the school authorities any privilege in excess of those stated in this Topic.

§ 154. Privilege of One in Charge of Group

One who is in charge of the training or education of a group of children is privileged to apply such force or impose such confinement upon one or more of them as is reasonably necessary to secure observance of the discipline necessary for the education and training of the children as a group.

Comment:

a. A schoolmaster or the staff in charge of a summer camp is privileged to use reasonable force for the purpose of pre-

See Appendix for Reporter's Notes, Court Citations, and Cross References

272

serving the discipline necessary for the proper education or training of the children as a group irrespective of whether the conduct of a child is such as to require the use of such force for its individual training or education.

§ 155. Effect of Excessive Force

If the actor applies a force or imposes a confinement upon a child which is in excess of that which is privileged,

(a) the actor is liable for so much of the force or confinement as is excessive;

(b) the child has the privilege stated in §§ 63–75 to defend himself against the actor's use or attempted use of the excessive force or confinement.

Comment:

a. An excessive punishment inflicted by one who is privileged under the rule stated in § 147 makes the actor liable for that part of the punishment which is in excess of that which he is privileged to inflict. It does not make him liable for so much of the punishment as was inflicted before the privilege was abused by the excessive punishment. The child is privileged to use force to defend himself from the excessive punishment under the rules stated in §§ 63–75.

### TOPIC 3. PRIVILEGE ANCILLARY TO DUTY OF PROTECTION

§ 156. General Principle

One who is under a duty to protect a third person or his land or chattels against harm from the misconduct of another is privileged to use such force against or to impose such restraint upon the other as is

(a) reasonable in view of the threatened harm, and

(b) reasonably necessary for the performance of his duty.

Comment:

a. The privilege stated in this Section is in some particulars concurrent with the privilege, stated in § 76, to use reason-