# EXHIBIT 4

Westlaw.

968 P.2d 539                                                                    Page 1
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

▷
Diamond Multimedia Systems, Inc. v. Superior Court
Cal. 1999.
    DIAMOND MULTIMEDIA SYSTEMS, INC. et
al., Petitioners,
v.
THE SUPERIOR COURT OF SANTA CLARA
COUNTY, Respondent; JOANNE PASS et al., Real
Parties in Interest.
**No. S058723.**

Supreme Court of California
Jan. 4, 1999.

SUMMARY

Purchasers of a California company's common
stock brought a class action against the company
and individual officers seeking damages under
Corp. Code, § 25500, for an alleged violation of
Corp. Code, § 25400, subd. (d) (unlawful for any
person in this state to knowingly make false or mis-
leading statements to induce stock transaction), of
the Corporate Securities Law (Corp. Code, § 25000
et seq.). Plaintiff class included both residents and
nonresidents of California. The trial court entered
an order overruling defendants' demurrer to the ac-
tion, finding that plaintiffs had adequately alleged
that defendants made misstatements for the purpose
of inducing purchase of the company's stock.
(Superior Court of Santa Clara County, Nos.
CV758927, CV759012 and CV759270, Peter G.
Stone, Judge.) The Court of Appeal, Sixth Dist.,
No. H016376, summarily denied defendants' peti-
tion for a writ of mandate seeking to compel the tri-
al court to sustain their demurrer and to dismiss the
class action.

The Supreme Court affirmed the judgment of the
Court of Appeal. The court held that the class action
was properly brought under Corp. Code, §§
25400 and 25500, since the conduct giving rise to
liability under Corp. Code, § 25400, subd. (d), oc-

curred in California. The civil remedy of Corp.
Code, § 25500, is available to both in-state and out-
of-state purchasers and sellers of securities whose
price has been affected by the unlawful market ma-
nipulation proscribed by Corp. Code, § 25400. The
remedy is not limited to intrastate transactions. The
Corp. Code, § 25400, phrase "in this state" simply
describes the location in which the proscribed con-
duct must occur. Further, Corp. Code, § 25500,
does not limit a violator's liability to persons who
purchase or sell stock in California. Under the stat-
ute, "any person" affected by acts of market manip-
ulation occurring in California may recover dam-
ages from the violator. The court further held im-
position of civil liability for violation of Corp.
Code, § 25400, subd. (d), would not conflict with
any provision of the federal securities laws applic-
able to this litigation. (Opinion by Baxter, J., with
George, C. J., Mosk, Kennard, and Werdegar, JJ.,
concurring. Dissenting opinion by Brown, J., with
Chin, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1) Statutes § 30--Construction--Language--Literal
Interpretation; Plain Meaning Rule.**
To determine the legislative intent of a statute, a
court begins with the words of the statute, because
they generally provide the most reliable indicator of
legislative intent. If the language is clear and unam-
biguous, the court's inquiry ends. There is no need
for judicial construction, and the court may not in-
dulge in it. If there is no ambiguity in the language,
the court presumes that the Legislature meant what
it said, and the plain meaning of the statute gov- erns.

**(2a, 2b, 2c, 2d) Securities Regulations §
20--Corporate Securities Law--Making False State-
ments to Induce Stock Transaction--Applicability
of Civil Remedy to Interstate Transactions.**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539

19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

The trial court properly overruled a demurrer by defendants, a California company and individual corporate officers, to a class action brought by purchasers of the company's common stock, which included both residents and nonresidents of California, for damages under Corp. Code, § 25500, for an alleged violation of Corp. Code, § 25400, subd. (d) (unlawful for any person in this state to knowingly make false or misleading statements to induce stock transaction), of the Corporate Securities Law (Corp. Code, § 25000 et seq.). The class action was properly brought under Corp. Code, §§ 25400 and 25500, since the conduct giving rise to liability under Corp. Code, § 25400, subd. (d), occurred in California. The civil remedy of Corp. Code, § 25500, is available to both in-state and out-of-state purchasers and sellers of securities whose price has been affected by the unlawful market manipulation proscribed by Corp. Code, § 25400. The remedy is not limited to intrastate transactions. The phrase "in this state" simply describes the location in which the proscribed conduct must occur. The statute does not require that the unlawful acts must be done with the intent to induce the transaction in California by a third party. Moreover, the manipulative conduct is unlawful regardless of whether any transaction actually occurs. Further, Corp. Code, § 25500, does not limit a violator's liability to persons who purchase or sell stock in California. Under the statute, "any person" affected by acts of market manipulation occurring in California may recover damages from the violator. Finally, imposition of civil liability for violation of Corp. Code, § 25400, subd. (d), would not conflict with any provision of the federal securities laws applicable to this litigation.
[See 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 299.]

**(3)** Securities Regulations § 17--Corporate Securities Law--Statutory Prohibition on Market Manipulation--Applicability to Interstate Transactions.
To the extent that Corp. Code, § 25400, subds. (a) and (b), prohibit any person in this state to make stock transactions for market manipulation purposes, Corp. Code, § 25008, applies to establish whether that conduct occurred in California. The

definition of "in this state" is not restrictive, however, and does not operate to confine liability for violation of Corp. Code, § 25400, to intrastate transactions.

**(4)** Statutes § 20--Construction--Judicial Function.
It is not the court's function to insert statutory language omitted by the Legislature.

**(5)** Statutes § 42--Construction--Extrinsic Aids.
Only when the language of a statute is susceptible to more than one reasonable construction is it appropriate to turn to extrinsic aids, including the legislative history of the measure, to ascertain its meaning.

**(6)** Securities Regulations § 1--Effect of Federal Securities Law on State Regulation and Remedies.
The Securities Exchange Act (15 U.S.C. § 78bb(a)) makes it clear that, except to the extent it has been subsequently modified by the Securities Exchange Litigation Uniform Standards Act, federal law in this area supplements, but does not displace, state regulation and remedies. Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions.

**(7)** Pleading § 16--Complaint--Sufficiency.
A complaint is sufficient and must be upheld if it states a cause of action on any theory.

**(8)** Securities Regulations § 20--Corporate Securities Law--Making False Statements to Induce Stock Transaction--Recovery of Damages by Out-of-state Investors--Burden on Interstate Commerce:Commerce § 3--State Regulation of Interstate Commerce.
In a class action brought by purchasers of a California company's common stock (which class included both residents and nonresidents of California) against the company and individual corporate officers, for damages under Corp. Code, § 25500, for an alleged violation of Corp. Code, § 25400, subd. (d) (unlawful for any person in this state to knowingly make false or misleading statements to induce stock transaction), the trial court properly overruled

a demurrer by defendants on commerce clause grounds. Permitting out-of-state investors to recover damages under Corp. Code, § 25500, does not impose an impermissible burden on interstate commerce in violation of the commerce clause (U.S. Const., art. I, § 8). Corp. Code, § 25400, regulates only manipulative conduct in California; it does not purport to regulate any securities transactions occurring outside of this state, and does not discriminate against interstate commerce.

## COUNSEL

Wilson Sonsini Goodrich & Rosati, Steven M. Schatz, Terry T. Johnson, Marta Cervantes, Thomas J. Martin and Rebecca A. Mitchells for Petitioners.
Daniel J. Popeo, David M. Young; and Lawrence W. Schonbrun for Washington Legal Foundation and Allied Educational Foundation as Amici Curiae on behalf of Petitioners.
Brobeck, Phleger & Harrison, Thomas M. Peterson, Tower C. Snow, Jr., Robert P. Varian, John B. Missing, Sara B. Brody, Patrick Thomas Murphy and Rachael E. Meny for the Securities Industry Association, the National Venture Capital Association and the American Electronics Association as Amici Curiae on behalf of Petitioners.
Shearman & Sterling, Jeffrey S. Facter, David L. Anderson and Michele F. Kyrouz for Adobe Systems Incorporated as Amici Curiae on behalf of Petitioners.
No appearance for Respondent.
Milberg Weiss Bershad Hynes & Lerach, Alan Schulman, Mark Solomon, William S. Dato; Abbey, Gardy & Squitieri, Arthur N. Abbey, Jill S. Abrams, James J. Seirmarco; Bernstein Litowitz Berger & Grossmann, Daniel L. Berger, Jeffrey N. Leibell; Faruqi & Faruqi, Nadeem Faruqi; Stull, Stull & Brody and Jules Brody for Real Parties in Interest Joanne Pass et al.
Barack, Rodos & Bacine, Edward M. Gergosian, Kristi A. Shelton; Burt & Pucillo, Michael J. Pucillo and Wendy H. Zoberman for Real Party in Interest the Lauren Group.
James McMahon; Harold E. Dunbar; Berman, De-Valerio, Pease & Tabacco and Joseph J. Tabacco,

Jr., for the Pennsylvania State Employees' *1040 Retirement System and the Missouri State Employees' Retirement System as Amici Curiae on behalf of Real Parties in Interest Joanne Pass et al.
Mooney, Green, Baker, Gibson and Saindon and Robert H. Stropp, Jr., for National Council of Senior Citizens as Amicus Curiae on behalf of Real Parties in Interest Joanne Pass et al.
Earl V. Brown, Jr.; and Judy Scott for the International Brotherhood of Teamsters and the Service Employees International Union as Amici Curiae on behalf of Real Parties in Interest Joanne Pass et al.
Rossbacher & Associates and Henry H. Rossbacher for National Council of Senior Citizens, the International Brotherhood of Teamsters and the Service Employees International Union as Amici Curiae on behalf of Real Parties in Interest Joanne Pass et al.

## BAXTER, J.

Corporations Code section 25400, a part of the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.), [FN1] provides that it is unlawful in this state to make false statements or engage in specified fraudulent transactions which affect the market for a security when done for the purpose of inducing purchase or sale of the security or raising or depressing the price of the security. In short, it prohibits market manipulation. [FN2] Section 25500 creates a civil remedy for buyers or sellers of stock FN3 the price of which has been affected by the forms of market manipulation proscribed by section 25400.

> FN1 All statutory references are to the Corporations Code unless otherwise stated. References to the Corporate Securities Law are to the Corporate Securities Law of 1968.

> FN2 " 'Manipulation' is 'virtually a term of art when used in connection with securities markets.' *Ernst & Ernst*, 425 U.S., at 199 [96 S.Ct. at 1384]. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

Page 4

affecting market activity. See, *e.g.*, § 9 of the 1934 Act, 15 U.S.C. § 78i (prohibiting specific manipulative practices); *Ernst & Ernst*, *supra*, at 195, 199 n. 21, 205 [96 S.Ct. at 1382, 1384, 1386];*Piper v. Chris-Craft Industries, Inc.*, *ante*, at 43 [97 S.Ct. at 950] (Rule 10b-6, also promulgated under § 10(b), is 'an antimanipulative provision designed to protect the orderliness of the securities market during distributions of stock' and 'to prevent stimulative trading by an issuer in its own securities in order to create an unnatural and unwarranted appearance of market activity') ...." (*Santa FeIndustries, Inc.* v. *Green* (1977) 430 U.S. 462, 476 [97 S.Ct. 1292, 1302, 51 L.Ed.2d 480].)

FN3 The definition of "security" encompasses many other kinds of financial interests. (See § 25019.) Because this litigation, as is true of most litigation raising the issues addressed here, involves stock, we refer to "stock" rather than "security."

The principal question in this mandamus action is whether that civil remedy is available to out-of-state purchasers who bought or sold a stock *1041 whose price was affected by market manipulation if the purchase or sale took place outside the State of California. The matter reached this court after the Court of Appeal summarily denied a petition for writ of mandate by which petitioners, defendants in the underlying lawsuit, sought to compel the Santa Clara County Superior Court to sustain their demurrer and dismiss a class action seeking damages under section 25500 for an alleged violation of section 25400. This court granted review and issued an order to show cause. We conclude that this action is properly brought under sections 25400 and 25500 and affirm the judgment of the Court of Appeal.

I. The Superior Court Action

Plaintiff Joanne Pass filed the underlying action as a class action on behalf of all purchasers of the common stock of Diamond Multimedia Systems, Inc. (Diamond Multimedia) between October 26, 1995, and June 20, 1996, except the named defendants and their families. The named defendants are Diamond Multimedia, Hyung Hwe Huh, its senior vice-president and chief technical officer; William J. Schroeder, board member, president, and chief executive officer; Gary B. Filler, senior vice-president and chief financial officer; and Chong-Moon Lee, founder and chairman of the board. Lee, Filler, and Schroeder controlled Diamond Multimedia through their board positions and stock ownership.

A. *General allegations.*

The complaint alleges [FN4] that all of the individual defendants were aware of adverse nonpublic information about Diamond Multimedia's business, finances, products, markets and present and future business prospects. Each was aware of and approved false statements issued by or on behalf of Diamond Multimedia during the class period. [FN5] The November 1995 stock offering which followed raised over $94 million for Diamond Multimedia *1042 while the individual defendants each received more than $2 million for the shares they sold, based on their insider information, at the artificially inflated price.

FN4 For purposes of ruling on a demurrer, the court assumes the truth of all well-pleaded allegations of a complaint. The ability of the plaintiff to prove them is not in issue. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 635 [49 Cal.Rptr.2d 377, 909 P.2d 981].)

FN5 The allegedly false and misleading statements made during the class period included statements in Securities and Exchange Commission filings in conjunction with an offering of shares. Allegedly the

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

Page 5

filings overstated assets, and omitted information about significant problems with Diamond Multimedia products which the statement described only generally. Other allegations are directed to publicity generated by the company about new product introduction which allegedly was intended to offset concern that the stock offering would dilute earnings, false and misleading information about the company provided to securities analysts, who relied on that information in making buy recommendations and projecting increased earnings and a target price for Diamond Multimedia shares of $44 to $47 in their reports. The complaint included specifics regarding the "true" facts of which defendants were aware, including customer dissatisfaction with and decreased demand for Diamond Multimedia products, canceled orders, "massive" return of products, unreliable suppliers, inadequate inventory control, overstated and obsolete inventory, and accounting practices which were not prepared in accordance with generally accepted accounting practices and were designed to falsely reflect continued financial success at a time when defendants allegedly knew that business was "collapsing" and revenues were declining dramatically.

Diamond Multimedia is a manufacturer and supplier of graphics accelerator and modem products, having its executive offices and principal place of business in San Jose, California. Its shares are traded on the NASDAQ National Market system. FN6 During the class period the shares rose from just under $20 per share on April 13, 1995, to over $40 per share in December 1995. At the time of a November 1995 offering, Diamond Multimedia sold 3,150,000 shares, and the individual defendants sold 315,041 shares at prices in the $30 per share range. In January through March 1996, the individual defendants sold 226,672 shares and in April and May 1996, they sold $136,250 worth of

shares. The price of the shares had declined to the $20 per share range at that time. The price fell to as low as 91/8 per share following a June 20, 1996, revelation by Diamond Multimedia that it would suffer a loss and subsequent admission that it would write down its inventory.

> FN6 NASDAQ is an acronym for National Association of Securities Dealers Automated Quotation System.

The plaintiff class includes California residents and others throughout the United States. Pass alleged that she had purchased 800 shares of Diamond Multimedia stock on May 17, 1996, at 183/4 per share. The place of purchase is not stated.

### B. The section 25400 cause of action.

The complaint purports to state a cause of action under subdivision (d) of section 25400 which provides: "It is unlawful for any person, directly or indirectly, in this state: [¶] ... [¶] (d) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading." *1043

In support of the section 25400 cause of action, the complaint alleges that defendants individually and pursuant to a conspiracy, or as aiders and abetters of one another, made untrue statements of material facts, omitted to state material facts necessary to make the statements not misleading, and engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon class members in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

order to sell their own Diamond Multimedia shares or induce the purchase of Diamond Multimedia stock by plaintiff and members of the class. Defendants sold or offered for sale Diamond Multimedia shares during the class period or willfully participated in such sales or offerings for sale. Defendants offered to sell or sold Diamond Multimedia shares by means of written or oral communications which included untrue statements of a material fact or omitted to state material facts necessary to make the statements not misleading. Members of the plaintiff class suffered damages because they relied on the integrity of the market when they purchased Diamond Multimedia shares at artificially inflated prices. Plaintiffs would not have purchased the shares at the price paid or at all had they been aware that the market price had been artificially and falsely inflated by defendants' misleading statements and concealments. At the time of their purchases the fair market value of the shares was substantially less than the price paid by class members.

Compensatory and punitive damages, preand postjudgment interest, attorneys and experts fees, and equitable or injunctive relief were sought.

Diamond Multimedia and all of the individual defendants except Lee (collectively Diamond Multimedia or defendants) demurred generally (Code Civ. Proc., § 430.10, subd. (e)) on the ground that the complaint did not state facts sufficient to constitute a cause of action as to either cause of action. FN7

> FN7 Lee demurred specially. His demurrer on grounds of uncertainty was overruled. On the other grounds stated (particularity, standard of pleading), it was sustained with leave to amend, but the court ruled he could not be held liable under section 25400 for aiding and abetting or conspir-acy.

The first of several bases for relief offered by Diamond Multimedia in support of its demurrer to the Corporate Securities Law cause of action was an ar-

gument that the complaint failed to plead the jurisdictional prerequisite for actions under sections 25400 and 25500 because there was no allegation that any stock purchases were made "in this state." FN8 Legislative history materials accompanied the memorandum of points and authorities. At the hearing on the demurrer, Diamond Multimedia argued that the legislative *1044 history of sections 25400 and 25500 reflected an intent to protect California investors, i.e., California residents or persons who purchase stock in California.

> FN8 Diamond Multimedia also argued that the individual defendants could not be held liable under sections 25400/25500 and that Diamond Multimedia could not be held liable for statements not made in connection with the November 1995 stock offering. It sought to have all allegations based on those statements stricken.

The trial court overruled the Diamond Multimedia demurrer to the Corporate Securities Law cause of action. FN9 It ruled that plaintiffs had adequately alleged that the defendants made misstatements for the purpose of inducing the purchase of Diamond Multimedia stock, but the individual defendants were not liable for aiding and abetting under section 25400, and Diamond Multimedia could not be held liable for statements that were not made in connection with the November 1995 stock offering.

> FN9 The complaint also set forth a cause of action for violation of Civil Code sections 1709-1710 (deceit). A demurrer to the deceit cause of action was sustained with leave to amend for the reason that reliance had not been adequately pleaded.

This petition followed.

II. Petition for Writ of Mandamus

The petition for writ of mandamus seeks a peremptory writ directing the superior court to vacate the order overruling Diamond Multimedia's demurrer

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

to the Corporate Securities Law cause of action and to enter a new order sustaining that demurrer. Diamond Multimedia seeks relief on the ground that the complaint fails to state a cause of action under sections 25400 and 25500 because it does not allege that plaintiffs are domiciled in California or that their purported Diamond Multimedia stock transactions occurred in California.

The dispute between defendants/petitioners and the real parties in interest (plaintiffs) centers on the introductory clause of section 25400: "It is unlawful for any person, directly or indirectly, *in this state*" to do any of the proscribed acts constituting market manipulation. (Italics added.) Plaintiffs argue that this language defines only the place at which the proscribed acts occur, and that the plain language of sections 25400 and 25500 does not limit the liability for violation of section 25400 to persons who bought or sold affected stock in California. They rely in part on this court's statement in *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1104 [23 Cal.Rptr.2d 101, 858 P.2d 568], that liability extends to " 'any person trading in the market.' " *Mirkin* is not dispositive, however, as the quoted statement was dictum and was not made with reference to the place at which a section 25500 plaintiff bought or sold stock. While *Mirkin* was a class action, apparently on behalf of a nationwide class, the action was for deceit and misrepresentation under *1045 Civil Code sections 1709 and 1710. Liability under sections 25400 and 25500 was not in issue. Our reference to civil remedies available under those provisions responded only to a claim that those remedies were inadequate and required privity of contract between the plaintiff and the defendant. The question here is one of first impression in this court.

Diamond Multimedia contends that "in this state" also defines the location at which a purchase or sale affected by the market manipulation takes place. It argues that it was the legislative intent to regulate and assert jurisdiction only over the offer and sale of securities in California and that the Corporate Securities Law regulates only intrastate securities transactions. Based on this reasoning Diamond Multimedia finally argues that the law imposes civil liability only for violations affecting intrastate transactions. Therefore, it claims, it is not enough that the seller is located in California. The purchaser must also be in California.

To reach this conclusion Diamond Multimedia reasons that while section 25500 does not state that the private cause of action is available only to persons who purchase stock in California, it refers back to section 25400. By doing so the Legislature incorporated the "in this state" limitation of section 25400. Therefore, section 25400 applies to persons who attempt to induce a purchase "in this state," while section 25500 provides a remedy for persons who purchase stock sold in violation of section 25400. Diamond Multimedia argues that, because section 25400 is intended to protect those who are induced to purchase stock in California, it is logical to conclude that section 25500 provides a remedy *only* for those who purchase stock in this state.

## III. Discussion

Diamond Multimedia urges this court to construe the civil remedy afforded by section 25500 narrowly so that California will not provide a more attractive forum and afford more expansive remedies for market manipulation than does federal securities law. It does appear that recent procedural changes applicable to the federal securities laws have resulted in the filing of an increased number of nationwide class action lawsuits on behalf of corporate shareholders in California courts under California law. [FN10] We agree with petitioners that, as a result of the PSLRA, the reach of the California *1046 Corporate Securities Law is increasingly important to shareholders, corporations, and the judicial system. The importance of the question is reflected in this court's grant of review and issuance of its order to show cause.

FN10 These changes were adopted in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539

19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

Page 8

Private Securities Litigation Reform Act of 1995 (Pub.L. No. 104-67 (Dec. 22, 1995) 109 Stat. 737, 1995 U.S. Code Cong. & Admin. News No. 1 (hereafter PSLRA)). The Report to the President and Congress on the First Year of Practice under the Private Securities Litigation Reform Act of 1995, authored by the Office of the General Counsel of the Securities and Exchange Commission (Apr. 1997) at pages 30-31 (reprinted in the PLI Corporate Law & Practice Course Handbook Series, No. B0-0013 (1997)) states, relying in part on a National Economic Research Associates study, that in the 10 months following enactment of the law, 78 cases had been filed in state courts as compared with 48 for the prior year. Another study reported that 40 percent of securities class actions filed in the first 10 months of 1996 were filed in state courts. In 1995 slightly more than 20 percent were filed in state court. The state court filings after enactment of the act appeared to the author to be attributable to the availability of discovery while a motion to dismiss was pending. The Stanford Securities Class Action Clearinghouse reported that of 39 state court actions that were "stand alone," i.e., not parallel to a federal action, 24 were filed in California.

Three factors were identified as making state courts attractive-first, the holding in *Matsushita Elec. Industries Co.* v. *Epstein* (1996) 516 U.S. 367 [116 S.Ct. 873, 134 L.Ed.2d 6], that a state court dismissal of a securities fraud class action pursuant to a settlement could include a provision barring suit in federal court based on the same transaction. The other two factors relate specifically to California-the absence of a reliance requirement, and the availability of jurisdiction over many high technology firms whose stocks are sold during periods of high volatility and whose officers and directors often receive a large part of their

compensation in company stock and stock options.

The Stanford University study, originally found only on-line (<http:// securities.stanford.edu> [visited Jan. 5, 1999]), is now available in the Practicing Law Institute Corporate Law and Practice Course Handbook Series. (See Grundfest & Perino, Securities Litigation Reform: The First Year's Experience (Feb. 1997) reprinted at PLI Corporate Law & Practice Course Handbook Series, No. B4-7199 (Sept. 1997); see also Perino, Testimony before Subcom. on Securities, U.S. Sen. Com. on Banking, Housing & Urban Affairs (July 24, 1997) reprinted as A Census of Securities Class Action Litigation after the Private Securities Litigation Reform Act of 1995, PLI Corporate Law & Practice Course Handbook Series, No. B4-7199 (Sept. 1997).)

Whether California courts should entertain shareholder class actions based on alleged market manipulation which may not be maintained under federal law is a legislative policy decision, however. While the burden on California courts and corporate defendants may increase if actions predicated on violation of section 25400 are properly brought under California law, the function of this court is only to construe and apply the law so as to carry out the legislative intent which underlies it. [FN11] Defendants' policy-based arguments must be addressed to Congress and/or the Legislature. [FN12]*1047

FN11 As *Mirkin v. Wasserman, supra,*5 Cal.4th 1082, demonstrates, however, nationwide class actions for market manipulation are permissible quite apart from the provisions of the Corporate Securities Law. Section 25400 is a preferred remedy because, unlike an action predicated on fraud or deceit, it is not necessary to demonstrate reliance on the defendant's false or misleading statement in the pur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

chase or sale of the security.

