# EXHIBIT 8

Westlaw.

246 Cal.App.2d 123                                                                    Page 1
246 Cal.App.2d 123, 54 Cal.Rptr. 533

▷
Odorizzi v. Bloomfield School Dist.
Cal.App.2.Dist.
  DONALD W. ODORIZZI, Plaintiff and Appellant,
                        v.
BLOOMFIELD SCHOOL DISTRICT, Defendant
              and Respondent.
              **Civ. No. 29510.**

District Court of Appeal, Second District, Division
                2, California.
                Nov. 3, 1966.

                HEADNOTES

**(1)** Schools § 106(3)--Teachers--Actions to Compel
Reinstatement--Pleading.
In an action by a teacher seeking to rescind his
resignation, a pleading suffices under Civ. Code, §
1567, concerning apparent consent that is not real
or free, and § 1689, concerning grounds for rescis-
sion, where the pleading, stripped of its conclu-
sions, sets forth sufficient facts to justify legal re-
lief.

**(2)** Contracts § 28--Consent--Duress and Menace-
Words and Phrases--"Duress."
Duress consists in unlawful confinement that
causes consent to a transaction through fear. The
confinement may be that of the person, of his relat-
ives, or of his property. (Civ. Code, § 1569.)
See **Cal.Jur.2d,** Contracts, §§ 65, 66; **Am.Jur.2d,**
Duress and Undue Influence, § 3.
**(3)** Words and Phrases--"Menace."
Menace, though often used interchangeably with
duress, is technically a threat of duress or a threat
of injury to the person, property or character of an-
other.

**(4)** Contracts § 28--Consent--Duress and Men-
aceSchools § 91--Teachers-- Resignation.
An action or threat in duress or menace must be un-
lawful, and a threat of legal action is not unlawful
unless the threatening party knows the falsity of his

claim. Neither duress nor menace was involved in a
teacher's resignation when school representatives
announced their intent to initiate suspension and
dismissal proceedings following his arrest on
charges of homosexual activity, such proceedings
being not only their legal right but their positive
duty as school officials.

**(5a, 5b)** Fraud and Deceit §
54(4)--Pleading--Insufficiency of Com-
plaintSchools § 106(3)--Teachers--Actions to Com-
pel Reinstatement--Pleading.
A cause of action for actual fraud was not stated in
a teacher's complaint for recission of his resignation
on the ground his consent to resign was obtained by
fraud where plaintiff charged school representatives
with misrepresentation in obtaining his resignation
but failed to assert the elements of knowledge of
falsity, intent to induce reliance, and justifiable reli-
ance.
See **Cal.Jur.2d,** Fraud and Deceit, § 64; **Am.Jur.,**
Fraud and Deceit (1st ed. § 244).
**(6)** Fraud and Deceit § 5(1)--Actual Fraud.
Actual fraud involves conscious misrepresentation,
concealment or non-disclosure of a material fact
that induces an innocent party to contract. (Civ.
Code, § 1572.)

**(7)** Fraud and Deceit § 54(1)--Pleading.
A complaint for fraud must plead misrepresenta-
tion, knowledge of falsity, intent to induce reliance,
justifiable reliance, and resulting damage.

**(8)** Fraud and Deceit § 34(1)--Constructive Fraud-
-Confidential Relations.
Constructive fraud arises on a breach of duty by
one in a confidential or fiduciary relationship to an-
other which induces justifiable reliance by the other
to his prejudice. (Civ. Code, § 1573.)

**(9)** Fraud and Deceit § 34(1)--Constructive Fraud-
-Confidential Relations.
The confidential relationship present in cases of
constructive fraud may exist whenever a person

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

with justification places trust and confidence in the integrity and fidelity of another.

**(10a, 10b)** Fraud and Deceit § 61--Pleading--Constructive Fraud--Facts Constituting Confidential Relationship.
Allegations of constructive fraud were inadequate where plaintiff-teacher set forth no facts to support the conclusion of his confidential relationship with representatives of defendant-school district other than that of employee and employer.

**(11)** Fraud and Deceit § 34(5)--Constructive Fraud--Confidential Relations.
No presumption of a confidential relationship arises from the bare fact that parties to a contract are employer and employee. The absence of a confidential relationship is especially apparent where the parties are negotiating to terminate their relationship of employer and employee.

**(12)** Contracts § 32--Consent--MistakeSchools § 106(3)--Teachers--Actions to Compel Reinstatement--Pleading.
In an action by a teacher seeking to rescind his resignation, the complaint failed to disclose facts suggesting that his consent to resign was obtained through mistake, either of law or fact, where the pleadings disclosed that defendant's school representatives had discussed with plaintiff the probable consequences of a pending criminal charge against him of homosexual activity, that all parties knew the material facts of the transaction, and that no party labored under any misapprehension of law of which another took advantage. The failure of defendant's representatives to forecast the exact pattern of future events did not provide a basis for claiming that they acted under some mistake.

**(13)** Contracts § 32--Consent--Mistake.
As applied to contracts, the doctrine of mistake customarily involves such errors as the nature of the transaction, the identity of the parties, the identity of the things to which the contract relates, or the occurrence of collateral happenings.

**(14a, 14b, 14c)** Contracts § 30--Consent--Undue InfluenceSchools § 106(3)--Teachers--Actions to Compel Reinstatement--Pleading.
A teacher's complaint sufficed to state a case for rescission of his resignation on the ground his consent to resign was obtained by undue influence where he alleged that he was under severe mental and emotional strain at the time he was urged to resign because of his arrest for homosexual activity, that he had had no sleep for 40 hours, that school representatives had assured him they were trying to assist him, he should rely on their advice, there was no time to consult an attorney, and the district would dismiss him and publicize the proceedings if he did not resign at once and that if he did resign the incident would not jeopardize his chances of securing a teaching post elsewhere.

**(15)** Contracts § 30--Consent--Undue InfluenceSchools § 91--Teachers-- ResignationWords and Phrases--"Undue Influence."
Undue influence, such as that used by a school district in persuading a teacher to resign, is a shorthand legal phrase used to describe persuasion that tends to be coercive in nature-persuasion that overcomes the will without convincing the judgment.

**(16)** Contracts § 30--Consent--Undue Influence.
The hallmark of persuasion that overcomes the will without convincing the judgment is high pressure, a pressure that works on mental, moral or emotional weakness to such an extent that it approaches the boundaries of coercion. In this sense, undue influence has been called overpersuasion.

**(17)** Contracts § 30--Consent--Undue Influence.
Misrepresentations of law or fact are not essential to a charge of undue influence; a person's will may be overborne without misrepresentation.

**(18)** Contracts § 30--Consent--Undue Influence.
In essence undue influence involves the use of excessive pressure to persuade one vulnerable to such pressure, pressure applied by a dominant subject to a servient object. In combination, the elements of undue susceptibility in the servient person and ex-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cessive pressure by the dominating one make the dominant person's influence undue, for it results in the apparent will of the servient person being in fact the will of the dominant person.

**(19)** Contracts § 30--Consent--Undue Influence.
Undue susceptibility to another's influence may consist of total weakness of mind that leaves a person entirely without understanding (Civ. Code, § 38), or a lesser weakness that destroys the capacity of a person to contract though he is not totally incapacitated (Civ. Code, § 39), or a still lesser weakness that provides sufficient grounds to rescind a contract for undue influence (Civ. Code, § 1575).

**(20)** Contracts § 30--Consent--Undue Influence.
Whether a person of subnormal capacities has been subjected to ordinary force or a person of normal capacities subjected to extraordinary force, the match is equally out of balance. Where will has been overcome against judgment, consent may be rescinded.

**(21)** Contracts § 30--Consent--Undue Influence.
Overpersuasion is generally accompanied by characteristics that tend to create a pattern. The pattern usually involves several of the following elements: discussion of the transaction at an unusual time or inappropriate time, consummation of the transaction in an unusual place, insistent demand that the business be finished at once, extreme emphasis on untoward consequences of delay, use of multiple persuaders by the dominant side against a single servient party, absence of third-party advisers to the servient party, and statements that there is no time to consult financial advisers or attorneys. When a number of these elements are simultaneously present, the persuasion may be characterized as excessive.

### SUMMARY

APPEAL from a judgment of the Superior Court of Los Angeles County. Shirley M. Hufstedler, Judge. Reversed.

Action by a school teacher for declaratory relief

and for rescission of a resignation allegedly submitted under undue influence. Judgment of dismissal after demurrer to amended complaint was sustained without leave to amend reversed.

### COUNSEL

Burton Marks, Green, Simke & Lasher and Stuart A. Simke for Plaintiff and Appellant.
Harold W. Kennedy, County Counsel, and Raymond W. Schneider, Deputy County Counsel, for Defendant and Respondent.

FLEMING, J.
Appeal from a judgment dismissing plaintiff's amended complaint on demurrer.

Plaintiff Donald Odorizzi was employed during 1964 as an elementary school teacher by defendant Bloomfield School District and was under contract with the district to continue to teach school the following year as a permanent employee. On June 10 he was arrested on criminal charges of homosexual activity, and on June 11 he signed and delivered to his superiors his written resignation as a teacher, a resignation which the district accepted on June 13. In July the criminal *127 charges against Odorizzi were dismissed under Penal Code, section 995, and in September he sought to resume his employment with the district. On the district's refusal to reinstate him he filed suit for declaratory and other relief.

Odorizzi's amended complaint asserts his resignation was invalid because obtained through duress, fraud, mistake, and undue influence and given at a time when he lacked capacity to make a valid contract. Specifically, Odorizzi declares he was under such severe mental and emotional strain at the time he signed his resignation, having just completed the process of arrest, questioning by the police, booking, and release on bail, and having gone for 40 hours without sleep, that he was incapable of rational thought or action. While he was in this condition and unable to think clearly, the superintendent of the district and the principal of his school came to his apartment. They said they were trying to help him and had his best interests at heart, that he

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

should take their advice and immediately resign his position with the district, that there was no time to consult an attorney, that if he did not resign immediately the district would suspend and dismiss him from his position and publicize the proceedings, his "aforedescribed arrest" and cause him "to suffer extreme embarrassment and humiliation"; but that if he resigned at once the incident would not be publicized and would not jeopardize his chances of securing employment as a teacher elsewhere. Odorizzi pleads that because of his faith and confidence in their representations they were able to substitute their will and judgment in place of his own and thus obtain his signature to his purported resignation. A demurrer to his amended complaint was sustained without leave to amend.

(1) By his complaint plaintiff in effect seeks to rescind his resignation pursuant to Civil Code, section 1689, on the ground that his consent had not been real or free within the meaning of Civil Code, section 1567, but had been obtained through duress, menace, fraud, undue influence, or mistake. A pleading under these sections is sufficient if, stripped of its conclusions, it sets forth sufficient facts to justify legal relief. (Gogerty v. Coachella Valley Junior College Dist., 57 Cal.2d 727, 731 [21 Cal.Rptr. 806, 371 P.2d 582]; Krug v. Meeham, 109 Cal.App.2d 274, 277 [240 P.2d 732].) In our view the facts in the amended complaint are insufficient to state a cause of action for duress, menace, fraud, or mistake, but they do set out sufficient elements to justify rescission of a consent *128 because of undue influence. We summarize our conclusions on each of these points.

1. No duress or menace has been pleaded. (2) Duress consists in unlawful confinement of another's person, or relatives, or property, which causes him to consent to a transaction through fear. (Civ. Code, § 1569.)(3) Duress is often used interchangeably with menace (Leeper v. Beltrami, 53 Cal.2d 195, 203 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]), but in California menace is technically a threat of duress or a threat of injury to the person,

property, or character of another. (Civ. Code, § 1570; Rest., Contracts, §§ 492, 493.) (4) We agree with respondent's contention that neither duress nor menace was involved in this case, because the action or threat in duress or menace must be unlawful, and a threat to take legal action is not unlawful unless the party making the threat knows the falsity of his claim. (Leeper v. Beltrami, 53 Cal.2d 195, 204 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803].) The amended complaint shows in substance that the school representatives announced their intention to initiate suspension and dismissal proceedings under Education Code, sections 13403, 13408 et seq. at a time when the filing of such proceedings was not only their legal right but their positive duty as school officials. (Ed. Code, § 13409; Board of Education v. Weiland, 179 Cal.App.2d 808 [4 Cal.Rptr. 286].) Although the filing of such proceedings might be extremely damaging to plaintiff's reputation, the injury would remain incidental so long as the school officials acted in good faith in the performance of their duties. (Schumm v. Berg, 37 Cal.2d 174, 185-186 [231 P.2d 39, 21 A.L.R.2d 1051].) Neither duress nor menace was present as a ground for rescission.

(5a) 2. Nor do we find a cause of action for fraud, either actual or constructive. (Civ. Code, §§ 1571 to 1574.)(6) Actual fraud involves conscious misrepresentation, or concealment, or non- disclosure of a material fact which induces the innocent party to enter the contract. (Civ. Code, § 1572; Pearson v. Norton, 230 Cal.App.2d 1, 7 [40 Cal.Rptr. 634]; Rest., Contracts, § 471.) (7) A complaint for fraud must plead misrepresentation, knowledge of falsity, intent to induce reliance, justifiable reliance, and resulting damage. (Sixta v. Ochsner, 187 Cal.App.2d 485, 489 [9 Cal.Rptr. 617]; Zinn v. Ex-Cell-O Corp., 148 Cal.App.2d 56, 68 [306 P.2d 1017].) (5b) While the amended complaint charged misrepresentation, it failed to assert the elements of knowledge of falsity, intent to induce reliance, and justifiable *129 reliance. A cause of action for actual fraud was therefore not stated. (Norkin v. United States Fire Ins., 237 Cal.App.2d 435 [47 Cal.Rptr.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

15].)

(8) Constructive fraud arises on a breach of duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by the latter to his prejudice. (Civ. Code, § 1573.)Plaintiff has attempted to bring himself within this category, for the amended complaint asserts the existence of a confidential relationship between the school superintendent and principal as agents of the defendant, and the plaintiff. (9) Such a confidential relationship may exist whenever a person with justification places trust and confidence in the integrity and fidelity of another. (*Vai v. Bank of America,* 56 Cal.2d 329, 338 [15 Cal.Rptr. 71, 364 P.2d 247]; *Pryor v. Bistline,* 215 Cal.App.2d 437, 446 [30 Cal.Rptr. 376].) (10a) Plaintiff, however, sets forth no facts to support his conclusion of a confidential relationship between the representatives of the school district and himself, other than that the parties bore the relationship of employer and employee to each other. (11) Under prevailing judicial opinion no presumption of a confidential relationship arises from the bare fact that parties to a contract are employer and employee; rather, additional ties must be brought out in order to create the presumption of a confidential relationship between the two. (Annot., 100 A.L.R. 875.)The absence of a confidential relationship between employer and employee is especially apparent where, as here, the parties were negotiating to bring about a termination of their relationship. In such a situation each party is expected to look after his own interests, and a lack of confidentiality is implicit in the subject matter of their dealings. (10b) We think the allegations of constructive fraud were inadequate.