FN12 Insofar as class actions are concerned, recently enacted federal legislation, which is inapplicable to pending actions, may accomplish what defendants urge this court to do by adopting their construction of sections 25400 and 25500. The Securities Litigation Uniform Standards Act of 1998 (Sen. No. 1260, 105th Cong., 2d Sess. (1998)) amends section 16 of the federal Securities Act of 1933 (15 U.S.C. § 77p) and section 28 of the Securities Exchange Act of 1934 (15 U.S.C. § 78bb) to prohibit class actions based on state statutory or common law by a private party "alleging- [¶] (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or [¶] (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security."
Section (c) of the act expressly provides, however: "The amendments made by this section shall not affect or apply to any action commenced before and pending on the date of the enactment of this Act." Notwithstanding the effort of Justice Brown to draw analogies between this action and the issues in *Guice v. Charles Schwab & Co., Inc.* (1996) 89 N.Y.2d 31 [651 N.Y.S.2d 352, 674 N.E.2d 282], and *Dahl v. CharlesSchwab & Co., Inc.* (Minn. 1996) 545 N.W.2d 918, neither those cases nor the others on which Justice Brown relies holds that federal law preempts actions by shareholders for damages suffered as a result of market manipulation.
Far from restricting market manipulation actions to those brought under federal securities law, Congress has chosen both to permit continuance of pending class actions based on misrepresentation or omissions of material fact and use of manipulat-

ive or deceptive devices in connection with a purchase or sale of securities and to leave individual actions unrestricted. The suggestion that federal securities law already impliedly preempted all such actions under the Corporate Securities Law ignores this clear congressional recognition that, except to the extent that the 1998 act limits class actions, there is no preemption. Shareholders' rights under state and federal law are cumulative. By enacting only a class action limitation, when it could have barred all actions based on state law to recover losses caused by market manipulation, Congress has confirmed the independent force of state securities law. Had Congress believed that its goals could not be accomplished if suits based on state law were permitted or that any conflict between state a federal law existed, all actions based on state law, not simply class actions, would have been banned.

This action presents only a question of law. Neither the wisdom of the legislation nor the merits of the underlying lawsuit are before us. We address only the proper construction of sections 25400 and 25500. As with any statutory construction inquiry, we must look first to the language of the statute. (1) "To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804].) If it is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348 [158 Cal.Rptr. 350, 599 P.2d 656].) "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." (*People v. Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].)

(2a) The central premise of Diamond Multimedia's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

argument is that section 25400 prohibits market manipulation with the intent to induce a purchase or sale of stock "in this state" and that, therefore, the section 25500 remedy is available only if the plaintiff purchased or sold stock in California. We are not persuaded that section 25400 can reasonably be read in the manner suggested by defendants. In arguing that it was the legislative intent *1048 to regulate only intrastate securities transactions, Diamond Multimedia fails to acknowledge that section 25400 does not regulate securities transactions other than those described in section 25400 which are undertaken "in this state" to manipulate the market. It regulates market manipulation, not third party transactions affected by market manipulation. Section 25500 simply provides a remedy for third parties whose sale or purchase of stock is affected by unlawful conduct in California, making the remedy available without any express territorial limitation.

Section 25400 does not, as defendants/petitioners suggest, provide that the acts constituting market manipulation must be done with the intent to induce the purchase or sale of stock in California by a third party. Moreover, the manipulative conduct is unlawful under several provisions of section 25400 regardless of whether any third party purchase or sale actually occurs. Subdivision (d), under which this action has been filed, does not require that any transaction occur. It makes it unlawful in California to knowingly make false or misleading statements for the purpose of inducing the purchase or sale of stock.

The language of section 25400 is very clear. It states: "It is unlawful for any person ... in this state" to engage in any of the conduct described thereafter. Thus, it is unlawful under subdivision (a) of section 25400 for a person or entity in California, for market manipulation purposes, to engage in "wash sales," specifically stock transactions which do not involve a change in beneficial ownership, or entering buy or sell orders knowing that other orders of the same size at the same price are

being made at the same time. Under subdivision (b) it is unlawful in California to make a series of stock trades to create the appearance of active trading in the stock or to raise or depress the price of the stock when done to induce a purchase or sale. Subdivision (c) makes it unlawful for broker-dealers or persons offering to sell or buy a stock in California to induce a purchase or sale through "tipster sheets," i.e., by circulating information that the price of the stock may rise or fall because of market operations conducted for the purpose of raising or depressing the price. Subdivision (d) makes it unlawful in California for sellers or buyers of stock to make false or misleading statements of material facts for the purpose of inducing a purchase or sale. [FN13] Finally, subdivision (e) makes it unlawful in California for any person for consideration received from another to induce a purchase or sale of stock through tipster sheets. *1049

> FN13 Contrary to the assertion of amici curiae Washington Legal Foundation and Allied Educational Foundation, an out-of-state securities seller may not be found liable under plaintiffs' construction of section 25400 if, while attending a one-day conference in California, the person omits to state a material fact about a security. Civil and criminal liability under section 25400 attach only if a person omits a material fact for the purpose of inducing the sale or purchase of the stock with knowledge that the omission was false or misleading.

Diamond Multimedia argues, however, that "in this state" should be read to modify the intent provisions of section 25400, not simply describe the location in which the proscribed conduct must take place-that a defendant must be shown to have intended to induce the purchase or sale of stock by others "in this state." As so modified, it would follow in Diamond Multimedia's view that section 25500 provides a remedy only to those persons who purchase or sell affected stock in California.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539                                                    Page 11
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

Diamond Multimedia suggests that this proposed construction of sections 25400 and 25500 would further the legislative intent that the law protect California domiciliaries-even those who purchase stock outside California-inasmuch as section 25008 deems out-of-state purchases by California domiciliaries to be made in this state. That is true only if the stock is delivered to the purchaser in California, however. (§ 25008, subd. (a).) Thus a resident of California who purchased Diamond Multimedia stock in Nevada during the class period might have no recourse under the Corporate Securities Law, while a Nevada domiciliary could seek relief under the law if he or she used the services of a California broker to complete the purchase in California.

Moreover, the language of sections 25400 and 25500 is not susceptible to this transposition of the phrase "in this state" in the manner suggested by petitioners. As plaintiffs note, even were we to transpose the "in this state" limitation in section 25400 as suggested by defendants, engaging in any of the conduct described in subdivisions (a), (b), and (d) of section 25400 for the purpose of inducing the purchase or sale of stock in California would still constitute a violation of that section regardless of whether any stock was sold or of the location at which other persons actually purchased or sold the stock. Reading section 25400 as suggested by defendants would not preclude suit under section 25500 by persons who purchased affected stock outside of California because section 25500 creates liability for any willful violation of section 25400 to "any" person who buys or sells stock at the artificially inflated or deflated price.

Only if one accepts defendants' additional thesis that because violation of section 25400 requires intent to induce a sale or purchase of stock in California and section 25400 is intended to protect only persons who purchase or sell stock in California, could we conclude that only those persons may exercise the section 25500 remedy. Section 25500 would thus incorporate the "in this state" restriction petitioners read into subdivision (d) of section

25400. Acceptance of this theory would necessitate not only transposing the "in this state" restriction from the introductory sentence which refers to the conduct proscribed by section 25400, but also ignoring the *1050 section 25500 creation of liability to "any person" who purchases or sells affected stock.

Were we to read section 25400 as suggested by defendants, we would have to assume that the Legislature did not intend the Commissioner of Corporations, who also has power to enforce section 25400 (see § 25530 et seq.), to enjoin manipulative conduct by California licensed stockbrokers and dealers whose intent is to affect the national market in a stock or to enjoin such conduct before any transactions in the stock are affected by the conduct.

We would also have to overlook the impact of that reading on criminal prosecution for violation of section 25400. The legislative intent that subdivisions (a), (b), and (d) of section 25400 define conduct that is unlawful "in this state" and that violation of those subdivisions occurs regardless of whether a third party California transaction results is reflected in section 25540, subdivision (b). That section provides felony criminal penalties for "[a]ny person who willfully violates Section 25400, 25401, or 25402." If intent to induce a purchase or sale of stock in this state and a transaction in this state were elements of the violation, criminal prosecution of a person who sought to influence the price of stock on a national exchange would not be possible. The statute does not impose the limitations petitioners suggest. The conduct proscribed in subdivisions (a), (b), and (d) of section 25400 is criminal if, in California, the defendant acted with the intent to induce any purchase or sale of stock regardless of whether it results in a third party purchase or sale of an affected stock.

In short, in subdivisions (a), (b), and (d) of section 25400 the Legislature made acts of market manipulation in California a felony. It did not make them so only if the defendant intended to affect only the market for stocks in California or only if California

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539

Page 12

19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

stock transactions resulted. Assuming, arguendo, that a stock transaction in California is an element of a violation of subdivisions (c) and (e) of section 25400, as the Legislature has provided that it is unlawful "in this state" to induce a purchase or sale by means of tips about potential market operations, there would still be liability to buyers in other states.

Subdivisions (c) and (e) of section 25400 make it unlawful "to induce the purchase or sale" of a stock by circulating tipster sheets. Section 25008 provides, inter alia, that a sale of a security is made in California when the offer to sell is made "in this state" or an offer to buy is accepted in California. (§ 25008, subd. (a).) An offer to sell is made "in this state" if the offer originates from California. (§ 25008, subd. (b).) Thus, a sale occurs "in this state" even if the purchaser is in, and communicates acceptance of the *1051 offer to sell from, New York. Thus, while aftermarket out-of-state purchases and sales might not qualify as purchases and sales induced "in this state," a California corporation which offered its shares for sale on a nationwide basis would be liable to out-of-state purchasers who accepted the offer. This follows because under section 25008, a sale occurs in California if the offer emanates from this state. The purchaser, who has a right to sue under section 25500, may be in another state. Petitioners' argument that section 25400 does not apply to interstate transactions thus fails.

As noted above, resort to section 25008, which defines "in this state" for the purpose of determining when a stock transaction takes place in California, does not aid Diamond Multimedia's argument. (3) To the extent that section 25400 prohibits stock transactions for market manipulation purposes in subdivisions (a) and (b), section 25008 applies to establish whether that conduct occurred in California. The definition of "in this state" is not restrictive, however, and does not operate to confine liability for violation of section 25400 to intrastate transactions. This is apparent when the section 25008 definitions are applied to violations of subdivisions

(c) and (e) of section 25400.

These section 25008 definitions, which clearly encompass interstate transactions, necessarily extend liability for stock transactions induced by conduct made unlawful by subdivisions (c) and (e) of section 25400 beyond those which occur wholly within California. Under defendants' reading of section 25400, however, it would be unlawful to engage in that type of manipulative conduct only if the purchaser was in California, and the section 25500 remedy would be available only if the stock was purchased by a person in California. That reading of section 25400 would render the section 25008 definition of sale "in this state" superfluous, as it would deny a remedy to the purchaser even if the offer to sell had been made in this state.

Inasmuch as section 25008 does apply in determining when "in this state" a defendant "induce[s] a sale of stock" by circulation of a tipster sheet, a violation may occur when the stock is purchased by a person in New York and the person in New York has a remedy under section 25500. There is no reason to believe that the Legislature intended to deny to an out-of-state purchaser a remedy for market manipulation in violation of subdivision (d) of section 25400 that it has provided to the same purchaser for violation of subdivisions (c) and (e) of that statute.

Nor is it surprising that in section 25008 the Legislature did not define when a false or misleading statement is made "in this state" for purposes of subdivision (d) of section 25400. Subdivision (d) does not prohibit stock transactions and thus the definitions of section 25008 are not implicated. *1052 Section 25400, subdivision (d) prohibits false or misleading statements or omissions when made for the purpose of manipulating the market for a stock. There is no need to provide a definition for "in this state" in that context. Unlike a stock transaction, in which the buyer and seller or offeree and offeror may be in different states, there is no difficulty in determining if the unlawful statement or omission in violation of subdivision (d) of sec-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

tion 25400 is made in this state and justifies assertion of jurisdiction over the violator. If the statement is made by a person in California or is willfully disseminated in California, it is made "in this state." Thus, while we recognize that the Legislature did not provide an alternative definition of "in this state" for subdivision (d) of section 25400, there was no need for it to do so.

The introductory clause of section 25400 prohibits commission of manipulative acts in California. FN14 It does not say in subdivision (d) that it is (1) unlawful in California to engage in market manipulation (2) with the intent to induce a purchase or sale of stock in California (3) if a purchase or sale of the stock in California is affected by the manipulative conduct.

> FN14 Transposition of "in this state" to each of the subdivisions of section 25400 would create additional anomalies that would be inconsistent with the purpose of the prohibition of market manipulation. A person attempting to affect the market in a stock to induce a purchase or sale in California could simply enter buy or sell orders, or engage in the sale and/or purchase of the stock outside California and thereby escape liability under subdivisions (a), (b), and (c) of section 25400.

This court is not free to insert as elements of a section 25400 violation a requirement that the defendant intend to induce a sale in California or, insofar as subdivisions (a), (b), and (d) are concerned, that there actually be an affected third party transaction in stock, nor is it free to impose limits on civil liability that do not exist for criminal liability under the same statute.

Section 25400 says and implies nothing about the person or persons who may enforce section 25400 or obtain relief for violation of section 25400. That subject is covered in section 25500 et seq. Insofar as this action is concerned, section 25500 applies, creating civil liability for the violation of section

25400 and making relief available to "any person." Section 25500 provides: "Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to *any other person* who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction...." (Italics added.)

Section 25500 does not limit a violator's liability to persons who purchase or sell stock in California. "Any" person affected by acts of market manipulation which take place in California may recover damages from the violator. *1053 Moreover, section 25500 is not the only provision of the law creating civil liability for violation of section 25400. In subdivision (b) of section 25530, the Corporate Securities Law of 1968 expressly permits the Commissioner of Corporations to seek relief on behalf of investors, and, like section 25500, section 25530, subdivision (b) contains no language limiting "investors" to California investors. It provides: "If the commissioner determines it is in the public interest, the commissioner may include in any action authorized by subdivision (a) [for injunctive relief] a claim for ancillary relief, including but not limited to, a claim for restitution or disgorgement or damages *on behalf of the persons injured* by the act or practice constituting the subject matter of the action, and the court shall have jurisdiction to award additional relief." (*Ibid.*, italics added.)

Comparison of section 25400 with other parts of the Corporate Securities Law leads to the same conclusion. When the Legislature intended that a purchase or sale of a stock must occur in California if the buyer or seller is to be subject to civil, criminal, or administrative penalties, it said so without the necessity of transposing the "in this state" proviso as Diamond Multimedia suggests we do in section 25400. Thus, section 25402 provides that it is unlawful for an issuer or insider "to purchase or sell any security of the issuer *in this state* at a time when he knows material information about the issuer gained from such relationship which would

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

significantly affect the market price of that security and which is not generally available to the public ...." (Italics added.) There the Legislature did not, as it did in section 25400, provide that "it is unlawful ... in this state" to use insider information in the purchase or sale of stock. Similarly, in section 25401 the Legislature expressly limited the scope of the prohibition of false or misleading statements in an offer to buy or sell. That section makes it "unlawful for any person to offer or sell a security *in this state* or buy or to buy a security *in this state* by means of any written or oral communication which includes an untrue statement ...." (*Ibid.*, italics added.) In sections 25110 and 25130, the Legislature again made it unlawful to offer or sell an unqualified security "in this state." In short, the various provisions of the Corporate Securities Law are quite specific in describing those unlawful practices in which a purchase or sale must occur in California. [FN15] In those sections, the Corporate Securities Law regulates securities transactions in California. Section 25400, by contrast, does not regulate third party securities transactions. Its focus is the prevention of manipulation of the market price of securities. The only transactions section 25400 regulates are manipulative transactions in California. The price of most stock is established **\*1054** on a national market. For that reason section 25400 is not concerned with whether the third party sale or purchase of a stock affected by such manipulation takes place in California and does not limit the right to recover for damage caused by market manipulation to persons who buy or sell stock in California.

> FN15 Even there, however, by virtue of section 25008, interstate transactions may be made "in this state."

As plaintiffs note, had the drafters and the Legislature intended to restrict in every case the civil liability of persons who engage in practices made unlawful by section 25400, they could easily have done so in section 25500 by inserting the "in this state" limitation in that section. It would then have

read: "Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security *in this state* at a price which was affected by such action or transaction ...." (4) The drafters and the Legislature did not do so, however, and it is not our function to insert language omitted by the Legislature. (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 274 [41 Cal.Rptr.2d 220, 895 P.2d 56].)

A conclusion that the Corporate Securities Law is directed only to intrastate transactions would be inconsistent with section 25008, which establishes the criteria by which to determine if offers to sell, sales, offers to purchase, and purchases are made in California. Section 25008 clearly contemplates interstate transactions. Under section 25008, "(a) [a]n offer or sale of a security is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state .... [¶] (b) [a]n offer to sell or buy is made in this state when the offer either originates from this state or is directed by the offeror to this state and received at the place to which it is directed. An offer to buy or to sell is accepted in this state when acceptance is communicated to the offeror in this state; and acceptance is communicated to the offeror in this state when the offeree directs it to the offeror in this state ...." These definitions bring interstate transactions within the scope of California regulation, and section 25500 provides for service of process on out-of-state defendants.

Defendants argue nonetheless that this court should consider the legislative purpose in enacting the Corporate Securities Law-that of regulating securities in the intrastate market not reached by federal securities regulation. We have no doubt that this was the intent of the drafters of the Corporate Securities Law and, presumably, the Legislature. It does not follow, however, that the civil remedies created by section 25500 are available only to persons who bought or sold securities in California. It is apparent that extending those remedies to any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539                                                                                                Page 15
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

person affected by the proscribed forms of manipu-
lative conduct has a far greater deterrent impact
than limiting a defendant's exposure to civil liabil-
ity for in-state transactions *1055 would have done.
Thus we have no reason to infer that the omission
in section 25500 of any territorial limitation was in-
advertent or that the Legislature anticipated that, by
proscribing manipulative conduct occurring only
"in this state" in section 25400, the Legislature an-
ticipated that section 25500 would be construed as
permitting civil recovery only if a purchase or sale
of stock affected by the proscribed conduct oc-
curred "in this state." The language of sections
25400 and 25500 does not lend itself to the con-
struction urged by defendants.

Defendants ask that we consider not only the con-
text in which the Corporate Securities Law was en-
acted, but also available legislative history in the
form of comments made by the committee appoin-
ted by then Commissioner of Corporations Harold
R. Volk, which drafted the law when the law was
submitted to the Legislature, and by Commissioner
Volk and Professor Harold Marsh, Jr., the reporter
of that committee, in their treatise, Practice Under
the California Corporate Securities Law of 1968
(1969). We decline the invitation. (5) Only when
the language of a statute is susceptible to more than
one reasonable construction is it appropriate to turn
to extrinsic aids, including the legislative history of
the measure, to ascertain its meaning. (*Granberry v.
IslayInvestments* (1995) 9 Cal.4th 738, 744 [38
Cal.Rptr.2d 650, 889 P.2d 970].)

We note, however, that the materials cited by defend-
ants are not inconsistent with our conclusion that
the civil remedies of section 25500 are not limited
in the manner suggested by Diamond Multimedia.
The drafters' comments confirm that the purpose of
the Corporate Securities Law is to give greater pro-
tection to California residents than that available
under the prior law or federal law, but they do not
suggest that the law was not intended to protect all
persons affected by market manipulation that oc-
curs in California.

The drafting committee was appointed by Commis-
sioner of Corporations Volk to review the then ap-
plicable 1917 Corporate Securities Law to determ-
ine if it gave sufficient protection to investors, was
unduly burdensome on legitimate businessmen, and
consider if the 1917 law was generally adequate to
the regulatory problems in the 1967 securities mar-
ket. (Volk, Preface to Proposed Corporate Securit-
ies Law of 1968 (Oct. 20, 1967); Drafting Com., In-
troduction to Proposed Corporate Securities Law of
1968 (hereafter Drafting Committee Report).) Dia-
mond Multimedia relies on the final sentence of a
paragraph of the introduction to support its argu-
ment that the intent of the drafters was to regulate
only intrastate stock transactions: "There has long
been a need in California to clearly define what acts
constitute a violation of our securities law. The
fraudulent and prohibited practices enumerated in
Part 5 are modeled upon existing Federal laws, both
statutory and common law, which are applicable to
all interstate securities transactions. The latter
*1056 constitute by far the bulk of the securities
market in California. The effort here is to more
clearly define the acts which are malum prohibitum
*and to apply the prohibitions to the intrastate se-
curities market* which is the greater state regulatory
problem when compared to the interstate market."
(Drafting Com. Rep., *supra*, at p. iii, italics added.)

This statement is not inconsistent with a conclusion
that the civil remedies of section 25500 are avail-
able to both in-state and out-of-state purchasers and
sellers affected by market manipulation occurring
in California. Section 25400 defines those practices
which are prohibited in California. Extending civil
remedies for violating those provisions to all af-
fected purchases is fully consistent with a purpose
of applying the prohibitions themselves to intra-
state conduct.

When describing section 25400 specifically, Marsh
and Volk note that unlike liability under sections
25401 and 25501, under which a violator is liable
only to persons with whom he or she deals, under
section 25500 "the defendant may be *liable to any*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*person* trading in the market for any length of time that the market price may have been affected by his misstatement. In view of this potentially enormous and virtually unlimited liability, the intent of the defendant to affect the market by inducing the purchase or sale of the security by others was a necessary qualification of the defendant's liability." (1 Marsh & Volk, Practice Under the Cal. Securities Laws (1998) § 14.05[2][e], p. 14-50, italics added (Marsh & Volk).) In the same discussion the authors explain why the plaintiff must establish fault as an element of a cause of action under subdivision (d) of section 25400. "[I]t is not an unreasonable requirement for holding a defendant *liable for everyone's trading losses* in the market for an indefinite period of time to insist that the plaintiff prove that the defendant did something wrong." (Marsh & Volk, *supra*, § 14.05[2][e], p. 14-50, italics added.) This explanation of the drafters' intent is inconsistent with a conclusion that a section 25400 violator must intend to induce a purchase or sale "in this state." And in their paragraph on "Persons Entitled to Recover," the authors note that, while sections 25501 and 25502 under which privity of contract between the defendant and plaintiff, under section 25500 the defendant who violates section 25400 is liable to "any other person" whose trade is affected by the unlawful conduct of the defendant. (Marsh & Volk, *supra*, § 14.05[5], p. 14-53.) Again there is no suggestion that only persons who bought or sold stock in California may seek relief under section 25500 for a section 25400 violation. [FN16]

FN16 Walter G. Olson, vice-chairman of the drafting committee, wrote shortly after the Corporate Securities Law become effective: "[L]iability for violation of [section 25400] flows to any and all persons who purchase or sell a security at a price affected by the act or transaction .... [T]he potential plaintiffs include everyone who buys or sells the securities affected." (Olson, *The California Corporate Securities Law of 1968* (1968) 9 Santa Clara L.Rev. 75, 98, fn. omitted.)

(2b) The contention that state exercise of jurisdiction over interstate transactions would somehow be inconsistent with federal law and thus *1057 violate the supremacy clause (U.S. Const., art. VI, cl. 2) also lacks merit. (6) The Securities Exchange Act of 1934 (15 U.S.C. § 78bb(a)) makes it clear that, except to the extent it has been subsequently modified by the Securities Litigation Uniform Standards Act of 1998, federal law in this arena supplements, but does not displace state regulation and remedies. "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions. See 15 U.S.C. § 78bb(a) (preserving 'all other rights and remedies that may exist at law or in equity')." (*Matsushita Elec. Industrial Co. v. Epstein, supra*, 516 U.S. at p. 383 [116 S.Ct. at p. 882]; see also *SEC v. National Securities, Inc.* (1969) 393 U.S. 453, 461 [89 S.Ct. 564, 569, 21 L.Ed.2d 668]; *Johnson-Bowles v. Division of Securities* (Utah Ct.App. 1992) 829 P.2d 101, cert. den. 843 P.2d 516; *E. F. Hutton & Co., Inc. v. Rousseff* (Fla. 1989) 537 So.2d 978.) [FN17]

FN17 15 United States Code section 78bb(a): "The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of. Except as otherwise specifically provided in this chapter, nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder. No State law which prohibits or regulates the making or promoting of wagering or gaming contracts, or the operation of 'bucket

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539                                                    Page 17
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

shops' or other similar or related activities, shall invalidate any put, call, straddle, option, privilege, or other security, or apply to any activity which is incidental or related to the offer, purchase, sale, exercise, settlement, or closeout of any such instrument, if such instrument is traded pursuant to rules and regulations of a self-regulatory organization that are filed with the Commission pursuant to section 78s(b) of this title."