(12) 3. As to mistake, the amended complaint fails to disclose any facts which would suggest that consent had been obtained through a mistake of fact or of law. The material facts of the transaction were known to both parties. Neither party was laboring under any misapprehension of law of which the other took advantage. The discussion between plaintiff and the school district representatives principally

attempted to evaluate the probable consequences of plaintiff's predicament and to predict the future course of events. The fact that their speculations did not forecast the exact pattern which events subsequently took does not provide the basis for *130 a claim that they were acting under some sort of mistake. (13) The doctrine of mistake customarily involves such errors as the nature of the transaction, the identity of the parties, the identity of the things to which the contract relates, or the occurrence of collateral happenings. (Rest., Contracts, § 502, com. e.) Errors of this nature were not present in the case at bench.

(14a) 4. However, the pleading does set out a claim that plaintiff's consent to the transaction had been obtained through the use of undue influence.

(15) Undue influence, in the sense we are concerned with here, is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment. (*Estate of Ricks,* 160 Cal. 467, 480-482 [117 P. 539].) (16) The hallmark of such persuasion is high pressure, a pressure which works on mental, moral, or emotional weakness to such an extent that it approaches the boundaries of coercion. In this sense, undue influence has been called overpersuasion. (*Kelly v. McCarthy,* 6 Cal.2d 347, 364 [57 P.2d 118].) (17) Misrepresentations of law or fact are not essential to the charge, for a person's will may be overborne without misrepresentation. By statutory definition undue influence includes "taking an unfair advantage of another's weakness of mind, or ... taking a grossly oppressive and unfair advantage of another's necessities or distress." (Civ. Code, § 1575.)While most reported cases of undue influence involve persons who bear a confidential relationship to one another, a confidential or authoritative relationship between the parties need not be present when the undue influence involves unfair advantage taken of another's weakness or distress. (*Wells Fargo Bank v. Brady,* 116 Cal.App.2d 381, 398 [254 P.2d 71]; *Buchmayer v. Buchmayer,* 68 Cal.App.2d 462, 467 [157 P.2d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

9].)

We paraphrase the summary of undue influence given the jury by Sir James P. Wilde in *Hall v. Hall,* L.R. 1, P. & D. 481, 482 (1868): To make a good contract a man must be a free agent. Pressure of whatever sort which overpowers the will without convincing the judgment is a species of restraint under which no valid contract can be made. Importunity or threats, if carried to the degree in which the free play of a man's will is overborne, constitute undue influence, although no force is used or threatened. A party may be led but not driven, and his acts must be the offspring of his own volition and not the record of someone else's. *131

(18) In essence undue influence involves the use of excessive pressure to persuade one vulnerable to such pressure, pressure applied by a dominant subject to a servient object. In combination, the elements of undue susceptibility in the servient person and excessive pressure by the dominating person make the latter's influence undue, for it results in the apparent will of the servient person being in fact the will of the dominant person.

(19) Undue susceptibility may consist of total weakness of mind which leaves a person entirely without understanding (Civ. Code, § 38); or, a lesser weakness which destroys the capacity of a person to make a contract even though he is not totally incapacitated (Civ. Code, § 39; *Peterson v. Ellebrecht,* 205 Cal.App.2d 718, 721-722 [23 Cal.Rptr. 349]); or, the first element in our equation, a still lesser weakness which provides sufficient grounds to rescind a contract for undue influence (Civ. Code, § 1575; *Faulkner v. Beatty,* 161 Cal.App.2d 547, 551 [327 P.2d 41]; *Stewart v. Marvin,* 139 Cal.App.2d 769, 775 [294 P.2d 114]). Such lesser weakness need not be long-lasting nor wholly incapacitating, but may be merely a lack of full vigor due to age (*Wells Fargo Bank v. Brady,* 116 Cal.App.2d 381, 397-398 [254 P.2d 71]), physical condition (*Weger v. Rocha,* 138 Cal.App. 109, 114-115 [32 P.2d 417]), emotional anguish (*Moore v. Moore,* 56 Cal. 89, 93;81 Cal. 195, 197-198 [22

P. 589, 874]), or a combination of such factors. The reported cases have usually involved elderly, sick, senile persons alleged to have executed wills or deeds under pressure. (*Malone v. Malone,* 155 Cal.App.2d 161 [317 P.2d 65] [constant importuning of a senile husband]; *Stewart v. Marvin,* 139 Cal.App.2d 769 [294 P.2d 114] [persistent nagging of elderly spouse].) In some of its aspects this lesser weakness could perhaps be called weakness of spirit. But whatever name we give it, this first element of undue influence resolves itself into a lessened capacity of the object to make a free contract.

(14b) In the present case plaintiff has pleaded that such weakness at the time he signed his resignation prevented him from freely and competently applying his judgment to the problem before him. Plaintiff declares he was under severe mental and emotional strain at the time because he had just completed the process of arrest, questioning, booking, and release on bail and had been without sleep for forty hours. It is possible that exhaustion and emotional turmoil may wholly incapacitate a person from exercising his judgment. As an *132 abstract question of pleading, plaintiff has pleaded that possibility and sufficient allegations to state a case for rescission.

Undue influence in its second aspect involves an application of excessive strength by a dominant subject against a servient object. Judicial consideration of this second element in undue influence has been relatively rare, for there are few cases denying persons who persuade but do not misrepresent the benefit of their bargain. Yet logically, the same legal consequences should apply to the results of excessive strength as to the results of undue weakness. Whether from weakness on one side, or strength on the other, or a combination of the two, undue influence occurs whenever there results "that kind of influence or supremacy of one mind over another by which that other is prevented from acting according to his own wish or judgment, and whereby the will of the person is overborne and he

is induced to do or forbear to do an act which he would not do, or would do, if left to act freely." (*Webb v. Saunders,* 79 Cal.App.2d 863, 871 [181 P.2d 43].) Undue influence involves a type of mismatch which our statute calls unfair advantage. (Civ. Code, § 1575.)(20) Whether a person of subnormal capacities has been subjected to ordinary force or a person of normal capacities subjected to extraordinary force, the match is equally out of balance. If will has been overcome against judgment, consent may be rescinded.

The difficulty, of course, lies in determining when the forces of persuasion have overflowed their normal banks and become oppressive flood waters. There are second thoughts to every bargain, and hindsight is still better than foresight. Undue influence cannot be used as a pretext to avoid bad bargains or escape from bargains which refuse to come up to expectations. A woman who buys a dress on impulse, which on critical inspection by her best friend turns out to be less fashionable than she had thought, is not legally entitled to set aside the sale on the ground that the saleswoman used all her wiles to close the sale. A man who buys a tract of desert land in the expectation that it is in the immediate path of the city's growth and will become another Palm Springs, an expectation cultivated in glowing terms by the seller, cannot rescind his bargain when things turn out differently. If we are temporarily persuaded against our better judgment to do something about which we later have second thoughts, we must abide the consequences of the risks inherent in managing our own affairs. (*Estate of Anderson,* 185 Cal. 700, 706-707 [198 P. 407].)*133

(21) However, overpersuasion is generally accompanied by certain characteristics which tend to create a pattern. The pattern usually involves several of the following elements: (1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward

consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party, (7) statements that there is no time to consult financial advisers or attorneys. If a number of these elements are simultaneously present, the persuasion may be characterized as excessive. The cases are illustrative:

*Moore v. Moore,* 56 Cal. 89, 93, and 81 Cal. 195 [22 P. 589, 874]. The pregnant wife of a man who had been shot to death on October 30 and buried on November 1 was approached by four members of her husband's family on November 2 or 3 and persuaded to deed her entire interest in her husband's estate to his children by a prior marriage. In finding the use of undue influence on Mrs. Moore, the court commented: "It was the second day after her late husband's funeral. It was at a time when she would naturally feel averse to transacting any business, and she might reasonably presume that her late husband's brothers would not apply to her at such a time to transact any important business, unless it was of a nature that would admit of no delay. And as it would admit of delay, the only reason which we can discover for their unseemly haste is, that they thought that she would be more likely to comply with their wishes then than at some future time, after she had recovered from the shock which she had then so recently experienced. If for that reason they selected that time for the accomplishment of their purpose, it seems to us that they not only took, but that they designed to take, an unfair advantage of her weakness of mind. If they did not, they probably can explain why they selected that inappropriate time for the transaction of business which might have been delayed for weeks without injury to anyone. In the absence of any explanation, it appears to us that the time was selected with reference to just that condition of mind which she alleges that she was then in.

"Taking an unfair advantage of another's weakness of mind is undue influence, and the law will not permit the retention of an advantage thus obtained.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(Civ. Code, § 1575.)"

*Weger v. Rocha,* 138 Cal.App. 109 [32 P.2d 417]. Plaintiff, **134** while confined in a cast in a hospital, gave a release of claims for personal injuries for a relatively small sum to an agent who spent two hours persuading her to sign. At the time of signing plaintiff was in a highly nervous and hysterical condition and suffering much pain, and she signed the release in order to terminate the interview. The court held that the release had been secured by the use of undue influence.

*Fyan v. McNutt* (1934) 266 Mich. 406 [254 N.W. 146]. At issue was the validity of an agreement by Mrs. McNutt to pay Fyan, a real estate broker, a 5 percent commission on all moneys received from the condemnation of Mrs. McNutt's land. Earlier, Fyan had secured an option from Mrs. McNutt to purchase her land for his own account and offer it for sale as part of a larger parcel to Wayne County for an airport site. On July 25 Fyan learned from the newspapers that the county would probably start condemnation proceedings rather than obtain an airport site by purchase. Fyan, with four others, arrived at Mrs. McNutt's house at 1 a.m. on July 26 with the commission agreement he wanted her to sign. Mrs. McNutt protested being awakened at that hour and was reluctant to sign, but Fyan told her he had to have the paper in Detroit by morning, that the whole airport proposition would fall through if she did not sign then and there, that there wasn't time to wait until morning to get outside advice. In holding the agreement invalid the Michigan Supreme Court said: "The late hour of the night at which her signature was secured over her protest and plea that she be given until the next day to consider her action, the urge of the moment, the co-operation of the others present in their desire to obtain a good price for their farm lands, the plaintiff's anxiety over the seeming weakness of his original option, all combined to produce a situation in which, to say the least, it is doubtful that the defendant had an opportunity to exercise her own free will. ... A valid contract can be entered into only

when there is a meeting of the minds of the parties under circumstances conducive to a free and voluntary execution of the agreement contemplated. It must be conceived in good faith and come into existence under circumstances that do not deprive the parties of the exercise of their own free will."

The difference between legitimate persuasion and excessive pressure, like the difference between seduction and rape, rests to a considerable extent in the manner in which the parties go about their business. For example, if a day or two after Odorizzi's release on bail the superintendent of the school district **135** had called him into his office during business hours and directed his attention to those provisions of the Education Code compelling his leave of absence and authorizing his suspension on the filing of written charges, had told him that the district contemplated filing written charges against him, had pointed out the alternative of resignation available to him, had informed him he was free to consult counsel or any adviser he wished and to consider the matter overnight and return with his decision the next day, it is extremely unlikely that any complaint about the use of excessive pressure could ever have been made against the school district.

(14c) But, according to the allegations of the complaint, this is not the way it happened, and if it had happened that way, plaintiff would never have resigned. Rather, the representatives of the school board undertook to achieve their objective by over-persuasion and imposition to secure plaintiff's signature but not his consent to his resignation through a high-pressure carrot-and-stick technique-under which they assured plaintiff they were trying to assist him, he should rely on their advice, there wasn't time to consult an attorney, if he didn't resign at once the school district would suspend and dismiss him from his position and publicize the proceedings, but if he did resign the incident wouldn't jeopardize his chances of securing a teaching post elsewhere.

Plaintiff has thus pleaded both subjective and ob-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

jective elements entering the undue influence equation and stated sufficient facts to put in issue the question whether his free will had been overborne by defendant's agents at a time when he was unable to function in a normal manner. It was sufficient to pose "... the ultimate question ... whether a free and competent judgment was merely influenced, or whether a mind was so dominated as to prevent the exercise of an independent judgment." (Williston on Contracts, § 1625 [rev. ed.]; Rest., Contracts, § 497, com. c.) The question cannot be resolved by an analysis of pleading but requires a finding of fact.

We express no opinion on the merits of plaintiff's case, or the propriety of his continuing to teach school (Ed. Code, § 13403), or the timeliness of his rescission (Civ. Code, § 1691). We do hold that his pleading, liberally construed, states a cause of action for rescission of a transaction to which his apparent consent had been obtained through the use of undue influence.

The judgment is reversed.

Roth, P. J., and Herndon, J., concurred. *136

Cal.App.2.Dist.
Odorizzi v. Bloomfield School Dist.
246 Cal.App.2d 123, 54 Cal.Rptr. 533

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 9

Westlaw.

113 Cal.App.4th 549                                                                                     Page 1
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

▷
van't Rood v. County of Santa Clara
Cal.App. 6 Dist.,2003.

Court of Appeal, Sixth District, California.
Richard van't ROOD, Plaintiff and Appellant;
John PEREIRA et al., Plaintiffs and Respondents,
v.
COUNTY OF SANTA CLARA, Defendant and Respondent.
No. H023716.

Nov. 20, 2003.

**Background:** Landowners petitioned to exclude their properties from subdivision map, due to allegedly invalid merger of their preexisting parcels in parcel map submitted by real estate vendor to county. The Superior Court, Santa Clara County, No. CV790517,Jack Komar, J., denied petition. One landowner appealed.

**Holdings:** The Court of Appeal, Wunderlich, J., held that:
(1) vendor's submission of map did not effect involuntary merger of preexisting parcels;
(2) vendor lacked authority as agent to effect voluntary merger of preexisting parcels;
(3) landowners met statutory requirements under Subdivision Map Act for exclusion of their properties from subdivision map; and
(4) Court of Appeal's reversal of trial court judgment and remand with directions to grant petition applied equally to nonappealing landowners.

Reversed and remanded with directions.

West Headnotes

**[1] Appeal and Error 30 ⟠23**

30 Appeal and Error
    30II Nature and Grounds of Appellate Jurisdiction
        30k23 k. Determination of Questions of Jur-

isdiction in General. Most Cited Cases
The question of appealability goes to the jurisdiction of the appellate court.

**[2] Zoning and Planning 414 ⟠571**

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(A) In General
            414k571 k. Right of Review. Most Cited Cases
Statute requiring that owners of two-thirds of affected property initiate proceeding to exclude property from subdivision map did not carry through to appellate level of proceeding, and thus, prosecution of appeal from denial of exclusion petition by only one of three landowners who had initiated exclusion proceeding was not prohibited by statute, and single landowner had standing as aggrieved party to prosecute appeal. West's Ann.Cal.C.C.P. § 902; West's Ann.Cal.Gov.Code § 66499.22.