(2c) Neither Diamond Multimedia nor Justice Brown has identified any direct or indirect conflict between sections 25400/25500 and any provision of the federal securities laws applicable to this litigation. As noted above (see fn. 12, *ante*), the Securities Litigation Uniform Standards Act of 1998 has no impact on this case. And, contrary to defendants' suggestion that the complaint in this action seeks to impose liability on the basis of forward-looking statements that are protected by federal law under 15 United States Code section 78u-5, plaintiffs allege, inter alia, that petitioners are liable for market manipulation on the basis of false and misleading statements and omissions, which statements, under section 25500, were made "willfully." Subdivision (c) of 15 United States Code section 78u-5, the "Safe Harbor" provision, immunizes forward-looking statements only "in any private action *1058 arising under this chapter" (*id.*,§ 78u-5(c)(1)), i.e., under the Securities and Exchange Act of 1934. Moreover, assuming, as does Justice Brown, that Congress intended a wider application of the Safe Harbor provision, the immunity it creates does not insulate forward-looking statements that omit information about factors that may cause actual results to differ materially and/or are made with actual knowledge that the statement is false and misleading. [FN18] The complaint alleges falsity, omission of such factors, and actual knowledge. (7) While the allegation of actual knowledge may not extend to all of the allegedly false and misleading statements, a complaint is sufficient and must be upheld if it states a cause of action on any theory.(*Americ-*

*an Airlines, Inc.* v. *County of San Mateo* (1996) 12 Cal.4th 1110, 1118 [51 Cal.Rptr.2d 251, 912 P.2d 1198]; *Alliance Mortgage Co.* v. *Rothwell* (1995) 10 Cal.4th 1226, 1232 [44 Cal.Rptr.2d 352, 900 P.2d 601].) For that reason, defendants' demurrer was properly overruled.

> FN18 15 United States Code section 78u-5 provides in pertinent part:
> "(c) Safe Harbor
>  "(1) In general
> "Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement whether written or oral, if and to the extent that-
> "(A) the forward-looking statement is-
>  "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual result to differ materially from those in the forward-looking statement; or
>  "(ii) immaterial; or
> "(B) the plaintiff fails to prove that the forward-looking statement-
>  "(i) if made by a natural person was made with actual knowledge by that person that the statement was false or misleading; or
>  "(ii) if made by a business entity; was-
> "(I) made by or with the approval of an executive officer of that entity; and
> "(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading."

If plaintiffs establish at trial that defendants knew their statements were false and misleading, imposition of civil liability for violation of subdivision (d) of section 25400 will not conflict with federal law.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

Amicus curiae Adobe Systems Incorporated (Adobe) suggests that the proper focus for construing sections 25400/25500 is on the latter section. FN19 It argues that the "in this state" language of section 25400 need not be considered. Instead, we should apply a presumption against extraterritoriality *1059 in remedial statutes. Adobe relies on our application of that presumption in *North Alaska Salmon Co. v. Pillsbury* (1916) 174 Cal. 1 [162 P. 93], a decision construing the then applicable workers' compensation law. A worker who entered into a contract with a California corporation for employment as a fisherman was injured in Alaska. The Industrial Accident Commission awarded compensation. On the employer's appeal this court annulled the award, holding that the right to compensation was controlled by the applicable statutes, not the contract, and the statute did not give the commission jurisdiction to award compensation for out-of-state injuries.

> FN19 Adobe asks that the court take judicial notice of the reply brief filed by plaintiffs' present counsel in *Mirkin v. Wasserman, supra,* 5 Cal.3d 1082, in which counsel stated that the Corporations Code does not address the remedies available to open market purchasers who claim fraud. While judicial notice is permissible under Evidence Code sections 452 and 459, we deny the request. What counsel argued in another case is irrelevant to the proper construction of sections 25400/25500.

The court also stated: "Although a state may have the power to legislate concerning the rights and obligations of its citizens with regard to transactions occurring beyond its boundaries, the presumption is that it did not intend to give its statutes any extraterritorial effect. The intention to make the act operative, with respect to occurrences outside the state, will not be declared to exist unless such intention is clearly expressed or reasonably to be inferred 'from the language of the act or from its pur-

pose, subject matter or history.' " (*North Alaska Salmon Co. v. Pillsbury, supra,* 174 Cal. at p. 4.) We found liability in the Workmen's Compensation, Insurance and Safety Act to indicate that the compensation provisions of that law were intended to apply to injuries suffered in other jurisdictions, and also noted that there was strong authority that workers' compensation statutes are not to be given extraterritorial effect absent an express declaration that do so. On that basis we held that the commission had exceeded its jurisdiction. (*Id.* at p. 7.)

As discussed above, however, unlike the injury in *North Alaska SalmonCo. v. Pillsbury, supra,* 174 Cal. 1, the conduct which gives rise to liability under section 25400 occurs in California.

The presumption applied in *North AlaskaSalmon* to a workers' compensation statute has never been applied to an injured person's right to recover damages suffered as a result of an unlawful act or omission committed in California. FN20 Civil Code section 3281 provides that "[e]very person who suffers detriment" from unlawful acts or omissions in California may recover damages from the person at fault. Product liability actions against *1060 California manufacturers by persons injured elsewhere by a defective product manufactured in California are a prime example of actions authorized by Civil Code section 3281. (See, e.g., *Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744 [1 Cal.Rptr.2d 556, 819 P.2d 14]; *Shiley Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 126 [6 Cal.Rptr.2d 38]; *Holmes v. Syntex Laboratories, Inc.* (1984) 156 Cal.App.3d 372 [202 Cal.Rptr. 773].) We see no reason to conclude that the Legislature intended a different result for actions based on violation of section 25400.

> FN20 Adobe identifies *EEOC v. Arabian American Oil Co.* (1991) 499 U.S. 244 [111 S.Ct. 1227, 113 L.Ed.2d 274], as an application of the presumption against extraterritoriality on which it relies. There, however, as in *North Alaska Salmon Co. v. Pillsbury, supra,* 174 Cal. 1, the wrongful act as well as the injury occurred in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

foreign jurisdiction. As the high court explained in *EEOC v. Arabian American Oil Co., supra,* 499 U.S. at page 248 [111 S.Ct. at pages 1230-1231], the presumption against extraterritoriality serves to prevent clashes between the laws of the United States and other nations. Sections 25400 and 25500 provide a remedy for a wrongful act committed in California. There is no potential in this for a "clash" between California law and that of any other state or of the United States.

The presumption against extraterritoriality is one against an intent to encompass *conduct* occurring in a foreign jurisdiction in the prohibitions and remedies of a domestic statute. (See, e.g., *Smith v. United States* (1993) 507 U.S. 197, 203-204 [113 S.Ct. 1178, 1182-1183, 122 L.Ed.2d 548] [presumption against extraterritorial application of United States law requires that doubts as to the reach of the Federal Tort Claims Act be resolved against its encompassing torts committed in Antarctica]; see also 73 Am.Jur.2d (2d ed. 1974) Statutes, § 359, p. 492 [absent clearly expressed contrary intent the presumption is that statute is intended to have no extraterritorial effect, but to apply only in jurisdiction of state or country enacting it]; *Tattis v. Karthans* (Miss. 1968) 215 So.2d 685 [words spoken in North Carolina not actionable under Mississippi state statute]; *Marmon v. Mustang Aviation, Inc.* (Tex. 1968) 430 S.W.2d 182 [Texas wrongful death statute does not provide remedy for death occurring in Colorado accident]; *Burns v. Rozen* (Fla.Dist.Ct.App. 1967) 201 So.2d 629 [Florida statute regulating method of taking fish applied only to territorial waters of state]; *Dur-ite Co.* v. *Industrial Commission* (1946) 394 Ill. 338 [68 N.E.2d 717] [workers' compensation law does not encompass persons employed outside State of Illinois].)

Diamond Multimedia argues that four federal decisions support its construction of sections 25400 and 25500. They do not. The first of those cases, *In re Victor Technologies Securities Litigation* (N.D.Cal. 1984) 102 F.R.D. 53 (*Victor Technologies*), actually supports plaintiffs. The decision does not address section 25400 in disposing of a motion for class certification. The opinion states only that state law claims, alleging false and misleading statements in a registration statement and prospectus filed with the Securities and Exchange Commission, were brought under sections 25500 and 25502. After addressing the requirements for class certification of rule 23(a) and (b) of the Federal Rules of Civil Procedure (28 U.S.C.), the court considered the defendants' argument that class certification for the state law claim should be denied on the ground that only persons who purchased stock in California could maintain a cause of action.

The district court rejected the argument, holding: "The jurisdictional prerequisites of a claim filed under section 25500 are satisfied when offers of securities are made from California to persons outside the state, or when acceptance of the offer is directed to a person within California. See Cal. Corp. Code § 25008(b).*See generally* Marsh & Volk, *Practice under the *1061 California Securities Laws*, § 3.08[1] (1983). [¶] As the offering materials in this action apparently emanated from Victor's California headquarters, and the buyers' acceptances were apparently directed at a California entity, it is appropriate to certify a plaintiff class for this claim. It should be emphasized, however, that the class certification for the claims filed under the California Corporations Code includes only those purchasers of Victor stock who purchased in direct response to the initial March 23 public offering. Those who purchased Victor stock on the open market at some point after the initial public offering will not be part of the sub-class entitled to proceed under sections 25500 and 25501 of the California Corporations Code. (Of course, if those who purchased later were California purchasers, they will be entitled to maintain a claim under the California Code.)" (102

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

F.R.D. at p. 60.)

*Victor Technologies* thus affirms that out-of-state purchasers may state a claim under section 25500. While it also holds that aftermarket purchasers may not do so unless they purchased their shares in California, there is no mention of section 25400, no consideration of the language of that section, and neither analysis or explanation of the conclusion. On that point the decision is not persuasive authority.

*Victor Technologies* was followed by *Weinberger v. Jackson* (N.D.Cal. 1984) 102 F.R.D. 839.Again the decision disposed of a motion for class certification. Without discussion, the district court followed *Victor Technologies*, and certified a nationwide class action which sought relief under federal law and sections 25400 and 25500, but excluded aftermarket purchasers who did not purchase their stock in California. Again, there was no discussion or analysis of section 25400. The district court said only "Aftermarket purchasers not purchasing in California are not part of the class as to the California Corporations Code claims. *See also*In re Victor Technologies Securities Litigation*, 102 F.R.D. 53, 60 (N.D. Cal. 1984)." (102 F.R.D. at p. 847.)

In *In re Activision Securities Litigation* (N.D.Cal. 1985) 621 F.Supp. 415, claims were brought under federal law and sections 25400/25500, 25401/25501, and 25504/25504.1 for sale of securities by means of an allegedly misleading registration statement and prospectus. The district court, again without discussion or analysis, excluded non-California aftermarket purchases from the class. It said only: "[M]embers of the plaintiff class who purchased Activision stock over-the-counter after the public offering should not be included in the class for claims filed under the California Corporations Code unless they purchased the stock in California. *Victor Technologies*, 102 F.R.D. at 60;*Weinberger v. Jackson, [102 F.R.D. 839].*" (621 F.Supp. at p. 432.)*The court failed to notice the distinction between *1062section 25400, which contains no such requirement, and sections 25401 and 25504,

*pursuant to which a purchase or sale by means of misleading communications must be "in this state."*

*Scholes v. Tomlinson* (N.D.Ill. 1992) 145 F.R.D. 485, made the same mistake. The Illinois class representative alleged violations of sections 25110, 25400, subdivision (d), and 25401. Quoting *McFarland v. Memorex* (N.D.Cal. 1982) 96 F.R.D. 357, the court stated: " 'Only purchasers who can show the requisite contacts with California can satisfy the jurisdictional limitations of Cal. Corp.Code, Section 25008.' *McFarland v. Memorex Corp., 96 F.R.D. 357, 364. (N.D.Cal.1982). 'These sections apply only to purchasers who buy a security in California ...'.McFarland, 96 F.R.D. at 364."* (145 F.R.D. at p. 493.)*In McFarland v. Memorex, supra,* 96 F.R.D. 357, the action was brought under sections 25401/25501, however. There was no section 25400/25500 claim.

Thus, while the federal decisions which have considered nationwide class actions under section 25400 have erroneously excluded aftermarket purchasers, they do recognize the right of out-of-state purchasers to seek relief under that section. They do not support defendants' contention that no out-of-state purchasers may bring a section 25400 action.

Diamond Multimedia has cited, and we have found, no decisions in the courts of our sister states in which actions on behalf of a nationwide class or out-of-state purchasers of securities brought under state securities laws have been dismissed because plaintiffs did not purchase the securities in the state. An interstate class action by an out-of-state purchaser of bonds was permitted in *Rosenthal v. DeanWitter Reynolds, Inc.* (Colo.Ct.App. 1994) 883 P. 2d 522.There the plaintiffs alleged, inter alia, fraudulent conduct in connection with the offer and sale of a security in violation of the Colorado Securities Act (Colo. Rev. Stat. § 11-51-123(3) (1987)). There the court upheld the right of a Pennsylvania purchaser of bonds issued and offered for sale in Colorado to represent a nationwide class of purchasers, rejecting a claim that the entire trans-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

action had to occur in Colorado. In so doing the Colorado court noted that *Simms Inv. Co. v. E.F. Hutton & Co.* (M.D.N.C. 1988) 699 F.Supp. 543 held that the Colorado securities law and the North Carolina common law of fraud could apply to a claim that defendants had made misrepresentations and omissions to induce the plaintiff to participate in a joint venture. The court read *Simms* as holding that, and agreed that Colorado law applied if either the offer or the sale took place in Colorado. Quoting *Simms*, the Colorado court observed: "Blue Sky laws 'protect legitimate resident issuers by exposing illegitimate resident issuers to liability, without regard to the markets of the issuer.' *\*1063Simms Investment Co. v. E.F. Hutton & Co., 699 F.Supp. at 545." (Rosenthal v. Dean Witter Reynolds, Inc., supra,* 883 P.2d at p. 531.)On certiorari, the Colorado Supreme Court affirmed the judgment of the court of appeals, holding that class certification was proper. Colorado law applied as the misleading statements in the offer to sell were made in Colorado. It was irrelevant that the purchase was made through a broker in Pennsylvania. (*Rosenthal v. DeanWitter Reynolds, Inc.* (Colo. 1995) 908 P.2d 1095, 1104.)

(8) Finally, we reject the claim that permitting out-of-state investors to recover damages under section 25500 would impose an impermissible burden on interstate commerce. Amici curiae Securities Industry Association, et al., argue that if section 25400 is construed as regulating out-of-state or interstate transactions in securities, the law may violate the commerce clause (U.S. Const., art. I, § 8). That argument fails to recognize that section 25400 regulates only manipulative conduct in California. It does not purport to regulate any "transactions" in securities which occur outside of this state (cf. *Healy v. The Beer Institute* (1989) 491 U.S. 324 [109 S.Ct. 2491, 105 L.Ed.2d 275]; *Edgar v. MITE Corp.* (1982) 457 U.S. 624 [102 S.Ct. 2629, 73 L.Ed.2d 269]) and does not discriminate against interstate commerce.

Amici curiae fail to explain how permitting persons

who purchase or sell stock at a time when the market price is affected by market manipulation occurring in California to recover damages from the California malefactor burdens interstate commerce. Indeed, such recovery is allowed under federal securities law and we are unable to see how permitting recovery under section 25500 for violation of section 25400 imposes any burden on interstate commerce. Quite the opposite. By affording a remedy to persons who are the victims of manipulative conduct, section 25500 stimulates commerce in corporate stock.

Even were there some indirect burden on interstate commerce, that burden would not be constitutionally impermissible. While petitioners and several amici curiae argue that California has no legitimate interest in protecting out-of-state investors, it has a clear and substantial interest in preventing fraudulent practices in this state which may have an effect both in California and throughout the country. That is the purpose of section 25400. While substantial criminal penalties are available, the Legislature might reasonably conclude that imposing civil liability for all trading losses occasioned by proscribed manipulative conduct will be a substantial deterrent to violation. Even assuming arguendo that California had no interest in protecting investors in other states, the Legislature may reasonably conclude that California does have a legitimate interest in discouraging unlawful conduct that has a potential to harm California investors as well as persons in other states. (See *\*1064* also *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 583 [114 Cal.Rptr. 106, 522 P.2d 666] [Purpose of wrongful death statute creating remedy for nonresidents as well as residents is to deter conduct that wrongfully takes life in this state.].) Extending the civil liability remedy to all investors serves that purpose.

It is true a state may not claim that its interest in protecting nonresident shareholders offsets a burden the state law imposes on interstate commerce. (See *Edgar v. MITE Corp., supra,* 457 U.S. at p. 644 [102 S.Ct. at pp. 2641-2642].) As noted earlier,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539

19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

however, section 25400 does not regulate stock transactions in other states and section 25500 does not penalize or discourage such transactions. Section 25400 may discourage fraudulent inducement of those transactions, but any indirect burden that places on out-of-state sales is clearly offset by the state interest in preventing fraud and protecting the integrity of the capital market for all investors.

California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices. California business depends on a national investment market to support our industry. The California remedy for market manipulation helps to ensure that the flow of out-of-state capital necessary to the growth of California business will continue. FN21 The Court of Appeal rejected a claim similar to that of petitioners and recognized the importance of extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California in *Clothesrigger, Inc. v. G.T.E. Corp.* (1987) 191 Cal.App.3d 605 [236 Cal.Rptr. 605]. There the plaintiff sought damages for fraud, negligent misrepresentation and unfair business practices in the charges made by defendant for long distance telephone calls. The trial court denied certification of a nationwide class on the ground that a nationwide class was not suitable as California had no interest in providing greater protection to residents of other states than that provided by their home states. The Court of Appeal reversed that order, noting that defendant had identified no interest of any other state that might *1065 be affected by extending California's law to the injured nonresidents, and recognizing that "California may have an important interest in applying its law to punish and deter the alleged wrongful conduct." (*Id.* at p. 615.)

> FN21 This point is emphasized by amici curiae the International Brotherhood of Teamsters and the Service Employees International Union, which note that Taft-Hartley pension plans, public pension plans, and company-sponsored stock in-

vestment plans have collectively invested over $500 billion in securities. They assert that protection of this nationwide group of investors is effective only if the Corporate Securities Law provides remedies to investors both within and outside California. Amicus curiae National Council of Senior Citizens states that the investment of public and private pensions had reached $1.3 trillion by 1992. They note that even California residents would suffer losses from market manipulation for which they would have no remedy under section 25500 if their pension plan made its investments in other states. This concern is echoed by two such pension plans, amici curiae Missouri State Employees' Retirement System and Pennsylvania State Employees' Retirement System, which state that they regularly invest substantial sums in securities of California corporations.

(2d) We conclude for all of these reasons that out-of-state purchasers and sellers of securities whose price has been affected by the unlawful market manipulation proscribed by section 25400 may avail themselves of the remedy afforded by section 25500. The remedy is not limited to transactions made in California. The trial court properly overruled petitioners' demurrer.

### IV. Disposition

The order of the Court of Appeal summarily denying the petition for writ of mandate is affirmed.

George, C. J., Mosk, J., and Kennard, J., and Werdegar, J., concurred.

**BROWN, J.,**
Dissenting.-

### I

Plaintiffs contend that both the language and legislative history of California's Corporate Securities

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539                                                                                          Page 23
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

Law of 1968 (Corp. Code, § 25000 et seq.) [FN1] demonstrate "a clear ... intent" that the Act apply "to interstate as well as intrastate transactions." But that construction is belied by the text of the Act itself, by statements of its principal drafter, by commentators and securities litigation practice, and by court decisions. According to these interpretations, spanning more than 30 years, the Act was never intended to have an extraterritorial effect. Instead, it was drafted and enacted in the expectation that it would *supplement* the federal securities acts, statutes that apply to and regulate a truly nationwide securities market. That was the view of the Act and its role from the outset. In a letter dated April 19, 1968, to Senator Randolph Collier, a member of the California Senate Committee on Finance, Harold Marsh, Jr., a corporate law professor and the reporter for the committee of experts appointed to draft what became the Act, wrote that in drafting the legislation, the committee "tried to reach a balanced judgment as to how far it was possible for California to go in asserting jurisdiction over ... predominately foreign transactions and, as a matter of policy, how far it *should* attempt to go." (Harold Marsh, Jr., Letter to Sen. Randolph Collier re Assem. Bill No. 1 (1968 Reg. Sess.) Apr. 19, 1968, p. 5.) The committee *1066 sought "to give the greatest possible protection to California investors and at the same time to recognize that *California cannot rule the United States*." (*Ibid.*, italics added.)

> FN1 References to the Act are to the Corporate Securities Law of 1968.

Professor Marsh's view of the Act's strictly intrastate application has been the almost unanimous consensus for more than a quarter-century. Because of the widely shared assumption that California's Blue Sky statute did not apply to out-of-state transactions, there simply was no litigation seeking to apply it extraterritorially. It was not until after Congress passed the Private Securities Litigation Reform Act of 1995, Public Law No. 104-67 (Dec. 22, 1995) 109 Statutes 737 (1995 U.S. Code Cong. & Admin. News, No. 1) (the Reform Act), legislation

intended by its sponsors to put a stop to what the Senate report called "frivolous 'strike' suits alleging violations of the Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation" (1995 U.S. Code Cong. & Admin. News, No. 2, at pp. 679, 683, reproducing Sen.Rep. No. 104-98 on Pub.L. No. 104-67 (June 19, 1995) (the Reform Act Report)) that serious, concerted efforts were mounted by the securities plaintiffs class action bar to widen the territorial scope of the California Blue Sky statute.

Before this litigation-founded on a revisionist history of the Act's purpose and scope-efforts were concentrated on enlarging the California statute by amendment. The ill-fated Proposition 211, rejected by California voters at the November 1996 election by a 3-to-1 margin, would have added Corporations Code section 25400.1 to the Act, containing almost identical language to existing section 25400, subdivision (d), but removing the limiting words "in this state." (See Ballot Pamp., Prop. 211: Text of Proposed Law, Gen. Elec. (Nov. 5, 1996) § 3, p. 95.) If, as the majority now assumes, existing Corporations Code section 25400 et seq. [FN2] has always authorized nationwide blue sky suits, why was the initiative provision needed? Of course, today's decision makes the defeat at the polls inconsequential. The court now magnanimously flings open the doors the voters emphatically closed. Indeed, the court insists on welcoming these actions despite Congress's repeated attempts to curtail them.

> FN2 All statutory references are to the Corporations Code unless otherwise stated.

## II

On November 3, 1998, the President signed into law the Securities Litigation Uniform Standards Act of 1998 (Sen. No. 1260, 105th Cong., 2d Sess. (1998) (the Uniform Standards Act)). Among other effects, the Uniform Standards Act expressly preempts state blue sky laws, like California's *1067 Act, and "makes Federal court the exclusive venue for most securities class action lawsuits." (Joint Ex-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

planatory Statement of the Com. of Conf., Uniform Standards Act of 1998, 144 Cong. Rec. H10,774 (daily ed. Oct. 13, 1998).) The joint statement goes on to describe the Uniform Standards Act as intended "to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive [securities class action] litigation by filing suit in State, rather than in Federal, court" and to "protect the interests of shareholders and employees of public companies that are the target of meritless 'strike' suits." (*Ibid.*)

As the majority points out, the Uniform Standards Act does not apply retroactively. (See maj. opn., *ante*, at p. 1046, fn. 12.) That does not end the preemption inquiry, however. Given the several actual, irresolvable conflicts between the Reform Act and California's Blue Sky Law, the federal statute itself *impliedly* preempts the state law on which this suit rests. The reason is as well established as it is simple-California's Act, as the court now interprets it, " '[stands] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Barnett Bank of Marion Cty., N.A. v. Nelson* (1996) 517 U.S. 25, 31 [116 S.Ct. 1103, 1108, 134 L.Ed.2d 237] (*Barnett Bank*), quoting *Hines v. Davidowitz* (1941) 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581]; see also *Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, 287 [115 S.Ct. 1483, 1487, 131 L.Ed.2d 385] ["a federal statute implicitly overrides state law ... when state law is in actual conflict with federal law"]; *Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 141 [83 S.Ct. 1210, 1216-1217, 10 L.Ed.2d 248].)