**[3] Appeal and Error 30 ⟠151(2)**

30 Appeal and Error
    30IV Right of Review
        30IV(A) Persons Entitled
            30k151 Parties or Persons Injured or Aggrieved
                30k151(2) k. Who Are "Aggrieved" in General. Most Cited Cases
One whose rights or interests are injuriously affected by the judgment is considered an "aggrieved party" who has standing to appeal. West's Ann.Cal.C.C.P. § 902.

**[4] Appeal and Error 30 ⟠151(1)**

30 Appeal and Error
    30IV Right of Review
        30IV(A) Persons Entitled
            30k151 Parties or Persons Injured or Aggrieved
                30k151(1) k. In General. Most Cited Cases

113 Cal.App.4th 549                                                                                                          Page 2
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

Appellate standing should be liberally construed, with any doubts resolved in favor of the right to appeal. West's Ann.Cal.C.C.P. § 902.

**[5] Zoning and Planning 414 ⬤═570**

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(A) In General
            414k570 k. Decisions Reviewable. Most Cited Cases
Landowner's appeal from denial of his petition to exclude his property from subdivision map was not rendered moot by later-enacted local zoning ordinance and state legislation; even if later-enacted provisions would afford landowner an alternative remedy, such remedy did not preclude appeal, and it was doubtful whether subsequent legislation would have retroactive effect. West's Ann.Cal.Gov.Code § 66499.22.

**[6] Appeal and Error 30 ⬤═1108**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(A) Decision in General
            30k1108 k. Effect of Change in State of Facts. Most Cited Cases
Except in rare cases where events subsequent to the lower court ruling under review have rendered the case totally moot, the appellate court does not, and may not, consider subsequent events.

**[7] Appeal and Error 30 ⬤═781(1)**

30 Appeal and Error
    30XIII Dismissal, Withdrawal, or Abandonment
        30k779 Grounds for Dismissal
            30k781 Want of Actual Controversy
                30k781(1) k. In General. Most Cited Cases
A case is "moot" when the decision of the reviewing court can have no practical impact or provide the parties effectual relief.

**[8] Appeal and Error 30 ⬤═781(4)**

30 Appeal and Error
    30XIII Dismissal, Withdrawal, or Abandonment
        30k779 Grounds for Dismissal
            30k781 Want of Actual Controversy
                30k781(4) k. Effect of Delay or Lapse of Time in General. Most Cited Cases
Subsequent legislation can render a pending appeal moot.

**[9] Statutes 361 ⬤═278.6**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.4 Prospective Construction
                361k278.6 k. Presumptions. Most Cited Cases
    (Formerly 361k263)

**Statutes 361 ⬤═278.5**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.4 Prospective Construction
                361k278.5 k. In General. Most Cited Cases
    (Formerly 361k263)
Owing to the long-standing and well-established presumption against the retroactive application of statutes, in the absence of a clear legislative intent to the contrary, statutory enactments apply prospectively.

**[10] Statutes 361 ⬤═278.1**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.1 k. In General. Most Cited Cases
    (Formerly 361k263)
Even in the face of a clear legislative signal indicating an intent that a statute apply retroactively, courts may not give a statute retroactive effect if doing so offends constitutional principles.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                    Page 3
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

**[11] Appeal and Error 30 ☞842(1)**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
         30k838 Questions Considered
            30k842 Review Dependent on Whether Questions Are of Law or of Fact
               30k842(1) k. In General. Most Cited Cases
The interpretation of documents presents a question of law for review on appeal in cases where no conflicting extrinsic evidence has been admitted to explain an instrument's meaning.

**[12] Principal and Agent 308 ☞24**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k24 k. Questions for Jury. Most Cited Cases
When conflicting evidence of agency is presented at trial, the appellate court reviews the trial court's agency determination for substantial evidence, but when the essential facts are not in conflict and the evidence is susceptible to a single inference, the agency determination is a matter of law for the reviewing court.

**[13] Zoning and Planning 414 ☞245**

414 Zoning and Planning
   414V Construction, Operation and Effect
      414V(A) In General
         414k245 k. Maps, Plats, or Plans, Regulations in General. Most Cited Cases
The three principal goals of the Subdivision Map Act are encouragement of orderly community development, prevention of undue burdens on the taxpaying public, and protection of individual real estate buyers. West's Ann.Cal.Gov.Code § 66410 et seq.

**[14] Zoning and Planning 414 ☞245**

414 Zoning and Planning
   414V Construction, Operation and Effect
      414V(A) In General
         414k245 k. Maps, Plats, or Plans, Regulations in General. Most Cited Cases
The Subdivision Map Act constitutes the major land use permit control vehicle for urban planning and environmental protection. West's Ann.Cal.Gov.Code § 66410 et seq.

**[15] Zoning and Planning 414 ☞381.5**

414 Zoning and Planning
   414VIII Permits, Certificates and Approvals
      414VIII(A) In General
         414k378 Grounds for Grant or Denial
            414k381.5 k. Maps, Plats, or Plans, Conformity to Regulations. Most Cited Cases
When a landowner wishes to subdivide its property, the proposed subdivision must be consistent with applicable zoning ordinances and the landowner must comply with the Subdivision Map Act. West's Ann.Cal.Gov.Code § 66410 et seq.

**[16] Zoning and Planning 414 ☞372.2**

414 Zoning and Planning
   414VIII Permits, Certificates and Approvals
      414VIII(A) In General
         414k372.1 Maps, Plats, or Plans, Filing or Approval Requirement
            414k372.2 k. As Condition to Conveyance. Most Cited Cases
To comply with the Subdivision Map Act, the landowner seeking to subdivide property must secure local approval and record an appropriate map, and subdivided lands may not be legally sold, leased, or financed without the required approval and map. West's Ann.Cal.Gov.Code §§ 66410 et seq., 66426, 66428, 66499.30(a, b).

**[17] Zoning and Planning 414 ☞376**

414 Zoning and Planning
   414VIII Permits, Certificates and Approvals
      414VIII(A) In General

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

414k375 Right to Permission, and Discretion

414k376 k. Change of Regulations as Affecting Right. Most Cited Cases

**Zoning and Planning 414 ☞461**

414 Zoning and Planning
 414VIII Permits, Certificates and Approvals
  414VIII(D) Effect of Determination; Revocation
   414k461 k. Effect of Determination in General. Most Cited Cases
Though compliance with the Subdivision Map Act is a necessary predicate to the sale of lands within its ambit, subdivision approval does not carry with it the unfettered right to build on those lands; even after subdivision, a builder must comply with the laws which are in effect at the time a building permit is issued, including the laws which were enacted after application for the permit. West's Ann.Cal.Gov.Code § 66410 et seq.

**[18] Zoning and Planning 414 ☞245**

414 Zoning and Planning
 414V Construction, Operation and Effect
  414V(A) In General
   414k245 k. Maps, Plats, or Plans, Regulations in General. Most Cited Cases
Pursuant to the Subdivision Map Act, "subdivision" generally refers to a division of land for sale, lease, or financing. West's Ann.Cal.Gov.Code § 66424.

**[19] Zoning and Planning 414 ☞254**

414 Zoning and Planning
 414V Construction, Operation and Effect
  414V(B) Architectural and Structural Designs
   414k254 k. Area and Frontage Requirements. Most Cited Cases
"Merger" refers to the combination of two parcels of land in common ownership.
*See 9 Miller & Starr, Cal. Real Estate (3d ed. 2001)
§ 25:149.*

**[20] Zoning and Planning 414 ☞254**

414 Zoning and Planning
 414V Construction, Operation and Effect
  414V(B) Architectural and Structural Designs
   414k254 k. Area and Frontage Requirements. Most Cited Cases

**Zoning and Planning 414 ☞359**

414 Zoning and Planning
 414VII Administration in General
  414k358 Procedure
   414k359 k. Notice, Hearing, and Evidence. Most Cited Cases
Merger provisions in the Subdivision Map Act provide landowners with elaborate procedural safeguards of notice and opportunity to be heard before their lots can be involuntarily merged, and reveal a state concern over local regulation of parcel merger for purposes of development, as well as for purposes of sale, lease, or financing. West's Ann.Cal.Gov.Code § 66451.10 et seq.

**[21] Zoning and Planning 414 ☞254**

414 Zoning and Planning
 414V Construction, Operation and Effect
  414V(B) Architectural and Structural Designs
   414k254 k. Area and Frontage Requirements. Most Cited Cases
Under the merger provisions in the Subdivision Map Act, contiguous parcels of land are not automatically merged by virtue of being held by the same owner. West's Ann.Cal.Gov.Code § 66451.10 et seq.

**[22] Zoning and Planning 414 ☞254**

414 Zoning and Planning
 414V Construction, Operation and Effect
  414V(B) Architectural and Structural Designs
   414k254 k. Area and Frontage Requirements. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                                 Page 5
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

A landowner may seek to voluntarily merge its parcels of land.

**[23] Zoning and Planning 414 ⬌381.5**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(A) In General
            414k378 Grounds for Grant or Denial
                414k381.5 k. Maps, Plats, or Plans, Conformity to Regulations. Most Cited Cases
To the extent a landowner's voluntary merger application affects other property owners, their acknowledgement and consent is required under the Subdivision Map Act, which requires consent both to final maps and to parcel maps. West's Ann.Cal.Gov.Code § 66430.

**[24] Constitutional Law 92 ⬌4096**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)3 Property in General
                92k4091 Zoning and Land Use
                    92k4096 k. Proceedings and Review. Most Cited Cases
    (Formerly 92k278.2(2))

**Zoning and Planning 414 ⬌434**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(C) Proceedings to Procure
            414k434 k. Notice. Most Cited Cases

**Zoning and Planning 414 ⬌436.1**

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(C) Proceedings to Procure
            414k436 Hearing and Determination
                414k436.1 k. In General. Most Cited Cases
Real estate vendor's submission of parcel map to county did not effect involuntary merger of real estate purchasers' preexisting parcels, even though map was ultimately recorded with tie-in marks allegedly signifying common ownership of preexisting parcels, since purchasers were not afforded constitutionally required due process procedural safeguards of notice and opportunity to be heard as to proposed merger. U.S.C.A. Const.Amend. 14; West's Ann.Cal. Const. Art. 1, §§ 7, 15.

**[25] Constitutional Law 92 ⬌3912**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
            92k3912 k. Duration and Timing of Deprivation; Pre- or Post-Deprivation Remedies. Most Cited Cases
    (Formerly 92k251.6)
Due process principles requiring reasonable notice and opportunity to be heard before governmental deprivation of a significant property interest are not rooted in statute but are compelled by the stronger force of constitutional principle. U.S.C.A. Const.Amend. 14; West's Ann.Cal. Const. Art. 1, §§ 7, 15.

**[26] Constitutional Law 92 ⬌4096**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)3 Property in General
                92k4091 Zoning and Land Use
                    92k4096 k. Proceedings and Review. Most Cited Cases
    (Formerly 92k278.2(2))
Even though notice and hearing requirements for parcel maps are not specifically set forth in the Subdivision Map Act, due process dictates that such constitutional prerequisites must be followed. U.S.C.A. Const.Amend. 14; West's Ann.Cal. Const. Art. 1, §§ 7, 15; West's Ann.Cal.Gov.Code § 66410 et seq.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                    Page 6
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

**[27] Constitutional Law 92 ⬅═➤4096**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applica-
tions
         92XXVII(G)3 Property in General
            92k4091 Zoning and Land Use
               92k4096 k. Proceedings and Re-
view. Most Cited Cases
    (Formerly 92k278.2(2))
Land use decisions on proposed subdivision of
property that affect property rights of adjacent
landowners require procedural due process for the
adjacent landowners as well as for the applicants.
U.S.C.A. Const.Amend. 14; West's Ann.Cal. Const.
Art. 1, §§ 7, 15.

**[28] Constitutional Law 92 ⬅═➤4096**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applica-
tions
         92XXVII(G)3 Property in General
            92k4091 Zoning and Land Use
               92k4096 k. Proceedings and Re-
view. Most Cited Cases
    (Formerly 92k278.2(2))
Whenever approval of a tentative subdivision map
will constitute a substantial or significant depriva-
tion of the property rights of other landowners, the
affected persons are entitled to due process pre-
requisites of reasonable notice and an opportunity
to be heard before the approval occurs. U.S.C.A.
Const.Amend. 14; West's Ann.Cal. Const. Art. 1,
§§ 7, 15.

**[29] Principal and Agent 308 ⬅═➤9**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k7 Appointment of Agent
            308k9 k. Agreements for Appointment.
Most Cited Cases

Actual agency typically arises by express agree-
ment. West's Ann.Cal.Civ.Code §§ 2295, 2298, 2299.

**[30] Principal and Agent 308 ⬅═➤14(2)**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k14 Implied Agency
            308k14(2) k. Conduct of Parties in
General. Most Cited Cases
Actual agency may be implied from the conduct of
the parties. West's Ann.Cal.Civ.Code §§ 2295,
2298, 2299.

**[31] Principal and Agent 308 ⬅═➤9**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k7 Appointment of Agent
            308k9 k. Agreements for Appointment.
Most Cited Cases

**Principal and Agent 308 ⬅═➤12**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k7 Appointment of Agent
            308k12 k. Parol Appointment or Au-
thority. Most Cited Cases
Where the agreement to create an agency is ex-
press, it may be oral, except where the agency is to
enter into a contract required by law to be in writ-
ing, in which case the authorization must be in writ-
ing under the "equal dignities rule." West's
Ann.Cal.Civ.Code §§ 2295, 2309.
*See 2 Witkin, Summary of Cal. Law (9th ed. 1987)
Agency & Employment, § 36.*
**[32] Principal and Agent 308 ⬅═➤1**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k1 k. Nature of the Relation in Gener-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                      Page 7
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

al. Most Cited Cases
"Agency" is the bilateral relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act; words or conduct by both principal and agent are necessary to create the relationship. West's Ann.Cal.Civ.Code § 2295.

**[33] Principal and Agent 308 ⇨9**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k7 Appointment of Agent
           308k9 k. Agreements for Appointment.
Most Cited Cases
Where the "equal dignities rule" applies, creation of agency by ratification requires formal, written ratification. West's Ann.Cal.Civ.Code §§ 2295, 2307, 2309, 2310.
*See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency & Employment, § 88.*

**[34] Principal and Agent 308 ⇨14(1)**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k14 Implied Agency
           308k14(1) k. In General. Most Cited Cases
Creation of agency by ratification is possible only when the person whose unauthorized act is to be accepted purported to act as agent for the ratifying party. West's Ann.Cal.Civ.Code §§ 2295, 2307, 2310.
*See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency & Employment, § 39.*

**[35] Principal and Agent 308 ⇨1**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k1 k. Nature of the Relation in General. Most Cited Cases
In the absence of the essential characteristic of the

right of control, there is no true agency. West's Ann.Cal.Civ.Code § 2295.

**[36] Principal and Agent 308 ⇨1**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k1 k. Nature of the Relation in General. Most Cited Cases
An agency is proved by evidence that the person for whom the work was performed had the right to control the activities of the alleged agent, and the fact that the parties had a preexisting relationship is not sufficient to make one party the agent for the other. West's Ann.Cal.Civ.Code § 2295.