It is a bedrock proposition of supremacy clause jurisprudence that where federal and state laws are in "irreconcilable conflict," state law must give way. (*Rice v. Norman Williams Co.* (1982) 458 U.S. 654, 659 [102 S.Ct. 3294, 3298-3299, 73 L.Ed.2d 1042].) That much was established early on by Chief Justice Marshall's opinion in *Gibbons v. Ogden* (1824) 22 U.S. (9 Wheat.) 1, 210-211 [6 L.Ed. 23, 73] (The supremacy clause applies "to such acts of the state legislatures as ... *interfere* with, or are

contrary to, the laws of congress .... [I]n every such case, the act of congress ... is supreme; and the law of the state ... must yield to it." [Italics added.]). That is plainly the case here.

Recent decisions by several state appellate courts applying these established "implied conflict preemption" principles in analogous securities fraud class action cases strongly suggest (if they do not establish unequivocally) that this suit, too, is in "direct and irreconcilable conflict" with the federal Reform Act. It is thus preempted. In *1068*Guice v. Charles Schwab & Co., Inc.* (1996) 89 N.Y.2d 31 [651 N.Y.S.2d 352, 674 N.E.2d 282],certiorari denied117 S.Ct. 1250 [137 L.Ed.2d 331](*Guice*), retail securities customers of two nationwide discount stock brokerage firms sought national class action monetary and injunctive relief, claiming that the failure of defendant brokers to disclose the acceptance of "payments for order flow" from wholesale securities dealers for routing customer orders to them breached defendants' fiduciary obligation under New York's common law of agency of "full and frank disclosure" to plaintiffs. (89 N.Y.2d at p. 38 [674 N.E.2d at p. 285].)

Relying on *Barnett Bank, supra*, 517 U.S. 25 [116 S.Ct. 1103], the latest in a long line of Supreme Court implied preemption decisions, the New York Court of Appeals held the claims of the plaintiff class were preempted by the 1975 amendments to the Securities Exchange Act and the implementing Securities Exchange Commission (SEC) regulations. (*Guice, supra*, 89 N.Y.2d at p. 39 [674 N.E.2d at p. 285].) The amendments, the New York high court reasoned, "were intended to give the SEC the power administratively to develop a 'coherent and rational regulatory structure to correspond to and to police effectively the new national [securities] market system [citation].' " (*Id.* at pp. 45-46 [674 N.E.2d at p. 289].) If the courts of each of the 50 states were permitted "to impose civil liability on national securities brokerage firms ... for failure to meet more stringent common-law agency standards of disclosure of receipt of order flow pay-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539                                                                                           Page 25
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

ments (rather than the Federally mandated *uniform* specific disclosure ...)[,] the congressional purpose of enabling the SEC to develop and police [a] 'coherent regulatory structure' for a national market system" would be defeated. (*Id.* at p. 46 [674 N.E.2d at p. 289].)

The *Guice* decision does not stand alone. Fully a half-dozen opinions by appellate courts across the country have reached the identical conclusion. (See *Dahl v. Charles Schwab & Co., Inc.* (Minn. 1996) 545 N.W.2d 918, 925 (*Dahl*), cert. den.519 U.S. 866 [117 S.Ct. 176, 136 L.Ed.2d 116] [reasoning that compliance with state laws might lead to an end to the practice of order flow payments, thus conflicting with federal law permitting it; state law preempted]; *Eirman v. Olde Discount Corp.* (Fla.Dist.Ct.App. 1997) 697 So.2d 865 [adopting rationale of *Guice* and *Dahl*]; *Orman v. Charles Schwab & Co., Inc.* (1997) 179 Ill.2d 282 [227 Ill.Dec. 927, 688 N.E.2d 620],cert. den. ___ U.S. ___ [118 S.Ct. 1518, 140 L.Ed.2d 670] [maintenance of state claims by plaintiff class would obstruct the national market system Congress intended to foster; state law preempted]; *McKey v. Charles Schwab & Co.* (1998) 67 Cal.App.4th 731 [79 Cal.Rptr.2d 213] (*McKey*) [collecting the cases nationally and adopting the rationale of *Guice* and *Dahl*].) To our knowledge, the only contrary authority consists of two federal district court decisions, one of which is unreported. (See *Gilman v. Wheat, First Securities,* *1069 Inc.* (D.Md. 1995) 896 F.Supp. 507; *Thomas v. CharlesSchwab & Co., Inc.* (W.D.La., July 12, 1995, No. 95-0307)1995 WL 626522; cf. *McKey, supra,* at pp. 740-741.)

Many of the factors that determined the result in the *Guice* and *Dahl* cases are present in this case. It is clear from the legislative history of the Reform Act (see Reform Act Report, *supra,* at pp. 683-703) that Congress was motivated by what the Senate report called "frivolous 'strike' suits alleging violations of the Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litig-

ation. These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud." (*Id.* at p. 683.) Virtually the entire thrust of the Reform Act is directed at inhibiting such "strike" shareholder litigation, which typically takes the form of fraud-based class action suits brought under SEC rule 10(b)-5 (17 C.F.R. § 240.10b-5 (1998)).

The Reform Act adopts a number of measures intended by Congress to remove incentives to shareholder participation in what the Reform Act's managers called class action litigation "abuses." (Reform Act Report, *supra,* at p. 683.) These include a "safe harbor" or circumscribed immunity from liability provision for "forward-looking statements" or forecasts by issuers if prescribed conditions are met (Reform Act Report, *supra,* § 102(a)); a mandatory stay of discovery in federal court litigation while a motion to dismiss is pending; enhanced pleading standards that require fact-specific recitals of allegations supporting fraud claims; a "lead plaintiff" provision designed to put shareholders, rather than class counsel, in charge of securities class action litigation; and a system of proportionate, rather than joint and several, liability for defendants not shown to have committed fraud knowingly. (*Id.*, § 101(b).)

Consider only one of the several possible conflicts with the California securities statute these provisions might produce: If, on the one hand, the federal Reform Act *limits* the liability of securities issuers for "forward looking" forecasts when the conditions prescribed by the "safe harbor" requirements (15 U.S.C. § 78u-5 of the Securities Exchange Act of 1934) are present and, on the other hand, California's Blue Sky Law imposes an *unqualified* liability on securities issuers for such forecasts, the two provisions cannot be reconciled. Because it is impossible for those subject to the California statute and the Reform Act to comply with both, the state statute must give way.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

Indeed, not a single provision of the Reform Act has a counterpart in California's Act. That fact probably accounts for the "migration," in the *1070 wake of passage of the Reform Act, of securities fraud class action litigation from the federal courts, historically the overwhelmingly preferred venue, to the suddenly more hospitable state courts and state blue sky statutes. An analysis prepared by Stanford Law School's Securities Litigation Law Project found that although the aggregate number of securities fraud class action lawsuits remained relatively static following enactment of the Reform Act, that statistic masks an underlying and significant change-a sharp increase in securities fraud class action litigation brought under state blue sky laws, and a corresponding diminution in comparable federal court SEC-based litigation. (Grundfest & Perino, *Securities Litigation Reform: The First Year's Experience* (Feb. 27, 1997) <http://securities.stanford.edu/report/pslra_yrl/index.html> [visited Jan. 5, 1999] (Grundfest & Perino).)

According to the authors of the Stanford study, the migratory trend from federal to state courts is driven by efforts of the plaintiffs' securities class action bar to evade the litigation hurdles the Reform Act placed in the path of such suits. The evidence presented, the study's authors concluded, "suggests that the level of class action securities fraud litigation has declined by about a third in federal courts, but that there has been an almost equal increase in the level of state court activity, largely as a result of the 'substitution effect' whereby plaintiffs resort to state court to avoid the new, more stringent requirements of federal cases." (Grundfest & Perino, *supra*, at pt. XI, Conclusions and Policy Issues.)

Under California law, nothing comparable to the provisions of the Reform Act-intended both to make abusive securities strike litigation more difficult to mount and sustain, and to further the declared congressional policy of a national securities market-would apply to class action securities fraud suits filed in our courts. Blue sky suits can thus continue to be financed and controlled by the same handful of class counsel whose "appearance ratio" has climbed significantly since passage of the Reform Act. (Grundfest & Perino, *supra*, at pt. VII, Appearance Ratio of Plaintiff Law Firms.) The Reform Act's mandatory freeze on discovery imposed by the Uniform Standards Act would not apply to state blue sky suits either. Indeed, class counsel's use of state blue sky statutes as a device to evade the Reform Act's provisions has already been documented. Observers point to the increasingly common practice of filing parallel securities fraud class action suits-one in state court, another in federal court-as a means of evading the Reform Act's mandatory discovery stay. (See, e.g., Grundfest & Perino, *supra*, at pt. XI, Conclusions and Policy Issues ["There has also been an increase in parallel litigation between state and federal courts in an apparent effort to avoid the federal discovery stay or other provisions of the Reform Act."].) *1071 Just that kind of whipsaw evasion was apparently attempted in this case. (See *In re Diamond Multimedia Systems, Inc. Securities Litigation* (N.D.Cal., Oct. 14, 1997, No. C-96-2644-SBA)1997 WL 773733.)The same conflict would seem to hold true for the Reform Act's enhanced, fact-specific pleading requirements and proportionate liability standard.

Although inferential, the conclusion is inescapable: if state courts resolutely ignore implied preemption principles, the effect of Congress's passage of the Reform Act will be to offer securities plaintiffs and their class counsel a "safe harbor" from which to evade the effects of the Reform Act. And that is exactly what has happened. Congress is now aware of the trend toward circumventing the Reform Act's impediments to securities class action litigation by migrating to state courts as the forum of choice. Indeed, Congress has acted with unusual speed to pass legislation precluding state court forum-shopping by securities class action counsel. The Uniform Standards Act *expressly* preempts state laws in conflict with the standards prescribed by the Reform Act.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The effect of the uniform standards legislation, however, is itself "forward looking." The question thus becomes whether a small population of securities issuers, cut off from the express effects of the Uniform Standards Act, has been marooned: deprived of the benefits of Congress's dual policy of furthering a national securities market while deterring abusive securities class action litigation. In other words, the relevant inquiry now is not, as plaintiffs argue, whether California's Act applies to extrastate transactions. Congress has *expressly* preempted state securities laws as of November 1998 with the enactment of the Uniform Standards Act. Before that date, however, Congress had *impliedly* preempted state blue sky provisions, including California's, that are in "irreconcilable conflict" with the provisions of the Reform Act itself.

The similarities between the case before the New York Court of Appeals in *Guice, supra,* 89 N.Y.2d 31 [674 N.E.2d 282], and this case are not only compelling, they point to the same conclusion. Just as the 1975 amendments to the Securities Exchange Act "were intended to give the SEC the power administratively to develop a 'coherent and rational regulatory structure to correspond to and to police effectively the new national [securities] market system' [citation]," so, 20 years later, the provisions of the Reform Act were intended by Congress to continue the development of that same national securities market. (89 N.Y.2d at pp. 45-46 [674 N.E.2d at p. 289].) And just as the New York Court of Appeals reasoned that permitting the courts of each of the 50 states "to impose civil liability on national securities brokerage firms ... for failure to meet more stringent [state] ... standards" (*1072*id. at p. 46 [674 N.E.2d at p. 289]) would defeat Congress's "purpose of enabling the SEC to develop and police [a] 'coherent regulatory structure' for a national market system," (*ibid.*) so fragmentation of the Reform Acts' express national standard into as many as 50 different state standards would wreak havoc on federal efforts to protect that market from abusive litigation practices.

As the United States Supreme Court said in rejecting a comparable scenario involving nuisance abatement suits under state law and the federal Clean Water Act, "It is unlikely-to say the least-that Congress intended to establish such a chaotic regulatory structure." (*International Paper Co. v. Ouellette* (1987) 479 U.S. 481, 497 [107 S.Ct. 805, 814, 93 L.Ed.2d 883].) The prospect of regulatory chaos raised by the *Ouellette* case, a prospect that would result from the efforts of one state to "do indirectly what [it] could not do directly-regulate the conduct of out-of-state [pollution] sources" (*id.* at p. 495 [107 S.Ct. at p. 813])-suggests that application of California's Blue Sky statutes in this case would also violate the commerce clause of the federal Constitution. (U.S. Const., art. I, § 8.)

The court's reasoning in *Edgar v. MITE Corp.* (1982) 457 U.S. 624 [102 S.Ct. 2629, 73 L.Ed.2d 269] (*Edgar*) explains why. A newly enacted Illinois antitakeover statute imposed a 20-day freeze on tender offers for shares of certain target companies (defined in terms of the target's contacts with Illinois residents). Because it favored target defenses, the 20-day freeze conflicted with the federal Williams Act (amending the Securities Exchange Act of 1934), which had no freeze period, and with Congress's declared policy of neutrality in takeover battles. In addition, provisions of the Williams Act laid down detailed rules intended to protect the interests of shareholders without "tipping the scales" in favor of the takeover company or its target.(*Edgar, supra,* 457 U.S. at p. 633 [102 S.Ct. at p. 2636].)

The court found that three provisions of the state antitakeover statute "upset the careful balance struck by Congress [in the Williams Act] and [that] therefore stand as obstacles to the accomplishment ... of the full purposes and objectives of Congress." (*Edgar, supra,* 457 U.S. at p. 634 [102 S.Ct. at p. 2636].) Although states are free to regulate intrastate securities transactions, blue sky statutes that have "a direct restraint on interstate commerce and ... a sweeping extraterritorial effect" are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

968 P.2d 539                                                                    Page 28
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

void under the commerce clause. (*Id.* at p. 642 [102 S.Ct. at p. 2640].) The court in *Edgar* went on to say that "the State has no legitimate interest in protecting nonresident shareholders" (*id.* at p. 644 [102 S.Ct. at p. 2641]) and that provisions of the Williams Act also duplicated substantive protection for shareholders provided in the state statute. (*Ibid.*) Because the Illinois statute *1073 "imposes a substantial burden on interstate commerce which outweighs its putative local benefits," it was invalid under the commerce clause. (*Id.* at p. 646 [102 S.Ct. at p. 2642].)

The same considerations that led the court to declare the Illinois statute at issue in *Edgar, supra,* 457 U.S. 624, unconstitutional under the commerce clause apply here. And they point to the same result. As the opinion in *Edgar* observed, "[t]he Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating States." (*Id.* at p. 641 [102 S.Ct. at p. 2640].) The commerce clause, however, "precludes the application of a state statute to commerce that takes place *wholly outside of the State's borders,* whether or not the commerce has effects within the State." (*Id.* at pp. 642-643 [102 S.Ct. at p. 2641], italics added.) Like the constitutional limitations on a state's assertion of extraterritorial jurisdiction, "[i]n either case, 'any attempt "directly" to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power.' " (*Id.* at p. 643 [102 S.Ct. at p. 2641], quoting *Shaffer v. Heitner* (1977) 433 U.S. 186, 197 [97 S.Ct. 2569, 2576, 53 L.Ed.2d 683].)

### Conclusion

The majority's decision is at odds with the text and structure of the Act and a quarter-century's understanding that it does not extend beyond California's borders. Fearful, perhaps, that state courts would not give effect to an implicit intent by applying established preemption rules, less than two months ago Congress acted to *expressly* rule out application

of conflicting state blue sky laws. For these defendants, congressional action comes too late. Cut off from the Uniform Standards Act, stranded by today's ruling, these unlucky few are left to fend for themselves. The concrete unfairness of that result is palpable enough; it is only heightened by this court's determination to ignore well-established principles governing implied preemption even in the face of the near unanimity among courts across the country in holding that similar 1975 amendments to the Securities Exchange Act preempted state laws in conflict with Congress's intent.

I dissent.

Chin, J., concurred. *1074

Cal. 1999.
Diamond Multimedia Systems, Inc. v. Superior Court
19 Cal.4th 1036, 968 P.2d 539, 80 Cal.Rptr.2d 828, 99 Cal. Daily Op. Serv. 84

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 5

BN I670465v1

Westlaw.

49 P.3d 1093                                                                    Page 1
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

▷
Estate of AUSTIN D. STEPHENS, Deceased.
KATHERINE STEPHENS VOHS, Petitioner and
Appellant, v. SCOTT WILLIAMS, as Cotrustee,
etc., et al., Claimants and Respondents.
Cal. 2002.

Supreme Court of California
Estate of AUSTIN D. STEPHENS, Deceased.
KATHERINE STEPHENS VOHS, Petitioner and
Appellant,
v.
SCOTT WILLIAMS, as Cotrustee, etc., et al.,
Claimants and Respondents.
**No. S095401.**

July 25, 2002.

SUMMARY

In a probate proceeding, the trial court rejected the
petition of the decedent's son to return real property
to the estate. The decedent had transferred his res-
idence to himself and his daughter as joint tenants,
and he orally instructed the daughter to sign his
name to the deed. (Superior Court of Orange
County, No. A173413, Richard O. Frazee, Sr.,
Judge.) The Court of Appeal, Fourth Dist., Div.
Three, No. G021962, reversed.

The Supreme Court reversed the judgment of the
Court of Appeal. The court held that the convey-
ance was valid. The court held that the signing of a
grantor's name by an interested amanuensis must be
presumed invalid. In such a case, the interested
amanuensis bears the burden to show that his or her
signing of the grantor's name was a mechanical act
in that the grantor intended to sign the document
using the instrumentality of the amanuensis. In this
case, the daughter rebutted the presumption of in-
validity. Because her signature was a mere mechan-
ical act, and not an exercise of judgment or discre-
tion, the decedent's oral instruction was sufficient.
Also, the daughter had cared for the decedent, and

it is perfectly natural for a parent to be more boun-
tiful to one child who has assumed the greatest bur-
den of care and lavished the highest degree of soli-
citude upon him or her. (Opinion by Moreno, J.,
with George, C. J., Baxter, Werdegar, Chin, and
Brown, JJ., concurring. Dissenting opinion by
Kennard, J. (see p. 678).)

HEADNOTES

Classified to California Digest of Official Reports

**(1a,         1b)         Deeds         §
3--Requisites--Execution--Amanuensis:Words,
Phrases, and Maxims--Amanuensis.**
Under the amanuensis rule, where the signing of a
grantor's name is done by another person with the
grantor's express authority, the person signing the
grantor's name is not deemed an agent but is instead
regarded as a mere instrument or amanuensis of the
grantor, and that signature is deemed to be the
grantor's signature. The amanuensis rule may be in-
voked as an exception to Civ. Code, § 2309 (oral
and written authorizations for agents). Further,
there is no requirement that an amanuensis must
sign the document in the presence of the principal.
Whether the principal directs the amanuensis by
telephone or the principal, in person, tells the
amanuensis to sign the document and the actual
signing is done outside the principal's presence, a
court is required to determine whether the signing
is a mechanical act.

**(2a,    2b,    2c,    2d,    2e,    2f)    Deeds    §
3--Requisites--Execution--    Amanuensis--Daughter's
Signing Father's Name to Deed Conveying Property
to Daughter:Frauds, Statute of § 6--Transfer of Real
Property.**
In a probate proceeding, the trial court did not err in
finding valid a conveyance of the decedent's resid-
ence to himself and his daughter as joint tenants,
even though the daughter signed the decedent's
name to the deed at his direction and out of his

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

49 P.3d 1093                                                                                                    Page 2
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

presence. The daughter was not authorized to sign the deed as the decedent's agent; while she had the decedent's written authority in the form of a power of attorney, that document specified that she had only the power to sell, convey, and transfer his real property. Thus, by law, she lacked authority to convey the property to herself as a gift. Nor was the gift authorized by Prob. Code, § 4264 (acts requiring express authorization in power of attorney). Further, the decedent did not ratify the signature, since ratification was required to be in writing, and no such writing existed. Nevertheless, the daughter qualified as an amanuensis. Although an instrument executed by an interested amanuensis is presumed invalid, the daughter successfully rebutted that presumption. Because her signature was a mere mechanical act, and not an exercise of judgment or discretion, the decedent's oral instruction was sufficient. Also, the daughter had cared for the father, and it is perfectly natural for a parent to be more bountiful to one of his or her children who has assumed the greatest degree of care and lavished the highest degree of solicitude upon him or her.

[See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 306; 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 150; 3 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 8:27 et seq.; West's Key Number Digest, Deeds ⚹⇒ 45.]

**(3) Deeds § 1--General Principles.**
A deed is a written instrument conveying or transferring the title to real property. It is an executed conveyance and operates as a present transfer of the real property. As a deed is an executed contract, it is subject to the rules applicable to contracts.

**(4) Deeds § 3--Requisites--Execution--By Agent:Agency § 20--Authorization-- Execution of Deed.**
Under Civ. Code, § 1091, an agent's authority to execute a deed on behalf of a principal must be conferred in writing. Moreover, the "equal dignities" rule of Civ. Code, § 2309, provides that a principal's oral authorization to an agent is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can

only be given by an instrument in writing.

**(5) Agency § 10--Powers of Attorney--Authority--To Convey Real Property.**
A power of attorney conferring authority to sell, exchange, transfer, or convey real property for the benefit of the principal does not authorize a conveyance as a gift or without substantial consideration. Also, a conveyance not within the scope of the power conferred is void.

**(6) Agency § 21--Ratification:Words, Phrases, and Maxims--Ratification.**
Ratification is the voluntary election by a person to adopt in some manner as his or her own an act that was purportedly done on his or her behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him or her.

**(7) Deeds § 3--Requisites--Execution--By Agent--Ratification--Equal Dignities Rule:Agency § 21--Ratification.**
Under the equal dignities rule (Civ. Code, § 2310), a ratification of an agent's act can be made only in the manner that would have been necessary to confer an original authority for the act ratified. Thus, just as an agent's authority to execute a deed must be in writing, so also must a principal's ratification of an invalid execution be in writing. A grantor cannot orally ratify and accept the execution of the deed instrument by a third party. Ratification by the grantor of the prior execution of the deed must be in writing.

**(8a,         8b)         Deeds         §
3--Requisites--Execution--Amanuensis:Words, Phrases,         and         Maxims--Amanuensis--Interested Amanuensis.**
If an amanuensis who signs an instrument of conveyance will directly benefit from the transfer of title, the validity of the transfer must be examined under a heightened level of judicial scrutiny. Obvious concerns arise, such as whether the transfer was the product of fraud, duress, or undue influence. The amanuensis rule is an exception to Civ. Code,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

49 P.3d 1093                                                                    Page 3
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

§§ 2309 and 2310 (authority of agents), and also operates as an exception to Prob. Code, § 4264, subd. (c), which prohibits attorneys-in-fact from making gifts of property to themselves. Since unscrupulous parties could attempt to use the amanuensis rule to avoid the protections contained in these statutes, the signing of a grantor's name by an interested amanuensis must be presumed invalid. In such a case, the interested amanuensis bears the burden to show that his or her signing of the grantor's name was a mechanical act in that the grantor intended to sign the document using the instrumentality of the amanuensis.

**(9a, 9b)** Deeds § 11--Validity--Fraud--Undue Influence--Parent and Child.
Where the relationship between the parties to a transfer of property is that of parent and child and the parent relies on the child for advice in business matters, a gift inter vivos, which is without consideration and where the parent does not have independent advice, is presumed to be fraudulent and to have been made under undue influence. The burden of proof then shifts to the child to show that the transaction was free from fraud and undue influence, and in all matters fair. The presumption may be rebutted by evidence that the act in question had its genesis in the mind of the parent and that the parent was not goaded to a completion by any act of such child. The child's burden of proof is by a preponderance of the evidence.

**(10)** Deeds § 9--Validity--Lack of Legal Advice.
The lack of independent legal advice by the grantor is not in and of itself a ground for vitiating a deed. But is a fact to be weighed by the trial court in determining whether the grantor acted voluntarily.

COUNSEL
E. Michael Ambrosi for Petitioner and Appellant.
Law Offices of Roger P. Sprigg and Roger P. Sprigg for Claimants and Respondents.

**MORENO, J.**
This matter involves a petition under the Probate Code seeking the return of real property to the deceased's estate. Prior to his death, the deceased orally instructed his daughter to sign his name on a grant deed *669 that vested title to his residence in himself and her as joint tenants; she did so outside of his presence and he later orally ratified the conveyance. We granted review to decide whether the transfer was valid. As discussed herein, we conclude the transfer was valid.

I.

In 1978, Austin David Stephens (Austin) and his wife, Thelma, executed crossover wills, which provided that when they passed away all their real and personal property would be equally divided between their children, Lawrence Stephens (Lawrence) and Shirley Williams (Shirley).