**[37] Principal and Agent 308 ⇨1**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k1 k. Nature of the Relation in General. Most Cited Cases
A person does not become the agent of another simply by offering help, making a suggestion, or performing a favor for another, without being subject to any legal duty of service and without assenting to any right of control; control may not be inferred merely from the fact that one person's act benefits another. West's Ann.Cal.Civ.Code § 2295.

**[38] Principal and Agent 308 ⇨147(2)**

308 Principal and Agent
   308III Rights and Liabilities as to Third Persons
      308III(C) Unauthorized and Wrongful Acts
         308k147 Duty to Disclose or Ascertain Authority
           308k147(2) k. Duty to Ascertain Authority in General. Most Cited Cases
Persons dealing with an assumed agent are bound at their peril to ascertain the extent of the agent's authority. West's Ann.Cal.Civ.Code § 2315 et seq.

**[39] Principal and Agent 308 ⇨150(2)**

308 Principal and Agent
   308III Rights and Liabilities as to Third Persons
      308III(C) Unauthorized and Wrongful Acts
         308k150 Effect of Exceeding Authority in General
           308k150(2) k. Rights and Liabilities of Principal. Most Cited Cases
A principal cannot be held liable for an actual agent who acts beyond the scope of his actual or ostensible authority. West's Ann.Cal.Civ.Code § 2315 et seq.
*See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency & Employment, § 78.*
[40] Principal and Agent 308 &#8718;178(1)

308 Principal and Agent
   308III Rights and Liabilities as to Third Persons
      308III(E) Notice to Agent
         308k178 Scope of Agency or Authority
           308k178(1) k. In General. Most Cited Cases
Within the scope of his authority, notice to an agent is notice to the principal, and one who acts through another will be presumed to know all that the agent learns during the transaction, whether it is actually communicated to him or not, and regardless of whether the notice is actual or constructive.

[41] Principal and Agent 308 &#8718;178(1)

308 Principal and Agent
   308III Rights and Liabilities as to Third Persons
      308III(E) Notice to Agent
         308k178 Scope of Agency or Authority
           308k178(1) k. In General. Most Cited Cases
The knowledge imputed to a principal is limited to that acquired by the agent within the scope of his authority, which is interpreted in accordance with the usual rules for interpretation of contracts in a particular case. West's Ann.Cal.Civ.Code § 2315 et seq.
*See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency & Employment, § 79.*
[42] Principal and Agent 308 &#8718;14(2)

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k14 Implied Agency
           308k14(2) k. Conduct of Parties in General. Most Cited Cases
Proof of an agency relationship may be established by evidence of the acts of the parties and their oral and written communications. West's Ann.Cal.Civ.Code § 2295.

[43] Principal and Agent 308 &#8718;23(2)

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k18 Evidence of Agency
           308k23 Weight and Sufficiency
              308k23(2) k. Character of Evidence Necessary. Most Cited Cases
Proof of an agent's authority, either actual or ostensible, may be established by circumstantial evidence. West's Ann.Cal.Civ.Code § 2315 et seq.

[44] Zoning and Planning 414 &#8718;254

414 Zoning and Planning
   414V Construction, Operation and Effect
      414V(B) Architectural and Structural Designs
         414k254 k. Area and Frontage Requirements. Most Cited Cases
Real estate sales contract providing that vendor would "complete lot split procedure" for purchaser did not confer either actual or ostensible authority upon vendor as purchaser's agent to effect merger of purchaser's preexisting land parcels, and thus vendor's submission to county of parcel map, which was ultimately recorded with tie-in marks allegedly signifying common ownership, did not effect voluntary merger. West's Ann.Cal.Civ.Code § 2315 et seq.; West's Ann.Cal.Gov.Code § 66451.10 et seq.

[45] Zoning and Planning 414 &#8718;254

414 Zoning and Planning

113 Cal.App.4th 549                                                                Page 9
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

414V Construction, Operation and Effect
    414V(B) Architectural and Structural Designs
        414k254 k. Area and Frontage Require-
ments. Most Cited Cases
Testimony of two real estate purchasers that one
understood that vendor would "take care of the pa-
perwork" and that the other understood vendor to
be an "honest man" did not prove that vendor was
actual agent with authority to effect merger of pur-
chasers' preexisting land parcels, and thus vendor's
submission to county of parcel map reflecting pur-
chase, which was ultimately recorded with tie-in
marks allegedly signifying common ownership of
preexisting parcels, did not effect voluntary mer-
gers. West's Ann.Cal.Civ.Code § 2315 et seq.;
West's Ann.Cal.Gov.Code § 66451.10 et seq.

[46] Zoning and Planning 414 ⇨381.5

414 Zoning and Planning
    414VIII Permits, Certificates and Approvals
        414VIII(A) In General
            414k378 Grounds for Grant or Denial
                414k381.5 k. Maps, Plats, or Plans,
Conformity to Regulations. Most Cited Cases
Landowners met statutory requirements under Sub-
division Map Act for exclusion of their properties
from subdivision map by demonstrating both neces-
sity and lack of reasonable objection; necessity was
demonstrated by invalid merger of their preexisting
parcels in map, which impaired their property
rights, and county's objection to exclusion was un-
reasonable, given invalidity of merger and fact that
preexisting parcels complied with zoning regula-
tions in effect when map was recorded. West's
Ann.Cal.Gov.Code § 66499.25.
*See 9 Miller & Starr, Cal. Real Estate (3d ed. 2001)
§ 25:220; Cal. Civil Practice (Thomson/West 2003)
Real Property Litigation, § 14:82.*
[47] Zoning and Planning 414 ⇨749

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(E) Further Review
            414k749 k. Determination and Disposi-

tion. Most Cited Cases
Court of Appeal's reversal of trial court judgment
denying landowners' petition to exclude their prop-
erties from subdivision map and remand with in-
structions to grant such petition applied to all
landowners who had filed petition, notwithstanding
the fact that only one of the landowners had ap-
pealed the judgment. West's Ann.Cal.Gov.Code §
66499.25.

**751 *554 Law Offices of Craig J. Bassett, Craig
J. Bassett, Morgan Hill, for Plaintiff and Appellant.
No appearance, for Plaintiffs and Respondents.
Ann Miller Ravel, County Counsel, David E. Kahn,
Deputy County Counsel, Office of the County
Counsel, for Defendant and Respondent County of
Santa Clara.

WUNDERLICH, J.
In 1970, a landowner subdivided his property and
sold portions of it to two adjoining neighbors.
Nearly 30 years later, it came to light that the map
filed in connection with the property division ap-
parently merged each neighbor's property holdings.
That revelation prompted the affected neighbors to
bring this proceeding to exclude their property from
the subdivision. Following a three-day hearing, the
trial court denied the petition for exclusion. One of
the petitioners brought this appeal.

As we explain below, we conclude that the trial
court should have granted the petition for exclusion
from the subdivision map. We therefore reverse the
judgment.


FACTUAL BACKGROUND

In 1970, John R. Weis sought permission from
Santa Clara County (County) to divide his 10-acre
property in San Martin. Weis initially applied to di-
vide his property into two lots, but later modified
his application to seek a division into three parcels.
Weis planned to keep one parcel, about three-
and-a-half acres in size, on which he and his wife
had a home. He planned to sell the other two par-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                                                     Page 10
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

cels to two adjoining neighbors, one to the northwest and one to the northeast. At the time, the zoning permitted one-acre minimum lots.

*555 In early April 1970, Weis signed a contract with his neighbors to the northwest, John W. Pereira and Edwin A. Vargas (collectively, Pereira/Vargas). At that time, Pereira and Vargas, partners in the dairy business, each owned undivided interests in two adjoining parcels, which together comprised nearly 12 acres. One of their preexisting parcels was approximately 5.3 acres in size, while the other comprised about 6.3 acres. Only one of the two preexisting Pereira/Vargas parcels shared a boundary with Weis's property. The contract between Pereira/Vargas and Weis called for the purchase of about 3.9 acres of additional land.

Two weeks later, Weis signed a similar contract with his neighbor to the northeast, Frank B. Pacheco. Like Pereira and Vargas, Pacheco was a dairy farmer who then owned two adjoining parcels, one comprising 10 acres and the other three-quarters of an acre. Both of Pacheco's preexisting parcels shared a boundary with Weis's property. Pacheco's contract with Weis called for the sale of an estimated 2.8 acres of additional land. The contract**752 further states: "Seller to provide Buyer with record of survey and complete lot split procedure."

Weis submitted his land division application as an exemption request. At the time of the application, a provision of the Santa Clara County Ordinance Code authorized the County's Land Development Committee (Committee) to exempt from local regulation certain land divisions involving four or fewer parcels. The ordinance set forth standards for the Committee's grant of both discretionary and mandatory exemptions.

As part of his application for a land division, Weis submitted a plot plan showing his 10-acre property alone, divided into three parcels. The County stamped the plot plan "Tentative Map."

On April 21, 1970, Weis appeared at a hearing before the Land Development Committee in connection with his application. Neither Pereira nor Vargas nor Pacheco knew of the hearing, and none of them attended. The Committee conditionally approved Weis's application at the hearing.[FN1] Several days later, the Committee formally confirmed its grant of the exemption request, subject to a survey of parcels and the recording of a parcel map.

> FN1. The pertinent portion of the Committee's minutes for April 21, 1970, reads as follows: "In attendance was John Weis. This item was continued from February 9, 1970. Weis indicated that he was selling the northwesterly portion of his land to the northwesterly owner and the northeasterly portion of his land to the northeasterly owner and was retaining a three acre site containing his home. All departments made recommendations. The application for exemption was conditionally approved on a motion by Bristow, seconded by Roetttger. The vote: 5 Ayes, 0 Noes."

As part of the approval process, the tentative map was stamped "Conditionally approved by the Land Development Committee on 4/21/70." *556 In contrast to the tentative map submitted by Weis, the conditionally approved tentative map includes "tie-in marks" [FN2]—added in pencil-connecting the parcels that Weis planned to sell with the existing properties owned by Pereira/Vargas and Pacheco. There was no direct evidence at trial of when the penciled tie-in marks were added or by whom.[FN3]

> FN2. The marks, in the shape of an elongated Z, also were referred to at times during trial as "crow's feet" or "hooked lines." According to two expert trial witnesses, attorney Robert Merritt and surveyor Earl Cross, the marks signify common property ownership.

> FN3. One witness, James Sirr, a longtime county employee, answered affirmatively

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                                                        Page 11
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

when asked if that was "something that would have been done at the Land Development Committee." Another witness, Arthur Pion, a longtime former county employee, testified concerning similar tie-in marks shown on another copy of the map, saying: "More than likely, they would have been put there by Engineering Services [county] staff."

The 1970 Land Development Committee subdivision file contains a land development check sheet that includes this handwritten comment, dated 4/23/70: "Parcel Map to include gross area of all 3 related parcels-to Henke." Henke was an employee of Westfall Engineers, the survey firm hired by Weis to prepare the parcel map. Consistent with the County's apparent instruction, the parcel map prepared by Westfall Engineers included not only Weis's land, but also the land already belonging to Pereira/Vargas and to Pacheco, with new gross acreages appearing for each. As noted above, at the time the parcel map was prepared, Weis owned a single 10-acre parcel, which he proposed to divide into three; Pereira/Vargas owned two parcels totaling some 12 acres; and Pacheco owned two parcels totaling 10.75 acres. Nevertheless, only three numbered parcels appear on the parcel map: Parcel 1, which shows Weis's land as a single, **753 smaller parcel; Parcel 2, which shows Pereira/Vargas's land as a single, larger parcel containing their two existing parcels plus the land they proposed to buy from Weis, all connected by tie-in marks; and Parcel 3, which similarly shows Pacheco's land as a single, larger parcel containing his two existing parcels plus the land he proposed to buy from Weis, all connected by tie-in marks. Apparently, none of the affected neighbors ever saw the parcel map either before its recordation or for many years thereafter.

On June 17, 1970, the county surveyor certified the parcel map. On June 18, 1970, the parcel map was filed in the County's records, in Book 269 of Maps at page 43.

On June 19, 1970, grant deeds were recorded for

Weis's conveyances to Pereira/Vargas and to Pacheco. The deed to Pereira/Vargas contains a metes and bounds description of the portion of Weis's property that they purchased from him. The deed to Pacheco likewise contains a metes and bounds description of the property that he purchased from Weis, which it identifies as "Parcel One." In addition, the Pacheco deed identifies a "Parcel Two," *557 described as a 30-foot wide easement for ingress and egress, apparently over the larger of the two parcels that Pacheco already owned. Neither the Pereira/Vargas deed nor the Pacheco deed contains any reference to the parcel map. Weis financed both sales, in each case taking a promissory note secured by a deed of trust encumbering the real property separately described in each grant deed.

The lots that Pereira/Vargas and Pacheco acquired from Weis each received a separate tax assessment and a separate assessor's parcel number. In addition, at least one of the two lots acquired in 1970 was the subject of a separate Williamson Act contract (an agreement with the county to restrict the property to agricultural use). Pereira/Vargas and Pacheco each fenced off their newly acquired land, using it for many years to pasture yearling cows.

Nearly three decades passed. During that time, both Weis and Pacheco died. Zoning for the area also changed, from one-acre to 20-acre minimum lots.

In 1999, appellant Richard van't Rood (van't Rood) entered a contract to purchase the Pacheco property. The property was marketed as two separate parcels, one being Pacheco's original 10.75 acres and the other being the two-plus acres acquired from Weis in 1970. After receiving a separate title report on each parcel, van't Rood surmised that the original 10.75-acre property itself might consist of two legal lots, thereby giving him a total of three separate parcels under contract. In late 1999, prior to completing the property purchase, van't Rood submitted a "pre-application" to the County for a lot line adjustment to alter the boundaries of the three legal lots he thought he was purchasing.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                                                                   Page 12
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

Based on the information available at the pre-application meeting, it appeared that the Pacheco property consisted of three legal, nonconforming lots. Appellant then completed his purchase of the property. The grant deed from Pacheco's trust to van't Rood was recorded in December 1999; it describes three parcels.

In January 2000, van't Rood formally applied for a three-lot lot line adjustment. In the course of evaluating the application, the County discovered the 1970 parcel map, which showed van't Rood's property as a single merged parcel. The County then informed van't Rood of its conclusion that he had only one parcel, not three. In the ensuing months, van't Rood sought to confirm that he had three parcels by applying to the County for certificates of compliance. He later withdrew that application when he became convinced that it was "pointless" to proceed in the face of **754 the County's insistence on the validity of the 1970 parcel map showing his parcels as merged.

This legal action followed.

#### *558 PROCEDURAL HISTORY

This proceeding was brought pursuant to provisions of the Subdivision Map Act that authorize landowners to petition to exclude their property from a subdivision map.[FN4]    (See    Gov.Code,    §§ 66499.21-66499.29.) The statute provides that the court "may" grant such a petition if "the petitioners produce to the court satisfactory evidence of the necessity of the exclusion of the real property" and "that there is no reasonable objection to making such exclusion."(Gov.Code, § 66499.25.)