In 1983, Thelma became seriously ill with cancer. Shirley drove her mother to every chemotherapy treatment and gave her around-the-clock care for five years. Shirley, who lived just two houses from her parents, installed an intercom linking their bedrooms so her mother could reach her at any time. At the same time, Shirley held two jobs. She worked in the daytime as a switchboard operator and in the evening as a cocktail waitress.

Soon after Thelma died in 1988, Austin's health began to suffer. Over the next six years, he had over 170 doctor visits and was hospitalized several times as a result of diabetes, a heart attack, prostate cancer, lip cancer, high blood pressure, glaucoma, and ear and eye surgeries. Shirley, as she did with her mother, took care of her father. She fixed him three meals a day, cleaned his pool and house, washed his clothes, watered his plants, purchased his groceries, gave him daily insulin shots, arranged his medical appointments, purchased his prescriptions, completed his insurance paperwork, medical forms and tax returns, paid his bills and cared for his pets.

Unlike Shirley, Lawrence was not involved in the daily activity of caring for his father. In August of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1989, Lawrence moved from California to Colorado to retire. Thereafter, he visited his father once or twice a year.

Austin began to lose his eyesight from glaucoma. In 1989, he executed a durable power of attorney, naming Shirley his attorney-in-fact. The document specified that she had the power to sell, convey, and transfer his real property. By 1990, Austin was blind and relied on Shirley to read documents for him. In 1991, Austin decided to make a gift of his home to Shirley due in part to her caring for him as well as Lawrence's departure to Colorado at a time when Austin felt he needed help.

A grant deed was typed by Agnes Stephens, who was Lawrence's ex-wife and Shirley's coworker. The deed vested title in Austin and Shirley as joint *670 tenants. Austin's name and address were typed on the deed for return by mailing after recording. Following preparation of the deed, Austin verbally instructed Shirley, in the presence of Austin's best friend and neighbor, Delbert Catron, to sign his name to the deed. Shirley followed her father's instructions. She executed the deed and had it notarized. Austin was not present at the time Shirley signed the deed.

The trial court determined that, after the deed was executed, Austin "orally and expressly" ratified Shirley's signing of his name to the deed. The trial court stated: "a. Shirley immediately told Austin of each step of the execution, notarization, forwarding of the deed to the County Recorder's office for recording, and return of the deed to him after recording. At each of these steps Austin verbally acknowledged to Shirley that that was what he wanted to happen and instructed her to proceed with the next step. [¶] b. While the deed was with the County Recorder's office for recording, Austin personally received a telephone call from a person from the County of Orange who inquired as to whether Austin intended the transfer of the real property to be a gift to Shirley. Austin told the caller that that was his intent. [¶] c. After the deed was recorded it was mailed to Austin's residence, at which time he

verbally acknowledged receiving it and instructed Shirley to place it in safekeeping. [¶] d. Subsequent to the recording of the deed, Austin had several conversations with Mr. Catron in which he told Mr. Catron that Shirley had followed his instructions and executed the deed. [¶] e. Around Christmas 1991, subsequent to the recording of the deed, Austin traveled to Florida where he stayed for several weeks or months to visit his brother, James Franklin Stephens. During that visit he repeatedly told his brother that he was angry with Larry for leaving California, that he had nothing but praise for Shirley for taking care of him, and that he had 'disinherited Larry.' "

The trial court also determined that Austin was at all times thereafter mentally competent and capable of taking action to disavow the validity of the deed if that was his desire, but that he did not do so despite his knowledge of the execution, notarization, and recording of the deed.

Within a few weeks of Austin's death in 1994, Lawrence filed a petition for probate of the will and a petition to determine title and require transfer of the property to the estate pursuant to Probate Code former section 9860, subdivision (a)(4). Lawrence died before trial, but his daughter, Katherine Stephens Vohs (Katherine), continued with the litigation as his successor in interest (Code Civ. Proc., §§ 377.31 & 377.32), and filed an amended petition.

(1a) After a court trial, the trial judge declared Shirley the sole owner of Austin's property under the "amanuensis" rule, which provides that where *671 the signing of a grantor's name is done with the grantor's express authority, the person signing the grantor's name is not deemed an agent but is instead regarded as a mere instrument or amanuensis of the grantor, and that signature is deemed to be that of the grantor. (See generally *Ledford v. Hubbard* (1926) 219 Ky. 9, 15 [292 S.W. 345, 348], and cases cited therein; *Lukey v. Smith* (1961) 77 Nev. 402 [365 P.2d 487, 488-489].) [FN1]

　　FN1 The Oxford English Dictionary (2d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

49 P.3d 1093                                                                                   Page 5
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

ed. 1989) defines "amanuensis" as "one who copies or writes from the dictation of another." Pablo Neruda has penned: "In the center of the earth I will push aside the emeralds so that I can see you-you like an amanuensis, with a pen of water, copying the green sprigs of plants." (Neruda, 100 Love Sonnets (1986) "In the Center of the Earth," p. 211, 1st verse.)

The trial court stated: "Shirley's signature of Austin's name was a purely ministerial, mechanical act and was not an exercise by Shirley of any authority under the power of attorney. The signature is therefore deemed to be that of Austin made by the hand of Shirley, and not the signature of Shirley as an authorized agent under the power of attorney or otherwise as a fiduciary. In so signing the deed, Shirley was not exercising any authority [under the power of attorney], and therefore did not exceed any authority. By virtue of Austin's antecedent instruction to Shirley and his subsequent ratification, the signature on the deed is deemed to be Austin's as a matter of law, meeting the requirement of [Civil Code section 1091] that a deed be executed by the grantor."

Katherine appealed. During the appeal's pendency, Shirley passed away. Her children continued to defend the lawsuit. (Code Civ. Proc., § 377.40; Prob. Code, § 58.) The Court of Appeal reversed. It held that under Civil Code section 2309, Shirley's authority to execute the deed as Austin's agent had to be in writing. As Shirley's written authority was derived from a durable power of attorney, Shirley could not convey the property to herself as a gift. Moreover, Austin's oral ratification of the deed was insufficient because Civil Code section 2310 requires that such ratification be in writing. Finally, the Court of Appeal rejected the amanuensis theory because the deed was admittedly not signed in Austin's presence.

The Court of Appeal reached its decision reluctantly: "The record is clear [that] Austin desired to give his home to Shirley to thank her for all her selfless giving, continuous help and love. Sadly, Austin and Shirley failed to comply with legal formalities necessary to carry out Austin's wishes."

We granted review; we now reverse.

II.

(2a) The Court of Appeal correctly determined that Shirley was not authorized to sign the deed as Austin's agent. (3) A deed is a written *672 instrument conveying or transferring the title to real property; it is an executed conveyance and operates as a present transfer of the real property. (3 Miller & Starr, Cal. Real Estate (3d ed. 2000) Deeds, § 8.1, p. 5 (Miller & Starr).) As a deed is "an executed contract, it is subject to the rules applicable to contracts." (Ibid.; see also Civ. Code, § 1040; Johnston v. City of Los Angeles (1917) 176 Cal. 479, 485-486[168 P. 1047] [deeds must be read like any other contracts].)

(4) An agent's authority to execute a deed on behalf of a principal must be conferred in writing. Civil Code section 1091 provides, in pertinent part: "An estate in real property ... can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing."

Moreover, the "equal dignities" rule of Civil Code section 2309 (section 2309) provides that a principal's *oral* authorization to an agent "is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing." (2b) The deed in this matter, as a present transfer of property, fell squarely within this rule. (See 3 Miller & Starr, supra, Deeds, § 8.27, p. 52 ["In general, if some other person executes a deed on behalf of the grantor, the grantor's authorization must be in writing."].) Shirley did not have written authority to execute the deed as Austin's agent. The transfer was thus not authorized by section 2309.

While Shirley had written authority from Austin in

49 P.3d 1093                                                                                              Page 6
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

the form of a power of attorney, that document specified that she had only the power to sell, convey, and transfer his real property. By law, she lacked authority to convey the property to herself as a gift. (5) "A power of attorney conferring authority to sell, exchange, transfer or convey real property for the benefit of the principal does not authorize a conveyance as a gift or without substantial consideration [citations]; and a conveyance without the scope of the power conferred is void." (*Shields v. Shields* (1962) 200 Cal.App.2d 99, 101[19 Cal.Rptr. 129].)

(2c) Nor was the gift authorized by Probate Code section 4264, which provides that a power of attorney may not be construed to grant authority to an attorney-in-fact to "[m]ake or revoke a gift of the principal's property in trust or otherwise" unless such act is "expressly authorized in the power of attorney." (Prob. Code, § 4264, subd. (c).)

Respondents concede that Shirley lacked written authority to execute the deed, but argue that Austin subsequently ratified her execution of the deed *673 by his oral statements to others. This argument is not persuasive. To be valid, any such ratification must have been made in writing; oral ratification was insufficient.

(6) "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. [Citations.]" (*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73[104 Cal.Rptr. 57, 500 P.2d 1401](*Rakestraw*).)

(7) However, the equal dignities rule of Civil Code section 2310 (section 2310) provides that a ratification of an agent's act "can be made only in the manner that would have been necessary to confer an original authority for the act ratified." In other words, just as an agent's authority to execute a deed must be in writing, so also must a principal's ratification of an invalid execution be in writing. "A

grantor cannot ratify and accept the execution of the [deed] instrument by the third party orally. Ratification by the grantor of the prior execution of the deed must be in writing." (3 Miller & Starr, *supra*, Deeds, § 8.27, p. 52.) Our cases, going back more than a hundred years, have affirmed this rule. For example, in *Videau v. Griffin* (1863) 21 Cal. 389, 391(*Griffin*), we held that where a deed is executed by an attorney without written authority, no subsequent parol acknowledgment by the principal will make that conveyance valid.

(2d) Respondents also urge that sections 2309 and 2310 are inapplicable because, even if Shirley acted as Austin's agent, her execution of the deed involved a claim solely between her and Austin, and claims between a principal and agent fall outside sections 2309 and 2310. In support, they cite two of our cases: *Sunset-Sternau Food Co. v. Bonzi* (1964) 60 Cal.2d 834[36 Cal.Rptr. 741, 389 P.2d 133](*Sunset-Sternau*), where we refused to apply section 2309 to an oral contract between a principal and agent; and *Rakestraw*, *supra*, 8 Cal.3d 67, where we refused to apply section 2310 to an oral ratification between a principal and agent. Their reliance is misplaced.

In *Sunset-Sternau*, an agent sued its principal for refusing to execute a contract that it had negotiated on the principal's behalf. (*Sunset-Sternau*, *supra*, 60 Cal.2d at pp. 836-837.)In *Rakestraw*, the principal, whose signature was forged onto a promissory note, sued her former friend on the theory that he aided the purported agent (the principal's husband) in the forgery. (*Rakestraw*, *supra*, 8 Cal.3d at pp. 70-71.)In *Sunset-Sternau*, we held that the absence of a written authorization did not preclude a finding that the contract was valid because the proscription of section 2309 does not *674 "prohibit the enforcement of the agreement between the principal and the agent ...." (*Sunset-Sternau*, *supra*, 60 Cal.2d at p. 842.)In *Rakestraw*, we likewise stated, "section 2310 was not intended to apply to [an oral] ratification as between a principal and agent." (*Rakestraw*, *supra*, 8 Cal.3d at p. 76.)In other

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

49 P.3d 1093                                                                    Page 7
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

words, we held that sections 2309 and 2310 do not control if the principal or the agent is seeking to enforce (or void) an agreement vis-a-vis the other.

Application of this reasoning quickly disposes of respondents' contention that sections 2309 and 2310 do not apply to this transaction. Unlike in *Rakestraw* and *Sunset-Sternau*, there is no dispute between Shirley as agent and Austin as principal. As such, *Rakestraw* and *Sunset-Sternau* do not control.

But Shirley had two independent roles in this transaction. Not only did she act as Austin's agent and execute the grant deed on his behalf, she was also the party who received an interest in the property through the grant deed. In this case, Shirley is simply asserting her rights as the party who received an interest in the property, not her rights as Austin's agent.

Respondents insist that the transaction should be valid as a deed signed by Austin, because Shirley acted as Austin's amanuensis in that she performed a mere mechanical function in signing Austin's name to the deed. (1b) The amanuensis rule has successfully been invoked as an exception to section 2309. [FN2] Respondents assert that the Court of Appeal erred in concluding that Shirley did not qualify as an amanuensis because she did not sign the deed in Austin's presence.

> FN2 See, e.g., *Ellis v. Mihelis* (1963) 60 Cal.2d 206, 213[32 Cal.Rptr. 415, 384 P.2d 7](*Mihelis*);*Murphy v. Munson* (1949) 95 Cal.App.2d 306, 311-313[212 P.2d 603](*Munson*);*Kadota Fig Assn. v. Case-Swayne Co.* (1946) 73 Cal.App.2d 815, 821[167 P.2d 523](*Kadota Fig*). These cases are fully discussed, *post*.

The sole authority cited by the Court of Appeal, *Pitney v. Pitney* (1921) 55 Cal.App. 22, 29[202 P. 940](*Pitney*), specifically requires that an amanuensis sign a deed in the presence of the grantor. In *Pitney*, the plaintiff, who was unable to read or write, had several deeds prepared for her. After they were read to her, she directed her attorney to sign her name, which he did in her presence. Such act "constituted and was in law the signature of the plaintiff." (*Id.* at p. 30.)The court explained, " 'The only exception to the rule that an authority to execute a deed must be conferred by writing, is where the execution by the attorney is in the presence of the principal. The exception arises from the doctrine that what one does in the presence of and by the direction of another is the act of the latter-as much so as if it were *675 done by himself in person. The attorney in such case, so far as the signature to the instrument is concerned, is a mere amanuensis of the grantor, and in the affixing of the seal is only the instrument, the hand, as it were, of the grantor. It is not sufficient that the attorney was directed to sign the name of the principal and affix his seal; the execution must be in the immediate presence of the principal, and this fact must be affirmatively established by the party who relies upon it as an excuse for the absence of a power in writing.' " (*Ibid.*, quoting *Griffin, supra,* 21 Cal. 389, 392.)

Subsequent cases have clarified, however, that application of the amanuensis rule is not confined to the situation in which an agent signs a contract in the principal's immediate presence. It may also apply when an agent, acting with merely mechanical and no discretionary authority, signs the principal's name *outside* the principal's presence.

In *Mihelis, supra,* 60 Cal.2d 206, a land purchaser orally authorized his agent, by telephone, to sign a land contract on his behalf. The seller invoked section 2309 to void the contract. We held that a contract signed by an agent in the principal's name, outside of the principal's presence, was binding. The signature was "purely a mechanical act which did not involve the exercise of discretion." (*Mihelis, supra,* at p. 214.)We explained: "[W]here the signing by an agent is an act of this character the authorization by the principal is not required to be in writing and the signature is to be treated as that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

49 P.3d 1093                                                                 Page 8
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

of the principal whether or not he was present at the execution of the agreement." (*Ibid.*)

Similarly, in *Munson, supra,* 95 Cal.App.2d 306, the Court of Appeal held that the principal's oral request to his agent, by telephone, to sign a document was "perfectly valid, whether the name was signed in or out of his presence." (*Id.* at p. 313.)The Court of Appeal explained that the amanuensis rule was an exception to section 2309 because " 'there was no attempt to delegate authority to the amanuensis to exercise discretion with respect to the provisions of the [agreement], but merely to authorize him to sign the agent's name to the document.' " (*Munson, supra,* at p. 312, quoting *Kadota Fig, supra,* 73 Cal.App.2d 815, 820.)

Likewise, *Kadota Fig, supra,* 73 Cal.App.2d 815, also held that an authorized agent's oral request that a third party perform "the mere mechanical act of signing" that agent's name to an instrument, outside the agent's presence, was "valid and binding," even though the instrument was required to be in writing. (*Id.* at p. 819.)There, the authorization was conveyed to a judge, by telephone, who acted as the amanuensis for the duly authorized agent of the principal. (*Ibid.*) The court held that section 2309, which requires a written **\*676** authorization " '*to enter into a contract* required by law to be in writing' " (*Kadota Fig, supra,* at p. 821, quoting § 2309, italics added in *Kadota Fig*), was not applicable because the judge was given no authority "to enter into a contract." (*Kadota Fig, supra,* at p. 819.)Instead, as the judge exercised no discretion or judgment, he acted merely as an amanuensis. Despite its acknowledgement of *Pitney, supra,* 55 Cal.App. 22, the *Kadota Fig* court held there was no requirement that the signature be made in the agent's presence: "[W]e ... know of no authority which requires that the signature of the party shall be actually made in his presence." (*Kadota Fig, supra,* at p. 821.)

As in *Mihelis, supra,* 60 Cal.2d 206, we again reject the formalistic notion that an amanuensis must sign the document in the presence of the principal.

Whether the principal directs the amanuensis by telephone or, as in the present case, the principal, in person, tells the amanuensis to sign the document and the actual signing is done outside the principal's presence, courts are required to determine whether the signing is a mechanical act. [FN3]

> FN3 *Estate of Huston* (1997) 51 Cal.4th 1721[60 Cal.Rptr.2d 217], cited by both parties, does not control here because the *Huston* court did not consider the amanuensis rule since it was never alleged by the parties. Given our holding today, *Huston* is inapplicable.

III.

(2e) In the above cited cases, however, the amanuensis had no interest in the contract. Here, Shirley claims to be an amanuensis despite the fact that she is also the sole beneficiary of this transfer. (8a) No prior California decision has addressed the issue of an "interested amanuensis." [FN4]Obvious concerns arise, namely, whether the transfer was the product of fraud, **\*677** duress, or undue influence. Accordingly, if the amanuensis will directly benefit from the transfer of title, the validity of the transfer must be examined under a heightened level of judicial scrutiny.

> FN4 While there is scant authority on the specific issue of the interested amanuensis, other jurisdictions have permitted the practice. (See, e.g., *Councill v. Mayhew* (1911) 172 Ala. 295 [55 So. 314, 319] [decedent's secretary could properly act as amanuensis and write decedent's will as dictated by decedent despite fact she was a minor beneficiary under the will]; *In re Martin's Estate* (1953) 1953 Okla. 260 [261 P.2d 603, 606] [decedent's sister, principal beneficiary under will, where she did no more than write will exactly as decedent dictated, could recover under will]; see also *Bartlett v. Drake* (1868) 100 Mass. 174, 175 [court upheld wife's signing of husband's name to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

49 P.3d 1093                                                                    Page 9
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

deed, in his absence, where he "recogni [zed] and adopt[ed] the signature as his own"], cited with approval in *Blaisdell v. Leach* (1894) 101 Cal. 405, 409[35 P. 1019], and in *Knaugh v. Baender* (1927) 84 Cal.App. 142, 148[257 P. 606]);*Mon-dragon v. Mondragon* (1923) 113 Tex. 404 [257 S.W. 215, 217] [sale of land from one brother to another upheld where the grantee wrote the contract and signed the name of both parties; court quoted amanu-ensis rule, but based its decision on fact that grantor adopted (as opposed to rati-fied) the contract after it was signed].)

The dissent correctly notes that several courts and commentators have endorsed the general rule that an agent, acting for one party to a contract of sale required to be in writing, cannot also act as the agent for the other party and validly bind that other party to such contract. (Dis. opn., *post*, at pp. 679-680.)Our decision does not conflict with this line of cases because we recognize that Shirley was not authorized to sign the deed as Austin's agent. Despite its claims to the contrary, however, the dis-sent cites *no* case where a court has held that a beneficiary to a will cannot also act as an amanuensis. As noted above, other jurisdictions *have* permitted this practice. (See, e.g., *Councill v. Mayhew, supra,* 55 So. at p. 319;*In re Martin's Estate, supra,* 261 P.2d at p. 606.)

(9a), (10) **(See fn. 5.)** In an undue influence case, for example, "[w]here the relationship between the parties is that of parent and child and the parent re-lies on the child for advice in business matters, a gift *inter vivos* ... which is without consideration and where the parent does not have independent ad-vice, is presumed to be fraudulent and to have been made under undue influence." (*Sparks v. Mendoza* (1948) 83 Cal.App.2d 511, 514[189 P.2d 43].) FN5 (9b) The burden of proof then shifts to the child "to show that the transaction was free from fraud and

undue influence, and in all particulars fair." (*Sparks, supra,* at p. 515.)Put differently, this pre-sumption may be rebutted by "evidence that the act in question had its genesis in the mind of the parent and that he was not goaded to a completion by any act of such child." (*Goldman v. Goldman* (1953) 116 Cal.App.2d 227, 234[253 P.2d 474].) The child's burden of proof is by a preponderance of the evidence. (*Estate of Gelonese* (1974) 36 Cal.App.3d 854, 862-863[111 Cal.Rptr. 833].)

> FN5 " 'Lack of independent [legal] advice by the grantor is not of and in itself a ground for vitiating a deed ... but is a fact to be weighed by the trial court in determ-ining whether the grantor acted voluntarily ....' " (*Camperi v. Chiechi* (1955) 134 Cal.App.2d 485, 505[286 P.2d 399], quot-ing *O'Neill v. Dennis* (1952) 109 Cal.App.2d 210, 214[240 P.2d 376].)

(8b) The amanuensis rule is an exception to Civil Code sections 2309 and 2310 and also operates as an exception to Probate Code section 4264, subdiv-ision (c), which prohibits attorneys-in-fact from making gifts of property to themselves. FN6 Be-cause unscrupulous parties could attempt to use the amanuensis rule to sidestep the protections con-tained in these code sections, we hold that the sign-ing of a grantor's name by an interested amanuensis *678 must be presumed invalid. In such a case, the interested amanuensis bears the burden to show that his or her signing of the grantor's name was a mechanical act in that the grantor intended to sign the document using the instrumentality of the amanuensis. FN7

> FN6 Probate Code section 21350, subdivi-sion (a)(1) disqualifies the drafter of an in-strument from being the recipient of a don-ative transfer under that instrument. Sec-tion 21350, subdivision (a)(4) prohibits a person with a "fiduciary relationship with the transferor" from being a recipient where such person "causes [the document] to be transcribed." Section 21351, subdivi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sion (a) exempts from section 21350, sub-division (a)(1) and (4) recipients who are related by blood to the transferor. In *Rice v. Clark* (2002) 28 Cal.4th 89[120 Cal.Rptr.2d 522, 47 P.3d 300], we discussed this statutory scheme in depth. To the extent that Shirley would be considered a "drafter" or "transcriber" under this scheme, as a blood relative, she would be exempt from the provisions of section 21350. When the amanuensis theory is offered in a situation where the donative transfer *is* prohibited under section 21350, however, the statutory scheme controls.

FN7 The dissent states that the protections outlined above "may look good at first glance, but ... [a]ny swindler who signs an aging and infirm relative's name to a deed ... can easily defeat the presumption of invalidity by falsely testifying that the relative asked the swindler to sign as an amanuensis." (Dis. opn., *post*, at p. 681.)These fears are unfounded. In the present case, based upon the testimony of several disinterested witnesses, the trial court overwhelmingly found that Shirley acted as Austin's amanuensis. On the other hand, it is unlikely that a "swindler's" testimony, without corroboration, will rebut the presumption of invalidity. Indeed, as seen in undue influence cases (*ante*, at p. 677) upon which our rule is patterned, the presumption of invalidity effectively acts as a safeguard against unscrupulous relatives who would otherwise seek to take advantage of an aging and infirm relative.

## IV.

(2f) Given that Shirley was an interested party to the deed, it is presumed that her signing of Austin's name was invalid. However, this presumption has been successfully rebutted in this case. The trial court found, based on overwhelming evidence, that Shirley acted as a mere amanuensis, signing the

deed at Austin's direct request, albeit not in his immediate presence. Because her signature was a mere mechanical act, not an exercise of judgment or discretion, Austin's oral instruction to Shirley was sufficient. "It is perfectly natural for a parent to be more bountiful to one of his children who has assumed the greatest burden of care and lavished the highest degree of solicitude upon him." (*Camperi v. Chiechi*, *supra*, 134 Cal.App.2d at p. 505.)The conveyance of Austin's real property to Shirley, therefore, must be deemed valid, as a deed executed by him. (Civ. Code, § 1091.)

The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.
**KENNARD, J.,** Dissenting.
Under California law, an interest in real property can be transferred only in writing. Ordinarily, the document transferring the interest must be signed by the donor, but a judicially created rule upholds conveyances signed by an "amanuensis"; that is, one who performs a "mechanical function" in signing the donor's name.