> FN4. Apparently, exclusion proceedings are rare. (See Curtin & Merritt, Cal. Subdivision Map Act and the Development Process (Cont.Ed.Bar 2d ed.2003) § 12.10, p. 325 [exclusion procedure "is rarely used"].) The witnesses in this matter included planning professionals with many

decades of collective experience, yet only one of them had ever encountered such a petition previously-and then only once. Nor have we found any published cases interpreting any of the provisions that govern the exclusion proceeding.

Van't Rood and Pereira initiated this proceeding in June 2000, seeking exclusion from the 1970 parcel map or a declaration that the map was invalid. The County objected to the initial petition, partly on the procedural ground that it was not signed and verified by owners of at least two-thirds of the affected property interests as required by statute. (See Gov.Code, § 66499.22.) In August 2000, an amended petition was filed by van't Rood, Pereira, and Vargas (collectively, petitioners). The County then objected to the amended petition. Among its objections were these: that petitioners failed to exhaust their administrative remedies; that the petition was time barred; that the 1970 parcel map is valid; that petitioners had constructive notice of the 1970 parcel map; that the consent of petitioners or their predecessors to the 1970 parcel map was not required by the then-governing statute; that the issuance of title insurance on the separately described property purchased in 1970 is irrelevant to the number of parcels in the subdivision; and that the separate property tax assessment of the 1970 lots is also irrelevant.

In May 2001, the trial court conducted an extensive evidentiary hearing on the petition, which consumed three court days. Among the witnesses were petitioners Pereira, Vargas, and van't Rood, as well as Susan Reggiardo (Pereira's daughter and Vargas's niece) and Nancy Pacheco Thompson (Pacheco's daughter). Various current and former County employees also testified, including Zachary Carter, planning department technician; Michael Lopez, planning department coordinator; Carolyn T. Walsh, principal planner; James F. Sirr, civil engineer; Martin Marcott, county surveyor; and Arthur J. Pion, a former employee of the County Planning Department. There was also expert testimony

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                              Page 13
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

from attorney Robert Merritt, from surveyor Earl Cross, and from surveyor and engineer Warren Mc-Dowell. At the conclusion of the hearing, the court announced its decision denying the petition. The *559 court directed the County to prepare a statement of decision, which it did. Petitioners objected to the proposed statement of decision, a hearing was held, and the court directed petitioners' attorney to prepare a revised statement.

In July 2000, the court filed its statement of decision, approved as to form by counsel for both sides. The statement of decision recites the court's legal conclusions, including these: that Weis was the actual agent of Pereira/Vargas and Pacheco; that Pereira/Vargas and Pacheco authorized Weis to do whatever was reasonably**755 necessary to obtain the County's approval so that they could acquire additional land from him; that petitioners' preexisting parcels were merged as a result of the 1970 parcel map; that there is no necessity to exclude the petitioners' property from the 1970 parcel map; and that the County's objections to exclusion are reasonable.

In September 2000, the court entered its formal judgment denying the petition. Van't Rood then moved for a new trial, asserting that the judgment was unsupported by the evidence and contrary to law, and also urging surprise as a ground. (Code Civ. Proc., § 657.) The trial court denied the motion for new trial.

This timely appeal ensued, brought by van't Rood alone.

## APPEALABILITY

[1] At the outset, the County raises two appealability issues, though it does not frame them as such. The threshold issues are critical "since the question of appealability goes to our jurisdiction.... [Citations.]" (*Olson v. Cory* (1983) 35 Cal.3d 390, 398, 197 Cal.Rptr. 843, 673 P.2d 720; accord, *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126, 32 Cal.Rptr.2d 275, 876 P.2d 1074.) The County cites

two separate grounds in support of its request that we "deny" this appeal.

[2] First, the County asserts that van't Rood cannot prosecute this appeal independently of Pereira/Vargas, because he does not own two-thirds of the property to be excluded from the map. Under the statute, participation by owners of two-thirds of the affected property is a requirement for initiating the exclusion proceeding. (Gov.Code, § 66499.22.) FN5But there is no suggestion in the statute that the participation requirement carries through to appeal.

> FN5. That provision reads in pertinent part as follows: "A proceeding for exclusion shall be initiated by filing a petition therefor in the offices of the county surveyor and clerk of the board of supervisors of the county in which the subdivision or the portion thereof sought to be excluded is situated.... The petition shall be signed and verified by the owners of at least two-thirds of the total area of the real property sought to be excluded." (Gov.Code, § 66499.22.)

[3][4] *560 We therefore apply the usual rule of appellate standing, which provides: "Any party aggrieved may appeal in the cases prescribed in this title." (Code Civ. Proc., § 902.) "One is considered, 'aggrieved' whose rights or interests are injuriously affected by the judgment. [Citations.]" (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737, 97 Cal.Rptr. 385, 488 P.2d 953.) As we have previously observed, appellate standing "should be 'liberally construed,' with 'any doubts resolved in favor of the right to appeal.' [Citation.]" (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 540, 104 Cal.Rptr.2d 686.) Under those standards, van't Rood clearly is an aggrieved party entitled to prosecute this appeal.

[5] Second, the County urges that we "deny" the appeal based on legislative changes at the local and state level occurring after trial. The County first

cites the adoption of a local ordinance in February 2002, which rezoned "many parcels to bring them into conformity with the General Plan."One effect of the ordinance was to reduce the minimum lot size of van't Rood's property from 20 acres to five. The County also mentions state legislation, effective January 2002, which requires that lot line adjustments comply with the General Plan. According to the County, the legislation effectively precludes van't Rood from using the lot line adjustment process to obtain three parcels, since the five-acre **756 zoning allows only two lots on his 13.4-acre property.

[6][7][8] "Except in rare cases where events subsequent to the ruling under review have rendered the case totally moot, we do not, and may not, consider subsequent events." (*In re Marriage of Jacobs* (1981) 126 Cal.App.3d 832, 835, 179 Cal.Rptr. 169.) A case is moot when the decision of the reviewing court "can have no practical impact or provide the parties effectual relief. [Citation.]" (*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888, 92 Cal.Rptr.2d 268. Accord, *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315-1316, 94 Cal.Rptr.2d 798.) Subsequent legislation can render a pending appeal moot. (*Equi v. San Francisco* (1936) 13 Cal.App.2d 140, 141-142, 56 P.2d 590.) Here, however, the County concedes that the legislation does not "automatically" moot van't Rood's appeal. Nevertheless, the County argues, "the recent legislation makes it possible for him to apply for a subdivision of his property into two parcels and also would make it illegal for him to obtain the lot line adjustment he was seeking to allow three lots...." Given these new opportunities and restrictions, the County asserts, van't Rood cannot now demonstrate the requisite necessity to exclude his property from the 1970 parcel map.

[9][10] We disagree with the County's view. In essence, the County contends that the later-enacted zoning ordinance gives van't Rood an alternative remedy to exclusion-applying for a new subdivision

of his property into *561 two lots. But the existence of an alternative remedy does not preclude us from granting van't Rood effective relief with respect to the remedy he pursued in this proceeding. That being so, the appeal is not moot. (*Woodward Park Homeowners Assn. v. Garreks, Inc., supra,* 77 Cal.App.4th at p. 888, 92 Cal.Rptr.2d 268.) Furthermore, we question whether the subsequent legislation even applies to this controversy. As we have previously observed, "there is a long-standing and well-established presumption against the retroactive application of statutes. [Citation.]" (*In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 171, 110 Cal.Rptr.2d 111.) Thus, " 'in the absence of a clear legislative intent to the contrary statutory enactments apply prospectively.' [Citation.]" (*Ibid.*)Furthermore, even in the face of a clear legislative signal, "we may not give a statute retroactive effect if doing so offends constitutional principles. [Citation.]" (*Id.* at p. 174, 110 Cal.Rptr.2d 111.)

In short, we reject both of the County's asserted grounds for dismissal. We conclude that van't Rood's appeal should be heard on its merits.

## ISSUES ON APPEAL

### I. Validity of the Parcel Map

Van't Rood's principal attack on the validity of the map rests on his contention that parcel maps are conveyances. He argues that the 1970 map is invalid because it failed to comply with the law governing real estate conveyances. He further argues that the 1970 map is a "wild" conveyance outside the chain of title that failed to afford him constructive notice and that therefore does not bind him as a bona fide purchaser.

Van't Rood also challenges the map's validity on constitutional grounds, asserting that the involuntary merger of his separate parcels of land violates due process, because it constitutes a taking of his property without adequate notice or the opportunity

113 Cal.App.4th 549                                                           Page 15
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

to be heard.

II. Agency

Van't Rood contends that there is no evidence to
support the trial court's finding**757 of "oral
agency." He further contends that the court's resol-
ution of the case on the basis of agency constituted
undue surprise, which required the grant of a new
trial.

III. Exclusion

Ultimately, the question presented by this appeal is
whether petitioners met the statutory requirements
for exclusion from the 1970 parcel map by demon-
strating both necessity and the lack of any reason-
able objection.

*562 STANDARDS OF REVIEW

[11] We independently review the judgment to the
extent it presents questions of law. The interpreta-
tion of statutes is a question of law. (See, e.g., *In re
Marriage of Petropoulos, supra,* 91 Cal.App.4th at
p. 169, 110 Cal.Rptr.2d 111.) The interpretation of
documents likewise presents a question of law in
cases such as this one, where no conflicting extrins-
ic evidence has been admitted to explain an instru-
ment's meaning. (*WYDA Associates v. Merner*
(1996) 42 Cal.App.4th 1702, 1710, 50 Cal.Rptr.2d
323.)

[12] Agency is generally a question of fact.
(*Brokaw v. Black-Foxe Military Institute* (1951) 37
Cal.2d 274, 278, 231 P.2d 816; *Violette v. Shoup*
(1993) 16 Cal.App.4th 611, 619, 20 Cal.Rptr.2d
358.) Where conflicting evidence of agency is
presented, we review the trial court's determina-
tions for substantial evidence. (*Associated Credit-
ors' Agency v. Davis* (1975) 13 Cal.3d 374, 383,
118 Cal.Rptr. 772, 530 P.2d 1084.) Here, however,
the facts are essentially undisputed, as the County's
counsel acknowledged during his closing argument

at trial. "When the essential facts are not in conflict
and the evidence is susceptible to a single infer-
ence, the agency determination is a matter of law
for the court. [Citation.]" (*Emery v. Visa Internat.
Service Assn.* (2002) 95 Cal.App.4th 952, 960, 116
Cal.Rptr.2d 25. See also, e.g., *Magnecomp Corp. v.
Athene Co.* (1989) 209 Cal.App.3d 526, 536, 257
Cal.Rptr. 278.)

DISCUSSION

I. Validity of the Parcel Map

A. The Map as a Conveyance

Much of van't Rood's attack on the 1970 parcel map
relies on his argument that it constitutes an invalid
conveyance. It has been said that a subdivision map
"recorded locally in the chain of title ... partakes of
the qualifications of a conveyance. [Citations.]"
(*John Taft Corp. v. Advisory Agency* (1984) 161
Cal.App.3d 749, 756, 207 Cal.Rptr. 840; cf., *Ste-
arns v. Title Ins. & Trust Co.* (1971) 18 Cal.App.3d
162, 169, 95 Cal.Rptr. 682 [record of survey is not
a conveyance]; see, Civ.Code, § 1215 [defining
conveyance].)

But as we explain below, our analysis of the map's
validity does not depend on its characterization as a
real estate conveyance. For that reason, we need not
and do not decide whether parcel maps are subject
to real estate conveyancing law.

*563 B. Subdivision Map Act

Instead, our assessment of the validity of the 1970
parcel map logically starts with the Subdivision
Map Act. (Gov.Code, §§ 66410-66499.37.)We be-
gin by reviewing the Act's history, purposes, and
significance. Next, we discuss the specific provi-
sions of the Act-both current and former-that per-
tain to the questions presented here. We then apply
those provisions to the undisputed facts of this case.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                                                     Page 16
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

1. History

The Subdivision Map Act has regulated the division of land in California since the nineteenth century. "The first Subdivision **758 Map Act was enacted in 1893. Subsequent versions of the Act were enacted in 1907, 1929, 1937 and 1943. The modern latest version of the Act was enacted as part of the Government Code in 1974." (Longtin, Cal. Land Use (2003 Supp.) Subdivisions, § 6.18, p. 463.) "All versions of the Act enacted subsequent to the first Act in 1893 contained grandfather clauses exempting from the current Act those subdivisions established in compliance with laws in effect when recorded." (*Ibid.*)

In the earliest twentieth-century version of the Act, "development was left almost entirely to the discretion of the developer. The act provided for no governmental regulation, and required submission of a subdivision map to local officials only to allow them to check its accuracy in order to assure good title to the resulting parcels." (2 Longtin, Cal. Land Use (2d ed. 1987) Subdivisions, § 6.02, p. 582.) "With the advent of zoning in the 1920s, subdivision mapping began to assume some importance as a land use control." (*Ibid.*) The 1929 version of the Act first authorized local subdivision regulations. (*Ibid.*) The 1937 enactment first prohibited sellers from conveying subdivided lots without prior local approval. (*Ibid.*) "The 1937 enactment was the basis for the 1943 codification which, together with many amendments thereto, remained in effect until the 1974 recodification. [Citation.]" (*Ibid.*) But by the late 1960's, "many uncoordinated amendments" had rendered the Act "so complex and disorganized that the need for recodification was apparent. Following attempts in 1971, 1972 and 1973, the Subdivision Map Act, which had been codified in the Business and Professions Code ( [§ ] 11500 et seq.), was recodified in the [Government Code section] 66410 et seq. [Citation.]" (*Ibid.*)

2. Statutory Objectives

[13] The Subdivision Map Act has three principal goals: to encourage orderly community development, to prevent undue burdens on the public, and *564 to protect individual real estate buyers. (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 997-998, 129 Cal.Rptr.2d 869, 62 P.3d 103; see 61 Ops.Cal.Atty.Gen. 299, 301 (1978); 2 Longtin, Cal. Land Use, *supra,* Subdivisions, § 6.03, p. 583; Curtin & Merritt, Subdivision Map Act Manual (2003 ed.) p. 1.) Thus, the Act serves "to coordinate planning with the community pattern laid out by local authorities and to assure proper improvements are made so the area does not become an undue burden on the taxpayer [citation]." (*Bright v. Board of Supervisors* (1977) 66 Cal.App.3d 191, 194, 135 Cal.Rptr. 758; accord, *Gardner v. County of Sonoma, supra,* 29 Cal.4th at pp. 997-998, 129 Cal.Rptr.2d 869, 62 P.3d 103; *Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985, 44 Cal.Rptr.2d 93.) It also serves "to protect individual transferees as well as the public at large." (*Bright v. Board of Supervisors, supra,* 66 Cal.App.3d at pp. 195-196, 135 Cal.Rptr. 758; see also, e.g., *John Taft Corp. v. Advisory Agency, supra,* 161 Cal.App.3d at p. 755, 207 Cal.Rptr. 840)

3. Importance and Effect

[14][15] "As now codified in the Government Code, the Subdivision Map Act constitutes the major land use permit control vehicle for urban planning and environmental protection. [Citations.]" (2 Longtin, Cal. Land Use, *supra,* Subdivisions, § 6.02, p. 583; see also *Gardner v. County of Sonoma, supra,* 29 Cal.4th at p. 996, 129 Cal.Rptr.2d 869, 62 P.3d 103.) When "a landowner wishes to subdivide its property, the proposed subdivision must be consistent with applicable zoning ordinances and the landowner must comply with the Subdivision Map Act. [Citation.]" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1197, 52 Cal.Rptr.2d 518; see also, e.g., Gov.Code, § 66473.5 [subdivision must **759 be consistent with local general plan]; *Woodland Hills Residents Assn., Inc.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*v. City Council* (1979) 23 Cal.3d 917, 936, 154 Cal.Rptr. 503, 593 P.2d 200 [same].)