In this case, a woman claiming to be an amanuensis signed her father's name to a deed conveying a joint tenancy interest in her father's house to *herself.* The majority holds that the transaction is valid. I disagree. *679

### I

Civil Code section 1091 states: "An estate in real property ... can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing." This provision is part of California's statute of frauds, which is based on the Statute of Frauds enacted in England in 1677, and which also applies to other important transactions such as contracts not to be performed within the lifetime of the promisor (Civ. Code, § 1624, subd. (a)(5)), agreements to lend amounts

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

49 P.3d 1093                                                                                                      Page 11
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

greater than $100,000 (Civ. Code, § 1624, subd. (a)(7)), creation of a suretyship (Civ. Code, § 2793), contracts for the sale of goods worth more than $500 (Cal. U. Com. Code, § 2201), and agreements to arbitrate a dispute (Code Civ. Proc., §§ 1281, 1281.2).

The preamble to the English Statute of Frauds stated that its purpose was the "prevention of many fraudulent Practices which are commonly endeavoured to be upheld by Perjury and Subordination of Perjury." (See Smith, A Treatise on the Law of Frauds and the Statute of Frauds (1907) p. 323.) By requiring that the specified transactions be in writing and signed by the parties, the statute of frauds avoids the likelihood that permitting oral proof of such transactions would encourage fraudulent claims by swindlers gambling that they can glibly persuade a jury to enforce a nonexistent oral agreement. (*Id.* at p. 326.)

Although generally a party to a transaction protected by the statute of frauds must *personally* sign the document implementing the transaction, the signature of an agent with written authorization (Civ. Code, §§ 1091, 2309) or an amanuensis (*Kadota Fig Assn. v. Case-Swayne Co.* (1946) 73 Cal.App.2d 815, 821[167 P.2d 523]) will also suffice. But *no one who stands to benefit by the transaction implemented in the document* may sign on another's behalf. Section 24 of the Restatement Second of Agency states: "One party to a transaction can be authorized to act as agent for the other party thereto, *except for the purpose of satisfying the requirements of the Statute of Frauds.*" (Italics added.) The author of a noted treatise agrees: "In the making of an ordinary written contract, the signature of either party can be validly inscribed by the other party if the latter is authorized by the first to do so. The decisions have established an exception to this rule in the case of contracts within the statute of frauds; they hold that the signature is not sufficient to bind a party if it is inscribed by the other party, even though the latter acted with the express authority of the former, at least if it is or-

ally given." (4 Corbin on Contracts (rev. ed. 1997) § 23.6, p. 815.)

A rule permitting an interested party to sign another party's name to a document covered by the statute of frauds creates an exception to the statute *680 that is so broad as to defeat its purpose, which is to prevent perjury by requiring that important transactions be in writing and signed by the parties. Otherwise, a party could write a document implementing such a transaction, sign the other party's name, and then enforce it by falsely testifying that the signature was authorized. (See 4 Corbin on Contracts, *supra*, at pp. 815-816.)As one court has stated, if a party to a contract or conveyance for which a signature is required by the statute of frauds could sign the other party's name to the implementing document, "the Statute of Frauds would be deprived of its meaning and reduced to an absurdity." (*Tate v. Shober* (E.D.Pa. 1941) 41 F.Supp. 478, 481.)

The rule described in the previous paragraph is recognized not only by the Restatement (Rest.2d Agency, § 24, p. 96) but also by one of the most prominent treatises on the law of contracts (4 Corbin on Contracts, *supra*, at pp. 815-816) and by legal encyclopedias (37 C.J.S. (1997) Statute of Frauds, § 134, p. 440; 72 Am.Jur.2d (2001) Statute of Frauds, § 297, pp. 792-793), as well as more than a dozen decisions (*Woodruff Oil & Fertilizer Co. v. Portsmouth Cotton Oil Refining Corp.* (4th Cir. 1917) 246 Fed. 375, 375;*Tate v. Shober, supra,* 41 F.Supp. 478, 481;*Happ Bros. Co. v. Hunter Mfg. & Commission Co.* (1916) 145 Ga. 836, 836 [90 S.E. 61, 61];*Lowe v. Mohler* (1914) 56 Ind.App. 593 [105 N.E. 934, 936];*Wingate v. Herschauer* (1876) 42 Iowa 506, 508;*Bent v. Cobb* (1857) 75 Mass. (9 Gray) 397, 397;*Dunham v. Hartman* (1900) 153 Mo. 625 [55 S.W. 233, 234];*Wilson v. Lewiston Mill Co.* (1896) 150 N.Y. 314, 325 [44 N.E. 959, 962];*Regal Music Co. v. Hirsch* (1959) 16 Misc.2d 365 [183 N.Y.S.2d 474, 479];*Dorian Holding & Trading Corp. v. Brunswick Terminal* Co. (1930) 230 A.D. 514 [245 N.Y.S. 410, 414];*Asbury v. Mauney* (1917) 173 N.C. 454, 458-459 [92 S.E.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

49 P.3d 1093                                                                                                Page 12
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

267, 269];*Dodd v. Stewart* (1923) 276 Pa. 225, 228 [120 A. 121, 122];*Walker v. Keeling* (Tex.Civ.App. 1942) 160 S.W.2d 310, 311).

At issue here is the validity of a deed conveying an interest in real property from Austin Stephens to his daughter, Shirley. The latter, who cared for her blind and aging father before he died, signed his name to the deed, and the testimony of an independent witness supports Shirley's claim that Austin told her to do so. But under the rule described above, Shirley was not allowed to sign her father's name to the deed because she was a party to that transaction. Thus, the deed does not comply with the statute of frauds and Shirley's heirs, who became parties when Shirley died while this appeal was pending, may not rely on it to support their claim to the property.

The majority acknowledges that its rule permitting an interested party such as Shirley to act as an amanuensis may be an invitation to fraud. (Maj. opn., *ante*, at p. 677.)To circumvent this problem, the majority proposes a "heightened level of judicial scrutiny." (*Ibid.*) The majority holds that a *681 signing of a grantor's name by an interested amanuensis shall be "presumed invalid," and any interested amanuensis shall "bear[] the burden to show that his or her signing of the grantor's name was a mechanical act ...." (*Id.* at p. 678.)According to the majority, Shirley rebutted this presumption of invalidity by evidence that Austin asked her to sign the deed on his behalf.

This rule may look good at first glance, but in practice it will have little effect. Any swindler who signs an aging and infirm relative's name to a deed without the relative's permission can easily defeat the presumption of invalidity by falsely testifying that the relative asked the swindler to sign as an amanuensis. And contrary to the majority's claim that it is subjecting claims by interested amanuenses to "heightened" scrutiny, its standard of proof-by preponderance of the evidence-is no different from the standard used in any civil case. (See Evid. Code, § 115 ["Except as otherwise provided

by law, the burden of proof requires proof by a preponderance of the evidence."].)

II

My sympathies lie with Shirley, because the evidence at trial suggests that she was a loving and caring daughter who acted in accord with the wishes of her ailing father when she signed his name to the deed conveying to her a joint tenancy interest in her father's home. That, however, is beside the point. The result in this case cannot depend on personal sympathies toward the claimant.

In the words of *Lowe v. Mohler, supra*, 105 N.E. 934, 936: "It is doubtless true that in some instances the application of this doctrine [that an interested party may not sign the name of another party to a document required by the statute of frauds] may work a hardship, and innocent parties may be required to suffer therefrom; but the aggregate good which comes from its strict enforcement so far overshadows the evil that the courts uniformly adhere to the rule as announced."

I would affirm the judgment of the Court of Appeal, which held that the deed purporting to transfer an interest in Austin Stephens's house to his daughter Shirley violated the statute of frauds. *682
053 cent-Y cent-R found without first cent-Y.

Cal. 2002.
Estate of Stephens
28 Cal.4th 665, 49 P.3d 1093, 122 Cal.Rptr.2d 358, 02 Cal. Daily Op. Serv. 6645, 2002 Daily Journal D.A.R. 8315

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 6

Westlaw.

72 Cal.App.4th 214                                                                                    Page 1
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

▷
Norwest Mortgage, Inc. v. Superior Court
Cal.App.4.Dist.
NORWEST MORTGAGE, INC., Petitioner,
v.
THE SUPERIOR COURT OF SAN DIEGO
COUNTY, Respondent; BRUCE H. CONLEY et
al., Real Parties in Interest.
No. D032050.

Court of Appeal, Fourth District, Division 1, Cali-
fornia.
Apr. 28, 1999.

SUMMARY

The trial court granted nationwide class certifica-
tion in an action brought by individuals on behalf
of all borrowers throughout the United States
against a mortgage company, alleging that defend-
ant's practice of charging borrowers costs for re-
quired insurance in an amount sufficient to cover
rebates provided by the insurer to defendant was an
unfair business practice under the unfair competi-
tion law (UCL) (Bus. & Prof. Code, § 17200 et
seq.). (Superior Court of San Diego County, No.
N73741, David B. Moon, Jr., Judge.)

The Court of Appeal ordered issuance of a writ of
mandate directing the trial court to vacate its order
granting plaintiffs' motion to certify the class ac-
tion, and to enter a new and different order denying
plaintiffs' motion for certification of a nationwide
class, without prejudice to a new motion. The court
held that the trial court erred in granting nationwide
class certification. Although California residents
and nonresidents for whom defendant purchased in-
surance in California could assert claims under the
UCL, nonresidents for whom defendant purchased
insurance outside of California could not. The court
held that the UCL was not intended to regulate con-
duct unconnected to California. The court further
held that, even though California had personal jur-
isdiction over defendant, which did business in
California, application of California law to the
claims of nonresidents for whom defendant pur-
chased insurance outside of California would be ar-
bitrary and unfair and transgress due process limita-
tions. In addition, the court held that, since Califor-
nia law did not apply to that group, choice of law
issues were irrelevant. (Opinion by McDonald, J.,
with Benke, Acting P. J., and Haller, J., concur-

HEADNOTES

Classified to California Digest of Official Reports

(1) Parties § 6--Class Actions; Class Certification-
-Appeal--Scope of Review.
The burden is on the party seeking certification of a
class to establish the existence of an ascertainable
class and a well-defined community of interest
among the class members. The community of in-
terest requirement embodies a threshold showing
that there are predominant common questions of
law and fact applicable to the class as a whole. To
determine if the class has the requisite community
of interest, an appellate court examines the allega-
tions of the complaint, the declarations of the attor-
neys, and the evidence introduced at the certifica-
tion hearing below. The appellate court then de-
cides whether the trial court correctly determined
the plaintiff satisfied its burden of showing that
common issues of law and fact predominate over
individual issues among the class members. Al-
though the trial court has great discretion to grant
class certification and its ruling will ordinarily be
affirmed if supported by substantial evidence, its
ruling may be reversed if based on erroneous legal
assumptions or criteria.

(2a, 2b, 2c, 2d) Parties § 6--Class Actions; Class
Certification-- Of Nonresidents:Unfair Competition
§ 8--Actions--When Unfair Business Practice Takes
Place Outside California.
In an action brought by individuals on behalf of all

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 Cal.App.4th 214                                                          Page 2
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

borrowers throughout the United States against a mortgage company alleging that defendant's practice of charging borrowers for required insurance in an amount sufficient to cover the insurer's kickbacks to defendant was an unfair business practice under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), the trial court erred in granting nationwide class certification. Although California residents and nonresidents for whom defendant purchased insurance in California could assert claims under the UCL, nonresidents for whom defendant purchased insurance outside of California could not. The UCL was not intended to regulate conduct unconnected to California. Even though California had personal jurisdiction over defendant, which did business in California, application of California law to the claims of nonresidents for whom defendant purchased insurance outside of California would be arbitrary and unfair and transgress due process limitations. In addition, since California law did not apply to that group, choice of law issues were irrelevant.
[See 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 260.]

(3)                    Statutes                §
46--Construction--Presumptions--Legislative   Intent-- Operation Beyond State.
A court ordinarily presumes that the Legislature did not intend the statutes of this state to have force or operation beyond the boundaries of the state. Accordingly, a court does not construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute.

(4)                    Statutes                §
47--Presumptions--Validity--Constitutionality.
When possible, a court construes a statute in favor of its constitutionality.

(5) Parties § 6--Class Actions; Class Certification--Of Nonresidents-- Constitutional Limitations.
There are constitutional limitations on a forum state's application of its law to the claims of nonres-

ident plaintiffs in a nationwide class action. To apply its law constitutionally to the claims of nonresident class members, the forum state must have a significant contact or significant aggregation of contacts to the claims asserted by each member of the plaintiff class, contacts creating state interests in order to ensure that the choice of forum law is not arbitrary or unfair.

COUNSEL
Severson & Werson and Jan T. Chilton for Petitioner.
No appearance for Respondent.
Blumenthal, Ostroff & Markham, Norman B. Blumenthal, David R. Markham, Sheldon A. Ostroff, Barron E. Ramos; Chavez & Gertler and Mark A. Chavez for Real Parties in Interest.

McDONALD, J.
Real parties in interest Bruce H. and Kathleen Conley and Kenneth and Dorine Younger (collectively plaintiffs) sued Norwest Mortgage, Inc. (Norwest Mortgage), alleging that Norwest Mortgage's "Forced Placement Insurance" (FPI) program was an unfair business practice under California's unfair competition law (UCL). (Bus. & Prof. Code [FN1] , § 17200 et seq.) Plaintiffs allege that on lapse or cancellation of the insurance they were required to maintain as borrowers from Norwest Mortgage, *217 Norwest Mortgage provided replacement insurance under the FPI program and charged the cost to plaintiffs. Plaintiffs allege the FPI cost charged to plaintiffs was unnecessarily expensive because it included an amount sufficient to cover rebates provided by the insurer to Norwest Mortgage.

> FN1 All statutory references are to the Business and Professions Code.

The complaint, styled as a class action lawsuit, asserts it is brought on behalf of all borrowers throughout the United States for whom Norwest Mortgage purchased FPI during the four years prior to the lawsuit. Although the complaint originally pleaded numerous claims, plaintiffs dismissed all but the UCL claim. Plaintiffs sought nationwide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 Cal.App.4th 214                                                                          Page 3
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

class certification. Norwest Mortgage opposed nationwide class certification, arguing that the UCL does not and cannot be applied to claims of non-California residents arising out of the purchase of FPI outside of California.

The trial court granted nationwide class certification. The trial court concluded, in part, that the UCL provides a remedy to non-California residents for unfair business practices that occur entirely outside California. Norwest Mortgage's petition for a writ of mandate seeks to reverse the order granting nationwide class certification.

I. The Facts [FN2]

A. *The Parties.*

Norwest Mortgage is a mortgage company incorporated in California but with its principal place of business in Iowa. Norwest Mortgage makes and services loans secured by deeds of trusts or mortgages (the security instruments) to homeowners in all 50 states. Plaintiffs are California residents for whom FPI was purchased by Norwest Mortgage under security instruments encumbering California real estate. The members of its proposed class (the borrowers) include similarly situated California residents and non-California residents for whom FPI was purchased by Norwest Mortgage under security instruments encumbering non-California real estate.

> FN2 Our factual background is derived from those facts that are admitted by plaintiffs' answer to Norwest Mortgage's petition for writ of mandate as supplemented by the facts developed in the proceedings for class certification.

B. *The FPI Program.*

The security instruments contain a covenant that obligates the borrowers to insure their homes against various physical hazards, including fire, and

to *218 make Norwest Mortgage an additional insured under the insurance policy. The security instruments provide that if the borrowers do not maintain the required insurance, Norwest Mortgage may purchase the FPI to protect its interests in the encumbered property and charge the borrowers for the FPI premiums.

Norwest Mortgage purchased FPI for the borrowers after the borrowers' insurance lapsed or was canceled. An estimated 27,000 class members for whom FPI was purchased reside in California; the remaining approximately 50,000 class members reside in other states.

Norwest Mortgage buys FPI from American Security Insurance Company (ASIC) through Norwest Insurance, Inc. Norwest Insurance, Inc., is an affiliate of Norwest Mortgage, is licensed as an insurance agent in California and most, but not all, of the other 49 states, and is headquartered in Minnesota. ASIC is headquartered in Georgia.

All decisions regarding Norwest Mortgage's FPI program were made by Norwest Mortgage employees at its headquarters in Iowa or at its other principal facility in Minneapolis, Minnesota. Until August 1995, Norwest Mortgage performed various tasks relating to FPI from its loan servicing centers in North Carolina, Michigan, Maryland, Illinois, Arizona and Ohio. Since August 1995 most of those functions have been "outsourced" to ASIC's hazard insurance processing center in Ohio; [FN3] the remaining functions are performed by Norwest Mortgage at its Iowa facility.

> FN3 The functions relating to the FPI performed by Norwest Mortgage from its Iowa and Minnesota facilities included receiving and reviewing insurance policies provided by borrowers, communicating with borrowers about their insurance obligations, sending warning letters when a borrower's policy was canceled or lapsed and ordering FPI if the borrower did not respond to the notices. Beginning in August

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 Cal.App.4th 214                                                                                   Page 4
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

1995 most of those functions have been performed by ASIC under a contract with Norwest Mortgage for a fee to ASIC of approximately $.10 per month per loan in Norwest Mortgage's portfolio.

Since mid-1996 no functions related to the FPI program have been conducted by Norwest Mortgage in California. Between mid-1995 and mid-1996, Norwest Mortgage conducted in California some functions relating to FPI in connection with a portfolio of loans Norwest Mortgage acquired when it purchased Directors Mortgage (Directors), a small California mortgage company. After acquiring Directors in mid-1995, Norwest Mortgage operated Directors' loan servicing center in Riverside, California for an approximately 12-month period and then transferred the loan servicing functions to Norwest Mortgage's facilities in other states. Only during that 12-month period did Norwest Mortgage perform in California any *219 functions relating to FPI and then only with respect to those loans in Directors' portfolio, which represented less than 11 percent of Norwest Mortgage's nationwide portfolio of loans.

### C. The Alleged UCL Violation.

Under some circumstances, Norwest Insurance, Inc. collects a commission in connection with the FPI it places for Norwest Mortgage. [FN4] The complaint asserts that it is an unfair business practice actionable under the UCL for Norwest Mortgage to procure FPI and charge the premium to the borrowers to the extent Norwest Mortgage benefits from "cash kickbacks" in the form of commissions paid to its affiliate, Norwest Insurance, Inc.

> FN4 In those states in which Norwest Insurance is a licensed insurance agent and where it is permissible under state insurance regulations, Norwest Insurance collects an 11 percent commission from ASIC on FPI that Norwest Insurance placed for Norwest Mortgage.

Plaintiffs also assert that in connection with placing FPI, Norwest Mortgage committed unfair business practices actionable under the UCL because it received and benefited from "in-kind kickbacks" from ASIC. Although plaintiffs' theory of "in-kind kickbacks" is somewhat murky, they apparently contend that ASIC provides "free" services [FN5] to Norwest Mortgage, including tracking the borrowers' insurance coverage and sending warning letters to defaulting borrowers on Norwest Mortgage's behalf, the cost of which Norwest Mortgage would otherwise be required to fund as part of its loan servicing functions. Plaintiffs appear to contend this arrangement is an unfair business practice in violation of the UCL because ASIC charges, and Norwest Mortgage passes on to defaulting borrowers, FPI premiums that are sufficiently inflated to subsidize ASIC's services to Norwest Mortgage.

> FN5 It is undisputed that Norwest Mortgage has paid ASIC for these services since August 1995, based on a fee of approximately $.10 per month per loan in Norwest Mortgage's portfolio. Although not explicit from plaintiffs' complaint or argument on appeal, we apprehend plaintiffs contend the pre-August 1995 arrangement constituted an "in-kind" kickback, and that the post-August 1995 arrangement charges a fee that is below the fair market value of the services ASIC provides and therefore only the value (rather than the fact) of the "in-kind" kickback was altered by the post-August 1995 arrangement.

### II. Procedural History

The first amended complaint alleged Norwest Mortgage could have replaced the borrowers' lapsed or canceled insurance policies at lower premiums but instead purchased FPI at inflated premiums to benefit from the cash and in-kind kickbacks offered by ASIC. The complaint alleged this conduct *220 was an unfair business practice in violation of the UCL and sought restitution of the excessive premiums

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 Cal.App.4th 214                                                                                    Page 5
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

charged to the borrowers and an injunction against Norwest Mortgage to prohibit this conduct. [FN6]

> FN6 The complaint also alleged Norwest Mortgage's conduct breached a contractual duty to the borrowers to mitigate the damages suffered by Norwest Mortgage arising from the borrowers' not maintaining the insurance, and breached the implied covenant of good faith and fair dealing owed by Norwest Mortgage to the borrowers. The complaint also contained causes of action for conversion and for imposition of a constructive trust on the funds collected by Norwest Mortgage from defaulting borrowers. These claims were dismissed before plaintiffs moved for class certifica- tion.

Plaintiffs moved for certification of the nationwide class, asserting all elements necessary to certification of the nationwide class were present: there was an ascertainable class; there were predominant common questions of law and fact; and the class representatives possessed claims typical of the class and adequately represented the class. From this predicate, plaintiffs argued the court should certify the nationwide class because Norwest Mortgage could not satisfy its burden under *Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605 [236 Cal.Rptr. 605] (hereafter *Clothesrigger*) of showing that (1) the laws of other interested states were in actual conflict with the UCL in a manner that would affect the outcome of the litigation, or (2) the other states had an interest in applying their laws to this dispute, or (3) the laws of other interested states rather than the UCL should be applied under the "comparative impairment" analysis. Plaintiffs also argued the choice of law provisions in the security instruments were irrelevant because the claim asserted by the lawsuit was not based on breach of contract but on violation of a statute, and a statutory claim was not governed by the choice of law provisions of the security instruments.

Norwest Mortgage opposed the motion. It argued the UCL was not intended to, and constitutionally could not, apply to the claims of non-California residents. Norwest Mortgage also asserted that even if California's statute could be applied to the claims of non-California residents, (1) the gravamen of the claim was sufficiently connected to the security instruments to require application of the choice of law provision of the security instruments, or (2) traditional choice of law principles showed there was an actual and true conflict among the laws of the various states and that each state had a paramount interest in having its law applied to the claims of its residents. Norwest Mortgage argued that in either case the court would be required to apply the laws of all 50 states, which would eliminate the *221 commonality of legal issues necessary to certification of the nationwide class. [FN7]

> FN7 Norwest Mortgage also challenged the adequacy of the class representatives.

The court granted the motion for certification of the nationwide class, reasoning that application of the UCL to the claims held by non-California residents was constitutionally permissible because Norwest Mortgage did not show the UCL was in conflict with the laws of any other state in a manner that would affect the outcome of the litigation. [FN8]

> FN8 The court also rejected Norwest Mortgage's argument that the contractual choice of law provision barred class certification, reasoning the action was not on the security instruments but was instead a claim for violation of the statute. It also reasoned that even if the action was on the security instruments, thereby triggering the contractual provision, there was no showing of a true conflict between the laws of the interested states. The court also concluded (1) ordinary choice of law principles did not preclude class certification because Norwest Mortgage did not show an actual conflict between the laws of the various states, and (2) the class representatives were adequate.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 Cal.App.4th 214                                                                                          Page 6
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

### III. Applicable Standards

(1) The burden is on the party seeking certification of a class to establish the existence of an ascertainable class and a well-defined community of interest among the class members. The community of interest requirement embodies a threshold showing that there are predominant common questions of law and fact applicable to the class as a whole. (*Clothesrigger, supra,*191 Cal.App.3d at p. 612; *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) To determine if the class has the requisite community of interest, we examine the allegations of the complaint, the declarations of the attorneys (*Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128, 134 [191 Cal.Rptr. 849]), and the evidence introduced at the certification hearing below. (*Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 656 [22 Cal.Rptr.2d 419].) We then decide whether the trial court correctly determined the plaintiff satisfied its burden of showing that common issues of law and fact predominate over individual issues among the class members. (*Block v. Major League Baseball* (1998) 65 Cal.App.4th 538, 542-543 [76 Cal.Rptr.2d 567].)

Although the trial court has great discretion to grant class certification and its ruling will ordinarily be affirmed if supported by substantial evidence (*Block v. Major League Baseball, supra,*65 Cal.App.4th at pp. 542-543), its ruling may be reversed if based on erroneous legal assumptions or criteria. (*Clothesrigger, supra,*191 Cal.App.3d 605; *Richmond v. Dart Industries, Inc., supra,*29 Cal.3d 462.)*222

### IV. The Trial Court Erred by Concluding the UCLApplied to All Members of the Class

(2a) The trial court concluded that the plaintiffs' UCL claim applied to all class members regardless of the state of their residence and regardless of the state in which Norwest Mortgage engaged in the conduct of purchasing the FPI. Based on the facts

developed below, there are at least three categories of class members relevant to our analysis: California residents regardless of where the Norwest Mortgage's conduct of purchasing FPI occurred (Category I members); non-California residents for whom Norwest Mortgage's conduct of purchasing FPI occurred in California (Category II members); and non-California residents for whom Norwest Mortgage's conduct of purchasing FPI occurred in states other than California (Category III members). We conclude that, although Category I members and Category II members may assert UCL claims, the Category III members (apparently the largest class) may not assert UCL claims. [FN9]

> FN9 Because we conclude plaintiffs' UCL claim cannot form the basis for the nationwide class sought by plaintiffs, and therefore the trial court's certification order must be vacated, the remaining contentions of the parties are not ripe for adjudication until the trial court determines on remand what class, if any, should be certified.