[16] To comply with the Act, the landowner must secure local approval and record an appropriate map. (*John Taft Corp. v. Advisory Agency, supra,* 161 Cal.App.3d at p. 755, 207 Cal.Rptr. 840.) A final (subdivision) map is generally required for subdivisions of five or more parcels. (See Gov.Code, § 66426; see generally Curtin & Merritt, Subdivision Map Act Manual, *supra,* p. 5.) A parcel map is generally required for the creation of four or fewer parcels. (See Gov.Code, § 66428; see generally Curtin & Merritt, Subdivision Map Act Manual, *supra,* p. 5.) Subdivided lands may not be legally sold, leased, or financed without the required approval and map. (*John Taft Corp. v. Advisory Agency, supra,* 161 Cal.App.3d at p. 755, 207 Cal.Rptr. 840; see, Gov.Code, § 66499.30, subds. (a) [prohibiting sale, lease, or finance of property until required final subdivision map is filed for record]; and subd. (b) [prohibiting sale, lease, or finance of property until required parcel map is filed for record].)

[17] *565 Though compliance with the Subdivision Map Act is a necessary predicate to the sale of lands within its ambit, subdivision approval does not carry with it the unfettered right to build on those lands. Even after subdivision, "a builder must comply with the laws which are in effect at the time a building permit is issued, including the laws which were enacted after application for the permit. [Citations.]" (*Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 795, 132 Cal.Rptr. 386, 553 P.2d 546; see also, e.g., *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 760, 29 Cal.Rptr.2d 804, 872 P.2d 143 [Subdivision Map Act's merger provisions do not affect applicability of zoning ordinances that require minimum parcel size for development]; *Beck Development Co. v. Southern Pacific Transportation Co., supra,* 44 Cal.App.4th at p. 1199, 52 Cal.Rptr.2d 518 [after subdivision, "developer must still comply with any applicable requirements for

obtaining building permits"].)

4. Key Provisions

a. Subdivision

The concept of a "subdivision" obviously is one of the basic underpinnings of the Subdivision Map Act. The Act therefore defines "subdivision." It also provides a mechanism for determining the legality of a previously established subdivision.

[18] The Act currently defines "subdivision" as "the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale, lease or financing, whether immediate or future." (Gov.Code, § 66424.) "Subdivision" thus generally refers to a *division* of land for sale, lease, or financing. (Cf., *Hirsch v. City of Mountain View* (1976) 64 Cal.App.3d 425, 432, 134 Cal.Rptr. 519 [consolidation of six parcels into a single, larger lot could constitute a subdivision of land, for purposes of imposing subdivision fees, given landowners' goal of increased density through consolidation].) The Act's current definition of "subdivision" is not based on the number of parcels resulting from the land division; a division into as few as two parcels now constitutes a subdivision under the Act.[FN6]

> FN6. Although the statutory definition no longer distinguishes between subdivisions based on their size, other provisions of the Map Act do. Among other things, as a general rule, "a subdivision of five or more parcels requires a tentative and a final map; a subdivision of four or fewer requires just a parcel map." (Curtin & Merritt, Subdivision Map Act Manual, *supra,* p. 5.)

**760 Prior to 1974, by contrast, the statutory definition of a subdivision expressly applied only to divisions that resulted in five or more parcels. (See

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                    Page 18
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

*566 Bus. & Prof.Code, former § 11535, subd. (a), added by Stats.1943, ch. 128, § 1, p. 867; *Stell v. Jay Hales Development Co.* (1992) 11 Cal.App.4th 1214, 1224, 15 Cal.Rptr.2d 220;55 Ops.Cal.Atty.Gen. 414, 417 (1972).) The prior Subdivision Map Act thus did not cover land divisions that created four or fewer parcels. (*Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at p. 1224, 15 Cal.Rptr.2d 220.) But those smaller divisions nevertheless were subject to regulation by local ordinance. (See Bus. & Prof.Code, former § 11540.1, as enacted by Stats.1949, ch. 1100, § 1, p.2001; *Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at p. 1224, 15 Cal.Rptr.2d 220.)

In this case, under then current law, Weis's 1970 three-parcel land division was not subject to the Subdivision Map Act. (Bus. & Prof.Code, former § 11535, subd. (a).) But it was subject to a local ordinance, Santa Clara County Ordinance Code, former section 12.2.3. As noted above, that local provision allowed certain land divisions involving four or fewer parcels to be exempt from regulation.

In order to be valid, a subdivision must be "in compliance with or exempt from" any applicable subdivision law or ordinance "in effect at the time the subdivision was established." (Gov.Code, § 66499.30, subd. (d).) A certificate of compliance establishes the validity of a prior land division. (See Gov.Code, § 66499.35; *Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at p. 1227, 15 Cal.Rptr.2d 220; see also, e.g., *Lakeview Meadows Ranch v. County of Santa Clara* (1994) 27 Cal.App.4th 593, 600, 32 Cal.Rptr.2d 615 [landowner entitled to certificates of compliance as a matter of law, where its parcels were lawfully created prior to enactment of any subdivision laws]; see generally Curtin & Merritt, Subdivision Map Act Manual, *supra,* pp. 74-75.) In this case, van't Rood submitted an application for a certificate of compliance, which he later withdrew.

b. Merger

[19] "Merger refers to the combination of two lots in common ownership...." (9 Miller & Starr, Cal. Real Estate (3d ed. 2001) Subdivisions, § 25:149, p. 367.) In this case, the trial court concluded that petitioners' preexisting parcels were merged as a result of the 1970 parcel map. In reaching that conclusion, the court relied on the tie-in marks shown on the map and on the fact that the map shows only three parcels.[FN7] To determine whether the **761 trial *567 court erred in concluding that the properties were merged, we first consider the Subdivision Map Act's merger provisions.

> FN7. According to some of the witnesses in this case, the tie-in marks signify only common ownership. For example, attorney Robert Merritt testified that such marks on subdivision and parcel maps generally mean that "the parcels are in common ownership." Surveyor and engineer Warren McDowell testified that "a hook would be used ... to show the [existing] ownership." And surveyor Earl Cross testified "that, in the surveying and engineering world," tie-in marks are "drafting symbols that show common ownership." Cross added that "they don't serve any purpose as to the result of the parcel map itself."

> But other witnesses testified that the tie-in marks demonstrate merger, when taken in the context of the parcel map. According to County planning department employee Zachary Carter: "The Subdivision Map Act says there must be intent to merge. And with the crow's feet and the total acreage and the total area called as parcel two, I would have to say that that would then be intent to merge." And former County planning department employee Arthur Pion testified: "Those we consider tie lines. And what the message is is that the adjoiners are to be a part of the parcels that are shown. And so they tie, well, the adjoining parcels,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and leave a message that that was really what the final map was to look like."

The Subdivision Map Act has contained express merger provisions since 1976. (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 752, 29 Cal.Rptr.2d 804, 872 P.2d 143; see Gov.Code, § 66451.10 et seq.) According to one commentator: "The subject of merger and anti-merger has had a tortuous history of successive statutes...." (9 Miller & Starr, Cal. Real Estate, *supra,* § 25:149, p. 367.) Under the original 1976 merger provision, merger of substandard parcels was automatic. (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 755, 29 Cal.Rptr.2d 804, 872 P.2d 143, discussing Gov.Code, former § 66424.2, Stats.1976, ch. 928, § 4, p. 2120.) "The 1977 amendment replaced the provision for automatic merger with one authorizing local agencies to adopt the merger provisions by ordinance. The ordinance could also deem any automatically merged parcels to be unmerged. (Stats.1977, ch. 234, § 5, p. 1034.) In 1980, all parcels merged by operation of law (under the 1976 statute) and not deemed merged by ordinance were automatically deemed unmerged. (Stats.1980, ch. 402, § 2, p. 788; *id.,* ch. 1217, §§ 2-3, p. 4127.)" (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 755, 29 Cal.Rptr.2d 804, 872 P.2d 143.) The current merger provisions were enacted in 1983 and amended over the next three years. (*Ibid.*) The legislation enacted in the 1980's operated to "clarify and 'unmerge' contiguous parcels where local agencies had not elected to pursue the notice and hearing option previously provided by the Act."(*Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at p. 1226, 15 Cal.Rptr.2d 220.)

[20] The Act's current merger provisions "appear to reflect two overall concerns. First, they provide landowners with elaborate procedural safeguards of notice and opportunity to be heard before their lots can be involuntarily merged." (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 752, 29 Cal.Rptr.2d 804, 872 P.2d 143.) Second, they re-

veal "*a state concern over local regulation of parcel merger for purposes of development*" as well as for purposes of sale, lease, or financing. (*Ibid.*)

*Automatic Merger*

[21] Under the Act's merger provisions, "contiguous parcels of land are not automatically merged by virtue of being held by the same owner." *568(Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 731, 29 Cal.Rptr.2d 804, 872 P.2d 143; accord, *Lakeview Meadows Ranch v. County of Santa Clara, supra,* 27 Cal.App.4th at p. 600, 32 Cal.Rptr.2d 615; see Gov.Code, § 66451.10.) Prior to the Legislature's first adoption of merger provisions in 1976, there was no statutory authority for merger by operation of law through common ownership. (*Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at pp. 1224-1225, 15 Cal.Rptr.2d 220.)

*Involuntary Merger*

The "concept of the involuntary merger of contiguous parcels in common ownership ... originated with a 1973 opinion of the California Attorney General (56 Ops.Cal.Atty.Gen. 509 (1973))...."(*Gomes v. County of Mendocino, supra,* 37 Cal.App.4th at pp. 987-988, 44 Cal.Rptr.2d 93, fn. omitted.) The Attorney General's opinion in turn relied on a decision of the California Supreme Court, *Hill v. City of Manhattan Beach* (1971) 6 Cal.3d 279, 98 Cal.Rptr. 785, 491 P.2d 369. (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 753, 29 Cal.Rptr.2d 804, 872 P.2d 143.) The Legislature responded to those authorities by enacting and later amending various parcel merger provisions. **762(*Gomes v. County of Mendocino, supra,* 37 Cal.App.4th at p. 988, 44 Cal.Rptr.2d 93.) "All of that legislation begins with a general negation of automatic parcel merger by virtue of common ownership, followed by a delineation of particular circumstances and conditions under which merger *will* take place." (*Morehart v.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                    Page 20
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

*County of Santa Barbara, supra,* 7 Cal.4th at p. 755, 29 Cal.Rptr.2d 804, 872 P.2d 143.)

The Act now provides a mechanism for involuntary mergers, which may be initiated by local governments under specified circumstances. For example, one provision permits the involuntary merger of parcels that were created in violation of subdivision laws and ordinances applicable at the time of their creation. (Gov.Code, § 66451.11, subd. (b)(2); *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 761, 29 Cal.Rptr.2d 804, 872 P.2d 143.) Another provision permits local governments to compel involuntary mergers under specified circumstances when at least one of the parcels is substandard under the local zoning ordinance. (Gov.Code, § 66451.11, subd. (a); *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 757, 29 Cal.Rptr.2d 804, 872 P.2d 143.)

Such involuntary mergers may be accomplished "only in accordance with the authority and procedures" prescribed in the Act. (Gov.Code, § 66451.10, subd. (b).) "Under the Act, a merger of parcels is initiated by recorded notice to the owner of an intention to determine status." (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 757, 29 Cal.Rptr.2d 804, 872 P.2d 143; see Gov.Code, § 66451.12.) In addition to notice, another key safeguard under the statute is the opportunity to be heard. (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 757, 29 Cal.Rptr.2d 804, 872 P.2d 143; see Gov.Code, § 66451.14.)

*\*569 Voluntary Merger*

[22] Of course, a landowner may seek to voluntarily merge its parcels. (See, e.g., *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 751, 29 Cal.Rptr.2d 804, 872 P.2d 143.) According to County, the merger effected by the 1970 parcel map was a voluntary one, initiated and accomplished by Weis on behalf of himself and his neighbors. For his part, van't Rood complains that the affected neighbors did not consent to the merger.

[23] To the extent a landowner's voluntary merger application affects other property owners, their acknowledgement and consent is required. In the current version of the Subdivision Map Act, the consent requirement applies both to final maps and to parcel maps. According to the statute: "No final map or parcel map required by this chapter or local ordinance which creates a subdivision shall be filed with the local agency without the written consent of all parties having any record title interest in the real property proposed to be subdivided, except as otherwise provided in this division." (Gov.Code, § 66430.) This is the County's current local practice as well, according to testimony at trial.

In 1970, however, the consent requirement applied only to final maps. According to the statute then in place: "A certificate, signed and acknowledged by all parties having any record title interest in the land subdivided, consenting to the preparation and recordation of the final map is required." (Bus. & Prof.Code, former § 11589, added by Stats.1943, ch. 128, § 1, p. 872; see also Bus. & Prof.Code, former § 11625, added by Stats.1943, ch. 128, § 1, p. 876 [requiring the subdivider to present evidence of consent as a prerequisite to recording final map].)

The County's position is that the 1970 parcel map is valid because it complied **\*\*763** with the then current statutory requirements for consent. But as the County acknowledges, even absent statutory compulsion, there are constitutional due process requirements.

C. Due Process

[24][25][26] "Due process principles require reasonable notice and opportunity to be heard before governmental deprivation of a significant property interest. [Citations.]" (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612, 156 Cal.Rptr. 718, 596 P.2d 1134.) These requirements "are not rooted in statute but are compelled by the stronger force of constitutional principle." (*Id.* at p. 616, 156

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:07-cv-04371-JSW    Document 104-4    Filed 08/22/2008    Page 32 of 56

113 Cal.App.4th 549                                                                    Page 21
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

Cal.Rptr. 718, 596 P.2d 1134.) Thus, "even though notice and hearing requirements for parcel maps are not specifically set forth in the Map Act, such constitutional prerequisites must be followed. [Citation.]" (Curtin & Merritt, Subdivision Map Act Manual, *supra*, p. 69, citing *Horn v. County of Ventura, supra*, 24 Cal.3d 605, 156 Cal.Rptr. 718, 596 P.2d 1134.)