#### A. *The UCL Was Not Intended to Regulate Conduct Unconnected to California.*

(3) We ordinarily presume the Legislature did not intend the statutes of this state to have force or operation beyond the boundaries of the state. (*North Alaska Salmon Co. v. Pillsbury* (1916) 174 Cal. 1, 4 [162 P. 93]; *People v. One 1953 Ford Victoria* (1957) 48 Cal.2d 595, 598-599 [311 P.2d 480].) Accordingly, we do not construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute. (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1058-1059 [80 Cal.Rptr.2d 828, 968 P.2d 539] (hereafter *Diamond*).)

(2b) The UCL bans unfair business practices (§ 17200) and authorizes injunctive and restitutionary relief against "[a]ny person who engages ... in unfair competition." (§ 17203.) However, it contains

72 Cal.App.4th 214                                                                                Page 7
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

no express declaration that it was designed or intended to regulate claims of nonresidents arising from conduct occurring entirely outside of California. Plaintiffs do not cite any pertinent California authority construing the UCL as applicable to claims of non-California residents injured by conduct occurring beyond *223 California's borders. [FN10] The only relevant authority from other jurisdictions of which we are aware concluded that a state consumer protection statute analogous to the UCL does not apply to claims arising solely from extraterritorial conduct. In *Consumer Protection v. Outdoor World* (1992) 91 Md.App. 275 [603 A.2d 1376], the defendant was charged in a Maryland court with two forms of unfair and deceptive sales practices: sending misleading solicitations into Maryland to induce Maryland residents to travel to campgrounds outside of Maryland; and high-pressure sales tactics occurring once the consumer reached the campground in another state. Although the Maryland court upheld the injunction against sending into Maryland misleading solicitations, it struck down an injunction prohibiting activities conducted beyond the borders of Maryland. The court stated at page 1383: "We agree with OWC that [plaintiff] has no authority, directly, to preclude sales practices that occur entirely within other States. If Pennsylvania and Virginia wish to permit the kinds of high-pressure sales techniques demonstrated in this record, that is their business. Once the consumer makes the decision to visit the campground and travels to the out-of-State location, he or she must look to the law there for protection.... To the extent that the order ... purports to exercise direct control over conduct occurring entirely outside the State, it is invalid." (*Consumer Protection v. Outdoor World, supra,* 603 A.2d at p. 1383.)

> FN10 Plaintiffs cite *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553 [71 Cal.Rptr.2d 731, 950 P.2d 1086] for the generic proposition that amendments to the UCL have always expanded rather than narrowed its scope, and that the 1992 amendments expanded the scope of

relief to allow injunctions against out-of-state activity. (*Id.* at p. 570.)However, *Stop Youth Addiction, Inc.,* clearly involved in-state conduct injuring in-state residents, and therefore had no occasion to consider the question posed here: whether the UCL regulates out-of-state conduct causing out-of-state injury.

Plaintiffs' arguments that the UCL applies to Category III members are unconvincing. They first argue that because the Legislature deleted the phrase "within this state" by a 1992 amendment to section 17203 (see Stats. 1992, ch. 430, § 3, p. 1707), it intended to expand the UCL to encompass extraterritorial conduct by a defendant. However, then existing law authorized injunctive relief against unfair competition consisting of conduct occurring in other states that caused injury in California. (*People* ex rel. *Mosk v. National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 776-777 [20 Cal.Rptr. 516].) Because the 1992 amendment contains no legislative history suggesting it was intended to change existing law to expand California's UCL to encompass claims for injuries suffered by non-California residents caused by conduct occurring outside of California, we should not ascribe that intent to the Legislature. (*Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213, 221-222 [*2246 61 Cal.Rptr.2d 638, 932 P.2d 210].) Instead, we construe the 1992 amendment as declarative of existing law because it only eliminated any linguistic basis for a defendant to contend that the "within this state" limitation prohibited an injunction against out-of-state conduct. FN11 The 1992 amendment did not expand the conduct regulated by the UCL. It clarified the scope of injunctive relief available to a plaintiff who was already entitled to pursue a claim under the UCL. FN12

> FN11 One commentator has placed a similar construction on the intent of the 1992 amendment. (See Stern, Consumer/Investor Remedies Using Bus. & Prof. Code

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 Cal.App.4th 214                                                      Page 8
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

§ 17200 (The Rutter Group 1996) p. 13.)

FN12 Our construction of section 17203 is in harmony with *Consumer Protection v. Outdoor World, supra,* 603 A.2d 1376, which concluded that out-of-state conduct causing injury within the state could be enjoined, but that the statute did not regulate out-of-state conduct causing out-of-state injury.

Plaintiffs argue *Diamond, supra,* 19 Cal.4th 1036 supports the right of Category III members to prosecute in California claims under the UCL. In *Diamond,* the defendants allegedly made fraudulent statements and omissions in California that induced non-Californians to make out-of-state purchases of securities. The issue in *Diamond* was whether, when conduct violating Corporations Code section 25400 occurs in California, non-Californians who purchased stock outside California could recover under Corporations Code section 25500. The court construed the statutory scheme as permitting recovery by the injured non-California residents. The *Diamond* court rejected the defendants' argument against extraterritorial application of domestic statutes and noted that "[t]he presumption against extraterritoriality is one against an intent to encompass *conduct* occurring in a foreign jurisdiction in the prohibitions and remedies of a domestic statute. [Citations.]" (*Diamond, supra,* 19 Cal.4th at p. 1059, fn. 20, original italics.) *Diamond* concluded that cases like *North Alaska Salmon Co. v. Pillsbury, supra,* 174 Cal. 1 were distinguishable because "unlike the injury in [*North Alaska*], the conduct which gives rise to liability under section 25400 occurs in California." (*Diamond, supra,* at p. 1059.) The *Diamond* court emphasized there was no constitutional impediment to permitting non-Californians a right of action under the domestic statute because California has a "clear and substantial interest in preventing fraudulent practices *in this state* ... [and] a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices," and for that reason has a

legitimate interest in "extending state-created remedies to out-of-state parties harmed by wrongful *conduct occurring in* California." (*Id.* at pp. 1063-1064, italics added.)

The linchpin of *Diamond*'s analysis is that state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct *225 occurring in California. However, the facts developed below show the claims of Category III members are for injuries suffered by non-California residents, caused by conduct occurring outside of California's borders, by defendants whose headquarters and principal places of operations are outside of California. *Diamond* does not support plaintiffs' effort to include Category III members in the nationwide class seeking recovery under the UCL. FN13

FN13 *Diamond* supports inclusion of Category II members as claimants entitled to state a UCL claim. Although they may be non-California residents, the injury arose from offending conduct occurring in California. The FPI was purchased as part of the loan servicing functions performed at Directors' loan servicing center in California. Whether this category of claimants can properly be included within a class requires an evaluation under traditional choice of law principles whether to apply California law or the laws of their respective home states. As to Category II members, there exists the potential for an actual and true conflict among possibly applicable laws. However, the parties have not litigated and the trial court has not decided whether the UCL rather than foreign laws may govern the claims of Category II members, and we therefore express no opinion on the proper disposition of this issue.

B. *Due Process Precludes Application of the UCL to the Claims Held by Category III Members.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(4) Our conclusion that the UCL is inapplicable to the claims of Category III members is buttressed by the maxim of statutory construction that, where possible, we construe a statute in favor of its constitutionality. (*Welton v. City of Los Angeles* (1976) 18 Cal.3d 497, 505 [134 Cal.Rptr. 668, 556 P.2d 1119].) (2c) Plaintiffs argue that because California has in personam jurisdiction over Norwest Mortgage, the UCL should be interpreted to encompass injuries to non-California residents caused by Norwest Mortgage's conduct occurring outside of California. This argument raises significant due process problems under *Phillips Petroleum Co. v. Shutts* (1985) 472 U.S. 797 [105 S.Ct. 2965, 86 L.Ed.2d 628] (hereafter *Shutts*). FN14

> FN14 Plaintiffs argue we should not consider the *Shutts* due process claim because Norwest Mortgage abandoned the argument by not raising it below in opposition to the motion for class certification. Norwest Mortgage moved for an order denying class certification and specifically argued exporting California law to nonresidents' claims would violate due process under *Shutts*. Although the court took Norwest Mortgage's motion off calendar for procedural reasons, it stated that the points and authorities filed by Norwest Mortgage, which encompassed the Shutts contention, would be considered as additional opposition to the motion for class certification. The *Shutts* argument is fully preserved.

(5) This court in *Clothesrigger, supra,* 191 Cal.App.3d 605, recognized that under *Shutts* there are constitutional limitations on the forum state's application of its law to the claims of nonresident plaintiffs in a nationwide class action: "To apply its law constitutionally to the claims of nonresident class members, the forum state must have a ' ''significant contact or [significant] aggregation of contacts'' to the claims asserted by *each member* of the *226 plaintiff class, contacts ''creating state interests[,''] in order to ensure that the choice of

[forum] law is not arbitrary or unfair.' [Citation.]" (*Clothesrigger, supra,* 191 Cal.App.3d at pp. 612-613, quoting *Shutts, supra,* 472 U.S. at pp. 821-822 [105 S.Ct. at p. 2979], italics added.)

(2d) We reiterate that the UCL claims of Category III members involve injuries suffered by non-California residents, caused by conduct occurring outside of California's borders by actors headquartered and operating outside of California. Norwest Mortgage argues that applying California law to these claims would be unconstitutional under *Shutts.* Plaintiffs argue applying California law would be constitutional because California has a constitutionally sufficient aggregation of contacts with these claims: Norwest Mortgage is incorporated and does business in California.

The fact that Norwest Mortgage is incorporated and does business in California gives California personal jurisdiction over Norwest Mortgage. However, *Shutts* specifically admonished that the existence of personal jurisdiction over the defendant does not alone permit application of the forum law to the claims of nonresident plaintiffs. The *Shutts* court stated at page 821 [105 S.Ct. at page 2979]: "We think that this is something of a 'bootstrap' argument. The Kansas class-action statute, like those of most other jurisdictions, requires that there be 'common issues of law or fact.' But while a State may, for the reasons we have previously stated, assume jurisdiction over the claims of plaintiffs whose principal contacts are with other States, it may not use this assumption of jurisdiction as an added weight in the scale when considering the permissible constitutional limits on choice of substantive law. It may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a 'common question of law.' The issue of personal jurisdiction over plaintiffs in a class action is entirely distinct from the question of the constitutional limitations on choice of law; the latter calculus is not altered by the fact that it may be more difficult or more burdensome to comply with

72 Cal.App.4th 214                                                                Page 10
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

the constitutional limitations because of the large number of transactions which the State proposes to adjudicate and which have little connection with the forum." (*Shutts, supra,* 472 U.S. at p. 821 [105 S.Ct. at p. 2979].)

*Shutts* concluded that, although the forum may have personal jurisdiction over the defendant, the forum still must have significant contact or a significant aggregation of contacts to the claims asserted by each member of the plaintiff class to ensure that application of the forum law to each plaintiff's claim is not arbitrary or unfair. (*Shutts, supra,* 472 U.S. at pp. 821-822 [105 S.Ct. at p. 2979].)*227

The *Clothesrigger* court, applying the *Shutts* test, concluded application of California law was constitutionally permissible there because the defendant's principal offices were in California and because the claims asserted by every nationwide class member related to the alleged fraudulent misrepresentations contained in literature prepared in California; thus the conduct occurred in California. (*Clothesrigger, supra,* 191 Cal.App.3d at p. 613; see also *Diamond, supra,* 19 Cal.4th at p. 1064 [*Clothesrigger* upheld application of California law "to out-of-state parties harmed by wrongful conduct occurring in California"].)

In contrast to the claims of class members in *Clothesrigger* and *Diamond,* the only contact between the claims of Category III members and California is Norwest Mortgage's state of incorporation. [FN15] Because Norwest Mortgage's headquarters and principal place of business, the place Category III members were injured, and the place the injury-producing conduct occurred are outside California, we conclude application of the UCL to the claims of Class III members would be arbitrary and unfair and transgress due process limitations. [FN16]

FN15 We are unpersuaded that the other "contacts" cited by plaintiffs permit application of California law to Category III members. Plaintiffs note Norwest Mort-

gage has a substantial number of loans in California, operated Directors' servicing center for a brief time, and (allegedly) owns property in California (although this latter "fact" is unsupported by any citation to the record.) (See *Davis v. Thayer* (1980) 113 Cal.App.3d 892, 912 [170 Cal.Rptr. 328] [court disregards factual assertions unsupported by record].) However, similar contacts in *Shutts* were found insufficient to allow application of Kansas law to non-Kansas members of the proposed class. (*Shutts, supra,* 472 U.S. at pp. 819, 822-823 [105 S.Ct. at pp. 2978, 2979-2980] [defendant's ownership of Kansas property and substantial business dealings in Kansas do not permit application of Kansas law to non-Kansas class members].)

FN16 Our conclusion that application of California law would offend due process limitations is further supported by *Shutts's* observation that "[w]hen considering fairness in this context, an important element is the expectation of the parties. [Citation.] There is no indication that when the leases involving land and royalty owners outside of Kansas were executed, the parties had any idea that Kansas law would control." (*Shutts, supra,* 472 U.S. at p. 822 [105 S.Ct. at pp. 2979-2980].) Here, there is no basis to conclude any non-Californian expected California law would govern his claim; instead, the contractual relationship between Norwest Mortgage and the borrowers specified the law of place of the encumbered property would govern. We consider the contractual choice of law provision relevant not because the current action is an action on the security instruments, but because it reinforces our conclusion that the parties in other states had no expectation that California law would govern their disputes with Norwest Mortgage.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

C. *The Inapplicability of the UCL to Claims of Category III Members Makes Moot Norwest Mortgage's Alleged Failure to Satisfy Its Clothesrigger Burden.*

Plaintiffs, relying on the analysis of *Clothesrigger, supra,* 191 Cal.App.3d 605 and *Hurtado v. Superior Court* (1974) 11 Cal.3d 574 [*228114 Cal.Rptr. 106, 522 P.2d 666], cite a series of cases for the proposition that unless Norwest Mortgage carries the burden of demonstrating an actual conflict between the laws of the foreign states and California law, as well as a true conflict between the laws of interested jurisdictions, California will apply its laws to the claims held by nonresident class members. From this predicate, plaintiffs argue that because Norwest Mortgage did not carry its burden to show that the laws of any other jurisdiction authorized lenders to charge excessive premiums and receive kickbacks, the trial court properly concluded the UCL applied to the claims of the Category III class members. However, in every case relied on by plaintiffs, the choice of law issues arose, and the *Clothesrigger* burden was triggered, because there were two interested jurisdictions whose laws could apply to the dispute and it was therefore necessary to make the choice of law determination. [FN17] However, when California law cannot be applied to the claims held by nonresident members of the nationwide class, there is no occasion for applying the choice of law rules to decide whether California's or another jurisdiction's law should govern. (*Clothesrigger, supra,* at p. 619 [only if "application of California law would be constitutional [will] the court ... determine whether California law will likely apply under California choice of law rules"]; *Osborne v. Subaru of America, Inc.* (1988) 198 Cal.App.3d 646, 654-655 [243 Cal.Rptr. 815]; *Anderson v. Savin Corp.* (1988) 206 Cal.App.3d 356, 362 [254 Cal.Rptr. 627] [only where both states have interest in applying own laws do choice of law questions arise].) Because there was no choice of law issue to be evaluated with respect to the claims of Category III members, the choice of law rules, including Norwest Mort-

gage's burden to show the laws of a different jurisdiction conflicted with California law, never became relevant. *229

FN17 As previously discussed, California law was potentially applicable to the claims in *Diamond* and *Clothesrigger* because the injury-producing conduct occurred in California. Similar reasons justified potential application of California law to the claims in the other cases cited by plaintiff. (*Hurtado v. Superior Court, supra,* 11 Cal.3d at p. 578 [injury-producing conduct and injury in California]; *North American Asbestos Corp. v. Superior Court* (1986) 180 Cal.App.3d 902, 906 [225 Cal.Rptr. 877] [injury in California]; *Bernhard v. Harrah's Club* (1976) 16 Cal.3d 313, 317-318 [128 Cal.Rptr. 215, 546 P.2d 719] [same]; *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 894-905 [72 Cal.Rptr.2d 73] [California law applied to decide enforceability of covenant not to compete that operated to bar California businesses from hiring for employment in California]; *Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co.* (1980) 103 Cal.App.3d 198, 200-201 [162 Cal.Rptr. 720] [California law applied to insurance contract purchased, issued and delivered in California to California resident]; *Shields v. Singleton* (1993) 15 Cal.App.4th 1611, 1621 [19 Cal.Rptr.2d 459] [California law applied to shareholder derivative lawsuit on behalf of company whose headquarters and substantially of its business were within California]; *Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1461-1462 [48 Cal.Rptr.2d 235] [California law applied to California resident injured by defamation published in California and elsewhere]; *In re Title U.S.A. Ins. Corp.* (1995) 36 Cal.App.4th 363, 372 [42 Cal.Rptr.2d 498] [California

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

72 Cal.App.4th 214

72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

law applied to liquidation proceeding of insurer with offices in California].) None of these cases applied California law to a claim having no nexus with California.

## V. Conclusion

Our conclusion that the UCL is inapplicable to the claims held by Category III members requires reversal of the order certifying a nationwide class asserting a UCL claim. If on remand plaintiffs seek certification of a class to include Category II members, the court must analyze the choice of law issues anew to determine whether California law or the laws of other states should govern the claims of Category II members. If the court determines the laws of other states will control some or all of the claims of Category II members, the court must also undertake the analysis described by *Canon U.S.A., Inc. v. Superior Court* (1998) 68 Cal.App.4th 1 [79 Cal.Rptr.2d 897] to decide whether to certify the class, considering the manageability and other issues created by subclassifications, and whether the class representatives will be adequate for any subclasses necessitated by choice of law determinations.

## *Disposition*

Let a writ of mandate issue directing the superior court to vacate its September 14, 1998, order granting plaintiffs' motion to certify the class action, and to enter a new and different order denying plaintiffs' motion for certification of a nationwide class, without prejudice to any motion for certification of a different class or classes consistent with our opinion. The temporary stay is vacated. Petitioner is entitled to costs.

Benke, Acting P. J., and Haller, J., concurred. **\*230**

Cal.App.4.Dist.
Norwest Mortgage, Inc. v. Superior Court
72 Cal.App.4th 214, 85 Cal.Rptr.2d 18, 99 Cal. Daily Op. Serv. 3706, 1999 Daily Journal D.A.R. 4696

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 7

Westlaw.

268 P. 334                                                    Page 1
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

▷
HARRY O'MEARA, Respondent, v. G. P.
HAIDEN et al., Defendants; G. P. HAIDEN, Appellant.
Cal. 1928.
HARRY O'MEARA, Respondent,
v.
G. P. HAIDEN et al., Defendants; G. P. HAIDEN,
Appellant.

Supreme Court of California.
**S. F. No. 11952.**

June 14, 1928.

[1] NEGLIGENCE-PERSONAL INJURIES-RE-
LEASE OF CLAIM-MUTUAL MISTAKE OF
FACT- RESCISSION.
A release of a claim and cause of action for dam-
ages for personal injuries to a child resulting from
being struck by the automobile of one of the de-
fendants, executed by the father of the child, is not
binding upon the father, where at the time of its ex-
ecution neither of the parties had knowledge of the
injury which the evidence shows resulted in the
child's death, and neither of them contracted with
such an injury in mind, as the release was made un-
der a mutual mistake of fact.

[2] ID.-EXTENT OF RELEASE.
In such a case, where the evidence showed that at
the time of the execution of the release neither
party had in mind the possibility that the child
might die or that he had sustained any more than
superficial wounds or bruises by reason of the acci-
dent, the attending physician being of the opinion
that the child had recovered from the injuries, it
was evident that the release was made and accepted
simply for the injuries which were then known to
the parties, and the release was not a bar to an ac-
tion for damages brought by the father where the
evidence showed that the child afterwards died
from internal injuries resulting from the accident.

[3] ID.-UNKNOWN INJURIES-SETTLEMENT.

If the injury in such a case is known at the time of
the settlement, the release is binding upon the
parties, even if unknown or unexpected con-
sequences result therefrom, but if the injury is un-
known, and the parties purport to settle for all injur-
ies sustained, the release will not be held to be
binding upon the parties as to the injury which was
unknown to them at the time of executing the re-
lease.

[4]    ID.-UNKNOWN    INJURIES-RE-
LEASE-RESCISSION.
In such a case, as the release covered only the claim
for injuries known to the parties at the time it was
executed and the recovery in the action was limited
by the instructions of the court to such damages as
the father may have sustained by reason of his son's
death, it was not necessary for plaintiff to have res-
cinded the release and restored the consideration re-
ceived therefor before the institution of the action.

[5] ID.-RESCISSION AND RESTORATION-
TIME OF.
In such a case, no restoration or tender of the con-
sideration paid on the release need be made until an
attack is made on the release, and where the release
is pleaded in defendant's answer, a written rescis-
sion and tender of the consideration made immedi-
ately upon the service of the answer on plaintiff is
within time.

[6]    ID.-PHOTOGRAPH    OF    DECEASED-
IDENTIFICATION BY MOTHER-ERRONEOUS
ADMISSION.
It was error in such a case to admit in evidence a
photograph of the deceased identified by the mother
while on the stand, who wept when it was pro-
duced, there being no dispute as to the identity of
the injured child and there being no apparent pur-
pose of offering in evidence the photograph, unless
to unduly prejudice the jury; but the error was not
ground for reversal where there was little doubt that
the child's death was due to the negligence of de-
fendant's servant, and the verdict under the circum-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

268 P. 334
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

stances could not be held to be excessive.

**[7] ID.-AMOUNT OF VERDICT.**
The amount of a verdict in such a case must be considered in the light of the economic conditions existing at the time, and a verdict of ten thousand dollars for the death of such child rendered in January, 1925, will not be held to be excessive.

**[8]    ID.-INSTRUCTIONS-REFERENCE    TO FRAUD.**
In such a case, where the court instructed the jury that if the consent of plaintiff was given to the release in question "by mistake or obtained through fraud" it was the legal right of plaintiff to rescind the same, the reference to fraud in the instruction, although there was no claim that the release was procured by fraud and the case was tried upon the theory of mistake only, cannot be held to have prejudiced the defendant.

APPEAL from a judgment of the Superior Court of Alameda County. E. C. Robinson, Judge. Affirmed.

The facts are stated in the opinion of the court.

*355 John Ralph Wilson for Appellant.
Ford, Johnson & Bourquin and Philip M. Carey for Respondent.

*356 CURTIS, J.
Action for damages for death of plaintiff's son from injuries sustained by reason of the negligent operation of an automobile by appellant.

On the 14th of September, 1922, Herbert O'Meara, plaintiff's son, then the age of seven years, while running across East 12th Street in the city of Oakland, was struck by an automobile driven by defendant B. Henderson, the agent of the defendant, G. P. Haiden. As a result of his injuries he remained in bed two weeks. He returned to school in November and attended irregularly for some five months. On November 1, 1922, the plaintiff in consideration of the sum of $250 paid to him by defendant Haiden executed and delivered to said defendant the following release:

1847 SF-Auto-19580-B

G. P. Haiden,

Herbert O'Meara-age 7.

In consideration of the payment of two hundred fifty no/100 dollars to me in hand paid by G. P. Haiden I do hereby release and forever discharge said G. P. Haiden from any and all actions, causes of actions, claims and demands for, upon or by reason of any damage, loss or injury which heretofore have been or which hereafter may be sustained by me in consequence of an automobile accident, which occurred at Seventh avenue and East Twelfth street, Oakland, California, on or about the 14th day of September, 1922, in which my minor son, Herbert was injured.

It being further agreed and understood that the payment of the said two hundred and fifty and no/100 dollars is not to be construed as an admission on the part of said G. P. Haiden of any liability whatever in consequence of said accident.