[27][28] *570 "Land use decisions that affect property rights of adjacent landowners require procedural due process for the adjacent landowners as well as for the applicants. [Citation.]" (*Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 558, 35 Cal.Rptr.2d 782, fn. omitted, citing *Horn v. County of Ventura, supra*, 24 Cal.3d at pp. 615-616, 156 Cal.Rptr. 718, 596 P.2d 1134.) Thus, "whenever approval of a tentative subdivision map will constitute a substantial or significant deprivation of the property rights of other landowners, the affected persons are entitled to a reasonable notice and an opportunity to be heard before the approval occurs." (*Horn v. County of Ventura, supra*, 24 Cal.3d at p. 616, 156 Cal.Rptr. 718, 596 P.2d 1134.)

According to the County, "Weis had ample procedural due process in the parcel map process" and "the constitutionally sufficient notice and opportunity to be heard provided to Weis was imputed as a matter of law to [Pereira/Vargas] and Pacheco." That is so, the County asserts, because "[Pereira/Vargas] and Pacheco gave 'actual authority' to Weis as their agent to take whatever steps were necessary to complete the County's land division procedure, including filing the parcel map."

To evaluate that assertion, we consider whether the record supports the trial court's agency determination.

II. Agency

We begin by setting forth the relevant principles of agency law. We then apply those principles to the

undisputed facts of this case.

A. Legal Principles

1. Definitions; Actual and Ostensible Agency

"An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." (Civ.Code, § 2295.) "An agency is either actual or ostensible." (Civ.Code, § 2298.) "An agency is actual when the agent is really employed by the principal." (Civ.Code, § 2299.) "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ.Code, § 2300.)

Here, the trial court made a finding that Weis was the actual agent of Pereira/Vargas and Pacheco; it did not find ostensible agency.[FN8]

> FN8. As the trial court explained in its statement of decision: "The court finds that WEIS was the actual agent of PACHECO and [PEREIRA/]VARGAS and that PACHECO and [PEREIRA/]VARGAS authorized WEIS to do what was reasonably necessary to obtain approval from the COUNTY OF SANTA CLARA to be able to convey the respective parcels to them to increase their pasture land. Therefore, knowledge of the 1970 parcel map is imputed to PACHECO and [PEREIRA/]VARGAS as a matter of law."
>
> The trial court previously made a tentative determination of ostensible agency, which it apparently abandoned after objection by van't Rood.

**764 *571 2. Creation

[29][30][31] Actual agency typically arises by express agreement. (See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency & Employment, § 36,

pp. 49-50; see also, e.g., *Naify v. Pacific Indemnity Co.* (1938) 11 Cal.2d 5, 12, 76 P.2d 663 [actual agency must rest on agreement or consent].) It also "may be implied from the conduct of the parties. [Citation.]" *(Thayer v. Pacific Elec. Ry. Co.* (1961) 55 Cal.2d 430, 438, 11 Cal.Rptr. 560, 360 P.2d 56.) Where the agreement to create an agency is express, it "may be oral, except where the agency is to enter into a contract required by law to be in writing, in which case the authorization must be in writing under the 'equal dignities rule.' [Citations.]" (2 Witkin, Summary of Cal. Law, *supra*, Agency & Employment, § 36, p. 50, italics omitted; see Civ.Code, § 2309.)

[32] " 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' [Citation.] 'The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.' [Citation.]" *(Edwards v. Freeman* (1949) 34 Cal.2d 589, 592, 212 P.2d 883, quoting Restatement, Agency, § 1.) Thus, the "formation of an agency relationship is a bilateral matter. Words or conduct by both principal and agent are necessary to create the relationship...."*(Hanks v. Carter & Higgins of Cal., Inc.* (1967) 250 Cal.App.2d 156, 163, 58 Cal.Rptr. 190.)

[33][34] An actual agency also may be created by ratification. (Civ.Code, § 2307; see 2 Witkin, Summary of Cal. Law, *supra*, Agency & Employment, § 39, pp. 51-52.) But "ratification can be made only in the manner that would have been necessary to confer an original authority for the act ratified...." (Civ.Code, § 2310.) Thus, where the equal dignities rule applies, it requires formal, written ratification. *(Ibid.*; see, generally, 2 Witkin, Summary of Cal. Law, *supra*, Agency & Employment, § 88, pp. 88-89.) Where a writing is not required, a principal may ratify an agency "by accepting or retaining the benefit of the act, with notice thereof." (Civ.Code,

§ 2310.) But "ratification is possible only when the person whose unauthorized act is to be accepted purported to act as agent for the ratifying party." (2 Witkin, Summary of Cal. Law, *supra*, Agency & Employment, § 39, p. 52, italics omitted.)

*572 3. Control

[35] "In the absence of the essential characteristic of the right of control, there is no true agency...."*(Edwards v. Freeman, supra,* 34 Cal.2d at p. 592, 212 P.2d 883; see also, e.g., *Emery v. Visa Internat. Service Assn., supra,* 95 Cal.App.4th at p. 960, 116 Cal.Rptr.2d 25 [no evidence "that VISA exercised a right to control the lottery merchants so as to create an agency by conduct"]; *St. Paul Ins. Co. v. Industrial Underwriters Ins. Co.* (1989) 214 Cal.App.3d 117, 123, 262 Cal.Rptr. 490 [insufficient evidence that automobile dealership had the right to control potential buyer during test drive].)

**765 [36][37] "The fact that parties had a preexisting relationship is not sufficient to make one party the agent for the other.... [Citation.] An agency is proved by evidence that the person for whom the work was performed had the right to control the activities of the alleged agent. [Citation.]" *(Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 983, 21 Cal.Rptr.2d 834; see also, e.g., *Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 826, 106 Cal.Rptr.2d 689 [indicia of agency relationship include right to control].) By the same token, "[a] person does not become the agent of another simply by offering help or making a suggestion." *(Violette v. Shoup, supra,* 16 Cal.App.4th at p. 620, 20 Cal.Rptr.2d 358.) Our high court long ago rejected the notion that "one who performs a mere favor for another, without being subject to any legal duty of service and without assenting to any right of control, can be an agent." *(Edwards v. Freeman, supra,* 34 Cal.2d at pp. 591-592, 212 P.2d 883.) "Control may not be inferred merely from the fact that one person's act benefits another. [Citation.]" *(St. Paul Ins. Co.*

113 Cal.App.4th 549                                                                                  Page 23
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

*v. Industrial Underwriters Ins. Co., supra,* 214 Cal.App.3d at p. 123, 262 Cal.Rptr. 490.)

4. Authority

An actual agent may have either actual or ostensible authority to act for the principal. (See Civ.Code, § 2315; 2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 75, p. 79.) "Actual authority is such as a principal intentionally confers upon an agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess. (Civ.Code, § 2316.) Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess. (Civ.Code, § 2317.) An agent will normally have the authority to do everything necessary or proper and usual in the ordinary course of business for effecting the purpose of his agency. (Civ.Code, § 2319.) Authority may be granted to an agent either by a precedent authorization or a subsequent ratification. (Civ.Code, § 2307.)" (*Ripani v. Liberty Loan Corp.* (1979) 95 Cal.App.3d 603, 611, 157 Cal.Rptr. 272.)

[38][39] *573 "[P]ersons dealing with an assumed agent are bound at their peril to ascertain the extent of the agent's authority. [Citation.]" (*Lindsay-Field v. Friendly* (1995) 36 Cal.App.4th 1728, 1734, 43 Cal.Rptr.2d 71; see also *Ernst v. Searle* (1933) 218 Cal. 233, 240, 22 P.2d 715.) A principal cannot be held when an actual agent acts beyond the scope of his actual or ostensible authority. (*Ernst v. Searle, supra,* 218 Cal. at p. 238, 22 P.2d 715; cf., *Chartered Bank of London v. Chrysler Corp.* (1981) 115 Cal.App.3d 755, 763, 171 Cal.Rptr. 748 [purported agent had no actual or ostensible authority to sell boat until purchase price was paid]; see, generally, 2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 78, pp. 80-81.)

[40][41] Within the scope of his authority, "notice to an agent is notice to the principal...."(*Watson v. Sutro* (1890) 86 Cal. 500, 516, 24 P. 172.) Thus, " 'one who acts through another will be presumed

to know all that the agent learns during the transaction, whether it is actually communicated to him or not.' " (*Id.* at p. 517, 24 P. 172.) "There is no difference in this respect between actual and constructive notice." (*Shapiro v. Equitable Life Assur. Soc.* (1946) 76 Cal.App.2d 75, 87, 172 P.2d 725.) But the knowledge imputed to a principal is limited to that acquired by the agent within the scope of his authority. (*Triple A Management Co. v. Frisone* (1999) 69 Cal.App.4th 520, 535, 81 Cal.Rptr.2d 669; *Redman v. Walters* (1979) 88 Cal.App.3d 448, 454, 152 Cal.Rptr. 42.) **766 "Authority in a particular case is interpreted in accordance with the usual rules for interpretation of contracts. [Citations.]" (2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 79, p. 81, italics omitted.)

5. Proof

[42][43] "Proof of an agency relationship may be established by 'evidence of the acts of the parties and their oral and written communications.'[Citations.]" (*Magnecomp Corp. v. Athene Co., supra,* 209 Cal.App.3d at p. 536, 257 Cal.Rptr. 278.) Proof of authority, either actual or ostensible, likewise may be established by circumstantial evidence. (*Ripani v. Liberty Loan Corp., supra,* 95 Cal.App.3d at p. 611, 157 Cal.Rptr. 272.)

B. Application

Guided by these principles of agency law, we consider whether the evidentiary record supports the trial court's determinations.

1. Trial Court's Agency Determinations

On the question of the existence and nature of an agency relationship, the trial court determined that Weis was the actual (not ostensible) agent of *574 Pereira/Vargas and of Pacheco. With respect to the scope of Weis's authority, the court concluded that Weis had authority from Pereira/Vargas and from

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                                                          Page 24
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

Pacheco to do whatever was "reasonably necessary" to obtain the County's approval so that they could purchase additional land from him.

### 2. Proof

The evidence of Weis's relationship with each of his neighbors is different. For that reason, we separately examine the evidence of agency and authority as it relates to each neighbor.

#### a. Pacheco

[44] The only evidence of an agency relationship between Weis and Pacheco is in their 1970 real estate sales contract, which provides that Weis is "to ... complete lot split procedure." With Weis and Pacheco both dead, there was no testimony at trial concerning any oral communications between them. And apart from the contract itself, there is no evidence of any conduct by Pacheco indicating that he conferred any authority on Weis to deal with his property. The written contract thus stands alone as the only evidence of the existence and scope of any agency relationship between Weis and Pacheco.

For purposes of our analysis here, we assume (without deciding) that the parties' agreement that Weis would "complete [the] lot split procedure" created an actual agency, and we turn to the question of the scope of Weis's authority. We interpret the express authority granted by the parties' 1970 agreement by resort to the usual rules for contract interpretation. (2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 79, p. 81.) Because no conflicting extrinsic evidence was admitted to explain the contract's meaning, its interpretation presents a question of law for our independent review. (*WYDA Associates v. Merner, supra,* 42 Cal.App.4th at p. 1710, 50 Cal.Rptr.2d 323.)

First, we discern no factual basis for finding actual authority. (See Civ.Code, § 2316 ["Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care,

allows the agent to believe himself to possess"].) In our view, nothing in the 1970 contract provision directing Weis to complete the "lot split procedure" can be construed as a grant of authority to effect a merger of Pacheco's preexisting parcels or to deal with those properties in any other fashion. (See *Ernst v. Searle, supra,* 218 Cal. at p. 240, 22 P.2d 715 [real **767 estate agent, who had actual authority to negotiate a property exchange, did not have actual authority to convey the property]; *Mason v. Mazel* (1947) 82 Cal.App.2d 769, 773, 187 P.2d 18 [real estate agent, who had "exclusive right to sell" property, did not have actual authority to enter binding contract for sale].) Moreover, we find nothing in *575 that provision that would warrant Weis in believing he had such authority. (See *Mannion v. Campbell Soup Co.* (1966) 243 Cal.App.2d 317, 323, 52 Cal.Rptr. 246.) In short, there is no evidence of actual authority.

Second, we find no proof of ostensible authority. (See Civ.Code, § 2317 ["Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess"].) There is no evidence of conduct on Pacheco's part that would justify a belief on the County's part that Weis was authorized to merge or otherwise affect Pacheco's preexisting property. (See *Ernst v. Searle, supra,* 218 Cal. at p. 240, 22 P.2d 715 [real estate agent, who had actual authority to negotiate a property exchange, did not have ostensible authority to convey the property].)

In sum, even assuming an actual agency relationship between Weis and Pacheco, there is no evidence to support the trial court's conclusion that Weis's authority extended to land that Pacheco already owned.

#### b. Pereira/Vargas

[45] Unlike the Pacheco contract, Weis's 1970 real estate sales contract with Pereira/Vargas did not expressly provide that he would complete the lot split.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                    Page 25
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

Thus, there is no documentary evidence of an actual agency relationship.

The only proof of actual agency was the trial testimony of both Pereira and Vargas concerning oral communications between Weis and them. Vargas testified only to his understanding that Weis "would take care of the paperwork" for the land division.FN9 Pereira testified that he never had a *576 conversation with Weis about his dealings with the County.FN10 Nothing in the **768 testimony of Pereira or Vargas suggests either that they assented to representation by Weis or that they had any right to control his activities with the County. Both assent and control are necessary predicates to establishing an actual agency relationship. (*Edwards v. Freeman, supra,* 34 Cal.2d at p. 591, 212 P.2d 883.)

> FN9. Vargas testified on direct examination as follows:
>
> "Q: Did you enter into a contract to purchase this parcel, the three and a half acres, from Mr. Weis?
>
> "A. Yes, we did.
>
> "Q. Did Mr. Weis inform you that he was processing some sort of approval through the County of Santa Clara for that lot?
>
> "A. Said he would take care of the paperwork.
>
> "Q. Now, let me go back over that. Is that a quote that you just gave us, that he would take care of the paperwork?
>
> "A. Well, we assumed he would take care of the paperwork. That was-
>
> "Q. Did he describe to you what the paperwork was?
>
> "A. No, he didn't, no."

Vargas then gave the following testimony on cross-examination:

> "Q. During the time that Mr. Weis was working with the county for the property division, it's my understanding that you didn't have any involvement in any of that paperwork that Mr. Weis was working on; is that right?
>
> "A. Correct.
>
> "Q. And that was based on the agreement that Mr. Weis would take care of that paperwork?
>
> "A. Right.
>
> "Q. When you bought the property from Mr. Weis in 1970, it's accurate that you never had a discussion about whether it was going to be separate property or combined property specifically at the time; is that right?
>
> "A. We were buying it as a separate parcel. I mean, no, there was never any discussion as far as combining or anything, no."