In further consideration of the amount above stated I do hereby bind myself, my heirs, executors and administrators to indemnify and hold harmless the said G. P. Haiden from any loss the said G. P. Haiden may be obliged to pay in the future in reference to the above mentioned accident.

In witness whereof, I have hereunto set my hand this 1st day of November, 1922.

H. O'MEARA.

Signed and sealed in the presence of

MRS. H. O. O'MEARA,

"J. A. STEWART."

*357 Thereafter and on the eighth day of April, 1923, the boy was again taken sick. Doctor Nichols, who attended him on this occasion, as well as at the time he was first injured, pronounced his recent ailment as measles. He died on the thirteenth day of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

268 P. 334
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

the same month.

Upon the death of his son the plaintiff brought this action for damages under section 376 of the Code of Civil Procedure, the amended complaint therein having been filed July 23, 1923. On September 7 following defendant Haiden filed his answer to the complaint setting up the foregoing release. On October 15, 1923, plaintiff served upon defendant Haiden a notice of rescission of said release, and tendered to said defendant the sum of $250 paid by defendant to plaintiff at the time of the execution of said release, which tender was refused by defendant.

The action came on for trial on January 22d following, and a verdict was rendered in favor of plaintiff for the sum of $10,250. From this judgment the defendant Haiden has appealed. It may be conceded that plaintiff's son received his injuries through the negligence of defendant and that said injuries were the proximate cause of his death. The court so found, and there was ample evidence to sustain this finding. The principal contentions of appellant on this appeal are, first, that the release was a complete defense to this action, that it was binding upon plaintiff and could not be rescinded and, second, that if the release could be rescinded, the action was prematurely brought, as it was instituted almost three months prior to any attempted rescission.

(1) It is conceded that at the time of the payment of the sum of $250 to plaintiff and the execution of said release, neither party thereto had in mind that the boy would die. The appellant testified that "At the time this release was obtained I did not have in mind that the boy was likely to die. The fact that the boy might die from his injuries was not in contemplation at all at the time the release was executed." The evidence shows that the cause of the boy's death was abscess of the spleen, and the physician testified that this abscess was in his opinion caused from a bruise over the abdomen producing a possible hemorrhage in the spleen which was not visible to the naked eye. He further explained how death resulted from a complication of the *358

bruised condition of the spleen and the infection of measles. Under these circumstances are the parties bound by the release in this action brought to recover damages for the injury fatal in its nature and effect when, at the time of its execution, neither of them had knowledge of such an injury, and neither of them contracted with such an injury in mind?

Section 1542 of the Civil Code provides that "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known to him must have materially affected his settlement with the debtor." This court in considering the extent to which a general release is binding upon the parties thereto has said in *Meyer v. Haas*, 126 Cal. 560, 663 [58 Pac. 1042, 1043]: "That portion of the contract, therefore, purporting to release and satisfy the claim upon which the action is based is, on the findings of the jury, absolutely void for the reason that the mind of plaintiff never consented to any such a release. ..." In that action the plaintiff, who had suffered injuries due to the negligence of the defendant, claimed, and the jury found, that the release given by the plaintiff was only in satisfaction of his claim for loss of time, although it purported on its face to be a release in full of all damages sustained as a result of said injuries. It is true that it was alleged and proven that said release had been procured by the fraud of the defendant therein; but this court has further held that a mutual mistake of fact concurred in by the parties invalidates a release (*Miller v. Brode,* 186 Cal. 409 [199 Pac. 531]). In the case of *Richardson v. Chicago etc. Ry. Co.,* 157 Minn. 474 [196 N. W. 643], cited by appellant, the correct rule appears to be stated. In that action the court said: "Where the consideration received for a release is intended as compensation for the injuries sustained, and it subsequently develops that a substantial injury existed which was not known to the parties when the settlement was made and consequently was not taken into account in making it, the release may be avoided on the ground of mutual mistake." This language is peculiarly applicable to the facts in this case. The evid-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ence shows that the injury was sustained on September 14, 1922, and that as a result thereof the boy was sent to the hospital, from which he returned *359 about two weeks thereafter. The doctor who attended the injured boy testified: "My first call was made on September 14, 1922, upon an automobile accident; he had muscular bruises over his right leg and arm and bruises over his abdomen; if I recall correctly I think there were small cuts which probably would be termed as bruises. I saw him on the 14th and 16th, and 19th, and the 30th of September and on the 4th of October; about the 4th of October so far as the bruises were concerned he seemed to be recovered, and from the immediate accident, so far as I could determine." The boy was in this condition on November 1, 1922, when the release was executed. It was not until the following March or April that his condition again became serious. Continuing, the doctor testified: "On the 29th day of November I examined him; there were no notes made relative to that; that was an office visit; the boy did not recuperate as rapidly as-to make a statement, I never saw the boy before the 14th of September, 1922. He didn't seem to be recuperating as rapidly as he might have done; he didn't seem to be up to par, to be normal at these dates; he was pale; he was anaemic; he was nervous. I saw him again on the 2d of March, I saw him again on the 8th day of April, 1923, at his home; I recall it was on a Sunday night along in the evening; he had the measles; I saw him on the following morning on the 9th, that was a call at home; I didn't see him any more until the 12th; upon that day his condition was critical." As already stated, the boy died on April 13, 1923. From this testimony of the doctor who attended the boy it appears that he did not visit or see the boy after the 4th of October, 1922, until the twenty-ninth day of November, 1922, and as stated by him, "about the 4th day of October so far as the bruises were concerned he seemed to be recovered, and from the immediate accident, so far as I could determine." It was during this time when the boy "seemed to be recovered from the immediate accident" that the parties entered into negotiations which resulted in the execution and delivery of the

release.

(2) The evidence, as before observed, shows that at the time of its execution neither party had in mind the possibility that the boy might die or that he had sustained any more than superficial wounds or bruises by reason of the accident. It is quite evident that the settlement made by the defendant and the *360 delivery and acceptance of the release was simply for the injuries sustained by the boy, and which were then known to the parties, and from which, from the testimony of the doctor, the boy had recovered.

(3) A further distinction is made in the case of *Richardson v. Chicago etc. Ry. Co., supra,* between the injury sustained and the effects or results from such injury. If the injury is known at the time of the settlement, the release is binding upon the parties, even if unknown or unexpected consequences result therefrom, but if the injury is unknown, and the parties purport to settle for all injuries sustained, then the release will not be held to be binding upon the parties as to the injury which was unknown to the parties at the time of executing the release. "To avoid such a release, the rule requires clear and convincing proof that a substantial injury, which was not discovered until after the settlement, had in fact been sustained in the accident and existed at the time of the settlement. That unknown and unexpected consequences resulted from known injuries is not sufficient." (*Richardson v. Chicago etc. Ry. Co., supra.*)The testimony of Doctor Nichols is that the boy died from an injury to his spleen received at the time he was run over by the defendant's automobile, and that such injury was not visible to the naked eye. The only conclusion to be drawn from his testimony as recited in this opinion is that he did not know of the injury to the boy's spleen at the time he ceased his visits to the boy on October 4, 1922; that his first knowledge that the boy had sustained any such injury was after the boy had come down with the measles, which was the following April, and which was long after the execution of the release. It is not contended nor is there any showing

268 P. 334
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

that the plaintiff had any knowledge of this injury except as he was informed thereof by the doctor. It appears, therefore, beyond question, that at the date of the release the injury which was the cause of the boy's death was not known to either party. It was not in the minds of the parties at the time of the settlement which resulted in the execution of this written release. Accordingly, although the release may purport upon its face to extend to the plaintiff's claim for damages arising from the death of his son, yet in reality it does not do so (sec. 1542, Civ. Code). It is unreasonable to suppose that plaintiff *361 would have entered into said agreement of settlement whereby he released the defendant of all damage for the sum of $250 had he known that there was any possibility that the boy had received this fatal injury to his spleen. Such knowledge would have materially affected his settlement with defendant. To hold him to the terms of the release would not only be manifestly unfair and unjust, but it would be against the law of this state as we understand the same and as we have attempted to state it in the foregoing pages of this opinion.

(4) It is next contended by appellant that the action was prematurely brought for the reason that no rescission of said release was made or was attempted to be made by the plaintiff until some three months after the institution of this action. In *Garcia v. California Truck Co.*, 183 Cal. 767 [192 Pac. 708], the plaintiff sought to recover damages for personal injuries sustained through the negligence of defendant. The defendant pleaded a release in full of all said damages. The plaintiff showed upon the trial that said release had been procured by fraud. He had not, however, prior to the trial attempted to rescind his contract of release, nor had he restored the consideration received by him from the defendant. This court held that rescission and restoration of consideration were necessary before plaintiff could recover, and reversed a judgment in favor of the plaintiff. In *Meyer v. Haas*, 126 Cal. 560 [58 Pac. 1042], which was also an action to recover damages for personal injuries, the defendant relied upon a release and written discharge executed and delivered

to him by the plaintiff. The plaintiff claimed that he understood that the release given by him was simply of his claim for loss of time and was not intended as a release in full of all damages sustained. No rescission was ever made by the plaintiff nor did he restore the consideration received. In holding that plaintiff was not required to make such rescission or restore said consideration this court said:

"It will be seen from these special findings of the jury, considered in connection with their general verdict, that the jury were of the opinion that plaintiff executed the alleged release under a mistake as to its contents, that he believed he was receiving the twenty-five dollars and giving the receipt in discharge of any claim he might have for loss *362 of time merely, and that he was led into this error by the artifice and deception of Kurtz as to the contents of the instrument, Kurtz acting as the agent of defendants and being in their employ, and at the same time pretending to act for plaintiff. The case is not without evidence to support such conclusions. That portion of the contract, therefore, purporting to release and satisfy the claim upon which the action is based is, on the findings of the jury, absolutely void for the reason that the mind of plaintiff never consented to any such a release, and the plaintiff should be bound only to the release and satisfaction of his claim for loss of time. This view of the case makes it clearly distinguishable from most of the cases cited by appellant. In those cases generally the parties sought to avoid or rescind contracts, the nature and contents of which they understood correctly, but they had been led to execute them by fraud or deception as to something other than the contents of the contract; and in such a case the contract would not be void but only voidable, and the rule requiring a return of everything received on the faith of the contract before it could be rescinded or avoided would apply; but this rule as to a return of everything received does not apply where a party is tricked or deceived into signing a contract different in its terms and objects from the contract which he has made and which he understands that he is executing. The contract under such

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

268 P. 334
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

circumstances will be held to be what the maker of it intended it should be, and not what it was made to appear to be by the deception practiced. The twenty-five dollars paid plaintiff may, therefore, properly be said to have been received in payment for the loss of time during his illness, and not in satisfaction of anything that his mind never consented that it should satisfy. The claim sued upon does not include this loss of time, and the court instructed the jury that they could find nothing against defendants for loss of time. No offer to return the money was necessary, for the reason that the plaintiff in this case 'is not attempting to avoid a contract which he has made, but is showing that he did not make the contract which he apparently made.' (*Mullen v. Old Colony R. R.*, 127 Mass. 86 [34 Am. Rep. 349]; *Chicago etc. Ry. Co. v. Lewis*, 109 Ill. 120; *Senter v. Senter*, 70 Cal. 619 [11 Pac. 782];*363Wilson v. Moriarty*, 77 Cal. 596 [20 Pac. 134]; 88 Cal. 207 [26 Pac. 85]; *Sullivan v. Moorhead*, 99 Cal. 157 [33 Pac. 796].)"

The present action in principle is much like the case of *Meyer v. Haas*, except that no fraud is claimed or proven to have been practiced by the defendant in the procurement of the release involved herein. In this action, however, the uncontradicted evidence, as we have already seen, shows that neither party to the release at the time they made the settlement evidenced by the release had in mind the injury which resulted in the boy's death. As to the damages sustained by the father for the death of his son due to defendant's negligence we have held that the release did not cover any damages sustained by reason of the boy's death. It only extended to damages for those injuries known to the parties at the time of executing it. The present action was by the instructions of the trial court limited to such damages as the father may have sustained by reason of his son's death. As plaintiff herein has not recovered any damages sustained by him for injuries, which were covered by the release, it was not necessary for him to rescind said release and restore the consideration received therefor before the institution of this action. (*Lumley v. Wabash R. Co.*, 76

Fed. 66; *McGill v. Louisville & N. R. R. Co.*, 114 Ky. 358 [70 S. W. 1048]; *Bliss v. New York etc. R. R. Co.*, 160 Mass. 447 [39 Am. St. Rep. 504, 36 N. E. 65].) This we understand to be the effect of the holding of this court in *Meyer v. Haas, supra.*In that action, however, the plaintiff did not either after or before the commencement thereof offer to rescind and restore the consideration received by him from the defendant Haas. In the present action after the commencement thereof and before the trial the plaintiff herein offered in writing to rescind and tendered the defendant the $250 received at the time of executing the release, which the defendant refused to accept. There is creditable authority to sustain plaintiff's contention that the rescission, assuming that a rescission was required, attempted to be made by plaintiff herein after suit began was timely, and was sufficient to entitle plaintiff to litigate the validity of the general release at the trial of the action. Undoubtedly no duty exists to return the consideration until the fraud or other invalidity is discovered. Beyond this the authorities are in conflict as to when the restoration of consideration or tender *364 thereof must be made. Some cases, in many of which cancellation of the release is asked in the complaint or statement of claim, decide that such return or tender must be made before the releasor institutes suit on the cause of action released. Other decisions take the view that a credit on the verdict is sufficient, and hence no actual tender is apparently required at any time. Furthermore, authority is not lacking for the statement that restoration or tender at any time during the pendency of the suit is early enough.

(5) But the clearest and soundest rule is that no restoration or tender need be made until an attack is made on the release. Such attack generally occurs when the ground of invalidity, as fraud, is replied in avoidance to a plea of the release to the original right. (34 Cyc. 1072.) In *Rockwell v. Capital Traction Co.*, 25 App. D. C. 98 [4 Ann. Cas. 648], the following rule is enunciated: "We see no good reason why one party more than the other should be required to anticipate a defense founded on the instru-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

268 P. 334
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

ment (a release), and offer to restore the consideration as the condition of bringing the action. We are of the opinion that it is time enough to make the tender in either case after the release shall have been pleaded in bar. Tender or offer to return accomplishes all the purposes for which it is required. ... Some of the cases to which our attention has been called, where the doctrine has been declared that tender or offer to return is a condition precedent to the institution of the suit, were either suits to rescind, or suits in courts of blended jurisdiction where cancellation was part of the remedy sought. (Citing cases.) ... On the other hand, many cases, some of which are cited, expressly decide that the offer to return may be made after the institution of the suit and while it is pending. (*O'Brien v. Chicago etc. R. Co.*, 89 Iowa, 644 [57 N. W. 425]; *Chicago etc. R. Co. v. Doyle*, 18 Kan. 58.)" There are cases to the contrary and some of those cited by defendant in his brief belong to that class, but in most of those cases we find simply general language purporting to uphold defendant's contention. And upon examination of these cases we find that the real point that we are here considering was not involved in any of said actions. Among the cases cited by defendant in support of his contention that rescission and restoration of consideration must precede the institution of the action are *365 the following: *Reed v. John Gill & Sons Co.*, 201 Mo. App. 457 [212 S. W. 43],*Reid v. St. Louis & S. F. R. Co.* (Mo.), 187 S. W. 15,*Althoff v. St. Louis Transit Co.*, 204 Mo. 166 [102 S. W. 642],*McCoy v. James T. McMahon Const. Co.* (Mo.), 216 S. W. 770, and *Randall v. Port Huron etc. Co.*, 215 Mich. 413 [184 N. W. 435]. In none of these cases, however, did the plaintiff, as the plaintiff did in this case, tender back and offer to restore the consideration before the trial. In *Garcia v. California Truck Co.*, 183 Cal. 767 [192 Pac. 708], relied upon by defendant, the plaintiff therein made no offer to rescind the release either before or after the institution of the action. The court held he could not recover for that reason and reversed the judgment in his favor. We think the true rule is that when the purpose of the action is to cancel or set aside a contract on the ground of fraud, mistake, or other reason, then it is necessary for the plaintiff therein to rescind said contract and tender back the consideration received prior to the commencement of the action, or else he will be precluded from recovery, but where plaintiff seeks to recover unliquidated damages for an injury sustained and the defendant relies upon a release as a defense to said action, the plaintiff is not precluded from showing the invalidity of said release, if he has made a timely offer to rescind the same and restore the consideration, even if said offer is made after the commencement of the action. In the present action, immediately upon the service of defendant's answer upon plaintiff, in which the defendant set up said release as a defense to plaintiff's action, the latter served upon defendant his written rescission of said release and a tender of said sum of $250, being the consideration received from defendant on execution and delivery of said release. It does not appear that plaintiff's attorneys knew of the execution of said release, prior to the time they were served with a copy of defendant's answer, nor does it appear that plaintiff himself had any real understanding of its legal effect before the matter had been brought to his attention by his attorneys after they had been served with said answer. The court found under these facts and circumstances that the plaintiff had acted with due promptness in rescinding the release and tendering back the consideration received thereunder. Under the authorities*366 cited above we believe said finding was fully justified.

(6) While the mother of the boy was on the stand she was shown and asked to identify a photograph of her deceased son. This was objected to by the defendant, but the court overruled the objection. Upon her testimony that the photograph shown her was that of her son it was admitted in evidence. There was no dispute as to the identity of the boy injured. Just what was the purpose of offering in evidence his photograph is not apparent from the record, unless it was to unduly prejudice the jury in favor of the plaintiff. The reporter's transcript shows that the mother wept as she identified her son's picture. The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

effect of such procedure cannot aid in the rendition of a just and fair verdict by the jury, which should be the purpose of all trials by jury. To permit the introduction of the dead boy's photograph under the circumstances shown in this action was undoubtedly error and in a closely contested case would result in serious prejudice to the cause of the defendant, and would, therefore, call for a reversal of the judgment. We are not prepared to say that it had that effect in this proceeding. There was little question but that the boy's death was due to the negligence of defendant's servant who was operating defendant's machine at the time of the boy's injury. The main questions involved in the case were of a legal character and have already been considered by us. The objectionable testimony just referred to had no hearing upon any of them.

(7) There is, however, one phase of the case upon which such testimony might have had a material bearing, and that is embraced in the further contention of defendant that the verdict was excessive. The verdict was for $10,250, the $250 evidently being paid to cover the amount paid out by the plaintiff for the funeral expenses of his son. The complaint alleges that this amount was expended for that purpose. This leaves a verdict of $10,000 for general damages due to the death of the son. In the case of *Wiezorek v. Ferris*, 176 Cal. 353 [167 Pac. 234], this court reversed a judgment in that amount in favor of a parent for the death of his minor son, his only child, a boy six and one-half years of age, solely upon the ground that the amount thereof was excessive. Were we to follow that case we would be compelled to grant a reversal of the judgment*367 herein. That case was decided in October, 1917, almost eleven years ago. Since the decision thereof radical changes have taken place in social conditions, and particularly in conditions affecting the costs of living. Courts have recognized this fact in passing upon the size of verdicts and have almost invariably made allowances therefor (*Martin v. Pacific Gas & Elec. Co.* (Cal. App.), 255 Pac. 284; *Bowes v. Public Service Ry. Co.*, 94 N. J. L. 378 [110 Atl. 699]; *Quinn v. Chica-*

go, *M. & St. P. Ry. Co.*, 162 Minn. 87 [46 A. L. R. 1228, 202 N. W. 275]). In the last one of these cases the supreme court of Minnesota said: "In recent years there has been a noticeable increase in the size of the verdicts in personal injury cases. The courts approve of verdicts to-day which would have been unhesitatingly set aside as excessive 10 or 15 years ago. Measured in money, the earning capacity of most men has increased; measured by its purchasing power, the value of a dollar has decreased. No immediate change in the situation is in sight. It is only right that these well-known facts should be taken into consideration." In the case of *Bowes v. Public Service Ry. Co.*, *supra*, decided in 1920, the supreme court of New Jersey expressed similar views in which it further said: "At a period when the purchasing power of the dollar has in the language of the day been 'cut in half,' the value of the sum awarded her is not to be estimated in the numerical *quantum* of recompense, but in its comparative ability to furnish the necessities of life."

In view of the changed conditions that now prevail from those existing some ten years ago, we do not feel that we would be justified in following at this time the views expressed by this court in *Wiezorek v. Ferris*, *supra*, regarding the subject of excessive verdicts. Under the present conditions that case cannot be accepted as a final authority in determining whether the verdict in the present action is excessive or not. On the other hand, the present verdict must be considered under the conditions prevailing at the present time, or at least at the time it was rendered in January, 1925. We must, as courts in other jurisdictions have done in passing upon similar questions as that involved herein, take judicial notice of the fact that the value of the dollar has materially changed from what it was some 10 to *368 15 years ago. Whether it is "cut in half" as intimated by the excerpt from one of the above-mentioned authorities, or not, it is universally admitted that it has materially decreased in value from what it was a few years ago. There has been a corresponding increase in wages and salaries as well as in the cost of living in all walks of life. The sum of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

268 P. 334
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

$10,000 dollars when measured by its present purchasing power is far less than what it formerly was. A verdict, therefore, in this amount for personal injuries may well be sustained by the courts of today, when formerly it would have been their duty to set it aside as excessive. Before the advent of the present-day conditions verdicts for the death of a child amounting to $5,000 or more were frequently rendered by juries, and sustained by the courts. One of such cases was decided by the district court of appeal in 1910 and a petition to hear the same was denied by this court. The verdict was for $5,000, and in sustaining the same Mr. Justice Hart, speaking for the court, said: "the jury were authorized, as the court properly instructed them, to consider and take into account, as an element affecting the pecuniary value of the service of deceased to the plaintiff, the fact that plaintiff has, by his death, been deprived of the comfort, society and protection of her son. ... And, obviously, this element of loss of society, comfort, and protection of the son to be reckoned in determining the pecuniary value of the service of the deceased to his mother is difficult to measure in mere dollars and cents, and manifestly must, with the whole question of damages, be left to the good sense and sound discretion of the jury to be exercised in the light of all the circumstances of the case." (*Clark v. Tulare Lake Dredging Co.*, 14 Cal. App. 414, 434 [112 Pac. 564, 572].) If, then, this court looked with approval upon a verdict in an amount of $5,000 in an action for the recovery of damages for the death of a child under former conditions we can have no reasonable or legal grounds now for withholding such approval of the verdict in the present action. Taking all things into consideration we are of the opinion that this verdict is not excessive. The erroneous admission of the boy's photograph in the manner already described did not then, in our opinion, have the effect of influencing the jury to render an improper *369 verdict against defendant, and the error in admitting it was not prejudicial to the defendant.

(8) In one of the instructions given by the court the jury were told that if the consent of plaintiff was given to the release in question "by mistake or obtained through fraud" then it was the legal right of plaintiff to rescind the same. As we have said above, there was no claim that the release was procured by fraud and the case was tried upon the theory of mistake only. The only reference to fraud throughout the record is in this instruction. Just how the court happened to mention in said instruction "fraud" as one of the grounds of avoiding the release is in no way explained. It may have been inadvertently done. In any event, we are not convinced that defendant was seriously prejudiced by this one reference to fraud, when the record shows plainly that plaintiff made no claim that the release was fraudulently obtained, and the sole contention of plaintiff throughout the trial was that the release was of no binding effect upon him by reason of the fact that it was executed under a mutual mistake of the parties. In our opinion the judgment should be affirmed and it is so ordered.

Preston, J., concurred.SEAWELL, J., Concurring.
I concur in the conclusion announced by the main opinion. I do not concur in the portion thereof which holds that the admission of a photograph taken of the minor two weeks before he received the fatal injuries was error. It would certainly have been proper to have shown the physical condition and mental precocity of the youth by oral testimony as matters pertinent for the consideration of the jury in determining the extent of damages sustained by the parents. A photograph, the integrity of which could not be doubted, would, in my opinion, have given the jury a truer conception of the youth's physical appearance than could have been conveyed to the jury by the descriptive power of speech. So, too, it would reflect something of the mental force of the subject. Emotional manifestations are not alone produced by the exhibition of photographs in cases of this class. Such manifestations are to be expected where mothers are called *370 to the witness chair to speak upon any branch of the case. I am of the opinion that no error was committed by the admission of the photograph.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

268 P. 334
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

Hearing in Bank denied.

All the Justices concurred.

Cal. 1928.
O'Meara v. Haiden
204 Cal. 354, 268 P. 334, 60 A.L.R. 1381

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.