FN10. Pereira testified on cross-examination as follows:

> "Q: Mr. Pereira, when you agreed to buy the property, did you talk to Mr. Weis at all about going down to the county with him to do whatever was necessary to effect the property division?
>
> "A: I don't think we ever had a conversation about going to the county for anything.
>
> "Q: Did Mr. Weis ever mention to you that he was going down there to accomplish the land division that he needed to do to sell you the property?

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                          Page 26
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

"A: Never did talk about anything like that.

"Q: Was it your assumption that he would do whatever was necessary to sell off the property?

"A. Just took it for granted everything was fine....

"Q. And did you trust Mr. Weis to do whatever was necessary to carry out the property transaction?

"A. I always though he was a real honest man."

In short, there is no evidence in the record to support a finding of actual agency between Weis and Pereira/Vargas.[FN11]

> FN11. Because we conclude that the evidence does not support a finding of agency, we need not and do not reach the question of whether any such agency would require a writing under the " 'equal dignities rule.' " (Cf., *Clifton Cattle Co. v. Thompson* (1974) 43 Cal.App.3d 11, 17, 117 Cal.Rptr. 500.)

3. Conclusion

Weis lacked the authority to deal with land that Pacheco and Pereira/Vargas already owned. He thus lacked authority to bind them to the merger of their properties apparently effected by the 1970 parcel map.

Given Weis's lack of authority, the 1970 parcel map is not valid as voluntary merger. As explained above, the map likewise is not valid as an involuntary merger, because Pereira/Vargas and Pacheco were not afforded constitutionally required procedural safeguards.

III. Exclusion

[46] That brings us to the ultimate question to be resolved, whether petitioners met the statutory requirements for exclusion of their property from the 1970 *577 map. Those requirements are that "the petitioners produce to the court satisfactory evidence of the necessity of the exclusion of the real property" and "that there is no reasonable objection to making such exclusion." (Gov.Code, § 66499.25.)In this case, the trial court concluded that petitioners failed to meet either prong of the statutory requirements.

A. Necessity

The court found no necessity to exclude, observing: "Petitioners have valid title to the property they purchased, and enjoy property ownership which is consistent with the legally filed and recorded 1970 parcel map."

We disagree. First, petitioners have asserted an impairment of their property rights. While it is true that they have title to the property they purchased in 1970, the parcel map stripped petitioners of the benefits of owning that land as a separate parcel; it also merged their preexisting properties, with the same effect-loss of potential development rights. (See, e.g., *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 833, fn. 2, 107 S.Ct. 3141, 97 L.Ed.2d 677 [right to develop property, subject to legitimate permitting requirements]; cf., *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 514, 518, 125 Cal.Rptr. 365, 542 P.2d 237 [recognizing potential diminution in value as a result of zoning, but rejecting argument that it constitutes an impermissible taking].) Second, the 1970 parcel is not valid. The map **769 cannot legally effect either a voluntary merger (because of the lack of Weis's authority to bind his neighbors) or an involuntary merger (because of the lack of due process). Petitioners apparently have no other remedy for releasing their property from the operation of the invalid map, which has impaired their property rights.

We conclude that petitioners have demonstrated the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

113 Cal.App.4th 549                                                                                            Page 27
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal. Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R. 12,603

requisite necessity for exclusion from the map.

B. No Reasonable Objection

The trial court found the County's objections to ex-
clusion reasonable, "because granting the petition
for exclusion would be in violation of the current
zoning regulations and in violation of the 1970 par-
cel map." The court also cited the County's general
authority to control orderly development, adding:
"To rule in favor of petitioners would be disruptive
of the entirety of the zoning plan that the com-
munity has enacted."

Again, we disagree. First, the fact that granting the
petition for exclusion would violate the 1970 parcel
map is not a reasonable basis for objection, given
our determination that the map is invalid to the ex-
tent it *578 purports to merge petitioners' proper-
ties. We also observe that whenever relief is gran-
ted under this statute, it necessarily will be "in viol-
ation" of the map from which exclusion is sought.
Second, as to the zoning issue, we acknowledge
that orderly community development is an import-
ant goal of the Subdivision Map Act. (See, e.g.,
Curtin & Merritt, Subdivision Map Act Manual,
supra, p. 1.) But the protection of individual real
estate buyers, such as petitioners, is another import-
ant statutory goal. (Ibid.) More importantly, the im-
pact on zoning and community development must
be measured against the ordinances, standards, and
policies in effect at time of the land division, rather
than against current regulations and standards. (Cf.,
Gov.Code, § 66474.2, subd. (a) [only existing
policies apply to tentative map approvals]; Bright
Development v. City of Tracy (1993) 20
Cal.App.4th 783, 800, 24 Cal.Rptr.2d 618 [city
could not apply policy that was not in effect at the
time tentative map application was deemed com-
plete]; Robertson v. Nichols (1949) 92 Cal.App.2d
201, 205, 206 P.2d 898 [validity of restrictions as-
sessed in light of conditions at the time they were
imposed].) The zoning at the time of the 1970 land
division was one-acre minimum. Changes in zoning
since that time do not constitute a reasonable basis

for objection to exclusion.

Under the circumstances presented here, and on this
record, there is no reasonable objection to exclu-
sion.

CONCLUSION

The 1970 parcel is invalid to the extent it purports
to merge properties belonging to petitioners. The
map cannot legally effect a voluntary merger, be-
cause Weis lacked authority to bind his neighbors.
It cannot legally effect an involuntary merger, be-
cause of the lack of due process afforded Pereira/
Vargas and Pacheco.

Given the map's invalidity and the other circum-
stances of this case, this record demonstrates both
the requisite necessity for exclusion from the map
and the lack of any reasonable objection.

DISPOSITION

[47] We reverse the judgment and remand the mat-
ter to the trial court with instructions to grant the
petition to exclude the petitioners' properties from
the 1970 parcel map. This decision applies to
Pereira and Vargas as well as van't Rood, notwith-
standing the fact that they did not join in appealing
the judgment. **770(Estate of McDill (1975) 14
Cal.3d 831, 841, 122 Cal.Rptr. 754, 537 P.2d 874.)
Appellant, van't Rood, shall have his costs on ap-
peal.

WE CONCUR: PREMO, Acting P.J., and ELIA, J.
Cal.App. 6 Dist.,2003.
Van't Rood v. County of Santa Clara
113 Cal.App.4th 549, 6 Cal.Rptr.3d 746, 03 Cal.
Daily Op. Serv. 10,052, 2003 Daily Journal D.A.R.
12,603

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 10

## California Code

- California Code
- CALIFORNIA CIVIL CODE
- DIVISION 3. OBLIGATIONS
- PART 2. CONTRACT
- TITLE 3. INTERPRETATION OF CONTRACTS

§ 1637 Civ.

For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this Chapter are to be applied.

(Enacted 1872.)

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT 11

## California Code

**California Code**
**CALIFORNIA CIVIL CODE**
**DIVISION 3. OBLIGATIONS**
**PART 2. CONTRACT**
**TITLE 3. INTERPRETATION OF CONTRACTS**

§ 1638 Civ.

The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.

(Enacted 1872.)

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT 12

# California Code

- California Code
- CALIFORNIA CIVIL CODE
- DIVISION 3. OBLIGATIONS
- PART 2. CONTRACT
- TITLE 3. INTERPRETATION OF CONTRACTS

§ 1639 Civ.

When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title.

(Enacted 1872.)

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT 13

# California Code

- **California Code**
- **CALIFORNIA CIVIL CODE**
- **DIVISION 3. OBLIGATIONS**
- **PART 2. CONTRACT**
- **TITLE 3. INTERPRETATION OF CONTRACTS**

§ 1644 Civ.

  The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.

(Enacted 1872.)

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT 14

# California Code

- **California Code**
- **CALIFORNIA CIVIL CODE**
- **DIVISION 3. OBLIGATIONS**
- **PART 2. CONTRACT**
- **TITLE 3. INTERPRETATION OF CONTRACTS**

§ 1647 Civ.

A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.

(Enacted 1872.)

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT 15

# California Code

📁 **California Code**
📁 **CALIFORNIA CIVIL CODE**
📁 **DIVISION 3. OBLIGATIONS**
📁 **PART 2. CONTRACT**
📁 **TITLE 3. INTERPRETATION OF CONTRACTS**

§ 1654 Civ.

In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

(Amended by Stats. 1982, Ch. 1120, sec. 1.)

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT 16

## California Code

🗀 **California Code**
🗀 **CALIFORNIA EVIDENCE CODE**
🗀 **DIVISION 5. BURDEN OF PROOF; BURDEN OF PRODUCING EVIDENCE; PRESUMPTIONS AND INFERENCES**
🗀 **Chapter 3. Presumptions and Inferences**
🗀 **Article 2. Conclusive Presumptions**

§ 623 Evid.

   Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it.

(Enacted by Stats. 1965, Ch. 299.)

Copyright © 2008 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT 17

# SUMMARY OF CALIFORNIA LAW

## Tenth Edition

## by B. E. WITKIN

*and members of the*

## WITKIN LEGAL INSTITUTE

### Volume 13



*2005*

(g) All parties approached the problem on an all-or-nothing basis. Had the insurers claimed equitable contribution rather than equitable subrogation, and established the kind and amount of insurance coverage that would have satisfied S's contractual obligation, they might have been successful. (256 C.A.2d 517.) (See *California Food Service Corp. v. Great Amer. Ins. Co.* (1982) 130 C.A.3d 892, 898, 900, 182 C.R. 67 [following *Patent Scaffolding*]; *Bramalea Calif. v. Reliable Interiors* (2004) 119 C.A.4th 468, 475, 14 C.R.3d 302 [same]; *Fireman's Fund Ins. Co. v. Wilshire Film Ventures* (1997) 52 C.A.4th 553, 556, 60 C.R.2d 591, supra, §184 [approving result, but not reasoning, of *Patent Scaffolding*].)

## IX.  EQUITABLE ESTOPPEL

### A.  In General.

#### 1.  [§190]  Nature of Doctrine.

(1) *In General.* Equitable estoppel, also called estoppel in pais, estoppel by conduct, and estoppel by misrepresentation, arises from declarations or conduct of the party estopped. "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (Ev.C. 623; see *Calistoga Nat. Bank v. Calistoga Vineyard Co.* (1935) 7 C.A.2d 65, 72, 46 P.2d 246; *Wilk v. Vencill* (1947) 30 C.2d 104, 107, 180 P.2d 351; *Klein v. Farmer* (1948) 85 C.A.2d 545, 552, 194 P.2d 106; 28 Am.Jur.2d (2000 ed.), Estoppel and Waiver §27 et seq.; Cal. Civil Practice, 3 Business Litigation, §32:6 et seq.)

(2) *Doctrine Acts Defensively.* "The doctrine acts defensively only. It operates to prevent one from taking an unfair advantage of another but not to give an unfair advantage to one seeking to invoke the doctrine." (*Peskin v. Phinney* (1960) 182 C.A.2d 632, 636, 6 C.R. 389 [doctrine cannot be used to overcome the out of pocket loss rule of damages for fraud (see 6 *Summary* (10th), *Torts,* §1710)]; *Green v. Travelers Indem. Co.* (1986) 185 C.A.3d 544, 555, 230 C.R. 13; *In re Marriage of Umphrey* (1990) 218 C.A.3d 647, 659, 267 C.R. 218 [husband was not estopped to dispute separation date stated in agreement; application of doctrine might inequitably convert husband's separate property into community asset].)

*West's Key Number Digest,* Estoppel ⊕52 et seq.

#### 2.  [§191]  Elements of Claim.

(1) *In General.* A valid claim of equitable estoppel consists of the following elements: (a) a representation or concealment of material facts

(b) made with knowledge, actual or virtual, of the facts (c) to a party ignorant, actually and permissibly, of the truth (d) with the intention, actual or virtual, that the ignorant party act on it, and (e) that party was induced to act on it. (See *Wood v. Blaney* (1895) 107 C. 291, 295, 40 P. 428; *Seymour v. Oelrichs* (1909) 156 C. 782, 795, 106 P. 88; *Los Angeles v. Babcock* (1929) 102 C.A. 571, 577, 283 P. 314; *Banco Mercantil, S.A. v. Sauls* (1956) 140 C.A.2d 316, 323, 295 P.2d 55; *California Milling Corp. v. White* (1964) 229 C.A.2d 469, 479, 40 C.R. 301, quoting the text; *Domarad v. Fisher & Burke* (1969) 270 C.A.2d 543, 555, 76 C.R. 529 [elements established]; *Long Beach v. Mansell* (1970) 3 C.3d 462, 489, 91 C.R. 23, 476 P.2d 423, infra, §§192, 199; *Baillargeon v. Department of Water & Power* (1977) 69 C.A.3d 670, 679, 138 C.R. 338 [elements were established]; *Lemat Corp. v. American Basketball Assn.* (1975) 51 C.A.3d 267, 276, 124 C.R. 388 [corporate contract was invalid for lack of authorization by directors; corporation was estopped to challenge validity where benefits of contract were retained]; *Division of Labor Law Enforcement v. Transpacific Trans. Co.* (1979) 88 C.A.3d 823, 828, 829, 152 C.R. 98 [employer's representation that annual bonus would be paid to employee was material inducement to accepting employment and remaining in employment]; *Guild Wineries & Distilleries v. Land Dynamics* (1980) 103 C.A.3d 966, 978, 163 C.R. 348, citing the text; *Hill v. Kaiser Aetna* (1982) 130 C.A.3d 188, 195, 181 C.R. 564, citing the text [employer's representation that bonus would be paid; following *Transpacific Trans. Co.*]; *San Diego Mun. Credit Union v. Smith* (1986) 176 C.A.3d 919, 922, 222 C.R. 467, citing the text.)

There can be no estoppel where one of these elements is missing. (See *El Dorado v. Al Tahoe Inv. Co.* (1959) 175 C.A.2d 407, 411, 346 P.2d 205 [no conduct of defendant inducing reliance; plaintiff acted mistakenly without seeking legal advice]; *California Cigarette Concessions v. Los Angeles* (1960) 53 C.2d 865, 869, 3 C.R. 675, 350 P.2d 715, 3 *Cal. Proc.* (4th), *Actions*, §688 [no showing of facts known to defendant but unknown to plaintiff; no showing that defendant's conduct induced plaintiff to act in reliance]; *Johnson v. Johnson* (1960) 179 C.A.2d 326, 330, 3 C.R. 575 [no showing that estoppel-asserter was misled by other party]; *Henry v. Los Angeles* (1962) 201 C.A.2d 299, 308, 20 C.R. 440 [no misrepresentation or concealment, only mutual mistake of law]; *Transport Clearings-Bay Area v. Simmonds* (1964) 226 C.A.2d 405, 429, 38 C.R. 116 [same]; *Hendren v. Yonash* (1966) 243 C.A.2d 672, 680, 52 C.R. 738 [no knowledge by plaintiffs, no reliance by defendants]; *In re Lisa R.* (1975) 13 C.3d 636, 645, 119 C.R. 475, 532 P.2d 123, citing the text [no reliance and detriment; no estoppel]; *California School Employees Assn. v. Jefferson Elementary School Dist.* (1975) 45 C.A.3d 683, 692, 119 C.R.